# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

REJON TAYLOR, Reg. 41070-074
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

NORRIS HOLDER, Reg. 26902-044
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

BRANDON BASHAM, Reg. 98940-071
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

WESLEY COONCE, Reg. 30011-039
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

BRANDON COUNCIL, Reg. 63961-056
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

CHADRICK FULKS, Reg. 16617-074
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

THOMAS HAGER, Reg. 08596-007
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

CHARLES HALL, Reg. 03766-036
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

Case No. _____

RICHARD JACKSON, Reg. 16669-058
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

JURIJUS KADAMOVAS, Reg. 21050-112
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

DARYL LAWRENCE, Reg. 66476-061
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

IOURI MIKHEL, Reg. 23675-112
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

RONALD MIKOS, Reg. 20716-424
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

JAMES ROANE, Reg. 32923-083
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

JULIUS ROBINSON, Reg. 26190-177
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

DAVID RUNYON, Reg. 57997-083
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

RICARDO SANCHEZ, Reg. 75820-004
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

RICHARD TIPTON, Reg. 32922-083
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

JORGE TORREZ, Reg. 16054-084
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

DANIEL TROYA, Reg. 75817-004
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

ALEJANDRO UMAÑA, Reg. 23077-058
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

                *Plaintiffs*,

          v.

DONALD J. TRUMP, in his official capacity
as President of the United States,
The White House
1600 Pennsylvania Avenue NW
Washington, DC 20500

PAMELA J. BONDI, in her official capacity
as Attorney General of the United States,
950 Pennsylvania Avenue NW
Washington, DC 20530

EMIL BOVE, in his official capacity as
Principal Associate Deputy Attorney General
of the United States,
950 Pennsylvania Avenue NW
Washington, DC 20530

WILLIAM MARSHALL, in his official
capacity as Director of the Federal Bureau
of Prisons,
320 First St. NW
Washington, DC 20534

KATHLEEN TOOMEY, in her official
capacity as Associate Deputy Director of the
Federal Bureau of Prisons,
320 First St. NW
Washington, DC 20534

SHANE SALEM, in his official capacity as
Assistant Director of the Correctional
Programs Division of the Federal Bureau
of Prisons,
320 First St. NW
Washington, DC 20534

RICK STOVER, in his official capacity as
Senior Deputy Assistant Director of the
Designation and Sentence Computation
Center of the Federal Bureau of Prisons,
320 First St. NW
Washington, DC 20534

ANDRE MATEVOUSIAN, in his official
capacity as North Central Regional Director
of the Federal Bureau of Prisons,
320 First St. NW
Washington, DC 20534

FEDERAL BUREAU OF PRISONS
320 First Street NW
Washington, DC 20534

*Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

*(Executive Order 14164 and illegal Redesignation Directive to indefinitely incarcerate recently-commuted persons at Federal Bureau of Prisons' Florence ADX supermax prison)*

## INTRODUCTION

1.      This is an action for declaratory and injunctive relief from the Trump Administration's express targeting of Plaintiffs for categorical, unjustified, and unconstitutional punishment of incarceration in conditions of "monstrosity."

2.      Until December 23, 2024, Plaintiffs were each serving federal death sentences. On that day, pursuant to his Article II powers, President Joseph R. Biden, Jr., commuted the death sentences of 37 people, including Plaintiffs, "to sentences of life imprisonment without the possibility of parole, leaving intact and in effect for each named person all other conditions and components of the sentences previously imposed upon them." Declaration of Corene Kendrick, (hereafter "Kendrick Decl.")[1] Ex. 1 (Clemency Grant).[2]

3.      Defendant Trump immediately expressed his fury at these acts of mercy. Less than 48 hours later, in his "Christmas Day message" on his social media platform, the President-elect specifically singled out the 37 people, telling them to "GO TO HELL!"[3] This was one of several statements by Defendant Trump and his campaign directing hostility at President Biden, the commutations, and the recipients of the commutation.

4.      Plaintiffs currently are incarcerated in the custody of Defendant Federal Bureau of Prisons ("BOP") at U.S. Penitentiary ("USP") Terre Haute, Special Confinement Unit ("SCU"), the federal death row. In the days and weeks after President Biden's commutations, BOP officials

---

[1] The Kendrick Declaration is attached to Plaintiffs' Motion for Temporary Restraining Order, filed contemporaneously with this Complaint.

[2] December 23, 2024, Executive Grant of Clemency, https://www.justice.gov/pardon/media/1382291/dl?inline. Not all 37 people granted clemency by President Biden have joined this litigation; nor do Plaintiffs bring this action as a putative class action.

[3] *See* Donald J. Trump (@realDonaldTrump), Truth Social (Dec. 25, 2024, 2:43 PM), https://truthsocial.com/@realDonaldTrump/posts/113715169361854155 (emphasis in original).

began working with Plaintiffs and their lawyers to reclassify and transfer the 37, according to controlling statutory and policy requirements, known as the "redesignation" process. BOP officials recommended in the first instance that most Plaintiffs be redesignated from the SCU to high security USPs or BOP health care facilities.

5.      On January 20, 2025, in one of his first acts as President, Defendant Trump signed Executive Order 14164 ("EO 14164" or "Executive Order"). Section 3(e) of EO 14164 singles out the 37 people whose death sentences were commuted, directing the Attorney General to "evaluate the places of imprisonment and conditions of confinement for each of the 37 murderers whose Federal death sentences were commuted by President Biden, and the Attorney General shall take all lawful and appropriate action to ensure that these offenders are imprisoned in conditions consistent with the monstrosity of their crimes and the threats they pose." Kendrick Decl. Ex. 2 (EO 14164) at § 3(e).[4]

6.      On February 5, 2025, in her first day in office as Attorney General, Defendant Bondi directed BOP to immediately implement EO 14164, including Section 3(e). Kendrick Decl. Ex. 3 (Bondi Memo).[5]

7.      EO 14164 and the Bondi Memo instituted a new procedure replacing the usual BOP redesignation process. In defiance of the controlling statutes, regulations, and policies governing the BOP redesignation process, Defendants Bondi and Bove ordered BOP staff to engage in a new sham process that categorically predetermined that all Plaintiffs—regardless of what the statutory BOP redesignation process had determined—will be incarcerated indefinitely in the most

---

[4] Restoring the Death Penalty and Protecting Public Safety, Exec. Order No. 14164, 90 Fed. Reg. 8,463 (Jan. 20, 2025), https://www.govinfo.gov/content/pkg/FR-2025-01-30/pdf/2025-02012.pdf.

[5] Off. of the Att'y Gen., *Memorandum for All Department of Justice Employees: Restoring a Measure of Justice to the Families of Victims of Commuted Murderers* (Feb. 5, 2025), https://www.justice.gov/ag/media/1388526/dl?inline.

oppressive conditions in the entire federal prison system: USP Florence Administrative Maximum Facility ("ADX"), the only federal supermax prison, located in Florence, Colorado. EO 14164, the Bondi Memo, and the new orders, procedures, and predetermined decisions made pursuant to it are hereinafter referred to as the "Redesignation Directive."

8.     On information and belief, Defendant BOP will begin transferring Plaintiffs from USP Terre Haute to ADX as soon as the week of April 21, 2025, based upon the Redesignation Directive as ordered and implemented by Defendants Trump, Bondi, and Bove. Defendants Marshall, Toomey, Salem, Stover, and Matevousian are legally responsible for the movement and transfer of Plaintiffs from USP Terre Haute to ADX.

9.     Defendant BOP's policies and regulations acknowledge ADX's harsh conditions, with a detailed process to be followed before transferring people there, including exclusions for people with medical or mental health conditions that could worsen by virtue of the extreme conditions of solitary confinement at ADX. *See infra* ¶¶ 99-109.

10.     Defendants' actions violate the U.S. Constitution: the bill of attainder and ex post facto clauses of Article I, Section 9; the plenary power clause of Article II, Section 2; the equal protection and procedural due process clauses of the Fifth Amendment; and the Eighth Amendment's prohibition on cruel and unusual punishments. Defendants' actions also violate the Administrative Procedure Act ("APA"). By categorically condemning Plaintiffs to indefinite incarceration in harsh conditions in response to their receipt of clemency from the previous President, it exceeds the statutory authority granted to the Attorney General and her deputy, and is arbitrary, capricious, and an abuse of discretion; it was made without proper notice and comment; and otherwise is not in accordance with law.

11.     Plaintiffs seek a declaratory judgment holding that Defendants' actions violate the

U.S. Constitution and the APA, and injunctive relief enjoining Section 3(e) of the Executive Order and the Bondi Memo, and ordering Defendants to assign Plaintiffs to the BOP facilities and units that BOP had previously determined were appropriate for each Plaintiff according to its statutory process, before the interference and overruling of those determinations by Defendants.

## JURISDICTION AND VENUE

12.    Plaintiffs bring suit under the U.S. Constitution (Art. I, § 9; Art. II, § 2; Fifth Amendment; Eighth Amendment) and the APA. The Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question) and § 1346 (civil action against the United States). The Court has jurisdiction to review final agency actions under 5 U.S.C. § 702.

13.    Venue is appropriate in the U.S. District Court for the District of Columbia under 28 U.S.C. § 1391(e) because Defendants' acts giving rise to the claims occurred in this District, and Defendants are headquartered in this District.

## PARTIES

**Plaintiffs**

14.    **Plaintiff Rejon Taylor**, age 40, was sentenced to death in December 2008 by the federal district court for the Eastern District of Tennessee. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. On information and belief, Defendant BOP initially determined that Mr. Taylor was a good candidate for redesignation to the Life Connections Program at a high security penitentiary, and that he was not appropriate for placement at ADX.

15.    **Plaintiff Norris Holder**, age 49, was sentenced to death in April 1998 by the federal district court for the Eastern District of Missouri. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. On information and belief,

Defendant BOP initially determined that he was not appropriate for placement in ADX, and would be placed at the Life Connections Program at USP-Terre Haute, a high security penitentiary.

16.    **Plaintiff Brandon Basham**, age 43, was sentenced to death in November 2004 by the federal district court for the District of South Carolina. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. Mr. Basham has a long and well-documented history of serious mental illness dating to early childhood. Mr. Basham was diagnosed with bipolar disorder and Fetal Alcohol Syndrome Disorder, and has exhibited symptoms of serious mental illness, including numerous suicide attempts, delusions, and hallucinations, prior to and while incarcerated in BOP. He has been diagnosed with developmental and intellectual disabilities. Defendant BOP has classified him as having a Mental Health Care Level of 3 – "Enhanced Outpatient Mental Health Care or Residential Mental Health Care."[6] On information and belief, Defendant BOP initially determined that due to his serious mental health needs, Mr. Basham would be sent to a Secure Mental Health Step-Down Program at a high security USP or a Federal Medical Center ("FMC"), and that he was not appropriate for placement at ADX.

17.    **Plaintiff Wesley Coonce**, age 44, was sentenced to death in July 2014 by the federal district court for the Western District of Missouri. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. Mr. Coonce has a long and well-documented history of serious mental illness so severe that he has been hospitalized in

---

[6] *See* Kendrick Decl. Ex. 4, Fed. Bureau of Prisons, *Care Level Classification for Medical and Mental Health Conditions or Disabilities, Federal Bureau of Prisons Clinical Guidance* (May 2019) (describing BOP medical and mental health care level system), at https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf. Pursuant to BOP policy, people with serious mental illness—including those deemed by BOP to have a Mental Health Care Level of 3 or 4—are presumptively excluded from placement at ADX. *See id.* at 14-15, 19; Kendrick Decl. Ex.5, Fed. Bureau of Prisons, Program Statement 5310.16 CN-1, *Treatment and Care of Inmates with Mental Illness* at 8-9 (Feb. 18, 2025), at https://www.bop.gov/policy/progstat/5310_016_cn-1.pdf; *see also infra* ¶¶ 60-61.

FMCs for inpatient mental health treatment. He also has diagnoses of intellectual disabilities and Fetal Alcohol Spectrum Disorder. On information and belief, Defendant BOP initially determined that his mental health conditions made him ineligible for placement at ADX.

18. **Plaintiff Brandon Council**, age 39, was sentenced to death in October 2019 by the federal district court for the District of South Carolina. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. Mr. Council has an extensive history of mental illness, including suicidal ideation, hallucinations, paranoia, and acts of self-harm, of which Defendant BOP is aware. On information and belief, Defendant BOP initially determined that Mr. Council was not appropriate for placement at ADX.

19. **Plaintiff Chadrick Fulks**, age 47, was sentenced to death in June 2004 by the federal district court for the District of South Carolina. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. Mr. Fulks has a long and well-documented history of serious medical conditions, including chronic stage three kidney disease and a neurogenic bladder, with multiple recurrent infections, requiring external catheter maintenance and multiple surgeries. He also has degenerative disc disease which causes muscle numbness in his back and extremities, recently resulting in a fall causing injuries serious enough to require several days' hospitalization in the Intensive Care Unit in September 2024. Mr. Fulks also has a long history of serious mental illness, including multiple suicide attempts, intellectual disability, Fetal Alcohol Spectrum Disorder, depression, and anxiety. On information and belief, Defendant BOP initially determined that Mr. Fulks was not appropriate for placement in ADX.

20. **Plaintiff Thomas Hager**, age 51, was sentenced to death in November 2007 by the federal district court for the Eastern District of Virginia. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. On information and belief,

Defendant BOP initially determined that Mr. Hager was not appropriate for placement in ADX.

21.    **Plaintiff Charles Hall**, age 54, was sentenced to death in July 2014 by the federal district court for the Western District of Missouri. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. Mr. Hall has a long and well-documented history of serious medical conditions, including Crohn's Disease for which he has undergone multiple bowel resection surgeries, including an ileostomy. Defendant BOP has classified him as having a Medical Care Level of 3 and incarcerated Mr. Hall without incident in a FMC for 18 months from 2021 to 2023 due to the severity of his symptoms and his need for inpatient medical care. He was hospitalized three times just in December 2024. Additionally, Mr. Hall has serious mental health needs: he has been diagnosed with Major Depressive Disorder, and Defendant BOP has, at times, placed him in FMCs due to his mental health conditions and suicidality. On information and belief, Defendant BOP initially determined that Mr. Hall was not appropriate for placement in ADX, and would be redesignated to either a FMC or to a USP capable of housing people with a Medical Care Level of 3.

22.    **Plaintiff Richard Jackson**, age 55, was sentenced to death in May 2001 by the federal district court for the Western District of North Carolina. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. On information and belief, Defendant BOP initially determined that Mr. Jackson was not appropriate for placement at ADX.

23.    **Plaintiff Jurijus Kadamovas**, age 58, was sentenced to death in March 2007 by the federal district court for the Central District of California. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. Mr. Kadamovas has several serious and poorly-controlled medical and mental health conditions, including Crohn's

disease, asthma, and sleep apnea, as well as depression and anxiety. On information and belief, Defendant BOP initially determined that Mr. Kadamovas was not appropriate for placement at ADX.

24.     **Plaintiff Daryl Lawrence**, age 49, was sentenced to death in August 2006 by the federal district court for the Southern District of Ohio. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. Mr. Lawrence has been diagnosed with polycythemia vera (a rare type of blood cancer) and hypertension, which require ongoing medical treatment and care. On information and belief, Defendant BOP initially determined that Mr. Lawrence was not appropriate for placement at ADX.

25.     **Plaintiff Iouri Mikhel**, age 59, was sentenced to death in March 2007 by the federal district court for the Central District of California. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. Mr. Mikhel has a long and well-documented history of serious mental illness, including a diagnosis of bipolar disorder. On information and belief, Defendant BOP initially determined that Mr. Mikhel would be transferred to the Life Connections Program at USP-Terre Haute, a high-security penitentiary, and that he was not appropriate for placement at ADX.

26.     **Plaintiff Ronald Mikos**, age 76, was sentenced to death in 2006 by the federal district court for the Northern District of Illinois. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. Mr. Mikos has been diagnosed with multiple serious medical conditions, including recurrent pressure ulcers, diabetes, heart disease, enlarged prostate with related urinary complications, hypertension, vascular disease, lower extremity edema, degenerative disc disease with cervical spondylosis and spinal stenosis, diverticulosis, hypothyroidism, glaucoma, cataracts, and macular degeneration. Defendant BOP

has also diagnosed Mr. Mikos with depression and an anxiety disorder. These conditions require ongoing treatment and care. Defendant BOP has classified him as a Medical Care Level 3.[7] Last year, Defendant BOP assigned Mr. Mikos to a handicapped cell equipped with handrails and additional space for movement based upon his age, poor balance, slow gait, short stride, and history of a past fall with injuries in his cell. In a Medical Duty Status report dated February 24, 2025, Defendant BOP renewed Mr. Mikos's annual housing assignment, clearly indicating that his assignment to a handicapped cell continues through May 15, 2026. On information and belief, Defendant BOP initially determined that Mr. Mikos would be redesignated to either a FMC or a USP capable of housing people classified Medical Care Level 3, and found that he was not appropriate for placement at ADX.

27.    **Plaintiff James Roane**, age 59, was sentenced to death in 1993 by the federal district court for the Eastern District of Virginia. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. Mr. Roane has several serious medical conditions, including prostate cancer (which may require surgery), chronic arthritis which has required (and continues to require) surgeries, hypertension, high cholesterol, glaucoma, skin cancer, and pre-diabetes. These conditions require ongoing treatment and care. Defendant BOP has classified Mr. Roane as Medical Care Level 3. On information and belief, Defendant BOP initially determined that Mr. Roane was not appropriate for placement at ADX.

28.    **Plaintiff Julius Robinson**, age 48, was sentenced to death in June 2002 by the federal district court for the Northern District of Texas. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. On information and belief,

---

[7] On January 27, 2025, following Defendant Trump's Executive Order, Mr. Mikos' Medical Care Level was downgraded to Level 2.

Defendant BOP initially determined that Mr. Robinson was not appropriate for placement at ADX.

29.     **Plaintiff David Runyon**, age 54, was sentenced to death in 2009 by the federal district court for the Eastern District of Virginia. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. Mr. Runyon has been diagnosed with several serious medical and mental health conditions, including severe traumatic brain injury, encephalomalacia (softening and loss of brain tissue), temporal lobe epilepsy, vertigo, and schizoaffective disorder. On information and belief, Defendant BOP initially determined that Mr. Runyon was not appropriate for placement at ADX.

30.     **Plaintiff Ricardo Sanchez**, age 41, was sentenced to death in 2009 by the federal district court for the Southern District of Florida. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. Mr. Sanchez has been diagnosed with developmental and intellectual disabilities, which BOP classifies as a type of serious mental health illness. On information and belief, Defendant BOP initially determined that based upon his developmental disabilities, Mr. Sanchez was better suited for a "Skills Program" for people with intellectual disabilities located at a medium or high-security prison, and not appropriate for placement at ADX.

31.     **Plaintiff Richard Tipton**, age 54, was sentenced to death in 1993 by the federal district court for the Eastern District of Virginia. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. On information and belief, Defendant BOP initially determined that Mr. Tipton was not appropriate for placement at ADX.

32.     **Plaintiff Jorge Torrez**, age 36, was sentenced to death in May 2014 by the federal district court for the Eastern District of Virginia. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. On information and belief, Defendant

BOP initially determined that Mr. Torrez was not appropriate for placement at ADX.

33.    **Plaintiff Daniel Troya**, age 41, was sentenced to death in May 2009 by the federal district court for the Southern District of Florida. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. On information and belief, Defendant BOP initially determined that Mr. Troya would be redesignated to a USP and was not appropriate for placement at ADX.

34.    **Plaintiff Alejandro Umaña**, age 42,[8] was sentenced to death in July 2010 by the federal district court for the Western District of North Carolina. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. Mr. Umaña has been diagnosed with intellectual and developmental disabilities, and several serious mental illnesses including brain damage, cognitive impairment, Post-Traumatic Stress Disorder, and psychotic symptomology. On information and belief, Defendant BOP determined that Mr. Umaña's mental health conditions met the criteria to exclude him from placement at ADX.

**Defendants**

35.    **Defendant Donald J. Trump** is the President of the United States. He issued EO 14164 on January 20, 2025, and is responsible for overseeing its implementation. He is sued in his official capacity.

36.    **Defendant Pamela J. Bondi** is the Attorney General of the United States. She oversees the U.S. Department of Justice ("DOJ"), including BOP, and is responsible for the enforcement and implementation of EO 14164 in federal prisons. She issued the Memo directing DOJ and BOP to implement EO 14164 on February 5, 2025. She is sued in her official capacity.

---

[8] Mr. Umaña's true year of birth is 1982. BOP records incorrectly show the year of his birth as 1984.

37.    **Defendant Emil Bove** is the Principal Associate Deputy Attorney General of the United States. The Principal Associate Deputy Attorney General is responsible for advising and assisting the Attorney General in formulating DOJ policies and programs, and for supervising and directing all organizational units of DOJ. Defendant Bove is responsible for the Attorney General/Office of the Deputy Attorney General's decision to reverse BOP's original redesignation decisions that would have led to most Plaintiffs being incarcerated in a BOP facility other than ADX. He is sued in his official capacity.

38.    **Defendant William Marshall** is the Director of the BOP. The Director of the BOP is responsible for the promulgation of BOP policies and for compliance with federal law and BOP policies, and is ultimately responsible for the placement and housing of all people in BOP custody. He is sued in his official capacity.[9]

39.    **Defendant Kathleen Toomey** is the Associate Deputy Director of the BOP. The Associate Deputy Director is responsible for the promulgation of and compliance with federal statutes and BOP policies, among other things. She is sued in her official capacity.

40.    **Defendant Shane Salem** is the Assistant Director of the Correctional Programs Division of BOP. He is responsible for overseeing BOP's classification and designation process and case management operations. He also has decision-making authority for designations of Plaintiffs to ADX. He is sued in his official capacity.

41.    **Defendant Rick Stover** is the Senior Deputy Assistant Director of the Designation and Sentencing Computation Center ("DSCC"), within the BOP's Correctional Programs Division. He is responsible for implementing and overseeing BOP's classification and designation process.  He is sued in his official capacity.

---

[9] Mr. Marshall was appointed to this position by President Trump on April 10, 2025.

42.    **Defendant Andre Matevousian** is the North Central Regional Director of the BOP. He is responsible for overseeing the operations and management of multiple BOP institutions in the North Central Region, including ADX Florence. He is sued in his official capacity.

43.    **Defendant Federal Bureau of Prisons** ("BOP") is an agency of DOJ. It is responsible for the custody and care of all federal prisoners. It is charged by Congress with the management and regulation of federal penal and correctional institutions.

44.    Defendants Bondi, Bove, Marshall, Toomey, Salem, Stover, and Matevousian are collectively referred to as the "Agency Defendants."

## FACTUAL ALLEGATIONS

### Executive Order 14164 and the Bondi Memo

45.    On his first day in office, January 20, 2025, Defendant Trump issued EO 14164, which sought to punish the 37 people whose death sentences former President Biden had commuted to life without the possibility of parole. EO 14164. In the Executive Order, Defendant Trump directed the Attorney General (a position that was vacant at the time) to "evaluate the places of imprisonment and conditions of confinement for each of the 37 murderers whose Federal death sentences were commuted by President Biden" to "ensure that these offenders are imprisoned in conditions consistent with the monstrosity of their crimes and the threats they pose." *Id.* § 3(e).

46.    EO 14164 makes clear Defendant Trump's contempt for the 37 people whose sentences were commuted (describing the 37 as "vile and sadistic" and "remorseless");[10] *see also, e.g.,* Truth Social, Dec. 25, 2025 ("to the 37 most violent criminals, who . . . were just given, incredibly, a pardon by Sleepy Joe Biden. I refuse to wish a Merry Christmas to those lucky "souls"

---

[10] Kendrick Decl. Ex. 2 (EO 14164) at § 1.

but, instead, will say, GO TO HELL!");[11] Truth Social, Dec. 24, 2024, ("Joe Biden just commuted the Death Sentence on 37 of the worst killers in our Country. When you hear the acts of each, you won't believe that he did this.");[12] Team Trump Statement on Biden's Abhorrent Pardon Decisions, Dec. 23, 2024 ("These are among the worst killers in the world and this abhorrent decision by Joe Biden is a slap in the face to the victims, their families, and their loved ones.").[13]

47.     On February 5, 2025, her first day as U.S. Attorney General, Defendant Bondi issued a memorandum implementing EO 14164 and specifically its provision directing the use of conditions of confinement as additional punishment for the 37 commuted people, including Plaintiffs. Bondi Memo.

**BOP's Standard Process for Individualized Classification and Facility Placement Decisions**

*The Institutional Designation and Redesignation Process*

48.     Federal law and regulations give Defendant BOP the exclusive authority to determine the institutional placement of every person in its custody. 18 U.S.C. § 3621(b).

49.     Under 18 U.S.C. § 3621(b), Defendant BOP "shall" place a person within 500 miles of their primary residence, "subject to bed availability, the prisoner's security designation, the prisoner's programmatic needs, the prisoner's mental and medical health needs, any request made by the prisoner related to faith-based needs, recommendations of the sentencing court, and other security concerns of the Bureau of Prisons . . . ." *Id.*

50.     Defendant BOP refers to the initial assignment of a person to a particular prison

---

[11] *See supra* n.2.

[12]    *See*    @realDonald    Trump,    Truth    Social    (Dec.    24,    2024),    at
https://truthsocial.com/@realDonaldTrump/posts/113707754946279224.

[13] *See* Bernd Debusmann, Jr., *As Biden commutes death row sentences, how Trump plans to expand executions*, BBC (Dec. 23, 2024), https://www.bbc.com/news/articles/czjd0j0y34wo.

facility as the "designation" process, *see* Kendrick Decl. Ex. 6 (PS 5100.08) at Ch. 1, p. 1;[14] BOP uses the term "redesignation" to refer to the reassignment and transfers of people from facility to facility within the system. *Id*. at Ch. 2, p. 6. Both designation and redesignation use the same risk factors to classify people, although the redesignation process additionally requires BOP officials to "carefully review[]" and consider recent in-custody behavior and program performance while in prison. *Id*. at Ch. 1, p. 3.

51.    Under Defendant BOP's Program Statement 5100.08, the relevant federal policy governing the designation and redesignation process, BOP facilities are classified into one of five security levels: minimum, low, medium, high, and administrative. *See id.* at Ch. 1, p. 1.[15] This policy—which was last updated, and approved by Defendant Toomey, on March 6, 2025, *id.* at 1 (program statement date and signature line bearing Defendant Toomey's name)—states that people are assigned to a prison based upon (a) the level of security and supervision they require, and (b) their "program needs," such as "substance abuse, educational / vocational training, individual counseling, group counseling, or medical / mental health treatment." *Id.* at Ch. 1, p. 1.

52.    Defendant BOP uses a database system called SENTRY to calculate security and supervision levels for people in its custody, and the scoring is spelled out in PS 5100.08. *See generally, id.* at Ch. 4 and 6. This policy also requires that BOP review these classification levels at least annually. *Id.* at Ch. 6, p. 1. Scoring variables for designation include but are not limited to

---

[14] Fed. Bureau of Prisons, Program Statement 5100.08, CN-2 (Mar. 6, 2025), at Ch. 1, p. 1, at https://www.bop.gov/policy/progstat/5100_008_cn-2.pdf.

[15] "United States Penitentiaries (USPs)" are "high security institutions" with "highly secured perimeters (featuring walls or reinforced fences), multiple- and single-occupant cell housing, the highest staff-to-inmate ratio, and close control of inmate movement." BOP, *About Our Facilities*, https://www.bop.gov/about/facilities/federal_prisons.jsp. An "Administrative Institution" is a facility "with a special mission, where inmates are assigned based on factors other than security and/or staff supervision (for example, medical / mental health, pretrial and holdover)" and are "designed to house all security level inmates." Kendrick Decl. Ex. 6 (PS 5100.08) at Ch. 2, p. 1.

the person's age; educational level; criminal history, history of violence, prior escapes and/or attempts; outstanding detainers from other jurisdictions; time to release; severity of their current offense; whether they voluntarily surrendered; and drug/alcohol abuse history. *Id.* at Ch. 4, pp. 5-7; Ch. 6, pp. 2-9. Once the person has been in custody, the SENTRY system also includes scores for review and possible redesignation, which include: percentage of time served; program participation; living skills and behavior in custody; the most serious and recent disciplinary incident reports (if any) for which the person was found guilty; the number of incident reports (if any); and efforts to build or maintain family/community ties. *Id.* at Ch. 6, pp. 9-16.

*Medical and Mental Health Classifications and Levels of Care*

53.     Defendant BOP classifies each of its prisons with an "Institution Care Level" based on the level of care it can provide to meet the medical and mental health needs of those it incarcerates. Kendrick Decl. Ex. 4 (Care Level Classification)[16] at 1 ("Care Levels"). BOP also assigns "Inmate Care Levels" for medical and mental health conditions to the people it incarcerates. *Id.* The goal of these institutional and individual care levels is to ensure that "inmates can be assigned to the BOP institutions that can best meet their health care needs." *Id.* ("Purpose of This Guidance").

54.     Institution Care Levels "are based primarily on the clinical capabilities and resources of the institution and the surrounding community, as well as specific missions, e.g. dialysis, oncology, etc." *Id.* ("Care Levels"). The "Inmate Care Levels" are determined by "their medical and/or mental health needs and are based primarily on the chronicity, complexity, intensity, and frequency of interventions and services that are required, as well as an inmate's

---

[16] Fed. Bureau of Prisons, *Care Level Classification for Medical and Mental Health Conditions or Disabilities, Federal Bureau of Prisons Clinical Guidance* (May 2019), https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf.

functional capability." *Id.*

55.     For both prisons and people, Defendant BOP assigns a care level of 1 through 4. *See id.* at 2-3 ("Care Levels 1–4 for Inmates: General Description"). The higher the number, the greater the medical or mental health needs (in the case of people) and the higher the level of care and services the prison can provide (in the case of institutions). *Id.*

56.     ADX has an Institution Care Level of 2. USP Terre Haute, where the Plaintiffs are currently incarcerated, has an Institution Care Level of 3.

57.     People whom Defendant BOP classifies as having a Medical and Mental Health Care Level of 2 are those whose conditions "can be managed through routine, regularly scheduled appointments with clinicians for monitoring." *Id.* at 2. Care Level Two facilities cannot provide the care and treatment necessary for those who have serious medical or mental health needs, including people classified as having a Medical or Mental Health Care Level of 3 or higher.

58.     Defendant BOP describes the people it classifies as Medical Care Level 3 as "outpatients who have complex, and usually chronic, medical or mental health conditions and who require frequent clinical contacts to maintain control or stability of their condition, or to prevent hospitalization or complications." *Id.* at 3.

59.     Additionally, people assigned Medical Care Level 3 "may require assistance with some activities of daily living that can be accomplished by inmate companions," and "stabilization of medical or mental health conditions may require periodic hospitalization." *Id.* Examples of such conditions include, but are not limited to, certain types of diabetes, cancer in partial remission, severe mental illness in remission on medication, severe congestive heart failure, inflammatory bowel disease, progressive neurologic conditions, chronic kidney disease, chronic pain that requires clinical interventions more frequently than monthly, asthma/COPD (with certain

complications), history of certain pressure ulcers and ongoing risk factors, and end stage liver disease, among others. *Id*.

60.     Mental Health Care Level 3 is for people who "have a mental illness requiring enhanced outpatient mental health care (i.e., weekly mental health interventions); or residential mental health care (i.e., placement in a residential Psychology Treatment Program)." Kendrick Decl. Ex. 5 (PS 5310.16)[17] at 8. Defendant BOP classifies people with the following mental health conditions as Mental Health Care Level 3: two or more psychiatric hospitalizations in the past three years; psychotic illness treated with three or more anti-psychotic medications; multiple diagnoses treated with five or more psychotropic medications; or patients requiring outpatient contacts with a prescribing psychiatric clinician more frequently than monthly over an extended time period. Kendrick Decl. Ex. 4 (Care Level Classification) at 14. BOP classifies the following diagnoses as "serious mental illnesses": Schizophrenia Spectrum and Other Psychotic Disorders, Bipolar and Related Disorders, and Major Depressive Disorder. Kendrick Decl. Ex. 5 (PS 5310.16) at 2. And BOP policy specifies that the following diagnoses are "often" classified as serious mental illnesses, "especially if the condition is sufficiently severe, persistent, and disabling": Anxiety Disorders, Obsessive-Compulsive and Related Disorders, Trauma and Stressor-Related Disorders, Intellectual Disabilities and Autism Spectrum Disorders, Major Neurocognitive Disorders, and Personality Disorders. *Id*. at 2-3.

61.     BOP has separate facilities for prisoners with mental illness, including severe mental illness, including Federal Medical Centers ("FMCs") in Springfield, Butner, Rochester, and Devens, and High Security Mental Health Step-Down Units at USP-Atlanta and USP-

---

[17] Fed. Bureau of Prisons, Program Statement 5310.16 CN-1, *Treatment and Care of Inmates with Mental Illness* (Feb. 18, 2025), at https://www.bop.gov/policy/progstat/5310_016_cn-1.pdf

Allenwood, and the High Security STAGES Program at USP-Florence.[18] It also has a SKILLS program for people with intellectual disabilities / lower functioning skills at FCI-Coleman.

62.     Upon information and belief, and as detailed above at Paragraphs 49-55, Defendant BOP had initially determined that designation to one or more of these specialized facilities was appropriate for many of the Plaintiffs who display serious mental health symptoms, are diagnosed with serious mental illnesses, and/or have developmental disabilities.

63.     Finally, Care Level 4 is the highest level, for both people and prisons. People with a Medical or Mental Health Care Level of 4 require services that are only available at a BOP Medical Referral Center, "which provides significantly enhanced medical services and limited inpatient care," including for people whose functioning is "so severely impaired as to require 24-hour skilled nursing care or nursing assistance." Kendrick Decl. Ex. 4 (Care Level Classification) at 3. Examples of such conditions include candidates for major joint or certain ligament surgery, renal failure requiring dialysis, functional limitations due to cognitive or physical impairment that prevent successful management in general population and/or require assistance in performing activities of daily living or the use of durable medical equipment, and certain stages of heart failure, among other conditions. *Id.*

*BOP Policies Governing the Process for Redesignation to ADX*

64.     Program Statement 5100.08 sets forth specific procedures and placement criteria to be followed before someone can be redesignated from any other federal prison to ADX. Kendrick Decl. Ex. 6 (PS 5100.08) at Ch. 7, pp. 17-19. ADX's "general population units are designed for male inmates *who have demonstrated an inability to function in a less restrictive environment without being a threat to others, or to the secure and orderly operation of the institution*." *Id.* at

---

[18] USP-Florence is a separate facility from ADX Florence.

Ch. 7, p. 17 (emphasis added). Accordingly, "[p]rior to referring an inmate to . . . ADX Florence, redesignation to another high security institution should be considered first." *Id.*; *see also* Declaration of Paul Gibson (hereafter "Gibson Decl.") at 5 (former BOP classification official of 32 years explaining presumption against ADX placement in BOP policy).[19] As detailed *infra* in paragraphs 77-84, BOP initially followed this Program Statement after the December 2024 commutations and before Defendants' unconstitutional and illegal actions.

65.    Given the solitary confinement conditions at ADX are so much more restrictive than conditions in its other prisons, *see infra* at ¶¶ 99-114 (describing conditions of confinement at ADX), BOP policy prohibits the referral of people with serious mental illnesses to ADX. *See* Kendrick Decl. Ex. 6 (PS 5100.08) at Ch. 7, p. 18; Gibson Decl. at 2, 9.

66.    Defendant BOP also has adopted a separate and additional set of procedures that govern designation to ADX. A BOP Memorandum dated October 15, 2012, sets out the procedures to be followed before a person may be designated (or redesignated) to ADX Florence. *See* Kendrick Decl. Ex. 7 (2012 ADX Referral Memo). It expressly states that the decision to redesignate a person to ADX lies exclusively with BOP: "the BOP's Designation and Sentence Computation Center has the responsibility" for processing referrals to ADX, and "placement of inmates in the ADX-GP [General Population] is at the discretion of the Assistant Director of the BOP's Correctional Programs Division in its Central Office." *Id*. at 1 ("Memorandum for Chief Executive Officers").

67.    The 2012 ADX Referral Memo requires that any person referred to ADX's "general population" must meet one or both of the following criteria: that the person's "placement in other correctional facilities creates a risk to institutional security and good order or poses a risk to the

---

[19] The Gibson Declaration is attached as Exhibit 8 to the Kendrick Declaration.

safety of staff, inmates, others, or to public safety," and that due to the person's "status, either before or after incarceration, the inmate may not be safely housed in the general population of another institution." *Id.* at Attach. A, p. 1; *see also* Gibson Decl. at 5.

68.     Recognizing that the conditions of confinement in ADX are much more restrictive than any other BOP facility, Defendant BOP's 2012 ADX Referral Memo provides for multiple levels of review before a person can be designated to ADX.

69.     The first step in the ADX designation process is for staff at the institution where the person is housed to submit an ADX referral packet to the Warden for review. As part of that process, a mental health evaluation is required, including the clinical evaluator's conclusion as to whether any psychological factors would preclude the person's placement at ADX.[20] The packet is only forwarded to the Regional Director for the region in which the person is located if the Warden concurs with the referral. Kendrick Decl. Ex. 7 (2012 ADX Referral Memo) at 3.[21]

70.     Only if the Regional Director concurs with the ADX referral does the process proceed to the next step, which is for staff at BOP's Designation and Security Computation Center (DSCC) to review and consider whether placement at ADX is appropriate. *Id.*

71.     Only if DSCC staff determine that the person warrants consideration for placement in ADX will the DSCC move forward with the referral.[22] At that point, a BOP Hearing

---

[20] *See* Kendrick Decl. Ex. 4 (Care Level Classification) at 14. This is because ordinarily, seriously mentally ill persons (classified as those with Mental Health Care Level 3 or higher), are excluded from placement at ADX. Kendrick Decl. Ex. 5 (PS 5310.16) at 18; *see also* Kendrick Decl. Ex. 6 (PS 5100.08) at 18 (requiring "a recent psychiatric or mental health evaluation" as part of the ADX referral packet). The psychological evaluations conducted of Plaintiffs as part of this process resulted in several of them being deemed to have met the exclusion criteria for ADX. *See infra* ¶¶ 14-34, 62.

[21] Both ADX and USP-Terre Haute are located in the North Central Region of BOP; Defendant Matevousian is the North Central Regional Director.

[22] If the DSCC staff believe that the person is not appropriate for ADX placement, they will notify the referring Warden.

Administrator is assigned to conduct a hearing on the appropriateness of the person's placement at ADX. At the same time, in recognition of the harm that the severe conditions of confinement at ADX inflict on people with mental illness, BOP's Psychology Services office conducts a review of the psychological assessment of the person to determine whether their mental health is such that they are psychologically precluded from placement at ADX. *Id.*

72.     Before the hearing, the person must receive a hearing notice containing "specific evidence which forms the basis for the referral" to ADX. *Id.* at 6. They are also entitled to a copy of the "Administrative Procedures for Transfer to the ADX-General Population." *Id.*

73.     At the hearing, the incarcerated person may be present, make a statement, and present evidence to the Hearing Administrator. *Id.* at 6-7.

74.     After the ADX referral hearing, the Hearing Administrator prepares a written recommendation for the Assistant Director of BOP's Correctional Programs Division (currently Defendant Salem), as to whether placement at ADX is warranted. *Id.* at 7. The incarcerated person receives a copy of the Hearing Administrator's recommendation. *Id.*

75.     Defendant Salem, the Assistant Director of the Correctional Programs Division, has decision-making authority as to whether to accept or reject the Hearing Administrator's recommendation about whether the person should be designated to ADX. *Id.* at 8.

76.     If the Assistant Director of the Correctional Programs Division decides to designate the person to ADX, the person can appeal that decision. *Id.* at 8-9. It is longstanding BOP practice to not transfer a person to ADX during the pendency of an appeal of a decision to send him there.

### BOP Follows Applicable Law and Policy and Concludes That Most Plaintiffs Should Not Be Sent to ADX

77.     After President Biden commuted the sentences of the 37 people on federal death row, BOP began the redesignation process required by statute and BOP regulations.

78.     This process has always been the standard course when death sentences are vacated either by courts or presidential clemency. Indeed, on at least 18 prior occasions, BOP has followed statutory and policy requirements when it considered redesignation for people whose federal death sentences were vacated. Each of them was redesignated from federal death row to other high-security USPs. None of those 18 people were redesignated to ADX. Declaration of David Patton (hereafter "Patton Decl.") ¶¶ 4-7.[23]

79.     BOP continued its process of redesignation throughout January and February 2025, using the statutory process described in the section above, and found that most of the Plaintiffs were not appropriate for transfer to ADX.

80.     Using the process required by statute and regulation, BOP staff concluded that each Plaintiff should be sent to a high-security USP, including facilities with Institutional Medical and Mental Health Care Levels adequate to provide care and treatment for those Plaintiffs with serious medical and mental health needs, and/or developmental disabilities. Despite their high-security classification, the conditions at these prisons are all materially less restrictive than conditions at ADX. *See infra* ¶¶ 14-34.

81.     For example, Plaintiff Basham has been classified as Mental Health Care Level 3, due to his diagnoses of major depressive disorder with psychotic features, a prior diagnosis of bipolar disorder, and multiple suicide attempts. Under the statutory process, BOP classification staff determined that Mr. Basham would be placed in a Secure Mental Health Program at USP-Allenwood or USP-Atlanta, with the possibility of placement at a higher level of mental health care facility at FMC-Springfield. Declaration of Lindsey Layer (hereafter "Layer Decl.") ¶¶ 11,

---

[23] The Patton Declaration is attached as Exhibit 10 to the Kendrick Declaration.

13.[24]

82.    Plaintiff Fulks was classified as Medical Care Level 3 due to his neurogenic bladder which requires a suprapubic catheter, chronic kidney disease, and degenerative disc disease. During the usual BOP classification process, his counsel requested that Mr. Fulks be sent to a FMC, and received no indication that he would be sent to ADX. Indeed, when Mr. Fulks' counsel asked if ADX could accommodate Mr. Fulks' medical needs, BOP classification staff told him that ADX was not a Care Level 3 facility. Declaration of Peter Konrad Williams (hereafter "Williams Decl.") ¶¶ 4, 14.[25]

83.    Plaintiff Hall also is classified as Medical Care Level 3 due to his medical history of multiple surgeries and hospitalizations. In fact, due to the severity of his medical conditions, prior to his commutation by President Biden, Mr. Hall was incarcerated from December 2021 to May 2023 at the FMC in Butner, North Carolina, instead of the Terre Haute SCU, without any incident. After the commutation, and prior to Defendant Trump's issuance of EO 14164, BOP classification staff told Mr. Hall's counsel that he would be designated to an FMC or another BOP facility equipped to handle patients at Medical Care Level 3. Declaration of F. Italia Patti (Hall) (hereafter "Patti Decl. (Hall)") ¶¶ 5-7.[26]

84.    While BOP preliminarily identified three Plaintiffs (Messrs. Coonce, Hall, and Umaña) as potential candidates for referral to ADX, after the required medical and mental health reviews by BOP, they were subsequently precluded from ADX placement due to their serious medical and/or mental health conditions that cannot be adequately managed at ADX. *See*

---

[24] The Layer Declaration is attached as Exhibit 23 to the Kendrick Declaration.

[25] The Williams Declaration is attached as Exhibit 35 to the Kendrick Declaration.

[26] The Patti Declaration (Hall) is attached as Exhibit 30 to the Kendrick Declaration.

Declaration of Amelia Bizzaro (hereafter "Bizzaro Decl.") ¶¶ 20, 32-34[27]; Declaration of Kelly Miller (hereafter "Miller Decl.") ¶¶ 31, 42, 44[28]; Patti Decl. (Hall) ¶¶ 12, 14.

**Effect of EO 14164 and the Bondi Memo on Plaintiffs: The Redesignation Directive**

85.     According to statute and BOP policy, the redesignation determinations made by BOP staff in January and February 2025 for all Plaintiffs should have been final. Instead, after Defendant Trump issued EO 14164 and Defendant Bondi issued her Memo, and not otherwise permitted by 18 U.S.C. § 3621(b) or Program Statement 5100.08, Defendants Bondi and Bove overruled BOP's considered and individualized judgment for each Plaintiff and ordered that Plaintiffs all be categorically redesignated to ADX. *See infra* ¶ 7.

86.     As a result of interference and overruling by Defendants Bondi and Bove of BOP's redesignation determinations, Defendant BOP went through the motions of a review process a second time, under the pretense that ADX designations for all Plaintiffs were not a foregone conclusion. BOP staff sent ADX referral packets for Plaintiffs to Defendant Matevousian, the North Central Regional Director, who "concurred" with the referrals. In turn, Defendant BOP's DSCC staff, supervised by Defendants Stover, and the Correctional Programs Division, via Defendant Salem, also "determined" that Plaintiffs were "appropriate" for ADX in sham proceedings.[29]

87.     Beginning the first week of April 2025, Defendant BOP issued ADX Hearing

---

[27] The Bizzaro Declaration is attached as Exhibit 15 to the Kendrick Declaration.

[28] The Miller Declaration is attached as Exhibit 26 to the Kendrick Declaration.

[29] Moreover, prior to, or in conjunction with the sham ADX referral process, Defendant BOP downgraded Plaintiff Mikos' Medical Care Level from Level 3 to Level 2, despite that there was no improvement in Mr. Mikos' medical conditions that warranted the reduction in Care Level. Declaration of Leane Renee ¶ 31 (hereafter "Renee Decl."), attached as Exhibit 32 to the Kendrick Declaration. Defendant BOP also downgraded Plaintiff Roane's Medical Care Level from Level 3 to Level 2, despite that there was no medical basis for determining that Mr. Roane did not require a Medical Care Level of 3.

Notices for all Plaintiffs. Because Defendants had predetermined that all Plaintiffs would be sent to ADX, these Notices—and the rest of the ADX designation process—were a sham.

88.    Some of Plaintiffs' Hearing Notices stated that they now had Security Threat Group ("STG") assignments of "Death Row Inmate." According to BOP, a Security Threat Group is defined as an "inmate group, gang, or organization acting in concert to promote violence, escape drug, or terrorist activity."[30] Plaintiffs—who no longer have death sentences—had never before been given a STG assignment by BOP solely because of having once been under a death sentence. These allegations are baseless and untrue for each Plaintiff.

89.    The grounds for ADX referral listed on Plaintiffs' ADX Hearing Notices were cookie-cutter. Most of Plaintiffs' ADX Hearing Notices included the following identical grounds for referral to ADX: "The inmate's placement in other correctional facilities creates a risk to institutional security and good order or poses a risk to the safety of staff, inmates, others or to public safety;" "As a result of the inmate's status, the inmate may not be safely housed in the general population of another institution;" and "The inmate has notoriety to the extent that the inmate's well-being would be jeopardized in a less secure setting." *See* Kendrick Decl. Ex. 11 (Kadamovas Hrg. Notice).[31]

90.    Then, beginning in the second week of April 2025, BOP Hearing Administrators conducted ADX hearings by videoconference for each Plaintiff. Many Plaintiffs spoke at their hearings, disputing the bases for referral to ADX. For example, they directed the Hearing Administrators to evidence supporting placements elsewhere, such as their successful

---

[30] Off. of the Inspector Gen., U.S. Dep't of Just., *Audit of the Federal Bureau of Prisons' Management of the National Gang Unit*, at i (2024), https://oig.justice.gov/sites/default/files/reports/24-115.pdf.

[31] Jurijus Kadamovas – Notice of Hearing on Referral for Transfer to ADX Florence General Population.

programming, clean disciplinary records, healthcare needs, and the injuries they would suffer and the losses they would incur if subjected to extreme isolation at ADX. *See* Kendrick Decl. Ex. 12 (Troya Hrg. Rpt.).[32]

91.    Unsurprisingly, following each Plaintiff's hearing, and in some cases within minutes or hours, the Hearing Administrator recommended that ADX placement was "warranted" for every one of them. Declaration of Rejon Taylor (hereafter "Taylor Decl.") ¶ 17 ("Just two hours later, I received his recommendation that I be sent to ADX."); *id.* ¶ 19 (referring to himself and nine others with similar hearings: "We all received our respective Hearing Administrator's Report and recommendation for ADX within a few hours after our hearings."); Declaration of Gerald W. King (hereafter "King Decl.") ¶ 13 ("On April 7, 2025, Mr. Tipton telephoned and informed me that he had attended his hearing that morning and had within hours received a decision from the hearing officer that recommended his designation to ADX.").[33]

92.    Just as most Plaintiffs' Hearing Notices included identical grounds for referral, the Hearing Administrator's Reports included, invariably, at least three identical grounds for designation, including "a. The inmate's placement in other correctional facilities creates a risk to institutional security and good order or poses a risk to the safety of staff, inmates, others, or public safety. b. As a result of the inmate's status, either before or after incarceration, the inmate may not be safely housed in the general population of another institution. c. The inmate has notoriety to the extent that the inmate's well-being would be jeopardized in a less secure setting." Taylor Decl. ¶ 20 ("All of us saw the same placement criteria listed to support our placement in the ADX[.]"). These grounds are baseless and untrue for each Plaintiff.

---

[32] Daniel Troya – ADX General Population Hearing Administrator's Report.

[33] The Taylor Declaration is attached as Exhibit 33 to the Kendrick Declaration, and the King Declaration is attached as Exhibit 22 to the Kendrick Declaration.

93.     In turn, in the narrative section under the header "Recommendation," each report contains similar, cookie-cutter verbiage recommending placement at ADX. This language concludes that President Biden's commutation of any given Plaintiff's death sentence "'does not negate his serious criminal convictions and his inability to safely remain at any general population setting[,] . . . [and] . . . [h]is lengthy record of being housed in solitary confinement would show his inability to safely be housed at any general population setting.'" *Id.* (quoting his Recommendation and Report and stating nine others received similar language in theirs).[34]

94.     These Reports also conclude invariably – and despite the unique circumstances, carceral conduct, and criminal record for each Plaintiff – that "'a threat is present if inmate . . . were to remain at any general population (GP) facility in the Bureau of Prisons (BOP).'" *Id.* These grounds are baseless and untrue for each Plaintiff.

95.     Some of the Plaintiffs' Hearing Administrator Reports also included statements attributed to Plaintiffs that they did not make. For example, Plaintiff Taylor's Hearing Administrator Report stated that he said that he had been incarcerated for 10 years. He did not say this, as he has been on death row for approximately 16 years. *Id.* ¶ 22.

96.     According to BOP policy, Defendant Salem, Assistant Director of BOP's Correctional Programs Division, must accept or reject the Hearing Administrator Report recommendations, "ordinarily within 30 working days of its receipt." Kendrick Decl. Ex. 7 (2012 ADX Referral Memo) at 8. Upon information and belief, Plaintiffs will be transferred to ADX prior to, or immediately upon receipt of, Defendant Salem's decision.

---

[34] Of course, the determination that because Plaintiffs have been held in solitary confinement in the SCU, they are unable to be safely housed in open population conditions is further evidence of the sham process engaged in by Defendants. Pursuant to BOP policy, everyone in the SCU—who is there solely by virtue of a death sentence—is held in solitary confinement. *See, e.g.,* 1st Am. Compl., *Kadamovas v. Bureau of Prisons*, No. 23-cv-22 (S.D. Ind. Dec. 13, 2023).

97.     In light of the language of Defendant Trump's Executive Order, his social media posts and public comments, and Defendant Bondi's Memo, Defendants' predetermined redesignation of all Plaintiffs to ADX evinces an explicit intent to wantonly inflict additional punishment on Plaintiffs for no reason other than their having received commutations of their death sentences from President Biden. Defendants' designations of Plaintiffs to ADX cannot reasonably be said to further nonpunitive purposes. The redesignations of Plaintiffs to extreme solitary confinement conditions of ADX, as described below, despite BOP's prior statutorily-based determinations that less restrictive USP facilities were appropriate placements for Plaintiffs, were purely for vindictive, punitive purposes.

98.     By ordering that Plaintiffs be subjected to "monstrous" conditions of confinement *because* of their receipt of commutations, Defendant Trump's Executive Order seeks to diminish or impair the effect of his predecessor's exercise of his Article II clemency powers.

### Conditions in ADX Compared to High-Security U.S. Penitentiaries

*Conditions in ADX*

99.     DOJ describes ADX as the most restrictive federal penitentiary in the country.[35] ADX is in a remote, high-desert area of Colorado, and its design is intended to force people to live in near-total isolation. People spend 22 to 24 hours a day locked alone in small cells built expressly for severe sensory deprivation and to minimize any human contact, including contact with prison staff. Gibson Decl. at 8.

100.     Defendant BOP denies that it uses solitary confinement, instead preferring the euphemism of "restrictive housing." Yet as noted by Dr. Craig Haney, an expert on the

---

[35] U.S. Dep't of Just., *Report and Recommendations Concerning the Use of Restrictive Housing* 38 (2016), https://www.justice.gov/dag/file/815551/dl (hereafter "DOJ Restrictive Housing Rpt.").

psychological effects of solitary confinement who has visited ADX multiple times, the specific nomenclature is irrelevant, as "the conditions at ADX . . . are solitary confinement by any other name." Declaration of Craig Haney, Ph.D., J.D., (hereafter "Haney Decl.") at ¶ 28.[36] Dr. Haney states that "'solitary confinement' is a term of art in correctional practice and scholarship. . . . [T]he term is generally used to refer to conditions of extreme (but not total) isolation from others." *Id*.[37]

101.    One man incarcerated at ADX for over a decade described ADX as "a prison where the building becomes the shackles" and described his cell as a "boxcar" and a "cage within a box encased by concrete … designed to suppress human sound and constrain the five senses." [38]

102.    In ADX "general population," people live, sleep, eat, bathe, and defecate in cells that measure 7 by 12 feet, smaller than a standard parking space, with solid walls of concrete and steel doors with a small slot for passing food trays; each cell contains a concrete bed with a thin mattress, concrete desk and stool, and a stainless steel sink/toilet and shower that releases water in 90 second increments and can be cut off by staff. As a result, and unlike in state supermax prisons, people in ADX do not leave their cells even for occasional showers.[39] People eat all meals alone

---

[36] Dr. Haney's expert declaration is attached as Exhibit 9 to the Kendrick Declaration.

[37] In fact, DOJ itself uses a similar definition, stating that "the terms 'isolation' or 'solitary confinement' mean the state of being confined to one's cell for approximately 22 hours per day or more, alone or with other prisoners, that limits contact with others… An isolation unit means a unit where all or most of those housed in the unit are subjected to isolation." U.S. Dep't of Just., *Letter to the Honorable Tom Corbett Re: Investigation of the State Correctional Institution at Cresson and Notice of Expanded Investigation* 5 (May 31, 2013), http://www.justice.gov/crt/about/spl/documents/cresson_findings_5-31-13.pdf (citing *Wilkinson v. Austin*, 545 U.S. 209, 214, 224 (2005) (describing solitary confinement as limiting human contact for 23 hours per day) and *Tillery v. Owens*, 907 F.2d 418, 422 (3d Cir. 1990) (defining solitary as limiting contact for 21 to 22 hours per day)).

[38] Ray Luc Levasseur, *Voices from Solitary: "A Prison Where the Building Becomes the Shackles"*, Solitary Watch (Nov. 27, 2013), https://solitarywatch.org/2013/11/27/voices-solitary-adx-prison-building-becomes-shackles/.

[39] *See* Dist. of Col. Corrs. Info. Council, *USP Florence Administrative Maximum Security (ADX) Inspection Report* 11-12 (Oct. 31, 2018) (hereafter "DC CIC Inspection Report"),

in their cells, within arm's reach of their toilets. There is one small window about four inches wide and three feet tall, which allows some diffused natural light but is angled to allow only views of cement and sky.[40]

103.    Cell walls are empty and drab; policies restrict people from hanging any drawings or photos that might humanize or personalize the cell, including photographs of family members, children's artwork, or calendars. Other than a small amount of "designated legal material" totaling three cubic feet, personal property must fit in a designated storage bag. People are not allowed to have more than two pencils and two pads of paper in their cells. ADX staff can impose a "property restriction sanction," which forbids a person from having any property in his cell other than a toothbrush, toothpaste, soap, and shampoo. Below are photographs of the sparse cells in which people are confined nearly all day, every day:

---

https://cic.dc.gov/sites/default/files/dc/sites/cic/publication/attachments/Florence%20ADMAX%20Inspection%20Report%20and%20BOP%20Response%20-%2010.31.18.pdf.

[40] *Id.* at 12.

 

104.    To the extent there is any programming such as religious or educational services, or self-improvement treatment like anger management, it occurs over closed-circuit televisions in the cells. There is no group prayer or congregate religious services offered; opportunities for religious worship consist of occasional one-on-one cell front visits by clergy.

105.    According to Dr. Haney, the mental health evaluations that are supposed to happen at ADX to identify potential symptoms of mental illness and psychological deterioration from the profound isolation "are typically superficial and pro forma, often lasting for no more than a few minutes and occurring 'cell-front'—that is, through the steel door of the cell. This is especially problematic given BOP's own guidelines and criteria state that ADX is not equipped to incarcerate people with serious psychiatric conditions." Haney Decl. ¶ 20. Any interactions with other human beings are with custody or health care staff and are infrequent, sporadic, and routinized, amounting to at most a few minutes a week of verbal exchanges that occur through the solid cell doors. There

---

[41] DC CIC Inspection Report at 11.

[42] Amnesty Int'l, *Entombed: Isolation in the U.S. Federal Prison System* 9 (July 2014), https://www.amnestyusa.org/wp-content/uploads/2017/04/amr510402014en.pdf.

are two layers of doors, an outer solid steel door with a slot for food, and an inner door of bars. *Id.* ¶ 15.



106. "Recreation," when custody staff actually offer it, is limited to exercising alone in an indoor room, in an outdoor area with high concrete walls, or in outdoor cages referred to as "dog runs" because they resemble animal kennels. The cages only allow one to walk a few steps. While outside, people cannot see the horizon, they may only glimpse the sky above them. *Id.* ¶¶ 24-25.







107.    Contact with the outside world is also severely restricted at ADX. Incarcerated people may have four 15-minute, monitored and recorded phone calls a month. All "social" (non-legal) visits are conducted on a "non-contact" basis, through a thick glass window and over a phone, so that there is never any physical contact between an incarcerated person and his visitors. Incarcerated people are only permitted five social visits per month, but in practice have much less than that due to ADX's remote location, often far from loved ones or family. Below is a photograph of where incarcerated people at ADX sit while having visits.



108.    The same is true of legal visits, which are non-contact and conducted through a thick glass partition. As there are only four legal visiting booths at ADX, legal visits are difficult to schedule, as are legal phone calls (which are often limited to just 30 minutes).

109.    Many incarcerated people at ADX report that they refuse to go to recreation, or discourage visitors, because they are subjected to harsh strip searches when leaving and entering their cells. Exercise time is often cancelled, and ADX regulations allow staff to suspend incarcerated people's right to exercise indoors or outdoors for up to three months at a time for a single rule violation, for engaging in acts of self-harm or suicide attempts, or for acting in ways that reflect severe mental health decompensation (for example, smearing feces on their cell walls).

110.    Dr. Haney concludes that "[t]he conditions of confinement that prevail at the federal supermax ADX facility constitute a severe, extreme form of solitary confinement. In fact, the conditions that have been created and the procedures that are followed at ADX are more socially isolating than those at any correctional facility that I have personally toured and inspected or of

which I am aware anywhere in the United States." Haney Decl. ¶ 98.

111.    There is well-documented and overwhelming scientific consensus confirming that the use of isolation in carceral settings is psychologically and physically harmful, and often inflicts devastating, irreversible harm on people that can persist even after their time in solitary has ended. At times, prolonged solitary confinement can be fatal. *See generally id.* ¶¶ 33-47. As a result, current correctional professional standards strictly limit the use of solitary confinement, *id.* ¶ 77, which is reflected in the detailed BOP policies and regulations around the process for placing people at ADX, and restrictions on its use for people with diagnosed mental illnesses, as described above in paragraphs 64-76.

112.    Dr. Haney writes that the "prolonged absence of meaningful human contact and social interaction, the enforced idleness and inactivity, the oppressive security and surveillance procedures, and the accompanying hardware and other paraphernalia that are brought or built into these units combine to create harsh, dehumanizing, and deprived conditions of confinement. These conditions predictably impair the psychological and behavioral functioning of many of the prisoners who are subjected to them." *Id.* ¶ 32.

113.    Psychological harm from prolonged isolation has been documented for at least five decades. For example, a landmark report from 1975 studying men placed in isolation in New York prisons found that even if they did not have diagnosed mental illnesses prior to placement in solitary confinement, many developed symptoms of rage, panic, loss of control and breakdowns, psychological regression, and a build-up of physiological and psychic tension that led to incidents of self-harm. Haney Dec. ¶ 35. Later studies of people subjected to solitary confinement documented other adverse psychological symptoms, including appetite and sleep disturbances, anxiety, withdrawal, hypersensitivity, ruminations, cognitive dysfunction, hallucinations, loss of

control, irritability, aggression, rage, paranoia, hopelessness, a sense of impending emotional breakdown, self-mutilation, and suicidal ideation. *Id.*

114.    In acknowledgement of the extreme conditions of solitary confinement at ADX, Defendant BOP policy specifies that a psychological evaluation is a required component of all referrals to ADX. That is because people who BOP has classified as Mental Health Care Level of 3 "are diverted from ADX placement" and people with a Mental Health Care Level of 4 "are not placed" at ADX, as BOP policy specifies that "the appropriate placement for these inmates is a Psychiatric Referral Center." Kendrick Decl. Ex. 5 (PS 5310.16) at 18. The only way that a person with a Mental Health Care Level of 3 can be designated to ADX is if Defendant BOP makes a finding that the person has "extraordinary security needs" that "cannot be managed elsewhere." *Id*.

115.    Plaintiffs Basham, Coonce, Council, Fulks, Hall, Kadamovas, Mikhel, Runyon, Sanchez, and Umaña all have mental health conditions that constitute serious mental illness pursuant to BOP policy and/or are classified by Defendant BOP as Mental Health Care Level 3 or higher.

116.    In 2016, after four years of litigation about Defendant BOP's persistent failure to abide by its longstanding policies restricting people with mental illness from being incarcerated at ADX, and in recognition of the particularly destructive effects that solitary confinement inflicts on people with mental illness, Defendant BOP agreed to a settlement that required it to adopt and implement a more robust screening process to ensure that people with serious mental illness were not sent to ADX.[43]

---

[43] *Cunningham, v. Fed. Bureau of Prisons*, No. 12-cv-1570, (D. Colo. Nov. 16, 2016), ECF No. 382-1. Nevertheless, following the expiration of the term of the *Cunningham* settlement in 2019, Defendant BOP has resumed its practice confining people with serious mental illness in ADX.

117.    In 2017, the Office of the Inspector General ("OIG") of DOJ issued a report entitled, "Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness."[44] In that report, the OIG found, among other things, that a sample of people with mental illness had been placed in ADX for an average of 69 months.[45] The OIG also found that despite BOP having adopted a new mental health policy in 2014 as part of the *Cunningham* settlement agreement described above, between 2014 and 2017, the total number of people receiving regular mental health treatment at ADX decreased by approximately 30 percent, including about 20 percent for people in solitary confinement ("Restrictive Housing Units").[46]

118.    ADX, which BOP has assigned an Institutional Medical Care Level of 2, is unable to provide constitutionally required medical care and treatment necessary for Plaintiffs Fulks, Hall, Kadamovas, Lawrence, Mikos, Roane, and Runyon. They all have complex chronic medical conditions requiring ongoing care, and that warrant placement in a BOP institution with an Institutional Medical Care Level of 3 or higher.

119.    While the psychological effects of solitary confinement are relatively well-known, the physical effects are no less harmful. For example, a 2020 study of the physical effects of solitary confinement on people in the custody of the State of Washington's Department of Corrections found negative health outcomes including severe Vitamin D deficiency due to a lack of natural direct light exposure, skin rashes, weight fluctuations, and chronic musculoskeletal pain and deterioration (which can lead to arthritis, osteoporosis, and muscle weakness) due to the inability to engage in large-muscle exercise or walk more than a few steps in a cell or exercise

---

[44] DOJ Restrictive Housing Rpt.

[45] *Id.* at ii.

[46] *Id.* at iii. The 2017 OIG report also analyzed a sample of 82 people with mental illness at ADX, and found that the average length of stay was 17 months longer than what BOP reported for all people confined at ADX. *Id.* at 29-30.

cage. Haney Dec. ¶ 36. Moreover, this study of people in solitary confinement in Washington found that they experienced long delays in receiving care (either at the prison or off-site) for chronic medical conditions, due to the security restrictions on movement within the prison, or to travel off-site to hospitals and specialists. *Id.*

120.    Finally, if Plaintiffs are transferred to ADX "general population," it will be for an indefinite period of time. According to ADX policy, the minimum stay in the first phase of ADX is 12 months, as the classification review process occurs once every 12 months. Moreover, while the ADX "step-down" program requires a minimum of two years and three months, there is no maximum time limit. As recently as 2023, an Assistant United States Attorney represented, and a former BOP official testified, that the average time to step is five to six years.[47] Some people have been confined at ADX for decades.

121.    On information and belief, Defendants Trump and Bondi intend for Plaintiffs to be incarcerated at ADX Florence for the remainder of their lives. On information and belief, if sent to ADX, and without judicial intervention, Plaintiffs will be incarcerated at ADX for at least the duration of the Trump Administration.

122.    But for EO 14164, the Bondi Memo, and Defendants' Redesignation Directive, Plaintiffs would not be assigned to ADX.

*Conditions at High-Security USPs*

123.    In contrast to the extreme conditions at ADX, all of which are designed to inflict maximum sensory deprivation and human isolation, in the typical general population unit at a high-security USP, where conditions are still highly restrictive, incarcerated people are permitted to be

---

[47] Trial Tr. (July 18, 2023) at 7, *United States v. Bowers*, 18 Cr. 292 (W.D. Pa. Aug. 24, 2023), ECF 1562; Trial Tr. (July 27, 2023) at 52, *United States v. Bowers*, 18 Cr. 292 (W.D. Pa. Aug. 1, 2023), ECF 1529.

outside their cells nearly all day, every day. Regulations and policies permit them to eat communally, engage in large-muscle exercise outside with others, attend educational and vocational programming in classrooms with others, work prison jobs and earn money, and attend congregate religious services in communion with others. *See, e.g.*, 28 C.F.R. § 544 (setting forth post-secondary and occupational educational programming options). People incarcerated in USPs have in-person visits with loved ones that allow for physical contact: they can hug their mother or hold their grandchild. They have access to (monitored) email communications with loved ones via a tablet. They have 300 minutes (five hours) per month of telephone calls, versus ADX's one hour per month. And even in administrative or disciplinary detention at USPs, incarcerated people presumptively retain these visiting privileges, including contact visits with loved ones. Conditions, while harsh, are materially less restrictive than at ADX.

124.    Unlike at ADX, solitary confinement at USPs is also durationally limited. Administrative detention for disciplinary reasons rarely lasts more than a few weeks. Disciplinary detention is, by policy, calibrated to the disciplinary infraction that resulted in confinement. Indeed, BOP reports that as of April 13, 2025, out of the 10,853 people housed in secure housing units ("SHU") for disciplinary detention or administrative detention, only 47 people— 0.43%— had been in the SHU for longer than a year.[48]

125.    In sum, actions taken by Defendants to enforce the mandates of EO 14164 and the Bondi Memo are causing and will continue to cause irreparable harm to Plaintiffs.

## CLAIMS FOR RELIEF

### COUNT 1
**Challenge to the Redesignation Directive**
**Fifth Amendment of the U.S. Constitution – Procedural Due Process**

---

[48]    Fed. Bureau of Prisons, *Statistics: Restricted Housing*, (Apr. 15, 2025), https://www.bop.gov/about/statistics/statistics_inmate_shu.jsp (last accessed April 15, 2025).

**All Plaintiffs**
**Against All Defendants in Their Official Capacities**

126.    The Fifth Amendment provides that "no person  shall. . . be deprived of life, liberty or property, without due process of law." U.S. Const. amend V.

127.    Section 3(e) of EO 14164, the Bondi Memo, and the orders, procedures, and predetermined redesignation decisions made pursuant to these directives of all Plaintiffs to ADX— together and hereinafter, the "Redesignation Directive" —violate Plaintiffs' procedural due process rights under the Fifth Amendment.

128.    Applying due process principles to prisons, the Supreme Court held that incarcerated people have a liberty interest in avoiding confinement conditions that are an "atypical and significant" hardship compared to the ordinary incidents of prison life. *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005). Before the government may encroach on such a liberty interest, it must provide incarcerated people with an opportunity to be heard at a meaningful time and in a meaningful manner.

129.    Plaintiffs have a liberty interest in avoiding their transfer to ADX, which is an "atypical and significant" hardship compared to the ordinary incidents of prison life. Conditions at ADX are more severe than routinely imposed in USPs, because conditions at ADX are uniquely isolating and have no durational limit.

130.    For Plaintiffs, the conditions of confinement in ADX are more severe than USPs, both because of the deprivations inherent in ADX confinement and the lengthy and indefinite confinement in ADX.  Plaintiffs' confinement is also "atypical" because it is selective: ADX only houses fewer than 0.25% of all people incarcerated in federal prisons, and Plaintiffs, in particular, were hand-picked by Defendant Trump's Executive Order for confinement at ADX.

131.    Plaintiffs' confinement at ADX is also "atypical and significant" because it is

41

indefinite and could be permanent. While ADX has a "step-down" program for good behavior, the Redesignation Directive has replaced BOP's ordinary procedures and, on information and belief, will prevent Plaintiffs from progressing through the step-down process.

132.    Plaintiffs' liberty interest in avoiding transfer to ADX entitles them to an opportunity to be heard at a meaningful time and in a meaningful manner. These procedural safeguards follow from Plaintiffs' weighty private interest in avoiding ADX's uniquely isolating conditions; the risk of erroneous deprivation from BOP's replacement of ordinary procedures with the Executive Order's pre-ordained outcomes; and the lack of a legitimate penological justification for Plaintiffs' placement at ADX. Gibson Decl. at 5; Haney Decl. ¶¶ 88-97.

133.    But BOP did not provide Plaintiffs a meaningful opportunity to be heard through its ordinary designation process. Defendants Bondi and Bove have instead ordered a pre-ordained outcome: every Plaintiff will be sent to ADX. As a result, the ADX hearings conducted by BOP, and the appeals from those hearings, were a sham. Plaintiffs' hearing notices contained rote language, pretextual assertions of security risks, and assigned them to a STG of "Death Row Inmate" for the first time. Plaintiffs' initial designation recommendations from the Hearing Administrator arrived within hours of their hearings. Taylor Decl. ¶ 17; King Decl. ¶ 13. This hearing process was an attempt to justify—*post hoc*—Defendants Bondi and Bove's uncompromising decree to place every Plaintiff at ADX. In doing so, BOP relied on pretextual rationales for overriding its original designation decisions, which were consistent with federal statutes and policies.

134.    Because Defendants had predetermined that Plaintiffs would be sent to ADX, the ADX hearings conducted by Defendant BOP, and the appeals of Defendant BOP's decisions designating them to ADX, were a sham. Defendants have denied Plaintiffs the opportunity to be

heard in a meaningful time and in a meaningful manner.

135.    For these reasons, Defendants have violated Plaintiffs' rights to procedural due process under the Fifth Amendment. In the absence of injunctive relief, Plaintiffs will suffer irreparable harm from these due process violations.

## COUNT 2
### Challenge to the Redesignation Directive
### Fifth Amendment of the U.S. Constitution – Equal Protection
### All Plaintiffs
### Against All Defendants in Their Official Capacities

136.    The Fifth Amendment's Due Process Clause incorporates a guarantee of equal protection of the laws against the United States equivalent to that guaranteed against States by the Equal Protection Clause of the Fourteenth Amendment.

137.    Defendants' Redesignation Directive violates the Fifth Amendment's equal protection guarantee.

138.    Prior to the promulgation of the Redesignation Directive, people under sentence of death in the federal system who were resentenced to life without parole due to a commutation or court action were subject to redesignation by BOP to determine where they would be housed. Such redesignations have occurred 18 times prior to President Biden's commutations of Plaintiffs' death sentences. Each of those times, BOP's redesignation occurred according to the process required by statute and BOP policy, which require an individualized consideration of the demands of public safety, institutional security, the particular needs of the incarcerated person, and the resources of the facility. Not one of the 18 people so redesignated was determined to be appropriate for ADX. All 18 were sent to USPs.

139.    The 18 people who were resentenced from federal death sentences to life without parole prior to the Redesignation Directive are similarly situated to Plaintiffs, who were

resentenced from federal death sentences to life without parole pursuant to commutations by President Biden.

140.    While President Biden was still in office, BOP began the normal redesignation process for all Plaintiffs and subsequently made determinations for where they would be housed, assuring a federal court that the housing decisions would "lead to similar outcomes" as in the past. Kadamovas Joint Mot. at 2, *Kadamovas v. Dir., Fed. Bureau of Prisons,* No. 23-cv-22 (S.D. Ind. Dec. 30, 2024), ECF No. 147.

141.    After Defendants Trump, Bondi, and Bove promulgated the Redesignation Directive, the process changed completely. The intent of the Redesignation Directive was clear: to send all Plaintiffs to ADX. As a result of the actions of Defendant Trump and Defendant Bondi, the BOP Defendants abandoned their prior redesignation efforts and undertook a sham process of hearings and recommendations that was implemented with the intent to redesignate every Plaintiff to ADX.  Plaintiffs have thus been subjected to a redesignation process that is profoundly different from that experienced by their similarly situated peers.

142.    The motivation for the disparate treatment is animus: Defendant Trump has expressed clear animus toward Plaintiffs, telling them in a public social media posting to "GO TO HELL!" and referring to President Biden's "Abhorrent Pardon Decisions." *See supra* ¶ 46. Defendant Trump issued EO 14164 with the intent to punish them and make them suffer. Defendant Bondi's Memorandum was issued to carry out that improper intent.

143.    Animus is not a permissible reason under the equal protection clause to treat similarly situated groups differently. Defendants have no legitimate interests in their disparate treatment of Plaintiffs.

144.    As a result of Defendants' actions, all Plaintiffs have been subjected to an extra-

legal process fundamentally different from that experienced by their similarly situated peers and required by statute.

145.    For these reasons, Defendants have violated Plaintiffs' rights to equal protection under the Fifth Amendment. In the absence of injunctive relief, Plaintiffs will suffer irreparable harm from these equal protection violations.

**COUNT 3**
**Challenge to the Redesignation Directive**
**Eighth Amendment of the U.S. Constitution – Cruel and Unusual Punishments**
**All Plaintiffs**
**All Defendants in Their Official Capacities**

146.    The Eighth Amendment prohibits cruel and unusual punishments. The Supreme Court has held that the Eighth Amendment thus prohibits the unnecessary and wanton infliction of pain, including those punishments that are without penological justification.

147.    The solitary confinement inflicted at ADX is objectively painful and harmful, and constitutes the type of unnecessary and wanton infliction of pain that gives rise to an Eighth Amendment violation. The courts and scientific literature have long recognized the deleterious effects of prolonged solitary confinement. ADX imposes particularly oppressive conditions designed to eliminate environmental stimulation and meaningful human contact. The indefinite nature of ADX confinement only exacerbates the harm posed by these conditions.

148.    Defendants have no penological justification for isolating the Plaintiffs at ADX. Before the Redesignation Directive, BOP officials followed BOP policy and federal statute and determined that each plaintiff would be placed at a high-security USP or medical facility. Following the Redesignation Directive, applicable only to the Plaintiffs and others whose death sentences were commuted by President Biden, Defendants overrode these determinations. Defendants implemented these overrides solely because Plaintiffs' sentences were commuted by

the prior Administration, which advances no rational penological purpose.  In implementing these overrides, Defendants have acted with deliberate indifference to the risk of harm to Plaintiffs.

149.    As an original matter, the Eighth Amendment also prohibits using prosecutorial power for arbitrary partisan or improper ends.

150.    Defendants seek to impose particularly harsh punishment on Plaintiffs due to their animus against Plaintiffs and the prior Administration.

151.    Defendants have therefore violated Plaintiffs' Eighth Amendment rights. As a result of Defendants' actions, in the absence of injunctive relief, Plaintiffs will suffer irreparable harm.

**COUNT 4**
**Challenge to the Redesignation Directive**
**Eighth Amendment of the U.S. Constitution - Deliberate Indifference to**
**Serious Medical and/or Mental Health Needs**
**Plaintiffs Basham, Coonce, Council, Fulks, Hall, Kadamovas, Lawrence, Mikhel, Mikos,**
**Roane, Runyon, Sanchez, and Umaña (the "Health Care Plaintiffs")**
**Against All Defendants**

152.    Under the Eighth Amendment, Defendants must provide incarcerated people in their custody with adequate and necessary health care, both for medical and mental health needs, that meets accepted standards of care and practice within the medical community.

153.    The Eighth Amendment prohibits deliberate indifference by government officials to the serious health needs of those people the government chooses to incarcerate. An official who has knowledge of an incarcerated person's health care needs that would place the person at substantial risk of serious harm if not treated, and who denies, delays, or otherwise interferes with the provision of health care, violates the Eighth Amendment.

154.    Plaintiffs Basham, Coonce, Council, Fulks, Hall, Kadamovas, Lawrence, Mikhel, Mikos, Roane, Runyon, Sanchez, and Umaña (hereafter "Health Care Plaintiffs") have each been

46

diagnosed with serious medical and / or mental health needs. Defendant BOP and Agency Defendants are subjectively aware of the Health Care Plaintiffs' health care diagnoses, and their need for higher levels of medical and mental health care than can be provided at ADX.

155.    As detailed *supra* in ¶¶ 48-76, the standard classification and redesignation process used by BOP considers incarcerated people's medical and mental health needs in determining which prison institutions are suitable and capable of meeting their needs. According to Defendants' own regulations and policies, ADX is not equipped to incarcerate people with serious medical or mental health conditions.

156.    Without the appropriate level of necessary medical and mental health treatment at ADX, the Health Care Plaintiffs will predictably experience the gratuitous infliction of pain, and serious and irreparable physical and psychological harm.

157.    Moreover, the Health Care Plaintiffs with documented diagnoses of serious mental illness are at heightened risk of irreparable psychological harm due to the severely harsh and punitive conditions of isolation at ADX.

158.    The Redesignation Directive promulgated and implemented by Defendants is a categorical determination that all people who received clemency from President Biden should be placed in so-called "monstrous" conditions.

159.    The plain language of EO 14164 and the Bondi Memo, as well as the public comments of Defendant Trump, evince a desire and motivation by Defendant Trump and Defendant Bondi to cause harm to all the recipients of clemency, and a deliberate indifference to the impact of ADX placement on the Health Care Plaintiffs.

160.    Defendants' deliberate actions of denying necessary and appropriate medical and mental health care to the Health Care Plaintiffs demonstrates that they have acted, and will

continue to act, with deliberate indifference to the Health Care Plaintiffs' serious health needs, and to the substantial risk of serious harm to these Plaintiffs.

161.    As a result of Defendants' actions described herein, in the absence of injunctive relief, the Health Care Plaintiffs will continue to suffer irreparable harm.

## COUNT 5
### Challenge to the Redesignation Directive
### Article I, § 9 of U.S. Constitution – Bill of Attainder
### All Plaintiffs
### Against All Defendants in their Official Capacities

162.    The Redesignation Directive constitutes impermissible acts of attainder by all Defendants in violation of Article 1, § 9 of the U.S. Constitution.

163.    By issuing and implementing the Redesignation Directive, Defendants intended to and did inflict retributive punishment on Plaintiffs, and such punishment constituted a bill of pain and penalties. In so doing, Defendants usurped the judicial role of fixing a degree of punishment for no reason other than retribution for President Biden's commutations of Plaintiffs' federal death sentences.

164.    The Redesignation Directive constitutes legislative action by Defendants within the meaning of the Constitution's Bill of Attainder Clause.

165.    The Redesignation Directive applies to an identifiable, closed group of people, including Plaintiffs: those 37 people who received commutation of their death sentences by President Biden on December 23, 2024.

166.    The punishment imposed by the Redesignation Directive is vindictive and serves no legitimate penological purpose. But for the Redesignation Directive, most Plaintiffs would be transferred to other, less restrictive BOP facilities pursuant to decisions made under the statutory BOP process.

167.    As a direct and proximate result of Defendant's constitutional violation, Plaintiffs will be irreparably injured. They have no adequate remedy at law for Defendant's actions and will suffer irreparable harm unless Defendants are enjoined from continuing their unlawful policies, practices, and customs which have directly and proximately caused these constitutional violations.

**COUNT 6**
**Challenge to the Redesignation Directive**
**Art. I, § 9 of the U.S. Constitution – Ex Post Facto**
**All Plaintiffs**
**Against All Defendants in their Official Capacities**

168.    The Redesignation Directive constitutes impermissible *ex post facto* punishment of all Defendants in violation of Article 1, § 9 of the U.S. Constitution.

169.    At the time of Plaintiffs' alleged crimes, indefinite solitary confinement, possibly for life, was not a possible punishment for capital crimes or for people whose death sentences had been commuted.

170.    At the time of Plaintiffs' executive clemency in December 2024, indefinite solitary confinement, possibly for life, was not a possible punishment for people whose death sentences had been commuted.

171.    By issuing and implementing the Redesignation Directive, Defendants undertook legislative action that intended to and did retroactively and retributively increase the punishment of Plaintiffs through the Redesignation Directive.

172.    The Redesignation Directive establishes a new procedure constituting legislative action that requires that Plaintiffs be placed in indefinite solitary confinement, possibly for life, because their death sentences were commuted. As alleged above, this interrupted the usual process of BOP in making placement determinations for people in federal custody, which does not include a role for either the President (Defendant Trump) or the Attorney General (Defendant Bondi) or

her designee (Defendant Bove).

173.    By issuing and implementing the Redesignation Directive, Defendants have retroactively increased the punishment of Plaintiffs. Placing Plaintiffs in indefinite solitary confinement, possibly for life, increases Plaintiffs' punishment because it greatly worsens their conditions of confinement, in violation of the Ex Post Facto clause and long-standing Supreme Court precedent, *In re Medley*, 134 U.S. 160 (1890). As alleged above, both the intent and effect of this change are punitive.

174.    As a direct and proximate result of Defendants' constitutional violations, Plaintiffs will be irreparably injured. No adequate remedy at law exists for Defendants' actions, and Plaintiffs will suffer irreparable harm unless Defendants are enjoined from continuing their unlawful conduct which has directly and proximately caused these constitutional violations.

**COUNT 7**
**Challenge to the Redesignation Directive**
**Art. II, § 2 of the U.S. Constitution – Clemency Power**
**All Plaintiffs**
**Against All Defendants in Their Official Capacities**

175.    Under Article II, § 2, cl. 1 of the U.S. Constitution, the President has plenary authority to commute criminal sentences. *Schick v. Reed*, 419 U.S. 256, 260, 266 (1974).

176.    The broad, exclusive, and final nature of the Article II clemency power protects it from any actions that attempt to abridge, diminish, impair, or limit the effect of its exercise. *Schick*, 419 U.S. at 266; *Ex parte Garland*, 71 U.S. (4 Wall.) 333, 380-81 (1866); *United States v. Klein*, 80 U.S. (13 Wall.) 128, 147-48 (1871).

177.    Such actions need not directly restrict the grant of clemency to run afoul of the Constitution; it is enough that an action indirectly diminishes the effect of a clemency order. *See Garland,* 71 U.S. at 380-81 (loyalty oath requirement to practice in federal court violated Article

II because it was indirect means of limiting the effect of pardon granted to ex-Confederate); *Klein,* 80 U.S. at 147 (proviso construing pardon as proof of disloyalty that precluded claim for rightful return of property "impair[ed] the effect of a pardon, and thus infring[ed] the constitutional power of the Executive").

178.    Additionally, the Pardon Clause empowers a President to lessen, not increase, punishment. As the Supreme Court has opined, "of course, the President may not aggravate punishment," *Schick*, 419 U.S. at 267, because the Constitution only authorizes "an executive action that mitigates or sets aside punishment for a crime." *Nixon v. United States*, 506 U.S. 224, 232 (1993) (citation omitted).

179.    President Biden's executive grant of clemency commuted the death sentences of Plaintiffs to life without the possibility of parole. It imposed no additional conditions on the commuted sentences.

180.    Ordinarily, the effect of that commutation order would have been to remove Plaintiffs from the federal death row (*i.e.,* the SCU) and to redesignate their place of imprisonment to the less-restrictive general population settings at one of the various high security penitentiaries.

181.    The Redesignation Directive unconstitutionally interferes with the exercise of the Article II clemency power because it diminishes or impairs the effect of the commutation order. Because of Defendants' actions, Plaintiffs were expressly precluded from being redesignated to the general population of a penitentiary. Instead, they were redesignated to the most notorious federal prison in the country to serve their life sentences under the most harsh and restrictive conditions of confinement available within BOP. Defendants thus impaired the effect of the commutation order and consequently infringed on the constitutional power of the Executive. Furthermore, Defendants punished Plaintiffs merely for being the recipients of President Biden's

executive grant of clemency.

182.    Defendants' violation of Article II, § 2, cl. 1 will cause Plaintiffs irreparable injury, including being subject to indefinite punitive conditions of confinement that entail serious physical, psychological and emotion harm, mental anguish, distress, humiliation, and indignity.

**COUNT 8**
**Challenge to the Bondi Memo**
**Administrative Procedure Act, 5 U.S.C. §§ 500-596 & 706**
**Agency Action in Excess of Statutory Jurisdiction or Authority, or Otherwise not in Accordance with Law**
**All Plaintiffs**
**Against Defendants Bondi and Bove in Their Official Capacities**

183.    The APA, 5 U.S.C. §§ 500-596 & 706, directs a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction [or] authority" or "otherwise not in accordance with law." 5 U.S.C. § 706(2)(C), (A).

184.    The Bondi Memo is final agency action. The Bondi Memo represents the consummation of the agency decision-making process within the Department of Justice and the Office of the Attorney General. The Bondi Memo was adopted by agency leadership and does not contemplate any further consideration by the agency prior to its implementation and enforcement. Rather than merely clarifying existing duties, the Bondi Memo determines Plaintiffs' rights and has direct and immediate legal consequences.

185.    Plaintiffs have been "adversely affected or aggrieved by agency action." 5 U.S.C. § 702. The Bondi Memo has the direct effect of countermanding the lawful decisions made by the BOP and replacing them with a sham process that will condemn Plaintiffs to potentially indefinite incarceration in ADX.

186.    Through the Bondi Memo and the policy it set in motion, Defendants Bondi and Bove acted "in excess of statutory jurisdiction [or] authority" and "otherwise not in accordance

with law," 5 U.S.C. § 706(2)(C), (A), by:

    a.  Overriding a BOP placement decision made after full consideration of the factors specified in 18 U.S.C. § 3621;

    b.  requiring BOP to treat the Plaintiffs' commutation as a relevant factor in their designation;

    c.  compelling BOP to make non-binding placement recommendations to Defendant Bove; and,

    d.  rejecting those placement recommendations and forcing BOP to conduct sham hearings that would designate every Plaintiff to ADX, against the agency's considered judgment

187.    The Bondi Memo and actions taken by Defendants Bondi and Bove are causing and will continue to cause irreparable harm to Plaintiffs, including serious physical, psychological, and emotional harm, distress, and mental anguish.

188.    Actions taken by Defendant BOP and Defendants Marshall, Toomey, Salem, Stove and Matevousian, acceding to the Bondi Memo and demands by Defendants Bondi and Bove that all Plaintiffs be designated to ADX, are causing and will cause irreparable harm to Plaintiffs, including serious physical, psychological, and emotional harm, distress, and mental anguish.

189.    The Bondi Memo and the actions of Defendants Bondi and Bove are in excess of statutory jurisdiction or authority and otherwise not in accordance with law, and should be held unlawful and set aside.

## COUNT 9
**Challenge to the Bondi Memo**
**Administrative Procedure Act, 5 U.S.C. §§ 500-596 & 706**
**Arbitrary and Capricious Agency Action**
**All Plaintiffs**
**Against Defendants Bondi and Bove in Their Official Capacities**

190.    The APA directs a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

191.    The Bondi Memo is final agency action. The Bondi Memo represents the consummation of the agency decision-making process within the Department of Justice and the Office of the Attorney General. The Bondi Memo was adopted by agency leadership and does not contemplate any further consideration by the agency prior to its implementation and enforcement. Rather than merely clarifying existing duties, the Bondi Memo determines Plaintiffs' rights and has direct and immediate legal consequences.

192.    Plaintiffs have been "adversely affected or aggrieved by agency action." 5 U.S.C. § 702. The Bondi Memo has the direct effect of countermanding the lawful decisions made by the BOP and replacing them with a sham process that will condemn Plaintiffs to potentially indefinite incarceration in ADX.

193.    The Bondi Memo is "arbitrary [and] capricious." 5 U.S.C. § 706(2)(A).

194.    The Bondi Memo abruptly departs from the longstanding position of DOJ and the Office of the Attorney General without satisfactorily explaining the reason for doing so:

> a.    The Bondi Memo and Defendants Bondi and Bove have provided no meaningful explanation for abandoning years of settled practice, nor have they provided a meaningful explanation why the *status quo ante*—which BOP implemented for years prior to the Redesignation Directive—was in any way flawed, let alone sufficiently flawed to warrant this abrupt and substantial change.
>
> b.    The Bondi Memo and Defendants Bondi and Bove have provided no

meaningful explanation why Defendants Bondi and Bove believed it was necessary or appropriate to insert themselves into the BOP designation process mandated by statute.

c.  Likewise, The Bondi Memo and Defendants Bondi and Bove have provided no meaningful explanation why they believed it was necessary or appropriate to consider the Plaintiffs' commutation as having any relevance to their designation.

d.  Nor have the Bondi Memo and Defendants Bondi and Bove provided a meaningful explanation why they believed it was necessary or appropriate to convert BOP placement designations into non-binding recommendations, then overrule those recommendations and direct BOP to conduct new hearings that would, in every case, reach a predetermined result: all Plaintiffs would be designated to ADX.

195.    The Bondi Memo and actions taken by Defendants Bondi and Bove are causing and will continue to cause irreparable harm to Plaintiffs, including serious physical, psychological, and emotional harm, distress, and mental anguish.

196.    Actions taken by Defendants BOP and Defendants Marshall, Toomey, Salem, Stove and Matevousian, acceding to the Bondi Memo and demands by Defendants Bondi and Bove that all Plaintiffs be designated to ADX, are causing and will cause irreparable harm to Plaintiffs, including serious physical, psychological, and emotional harm, distress, and mental anguish.

197.    The agency action is arbitrary and capricious and should be held unlawful and set aside.

**COUNT 10**
**Challenge to the Bondi Memo**
**Administrative Procedure Act, 5 U.S.C. §§ 553(b), (c)**
**Notice and Comment**
**All Plaintiffs**
**Against Defendant Bondi in Her Official Capacity**

198.    The APA requires notice and opportunity for comment prior to the promulgation of rules, 5 U.S.C. §§ 553(b), (c), and the Court must set aside agency action undertaken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

199.    Defendant Bondi failed to provide notice and an opportunity to comment in a timely manner before publication of the Bondi Memo.

200.    The Bondi Memo is a legislative rule.

201.    The APA requires that a regulation be published "not less than 30 days before its effective date." 5 U.S.C. § 553(d). Defendant Bondi failed to publish the Memo 30 days before its effective date.

202.    Defendant Bondi has not articulated reasons sufficient to show good cause why these requirements are inapplicable.

203.    Plaintiffs have been prejudiced by the failure of Defendant Bondi to comply with the notice and requirement provisions of the APA.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court grant the following relief:

(A)    Issue a judgment under 28 U.S.C. §§ 2201-02 declaring that Section 3(e) of Executive Order 14164 and the Bondi Memo violate Plaintiffs' rights under Article I, § 9; Article II, § 2; and the Fifth and Eighth Amendments to the United States Constitution; and that the Bondi Memo violates the Administrative Procedure Act, for the reasons and on the Counts set forth above;

(B)     Enter preliminary and permanent injunctive and declaratory relief, including but not limited to enjoining Section 3(e) of the Executive Order and the Bondi Memo, and ordering the Defendants to assign the Plaintiffs to housing locations based on the designation decisions that had been reached prior to the issuance of the Executive Order and Bondi Memo;

(C)     Award Plaintiffs their costs and reasonable attorneys' fees pursuant to 28 U.S.C. § 2412, 5 U.S.C. § 504, and 42 U.S.C. § 12205, and any other applicable source of law; and

(D)     Grant any other and further relief this Court deems just, proper, and appropriate.


Dated: April 16, 2025                    Respectfully submitted,
        Washington, DC


                                         */s/ Maria V. Morris*

Brian Stull, N.C. 36002*                 David C. Fathi, Wash. 24893**
Claudia Van Wyk, Penn. 95130*            Maria V. Morris, D.C. 1697904
**ACLU FOUNDATION**                      Jennifer Wedekind, D.C. 1012362
201 W. Main St., Ste. 402                **ACLU FOUNDATION**
Durham, NC 27701                         915 15th Street NW
Tel: (919) 682-5659                      Washington, DC 20005
bstull@aclu.org                          Tel: (202) 393-4930
cvanwyk@aclu.org                         dfathi@aclu.org
                                         mmorris@aclu.org
                                         jwedekind@aclu.org


Corene T. Kendrick, Cal. 226642*         Sara Norman, Cal. 189536*
**ACLU FOUNDATION**                      **LAW OFFICES OF SARA NORMAN**
425 California St., Ste. 700             P.O. Box 170462
San Francisco, CA 94104                  San Francisco, CA 94117
Tel: (202) 393-4930                      Tel: (415) 236-3763
ckendrick@aclu.org                       sara@saranormanlaw.com

Laura Rovner, Colo. 35592*
Nicole Godfrey, Colo. 41546***
Miriam Kerler, Colo. 56575***
**STUDENT LAW OFFICE**
**UNIVERSITY OF DENVER**
**STURM COLLEGE OF LAW**
2255 E. Evans Ave., Ste. 335
Denver, CO 80210
Tel: (303) 871-6140
laura.rovner@du.edu
nicole.godfrey@du.edu
miriam.kerler@du.edu

Joseph Margulies, Ill. 6198353
(Admitted to D.D.C. as pro bono counsel)
**CORNELL UNIVERSITY**
Professor of the Practice of Government
216 White Hall
Ithaca, NY 14850
Tel: (607) 255-6477
jm347@cornell.edu

David Patton*
Ian Robertson*
Krysta Kilinski*
**HECKER FINK LLP**
350 Fifth Ave, 63rd Floor
New York, NY 10118
Tel: (212) 763-0883
dpatton@heckerfink.com
irobertson@heckerfink.com
kkilinski@heckerfink.com

C.J. Sandley, Ala. 5317-S48R*
Kayla Vinson, Ala. 3664-S48Q*
D. Korbin Felder, Miss. 106643*
**CENTER FOR CONSTITUTIONAL**
**RIGHTS**
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6443
csandley@ccrjustice.org
kvinson@ccrjustice.org
kfelder@ccrjustice.org

Carmen Iguina González
**HECKER FINK LLP**
1050 K Street NW, Suite 1040
Washington, DC 20001
Tel: (202) 742-2661
ciguinagonzalez@heckerfink.com

*Attorneys for Plaintiffs*

*\* Pro hac vice application forthcoming*

*\*\* Not admitted in D.C.; practice limited to federal courts. Pro hac vice application forthcoming.*

*\*\*\* Application for admission to District of D.C. accepted, awaiting May 5, 2025 admission ceremony*