## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

REJON TAYLOR, *et al.*,

         *Plaintiffs*,

      v.

DONALD J. TRUMP, *et al.*, in their official capacities,

         *Defendants*.

Case No. _____

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
## FOR TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND.................................................... 2

    I.   The President's Executive Order and Attorney General's Memorandum turned the placement process for the commutation recipients upside down. ................................... 3

    II.  Because ADX is the BOP's highest security and most restrictive prison, redesignation to ADX is strictly regulated. ....................................................... 9

LEGAL STANDARD.......................................................................................................... 14

ARGUMENT ........................................................................................................................ 14

    I.   Plaintiffs are likely to succeed on the merits. ................................................. 14

        A.  The Redesignation Directive violates Plaintiffs' procedural due process rights.......................................................................................................... 14

        B.  The Redesignation Directive violates Plaintiffs' equal protection rights............... 22

        C.  The Bondi Memo violates the Administrative Procedure Act. .............................. 25

        D.  The Redesignation Directive violates Plaintiffs' right to be free from cruel and unusual punishments. ....................................................................... 30

        E.  The Redesignation Directive violates Plaintiffs' rights under Article II, § 2, cl. 1......................................................................................................... 35

    II.  The Redesignation Directive will cause Plaintiffs irreparable harm............................. 39

    III.  The balance of equities and public interest weigh heavily in Plaintiffs' favor. ............. 40

CONCLUSION.................................................................................................................... 42

# TABLE OF AUTHORITIES

**CASES**                                                                    **Page(s)**

*Aamer v. Obama,*
    742 F.3d 1023 (D.C. Cir. 2014) ............................................................ 14

*Am. Bar Ass'n v. United States Dep't of Educ.,*
    370 F. Supp. 3d 1 (D.D.C. 2019) ........................................................ 27

*Am. Foreign Serv. Ass'n v. Trump,*
    No. 25 Civ. 352, 2025 WL 435415 (D.D.C. Feb. 7, 2025) ................... 14

*Am. Wild Horse Pres. Campaign v. Perdue,*
    873 F.3d 914 (D.C. Cir. 2017) ............................................................ 28

*ANR Pipeline Co. v. F.E.R.C.,*
    71 F.3d 897 (D.C. Cir. 1995) .............................................................. 27

*Arabzada v. Donis,*
    725 F. Supp. 3d 1 (D.D.C. 2024) .......................................................... 8

*Aref v. Holder,*
    774 F. Supp. 2d 147 (D.D.C. 2011) .................................................... 20

*Aref v. Lynch,*
    833 F.3d 242 (D.C. Cir. 2016) .................................................... *passim*

*Ashkenazi v. Att'y Gen. of U.S.,*
    246 F. Supp. 2d 1 (D.D.C. 2003) ........................................................ 40

*Ashkenazi v. Att'y Gen. of U.S.,*
    346 F.3d 191 (D.C. Cir. 2003) ............................................................ 40

*Bailey v. Fed. Bureau of Prisons,*
    No. 24 Civ. 1219, 2024 WL 3219207 (D.D.C. June 28, 2024) ........... 41

*Bauer v. DeVos,*
    325 F. Supp. 3d 74 (D.D.C. 2018) ...................................................... 14

*Biddle v. Perovich,*
    274 U.S. 480 (1927) ............................................................................ 38

*Brandon v. D.C. Bd. of Parole,*
    734 F.2d 56 (D.C. Cir. 1984) .............................................................. 23

*Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*,
   492 U.S. 257 (1989) ............................................................................ 34

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) ........................................................... 39

*City of Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985) ...................................................................... 23, 24

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
   603 U.S. 799 (2024) ............................................................................ 29

*Davis v. Ayala*,
   576 U.S. 257 (2015) ............................................................................ 31

*Dir., Off. of Workers' Comp. Programs, Dep't of Lab. v. Newport News Shipbuilding & Dry*
   *Dock Co.*,
   514 U.S. 122 (1995) ...................................................................... 28, 29

*Doe v. McHenry*,
   No. 25 Civ. 286, 2025 WL 388218 (D.D.C. Feb. 4, 2025) ................. 14

*E. Bay Sanctuary Covenant v. Garland*,
   994 F.3d 962 (9th Cir. 2020) ............................................................. 26

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016) ............................................................................ 27

*Ex parte Garland*,
   71 U.S. (4 Wall.) 333 (1866) ................................................... 36, 37, 39

*Ex parte Grossman*,
   267 U.S. 87 (1925) .............................................................................. 37

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*,
   636 F.2d 755 (D.C. Cir. 1980) ........................................................... 41

*Foster v. Runnels*,
   554 F.3d 807 (9th Cir. 2009) ............................................................. 32

*Goings v. Ct. Servs. & Offender Supervision Agency for D.C.*,
   786 F. Supp. 2d 48 (D.D.C. 2011) ..................................................... 40

*Gomez v. Trump*,
   485 F. Supp. 3d 145 (D.D.C. 2020) ................................................... 26

*Harrison v. Fed. Bureau of Prisons*,
  298 F. Supp. 3d 174 (D.D.C. 2018) .................................................................. 23

*Heller v. Doe by Doe*,
  509 U.S. 312 (1993).......................................................................................... 24

*Hope v. Pelzer*,
  536 U.S. 730 (2002).......................................................................................... 33

*Hudson v. McMillian*,
  503 U.S. 1 (1992).............................................................................................. 31

*Huisha-Huisha v. Mayorkas*,
  27 F.4th 718 (D.C. Cir. 2022) .......................................................................... 41

*Huisha-Huisha v. Mayorkas*,
  560 F. Supp. 3d 146 (D.D.C. 2021) .................................................................. 41

*Hutto v. Finney*,
  437 U.S. 678 (1978)........................................................................................... 32

*Incumaa v. Stirling*,
  791 F.3d 517 (4th Cir. 2015) ........................................................................... 19

*Jasperson v. Fed. Bureau of Prisons*,
  460 F. Supp. 2d 76 (D.D.C. 2006) ............................................................ 30, 40

*John Doe Co. v. Consumer Fin. Prot. Bureau*,
  235 F. Supp. 3d 194 (D.D.C. 2017).................................................................. 39

*Kadamovas v. Dir., Fed. Bureau of Prisons*,
  23 Civ. 22 (S.D. Ind. Dec. 30, 2024) ............................................................... 22

*Kelly v. Brewer*,
  525 F.2d 394 (8th Cir. 1975) ........................................................................... 20

*Koyce v. U.S. Bd. of Parole*,
  306 F.2d 759 (D.C. Cir. 1962) .......................................................................... 23

*Louisville Gas & Elec. Co. v. Coleman*,
  277 U.S. 32 (1928)............................................................................................ 24

*Love v. Bureau of Prisons*,
  No. 24 Civ. 2571, 2025 WL 105845 (D.D.C. Jan. 15, 2025) ............................ 30

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ................................................................................ 29

*Martin v. Gerlinski*,
   133 F.3d 1076 (8th Cir. 1998) ................................................................ 30

*Mathews v. Eldridge*,
   424 U.S. 319 (1976) ........................................................................... 18, 19

*In re Medley*,
   134 U.S. 160 (1890) ................................................................................ 31

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012) .................................................................. 41

*Mills v. District of Columbia*,
   571 F.3d 1304 (D.C. Cir. 2009) ............................................................. 40

*Mims v. Shapp*,
   744 F.2d 946 (3rd Cir. 1984) ................................................................. 20

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ................................................................................ 39

*Nat. Res. Def. Council, Inc. v. Morton*,
   337 F. Supp. 167 (D.D.C. 1971) ............................................................ 41

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
   No. 25 Civ. 333, 2025 WL 573764 (D. Md. Feb. 21, 2025) .................... 41

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
   No. 25 Civ. 239, 2025 WL 597959 (D.D.C. Feb. 25, 2025) .................... 41

*Nixon v. Adm'r of Gen. Servs.*,
   433 U.S. 425 (1977) ................................................................................ 38

*Nixon v. United States*,
   506 U.S. 224 (1993) ................................................................................ 35

*Palakovic v. Wetzel*,
   854 F.3d 209 (3d Cir. 2017) .................................................................... 11

*Porter v. Clarke*,
   923 F.3d 348 (4th Cir. 2019) .................................................................. 32

*Proctor v. LeClaire*,
    846 F.3d 597 (2d Cir. 2017).........................................................20, 21

*Pursuing Am.'s Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016).............................................................40

*Quintanilla v. Bryson*,
    730 F. App'x 738 (11th Cir. 2018)........................................................20

*Reynolds v. Quiros*,
    990 F.3d 286 (2d Cir. 2021)...............................................................25

*Rezaq v. Nalley*,
    677 F.3d 1001 (10th Cir. 2012)...........................................................15

*Rhodes v. Chapman*,
    452 U.S. 337 (1981).................................................................31, 33

*Richmond v. Scibana*,
    387 F.3d 602 (7th Cir. 2004).............................................................30

*Romer v. Evans*,
    517 U.S. 620 (1996).....................................................................24

*Royer v. Fed. Bureau of Prisons*,
    933 F. Supp. 2d 170 (D.D.C. 2013).............................................15, 17, 19

*Sandin v. Conner*,
    515 U.S. 472 (1995).....................................................................15

*SAS Inst., Inc. v. Iancu*,
    584 U.S. 357 (2018).....................................................................26

*Schick v. Reed*,
    419 U.S. 256 (1974)...........................................................35, 36, 37, 38

*Sherley v. Sebelius*,
    644 F.3d 388 (D.C. Cir. 2011)............................................................14

*Simms v. District of Columbia*,
    872 F. Supp. 2d 90 (D.D.C. 2012).........................................................40

*Sourbeer v. Robinson*,
    791 F.2d 1094 (3d Cir. 1986).............................................................20

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
  540 F. Supp. 3d 45 (D.D.C. 2021) ................................................................ 39

*Tate v. Pompeo,*
  513 F. Supp. 3d 132 (D.D.C. 2021) .............................................................. 26

*The Laura,*
  114 U.S. 411 (1885).......................................................................................... 37

*Thomas v. Bryant,*
  614 F.3d 1288 (11th Cir. 2010) ...................................................................... 32

*Timbs v. Indiana,*
  586 U.S. 146 (2019).......................................................................................... 34

*Toevs v. Reid,*
  685 F.3d 903 (10th Cir. 2012) ........................................................................ 20

*Trump v. Thompson,*
  20 F.4th 10 (D.C. Cir. 2021)............................................................................ 38

*U.S. Dep't of Agriculture v. Moreno,*
  413 U.S. 528 (1973)............................................................................. 22, 24, 35

*United States v. Bowers,*
  18 Cr. 292 (W.D. Pa. Aug. 24, 2023) ............................................................ 12

*United States v. Klein,*
  80 U.S. 128 (1871)...................................................................................... 37, 39

*United States v. Nixon,*
  418 U.S. 683 (1974).......................................................................................... 38

*United States v. Rosenberg,*
  888 F.2d 1406 (D.C. Cir. 1989) ...................................................................... 34

*United States v. Saipov,*
  No. 17 Cr. 722 (S.D.N.Y. Feb. 22, 2023) ..................................................... 10

*United States v. Whitehorn,*
  710 F. Supp. 803 (D.D.C.)............................................................................... 34

*Walker v. Farnan,*
  583 U.S. 932 (2017).......................................................................................... 31

*Wilkinson v. Austin*,
    545 U.S. 209 (2005)................................................................. 15, 16, 19, 19, 21

*Williams v. Sec'y, Penn. Dep't of Corrs.*,
    848 F.3d 549 (3d Cir. 2017)................................................................. 31

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)................................................................. 14, 39

*Wisconsin Valley Improvement v. F.E.R.C.*,
    236 F.3d 738 (D.C. Cir. 2001)................................................................. 26, 27

*Women Prisoners of D.C. Dep't of Corr. v. D.C.*,
    93 F.3d 910 (D.C. Cir. 1996)................................................................. 23

*Zadvydas v. Davis*,
    533 U.S. 678 (2001)................................................................. 17

## US CONSTITUTIONAL PROVISIONS

U.S. Const. amend. V ................................................................. 15

U.S. Const. art. II, § 2 ................................................................. 35

## STATUTES

5 U.S.C. § 702 ................................................................. 28

5 U.S.C. § 705 ................................................................. 14

5 U.S.C. § 706(2)(A) ................................................................. 25, 26

5 U.S.C. § 706(C) ................................................................. 25, 26

18 U.S.C. § 3621(b) .................................................................6, 21, 25, 38

18 U.S.C. § 3625 ................................................................. 29

## REGULATIONS

28 C.F.R. § 544 ................................................................. 12

## FEDERAL RULES

Fed. R. Civ. P. 65(c) ................................................................. 41

Fed. R. Evid. 201(c)(2) .............................................................................................. 8

**OTHER AUTHORITIES**

Donald J. Trump (@realDonaldTrump), Truth Social (Dec. 25, 2024, 2:43 PM),
     https://truthsocial.com/@realDonaldTrump/posts/113715169361854155 ............................ 2

Executive Grant of Clemency (Dec. 23. 2024),
     https://www.justice.gov/pardon/media/1382291/dl?inline .................................................... 2

Fed. Bureau of Prisons, *About Our Facilities*,
     https://www.bop.gov/about/facilities/federal_prisons.jsp ..................................................... 12

Fed. Bureau of Prisons, Program Statement 5100.08, CN-2 (Mar. 6, 2025),
     https://www.bop.gov/policy/progstat/5100_008_cn-2.pdf .................................... 4, 7, 13, 32

Fed. Bureau of Prisons, Program Statement 5267.09 (Dec. 10, 2015),
     https://www.bop.gov/policy/progstat/5267_09.pdf ....................................................... 13, 16

Fed. Bureau of Prisons, *Restricted Housing*,
     https://www.bop.gov/about/statistics/statistics_inmate_shu.jsp ............................... 9, 12, 17

Fed. Bureau of Prisons, *Sentences Imposed*,
     https://www.bop.gov/about/statistics/statistics_inmate_sentences.jsp ................................. 9

Fed. Bureau of Prisons, *Stay in Touch*, https://www.bop.gov/inmates/communications.jsp ....... 13

FLM 5321.09(1)A, Institution Supplement – General Population and Step-Down Unit
     Operations (June 6, 2024) .................................................................................................. 12

Further Observations of the United States of America, Inmates of the Administrative
     Maximum United States Prison, Case No. 13.956 (Dec. 2024),
     https://www.state.gov/wp-content/uploads/2024/12/Case-No.-13.956-Inmates-of-ADX-
     U.S.-Further-Observations.pdf............................................................................................ 12

John F. Stinneford, *Is Solitary Confinement a Punishment?*, 115 Nw. U. L. Rev. 9 (2020) ........ 34

Mark Binelli, *Inside America's Toughest Federal Prison*, N.Y. Times (March 26, 2015),
     https://www.nytimes.com/2015/03/29/magazine/inside-americas-toughest-federal-
     prison.html ........................................................................................................................ 11

Off. of the Att'y Gen., *Memorandum for All Department of Justice Employees: Restoring a
     Measure of Justice to the Families of Victims of Commuted Murderers* (Feb. 5, 2025),
     https://www.justice.gov/ag/media/1388526/dl?inline ........................................................ 3

Off. of the Inspector Gen., U.S. Dep't of Just., *Audit of the Federal Bureau of Prisons' Management of the National Gang Unit* (2024), https://oig.justice.gov/sites/default/files/reports/24-115.pdf ................................................. 8

Ray Sanchez, *What's life like in Supermax prison?* CNN (Dec. 6, 2024), https://www.cnn.com/2015/06/25/us/dzhokhar-tsarnaev-supermax-prison/index.html ...... 11

Restoring the Death Penalty and Protecting Public Safety, Exec. Order No. 14164, 90 Fed. Reg. 8,463 (Jan. 20, 2025), https://www.govinfo.gov/content/pkg/FR-2025-01-30/pdf/2025-02012.pdf ............................................................................................................. 3

THE FEDERALIST NO. 74 (Alexander Hamilton) .................................................... 35, 36

U.S. Dep't of Just., *Report and Recommendations Concerning the Use of Restrictive Housing - Final Report* (Jan. 2016), https://www.justice.gov/dag/file/815551/dl ......... 9, 10, 13, 16, 17

U.S. Sent.'g Comm'n, *Life Sentences in the Federal System* (2022), https://www.ussc.gov/research/research-reports/life-sentences-federal-system.................... 9

Voices from Solitary, *A Prison Where the Building Becomes the Shackles* (Nov. 27, 2013), https://solitarywatch.org/2013/11/27/voices-solitary-adx-prison-building-becomes-shackles/ ................................................................................................................................... 11

2 J. Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 624 (T. Cooley 4th ed. 1873) ...................................................................................................................... 34

## **INTRODUCTION**

This is a case about retaliation and extra-judicial punishment.

The heart of this litigation is simple. President Biden commuted Plaintiffs' death sentences. In response, President Trump issued an Executive Order that directed the Attorney General to punish the Plaintiffs by housing them "in conditions consistent with the monstrosity of their crimes[.]" The Attorney General responded with a Memorandum that summoned into existence a new and unprecedented procedure beyond anything allowed by Congress. This procedure had two steps:

➢ In step one, the Attorney General and Deputy Attorney General hijacked the Federal Bureau of Prisons' (BOP) placement process. The BOP had already conducted the review required by statute and had concluded that each of the Plaintiffs should be housed in either a high security United States Penitentiary (USP) or a Federal Medical Center. The Deputy Attorney General overruled that decision in every case and ordered the BOP to present their placement decisions to him in the form of non-binding recommendations.

➢ In step two, the Deputy Attorney General rejected every recommendation and ordered the BOP to conduct new reviews that would, by fiat, redesignate every Plaintiff to the United States Penitentiary—Administrative Maximum prison in Florence, Colorado (ADX), the most restrictive and oppressive federal prison in the country. Though these subsequent reviews mimicked the process required by law, in fact the Attorney General and the Deputy Attorney General had already decided that every Plaintiff would be sent to ADX, and the second review conducted by the BOP merely cloaked that result in a veneer of legitimacy.

Plaintiffs refer to this new procedure, as well as the sham placement decisions made pursuant to it, as the Redesignation Directive.[1]

The Redesignation Directive is illegal. It violates the Due Process Clause by hurling each Plaintiff into ADX without notice and a meaningful opportunity to be heard, because a sham

---

[1] Ordinarily, when the BOP assigns a prisoner to a facility, it is called a designation; when it reassigns a prisoner from one facility to another, it is called a redesignation.

process is the same as no process at all. It violates the Equal Protection Clause because for no other reason than animus, it treats the Plaintiffs differently from every person whose federal death sentence has been set aside by a court or commuted by a President. It violates the Administrative Procedure Act because the Attorney General and her Deputy usurped powers far beyond those granted by Congress, and because they abandoned years of settled practice without explanation. It violates the Cruel and Unusual Punishments Clause because it subjects Plaintiffs to gratuitously cruel pain and suffering without any penological justification. And it violates the Pardon Power because it diminishes the effect of the commutation granted by President Biden.

Because Plaintiffs are likely to prevail on the merits; because they will be irreparably harmed if the Redesignation Directive is allowed to stand; because the equities tilt strongly in their favor; and because the public interest favors bringing this Directive to an immediate halt, the Court should grant Plaintiffs' Motion for a Temporary Restraining Order.

## FACTUAL AND PROCEDURAL BACKGROUND

On December 23, 2024, President Biden exercised his presidential power to commute the federal death sentences of 37 people, granting them sentences of life without parole. Kendrick Decl. Ex. 1 (Clemency Grant).[2] This act of mercy enraged President-elect Trump, who promptly took to social media to attack President Biden and the commutation recipients. In his Christmas Day message to the nation, Trump told the 37 to "GO TO HELL!"[3] And when he became President, he unlawfully retaliated against them.

---

[2] December 23, 2024, Executive Grant of Clemency,
https://www.justice.gov/pardon/media/1382291/dl?inline.

[3] Donald J. Trump (@realDonaldTrump), Truth Social (Dec. 25, 2024, 2:43 PM), https://truthsocial.com/@realDonaldTrump/posts/113715169361854155 (emphasis in original).

## I.    The President's Executive Order and Attorney General's Memorandum turned the placement process for the commutation recipients upside down.

On his first day in office, President Trump issued Executive Order No. 14164, which sought to reinstate in a different form the punishment abated by President Biden's grant of clemency. Kendrick Decl. Ex. 2 (EO 14164).[4] Section 3(e) of the Order directed the Attorney General to "evaluate the places of imprisonment and conditions of confinement for each of the 37 murderers whose Federal death sentences were commuted by President Biden" and to "ensure that these offenders are imprisoned in conditions consistent with the monstrosity of their crimes and the threats they pose." On her first day in office, Attorney General Pam Bondi issued a Memorandum to implement EO 14164 and set in motion an illegal process that will cast Plaintiffs into ADX, the most restrictive prison the United States has ever constructed. *See* Kendrick Decl. Ex. 3 (Bondi Memo).[5]

While the President and Attorney General were levying this extra-judicial punishment, the Federal Bureau of Prisons (BOP) had already begun doing its job. Congress has charged the BOP with the exclusive authority to determine the placement of every person in federal custody, and it has specified the factors the BOP must consider when it exercises its judgment. 18 U.S.C. § 3621(b) ("The [BOP] shall designate the place of the prisoner's imprisonment, . . . subject to bed availability, the prisoner's security designation, the prisoner's programmatic needs, the prisoner's mental and medical health needs, any request made by the prisoner related to faith-based needs, recommendations of the sentencing court, and other security concerns . . . ."). The BOP claims

---

[4] Restoring the Death Penalty and Protecting Public Safety, Exec. Order No. 14164, 90 Fed. Reg. 8,463 (Jan. 20, 2025), https://www.govinfo.gov/content/pkg/FR-2025-01-30/pdf/2025-02012.pdf.

[5] Off. of the Att'y Gen., *Memorandum for All Department of Justice Employees: Restoring a Measure of Justice to the Families of Victims of Commuted Murderers* (Feb. 5, 2025), https://www.justice.gov/ag/media/1388526/dl?inline.

considerable expertise in this process, having promulgated detailed procedures for placing incarcerated people "in the most appropriate security level institution that also meets their program needs and is consistent with the Bureau's mission to protect society." Kendrick Decl. Ex. 6 (PS 5100.08)[6] at 1. On 18 prior occasions, the BOP has exercised its statutory authority to redesignate federal death row prisoners whose death sentences have been set aside by a court or commuted by a president. *See* Declaration of David Patton (hereafter "Patton Decl.")[7] ¶¶ 4, 7. In each of these cases, the BOP followed the statutory process and placed the person in a federal facility other than ADX. *See id.* ¶ 7.

After President Biden commuted these 37 sentences, the BOP began that familiar process and was well underway when President Trump issued his EO. Indeed, when the warden at USP Terre Haute ventured out of his lane and took it upon himself—apparently in response to EO 14164—to refer all Plaintiffs to ADX, the BOP quickly ordered the warden to rescind his referrals while the BOP finished the process mandated by statute. *See* Declaration of Leane Renee (hereafter "Renee Decl.")[8] ¶¶ 26, 28; Declaration of Kelley J. Henry (hereafter "Henry Decl.")[9] ¶ 9; Declaration of Eliza Meredith (hereafter "Meredith Decl.")[10] ¶¶ 16-17. In or around February, the

---

[6] Fed. Bureau of Prisons, Program Statement 5100.08, CN-2 (Mar. 6, 2025), at Ch. 1, p. 1, at https://www.bop.gov/policy/progstat/5100_008_cn-2.pdf; *see also id.* ("In summary, the initial assignment (designation) of an inmate to a particular institution is based primarily upon: The level of security and supervision the inmate requires; the level of security and staff supervision the institution is able to provide; and[] the inmate's program needs."); *cf. id.* at Ch. 6, p. 17-Ch. 7, p. 16 (detailing the bases and procedures for transfer of a prisoner, based on disciplinary problems, medical needs, programmatic needs and other institutional issues).

[7] The Patton Declaration is attached as Exhibit 10 to the Kendrick Declaration.

[8] The Renee Declaration is attached as Exhibit 32 to the Kendrick Declaration.

[9] The Henry Declaration is attached as Exhibit 20 to the Kendrick Declaration.

[10] The Meredith Declaration is attached as Exhibit 25 to the Kendrick Declaration.

BOP completed its review and determined that most Plaintiffs should not be sent to ADX.[11] *See, e.g.*, Henry Decl. ¶ 8, Renee Decl. ¶¶ 1, 29; Meredith Decl. ¶¶ 1, 25, 35; Declaration of Peter Konrad Williams (hereafter "Williams Decl.")[12] ¶ 8.

Several plaintiffs whose serious medical and mental health needs could not be met at ADX were to be sent to prison medical facilities or to USPs specifically designed to care for such patients. *See, e.g.*, Declaration of Lindsey Layer (hereafter "Layer Decl.")[13] ¶¶ 11-13 (Plaintiff classified as Mental Health Care Level 3 would be sent to USP with secure mental health care program or medical prison, rather than ADX, since ADX does not have the resources to care for any additional people with mental illness); Bizzaro Decl. ¶¶ 19-20, 23, 34 (Plaintiff with diagnosis of intellectual disability and fetal alcohol syndrome and no disciplinary incidents for nearly eight years found by BOP doctor to be ineligible for ADX); Declaration of F. Italia Patti (hereafter "Patti Decl. (Hall)")[14] ¶¶ 1, 5, 7, 12-14 (Plaintiff with severe Crohn's Disease requiring over 200 hospital admissions or consultations over last 20 years and no disciplinary write-ups in more than 12 years was to be housed to a medical center or USP that could handle his needs); Renee Decl. ¶¶ 6, 15, 17-18, 23-24 (76-year-old Plaintiff with memory loss, cognitive decline, neurological

---

[11] The BOP quickly concluded that the great majority of Plaintiffs were not appropriate for designation to ADX, but rather should be sent to high-security penitentiaries (USPs) or Federal Medical Centers, including facilities that could provide care and treatment for those Plaintiffs with serious medical and mental health needs. While the BOP initially identified three Plaintiffs as potential candidates for referral to ADX, it later determined that all three were precluded from ADX because they suffered from serious medical and/or mental health conditions that cannot be adequately treated there. Declaration of Amelia L. Bizzaro (hereafter "Bizzaro Decl.") ¶¶ 19-20, 23, 30, 32-34; Patti Decl. (Hall) ¶¶ 12, 14; Declaration of Kelly Miller (hereafter "Miller Decl.") ¶ 44, attached as Exhibit 26 to the Kendrick Declaration.

[12] The Williams Declaration is attached as Exhibit 35 to the Kendrick Declaration.

[13] The Layer Declaration is attached as Exhibit 23 to the Kendrick Declaration.

[14] The Patti Declaration is attached as Exhibit 30 to the Kendrick Declaration.

impairments, heart disease, diabetes, and diverticulosis required Medical Care Level 3 placement and therefore could not be housed at ADX).

These determinations should have been binding, since the law gives the Attorney General and the President no role in the placement process. *See* 18 U.S.C. § 3621(b); Expert Declaration of Paul Gibson (hereafter "Gibson Decl.")[15] at 4 ("I have never known of any of these [referral] packets to have been reviewed by any entity outside of the [BOP], including by the ODAG, the Attorney General or the President."). Yet once President Trump issued his EO and Attorney General Bondi fired off her Memorandum, everything changed. Now, and for the first time, Plaintiffs[16] faced an extra-legal process. Implementing EO 14164, the Bondi Memo—as it was applied and understood by Defendants—stripped the BOP of its statutory role and inserted the Attorney General's office into the placement decision. Although the Bondi Memo includes language directing the BOP to consider "all other relevant considerations," this is empty verbiage. In purpose and effect, the Memo overrode the statutory placement process. Indeed, the Bondi Memo placed BOP officials in a "holding pattern," unable to implement their reasoned placement decisions pending the Attorney General's review. Bizzaro Decl. ¶¶ 26, 28; Meredith Decl. ¶ 28; Declaration of Robert Lee (hereafter "Lee Decl.")[17] ¶ 16.

They did not have long to wait: based on Bondi's Memo, and not otherwise permitted by 18 U.S.C. § 3621(b) or PS 5100.08, the Attorney General's Office overruled the BOP's considered judgment for each and every Plaintiff and ordered the BOP to start over, refer them all for

---

[15] The Gibson Declaration is attached as Exhibit 8 to the Kendrick Declaration.

[16] Although the President's Executive Order and the Bondi Memo were directed at all the commuted death-row prisoners, not all those affected have joined this litigation.

[17] The Lee Declaration is attached as Exhibit 24 to the Kendrick Declaration.

placement at ADX, and confirm these referrals with sham hearings—even for those whose health and safety would be imperiled at ADX by virtue of their preexisting medical and mental health conditions. *See, e.g.*, Declaration of F. Italia Patti (hereafter "Patti Decl. (Kadamovas)")[18] ¶ 8 (BOP officials were informed that President and Attorney General's office were directing Biden's capital commutation recipients to be sent to ADX); Declaration of Kimberly Newberry (hereafter "Newberry Decl.")[19] ¶¶ 48, 51 (according to BOP official, Attorney General's office not open to allowing Biden capital commutation recipient to be placed anywhere but ADX); Patti Decl. (Hall) ¶¶ 12-14 (following EO, BOP understood they were being told to send all recipients of Biden capital commutations to ADX and were helpless to designate medically precluded people for another institution); Renee Decl. ¶¶ 31, 33 (medically fragile elderly Plaintiff, who was determined by BOP to require Care Level 3, demoted to Care Level 2 and referred for ADX placement); Layer Decl. ¶¶ 17-18; Meredith Decl. ¶¶ 32-34 (according to BOP official, Attorney General's involvement in placement process meant placement decisions were not based on BOP's security assessments or prison's resources).

The BOP then relinquished its statutory role, abandoned its prior decisions, and acceded to the demands of the Attorney General. Abandoning the lawful process that would have sent the Plaintiffs to USPs or high security medical prisons, the BOP instituted kangaroo courts to confirm the decision that had already been reached by the Attorney General and Deputy Attorney General. The notices that Plaintiffs received of an imminent "hearing" uniformly checked the same boxes

---

[18] The Patti Declaration is attached as Exhibit 31 to the Kendrick Declaration.

[19] The Newberry Declaration is attached as Exhibit 28 to the Kendrick Declaration.

to warrant their referral to ADX. *See, e.g.*, Kendrick Decl. Ex. 11 (Kadamovas Hrg. Notice)[20] at 1. They were all now lumped into a "Security Threat Group" called "Death Row Inmates," even though none are under a death sentence, and none met the definition for that designation because none were shown to be part of an "inmate group[], gang[], or organization[] acting in concert to promote violence, escape, drug, or terrorist activity."[21] *See, e.g.*, Kendrick Decl. Ex. 11 (Kadamovas Hrg. Notice) at 1; Kendrick Decl. Ex. 12 (Troya Hrg. Rpt.)[22] at 4. After this faux-hearing, the Hearing Administrator found that every Plaintiff met "the same placement criteria" for placement in ADX. Declaration of Rejon Taylor (hereafter "Taylor Decl.")[23] ¶¶ 19-20. Every hearing report was thick with boilerplate language and shorn of any indication the BOP had considered the people before them as individuals, rather than part of a monstrous "Other." *Compare* Kendrick Decl. Ex. 13 (Taylor Hrg. Rpt.)[24] ("Although he was granted Executive Clemency from the President . . . , this does not negate his serious criminal convictions and his inability to safely remain at any general population setting.") *with* Kendrick Decl. Ex. 12 (Troya Hrg. Rpt.) (using identical language, here and elsewhere). Nearly all Plaintiffs received the report

---

[20] Jurijus Kadamovas – Notice of Hearing on Referral for Transfer to ADX Florence General Population.

[21] Off. of the Inspector Gen., U.S. Dep't of Just., *Audit of the Federal Bureau of Prisons' Management of the National Gang Unit* (2024), https://oig.justice.gov/sites/default/files/reports/24-115.pdf. Pursuant to Fed. R. Evid. 201(c)(2), Plaintiffs request that the Court take judicial notice of policies and other information posted on the DOJ and BOP websites. *See Arabzada v. Donis*, 725 F. Supp. 3d 1, 10 (D.D.C. 2024) ("A court may take judicial notice of information posted on official public websites of government agencies.").

[22] Daniel Troya – ADX General Population Hearing Administrator's Report.

[23] The Taylor Declaration is attached as Exhibit 33 to the Kendrick Declaration.

[24] Rejon Taylor – ADX General Population Hearing Administrator's Report.

within hours of the hearing. *See* Declaration of Gerald W. King, Jr. (hereafter "King Decl.")[25] ¶ 13; Taylor Decl. ¶ 19. Many reports falsified what Plaintiffs had said. *See* Taylor Decl. ¶ 22. The fix was in.

## II.    Because ADX is the BOP's highest security and most restrictive prison, redesignation to ADX is strictly regulated.

ADX is the most restrictive federal penitentiary in the country.[26] Established in 1994, it houses less than one quarter of one percent of all people incarcerated in federal custody.[27] These are people whom the BOP has classified as the "most violent, predatory, disruptive, and escape-prone" in federal custody. U.S. Dep't of Just., *Report and Recommendations Concerning the Use of Restrictive Housing – Final Report*, at 38 (January 2016), https://www.justice.gov/dag/file/815551/dl (hereafter "DOJ Restrictive Housing Report").

Defendants are redesignating Plaintiffs to ADX's "general population," but in this setting, the term is a misnomer. Even in general population, people at ADX are imprisoned under uniquely oppressive conditions and isolated from nearly all human contact. Gibson Decl. at 7 ("[T]he super-max concept involves total isolation. . . . It is by far the most restrictive and isolating prison in the BOP."). They live alone in a concrete and steel cell roughly the size of a parking space. *Id.* Their

---

[25] The King Declaration is attached as Exhibit 22 to the Kendrick Declaration.

[26] *See* DOJ Restrictive Housing Report at 38; *see also* Expert Declaration of Craig Haney, J.D., Ph.D. (hereafter "Haney Decl.") ¶ 14, attached as Exhibit 9 to the Kendrick Declaration.

[27]     *Restricted Housing*, Fed. Bureau of Prisons, https://www.bop.gov/about/statistics/statistics_inmate_shu.jsp (noting that ADX "is a unique facility designed to house inmates who pose the greatest risks to staff, other inmates and the public"). For reference and comparison, 3,555 prisoners are serving life sentences. *See Sentences Imposed*, Fed. Bureau of Prisons, https://www.bop.gov/about/statistics/statistics_inmate_sentences.jsp. Nearly half of those sentenced to life imprisonment between 2016 and 2021 were convicted of murder. *Life Sentences in the Federal System*, U.S. Sent'g Comm'n (2022), https://www.ussc.gov/research/research-reports/life-sentences-federal-system.

food is delivered through a slot in the door. *Id.* They eat in their cells, within arm's reach of their toilets. *Id.* They shower in their cells, so that staff need not engage in even the limited contact required to escort them to showers on the range.[28] Any religious or educational "programming" takes place in their cells, via closed circuit television. Haney Decl. ¶ 19. Group prayer, an essential tenet of some faiths, is strictly forbidden. *Id.* Natural light comes through a single, narrow slit of a window, four inches wide, designed to ensure that nothing is visible except cement and sky. *Id.* ¶ 17.

And people remain in these cells nearly all day, every day.[29] If they get a chance to exercise, they do so alone, either in a small cage that staff refer to as a "dog run" or in an empty indoor room only slightly larger than their cells.[30] No one at ADX can ever touch the hand of a loved one, DOJ Restrictive Housing Report at 40; all visits—including legal visits—are conducted "through a thick glass window[.]". Haney Decl. ¶ 22.[31] Dr. Craig Haney has researched and evaluated isolated confinement for nearly 50 years, been qualified as an expert witness in dozens of jurisdictions, and toured and inspected maximum-security prisons in at least 26 states, and the federal prison system, including ADX; he has also inspected prisons in seven foreign countries. Haney Decl. ¶¶ 8-10. He

---

[28] Transcript of Trial Testimony of BOP Attorney Chris Synsvoll at 2885-86, *United States v. Saipov*, No. 17 Cr. 722 (S.D.N.Y. Feb. 22, 2023) (hereafter "Synsvoll Saipov Tr.").

[29] *Compare* DOJ Restrictive Housing Report at 41 (describing 10.5 hours per week of out-of-cell time) *with* Haney Decl. ¶ 15 (finding time in cell between 22-24 hours per day).

[30] Haney Decl. ¶ 24 (explaining that recreation is "limited to the one or two days a week when they are allowed outdoor[s] . . . with a limited number of others confined individually, in separate outdoor cages").

[31] By design, even these non-contact visits are likely to be rare for most prisoners, as the BOP built ADX "in a remote and sparsely populated area of Colorado, a several hour drive from the Denver International Airport." Haney Decl. ¶ 14.

describes ADX as "the most socially isolating prison environment [he has] encountered anywhere in the United States or elsewhere in the world." Haney Decl. ¶ 13.

Former warden Robert Hood once described ADX as "a clean version of hell."[32] According to Warden Hood, to live in ADX is "far much worse than death."[33] As one man who spent over a decade in ADX described it, the cell "is designed to inflict physical, psychological, and spiritual isolation. You will feel the pain. You will not leave the … cell except in restraints. Within months it seems endless."[34] The damage inflicted by these conditions is well and widely known. A "robust body of legal and scientific authority recogniz[es] the devastating mental health consequences caused by long-term isolation in solitary confinement[.]" *Palakovic v. Wetzel*, 854 F.3d 209, 225 (3d Cir. 2017); Haney Decl. ¶ 33. "These include increases in the following potentially damaging symptoms and problematic behaviors: anxiety, withdrawal, hypersensitivity, ruminations, cognitive dysfunction, hallucinations, loss of control, irritability, aggression, and rage, paranoia, hopelessness, a sense of impending emotional breakdown, self-mutilation, and suicidal ideation and behavior." Haney Decl. ¶ 35.

If they are sent to ADX, the Plaintiffs may be forced to endure these conditions indefinitely. While ADX policy contemplates that the minimum time to progress through the Step-Down

---

[32] Mark Binelli, *Inside America's Toughest Federal Prison*, N.Y. Times (March 26, 2015), https://www.nytimes.com/2015/03/29/magazine/inside-americas-toughest-federal-prison.html.

[33] Ray Sanchez, *What's life like in Supermax prison?* CNN (Dec. 6, 2024), https://www.cnn.com/2015/06/25/us/dzhokhar-tsarnaev-supermax-prison/index.html.

[34] Voices from Solitary, *A Prison Where the Building Becomes the Shackles* (Nov. 27, 2013), https://solitarywatch.org/2013/11/27/voices-solitary-adx-prison-building-becomes-shackles/.

Program is over two years, *see* Kendrick Decl. Ex. 14 (FLM 5321.09)[35], the BOP acknowledges

that the process could take far longer and there is no outer time limit.[36] Indeed, as recently as 2023,

an Assistant United States Attorney represented, and a former BOP official testified, that the average time

to step down is five to six years.[37] And since Plaintiffs are being punished for their crimes of

commitment and the commutations they received, there is no reason to believe the Attorney

General's calculus will *ever* change. Plaintiffs may stay in ADX for decades, regardless of what

the BOP might urge. *See* Newberry Decl. ¶ 54. The consequences for Plaintiffs will be devastating.

By contrast, in the typical general population unit at a United States Penitentiary, people

are allowed outside their cells nearly all day.[38] They eat communally. They exercise, attend in-

person educational and vocational programming, and participate in classes with others. They work

and earn a salary. They can learn a trade. They can go to congregate worship and participate in

communal prayer. *See generally* 28 C.F.R. § 544 (setting out programming). They have in-person,

---

[35] FLM 5321.09(1)A, Institution Supplement – General Population and Step-Down Unit Operations (June 6, 2024).

[36] Further Observations of the United States of America, Inmates of the Administrative Maximum United States Prison, Case No. 13.956 (Dec. 2024) at 8, https://www.state.gov/wp-content/uploads/2024/12/Case-No.-13.956-Inmates-of-ADX-U.S.-Further-Observations.pdf.

[37] Trial Tr. (July 18, 2023) at 7, *United States v. Bowers*, 18 Cr. 292 (W.D. Pa. Aug. 24, 2023), ECF 1562; Trial Tr. (July 27, 2023) at 52, *United States v. Bowers*, 18 Cr. 292 (W.D. Pa. Aug. 1, 2023), ECF 1529.

[38] *See generally* BOP, *About Our Facilities*, https://www.bop.gov/about/facilities/federal_prisons.jsp (setting out housing in various levels of custody). Though people in administrative segregation are confined to their cells, this form of detention will "generally only last for a few weeks." *Aref v. Lynch*, 833 F.3d 242, 257 (D.C. Cir. 2016); *see also Statistics: Restricted Housing*, Bureau of Prisons, https://www.bop.gov/about/statistics/statistics_inmate_shu.jsp (overwhelming majority of people placed in segregation are there fewer than 90 days, and fewer than ½ of one percent are in restricted housing longer than a year at a time).

contact visits with loved ones. They can hug their mother and hold their child. *See* PS 5267.09.[39]
They have access to email communications.[40]

Precisely because the conditions at ADX are so exceptionally severe, the BOP has always
tightly restricted placement there. Pursuant to BOP policy, people typically "'work' their way to
the ADX through progressive acts of predatory violence or other extremely disruptive behavior,
demonstrating they cannot function in an open population institution without posing a risk to the
safety and security of the institution, staff, inmates, and the public."[41] DOJ Restrictive Housing
Report at 38. At least until the Trump EO and the Bondi Memorandum, the BOP said that it
typically reserved ADX for those who demonstrate "severe or chronic behavior patterns that
cannot be addressed in any other Bureau institution." Kendrick Decl. Ex. 6 (PS 5100.08), Ch. 7,
p. 17-18. For this reason, people are almost never sent to ADX in the first instance; "redesignation
to another high security institution should be considered first." *Id.*; Gibson Decl. at 5 (noting that
"[a] referral to ADX for inmates who have not exhibited recent violent behavior, such as the
serious assault or murder of other inmates or staff, is an abuse of the agency's discretion" because
"[t]he need for such a restrictive environment is the only legitimate penological purpose for
designating an inmate to the ADX."). In the ordinary course, placement at ADX should occur only
after a lengthy process of consideration and observation. In effect, BOP policy and protocol
"presume[] ADX is inappropriate unless conclusively shown otherwise." *Compare* Gibson Decl.
at 5 *with* Kendrick Decl. Ex. 13 (Taylor Hrg. Rpt.) (presuming, based only on commuted death-
sentence "inability to safely remain at any general population setting").

---

[39] Fed. Bureau of Prisons, Program Statement 5267.09 (Dec. 10, 2015) (hereafter "PS 5267.09"),
at 17, at https://www.bop.gov/policy/progstat/5267_09.pdf.

[40] BOP, *Stay in Touch*, https://www.bop.gov/inmates/communications.jsp (setting out email and
other methods for maintaining contact with prisoners).

The Redesignation Directive completely upends prior practice. Contrary to the BOP's considered judgment, long-settled practice, and statutory obligations, Defendants have decided to place the Plaintiffs in ADX based not on evolving considerations such as security concerns or program needs, but because their sentences were commuted. To put it plainly, the Directive replaces professional expertise with naked, retaliatory animus.

## LEGAL STANDARD

To obtain a temporary restraining order (TRO) or a preliminary injunction (PI), plaintiffs must show that: they will likely succeed on the merits; they will likely be irreparably harmed if relief were withheld; the balance of equities tilts their way; and the public interest favors injunctive relief. *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008); *see also Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014); *Am. Foreign Serv. Ass'n v. Trump*, No. 25 Civ. 352 (CJN), 2025 WL 435415, at *1 (D.D.C. Feb. 7, 2025). The standards for temporary restraining orders and preliminary injunctions are the same. *See Doe v. McHenry*, --- F. Supp. 3d ---, 2025 WL 388218, at *2 (D.D.C. Feb. 4, 2025). The factors considered when issuing a stay of agency action under the Administrative Procedures Act, 5 U.S.C. § 705, substantially overlap with the *Winter* factors for a preliminary injunction. *See*, *e.g.*, *Bauer v. DeVos*, 325 F. Supp. 3d 74, 104–07 (D.D.C. 2018).

Courts in this Circuit have traditionally used a sliding scale to apply these factors, allowing a stronger showing on some factors to compensate for a weaker showing on others. *See id.* at 105. The Court of Appeals has suggested, but not decided, that a likelihood of success on the merits may be required. *See Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011) (citing *Winter*, 555 U.S. at 20–22*)*. Under either approach, Plaintiffs are entitled to a TRO.

## ARGUMENT

I.    **Plaintiffs are likely to succeed on the merits.**

    A.    **The Redesignation Directive violates Plaintiffs' procedural due process rights.**

14

The Fifth Amendment ensures that no person "is deprived of life, liberty, or property without due process of law." U.S. Const. amend. V; *see also Aref*, 833 F.3d at 252. Applying this principle, the Supreme Court has held that incarcerated people have a "liberty interest in avoiding particular conditions of confinement" that are an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Wilkinson v. Austin*, 545 U.S. 209, 222 (2005) (cleaned up) (finding liberty interest in avoiding assignment to Ohio's supermax prison). Where there is such a liberty interest, incarcerated people must receive the "fundamental requirement[s] of due process," including "the opportunity to be heard at a meaningful time and in a meaningful manner." *Royer v. Fed. Bureau of Prisons*, 933 F. Supp. 2d 170, 188 (D.D.C. 2013) (finding liberty interest in avoiding confinement conditions—including at ADX—associated with "terrorist" designation).

Here, Plaintiffs have a liberty interest in avoiding the uniquely severe conditions at ADX. Yet, the Redesignation Directive provides the Plaintiffs with nothing more than a sham process to protect that interest.

### 1.  Plaintiffs have a liberty interest in avoiding indefinite placement at ADX.

Incarcerated people have a liberty interest in avoiding conditions of confinement that are "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). In the D.C. Circuit, the conditions must be "atypical and significant" in comparison to routinely imposed "administrative segregation." *Aref*, 833 F.3d at 254. Three factors are relevant: (1) the conditions relative to routine administrative segregation; (2) the "duration" of the confinement; and (3) the "duration relative to [the] length of administrative segregation routinely imposed on prisoners serving similar sentences." *Id.* at 255.[42]

---

[42] The *Aref* court observed that the D.C. Circuit's liberty interest test is "unique" compared to its sister circuits. 833 F.3d at 254. Some circuits use the general population as their baseline, while

First, the conditions at ADX are undeniably, and uniquely, severe. Haney Decl. ¶ 12(a) ("The conditions of confinement to which people are subjected at ADX constitute a severe, extreme form of solitary confinement" and are "more socially isolating than those at any correctional facility that I have personally toured and inspected or of which I am aware anywhere in the United States."). In *Wilkinson v. Austin*, the Supreme Court found a liberty interest in avoiding similar conditions at a state "super-max" facility "under any plausible baseline." 545 U.S. at 223. Just as in *Wilkinson*, ADX prohibits "almost all human contact." *Wilkinson*, 545 U.S. at 223-24. People incarcerated at ADX eat alone. They exercise alone. They receive "programming" through a video screen. And they spend nearly every hour of every day in a cell the size of a parking spot. DOJ Restrictive Housing Report at 10-41. The cells themselves "are more isolating than those in other prisons—even in comparison to other solitary confinement units—because they are constructed with two exterior metal doors," configured to prevent contact with other prisoners and even incidental movement in hallways. Haney Decl. ¶ 15. These conditions are more isolating than typical administrative segregation at USPs, which, unlike ADX, allow contact visits with loved ones. *See* PS 5267.09 at 12 (noting that ordinarily, people at USPs retain normal "visiting privileges while in detention or segregation status").

The next two factors—which both look to the duration of the confinement—are even more clear-cut. And duration is "a crucial element" of the liberty-interest analysis. *Aref*, 833 F.3d at 254. As a result, a liberty interest can arise even "under less-severe conditions when the deprivation is

---

other circuits are inconsistent in applying a baseline and consider additional factors such as penological justification. *See id*. at 253 & n.7 (surveying the case law and the differences between circuits). The court therefore cautioned against "relying too heavily on out-of-circuit precedent" when evaluating due process claims. *Id*. at 254. As such, cases such as *Rezaq v. Nalley*, 677 F.3d 1001 (10th Cir. 2012), which apply significantly different standards when addressing transfers to ADX, should be given no weight.

prolonged or indefinite." *Id.* at 255. Indeed, in *Aref v. Lynch*, the D.C. Circuit recognized a liberty interest in avoiding designation to BOP's Communication Management Units (CMUs), though those conditions involved "significantly less deprivation than administrative segregation." *Id.* at 257 (noting that prisoners in CMUs can access "common spaces with other CMU inmates for sixteen hours a day" and have no restrictions on exercise). Instead, the CMU's atypical "selectivity" and "duration" pushed CMU designation over the "threshold" and created a liberty interest. *Id.* at 257.

As in *Aref*, Plaintiffs' placement at ADX is "indefinite and could be permanent." *Id.* at 257. Section 3(e) of EO 14164 has no end-date. On the contrary, it orders Plaintiffs' placement in conditions "consistent with the monstrosity of their crimes"—an historical fact that Plaintiffs cannot alter. Kendrick Decl. Ex. 2 (EO 14164) § 3(e); *see Royer*, 933 F. Supp. 2d at 173 (finding liberty interest in avoiding confinement that plaintiff alleged would last "for the remainder of his prison term"); *cf. Zadvydas v. Davis*, 533 U.S. 678, 690, 699 (2001) (observing that "indefinite detention" of non-citizen would raise "a serious constitutional problem" and defining "indefinite" as without "reasonably foreseeable" end). By contrast, administrative segregation at a USP will "generally only last for a few weeks." *Aref*, 833 F.3d at 257; *see also Statistics: Restricted Housing*, BUREAU OF PRISONS, https://www.bop.gov/about/statistics/statistics_inmate_shu.jsp (of 10,669 people placed in restricted housing, over 90% were there fewer than 90 days, and only 45 people were there longer than a year). The duration of the Plaintiffs' prospective confinement at ADX is therefore both "significant" in absolute terms and "atypical" relative to "prisoners serving similar sentences." *Aref*, 833 F.3d at 254–55 (describing the third factor under the liberty interest inquiry).

To be sure, ADX has a "step-down" program for transfer out based on good behavior. But the Redesignation Directive has already substituted executive fiat for BOP procedure, and there is

17

no reason to believe this usurpation will end anytime soon. Regardless, the mere *appearance* of a potential path out does not establish that a deprivation is durationally limited. In *Aref,* although the BOP performed a "periodic review" of the plaintiffs' placement in CMUs, the D.C. Circuit emphasized that the designation was indefinite and "could be permanent." *Aref*, 833 F.3d at 248, 257. And in *Wilkinson*, the plaintiffs' "super-max" designations were subject to periodic review, but the Supreme Court still found that their confinement was "indefinite" because the ultimate length of their placement was "limited only by [their] sentence," *Wilkinson*, 545 U.S. at 214–15. So too here. Even if Plaintiffs could meaningfully participate in the step-down program, which itself remains speculative, that would not "limit[] . . . the duration" of their placement. *Aref*, 833 F.3d at 248. Indeed, as we have noted, the step-down process typically takes five to six years. *See infra* n.37.

Finally, as in *Aref*, Plaintiffs' placement at ADX is "selective[]." *Aref,* 833 F.3d at 257. By any measure, ADX houses only a "selective" group of people—less than 0.25% of all federal prisoners. While many more prisoners "could be designated" to ADX, only this "handful" of Plaintiffs were ultimately selected by President Trump—not based on their institutional conduct but rather on the fact that their death sentences were commuted. *Id.* In fact, and as we have noted, none of the 18 people who had their federal death sentences overturned or commuted previously were transferred from death row to ADX. *See* Patton Decl. ¶ 7. That, too, establishes the "atypicality" of Plaintiffs' placement.

### 2.    BOP has denied Plaintiffs a meaningful opportunity to contest their transfer.

Plaintiffs' liberty interest in avoiding transfer to ADX entitles them to due process. The Supreme Court has "declined to establish rigid rules" for the level of process due and instead has embraced the balancing test established in *Mathews v. Eldridge*, 424 U.S. 319 (1976), to evaluate

the sufficiency of particular procedures. *Wilkinson*, 545 U.S. at 224–25. This test considers (1) the private interest that will be affected; (2) the risk of erroneous deprivation and the probable value of additional procedural safeguards; and (3) the government's interest, including the fiscal or administrative burden that additional process may entail. *See id.* (citing *Mathews*, 424 U.S. at 335). At base, the "fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Royer*, 933 F. Supp. 2d at 188 (quoting *Mathews*, 424 U.S. at 333). Balancing the *Mathews* factors demonstrates that Defendants have violated this due process command by providing Plaintiffs no "meaningful" opportunity to challenge their designation to ADX. Instead, they implemented a sham process leading to a pre-determined result.

First, the Plaintiffs' private interest in avoiding prolonged confinement in ADX's uniquely isolating environment is clear: "Prolonged solitary confinement exacts a heavy psychological toll that often continues to plague an inmate's mind even after he is resocialized." *Incumaa v. Stirling*, 791 F.3d 517, 534 (4th Cir. 2015). As such, even when evaluated "within the context of the prison system and its attendant curtailment of liberties[,]" *Wilkinson*, 545 U.S. at 225, Plaintiffs' private interest in avoiding ADX is "significant," *Incumaa*, 791 F.3d at 534.

Second, the risk of erroneous deprivation is high, and "additional or alternative procedural safeguards" demonstrably lower that risk. *See Wilkinson*, 545 U.S. at 225 (citing *Mathews*, 424 U.S. at 335). As the Supreme Court has said, these safeguards are necessary to prevent an incarcerated person from being "singled out" for confinement based on an "insufficient reason." *Id.* at 226. Yet that is precisely what happened here. When the BOP conducted its initial review— following its statutorily mandated procedures and providing the Plaintiffs with a meaningful opportunity to be heard—all were assigned either to a USP or a Federal Medical Center.  Following the Bondi Memorandum, however, the BOP reached a completely different, pre-ordained outcome

dictated by Defendants Bondi and Bove—one that "single[s] out" Plaintiffs for having received a commutation. For that reason, the Court need not guess whether additional safeguards would provide any value—the initial determinations prove that they would and they did.

Indeed, when considering the utility of additional safeguards, this Court has been appropriately wary that a review not be "simply a sham[.]" *Aref v. Holder*, 774 F. Supp. 2d 147, 166 (D.D.C. 2011) (cleaned up) (holding that contentions that reviews were "illusory" and meaningless sufficiently alleged a "high risk that the procedures used by the defendants have resulted in erroneous deprivations"). Courts across the country agree; procedures for reviewing placement in solitary confinement "cannot be a sham or pretext." *E.g.*, *Toevs v. Reid*, 685 F.3d 903, 912 (10th Cir. 2012); *see also Proctor v. LeClaire*, 846 F.3d 597, 612 (2d Cir. 2017) (review may not be a "hollow formalit[y]"); *Mims v. Shapp*, 744 F.2d 946, 954 (3rd Cir. 1984) (due process bars confinement reviews that are "simply a sham"); *Kelly v. Brewer*, 525 F.2d 394, 400 (8th Cir. 1975) ("[W]here an inmate is held in segregation for a prolonged or indefinite period of time due process requires that his situation be reviewed periodically in a meaningful way[.]"); *Quintanilla v. Bryson*, 730 F. App'x 738, 744 (11th Cir. 2018) (periodic review "must be meaningful; it cannot be a sham or a pretext").

But here, following the Redesignation Directive, review became illusory. Both Plaintiffs' ADX referrals and Hearing Administrator reports used "repetitive and rote" language, relied on "boilerplate explanations," and often included "careless errors" at odds with known facts—all indicia of a sham review process. *Proctor,* 846 F.3d at 613 (citing *Sourbeer v. Robinson,* 791 F.2d 1094, 1101 (3d Cir. 1986)); *see, e.g.*, Kendrick Decl. Ex. 11 (Kadamovas Hrg. Notice); Kendrick Decl. Ex. 12 (Troya Hrg. Rpt.); Kendrick Decl. Ex. 13 (Taylor Hrg. Rpt.); *see also, e.g.*, Compl. ¶¶ 87–94. The hearing timeline also suggests that the process was pretextual: Plaintiffs' ADX

designation recommendations came only hours after their initial hearings. King Decl. ¶ 13; Taylor Decl. ¶ 19. Indeed, reviewing these facts, a BOP classification expert found that "the process BOP is following [with Plaintiffs] is inconsistent with BOP policy and practice." Gibson Decl. at 10. The unavoidable conclusion, in other words, is that individualized determinations based on the factors specified by law and BOP regulations gave way to a blanket, pre-ordained determination. *Compare* 18 U.S.C. § 3621(b) (statutory criteria for facility placement) *with* Meredith Decl. ¶ 34 (recounting Synsvoll's statement to attorneys that ADX hearings were "driven by President Trump's Executive Order and a related memorandum issued by Attorney General Bondi" and "not based on the BOP's assessment of the prisoners' security needs"). But a "[r]eview with a pre-ordained outcome is tantamount to no review at all." *Proctor*, 846 F.3d at 610.

Finally, there is no penological justification to justify the Redesignation Directive. Unlike in *Wilkinson*, for instance, where the Court assumed that "[p]rison security . . . provides the backdrop of the State's interest," 545 U.S. at 227, in this case, the BOP had already taken security considerations into account when it conducted its ordinary designation process before the Redesignation Directive. But, as we have stressed throughout, the Office of the Attorney General overrode that process and ordered the BOP to reach a different result. Consequently, Plaintiffs' subsequent ADX referrals relied on pretextual justifications divorced from individualized review. *See* Gibson Decl. at 5 (concluding that "several aspects" of Plaintiff's notice for ADX referral were "contrary to BOP practice" and an "abuse of discretion"); Haney Decl. ¶¶ 88-97 (similar, and explaining there is no sound basis to categorically conclude former death-row prisoners are dangerous when extant studies show the opposite); *see also Proctor*, 846 F.3d at 611 ("The state may not use Ad Seg as a charade in the name of prison security to mask indefinite punishment for past transgressions"). There is likewise no additional "fiscal [or] administrative burden" on the

BOP because Plaintiffs seek reinstatement of the original designations. *Wilkinson*, 545 U.S. at 224.

Plaintiffs are therefore likely to prevail on their claim that Defendants violated their rights to due process.

### B.    The Redesignation Directive violates Plaintiffs' equal protection rights.

If the Equal Protection Clause means anything, it means the government may not treat one group worse than another that is similarly situated, for no other reason than animus. *See U.S. Dep't of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973). Yet, Defendants have repeatedly broadcast their animus towards Plaintiffs, first with President Trump's Christmas message telling Plaintiffs to "GO TO HELL!", continuing with his inauguration-day executive order directing that Plaintiffs be imprisoned in "conditions consistent with the monstrosity of their crimes," following with Attorney General Bondi's characterization of the commutations as "appalling," and culminating with the Redesignation Directive, which made a mockery of the law. Defendants have violated Plaintiffs' rights to equal protection of the laws by subjecting them to disparate treatment based on this animus.

Plaintiffs are not the first people to have their death sentences set aside by a court or commuted by a President. As we have noted, at least 18 people have passed this way before, and in every case, the BOP decided that the prisoner should be transferred to a USP, *see* Patton Decl. ¶¶ 4, 7; *see also* Joint Mot. to Stay Proceedings at 2, *Kadamovas v. Dir., Fed. Bureau of Prisons*, 23 Civ. 22 (S.D. Ind. Dec. 30, 2024), ECF 147 (hereafter "Kadamovas Joint Mot."). For example, in 2024 a condemned federal prisoner resentenced to life was redesignated and transferred to USP Lee. *See* Kadamovas Joint Mot. at 2 n.2. Prior to the Redesignation Directive, *no federal death row prisoner whose death sentence had been set aside had ever been transferred from death row to ADX. See* Patton Decl. ¶ 7.

After President Biden's commutations, the BOP initiated the same statutory process for

this new group. On December 30, 2024, the BOP represented in court that "it can be reasonably expected that BOP's review" on this occasion would "lead to similar outcomes" as in the past. *Kadamovas Joint Motion* at 2. But the BOP did not reckon on the interference from the President and Attorney General. When he took office, President Trump demanded that the Plaintiffs be housed under conditions that match the "monstrosity" of the underlying crimes. Implementing this demand, the Redesignation Directive jettisoned the prior designations by the BOP and substituted a sham process with a pre-determined result. Unlike their 18 predecessors, all Plaintiffs have been subjected to a process run by the Attorney General's Office and designed to ensure they will be sent to ADX.

Under the Equal Protection Clause, the federal government must "treat similarly situated persons alike." *Women Prisoners of D.C. Dep't of Corr. v. D.C.*, 93 F.3d 910, 924 (D.C. Cir. 1996); *see also City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (the Fourteenth Amendment's equal protection clause is incorporated into the Fifth Amendment's due process guarantee). For Equal Protection purposes, Plaintiffs are similarly situated to the 18 who came before them. *See Koyce v. U.S. Bd. of Parole,* 306 F.2d 759, 762 (D.C. Cir. 1962) ("In determining whether [a prisoner] is being denied equal protection of the law, the class to which he belongs consists of the persons confined as he was confined, subject to the same conditions to which he was subject.")

Any disparate treatment between similarly situated groups must "bear some rational relationship to a legitimate [governmental] purpose.'" *Harrison v. Fed. Bureau of Prisons*, 298 F. Supp. 3d 174, 181 (D.D.C. 2018) (quoting *Brandon v. D.C. Bd. of Parole*, 734 F.2d 56, 60 (D.C. Cir. 1984)). Such a legitimate purpose is missing here.

To begin with, the government's legitimate interests were abundantly well protected by the

very statutory process the Defendants jettisoned. Section 3621 already directs the BOP to consider the demands of public safety, institutional security, the particular needs of the incarcerated person, and the resources of the facility. *Moreno*, 413 U.S. at 536–37 (the existence of provisions in current law to address the legitimate interests purportedly motivating the disparate treatment "necessarily casts considerable doubt" upon an argument that the new actions "could rationally have been intended" to accomplish the same ends). Indeed, inasmuch as the Redesignation Directive forces the trained professionals in the BOP to accede to the retaliatory impulses of political appointees, it devalues correctional expertise and detracts from sound practice. Moreover, the "unprecedented" nature of Defendants' actions – inflicting added punishment by fiat on people with commuted sentences – "is itself instructive; 'discriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision.'" *Romer v. Evans*, 517 U.S. 620, 633 (1996) (quoting *Louisville Gas & Elec. Co. v. Coleman*, 277 U.S. 32, 37–38 (1928)).

In addition, Defendants' actions bear the unmistakable and impermissible stench of animus. As the Supreme Court has instructed, "if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Moreno,* 413 U.S. at 534. Likewise, "mere negative attitudes, or fear" do not constitute legitimate governmental interests. *City of Cleburne*, 473 U.S. at 448. Here, as in *Romer*, because the President's actions "seem[] inexplicable by anything but animus toward the class it affects[, they] lack[] a rational relationship to legitimate state interests." 517 U.S. at 632.

The Redesignation Directive violates equal protection because there is no "rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller*

*v. Doe by Doe*, 509 U.S. 312, 320 (1993); *see also Reynolds v. Quiros*, 990 F.3d 286, 300-301 (2d Cir. 2021) (holding that Connecticut violated plaintiff's equal protection rights when it abolished the death penalty but transferred plaintiff to a more restrictive setting than other, similarly situated former death row prisoners for no rational reason). Plaintiffs are entitled to the designation process required by law and BOP policy, untainted by Defendants' animus.

###### C.    The Bondi Memo violates the Administrative Procedure Act.

The APA directs a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions" that are either "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2)(A), (C). The Bondi Memo violates both provisions.

###### 1.    The Bondi Memo exceeds the statutory authority granted to the Attorney General and her deputy, and is not in accordance with law.

Congress makes the law, not executive agencies. In 18 U.S.C. § 3621(b), Congress gave the BOP the exclusive authority to designate "the place of [a] prisoner's imprisonment." *Id.* ("The Bureau of Prisons shall . . ."). The statute does not give the Attorney General or her Deputy any role in the designation process, much less the power to direct the BOP to subject a discrete class of prisoners—those whose death sentences have been commuted—to a different designation process than that spelled out in the statute. One scours the United States Code in vain for language that authorizes the Attorney General or her Deputy to: override a BOP placement decision made after full consideration of the statutory factors; require the BOP to treat the prisoner's commutation as a relevant factor in a prisoner's housing; compel the BOP to make non-binding placement recommendations to the Deputy Attorney General; or force the BOP to place every Plaintiff into ADX, against the agency's considered judgment. But through the Bondi Memo, the Attorney General has unlawfully inserted herself and her Deputy into BOP's designation process, setting in

motion a de facto policy requiring the BOP to ignore the statutory criteria governing placements decisions and categorically condemn Plaintiffs to ADX.

When an agency has engaged in this sort of "'shenanigans' by exceeding its statutory bounds," *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 371 (2018), its action must be "set aside" as "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." *Id.*; 5 U.S.C. § 706(2)(A), (C); *see also*, *e.g.*, *Gomez v. Trump*, 485 F. Supp. 3d 145, 194 (D.D.C. 2020) (implementing Presidential Proclamations, the State Department likely violated the APA when it suspended the statutory process to issue visas; "[b]ecause Defendants have not identified any statutory authority that would permit the suspension of this ordinary process, the court concludes that Plaintiffs are likely to succeed on the merits of their claim that Defendants' No-Visa Policy is 'not in accordance with law' and 'in excess of statutory . . . authority'") (quoting 5 U.S.C. § 706 (2)(A), (C)); *Tate v. Pompeo*, 513 F. Supp. 3d 132, 146 (D.D.C. 2021) (same); *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 975-81, 988 (9th Cir. 2020) (preliminary injunction appropriate because Rule issued by Departments of Justice and Homeland Security requiring asylum seekers to first seek asylum in Mexico was "inconsistent with" Immigration and Naturalization Act and therefore "in excess of statutory authority" and "not in accordance with law").

> ### 2. The Bondi Memo is arbitrary and capricious because the Attorney General and her Deputy have abandoned years of settled practice without explanation.

Even if the Attorney General or her Deputy had authority to direct BOP to ignore the statutorily required process, the policy contrived by the Attorney General and her Deputy to send Plaintiffs to ADX must also be set aside because it is arbitrary and capricious. The D.C. Circuit has long held that "an agency acts arbitrarily and capriciously when it abruptly departs from a position it previously held without satisfactorily explaining its reason for doing so." *Wisconsin*

*Valley Improvement v. F.E.R.C.*, 236 F.3d 738, 748 (D.C. Cir. 2001). "Indeed, where an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious." *Id.* (quoting *ANR Pipeline Co. v. F.E.R.C.,* 71 F.3d 897, 901 (D.C. Cir. 1995)); *see also Am. Bar Ass'n v. United States Dep't of Educ.,* 370 F. Supp. 3d 1, 34 n.14 (D.D.C. 2019) ("Even if the Department had not yet settled on an interpretation of the term 'public education services' before it adopted the . . . standard in 2014, its application of that standard from that point forward would still be arbitrary and capricious for lack of any reasoned explanation."); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("Agencies are free to change their existing policies," but they must "provide a reasoned explanation for the change" and an "unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice") (cleaned up)).

Here, the Bondi Memo does not provide an explanation for abandoning settled practice and hijacking BOP's designation process. In the half-century of the modern death penalty, the Attorney General has never before commandeered the statutory designation process nor acted against former death row inmates simply because their sentences were commuted. And the error is particularly egregious in this case, because the Attorney General and her Deputy did not merely change agency practice; they changed horses midstream. After President Biden commuted Plaintiffs' sentences, the BOP applied the factors specified by Congress and undertook the reasoned analysis required by law and BOP regulations. It was only afterwards that the Attorney General and her Deputy intervened and adopted an entirely new, extra-statutory policy of commanding that the BOP *recommend* placements to the DAG. Newberry Decl. ¶¶ 37, 47 (noting that after the Executive Order and Bondi Memorandum, BOP "now needed to present [its] designation plan to someone in the Office of the Deputy Attorney General ('ODAG')" who could "exercise veto power"); Lee

Decl. ¶ 16 ("[F]ollowing President Trump's Executive Order, the BOP would be required to submit their plans for placement to the Deputy Attorney General . . . for discussion and approval.").

The Attorney General and her Deputy continued on this unprecedented course when they rejected every recommendation and ordered the BOP to conduct sham hearings that would culminate in all Plaintiffs being transferred to ADX. Meredith Decl. ¶¶ 32-33 (noting that "the BOP had presented its spreadsheet of recommendations . . . to the ODAG, but the proposal had been rejected" and that, "because of the ODAG's direct involvement in the process, we should assume the outcome of these procedures would be for all of the men . . .to be transferred to ADX, regardless of their actual security needs"); Newberry Decl. ¶ 48 ("[T]he Attorney General's Office was not open to transfers to other institutions outside of ADX.").

Because nothing in the administrative record even attempts to account for these multiple departures from years of settled practice, the actions of the Attorney General were arbitrary and capricious. *See, e.g., Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 927 (D.C. Cir. 2017) ("While the agency tries to whistle past that factual graveyard, the established pattern of agency conduct and formalized positions cannot be evaded. The Service's failure even to acknowledge its past practice and formal policies . . . , let alone to explain its reversal of course . . . , was arbitrary and capricious.")

### 3.    The Plaintiffs have been injured by the Bondi Memo.

Section 702 of the APA grants standing to those "adversely affected or aggrieved by agency action." 5 U.S.C. § 702; *see Dir., Off. of Workers' Comp. Programs, Dep't of Lab. v. Newport News Shipbuilding & Dry Dock Co*., 514 U.S. 122, 126 (1995) ("The phrase 'person adversely affected or aggrieved' is a term of art used in many statutes to designate those who have standing to challenge or appeal an agency decision . . . ."). This requires a showing that Plaintiffs have been

"injured in fact by agency action." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,* 603 U.S. 799, 807-08 (2024) (quoting *Newport News*, 514 U.S. at 127).

Plaintiffs are injured in fact by the Bondi Memo. As we have repeatedly described, the Plaintiffs are about to be cast into ADX only because the Attorney General and her Deputy countermanded the lawful decisions made by the BOP and replaced them with a sham process that will condemn Plaintiffs to potentially indefinite incarceration under the harshest conditions of confinement. The injury for each Plaintiff, therefore, is directly traceable to the Bondi Memo and the unlawful policy it set in motion.

Defendants may argue that because the Plaintiffs have not yet been sent to ADX, they have suffered no injury. But this misunderstands the nature of the wrong, which is the Attorney General's unlawful interference with BOP's statutorily required redesignation process. As the Supreme Court explained years ago:

> The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy. Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573 n.7 (1992). The fact that the Plaintiffs have not yet been sent to ADX is thus irrelevant to the fact that the Attorney General and her Deputy have exceeded the power granted to them by Congress to create a hitherto unknown, extralegal process.

### 4. Section 3625 does not bar APA review.

The statutory bar on judicial review of BOP designation decisions contained in 18 U.S.C. § 3625 does not apply here, since Plaintiffs do not challenge a particular designation decision. Indeed, the relief they seek is that the lawful designation be reinstated. Their challenge is to the

perversion of the lawful process by the Attorney General and her Deputy. As a consequence, they challenge the formal and informal "rules that [have been] used to decide" their placement, which is not barred by § 3625. *See*, *e.g.*, *Richmond v. Scibana*, 387 F.3d 602, 605 (7th Cir. 2004) (finding that § 3625 did not bar a challenge to a placement policy). When the challenge is to a rule or policy that compels or contorts the placement decision, courts have repeatedly held that § 3625 does not bar judicial review under the APA. *See id.*; *Martin v. Gerlinski*, 133 F.3d 1076, 1079 (8th Cir. 1998) ("[I]t is apparent that § 3625 precludes judicial review of agency adjudicative decisions but not of rulemaking decisions"); *Jasperson v. Fed. Bureau of Prisons*, 460 F. Supp. 2d 76, 84 (D.D.C. 2006) (concluding judicial review was not barred by § 3625 because "Jasperson challenges the rulemaking leading to the BOP policy that informed his confinement determination, rather than challenging the determination itself").

In *Love v. Bureau of Prisons*, for instance, two plaintiffs challenged BOP's method of scoring criminal-history points for D.C. convictions, and both alleged they received worse facility placements because of BOP's scoring practices. No. 24-cv-2571, 2025 WL 105845, at *4 (D.D.C. Jan. 15, 2025). The defendants argued that APA review of "a component of the Bureau's security-level scoring process" for placement determinations would thwart § 3625's purpose, *id. at* *12, yet the court found that § 3625 posed no bar to that challenge because the plaintiffs sought review of "a broad policy that informs the designation decision." *Id.* at *11. So too here: Plaintiffs seek review of the "broad policy" reflected in the Redesignation Directive and culminating in their facility designation.

### D.   The Redesignation Directive violates Plaintiffs' right to be free from cruel and unusual punishments.

The Supreme Court has long held that the Eighth Amendment forbids the "unnecessary and wanton infliction of pain"—including punishment that is "totally without penological

justification." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (internal quotation marks omitted); *see also Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (describing "settled rule that the unnecessary and wanton infliction of pain [] constitutes cruel and unusual punishment forbidden by the Eighth Amendment" (internal quotation marks omitted)).

### 1. The Eighth Amendment prohibits the gratuitous infliction of pain and suffering.

The solitary confinement inflicted at ADX is objectively painful and harmful. Precedent going back to 1890 acknowledges the destructive effects of solitary confinement. *See In re Medley*, 134 U.S. 160, 168 (1890) ("A considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community."); *Davis v. Ayala*, 576 U.S. 257, 289 (2015) (Kennedy, J., concurring) ("Years on end of near-total isolation exact a terrible price."); *Williams v. Sec'y, Penn. Dep't of Corrs.*, 848 F.3d 549, 566–69 (3d Cir. 2017) ("[T]his experience is psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at risk of long term . . . damage.") (internal quotation marks and citation omitted), *cert. denied sub nom. Walker v. Farnan*, 583 U.S. 932 (2017); Haney Decl. ¶¶ 33-46 (setting out multiple studies and bases for the conclusion that time in isolation "can and routinely does have extremely damaging psychological and physical effects—and, in the worst case scenarios, can lead to death—for persons exposed to it").

Plaintiffs' claims, moreover, center not on the generic and temporally-limited conditions of solitary confinement, but on the particularly oppressive conditions at ADX, imposed indefinitely. The institution is specifically designed to cut off those imprisoned from human

contact. As set out in the facts, people confined in ADX do everything alone, without touching another human being. In their tiny cells, they eat alone and receive "programming" through the television, alone. In rooms little bigger than their cells, they exercise alone. Their cells contain showers so that corrections officers will not have to escort them. BOP officials know ADX confinement is painful and harmful, and for that reason make it the last resort. Gibson Decl. at 5; *cf.* Haney Decl. ¶¶ 62-74 (documenting professional scientific, mental health, legal, and correctional organizations finding solitary confinement should be used "only as an absolute last resort and only for the shortest possible time (not to exceed 15 days)"). Because of ADX's excruciating and damaging conditions, BOP has a policy of excluding people with significant mental illness from placement there. Kendrick Decl. Ex. 6 (PS 5100.08), Ch. 7, p. 18. Finally, the indefinite nature of ADX confinement exacerbates the already considerable pain entailed. *See Hutto v. Finney*, 437 U.S. 678, 686 (1978) (holding "the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards"). In sum, this indefinite, painful punishment, inflicted without justification, by Plaintiffs' conduct or otherwise, exemplifies the objective harm that is the central concern of the Eighth Amendment.

Just as straightforward, "if a prison official lacks a legitimate penological justification for subjecting an inmate to a condition of confinement that poses a substantial risk of serious harm—like prolonged solitary confinement, . . . then the official is presumptively acting with deliberate indifference to that risk." *Porter v. Clarke*, 923 F.3d 348, 362 (4th Cir. 2019); *Thomas v. Bryant*, 614 F.3d 1288, 1311 (11th Cir. 2010) (same for use of chemical agents without penological justification); *Foster v. Runnels*, 554 F.3d 807, 814 (9th Cir. 2009) (same for "sustained deprivation of food . . . without any penological purpose"). Defendants can point to no legitimate penological justification for their conduct here. As we have stressed, the BOP considered the

government's legitimate penological purposes in the very process the Defendants countermanded. Defendants have created a Redesignation Directive applicable only to Plaintiffs, targeting them for mistreatment solely because their sentences were commuted, which advances no rational penological purposes. Gibson Decl. at 5-6; Haney Decl. ¶¶ 88-97.

This rule is as simple as it is obvious. While prisons need not be comfortable, *Chapman*, 452 U.S. at 349, inflicting pain for its own sake—that is, without penological justification—is cruel and unusual. The Court's decision in *Hope v. Pelzer*, 536 U.S. 730, 746 (2002) exemplifies the principle. There, prison officials chained an Alabama prisoner to a hitching post, for hours and without water or bathroom access, for refusing to work. *Id.* at 738. The Court emphasized that "[a]ny safety concerns had long since abated by the time petitioner was handcuffed to the hitching post because [he] had already been subdued, handcuffed, placed in leg irons, and transported back to the prison" and stressed the "clear lack of an emergency situation[.]" *Id.* In finding an "obvious" Eighth Amendment violation, and "deliberate indifference" to the prisoner's health and safety, the Court emphasized that the prison officials had acted "'totally without penological justification.'" *Hope*, 536 U.S. at 737–38 (quoting *Chapman*, 452 U.S. at 346).

In short, the pain Defendants seek to inflict through indefinite confinement of Plaintiffs at ADX constitutes the unnecessary and wanton infliction of pain, without penological justification, in violation of the Eighth Amendment.

### 2. Imposition of the Redesignation Directive would also contravene the Eighth Amendment's original meaning and intent.

Defendants' attempt to impose these harsh and destructive conditions to make a political statement equally runs headlong into the Eighth Amendment's original meaning. As the Supreme Court explained in finding the Eighth Amendment's Excessive Fines Clause applicable to the States, the framers had front of mind the abuses of the 17th century Stuarts when they adopted the

Eighth Amendment's protections, including the Stuarts' use of the criminal legal system to "harass their political foes." *Timbs v. Indiana*, 586 U.S. 146, 152 (2019). In unanimously holding these rights to be fundamental for the purposes of the incorporation doctrine, the Court acknowledged the Amendment's role in protecting against the Government deploying fines and other punishments "to retaliate against or chill the speech of political enemies." *Id.* at 153-54. In keeping with this history, the Court has also understood the Eighth Amendment's design to prevent the use of the prosecutorial power for "partisan" or "improper" ends. *Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 266–68 (1989) (internal quotation marks omitted). The framers designed the Eighth Amendment to leave the Star Chamber behind, but the current Administration looks to resuscitate the abuses of a bygone era. *See* John F. Stinneford, *Is Solitary Confinement a Punishment?*, 115 Nw. U. L. Rev. 9, 25 (2020) (identifying abuses of the Court of Star Chambers as including undertaking "to punish where no law doth warrant, and to make decrees for things having no such authority, and to inflict heavier punishments than by any law is warranted") (internal quotation marks omitted). Indeed, Justice Story explained that the Eighth Amendment was "adopted as an admonition to all departments of the national government, to warn them against such violent proceedings as had taken place in England in the arbitrary reigns of some of the Stuarts." 2 J. Story, Commentaries on the Constitution of the United States 624 (T. Cooley 4th ed. 1873) (cited in *Browning-Ferris*, 492 U.S. at 267 n.9).

Just as the government may not impose restrictive conditions of confinement on incarcerated people based on their political beliefs, *United States v. Whitehorn*, 710 F. Supp. 803, 815 (D.D.C.), *rev'd on other grounds sub nom. United States v. Rosenberg*, 888 F.2d 1406 (D.C. Cir. 1989), so too must Defendants be barred from imposing harsher conditions on Plaintiffs based on the President's broadcasted animus. What is true for the Equal Protection Clause is no less true

for the Cruel and Unusual Punishments Clause: "a bare . . . desire to harm a politically unpopular group cannot" justify additional, extralegal punishment with no penological purpose. *Moreno*, 413 U.S. at 534.

Considering the original meaning of the Eighth Amendment, together with the original purpose of the President's pardon and commutation power to temper the severity of punishment, it is clear Defendants' conduct would have been as much condemned at the Founding as it should be today. *See* THE FEDERALIST NO. 74 (Alexander Hamilton) (justifying the pardon power because without it "justice would wear a countenance too sanguinary and cruel").

E.    **The Redesignation Directive violates Plaintiffs' rights under Article II, § 2, cl. 1.**

Article II of the Constitution provides the President with the "Power to grant Reprieves and Pardons for Offences against the United States, except in Cases of Impeachment." U.S. Const. art. II, § 2, cl. 1. This "broad power" gives the President "plenary authority" to commute criminal sentences. *Schick v. Reed*, 419 U.S. 256, 260, 266 (1974). Limitations on the Article II clemency power, "if any, must be found in the Constitution itself." *Id*. at 267.

The Pardon Clause empowers a President to lessen, not increase, punishment. As the Supreme Court has opined, "of course, the President may not aggravate punishment," *Schick*, 419 U.S. at 267, because the Constitution only authorizes "an executive action that mitigates or sets aside punishment for a crime." *Nixon v. United States*, 506 U.S. 224, 232 (1993) (cleaned up). President Trump violates these Constitutional principles by attempting to transform this instrument of lenity into one of brutality. EO 14164 is an improper attempt to fetter President Biden's grant of clemency by ensuring that all recipients would be punished with oppressive conditions of confinement. As such, the EO unconstitutionally interferes with and abridges President Biden's exercise of his Article II clemency powers.

35

1.    **The broad, exclusive, and final nature of the Article II clemency power protects it from any actions that attempt to undermine its exercise.**

Attempts to infringe upon the President's constitutional prerogative to pardon or commute sentences have been rare. The dearth of such cases demonstrates that the exercise of the Article II clemency power is universally regarded as final and that, as "the draftsmen of Art. II, [§] 2" recognized, the "'prerogative' of the President . . . ought not be 'fettered or embarrassed.'" *Schick*, 419 U.S. at 263 (quoting, respectively, James Madison's Journal for Aug. 25, 178, and Federalist No. 74).

The few cases that exist confirm this Constitutional principle. In *Ex parte Garland*, 71 U.S. (4 Wall.) 333 (1866), the Supreme Court considered a statute that effectively disbarred ex-Confederates by requiring attorneys, as a condition for admission to any federal bar, to swear they had not exercised the functions of any office of an authority hostile to the United States. 71 U.S. at 376. Despite having received a full pardon, the petitioner, Garland, could not give the oath because he had served in a Confederate legislature during the Civil War. The Court in *Garland* held that the pardon relieved "the petitioner from all penalties and disabilities attached to the offence of treason, committed by his participation in the Rebellion." *Id*. at 381. "So far as that offence is concerned, he is thus placed beyond the reach of punishment of any kind." *Id*. Consequently, depriving Garland of his right to practice law—even by the indirect means of imposing an oath requirement—violated the Pardon Clause:

> [T]o exclude him, by reason of that offence, from continuing in the enjoyment of a previously acquired right, is to enforce a punishment for that offence notwithstanding the pardon. If such exclusion can be effected by the exaction of an expurgatory oath covering the offence, the pardon may be avoided, and that accomplished indirectly which cannot be reached by direct legislation. It is not within the constitutional power of Congress thus to inflict punishment beyond the reach of executive clemency.

*Id*. As the Court observed, the attempt to "limit the effect of [Garland's] pardon" was improper

because "[t]he benign prerogative of mercy reposed in him cannot be fettered by any legislative restrictions." *Id*. at 380.

In *United States v. Klein*, 80 U.S. 128 (1871), the United States was sued by claimants for the proceeds of property seized by the federal government during the Civil War. *Id.* at 132. The governing statute contained a loyalty requirement, under which the claimant had to prove that he had not "given any aid or comfort" to the Confederacy. *Id*. at 131. The Supreme Court had previously held that receipt of a Presidential pardon for wartime activities satisfied the loyalty requirement. *Id*. at 132-33. Congress then enacted a proviso that required courts to treat receipt of a Presidential pardon as conclusive proof of disloyalty rather than loyalty. *Id*. at 133-34. The *Klein* court held the proviso to be an infringement on the President's pardon power. Although the proviso did not impose direct restrictions on the President's power to pardon, the Court held that the Congress could not in any manner limit the full legal effect of the President's power. *Id.* at 147-48. Thus, the proviso was unconstitutional because it "impair[ed] the effect of a pardon, and thus infring[ed] the constitutional power of the Executive," to whom the Constitution "intrust[s]" the pardon power "alone." *Id.* at 147. "[I]t is clear," the Court explained, "that the legislature cannot change the effect of such a pardon any more than the executive can change a law." *Id*. at 148. As an attempt to do exactly that, the law impermissibly "impair[ed] the executive authority." *Id*.

Summing up this line of cases, the *Schick* court observed that the clemency power of the President "flows from the Constitution alone, not from any legislative enactments, and that it cannot be modified, abridged, or diminished by the Congress." 419 U.S. at 266.[43] Although the Court's admonition was aimed at the legislative branch, the jurisprudence establishes a broader

---

[43] *See also Ex parte Grossman*, 267 U.S. 87, 120 (1925) (Article II clemency power not subject to "modification or regulation by Congress."); *The Laura*, 114 U.S. 411, 414 (1885) (clemency power "cannot be interrupted, abridged, or limited by any legislative enactment").

point: The Article II clemency power is an expansive Executive prerogative that cannot be abridged by subsequent government action. Any suggestion to the contrary would render the Article II power a nullity.[44]

### 2. Because EO 14164 interferes with and abridges President Biden's exercise of his Article II power, it should be declared unconstitutional.

President Biden's grant of clemency contained no conditions or qualifications; it simply "commute[d] the sentences of death imposed as to each . . . [of the] named persons to sentences of life imprisonment without the possibility of parole." Kendrick Decl. Ex. 1 (Clemency Grant). Under applicable law and BOP policy, the commutation removes the named persons from the federal death row and triggers a redesignation by the BOP, pursuant to its exclusive authority under 18 U.S.C. § 3621(b).

EO 14164, however, unconstitutionally interferes with the effect of President Biden's commutation. It guarantees that the commutation recipients will be subject to boundless oversight by the Attorney General, and for the express purpose of ensuring that they be treated differently— and more punitively—than other life-sentenced prisoners convicted of the same crimes. That is plainly an attempt to diminish and impair the effect of President Biden's exercise of his clemency

---

[44] *Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021), is not to the contrary. There, the D.C. Circuit considered whether President Biden could waive then-former President Trump's invocation of the Article II executive privilege to withhold certain documents from a Congressional committee investigating the events of January 6th. In ruling against Trump, the Court observed that the privilege "resides with the sitting President," and that "the incumbent President is 'in the best position to assess the present and future needs of the Executive Branch.'" 20 F.4th at 26-27 (quoting *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977) (cleaned up). But the executive privilege is "qualified" and "not 'absolute,'" *id.* at 26 (quoting *United States v. Nixon*, 418 U.S. 683, 707 (1974)), while the pardon power is "broad" and "plenary,." *Schick*, 419 U.S. at 266. Moreover, the pardon power is complete as soon as the President acts. *Cf. Biddle v. Perovich*, 274 U.S. 480, 486-87 (1927) (President's commutation effective even without consent and against the will of recipient). Accordingly, this is not a situation like *Thompson* where a court must weigh the current President's Article II interests against the former President's Article II interests—here, the current President has no Article II interest in the former President's exercise of clemency.

powers, and thus violates Article II.

The EO need not directly restrict the grant of clemency to run afoul of the Constitution; it is enough that it indirectly diminishes the effect of President Biden's actions. *See Garland*, 71 U.S. at 381 (recipient of pardons prohibited from practicing law in federal court); *Klein*, 80 U.S. at 147-48 (recipient of pardons precluded from the rightful return of property or its proceeds).

Likewise, although EO 14164 did not directly restrict the President's commutation power, it diminished the effect of those commutations because it imposes an additional punishment on plaintiffs *solely because of President Biden's exercise of his commutation power.* By virtue of having their death sentences commuted by President Biden, the Plaintiffs here were effectively precluded from serving their newly-imposed life sentences in a typical penitentiary, and instead were targeted for indefinitely harsh conditions of confinement at the most notorious federal prison in the country. As with *Garland* and *Klein*, this attempt to limit the effect of President Biden's commutation order violates Article II. Consequently, these factors strongly support the likelihood of success on the merits of Plaintiffs' claim that EO 141464—as well as any actions to implement the EO by the Attorney General or BOP—are unconstitutional.

## II.    The Redesignation Directive will cause Plaintiffs irreparable harm.

Plaintiffs establish irreparable harm when they demonstrate an injury "both certain and great[,] actual and not theoretical[,]" and so imminent "that there is a 'clear and present' need for equitable relief." *John Doe Co. v. Consumer Fin. Prot. Bureau*, 235 F. Supp. 3d 194, 202 (D.D.C. 2017) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). A showing of *likely* future harm can qualify as irreparable. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 540 F. Supp. 3d 45, 55 (D.D.C. 2021) (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 162 (2010); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). Loss of constitutional freedoms "unquestionably constitutes irreparable injury."

*Goings v. Ct. Servs. & Offender Supervision Agency for D.C.*, 786 F. Supp. 2d 48, 78 (D.D.C. 2011) (quoting *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009)).

For example, in *Jasperson*, the BOP adopted a categorical rule that contravened "a clear statutory directive to make an individualized confinement determination." 460 F. Supp. 2d at 90. This Court held that the Bureau's decision not to make an individualized assessment would cause irreparable harm because it deprived Jasperson of a statutory right that would have considered both his individual circumstances and the prospect of more favorable conditions of confinement. *Id*. at 90-91; *accord Ashkenazi v. Att'y Gen. of U.S.*, 246 F. Supp. 2d 1, 9-10 (D.D.C. 2003) (plaintiff irreparably harmed by BOP's "inability to exercise its discretion and place him in the facility it believes is most appropriate"), *vacated as moot*, 346 F.3d 191 (D.C. Cir. 2003).

Likewise here, the Redesignation Directive required the BOP to scrap its individualized determinations, despite a "clear statutory directive" to undertake them. In place of this assessment, the Directive substituted a blanket designation sending all the Plaintiffs to ADX for the indefinite future. In the process, the Directive deprived the Plaintiffs of the array of constitutional rights detailed above. It will, unless this Court orders otherwise, irreparably deprive each Plaintiff of the opportunity to show why he should be housed under less onerous conditions that are rationally tailored to individualized security concerns, programmatic needs, and other individual factors. Just as in *Jasperson* and *Ashkenazi*, therefore, the Directive will cause Plaintiffs irreparable harm.

### III. The balance of equities and public interest weigh heavily in Plaintiffs' favor.

In cases against the government, courts can consider the balance of equities and the public interest together. *See Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). Where the government's actions violate the Constitution and subject plaintiffs to irreparable harm, both the equities and the public interest weigh in plaintiffs' favor. "It is always in the public interest to prevent the violation of a party's constitutional rights." *Simms v. District of Columbia*, 872 F.

Supp. 2d 90, 105 (D.D.C. 2012) (internal quotation marks omitted); *see also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (same) (internal quotation marks omitted).

As described in detail in this Memorandum, the Redesignation Directive has deprived Plaintiffs of their rights under the Due Process Clause, the Equal Protection Clause, the Cruel and Unusual Punishments Clause, the Pardon Clause, and the APA. It deprives Plaintiffs of a meaningful opportunity to show why they should not be condemned to a life bereft of human contact, in a cell the size of a parking spot, where they will eat alone and see nothing out the window but a strip of sky. It has stripped the BOP of the power to consider and give effect to any such reasons. It will place them at risk of suffering the physical and mental breakdowns that months and years of solitude produce. And it will do all this for no legitimate penological purpose, but only to give expression to vindictive animus. The equities and public interest align on Plaintiffs' side, with no legitimate interest at all on the Defendants' side. This factor, like the others this Court must consider, weighs heavily in favor of a TRO.[45]

---

[45] For several reasons, the Court should exercise its discretion and waive a security bond, as authorized by Federal Rule of Civil Procedure 65 (c). *See, e.g., Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n,* 636 F.2d 755, 759 (D.C. Cir. 1980) (district courts have "power not only to set the amount of security but to dispense with any security requirement whatsoever"); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget,* ___F. Supp. 3d ___, No. CV 25-239, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) (exercising discretion to set no bond). First, the government would suffer no financial harm as a result of the requested injunction, which would merely prohibit it from transferring Plaintiffs to ADX during the pendency of this case. *See Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 169 (D.D.C. 1971); *see also Bailey v. Fed. Bureau of Prisons*, No. CV 24-1219, 2024 WL 3219207, at *13 n. 5 (D.D.C. June 28, 2024) (setting no bond because of the "lack of financial harm that will be inflicted on the government"). Second, none of the Plaintiffs have means to post bond; they were found to be indigent in their criminal proceedings, have remained incarcerated at least since they were convicted, and continue to be represented in those proceedings by court-appointed counsel. *Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 176-77 (D.D.C. 2021), *aff'd in part, rev'd in part on other grounds*, 27 F.4th 718 (D.C. Cir. 2022) (setting no bond where plaintiffs were families fleeing persecution without means to post bond). Third, Plaintiffs seek to vindicate important constitutional rights, as described in detail above. *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, --- F. Supp. 3d ---, 2025 WL 573764, at *30 (D. Md. Feb. 21, 2025) (collecting cases that waive security bond "where a fundamental

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant the Motion for a Temporary Restraining Order, restore the *status quo ante* by enjoining the Defendants from implementing the Redesignation Directive in whole or in part, and direct the Defendants to enforce the placement designations reached by the BOP prior to the Bondi Memorandum. The Court should also retain jurisdiction of the matter to ensure that the Redesignation Directive is not applied to the Plaintiffs in the future, and waive a security bond under Rule 65(c). A proposed Order is attached.

Dated: April 16, 2025
      Washington, DC

Respectfully submitted,

*/s/ Maria V. Morris*

| | |
|---|---|
| Brian Stull, N.C. 36002* | David C. Fathi, Wash. 24893** |
| Claudia Van Wyk, Penn. 95130* | Maria V. Morris, D.C. 1697904 |
| **ACLU FOUNDATION** | Jennifer Wedekind, D.C. 1012362 |
| 201 W. Main St., Ste. 402 | **ACLU FOUNDATION** |
| Durham, NC 27701 | 915 15th Street NW |
| Tel: (919) 682-5659 | Washington, DC 20005 |
| bstull@aclu.org | Tel: (202) 393-4930 |
| cvanwyk@aclu.org | dfathi@aclu.org |
| | mmorris@aclu.org |
| | jwedekind@aclu.org |
| | |
| Corene T. Kendrick, Cal. 226642* | Sara Norman, Cal. 189536* |
| **ACLU FOUNDATION** | **LAW OFFICES OF SARA NORMAN** |
| 425 California St., Ste. 700 | P.O. Box 170462 |
| San Francisco, CA 94104 | San Francisco, CA 94117 |
| Tel: (202) 393-4930 | Tel: (415) 236-3763 |
| ckendrick@aclu.org | sara@saranormanlaw.com |

---

constitutional right is at stake").

Laura Rovner, Colo. 35592*
Nicole Godfrey, Colo. 41546***
Miriam Kerler, Colo. 56575***
**STUDENT LAW OFFICE**
**UNIVERSITY OF DENVER**
**STURM COLLEGE OF LAW**
2255 E. Evans Ave., Ste. 335
Denver, CO 80210
Tel: (303) 871-6140
laura.rovner@du.edu
nicole.godfrey@du.edu
miriam.kerler@du.edu

Joseph Margulies, Ill. 6198353
(Admitted to D.D.C. as pro bono counsel)
**CORNELL UNIVERSITY**
Professor of the Practice of Government
216 White Hall
Ithaca, NY 14850
Tel: (607) 255-6477
jm347@cornell.edu

David Patton*
Ian Robertson*
Krysta Kilinski*
**HECKER FINK LLP**
350 Fifth Ave, 63rd Floor
New York, NY 10118
Tel: (212) 763-0883
dpatton@heckerfink.com
irobertson@heckerfink.com
kkilinski@heckerfink.com

C.J. Sandley, Ala. 5317-S48R*
Kayla Vinson, Ala. 3664-S48Q*
D. Korbin Felder, Miss. 106643*
**CENTER FOR CONSTITUTIONAL**
**RIGHTS**
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6443
csandley@ccrjustice.org
kvinson@ccrjustice.org
kfelder@ccrjustice.org

Carmen Iguina González
**HECKER FINK LLP**
1050 K Street NW, Suite 1040
Washington, DC 20001
Tel: (202) 742-2661
ciguinagonzalez@heckerfink.com

*Attorneys for Plaintiffs*
*\* Pro hac vice application forthcoming*
*\*\* Not admitted in D.C.; practice limited to*
*federal courts. Pro hac vice application*
*forthcoming.*

*\*\*\* Application for admission to District of*
*D.C. accepted, awaiting May 5, 2025*
*admission ceremony*