# EXHIBIT 8

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

REJON TAYLOR, *et al.*,

           *Plaintiffs,*

    v.

DONALD J. TRUMP, *et al.*, in their official capacities,

           *Defendants.*

Case No. _____

**EXPERT AFFIDAVIT OF PAUL GIBSON**



Paul Gibson, Chief Operation Officer
Paul@bopera.org
WWW.bopera.org
Cell: 570-504-6586
Business: 212-461-2252

## AFFIDAVIT OF PAUL GIBSON

I, Paul Gibson, hereby declare under penalty of perjury that the following is true and correct.

## STATEMENT OF EXPERTISE

I am the founder of Beyond the Sentence, LLC (a Prison Consulting firm) and am currently working with My Federal Prison Consultants (MFPC) and The Prison Education and Reform Alliance (PERA), which I joined shortly after retiring from the Federal Bureau of Prisons (BOP). Since my retirement from the Bureau, I have provided consulting, training and expert reviews of federal prison issues. I previously worked directly with offenders for over 34 years.

I was previously employed by the BOP for almost 32 years working in classification, treatment, and correctional programs prior to moving into a correctional management capacity before retiring in 2022. I am a member of the National Association of Criminal Defense Lawyers (NACDL).

During my career with the Bureau, I worked at two different medium security facilities and two different U.S. Penitentiaries. When not directly involved in inmate classification issues (a term used to identify the programming and security needs of an incarcerated adult) I oversaw staff who were directly involved in all case management and classification issues. Throughout my career I maintained the collateral duty assignments as an instructor for staff Annual Refresher Training (ART) and Introduction to Correctional Techniques (ICT) in the areas of Hostage Negotiation, Inmate Classification, Central Inmate Monitoring, Victim-Witness, Ethics, and Leadership. During my final 18 months with the Bureau, I was temporarily promoted to Warden at the Federal Correctional Complex at Allenwood for six months. Prior to that, I served as an Associate Warden at Allenwood for three years, during which time I also was temporarily deployed to high need facilities within the Bureau of Prisons. In September of 2019 I was deployed to FCI Ray Brook, NY where I served as the Acting Warden during the absence of the warden and both associate wardens. In March of 2020 I was deployed to MCC New York where I served as the Incident Commander following a major security breach.

During the majority of my assignment as an Associate Warden at the Federal Correctional Complex at Allenwood, I provided oversight to the Secure Mental Health Unit (SMHU) at the USP. I also served as the chair of the multi-disciplinary committee that developed the Transitional Care Unit (TCU), which is a follow-on program to the SMHU to assist inmates in transitioning from SMHU housing to general population. In 2020 I again served as the chair of the multi-disciplinary committee which developed the plan for the Secure Administrative Unit (SAU), the Secure STAGES Unit (designed for inmates diagnosed with Borderline Personality Disorder) and the Secure Skills Unit (designed for inmates with an intellectual deficit) at USP Allenwood. Prior to working for the federal government, I was employed as a Deputy Sheriff in North Carolina and as an Army Officer (Military Police) prior to that.

During my career with the Bureau, I transferred hundreds of inmates in accordance with BOP policy directives.

I have also reviewed and approved numerous ADX packets from my time at USP Canaan and USP Allenwood. During my service at USP Allenwood, I also received numerous inmates from the ADX who were found too mentally ill for continuation in the ADX program.

My training, experiences, and skillset is unique, policy-focused, and has been molded by daily, direct interactions with inmates in the trenches of the federal prison system. This has continued throughout my retirement through interactions with defendants and attorneys.

I hold a bachelor's degree in Criminal Justice from Indiana University of Pennsylvania. Unless otherwise stated, I have personal knowledge of the facts stated herein and can testify competently thereto if called as a witness in this matter.

## SCOPE OF REVIEW

I have been asked to explain the BOP transfer policy, process and eligibility criteria as it relates to inmates referred to the Florence Administrative Maximum Security Facility (ADX). I will also provide my opinion on the information that I have been provided regarding the government's decision to transfer nearly all of those inmates whose death sentences were commuted by President Biden to the ADX pursuant to the Executive Order entitled *"Restoring the Death Penalty and Protecting Public Safety"* and the memorandum from Attorney General Bondi entitled *"Restoring a Measure of Justice to the Families of Victims of Commuted Murderers."* I offer my opinion from a BOP correctional treatment/correctional management perspective having transferred hundreds of inmates, reviewed and approved numerous ADX packets while at USP Canaan and USP Allenwood, and, during my service at USP Allenwood, having received numerous inmates from the ADX who were found too mentally ill for continuation in the ADX program. The BOP decision makers regarding the designation to the ADX would be Rick Stover of the Designation and Sentence Computation Center (DSCC) and Shane Salem of the Correctional Programs Division (CPD), Central Office.

## SUBJECT OF MY OPINION

My opinion is based on information provided to me by counsel for the Plaintiffs. I have not independently confirmed this information. My opinion assumes that this information is true.

Following President Biden's commutation of the death sentences of most of the people on the BOP's death row, lawyers for the men whose death sentences had been commuted learned that Chris Synsvoll, a BOP attorney assigned to the ADX, would be their point person for communications and information about the process for redesignating their clients to other facilities.

Mr. Synsvoll spoke with several of the Plaintiffs' attorneys in early January 2025, both individually and, on January 7, as a group. He explained that determinations of where the men whose death sentences had been commuted would be transferred would be done in accordance with the BOP's standard policy. According to Mr. Synsvoll, each person would be reviewed individually by BOP officials, taking medical conditions, mental health conditions, and disciplinary history into account.

Mr. Synsvoll encouraged the defense teams to send client specific information relevant to placement decision, such as information about medical and mental health conditions, adjustment to confinement, incident report context, and the location of family members. Mr. Synsvoll told the Plaintiffs' attorneys that their clients were not automatically being sent to ADX and said that placement options included Federal Medical Centers, mental health step-down programs and USPs. Mr. Synsvoll told the attorneys it was possible but unlikely that any of

2

the men whose death sentences had been commuted would go to a medium security facility. However, he thought they might get sent to a medium security facility within a of couple years.

According to Mr. Synsvoll, the people who were designated to the ADMAX GP would not necessarily start the program from the beginning. Rather, they could be placed in a step-down unit at a level consistent with their current placement.

At the January 7 meeting with a group of defense lawyers, Mr. Synsvoll also invited defense teams to contact him individually to discuss client information in a non-group setting. Many of the legal teams did so and several lawyers were told their clients were not being placed at the ADX because they were not appropriate for the ADX. Several of the men whose death sentences were commuted are elderly or have serious medical or mental health conditions.

On January 20, 2025, President Trump signed Executive Order ("EO") 14164, directing the Attorney General to "evaluate the places of imprisonment and conditions of confinement for each of the 37 murderers whose Federal death sentences were commuted by President Biden, and the Attorney General shall take all lawful and appropriate action to ensure that these offenders are imprisoned in conditions consistent with the monstrosity of their crimes and the threats they pose." Following issuance of this EO, the warden or possibly staff at the Secure Confinement Unit ("SCU") at FCI Terre Haute, the location of federal death row, issued referrals to the ADX for all people who had received death sentence commutations.

On January 28, 2025, Mr. Synsvoll met with several of the defense lawyers as a group. He told them the blanket referral did not come from Rick Stover or Shane Salem, the individuals at BOP who would normally have to approve a referral. Mr. Synsvoll informed the group that there were, at that time, no referrals to ADX.

Mr. Synsvoll further informed the defense lawyers that the BOP was continuing to process each of the individuals in the manner described during the January 7, 2025 meeting. However, because of the EO, the BOP now had to submit the referrals to the Office of the Deputy Attorney General (ODAG) with individual designation recommendations for their approval. If the ODAG rejected BOP recommendations, the BOP would need to start over.

Mr. Synsvoll confirmed the BOP was still going to recommend non-ADX placements for the majority of the individuals but that some individuals, particularly those found guilty of homicide in a BOP facility, were likely to be sent to the ADX.

Mr. Synsvoll also told the defense teams that, to his knowledge, the ODAG had never previously been involved in designations to particular facilities.

Mr. Synsvoll encouraged the defense teams to continue sending him information about their clients, which some of them did.

On February 5, 2025, Attorney General Bondi issued a memo to all BOP employees entitled "*Restoring a Measure of Justice to the Families of Victims of Commuted Murderers*". The memo directed the BOP "to ensure that the conditions of confinement for each of the 37 commuted murderers are consistent with the security risks those inmates present because of their egregious crimes, criminal histories, and all other relevant considerations."

Following issuance of the memo, the ODAG overruled the BOP recommendations of where individuals should be designated.

3

On February 20, 2025, Mr. Synsvoll informed the defense attorneys that BOP had presented its recommendations to the ODAG, but the ODAG had rejected them. He informed the attorneys that all of the men whose death sentences had been commuted were being referred to ADX, except for two people who were already at MCFP Springfield for medical reasons.

Currently, all the ADX referral packets have gone up the chain to the North Central Regional Office (NCRO) and the BOP is beginning ADX referral hearings at USP Terre Haute. However, the lawyers understand from BOP staff that this is predetermined that the hearings will result in a redesignation to the ADX.

There are some individuals that have been flagged as having medical and/or mental health issues that potentially exclude them from ADX designation, but those individuals are being reviewed under the criteria for the extraordinary security measures exception for medical/mental health exemptions and will likely be redesignated to the ADX too.

The ODAG visited the ADX on March 28, 2025 to observe the conditions at the facility.

One of the people whose death sentence was commuted has informed his attorneys that he received the notice for his hearing for transfer to ADX, and that it states the following, among other things:
1. The reasons for his referral are:
    a. "The Inmate's placement in other correctional facilities creates a risk to institutional security and good order or poses a risk to the safety of staff, Inmates, other's or to public safety."
    b. "As a result of the inmate's status, either before or after incarceration, the inmate may not be safely housed in the general population of another institution."
    c. "The inmate has notoriety to the extent that the inmate's well-being would be jeopardized in a less secure setting."
2. He has been classified as "Security Threat Group (STG) assignments of Death Row Inmate."
3. The basis given for the referral is:
    a. He is being referred for placement in the General Population at the United States Penitentiary, Administrative Maximum, in Florence;
    b. He arrived at USP Terre Haute SCU on June 24, 2009;
    c. He was convicted for abducting the owner of an Atlanta restaurant from his home, driving him across a state line, shooting and killing him, and he was "involved in an extensive escape plot with his mother, and brother.
    d. Institution staff believe his placement in other correctional facilities creates a risk to institutional security and good order and poses a risk to the safety of staff, inmates, others, or to public safety. A recommendation to transfer him to ADX-GP was submitted and a placement hearing was approved to be conducted.
4. The statement of his Disciplinary is that he "has clear conduct during service of his sentence in the Federal Bureau of Prisons."

## SUMMARY OF FINDINGS

In my 14 years working in United States Penitentiaries ("USP", the BOPs high security prisons), I have reviewed and signed off on hundreds, if not thousands, of transfer referrals, including numerous transfer referrals to place inmates at the ADX. After submission, these referrals were reviewed by Central Office, the Designation and Sentence Computation Center, the Correctional Programs Division, ADX staff (for referrals to ADX) and psychology services. I have never known of any of these packets to have been reviewed by any entity outside of the Bureau, including by the ODAG, the Attorney General or the President. I never had a

4

referral packet returned with any indication that anyone outside the Bureau had reviewed it, let alone objected to it or rejected it. The only input I have ever been aware of with regard to placement decisions are those inmates who are being considered for Witness Security, who must be approved by the Office of Enforcement Operations as Witness Security cases. Even in these instances, it is the BOP that makes the placement decision. The BOP process has worked well for years because it is staffed by people who know and apply BOP policies and have experience in doing so.

During my service at USP Allenwood where I oversaw the Secure Mental Health Unit (SMHU), we had regular contact with Mr. Synsvoll with regard to inmates who were being transferred to or from the ADX and to or from the SMHU. In this experience, I found Mr. Synsvoll to be very professional, honest, and extremely knowledgeable about the referral process.

The referral of people to the Florence ADX facility based solely on their crime of conviction or without individualized assessment of their recent in-prison conduct does not conform with BOP policy and process. In my experience, referrals to a higher level of security, including those to the ADX, are always based on either recent conduct or as a result of verified information about current escape risk or current risk to the orderly running of the institution. I have never seen a transfer referral based on conduct that happened years ago. Transfer referrals are also not done based on the crime of conviction, except in the rare instance when the initial classification is erroneous. I have also never seen any involvement by the ODAG in the transfer referral process.

A referral to the ADX unit for inmates who have not exhibited recent violent behavior, such as the serious assault or murder of other inmates or staff, is an abuse of the agency's discretion. The decision to place offenders in isolation without proper justification and adherence to the clinical requirements is unprecedented. The BOP has other appropriate high and/or administrative designation options to comply with the government's executive order that conform to their policy directives to achieve correctional treatment objectives.

While I was working at the BOP, on numerous occasions I ran rosters from the Bureau's database (SENTRY) for inmate data. On these rosters, I could see that there were inmates with a prior history of murdering a staff member or another inmate housed throughout the BOP, mostly but not exclusively in USPs. These individuals are assigned the Security Threat Group (STG) codes of MURBOP or MURDER I. Additionally, any inmate convicted of a crime against a staff member will also have the Case Management Activity (CMA) assignment of VWP*. I saw that inmates with these SENTRY STG or CMA assignments are housed in different level facilities throughout the Bureau.

In my experience, and according to BOP policy, inmates are not sent to the ADX unless they have shown through their in-prison conduct that they cannot function in a less restrictive environment without being a threat to others or to the orderly functioning of the institution. The need for such a restrictive environment is the only legitimate penological purpose for designating an inmate to the ADX. Therefore, when there is a need to transfer an inmate, BOP staff should and, in my experience, do consider whether another high security institution would be appropriate for the inmate. BOP policy presumes the ADX is inappropriate unless conclusively shown otherwise.

There are several aspects of the notice for the referral to ADX described above that are contrary to BOP practice and, in my professional opinion, an abuse of discretion. First, if this individual has been in BOP custody since 2009 and has had clear conduct during service of his sentence, there is no reason he should be classified as maximum custody, which is a prerequisite for placement at the ADX. Second, this individual's case is not particularly well known. I am not familiar with it and a search of the internet turns up very little. Generally, when "notoriety" is a basis for referral to a particular prison, they should have the corresponding CIM

5

assignment of Broad Publicity. Based on my online research, there has not been broad publicity of this case, and he therefore should not have a "broad publicity" assignment. Third, because his sentence has been commuted, he is no longer sentenced to death and should not be classified as having the STG code of "Death Row Inmate." If that is the only STG code he has been assigned, he should not have an STG code at all. Finally, as discussed above, the referral of someone to the ADX facility based solely on their crime of conviction or without individualized assessment of their recent in-prison conduct does not conform with BOP policy and process. It appears that the only conduct referenced in the notice is the crime that led to this person's conviction in 2009. This conduct on its own does not provide a basis for referring someone to ADX.

If the reasons for referring this individual to ADX are what is stated above, they do not justify the referral. A referral for such reasons is entirely inconsistent with BOP practice.

## GOVERNING POLICY

The key policy governing ADX transfers is Program Statement 5100.08, <u>Inmate Security Designation and Custody Classification</u>. This policy, Program Statement 5100.08, is the BOP's classification manual.[1]

The manual explains that general population units at the ADX "are designed for male inmates who have demonstrated an inability to function in a less restrictive environment without being a threat to others, or to the secure and orderly operation of the institution."  P.S. 5100.08, Chap. 7 § 21.b.

The classification manual and BOP practices reflect that referrals are triggered by recent serious incident reports as staff are to include the disciplinary reports related to the *"behavior prompting the referral."* P.S. 5100.08, Chap. 7, § 21.b.(2).

The classification manual directs staff to consider "another high security institution" prior to referring a person to the ADX. P.S. 5100.08, Chap. 7, § 21.b.(1).

The classification manual states that people with serious psychiatric illnesses should not be referred to the ADX. P.S. 5100.08, Chap. 7, § 21.b.(2).

The classification manual sets out, in detail, a classification process that is conducted entirely by BOP staff. It does not contemplate any role for the ODAG, the Attorney General or the President.

## FACILITY DESIGNATION & INMATE CLASSIFICATION (BRAVO)

### BOP Facilities

The BOP classifies facilities into several categories including <u>minimum</u> security (camp), <u>low</u> and <u>medium</u> security federal correctional facilities, (FCIs), <u>high</u> security U.S. penitentiaries (USP) and <u>administrative</u> (Medical centers, detention centers & the ADX). In recent years, the agency has developed "*satellite*" low security facilities and various specialized restrictive housing unit programs including Reintegration Housing Units (RHU), high security Secure Mental Health Units, Special Management Units (SMU) and Communication Management Units (CMU). The last BOP SMU was recently closed after abusive correctional practices and the murders of several inmates

---

[1] The Program Statement on <u>Control Unit Programs</u>, P.S. 5212.07, applies to the referral to and placement in Control Units, which includes Unit B at ADMAX. Most, if not all, people who are sent to ADMAX are sent first to Unit B, the Control Unit. This policy, like Program Statement 5100.008, provides that people should only be referred if they are "unable to function without being a threat to others to the orderly operation of the institution." P.S. 5212.07 at § 1.a. It also notes requires that the request for placement include documentation relating to the "specific acts that prompted the recommendation." *Id.* at § 6.a.2. Additionally, it provides that the referral cannot be considered "solely on the nature of the crime which resulted in that inmate's incarceration." *Id.* at § 6.b.7.

6

housed there came to light.[2] In my professional opinion, the BOP's own policies require the consideration of these alternatives prior to a referral to the ADX.

**ADX:** Florence ADX is referred to as a *"super-max,"* and is the only one of its kind in the federal system. After activation, it replaced the mission of the former Marion, Illinois Control Unit which was created after the brutal murders of two BOP staff members by the Aryan Brotherhood in separate incidents on the same day in 1983. The super-max concept involves total isolation. The purpose is to incapacitate, isolate, and eliminate contact between inmates while limiting the contact with staff. Inmates are locked in a small cell (approximately 75 Sq. Ft.) twenty-three hours a day aside from being shackled in handcuffs and leg irons to be moved to a caged-in shower area for cells that do not have a shower built in. The cell, desk, and mattress platform are made of concrete and food is delivered to the cell where inmates eat near an open toilet. It is by far the most restrictive and isolating prison in the BOP.

## Inmate Security Classification

All inmates have a security classification, which is based on a security point system and public safety factors (PSFs) to determine their required level of control and supervision. The security classification determines the type of facility to which an inmate will be assigned. The inmate security classification tool is known as "BRAVO" (Bureau Risk Assessment Verification and Observation). PSF's involve certain demonstrated behaviors which require increased security measures to ensure the protection of society and are ordinarily applied to limit placement at an institution outside of the security scoring based on the need for increased security.

Some of the factors used in determining a person's security classification are their age, criminal history, violence and/or escape history and characteristics of the instant offense. Each factor has a corresponding point value, which are then totaled to determine an overall security level. Below is a chart based on the BOP classification manual (CPD/CPB, Number P5100.08, Inmate Security Designation and Custody Classification).[3] It should be noted that people serving a life sentence are automatically assigned to high security regardless of their security point total. Thus, people could have points that would otherwise result in a lower security level,[4] but because they are serving a life sentence, they are nonetheless classified as High Security.

## Inmate Custody Classification

Aside from a security level, each inmate also has a *"custody"* classification. Custody classification determines

---

[2] https://www.washlaw.org/wp-content/uploads/2023/07/Cruel-and-Usual-An-Investigation-Into-Prison-Abuse-at-USP-Thomson.pdf
[3] https://www.bop.gov/policy/progstat/5100_008cn.pdf
[4] The matrix for male inmates' security levels is as follows:

| Security Level | |
|---|---|
| MINIMUM | 0-11 Points |
| LOW | 12-15 Points |
| MEDIUM | 16-23 Points |
| HIGH | 24 + Points |

7

that level of staff supervision the inmate requires. Custody classification is defined in the classification manual as:

> "Custody Classification: *The review process to assign a custody level based on an inmate's criminal history, instant offense, and institutional adjustment. A custody level (i.e., COMMUNITY, OUT, IN, and MAXIMUM) dictates the degree of staff supervision required for an individual inmate.*"

A custody level is reviewed yearly based on static and dynamic risk factors such as programming and inmate behavior. While the security classification is an automatic calculation based on the data points, the custody level can be changed at the discretion of staff based on their professional opinion based on behavioral adjustment.

The classification manual defines maximum custody as:

> Maximum Custody:  *This classification is for individuals who, by their behavior, have been identified as **assaultive, predacious, riotous, serious escape risks, or seriously disruptive to the orderly running of an institution.***"

All USPs house people classified as Maximum custody.

Inmates with death sentences are generally classified as Maximum custody and they remain assigned to that level until they are executed, as there is no reason to reduce their custody level as long as they remain on death row. However, inmates on death row who have not incurred recent incident reports and have been fully compliant with institution rules and regulations may not meet the criteria for maximum custody. Theoretically, an inmate on death row could have security points commensurate with low or medium security, because they do not have the typical factors that elevate a person's security classification such as a serious and recent history of violence, escape and/or predatory prison behavior, yet be classified as maximum custody essentially as a default classification for anyone on death row.

While the security classification assigned to each inmate is automatic based on the combination of the static and dynamic factors, the custody classification is subjective and a decision must be made at each yearly custody review to either increase it, decrease it or leave it the same. In my professional opinion, the custody classification for people on death row is often not based on overall circumstances and behavior, but rather on the fact they were going to be executed.  Therefore, these individuals may no longer meet the criteria for maximum custody as defined by policy.

## MEDICAL/MENTAL HEALTH CLASSIFICATION

From a medical/clinical classification perspective, inmates referred to the ADMAX must be cleared based on a mental and physical health evaluation. Medical classification is based on a four-level system referred to as "*Care Levels*" which are explained in a BOP clinical guide [5] as indicated below:

**CARE LEVEL 1**: Care Level 1 inmates are less than 70 years of age and are generally healthy.

**CARE LEVEL 2**: Care Level 2 inmates are stable outpatients who require clinician evaluations monthly to every 6 months.  Their medical and mental health conditions can be managed through routine, regularly scheduled appointments with clinicians for monitoring.

---

[5] https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf

8

**CARE LEVEL 3**: Care Level 3 inmates are outpatients who have complex, and usually chronic, medical or mental health conditions and who require frequent clinical contacts to maintain control or stability of their condition, or to prevent hospitalization or complications. They may require assistance with some activities of daily living (ADLs) that can be accomplished by inmate companions.

**CARE LEVEL 4**: Care Level 4 inmates require services available only at a BOP Medical Referral Center (MRC), which provides significantly enhanced medical services and limited inpatient care. Functioning may be so severely impaired as to require 24-hour skilled nursing care or nursing assistance. Example conditions: Cancer on active treatment, dialysis, quadriplegia, stroke or head injury patients, major surgical treatment, and high-risk pregnancy.

During the designation process, inmates with chronic care needs are reviewed by the BOP Office of Medical Designations and Transportation (OMDT). The entire Florence complex, including the ADX is a care level two facility. Inmates requiring care level 3 or 4 care are not appropriate for designation to the facility, unless they are found to need "extraordinary security measures."

The BOP has a similar four-level classification system for mental health:

**CARE1-MH:** No Significant Mental Health Care

**CARE2-MH:** Routine Outpatient Mental Health Care or Crisis-Oriented Mental Health Care.

**CARE3-MH:** Enhanced Outpatient Mental Health Care or Residential Mental Health Care

**CARE4-MH:** Inpatient Psychiatric Care

As with medical care levels, people requiring Care3-MH or Care4-MH level of care are not appropriate for designation to the ADX, absent a finding of a need for "extraordinary security concerns." Inmates with a diagnosed mental health condition who are referred for ADX placement must also be reviewed by the Extraordinary Security Concerns (ESC) Committee to determine if his security concerns override his mental health concerns or if the mental health concerns override his security concerns. Inmates who have been referred for ADX placement whose mental health concerns override their security concerns are placed in the Secure Mental Health Unit (SMHU) at either USP Allenwood or FCI Atlanta. Very basically, these two units provide the security of an ADX unit while also providing intensive mental health treatment.

## ALTERNATE CORRECTIONAL TREATMENT PROGRAMS

From a case management perspective, inmates who have been recently compliant with BOP rules and regulations can be managed in one of the many specialized individual program units for re-integration within the broader BOP general population. In accordance with the above-mentioned directives, prior to referral to the ADX, alternate high security environments should be considered such as reintegration housing units or possibly one of the secure mental health units. Individual reviews should be conducted to determine what programs and facilities are appropriate based on the individuals' classification and correctional treatment needs. Specifically, the January, 2025 First Step Act (FSA), program guide should be referred to for alternative placement options. [6]

## CONCLUSION

---

[6] https://www.bop.gov/inmates/fsa/docs/fsa-approved-program-guide.pdf?v=1.0.3

9

BOP policy and past practice dictates that referrals to the Florence ADX should be processed on a case-by-case basis only after other more appropriate facilities are considered. The process the BOP is following with the individuals whose death sentences were commuted by President Biden is inconsistent with BOP policy and practice. Further, there are rigid medical and psychological criteria that must be adhered to, given the detrimental effects solitary confinement has on people with pre-existing conditions. There is no penological reason to redesignate inmates to the ADX solely based on their death sentences having been commuted.

Executed on this 12th day of April 2025

*[signature]*

Paul Gibson
Chief Operating Officer
PERA