# EXHIBIT 9

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

REJON TAYLOR, *et al.*,

                    *Plaintiffs,*

          v.

DONALD J. TRUMP, *et al.*, in their official
capacities,

                    *Defendants*.

Case No. _____

**EXPERT DECLARATION OF CRAIG HANEY, J.D., Ph.D.**

# TABLE OF CONTENTS

I.    Qualifications ................................................................................................... 1

II.    Basis and Summary of Opinions ...................................................................... 6

III.    ADX Subjects Persons to a Severe, Extreme Form of Solitary Confinement ................... 7

IV. The Broad Scientific, Mental Health, Human Rights, Legal, and Correctional Consensus on the Harmful Effects of Solitary Confinement .............................................................. 14

   A.   The Scientific Evidence That Solitary Confinement is Harmful ..................................... 17

   B.    The Negative Effects of Solitary Confinement Should Be Interpreted Within a Larger Scientific Framework on Social Isolation .................................................................. 27

   C.   Current Professional Standards Severely Limit the Use of Solitary Confinement .......... 37

V.   The Heightened Risk of Harm and Prohibitions Against Housing the Mentally Ill in Solitary Confinement .................................................................................................... 45

VI.    There Is No Legitimate Penological Justification for the Per Se Housing of Formerly Federally Death-Sentenced Persons at ADX ............................................................ 49

VIII. Conclusion ..................................................................................................... 53

I, Craig Haney, hereby declare as follows:

1.  I have been retained by Plaintiffs' counsel to provide expert opinions about: (a) the nature of the conditions of confinement to which people are subjected at the United States Penitentiary-Administrative Maximum ("ADX") in Florence, Colorado; (b) the scientific consensus on the psychologically and physically harmful nature of long-term exposure to conditions of "solitary confinement"; and (c) the scientific consensus on the future dangerousness and corresponding security risks posed by persons who have been sentenced to death. If called to testify, I could and would testify as follows:

## I.    Qualifications

2.  I am a Distinguished Professor of Psychology at the University of California, Santa Cruz, where I also have served as the University Presidential Chair, 2015-2018, the Director of the Legal Studies Program, and Chair of the Department of Psychology. My area of academic specialization is in what is generally termed "psychology and law," which is the application of psychological data and principles to legal issues. I teach graduate and undergraduate courses in social psychology, psychology and law, and research methods. I received a bachelor's degree in psychology from the University of Pennsylvania, an M.A. and Ph.D. in Psychology and a J.D. degree from Stanford University, and I have been the recipient of a number of scholarship, fellowship, and other academic awards.

3.  I have published numerous scholarly articles and book chapters on topics in law and psychology, including encyclopedia and handbook chapters on the backgrounds and social histories of persons accused of violent crimes, the psychological effects of imprisonment, and the nature and consequences of overcrowded prison conditions as well as solitary or "supermax"-type confinement. In addition to these scholarly articles and book chapters, I have published three sole-authored books: *Death by Design: Capital Punishment as a Social Psychological System*

(Oxford University Press, 2005), *Reforming Punishment: Psychological Limits to the Pains of Imprisonment* (American Psychological Association Books, 2006), and *Criminality in Context: The Psychological Foundations of Criminal Justice Reform* (American Psychological Association Books, 2020). In addition, along with the other members of a National Academy of Sciences Committee on which I served, I co-authored the committee's report, published in book form as *The Growth of Incarceration in the United States: Exploring the Causes and Consequences*, released in April 2014.

4.      In the course of my academic work in psychology and law, I have lectured and given invited addresses throughout the country on the role of social and institutional histories in explaining criminal violence, the psychological effects of living and working in institutional settings (typically maximum security prisons), and the psychological and systemic consequences of extreme prison conditions, particularly overcrowding and solitary confinement. I have given these lectures and addresses at various law schools, bar associations, university campuses, and numerous professional psychology organizations such as the American Psychological Association.

5.      I also have served as a consultant to numerous governmental, law enforcement, and legal agencies and organizations, including the Palo Alto Police Department, various California Legislative Select Committees, the National Science Foundation, the American Association for the Advancement of Science, and the United States Department of Justice. For example, in the summer of 2000, I was invited to attend and participated in a White House Forum on the uses of science and technology to improve crime and prison policy, and in 2001 I participated in a conference jointly sponsored by the United States Department of Health and Human Services (DHHS) concerning government policies and programs that could better address the needs of formerly incarcerated persons as they are reintegrated into their communities. I continued to work

with DHHS on the issue of how best to ensure the successful reintegration of prisoners into the communities from which they have come. I also consulted with the Department of Homeland Security on immigrant detention-related issues, and I served as both a consultant to and an expert witness before the United States Congress.

6.      I was appointed in 2012 as a member of a National Academy of Sciences committee analyzing the causes and consequences of high rates of incarceration in the United States. In conjunction with the release of the National Academy committee's report that I mentioned earlier (*The Growth of Incarceration in the United States: Exploring the Causes and Consequences*), I traveled to Washington, DC several times in 2014 and 2015, to, among other things, brief members of Congress, their staffs, and the White House on our findings. I served as a member of the Advisory Council member of the Vera Institute of Justice Safe Alternatives to Segregation program, working with state correctional systems (e.g., Louisiana and Washington) to reduce the number of persons housed in isolated confinement. I also recently co-directed an international correctional cultural exchange program between the United States and Norway in which state correctional administrators and staff (e.g., North Dakota, Oregon, Rhode Island) are trained in alternative correctional perspectives and practices. Although other responsibilities led me to step down as a co-director, I still serve as a consultant to the program, which is now known as AMEND at UCSF and operates in numerous state prison systems throughout the United States. A copy of my curriculum vitae is attached to this expert report as Appendix 1.

7.      My academic interest in the psychological effects of various prison conditions is long-standing and dates back to 1971, when I was still a graduate student. I was one of the principal researchers in what has come to be known as the "Stanford Prison Experiment," in which my colleagues Philip Zimbardo, Curtis Banks, and I randomly assigned normal, psychologically

healthy college students to the roles of either "prisoner" or "guard" within a simulated prison environment that we had created in the basement of the Psychology Department at Stanford University. The study has since come to be regarded as a "classic" study in the field of social psychology, demonstrating the power of institutional settings to change and transform the thoughts and actions of people who enter them.[1]

8.    Since then, I have studied the psychological effects of living and working in real (as opposed to simulated) institutional environments, including juvenile facilities, mainline adult prison and jail settings, specialized correctional housing units (such as solitary and "supermax"-type confinement), and problematic prisons and prison systems (especially those with overcrowded conditions of confinement). Because I focus primarily on the psychological and "mental health" effects of correctional environments, my work has included studying the ways that mentally ill prisoners are affected by their conditions of confinement and how prison systems address the needs of this vulnerable population. In the course of my research, writing, and consulting on prison-related issues in general, I have toured and inspected numerous maximum security state prisons and related facilities (in Alabama, Arkansas, Arizona, California, Florida, Georgia, Idaho, Louisiana, Maryland, Massachusetts, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, and Washington), many maximum security federal prisons (including the Administrative Maximum or "ADX" facility in Florence, Colorado), as well as prisons in Canada,

---

[1] For example, see Craig Haney, Curtis Banks & Philip Zimbardo, Interpersonal Dynamics in a Simulated Prison, International Journal of Criminology and Penology, 1, 69 (1973); Craig Haney & Philip Zimbardo, The Socialization into Criminality: On Becoming a Prisoner and a Guard, in Law, Justice, and the Individual in Society; Psychological and Legal Issues (J. Tapp and F. Levine, eds., 1977); and Craig Haney & Philip Zimbardo, Persistent Dispositionalism in Interactionist Clothing: Fundamental Attribution Error in Explaining Prison Abuse, Personality and Social Psychology Bulletin, 35, 807-814 (2009).

Cuba, England, Ireland, Hungary, Mexico, and Russia. I also have conducted numerous interviews with correctional officials, guards, and prisoners to assess the psychological impact of penal confinement, and statistically analyzed aggregate data from numerous correctional documents and official records to examine the effects of specific conditions of confinement on the mental health and well-being of prisoners confined within them and on the quality of prison life in general.[2]

9.     I have been qualified and have testified as an expert in various federal courts, including United States District Courts in Alabama, Arizona, Arkansas, California, Georgia, Hawaii, Nevada, New Mexico, North Carolina, Pennsylvania, South Carolina, Texas, and Washington, and in numerous state courts, including courts in Arizona, Colorado, Florida, Montana, New Jersey, New Mexico, Ohio, Oklahoma, Oregon, Tennessee, Utah, and Wyoming as well as, in California, the Superior Courts of Alameda, Calaveras, Kern, Los Angeles, Marin, Mariposa, Monterey, Orange, Sacramento, San Diego, San Francisco, San Mateo, Santa Clara, Santa Cruz, Shasta, Tulare, Ventura, and Yolo counties. My research, writing, and testimony have been cited by state courts, including the California Supreme Court, and by Federal District Courts,

---

[2] For example, Craig Haney & Philip Zimbardo, The Socialization into Criminality: On Becoming a Prisoner and a Guard, in Law, Justice, and the Individual in Society: Psychological and Legal Issues (pp. 198-223) (J. Tapp and F. Levine, eds., 1977); Craig Haney, Craig Haney, Psychology and Prison Pain: Confronting the Coming Crisis in Eighth Amendment Law, Psychology, Public Policy, and Law, 3, 499-588 (1997); Craig Haney, The Consequences of Prison Life: Notes on the New Psychology of Prison Effects, in D. Canter & R. Zukauskiene (Eds.), Psychology and Law: Bridging the Gap (pp. 143-65). Burlington, VT: Ashgate Publishing (2008); Craig Haney, On Mitigation as Counter-Narrative: A Case Study of the Hidden Context of Prison Violence, *University of Missouri-Kansas City Law Review, 77*, 911-946 (2009); Craig Haney, Counting Casualties in the War on Prisoners, *University of San Francisco Law Review, 43,* 87-138 (2008); Craig Haney, The Perversions of Prison: On the Origins of Hypermasculinity and Sexual Violence in Confinement, *American Criminal Law Review, 48*, 121-141 (2011) [Reprinted in: S. Ferguson (Ed.), Readings in Race, Ethnicity, Gender and Class. Sage Publications (2012)]; and Craig Haney, Prison Effects in the Age of Mass Imprisonment, *The Prison Journal, 92*, 1-24 (2012).

Circuit Courts of Appeal, and the United States Supreme Court.[3]

## II.    Basis and Summary of Opinions

10.    I have been retained by Plaintiffs' counsel to provide expert evidence in this matter. As noted above, I was asked to address several specific, inter-related issues in this report. The bases for the opinions that I have reached in this expert report include my experience conducting research on and evaluating conditions of isolated prison confinement for the last nearly 50 years in numerous prison and jail systems. That experience includes touring and inspecting the ADX facility on multiple occasions over the last approximately 25 years, as well as interviewing numerous prisoners housed there about the psychological effect of their isolated confinement.[4]

11.    In addition, I rely on my knowledge and review of the existing empirical literature on solitary confinement. In fact, I have previously published several academic reviews of this literature. Those reviews are attached to this expert report as Appendix 2. The methodology employed in these studies is consistent with the methodology routinely employed in social science research generally. Specifically, it is empirical in nature - based on data that I and a large number of other scholars and researchers have collected, in solitary confinement units specifically as well as more generally in other environments characterized by extreme social isolation.

12.    By way of briefly summarizing the opinions offered and conclusions reached in the following sections of this report, I have concluded that:

a.    The conditions of confinement to which people are subjected at ADX constitute a severe, extreme form of solitary confinement. Because of the way that ADX is physically constructed and operated, conditions there are more socially

---

[3] *See, e.g., Brown v. Plata*, 563 U.S. 493 (2011).
[4] I use the terms "prisoners," "incarcerated people," or "incarcerated persons" interchangeably to refer to any person who is incarcerated or detained in a carceral facility. The scientific and professional literature typically uses these terms interchangeably, in this same way.

isolating than those at any correctional facility that I have personally toured and inspected or of which I am aware anywhere in the United States.

b.   There is a widespread scientific, mental health, human rights, legal and even correctional consensus that solitary confinement places persons at significant risk of serious harm. In fact, as a result of that consensus, numerous professional organizations recommend that people be placed in solitary confinement only when it is absolutely necessary to do so and, even then, for only the briefest amount of time possible. They further agree that members of vulnerable groups (such as the mentally ill) should never be placed there.

c.   The BOP's stated justification for housing people under the extreme conditions that prevail at ADX is a penological necessity—that is, that their alleged future dangerousness and/or the other security risks they pose preclude them from being housed safely anywhere else. These characterizations do not apply categorically to persons whose death sentences have been commuted. Persons who have been convicted of death-eligible crimes do not, as a group, represent heightened future dangers or security risks in a prison setting. There is no legitimate penological justification for housing them at ADX.

### III.    ADX Subjects Persons to a Severe, Extreme Form of Solitary Confinement

13.    ADX was architecturally designed and geographically located to maximize the degree of isolation to which its residents are subjected. It is the most socially isolating prison environment I have encountered anywhere in the United States or elsewhere in the world.

14.    ADX opened in 1994, intended to be the "Alcatraz of the Rockies," the BOP's successor to the nation's first and perhaps most notorious "supermax" prison located on an island

in the middle of San Francisco Bay. ADX is located in a remote and sparsely populated area of Colorado, a several hour drive from the Denver International Airport. It was constructed and continues to be operated in such a way that the people housed there are prohibited from having any form of meaningful social interaction. Instead, they are isolated nearly around-the-clock, living in small concrete cells, often for years at a time. A former ADX warden, Robert Hood, minced no words in describing the stark, punishing conditions and day-to-day routines imposed there as the equivalent of "a clean version of hell."[5] Hood candidly observed that the prison was "not designed for humanity…" and that life there was "worse than death."[6]

15.    The people incarcerated at ADX are confined alone in their cells for between 22-24 hours each day.[7] The cells themselves are more isolating than those in other prisons—even in comparison to other solitary confinement units—because they constructed with two exterior metal doors. Specifically, most cells have an inner door made of metal bars and an outer door made of solid steel, with a small, closable slot. The space between the two doors creates a small "sally port" inside each cell. The double-door configuration thus adds another layer of isolation, distancing prisoners from even the incidental movement that takes place on the hallway outside their cells.

---

[5] See Binelli, M., Inside America's Toughest Prison, *New York Times Magazine*, March 26, 2015, https://www.nytimes.com/2015/03/29/magazine/inside-americas-toughest-federal-prison.html, and 60 Minutes, "A Clean Version of Hell," aired October 14, 2007. https://www.cbs.com/shows/video/7rMUi4wkFIfTF2iyKBUl7uCHF8_gA18K/

[6] In CNN interview https://www.corrections1.com/escapes/articles/5-things-to-know-about-the-escape-proof-supermax-prison-Nw3H6vQbd0EN0mSd/

[7] The photographs that are inserted at various points in this Declaration are intended to illustrate the conditions that prevail at ADX. Although I did not take the photographs myself, they accurately depict what I have personally observed in my tours of the facility.



16.     The combination of the cell configuration and solid concrete cell construction prohibits prisoners from seeing into each other's cells or communicating with each other. The extremely limited day-to-day communication or contact prisoners have with prison staff occurs through these two doors. The separate housing units also are constructed in a way that prohibits contact with the outside natural world, giving even visitors the distinct feeling that much of the prison is actually underground.

17.     In addition to their isolating design, the cells themselves are small. They measure approximately 12 feet by 7 feet—smaller than an average parking space and only slightly larger than a king-sized bed. The cells contain a narrow exterior window, approximately 42 inches tall and four inches, that wide allows some natural light to enter the cell. However, they are designed to prevent prisoners from seeing any of the outside world, other than cement and sky.

18.     Each ADX cell is outfitted with a concrete bed, desk, and stool, and a steel combination sink and toilet. The cells also include a shower within them, with the timing and flow of water controlled by correctional staff outside the cell. As a result, people incarcerated in ADX

do not even have the opportunity to leave their cells to take showers, which is the usual practice in many states' supermax prisons. A thin mattress covers the concrete bunk. The cell walls are empty and drab; prisoners are prohibited from hanging anything on the walls, such as drawings or photographs, that might personalize or humanize the space. In addition, except for a limited amount of "designated legal material," personal property is limited to what can fit "neatly" into a designated storage bag. Persons confined to ADX live virtually their entire lives inside these small, largely barren spaces. This means that they are forced to eat, sleep, and defecate in the same immediate area.

 

19.    The extreme form of solitary confinement to which people housed at ADX are subjected means that they are deprived of virtually all meaningful social contact. Their brief interactions with staff are sporadic, infrequent, and routinized, amounting no more than a few minutes a week of pro forma verbal exchange that takes place through the solid steel doors of their cells, typically only when meals are provided or they are being escorted outside their cells

(typically to recreation). ADX prisoners have told me that they can go for days with little or no actual verbal exchange with staff. Even educational programming is conducted without human contact. Rather than in-person interactions with teachers or other students, "classes" at ADX consist of closed-circuit television programs, followed by short quizzes. As with education, religious services are provided via television. Prisoners can be punished by having televisions withheld.

20.    The regular mental health evaluations that are supposed to occur (to identify potential symptoms of mental illness and psychological deterioration) are typically superficial and pro forma, often lasting for no more than a few minutes and occurring "cell-front"—that is, through the steel door of the cell. This is especially problematic given BOP's own guidelines and criteria state that ADX is not equipped to incarcerate people with serious psychiatric conditions.

21.    Other than being confined in their cells virtually around-the-clock, ADX prisoners may get medical treatment, use the "law library" (a specially outfitted computer terminal located in small area), or to go to visitation or "recreation." Frequent staff shortages result in exercise times being cancelled. A few "general population" ADX prisoners are permitted to work as orderlies, cleaning up the housing unit. Otherwise, there are no other jobs.

22.    Contact with the outside world is severely restricted at ADX. General population prisoners may have four 15-minute monitored and recorded phone calls per month. Although in theory prisoners in general population also may receive as many as five "social" visits per month, the remote location of the facility means that they occur infrequently, if at all. The visits are all conducted on a "non-contact" basis, through a thick glass window, so that there is never any physical contact between incarcerated person and his visitors. The same is true of "legal" visits, which are non-contact and conducted through a thick glass partition. Because there are only four

11

legal visiting booths at ADX, legal visits are difficult to schedule, as are legal phone calls (which are often limited to just 30 minutes).

23.      In addition, whenever a person in ADX "general population" leaves his unit to attend a legal or social visit, he is subjected to a strip search both before and after the visit then placed in hand and leg shackles that are connected to chains circling his waist. Some prisoners remain shackled for the duration of the visit.  There are at least two correctional officers who escort ADX prisoners within the facility, armed with pepper spray and batons.

24.      These basic conditions vary only slightly in the different "units" inside ADX. For example, the so-called "general population" units are configured and operated as a standard supermax or solitary confinement units, where people are confined alone in their cells at least 22 hours per day. Their regular "contact" with other prisoners is limited to the one or two days a week when they are allowed outdoor "recreation" along with a limited number of others confined individually, in separate outdoor cages.  Commonly referred to as "dog runs," the cages lack exercise equipment, except for, in some units pull up bars and exercise balls. People who ask to leave the cage for any reason (such as to use the bathroom) may not return.



In addition, on one or two days a week, "general population" ADX prisoners are permitted a few hours of access to individual indoor "recreation rooms," but only by themselves.



25.    As extremely harsh and isolating "general population" conditions are at ADX, there are several units where the regime is even more severe. In the ADX "control unit," people have contact only with staff, through the solid steel doors of their cells. Even when they are allowed outdoor exercise, they are placed alone in an enclosed concrete area with high walls and a metal grate overhead. It limits their view of the outside world to a glimpse of the sky above.



13

26.    "Range 13" is an even more punishing environment. In a separate area that is isolated from the other housing units, it is designed to hold just two prisoners at a time, but consists of four cells, configured so that the prisoners can be "rotated" to ensure they are always housed at a distance from one another, separated by a wall. Each of the cells is self-contained, with its own shower and exercise area, and movement is controlled electronically (i.e., minimizing any contact with prison staff). To my knowledge, it is the most completely isolating environment in existence in any correctional system in the world.

27.    ADX also operates a three-step "step-down" program that provides certain general population prisoners very limited contact with other prisoners, presumably to begin to re-accustom themselves to the human contact and social interactions that they have been prohibited from having at ADX. Even here, prisoners spend the overwhelming amount of time each day confined alone in their cells. Each of the steps has a specified minimum stay, during which time prisoners are evaluated to determine whether they can progress to the next step. The minimum amount of time it would take to complete the three steps is two years and three months, which virtually no one manages to do. Movement through the steps and eventual release from the step-down program is at the discretion of the prison administration. There is no maximum time a person can be retained in the step-down program, or at ADX more generally, and many prisoners have been there for years (some even for decades).

## IV. The Broad Scientific, Mental Health, Human Rights, Legal, and Correctional Consensus on the Harmful Effects of Solitary Confinement

28.    The BOP denies that it uses solitary confinement, instead preferring the euphemism "restrictive housing." However, the conditions at ADX, as I have described them in the above paragraphs, are solitary confinement by any other name. They constitute a truly severe form of

solitary confinement at that. I should note at the outset that "solitary confinement" is a term of art in correctional practice and scholarship. For perhaps obvious reasons, total and absolute solitary confinement - literally complete isolation from any form of human contact - does not exist in prison and never has. Instead, the term is generally used to refer to conditions of extreme (but not total) isolation from others. I have defined it elsewhere, in a way that is entirely consistent with its use in the broader correctional literature, as:

> [S]egregation from the mainstream prisoner population in attached housing units or free-standing facilities where prisoners are involuntarily confined in their cells for upwards of 23 hours a day or more, given only extremely limited or no opportunities for direct and normal social contact with other persons (i.e., contact that is not mediated by bars, restraints, security glass or screens, and the like), and afforded extremely limited if any access to meaningful programming of any kind.[8]

29.    This definition is similar to the one employed by the National Institute of Corrections (NIC), as cited by former Washington State Secretary of Corrections Chase Riveland, in a standard reference work on solitary-type confinement that was sponsored and disseminated by the United States Department of Justice. Riveland noted that the NIC itself had defined solitary or "supermax" housing as occurring in a "freestanding facility, or a distinct unit within a freestanding facility, that provides for the management and secure control of inmates" under conditions characterized by "separation, restricted movement, and limited access to staff and other inmates."[9] The United States Department of Justice has employed a similar definition, noting that "the terms 'isolation' or 'solitary confinement' mean the state of being confined to one's cell for approximately 22 hours per day or more, alone or with other prisoners, that limits contact with

---

[8] Haney, C., The Social Psychology of Isolation*: Why Solitary Confinement Is Psychologically Harmful, Prison Service Journal, 181*, 12–20 (2009), at footnote 1.

[9] Chase Riveland, *Supermax Prisons: Overview and General Considerations. National Institute of Corrections*. Washington DC: United States Department of Justice (1999), at p. 3, *available at* http://static.nicic.gov/Library/014937.pdf.

others… An isolation unit means a unit where all or most of those housed in the unit are subjected to isolation."[10]

30.     As I discuss below, there is a well-documented and overwhelming scientific consensus confirming the fact that solitary confinement is psychologically and physically harmful.[11] Its adverse effects are not only painful but often inflict actual damage, which is often severe, sometimes long-lasting, can be irreversible and even fatal. The effects include a range of adverse psychological reactions ranging from depression to acute anxiety to cognitive impairment. In addition, the high levels of mental pain and suffering can lead to the increased incidence of self-harm and suicide. For some prisoners, the attempt to cope with isolated confinement sets in motion a set of cognitive, emotional, and behavioral changes that are difficult reverse once time in solitary confinement has ended. Because the effects can persist beyond the time that prisoners are housed in isolation, they can lead to long-term disability and dysfunction.

31.     We clearly do know what happens to people in prison, jail, and—as I discuss below—elsewhere in society when they are deprived of normal social contact for extended periods of time. In fact, over the last several decades, new insights about the fundamental human need for meaningful social contact and for caring human touch have added important theoretical

---

[10] United States Department of Justice, Letter to the Honorable Tom Corbett, Re: *Investigation of the State Correctional Institution at Cresson and Notice of Expanded Investigation,* May 31, 2013, at p. 5 (emphasis in original), *available at* http://www.justice.gov/crt/about/spl/documents/cresson_findings_5-31-13.pdf, citing also to *Wilkinson v. Austin*, 545 U.S. 209, 214, 224 (2005), where the United States Supreme Court described solitary confinement as limiting human contact for 23 hours per day; and *Tillery v. Owens*, 907 F.2d 418, 422 (3d Cir. 1990), where the Third Circuit described it as limiting contact for 21 to 22 hours per day.

[11] There are remarkably few studies that reach opposite conclusions. They are not only statistical outliers, in comparison to the numerous studies that document the harmful effects of solitary confinement in particular and social isolation in general, but they are marked by their serious methodological flaws.

dimensions to the already existing substantial body of empirical data on these issues. These data and theoretical insights add considerable weight to the long-standing consensus view: the experience of solitary confinement is not only painful but also places prisoners at significant risk of serious psychological and physical harm.

32.    Indeed, in light of the fact that social isolation and social exclusion in general are well-known to be harmful stressors that undermine health and well-being,[12] it should not be surprising that there is a large literature that establishes the fact that solitary confinement places prisoners at significant risk of serious psychological and physical harm. The prolonged absence of meaningful human contact and social interaction, the enforced idleness and inactivity, the oppressive security and surveillance procedures, and the accompanying hardware and other paraphernalia that are brought or built into these units combine to create harsh, dehumanizing, and deprived conditions of confinement. These conditions predictably impair the psychological and behavioral functioning of many of the prisoners who are subjected to them.[13]

### A.    The Scientific Evidence That Solitary Confinement is Harmful

33.    The adverse psychological consequences of solitary confinement have been documented over more than five decades of robust scientific research. Conducted by researchers with different professional expertise (ranging from psychiatry to sociology and architecture) and produced in locations across multiple countries, the studies consistently reveal distinctive patterns

---

[12] A more in-depth discussion of the literature that establishes this appears in a later section of this report.

[13] For example, see: Kristin Cloyes, David Lovell, David Allen & Lorna Rhodes, Assessment of Psychosocial Impairment in a Supermaximum Security Unit Sample, *Criminal Justice and Behavior, 33*, 760-781 (2006); Craig Haney, Mental Health Issues in Long-Term Solitary and "Supermax" Confinement, *Crime & Delinquency, 49*, 124-156 (2003); and Peter Scharff Smith, The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature, *Crime & Justice, 34*, 441-528 (2006).

of psychological harm.[14] The harm is often severe, sometimes irreversible and, in the case of suicide, even fatal.

34.    Indeed, as researchers and mental health experts have learned over many decades, for some prisoners, the attempt to cope with isolated confinement sets in motion a set of cognitive, emotional, and behavioral changes that could persist beyond the time that the incarcerated persons were housed in isolation and could lead to long-term disability and dysfunction. For example, a group of Stanford researchers found that behavioral patterns and psychological reactions developed in the course of adapting to solitary confinement were persistent and problematic when formerly long-term isolated incarcerated persons attempted to transition back to mainline prison housing.[15] Psychiatrist Terry Kupers, who has written extensively about the mental health risks of solitary confinement, has termed the lingering negative effects of the experience "SHU post-release syndrome."[16] In fact, more recent research suggests that the harmful effects of solitary confinement persist even after a person has been released from prison. For example, solitary confinement survivors suffer post-prison adjustment problems at higher rates than the already high rates experienced by formerly incarcerated persons in general, including being more likely to

---

[14] *See, e.g.*, Arrigo, B., & Bullock, J., *The Psychological Effects of Solitary Confinement on Prisoners in Supermax Units: Reviewing What We Know and What Should Change*, Int'l J. of Offender Therapy & Comparative Criminology, 52, 622-640 (2008); Craig Haney & Mona Lynch, *Regulating Prisons of the Future: The Psychological Consequences of Solitary and Supermax Confinement*, *New York University Review of Law & Social Change 23*, 477-570 (1997); Peter Scharff Smith, *supra* note 9.

[15] *See* Human Rights in Trauma Mental Health Lab, Stanford Univ., *Mental Health Consequences Following Release from Long-Term Solitary Confinement in California* (2017) at https://perma.cc/5WGK-UBBN.

[16] *See* Terry Kupers, *Solitary: The Inside Story of Supermax Isolation and What We Can Do to Abolish It.* Oakland, CA: Univ. of Cal. Press (2017), especially pp. 151-167. The acronym "SHU" stands for "Security Housing Unit," which solitary confinement units are sometime labelled.

manifest symptoms of PTSD.[17]

35.    In addition to the lingering negative consequences of solitary confinement, research suggests that the adverse effects can be experienced almost immediately. For example, nearly five decades ago, psychologist Hans Toch's large-scale study of incarcerated men "in crisis" in New York State correctional facilities made important observations about the effects of isolation.[18] After conducting numerous in-depth interviews of the men, Toch concluded that "isolation panic" was a serious problem. The symptoms he reported included rage, panic, loss of control and breakdowns, psychological regression, and a build-up of physiological and psychic tension that led to incidents of self-harm.[19] Toch noted that while isolation panic could occur under other conditions of confinement it was "most sharply prevalent in segregation." Moreover, it marked an important dichotomy for incarcerated people: the "distinction between imprisonment, which is tolerable, and isolation, which is not."[20] Studies done in the 1980s and 1990s identified other adverse psychological symptoms produced by these conditions, including: appetite and sleep disturbances, anxiety, panic, rage, loss of control, paranoia, hallucinations, and self-mutilations. Direct studies of prison isolation have documented an extremely broad range of harmful psychological reactions. These include increases in the following potentially damaging symptoms and problematic behaviors: anxiety, withdrawal, hypersensitivity, ruminations, cognitive dysfunction, hallucinations, loss of control, irritability, aggression, and rage, paranoia,

---

[17] *See e.g.*, Brian Hagan et al., *History of Solitary Confinement Is Associated with Post-Traumatic Stress Disorder Symptoms among Individuals Recently Released from Prison*, J. of Urban Health, 95, 141-148 (2018); and Arthur Ryan & Jordan DeVylder, *Previously Incarcerated Individuals with Psychotic Symptoms Are More Likely to Report a History of Solitary Confinement*, Psychiatry Research, 290, 113064 (2020). https://doi.org/10.1016/j.psychres.2020.113064.
[18] Hans Toch, *Men in Crisis: Human Breakdowns in Prisons*. Chicago: Aldine Pub. Co. (1975).
[19] *Id.* at 54.
[20] *Id*.

hopelessness, a sense of impending emotional breakdown, self-mutilation, and suicidal ideation and behavior.[21]

36.    In addition, a 2020 study led by Justin Strong and other scientists analyzed the physical health effects of incarceration in solitary confinement, by sampling population groups incarcerated in solitary confinement in the State of Washington, and concluded that solitary confinement led to negative physical health outcomes.[22] This included conditions such as severe Vitamin D deficiency due to a lack of natural direct light exposure, skin rashes, weight fluctuations, and chronic musculoskeletal pain and deterioration (which can lead to arthritis, osteoporosis, and muscle weakness) due to the inability to engage in large-muscle exercise or walk more than a few steps in a cell or exercise cage. Moreover, people in solitary confinement experienced long delays in receiving care (either at the prison or off-site) for chronic medical conditions, due to the security restrictions on movement within the prison, or to travel off-site to hospitals and specialists.

37.    Additional research established a relationship between housing type and various kinds of incident reports in prison. It showed that self-harm and suicide are much more prevalent in isolated, punitive housing units like solitary confinement. Researchers have attributed higher suicide rates in solitary confinement-type units to the heightened levels of "environmental stress" generated by "isolation, punitive sanctions, [and] severely restricted living conditions" that exist there.[23] They reported that "the conditions of deprivation in locked units and higher-security

---

[21] Many of these findings are summarized and discussed in Haney & Lynch, *supra* note 10, and Haney, *supra* note 9.

[22] Justin D. Strong, et al., *The body in isolation: The physical health impacts of incarceration in solitary confinement*, PLoS ONE 15 (10:e0238510).
https://pmc.ncbi.nlm.nih.gov/articles/PMC7546459/pdf/pone.0238510.pdf

[23] Raymond Patterson & Kerry Hughes, Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999-2004, *Psychiatric Services, 59*, 676-682 (2008), at p. 678.

housing were a common stressor shared by many of the prisoners who committed suicide."[24] In addition, signs of deteriorating mental and physical health (beyond self-injury), other-directed violence, such as stabbings, attacks on staff, and property destruction, and collective violence were all found to be more prevalent in these units.[25]

38.     To take just one example of the scientific evidence establishing the harmfulness of solitary confinement, consider the extensive research on the relationship between placement in solitary confinement and instances of the extreme outcomes of self-harm and suicidality. To my knowledge, virtually every study of the topic has found that suicide and rates of self-harm are significantly higher in solitary confinement than in other prison settings.[26] For example, in 2018 Robert Canning and Joel Dvoskin acknowledged that suicide was related to placement in solitary confinement and that even prisoners who were placed there for their own protection may experience "anxiety and agitation" that "can rise to psychotic proportions and quickly precipitate

---

[24] *Id.*

[25] *See, e.g.*, Howard Bidna, Effects of Increased Security on Prison Violence, *Journal of Criminal Justice 3*, 33-46 (1975); K. Anthony Edwards, *Some* Characteristics of Prisoners Transferred from Prison to a State Mental Hospital, *Behavioral Sciences & the Law, 6,* 131-137 (1988); Peter Kratcoski, The Implications of Research Explaining Prison Violence and Disruption, *Federal Probation, 52,* 27-32 (1988); Frank Porporino, Managing Violent Individuals in Correctional Settings, *Journal of Interpersonal Violence, 1,* 213-237 (1986); and Pamela Steinke, Using Situational Factors to Predict Types of Prison Violence, *Journal of Offender Rehabilitation, 17,* 119-132 (1991).

[26] For examples of pre-2018 research and writing that acknowledged the relationship between solitary confinement and suicidality, see: Meredith Dye, Deprivation, Importation, and Prison Suicide: Combined Effects of Institutional Conditions and Inmate Composition, *Journal of Criminal Justice, 38,* 796-806 (2010); Seena Fazel, Julia Cartwright, Arabella Norman-Nott, & Keith Hawton, Suicide in Prisoners: A Systematic Review of Prisoners, *Journal of Clinical Psychiatry, 69,* 1721-1731 (2008); Stefan Fruehwald, Teresa Matschnig, Franz Koenig, Peter Bauer, & Patrick Frottier*,* Suicide in Custody: Case-Control Study, *British Journal of Psychiatry, 185,* 494-498 (2004); and Fatos Kaba, Andrea Lewis, Sarah Glowa-Kollisch, James Hadler, et al., Solitary Confinement and Risk of Self-Harm Among Jail Inmates, *American Journal of Public Health, 104,* 442-447 (2014).

a suicidal crisis."[27]

39.    Several years later, in 2022, Canning joined with another colleague, Alan Berman, to publish an article that began by noting that "[s]uicide is a leading cause of death in U.S. correctional populations."[28] They repeated the conclusions of earlier analyses by Canning and Dvoskin to the effect that "being medically ill, having a history of childhood maltreatment, and placement in segregated housing" were additional, important risk factors.[29] Berman and Canning also identified several "imminent and symptomatic risk factors" for suicide that are especially notable because they are among the known psychological reactions to being placed in solitary confinement, including "current anxiety/agitation," "sleep disturbance," social isolation/withdrawal," "feelings of 'frantic hopelessness,'" affective disturbance," "irritability," "insomnia," and "nightmares."[30]

40.    Relatedly, in 2019, Rafaella Calati and her colleagues published an extensive narrative review of the literature on "the link between social isolation… and suicidal thoughts and behaviors," considering the results of a wide range of studies on the topic.[31] Calati et al. concluded that "[b]oth the objective condition of being alone (e.g., living alone) and the subjective feeling of being alone (i.e., loneliness) were strongly associated with suicidal outcomes."[32] The authors noted that "[t]he specific condition of physical and social isolation of life in prison intensifies

---

[27] Robert Canning & Joel Dvoskin, Preventing Suicide in Detention and Correctional Facilities, in J. Wooldredge & P. Smith (Eds.), *Oxford Handbook of Prisons and Imprisonment* (pp. 551-578). New York: Oxford University Press (2018), at p. 555.
[28] Alan Berman, and Robert Canning, Proximal Risk for Suicide in Correctional Settings: A Call for Priority Research, *Psychiatric Services*, 19(3), 407-412 (2022).
[29] *Id.* at 408.
[30] *Id.* at 410.
[31] Rafaella Calati, et al., Suicidal Thoughts and Behaviors and Social Isolation: A Narrative Review of the Literature, *Journal of Affective Disorders, 245*, 653-667 (2019), at p. 660.
[32] *Id.* at 663.

suicidal risk," that "suicidal behaviors are frequent in this context," and that "being in isolation or segregation cells is a risk factor for suicide, while contacts with family and inmates might represent a protective factor."[33]

41.    Perhaps the most extensive analyses of the causes of prison suicide have been conducted by Louis Favril and his colleagues, including in a series of publications that appeared between 2019 and 2022. In the first, Favril, Wittouck, Audenaert, and Vander Laenen noted that suicide is the "leading cause of mortality in custodial settings worldwide".[34] Examining 17 years of suicide data from the Belgian prison system between 2000 and 2016, they reported that 60% of all suicides occurred in single-occupant cells,[35] and characterized the fact that one in ten suicides occurred among prisoners housed in solitary confinement as "worrying at the least," largely because "the use of solitary confinement can be detrimental to prisoners' mental health and well-being."[36] In the second publication on the topic, in 2020 Favril and colleagues Yu, Hawton, and Fazel systematically analyzed the relationship between solitary confinement and self-harm and suicide by conducting a meta-analysis of numerous previously published studies that had been done across a range of some 20 countries. They concluded that the "environmental risk factor" of solitary confinement was "clearly associated with self-harm."[37] Favril's sole-authored, follow-up literature review, published the next year, in 2021, examined the epidemiology of and risk factors for prison suicide, and included a series of recommendations for prevention.[38] He noted that, in

---

[33] *Id*. at 661.
[34] Louis Favril, Ciska Wittouck, Kurt Audenaert, & Freya Vander Laenen, 17-year National Study of Prison Suicides in Belgium, Crisis, *40*, 42–53 (2019), at 42.
[35] *Id*. at 46.
[36] *Id*. at 48.
[37] Louis Favril, Rongqin Yu, Keith Hawton, & Seena Fazel, Risk Factors for Self-Harm in Prison: A Systematic Review and Meta-Analysis, *Lancet: Psychiatry, 7,* 682–691 (2020), at 688.
[38] Louis Favril, Epidemiology, Risk Factors, and Prevention of Suicidal Thoughts and Behaviour in Prison: A Literature Review, *Psychologica Belgica, 61(1),* 341-355 (2021).

addition to a number of pre-existing risk factors (such as economic disenfranchisement and exposure to childhood adversity), "disconnection from family and friends on the outside" of prison is "a strong and consistent risk factor for suicidal thoughts and behaviour in prisoners," and also that "there is evidence that solitary confinement itself is an independent risk factor for suicidal behavior, even after release from prison."[39] He noted further: "Whilst interventions aimed at the physical prevention of suicide may have the ability to save lives, they do not address the reasons why prisoners are suicidal in the first place, nor do they reduce the longer-term risk of suicide. Appropriate psychosocial care and support should be provided."[40] Finally, in 2022, Favril and colleagues Shaw and Fazel conducted an updated, comprehensive meta-analytic review whose findings were consistent with their earlier results, including the fact that, among a number of the "custodial factors" that they examined, solitary confinement was the one that was most significantly associated with in-prison suicide attempts.[41]

42.    Although suicide is the most extreme outcome, it is certainly not the only harmful consequence of exposure to solitary confinement. In 2018, I published the results of a study that used a structured interview and systematic assessment format to determine the prevalence of symptoms of psychological stress, trauma, and isolation-related psychopathology in a randomly selected sample of persons who had been in extremely long-term isolation, having been housed for ten years or more in continuous solitary confinement (a Security Housing Unit or "SHU"). When I compared the results of these assessments with those of a randomly selected sample of general population (GP) incarcerated persons who had spent ten years or more of continuous

---

[39] *Id.* at 345.
[40] *Id.* at 348.
[41] Louis Favril, Jenny Shaw, & Seena Fazel, Prevalence and Risk Factors for Suicide Attempts in Prison, *Clinical Psychology Review, 97*, 102190 (2022).

imprisonment,[42] I found dramatic differences between them. That is, the persons in long-term isolation reported nearly <u>twice</u> the mean number of symptoms of both stress-related trauma (e.g., troubled sleep, heart palpitations, feelings of an impending breakdown) and isolation-related pathology (e.g., ruminations, irrational anger, depression, social withdrawal) overall compared to those housed in general population and who had been in prison for similar amounts of time. The intensity with which the reported symptoms was reported also differed very significantly—on average they were experienced well over <u>twice</u> as intensely by the isolated group. In addition, incarcerated persons in long-term solitary confinement not only reported being significantly more "lonely" than the persons in long-term general population but also reported extremely high levels of loneliness rarely found anywhere else in the literature.[43]

43.    Other researchers also documented high levels of psychological distress in persons housed in solitary confinement. For example, in a 2020 publication, Keramet Reiter and her colleagues found clinically significant symptoms in sizable numbers of persons housed under isolated conditions, prevalence rates for serious mental illness and self-harming behavior in solitary confinement that were approximately twice as high as among general population incarcerated persons, "[s]ymptoms such as anxiety and depression [that] were especially prevalent in [the isolated] population, along with symptoms ostensibly specific to solitary confinement, such as sensory hypersensitivity and a perceived loss of identity…" as well as respondents who "pointed

---

[42] Craig Haney, Restricting the Use of Solitary Confinement, *Annual Review of Criminology, 1,* 285-310 (2018).
[43] *Id*.; *see also* Craig Haney, Solitary Confinement, Loneliness, and Psychological Harm, in J. Lobel & P. Scharff Smith (Eds.), *Solitary Confinement: Effects, Practices, and Pathways to Reform* (pp. 129-152). New York: Oxford University Press 2020).

to psychiatric distress—in profoundly existential terms…"[44]

44.    Relatedly, there is evidence that the stressfulness and long-term damage that is inflicted by solitary confinement can adversely affect someone's life expectancy. A 2019 study published in the Journal of the American Medical Association, analyzing the experiences of more than 200,0000 persons who were released from a state prison system between 2000 and 2015, confirmed this. The researchers found that those who spent any time in solitary-type confinement (such as administrative or disciplinary segregation) "were 24% more likely to die in the first year after release."[45] Incarcerated people who spent time in solitary-type confinement also were more likely to commit suicide (78% more likely than other prisoners) and to be victims of homicide (54% more likely) after being released from prison, and they were "127% more likely to die of an opioid overdose in the first 2 weeks after release."[46]

45.    Although much of the research summarized above focused on the consequences of longer-term solitary confinement—lasting days, weeks, months, or even years, there also is evidence that even an initial, brief period in which someone is placed in solitary confinement carries heightened risk of harm. This was first identified in the previously mentioned research conducted by psychologist Hans Toch in New York State correctional facilities. After numerous in-depth interviews, Toch identified a phenomenon that he termed "isolation panic," an extreme psychological reaction that some prisoners have, including in the early stages when first placed

---

[44] Keramet Reiter, et al., Psychological Distress in Solitary Confinement: Symptoms, Severity, and Prevalence in the United States, 2017-2018, *American Journal of Public Health, 110*, 556-562 (2020), p. 560.
[45] Lauren Brinkley-Rubinstein, et al., Association of Restrictive Housing During Incarceration with Mortality After Release, *Journal of American Medical Association*, Oct. 4, 2019, at https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2752350.
[46] *Id.*

alone in a solitary confinement cell.[47]

46.    Taken as a whole, the studies summarized in the preceding paragraphs confirm what I have observed in my own work: time spent in isolation is not only painful but harmful. It can and routinely does have extremely damaging psychological and physical effects—and, in the worst case scenarios, can lead to death—for persons exposed to it.

**B.    The Negative Effects of Solitary Confinement Should Be Interpreted Within a Larger Scientific Framework on Social Isolation**

47.    It is important to understand that, as I alluded to in passing earlier, the research on solitary confinement that I summarized above does not exist in an empirical or theoretical vacuum. In fact, what we know about the negative psychological effects of prison isolation is actually situated in an even larger scientific literature about the harmful effects of social isolation and exclusion in society more generally. That is, there is now a wealth of scientific knowledge about the harmful effects of social isolation and exclusion in contexts and settings outside of prison.

48.    Prison research is notoriously difficult to conduct, primarily because prisons are "closed" institutions and because researchers lack control over where and how prisoners are housed (which are decisions governed by correctional rather than scientific contingencies). Absent these constraints in the world outside prison, researchers have been able to conduct a vast number of scientific studies on the effects of social isolation and exclusion. That much larger scientific literature forms the empirical and theoretical framework in which the results of research on solitary confinement in prison can and should be understood and interpreted.

49.    There has been a great deal of methodologically sophisticated research - much of it done in the last several decades – that has produced an impressive scientific database that very

---

[47] Toch, *supra* note 14, at 54.

carefully documents what many of us who have been studying prison solitary confinement already knew—namely, that meaningful social contact is a fundamental human need, and whose deprivation has a range of potentially very serious psychological and even physical effects. The database is so extensive that it would be impossible for me to comprehensively review it in the time available to complete this report. Instead, I will summarize a representative sample of the research and its most important conclusions. Even this brief summary establishes that there is a larger empirical and theoretical scientific framework through which the nature and significance of the adverse effects of solitary confinement can and should be understood.'

50.    The need to belong, to be socially connected, and to have social contact with others—has been recognized for several decades in psychology and other behavioral sciences.[48] Psychologists have long known that social contact is fundamental to establishing and maintaining emotional health and well-being. Years ago, social psychologist Herbert Kelman argued that denying persons contact with others was a form of dehumanization.[49] As one researcher put it more recently: "Since its inception, the field of psychology emphasized the importance of social connections."[50] "Affiliation" - the opportunity to have meaningful contact with others - helps us reduce anxiety in the face of uncertainty or fear-arousing stimuli.[51]

---

[48] *See, e.g.*, Baumeister, R., & Leary, M. (1995). The need to belong: Desire for interpersonal attachments as a fundamental human motivation. *Psychological Bulletin, 117*, 497-529.

[49] Kelman, H., Violence Without Restraint: Reflections on the Dehumanization of Victims and Victimizers. In G. Kren & L. Rappaport (Eds.), *Varieties of Psychohistory* (pp. 282-314). New York: Springer (1976).

[50] DeWall, C., Looking Back and Forward: Lessons Learned and Moving Forward, in C. DeWall (Ed.), *The Oxford Handbook of Social Exclusion* (pp. 301-03). New York: Oxford University Press (2013), at p. 301.

[51] *See, e.g.*, Stanley Schachter, *The Psychology of Affiliation: Experimental Studies of the Sources of Gregariousness*. Stanford, CA: Stanford University Press (1959); Irving Sarnoff & Philip Zimbardo, Anxiety, Fear, and Social Affiliation, *Journal of Abnormal Social Psychology, 62*, 356-363 (1961); Philip Zimbardo & Robert Formica, Emotional Comparison and Self-Esteem as Determinants of Affiliation, *Journal of Personality, 31*, 141-162 (1963).

51.     Indeed, one of the ways that people determine the appropriateness of their feelings - how we establish the very nature and tenor of our emotions - is through contact with others.[52] Thus, prolonged social deprivation is painful and destabilizing in part because it deprives persons of the opportunity to ground their thoughts and emotions in a meaningful social context - to know what they feel and whether those feelings are appropriate.

52.     Not surprisingly, then, numerous scientific studies have established the psychological significance of social contact, connectedness and belongingness. They have concluded, among other things, that the human brain is literally "wired to connect" to others.[53] Thwarting this "need to connect" not only undermines psychological well-being but also increases physical morbidity and mortality. Indeed, in part out of recognition of the importance of the human need for social contact, connection, and belongingness, social psychologists and others have written extensively about the harmful effects of its deprivation - what happens when people are subjected to social exclusion and isolation.

53.     Some of the most dramatic demonstrations of the harmful effects of social deprivation have been found in animal research, where certain kinds of more intrusive scientific procedures and controls are possible to employ. Numerous animal studies have documented the neurological consequences of social isolation, measured in ways that they could not be done with

---

[52] *See, e.g.*, A. Fischer, A. Manstead, & R. Zaalberg, Social Influences on the Emotion Process, in M. Hewstone & W. Stroebe (Eds.), *European Review of Social Psychology* (pp. 171-202). Volume 14. Wiley Press (2004); C. Saarni, *The Development of Emotional Competence.* New York: Guilford Press (1999); Stanley Schachter & Jerome Singer, Cognitive, Social, and Physiological Determinants of Emotional State, *Psychological Review, 69*, 379-399 (1962); L. Tiedens & C. Leach (Eds.), *The Social Life of Emotions*. New York: Cambridge University Press (2004); and S. Truax, Determinants of Emotion Attributions: A Unifying View, *Motivation and Emotion, 8,* 33-54 (1984).

[53] Lieberman, M., *Social: Why Our Brains Are Wired to Connect*. New York: Random House (2013).

human study subjects. The studies have found that social isolation actually has the capacity to alter the brain's neurochemistry, structure, and function. Thus, social isolation leads to anxiety-like behavior in animals, impairs their working memory, and disrupts their brain activity,[54] as well as altering their neuroendocrinal responses in ways that that exacerbate the effects of stress.[55] Social isolation represents a chronic stressor that also changes animal brain chemistry in ways that negatively affect the cellular mechanisms of aging,[56] precipitates depression-like behavior in mammals,[57] and suppresses the animal immune response to illness.[58]

54.     In fact, the damaging effects of social isolation on laboratory animals are so well-documented that they have led governmental and scientific funding organizations—for example, the National Institute of Health—to prohibit researchers from placing animals in completely isolated conditions for prolonged periods. It is considered unethical to do so and a basis for denying or revoking funding to scientists who violate this prohibition. As a result, university research facilities that conduct animal research have "institutional animal care and use committees" that promulgate guidelines for conducting animal research, virtually all of which include limitations

---

[54] *See, e.g.*, Zorzo, C., Mendez-Lopez, M., Mendez, M., & Arias, J. (2018). Adult social isolation leads to anxiety and spatial memory impairment: Brain activity pattern of COx and c-Fos. *Behavioural Brain Research, 365,* 170-177.

[55] *See, e.g.*, Frietas, B., Antoniazzi, V., dos Santos, C., et al. (2019). Social isolation and social support at adulthood affect epigenetic mechanisms, brain-derived neurotrophic factor levels and behavior of chronically stressed rats. *Behavioural Brain Research, 366,* 36-44.

[56] *See, e.g.*, Stevenson, J., McMahon, E., Boner, W., & Haussmann, M. (2019). Oxytocin administration prevents cellular aging caused by social isolation. *Psychoneuroendocrinology, 103,* 52-60.

[57] *See, e.g.*, Gong, Y., Tong, L., Yang, R., et al. (2018). Dynamic changes in hippocampal microglia contribute to depressive behavior induced by early social isolation. *Neuropharmacology, 135,* 223-233.

[58] *See, e.g.*, Wu, W., Yamaura, T., Murakami, K., et al. (2000). Social isolation stress enhances liver metastasis of murine colon 26-L5 carcinoma cells by suppressing immune response in mice. *Life Sciences, 66,* 1827-1838.

on the degree to which laboratory animals can be subjected to any form of social isolation.[59]

55.    Of course, the results of animal studies are not directly transferable to human populations. However, literally hundreds of studies done with human participants have reached many of the same conclusions. For example, scientists have established that social isolation is a significant risk factor for depression and anxiety among adolescents and adults,[60] and is related as well to psychosis,[61] paranoia,[62] and suicidal behavior.[63] It also leads to reduced cognitive functioning.[64] Among people who already have been diagnosed or identified as mentally ill in free

---

[59] For example, Emory University's guidelines mandate "environmental enrichment" for nonhuman primates used in research. The enrichment is aimed at "identifying and providing the environmental stimuli necessary for psychological and physiological wellbeing." The Emory guidelines mandate that "all nonhuman primates must be housed with one or more members of the same species." Any exception to this policy requires advanced approval and is "reviewed by the Attending Veterinarian every 30 days."
http://www.iacuc.emory.edu/documents/policies/360_Environmental_Enrichment_for_Nonhuman_Primates.pdf.

[60] *See, e.g*., Ge, L., Chun, W., Ong, R., & Heng, B. (2017). Social isolation, loneliness and their relationship with depressive symptoms: A population-based study. *PLoS ONE, 12(8),* e0182145. https://doi.org/10.1371/journal.pone.0182145; Hafner, S., et al., Association Between Social Isolation and Inflammatory Markers in Depressed and Non-depressed Individuals: Results from the MONICA/KORA Study, *Brain, Behavior, and Immunity, 25,* 1701-1707 (2011); Richardson, C., Oar, E., Fardouly, J. et al. (2019). The moderating role of sleep in the relationship between social isolation and internalising problems in early adolescence. *Child Psychiatry & Human Development,* 1-10 https://doi.org/10.1007/s10578-019-00901-9; van Beljouw, I. M., van Exel, E., de Jong Gierveld, J., Comijs, H. C., Heerings, M., Stek, M.L., et al. (2014). "Being all alone makes me sad": Loneliness in older adults with depressive symptoms. *International Psychogeriatrics, 9.* https://doi.org/10.1017/S1041610214000581 1-11.1; Wang, J., Lloyd-Evans, B., Giacco, D. et al. (2017). Social isolation and mental health: A conceptual and methodological review. *Social Psychiatry and Psychiatric Epidemiology, 52,* 1451-1461.

[61] *See, e.g*., DeNiro, D. (1995). Perceived alienation in individuals with residual-type schizophrenia. *Issues in Mental Health Nursing, 16(3),* 185-200.

[62] *See, e.g*., Butter, S., Murphy, J., Shelvin, M., & Houston, J. (2017). Social isolation and psychosis-like experiences: A UK general population analysis. *Psychosis: Psychological, Social and Integrative Approaches, 9(4),* 291-300.

[63] *See, e.g*., Goldsmith, S., Pellmar, T., Kleinman, A., & Bunney, W. (2002). *Reducing suicide: A national imperative,* Washington, DC: National Academy Press.

[64] *See, e.g*., Fratiglioni, L., Wang, H., Ericsson, K., Maytan, M., & Winblad, B. (2000). Influence of social network on occurrence of dementia: A community-based longitudinal study. *Lancet, 355,* 1315-1319; Shankar, A., Hamer, M., McMunn, A., & Steptoe, A. (2013). Social isolation

society, isolation has been implicated in the maintenance of delusional or psychotic beliefs,[65] a lack of insight into one's psychiatric symptoms,[66] and a higher rate of hospital usage.[67]

56.     In addition, social isolation also adversely impacts the functioning of the human immune system[68] and undermines physical health outcomes in general.[69] Not surprisingly it has been linked to higher rates of mortality; that is, social isolation literally lowers the age at which people die from all causes, not just deaths from suicide discussed above.[70] In fact, researchers have

---

and loneliness: Relationships with cognitive function during 4 years of follow-up in the English Longitudinal Study of Ageing. *Psychosomatic Medicine, 75*, 161-170.

[65] *See, e.g.*, Garety, P., Kuipers, E., Fowler, D., Freeman, D., & Bebbington, P. (2001). A cognitive model of the positive symptoms of psychosis. <u>*Psychological Medicine, 31(2),*</u> 189-195, who wrote about the way that social marginalization contributes to beliefs about the self as "vulnerable to threat, or about others as dangerous" (p. 190) and the way that "social isolation contributes to the acceptance of… psychotic appraisal by reducing access to alternative move normalizing explanations" (p. 191).

[66] *See, e.g.*, White, R., Bebbington, P., Person, J., Johnson, S., & Ellis, D. (2000). The social context of insight in schizophrenia. *Social Psychiatry and Psychiatric Epidemiology, 35(11),* 500-507.

[67] *See, e.g.*, Mgutshini, T. (2010). Risk factors for psychiatric re-hospitalization: An exploration. *International Journal of Mental Health Nursing, 19(4),* 257-267; and Thornicroft, G. (1991). Social Deprivation and Rates of Treated Mental Disorder: Developing Statistical Models to Predict Psychiatric Service Utilisation, *British Journal of Psychiatry, 158*, 475-484.

[68] *See, e.g.*, Pressman, S., Cohen, S., Miller, G., et al., (2005). Loneliness, social network size, and immune response to influenza vaccination in college freshmen. *Health Psychology, 24*, 297-306.

[69] *See, e.g.*, Beller, J., & Wagner, A. (2018). Loneliness, social isolation, their synergistic interaction, and mortality. *Health Psychology, 37(9),* 808-813; Fiorillo, D., & Fabio Sabatini, F. (2011). Quality and Quantity: The Role of Social Interactions in Self-Reported Individual Health. *Social Science & Medicine, 73*, 1644-1652.

[70] *See, e.g.*, Coyle, & Dugan, (2012); and Elovainio, M., Hakulinen, C., Pulkki-Raback, L., et al. (2017). Contribution of risk factors to excess mortality in isolated and lonely individuals: An analysis of data from the U.K. Biobank cohort study. *The Lancet Public Health, 2*, e260-e266; Hawkley, L., & Cacioppo, J. (2010). Loneliness matters: A theoretical and empirical review of consequences and mechanisms. *Annals of Behavioral Medicine, 40*, 218-227; Heinrich, L., & Gullone, E. (2006). The clinical significance of loneliness: A literature review. *Clinical Psychology Review, 26,* 695-718; Marcus, A., Illescas, A., Hohl, B., & Llanos, A. (2017). Relationships between social isolation, neighborhood poverty, and cancer mortality in a population-based study of US adults. PLoS ONE, 12(3), e0173370. doi: 10.1371/journal.pone.0173370; Pantell, M., Rehkopf, D., Jutte, D., et al. (2013). Social isolation: A predictor of mortality comparable to traditional clinical risk factors. *American Journal of*

concluded that the health risk of social isolation on mortality rates is comparable to that caused by smoking.[71] In part because of its dramatic life-shortening effects, the social isolation of older adults was the focus of two of the Canadian National Seniors Council most recent reports.[72] Its negative effects on psychological and physical well-being have led to social isolation being recognized internationally as a major public health problem.[73]

57.    There is a closely related and well-developed body of literature on "social exclusion" - what happens when people are involuntarily separated from others (as they are in most prison solitary confinement units). These studies, too, show that being separated from others produces a host of serious negative consequences. Researchers have documented the fact that excluding persons from contact with others is not only "painful in itself," but also "undermines people's sense of belonging, control, self-esteem, and meaningfulness, reduces pro-social

---

*Public Health, 30,* 241-256; and Tanskanen, J., & Anttila, T. (2016). A prospective study of social isolation, loneliness, and mortality in Finland. American Journal of Public Health, 106(11), 2042-2048.

[71] *See, e.g*., Holt-Lunstad, J., Smith, T. B., & Layton, B. (2010). Social relationships and mortality risk: A meta-analytic review. *PLoS Medicine, 7,* 1–20. Holt-Lunstad, J., Smith, T. B., Baker, M., Harris, T., & Stephenson, D. (2015). Loneliness and social isolation as risk factors for mortality: A meta-analytic review. *Perspectives on Psychological Science, 10,* 227–237.

[72] *See* National Seniors Council. (2014). *Report on the social isolation of seniors 2013-2014*, at http://www.seniorscouncil.gc.ca/eng/research_publications/social_isolation/page00.html; National Seniors Council. (2017). *Who's at risk and what can be done about it? A review of the literature on the social isolation of different groups of seniors*, at https://www.canada.ca/en/national-seniors-council/programs/publications-reports/2017/review-social-isolation-seniors.html.

[73] *See, e.g*., Leigh-Hunt, N., Bagguley, D., Bash, K., et al. (2017). An overview of systematic reviews on the public health consequences of social isolation and loneliness. *Public Health, 152,* 157-171. In fact, an international commission formed by former French President, Nicholas Sarkozy, and led by Nobel Prize winners Joseph Stiglitz and Amartya Sen and economist Jean-Paul Fitoussi to identify key indicators of social progress, quality of life, and well-being identified social connectedness as one of the key dimensions that nations should take into account. Stiglitz, J., Sen, A., Fitoussi, J., et al. (2008). *Report by the Commission on the Measurement of Economic Performance and Social Progress*. Paris, France: The Commission http://ec.europa.eu/eurostat/documents/118025/118123/Fitoussi+Commission+report

behavior, and impairs self-regulation."[74] Indeed, the subjective experience of social exclusion results in what has been called "cognitive deconstructive states" in which there is emotional numbing, reduced empathy, cognitive inflexibility, lethargy, and an absence of meaningful thought.[75]

58.    Social exclusion has been shown to heighten people's feelings of physical vulnerability and the expectation that they will experience physical harm in the future,[76] and may precipitate aggressive behavior - "action-oriented coping" - in response.[77] As two authors noted in summarizing these overall effects:

> Social exclusion is detrimental and can lead to depression, alienation, and sometimes even to violent behaviour. Laboratory studies show that even a brief episode of exclusion lowers mood, causes social pain, which is analogous to physical pain, and elicits various behavioural responses, such as aggressive behaviour or affiliation-seeking behavior.[78]

59.    In fact, the editor of an authoritative Oxford Handbook of Social Exclusion concluded the volume by summarizing the "serious threat" that social exclusion represents to psychological health and well-being, including "increased salivary cortisol levels… and blood

---

[74] Bastian, B., & Haslam, N. (2010). Excluded from Humanity: The Dehumanizing Effects of Social Ostracism. *Journal of Experimental Social Psychology, 46*, 107-113, p. 107, internal references omitted.

[75] Twenge, J., Catanese, K., & Baumeister, R. (2003). Social Exclusion and the Deconstructed State: Time Perception, Meaninglessness, Lethargy, Lack of Emotion, and Self Awareness. *Journal of Personality and Social Psychology, 85*, 409-423 (2003).

[76] *See, e.g*., Dean, K., Wentworth, G., & LeCompte, N. (2016). Social exclusion and perceived vulnerability to physical harm. *Self and Identity, 18(1),* 87-102.

[77] Reiter-Scheidl, K., Poapousek, I., Lackner, H., et al. (2018). Aggressive behavior after social exclusion is linked with the spontaneous initiation of more action-oriented coping immediately following the exclusion episode. *Physiology & Behavior, 195*, 142-150.

[78] Syrjamaki, A., & Hietanen, J., (2018). The effects of social exclusion on processing of social information—A cognitive psychology perspective. *British Journal of Social Psychology,* DOI:10.1111/bjso.12299 (internal citations omitted). See, also: DeWall, et al. (2011). Belongingness as a Core Personality Trait: How Social Exclusion Influences Social Functioning and Personality Expression, *Journal of Personality, 79*, 979-1012.

flow to brain regions associated with physical pain," "sweeping changes" in attention, memory, thinking, and self-regulation, as well as changes in aggression and prosocial behavior. As he put it: "This dizzying array of responses to social exclusion supports the premise that it strikes at the core of well-being."[79]

60.     In addition to subjecting prisoners to social isolation and social exclusion, solitary confinement often greatly limits or completely deprives them of the opportunity to give and receive caring human touch. Isolated prisoners may go for days, weeks, months, or even years without ever touching another person with affection. Yet, psychologists have long known that: "Touch is central to human social life. It is the most developed sensory modality at birth, and it contributes to cognitive, brain, and socioemotional development throughout infancy and childhood."[80] The need for caring human touch is so fundamental that early deprivation is a risk factor for neurodevelopmental disorders, depression, suicidality, and other self-destructive behavior.[81] Later deprivation is associated with violent behavior in adolescents.[82] Conversely, a number of experts

---

[79] DeWall, *supra* note 34, at p. 302. See, also: Johan Karremans, et al. (2011). Secure Attachment Partners Attenuate Neural Responses to Social Exclusion: An fMRI Investigation. *International Journal of Psychophysiology, 81*, 44-50 (2011).

[80] Hertenstein, M., Keltner, D., App, B., Bulleit, B, & Jaskolka, A., Touch Communicates Distinct Emotions. Emotion, 6, 528-533 (2006), at p. 528. See also: Hertenstein, M., & Weiss, S. (Eds.), *The Handbook of Touch: Neuroscience, Behavioral, and Health Perspectives.* New York: Springer (2011).

[81] *See, e.g.*, Cascio, C., Somatosensory Processes in Neurodevelopmental Disorders, *Journal of Neurodevelopmental Disorders, 2*, 62-69 (2010); Field, S., Touch Deprivation and Aggression Against Self Among Adolescents, in Stoff, D. & Susman, E. (Ed.), *Developmental psychobiology of aggression* (117-140). New York: Cambridge (2005).

[82] Field, T., Violence and Touch Deprivation in Adolescents, *Adolescence, 37,* 735-749 (2002). Recent theory and research now indicate that "touch is a primary platform for the development of secure attachments and cooperative relationships," is "intimately involved in patterns of caregiving," is a "powerful means by which individuals reduce the suffering of others," and also "promotes cooperation and reciprocal altruism." Goetz, J., Keltner, D., & Simon-Thomas, E., Compassion: An Evolutionary Analysis and Empirical Review, *Psychological Bulletin, 136*, 351-374 (2010), at p. 360. The uniquely prosocial emotion of compassion "is universally signaled through touch," so that persons who live in a world without touch are denied the

have argued that caring human touch is so integral to our well-being that it is actually therapeutic. Thus, it has been recommended to treat a host of maladies including depression, suicidality, and learning disabilities.[83]

61.     If anything, the kind of social isolation, social exclusion, and the deprivation of caring touch that occurs in solitary confinement in prisons and jails is far more stressful, harmful, and dangerous than in the larger society where these deleterious effects have been elaborately documented. Prison and jail isolation is enforced isolation (indeed, prisoners are often forcibly removed from their cells and taken to solitary confinement), it is pejoratively imposed (i.e., there is stigma and often gratuitous humiliation associated with it), and it is accompanied by a host of additional deprivations beyond the sheer deprivation of meaningful social contact. Those deprivations commonly include the lack of positive environmental stimulation, severe restrictions on property, and a dearth or complete absence of meaningful activity and programming. Thus, there is every reason to believe that the adverse psychological and physical effects of social isolation and exclusion and the deprivation of caring touch that occur in the course of solitary confinement exceed those that typically occur as a result of experiencing social isolation in free society.

---

experience of receiving or expressing compassion in this way. Stellar, J., & Keltner, D., Compassion, in Tugade, M., Shiota, M., & Kirby, L. (Eds.), *Handbook of Positive Emotions* (pp. 329-41). New York: Guilford (2014). Researchers have found that caring human touch mediates a sense of security and place, a sense of shared companionship, of being and nurturing, feelings of worth and competence, access to reliable alliance and assistance, and guidance and support in stressful situations. Weiss, R., The Attachment Bond in Childhood and Adulthood, in C. Parkes, J. Stevenson-Hinde, & P. Marris (Eds.), *Attachment Across the Life Cycle* (66-76). London: Routledge (1995).

[83] *See, e.g.*, Dobson, S., Upadhyaya, S., Conyers, I., & Raghavan, R., Touch in the Care of People with Profound and Complex Needs, *Journal of Learning Disabilities, 6,* 351-362 (2002); Field, T., Deprivation and Aggression Against Self Among Adolescents. In D. Stoff & E. Susman (Eds.), *Developmental Psychobiology of Aggression* (pp. 117-40). New York: Cambridge (2005).

C.      **Current Professional Standards Severely Limit the Use of Solitary Confinement**

62.     These basic facts comprise the scientific reasons that numerous professional scientific, mental health, legal, and correctional organizations as well as faith communities and international human rights monitoring bodies have promulgated standards to be followed with respect to prisoners housed in segregated confinement, including using this form of harsh confinement only as an absolute last resort and only for the shortest possible time (not to exceed 15 days). Thus, they not only have explicitly acknowledged the harmful effects of solitary confinement but also have articulated standards by which its use should be strictly limited and, in some cases, prohibited.

63.     Distinguished expert panels that have investigated and analyzed these issues have reached nearly identical conclusions about the harmful effects of solitary confinement. For example, a landmark report was published in 2006 that was based in large part on a series of fact-finding hearings conducted across the United States by the bipartisan Commission on Safety and Abuse in America's Prisons. In the course of the hearings, diverse groups of nationally recognized experts, stakeholders, and policymakers testified about a wide range of prison-related issues. Among other things, the Commission concluded that solitary confinement was "expensive and soul destroying"[84] and recommended that prison systems "end conditions of isolation."[85]

64.     The next year, in 2007, an international group of prominent mental health and correctional experts meeting on psychological trauma in Istanbul, Turkey issued a joint statement on "the use and effects of solitary confinement." In what has come to be known as the "Istanbul

---

[84] Gibbons, J., and Katzenbach, N., *Confronting Confinement: A Report of the Commission on Safety and Abuse in America's Prisons.* New York: Vera Institute of Justice (2006), at p. 59, *at* http://www.vera.org/sites/default/files/resources/downloads/Confronting_Confinement.pdf.
[85] *Id*. at p. 57.

Statement," they acknowledged that the "central harmful feature" of solitary confinement is its reduction of meaningful social contact to a level "insufficient to sustain health and well being."[86] Citing various statements, comments, and principles that had been previously issued by the United Nations - all recommending that the use of solitary confinement be carefully restricted or abolished altogether - the Istanbul group concluded that "[a]s a general principle solitary confinement should only be used in very exceptional cases, for as short a time as possible and only as a last resort." Notably, the specific recommendations they made about how such a regime should be structured and operated would, if adopted, end most forms of long-term isolated confinement.

65.    In 2010, the American Bar Association Standards for Criminal Justice hold that "[s]egregated housing should be for the briefest term and under the least restrictive conditions practicable"[87] and that at intervals "not to exceed [90 days], a full classification review" should be conducted that addresses the prisoner's "individualized plan" in segregation with "a presumption in favor of removing the prisoner from segregated housing."[88]

66.    In 2011, the United Nations Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment concluded that solitary confinement for longer than 15 days constitutes torture, and that juveniles and people with mental illness should never be held in solitary confinement.[89]

---

[86] International Psychological Trauma Symposium, *Istanbul Statement on the Use and Effects of Solitary Confinement.* Istanbul, Turkey (December 9, 2007), *available at* http://www.univie.ac.at/bimtor/dateien/topic8_istanbul_statement_effects_solconfinment.pdf.

[87] American Bar Association, *ABA Criminal Justice Standards on the Treatment of Prisoners,* Standard 23-2.6(a) (2010), *available at* http://www.americanbar.org/publications/criminal_justice_section_archive/crimjust_standards_treatmentprisoners.html [hereinafter "*ABA Standards*"].

[88] ABA Standards, 23-2.9.

[89] Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Interim Report of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, U.N. Doc A/66/268, paras. 76-78 (Aug. 5, 2011).

67.     Similarly, the Society of Correctional Physicians issued a Position Statement "acknowledg[ing] that prolonged segregation of inmates with serious mental illness, with rare exceptions, violates basic tenets of mental health treatment." The National Alliance on Mental Illness has reached much the same set of conclusions and recommendations.[90]

68.     In 2013, the American Public Health Association issued a report that focused attention on solitary confinement as a "public health issue." The Association detailed the public health harms of solitary confinement, urged correctional authorities to "eliminate solitary confinement for security purposes unless no other less restrictive option is available to manage a current, serious, and ongoing threat to the safety of others," and recommended that, because of the risks involved, "[p]unitive segregation should be eliminated."[91]

69.     The National Academy of Science assembled a committee of the nation's most distinguished prison scholars to analyze the causes and consequences of the high rate of incarceration in the United States. In 2014, after several years of study, the committee issued its final report. Among other things, the report quoted two esteemed prison researchers – Hans Toch to the effect that many forms of solitary confinement are "draconian, redolent with custodial overkill, and stultifying" and Norval Morris to the effect that such confinement "raise[d] the level of punishment close to that of psychological torture."[92] The committee itself concluded that there

---

[90] Society of Correctional Physicians, *Position Statement, Restricted Housing of Mentally Ill Inmates* (2013), *available at* http://societyofcorrectionalphysicians.org/resources/position-statements/restricted-housing-of-mentally-ill-inmates; National Alliance on Mental Illness, Public Policy Platform Section 9.8, *available at* http://www.nami.org/Template.cfm?Section=NAMI_Policy_Platform&Template=/ContentManagement/ContentDisplay.cfm&ContentID=38253 ("oppos[ing] the use of solitary confinement and equivalent forms of extended administrative segregation for persons with mental illnesses").

[91] American Public Health Association, *Solitary Confinement as a Public Health Issue*, Policy No. 201310 (2013), *at* http://www.apha.org/advocacy/policy/policysearch/default.htm?id=1462.

[92] National Research Council, *The Growth of Incarceration in the United States: Exploring Causes and Consequences*. Washington, DC: National Academies Press, p. 185.

are "sound theoretical bases" that explain the adverse psychological effects of prison isolation, and that "[a]n extensive empirical literature indicates that long-term isolation or solitary confinement in prison settings can inflict emotional damage."[93] The report recommended placing significant limitations on the use of solitary confinement, including "limiting or prohibiting the long-term isolation of prisoners with special vulnerabilities (such as serious mental illness)."[94]

70.     In April 2016, the National Commission on Correctional Health Care ("NCCHC")—an organization of health care professionals who work in correctional settings— issued a Position Statement on solitary confinement.[95] Relying on many of the sources and consensus positions that I have quoted in the preceding paragraphs of this section of my report, the NCCHC declared, among other things, that solitary confinement of longer than 15 days constitutes "cruel, inhumane, or degrading treatment of inmates" of the sort that correctional health professionals should not participate in.

71.     Various faith-based organizations have also issued similar policy statements and recommendations urging significant reductions in the use of solitary confinement and its outright elimination for some populations. For example, New York State Council of Churches passed a resolution in 2012 opposing the use of prison isolation and urging all members of the faith to participate in work to "significantly limit the use of solitary confinement."[96]

72.     Moreover, in 2015 a Commission of the United Nations approved the Standard

---

[93] *Id*. at p. 186.
[94] *Id*. at p. 188.
[95] Available at: http://www.ncchc.org/solitary-confinement.
[96] New York State Council of Churches, *Resolution Opposing the Use of Prolonged Solitary Confinement in the Correctional Facilities of New York State and New York City* (2012), *available at* https://sites.google.com/site/nyscouncilofchurches/priorities/on-solitary-confinement; Presbyterian Church (USA), *Commissioners' Resolution 11-2, On Prolonged Solitary Confinement in U.S. Prisons* (2012), *available at* https://pc-biz.org/MeetingPapers/(S(em2ohnl5h5sdehz2rjteqxtn))/Explorer.aspx?id=4389

Minimum Rules for the Treatment of Prisoners (known as the "Mandela Rules") that contained several provisions designed to significantly regulate and limit the use of solitary confinement. Specifically, Rule 43.1 prohibits the use of "indefinite" and "prolonged" solitary confinement.[97] More generally, Rule 45.1 provides that solitary confinement "shall be used only in exceptional cases as a last resort, for as short a time as possible…"

73.    In fact, these standards are not only well-known in the scientific, mental health, human rights, legal, and correctional communities but, as I will discuss later in this report, they have been acknowledged by the Manitoba prison authorities themselves, who have pledged to adhere to them.

74.    In addition to the increasingly broad and deep consensus about the harmfulness of solitary confinement among scientific, legal, religious, and medical and mental health organizations, there are a number of state correctional systems in the United States that have explicitly recognized the psychological risks as well as the added expense and overall ineffectiveness of punitive isolation and taken steps to significantly reduce its use. For example, in 2015, a New York *Times* Magazine article reported on the views of Colorado officials, including the head of the state Department of Corrections: "Gov. John W. Hickenlooper of Colorado signed [a bill banning solitary confinement for anyone under 21] at the urging of the state corrections chief, Rick Raemisch, who spent a night in solitary confinement and wrote about it in a New York *Times* Op-Ed. concluding that its overuse is 'counterproductive and inhumane.'"[98] The Colorado

---

[97] Commission on Crime Prevention and Criminal Justice, *United Nations Standard Minimum Rules for the Treatment of Prisoners (the Mandela Rules)*, United Nations Economic and Social Council, May 21, 2015. The Commission defined "solitary confinement" as "confinement of prisoners for 22 hours or more a day without meaningful human contact." See Rule 44.
[98] Binelli, M., This Place is Not Designed for Humanity, *New York Times Magazine*, March 29, 2015, p. 40. For the Colorado Executive Director of Corrections Op Ed, see Raemisch, R., My

Department of Corrections was one of the leaders in the decade-old movement to very significantly reduce the overall number of prisoners housed in solitary confinement units in the United States and to reduce and eventually prohibit mentally ill prisoners from being housed in them.[99] Eventually, Rick Raemisch, the director of the Colorado Department of Corrections, announced that Colorado had not only prohibited mentally ill prisoners from being placed in isolation but also ended the use of long-term solitary confinement altogether, so that even prisoners "who commit serious violations like assault will now spend at most 15 days in solitary.…"[100]

75.    In fact, over the last decade, prison systems in the United States as diverse as Maine, Mississippi, and North Dakota have drastically reduced the number of prisoners housed in solitary or isolated confinement.[101] In addition, several states have closed their primary solitary confinement units altogether. For example, in January, 2013, the Illinois Department of Corrections closed its supermax prison located at the Tamms Correctional Center.[102] In Colorado,

---

Night in Solitary, *New York Times*, February 20, 2014 [available at:
http://www.nytimes.com/2014/02/21/opinion/my-night-in-solitary.html?_r=0
[99] Memo to Wardens from Lou Archuleta, Interim Director of Prisons, Colorado DOC, December 10, 2013. See, also: Jennifer Brown, Colorado Stops Putting Mentally Ill Prisoners in Solitary Confinement, *Denver Post*, Dec. 12, 2013, *available at*
http://www.denverpost.com/news/ci_24712664/colorado-wont-put-mentally-ill-prisoners-solitary-confinement.
[100] Raemisch, R. (2017). Putting an End to Long-Term Solitary. *New York Times*. October 13. A25. https://www.nytimes.com/2017/10/12/opinion/solitary-confinement-colorado-prison.html
[101] For a discussion of the nature and impact of the reforms to punitive isolation in Mississippi, see Kupers, T., et al., Beyond Supermax Administrative Segregation: Mississippi's Experience Rethinking Prison Classification and Alternative Mental Health Programs, *Criminal Justice & Behavior, 36*, 1037-1050 (2009); and Buntin, J., Exodus: How America's Reddest State-And Its Most Notorious Prison-Became a Model of Corrections Reform, *Governing, 23*, 20- (2010). For a discussion of the reforms to punitive isolation in Maine, see: Heiden, Z., *Change Is Possible: A Case Study of Solitary Confinement Reform in Maine*, ACLU of Maine, March, 2013, at http://www.aclumaine.org/sites/default/files/uploads/users/admin/ACLU_Solitary_Report_webversion.pdf; and Tapley, L., Reform Comes to the Supermax, *Portland Phoenix*, May 25, 2011, at http://portland.thephoenix.com/news/121171-reform-comes-to-the-supermax/.
[102] See Tamms Correctional Center Closing-Fact Sheet, Illinois Department of Corrections, at http://www.ilga.gov/commission.cgfa2006/upload/TammsMeetingTestimonyDocuments.pdf.

in addition to reducing their administrative segregation population by nearly 37%, the Department of Corrections completely shut down the entire 316-bed facility.[103] A lawsuit over the effects of extremely long-term solitary—*Ashker v. Brown*—was settled when the state of California agreed to close one of the nation's most notorious prison isolation units, the Pelican Bay SHU, in part because the state's Secretary of Corrections acknowledged the capacity of such units to "drive prisoners mad."[104] More recently, in litigation surrounding the use of solitary in Arizona state prisons, *Jensen v. Thornell*, the federal court found that the conditions in the state's isolation units violated the Eighth Amendment. The judge ordered that nobody under the age of 18 or with a serious mental illness could be incarcerated in solitary confinement, and set a presumptive limit of no more than 60 days in isolation for all other prisoners.[105]

76.    As a further reflection of these correctional trends, the Vera Institute of Justice received funding from the U.S. Department of Justice to launch a Safe Alternatives to Segregation Initiative ("SAFE Initiative") with the explicit goal of assisting states and counties to reduce their use of segregation and solitary confinement and to develop effective alternatives to its use. The 11-member Vera SAFE Initiative Advisory Board (on which I served) includes several state corrections secretaries and deputy secretaries, including those in Colorado, New Mexico, Pennsylvania, and Washington, who are publicly committed to developing ways of achieving significant reductions in the use of prison isolation.

77.    Finally, a joint study group convened by Yale Law School and the Association of

---

[103] News Release, Colorado Department of Corrections, *The Department of Corrections Announces the Closure of Colorado State Penitentiary II* (March 19, 2012), at http://www.doc.state.co.us/sites/default/files/Press%20release%20CSP%20II%20close%20%20F eb%201%202013.pdf.
[104] 60 Minutes, see n. 5.
[105] *Jensen v. Thornell*, No. CV-12-00601-PHX-ROS, 2023 WL 2838040, *27 (D. Ariz. April 7, 2023).

State Correctional Administrators (the professional organization of the top correctional officials in the United States) filed a report on solitary confinement in 2015 in which they observed:

> [D]ozens of initiatives are underway to reduce the degree and duration of isolation or to ban it outright, and to develop alternatives to protect the safety and well-being of the people living and working in prisons. The harms of such confinement for prisoners, staff, and the communities to which prisoners return upon release are more than well-documented. In some jurisdictions, isolated confinement has been limited or abolished for especially vulnerable groups (the mentally ill, juveniles, and pregnant women), and across the country, correctional directors are working on system-wide reforms for all prisoners.[106]

78.    In fact, this extraordinarily wide range of scientific experts and professional organizations have all taken positions that: solitary confinement is harmful; it should be used only when absolutely necessary; although the risk of harm begins immediately, because the length of time a person is held in solitary confinement increases this risk, the length of exposure should be limited to the briefest amount of time possible; and certain vulnerable groups (such as the seriously mentally ill) should be prohibited entirely from ever being placed there.

79.    The consistency of these recommendations is based largely on the fact that the science of solitary is clear: enforced social isolation and the associated additional deprivations that persons suffer when they are placed in solitary confinement are painful and harmful, sometimes inflicting permanent damage that, in a disproportionate number of cases, is life-threatening. In the next section of this report I discuss the well-known fact that, however damaging solitary confinement is likely to be to any person who is subjected to it, it is far more dangerous to persons who are mentally ill, and to children and adolescents, whose developing brains render them far more vulnerable to its stressfulness and harm.

---

[106] Liman Program Yale Law School & Association of State Correctional Administrators, *Time In Cell: ASCA-Liman 2014 National Survey of Administrative Segregation in Prison* (August, 2015), p. 7.

**V.     The Heightened Risk of Harm and Prohibitions Against Housing the Mentally Ill in Solitary Confinement**

80.     In addition to the general standards limiting the use of solitary confinement, because of its recognized significant risk of serious harm, there is also a widespread consensus among scientific, mental health, legal, and correctional experts that otherwise vulnerable persons—including persons who are mentally ill and juveniles— are at an even greater risk of harm in solitary confinement and, therefore, should never be placed there. As I will note in a several later paragraphs, this is precisely why court cases and human rights mandates have precluded mentally ill persons from being placed in solitary confinement. There are very sound scientific reasons why persons who suffer from mental illness experience greater difficulties tolerating the painful experience of isolated confinement and are more likely to be harmed by it.

81.     Conditions of solitary confinement are significantly more stressful and painful than other forms of imprisonment for mentally ill people, because they are generally more sensitive and reactive to psychological stressors and emotional pain. In many ways, the harshness and severe levels of deprivation that are imposed on them in isolation are the antithesis of the kind of benign and socially supportive atmosphere that mental health clinicians seek to create within genuinely therapeutic environments. Not surprisingly, mentally ill people are more likely to deteriorate and decompensate when they are subjected to the harshness and stress of prison isolation.

82.     Some of the deterioration and decompensation that mentally ill people suffer in isolated confinement results from the critically important role that social contact and social interaction play in maintaining psychological equilibrium. The psychiatrist Harry Stack Sullivan once summarized the clinical significance of meaningful social contact by observing that "[w]e can't be alone in things and be very clear on what happened to us, and we… can't be alone and be very clear even on what is happening in us very long-excepting that it gets simpler and simpler,

45

and more primitive and more primitive, and less and less socially acceptable."[107] Social contact and social interaction are essential components in the creation and maintenance of normal social identity and social reality. Thus, the experience of isolation is psychologically destabilizing as it undermines a person's sense of self or social identity and erodes his connection to a shared social reality. Isolated prisoners have few if any opportunities to receive feedback about their feelings and beliefs, which become increasingly untethered from any normal social context. As Cooke and Goldstein put it:

> A socially isolated individual who has few, and/or superficial contacts with family, peers, and community cannot benefit from social comparison. Thus, these individuals have no mechanism to evaluate their own beliefs and actions in terms of reasonableness or acceptability within the broader community. They are apt to confuse reality with their idiosyncratic beliefs and fantasies and likely to act upon such fantasies, including violent ones.[108]

In extreme cases, a related pattern emerges: isolated confinement becomes so painful, so bizarre, and so impossible to make sense of that some prisoners create their own reality-they live in a world of fantasy instead of the intolerable one that surrounds them.

83.     It is important to note that many of the direct negative psychological effects of isolation mimic or parallel specific symptoms of mental illness. Even though the direct effects of isolation, experienced in reaction to adverse conditions of confinement, are generally less chronic than those that are produced by a diagnosable mental illness, they can add to and compound a mentally ill prisoner's outward manifestation of symptoms as well as the internal experience of their disorder. For example, as I noted earlier, many studies have documented the degree to which isolated confinement contributes to feelings of lethargy, hopelessness, and depression. For already

---

[107] Sullivan, H., The Illusion of Personal Individuality, *Psychiatry, 12*, 317-332 (1971), at p. 326.
[108] Cooke, M. & Goldstein, J., Social Isolation and Violent Behavior, *Forensic Reports, 2,* 287-294 (1989), at p. 288.

clinically depressed prisoners, these acute situational effects are likely to exacerbate their pre-existing chronic condition and lead to worsening of their depressed state. Similarly, the mood swings that some prisoners report experiencing in isolation would be expected to amplify the pre-existing emotional instability that prisoners diagnosed with bi-polar disorder suffer. Prisoners who suffer from disorders of impulse control would likely find their pre-existing condition made worse by the frustration, irritability, and anger that many isolated prisoners report experiencing. And prisoners prone to psychotic breaks may suffer more in isolated confinement due to conditions that deny them the stabilizing influence of social feedback that grounds their sense of reality in a stable and meaningful social world.

84.    The widespread recognition of the heightened vulnerability of mentally ill prisoners to the adverse psychological effects of isolated confinement has led numerous corrections officials, professional mental health groups, and human rights organizations to prohibit their placement in such units or, if it is absolutely necessary (and only as a last resort) to confine them there, to very strictly limit the duration of such confinement, and to provide prisoners with significant amounts of out-of-cell time and augmented access to care.

85.    For example, in 2012 the American Psychiatric Association ("APA") issued a Position Statement on Segregation of Prisoners with Mental Illness recommending that "prolonged segregation" (which it defined as segregation lasting longer than four weeks) of prisoners with serious mental illness "with rare exceptions, should be avoided due to the potential for harm to such inmates."[109] Indeed, the fact that the APA raised such time-based concerns, recommending outright prohibitions of "prolonged" exposure for vulnerable populations such as juveniles and the

---

[109] American Psychiatric Association, *Position Statement on Segregation of Prisoners with Mental Illness* (2012), at http://www.psych.org/File%20Library/Learn/Archives/ps2012_PrisonerSegregation.pdf.

mentally ill, acknowledges the widely accepted fact that mentally ill prisoners are especially vulnerable to isolation - and stress-related regression, deterioration, and decompensation that worsen their psychiatric conditions and intensify their mental health-related symptoms and maladies (including depression, psychosis, and self-harm). It also underscores the universally accepted principle that time matters, and that the longer someone is exposed to the stressful, traumatic, and toxic environment of prison isolation the worse its effects and the greater the risks of more serious harm.[110]

86.    It is important to note that the American Psychiatric Association's position statement was written without the benefit of the more recently articulated mandates from the United Nations (i.e., the Mandela Rules), or the position statement from the National Commission on Correctional Healthcare (NCCHC) among others. These more recently articulated positions reflect a more informed consensus that was shared by prominent experts even before the 2014 American Psychiatric Association's official statement.

87.    For example, an article by psychiatric expert Jeffrey Metzner and human rights attorney Jamie Fellner explicitly concluded that "[i]solation can be harmful to any prisoner," and that the potentially adverse effects of isolation include "anxiety, depression, anger, cognitive

---

[110] American Psychiatric Association, *Statements: Segregation of Prisoners with Mental Illness* (2012), at http://www.psychiatry.org/advocacy--newsroom/position-statements; *see also* American Academy of Child and Adolescent Psychiatry, *Solitary Confinement of Juvenile Offenders* (2012), at http://www.aacap.org/AACAP/Policy_Statements/2012/Solitary_Confinement_of _Juvenile_Offenders.aspx (opposing "the use of solitary confinement in correctional facilities for juveniles," stating that "any youth that is confined for *more than 24 hours* must be evaluated by a mental health professional" (emphasis added); Mental Health America, *Seclusion and Restraints, Policy Position Statement 24* (2011), *available at* http://www.nmha.org/positions/seclusion-restraints ("urg[ing] abolition of the use of seclusion . . . to control symptoms of mental illnesses").

disturbances, perceptual distortions, obsessive thoughts, paranoia, and psychosis."[111] In fact, Metzner and Fellner's deep concerns over the harmfulness of isolated conditions of confinement led them to recommend that professional organizations "should actively support practitioners who work for changed segregation policies and they should use their institutional authority to press for a nationwide rethinking of the use of isolation" in the name of their "commitment to ethics and human rights."[112]

## VI.   There Is No Legitimate Penological Justification for the Per Se Housing of Formerly Federally Death-Sentenced Persons at ADX

88.    With the above scientific consensus about the harmful and severe effects of solitary confinement and the host of professional standards drastically limiting its use in mind, I have been asked to summarize the scientific literature on whether currently or formerly death-sentenced prisoners—as a group—represent such a high risk of future dangerous that their placement in an ultra-secure facility such as ADX is penologically justified.

89.    There are two inter-related components to this issue. The first is whether the decision to place persons in an ultra-secure solitary confinement facility such as ADX should be ever be made categorically—that is, absent an individualized determination that such placement is necessary and justified. Because placement in solitary confinement exposes persons to such a significant risk of serious harm, it can only be penologically justified after a careful, case-by-case assessment. In the case of ADX, the Bureau of Prisons itself acknowledges that the threshold for placement in this ultra-secure facility must be set very high and that a number of issues must be

---

[111] Jeffrey Metzner & Jamie Fellner, Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics, *Journal of the Academy of Psychiatry and Law, 38,* 104-108 (2010), at p. 104, at
http://www.hrw.org/sites/default/files/related_material/Solitary%20Confinement%20and%20Mental%20Illness%20in%20US%20Prisons.pdf.
[112] Metzner & Fellner, at p. 107.

factored into the decision.

90.    Thus, the BOP's mission statement for ADX clearly states that it is reserved for "the most violent, predatory, and escape-prone" persons in the entire federal prison system—those who clearly "need the security and controls" available there, and nowhere else.[113] Indeed, the threshold for ADX placement is set so high that persons housed there represent "less that ¼ of 1 percent of the Bureau's inmate Population."[114] Not only is placement at ADX reserved for the extraordinarily small number of persons who are deemed to require the extraordinary level of security and control imposed, but the determination of whether placement is necessary must be judged as "appropriate for that inmate."[115] In order to ensure that it is, placement in ADX occurs only after the BOP has engaged in a "multi-step process, which includes a formal hearing, full clinical psychological evaluation (which is reviewed by the Bureau's Central Office), and medical review for determining whether an inmate is appropriate for placement at the ADX."[116] In addition, "[e]ach inmate referred for placement receives a hearing, during which the inmate may make a statement."[117]  Moreover, after the initial decision is made to place someone in ADX, the BOP requires that the person's "continued placement is then closely scrutinized on a regular basis to ensure only those inmates who require the security and controls of the institution are housed at ADX."[118] Needless to say, as the BOP itself recognizes, the entire process—from the initial placement decision through the continuous process of evaluation is necessarily highly individualized.

---

[113] Federal Bureau of Prisons, Overview of ADX and Its Units, July 16, 2020, p. 1.
[114] *Id*.
[115] *Id.*
[116] *Id.*
[117] *Id.*
[118] *Id.* at p. 2.

91.     The second component to be considered is whether there are special characteristics that might apply to members of the group in question—persons who were once sentenced to death—that can legitimately serve as blanket justifications their placement in ADX—that is, whether there is a valid reason to believe that they, as a group, should be categorically deemed among "the most violent, predatory, and escape-prone" persons in the entire federal prison system. In fact, there is much evidence to the contrary.

92.     In part because predictions of future dangerousness have played both a direct and indirect role in capital cases in the United States—factoring implicitly into the judgments made by capital jurors and made explicit in the sentencing statutes in some U.S. jurisdictions (notably, Texas)—the issue of whether persons convicted of "death-eligible" crimes represent an especially high risk of engaging in subsequent violent and predatory behavior has been extensively studied.

94.     Violent behavior such as murder is scientifically understood as typically resulting from an interaction between personal characteristics and situational factors. One of the reasons that violent criminal behavior in free society is not consistently repeated inside prison is in part because institutional conditions are radically different from those in the world outside prison. Even in-prison violence is not commonly repeated by the persons who have engaged in it in the past, in part because the situational factors that influenced and/or precipitated it are unlikely to recur. Another reason is that death-sentenced prisoners tend to be older than prisoners in general, and age is one of the most reliable known predictors of positive institutional adjustment. Finally, formerly death-sentenced prisoners who are serving life-without-parole sentences are, by definition, "long-termers" in prison, persons who, as one researcher put it, "appear to more fully

realize the need to c0-exist with correctional authorities within the confines of the institution."[119]

95. Thus radically changed circumstances, the tendency for death-sentenced persons to be incarcerated longer and to age and mature in prison, and the investment long-term prisoners generally have in institutional stability are among the reasons why research has shown that persons formerly sentenced to death do not, as a rule, represent a threat of greater future dangerousness than other prisoners.

96. Generally, "studies of the prison behavior of capital offenders in the general prison population have consistently found that the majority of these offenders are never sanctioned for assaultive misconduct."[120] In fact, former death row prisoners as well as persons who could have been sentenced to death for potentially capital crimes but received life sentences instead are actually less likely to engage in serious violence in prison compared to those who have committed non-capital crimes. For example, as one early study showed, persons in Texas who originally had been sentenced to death but were subsequently released from death row were not "more violently assaultive or predatory, or a disproportionate threat to other inmates and staff" compared to those who had originally been sentenced to life, prisoners housed in a high security mainline prison, or Texas prisoners in general.[121] In addition, life-without-parole sentenced prisoners tend to "act as a stabilizing rather than disruptive force in the prison environment."[122]

---

[119] Flanagan, T., Time Served and Institutional Misconduct: Patterns of Involvement in Disciplinary Infractions among Long-Term and Short-Term Inmates, *Journal of Criminal Justice, 8,* 357-367 (1980), p. 364.

[120] Cunningham, M., Reidy, T., & Sorensen, J., Assertions of "Future Dangerousness" at Federal Capital Sentencing: Rates and Correlates of Subsequent Prison Misconduct and Violence, *Law and Human Behavior, 32,* 46-63 (2008), p. 48

[121] Marquart, J., Ekland-Olson, S., & Sorensen, J., Gazing into the Crystal Ball: Can Jurors Accurately Predict Dangerousness in Capital Cases? *Law & Society Review, 23(3),* 449-468 (1989), p. 461

[122] Cunningham, M., & Sorenson, J., Life-Without-Parole and Other Long-Term High-Security Inmates, *Criminal Justice and Behavior, 33(6),* 683-705 (2006), p. 683.

97.     In sum, the en masse transfer of all formerly federally death-sentenced prisoners to ADX violates the BOP's own strict policy of engaging in an in-depth individual assessment of whether such a placement is necessary. In fact, there are many people who have been convicted of similar if not identical crimes who are housed safely elsewhere in the Bureau of Prison facilities. Thus, any assertion that that this group of persons categorically represents "the most violent, predatory, and escape-prone" persons in the entire federal prison system" and therefore can only be housed safely at ADX, is scientifically unsupported. Such en masse, categorical transfer lacks penological justification.

## VIII. Conclusion

98.     The conditions of confinement that prevail at the federal supermax ADX facility constitute a severe, extreme form of solitary confinement. In fact, the conditions that have been created and the procedures that are followed at ADX are more socially isolating than those at any correctional facility that I have personally toured and inspected or of which I am aware anywhere in the United States.

99.     Numerous scientific studies, conducted by researchers from diverse disciplinary backgrounds, working independently and across several continents, and over many decades, have reached almost identical conclusions about the negative effects of social isolation in general and solitary confinement in particular. The findings are robust and theoretically coherent, and are both consistent with and illuminated by an already vast and rapidly growing literature on the importance of meaningful social contact for the maintenance of mental and physical health. That body of scientific knowledge – gained from research done both inside prison and in society at large – establishes the psychological and medical harm that results from social isolation, social exclusion, and the deprivation of human touch.

100.     The consistency and theoretical coherence of the findings has led numerous scientific and professional organizations to reach a consensus about the damaging effects of solitary confinement, including a distinguished National Academies of Science committee, the American Psychiatric Association, the American Psychological Association (the world's largest professional association of psychologists), the National Commission on Correctional Health Care (NCCHC), the Association of State Correctional Administrators (ASCA, the largest professional association of American prison administrators), and the United Nations. The extensive empirical findings are rooted in a sound theoretical framework. This consensus has led to a series of recommendations made by distinguished professional legal, medical, mental health, human rights, and correctional organizations to prohibit this potentially dangerous practice for vulnerable prisoners (such as the mentally ill) and to significantly reduce its use for all others. Specifically, as a result of that consensus, numerous professional organizations have recommended that persons be placed in solitary confinement only when it is absolutely necessary to do so and, even then, for only the briefest amount of time possible. They have agreed further that members of vulnerable groups (such as the mentally ill) should never be placed there.

101.     Finally, transferring formerly federally death-sentenced prisoners en mass to ADX violates the BOP's own policy that such transfers must be based on an individualized assessment of and judgment about the clear necessity of doing so because they cannot be housed safely anywhere else. Moreover, persons who have been convicted of death-eligible crimes do not, as a group, represent heightened future dangers or security risks in a prison setting. Hence there is no legitimate penological justification for transferring them, as a group, to ADX.

//

//

54

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed the 10th of April, 2025, in Santa Cruz, California.


Craig Haney, J.D., Ph.D.
Craig Haney, J.D., Ph.D.

# APPENDIX 1

CURRICULUM VITAE

Craig William Haney
Distinguished Professor of Psychology
UC Presidential Chair, 2015-2018
University of California, Santa Cruz 95064

## EMPLOYMENT HISTORY

| | |
|---|---|
| 2015-2018 | University of California Presidential Chair |
| 2014-present | Distinguished Professor of Psychology, University of California, Santa Cruz |
| 1985-2014 | University of California, Santa Cruz, Professor of Psychology |
| 1981-85 | University of California, Santa Cruz, Associate Professor of Psychology |
| 1978-81 | University of California, Santa Cruz, Assistant Professor of Psychology |
| 1977-78 | University of California, Santa Cruz, Lecturer in Psychology |
| 1976-77 | Stanford University, Acting Assistant Professor of Psychology |

## EDUCATION

| | |
|---|---|
| 1978 | Stanford Law School, J.D. |
| 1978 | Stanford University, Ph.D. (Psychology) |
| 1972 | Stanford University, M.A. (Psychology) |
| 1970 | University of Pennsylvania, B.A. |

## HONORS AWARDS GRANTS

| | |
|---|---|
| 2024 | Lynn Stuart Weiss Award from American Psychological Foundation in recognition of "psychological that attempts to promote peace through world law." |

|      | Appointed to the Editorial Board of the University of California Press. |
|------|---|
| 2022 | Appointed to the American Psychological Association *Amicus Curiae* Expert Panel ("ACEP"). |
|      | Nominated for the Social Science Research Council's Albert O. Hirschman Prize for Excellence in Social and Behavioral Science. |
|      | Psychology Department "Most Inspiring Instructor" |
|      | Appointed to American Psychological Association Presidential Task Force on Raising the Age at Which Persons Are Eligible for Capital Punishment |
| 2021 | Finalist, Association of American Publishers, Professional and Scholarly Excellence (PROSE) Award for Excellence in Social Science (for <u>Criminality in Context: Psychological Foundations of Criminal Justice Reform</u>). |
| 2020 | Finalist, Stockholm Prize in Criminology (for "outstanding achievements in criminological research or for the application of research results by practitioners for the reduction of crime and the advancement of human rights"). |
| 2018 | Emerald Literati Award for "Outstanding Paper" (for "Reducing the Use and Impact of Solitary Confinement in Corrections"). |
| 2016 | Vera Institute of Justice "Reimagining Prisons" Initiative Advisory Council. |
|      | Psychology Department "Most Inspiring Instructor" |
| 2015 | University of California Presidential Chair (2015-2018 Term) |
|      | Martin F. Chemers Award for Outstanding Research in Social Science |
|      | Excellence in Teaching Award (Academic Senate Committee on Teaching). |
|      | President's Research Catalyst Award for "UC Consortium on Criminal Justice Healthcare" (with Brie Williams and Scott Allen). |
|      | Vera Institute of Justice "Safe Alternatives to Segregation" (SAS) Initiative Advisory Council. |

|       | Who's Who in Psychology (Top 20 Psychology Professors in California) [http://careersinpsychology.org/psychology-degrees-schools-employment-ca/#ca-psych-prof] |
|-------|------|
| 2014  | Distinguished Faculty Research Lecturer, University of California, Santa Cruz. |
| 2013  | Distinguished Plenary Speaker, American Psychological Association Annual Convention. |
| 2012  | Appointed to National Academy of Sciences Committee to Study the Causes and Consequences of High Rates of Incarceration in the United States. |
|       | Invited Expert Witness, United States Senate, Judiciary Committee. |
| 2011  | Edward G. Donnelly Memorial Speaker, University of West Virginia Law School. |
| 2009  | Nominated as American Psychological Foundation William Bevan Distinguished Lecturer. |
|       | Psi Chi "Best Lecturer" Award (by vote of UCSC undergraduate psychology majors). |
| 2006  | Herbert Jacobs Prize for Most Outstanding Book published on law and society in 2005 (from the Law & Society Association, for Death by Design). |
|       | Nominated for National Book Award (by American Psychological Association Books, for Reforming Punishment: Psychological Limits to the Pains of Imprisonment). |
|       | "Dream course" instructor in psychology and law, University of Oklahoma. |
| 2005  | Annual Distinguished Faculty Alumni Lecturer, University of California, Santa Cruz. |
|       | Invited Expert Witness, United States House of Representatives, Subcommittee on Immigration, Border Security, and Claims, Committee on the Judiciary |
|       | Arthur C. Helton Human Rights Award from the American Immigration Lawyers Association (co-recipient). |

3

Scholar-in-Residence, Center for Social Justice, Boalt Hall School of Law (University of California, Berkeley).

2004   "Golden Apple Award" for Distinguished Teaching, awarded by the Social Sciences Division, University of California, Santa Cruz.

National Science Foundation Grant to Study Capital Jury Decision-making

2002   Santa Cruz Alumni Association Distinguished Teaching Award, University of California, Santa Cruz.

United States Department of Health & Human Services/Urban Institute, "Effects of Incarceration on Children, Families, and Low-Income Communities" Project.

American Association for the Advancement of Science/American Academy of Forensic Science Project: "Scientific Evidence Summit" Planning Committee.

Teacher of the Year (UC Santa Cruz Re-Entry Students' Award).

2000   Invited Participant White House Forum on the Uses of Science and Technology to Improve National Crime and Prison Policy.

Excellence in Teaching Award (Academic Senate Committee on Teaching).

Joint American Association for the Advancement of Science-American Bar Association Science and Technology Section National Conference of Lawyers and Scientists.

1999   American Psychology-Law Society Presidential Initiative Invitee ("Reviewing the Discipline: A Bridge to the Future")

National Science Foundation Grant to Study Capital Jury Decision-making (renewal and extension).

1997   National Science Foundation Grant to Study Capital Jury Decision-making.

1996   Teacher of the Year (UC Santa Cruz Re-Entry Students' Award).

1995   Gordon Allport Intergroup Relations Prize (Honorable Mention)

Excellence in Teaching Convocation, Social Sciences Division

| | |
|---|---|
| 1994 | Outstanding Contributions to Preservation of Constitutional Rights, California Attorneys for Criminal Justice. |
| 1992 | Psychology Undergraduate Student Association Teaching Award |
| | SR 43 Grant for Policy-Oriented Research With Linguistically Diverse Minorities |
| 1991 | Alumni Association Teaching Award ("Favorite Professor") |
| 1990 | Prison Law Office Award for Contributions to Prison Litigation |
| 1989 | UC Mexus Award for Comparative Research on Mexican Prisons |
| 1976 | Hilmer Oehlmann Jr. Award for Excellence in Legal Writing at Stanford Law School |
| 1975-76 | Law and Psychology Fellow, Stanford Law School |
| 1974-76 | Russell Sage Foundation Residency in Law and Social Science |
| 1974 | Gordon Allport Intergroup Relations Prize, Honorable Mention |
| 1969-71 | University Fellow, Stanford University |
| 1969-74 | Society of Sigma Xi |
| 1969 | B.A. Degree Magna cum laude with Honors in Psychology |
| | Phi Beta Kappa |
| 1967-1969 | University Scholar, University of Pennsylvania |


UNIVERSITY SERVICE AND ADMINISTRATION

| | |
|---|---|
| 2010-2016 | Director, Legal Studies Program |
| 2010-2014 | Director, Graduate Program in Social Psychology |
| 2009 | Chair, Legal Studies Review Committee |
| 2004-2006 | Chair, Committee on Academic Personnel |
| 1998-2002 | Chair, Department of Psychology |

| 1994-1998 | Chair, Department of Sociology |
| 1992-1995 | Chair, Legal Studies Program |
| 1995 (Fall) | Committee on Academic Personnel |
| 1995-1996 | University Committee on Academic Personnel (UCAP) |
| 1990-1992 | Committee on Academic Personnel |
| 1991-1992 | Chair, Social Science Division Academic Personnel Committee |
| 1984-1986 | Chair, Committee on Privilege and Tenure |

## WRITINGS AND OTHER CREATIVE ACTIVITIES IN PROGRESS

Books:

Counting Casualties in the War on Prisoners: Toward a Just and Lasting Peace (working title, in preparation).

Articles:

"The Psychological Foundations of Capital Mitigation: Why Social Historical Factors Are Central to Assessing Culpability," in preparation.

## PUBLISHED WRITINGS AND CREATIVE ACTIVITIES

Books

| 2020 | Criminality in Context: The Psychological Foundations of Criminal Justice Reform. Washington, DC: American Psychological Association Books. |
| 2014 | The Growth of Incarceration in the United States: Exploring the Causes and Consequences (with Jeremy Travis, Bruce Western, et al.). [Report of the National Academy of Sciences Committee on the Causes and Consequences of High Rates of Incarceration in the United States.] Washington, DC: National Academy Press. |

2006    Reforming Punishment: Psychological Limits to the Pains of
        Imprisonment, Washington, DC: American Psychological
        Association Books.

2005    Death by Design: Capital Punishment as a Social Psychological
        System. New York: Oxford University Press.

## Monographs and Technical Reports

1989    Employment Testing and Employment Discrimination (with
        Hurtado). Technical Report for the National Commission on
        Testing and Public Policy. New York: Ford Foundation.

2005    Conditions of Confinement for Detained Asylum Seekers Subject to
        Expedited Removal (Appendix C in Study of Asylum Seekers in
        Expedited Removal as Authorized by Section 605 of International
        Religious Freedom Act of 1998).

## Articles in Professional Journals and Book Chapters

2024    "Understanding Attitudes Toward Police Surveillance: The Role of
        Authoritarianism, Fear of Crime, and Private Sector Surveillance
        Attitudes" (with Camille Conrey), Surveillance & Society, in press.

        "Prison Overcrowding," in P. Zapf (Eds.), APA Handbook of
        Forensic Psychology. Second Edition. Washington, DC: APA Books,
        in press.

        "The Death Penalty" (with Joanna Weill & Mona Lynch), in P. Zapf
        (Eds.), APA Handbook of Forensic Psychology. Second Edition.
        Washington, DC: APA Books, in press.

2023    "Choosing Between Life and Death: Capital Jury Penalty-Phase
        Decision-Making," in M. Miller, L. Yelderman, M. Huss, & J.
        Cantone (Eds.), Cambridge Handbook of the Psychology of Legal
        Decision-Making (pp. 443-459). Cambridge University Press.

        "The Resource Team: A Case Study of Solitary Confinement Reform
        in Oregon" (with David Cloud, Dallas Augustine, Cyrus Ahalt, &
        Brie Williams), PLoS ONE, 18(7): e0288187.
        https://doi.org/10.1371/ journal.pone.0288187

"The Impact of Isolation on Brain Health" (with Vibol Heng and Richard Smeyne), in M. Zigmond, L. Rowland, & J. Coyle (Eds.), The Neurobiology of Brain Disorders: Biological Basis of Neurological and Psychiatric Disorders (pp. 963-975). Second Edition. Elsevier Academic Press. https://doi.org/10.1016/B978-0-323-85654-6.00024-1

2022        "*Roper* and Race: The Nature and Effects of Death Penalty Exclusions for Juveniles and the 'Late Adolescent Class'" (with Frank R. Baumgartner & Karen A. Steele), Journal of Pediatric Neuropsychology, 8, 168-177.

"Sykes's Prison in Context: Change and Continuity in the Life Span of a Penitentiary," in B. Crewe, A. Goldsmith, & M. Halsey (Eds.), Power and Pain in the Modern Prison: *The Society of Captives* Revisited (pp. 11-35). New York: Oxford University Press.

"The Continuing Unfairness of Death Qualification: Changing Death Penalty Attitudes and Capital Jury Selection" (with Eileen Zurbriggen & Joanna Weill), Psychology, Public Policy, and Law, 28(1), 1-31.

"Foreword," for John Hagedorn, Gangs on Trial: Challenging Stereotypes and Demonization in the Courts. Philadelphia, PA: Temple University Press.

2021        "'We Just Need to Open the Door': A Case Study of North Dakota Department of Corrections' Quest to End Solitary Confinement" (with David Cloud, Dallas Augustine, Cyrus Ahalt, Lisa Peterson, Colby Braun, & Brie Williams), Heath & Justice, 9(28). https://doi.org/10.1186/s40352-021-00155-5

"The Death Qualification Process Continues to Render Capital Juries Less Representative and More Unfair. Amicus Journal, 42, 20-25.

"Framing Criminal Justice and Crime in the News, 2015-2017" (with Camille Conrey), Journal of Crime and Justice, 44(3), 297-315.

2020        "Solitary Confinement, Loneliness, and Psychological Harm," in Jules Lobel and Peter Scharff Smith (Eds.), Solitary Confinement:

Effects, Practices, and Pathways to Reform (129-152). New York: Oxford University Press.

"Continuing to Acknowledge the Power of Dehumanizing Environments: Responding to Haslam, et al. (2019) and Le Texier (2019)" (with Philip Zimbardo), American Psychologist, 75(3), 400-402.

"The Science of Solitary: Expanding the Harmfulness Narrative," Northwestern Law Review, 115(1), 211-256.

"Consensus Statement from the Santa Cruz Summit on Solitary Confinement and Health" (with Brie Williams and Cyrus Ahalt), Northwestern University Law Review, 115(1), 335-360.

"Solitary Confinement is Not Solitude: The Worst Case Scenario of Being 'Along' in Prison," in Robert Coplan, Julie Bowker, & Larry Nelson (Eds.), Handbook of Solitude: Psychological Perspectives on Isolation, Social Withdrawal, and Being Alone (pp. 390-403). Second Edition. New York: Wiley-Blackwell.

2019        "Afterword," in Robert Johnson, Condemned to Die: Life Under Sentence of Death (pp. 137-141). Second Edition. New York: Routledge.

"Changing Correctional Culture: Exploring the Role of U.S.-Norway Exchange in Placing Health and Well-Being at the Center of U.S. Prison Reform" (with Cyrus Ahalt, Brie Williams, and Kim Ekhaugen), American Journal of Public Health, 110(S1), S27-S29.

2018        "Restricting the Use of Solitary Confinement," Annual Review of Criminology, 1, 285-310.

"Death Qualification in Black and White: Racialized Decision-Making and Death-Qualified Juries" (with Mona Lynch), Law & Policy, 40(2), 148-171.

"Balancing the Rights to Protection and Participation: A Call for Expanded Access to Ethically Conducted Correctional Research. Journal of General Internal Medicine, 33(22).
DOI: 10.1007/s11606-018-4318-9.

"The Plight of Long-Term Mentally-Ill Prisoners" (with Camille Conrey and Roxy Davis), in Kelly Frailing and Risdon Slate (Eds.),

9

<u>The Criminalization of Mental Illness</u> (pp. 163-180). Durham, NC: Carolina Academic Press.

"The Psychological Effects of Solitary Confinement: A Systematic Critique," <u>Crime and Justice</u>, <u>47</u>, 365-416.

"The Media's Impact on the Right to a Fair Trial: A Content Analysis of Pretrial Publicity in Capital Cases (with Shirin Bakhshay), <u>Psychology, Public Policy, and Law</u>, <u>24</u>, 326-346.

2017    "Mechanisms of Moral Disengagement and Prisoner Abuse" (with Joanna Weill). <u>Analyses of Social Issues and Public Policy</u>, <u>17</u>, 286-318.

"'Madness' and Penal Confinement: Observations on Mental Illness and Prison Pain," <u>Punishment and Society</u>, <u>19</u>, 310-326.

"Contexts of Ill-Treatment: The Relationship of Captivity and Prison Confinement to Cruel, Inhuman, or Degrading Treatment and Torture" (with Shirin Bakhshay), in Metin Başoğlu (Ed.), <u>Torture and Its Definition in International Law: An Interdisciplinary Approach (</u>pp. 139-178). New York: Oxford.

Special Issue: "Translating Research into Policy to Advance Correctional Health" (guest editor with B. Williams, C. Ahalt, S. Allen, & J. Rich), Part II, <u>International Journal of Prisoner Health</u>, <u>13</u>, 137-227.

"Reducing the Use and Impact of Solitary Confinement in Corrections" (with Cyrus Ahalt, Sarah Rios, Matthew Fox, David Farabee, and Brie Williams), <u>International Journal of Prisoner Health</u>, <u>13</u>, 41-48.

2016    "Examining Jail Isolation: What We Don't Know Can Be Profoundly Harmful" (with Joanna Weill, Shirin Bakhshay, and Tiffany Winslow), <u>The Prison Journal</u>, <u>96</u>, 126-152.

"On Structural Evil: Disengaging From Our Moral Selves," Review of the book <u>Moral Disengagement: How People Do Harm and Live With Themselves</u>, by A. Bandura], <u>PsycCRITIQUES</u>, 61(8).

2015    "When Did Prisons Become Acceptable Mental Healthcare Facilities?," Report of the Stanford Law School Three Strikes Project (with Michael Romano et al.) [available at:

http://law.stanford.edu/wp-content/uploads/sites/default/files/child-page/632655/doc/slspublic/Report_v12.pdf ].

"Emotion, Authority, and Death: (Raced) Negotiations in Capital Jury Negotiations" (with Mona Lynch), Law & Social Inquiry, 40, 377-405.

"Prison Overcrowding," in B. Cutler & P. Zapf (Eds.), APA Handbook of Forensic Psychology (pp. 415-436). Washington, DC: APA Books.

"The Death Penalty" (with Joanna Weill & Mona Lynch), in B. Cutler & P. Zapf (Eds.), APA Handbook of Forensic Psychology (pp. 451-510). Washington, DC: APA Books.

"'Prisonization' and Latinas in Alternative High Schools" (with Aida Hurtado & Ruby Hernandez), in J. Hall (Ed.), Routledge Studies in Education and Neoliberalism: Female Students and Cultures of Violence in the City (pp. 113-134). Florence, KY: Routledge.

2014    "How Healthcare Reform Can Transform the Health of Criminal Justice-Involved Individuals" (with Josiah Rich, et al.), Health Affairs, 33:3 (March), 1-6.

2013    "Foreword," for H. Toch, Organizational Change Through Individual Empowerment: Applying Social Psychology in Prisons and Policing. Washington, DC: APA Books.

"Foreword," for J. Ashford & M. Kupferberg, Death Penalty Mitigation: A Handbook for Mitigation Specialists, Investigators, Social Scientists, and Lawyers. New York: Oxford University Press.

2012    "Politicizing Crime and Punishment: Redefining 'Justice' to Fight the 'War on Prisoners,'" West Virginia Law Review, 114, 373-414.

"Prison Effects in the Age of Mass Incarceration," Prison Journal, 92, 1-24.

"The Psychological Effects of Imprisonment," in J. Petersilia & K. Reitz (Eds.), Oxford Handbook of Sentencing and Corrections (pp. 584-605). New York: Oxford University Press.

2011 "The Perversions of Prison: On the Origins of Hypermasculinity and Sexual Violence in Confinement," <u>American Criminal Law Review</u>, <u>48</u>, 121-141. [Reprinted in: S. Ferguson (Ed.), <u>Readings in Race, Gender, Sexuality, and Social Class</u>. Sage Publications (2012).]

"Mapping the Racial Bias of the White Male Capital Juror: Jury Composition and the 'Empathic Divide'" (with Mona Lynch), <u>Law and Society Review</u>, <u>45</u>, 69-102.

"Getting to the Point: Attempting to Improve Juror Comprehension of Capital Penalty Phase Instructions" (with Amy Smith), <u>Law and Human Behavior</u>, <u>35</u>, 339-350.

"Where the Boys Are: Macro and Micro Considerations for the Study of Young Latino Men's Educational Achievement" (with A. Hurtado & J. Hurtado), in P. Noguera & A. Hurtado (Eds.), <u>Understanding the Disenfranchisement of Latino Males: Contemporary Perspectives on Cultural and Structural Factors</u> (pp. 101-121). New York: Routledge Press.

"Looking Across the Empathic Divide: Racialized Decision-Making on the Capital Jury" (with Mona Lynch), <u>Michigan State Law Review</u>, 2011, 573-608.

2010 "Demonizing the 'Enemy': The Role of Science in Declaring the 'War on Prisoners,'" <u>Connecticut Public Interest Law Review</u>, <u>9</u>, 139-196.

"Hiding From the Death Penalty," <u>Huffington Post</u>, July 26, 2010 [www.huffingtonpost.com/craig-haney/hiding-from-the-death-pen-pen_b_659940.html]; reprinted in <u>Sentencing and Justice Reform Advocate</u>, <u>2</u>, 3 (February, 2011).

2009 "Capital Jury Deliberation: Effects on Death Sentencing, Comprehension, and Discrimination" (with Mona Lynch), <u>Law and Human Behavior</u>, <u>33</u>, 481-496.

"The Social Psychology of Isolation: Why Solitary Confinement is Psychologically Harmful," <u>Prison Service Journal UK</u> (Solitary Confinement Special Issue), Issue 181, 12-20. [Reprinted: <u>California Prison Focus</u>, #36, 1, 14-15 (2011).]

"The Stanford Prison Experiment," in John Levine & Michael Hogg (Eds.), <u>Encyclopedia of Group Processes and Intergroup Relations</u>. Thousand Oaks, CA: Sage Publications.

"Media Criminology and the Death Penalty," <u>DePaul Law Review</u>, <u>58</u>, 689-740. (Reprinted: <u>Capital Litigation Update</u>, 2010.)

"On Mitigation as Counter-Narrative: A Case Study of the Hidden Context of Prison Violence," <u>University of Missouri-Kansas City Law Review</u>, <u>77</u>, 911-946.

"Persistent Dispositionalism in Interactionist Clothing: Fundamental Attribution Error in Explaining Prison Abuse," (with P. Zimbardo), <u>Personality and Social Psychology Bulletin</u>, <u>35</u>, 807-814.

2008    "Counting Casualties in the War on Prisoners," <u>University of San Francisco Law Review</u>, <u>43</u>, 87-138.

"Evolving Standards of Decency: Advancing the Nature and Logic of Capital Mitigation," <u>Hofstra Law Review</u>, <u>36</u>, 835-882.

"A Culture of Harm: Taming the Dynamics of Cruelty in Supermax Prisons," <u>Criminal Justice and Behavior</u>, <u>35</u>, 956-984.

"The Consequences of Prison Life: Notes on the New Psychology of Prison Effects," in D. Canter & R. Zukauskiene (Eds.), <u>Psychology and Law: Bridging the Gap</u> (pp. 143-165). Burlington, VT: Ashgate Publishing.

"The Stanford Prison Experiment," in J. Bennett & Y. Jewkes (Eds.), <u>Dictionary of Prisons</u> (pp. 278-280). Devon, UK: Willan Publishers.

"Capital Mitigation," in Brian Cutler (Ed.), <u>The Encyclopedia of Psychology and the Law</u> (pp. 60-63). Volume I. Thousand Oaks, CA: Sage Publications.

Death Qualification of Juries," in Brian Cutler (Ed.), <u>The Encyclopedia of Psychology and the Law</u> (pp. 190-192). Volume I. Thousand Oaks, CA: Sage Publications.

"Stanford Prison Experiment," in Brian Cutler (Ed.), <u>The Encyclopedia of Psychology and the Law</u> (pp. 756-757) (with P. Zimbardo). Volume II. Thousand Oaks, CA: Sage Publications.

"Supermax Prisons," in Brian Cutler (Ed.), <u>The Encyclopedia of Psychology and the Law</u> (pp. 787-790). Volume II. Thousand Oaks, CA: Sage Publications.

2006       "The Wages of Prison Overcrowding: Harmful Psychological Consequences and Dysfunctional Correctional Reactions," <u>Washington University Journal of Law & Policy</u>, <u>22</u>, 265-293. [Reprinted in: N. Berlatsky, <u>Opposing Viewpoints: America's Prisons</u>. Florence, KY: Cengage Learning, 2010.]

"Exonerations and Wrongful Condemnations: Expanding the Zone of Perceived Injustice in Capital Cases," <u>Golden Gate Law Review</u>, <u>37</u>, 131-173.

"Preface," D. Jones (Ed.), <u>Humane Prisons</u>. San Francisco, CA: Radcliffe Medical Press.

2005       "The Contextual Revolution in Psychology and the Question of Prison Effects," in Alison Liebling and Shadd Maruna (Eds.), <u>The Effects of Imprisonment</u> (pp. 66-93). Devon, UK: Willan Publishing.

"Achieving Educational Equity: Beyond Individual Measures of Merit," (with A. Hurtado), <u>Harvard Journal of Hispanic Policy</u>, <u>17</u>, 87-92.

"Conditions of Confinement for Detained Asylum Seekers Subject to Expedited Removal," in M. Hetfield (Ed.), <u>Report on Asylum Seekers in Expedited Removal</u>. Volume II: Expert Reports. Washington, DC: United States Commission on International Religious Freedom.

2004       "Special Issue on the Death Penalty in the United States" (co-edited with R. Weiner), <u>Psychology, Public Policy, and Law</u>, <u>10</u>, 374-621.

"Death Is Different: An Editorial Introduction" (with R. Wiener), <u>Psychology, Public Policy, and Law</u>, <u>10</u>, 374-378.

"The Death Penalty in the United States: A Crisis of Conscience" (with R. Wiener), <u>Psychology, Public Policy, and Law</u>, <u>10</u>, 618-621.

"Condemning the Other in Death Penalty Trials: Biographical Racism, Structural Mitigation, and the Empathic Divide," <u>DePaul Law Review</u>, <u>53</u>, 1557-1590.

"Capital Constructions: Newspaper Reporting in Death Penalty Cases" (with S. Greene), Analyses of Social Issues and Public Policy (ASAP), 4, 1-22.

"Abu Ghraib and the American Prison System," The Commonwealth, 98 (#16), 40-42.

"Disciplinary Segregation," in Mary Bosworth (Ed.), Encyclopedia of U.S. Prisons and Correctional Facilities (240-244). Volume 1. Thousand Oaks, CA: Sage Publications.

"Super-Maximum Secure Prisons," in Mary Bosworth (Ed.), Encyclopedia of U.S. Prisons and Correctional Facilities (pp. 938-944). Volume 2. Thousand Oaks, CA: Sage Publications.

2003    "Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement," Crime & Delinquency (special issue on mental health and the criminal justice system), 49, 124-156. [Reprinted in: Roesch, R., & Gagnon, N. (Eds.), Psychology and Law: Criminal and Civil Perspectives. Hampshire, UK: Ashgate (2007).]

"The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment," in Travis, J., & Waul, M. (Eds.), Prisoners Once Removed: The Impact of Incarceration and Reentry on Children, Families, and Communities (pp. 33-66). Washington, DC: Urban Institute Press.

"Comments on "Dying Twice": Death Row Confinement in the Age of the Supermax," Capital University Law Review.

2002    "Making Law Modern: Toward a Contextual Model of Justice, Psychology, Public Policy, and Law, 7, 3-63.

"Psychological Jurisprudence: Taking Psychology and Law into the Twenty-First Century," (with John Darley, Sol Fulero, and Tom Tyler), in J. Ogloff (Ed.), Taking Psychology and Law into the Twenty-First Century (pp. 35-59). New York: Kluwer Academic/Plenum Publishing.

"Science, Law, and Psychological Injury: The Daubert Standards and Beyond," (with Amy Smith), in Schultz, I., Brady, D., and Carella, S., The Handbook of Psychological Injury (pp. 184-201). Chicago, IL: American Bar Association. [CD-ROM format]

15

2001     "Vulnerable Offenders and the Law: Treatment Rights in Uncertain Legal Times" (with D. Specter). In J. Ashford, B. Sales, & W. Reid (Eds.), <u>Treating Adult and Juvenile Offenders with Special Needs</u> (pp. 51-79). Washington, D.C.: American Psychological Association.

         "Afterword," in J. Evans (Ed.), <u>Undoing Time</u> (pp. 245-256). Boston, MA: Northeastern University Press.

2000     "Discrimination and Instructional Comprehension: Guided Discretion, Racial Bias, and the Death Penalty" (with M. Lynch), <u>Law and Human Behavior</u>, <u>24</u>, 337-358.

         "Cycles of Pain: Risk Factors in the Lives of Incarcerated Women and Their Children," (with S. Greene and A. Hurtado), <u>Prison Journal</u>, <u>80</u>, 3-23.

1999     "Reflections on the Stanford Prison Experiment: Genesis, Transformations, Consequences ('The SPE and the Analysis of Institutions')," In Thomas Blass (Ed.), <u>Obedience to Authority: Current Perspectives on the Milgram Paradigm</u> (pp. 221-237). Hillsdale, NJ: Erlbaum.

         "Ideology and Crime Control," <u>American Psychologist</u>, <u>54</u>, 786-788.

1998     "The Past and Future of U.S. Prison Policy: Twenty-Five Years After the Stanford Prison Experiment," (with P. Zimbardo), <u>American Psychologist</u>, <u>53</u>, 709-727. [Reprinted in special issue of Norweigian journal as: USAs fengselspolitikk i fortid og fremtid, <u>Vardoger</u>, 25, 171-183 (2000); in H. Tischler (Ed.), <u>Debating Points: Crime and Punishment</u>. Englewood Cliffs, NJ: Prentice-Hall (2001); <u>Annual Editions</u>: <u>Criminal Justice</u>. Guilford, CT: Dushkin/McGraw-Hill, in press; Herman, Peter (Ed.), <u>The American Prison System</u> (pp. 17-43) (Reference Shelf Series). New York: H.W. Wilson (2001); and in Edward Latessa & Alexander Holsinger (Eds.), <u>Correctional Contexts: Contemporary and Classical Readings</u>. Fourth Edition. Oxford University Press (2010).]

         "Riding the Punishment Wave: On the Origins of Our Devolving Standards of Decency," <u>Hastings Women's Law Journal</u>, <u>9</u>, 27-78.

         "Becoming the Mainstream: "Merit," Changing Demographics, and Higher Education in California" (with A. Hurtado and E. Garcia), <u>La Raza Law Journal</u>, <u>10</u>, 645-690.

1997  "Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement," (with M. Lynch), New York University Review of Law and Social Change, 23, 477-570.

"Psychology and the Limits to Prison Pain: Confronting the Coming Crisis in Eighth Amendment Law," Psychology, Public Policy, and Law, 3, 499-588.

"Commonsense Justice and the Death Penalty: Problematizing the 'Will of the People,'" Psychology, Public Policy, and Law, 3, 303-337.

"Violence and the Capital Jury: Mechanisms of Moral Disengagement and the Impulse to Condemn to Death," Stanford Law Review, 49, 1447-1486.

"Mitigation and the Study of Lives: The Roots of Violent Criminality and the Nature of Capital Justice." In James Acker, Robert Bohm, and Charles Lanier, America's Experiment with Capital Punishment: Reflections on the Past, Present, and Future of the Ultimate Penal Sanction. Durham, NC: Carolina Academic Press, 343-377.

"Clarifying Life and Death Matters: An Analysis of Instructional Comprehension and Penalty Phase Arguments" (with M. Lynch), Law and Human Behavior, 21, 575-595.

"Psychological Secrecy and the Death Penalty: Observations on 'the Mere Extinguishment of Life,'" Studies in Law, Politics, and Society, 16, 3-69.

1995  "The Social Context of Capital Murder: Social Histories and the Logic of Capital Mitigation," Santa Clara Law Review, 35, 547-609. [Reprinted in part in David Papke (Ed.), Law and Popular Culture, Lexis/Nexis Publications, 2011)].

"Taking Capital Jurors Seriously," Indiana Law Journal, 70, 1223-1232.

"Death Penalty Opinion: Myth and Misconception," California Criminal Defense Practice Reporter, 1995(1), 1-7.

1994  "The Jurisprudence of Race and Meritocracy: Standardized Testing

and 'Race-Neutral' Racism in the Workplace," (with A. Hurtado), Law and Human Behavior, 18, 223-248.

"Comprehending Life and Death Matters: A Preliminary Study of California's Capital Penalty Instructions" (with M. Lynch), Law and Human Behavior, 18, 411-434.

"Felony Voir Dire: An Exploratory Study of Its Content and Effect," (with C. Johnson), Law and Human Behavior, 18, 487-506.

"Broken Promise: The Supreme Court's Response to Social Science Research on Capital Punishment" (with D. Logan), Journal of Social Issues (special issue on the death penalty in the United States), 50, 75-101.

"Deciding to Take a Life: Capital Juries, Sentencing Instructions, and the Jurisprudence of Death" (with L. Sontag and S. Costanzo), Journal of Social Issues (special issue on the death penalty in the United States), 50, 149-176. [Reprinted in Koosed, M. (Ed.), Capital Punishment. New York: Garland Publishing (1995).]

"Modern' Death Qualification: New Data on Its Biasing Effects," (with A. Hurtado and L. Vega), Law and Human Behavior, 18, 619-633.

"Processing the Mad, Badly," Contemporary Psychology, 39, 898-899.

"Language is Power," Contemporary Psychology, 39, 1039-1040.

1993 "Infamous Punishment: The Psychological Effects of Isolation," National Prison Project Journal, 8, 3-21. [Reprinted in Marquart, James & Sorensen, Jonathan (Eds.), Correctional Contexts: Contemporary and Classical Readings (pp. 428-437). Los Angeles: Roxbury Publishing (1997); Alarid, Leanne & Cromwell, Paul (Eds.), Correctional Perspectives: Views from Academics, Practitioners, and Prisoners (pp. 161-170). Los Angeles: Roxbury Publishing (2001).]

"Psychology and Legal Change: The Impact of a Decade," Law and Human Behavior, 17, 371-398. [Reprinted in: Roesch, R., & Gagnon, N. (Eds.), Psychology and Law: Criminal and Civil Perspectives. Hampshire, UK: Ashgate (2007).]

1992    "Death Penalty Attitudes: The Beliefs of Death-Qualified Californians," (with A. Hurtado and L. Vega). <u>Forum</u>, <u>19</u>, 43-47.

"The Influence of Race on Sentencing: A Meta-Analytic Review of Experimental Studies." (with L. Sweeney). Special issue on Discrimination and the Law. <u>Behavioral Science and Law</u>, <u>10</u>, 179-195.

1991    "The Fourteenth Amendment and Symbolic Legality: Let Them Eat Due Process," <u>Law and Human Behavior</u>, <u>15</u>, 183-204.

1988    "In Defense of the Jury," <u>Contemporary Psychology</u>, <u>33</u>, 653-655.

1986    "Civil Rights and Institutional Law: The Role of Social Psychology in Judicial Implementation," (with T. Pettigrew), <u>Journal of Community Psychology</u>, <u>14</u>, 267-277.

1984    "Editor's Introduction.  Special Issue on Death Qualification," <u>Law and Human Behavior</u>, <u>8</u>, 1-6.

"On the Selection of Capital Juries:  The Biasing Effects of Death Qualification," <u>Law and Human Behavior</u>, <u>8</u>, 121-132.

"Examining Death Qualification:  Further Analysis of the Process Effect," <u>Law and Human Behavior</u>, <u>8</u>, 133-151.

"Evolving Standards and the Capital Jury," <u>Law and Human Behavior</u>, <u>8</u>, 153-158.

"Postscript," <u>Law and Human Behavior</u>, <u>8</u>, 159.

"Social Factfinding and Legal Decisions:  Judicial Reform and the Use of Social Science."  In Muller, D., Blackman, D., and Chapman, A. (Eds.), <u>Perspectives in Psychology and Law</u>.  New York:  John Wiley, pp. 43-54.

1983    "The Future of Crime and Personality Research:  A Social Psychologist's View," in Laufer, W. and Day, J. (Eds.), <u>Personality Theory, Moral Development, and Criminal Behavioral Behavior</u>. Lexington, Mass.:  Lexington Books, pp. 471-473.

"The Good, the Bad, and the Lawful:  An Essay on Psychological Injustice," in Laufer, W. and Day, J. (Eds.), Personality Theory, Moral Development, and Criminal Behavior.  Lexington, Mass.: Lexington Books, pp. 107-117.

"Ordering the Courtroom, Psychologically," Jurimetrics, 23, 321-324.

1982    "Psychological Theory and Criminal Justice Policy:  Law and Psychology in the 'Formative Era,'" Law and Human Behavior, 6, 191-235. [Reprinted in Presser, S. and Zainaldin, J. (Eds.), Law and American History: Cases and Materials. Minneapolis, MN: West Publishing, 1989; and in C. Kubrin, T. Stucky & A. Tynes (Eds.) Introduction to Criminal Justice: A Sociological Perspective. Palo Alto, CA: Stanford University Press (2012).]

"Data and Decisions: Social Science and Judicial Reform," in P. DuBois (Ed.), The Analysis of Judicial Reform.  Lexington, Mass.: D.C. Heath, pp. 43-59.

"Employment Tests and Employment Discrimination:  A Dissenting Psychological Opinion," Industrial Relations Law Journal, 5, pp. 1-86.

"To Polygraph or Not:  The Effects of Preemployment Polygraphing on Work-Related Attitudes," (with L. White and M. Lopez), Polygraph, 11, 185-199.

1981    "Death Qualification as a Biasing Legal Process," The Death Penalty Reporter, 1 (10), pp. 1-5. [Reprinted in Augustus: A Journal of Progressive Human Sciences, 9(3), 9-13 (1986).]

1980    "Juries and the Death Penalty:  Readdressing the Witherspoon Question," Crime and Delinquency, October, pp. 512-527.

"Psychology and Legal Change: On the Limits of a Factual Jurisprudence," Law and Human Behavior, 6, 191-235. [Reprinted in Loh, Wallace (Ed.), Social Research and the Judicial Process. New York: Russell Sage, 1983.]

"The Creation of Legal Dependency:  Law School in a Nutshell" (with M. Lowy), in R. Warner (Ed.), The People's Law Review. Reading, Mass.: Addison-Wesley, pp. 36-41.

"Television Criminology:  Network Illusions of Criminal Justice Realities" (with J. Manzolati), in E. Aronson (Ed.), Readings on the Social Animal. San Francisco, W.H. Freeman, pp. 125-136.

1979    "A Psychologist Looks at the Criminal Justice System," in A. Calvin (Ed.), Challenges and Alternatives to the Criminal Justice System. Ann Arbor: Monograph Press, pp. 77-85.

"Social Psychology and the Criminal Law," in P. Middlebrook (Ed.), Social Psychology and Modern Life. New York: Random House, pp. 671-711.

"Bargain Justice in an Unjust World:  Good Deals in the Criminal Courts" (with M. Lowy), Law and Society Review, 13, pp. 633-650. [Reprinted in Kadish, Sanford and Paulsen, Robert (Eds.), Criminal Law and Its Processes. Boston: Little, Brown, 1983.]

1977    "Prison Behavior" (with P. Zimbardo), in B. Wolman (Ed.), The Encyclopedia of Neurology, Psychiatry, Psychoanalysis, and Psychology, Vol. IX, pp. 70-74.

"The Socialization into Criminality:  On Becoming a Prisoner and a Guard" (with P. Zimbardo), in J. Tapp and F. Levine (Eds.), Law, Justice, and the Individual in Society: Psychological and Legal Issues (pp. 198-223).  New York: Holt, Rinehart, and Winston.

1976    "The Play's the Thing:  Methodological Notes on Social Simulations," in P. Golden (Ed.), The Research Experience, pp. 177-190. Itasca, IL: Peacock.

1975    "The Blackboard Penitentiary:  It's Tough to Tell a High School from a Prison" (with P. Zimbardo).  Psychology Today, 26ff.

"Implementing Research Results in Criminal Justice Settings," Proceedings, Third Annual Conference on Corrections in the U.S. Military, Center for Advanced Study in the Behavioral Sciences, June 6-7.

"The Psychology of Imprisonment:  Privation, Power, and Pathology"  (with P. Zimbardo, C. Banks, and D. Jaffe), in D. Rosenhan and P. London (Eds.), Theory and Research in Abnormal Psychology.  New York:  Holt Rinehart, and Winston.  [Reprinted in:  Rubin, Z. (Ed.), Doing Unto Others:  Joining, Molding,

Conforming, Helping, Loving.  Englewood Cliffs:  Prentice-Hall, 1974.  Brigham, John, and Wrightsman, Lawrence (Eds.) Contemporary Issues in Social Psychology.  Third Edition. Monterey:  Brooks/Cole, 1977. Calhoun, James  Readings, Cases, and Study Guide for Psychology of Adjustment and Human Relationships. New York: Random House, 1978; translated as: La Psicologia del encarcelamiento: privacion, poder y patologia, Revisita de Psicologia Social, 1, 95-105 (1986).]

1973    "Social Roles, Role-Playing, and Education" (with P. Zimbardo), The Behavioral and Social Science Teacher, Fall, 1(1), pp. 24-45. [Reprinted in:  Zimbardo, P., and Maslach, C. (Eds.) Psychology For Our Times. Glenview, Ill.: Scott, Foresman, 1977.  Hollander, E. and Hunt, R. (Eds.) Current Perspectives in Social Psychology. Third Edition. New York: Oxford University Press, 1978.]

"The Mind is a Formidable Jailer:  A Pirandellian Prison" (with P. Zimbardo, C. Banks, and D. Jaffe), The New York Times Magazine, April 8, Section 6, 38-60.  [Reprinted in Krupat, E. (Ed.), Psychology Is Social:  Readings and Conversations in Social Psychology. Glenview, Ill.: Scott, Foresman, 1982.]

"Interpersonal Dynamics in a Simulated Prison" (with C. Banks and P. Zimbardo), International Journal of Criminology and Penology, 1, pp. 69-97.  [Reprinted in:  Steffensmeier, Darrell, and Terry, Robert (Eds.) Examining Deviance Experimentally. New York: Alfred Publishing, 1975; Golden, P. (Ed.) The Research Experience. Itasca, Ill.: Peacock, 1976; Leger, Robert (Ed.) The Sociology of Corrections. New York:  John Wiley, 1977; A kiserleti tarsadalom-lelektan foarma. Budapest, Hungary: Gondolat Konyvkiado, 1977; Johnston, Norman, and Savitz, L. Justice and Corrections. New York: John Wiley, 1978; Research Methods in Education and Social Sciences. The Open University, 1979; Goldstein, J. (Ed.), Modern Sociology. British Columbia:  Open Learning Institute, 1980; Ross, Robert R. (Ed.), Prison Guard/ Correctional Officer: The Use and Abuse of Human Resources of Prison. Toronto:  Butterworth's 1981; Monahan, John, and Walker, Laurens (Eds.), Social Science in Law: Cases, Materials, and Problems. Foundation Press, 1985; Siuta, Jerzy (Ed.), The Context of Human Behavior. Jagiellonian University Press, 2001; Ferguson, Susan (Ed.), Mapping the Social Landscape: Readings in Sociology. St. Enumclaw, WA: Mayfield Publishing, 2001 & 2010; Pethes, Nicolas (Ed.), Menschenversuche (Experiments with Humans). Frankfurt, Germany: Suhrkamp Verlag, 2006.]

"A Study of Prisoners and Guards" (with C. Banks and P. Zimbardo). Naval Research Reviews, 1-17. [Reprinted in Aronson, E. (Ed.) Readings About the Social Animal. San Francisco: W.H. Freeman, 1980; Gross, R. (Ed.) Key Studies in Psychology. Third Edition. London: Hodder & Stoughton, 1999; Collier, C. (Ed.), Basic Themes in Law and Jurisprudence. Anderson Publishing, 2000.]

MEMBERSHIP/ACTIVITIES IN PROFESSIONAL ASSOCIATIONS

American Psychological Association

American Psychology and Law Society

Law and Society Association

National Council on Crime and Delinquency

INVITED ADDRESSES AND PAPERS AT PROFESSIONAL ACADEMIC MEETINGS AND RELATED SETTINGS (SELECTED)

2024    "On the Nature of Institutional Trauma," California Attorneys for Criminal Justice Death Penalty Conference, February.

"The Psychological Effects of Solitary Confinement," testimony before the Pennsylvania House Judiciary Committee, Harrisburg, PA, March.

"On the Nature of Prison Trauma," Yale Law School Liman Center Conference on Incarceration and Public Health, April.

"Solitary Confinement in the United States: Conditions and Consequences," World Health Organization, Amsterdam, Netherlands, April.

2023    "On the Nature of Prison Trauma and the Prospects for Reform and Abolition," John Lewis College, Practical Activism Conference, UCSC, February.

"The Psychological Consequences of Imprisonment and Alternatives to Incarceration," invited webinar for California prosecutors sponsored by The Prosecutors' Alliance, May.

23

"The Psychological Principles at the Foundation of Humane and Effective Prisons," Norwegian Prison Service Academy, September.

"The Nature of Solitary Confinement and the Definition of 'Cruel, Inhuman, and Degrading' Treatment," United Nations Human Rights Council Hearings, Geneva, Switzerland, October.

2022    "Promulgating Myth, Ensuring Ignorance: How the Media Derails Criminal Justice Reform," Media and Society Lecture Series, University of California, Santa Cruz, CA, March.

"Context is Everything: From the Stanford Prison Experiment to Supermax Prisons and Back," Joint UCSF Amend/Norwegian Prison Service Training Program, Oslo, Norway, May.

"The Social Psychology of Solitary Confinement," Stanford University, Stanford, CA, May.

"Dismantling Dehumanization," Advancing Real Change Conference, Baltimore, MD, June.

"The Pains of Imprisonment," United Justice Summit Coalition, New York, New York, July.

"The Social and Developmental Causes of Crime," Keynote Address in the Rethinking the Social Environment in Criminal Law Theory and Doctrine: Interdisciplinary Perspectives Academic Workshop, Max Planck Institute for the Study of Crime, Security, and Law, Freiburg, Germany, September.

2021    "Imagining Freedom: Psychological Constriction and Constraint in Confinement," in conversation with Professors Reginal Dwayne Betts and Gina Dent, Santa Cruz, CA, January.

"Prisoners of Isolation: The Dangers of Social Deprivation, in Prisons and Pandemics," University Forum, University of California, Santa Cruz, CA, February.

"The Stanford Prison Experiment: Trauma Realized," New Jersey Reentry Conference Annual Meeting, Trenton, NJ, April.

"Criminality in Context," National Seminar on the Development and Presentation of Mitigating Evidence in Capital Cases, May.

2020    "A History to Avoid Repeating: Changing the Narrative in Criminal Justice Reform," Governor's Committee on the Reform of the California Penal Code, Sacramento, CA, January.

"The Science of Solitary: Expanding the Harmfulness Narrative," International Symposium on Solitary Confinement, Thomas Jefferson University, Philadelphia, PA, November.

"Social Histories and Capital Mitigation," Virginia Death Penalty Attorneys' Conference, November.

"Putting Criminality in Context," Advancing Real Change Symposium, Baltimore, MD, December.

"The Role of Expert Witnesses in Prison Litigation," UCLA Law School Seminar, December.

2019    "The Recent History of Corrections in Norway and the United States," Plenary Address, Justice Reinvestment Summit, Salem, OR, February.

"The Dimensions of Suffering in Solitary Confinement," Plenary Address, Washington College of Law at American University, Washington, DC, March.

"Implementing Norwegian Correctional Principles to Change Prison Culture in Oregon Prisons," Invited Address, Oregon Department of Corrections Leadership Team, Salem, OR, June.

"Humanizing American Jails and Prisons," Center for Court Innovation, International Summit, New York, NY, June.

"Changing the Narrative in Criminal Justice Reform," Invited Address, Norwegian Correctional Academy, Oslo, Norway, September.

Plenary Address, "Perspectives on Solitary Confinement," Northwestern University Law Review Symposium, Chicago, IL, November.

2018    "The Art and Science of Capital Mitigation," Federal Death Penalty Training Conference, Atlanta, Georgia, June.

"From Eastern State Penitentiary to Supermax Prisons," Safe Alternatives to Segregation Conference, Vera Institute of Justice, Philadelphia, PA, June.

Plenary Address, "Advancing Prisoners' Rights Through Law and Psychology," Denver Law Prisoners' Advocates Conference, University of Denver Sturm College of Law, Denver, CO, October.

"In Praise of Positivism in the Age of 'Fake News' and 'Alternative Facts,'" Research Frontiers Conference, Santa Cruz, CA, October.

2017    "Neuroscience in Policy: Solitary Confinement in California," Law & Neuroscience Conference, San Francisco, CA, February.

"In My Solitude: The Detrimental Effects of Solitary Confinement on the Brain," Exploratorium-Fisher Bay Observation Gallery, San Francisco, CA, February.

"Brief History of Correctional Reform in the United States," Community Corrections Partnership/Smart on Crime Community Forum, Santa Cruz Civic Auditorium, May.

"Reducing and Eliminating the Use of Solitary Confinement in Irish Prisons," Joint Conference with the Irish Prison Service, Department of Justice, and Irish Penal Reform Trust, Dublin, Ireland, June.

"The Emerging Consensus on When, for How Long, and On Whom Solitary Confinement Should Ever Be Imposed," Leadership, Culture and Managing Prisons: Knowledge Exchange between the USA and Europe (LEADERS), Trinity College, Dublin, Ireland, June.

"Sykes and Solitary: The Transformation of the Penal Subject in the Devolution from a 'Society of Captives' to Supermax Prisons," Power and Authority in Modern Prisons: Essays in Memory of Gresham Sykes Workshop, Centre for Prison Research, Cambridge University, Cambridge, England, September.

"Context Is Everything: The Social Psychology of Imprisonment," Joint USA/Scandinavian Correctional Exchange Program, Oslo, Norway, September.

2016    "The Culture of Punishment," American Justice Summit, New York, January.

26

"Mental Illness and Prison Confinement," Conference on Race, Class, Gender and Ethnicity (CRCGE), University of North Carolina Law School, Chapel Hill, NC, February.

"Reforming the Treatment of California's Mentally Ill Prisoners: Coleman and Beyond," Meeting of the UC Consortium on Criminal Justice & Health, San Francisco, April.

"Bending Toward Justice? The Urgency (and Possibility) of Criminal Justice Reform," UC Santa Cruz Alumni Association "Original Thinkers" Series, San Jose, CA (March), and Museum of Tolerance, Los Angeles (April).

"Isolation and Mental Health," International and Inter-Disciplinary Perspectives on Prolonged Solitary Confinement, University of Pittsburgh Law School, Pittsburgh, PA, April.

"Mechanisms of Moral Disengagement in the Treatment of Prisoners" (with Joanna Weill), Conference of the Society for the Study of Social Issues, Minneapolis, June.

2015    "Reforming the Criminal Justice System," Bipartisan Summit on Criminal Justice Reform, American Civil Liberties Union/Koch Industries co-sponsored, Washington, DC, March.

"PrisonWorld: How Mass Incarceration Transformed U.S. Prisons, Impacted Prisoners, and Changed American Society," Distinguished Faculty Research Lecture, UC Santa Cruz, March.

"Think Different, About Crime and Punishment," Invited Lecture, UC Santa Cruz 50th Anniversary Alumni Reunion, April.

"The Intellectual Legacy of the Civil Rights Movement: Two Fifty-Year Anniversaries," College 10 Commencement Address, June.

"Race and Capital Mitigation," Perspectives on Racial and Ethnic Bias for Capital and Non-Capital Lawyers, New York, September.

"The Dimensions of Suffering in Solitary Confinement," Vera Institute of Justice, "Safe Alternatives to Solitary Confinement-A Human Dignity Approach" Conference, Washington, DC, September.

"Mental Health and Administrative Segregation," Topical Working Group on the Use of Administrative Segregation in the U.S.,

National Institute of Justice/Department of Justice, Washington, DC, October.

"The Psychological Effects of Segregated Confinement," Ninth Circuit Court of Appeals "Corrections Summit," Sacramento, CA, November.

"How Can the University of California Address Mass Incarceration in California and Beyond?," Keynote Address, Inaugural Meeting of the UC Consortium on Criminal Justice & Health, San Francisco, November.

2014    "Solitary Confinement: Legal, Clinical, and Neurobiological Perspectives," American Association for the Advancement of Science (AAAS), Chicago, IL February.

"Overcrowding, Isolation, and Mental Health Care, Prisoners' Access to Justice: Exploring Legal, Medical, and Educational Rights," University of California, School of Law, Irvine, CA, February.

"The Continuing Significance of Death Qualification" (with Joanna Weill), Annual Conference of the American Psychology-Law Society, New Orleans, March.

"Using Psychology at Multiple Levels to Transform Adverse Conditions of Confinement," Society for the Study of Social Issues Conference, Portland, OR, June.

"Humane and Effective Alternatives to Isolated Confinement," American Civil Liberties Union National Prison Project Convening on Solitary Confinement, Washington, DC, September.

"Community of Assessment of Public Safety," Community Assessment Project of Santa Cruz County, Year 20, Cabrillo College, November.

"Overview of National Academy of Sciences Report on Causes and Consequences of High Rates of Incarceration," Chief Justice Earl Warren Institute on Law & Social Policy, Boalt Hall Law School, Berkeley, CA, November.

"Presidential Panel, Overview of National Academy of Sciences Report on Causes and Consequences of High Rates of Incarceration," American Society for Criminology, San Francisco, November.

"Presidential Panel, National Academy of Sciences Report on Consequences of High Rates of Incarceration on Individuals," American Society for Criminology, San Francisco, November.

"Findings of National Academy of Sciences Committee on the Causes and Consequences of High Rates of Incarceration," Association of Public Policy Analysis and Management Convention (APPAM), Albuquerque, NM, November.

"Politics and the Penal State: Mass Incarceration and American Society," New York University Abu Dhabi International Scholars Program, Abu Dhabi, United Arab Emirates, December.

2013      "Isolation and Mental Health," Michigan Journal of Race and Law Symposium, University of Michigan School of Law, Ann Arbor, MI, February.

"Social Histories of Capital Defendants" (with Joanna Weill), Annual Conference of Psychology-Law Society, Portland, OR, March.

"Risk Factors and Trauma in the Lives of Capital Defendants" (with Joanna Weill), American Psychological Association Annual Convention, Honolulu, HI, August.

"Bending Toward Justice: Psychological Science and Criminal Justice Reform," Invited Plenary Address, American Psychological Association Annual Convention, Honolulu, HI, August.

"Severe Conditions of Confinement and International Torture Standards," Istanbul Center for Behavior Research and Therapy, Istanbul, Turkey, December.

2012      "The Psychological Consequences of Long-term Solitary Confinement," Joint Yale/Columbia Law School Conference on Incarceration and Isolation, New York, April.

"The Creation of the Penal State in America," Managing Social Vulnerability: The Welfare and Penal System in Comparative Perspective, Central European University, Budapest, Hungary, July.

2011      "Tensions Between Psychology and the Criminal Justice System: On the Persistence of Injustice," opening presentation, "A Critical Eye

on Criminal Justice" lecture series, Golden Gate University Law School, San Francisco, CA, January.

"The Decline in Death Penalty Verdicts and Executions: The Death of Capital Punishment?" Presentation at "A Legacy of Justice" week, at the University of California, Davis King Hall Law School, Davis, CA, January.

"Invited Keynote Address: The Nature and Consequences of Prison Overcrowding—Urgency and Implications," West Virginia School of Law, Morgantown, West Virginia, March.

"Symposium: The Stanford Prison Experiment—Enduring Lessons 40 Years Later," American Psychological Association Annual Convention, Washington, DC, August.

"The Dangerous Overuse of Solitary Confinement: Pervasive Human Rights Violations in Prisons, Jails, and Other Places of Detention" Panel, United Nations, New York, New York, October.

"Criminal Justice Reform: Issues and Recommendation," United States Congress, Washington, DC, November.

2010    "The Hardening of Prison Conditions," Opening Address, "The Imprisoned" Arthur Liman Colloquium Public Interest Series, Yale Law School, New Haven, CN, March.

"Desensitization to Inhumane Treatment: The Pitfalls of Prison Work," panel presentation at "The Imprisoned" Arthur Liman Colloquium Public Interest Series, Yale Law School, New Haven, CN, March.

"Mental Ill Health in Immigration Detention," Department of Homeland Security/DOJ Office for Civil Rights and Civil Liberties, Washington, DC, September.

2009    "Counting Casualties in the War on Prisoners," Keynote Address, at "The Road to Prison Reform: Treating the Causes and Conditions of Our Overburdened System," University of Connecticut Law School, Hartford, CN, February.

"Defining the Problem in California's Prison Crisis: Overcrowding and Its Consequences," California Correctional Crisis Conference," Hastings Law School, San Francisco, CA, March.

2008    "Prisonization and Contemporary Conditions of Confinement,"
        Keynote Address, Women Defenders Association, Boalt Law School,
        University of California, November.

        "Media Criminology and the Empathic Divide: The Continuing
        Significance of Race in Capital Trials," Invited Address, Media,
        Race, and the Death Penalty Conference, DePaul University School
        of Law, Chicago, IL, March.

        "The State of the Prisons in California," Invited Opening Address,
        Confronting the Crisis: Current State Initiatives and Lasting
        Solutions for California's Prison Conditions Conference, University
        of San Francisco School of Law, San Francisco, CA, March.

        "Mass Incarceration and Its Effects on American Society," Invited
        Opening Address, Behind the Walls Prison Law Symposium,
        University of California Davis School of Law, Davis, CA, March.


2007    "The Psychology of Imprisonment: How Prison Conditions Affect
         Prisoners and Correctional Officers," United States Department of
         Justice, National Institute of Corrections Management Training for
         "Correctional Excellence" Course, Denver, CO, May.

        "Statement on Psychologists, Detention, and Torture," Invited
        Address, American Psychological Association Annual Convention,
        San Francisco, CA, August.

        "Prisoners of Isolation," Invited Address, University of Indiana Law
        School, Indianapolis, IN, October.

        "Mitigation in Three Strikes Cases," Stanford Law School, Palo Alto,
        CA, September.

        "The Psychology of Imprisonment," Occidental College, Los
        Angeles, CA, November.


2006    "Mitigation and Social Histories in Death Penalty Cases," Ninth
        Circuit Federal Capital Case Committee, Seattle, WA, May.

        "The Crisis in the Prisons: Using Psychology to Understand and
        Improve Prison Conditions," Invited Keynote Address, Psi Chi
        (Undergraduate Psychology Honor Society) Research Conference,
        San Francisco, CA, May.

31

"Exoneration and 'Wrongful Condemnation': Why Juries Sentence to Death When Life is the Proper Verdict," Faces of Innocence Conference, UCLA Law School, April.

"The Continuing Effects of Imprisonment: Implications for Families and Communities," Research and Practice Symposium on Incarceration and Marriage, United States Department of Health and Human Services, Washington, DC, April.

"Ordinary People, Extraordinary Acts," National Guantanamo Teach In, Seton Hall School of Law, Newark, NJ, October.

"The Next Generation of Death Penalty Research," Invited Address, State University of New York, School of Criminal Justice, Albany, NY, October.

2005        "The 'Design' of the System of Death Sentencing: Systemic Forms of 'Moral Disengagement in the Administration of Capital Punishment, Scholar-in-Residence, invited address, Center for Social Justice, Boalt Hall School of Law (Berkeley), March.

"Humane Treatment for Asylum Seekers in U.S. Detention Centers," United States House of Representatives, Washington, DC, March.

"Prisonworld: What Overincarceration Has Done to Prisoners and the Rest of Us," Scholar-in-Residence, invited address, Center for Social Justice, Boalt Hall School of Law (Berkeley), March.

"Prison Conditions and Their Psychological Effects on Prisoners," European Association for Psychology and Law, Vilnius, Lithuania, July.

2004        "Recognizing the Adverse Psychological Effects of Incarceration, With Special Attention to Solitary-Type Confinement and Other Forms of 'Ill-Treatment' in Detention," International Committee of the Red Cross, Training Program for Detention Monitors, Geneva, Switzerland, November.

"Prison Conditions in Post-"War on Crime" Era: Coming to Terms with the Continuing Pains of Imprisonment," Boalt Law School Conference, After the War on Crime: Race, Democracy, and a New Reconstruction, Berkeley, CA, October.

"Cruel and Unusual? The United States Prison System at the Start of the 21st Century," Invited speaker, Siebel Scholars Convocation, University of Illinois, Urbana, IL, October.

"The Social Historical Roots of Violence: Introducing Life Narratives into Capital Sentencing Procedures," Invited Symposium, XXVIII International Congress of Psychology, Beijing, China, August.

"Death by Design: Capital Punishment as a Social Psychological System," Division 41 (Psychology and Law) Invited Address, American Psychological Association Annual Convention, Honolulu, HI, July.

"The Psychology of Imprisonment and the Lessons of Abu Ghraib," Commonwealth Club Public Interest Lecture Series, San Francisco, May.

"Restructuring Prisons and Restructuring Prison Reform," Yale Law School Conference on the Current Status of Prison Litigation in the United States, New Haven, CN, May.

"The Effects of Prison Conditions on Prisoners and Guards: Using Psychological Theory and Data to Understand Prison Behavior," United States Department of Justice, National Institute of Corrections Management Training Course, Denver, CO, May.

"The Contextual Revolution in Psychology and the Question of Prison Effects: What We Know about How Prison Affects Prisoners and Guards," Cambridge University, Cambridge, England, April.

"Death Penalty Attitudes, Death Qualification, and Juror Instructional Comprehension," American Psychology-Law Society, Annual Conference, Scottsdale, AZ, March.

2003         "Crossing the Empathic Divide: Race Factors in Death Penalty Decisionmaking," DePaul Law School Symposium on Race and the Death Penalty in the United States, Chicago, October.

"Supermax Prisons and the Prison Reform Paradigm," PACE Law School Conference on Prison Reform Revisited: The Unfinished Agenda, New York, October.

"Mental Health Issues in Supermax Confinement," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

33

"Roundtable on Capital Punishment in the United States: The Key Psychological Issues," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Psychology and Legal Change: Taking Stock," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Economic Justice and Criminal Justice: Social Welfare and Social Control," Society for the Study of Social Issues Conference, January.

"Race, Gender, and Class Issues in the Criminal Justice System," Center for Justice, Tolerance & Community and Barrios Unidos Conference, March.

2002    "The Psychological Effects of Imprisonment: Prisonization and Beyond." Joint Urban Institute and United States Department of Health and Human Services Conference on "From Prison to Home." Washington, DC, January.

"On the Nature of Mitigation: Current Research on Capital Jury Decisionmaking." American Psychology and Law Society, Mid-Winter Meetings, Austin, Texas, March.

"Prison Conditions and Death Row Confinement." New York Bar Association, New York City, June.

2001    "Supermax and Solitary Confinement: The State of the Research and the State of the Prisons." Best Practices and Human Rights in Supermax Prisons: A Dialogue. Conference sponsored by University of Washington and the Washington Department of Corrections, Seattle, September.

"Mental Health in Supermax: On Psychological Distress and Institutional Care." Best Practices and Human Rights in Supermax Prisons: A Dialogue. Conference sponsored by University of Washington and the Washington Department of Corrections, Seattle, September.

"On the Nature of Mitigation: Research Results and Trial Process and Outcomes." Boalt Hall School of Law, University of California, Berkeley, August.

34

"Toward an Integrated Theory of Mitigation." American Psychological Association Annual Convention, San Francisco, CA, August.

Discussant: "Constructing Class Identities—The Impact of Educational Experiences." American Psychological Association Annual Convention, San Francisco, CA, August.

"The Rise of Carceral Consciousness." American Psychological Association Annual Convention, San Francisco, CA, August.

2000        "On the Nature of Mitigation: Countering Generic Myths in Death Penalty Decisionmaking," City University of New York Second International Advances in Qualitative Psychology Conference, March.

"Why Has U.S. Prison Policy Gone From Bad to Worse? Insights From the Stanford Prison Study and Beyond," Claremont Conference on Women, Prisons, and Criminal Injustice, March.

"The Use of Social Histories in Capital Litigation," Yale Law School, April.

"Debunking Myths About Capital Violence," Georgetown Law School, April.

"Research on Capital Jury Decisionmaking: New Data on Juror Comprehension and the Nature of Mitigation," Society for Study of Social Issues Convention, Minneapolis, June.

"Crime and Punishment: Where Do We Go From Here?" Division 41 Invited Symposium, "Beyond the Boundaries: Where Should Psychology and Law Be Taking Us?" American Psychological Association Annual Convention, Washington, DC, August.

1999        "Psychology and the State of U.S. Prisons at the Millennium," American Psychological Association Annual Convention, Boston, MA, August.

"Spreading Prison Pain: On the Worldwide Movement Towards Incarcerative Social Control," Joint American Psychology-Law Society/European Association of Psychology and Law Conference, Dublin, Ireland, July.

1998    "Prison Conditions and Prisoner Mental Health," Beyond the Prison Industrial Complex Conference, University of California, Berkeley, September.

"The State of US Prisons: A Conversation," International Congress of Applied Psychology, San Francisco, CA, August.

"Deathwork: Capital Punishment as a Social Psychological System," Invited SPPSI Address, American Psychological Association Annual Convention, San Francisco, CA, August.

"The Use and Misuse of Psychology in Justice Studies: Psychology and Legal Change: What Happened to Justice?," (panelist), American Psychological Association Annual Convention, San Francisco, CA, August.

"Twenty Five Years of American Corrections: Past and Future," American Psychology and Law Society, Redondo Beach, CA, March.

1997    "Deconstructing the Death Penalty," School of Justice Studies, Arizona State University, Tempe, AZ, October.

"Mitigation and the Study of Lives," Invited Address to Division 41 (Psychology and Law), American Psychological Association Annual Convention, Chicago, August.

1996    "The Stanford Prison Experiment and 25 Years of American Prison Policy," American Psychological Association Annual Convention, Toronto, August.

1995    "Looking Closely at the Death Penalty: Public Stereotypes and Capital Punishment," Invited Address, Arizona State University College of Public Programs series on Free Speech, Affirmative Action and Multiculturalism, Tempe, AZ, April.

"Race and the Flaws of the Meritocratic Vision," Invited Address, Arizona State University College of Public Programs series on Free Speech, Affirmative Action and Multiculturalism, Tempe, AZ, April.

"Taking Capital Jurors Seriously," Invited Address, National Conference on Juries and the Death Penalty, Indiana Law School, Bloomington, February.

1994        "Mitigation and the Social Genetics of Violence: Childhood
            Treatment and Adult Criminality," Invited Address, Conference on
            the Capital Punishment, Santa Clara Law School, October, Santa
            Clara.

1992        "Social Science and the Death Penalty," Chair and Discussant,
            American Psychological Association Annual Convention, San
            Francisco, CA, August.

1991        "Capital Jury Decisionmaking," Invited panelist, American
            Psychological Association Annual Convention, Atlanta, GA, August.

1990        "Racial Discrimination in Death Penalty Cases," Invited
            presentation, NAACP Legal Defense Fund Conference on Capital
            Litigation, August, Airlie, VA.

1989        "Psychology and Legal Change: The Impact of a Decade," Invited
            Address to Division 41 (Psychology and Law), American
            Psychological Association Annual Convention, New Orleans, LA.,
            August.

            "Judicial Remedies to Pretrial Prejudice," Law & Society
            Association Annual Meeting, Madison, WI, June.

            "The Social Psychology of Police Interrogation Techniques" (with R.
            Liebowitz), Law & Society Association Annual Meeting, Madison,
            WI, June.

1987        "The Fourteenth Amendment and Symbolic Legality: Let Them Eat
            Due Process," APA Annual Convention, New York, N.Y. August.

            "The Nature and Function of Prison in the United States and
            Mexico: A Preliminary Comparison," InterAmerican Congress of
            Psychology, Havana, Cuba, July.

1986        Chair, Division 41 Invited Address and "Commentary on the
            Execution Ritual," APA Annual Convention, Washington, D.C.,
            August.

"Capital Punishment," Invited Address, National Association of Criminal Defense Lawyers Annual Convention, Monterey, CA, August.

1985    "The Role of Law in Graduate Social Science Programs" and "Current Directions in Death Qualification Research," American Society of Criminology, San Diego, CA, November.

"The State of the Prisons:  What's Happened to 'Justice' in the '70s and '80s?" Invited Address to Division 41 (Psychology and Law); APA Annual Convention, Los Angeles, CA, August.

1983    "The Role of Social Science in Death Penalty Litigation." Invited Address in National College of Criminal Defense Death Penalty Conference, Indianapolis, IN, September.

1982    "Psychology in the Court:  Social Science Data and Legal Decision-Making." Invited Plenary Address, International Conference on Psychology and Law, University College, Swansea, Wales, July.

1982    "Paradigms in Conflict: Contrasting Methods and Styles of Psychology and Law." Invited Address, Social Science Research Council, Conference on Psychology and Law, Wolfson College, Oxford University, March.

1982    "Law and Psychology: Conflicts in Professional Roles." Invited paper, Western Psychological Association Annual Meeting, April.

1980    "Using Psychology in Test Case Litigation," panelist, American Psychological Association Annual Convention, Montreal, Canada, September.

"On the Selection of Capital Juries: The Biasing Effects of Death Qualification." Paper presented at the Interdisciplinary Conference on Capital Punishment. Georgia State University, Atlanta, GA, April.

"Diminished Capacity and Imprisonment: The Legal and Psychological Issues," Proceedings of the American Trial Lawyers Association, Mid-Winter Meeting, January.

1975        "Social Change and the Ideology of Individualism in Psychology and
            Law." Paper presented at the Western Psychological Association
            Annual Meeting, April.


## SERVICE TO STAFF OR EDITORIAL BOARDS OF FOUNDATIONS, SCHOLARLY JOURNALS OR PRESSES

2018-present:    Editorial Consultant, PLoS ONE.

2016-present    Editorial Consultant, <u>Translational Issues in Psychological Science</u>.

2016-present    Editorial Consultant, <u>International Journal of Law and Psychiatry</u>.

2016-present    Editorial Consultant, <u>Justice Quarterly.</u>

2015-present    Editorial Consultant, <u>Criminal Justice Review</u>.

2015-present    Editorial Consultant, <u>American Journal of Criminal Justice.</u>

2015-present    Editorial Consultant, <u>American Journal of Psychology.</u>

2015-present    Editorial Consultant, <u>Criminal Justice Policy Review.</u>

2014-2018       Editorial Board Member, <u>Law and Social Inquiry</u>.

2013-present    Editorial Consultant, <u>Criminal Justice and Behavior</u>.

2012-present:   Editorial Consultant, <u>American Sociological Review.</u>

2012-present:   Editorial Consultant, <u>Criminology</u>.

2011-present    Editorial Consultant, <u>Social Psychological and Personality Science</u>.

2008-present    Editorial Consultant, <u>New England Journal of Medicine</u>.

2007-present    Editorial Board Member, <u>Correctional Mental Health Reporter</u>.

2007-present    Editorial Consultant, <u>Journal of Offender Rehabilitation</u>.

2004-2016       Editorial Board Member, American Psychology and Law Society

Book Series, Oxford University Press.

| | |
|---|---|
| 2000-2003 | Reviewer, Society for the Study of Social Issues Grants-in-Aid Program. |
| 2000-present: | Editorial Consultant, <u>Punishment and Society</u>. |
| 2000-2015 | Editorial Board Member, <u>ASAP</u> (on-line journal of the Society for the Study of Social Issues) |
| 1997-2004 | Editorial Board Member, <u>Psychology, Public Policy, and Law</u> |
| 1997-present | Editorial Consultant, <u>Psychology, Public Policy, and Law</u> |
| 1991 | Editorial Consultant, Brooks/Cole Publishing |
| 1989-present | Editorial Consultant, <u>Journal of Personality and Social Psychology</u> |
| 1988-present | Editorial Consultant, <u>American Psychologist</u> |
| 1985 | Editorial Consultant, <u>American Bar Foundation Research Journal</u> |
| 1985-2006 | <u>Law and Human Behavior</u>, Editorial Board Member |
| 1985 | Editorial Consultant, Columbia University Press |
| 1985-present | Editorial Consultant, <u>Law and Social Inquiry</u> |
| 1980-present | Reviewer, National Science Foundation |
| 1997 | Reviewer, National Institutes of Mental Health |
| 1980-present | Editorial Consultant, <u>Law and Society Review</u> |
| 1979-present | Editorial Consultant, <u>Law and Human Behavior</u> |
| 1997-present | Editorial Consultant, <u>Legal and Criminological Psychology</u> |

<u>GOVERNMENTAL, LEGAL AND CRIMINAL JUSTICE CONSULTING</u>

Training Consultant, Palo Alto Police Department, 1973-1974.

Evaluation Consultant, San Mateo County Sheriff's Department, 1974.

Design and Training Consultant to Napa County Board of Supervisors, County Sheriff's Department (county jail), 1974.

Training Consultation, California Department of Corrections, 1974.

Consultant to California Legislature Select Committee in Criminal Justice, 1974, 1980-1981 (effects of prison conditions, evaluation of proposed prison legislation).

Reviewer, National Science Foundation (Law and Social Science, Research Applied to National Needs Programs), 1978-present.

Consultant, Santa Clara County Board of Supervisors, 1980 (effects of jail overcrowding, evaluation of county criminal justice policy).

Consultant to Packard Foundation, 1981 (evaluation of inmate counseling and guard training programs at San Quentin and Soledad prisons).

Member, San Francisco Foundation Criminal Justice Task Force, 1980-1982 (corrections expert).

Consultant to NAACP Legal Defense Fund, 1982- present (expert witness, case evaluation, attorney training).

Faculty, National Judicial College, 1980-1983.

Consultant to Public Advocates, Inc., 1983-1986 (public interest litigation).

Consultant to California Child, Youth, Family Coalition, 1981-82 (evaluation of proposed juvenile justice legislation).

Consultant to California Senate Office of Research, 1982 (evaluation of causes and consequences of overcrowding in California Youth Authority facilities).

Consultant, New Mexico State Public Defender, 1980-1983 (investigation of causes of February, 1980 prison riot).

Consultant, California State Supreme Court, 1983 (evaluation of county jail conditions).

Member, California State Bar Committee on Standards in Prisons and Jails, 1983.

Consultant, California Legislature Joint Committee on Prison Construction and Operations, 1985.

Consultant, United States Bureau of Prisons and United States Department of the

Interior (Prison History, Conditions of Confinement Exhibition, Alcatraz Island), 1989-1991.

Consultant to United States Department of Justice, 1980-1990 (evaluation of institutional conditions).

Consultant to California Judicial Council (judicial training programs), 2000.

Consultant to American Bar Association/American Association for Advancement of Science Task Force on Forensic Standards for Scientific Evidence, 2000.

Invited Participant, White House Forum on the Uses of Science and Technology to Improve Crime and Prison Policy, 2000.

Member, Joint Legislative/California Department of Corrections Task Force on Violence, 2001.

Consultant, United States Department of Health & Human Services/Urban Institute, "Effects of Incarceration on Children, Families, and Low-Income Communities" Project, 2002.

Detention Consultant, United States Commission on International Religious Freedom (USCIRF). Evaluation of Immigration and Naturalization Service Detention Facilities, July, 2004-2005.

Consultant, International Committee of the Red Cross, Geneva, Switzerland, Consultant on international conditions of confinement.

Member, Institutional Research External Review Panel, California Department of Corrections, November, 2004-2008.

Consultant, United States Department of Health & Human Services on programs designed to enhance post-prison success and community reintegration, 2006.

Consultant/Witness, U.S. House of Representatives, Judiciary Committee, Evaluation of legislative and budgetary proposals concerning the detention of undocumented persons, February-March, 2005.

Invited Expert Witness to National Commission on Safety and Abuse in America's Prisons (Nicholas Katzenbach, Chair); Newark, New Jersey, July 19-20, 2005.

Testimony to the United States Senate, Judiciary Subcommittee on the Constitution, Civil Rights, and Property Rights (Senators Brownback and Feingold, co-chairs), Hearing on "An Examination of the Death Penalty in the United States," February 7, 2006.

National Council of Crime and Delinquency "Sentencing and Correctional Policy

Task Force," member providing written policy recommendations to the California legislature concerning overcrowding crisis in the California Department of Corrections and Rehabilitation.

Trainer/Instructor, Federal Bureau of Prisons and United States Department of Justice, "Correctional Excellence" Program, providing instruction concerning conditions of confinement and psychological stresses of living and working in correctional environments to mid-level management corrections professionals, May, 2004-2008.

Invited Expert Witness, California Commission on the Fair Administration of Justice, Public Hearing, Santa Clara University, March 28, 2008.

Invited Participant, Department of Homeland Security, Mental Health Effects of Detention and Isolation, 2010.

Invited Witness, Before the California Assembly Committee on Public Safety, August 23, 2011.

Consultant, "Reforming the Criminal Justice System in the United States" Joint Working Group with Senator James Webb and Congressional Staffs, 2011 Developing National Criminal Justice Commission Legislation.

Invited Participant, United Nations, Forum with United Nations Special Rapporteur on Torture Concerning the Overuse of Solitary Confinement, New York, October, 2011.

Invited Witness, Before United States Senate Judiciary Subcommittee on the Constitution, Civil Rights, and Human Rights Hearing on Solitary Confinement, June 19, 2012.

Member, National Academy of Sciences Committee to Study the Causes and Consequences of the High Rate of Incarceration in the United States, 2012-2014.

Member, National Academy of Sciences Briefing Group, briefed media and public officials at Pew Research Center, Congressional staff, and White House staff concerning policy implications of The Growth of Incarceration in the United States: Exploring the Causes and Consequences (2014), April 30-May 1.

Consultant to United States Department of Justice and White House Domestic Policy Council on formulation of federal policy concerning use of segregation confinement, 2015.

PRISON AND JAIL CONDITIONS EVALUATIONS

Hoptowit v. Ray [United States District Court, Eastern District of Washington, 1980; 682 F.2d 1237 (9th Cir. 1982)]. Evaluation of psychological effects of conditions of confinement at Washington State Penitentiary at Walla Walla for United States Department of Justice.

Wilson v. Brown (Marin County Superior Court; September, 1982, Justice Burke). Evaluation of effects of overcrowding on San Quentin mainline inmates.

Thompson v. Enomoto (United States District Court, Northern District of California, Judge Stanley Weigel, 1982 and continuing). Evaluation of conditions of confinement on Condemned Row, San Quentin Prison.

Toussaint v. McCarthy [United States District Court, Northern District of California, Judge Stanley Weigel, 553 F. Supp. 1365 (1983); 722 F. 2d 1490 (9th Cir. 1984) 711 F. Supp. 536 (1989)]. Evaluation of psychological effects of conditions of confinement in lockup units at DVI, Folsom, San Quentin, and Soledad.

In re Priest (Proceeding by special appointment of the California Supreme Court, Judge Spurgeon Avakian, 1983). Evaluation of conditions of confinement in Lake County Jail.

Ruiz v. Estelle [United States District Court, Southern District of Texas, Judge William Justice, 503 F. Supp. 1265 (1980)]. Evaluation of effects of overcrowding in the Texas prison system, 1983-1985.

In re Atascadero State Hospital (Civil Rights of Institutionalized Persons Act of 1980 action). Evaluation of conditions of confinement and nature of patient care at ASH for United States Department of Justice, 1983-1984.

In re Rock (Monterey County Superior Court 1984). Appointed to evaluate conditions of confinement in Soledad State Prison in Soledad, California.

In re Mackey (Sacramento County Superior Court, 1985). Appointed to evaluate conditions of confinement at Folsom State Prison mainline housing units.

Bruscino v. Carlson (United States District Court, Southern District of Illinois 1984 1985). Evaluation of conditions of confinement at the United States Penitentiary at Marion, Illinois [654 F. Supp. 609 (1987); 854 F.2d 162 (7th Cir. 1988)].

Dohner v. McCarthy [United States District Court, Central District of California, 1984-1985; 636 F. Supp. 408 (1985)].  Evaluation of conditions of confinement at California Men's Colony, San Luis Obispo.

Invited Testimony before Joint Legislative Committee on Prison Construction and Operations hearings on the causes and consequences of violence at Folsom Prison, June, 1985.

Stewart v. Gates [United States District Court, 1987]. Evaluation of conditions of confinement in psychiatric and medical units in Orange County Main Jail, Santa Ana, California.

Duran v. Anaya (United States District Court, 1987-1988).  Evaluation of conditions of confinement in the Penitentiary of New Mexico, Santa Fe, New Mexico [Duran v. Anaya, No. 77-721 (D. N.M. July 17, 1980); Duran v. King, No. 77-721 (D. N.M. March 15, 1984)].

Gates v. Deukmejian (United States District Court, Eastern District of California, 1989).  Evaluation of conditions of confinement at California Medical Facility, Vacaville, California.

Kozeak v. McCarthy (San Bernardino Superior Court, 1990).  Evaluation of conditions of confinement at California Institution for Women, Frontera, California.

Coleman v. Gomez (United States District Court, Eastern District of California, 1992-3; Magistrate Moulds, Chief Judge Lawrence Karlton, 912 F. Supp. 1282 (1995). Evaluation of study of quality of mental health care in California prison system, special mental health needs at Pelican Bay State Prison.

Madrid v. Gomez (United States District Court, Northern District of California, 1993, District Judge Thelton Henderson, 889 F. Supp. 1146 (N.D. Cal. 1995). Evaluation of conditions of confinement and psychological consequences of isolation in Security Housing Unit at Pelican Bay State Prison, Crescent City, California.

Clark v. Wilson, (United States District Court, Northern District of California, 1998, District Judge Fern Smith, No. C-96-1486 FMS), evaluation of screening procedures to identify and treatment of developmentally disabled prisoners in California Department of Corrections.

Turay v. Seling [United States District Court, Western District of Washington (1998)]. Evaluation of Conditions of Confinement-Related Issues in Special Commitment Center at McNeil Island Correctional Center.

In re: The Commitment of Durden, Jackson, Leach, & Wilson. [Circuit Court, Palm Beach County, Florida (1999).] Evaluation of Conditions of Confinement in Martin Treatment Facility.

Ruiz v. Johnson [United States District Court, Southern District of Texas, District Judge William Wayne Justice, 37 F. Supp. 2d 855 (SD Texas 1999)]. Evaluation of current conditions of confinement, especially in security housing or "high security" units.

Osterback v. Moore (United States District Court, Southern District of Florida (97-2806-CIV-MORENO) (2001) [see, Osterback v. Moore, 531 U.S. 1172 (2001)]. Evaluation of Close Management Units and Conditions in the Florida Department of Corrections.

Valdivia v. Davis (United States District Court, Eastern District of California, 2002). Evaluation of due process protections afforded mentally ill and developmentally disabled parolees in parole revocation process.

Ayers v. Perry (United States District Court, New Mexico, 2003). Evaluation of conditions of confinement and mental health services in New Mexico Department of Corrections "special controls facilities."

Disability Law Center v. Massachusetts Department of Corrections (Federal District Court, Massachusetts, 2007). Evaluation of conditions of confinement and treatment of mentally ill prisoners in disciplinary lockup and segregation units.

Plata/Coleman v. Schwarzenegger (Ninth Circuit Court of Appeals, Three-Judge Panel, 2008). Evaluation of conditions of confinement, effects of overcrowding on provision of medical and mental health care in California Department of Corrections and Rehabilitation. [See Brown v. Plata, 563 U.S. 493 (2011).]

Ashker v. Brown (United States District Court, Northern District of California, 2013-2015). Evaluation of the effect of long-term isolated confinement in Pelican Bay State Prison Security Housing Unit.

Parsons v. Ryan (United States District Court, District of Arizona, 2012-14). Evaluation of conditions of segregated confinement for mentally ill and non-mentally ill prisoners in statewide correctional facilities. [See Parsons v. Ryan, 754 F.3d 657 (9th Cir. 2014)].

Coleman v. Brown (United States District Court, District of California, 2013-2014). Evaluation of treatment of mentally ill prisoners housed in administrative segregation in California prisons. [See Coleman v. Brown, 28 F.Supp.3d 1068 (2014).]

Johnson v. Wetzel et al. (United States District Court, Middle District of Pennsylvania, 2016). Evaluation of effects of prolonged solitary confinement. [See Johnson v. Wetzel et al., 209 F.Supp.3d 766 (M.D. Pennsylvania, 2016).]

Braggs v. Dunn (United States District Court, Middle District of Alabama, 2015-2017). Evaluation of mental health care delivery system, overcrowded conditions of confinement, and use of segregation in statewide prison system. [See Braggs v. Dunn, 257 F. Supp. 3d 1171 (M.D. Ala. 2017).]

Rasho v. Walker, 376 F.Supp.3d 888 (C.D. Ill. 2019). Evaluation of conditions of confinement and aspects of mental health treatment for mentally ill prisoners in the Illinois Department of Corrections.

Harvard v. Inch, 2020 WL 701990 (N.D. Florida 2020). Evaluation of conditions of confinement in solitary confinement/restrictive housing units in the Florida Department of Corrections.

Davis v. Baldwin, WL: 2414640 (S.D. Ill 2021). Evaluation of conditions of confinement in solitary confinement/restrictive housing units throughout the Illinois Department of Corrections.

Tellis v. LeBlanc, WL 67572 (WD Louisiana 2022). Conditions of confinement and treatment of prisoners at David Wade Correctional Center, Louisiana.

Jensen v. Shinn, 609 F. Supp.3d 789 (D. Arizona 2022). Evaluation of conditions of confinement in solitary confinement/restrictive housing units in Arizona Department of Corrections.

Thorpe v. Virginia Department of Corrections, Case No. 2:20CV00007 (W.D. Virginia 2023). Evaluation of conditions of confinement and treatment of prisoners in solitary confinement/restrictive housing unit.

# APPENDIX 2

# New York University

# Review of Law
# & Social Change

Regulating Prisons of the Future: A
Psychological Analysis of Supermax
and Solitary Confinement
*Craig Haney*
*Mona Lynch*

**Volume XXIII**                    **1997**                    **Number 4**

# REGULATING PRISONS OF THE FUTURE: A PSYCHOLOGICAL ANALYSIS OF SUPERMAX AND SOLITARY CONFINEMENT

### CRAIG HANEY* AND MONA LYNCH**

| | | |
|---|---|---|
| Introduction | | 478 |
| Part I. | On The Use of Solitary Confinement | 481 |
| Part II. | The Empirical Literature on Solitary Confinement | 496 |
| | A. Early Laboratory Experiments on Sensory Deprivation | 500 |
| | B. Psychological Literature on The Importance of Social Contact and Support | 503 |
| | C. Acutely Isolated and Restricted Living Conditions | 506 |
| | D. Use of Seclusion with Hospitalized Mental Patients | 507 |
| | E. Studies of Torture Victims | 508 |
| | F. Data From Isolated and Segregated Prisoners | 511 |
| | 1. Autobiographical and Descriptive Accounts | 511 |
| | 2. Direct Studies of Solitary Confinement and Segregation | 515 |
| | G. The Secondary Effects of Solitary Confinement in Prisons | 525 |
| | H. Conclusions Concerning the Effects of Solitary and Punitive Segregation | 529 |
| Part III. | Constitutional Challenges to Supermax and Solitary Confinement: The Current State of Legal Doctrine | 539 |
| | A. The Current Contours of Eighth Amendment Jurisprudence | 541 |
| | B. Solitary Confinement and Cruel and Unusual Punishment | 542 |
| | 1. Psychological Harm | 543 |
| | 2. Deference to Administrative Discretion | 548 |
| | 3. The Normalization of Solitary Confinement | 552 |
| | C. Pelican Bay | 554 |
| Part IV. | Regulating The Use of Supermax and Solitary Confinement Toward Humane Limits on The Pains of Isolation | 558 |

* Professor of Psychology, University of California, Santa Cruz. B.A., University of Pennsylvania; M.A., Ph.D., Stanford University; J.D., Stanford Law School.

** Assistant Professor, School of Justice Studies, Arizona State University. B.A., University of California, Santa Cruz; M.A., Stanford University; Ph.D., University of California, Santa Cruz.

478          *REVIEW OF LAW & SOCIAL CHANGE*          [Vol. XXIII:477

Conclusion ..................................................... 566

> *In this Orwellian age, punishment that endangers sanity, no less than physical injury by the strap, is prohibited by the Constitution. Indeed, we have learned to our sorrow in the last few decades that true inhumanity seeks to destroy the psyche rather than merely the body.*[1]

> *The mental, physical, and emotional status of individuals, whether in or out of custody, do deteriorate and there is no power on earth to prevent it. We decline to enter this uncharted bog. . . . The Constitution does not require that prisoners, as individuals or as a group, be provided with any and every amenity which some person may think is needed to avoid mental, physical, and emotional deterioration.*[2]

## INTRODUCTION

When California Governor George Deukmejian several years ago dedicated what was then the state's newest prison—a massive, windowless "security housing unit" (SHU) designed to segregate and isolate over a thousand prisoners from the rest of the prison system and from one another—he boasted that the Pelican Bay facility was "a state-of-the-art prison that will serve as a model for the rest of the nation. . . ."[3] A California prison spokesman would later confirm that "we've had delegations here from other states and even other countries" studying the prison, one that kept prisoners confined to their cells almost twenty-three hours a day and minimized all forms of human contact through the use of technologically sophisticated locking and monitoring devices.[4] News commentators closely followed the legal case that decided the constitutionality of the prison because they believed the proceedings might well "determine the shape of American penology in the 21st century."[5] Even the federal district court judge whose written opinion criticized the operation of the facility noted that it was a "prison of the future"[6] and acknowledged that the prisoners'

---

1. Sostre v. McGinnis, 442 F.2d 178, 208 (2d Cir. 1971)(Feinberg, J., dissenting).

2. Newman v. Alabama, 559 F.2d 283, 291 (5th Cir. 1977).

3. *California Dedicates New High-Tech Max Security Prison*, CORRECTIONS DIGEST, June 27, 1990, at 9.

4. John Roemer, *High-Tech Deprivation Pelican Bay Prison Was Fine-Tuned To Isolate Gang Leaders, But Is It Instead Turning Out Dangerous Ex-Cons?* SAN JOSE MERCURY NEWS, June 7, 1992, at 16 (quoting Lt. Al Deines).

5. Claire Cooper, *Prison on Trial: Inmates Allege High-Tech Torture*, SACRAMENTO BEE, Sept. 18, 1993, at A1.

6. Madrid v. Gomez, 889 F. Supp. 1146, 1155 (N.D. Cal. 1995). Despite serving as a putative model for the rest of the nation, more than 200 prisoner complaints concerning Pelican Bay were filed with the United States District Court in less than two years of the prison's operation. Chief Judge Thelton Henderson took the unusual step of meeting with the warden and the state attorney general's office in response to the dramatic number of

claims of cruel and unusual punishment had "generated considerable attention . . . because the Pelican Bay SHU is considered a state-of-the-art, 'modern day' SHU, and thus a potential forerunner for other similar units around the country."[7]

As one of the first and most visible of these "super-maximum security" facilities, the Pelican Bay SHU in Crescent City, California was one of the very few to attract media attention.[8] The legal challenge to conditions in California's "supermax" resulted in a strongly worded opinion in which the federal court condemned certain features of the prison but left the basic regimen of segregation and isolation largely intact. Although the court concluded that this kind of confinement "may press against the outer bounds of what most humans can psychologically tolerate,"[9] the judge refrained from ordering any substantial modifications in the overall conditions that prevailed inside this supermax prison. To many observers, and to correctional officials hoping to emulate the California model, this seemed to provide precisely the kind of constitutional imprimatur needed to move forward and make this "prison of the future" a reality in various jurisdictions across the country.

The SHU at Pelican Bay thus appears to be at the cutting-edge of an extraordinarily important yet little-debated correctional trend: the increasingly widespread use of long-term and intensely segregated confinement supposedly reserved for the system's most troublesome offenders. Such confinement typically takes place inside newly-created, specialized housing units devoted exclusively to the task of establishing and maintaining previously unheard-of conditions of restricted movement and social isolation. Despite the dramatic shift in correctional philosophy that this trend represents and the extraordinary public expense that it has incurred, there has been surprisingly little public discussion or political debate about the wisdom of this new approach to prison punishment. Notwithstanding the potential damage to prisoners incarcerated for long periods of time in these segregation units and the potential risks to those members of the public who will eventually interact with some of the most adversely affected prisoners once they are released, few legal challenges have been lodged against these new policies and little or no systematic expert commentary has appeared analyzing the psychological and correctional consequences of this kind of penal confinement.

complaints the District Court had received, eventually leading to a class action lawsuit concerning conditions at the prison. *Id.* The first author (Haney) was one of several expert witnesses who testified about the psychological effects of confinement in this environment at the federal trial conducted before Judge Henderson in late 1993.

7. *Id.* at 1261.

8. *See, e.g.,* Leslie White, *Inside the Alcatraz of the '90s*, 12 CAL. LAW., Apr. 1992, at 42; Nat Hentoff, *Buried Alive in American Prisons; Charles Dickens's Report to Zoe Baird*, THE WASH. POST, Jan. 9, 1993, at A21; Howard Mintz, *Is Pelican Bay Too Tough?* THE RECORDER, Sept. 19, 1991.

9. Madrid v. Gomez, 889 F. Supp. at 1267.

Indeed, although solitary confinement has a long and, at times, controversial history in the United States,[10] a new consensus has emerged quietly over the last few decades among prison policymakers. In part in response to increasing pressures in badly overcrowded prison systems and the absence of resources with which to attempt alternative approaches, correctional administrators are turning to aggressive policies of punitive segregation in the hope of enhancing their control over prisoners.[11] The invention of a new and supposedly improved penal form—"hi-tech maxi-maxi" prisons devoted exclusively to the task of long-term segregated confinement—has given them a unique and (they argue) effective weapon in this war against unwieldy numbers of unruly prisoners.[12] By 1991, some version of these "supermax" prisons featuring extreme segregation and isolation was functioning in 36 states, with many others in the planning stages.[13] In addition, a newly opened, highly restrictive, modern "control unit" has apparently committed the federal penitentiary system to the use of this penal form for some time to come.[14] Although these trends have occurred quickly and quietly, they have had an enormous impact on American corrections. It is likely that at no point in the modern history of imprisonment have so many prisoners been so completely isolated for so long a period of time in facilities designed so completely for the purpose of near total isolation.

In this Article, we provide a comprehensive review of the existing literature on the effects of solitary confinement and punitive segregation and a discussion of the recent U.S. case law limiting its use in state and federal prisons. We address the psychological question of whether solitary confinement represents a distinct and distinctly worse form of incarceration than maximum security imprisonment generally. After providing a brief history of solitary confinement as legal punishment, we look in detail at its

---

10. *See infra* notes 28-71 and accompanying text.

11. For general discussions of the prevalence of solitary confinement in modern corrections as well as descriptions of some of the specific conditions subsumed by the term, see ROSEMARY L. O'BRIEN, SPECIAL HANDLING UNITS, FORUM ON CORRECTIONS RESEARCH, Sept. 1992, at 11. For an especially sympathetic view of these developments, see David Ward, *Control Strategies for Problem Prisoners in American Penal Systems, in* PROBLEMS OF LONGTERM IMPRISONMENT 74 (Anthony Bottoms & Roy Light, eds., 1987).

12. Craig Haney, *Infamous Punishment: The Psychological Effects of Isolation,* 8 THE NAT'L PRISON PROJECT J. 3 (1993) [hereinafter Haney, *Infamous Punishment*]; Russ Immarigeon, *The Marionization of American Prisons,* 7 THE NAT'L PRISON PROJECT J. 1 (1992). Human Rights Watch has concluded that "confinement in 'maxi-maxis' is administered by prison officials without independent supervision and leads to a situation in which inmates may in fact be sentenced twice: once by the court, to a certain period of imprisonment; and the second time by the prison administration, to particularly harsh conditions." HUMAN RIGHTS WATCH, PRISON CONDITIONS IN THE UNITED STATES 3 (1991).

13. Editorial, *Inside the Super-Maximum Prisons,* THE WASH. POST, Nov. 24, 1991, at C6.

14. Robert Perkinson, *Shackled Justice: Florence Federal Penitentiary and the New Politics of Punishment,* SOC. JUST. 117 (1994); Francis X. Clines, *A Futuristic Prison Awaits the Hard-Core 400,* N.Y. TIMES, Oct. 17, 1994, at A2.

psychological effects and focus especially on the threat it poses for the mental health of prisoners. We will suggest that the scholarly literature on this question is clear and that there is sufficient empirical justification to regard solitary confinement as a unique correctional environment that warrants special legal status. We turn next to a discussion of the way in which the courts have treated this issue, both historically and through the lens of contemporary legal doctrine. We will argue that constitutional doctrines currently governing solitary confinement fail to recognize the nature and magnitude of the psychological trauma that can be inflicted by this form of punishment and, therefore, that they fail to adequately regulate its use by properly limiting the nature and duration of prisoners' exposure to such confinement. We conclude by proposing a series of remedies to these legal shortcomings in the form of model regulations for the use of solitary confinement and punitive isolation.

## I.

### ON THE USE OF SOLITARY CONFINEMENT

Historically, the use of solitary confinement in correctional settings has been a continuing point of contention between prison administrators, mental health professionals, and legal decision makers. When British humanitarians debated the proper form of prison life in the 18th century, they touted solitary confinement for its powerful effect.[15] The English jurist William Paley wrote that solitary confinement "would augment the terror of the punishment,"[16] and many believed that this enhanced punishment would serve as a greater deterrent and increase its reformative effect.[17] Penologists were also enamored of the orderliness that solitary confinement permitted them to impose upon the prison regime, although one historian noted that the rigid system of "perfect order and perfect silence" in operation at Petonville prison resulted in "twenty times more cases of mental disease than in any other prison in the country."[18] Indeed, reformers of England's harsh system of capital punishment thought they had found in

---

15. Solitary confinement was advocated as what one historian has called "reclamation," a technique intended to effect "a deeper change in the offender's psyche" than that produced by the rehabilitative aspects of mere hard labor. Adam J. Hirsch, *From Pillory to Penitentiary: The Rise of Criminal Incarceration in Early Massachusetts*, 80 MICH. L. REV. 1179, 1209 (1982).

16. WILLIAM PALEY, PRINCIPLES OF MORAL AND POLITICAL PHILOSOPHY 291 (1790).

17. LOUIS P. MASUR, RITES OF EXECUTION: CAPITAL PUNISHMENT AND THE TRANSFORMATION OF AMERICAN CULTURE, 1776-1865 (1989).

18. CHRISTOPHER HIBBERT, THE ROOTS OF EVIL: A SOCIAL HISTORY OF CRIME AND PUNISHMENT 160 (1963). As Martha Duncan observed, "the reformers' preoccupation with order was not entirely rational. . . ." Martha Duncan, *In Slime and Darkness: The Metaphor of Filth in Criminal Justice*, 68 TUL. L. REV. 725, 788 (1994).

solitary confinement "the 'most terrible penalty' short of death that a society could inflict *and* 'the most humane.'"[19]

It was not the success of solitary confinement that accounted for its popularity in the late 18th and early 19th centuries. As one commentator of the early use of solitary in the Netherlands observed, this type of imprisonment "appeared not to be successful at all. Again and again reports of insanity, suicide, and the complete alienation of prisoners from social life seriously discredited the new form of punishment."[20] Instead, much of the enthusiasm for solitary confinement derived from the underlying view of criminality it reflected. The individualism of the age underscored the hope that criminals could be compelled to change internally, especially when kept isolated from each other and from the influence of the outside social world.[21] As another Dutch commentator put it, "[m]ind control became a major objective, and solitary confinement fit into this model."[22] By maximizing control over its prisoners, solitary confinement was thought to maximize the prison's ability to change or transform them:

> Uprooted from his universe, the inmate in solitary confinement gradually becomes aware of his weakness, of his fragility, of his absolute dependence upon the administration, that is, on the "other"; thus he becomes aware of himself as a subject-of-need. This is what can be described as the first stage of *reformation*: transformation of the real subject (criminal) into an "ideal subject" (prisoner).[23]

Yet, especially in the early years before the use of solitary confinement became so widespread, courts and jailers remained sensitive to the effects of the "horrible situation of complete and continuous solitude"[24] and took steps to mitigate them, even for prisoners who were considered the most dangerous: "Early modern judges had fewer scruples about meting out physical punishments, but they found solitary confinement an unbearable torment."[25] Eventually, of course, the fundamental compatibility of solitary

---

19. MICHAEL JACKSON, PRISONERS OF ISOLATION: SOLITARY CONFINEMENT IN CANADA 13 (1983) (emphasis added) (citing JONAS HANWAY, SOLITUDE IN IMPRISONMENT 141 (1776)).

20. Herman Franke, *The Rise and Decline of Solitary Confinement: Socio-Historical Explanations of Long-term Penal Changes*, 32 BRIT. J. CRIMINOLOGY 125, 128 (1992).

21. *See* Franke, *supra* note 20, at 140 ("[t]he worldwide enthusiasm for solitary confinement at the beginning of the nineteenth century should. . .be understood as a refutation of the assumption that causes of crime were to be sought in social circumstances. . . .").

22. Pieter Spierenburg, *From Amsterdam to Auburn: An Explanation for the Rise of the Prison in Seventeenth-Century Holland and Nineteenth-Century America*, 20 J. SOC. HIST. 439, 455 (1987) [hereinafter Spierenburg, *From Amsterdam to Auburn*].

23. DARIO MELOSSI & MASSIMO PAVARINI, THE PRISON AND THE FACTORY: ORIGINS OF THE PENITENTIARY SYSTEM 150 (Glynis Cousin trans., Barnes & Noble Books) (1981).

24. PIETER SPIERENBURG, THE PRISON EXPERIENCE: DISCIPLINARY INSTITUTIONS AND THEIR INMATES IN EARLY MODERN EUROPE 193 (1991)(internal quotation marks omitted) [hereinafter SPIERENBURG, THE PRISON EXPERIENCE].

25. *Id.* at 281.

confinement with other political and ideological transformations ensured its widespread use through much of nineteenth-century Europe.[26] This occurred despite the fact that these extreme forms of isolation appeared to lead to "illness, lunacy, and agony"[27] for many prisoners subjected to them.

Similarly, Louis Masur noted that "in the United States, the idea of solitary confinement belonged more to the age than to any individual" and that "[b]y the 1770s and 1780s, nearly everyone was abuzz with the possibility of solitary confinement" as a correctional practice.[28] Indeed, the great penological debate of the early 19th century turned on this question: whether prisoners should be completely isolated from one another (as they were under the Pennsylvania model) or permitted to engage in silent, congregate labor (as practiced under the model initiated in Auburn, New York). The first block of solitary confinement cells in the Walnut Street jail was authorized by the Pennsylvania legislature in 1790, to house "the more hardened and atrocious offenders."[29] Despite recognition by some jurists soon thereafter that solitary confinement was "a greater evil than certain death" and reports in some newspapers that prisoners in solitary "beg, with the greatest earnestness, that they may be hanged out of their misery,"[30] Pennsylvania officials were pleased enough with the results to use this form of punishment as the model upon which their large penitentiary was built. Thus, when the Western State Penitentiary was opened in 1826, all of its prisoners were confined in solitary cells.[31]

But when a similar form of solitary confinement was tried in New York, Beaumont and Tocqueville were on hand to record the outcome:

> This experiment, of which the favourable results had been anticipated, proved fatal for the majority of prisoners. It devours the victim incessantly and unmercifully; it does not reform, it kills. The unfortunate creatures submitted to this experiment wasted away. . . ."[32]

---

26. *See* MICHEL FOUCAULT, DISCIPLINE AND PUNISH: THE BIRTH OF THE PRISON (trans. Alan Sheridan) (1977); Franke, *supra* note 20; Spierenburg, *From Amsterdam to Auburn, supra* note 22.

27. GEORG RUSCHE & OTTO KIRCHHEIMER, PUNISHMENT AND SOCIAL STRUCTURE 137 (1968).

28. MASUR, *supra* note 17, at 80-81.

29. HARRY ELMER BARNES, THE EVOLUTION OF PENOLOGY IN PENNSYLVANIA 120 (1927).

30. MASUR, *supra* note 17, at 83.

31. HIRSCH, *supra* note 15, at 1260.

32. *See* TORSTEN ERIKSSON, THE REFORMERS, AN HISTORICAL SURVEY OF PIONEER EXPERIMENTS IN THE TREATMENT OF CRIMINALS 49 (1976) (quoting Beaumont and Tocqueville).

Another historian also termed the Auburn experiment a "hopeless failure that led to a marked prevalence of sickness and insanity on the part of the convicts in solitary confinement."[33]

Numerous states experimented with the Pennsylvania system of complete isolation during the nineteenth century, only to abandon the practice in light of its adverse effects.[34] By the end of the century, United States Supreme Court Justice Miller could summarize a hundred years of experience with solitary since the first cells were constructed at Walnut Street this way: "[T]here were serious objections to it... and solitary confinement was found to be too severe."[35] Specifically, as Miller recounted:

> A considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community.[36]

Notwithstanding such general condemnation, solitary confinement continued to be part of at least some of the prison sentences that were meted out in a number of American jurisdictions. For example, it was common practice in the nineteenth century to require a death-sentenced prisoner to spend the final months preceding his or her execution date in solitary confinement.[37] In some states where solitary confinement was still permitted by statute to be part of a prisoner's standard sentence, sentencing authorities and prison administrators were afforded much discretion in

---

33. Harry Elmer Barnes, *The Historical Origin of the Prison System in America*, 12 J. CRIM. L. & CRIMINOLOGY 35, 53 (1921). Barnes also distinguished the Pennsylvania and Auburn systems in terms of the specific conditions of confinement that each imposed. Unlike the Pennsylvania model in which prisoners were placed in two large, roomy cells with provisions for labor and an individual outside yard, Auburn's solitary confinement cells more closely resembled those used in modern-day prisons—"a single small inside cell without any labor or other adequate provisions for physical exercise." *Id.*

34. Barnes recounted the following history of adoption and abandonment of the so-called "Pennsylvania system" of complete solitary confinement in the United States:

| State | Introduced | Abandoned |
|---|---|---|
| Maine | 1824 | 1827 |
| Maryland | 1809 | 1838 |
| Massachusetts | 1811 | 1829 |
| New Jersey | 1820 | 1828 |
|  | 1833 (reintroduced) | 1858 |
| Rhode Island | 1838 | 1844 |
| Virginia | 1824 | 1827 |

*Id.* at n. 54.

35. *In re* Medley, 134 U.S. 160, 168 (1890).

36. *Id.*

37. Thus, a Vermont statute provided:

When execution is not to take place until after six months from date of sentence, the court at the same time shall sentence the respondent to hard labor in the state

deciding whether or not to actually impose it.[38] For example, an 1860 Pennsylvania statute providing that prisoners were to be sentenced to "undergo an imprisonment at separate and solitary confinement, at labor, or by simple imprisonment" was still on the books in the early twentieth century.[39] The Illinois Supreme Court held that a law encouraging wardens to employ physically capable prisoners in some form of labor did not conflict with a sentencing court's discretion to prescribe some portion of a prisoner's sentence to be served in solitary.[40]

Other jurisdictions placed statutory limits on the amount of time a prisoner could be sentenced to solitary confinement. Thus, an 1818 Massachusetts law provided additional punishment for repeat offenders, including "solitary imprisonment, not exceeding 30 days."[41] At least one state explicitly excluded solitary confinement from the terms of its prison sentences,[42] and more commonly its imposition was carefully circumscribed. Thus, when the Minnesota legislature in 1868 provided for life imprisonment as an alternative to the death penalty in first degree murder cases, the law specified that the convicted person:

> shall be punished by imprisonment at hard labor in the state-prison during the remainder of the term of his natural life, with solitary confinement upon bread and water diet for twelve days in each year during the term, to be apportioned in periods of not

prison or house of correction until three months before the time fixed in the sentence of death for execution thereof, and shall also sentence him to solitary confinement in the state prison or house of correction from the expiration of the sentence to hard labor until the time of execution.

VT. STAT. ANN. § 2007 (1880). *See* Rogers v. Peck, 199 U.S. 425, 432 (1905) (describing the statute).

38. *See Ex parte* Geary, 10 F. Cas. 137, 138 (N.D. Ill. 1871) (noting that "the [Illinois] law provides that the court, in the case of the confinement of a criminal in the penitentiary, shall designate what part of the punishment shall be solitary confinement, and what part shall be hard labor . . . and it is clear that all who are not by the order of the court in solitary confinement are subject to hard labor . . . ."); McCall v. State, 185 So. 608, 613 (Fla. 1939)(applying a 1927 Florida statute allowing prisoner to be "sentenced to solitary confinement at the discretion of the court").

39. *In re* Spencer, 228 U.S. 652, 656-57 (1913). The phrase meant nothing more, however, than "imprisonment in the penitentiary or in a suitable county prison." Stanton v. Francies, 95 A. 798 (Pa. 1915).

40. People v. Hahn, 83 N.E. 937, 938 (Ill. 1908) (applying a 1903 Illinois statute stating that "the court, in pronouncing sentence, shall designate what portion of time the offender shall be confined to solitary imprisonment, and what portion to hard labor"). Hahn had been sentenced to 15 years imprisonment for murder and challenged the court's order that the first 24 hours of the sentence be spent in solitary. *Id.*

41. Commonwealth v. Richardson, 55 N.E. 988, 989 (Mass. 1900) (citing MASS. GEN. L. ch. 176, §§5-6, year unknown).

42. *See, e.g.*, State v. Palmieri, 46 N.E. 2d 318, 321 (Ohio Ct. App. 1938)(sentencing prisoner to "hard labor for not less than one year nor more than twenty years, no part of such time to be kept in solitary confinement").

exceeding three days' duration each, with an interval of not less than fourteen days intervening each two successive periods.[43]

It also mandated that "solitary imprisonment in the state-prison is hereby abolished, except for prison discipline."[44]

The special pains of solitary confinement were implicitly acknowledged in other ways as well, as in Ohio laws passed in the 1880s that prohibited corrections officials from "relaxing" a sentence at hard labor "even in the case of disability" but allowed the corrections board to "modify the sentence of the court to solitary confinement, when necessary to prevent serious injury to health" and provided for the transfer of "insane convicts" from solitary to an asylum.[45]

By the turn of the century, recognition of the painful psychological effects of solitary confinement was reflected in other legal decisions. For example, a series of state cases beginning around this time questioned the voluntariness of confessions in which solitary confinement had been used to persuade defendants to talk.[46] In 1910, the Washington Supreme Court wrote:

> The effect of solitary confinement on the mind of a person charged with a crime may be imagined. It is a well-known psychological fact that men and women have frequently confessed to crimes which they did not commit. They have done it sometimes to escape present punishment which had become torture to them; sometimes through other motives; and the object of putting the inmates of this jail in this dark cell in solitary confinement is easily understood.[47]

The effects of solitary confinement also provided the basis for claims of insanity. For example, in one case the defendant managed to escape from the "incorrigible ward" at San Quentin where he had been held in solitary confinement for 8 years. The prisoner made his way to the dining area of the prison where he attacked another convict. At trial he pled insanity on the basis of the effects of the circumstances under which he had been kept: "Defendant was allowed to show very fully the condition and mode of life of those so confined, and to introduce the evidence of experts

---

43. Holden v. Minnesota, 137 U.S. 483, 488 (1890) (citing MINN. STAT.§3 (1868)). Similarly, a Massachusetts statute provided that "where the punishment of imprisonment in the state prison is awarded, solitary confinement not exceeding twenty days at a time shall form part thereof." Murphy v. Massachusetts, 177 U.S. 155, 162 (1900) (citing MASS. GEN. L. ch. 504 (1895)).

44. MINN. STAT. Ch. 79, §1 (1876).

45. State v. Peters, 4 N.E. 81, 87 (Ohio 1885) (citing OHIO LAWS ch. 81, §187 (1884)).

46. People v. Gonzales, 69 P. 487 (Cal. 1902); People v. Loper, 112 P. 720 (Cal. 1911); Stitt v. People, 219 P. 205 (Colo. 1923); Osborn v. People, 262 P. 892 (Colo. 1927); People v. Albers, 195 N.E. 459 (Ill. 1935); Kokenes v. State, 13 N.E. 2d 524 (Ind. 1938); Wright v. State, 9 A.2d 253 (Md. 1939); Commonwealth v. Sheppard, 48 N.E.2d 630 (Mass. 1943).

47. State v. Miller, 111 P. 1053 (Wash. 1910).

as to the probable effect on the mind as to such conditions and mode of life."[48] The former warden of the prison was permitted to give descriptive testimony about the ward, "the object clearly being to show such conditions as might produce insanity."[49]

Long-term solitary confinement was no longer commonplace in prison sentences in the United States by the beginning of the twentieth century. Although some criminal statutes retained nineteenth century terminology that included solitary confinement as part of the terms of imprisonment, in actual practice its use had largely ended. For example, even though prisoners convicted of certain crimes in Pennsylvania were sentenced to "imprisonment, by separate or solitary confinement at labor"—this in fact meant nothing more than the "equivalent of imprisonment in a penitentiary."[50] In some jurisdictions prisoners could be sentenced to a brief period of solitary confinement—say, on the anniversary of the crime for which they were incarcerated.[51] Otherwise, solitary confinement was reserved as punishment for prison infractions.

Here, too, the trend was towards explicitly circumscribed terms. For example, although the Michigan Supreme Court failed to agree on whether to order the release from solitary confinement of a citizen held in jail on a civil suit, the Chief Justice cited the regulation limiting such confinement to 10 days.[52] Noting that the record showed that the prisoner had been in

---

48. People v. Oppenheimer, 106 P. 74, 80 (Cal. 1909).

49. *Id.* at 78. *See also* People v. Egan, 23 P.2d 755, 755 (Cal. 1933) (stating that the defendant admitted that "by reason of his incarceration in Folsom prison for a number of years, a considerable portion of the time being in solitary confinement, he had 'just come out embittered against society. . . and came out with the intention that society owed [him] a duty and [he] was going to collect that duty. . . .'").

50. Commonwealth v. Baldi, 347 Pa. 601, 601, 33 A.2d 12, 13 (Pa. 1943).

51. *See e.g.* People v. Thompson, 44 N.E.2d 876 (Ill. 1942) (upholding sentence in which defendant was punished with a one hundred year sentence, and ordered to be placed in solitary confinement on each anniversary of the crime). The practice of permitting trial courts to specify some portion of a prison sentence to be served in solitary confinement persisted until recently in some states. For example, until 1993, some Nebraska criminal statutes provided that "the court . . . shall determine and declare in its sentence whether any such convict shall be kept in solitary confinement . . . and . . . for what period of time." NEB. REV. STAT. §29-2204 (1943). *See* State v. Bennett, 508 N.W.2d 294, 298 (Neb. 1993) (holding that requirement that defendant be kept in solitary confinement from the anniversary of the offense, July 28 to August 8 of each year was not an abuse of discretion, but that statute repealing the authority of court to order solitary confinement would be applied to defendant whose appeal was pending at the time the statute became effective). Although the amount of time prisoners were sentenced to solitary under this law was typically brief, solitary was clearly and pointedly designed to increase the punitiveness of the sentence, as when the Nebraska Supreme Court approved a criminal sentence for manslaughter that included placing the prisoner in solitary confinement both on his birthday and the anniversary of the crime for which he was committed to prison. State v. Stratton, 374 N.W.2d 31, 33-34 (Neb. 1985).

52. Leach v. Whitbeck, 115 N.W. 253, 254 (Mich. 1908). "If any person confined in any jail, upon a conviction or charge of any criminal offense, shall be refractory or disorderly, or shall willfully or wantonly destroy or injure any article of bedding, or other furniture, or a door or window, or any other part of such prison, the sheriff of the county, after due inquiry,

solitary for at least three months, the Court wrote that "[t]he records of the courts of this state do not show that any prisoner, civil or criminal (except convicted of a capital offense), has ever for such a length of time been subjected to such punishment."[53]

Although, until recently, solitary confinement was used more sparingly in the twentieth century, and rarely as a method of long-term incarceration, its cruel and unusual aspects continued to be debated much as they were during its period of initial popularity in the early nineteenth century. For example, the Federal Bureau of Prisons' decision in 1934 to concentrate its most troublesome prisoners in a place of draconian isolation—Alcatraz Island—was questioned from the start. Under the direction of a warden who attempted to extend so-called "principles of scientific management" to the task of prison operations, Alcatraz was thought by some critics to have "pushed penology into the realm of mad science."[54] Public scrutiny followed. That is:

> It didn't take long for the routine—and especially [the warden's] edict of silence—to drive convicts stir-crazy. . . . Word of the self-mutilations began to leak. The Bureau of Prisons treated Alcatraz as if it were top secret, which only fueled media curiosity. Paroled inmates were speaking out. . . . The *Saturday Evening Post* in 1938 published a story in which an Alcatraz parolee claimed that he knew of 14 convicts who had gone violently insane there.[55]

Alcatraz closed amid controversy in 1963.[56] A committee of British experts evaluated the Alcatraz experiment for possible replication in their country but decided against it. Among other things they concluded that "the dominant atmosphere" in a place like Alcatraz "could hardly fail to be excessively custodial" and that it also "might become repressive with the staff attitudes becoming affected by their anxieties about the attitudes and activities of a concentrated group of evil men who felt themselves finally rejected by society. . ."[57]

---

may cause such person to be kept in solitary confinement, not more than ten days for any one offense; and during such solitary confinement, he shall be fed with bread and water only, unless other food shall be necessary for the preservation of his health." *Id.* (citing MICH. COMP. LAWS §2674 (1897)).

53. Leach, 115 N.W. at 254.

54. Jay Stuller, *There Never Was a Harder Place Than "The Rock." (U.S. Penitentiary, Alcatraz)*, 26 SMITHSONIAN 84, 86 (1995).

55. *Id.*

56. In the meantime a large, critical literature about the institution—much of it produced by ex-convict former inhabitants—educated the public about its harshness. For example, see: Roy Gardner, *Hellcatraz: The Rock of Despair* (1939); John Godwin, *Alcatraz: 1868-1963* (1963); Alvin Karpis, *On the Rock: Twenty-Five Years in Alcatraz / The Prison Story of Alvin Karpis as Told to Robert Livesey* (1980). See, also: James A. Johnston, *Alcatraz Island Prison, and the Men Who Live There.* (1949); Jim Quillan, *Alcatraz From Inside: The Hard Years, 1942-1952* (1991).

57. Home Office, *Managing the Long-Term Prison System, The Report of the Control Committee* 53 (1984), discussing the findings of the earlier "Radzinowicz Report"—Home

Despite Alcatraz's controversial history, the Bureau of Prisons sought to replace it with a similarly-run facility. As part of the newly constructed federal penitentiary at Marion, Illinois, a special "control unit" was erected in which conditions were more severe in some respects than those at Alcatraz.[58] The Marion control unit operated for a decade as perhaps the most secure and oppressive correctional facility in the world.[59] Yet, when violence erupted there in 1983, authorities responded to the tragic events not by questioning the logic and effectiveness of their especially punitive regime but rather by extending it to the entire prison.[60] Conditions at Marion became the subject of a congressional report,[61] several critical outside evaluations,[62] media commentary dubbing Marion "the new Alcatraz,"[63] and extensive testimony in a federal lawsuit that addressed their psychologically harmful consequences.[64] Yet, they persisted.

During approximately the same time period, criticism and controversy was directed at the use of so-called "group isolation" in a special high security unit of a women's federal prison that eventually led to the transfer of the women prisoners who had been confined there.[65] Nonetheless, the Federal Bureau of Prisons committed itself to a continuation of the Control

---

Office, *The Regime for Long-Term Prisoners in Conditions of Maximum Security: Report of the Advisory Council on the Penal System*, HMSO (1968).

58. The control unit itself evolved from prisoner disruptions and work stoppages that plagued the Marion penitentiary. *See* Adams v. Carlson, 488 F.2d 619, 622 (7th Cir. 1973)("Taking no chances with simply isolating the ringleaders, the Marion administration undertook widespread segregation of inmates suspected of insubordination. . . ."). However, the court also noted that "[t]rouble at Marion was not abated by the segregation of rebellious inmates." *Id.* at 623.

59. *See* J. Michael Olivero & James B. Roberts, *The United States Federal Penitentiary at Marion, Illinois: Alcatraz Revisited*, 16 NEW ENG. J. CRIM. & CIV. CONFINEMENT 21 (1990) (describing conditions at Marion and the events that led to the extension of the Control Unit regime to the rest of the institution).

60. *See* Olivero & Roberts, *supra* note 59. *See also*, Bruscino v. Carlson, 654 F.Supp. 609 (S.D.Ill. 1987)(denying relief in class-action suit on behalf of Marion inmates), *aff'd*, 854 F.2d 162 (7th Cir. 1988).

61. David A. Ward & Allen F. Breed, THE UNITED STATES PENITENTIARY MARION, ILLINOIS: CONSULTANTS' REPORT SUBMITTED TO COMMITTEE ON THE JUDICIARY, H.R. Doc. No. H522-3, 90th Cong., 2d Sess. 1984.

62. AMNESTY INTERNATIONAL, ALLEGATIONS OF ILL-TREATMENT IN MARION PRISON, ILLINOIS, USA. (1987) [hereinafter AMNESTY INTERNATIONAL, MARION]; HUMAN RIGHTS WATCH, PRISON CONDITIONS IN THE UNITED STATES: A HUMAN RIGHTS WATCH REPORT (1991).

63. Jack Anderson & Joseph Spear, *"New Alcatraz" Abuses Charged*, WASH. POST, July 27, 1985, at E9. *See also*, Michael Isikoff, *Hard Time: The Mission at Marion*, WASH. POST, May 28, 1991, at A1, A6. Selwyn Raab, *Uprising Challenges "Maxi-Maxi" Prison Idea*, N. Y. TIMES, June 2, 1991, at 20; Martin Tolchin, *Quaker Group Cites "Brutal Repression" at a Federal Prison*, N. Y. TIMES, June 19, 1985, at A20.

64. Bruscino, 654 F. Supp. at 611.

65. AMNESTY INTERNATIONAL, UNITED STATES OF AMERICA: THE HIGH SECURITY UNIT, LEXINGTON FEDERAL PRISON, KENTUCKY (1988). For additional discussion of conditions at the High Security Unit at Lexington Federal Prison and their consequences for prisoners, see Richard Korn, *The Effects of Confinement in the High Security Unit at Lexington*, 15 SOC. JUST. 8 (1988) [hereinafter Korn, *Lexington*]; Richard Korn, *Follow-up Report*

Unit philosophy, recently completing construction of a modernized version of these earlier institutions at Florence, Colorado.[66]

Similarly, when California opened in its first "adjustment center" a little more than forty years ago, it became "the subject of considerable criticism."[67] Although the original concept of the "adjustment center" included the goal of returning prisoners to the mainline prison population and, ultimately, to society at large through an enriched program of psychological and social services, that plan was never implemented. The adjustment centers were recognized as "dismal failures" that represented little more than renamed isolation or segregation units that had proven problematic in the past.[68] Twenty years later the use of solitary confinement in California prisons was evaluated in a report by the state legislature and it was still controversial.[69] Based on interviews with prison administrators, inmates, and psychiatrists, the report criticized punitive segregation because of the arbitrariness with which prisoners were segregated; the fact that, once there, they were denied adequate program participation, psychological counseling, and recreation; and that decisions about whether to release prisoners from these lockup units were "arbitrary, subjective, and not based on any set of criteria."[70] In addition, the authors of the report concluded that long-term isolation resulted in psychological impairment and reduced prisoners' subsequent chances of successful rehabilitation.[71]

During the same two decades, numerous lawsuits alleging violations of prisoners' Eighth Amendment rights posed similar questions about the effects of solitary confinement in various prison systems across the country.[72] This litigation alleged a panoply of ill effects—both physical and mental—stemming from conditions of isolation at the prisons in question.[73]

---

*on the Effects of Confinement in the High Security Unit at Lexington,* 15 Soc. Just. 20 (1988) [hereinafter Korn, *Follow-up*]; Baraldini v. Meese, 691 F.Supp. 432 (1988)(holding that while criteria used by Bureau of Prisons in assigning prisoners to the unit violated their First Amendment rights, the conditions themselves were not cruel and unusual under the Eighth Amendment).

66. *See, e.g.,* Fay Dowker & Glenn Good, *From Alcatraz to Marion to Florence: Control Unit Prisons in the United States, in* Cages of Steel; The Politics of Imprisonment in the United States 131 (Ward Churchill & J.J. Vander Wall eds. 1992) (describing the development of control unit prisons in the United States); Perkinson, *supra* note 14; Peter G. Chronis, *"Baddest of the Bad" Coming to New Federal Prison,* Denver Post, May 11, 1990, at B1.1 (describing the construction of a new control unit prison in Colorado).

67. California Assembly Select Committee on Prison Reform and Rehabilitation, Administrative Segregation in California's Prisons vii (1973).

68. *Id.* at 2-3.

69. *Id.*

70. *Id.* at 27.

71. *Id.*

72. *See infra* notes 326-387 and accompanying text.

73. *See, e.g.* Thomas B. Benjamin and Kenneth Lux, *Constitutional and Psychological Implications of the Use of Solitary Confinement: Experience at the Maine State Prison,* 9 Clearinghouse Rev. 83 (1975) [hereinafter Benjamin & Lux, *Maine State Prison*] (stating that prisoners in solitary confinement at the Maine State Prison develop anger, hostility,

Psychologists and psychiatrists alike wrote and testified about the nature, magnitude, and long-term consequences of these acute negative effects.[74]

Notwithstanding this long history of criticism and heightened awareness among mental health professionals about their harmful effects, long term solitary confinement and related practices are now being used on an increasingly widespread basis in prison systems across the United States. As mentioned earlier, rapid expansion of the nation's prison population—so rapid and unprecedented that massive building programs have been unable to keep pace—has meant that most correctional systems are plagued by extreme overcrowding and the serious management and control problems that go with it.[75] Many prison officials appear convinced that the turmoil brought about by increased population pressures can be managed by segregating and isolating prisoners whom they view as especially troublesome. In addition, many correctional administrators claim that the violence that purportedly plagues most prison systems now in a way it did not

---

aggression, and mental illness); Thomas B. Benjamin and Kenneth Lux, *Solitary Confinement as Psychological Punishment*, 13 CAL. W. L. REV. 265 (1977) [hereinafter Benjamin & Lux, *Solitary Confinement*] (detailing cognitive and emotional impairments resulting from solitary confinement); Jackson, *supra* note 19 at 64-80 (describing hallucinations, aggression, and self-mutilation found in inmates in solitary confinement); Maria A. Luise, *Solitary Confinement: Legal and Psychological Considerations*, 15 NEW ENG. J. ON CRIM. & CIV. CONFINEMENT 301 (1989) (arguing that solitary confinement may be cruel and unusual punishment); Nan Miller, *International Protection of the Rights of Prisoners: Is Solitary Confinement in the United States a Violation of International Standards?* 26 CAL. W. INT'L L. L. J. 139 (1995) (arguing that solitary confinement is a form of punishment that produces severe enough psychological effects to render it a violation of international human rights treaties).

74. *See, e.g.* Stanley L. Brodsky and Forrest R. Scogin, *Inmates in Protective Custody: First Data on Emotional Effects*, 1 FORENSIC REP. 267 (1988) (reporting psychological effects including anger, anxiety, and sleep disturbances); Stuart Grassian, *Psychopathological Effects of Solitary Confinement*, 140 AM. J. PSYCHIATRY 1450 (1983) [hereinafter Grassian, *Psychopathological Effects*] (detailing findings of perceptual changes, affective disturbances, disorders of thought and difficulties with thinking, and lack of impulse control); Stuart Grassian and Nancy Friedman, *Effects of Sensory Deprivation in Psychiatric Seclusion and Solitary Confinement*, 8 INT'L J. L. & PSYCHIATRY 49 (1986) (alleging that solitary confinement results in anxiety, hallucinations, regression, and can have long-term psychological implications); Haney, *Infamous Punishment*, *supra* note 12 (describing long-term results including dependence on institutional control, loss of ability to control or initiate behavior, withdrawal, and psychiatric disorders); Thomas O. Hilliard, *The Black Psychologist in Action: A Psychological Evaluation of the Adjustment Center Environment at San Quentin Prison*, 2 J. BLACK PSYCH. 75 (1976) (reporting frustration, hopelessness, and bitterness as results of time in solitary confinement); Korn, *Lexington, supra* note 63 (discussing findings of claustrophobia, chronic rage reaction, depression, hallucination, and apathy).

75. For data on the extraordinary increases in prison populations in the United States and discussions of some of the forces creating such changes, *see* Craig Haney, *Psychology and the Limits to Prison Pain: Confronting the Coming Crisis in Eighth Amendment Law*, 3 PSYCHOL., PUB. POL., AND LAW 499 (1997) [hereinafter Haney, *Psychology and the Limits to Prison Pain*]; and Craig Haney, *Riding the Punishment Wave: On the Origins of Our Devolving Standards of Decency*, 9 HASTINGS WOMEN'S L. J. 217 (1998) [hereinafter Haney, *Riding the Punishment Wave*].

twenty years ago can only be controlled by implementing policies that isolate suspected gang members in punitive segregation units. As one commentator summarized: "[T]he rise in power of prison gangs has made supermax facilities increasingly popular."[76]

Among other things, these policies of supermax confinement are designed to remove gang members from the mainline population and subject them to increased punishment in the form of solitary confinement for periods of long and sometimes indefinite duration. For example, one recent study noted that the California Department of Corrections has implemented a number of special practices to deal with their perceived gang problem, including "using 'confidential informants,' segregating gang members in different buildings and prisons, intercepting gang communications, setting up task forces to monitor and track gang members, locking up gang leaders in high security prisons, and 'locking down' entire institutions."[77]

Of course, this emphasis on long-term punitive segregation as a solution to the prison gang problem has influenced the makeup of the prisoner population in solitary confinement. A decade and a half ago, Barak-Glantz found that, not surprisingly, prisoners in punitive segregation were more likely to be committed to prison for violent offenses and more likely to be repeat offenders than were a sample of "control" prisoners.[78] In addition, the racial distribution of his sample of punitive segregation prisoners was not significantly different from the distribution of prisoners in the general population of the maximum security prison.[79] However, this latter finding differs dramatically from the more recent data collected by the senior author at one California prison in which 90% of the random sample of punitive isolation prisoners were minority (indeed, fully 70% were Latino).[80] This suggests that although punitive segregation has not always resulted in the overrepresentation of minority prisoners, the tendency of prison systems like California's to use alleged gang *membership* (as opposed to leadership) as one of the primary criteria for such segregation has the perhaps unintended consequence of disproportionately singling out minority prisoners. That is, because the criterion of gang membership is notoriously difficult to define and apply with precision or reliability, substituting it for overt, discrete behavior (i.e., actual disciplinary infractions) has left prison authorities with the subjective task of trying to determine whether prisoners fit into what is, at best, an elusive category.[81] This ill-defined task is

---

76. Scott Tachiki, *Indeterminate Sentences in Supermax Prisons Based Upon Alleged Gang Affiliations: A Reexamination of Procedural Protection and a Proposal for Greater Procedural Requirements*, 83 CAL. L. REV. 1115, 1131 (1995).

77. Geoffrey Hunt et al., *Changes in Prison Culture: Prison Gangs and the Case of the "Pepsi Generation,"* 40 SOC. PROB. 398, 400 (1993).

78. Israel L. Barak-Glantz, *Who's in the "Hole"?* 8 CRIM. JUST. REV. 29 (1983).

79. *Id.* at 33.

80. CRAIG HANEY, THE WORST OF THE WORST: PSYCHOLOGICAL TRAUMA AND PSYCHIATRIC SYMPTOMS IN PUNITIVE SEGREGATION (1996).

81. *See* Tachiki, *supra* note 76.

susceptible to bias and stereotyping, as well as the very real possibility that increased solidarity among minority prisoners may increase the risk that they will be wrongly classified as gang members and placed in indefinite punitive segregation as a result.

The recent willingness to resort to solitary and supermax confinement is supported as well by a general tendency among corrections officials to account for violence within the prison walls through an exclusive focus on the characteristics of the prisoners who engage in it rather than the situation or context in which it occurs.[82] Instead of considering the possibility that worsening prison conditions themselves may constitute the source of behavioral problems, a "new breed" of convict is christened periodically to account for putative increases in prison violence. Thus, the claim that a unique or special type of criminal has arrived on the prison scene who cannot be controlled through existing measures is accompanied by an escalation in the level of prison punishment that includes the creation of special conditions of confinement like solitary and punitive segregation units. Indeed, just the past thirty years have seen the emergence of several allegedly new criminal types, each one more fearsome than its predecessor and requiring a new level of prison security.[83]

For example, Cohen and Taylor noted that the creation of "special security wings" in British prisons in the mid-1960s was justified when "[t]he media and the judiciary made great play with the idea of a 'new' type of criminal who was more ruthless, more violent and more organized than his predecessors."[84] A decade or so later, prison officials in New South Wales justified the construction of a controversial isolation unit in its main prison

---

82. For extended discussions of situational versus dispositional modes of explaining prison behavior, *see* Craig Haney, *Criminal Justice and the Nineteenth-Century Paradigm: The Triumph of Psychological Individualism in the "Formative Era,"* 6 LAW & HUM. BEHAV. 191 (1982); Craig Haney et al., *Interpersonal Dynamics in a Simulated Prison,* 1 INT'L J. CRIMINOLOGY & PENOLOGY 69 (1973); Craig Haney & Philip G. Zimbardo, *The Socialization into Criminality: On Becoming a Prisoner and a Guard, in* LAW, JUSTICE, AND THE INDIVIDUAL IN SOCIETY 198 (June Louin Tapp & Felice J. Levine, eds. 1977) [hereinafter Haney & Zimbardo, *Socialization*].

83. For parallels with the construction of general criminal categories that justified especially long (sometimes life) sentences for "habitual" and then "career" criminals in the 1920s and late 1960s, respectively, *see* Ronald C. Kramer, *From "Habitual Offenders" to "Career Criminals": The Historical Construction and Development of Criminal Categories,* 6 LAW & HUM. BEHAV. 273 (1982).

84. STANLEY COHEN & LAURIE TAYLOR, PSYCHOLOGICAL SURVIVAL: THE EXPERIENCE OF LONG-TERM IMPRISONMENT 13 (1972). Cohen and Taylor also described the special security precautions that were taken to accommodate this new breed: "The new security measures introduced during 1965 to help contain such men included electronic surveillance, dog runs, armed guards, gas masks, and (according to one report) the siting of a machine-gun nest on the external wall [of the prison]." *Id.* Another commentator referred to the British policy for these convicts as one of "incarcerating men in granite tombs for years on end." FRANK NORMAN, LOCK 'EM UP AND COUNT 'EM 6 (1970).

*REVIEW OF LAW & SOCIAL CHANGE*        [Vol. XXIII:477

by claiming that "[m]en are going to be put there only because they have shown themselves to be savage monsters."[85]

Around the same time, California prison officials claimed that increased use of punitive segregation in the state's prisons was needed to stem an "intolerable violence problem" brought about by an influx of aggressive prisoners.[86] About a decade later—in the early 1980s—Barak-Glantz observed that "researchers as well as correctional administrators are almost unanimous in their belief that prisons are receiving a more aggressive, more dangerous, more vocal, and less tractable offender."[87] And now—still a decade after that—many of today's prisoners are described as "rapacious monsters" in media depictions that are as ubiquitous as they are sensationalized, helping to fuel the public's demand for longer prison sentences and specialized, "tougher" institutions for those who are incarcerated.[88] Thus, the Pelican Bay Security Housing Unit was described by the correctional official who authorized its construction as "an important tool in managing a growing and more violent inmate population."[89]

In response, a penal philosophy of sorts has emerged in which prison systems are now using *long-term* solitary confinement as a proactive policy of management and control. This policy represents a dramatic departure from pre-existing norms concerning the use of punitive segregation. The Seventh Circuit some 25 years ago summarized the then-prevailing view:

> If a man commits a crime against state or federal law while in prison, he is tried in a court of law and sentenced to additional time in prison. Segregation is not usually imposed for criminal misconduct; it is reserved, instead, to correct serious infractions of prison rules. For a single such event, segregation does not and should not exceed a few months, if that long.[90]

---

85. *See* W.E. Lucas, *Solitary Confinement: Isolation as Coercion to Conform* 9 AUSTRALIAN & NEW ZEALAND J. OF CRIMINOLOGY 153, 163 (1976) (quoting New South Wales Commissioner of Corrective Services). A policy statement issued by the same office captured the extension of this logic that is sometimes made by correctional administrators: "The conventional moral and legal restrictions are not acceptable in extreme areas of criminality; consequently, the ordinary and established codes of human conduct need not be expected to relate to the inmate population located in the programme involving maximum security containment." *Id.* at 164.

86. Howard Bidna, *Effects of Increased Security on Prison Violence*, 3 J. CRIM. JUST. 33 (1975) [hereinafter Bidna, *Effects of Increased Security*].

87. Barak-Glantz, *supra* note 76, at 29.

88. *See, e.g.,* David A. Kaplan et al., *The Incorrigibles: They Rape and Molest. They Defy Treatment. How Can Society Protect Itself?* NEWSWEEK, Jan. 18, 1993, at 48. This article is typical of the genre. It ends with the observation that "[o]ne way or another, society keeps searching for a way to protect itself. After all, the Constitution isn't a suicide pact." *Id.* at 50.

89. Decl. of Daniel J. McCarthy, former Director of Corrections, Madrid v. Gomez, No. C-90-3094 (N.D. Cal. 1993).

90. Adams v. Carlson, 488 F.2d 619, 628 (7th Cir. 1973).

Criticized as the "Marionization" of American prisons,[91] after the notorious federal penitentiary at Marion where the new policy seems to have originated,[92] a number of prison systems (including the Federal Bureau of Prisons) have either begun or completed construction on specialized prisons devoted *entirely* to long-term punitive segregation and solitary confinement-like conditions and routines.[93] Thus, one analyst has referred to the "accelerating movement toward housing prisoners officially categorized as violent or disruptive in separate, free-standing facilities where they are locked in their cells approximately 23 hours per day."[94] This movement has been indirectly facilitated by some academic commentary that has appeared in recent years minimizing previous concerns over the potential psychological harm caused by solitary confinement and implicitly authorizing its increased use.[95]

91. *See* AMNESTY INTERNATIONAL, MARION, *supra* note 60; HUMAN RIGHTS WATCH, *supra* note 60; Immarigeon, *supra* note 12.

92. *See supra* notes 56-62, and accompanying text.

93. Conditions at Pelican Bay generated some amount of public attention (see *supra* note 8), and California was by no means the only state in which concerns were raised about the construction of "supermax" prisons. *See, e.g.* Bill Newman, *Marionizing Massachusetts*, 37 MASS. REV. 9, 81 (1996) (highlighting Eighth Amendment lawsuits in Illinois and Massachusetts that examined the extreme sensory deprivation and adverse psychological effects of lockdown in prisons). *But see* Robert Sheppard et al., *Closed Maximum Security: The Illinois SuperMax*, 58 CORRECTIONS TODAY 84, 84 (1996) (praising the new Illinois prison as "society's latest, no-holds-barred effort to ensure that certain predatory people are isolated from the rest of us, and from each other.") The authors of the latter article also provided detailed descriptions of the security hardware and other precautions built into the new facility (down to the number of video cameras that had been installed). Yet, despite conceding that "the lack of human contact, the absence of meaningful work, and a poverty of sensory and intellectual stimulation may have potentially adverse consequences"—so much so that the prison required a "baseline assessment" of each inmate upon entry to the unit and "periodic reevaluations at specific intervals" to be conducted by mental health staff—they provided no details of the nature or adequacy of those evaluations, nor did they bother to justify taking the risks of such "adverse consequences" with prisoners in the first place. *Id.* at 87.

94. Immarigeon, *supra* note 12 at 1. *See also* Miles Corwin, *High Tech Facility Ushers in New Era of State Prisons*, L. A. TIMES, May 1, 1990, at A1 (discussing the high-tech supermax prison at Pelican Bay).

95. James Bonta & Paul Gendreau, *Reexamining the Cruel and Unusual Punishment of Prison Life*, 14 LAW & HUM. BEHAV. 347 (1990) [hereinafter Bonta & Gendreau, *Reexamining*]; Paul Gendreau & James Bonta, *Solitary Confinement is Not Cruel and Unusual Punishment: People Sometimes Are!* 26 CANADIAN J. CRIMINOLOGY 467 (1984) [hereinafter Gendreau & Bonta, *Solitary*]; Paul Gendreau and James Bonta, *Boats Against the Current: A Rebuttal*, 15 LAW & HUM. BEHAV. 563 (1991) [hereinafter Gendreau & Bonta, *Boats*]; Peter Suedfeld, *Beyond Sentimentality*, 22 INT'L J. OFFENDER THERAPY & COMP. CRIMINOLOGY 49 (1978); Peter Suedfeld & Chunilal Roy, *Using Social Isolation to Change the Behavior of Disruptive Inmates*, 19 INT'L J. OFFENDER THERAPY & COMP. CRIMINOLOGY 90 (1975) [hereinafter Suedfeld & Roy, *Social Isolation*]; Peter Suedfeld et al., *Reactions and Attributes of Prisoners in Solitary Confinement*, 9 CRIM. JUST. BEHAV. 303 (1982) [hereinafter Suedfeld et al., *Reactions*]. One commentator has gone so far as to advocate an explicit return to the "Pennsylvania" model in which "inmates serve their entire sentences in total isolation from one another." Robert Rogers, *Solitary Confinement*, 37 INT'L J. OFFENDER THERAPY COMP. CRIMINOLOGY 339, 343 (1993).

As the correctional establishment in the United States appears poised to embark on a new era of repressive prisoner control that is based on unprecedented levels and kinds of solitary and related forms of penal confinement, the time has come to reconsider this prison form and to take a comprehensive look at what we know about its psychological effects. Despite the newness of supermax prisons, the regime of solitary confinement that is at their core not only has a long historical record but an equally rich store of research data on which to draw. The magnitude of the public resources that are about to be committed, the large number of prisoners likely to be affected, and the potential implications for our long-term crime rates as well as the loss of alternative prison and social welfare programs that may be sacrificed in the wake of the supermax approach compel us to a sober and realistic assessment of the expected consequences.

## II.
### THE EMPIRICAL LITERATURE ON SOLITARY CONFINEMENT

Several caveats are in order concerning the terminology that will be used in the discussion that follows. It is common for researchers and legal commentators to use the term "solitary confinement" generically, as if it refers to a single type of experience or describes the same set of conditions. Of course, it does not. Conditions of so-called solitary confinement vary dramatically, and these variations may very well account for the presence or absence of negative psychological effects found in empirical research. Thus, some authors have sought to draw conclusions about solitary confinement based on the results of studies in which the nature of the confinement in question bore little relationship to common correctional practices. For example, when Bonta and Gendreau argued that "solitary confinement" did not itself constitute a psychologically destructive environment—the real "culprit" they said was "the manner in which inmates have been treated" in solitary confinement and the excessive amounts of time they spent there[96]—they simply redefined the term in such a way as to exclude what is, in many jurisdictions, the very essence of the experience. Therefore, whenever possible in our review of the empirical literature we will attempt to specify the exact nature of the conditions of solitary confinement studied.

Amnesty International has used the term "solitary confinement" to cover "all forms of incarceration that totally remove a prisoner from inmate society. It often means that the prisoner is visually and acoustically isolated from all other prisoners, as well as having no personal contact with them."[97] Yet, this general rubric subsumes many variations. For example,

---

96. Bonta & Gendreau, *Reexamining, supra* note 93, at 361.

97. AMNESTY INTERNATIONAL, AMNESTY INTERNATIONAL'S WORK ON PRISON CONDITIONS OF PERSONS SUSPECTED OR CONVICTED OF POLITICALLY MOTIVATED CRIMES IN THE FEDERAL REPUBLIC OF GERMANY: ISOLATION AND SOLITARY CONFINEMENT 9 (1980)

some American correctional systems now are so crowded that even prisoners in "solitary confinement" units are double-celled and, therefore, not isolated from one another at all. In fact, by some definitions, these prisoners are simultaneously and paradoxically isolated *and* overcrowded. Similarly, even when they are single-celled it is impossible to completely curtail communication between prisoners in solitary confinement units (under all but the most extreme architectural designs). In some of these units, sensory *overload* rather than sensory deprivation adversely affects prisoners whose restricted confinement in close quarters means they cannot escape the intrusive noise or presence of others. Moreover, some of the special units that have been most soundly condemned by mental health experts and the courts impose a regimen known as "small group isolation" on prisoners in which a restricted number of them are housed together but away from everyone else.[98]

For largely historical reasons and to maintain consistency with existing literature, we will continue to employ the term "solitary confinement" to refer to this broad set of conditions. However, we will often use the seemingly more accurate term, "punitive segregation" interchangeably with solitary confinement to convey the sense in which, at the very least, solitary confinement entails segregation from the general population of prisoners for a punitive purpose that virtually always imposes severe restrictions in movement and activity within the segregated unit itself. Thus, solitary confinement or punitive segregation includes at least *partial* social isolation and *partial* reduction of certain forms of stimulation, as compared to general population prisoners.[99] Because of the ambiguity in the use of the term "solitary confinement," it is also difficult to estimate with any degree of precision how many prisoners may be subjected to the kinds of conditions whose effects we analyze here. In 1984, for example, Corrections Compendium reported on the results of a national survey of state correctional systems concerning the use of "restrictive housing" (defined in the survey as "[a] form of separation from the general population [of prisoners] for some necessary administrative purpose"). The percentages of prisoners

[hereinafter AMNESTY INTERNATIONAL, WORK ON PRISON CONDITIONS]. Judge McMillan employed this definition in Berch v. Stahl, 373 F. Supp. 412, 420 (W.D.N.C. 1974): "Solitary confinement by definition means confinement alone and removed from sustained contact with other human beings. Its severity as punishment is drastically increased when the isolation is accompanied by . . . 'sensory deprivation' . . . ."

98. The Amnesty Report on prison conditions imposed on persons suspected of political crimes in the Federal Republic of Germany refers to this as *Umschluss*. The Report also described the establishment of so-called "silent wings" (*Tote Trakte*) in which prisoners were prohibited from speaking to one another. AMNESTY INTERNATIONAL, WORK ON PRISON CONDITIONS, *supra* note 95 at 10.

99. Don Foster observed that solitary confinement "looks less and less like a single unified entity, but more as a situation varying along a continuum of severity." DON FOSTER, DETENTION & TORTURE IN SOUTH AFRICA: PSYCHOLOGICAL, LEGAL & HISTORICAL STUDIES 67 (1987) [hereinafter FOSTER, DETENTION AND TORTURE].

in restrictive housing ranged from 2.3% to 27.2% and averaged 7.7%.[100] We note that the increasingly widespread use of so-called "supermax" prisons that impose largely segregated and solitary-like confinement on a long-term basis means that these percentages likely have increased and will continue to do so for the foreseeable future.

We also acknowledge at the outset that there are significant limitations on the manner in which research on solitary confinement can be conducted. That is, the study of this experience has been constrained by ethical, legal, and practical barriers precluding the use of a single technique or design that could resolve all scientific questions about the causal role of such confinement in producing various measured effects. Yet, we will argue that this fact alone neither diminishes the significance of the relevant empirical research nor eliminates the possibility of gaining social scientific understanding of the topic. Indeed, our intention in providing a comprehensive review of the empirical literature is to transcend this limitation by interpreting the *pattern* of results that has emerged from this work and drawing conclusions about this specialized correctional environment. Like many complex empirical issues in psychology, in the absence of a single, definitive piece of research that effectively establishes a causal connection, we rely upon the method of "triangulation" wherein we systematically review available research from numerous diverse sources, each of which addresses some of the ways in which solitary confinement and punitive segregation may affect prisoners.

Although some commentators have advocated shrinking the pool of available knowledge to include only what they term "scientific experiments"[101] and drastically limiting the acknowledged effects of solitary confinement to the statistically quantifiable, we firmly believe that much crucial information is lost or ignored by narrowing the scope of inquiry in this way. We do not believe that controlled laboratory studies represent the only source of valid scientific knowledge on this or any topic. In fact, much of the experimental research on isolation and sensory deprivation conducted with non-prisoner subjects is especially problematic because many of the crucial components of the experience of solitary confinement in prison are lacking.[102] Yet, we believe these studies provide *some* insight into the effects of significantly decreased stimulation and restricted movement on prisoners. Because these are major components of conditions of solitary confinement, we have included this research in our discussion. Similarly, although the subjectivity of personal accounts of the effects of solitary confinement may affect the weight or significance that should be

---

100. *Restrictive Housing*, CORRECTIONS COMPENDIUM, Mar. 1985, at 1, 4-7.

101. Gendreau & Bonta, *Boats, supra* note 93.

102. The contrast between conditions in prison solitary confinement and those that prevail in sensory deprivation studies can be significant. *See infra* text accompanying notes 112-115.

attached to them, we have not *a priori* excluded observational studies or autobiographical writing from consideration.

In addition, we have been relatively inclusive in accepting the definitions of researchers and prison systems themselves concerning what constitutes "solitary confinement." For example, some of the published research on the effects of solitary confinement refers to the conditions in question as "segregation"[103] or to "isolation cells"[104] without offering specific details about what, if any, contact inmates might have had with others, or what kinds of stimulation and other activities (e.g., reading material, television) were available to prisoners. We have included these studies in our review if the researchers themselves termed the conditions solitary (or solitary-like) confinement. Similarly, we recognize that a variety of terms have been used to refer to solitary confinement in different correctional systems.[105] As long as they fit within our general definition of solitary-like confinement, we have included whatever published data were available on them, irrespective of labels. We also included studies that looked at dependent variables such as disciplinary infraction rates as a function of the restrictiveness of housing, whether or not the most restrictive conditions qualified as complete solitary confinement.

There is a logic to this inclusivity. Because it led us to examine a broad range of solitary-like conditions—not just the harshest or most extreme versions—our inclusive approach actually provided a conservative test of their negative effects. Indeed, one of the great strengths of this literature, viewed in its totality, is the robustness it reveals in the psychological effects of solitary-like confinement. That is, a very clear and consistent message emerges from the examination of studies conducted over a vast array of different isolated and restricted conditions for subjects who differed greatly in background and the duration of their confinement.

---

103. Frank Porporino, *Managing Violent Individuals in Correctional Settings*, 1 J. OF INTERPERSONAL VIOLENCE 139, 213-237 (1986).

104. Anne Jones, *Self-Mutilation in Prison: A Comparison of Mutilators and Nonmutilators*, 13 CRIM. JUST. AND BEHAV. 286, 287 (1986).

105. In the United States they have been called, among other things: "adjustment centers" in California, JACKSON, *supra* note 19, at 95; "special treatment and rehabilitative training units" ("STRT") in the Federal Bureau of Prisons, *id.* at 154; "punitive dissociation" in Tennessee, *id.* at 115; and "special program units," in Illinois, *id.* at 154. In Canada, where they are said to be reserved for "dangerous inmates," *id.* at 155, and "particularly dangerous inmates," *id.* at 156, the units have been termed "special correctional units," *id.* at 44; "special handling units," *id.* at 150; "super-maximum security units," *id.* at 48; and "Prisons of Isolation," *id.* at 36. In England, so-called "intractable prisoners," *id.* at 155, are sent to places that have been labeled "control units," *id.* at 155. Although in some cases these units have included special behavior modification regimens (as in the case of the Federal Bureau of Prisons' "STRT" program and the "special program units" in Illinois), they virtually always include special housing and security, the isolation of prisoners from the mainline population and usually (but not always) from each other, and greatly restricted movement and activity within the prison itself. *Id.*

Thus, we have reviewed a wide range of studies—from controlled laboratory experiments to more qualitative case studies—and looked at data from a diverse group of persons exposed to solitary-like conditions—from college students to North American prisoners themselves. The empirical record compels an unmistakable conclusion: this experience is psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at risk of long-term emotional and even physical damage.

### A.  *Early Laboratory Experiments on Sensory Deprivation*

"Sensory deprivation" has been defined as "conditions aimed at reducing, altering or by some means or other, interfering with a person's normal stimulation from, and commerce with, his environment."[106] If we were to adopt this definition, then virtually all forms of solitary confinement and punitive segregation would qualify as sensory deprivation. Although the role of sensory deprivation and social isolation in the "brainwashing" of prisoners of war by their Korean captors[107] is what sparked much of the initial interest among researchers, the resulting studies often employed experimental conditions that did not closely approximate those created inside actual prisons. For example, most research on sensory deprivation has been done in highly artificial environments that are intended for only short term exposure. Taken as a whole, however, this research does underscore the importance of sensory and perceptual stimulation and the dramatic, negative effects that can occur when people are deprived of it.

Under conditions of extreme sensory deprivation, subjects characteristically experience perceptual distortions, hallucinatory experiences, and sometimes high levels of anxiety. As one overview of the early research on the topic suggested, "the absence of stimulation leads to the debilitation of behavior, making the individual less efficient and inducing strong affective states which are associated with marked changes in motivation."[108] Here we review a representative sample of sensory deprivation studies to illustrate the specific psychological reactions that have been produced under such severe conditions.

Some of the first reports on the effects of experimentally-induced sensory deprivation came from John Lilly's pioneering water-tank isolation studies. Although the initial research provided little more than qualitative

---

106. Leo Goldberger, *Experimental Isolation: An Overview*, 122 AM. J. PSYCH. 774, 775 (1966) (emphasis omitted).

107. THE PSYCHODYNAMIC IMPLICATIONS OF PHYSIOLOGICAL STUDIES ON SENSORY DEPRIVATION vi (Leo Madow & Laurence H. Snow eds. 1970).

108. Philip E. Kubzansky & P. Herbert Leiderman, *Sensory Deprivation: An Overview*, *in* SENSORY DEPRIVATION: A SYMPOSIUM HELD AT HARVARD MEDICAL SCHOOL 220, 237 (Philip Solomon, et al., eds.) (1961).

reports of "reveries and fantasies"[109] that the researcher and another subject experienced while immersed, later and more controlled water-tank suspension studies documented acute psychological reactions. Subjects often terminated participation within 8 hours of being placed in water-tanks and a large majority reported recurring fantasies during their immersion.[110] In another study, all twenty subjects were confined to a sound restricted room wearing goggles. They were asked to stay as long as possible and could leave the experiment at any time.[111] Although the isolation conditions were periodically interrupted, subjects ended participation after relatively brief periods (two days on average for women and just over one day for men) and all of them listed anxiety and panic among their reasons for quitting.[112] In several other studies anxiety reactions were cited by a significant percentage of subjects who terminated participation.[113]

Several psychological variables appeared to moderate the level of stress created by sensory deprivation and the subjects' ability to endure it, including knowledge of the study's duration, awareness of the passage of time, and prior level of comfort and familiarity with the experimenter and experimental conditions. Specifically, informing subjects of the upper time limit of the study enhanced their ability to tolerate the isolation.[114] In another series of studies, researchers concluded that the general atmosphere in the laboratory, the appearance and behavior of the personnel, and the subjects' degree of comfort and familiarity with both were crucial factors

---

109. John Lilly, *Mental Effects of Reduction of Ordinary Levels of Physical Stimuli on Intact, Healthy Persons*, 5 PSYCH. RES. REP. 1, 7 (1956). For other early work on this topic, see W.H. Bexton, W. Heron, & T.H. Scott, *Effects of Decreased Variation in the Sensory Environment*, 8 CAN. J. PSYCHOL. 70 (1954), and JACK A. VERNON, INSIDE THE BLACK ROOM (1963).

110. Marvin Zuckerman, *Variables Affecting Deprivation Results, in* SENSORY DEPRIVATION: FIFTEEN YEARS OF RESEARCH 47, 49-50 (John P. Zubek, ed. 1969).

111. S. Smith & W. Lewty, *Perceptual Isolation Using a Silent Room*, 2 LANCET 342 (1959).

112. All subjects were fed and tested by the experimenters 4 times a day. Length of stay ranged from 6-92 hours with women lasting on average 49 hours, men only 29 hours. *Id.*

113. *See* Zuckerman, *supra* note 108, at 49 (citing studies where anxiety was reported as a reason for terminating the experiment). For example, one researcher studied whether the sensory deprivation that polio patients experienced in respirator tanks caused psychological impairment. He conducted an experiment in which healthy subjects were placed in such tanks and then reactions were measured. Less than a third of the subjects lasted for the agreed upon thirty-six hour experimental period. Many left due to anxiety, panic, and other somatic complaints. Six of the seventeen subjects described "aberrant" mental imagery, and all reported time distortions. Herbert P. Leiderman, *Man Alone: Sensory Deprivation and Behavioral Change*, 8 CORRECTIVE PSYCH. & J. OF SOC. THERAPY 64, 69 (1962).

114. Zuckerman, *supra* note 110, at 68. Two-thirds to three-quarters of those who were informed of the upper time limit of the study stayed until the end, whether the duration was 4 days, 1 week, or 2 weeks. However, those that were not informed of the duration, and were told of the passage of time, quit earlier than those that were told nothing at all.

influencing whether and when the experience became stressful or intolerable.[115]

The dissimilarities between conditions created in these studies and those in solitary confinement or punitive segregation in correctional institutions are obvious.[116] For example, the *complete* restriction of sensory stimulation created in many of these studies exceeds even the most severe prison isolation regimen. In addition, the subjects were all volunteers who were often paid for their participation, which at least one researcher has speculated may both account for the dramatic effects and compromise the generalizability of the results to prison settings.[117] On the other hand, the exposure tended to be of extremely brief duration (at least when compared to prison lockup), subjects typically knew the time limit in advance of participation, were given the option of terminating their confinement, and there was a positive scientific rather than negative punitive meaning attached to the experience itself. Indeed, the experimenters in these studies were not perceived as hostile adversaries, and the confinement—although painful—was not experienced as punishment. Nonetheless, these studies do emphasize the importance of sensory stimulation in human experience and the dramatic effects that can be produced when such stimulation is significantly curtailed.[118] In addition:

> One of the most important results of sensory deprivation experiments has been the finding that the resultant psychologic disturbances are virtually universal. Similar symptoms occurring in the

---

115. *See generally* Martin T. Orne & Karl E. Scheibe, *The Contribution of Non-Deprivation Factors in the Production of Sensory Deprivation Effects: The Psychology of the "Panic Button,"* 68 J. ABNORMAL AND SOC. PSYCHOL. 3 (1964); Martin Zuckerman et al., *Responses to Confinement: An Investigation of Sensory Deprivation, Social Isolation, Restriction of Movement and Set Factors*, 27 PERCEPTUAL AND MOTOR SKILLS 319, 333 (1968).

116. Oddly, Bonta & Gendreau, whose writings have minimized the psychological significance of solitary confinement in prison, also counseled penologists to rely more heavily upon the results of these studies: "[T]here exists an extensive experimental literature on the effects of placing people (usually volunteer college students) in solitary, or conditions of sensory deprivation, which has been ignored in the penology literature. . . . In fact, this literature . . . and many of these studies are, methodologically, the most rigorous of all the prison studies. Therefore, conclusions drawn from this source are especially informative." Bonta & Gendreau, *Reexamining*, *supra* note 93, at 360 (citations omitted).

117. Melvin Morris Weinberg, Effects of Partial Sensory Deprivation on Involuntary Subjects (1967) (unpublished Ph.D. dissertation, Michigan State University) (on file with N.Y.U. Rev. L. & Soc. Change).

118. As one reviewer summarized:

> The general response to isolation and sensory deprivation includes boredom, restlessness, irritability, increasing anxiety that is often extreme, and, eventually, depersonalization, disorientation, difficulty in concentration, impairment of the ability to solve simple problems, and sometimes delusions and abnormal visual sensations . . . . After periods of isolation, many subjects complain of fatigue, drowsiness, confusion, a loss of orientation in time, and difficulty in readjusting to a normal environment.

Frederick Hocking, *Extreme Environmental Stress and its Significance for Psychopathology*, 24 AM. J. PSYCHOTHERAPY 4, 7 (1970).

*SOLITARY CONFINEMENT*

deaf, and in explorers and prisoners had, in the past, been thought to be due to personal predisposition.[119]

Finally, although it is clear that virtually everyone exposed to these conditions was affected in some way, it is also clear that even in these extreme situations people did not respond in identical fashion and that various aspects of the environment mediated the experience itself.

## B. *Psychological Literature on the Importance of Social Contact and Support*

Classic theory and research in social psychology have underscored the importance of social contact for the creation and maintenance of "self." Indeed, two of the very first social psychologists—Charles Cooley and George Herbert Mead—premised their theories of selfhood entirely upon social interaction. Cooley's evocative term—"looking glass self"—suggested that we look to others and in them see identity-forming reflections of ourselves.[120] Mead also emphasized the importance of direct feedback from others in establishing a sense of self, writing that "[w]e appear as selves in our conduct insofar as we ourselves take the attitude that others take toward us . . . ."[121] More recently, Leon Festinger's pivotal theory of social comparison processes posited an essential human "drive" for social evaluation that pushes people to belong to groups and associate with

---

119. *Id.* Leiderman's review of much the same literature led him to similar conclusions:

> These disparate findings converge on one major point. Man is dependent on adequate and changing amounts of sensory and social stimulation in order to maintain his psychic and physiological functioning. When he lacks adequate supplies of stimuli, he may develop mental aberrations involving imagery similar to that of hallucinations, a loss of sense of time, a loss of motor coordination, become unable to think or reason clearly, become less able to initiate new tasks, perform less well on certain memory and visual tests, and perhaps become more susceptible to suggestion. Depending on the individual's biological, perceptual and social history, he may develop unusual cravings for or reactions against certain types of stimulations. If these become sufficiently fixed and persistent, they may interfere with his major task of preserving himself.

Leiderman, *supra* note 111 at 73.

120. CHARLIE HORTON COOLEY, HUMAN NATURE AND THE SOCIAL ORDER 168-210 (1902).

121. George Herbert Mead, *The Genesis of the Self and Social Control*, 35 INT'L J. OF ETHICS 251, 268 (1925). In a related vein, Susan Houston wrote:

> There is no reasonable way to explain the extreme mental dissolution in situations of isolation without considering the mind as partly made up of material from other minds. The basic element in sensory deprivation situations is lack of human companionship, which would provide the necessary element to maintain mental stability in some sort of literal sense.

Susan Houston, *Inquiry Into the Structure of Mentation Processes*, 21 PSYCHOL. REPORTS 649, 653 (1967).

others.[122] Researchers have documented the importance of social comparison to concepts about the self,[123] perceptions of relative deprivation,[124] and feelings of equity or fairness.[125] In a related series of experimental studies, one social psychologist documented the increased need to affiliate with others in order to interpret emotional states, especially in the face of ambiguous and anxiety-arousing situations.[126] Subsequent research on this issue added catharsis, interpersonal support, and self-esteem as components of the strong need to be with others—all needs that go unfulfilled when persons are isolated or alone.[127]

A separate but related line of research has documented the positive role sometimes played by the presence of others—often referred to simply as "social support"—in mitigating and buffering the negative effects of stress. Such studies underscore the relationship between connectedness to

---

122. Leon Festinger, *A Theory of Social Comparison Processes*, 7 HUMAN RELATIONS 327 (1954). For more recent discussions of the concept of social comparison, see Symposium, 12 PERSONALITY AND SOC. PSYCHOL. BULL. 261 (1986).

123. Hazel Markus, *Self-Schemata and Processing Information About the Self*, 35 J. PERSONALITY AND SOC. PSYCHOL. 63 (1977).

124. *See generally*, RELATIVE DEPRIVATION AND SOCIAL COMPARISON: THE ONTARIO SYMPOSIUM, Vol. 4 (James M. Olson et al., eds. 1986).

125. William Austin, *Equity Theory and Social Comparison Processes, in* SOCIAL COMPARISON PROCESSES: THEORETICAL AND EMPIRICAL PERSPECTIVES 279 (Jerry M. Suls & Richard L. Miller eds. 1977).

126. Stanley Schachter, THE PSYCHOLOGY OF AFFILIATION: EXPERIMENTAL STUDIES OF THE SOURCES OF GREGARIOUSNESS 126 (1959).

127. *See, e.g.,* Irving Sarnoff and Philip G. Zimbardo, *Anxiety, Fear, and Social Affiliation*, 62 J. ABNORMAL SOC. PSYCHOL. 356 (1961); Philip G. Zimbardo & Robert Formica, *Emotional Comparison and Self-Esteem as Determinants of Affiliation*, 31 J. PERSONALITY 141 (1963). John Bowlby, whose work focused primarily on early childhood experiences, was also emphatic about the importance of social contact throughout the life cycle:

Intimate attachments to other human beings are the hub around which a person's life revolves, not only when he is an infant or a toddler or a schoolchild but throughout his adolescence and his years of maturity as well, and on into old age. From these intimate attachments a person draws his strength and enjoyment of life and, through what he contributes, he gives strength and enjoyment of others. These are matters about which current science and traditional wisdom are at one.

JOHN BOWLBY, ATTACHMENT AND LOSS: LOSS, SADNESS, AND DEPRESSION 442 (1980). Cultural theorists have also written about the historical importance of isolation and the construction of self. Thus, John Bender has argued that the new prisons of the late 18th and early 19th century were notable for their emphasis on isolation, which was thought to render prisoners more malleable as subjects for reconstruction:

Isolation divests the criminal of narrative resources and designates a 'character' to be formulated. The old prisons had allowed prisoners full access to narrative instruments: writing and publication, visits by auditors, normal reading matter, even hedged participation in society at large within the surrounding neighborhoods. . . . Isolation is conceptually requisite in the [new] penitentiary, not so that prisoners can reflect on the past—that would be old-style ritual penance aimed at forgiveness of sin rather than at alteration of being—but so that omniscience can restructure the inmate's identity through control of narrative resources.

JOHN BENDER, IMAGINING THE PENITENTIARY: FICTION AND THE ARCHITECTURE OF MIND IN EIGHTEENTH-CENTURY ENGLAND 202-3 (1987).

*SOLITARY CONFINEMENT*

others and physical and mental health.[128] Thus, social isolation has been related to a number of dysfunctional psychological states and outcomes. For example, there appears to be an inverse relationship between social isolation and subjective measures of well-being among the elderly.[129] A number of studies also have established a connection between isolation and psychiatric illness. For example, one researcher found that patients who were unmarried, unemployed, living alone, or without religious affiliations were more frequent users of mental health services,[130] and another found certain measures of social deprivation to correlate significantly with psychiatric admission rates.[131]

Finally, the importance of social contact in grounding human identity and contributing to mental health is indirectly underscored by the frequency with which isolation is used to create or intensify human malleability. Techniques of coercive interrogation or so-called "brainwashing" virtually always include extreme forms of social isolation. As two students of these techniques wrote:

> Man is a social animal; he does not live alone. From birth to death he lives in the company of his fellow men. When he is totally isolated, he is removed from all of the interpersonal relations which are so important to him, and taken out of the social role which sustains him. His internal as well as his external life is disrupted.

---

128. Sidney Cobb, *Social Support as a Moderator of Life Stress*, 38 PSYCHOSOM. MED. 300 (1976); Alfred Dean and Nan Lin, *The Stress-Buffering Role of Social Support*, 165 NERVOUS & MENTAL DISEASE 403 (1977).

129. Thus, one study found that living alone, being unmarried, having no companions, or having no confidants were related to chronic health problems and low scores on measures of subjective well-being. Neena Chappell & Mark Badger, *Social Isolation and Well-Being*, 44 J. GERONTOL. 169 (1989). This study and others explore the conceptual distinction between social isolation and psychological isolation and suggest that it is the quality of the social contact—for example, having companionship and confidants—rather than simply the presence of others that contributes to well-being. *See also* ELOISE RATHBONE-MCCUAN AND JOAN HASHIMI, ISOLATED ELDERS: HEALTH AND SOCIAL INTERVENTION (1982).

130. Gary L. Tischler et. al., *Utilisation of Mental Health Services*, 32 ARCH. GEN. PSYCH. 411, 411-415 (1975).

131. *See, e.g.,* E. H. Hare, *Mental Illness and Social Conditions in Bristol*, 102 J. MENTAL SCI. 340 (1956); Graham Thornicroft, *Social Deprivation and Rates of Treated Mental Disorder: Developing Statistical Models to Predict Psychiatric Service Utilisation*, 158 BRIT. J. PSYCH. 475 (1991). *Cf.* Margaret K. Cooke & Jeffrey H. Goldstein, *Social Isolation and Violent Behavior*, 2 FORENSIC REP. 287, 288 (1989):

A socially isolated individual who has few, and/or superficial contacts with family, peers, and community cannot benefit from social comparison. Thus, these individuals have no mechanism to evaluate their own beliefs and action in terms of reasonableness or acceptability within the broader community. They are apt to confuse reality with their idiosyncratic beliefs and fantasies and likely to act upon such fantasies, including violent ones.

Exposed for the first time to total isolation . . . he develops a predictable group of symptoms, which might almost be called a "disease syndrome."[132]

Among the symptoms identified as part of this syndrome were bewilderment, anxiety, frustration, dejection, boredom, rumination, and depression. In addition, the authors observed that "[s]ome prisoners may become delirious and have visual hallucinations."[133]

### C.  *Acutely Isolated and Restricted Living Conditions*

Observations of persons who have lived under isolated and restricted conditions provide some insight into the psychological stress of limited personal mobility, reductions in the nature and variety of activity and stimulation available in one's surrounding environment, and social (as opposed to purely sensory) deprivation. Thus, one early study of this topic concluded that "[i]t seems perfectly clear from work thus far that acute disturbances of the normal personality may occur, and rather quickly, in an environment providing reduced sensory or perceptual experience."[134] A more recent review that summarized several decades of research on people who were confined, restricted in movement and activity, and isolated from a larger population noted that "[r]eports of an inability to concentrate or maintain focus are common" and that "isolation produces significant and often dramatic increases in suggestibility and hypnotizability" and attentional shifts of the type associated with hallucinations.[135] Researchers reported increased levels of psychological problems, including sleep disturbances, impaired cognition, anxiety, hostility, minor forms of psychopathology, heightened frictions and social conflict among members of the confined group, and potential long-term animosities that could result in deterioration of interpersonal and familial relationships.[136]

In addition, studies have confirmed the value of psychological screening and training to prepare military personnel for assignment in Antarctica and other isolated and confined environments. These precautions appear

---

132. Lawrence E. Hinkle & Harold E. Wolff, *Communist Interrogation and Indoctrination of "Enemies of the States"*, 76 ARCH. NEUROL. & PSYCH. 115, 127 (1956).

133. *Id.* at 128.

134. Raymond H. Thoenig, *Solitary Confinement—Punishment Within the Letter of Law or Psychological Torture?* 1972 WIS. L. REV. 223, 232 (1972) (citing E.K. Eric Gunderson, *Emotional Symptoms in Extremely Isolated Groups* 9 ARCH. GEN. PSYCH. 362, 363 (1963)). This and other research identified psychological symptoms that were manifested over the six to eight month period in which personnel were confined to indoor quarters with very limited resources for stimulation. Symptoms included insomnia, anxiety, depression, and irritability, and these effects increased as the winter months wore on.

135. Albert A. Harrison et al., *The Human Experience in Antarctica: Applications to Life in Space*, 34 BEHAV. SCI. 253, 257 (1989). The authors concluded that such environments are clearly "stressful" and that a "recurrent concern is that the stresses of isolation and confinement lead to poor mental health and negative moods." *Id.* at 258.

136. *Id.*

necessary to minimize the negative effects of the environment on those who will live there. Similarly, a special emphasis on "environmental design" is needed to minimize the effects of such isolation stress on human behavior. For example, research focused on maximizing the habitability of this kind of confinement and isolation indicates that "[w]indows are a critical design feature" because they allow the entry of natural light, make it possible to communicate with the outside world, and reduce feelings of being cramped.[137] Further, some researchers observed that adjustment to the isolated and confined environment "depends importantly upon the man's specific job at the station,"[138] suggesting that the psychological role that a person fills during isolation, including a basic sense of purpose, may be an important component in his or her adjustment. Of course, the intended negative or pejorative meaning of punitive segregation that is necessarily communicated to and emphasized with prisoners makes it unlikely that anyone's positive "role" or sense of purpose in lockup will moderate the negative psychological effects associated with such confinement.

### D.    *Use of Seclusion With Hospitalized Mental Patients*

The debate over whether "seclusion"—the imposition of sensory and social deprivation with hospitalized mental patients—can ever be used to accomplish a therapeutic purpose provides another perspective on the psychological consequences of solitary confinement.[139] Mental health professionals are divided over whether such seclusion sometimes can be beneficial or should *never* be permitted.[140] Mental patients who have been subjected to seclusion seem critical of the experience and question its therapeutic effect.[141] Indeed, there is now "considerable self-scrutiny in psychiatry over the uses and abuses of such measures" and an awareness of the "potential dangers"[142] of seclusion practices that has translated into mental health standards governing the manner and conditions under which they should be used.[143]

---

137. *Id.* at 260-264.

138. E.K. Eric Gunderson, *Mental Health Problems in Antarctica*, 17 Arch. Environ. Health 558, 564 (1988).

139. Of course, there are important differences between the two conditions. *See, e.g.,* Grassian and Friedman, *supra* note 71 (comparing the effects of seclusion and solitary confinement).

140. Tom Mason, *Seclusion Theory Reviewed—A Benevolent or Malevolent Intervention?* 33 Med. Sci. Law 95 (1993).

141. *See, e.g.,* Ellen Heyman, *Seclusion*, 25 J. Psychosoc. Nursing and Mental Health Services 8, 8-12, 35, 37 (1987); Stanley M. Soliday, *A Comparison of Patient and Staff Attitudes Toward Seclusion*, 173 J. of Nervous and Mental Disease 282 (1985).

142. Jeff Mitchell & Christopher Varley, *Isolation and Restraint in Juvenile Correctional Facilities*, 29 J. Am. Acad. Child Adolescent Psych. 251 (1990).

143. Joint Commission on the Accreditation of Hospitals, Consolidated Standards Manual, 1985; For Child, Adolescent, and Adult Psychiatric, Alcoholism, and Drug Abuse Facilities and Facilities Serving the Mentally Retarded and Developmentally Disabled 81-84 (Chicago, IL 1985).

One balanced review of the literature on this question recently concluded that "although it appears to be reasonably well-established that seclusion and restraint 'work,' i.e., they provide an effective means for preventing injury and reducing agitation, it is at least equally well-established that these procedures can have serious deleterious physical and (more often) psychological effects on patients."[144]

Recognition of the risks of seclusion also has led to various task force reports and advisory opinions that recommend physician authorization, safety features in seclusion room design, and specialized training for hospital staff[145] as well as a range of proposed alternatives to seclusion for mental patients.[146] A number of psychiatrists have publicly criticized the use of isolation as "a prolonged intervention lasting days, weeks, and in some cases, months"[147] in juvenile correction facilities, citing the fact that "[t]he literature suggests that a variety of mental and behavioral disturbances can be created by isolation for long periods of time"[148] and that "programs relying on excessive isolation experience high rates of aversive behaviors among residents."[149]

## E.    Studies of Torture Victims

Research done with torture survivors also provides some insight into the psychological effects of solitary confinement. Indeed, legal and psychological commentators critical of solitary confinement often analogized it to torture.[150] The fact that solitary confinement is among the most frequently used psychological torture techniques seems to underscore its aversive nature and destructive potential.[151] Methods of psychological torture have

---

144. William A. Fisher, *Restraint and Seclusion: A Review of the Literature*, 151 AM. J. PSYCH. 1584, 1588 (1994).

145. *See, e.g.*, AMERICAN PSYCHIATRIC ASSOCIATION, TASK FORCE REPORT 22: SECLUSION AND RESTRAINT: THE PSYCHIATRIC USES (1985).

146. D.G. Kingdon & E.W. Bakewell, *Aggressive Behaviour: Evaluation of a Non-Seclusion Policy of a District Psychiatric Service*, 153 BRIT. J. PSYCH. 631 (1988).

147. Mitchell & Varley, *supra* note 140, at 252.

148. *Id.*

149. *Id.* at 253. *See also* P. Herbert Leiderman et al., *Sensory Deprivation: Clinical Aspects*, 101 ARCH. OF INTERNAL MED. 389-396 (1958) (finding that changes in social and sensory environment of long-term hospital patients eliminated anxiety, delusions, and hallucinations developed by some patients).

150. *See, e.g.*, Lucas, *supra* note 83, at 155 (asking "Is Solitary Confinement Torture?"); Tim Shallice, *Solitary Confinement: A Torture Revived?* NEW SCIENTIST, Nov. 28, 1974, at 666; Thoenig, *supra* note 132, at 231-233.

151. Foster, *supra* note 97. Solitary confinement is one of the most common "psychological procedures" used to torture South African detainees. *Id.* at 69. Foster also reported on the frequency with which solitary confinement was used for various age groups and in different geographical regions of the country and concluded that "[g]iven the full context of dependency, helplessness and social isolation common to conditions of South African security law detention, there can be little doubt that solitary confinement under these circumstances should in itself be regarded as a form of torture." *Id.* at 136. *See also* Hinkle & Wolff, *supra* note 130, at 115-75 (describing effects of isolation cells used by the "Communist State Police" in the Soviet Union and China).

been divided by researchers into two types: "weakening" methods are designed to exhaust the victim and render her helpless, while "personality destroying" methods are designed to induce guilt, fear and loss of self-esteem.[152] Specific torture techniques often include stimulus deprivation as well as a near-complete loss of control. Some descriptions of these techniques bear close similarity to descriptions of modern supermax prisons:

> Victims are submitted to a detailed set of regulations and rules, resulting in close supervision where everything (including completely insignificant details) is controlled. Violation of the rules (either real of supposed) is used as an excuse to punish the "offending" victim. . . . During torture and imprisonment the aggression of the victim is by necessity turned inwards and there is no possibility of adequately expressing emotions.[153]

When used as a method of torture, solitary confinement impairs the victim's ability to think coherently and logically, and can produce anxiety, emotional instability, disorientation, anger, depression, and hallucinations.[154] Torturers have long recognized that more severe sensory deprivation results in more severe psychological trauma.[155]

Torture victims are often diagnosed as suffering from Post Traumatic Stress Disorder ("PTSD"),[156] an extreme psychological reaction that can occur in the wake of a traumatic event. The disorder generally entails a subsequent, overwhelming emotional reaction that may be followed by some form of denial, including symptoms of amnesia, and avoidance of anything related to the trauma, as well as detachment and estrangement from others, limited affect, and a poor outlook on the future. Intrusive thoughts about the event, including pseudo-hallucinations and disturbing thoughts and emotions that "flood" the victim are also characteristic of

---

152. F.E. Somnier & I.K. Genefke, *Psychotherapy for Victims of Torture*, 149 BRIT. J. PSYCH. 323, 324 (1986).

153. *Id.*

154. *Id.* at 325-26; Shaun R. Whittaker, *Counseling Torture Victims*, 16 THE COUNSELING PSYCHOLOGIST 272, 273 (1988). As one commentator summarized: "Even the most unintrusive [torture] techniques were found to leave lasting psychological scars. For instance, sensory deprivation frequently led to anxiety, hypochondria, and hysteria." Matthew Lippman, *The Development and Drafting of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, 27 B.C. INT'L & COMP. L. REV. 275, 310 (1994).

155. William Ristow & Tim Shallice, *Taking the Hood Off British Torture*, NEW SCIENTIST, Aug. 5, 1976, at 272 ("The major 'advance' that the Combined Services Intelligence Centre instituted was to replace isolation in featureless, soundless cells (the KGB method) by the much more extreme environment of severe sensory deprivation").

156. Federico A. Allodi, *Assessment and Treatment of Torture Victims: A Critical Review*, 179 J. NERVOUS AND MENTAL DISEASE 4 (1991); Kenneth S. Pope & Rosa E. Garcia-Peltoniemi, *Responding to Victims of Torture: Clinical Issues, Professional Responsibilities, and Useful Resources*, 22 PROFESSIONAL PSYCHOLOGY: RESEARCH AND PRACTICE 269, 272 (1991); Robert I. Simon & Robert A. Blum, *After the Terrorist Incident: Psychotherapeutic Treatment of Former Hostages*, 41 AM. J. PSYCHOTHERAPY 194, 195 (1987); Whittaker, *supra* note 152, at 274.

PTSD.[157] Such intrusive thoughts often include feelings of guilt, fear, shame and rage over one's vulnerability as a victim, rage at the source of the trauma, and fear of the loss of control of aggressive impulses.[158]

In the absence of therapy (or some other form of resolution or relief), PTSD victims often suffer from psychosomatic problems, an inability to work productively or to experience positive emotions. The onset of the disorder may be delayed by six months or more, but the symptoms may continue for years. Persons with higher levels of pre-trauma psychological health have better prognoses and, conversely, persons with less sturdy personalities appear to be more vulnerable to the stressors that lead to the disorder.[159] Some discussions of the psychotherapeutic techniques for treating the long-term problems of torture victims have acknowledged that segregated prisoners should be numbered among the patient population. For example, one review pointed to the guilt and discomfort clinicians may experience upon learning that "the clinician's [own] government was involved, directly or indirectly, in the torture,"[160] and used Amnesty International's condemnation of the High Security Unit of the Lexington Federal Prison as an example.[161] Others have argued that the effects of reduced environmental stimulation can require long-term psychotherapy to abate.[162]

---

157. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 236 (3d ed. 1980). *See also* Mardi J. Horowitz, *Post-traumatic Stress Disorders: Psychosocial Aspects of the Diagnosis*, 19 INT. J. MENT. HEALTH 21 (1990) [hereinafter Horowitz, *Post-traumatic Stress*].

158. Ronald Siegel found that conditions of isolation, visual deprivation, restraint on physical movements, physical abuse, and threat of death that accompanied hostage situations appeared to influence the production of hallucinations in about a quarter of the survivors he examined. Ronald K. Siegel, *Hostage Hallucinations: Visual Imagery Induced by Isolation and Life-Threatening Stress*, 172 J. NERVOUS AND MENTAL DISEASE 264, 266 (1984). Hallucinations were also found by Grassian to be one of the defining characteristics of a psychiatric syndrome he identified in prisoners exposed to solitary confinement. Grassian, *Psychopathological Effects*, *supra* note 72, at 1451; Grassian and Friedman, *supra* note 72, at 54.

159. Horowitz, *Post-traumatic Stress*, *supra* note 155, at 21.

160. Pope & Garcia-Peltoniemi, *supra* note 154, at 270. D.H. Foster also commented on the inadvisability of concentrating on the psychologically negative effects of solitary confinement absent a broader discourse about the political context in which such confinement occurs, observing that: "For obvious ethical reasons, no systematic study of [solitary confinement] effects under political detention conditions has been possible, other than reported experiences of former detainees. In such cases, reports have been very negative." Donald Hugh Foster, *Political Detention in South Africa: A Sociopsychological Perspective*, 18 INT. J. MENT. HEALTH 21, 25 (1989).

161. Amnesty concluded that the "prolonged isolation, humiliating strip-searches and additional restrictions" imposed upon the women in this unit "had a detrimental effect on their physical and mental health." AMNESTY INTERNATIONAL, AMNESTY INTERNATIONAL REPORT: 1989 152 (1989).

162. Somnier & Genefke, *supra* note 150.

## F.  Data From Isolated and Segregated Prisoners

### 1.  Autobiographical and Descriptive Accounts

Personal accounts of life in long-term solitary confinement and punitive segregation provide elaborate descriptions of the pains of such imprisonment, as well as the psychological extremes to which prisoners have gone to adjust to it. For example, Christopher Burney's eloquent account of his eighteen months in a German wartime prison camp focused on his attempts to survive the assault on his identity that the monotony and utter lack of stimulation represented: "We are narrow men, twisted men, smooth and nicely rounded men, and poets; but whatever we are, we have our shape, and we preserve it best in the experience of many things."[163] Because solitary confinement denied him the "experience of many things," he struggled to create an inner world of existence that preserved his sense of who he was. Although Burney observed that humans are "adaptable creatures" who "flatter ourselves with the conceit that by adapting ourselves to events we master them,"[164] his attempts to achieve psychological mastery of this environment were part of a constant battle to preserve his sanity.[165] Indeed, like many autobiographical accounts of solitary confinement, Burney's dwelled on ways of avoiding madness. He conceded: "[n]o doubt I would have gone mad, because it takes a well-nourished brain to cope with such an absolute as Nothing."[166]

Jack Abbott's account of his numerous experiences in solitary confinement were similarly graphic and stark.[167] Indeed, he argued that prison solitary was so powerful that it could "alter the ontological makeup of a

---

163. CHRISTOPHER BURNEY, SOLITARY CONFINEMENT 8 (1961).

164. *Id.* at 11.

165. Burney used self-imposed routines both to create artificial "events" during the day that made the passage of time more bearable, and to provide some semblance of structure to an otherwise unmarked experience. He paced in his cell—"the stock-in-trade of all those in solitary confinement," engaged in purposeful flights of imagination (like fantasized journeys), and forced himself through mental exercises (like self-administered quizzes). *Id.* at 20. *See also* Semyon Gluzman, *Fear of Freedom: Psychological Decompensation or Existentialist Phenomenon?* 139 AM. J. PSYCH. 57 (1982). A Soviet psychiatrist sentenced to some seven years in a labor camp, Gluzman spent long periods in solitary confinement and wrote eloquently about the psychological challenges of this extreme form of imprisonment:

> There is no doubt that the very environment of the political labor camp, the combination of informational deprivation with constant extreme stimuli, has an impact on the individual's state of mind. Although situationally induced changes of mood—feelings of loneliness and distress—are not rare here, they are not manifestations of psychic disorder. They are a natural, healthy reaction to gloating brutality and trampled justice, to abuses of power, to the insensitivity of God and the world. Psychological inadequacy or deficiency under such conditions would manifest itself by the *absence* of such negative emotions.

*Id.* at 60.

166. Burney, *supra* note 161, at 21. Foster also discussed the fear of going insane that plagued a number of South African detainees who had been placed in solitary confinement. FOSTER, DETENTION AND TORTURE, *supra* note 97 at 136-140.

167. JACK ABBOTT, IN THE BELLY OF THE BEAST: LETTERS FROM PRISON (1981).

stone."[168] He, too, focused on the despair that descended with inactivity and lack of meaning: "You sit in solitary confinement stewing in nothingness. . . . The lethargy of months that add up to years in a cell, alone, entwines itself about every 'physical' activity of the living body and strangles it slowly to death. . . . Time descends in your cell like the lid of a coffin."[169] Of course, the death of which he wrote was psychological in nature. Like Burney, Abbott's goal was to find ways of fighting against the monotonous routine and emptiness "without losing my mind."[170]

Descriptive accounts by those a step removed from the actual experience of prison solitary have focused on a related set of psychological issues. For example, Cohen and Taylor provided a lengthy account of a group of men sentenced to long-term confinement in a British special security unit. Among other things, they found that relationships with persons outside the prison became increasingly difficult to maintain, and that prisoners with no workable, sustaining ideology were prone to psychic retreat or withdrawal, or to fighting in self-destructive ways. Over time many prisoners learned to cope with the pains of imprisonment in an unreflective way, and what the authors referred to as the "ultimate existential problem"—fear of deterioration—became increasingly acute.[171] Although conditions in the units were severe—one of the men likened it to "living in a submarine"[172]—the men were permitted group interaction, relative freedom of movement within the units, and contact with outsiders (like Cohen and Taylor) to conduct classes. The authors found that the men in these units "hardly lost their identities,"[173] at least in the sense that there were clear assertions of self and even clearer differences between prisoners in terms of how they approached their confinement. Of course, imperatives of institutional life did mean that "over time certain adaptations [were] favored in that they represent the only workable ways of dealing with the accumulating problems of life inside."[174] Distinct strategies emerged by which the prisoners adapted to their conditions of confinement that appeared to be a function of their relationship to authority.

Michael Jackson's analysis of conditions in a variety of segregation units in Canada also detailed prisoners' psychological reactions to their confinement.[175] Prisoners reported difficulties concentrating on even simple tasks, experienced headaches, mental and physical deterioration, emotional flatness, lability, breakdowns, hallucinations, paranoia, hostility and

168. *Id.* at 45.
169. *Id.* at 44.
170. *Id.* at 46.
171. Cohen and Taylor, *supra* note 82, at 198.
172. *Id.* at 62. The conditions in these units are described in some detail in chapter 3 of Cohen and Taylor's book, where the environment is termed a "closed emotional world." *Id.* at 60.
173. *Id.* at 148.
174. *Id.* at 153.
175. Jackson, *supra* note 19.

rage, and some were beset with thoughts of self-mutilation and suicide (which, in some instances, they acted upon). Jackson also described the "double binds" that prisoners in these units commonly confronted. For example:

> The undercurrent of violence in the SHU poses a terrible dilemma for the prisoners. If they seek to avoid it by staying in their cells or forgoing exercise in the yard or time in the common room, they will be viewed negatively as demonstrating an unwillingness or an inability to associate with others. If they decide to come out of their cells when they are concerned about being attacked, they feel they are forced to carry a knife or other weapon in order to defend themselves. If a weapon is discovered the authorities' view that they are indeed dangerous and require further confinement in the SHU is reinforced.[176]

Those placed in "special handling units" in which they supposedly were given the opportunity to ascend to slightly increased levels of freedom and privileges were confused about the criteria used to evaluate their behavior, harbored a sense of anger "bordering on outrage" about the illegitimacy and unreliability of the process by which they were reviewed,[177] and were plagued by a deep sense of helplessness.

The descriptive accounts of two psychiatrists who were employed in several of the California Department of Corrections's punitive segregation units provide additional data on the psychological adaptations needed to survive in such places. Frank Rundle's observations of Soledad's "adjustment center" led him to conclude that "madness" among the prisoners who were confined there was at least "partially functional and adaptive."[178] Specifically, Rundle watched some prisoners who had been isolated for days "become so desperate for relief that they would set their mattresses afire so as to force the staff to open the door and remove them from the torture chamber."[179] Other prisoners "would burst out in a frenzied rage of aimless destruction, tearing their sinks and toilets from the walls, ripping their clothing and bedding, and destroying their few personal possessions in

---

176. *Id.* at 177.

177. *Id.* at 170-171. In addition:

[T]here are still no real programs in Millhaven. The world of the SHU is still circumscribed by a television set, a common room and an exercise yard. The prisoner, even though he is now equipped with an individual program plan, is still no more able than he ever was to demonstrate "responsible behavior" beyond not breaking the rules.

*Id.* at 173.

178. Frank Rundle, *The Roots of Violence at Soledad*, *in* THE POLITICS OF PUNISHMENT: A CRITICAL ANALYSIS OF PRISONS IN AMERICA 163, 167 (Erik Olin Wright ed.,) (1973).

179. *Id.*

order to alleviate the numbing sense of deadness or non-being and to escape the torture of their own thoughts and despair."[180]

Similarly, Robert Slater recounted the "atmosphere of terror" that prevailed in San Quentin prison during the 1980s, when most of the prison's housing consisted of "lockup" or punitive segregation of some kind.[181] Slater observed the psychiatric consequences for "large numbers" of prisoners in their attempts "to cope with the psychological effects of terror as well as the debilitating effects of long-term lockup, excessive noise, poor sanitary conditions, sensory overload or deprivation . . . lack of privacy, brutality, isolation, and pests."[182] His description of the symptoms suffered by prisoners in these units included:

> tension, irritability, sleeplessness, nightmares, inability to think clearly or to concentrate, and fear of impending loss of impulse control. Sometimes the anxiety is severe enough to be crippling. It interferes with sleep, concentration, work, and study and predisposes prisoners to brief psychotic reactions, suicidal behavior and psychophysiological reactions. It causes misperceptions and over-reactions. It fuels the cycle of violence, leading to more violence and terror.[183]

Slater attributed these reactions primarily to the acute effects of the environment in which the prisoners were confined since, in his opinion, "[t]hese are individuals who do not experience much anxiety in the free community of lower security prisons and their anxiety, therefore, would usually be regarded by psychiatrists as 'exogenous' or 'anxiety associated with the stress of day-to-day living.'"[184] Indeed, he concluded that the main function of a psychiatrist in environments like these was to "prevent the atmosphere of terror from breaking men down to the point where they are incapable of making rational decisions."[185]

---

180. *Id.*

181. Robert G. Slater, *Psychiatric Intervention in an Atmosphere of Terror*, 7 AM. J. FORENSIC PSYCH. 5, 6 (1986).

182. *Id.* at 10.

183. *Id.*

184. *See id.*

185. *See id.* A former employee of the California Department of Corrections, Slater was no prisoner "sympathizer" nor someone easily convinced about the authenticity of prison-related syndromes. *See* Robert G. Slater, *Abuses of Psychiatry in a Correctional Setting*, 7 AM. J. FORENSIC PSYCH. 41 (1986). Jay Stuller also provided an early example of extreme isolation leading to a prisoner breakdown and the inability to make rational decisions:

> In 1941 Henry Young, age 29, went on trial in San Francisco for the murder of another Alcatraz convict, Rufus McCain. He expected a first-degree murder conviction. But his attorney put Alcatraz in the dock, claiming that repeated beatings by guards and solitary confinement had put Young into a "psychological coma," which made him "legally unconscious" during the killing. Fellow convicts, brought to the courthouse shackled, testified to the prison's systematic brutality. Newspapers nationwide carried stories citing "the trial of Alcatraz." Young's attorney said

## 2. Direct Studies of Solitary Confinement and Segregation

Some of the effects of solitary confinement have been studied in research conducted in actual prison settings. A few of the studies have employed experimental or quasi-experimental designs. For example, one early study used long-term federal prisoner volunteers to examine the effects of short-term solitary confinement.[186] Half of the prisoners were placed in solitary for four days, although one dropped out before the end of the experiment; the other half served as controls. The researchers found no deterioration of mental or psycho-motor functioning after the brief period of isolation, and speculated that self-selection bias might have influenced the results (i.e., those better able to tolerate isolation might have been more likely to volunteer). Despite the possible role of self-selection in minimizing the measured effects, some psychological changes *were* identified in the isolated subjects, who showed significantly increased levels of anxiety and tended to be less "verbally productive" than the group of prisoners who had not been placed in solitary.

Another such study evaluated the psychiatric consequences of sensory deprivation in a maximum security prison.[187] Experimental subjects were placed in "relative deprivation" for seven days and were then compared to a control group. While few physiological differences were found between experimental subjects and control prisoners, EEG levels declined for the isolated group. These physiological differences correlated with apathetic, lethargic behavior, and the greater the social deprivation, the greater the withdrawal of the subject. The researchers concluded that, from a rehabilitative standpoint, long-term prisoners did not receive adequate stimulation. They also suggested that sensory-deprived inmates "cannot adjust to a sudden release into free society because [their] mental and emotional mechanisms are adjusted to the deprivation circumstances," and that the inmates they studied could not "tolerate the myriad sensory input in normal environments with its pace, noise, confusion and instant decision-making."[188] The researchers argued that the consequences of such confinement might well extend beyond the period of incarceration since "anxiety, restlessness, sleeplessness and irritability become so great in the released ex-inmate that he may seek means to return to prison with its retarded input and routine existence."[189] Finally, they concluded that adequate sensory stimulation

in closing argument "It was Alcatraz that killed McCain. It was the cold, sadistic logic that some men call penology that killed him." The jury agreed, finding Young guilty only of involuntary manslaughter.

Stuller, *supra* note 54, at 88-90.

186. Richard H. Walters, John E. Callagan & Albert F. Newman, *Effect of Solitary Confinement on Prisoners*, 119 Am. J. Psych. 771 (1963).

187. George Scott & Paul Gendreau, *Psychiatric Implications of Sensory Deprivation in a Maximum Security Prison*, 14 Can. Psych. Ass'n. J. [La Revue de l'Association des Psychiatres du Canada] 337 (1969).

188. *Id.* at 341.

189. *Id.*

should be introduced into maximum security prisons in the form of education, shop training, instruction in trades, and physical exercise programs, and that the lack of such programs was detrimental to the inmate's health and long-term rehabilitative potential.

Several years later, one of the same researchers and his colleagues conducted another study on solitary confinement, this one comparing prisoner volunteers in isolation for seven days to controls who were not isolated.[190] After carefully screening 82 volunteers and rejecting any with medical, psychiatric, behavioral, or intelligence problems, they randomly assigned 20 "fit" volunteers to the isolated conditions. Isolated subjects were once again found to have lowered EEG frequencies, which the researchers felt might be related to "frustration and stress" produced by the deprived circumstances of their solitary confinement.[191] In a smaller follow-up study[192] using carefully screened subjects, eight "controls" were compared to eight prisoners who were placed in solitary confinement for ten days—"this being the longest time inmates usually remain in solitary."[193] Although the researchers found no physiological evidence that this brief stay in solitary was any more stressful than the control conditions, fully half of the original subjects in solitary confinement, who had volunteered for the study and been screened for fitness, quit and were replaced with new subjects by the end of the second day of the experiment. Surprisingly, the researchers concluded that solitary was not stressful for inmates and offered the opinion that the "quitters" may have been "constitutionally" different from those who remained.[194]

Among other things, these studies illustrate the degree to which experimental research on solitary confinement is plagued by several significant limitations. One significant problem is that most such research is based on periods of isolation that are vastly shorter (generally no more than 4-10 days) than the periods typically experienced by prisoners placed in actual punitive segregation. The use of volunteer subjects also may compromise the applicability of experimental research to real-life solitary confinement. As noted earlier, self-selection may increase the probability that persons with relatively higher tolerance for isolation will participate. Also, because of the way in which real or perceived control serves as an important mediator of psychological reactions to stress,[195] the ill effects of solitary may be

190. Paul Gendreau et al., *Changes in EEG Alpha Frequency and Evoked Response Latency During Solitary Confinement*, 79 J. ABNORMAL PSYCH. 54 (1972).

191. *Id.* at 57.

192. C.E.J. Ecclestone et al., *Solitary Confinement of Prisoners: An Assessment of its Effects on Inmates' Personal Constructs and Adrenocortical Activity*, 6 CAN. J. BEHAV. SCI. 178 (1974).

193. *Id.* at 179.

194. *Id.* at 189.

195. A sense of control can reduce subjective ratings of stress and threat and result in dramatic changes in the ways in which symptoms are labeled. Judith Rodin, *Aging and Health: Effects of the Sense of Control*, 233 SCIENCE 1271, 1273-74 (1986).

either re-labeled or minimized by subjects who, by virtue of their having chosen to participate and being able to decide whether or not to continue in the study, experience a measure of control that prisoners placed involuntarily into segregated confinement do not have.[196] Despite their limitations, these studies do illustrate the degree to which brief exposure to isolation can produce increased anxiety, lowered verbal production, decreased EEG levels that were correlated with apathetic behavior, and discomfort that even volunteers were unwilling to tolerate for short periods of time.

Although experimental research on solitary confinement is difficult to conduct, it has been supplemented by reasonably good clinical data about isolation effects in prison. For example, one early study collected observational data on the effects of solitary from 21 isolated prisoners.[197] The authors observed three response patterns typical of prisoners placed in isolation: verbal aggression, physical destruction of surroundings, and the development of an inner fantasy world, including paranoid psychosis. In addition, they observed an overall reaction to solitary confinement that

---

196. An unpublished study that is sometimes cited in the literature on solitary confinement suffered from a host of additional problems. *See* Weinberg, *supra* note 115. This study compared thirty-two prisoners involuntarily sentenced to segregated housing due to disciplinary infractions. Twenty subjects—the experimental group—were sent to solitary confinement for *five days,* where they were exposed to markedly reduced visual and auditory stimulation, including no reading materials or radios, substantially reduced lighting, and prohibitions against communicating with staff and other prisoners. The remaining twelve "control" subjects spent at least five days in segregation where they were physically restricted to a solitary cell for the entire period but given access to reading materials, radios, and the opportunity to talk to other inmates. All subjects were assessed on a variety of perceptual and cognitive tests, both before and after their terms in segregated housing. No differences were found between the two groups, or within groups comparing scores from before and after time in solitary confinement and segregation. However, these null findings were compromised by numerous methodological limitations, including the extremely short duration of the solitary confinement itself, the small sample size, lack of matched controls, and the fact that both solitary confinement and "control" subjects experienced special confinement as punishment for institutional transgressions. In addition, *all* subjects were confined to segregated housing for one or two days prior to the pre-test, awaiting the disposition on their charges. This fact alone confounded any meaningful interpretation of the comparisons between and within the groups since all subjects were "contaminated" by their stay in solitary immediately before the study began. Moreover, except for the partial sensory deprivation to which they were exposed, the conditions under which experimental subjects were confined did not differ significantly from those of the controls. Both groups experienced significant restrictions in the nature of their confinement or, as the author himself put it, "both groups of subjects were living in discomfort for at least five days." *Id.* at 45. The final significant problem with the study concerned what was *not* measured. Aside from the Rorschach test—administered to measure ego control—all of the other measures were of intellectual and perceptual skills. At the time this study was conducted the Rorschach was notoriously difficult to score in a standardized fashion, and the experimenter's inexperience with the test restricted the scope of potentially interesting psychological effects he attempted to measure. No objective or qualitative data were collected regarding depression, anxiety, self-injury, or any of the somatic illnesses that would be expected to be associated with the stress of isolation.

197. Bruno M. Cormier & Paul J. Williams, *Excessive Deprivation of Liberty*, 11 CAN. PSYCH. ASS'N. J. 470 (1966).

they described as uncontrolled rage, including an increase in homicidal and suicidal impulses.

Another study analyzed the effects of solitary confinement in case studies of prisoners who were held indefinitely in a Maine prison, many of whom had been given no reason for their isolation.[198] The authors found that almost every prisoner in the isolation unit had attempted suicide,[199] and that the prisoners often acted out in seemingly irrational ways such as smashing their heads against the concrete walls and destroying their beds and light fixtures.[200]

Hans Toch's large scale psychological study of prisoners "in crisis" in New York state correctional facilities included important observations about the effects of isolation.[201] After hundreds of in-depth interviews with such prisoners, he concluded that "isolation panic" was a serious problem among prisoners in solitary confinement.[202] Symptoms reported included rage, panic, loss of control, breakdowns, psychological regression, and a build-up of physiological and psychic tension that led to incidents of self-mutilation.[203] Toch noted that although isolation panic could occur under other conditions of confinement, it was "most sharply prevalent in segregation."[204] Moreover, it marked an important dichotomy for prisoners: the "distinction between imprisonment, which is tolerable, and isolation, which is not."[205]

During the same time period, Thomas Hilliard published the results of his evaluation of several prisoners who were being kept in the Adjustment Center at San Quentin.[206] He wrote that the solitary confinement produced overwhelming tension and anxiety in the inmates for several reasons: the "caging" and chaining of the prisoners; the absence of meaningful exercise, activity, or other outlet through which to release frustration; the indeterminacy of the terms; the absence of any program leading to release; and the sense of possibly never being freed from such confinement. The prisoners experienced a "pervasive sense of frustration and hopelessness," "deep feelings of despair," and concerns that the psychological pain of their confinement might drive them "to extreme actions and desperate solutions."[207] Hilliard concluded that conditions of confinement in the Adjustment

---

198. Benjamin & Lux, *Maine State Prison*, *supra* note 73.

199. *Id.* at 84. One nearly died from loss of blood after cutting himself with his broken light bulb, another swallowed glass, and a number of prisoners attempted hanging themselves. Several were successful. *Id.*

200. One of the prisoners offered this explanation for his extreme behavior: "In such an environment, it is normal to act abnormal." *Id.* at 84.

201. HANS TOCH, MOSAIC OF DESPAIR: HUMAN BREAKDOWNS IN PRISONS (1992).

202. *Id.* at 48.

203. *Id.* at 49.

204. *Id.* at 54.

205. *Id.*

206. Hilliard, *supra* note 72. Conditions in the Adjustment Center were described in Spain v. Procunier, 408 F. Supp. 534 (N.D. Cal. 1976).

207. Hilliard, *supra* note 72, at 77-80.

Center were "overwhelmingly negative and antagonistic to effective reha-
bilitation," and that they produced "hostility, resentment and
resistance."[208]

One small-scale study reported on four prisoners in a Canadian facility
who were sentenced to solitary confinement for disruptive behavior. The
study illustrated not only the potential psychiatric consequences of isola-
tion but also the way that the researchers' orientation could influence inter-
pretations of seemingly objective data.[209] The authors of this study, who
became professionally associated with the promotion of isolation as a tech-
nique for producing positive behavioral change,[210] reported a variety of

208. *Id.* at 81.

209. Suedfeld & Roy, *supra* note 93.

210. *See, e.g.,* Peter Suedfeld, *The Benefits of Boredom: Sensory Deprivation Reconsid-
ered,* 63 AMERICAN SCIENTIST 60 (1975). Indeed, Professor Suedfeld has touted the salutary,
therapeutic benefits of "reduced environmental stimulation" (RES) for a remarkable vari-
ety of behavioral problems and psychological ills. *See generally* Peter Suedfeld, *The Re-
stricted Environmental Stimulation Technique in the Modification of Addictive Behaviors:
Through the Centuries to Frontiers for the Eighties,* 2 BULL. SOC. PSYCHOL. IN ADDICTIVE
BEHAV. 231 (1983)(advocating the therapeutic use of RES for the treatment of a full range
of addictive behaviors, including alcoholism); Darylynn Rank & Peter Suedfeld, *Positive
Reactions of Alcoholic Men to Sensory Deprivation,* 13 INT. J. ADDICTIONS 807 (1978)(alco-
holism); Peter Suedfeld & Frederick F. Ikard, *Use of Sensory Deprivation in Facilitating the
Reduction of Cigarette Smoking,* 42 J. CONSULTING AND CLIN. PSYCHOL. 888 (1974)(smok-
ing cessation); Alistair Wallbaum et al., *Progressive Muscle Relaxation and Restricted Envi-
ronmental Stimulation Therapy for Chronic Tension Headache: A Pilot Study,* 38 INT. J.
PSYCHOSOMATICS 33 (1991)(alleviating tension headaches); Peter Suedfeld et al., *Reduction
of Post-ECT Memory Complaints Through Brief, Partial Restricted Environmental Stimula-
tion (REST),* 13 PROGRESS IN NEURO-PSYCHOPHARM. & BIOL. PSYCH. 693 (1989)(reducing
complaints about memory loss by patients who have undergone electroshock treatments);
Peter Suedfeld & J. Christopher Clarke, *Specific Food Aversion Acquired During Restricted
Environmental Stimulation,* 11 J. APPLIED SOC. PSYCHOL. 538 (1981)(facilitating dieting);
Peter Suedfeld et al., *Enhancement of Scientific Creativity by Flotation REST (Restricted
Environmental Stimulation Technique),* 7 J. ENV'TL. PSYCHOL. 219 (1987)(enhancing scien-
tific creativity); Peter Suedfeld & Geraldine Schwartz, *Restricted Environmental Stimulation
Therapy (REST) as a Treatment for Autistic Children,* 4 J. DEVELOP. & BEHAV. PEDIATRICS
196 (1983)(curing autism in children); Peter Suedfeld & Robert Hare, *Sensory Deprivation
in the Treatment of Snake Phobia: Behavioral, Self-Report, and Physiological Effects,* 8
BEHAV. THERAPY 240 (1977)(treating snake phobias in adults). Chuni Roy, Suedfeld's co-
author in their initial study on the effects of solitary confinement with prisoners, also advo-
cated the use of Suedfeld's version of RES as an effective therapeutic remedy for smoking,
hypertension, and general psychosomatic disorders: "The author hopes that medical practi-
tioners, psychiatrists and others will give some serious attention to this unique therapeutic
tool." Chuni Roy, *The Clinical Application of Restricted Environmental Stimulation Therapy
(REST): Observations of a Psychiatrist,* 159 BRIT. J. PSYCH. 592, 593 (1991). However, the
kind of RES advocated in these articles, consisting of "a flotation tank, various relaxation
tapes, and a REST chamber for 24 hours," bears virtually no relationship to, and, indeed,
seems almost the antithesis of, the conditions that prevail in solitary confinement or puni-
tive segregation units in actual prisons. *Id.* at 592. In his later writing, however, Suedfeld has
begun to blur the distinction between the potentially therapeutic use of certain forms of
voluntary, carefully controlled forms of isolation with the involuntary, punitive solitary con-
finement that is practiced in prison. Indeed, he has appeared to defend solitary confinement
in maximum security prisons as if it were therapeutic RES, and he has argued, without
benefit of supporting data, that "solitary confinement has been viewed by many prisoners as
a pleasant and desirable time-out from the constant pressures and over-stimulation of the

disturbing reactions by each of the isolated prisoners. The first prisoner, placed in solitary confinement for a month, became agitated, banging on his door by the fourth day. With no relief, the prisoner's behavior subsided and he became calm, quiet, and uninterested in his surroundings; furthermore, he began "muttering in an incoherent way."[211] After his thirty days of isolation, staff reported him to be more cooperative and pleasant, yet a few months later he underwent six treatments of electroconvulsive shock therapy for severe depression. A second prisoner also became extremely agitated and verbally abusive during his 30-day stay. He was given antipsychotic medication four times a day with little effect. This prisoner also became "calm, but incoherent."[212] He hallucinated sporadically, was unsteady on his feet, and slept heavily, even though no psychotic symptoms had been noted prior to his experience in solitary. A third prisoner, sentenced to a week of solitary, displayed inappropriate behavior by the fourth day, including giggling, staring into space for long periods, loss of appetite, and heavy sleeping.[213] Remarkably, the authors concluded after these accounts that the prisoners had benefited from their experience in solitary, based on nurses' reports of behavior change. Even those reports were questioned, however, when one of the authors reported in a separate paper that some security staff had disagreed with the extent of improvement reported by the nurses.[214]

In a later inquiry, the same researcher recruited prisoners from three North American prisons for two related studies.[215] The first study focused on 12 prisoners who had previously been in solitary for between five days to two and a half years. The qualitative data showed that three-quarters of the subjects suffered from apathy and depression, two-thirds complained of boredom, and half reported time distortions while in solitary. These complaints apparently were not pre-existing but began with the prisoners' isolation. In addition, fantasy and imagery increased, as did physical deterioration for a quarter of the respondents. Nonetheless, the researchers reported no evidence of adverse effects from isolation and noted that the "major complaints of the prisoners did not relate to social isolation, nor to a general lack of stimulation," but rather to such factors as physical beatings and use of tear gas and humiliation by the guards.[216] In a second study, the same researchers compared previously isolated inmates to those who

---

regular environment." Suedfeld, *Beyond Sentimentality, supra* note 91, at 51 (internal citations omitted).

211. Suedfeld & Roy, *Social Isolation, supra* note 93, at 92.

212. *Id.* at 94.

213. *Id.* at 95. The researchers failed to describe the week in isolation for the fourth prisoner, a schizophrenic, although they did claim that his behavior improved from subsequent visits to solitary.

214. Peter Suedfeld, *Solitary Confinement in the Correctional Setting: Goals, Problems, and Suggestion,* 20 CORRECTIVE AND SOC. PSYCH. 10, 17 (1974).

215. Suedfeld *et al., Reactions, supra* note 95.

216. *Id.* at 317.

had never been in isolation. Subjects were interviewed and took several assessment tests in which ratings of personality, affect, intelligence, and creativity were obtained. The prisoners varied widely in terms of their lengths of stay (from several days to many months) and the number of previous times in solitary. Compared to a group of prisoners that had never been in isolation, those in solitary differed significantly on only a few factors, including measures of subjective stress. However, the assessment tests did show that longer time spent in solitary confinement was associated with a series of psychological reactions consistent with PTSD,[217] including suspicion, distrust, forceful and self-seeking behavior, inhibition, anxiety, submissiveness, depression, lack of self-insight, and higher levels of hostility.[218]

In what was the most elaborate psychiatric assessment of prisoners in solitary confinement to date, Stuart Grassian reported on 15 prisoners kept in isolation for varying amounts of time at a Massachusetts prison.[219] He found that prisoners were initially reluctant to speak candidly about their experiences in solitary but, after considerable reassurance, they described a series of psychiatric symptoms that were "strikingly consistent."[220] Specifically, Grassian observed that two-thirds of the isolated prisoners had become hypersensitive to external stimuli and about the same number experienced massive free floating anxiety. In addition, about half of the prisoners suffered from perceptual disturbances that for some included hallucinations and perceptual illusions. Half complained of cognitive dysfunction such as confused states, difficulty concentrating, and memory lapses. About a third of the prisoners Grassian examined also described thought disturbances such as paranoia, aggressive fantasies (particularly aimed at guards) and impulse control problems. Three out of the fifteen had cut themselves in suicide attempts while in isolation. In all but a very few instances the prisoners reported never having experienced any of these psychiatric reactions until being placed in solitary confinement, and all reported that their symptoms subsided shortly after being given a brief respite from isolation which took place, by law, every 15 days. Grassian concluded that "rigidly imposed solitary confinement may have substantial psychopathological effects and that these effects may form a clinically distinguishable syndrome."[221] He also noted that: "[S]olitary confinement

---

217. *See, e.g.,* Horowitz, *Post-traumatic Stress, supra* note 155.

218. *Id.*

219. Grassian, *Psychopathological Effects, supra* note 72, at 1451. Grassian reported that the prisoners were kept in 1.8 m. x 2.7 m. windowless cells that were sparsely furnished with a toilet and sink, a bunk, a small fixed steel table, and a stool. The cells had double doors, the outer one solid steel except for a small Plexiglas window. The length of stay at time of assessment ranged from 11 days to 10 months, with two months as the median.

220. *Id.* at 1452.

221. *Id.* at 1453. Compare Barte's analysis of the "psychopathogenic" effects of solitary confinement in French prisons and his conclusion that prisoners placed there for extended periods of time could become schizophrenic instead of receptive to social rehabilitation. He argued that the practice was unjustifiable, counterproductive, and "a denial of the bonds

cannot be viewed as a single entity. The effects of solitary confinement situations vary substantially with the rigidity of the sensory and social isolation imposed."[222]

In another clinical study, Richard Korn evaluated five female prisoners housed in the High Security Unit at Lexington. The women were seen on two occasions, 108 days apart. The Lexington unit was a "high tech" prison-within-a-prison located in the basement of an older federal facility.[223] On his first visit, Korn found that the prisoners suffered from a number of psychological and physical ailments. All reported feelings of chronic, suppressed rage and low-level to severe depression. Three of the five reported visual hallucinations, which Korn attributed to the monotonous visual environment, and the same number complained of an inability

---

that unite humankind." Henri N. Barte, *L'Isolement Carceral*, 28 PERSPECTIVES PSYCHIA-TRIQUES 252 (1989). Other social scientific and clinical literature published in international journals has reached many of the same conclusions. *See, e.g.*, Reto Volkart, *Einzelhaft: Eine Literaturubersicht [Solitary Confinement: A Literature Survey]*, 42 PSYCHOLOGIE - SCHWE-IZERISCHE ZEITSCHRIFT FUR PSYCHOLOGIE UND IRHE ANWENDUNGEN 1 (1983) (reviewing the empirical and theoretical literature on the negative effects of solitary confinement); Reto Volkart et al., *Eine Kontrollierte Untersuchung uber Psychopathologische Effekte der Einzelhaft [A Controlled Investigation on Psychopathological Effects of Solitary Confinement]*, 42 PSYCHOLOGIE - SCHWEIZERISCHE ZEITSCHRIFT FUR PSYCHOLOGIE UND IRHE ANWENDUNGEN 25 (1983) (concluding that when prisoners in "normal" conditions of confinement were compared to those in solitary confinement, the latter were found to display significantly more psychopathological symptoms, including heightened feelings of anxiety, emotional hypersensitivity, ideas of persecution, and disordered thinking); Reto Volkart, *Einzelhaft als Risikofaktor fur Psychiatrische Hospitalisierung [Solitary Confinement as a Risk for Psychiatric Hospitalization]*, 16 PSYCHIATRIA CLINICA 365 (1983) (finding that prisoners who had been kept in solitary confinement were over-represented amongst prisoners hospitalized in a psychiatric clinic); Boguslaw Waligora, FUNKCJONOWANIE CZLOWIEKA W WARUNKACH IZOLACJI WIEZIENNEJ [HOW MEN FUNCTION IN CONDITIONS OF PENITEN-TIARY ISOLATION] (Seria Psychologia I Pedagogika No. 34, 1974) (so-called "pejorative isolation" of the sort that occurs in prison strengthens "the asocial features in the criminal's personality thus becoming an essential cause of difficulties and failures in the process of his resocialization"). *See also* Ida Koch, *Mental and Social Sequelae of Isolation: The Evidence of Deprivation Experiments and of Pretrial Detention in Denmark, in* THE EXPANSION OF EUROPEAN PRISON SYSTEMS, WORKING PAPERS IN EUROPEAN CRIMINOLOGY NO. 7 119 (Bill Rolston & Mike Tomlinson eds., 1986). Koch found evidence of "acute isolation syndrome" among detainees that occurred after only a few days in isolation and included "problems of concentration, restlessness, failure of memory, sleeping problems and impaired sense of time and ability to follow the rhythms of day and night." *Id.* at 124. If the isolated confinement persisted "a few weeks" or more, there was the possibility that detainees would develop "chronic isolation syndrome," including intensified difficulties with memory and concentration, "inexplicable fatigue," a "distinct emotional lability" that can include "fits of rage," hallucinations, and the "extremely common" belief among isolated inmates that "they have gone or are going mad." *Id.* at 125.

222. Grassian, *Psychopathological Effects, supra* note 72, at 1454.

223. Korn, note 65. At the time of evaluation, the prisoners occupied cells that were dark, small, and uniform in color, and all decorations were forbidden. The prisoners were allowed to use common recreation and yard areas, although those places were monitored by video cameras, as were the women's shower stalls. To avoid the constant monitoring that took place in the common areas, the women typically remained in their individual cells.

to concentrate and sustain attention. Prisoners reported physical manifestations of extreme stress including weight loss, lack of appetite, dizziness, heart palpitations, and the aggravation of pre-existing medical problems. On his follow-up visit, Korn found that the physical and mental condition of all the women had deteriorated to a dangerous level that he believed might be life-threatening. One prisoner was hospitalized for severe dehydration caused by the inability to keep down food or liquids. Among the women, insomnia, anxiety, fears of loss of impulse-control, intrusive thoughts about prison traumas, obsessive ideation, and increased hallucinations were reported.[224]

Stanley Brodsky and Forrest Scogin studied inmates placed in protective custody units (PC), where they experienced varying degrees of social isolation. Among PC inmates who were confined to a single cell for long periods, who had their activities restricted, and whose psychological stimulation was significantly decreased, the researchers found high levels of psychological stress. Specifically, fully 86% of the prisoners reported feeling moderate to severe anger, 79% expressed negative physical symptoms, and none reported any positive feelings. On the other hand, PC prisoners who lived in spacious two-man cells and were allowed program participation had no complaints and were actually psychologically better off than those in the general population. The researchers suggested that PC status itself was not responsible for negative psychological effects but rather the actual living conditions, such as social isolation and enforced idleness, that are often associated with that status.[225]

More recently, a group of German researchers reported on the long-term psychiatric consequences of political imprisonment that included solitary confinement in East German prison camps.[226] The criterion used to select the sample was "a psychiatric disorder assumed to be due to a period of political imprisonment of at least six weeks."[227] Despite the fact that seventy-one percent of the ex-prisoners had "no mental disturbances of any kind before imprisonment,"[228] numerous psychiatric symptoms were reported after they were released, including "inner restlessness, irritability, brooding, feelings of weariness, insomnia, and trembling."[229] In the opinion of the researchers, all of these patients suffered from a mental disturbance "characterized by symptoms of depression and anxiety accompanied by vegetative complaints and increased arousal."[230] They concluded further

---

224. *Id.*
225. Stanley L. Brodsky & Forrest R. Scogin, *Inmates in Protective Custody: First Data on Emotional Effects*, 1 FORENSIC REP. 267 (1988).
226. Michael Bauer et al., *Long-Term Mental Sequelae of Political Imprisonment in East Germany*, 181 J. NERVOUS & MENTAL DISEASE 257 (1993). The authors reported that 93% of the patients had spent an average of 74.2 days in solitary confinement. *Id.* at 258.
227. *Id.*
228. *Id.*
229. *Id.*
230. *Id.* at 260.

that the psychiatric disorders diagnosed in the study were "due mainly to long-term stress and particularly to imprisonment" and not to any adjustment problems that may have occurred afterwards."[231]

Finally, Haney has reported on research conducted with prisoners in Pelican Bay, California's "state-of-the-art" supermax prison devoted entirely to the segregated confinement of prisoners who had committed serious disciplinary infractions or were suspected of prison gang membership or affiliation.[232] This study found extraordinarily high rates of symptoms of psychological trauma among prisoners confined in these units. More than four out of five of those evaluated suffered from feelings of anxiety and nervousness, headaches, troubled sleep, and lethargy or chronic tiredness, and over half complained of nightmares, heart palpitations, and fear of impending nervous breakdowns. In addition, equally high numbers reported specific psychopathological effects of social isolation. That is, more than four out of five solitary confinement prisoners suffered from ruminations, confused thought processes, an over-sensitivity to stimuli, irrational anger, and social withdrawal. In addition, well over half reported violent fantasies, emotional flatness, mood swings, chronic depression, and feelings of overall deterioration, nearly half suffered from hallucinations and perceptual distortions, and a quarter experienced suicidal ideation.[233]

---

231. *Id.* at 261. Two factors limit the direct relevance of this study to the present discussion. First, and most important, these subjects were selected on the basis of their psychiatric symptomatology. Therefore, the data do not permit generalizations about the incident rates of these disorders among all prisoners subjected to the same conditions. They do underscore, however, the extreme and long-term psychiatric consequences that such traumatic experiences can have on prisoners and provide some insight into the patterns of psychiatric disorders that appear to be caused by this kind of confinement. Second, in addition to solitary confinement, the prisoners in the German study were subjected to some conditions that are not ordinarily imposed upon prisoners in correctional institutions, such as repeated interrogations. In fact, we have omitted discussion of several other studies of long-term psychiatric problems suffered by prisoners of war who experienced a variety of brutal conditions, including solitary confinement, because of the likelihood that the other dimensions of their mistreatment played a significant role in the resulting trauma. *See, e.g.,* Harvey D. Strassman et al., *A Prisoner of War Syndrome: Apathy as a Reaction to Severe Stress,* 112 AM. J. PSYCH. 998 (1956); Patricia B. Sutker et al., *Cognitive Deficits and Psychopathology among Former Prisoners of War and Combat Veterans of the Korean Conflict,* 148 AM. J. PSYCH. 67 (1991). On the other hand, the frequency with which solitary confinement is used as a part of a range of brutalizing conditions speaks, at least indirectly, to its harmful effects.

232. Haney, *Infamous Punishment, supra* note 12; Haney, *supra* note 78. Unlike the German study, this research was conducted with a random sample of prisoners, ensuring their representativeness and permitting the results to be generalized to the entire population in the supermax prison of prisoners.

233. *See also,* Whittaker, *supra* note 152, at 273 (noting that solitary confinement "leads the person to fantasize and daydream. Logical and coherent thinking becomes impossible. The person becomes anxious, angry, and depressed."). These results are consistent with studies of other populations exposed to long-term solitary confinement. For example, one study of concentration camp survivors identified three forms of psychic disturbance that resembled the pattern of complaints voiced by a number of the prisoners Haney interviewed: resignation and despair (including depression and emotional flatness), apathy and inhibition (including lethargy and feelings of deterioration), and aggressive irritability (including anger and emotional instability). Only slightly more than one concentration camp

### G.   The Secondary Effects of Solitary Confinement in Prisons[234]

Other studies have linked isolated confinement in prison to various forms of stress-related, dysfunctional, and destructive behavior. For example, one researcher found that prisoners held in "protective" custody units in a Michigan prison had the highest levels of sick calls in the prison. He suggested that these sick calls might be related to the higher levels of stress that the prisoners experienced.[235] Another study looked at the background characteristics of prisoners transferred to a mental hospital setting and found that, among other things, a disproportionate number of them had lived in protective custody or other forms of restricted housing prior to transfer.[236] The author of this study acknowledged that it was impossible to determine whether the specialized conditions of confinement caused the mental illness or whether prison staff steered the mentally ill toward such special units.[237]

An analysis of the 902 self-mutilation incidents in the North Carolina Department of Corrections occurring between 1958 and 1966 revealed that nearly half occurred in segregation units.[238] Similarly, a Virginia researcher found that 51% of the prison self-mutilation incidents she examined over the preceding year had taken place in isolation units.[239] A nationwide survey found that "isolation" was one of the key correlates of jail suicides and that this correlate had remained stable between 1979 and 1986.[240] More recently, another study concluded that violence towards self and towards staff were both significantly more likely when the violator was alone and living in disciplinary or restricted movement housing.[241]

---

survivor in ten was relatively free of symptoms. In addition, many of the survivors were impaired in their interpersonal behavior, reporting feelings of mistrust, isolation, and paranoia. PAUL MATUSSEK, INTERNMENT IN CONCENTRATION CAMPS AND ITS CONSEQUENCES (1975).

234. We define a "secondary" effect as something that appears to be a consequence of the primary psychological effects of solitary confinement, including subsequent reactive and dysfunctional behavior, both at an individual (e.g., suicide and violence) and collective (e.g., riots) level. We have omitted discussion of what might be termed "tertiary" effects, that is, the impact of solitary confinement on those persons who are related to and interact with the persons confined therein.

235. Ernest Otto Moore, A Prison Environment: Its Effect on Health Care Utilization (1980) (unpublished dissertation, University of Michigan (Ann Arbor)) (on file with the University of Michigan Library).

236. K. Anthony Edwards, *Some Characteristics of Inmates Transferred from Prison to a State Mental Hospital,* 6 BEHAV. SCI. & LAW 131 (1988).

237. *Id.* at 136.

238. Elmer H. Johnson, *Felon Self-Mutilation: Correlate of Stress in Prison, in* JAIL HOUSE BLUES 237, 269 (Bruce L. Danto ed., 1973).

239. *Jones, supra* note 104, at 290.

240. Lindsay M. Hayes, *National Study of Jail Suicides: Seven Years Later,* 60 PSYCH. Q. 7, 23 (1989).

241. Pamela Steinke, *Using Situational Factors to Predict Types of Prison Violence,* 17 J. OFFENDER REHAB. 119 (1991).

Howard Bidna evaluated the effects of intensified security and control measures implemented throughout the California prison system in response to what prison officials characterized as an "intolerable violence problem" that plagued state correctional institutions in the early 1970s.[242] He found that while the overall rate of stabbings in the prison system decreased, there was no significant effect on fatal stabbings or assaults by prisoners on staff. In addition, stabbings appeared to have "shifted" from the general population to security housing units, where the rate of stabbings rose significantly in the wake of increased coercion. Bidna hypothesized that this increase in violence might be accounted for by "the impact of crowding on aggressive tendencies, the lack of both mental and physical exercise in security units, the attachment of the violent label, and possible changing characteristics of the inmate population" in the units themselves.[243] He concluded that "the imposition of tighter security measures, of the type inaugurated in California, is not likely to solve the problem of prison violence."[244]

Frank Porporino analyzed extensive incidence report data collected over a five year period in the Canadian prison system.[245] He found that while only about 5% of the prison population was held in "punitive dissociation" (defined as confinement with limitation of privileges and close security supervision), 28.6% of self-directed violence and 29.6% of property damage incidents occurred in these housing units.[246] Overall, 14.3% of security incidents occurred in such restricted housing. Porporino concluded that "[e]fforts to maintain order and control through more restrictive security can attain only limited success in curbing the incidence of prison violence" and that, in extreme cases, "such measures may increase the motivation to engage in violence or prod the ingenuity of inmates and result in more extreme violence."[247] The fact that self-directed violence and property damage were more likely to occur in segregation units where limitations of privileges and security restrictions were greatest led him to speculate that "as prison conditions become more taxing, those individuals with

---

242. Bidna, *Effects of Increased Security, supra* note 84, at 33.

243. *Id.* at 44.

244. *Id.* at 45. Kevin Wright studied the interaction between prisoner characteristics and prison environments and also concluded that heightened controls may adversely affect violence-prone inmates:

Inmates who are perceived as potentially violent or who engage in violence are removed from less secure settings and placed in more structured settings with less freedom. It is possible that this practice compounds the problem. If these individuals were given greater freedom and opportunities to substantiate their self worth and manhood, then violence might be reduced.

Kevin Wright, *The Violent and Victimized in the Male Prison*, 16 J. OFFENDER REHAB. 1, 24 (1991).

245. Frank Porporino, *Managing Violent Individuals in Correctional Settings*, 1 J. INTERPERS. VIOLENCE 213 (1986).

246. *Id.* at 216.

247. *Id.* at 218.

the poorest coping skills may be particularly likely to resort to a pattern of impulsive and self-defeating violence."[248]

In addition to prompting individual aggressive responses, severe conditions of confinement have been related to collective prison violence. For example, one social scientist who analyzed the 1980 New Mexico riot (that began among prisoners who had been housed in punitive segregation) concluded that it was the result of a disintegration of social organization that had occurred during the preceding five years:

> During the 1970's, the State Penitentiary changed from a relatively benign and well-run institution, to one that was harsh, abusive, painfully boring, and without the 'regulatory mechanisms' that had been in place in the early 1970's. With few programs or work assignments available, inmates remained confined to their living units with little to do or look forward to. Inmates became increasingly hostile not only toward prison officials and guards, but also toward one another.[249]

The harsh, abusive, and painfully boring conditions in the New Mexico prison resemble precisely the atmosphere that prisoners report prevails in many supermax prisons and segregation units. A similar pattern of increasing, widespread hostility toward staff and other inmates may result.

Peter Kratcoski's study of incident reports from two U.S. prisons found that the highest percentages of assaults on guards occurred in the detention/high security housing units.[250] Seventy-one percent of the total number of assaults on staff in the federal institution he studied took place in the detention unit (which housed less than 10% of the prisoners), and 35% of such assaults in the state facility occurred in the high security unit.[251] These disproportions were made even more significant by the fact that restrictions in the units reduced prisoner access to staff. Kratcoski concluded that, despite the increased security measures that disciplinary or isolation units provided, the corresponding restrictions and deprivations imposed on prisoners helped to account for the higher violence rates:

> [I]f prisoners with few privileges are denied them, a spontaneous angry response, caused by frustration, is likely to result. Such activities as access to medical care when daily rounds are conducted or reception or posting of mail may be viewed with great importance by prisoners and denial of these services can result in angry

---

248. *Id.* at 219.

249. Bert Useem, *Disorganization and the New Mexico Prison Riot of 1980,* 50 AM. SOCIOL. REV. 677, 685 (1985). *See also* BERT USEEM AND PETER KIMBALL, STATES OF SIEGE: U.S. PRISON RIOTS 1971-1986 (1989) (offering case studies of prison riots in five states).

250. Peter Kratcoski, *The Implications of Research Explaining Prison Violence and Disruption,* 52 FED. PROBATION 27, 28 (1988).

251. *Id.* at 28.

retaliations. Life in prison is so sterile, and the privileges enjoyed so few, that any interference with the privileges can trigger an outburst.[252]

Numerous studies have underscored the importance of staff attitudes and behavior on prisoners. This research has direct implications for solitary confinement units, where staff members tend to become especially harsh and rigid in their treatment of inmates. Thus, one study found that alienation between staff and prisoners was an important component in prison disturbances.[253] Other researchers attributed reduced levels of violence at an English prison to the lack of tension and good communication between staff and inmates.[254] To be sure, guards and prisoners are immersed in a tight dynamic in any maximum security setting, and their attitudes and behaviors are mutually influenced and reinforced by one another. Supermax and solitary confinement likely intensify the process because prisoners have so few other stimuli on which to focus and guards for the most part have only negative sanctions to impose. But as one prison commentator observed, the guards' "concentration upon control is likely to stimulate resistance" among prisoners.[255] Similarly, a former warden noted that "if prison management provides an overly rigid and authoritarian style of management—that is, if it provides a target to be knocked down—prisoners may resort to violence as a means of saving face, as a means of showing that they can resist the regime."[256]

Although no research of which we are aware has focused specifically on the state of mind of guards who work in solitary confinement or supermax units, there is reason to believe that the level of fear and uncertainty is higher among them than guards working in the general prison population. Preconceptions that are based largely on the reputation of the prisoners in supermax and solitary confinement are no doubt exacerbated by the stressful conditions to which both guard and prisoner groups are exposed. Indeed, Lucien Lombardo has concluded that much prison violence is the result of actions that both guards and prisoners take in response to stereotypical images they hold of each other. When both groups believe the other to be prone to violence, individuals in those groups act accordingly and often preemptively.[257] Since solitary confinement units are often permeated by an atmosphere of repression, domination, and control,

---

252. *Id.* at 32.

253. E.C. Zeeman, *A Model for Prison Disturbances*, 17 BRIT. J. CRIMINOL. 251, 252 (1977).

254. GUNN, J. ET AL., PSYCHIATRIC ASPECTS OF IMPRISONMENT (1978).

255. Michael Jenkins, *Control Problems in Dispersals, in* PROBLEMS OF LONGTERM IMPRISONMENT 261, 277 (Anthony E. Bottoms & Roy Light eds., 1987).

256. David J. Cooke, *Containing Violent Prisoners: An Analysis of the Barlinne Special Unit,* 29 BRIT. J. CRIMINOL. 129, 139 (1989).

257. LUCIEN X. LOMBARDO, GUARDS IMPRISONED: CORRECTIONAL OFFICERS AT WORK (1989).

a perverse dynamic may be created in which prisoners come to believe that they are as dangerous as their treatment seems to imply. Guards, also presuming great danger, overreact to transgressions in ways that escalate tension and violence.[258]

In sum, studies of the secondary effects of prison isolation and segregation indicate that such confinement is associated with increases in psychiatric complaints, self-mutilation, suicide, and property damage. These conditions also increase prisoner frustration to levels that may produce violent outbursts and assaults against staff, conditions similar to those created in isolation units have been identified as precipitating causes in prison riots. Thus, solitary confinement and punitive segregation may be responsible for escalating dangerous tensions between prisoners and guards that culminate in increased levels of disciplinary infractions and violent assaults and, in extreme cases, indirectly contribute to collective violence.

## H.  *Conclusions Concerning the Effects of Solitary and Supermax Confinement*

The possibility that higher levels of disciplinary infractions and mental health problems occur in segregated housing because of the "type" of prisoner incarcerated there seems improbable in light of the nature, magnitude, and consistency of the effects we have reviewed. A comprehensive assessment of the extensive clinical data collected on this issue, including the nature and extent of the psychic indices of stress employed, the unique and consistent psychopathological reactions that have been found, and the harmful secondary effects that have been documented in virtually every study on the question, point to the damaging psychological effects of punitive, isolated prison housing itself. Commentators who have insisted that research on solitary confinement employ experimental methods before definitive conclusions can be reached[259] have perhaps ignored the virtual impossibility of acquiring such data.[260] The practical and ethical constraints

---

258. *See, e.g.,* Jackson, *supra* note 19, at 53-54 (footnotes omitted): "The guards, by perceiving the prisoners as the most dangerous and violent of men, can justify to themselves the intensity of the surveillance and the rigours of detention. Prisoners, by responding to that perception of dangerousness with acts of defiance, have at least one avenue of asserting their individuality and their autonomy, of making manifest their refusal to submit."

259. *See, e.g.*, Bonta & Gendreau, *Reexamining, supra* note 93, at 349.

260. The only true experiment on the psychological effects of prison-like environments was conducted 25 years ago using college student volunteers who were randomly assigned to the role of either prisoner or guard. Although technically not a study of the effects of punitive isolation, student prisoners were subjected to reduced environmental stimulation, minimal out-of-cell time, and drastically reduced opportunities for meaningful social interaction, including extremely limited contact with other prisoners as well as friends and family. Scheduled to last for two weeks, the study was terminated after only six days because of the acute psychological distress that subjects experienced. Haney, *Socialization, supra* note 80.

that govern research in this area mean that researchers simply cannot create the psychological equivalent of genuine solitary or supermax confinement (including powerlessness and loss of control for the prisoner, the punitive and stigmatizing quality of the confinement, indeterminance of the time spent in solitary, constant threat of physical and psychological abuse, and so on) and randomly assign persons to such exposure.

Despite these ethical limitations and their methodological consequences, distinctive patterns of negative effects have emerged clearly, consistently, and unequivocally from personal accounts, descriptive studies, and systematic research on solitary and punitive segregation. The studies included in this review span a period of over three decades and were conducted in locations across several continents by researchers ranging from psychiatrists to sociologists to architects. In addition to the corroborating data from research on situations that are at least in some important ways psychologically analogous to solitary confinement (such as studies of harmful effects of acute sensory deprivation,[261] the psychological significance of social contact,[262] the pains of isolated, restricted living,[263] and the psychiatric risks of seclusion for mental patients[264]), strikingly similar negative psychological effects have been uncovered in a wide variety of studies of solitary confinement itself. The case studies reported anxiety, panic, rage, loss of control, appetite and sleep disturbances, self-mutilations, and other recurring themes and symptoms.[265] Direct studies of the effects of prison isolation have documented a wide range of harmful psychological effects, including increases in negative attitudes and affect, insomnia, anxiety, panic, withdrawal, hypersensitivity, ruminations, cognitive dysfunction, hallucinations, loss of control, aggression, rage, paranoia, hopelessness, lethargy, depression, emotional breakdowns, self-mutilation, and suicidal impulses.[266] Among the correlational studies of the relationship between housing type and various incident reports, self-mutilation is prevalent in isolated housing, as is deterioration of mental and physical health, other-directed violence, such as stabbings, attacks on staff, and property destruction, and collective violence.[267] In addition, many of the negative effects of solitary confinement are analogous to the acute reactions of trauma victims, and the psychiatric sequelae fit the common diagnostic criteria for victims of deprivation and constraint torture techniques.[268]

---

261. *See supra* notes 104-117 and accompanying text.
262. *See supra* notes 118-131 and accompanying text.
263. *See supra* notes 132-136 and accompanying text.
264. *See supra* notes 137-147 and accompanying text.
265. *See supra* notes 161-183 and accompanying text.
266. *See supra* notes 184-231 and accompanying text.
267. *See supra* notes 132-260 and accompanying text.
268. *See supra* notes 148-160 and accompanying text.

There is not a single study of solitary confinement wherein non-voluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects. The deleterious effects varied in severity and included hypertension, uncontrollable anger, hallucinations, psychosis, chronic depression, and suicidal thoughts and behavior. Commentators who have sought to attribute these harmful consequences not to isolation per se but to mistreatment by guards and to the loss of educational, vocational, and recreational activities by prisoners[269] seem to ignore the extent to which these practices regularly occur in solitary confinement. Greater exposure to staff mistreatment and the loss of meaningful programming cannot be characterized as unfortunate but merely occasional incidents to solitary confinement; they are too often an integral part of the experience.

Indeed, there is reason to believe that in some ways the published literature on the measurable effects of solitary confinement may underestimate its actual harm. Even in direct studies of the consequences of solitary confinement, those most adversely affected are likely to be absent from the calculation of consequences. For instance, data from persons who were completely unable to adapt to solitary confinement and became psychotic or committed suicide generally would not be included.[270] Thus, a comprehensive picture that includes the most negative effects of solitary confinement is difficult to obtain. Moreover, there is reason to believe that prisoners may understate the degree to which they are affected by solitary confinement. Many studies of torture victims underscore the emotional barriers that can prevent them from talking openly and honestly about their experiences.[271] Patients who have been exposed to profound trauma may view even therapists as hostile figures who are not so different from the authorities responsible for their mistreatment. The desire to avoid talking about or re-living the incidents and the possibility that some victims may be in a denial state of PTSD[272] make establishing any form of candid and revealing dialogue difficult. An interviewer or therapist who asks too

---

269. *E.g.,* Suedfeld et al., *Reactions, supra* note 93 at 333.

270. *See, e.g.,* Suedfeld et al., *Reactions, supra* note 93, at 335.

271. *See, e.g.,* Allodi, *supra* note 154; Marianne Kastrup et al., *Coping with the Exposure to Torture,* 10 CONTEMP. FAM. THER. 280 (1988); Jorgen Ortmann et al., *Rehabilitation of Torture Victims: An Interdisciplinary Treatment Model,* 7 AM. J. SOC. PSYCH. 161, 165 (1987); Pope & Garcia-Peltoniemi, *supra* note 154; Simon & Blum, *supra* note 154; Somnier & Genefke, *supra* note 150; Whittaker, *supra* note 152. Suedfeld and his co-authors argue, to the contrary, that "[t]he exact extent to which such reactions occur [in solitary confinement] is a matter of some controversy" and that, even when "self-injurious and other abnormal behavior" does take place in isolation units, it cannot be taken at face value since it "may be a device to attract attention, to be given a change of routine, or to exert power over the administration and staff of the institution." Suedfeld et al., *Reactions, supra* note 93, at 335. We find these suggestions highly speculative and, especially in the absence of any supporting data, implausible as a general explanation for behavior in solitary.

272. *See, e.g.,* Horowitz, *Post-traumatic Stress, supra* note 155; Ortmann et al. *supra* note 269; Pope & Garcia-Peltoniemi, *supra* note 154.

many questions or is in other ways threatening may easily make persons with such trauma histories feel interrogated and defensive.[273]

Hans Toch, a psychologist who conducted extensive research with prisoners in New York correctional facilities, has described the difficult yet crucial task of establishing trust with inmates. Trust is particularly important when respondents are called upon to reveal or admit psychological stress or personal vulnerability, such as the ill effects of isolation.[274] Similarly, Stuart Grassian reported initial resistance in his assessment of prisoners in a Massachusetts segregation unit. Prisoners at first denied that the isolation affected them, avoided talking about it, and appeared to want to repress or deny the effects of the experience. For example, one prisoner could not provide any details about having slashed his wrist or remember much about the several days surrounding the incident. It was only after Grassian established rapport, offered reassurance, and gained the trust of the prisoners that they were willing to be candid with him.[275] The complexities of data-gathering in an environment as powerful and fraught with suspicion and distrust as punitive solitary confinement mean that evidence of psychological deterioration will be especially difficult for unskilled or insensitive researchers to uncover there.

The existence of pre-existing psychiatric disorders among prisoners sent to supermax and solitary confinement is sometimes used to minimize the implications of the adverse reactions and psychological dysfunction that occur there. That is, causal responsibility for subsequent psychological trauma is attributed to problems prisoners bring into punitive segregation rather than to the psychologically harmful conditions the prisoners encounter once they have arrived. Without in any way gainsaying the proposition that mentally or emotionally disturbed prisoners are too often placed in solitary confinement rather than prison psychiatric treatment programs,

---

273. Whittaker, *supra* note 152, at 276.

274. Toch, *supra* note 199. Toch noted that "inmates who break down. . .are expected to make light of their problems, to deny their manifest despair. If they fail to do so, they risk being seen, and seeing themselves, as weak, impotent, or sick." *Id.* at 11. Further: "[i]n male prisons, fear connotes weakness, and weakness unmanliness. Indices of fear must be disguised or explained away. The truth, if revealed at all, must be cautiously or circumspectly broached." *Id.* at 53. Toch observed:

> It is a fact, described in important Danish and international prison literature, that accused and convicted persons do not show their symptoms to the prison staff if they can at all avoid it. This is even more true of men than of women. Very rarely do they disclose their real condition; they hide nervousness and suppress complaints. . . . Among the most often stated [reasons] are that the prisoner does not want to humiliate him/herself, does not want to demonstrate the result of the suppression, is afraid it will be used against him/her, especially by the police, is afraid of an uncontrollable opening and wants to try to maintain the feeling of his/her own worth.

*Id.* at 126-7.

275. Grassian, *Psychopathological Effects, supra* note 72, at 1451-2.

such dismissive logic is fundamentally flawed. First, no direct empirical evidence is offered to support the argument that the heightened levels of psychological trauma detected in punitive segregation reflect little more than the greater prevalence of chronic psychiatric disorders among the population of prisoners sent there. Indeed, this argument flies in the face of the conventional correctional justification that is offered for supermax prisons—that they are needed to contain the most dangerous (not the most psychologically vulnerable) prisoners in the system. In addition, the lack of psychiatric screening and monitoring, and the failure to provide for adequate psychological counseling and treatment that characterize many of these units suggest that correctional officials themselves do not believe that a sizable number of the prisoners who are being sent to segregation are already suffering from severe emotional problems.

Second, the data that we have reviewed in the preceding pages seem to belie this explanation. As we have noted, at least some of the research on the psychological effects of solitary confinement is experimental or quasi-experimental in nature and, therefore, allows for relatively straightforward causal inferences. Even in the non-experimental studies, subjects themselves consistently identify punitive segregation as the source of their psychic trauma. Given the psychologically powerful components of the experience, this inference seems unsurprising and theoretically sound. Third, the extraordinary levels of psychological pain and suffering documented in many of these studies, measured among prisoners who place a special premium on minimizing admissions of personal vulnerability,[276] also appear to undercut the possibility that nothing more than pre-existing dysfunction is being manifested. That is, it seems improbable that the extremely high percentages of persons suffering from psychological trauma in the Brodsky, Korn, Grassian, and Haney studies can be accounted for simply in terms of pre-existing yet undetected chronic emotional problems.[277] This improbability would seem to increase as alleged gang membership becomes one of

---

276. As Toch put it, "[p]ersonal breakdowns in isolation do not square with manly self-images and reputations." TOCH, *supra* note 199, at 52.

277. Again, without dismissing the importance of correctional practices that may result in the overrepresentation of psychiatrically disturbed prisoners in supermax or solitary confinement, we do not believe that they can account for the levels of psychological trauma and psychopathological symptoms detected in the aforementioned studies. For example, one Canadian study estimated that approximately 30% of prisoners in special handling and long-term segregation units suffered from "severe mental disorders." Sheilagh Hodgins & Gilles Cote, *The Mental Health of Penitentiary Inmates in Isolation*, 33 CAN. J. OF CRIMINOL. 175, 182 (1991). Although this figure is higher than similar estimates for the prisoner population in general, where between 8 and 25% of inmates have been found to suffer from some form of severe psychiatric disorder, the rate does not approximate the two-thirds or more of segregated prisoners who report suffering psychological trauma and acute isolation effects in the various studies we reviewed. Moreover, it would be incorrect to assume that the levels of psychopathology measured in studies such as Hodgins and Cote's are independent of the psychological stresses of prolonged isolation to which their subjects were exposed.

the primary bases upon which confinement in punitive segregation is premised.[278]

Finally, it is important to acknowledge the fact that, however frequently they occur, pre-existing psychiatric disorders among segregated prisoners may render them more vulnerable to the psychological assaults of solitary confinement. This vulnerability raises additional serious questions about the propriety of punitive isolation. As one mental health expert noted: "In general, the psychologically rich get richer: healthy people tend to be resilient in their responses to stressor events, and people with personality or character disorders may be somewhat more vulnerable to PTSD following stressor events than are the mentally healthy."[279] Those with pre-existing psychological disorders may therefore suffer more psychic pain and be at greater risk for permanent damage in segregation than others. In fact, in any other context this basic point would represent an argument in favor of *increased* concern for the mental health of persons confined to these psychologically stressful environments. Indeed, it is difficult to imagine another population of persons for whom the existence of predisposing vulnerability would be used to justify less, not more, caution and concern.

The debate over *how much* harm supermax and solitary confinement inflict on *how many*—virtually every researcher in this area acknowledges that they produce some ill effects in at least some of the prisoners on whom they are imposed—masks another important issue in evaluating their resurgence in contemporary U.S. corrections. That is, there are no credible or convincing data of which we are aware to suggest that such confinement produces any widespread beneficial effects. In essence, this was the conclusion of an official Canadian study group on "dissociation" that filed a report with the Commissioner of Penitentiaries in the mid-1970s: "Although we recognize the limitations on social sciences in effective change in inmates, we must still acknowledge the lack of substantive rehabilitative or therapeutic value in the concept of segregation."[280] Moreover, since most prisoners eventually will be released from prison, "segregation as it presently exists is not practical. It further enhances the inmate's antisocial attitudes and, in general, constitutes a self-fulfilling prophecy."[281] Another study concluded that the use of solitary was not even effective as a deterrent. Disciplinary incidence rates were not affected among the punished

---

278. Researchers have found that although some gang members display symptoms of psychopathology, "their number is usually lower than that found among the general population, because the gangs themselves, in effect, screen their membership. Simply put, most gangs want to eliminate or at least limit the number of individuals who display mental disorders because they are unpredictable and create too many problems for the organization." MARTIN SANCHEZ-JANKOWSKI, ISLANDS IN THE STREET: GANGS AND AMERICAN URBAN SOCIETY 312 (1991).

279. Horowitz, *Post-traumatic Stress, supra* note 155, at 21.

280. JAMES VANTOUR, SOLICITOR GENERAL OF CANADA, REPORT OF THE STUDY GROUP ON DISSOCIATION 24 (1975).

281. *Id.*

nor among the general population by the length or number of visits to the "hole."[282]

In a related vein, although researchers have identified various categories of prisoners for whom punitive segregation is ill-advised, the literature fails to describe those whom it is likely to "help." For example, Herbert Leiderman's review of the isolation literature led him to recommend that "[i]solation as a punishment device should probably be reconsidered."[283] Leiderman observed that there were essentially three types of persons who might be placed in prison isolation and that the psychiatric threats to each would vary as a function of their pre-existing condition. The worst risks, of course, were persons whose "inner life is under poor control" because isolation would only force them to rely on already inadequate psychological resources.[284] Indeed, "[d]riving them further into themselves can only lead to an increase of anxieties, fears, and perhaps to the point of psychosis."[285] A second group consisted of those who "might seek out isolation as an expression of a pathological inner need" and for whom isolation would not only be ill-advised but ineffective as punishment.[286] Even for the final group, the psychologically healthy, Leiderman questioned the utility of isolation. Although such persons "should be able to tolerate varying periods of isolation without much deleterious effect," he thought they would truly learn "more adaptive behavior" only through use of "those techniques which utilize appropriate social interaction."[287]

Similarly, Hans Toch acknowledged that isolation generally could "dramatize the pains of imprisonment per se and also make those pains more acute," in part because it "removes even the coping resources ordinarily available in prisons."[288] Toch argued that this intensification of pain was especially poignant for certain types of prisoners. For example, he found that even though isolation was the "most trying test of the extroverted inmate's coping competence," it ironically tended to "be used disproportionately with inmates who are hyperactive and relatively poor copers."[289] Moreover, punitive isolation would "backfire most with individuals who have developed an acute sense of victimization or injustice" and that, for these prisoners, the use of solitary confinement as punishment

---

282. Barak-Glantz, *supra* note 76.

283. Liederman, *supra* note 109, at 73. Similarly, the editors of the journal that published Leiderman's article questioned the wisdom of solitary confinement as a correctional policy: "[E]xperimenters' clinical findings on the deleterious effects of sensory deprivation reinforce the conviction that punitive isolation and similar prison methods can negate the purposes that correction is intended to serve." Editors, *Point of View*, 8 CORRECTIVE PSYCH. AND J. SOC. THERAP. 57, 58 (1962).

284. Leiderman, *supra* note 111, at 72.

285. *Id.*

286. *Id.*

287. *Id.*

288. TOCH, *supra* note 199, at 50.

289. *Id.*

"serves to accentuate the state of mind that provoked it."[290] Toch also suggested that punitive segregation was inappropriate for many of those prisoners who were most distressed by their imprisonment and who, unfortunately, were more likely to be put in precisely the place least able to help them. That is:

> [I]t remains a tragic fact that our ultimate tool for dealing with fear-obsessed persons defies and defeats their regeneration: We isolate such persons, make them feel trapped, and seal their fate. We place those who are their own worst enemies face to face with themselves, alone, in a void.[291]

In contrast to the absence of documentation that supermax or solitary confinement "works," in general or for any particular type of inmate, there is some direct evidence to suggest that other approaches to handling violent prisoners are effective in both reducing levels of institutional aggression and decreasing recidivism among such prisoners upon release. Specifically, David Cooke has reported on an experimental unit "designed to contain violent and disruptive prisoners" in Scotland, following the abolition of the death penalty in 1973.[292] Prisoners eligible for placement in the unit were screened by psychological and psychiatric staff and deemed unsuitable if they suffered from "profound psychiatric illness," were gang members, or the staff suspected they would be "unable to cope with the stressful regime" at the prison.[293] The cohort of prisoners who were transferred to the facility had all been involved in serious crimes of violence, were serving long prison sentences, and had been disruptive while incarcerated in other prisons. Past infractions included numerous assaults on prison staff. In spite of these past problems, transfer to the unit resulted in rapid positive change among the prisoners, including significant reductions in violence and disciplinary infractions.

To explain this markedly improved behavior, Cooke pointed to the radically different conditions that had been created inside the special unit. He noted that most of the factors that might promote violence in prison, such as "the level of frustration in the environment, as exemplified by closed visits, letters going missing, lack of work, the general monotony of prison life, limited access to education, poor food, etc.,"[294] were largely absent in this unit. Indeed, although these prisoners were isolated from the rest of the Scottish prison population, they were given relative autonomy within the unit itself. A supportive and expressive environment was created that allowed prisoners to "discharge their emotions verbally rather than in their habitual physical mode," and prisoners were given "access to regular

---

290. *Id.*
291. *Id.* at 330.
292. Cooke, *supra* note 254, at 129.
293. *Id.* at 130.
294. *Id.* at 138.

and frequent visits from family and friends."[295] Finally, significant emphasis was placed on creating a positive relationship between prisoners and staff, something that a number of commentators have argued was "of central importance in the success of the regime."[296] Indeed, one commentator concluded that "relations between staff and prisoners are at the heart of the whole prison system, and that control and security flow from getting that relationship right."[297]

Finally, we note that the psychologically destructive treatment to which prisoners in long-term punitive segregation and supermax prisons are exposed would not be countenanced for any other group in our society.[298] Indeed, revelations that abused children,[299] the mentally disabled in

---

295. *Id.* at 140-141. *See also* Winston Collins, *The Effect of Social Isolation on Inmate Self Concept*, 45 Diss. Abs. Int'l. 643 (1984) (finding that the more isolated prisoners, those who had less contact with persons outside the prison, tended to experience greater reductions in measured self-concept during the incarceration). For a discussion of the importance of maintaining family ties for both prison and post-release adjustment, see Creasie Hairston, *Family Ties During Imprisonment: Do They Influence Future Criminal Activity?* 52 Fed. Probation 48 (1988); Creasie Hairston, *Family Ties During Imprisonment: Important to Whom and for What?* 18 J. Soc. & Soc. Welfare 87 (1991). Punitive isolation typically results in drastic reductions in visits from family and friends, in part because the visitation time permitted segregated prisoners is officially limited and in part because of the often inhospitable conditions under which visitation occurs. Because of reduced outside social contact, such confinement has a directly negative effect on prisoners and may serve to undermine their post-release adjustment. That is, supermax and solitary confinement helps to ensure that prisoners will have few if any social ties to resume in the free world. In addition, prolonged prison isolation can create a fear of future social contact that will disable prisoners, especially upon release:

> It is very common for isolated prisoners to experience fear of having to function with other people again. And this fear is seldom unfounded. Many detainees who have been in isolation say that the first time they have to spend with others is very painful. They are unable to concentrate on conversation, have difficulty paying attention, become restless, tired of any form of social life, or afraid of human openness and emotional intimacy. . . . This social disability may continue for years after a person has been in isolation. The disability may express itself in a fear of becoming attached to another person. Persons who have been in isolation have reported that they can no longer cope with physical and emotional intimacy and contact, and they feel an urge to be alone which is unnatural for them. They feel severely handicapped.

Toch, *supra* note 199, at 126 (footnotes omitted).

296. Cooke, *supra* note 254, at 142 (citing Mike Fitzgerald, *The Telephone Rings: Long-term Imprisonment*, *in* Problems in Longterm Imprisonment (Anthony Bottoms & Roy Light, eds., 1987)). *See also* D.J. West, *The Clinical Approach to Criminology*, 10 Psychol. Med. 619 (1980); Peter B. Whatmore, *Barlinnie Special Unit: An Insider's View*, *in* Problems of Longterm Imprisonment (Anthony Bottoms & Roy Light, eds., 1987). *See also* Peter McKinlay, *Good Staff-Prisoner Relations Key to Success of Scotland's Supermax*, 7 Nat'l. Prison Proj. J. 22 (1992) (containing the comments of Peter McKinlay, former director of the Scottish Prison Service).

297. Fitzgerald, *supra* note 290, at 148-9 (quoting from a report of the British Home Office, *Managing the Long-Term Prison System: The Report of the Control Review Committee*, HMSO (1984)).

298. That is, current debates over exactly how negatively solitary confinement affects prisoners, the magnitude and permanence of the harm and size of the group that suffers it, would seem strangely out of place were we to substitute virtually any other group into the

institutional settings,[300] or elderly citizens in nursing homes have been subjected to punitive isolation are understandably and justifiably met with widespread criticism and public indignation. Similarly, few people doubt the adverse psychological consequences that isolated hostage victims are presumed to incur. Accounts of innocent citizens held in social isolation under degraded conditions generate appropriately widespread public concern and unquestioned support for the provision of badly needed psychiatric services.[301] The fact that the harm inflicted by this kind of confinement on innocents is real, tangible, psychologically damaging, and potentially

---

equation. With this in mind, *compare* Bonta & Gendreau, *Reexamining, supra* note 95 and Gendreau & Bonta, *Solitary, supra* note 93, *with* Julian V. Roberts & Michael Jackson, *Boats Against the Current: A Note on the Effects of Imprisonment*, 15 L. & HUM. BEHAV. 557 (1991).

299. For example, parents responsible for the long-term solitary confinement of their children would be criminally prosecuted, and few citizens would question the propriety of that prosecution. The charges would be serious: felony child abuse and/or endangerment. According to the Child Abuse Prevention and Treatment Act of 1996, 42 U.S.C.A. § 5106(g)(4): "[T]he term 'child abuse and neglect' means the physical or mental injury, sexual abuse or exploitation, negligent treatment, or maltreatment of a child by a person who is responsible for the child's welfare." Endangerment is ordinarily conceived in terms of acts of omission, as in intentionally failing to take actions when the failure results in harm to a child's physical or mental development and well-being. For example, California's felony child endangerment statute provides: "Any person who . . .willfully causes or permits such child to be placed in such situation that its person or health is endangered, is punishable by imprisonment." Cal. Penal Code § 273a (Deering 1997).

300. The long-term punitive isolation of mental patients has never been advocated or widely accepted and even its short-term "therapeutic" use has been severely criticized and restricted. *See supra* notes 137-147 and accompanying text. In Massachusetts, for example, a forensic psychiatrist was asked by the courts to report on the effects of solitary confinement in two concurrent lawsuits, one involving isolation in a mental hospital, another involving the punitive use of solitary in a state prison. The resulting contrast was instructive. The mental hospital regulations dictated that the use of isolation be limited to no more than 8 hours at a time, with staff interaction for 15 minutes every 2 hours, and for therapeutic reasons only, those reasons conveyed to the patient so he or she was made aware that therapy, not punishment, guided the decision. On the other hand, prison regulations allowed inmates to be maintained in isolation for 15 days without respite, renewable after a 24 hour break. Grassian and Friedman, *supra* note 72, at 62.

301. For example, *see* JAMES CAMPBELL, HOSTAGE: TERROR AND TRIUMPH (1992) (analyzing the psychological trauma of hostage experiences, the subsequent recovery process, and recommended treatment); Robert Hillman, *The Psychopathology of Being Held Hostage,* 138 AM. J. PSYCH. 1193 (1981) (comparing the psychopathological effects of being taken hostage with prisoner of war and concentration camp survival); Peggy Jessee et al., *The Aftereffects of a Hostage Situation on Children's Behavior*, 62 AM. J. ORTHOPSYCHOL. 309 (1992) (discussing the negative consequences of hostage experiences on children); Thomas Strentz, *Crisis Intervention and Survival Strategies for Victims of Hostage Situations*, *in* CRISIS INTERVENTION AND TIME-LIMITED COGNITIVE TREATMENT 127 (Albert Roberts ed., 1995) (discussing FBI involvement in assisting with provision of social work services and psychological support for hostage victims at crisis sites); Henk Van der Ploeg and Wim Kleijn, *Being Held Hostage in the Netherlands: A Study of Long-Term Aftereffects*, 2 J. TRAUMATIC STRESS 153 (1989) (finding that the aftereffects of hostage experience included PTSD and symptoms of generalized anxiety disorder that warranted psychological treatment).

long-lasting or even permanent is beyond debate. Yet the fact that no comparable recognition and concern is typically extended to prisoners in solitary confinement, whose experiences in captivity may be similar or worse, and are often of longer duration, reflects a distorted legal and societal view. By this view, to be sure, prisoners neither require nor deserve the same humane treatment as the rest of us. But this same view confounds the putative blameworthiness of the targets of such mistreatment with the consequences of the mistreatment itself. Thus, devaluing the prisoners' claim to be free from such harm has led to the erroneous perception that the harm is not real. Moreover, whatever their alleged transgressions in prison, no person can be constitutionally sentenced to torture, to potentially permanent psychiatric damage, or to psychological deterioration that may impede future adjustment in and out of prison. However deserving of some form of punishment prisoners placed in solitary confinement may be, legal regulators must carefully establish the limits of such punishment and implement effective mechanisms and procedures by which those limits can be enforced. They have done neither.

### III.

### CONSTITUTIONAL CHALLENGES TO SUPERMAX AND SOLITARY CONFINEMENT: THE CURRENT STATE OF LEGAL DOCTRINE

Judicial analyses of the constitutionality of punitive isolation have too often truncated the crucial inquiry into the psychological risks that such units pose. Courts frequently have engaged in superficial assessments of the damage that may be inflicted by solitary confinement and manifested a corresponding disregard of the magnitude of the psychic pain that the segregated prisoners suffer. In addition, courts have long granted nearly complete deference to correctional decision makers. Although these unfortunate tendencies were in decline during the "civil rights revolution" several decades ago, the modern trend appears to be in the opposite direction.[302] Moreover, the normative acceptability of supermax confinement in maximum security prisons threatens to distort any implicit comparative standard used to gauge the constitutional significance of the psychological harm, making even clearly cruel punishment appear commonplace to the courts. That is, the increasingly widespread use of segregation is beginning to substitute as its legal and psychological justification; conditions that are no worse than even a deteriorating norm or inflict no more harm than other equally bad prisons are presumed to be tolerable and constitutional. In addition, the relative newness of long-term punitive isolation and the persistent biases against the largely subjective tools with which we must

---

302. This trend appears related to other changes that have taken place in the public and political climate concerning crime and punishment. For a discussion of some of these changes and their impact on prison policy in general, see Haney, *Psychology and the Limits to Prison Pain, supra* note 73, and Haney, *Riding the Punishment Wave, supra* note 73.

measure its harms further undermine contemporary legal analyses of this emerging penal form.[303]

In the earliest federal cases involving solitary confinement, legal questions concerning effects were posed only indirectly. For example, *In re Medley*[304] presented the issue of whether a Colorado law imposing solitary confinement on prisoners awaiting execution for crimes committed prior to passage of the law was constitutionally *ex post facto*, inasmuch as it amounted to a harsher regime of punishment than had been prescribed at the time of the crime. In concluding that it was, the Supreme Court discussed the nature of solitary confinement itself. The Court noted that "it is within the memory of many persons interested in prison discipline that some 30 or 40 years ago the whole subject attracted the general public attention, and its main feature of solitary confinement was found to be too severe."[305] Although the Justices stopped well short of prohibiting solitary confinement for condemned prisoners, they did note that "[i]n Great Britain, as in other countries, public sentiment revolted against this severity and. . .the additional punishment of solitary confinement was repealed."[306]

One year later, the Court rejected a direct Eighth Amendment challenge to solitary confinement by deferring to a determination made by the legislature and courts of New York that such punishment was not cruel and unusual.[307] Condemned prisoners who were left in solitary in excess of the statutory period, often because their execution was stayed pending resolution of a legal appeal, thereafter complained to federal courts to no avail.

As the *Medley* opinion made clear, however, federal courts during this period were not oblivious to the special pains of solitary confinement. In 1922, Justice Brandeis noted in dissent that "the most severe punishment inflicted" in American prisons "was solitary confinement without labor."[308] Indeed, its unique severity made hard labor seem lenient by comparison, and Brandeis termed prison work a "means of restoring and giving self-respect."[309] In 1940, the Supreme Court referred to solitary confinement as one of the techniques of "physical and mental torture" that had been used by governments to coerce confessions from their citizens:

> The rack, the thumbscrew, the wheel, solitary confinement, protracted questioning and cross questioning, and other ingenious

---

303. *See infra* notes 326 to 359 and the accompanying text. Also see the discussion in Haney, *Psychology and the Limits to Prison Pain*, *supra* note 73.

304. 134 U.S. 160 (1890).

305. *Id.* at 168.

306. *Id.* at 170.

307. McElvaine v. Brush, 142 U.S. 155 (1891). The same year *Medley* was decided the Court had determined that death by electrocution was not forbidden by the 8th Amendment. *In re Kemmler*, 136 U.S. 436 (1890). The *McElvaine* Court decided that its decision in *Kemmler* was "decisive of this, although the character of the confinement of the condemned pending his execution was not alluded to" in the earlier case. *McElvaine*, 142 U.S. at 159.

308. United States v. Moreland, 258 U.S. 433, 449 (1922) (Brandeis, J., dissenting).

309. *Id.* at 450.

forms of entrapment of the helpless or unpopular had left their wake of mutilated bodies and shattered minds along the way to the cross, the guillotine, the stake and the hangman's noose.[310]

Despite occasional sensitivity to the unusual cruelty of solitary confinement, the Court has been reluctant to consistently accord the suffering of prisoners—whether from isolation or other extremely harsh conditions of confinement—meaningful constitutional recognition.

### A. *The Current Contours of Eighth Amendment Jurisprudence*

Reconstructing the history of the Constitutional prohibition against cruel and unusual punishment, Anthony F. Granucci concluded that the Framer's use of the phrase was a misinterpretation of English law.[311] The result, protecting individuals against torturous but not excessive punishments, gave the Eighth Amendment too narrow a scope, and it was rarely invoked.[312] Not until the turn of the century did the Supreme Court expand the reach of the cruel and unusual punishment clause to include severely disproportionate penalties.[313]

The Court has employed a number of different concepts in determining whether punishment is cruel and unusual. These include disproportionality to the offense,[314] lack of relationship between penal objectives and the severity of the punishment,[315] arbitrariness,[316] repudiation by modern society,[317] and inherent cruelty.[318] Of course, these concepts govern Eighth Amendment challenges to the constitutionality of particular conditions of confinement. Eighth Amendment based claims in which particular prison conditions have been found unconstitutional include: solitary confinement, beatings by prison guards, forced labor, denial of food, and deprivations of

---

310. Chambers v. Florida, 309 U.S. 227, 237-8 (1940).

311. Anthony F. Granucci, *"Nor Cruel and Unusual Punishments Inflicted": The Original Meaning*, 57 CAL. L. REV. 839 (1969).

312. *Id.* at 865.

313. Weems v. United States, 217 U.S. 349 (1910) (holding that 15 years hard labor for making a false entry in government payroll records is so disproportionate a punishment as to violate the Eighth Amendment). *See also* O'Neil v. Vermont, 144 U.S. 323, 340 (1892) (Justice Fields arguing in dissent that a possible 54 year prison sentence for shipping alcoholic beverages violates the Eighth Amendment's prohibition of excessive punishment).

314. *Weems*, 217 U.S. at 549; Furman v. Georgia, 408 U.S. 238 (1972) (J. Brennan, concurring); Gregg v. Georgia, 428 U.S. 153, 173 (1976).

315. *Furman*, 408 U.S. at 281 (J. Brennan, concurring); *see also* Rudolph v. Alabama, 375 U.S. 889 (1963) (J. Goldberg, dissenting).

316. Furman, 408 U.S. at 250 (J. Douglas, concurring) (noting that a punishment that is "administered arbitrarily or discriminatorily" is "unusually imposed").

317. Trop v. Dulles, 356 U.S. 86 (1958).

318. Louisiana *ex. rel.* Francis v. Resweber, 329 U.S. 459, 471 (1947) (J. Frankfurter, concurring) (punishment that is "repugnant to the conscience of mankind" is cruel and unusual (quoting Palko v. Connecticut, 302 U.S. 319, 323 (1937))); *Furman*, 408 U.S. at 359 (J. Marshall, concurring) (stating that punishment that "shocks the conscience and sense of justice of the people" is cruel and unusual).

medical treatment.[319] However, none of these conditions are *per se* unconstitutional.

In *Wilson v. Seiter*[320] the Supreme Court articulated a two-prong test to determine whether prison-related treatment and deprivations are cruel and unusual. The objective component of the test requires the plaintiff to show that the prison conditions have the "sufficiently serious"[321] result of denying "the minimal civilized measure of life's necessities."[322] In addition, the conditions of imprisonment must pose a "substantial risk of serious harm."[323] There is no fixed standard for determining how much harm the prisoner must suffer before this first prong is satisfied. Although the failure to draw a bright-line test may derive in part from Chief Justice Warren's often-quoted observation that the Eighth Amendment "must draw its meaning from the evolving standards that mark the progress of a maturing society,"[324] attempts to define "minimal civilized measures" of prisoners' mental health and well-being seem more likely to have *devolved* in recent years (as we discuss below).

The subjective component of the *Wilson* test asks whether prison officials were deliberately indifferent to the inmate's health and safety.[325] To satisfy this prong, the plaintiff must first show that officials knew of the risk of harm to the prisoner and then that they nonetheless disregarded it. Only then would prison officials be found to have a "sufficiently culpable state of mind" to satisfy *Wilson's* subjective requirement.[326] In the case of solitary confinement, one commentator has argued that because the harms of "extreme conditions of confinement" are well known to officials before prisons are even built, the subjective component of an Eighth Amendment violation seemingly should be "met without difficulty."[327] But there is little evidence that it has worked that way in practice.

## B.   *Solitary Confinement and Cruel and Unusual Punishment*

As we have noted, inquiries into the constitutionality of supermax and solitary confinement currently suffer from several major flaws. First, the legal analysis often reflects a superficial understanding of the nature of the

---

319. For a catalogue of cases in which these kinds of claims were advanced, see William H. Danne, Jr., Annotation, *Prison Conditions as Amounting to Cruel and Unusual Punishment*, 51 A.L.R.3D 111 (1996).

320. 501 U.S. 294 (1991).

321. *Id.* at 298.

322. Rhodes v. Chapman, 452 U.S. 337, 347 (1981).

323. *Farmer*, 511 U.S. at 894 (1994).

324. Trop v. Dulles, 356 U.S. 86, 100 (1958) (punishment of expatriation for a one day wartime desertion violates cruel and unusual punishment clause); *see also Rhodes*, 452 U.S. at 346 (determining whether punishment is cruel and unusual depends not upon a static test but rather upon dynamic community standards).

325. Estelle v. Gamble, 429 U.S. 97, 104 (1976).

326. Farmer v. Brennan, 511 U.S. 825, 832 (1994).

327. Sally Mann Romano, *If the SHU Fits: Cruel and Unusual Punishment at California's Pelican Bay State Prison*, 45 EMORY L.J. 1089, 1117 (1997).

*SOLITARY CONFINEMENT*

psychological harm inflicted on many prisoners confined to isolation units. Second, while perhaps less categorical now than fifty years ago, judicial deference to administrative discretion has re-emerged as a constitutional norm. Finally, the increasingly widespread use of long-term punitive segregation is beginning to serve as a *de facto* justification for the practice, undercutting its meaningful legal regulation and critical analysis of its adverse psychological effects. This section briefly surveys each of these problem areas, then turns to the recent decision on the constitutionality of the Security Housing Unit at Pelican Bay Prison, where many of the limitations in prevailing legal doctrine became evident.

### 1. Psychological Harm

The federal courts have traditionally been loathe to examine the psychological effects of solitary confinement or to acknowledge the constitutional significance of its harmfulness to prisoners.[328] Instead, the courts have tended to focus on the physical conditions of confinement and issues such as whether prisoners were provided the "basic element of hygiene."[329] In *Newman v. Alabama*,[330] for example, the Fifth Circuit found that the state's provision of "reasonably adequate food, clothing, shelter, sanitation, medical care, and personal safety. . .ends its obligations under Amendment Eight."[331] Indeed, the *Newman* court was reluctant to consider psychological or psychiatric consequences of confinement, calling such inquiries an "uncharted bog."[332]

An even more dramatic example of the tendency of courts to shift the focus from psychological to physical conditions was provided in *O'Brien v. Moriarty*.[333] The First Circuit rejected a challenge to conditions in the isolation unit at Walpole prison that had been based largely on prisoners' psychological reactions, including depression and self-mutilation, to their

---

328. We have confined our discussion to federal case law. Most state courts have refrained from conducting detailed analyses of solitary confinement or the effects of such incarceration. *But see* State v. Wall, 356 So.2d 75 (La. Ct. App. 1977) (finding that placement of Louisiana prisoner in solitary confinement for 5 days following disciplinary infraction not cruel and unusual); People v. Hoffmeister, 217 N.W.2d 58 (Mich. Ct. App. 1974) (Michigan trial court's recommendation that the first 5 years of prisoner's life sentence be served in solitary confinement not cruel and unusual); Birdo v. Rodriguez, 501 P.2d 195 (N.M. 1972) (requiring prisoner who alleged he was being kept in excessively cold and rat and insect-infested conditions, without being informed of the reason, to exhaust administrative remedies). The use of such confinement for juveniles, however, has been enjoined by state courts. *See, e.g.,* People v. Owen, 295 N.E.2d 455 (Ill. 1973) (precluding the use of lengthy periods of solitary confinement for juveniles without prior institutional hearings); State v. Werner, 242 S.E.2d 907 (W.Va. 1978) (finding use of punitive practices like solitary confinement with juveniles prohibited by constitution).

329. Novak v. Beto, 453 F.2d 661, 665 (5th Cir. 1971).

330. 559 F.2d 283 (5th Cir. 1977).

331. *Id.* at 291.

332. *Id.*

333. 489 F.2d 941 (1st Cir. 1974).

confinement.[334] Noting that the prisoners had not complained about inadequate physical conditions like poor sanitation or heat, the court concluded that merely being "cut off markedly from all others" was not "so severe as to be *per se* impermissible."[335]

Similarly, in *Johnson v. Anderson*,[336] a federal district court ruled that the transfer of prisoners into solitary confinement at the Delaware Correctional Center absent a hearing within a reasonable period of time violated their due process rights, but that conditions in the solitary unit, although "extremely unpleasant,"[337] did not constitute cruel and unusual punishment. In reaching its conclusion, the court employed a three-part analysis that balanced the nature of: the hardship and deprivation inflicted, the duration of the time spent in solitary, and the seriousness of the infraction for which it was imposed.[338] The judge also acknowledged that "[w]hile aware that more subtle forms of punishment, psychological in nature, may also offend the Eighth Amendment's guarantee of civilized treatment, the courts have generally been more tolerant of the non-physical deprivations associated with solitary confinement."[339] Thus, isolating prisoners from companionship, imposing severe restrictions on intellectual stimulation, and exposing prisoners to prolonged inactivity in solitary generally would not constitute Eighth Amendment violations *if* prisoners had received other things the judge believed necessary to maintain their physical well-being.[340] Even in a case where the prisoners showed that they were forced to live "a monotonous and bleak existence," because they failed to present any testimony "that the deprivations they have experienced have inflicted demonstrable psychological damage on them" or any authoritative evidence that "such deprivations are calculated to induce mental deterioration or imbalance,"[341] they did not prevail.[342]

---

334. Prisoners were housed alone in 6 x 9 foot cells for 23 hours each day. Although they had been permitted to interact and converse with one another in a corridor outside their cells, this practice was ended following a prison disturbance. The total isolation that followed this termination appeared to precipitate the psychological reactions and was what gave rise to the litigation. *Id.* at 942-3.

335. *Id.* at 944.

336. 370 F. Supp. 1373 (D. Del. 1974).

337. *Id.* at 1388.

338. *Id.* at 1386-7 (citing to Malcolm Wheeler, *Toward a Theory of Limited Punishment: An Examination of the Eighth Amendment*, 24 STAN. L. REV. 838 (1972)).

339. *Id.* at 1387 (footnote omitted).

340. The cells in the isolation unit were described by the court as dry, clean, heated, and including exterior windows that "admit a substantial amount of daylight." However, the prisoners in these units also were prohibited access to reading materials, commissary, and out-of-cell exercise. In addition, they were denied visitation and the only face-to-face contact they had was with guards, doctors, and a social worker who made weekly visits. *Id.* at 1385-6.

341. *Id.* at 1390. The court also expressed doubts that a consensus of evidence or opinion "could be marshaled" in support of the "general proposition" that the deprivations of solitary confinement produced psychological deterioration and damage. *Ibid.* Of course, the court did not have the benefit of the studies we reviewed above, many of which were conducted post-1974.

A pair of California cases provided a counterpoint to the otherwise anti-psychological bent of some of the early federal court decisions. In *Jordan v. Fitzharris*,[343] a federal district court examined conditions in the "strip cells" at Soledad prison. The judge found that confinement in such cells could result "in a slow burning fire of resentment on the part of the inmates until it finally explodes into open revolt, coupled with violent and bizarre conduct," that the conditions themselves were "degrading," and that they offended "elemental concepts of decency."[344]  In *Spain v. Procunier*[345] another federal district court considered conditions of confinement in San Quentin's "Adjustment Center," where prisoners were segregated for long periods of time, denied access to programming of any sort, visited behind screens while chained and manacled, and given only 5 hours of indoor exercise per week. Judge Zirpoli found that such confinement occurred in an "atmosphere of fear and apprehension" and ruled that these "degrading conditions" were "counterproductive" because they instilled in prisoners "a deeper hatred for and alienation from the society that initially justly put them there."[346] In both cases, the courts' analysis of the psychological consequences of long-term solitary confinement contributed to their conclusions that the conditions of confinement were cruel and unusual.[347]

Similarly, in *LaReau v. MacDougall*,[348] the Second Circuit considered the psychological effects of five days of isolation in a dark strip cell at the

---

342. The court also found that if "undue corporal punishment were an established and recurring feature of the prison regime, there would be cause for searching Eighth Amendment scrutiny," but not where only "isolated guards may have overstepped the bounds of moderation." *Id.*

343. 257 F. Supp. 674 (1966).

344. *Id.* at 680.

345. 408 F. Supp. 534 (N.D.Cal. 1976), *aff'd in part, rev'd in part,* 600 F.2d 189 (9th Cir. 1979).

346. *Id.* at 541-4. Judge Zirpoli was no stranger to questions about the nature of solitary confinement. Almost 30 years earlier he had represented the United States in defending against Robert Stroud's claim that conditions of confinement at Alcatraz constituted cruel and unusual punishment. Stroud v. Johnston, 139 F.2d 171 (9th Cir. 1943).

347. Another California case found that conditions that resembled restrictive housing and solitary confinement for pretrial detainees in the main Los Angeles County Jail were unconstitutional. The court in Dillard v. Pitchess, 399 F.Supp. 1225 (C.D. Cal. 1975) described those conditions this way: "[A prisoner is] forced to spend substantially all of his time in one of the drab and dismal cells. . .virtually without recreation, diversion or entertainment; where the depressing monotony is not broken by a change of setting even at meal time; and where he sleeps and eats in immediate proximity to the toilet, necessarily in the hope that the cellmate's digestive system will remain reasonably regular and subdued." *Id.* at 1233. Pre-trial detainees at the jail were kept "for weeks or months at a time" under these conditions which experts at trial testified were "physically and psychologically unhealthy." *Id.* at 1236. The court concluded: "[U]nder any responsible modern day evaluation, to keep any person for long periods of time in such manner constitutes cruel and unusual punishment." *Id.*

348. 473 F.2d 974 (2d Cir. 1974). The prison apparently distinguished between punitive segregation, a maximum punitive cell, and the strip cell to which LaReau was confined. The latter was a 6 x 10 cell with a solid steel door, total silence, long periods of total darkness, no

Connecticut Correctional Institution. Holding that the punishment violated the Eighth Amendment, the court found that the strips cells went beyond "mere coerced stagnation" to actually "threatening an inmate's sanity and severing his contacts with reality by placing him in a dark cell almost continuously day and night."[349] The court noted that "prison officials, no less than sentencing judges, are bound by the strictures of the Eighth Amendment" and that the conditions in the strip cells fell below the "irreducible minimum of decency" required by those strictures.[350] The court found "most offensive" the fact that prisoners were required to "live, eat and perhaps sleep in close confines with his own human waste," and concluded that such treatment seriously threatened inmates' "physical and mental soundness."[351]

In *Berch v. Stahl*[352] jail inmates challenged various forms of solitary confinement in the Mecklenburg County Jail. Judge McMillan ruled that although solitary confinement for punishment purposes was "an extremely severe form of punishment," it was not cruel and unusual "when administered within proper bounds."[353] However, it did offend the Eighth Amendment when imposed for "excessive durations."[354] For prisoners subjected not only to isolation but also sensory deprivation in "cells so bare and dimly lit" that it was difficult for them to "do anything except sit, think and feel," there was the distinct possibility that their "[m]ental and emotional stability are thus threatened, and mental health may be impaired."[355]

Although less explicitly psychological in their analysis, other courts clearly recognized the pains of solitary confinement. For example, in *Landman v. Royster,*[356] a federal court ruled that prisoners in solitary confinement are "denied all human intercourse and any means of diversion" and "[l]oss of good time credit may in effect amount to an additional prison sentence."[357] Thus, due process required that they be given a hearing in front of an impartial tribunal that afforded the right to counsel or counsel substitute and the opportunity to cross-examine witnesses before being placed there. The court noted further that it mattered little whether the

---

sink or toilet (except for a hole in the floor that was flushed from outside the cell), and no reading material. The maximum period of time to which a prisoner could be sentenced was eight days, extended only upon approval of the Commissioner of Corrections. *Id.* at 976-977.

349. *Id.* at 978.
350. *Id.*
351. *Id.*
352. 373 F. Supp. 412 (W.D.N.C. 1974).
353. *Id.* at 420.
354. *Id.*
355. *Id.*
356. 333 F. Supp. 621 (E.D.Va. 1971). Conditions at the solitary units at the Virginia State Penitentiary and the Virginia State Farm included the absence of any work and educational programs, no direct library access, limited outdoor exercise, and virtually no chance of parole directly from solitary.
357. *Id.* at 652.

prison administration chose to characterize solitary confinement as punishment or as something done in the interests of security or control. Instead the *effect* of the decision to place someone in solitary, given the realities of the conditions there, was what triggered the due process hearing.[358]

To be sure, courts in a number of other cases demonstrated a persistent unwillingness to consider the numerous studies on the adverse psychological effects of isolation. Some acknowledged the serious psychological risks posed by solitary confinement even as they declined to forbid prison officials from taking them. As the First Circuit noted:

> Although depression, hopelessness, frustration, and other psychological states may well prove to be inevitable by products of life-long incarceration, the threat of substantial serious and possibly irreversible if not critical psychological illness together with prolonged or indefinite segregated confinement should increase the burden on prison authorities to explore feasible alternative custodial arrangements.[359]

Yet, many courts have simply refrained from ever directly "increasing the burden" on prison officials to address the psychological pains of supermax or solitary confinement and failed to provide them with meaningful legal incentives to explore feasible alternatives. The tendency to minimize psychological inquiries into the effects of solitary confinement has significantly reduced the effectiveness of judicial oversight.[360] As one commentator has noted, "the emotional consequences of isolation

---

358. Other due process cases implicitly recognized the punitive nature of solitary confinement. *See, e.g.,* Gray v. Creamer, 465 F. 2d 179 (3rd Cir. 1972) (transferring prisoners from general prison population to segregated confinement without a hearing or notice of charges violated due process).

359. Jackson v. Meachum, 699 F.2d 578, 584 (1st Cir. 1983).

360. Even courts that recognize the possibility and impropriety of psychological harm appear much more comfortable focusing on physical rather than psychological forms of mistreatment. For example, in Young v. Quinlan, 960 F.2d 351 (3d Cir. 1992), the court noted that "[w]hile the prison administration may punish, it may not do so in a manner that threatens the physical and mental health of prisoners." *Id.* at 364. The court found that placing a prisoner in a "dry cell" in which he was refused the opportunity "to relieve himself with dignity, let alone adequate sanitation" was cruel and unusual. *Id.* at 365. But its analysis focused much more on the physical conditions, the squalor and inadequate sanitation than on whether such conditions might "jeopardize the mental health or stability of the inmates so confined." *Id.* at 364. The tendency to ignore psychological testimony about the effects of solitary confinement or minimize its implications has not been limited to courts in the United States. A Canadian Justice dismissed expert testimony on the adverse effects of solitary confinement because the experts were "quite naturally for them, carrying on their dialogue in the witness box in the language of their discipline, namely Psychology." JACKSON, *supra* note 19, at 102. Without benefit of any independent empirical base of his own, however, the Justice simply asserted that "[i]n the context of construing and/or applying the laws of this country . . . such terminology overstates or exaggerates the effects and consequences of the accused." *Id.*

play a minor role in determining whether a constitutional violation exists."[361]

## 2. Deference to Administrative Discretion

In the early years of federal litigation concerning prison conditions generally and solitary confinement in particular, courts were extremely reluctant to critically scrutinize the judgments of corrections officials and order relief for prisoners. A district court's 1961 decision in *Blythe v. Ellis*[362] captured the attitude of the courts toward the decisions of prison administrators. A prisoner who had discussed a "personal problem" with the Director of the Texas Department of Corrections was placed in solitary confinement where the conditions were described as "most unpleasant and detrimental to health."[363] Although the prisoner was "yet weak from surgery" when he was placed in solitary, and "sickness and more surgery resulted from the unhealthy conditions" there,[364] the district court dismissed the claim by characterizing placement in such a unit as "internal discipline" and noting that "[f]ederal courts do not inquire into such matters as solitary confinement."[365]

A New York case that was decided a decade later reached similar conclusions about solitary confinement. In *Sostre v. McGinnis*,[366] the Second Circuit focused primarily on the adequacy of the prisoner's diet, his opportunity for exercise and personal hygiene, and access to therapy, reading materials, and communication with other prisoners in concluding that the conditions in this solitary confinement unit were "several notches above those truly barbarous and inhumane conditions" that courts had previously found unconstitutional.[367] The court explicitly acknowledged its deference to correctional administrators: "Even a lifetime of study in prison administration and several advanced degrees in the field would not qualify us as a federal court to command state officials to shun a policy that they have

---

361. Maria A. Luise, *Solitary Confinement: Legal and Psychological Considerations*, 15 NEW ENG. J. CRIM. & CIV. CONFINEMENT 301, 317 (1989). But see Justice Blackmun's attempt to counter this tendency by reminding his colleagues of the importance of psychological harm in analyses of prison cruelty. In his partial concurrence in Hudson v. McMillian, 503 U.S. 1 (1992), he wrote that it was "not hard to imagine inflictions of psychological harm—without corresponding physical harm—that might prove to be cruel and unusual punishment," that "pain" surely included psychological harm, and that there was no precedent of which he was aware indicating that "psychological pain is not cognizable for constitutional purposes." *Id.* at 16.

362. 194 F. Supp. 139 (S.D. Tex. 1961).

363. *Id.* at 139.

364. *Id.*

365. *Id.* at 140.

366. 442 F.2d 178 (2d Cir. 1971), *rev'd on other grounds sub nom.* Davidson v. Scully, 694 F.2d 50 (2d Cir. 1982).

367. *Sostre*, 442 F.2d at 193-4.

*SOLITARY CONFINEMENT*

decided is suitable because to us the choice may seem unsound or personally repugnant."[368]

As the decade of the 1970s progressed and an increasing number of prisoner rights cases worked their way through the federal system, however, a different view began to surface. One Court of Appeals noted that "blind deference to correctional officials does no real service to them" and suggested that prisoners "need to be able to challenge what appears to be arbitrary assertions of power by correctional officials during the course of their confinement."[369]

Yet, one significant barrier to those challenges remained: the Supreme Court had still done little to take the Constitution inside prison walls. That barrier was partially crossed in *Wolff v. McDonnell*.[370] Here the Court addressed a procedural due process claim concerning the adequacy of disciplinary procedures used in a Nebraska prison, and gave prison litigators some hope that the era of blind deference to correctional administrators might be ending. While noting that prisoners could have their constitutional rights "diminished by the needs and exigencies of the institutional environment,"[371] they could not be stripped of their rights entirely. Indeed, Justice White wrote that "[t]here is no iron curtain drawn between the Constitution and the prisons of this country."[372]

The *Wolff* doctrine certainly did not suggest that the preferences and concerns of prison officials were to be ignored. Although prisoners were entitled to the protection of the Due Process Clause, there still "must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution."[373] The liberty interest at stake in the loss of good time credits entitled prisoners to the minimal requirements of due

---

368. *Id.* at 191.

369. Palmigiano v. Baxter, 487 F.2d 1280, 1283-4 (1st Cir. 1973), *rev'd on other grounds*, 425 U.S. 308 (1976).

370. 418 U.S. 539 (1974).

371. *Id.* at 555.

372. *Id.* at 555-6.

373. *Id.* at 556. Justice White acknowledged that the unique nature of prison hearings was relevant to the balancing required by a due process analysis:

> Prison disciplinary proceedings. . .take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so. . . .[M]any are recidivists who have repeatedly employed illegal and often very violent means to attain their ends. They may have little regard for the safety of others or their property, or for the rules designed to provide an orderly and reasonably safe prison life. . . . Guards and inmates co-exist in direct and intimate contact. Tension between them is unremitting. Frustration, resentment, and despair are commonplace. . . . Retaliation is much more than a theoretical possibility; and the basic and unavoidable task of providing reasonable personal safety for guards and inmates may be at stake, to say nothing of the impact of disciplinary confrontations and the resulting escalation of personal antagonism on the important aims of the correctional process.

*Id.* at 561-2.

But White did not seem to recognize that the closed, tightly controlled environment of prison and the unremitting tension, frustration, resentment, and despair that it generates

process, but because adversary proceedings typical of a criminal trial would "very likely raise the level of confrontation between staff and inmate, and make more difficult the utilization of the disciplinary process as a tool to advance the rehabilitative goals of the institution,"[374] the opportunity to confront and cross-examine one's accusers was not made part of the constitutionally-required procedure. The Court did not single out solitary confinement; it was willing to mandate the same process when any "major change in the conditions of confinement" was imposed.[375]

It was not until *Hutto v. Finney*[376] was decided in the late 1970s that the Supreme Court explicitly acknowledges that solitary confinement represented a type of punishment and therefore was subject to Eighth Amendment standards. At issue was a district court's remedial order following a finding that conditions in the Arkansas prison system were cruel and unusual.[377] The contested order limited a prisoner's stay in punitive isolation to 30 days.[378] The Supreme Court endorsed the district judge's analysis that punitive isolation, although not *a per se* constitutional violation, "may be, depending on the duration of the confinement and the conditions thereof."[379] Put simply, the Court found that what "might be tolerable for a few days" could be "intolerable for weeks or months."[380] Among other things, this decision seemed to signal a willingness to review the solitary confinement policies and practices of prison administrators and perhaps to consider whether conditions in punitive isolation were psychologically tolerable.

Unfortunately, the Court quickly clarified its position, and set course in the opposite direction. Just a year after *Hutto* the Court reaffirmed its deferential stance toward corrections officials: "[P]rison administrators [are to be] accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."[381] This is a course from which the Justices have rarely strayed. Indeed, more recently,

---

might distort the judgment and undermine the fair-mindedness of corrections officials, making meaningful judicial oversight that much more essential. He wrote instead that: "We should not be too ready to exercise oversight and put aside the judgment of prison administrators." *Id.* at 566.

374. *Id.* at 563.

375. *Id.* at 572 & n.19.

376. 437 U.S. 678 (1978).

377. Justice Stevens recounted the district court's characterization of the "routine conditions" in the Arkansas system as a "dark and evil world completely alien to the free world." *Id.* at 681 (quoting Holt v. Sarver, 309 F. Supp. 362, 381 (E.D. Ark. 1970)).

378. "Punitive isolation" at that time in Arkansas was described as indeterminate confinement in a windowless 8 x 10 cell into which four or more prisoners were typically crowded, with no furniture other than a source of water and toilet controlled from outside the cell, and a special, highly restrictive, and unappealing diet. *Id.* at 682-3.

379. *Id.* at 685-6.

380. *Id.* at 687.

381. Bell v. Wolfish, 441 U.S. 520, 547 (1979).

the Court's greater emphasis on the state of mind of prison officials[382] and its use of what amounts to a criminal recklessness standard with respect to the subjective prong of its Eighth Amendment inquiries,[383] suggests that its deferential tendencies have become even more pronounced. A willingness to routinely uphold virtually all internal correctional decisions concerning conditions of confinement in long-term supermax and solitary-like confinement—as judgments about "practices needed to preserve internal order and discipline and to maintain institutional security"—may emerge as a result.[384]

Perhaps not surprisingly, many of the subsequent cases concerning solitary confinement or disciplinary segregation have focused on alleged violations of procedural due process rather than potentially cruel and unusual conditions.[385] This stance may reflect a compromise; while courts are still uncomfortable second-guessing the policies of prison administrators in creating and maintaining psychologically harmful conditions in solitary confinement, they are at least more willing to carefully and critically review the procedures by which prisoners were placed in such conditions.

Perhaps also to avoid challenging prison administrators too directly or fundamentally, much caselaw has focused on very specific aspects of solitary confinement rather than the totality of conditions. Litigation has targeted mail policies,[386] food,[387] conditions under which isolated prisoners exercised,[388] and the justification for long-term disciplinary segregation,[389] leaving the overall atmosphere intact.

---

382. Wilson v. Seiter, 501 U.S. 294 (1991).

383. Farmer, 511 U.S. 825. The prison official "must both be aware of facts from which an inference could be drawn that substantial risk of serious harm exists, and he must also draw that inference." *Id.* at 837.

384. *See* Peterkin v. Jeffes, 855 F.2d 1021, 1033 (3d Cir. 1988) ("The Eighth Amendment does not authorize a federal court to second guess their decisions nor is it our role to express our agreement or disagreement with their overall policies or theories of prison administration, as long as we find no constitutional violation.").

385. *See, e.g.*, Graham v. Baughman, 772 F.2d 441 (8th Cir. 1985) (finding that prison officials' arbitrary denial of inmates' qualified right to present witnesses or documentary evidence at disciplinary hearing violated procedural due process); Pitts v. Kee, 511 F. Supp. 497 (D. Del. 1981) (finding that keeping a prisoner in solitary confinement without affording him an opportunity to rebut charges against him violated due process clause).

386. *See, e.g.*, Gregory v. Auger, 768 F.2d 287 (8th Cir. 1985) (holding that Iowa prison officials may implement certain restrictive mail policies in disciplinary detention); Guajardo v. Estelle, 568 F. Supp. 1354 (S.D. Texas 1983) (holding that denial of certain publications to inmates in punitive segregation did not violate First Amendment rights).

387. *See, e.g.*, Ford v. Board of Managers, 407 F.2d 937 (3d Cir. 1969) (finding no Eighth Amendment violation in the fact that prisoners in solitary confinement received only four slices of bread and a pint of water three times daily and one full meal every other day). *But see* Jenkins v. Werger, 564 F.Supp. 806 (D. Wyo. 1983) (finding that statute permitting inmates who were "unruly or disorderly," or who "willfully or wantonly" destroyed prison property to be confined to solitary confinement where they were fed only bread and water for five days violated the Eighth Amendment).

388. *See, e.g.,* Gordon v. Faber, 800 F. Supp. 797 (N.D. Iowa 1992) (holding that forcing prisoners to exercise outside in subfreezing weather without hats or gloves for more than

### 3. The Normalization of Solitary Confinement

Another more subtle but equally important trend threatens to undermine the utility and vitality of the Eighth Amendment in future litigation over cruel conditions of supermax and solitary confinement. In the modern era of Eighth Amendment jurisprudence, a prisoner's right to be free of cruel and unusual punishment is thought to be informed by "broad and idealistic concepts of dignity, civilized standards, humanity, and decency."[390] An implicit assumption in the way most commentators have thought and written about these idealistic concepts was that they *were* "evolving," improving, moving, however slowly, towards more humane and civilized standards of treatment. Indeed, Chief Justice Warren's previously cited view explicitly recognized the degree to which the Eighth Amendment was thought to be tethered to increasingly civilized and humane sensitivities, indeed, that the Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society."[391] Presumably, then, as the process of its "maturing" unfolded, our society would progress towards greater levels of decency in the standards used to evaluate and limit state-sanctioned punishment.

This perspective establishes the context in which the objective prong of *Wilson's* two step inquiry—that is, whether the conditions in question inflicted pain serious enough to implicate constitutional concerns—must be viewed. As the Supreme Court stated in *Farmer v. Brennan*, the conditions created by "a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities."[392] Indeed, it was precisely this definition of "minimal civilized measures" that most courts, legal commentators, and prison litigators assumed was in the process of evolving—however slowly—towards something more sensitive, humane, and decent.

Over the last several decades, however, this process appears to have been reversed. We have witnessed what might better be characterized as the "devolution" of standards of decency on matters of crime and punishment.[393] State sanctioned punishments that once were generally disfavored if not actually condemned by the larger society have now become politically expedient and once again commonplace.[394] Applicable standards for Eighth Amendment assessments of supermax and solitary confinement are

---

one hour inflicted pain in the absence of penological purpose and, therefore, violates the Eighth Amendment).

389. *See, e.g.*, Morris v. Travisono, 549 F. Supp. 291 (D.R.I. 1982) (finding that confinement in punitive segregation for over eight years could not be justified by prison or criminal record and instead appeared to be punishment for the murder of a prison guard).

390. Estelle v. Gamble, 429 U.S. 97, 102 (1976).

391. Trop v. Dulles, 356 U.S. 86, 101 (1958).

392. *Farmer*, 511 U.S. at 834 (citing Rhodes v. Chapman, 452 U.S. 337, 349 (1981)).

393. *See supra* note 300 and the articles cited therein.

394. Francis Cullen, *Assessing the Penal Harm Movement*, 32 J. RES. IN CRIME & DELINQ. 338 (1995).

implicated at several levels. For one, dimensions of public repudiation are themselves influenced by existing penal practices. What people think about prison practices is influenced in part by what they learn about practices that are currently in effect and by the presumption that institutions engage in those practices for good reasons.[395] Yet, legal commentators have been shocked by what they have characterized as a "rage to punish"[396] that has emerged in American political and correctional circles in recent years. This period has been termed the "mean season"[397] of American corrections, one in which prison policy has been reduced to finding "creative strategies to make offenders suffer,"[398] and the best that many critics can say about prevailing correctional practices is that they reflect the "malign neglect"[399] of those who impose them.

This politically-inspired punishment wave has made it increasingly difficult for the public to repudiate supermax and solitary confinement. Thus, when the Supreme Court indicates that the harm complained of in an Eighth Amendment case must be validated by more than a scientific and statistical inquiry establishing some likelihood that serious injury would result, and would require a demonstration that the risk be so grave that society would not tolerate unwilling exposure to it,[400] it is becoming increasingly difficult to imagine what such a demonstration might consist of. It is precisely in times like these—admittedly, unusual times—that the circularity of the Eighth Amendment—evaluating the propriety of policies and practices of publicly-elected or politically appointed officials by reference to the sentiments of the public or the officials themselves—is most problematic. And, certainly to the extent that members of the public at large are kept uninformed about the psychological consequences of long-term supermax and solitary confinement and have little or no firsthand knowledge of actual prison conditions, then they are even less likely to condemn or reject practices whose widespread use implies professional acceptability.

Moreover, to courts that have become accustomed to mainline conditions of confinement that are increasingly severe and countenanced by the same correctional perspective that has created the "mean season" of contemporary prison life, long-term supermax and solitary confinement no doubt look less unusual and, presumably, less cruel—not because they are objectively any more tolerable but because we have simply gotten used to

---

395. Haney and Zimbardo termed this the "presumption of institutional rationality." Haney & Zimbardo, *Socialization, supra* note 80, at 204.

396. LOIS G. FORER, A RAGE TO PUNISH: THE UNINTENDED CONSEQUENCES OF MANDATORY SENTENCING (1994).

397. Cullen, *supra* note 392, at 340.

398. *Id.*

399. MICHAEL TONRY, MALIGN NEGLECT: RACE, CRIME, AND PUNISHMENT IN AMERICA (1995).

400. Helling v. McKinney, 509 U.S. 25, 36 (1993).

them and to other conditions much like them. One variation of this implicit comparative logic could be seen in the Supreme Court's analysis of due process issues in *Sandin v. Conner*.[401] Because disciplinary segregation did not, in the Court's view, impose a hardship that was "atypical and significant"[402] in relation to the "ordinary incidents of prison life" at the institution in question,[403] it held that no additional procedures were constitutionally mandated in order to place prisoners there. Indeed, since conditions in the prison were said to "involve significant amounts of 'lockdown' time even for inmates in the general population,"[404] the Justices concluded that 30 days in the hole did not represent a major disruption. The harshness of conditions in the general prison population mitigated their view of the nature of the deprivation created by this solitary-like confinement.

Thus, direct judicial scrutiny of supermax and solitary confinement is significantly weakened by the requirement that courts formally defer to the judgments of the same prison officials who have created the conditions under review. And, as these extreme penal practices become increasingly widespread, it becomes correspondingly more difficult for courts to condemn them as outside correctional norms. Long-term and severe conditions of solitary confinement are "penologically justified" by their increasingly widespread use, and perhaps little else. Put differently, one is hard pressed to apply a standard of review that requires any practice, however ill-conceived, to be "totally without penological justification,"[405] so long as it exists in more than a few prison systems.

## C. *Pelican Bay*

The inadequacies that plague current constitutional doctrines used to evaluate solitary confinement were apparent in the recently litigated case involving the Security Housing Unit at Pelican Bay Prison. Many commentators viewed the litigation as a test case on the constitutional viability of the new "supermax" prison form.[406] The trial court heard extensive testimony concerning the psychologically destructive potential of the extreme form of punitive segregation practiced at the prison, and it reached a series of extremely critical conclusions about the operation of the prison itself, including a number of sophisticated insights about the psychological dynamics prevailing inside the isolation units. However, the court stopped short of taking all of the direct steps necessary to reduce the widespread psychic pain suffered at the prison or to lessen the risks of long-term harm

---

401. 515 U.S. 472 (1995).
402. *Id.* at 484.
403. *Id.* at 486.
404. *Id.*
405. Young v. Quinlan, 960 F.2d 351 (1992).
406. Madrid v. Gomez, 889 F. Supp. 1146 (N.D. Cal. 1995).

for the great majority of prisoners housed there. To be sure, the court ordered the Pelican Bay SHU to modify a number of specific practices, such as the prevalent pattern of brutality, the "systematic deficiencies" in the provision of medical care,"[407] and the severe shortcomings in the level of mental health staffing needed to provide adequate psychological screening, monitoring, or treatment services. But prevailing legal doctrine precluded the court from significantly altering the general conditions of SHU confinement at the prison. Indeed, the court was unable to extend its otherwise complex and nuanced understanding of the psychological forces at work in a punitive segregation unit to the critical task of directly modifying the totality of conditions that adversely affected the great majority of prisoners who experienced them on a long-term basis.

The *Madrid* court acknowledged the prison's "tremendous potential for abuse," stemming in part from the guards' "nearly total control over the inmates under their supervision," as well as the fact that the physical environment at the prison "reinforces a sense of isolation and detachment from the outside world, and helps create a palpable distance from ordinary compunctions, inhibitions and community norms."[408] The findings of fact pointed to the "stark sterility and unremitting monotony" of the prison,[409] the fact that prisoners "can go weeks, months or potentially years with little or no opportunity for normal social contact with other people,"[410] and the fact that overall conditions in the units "may be harsher than necessary to accommodate the needs of the institution."[411]

Nonetheless, the court did not require the prison to alter or modify any of these general conditions. The opinion acknowledged that "[s]ocial science and clinical literature have consistently reported that when human beings are subjected to social isolation and reduced environmental stimulation, they may deteriorate mentally and in some cases develop psychiatric

---

407. *Id.* at 1210.

408. *Id.* at 1160. The court found that the use of excessive force had taken a variety of forms at the prison. This included breaking one prisoner's arm by bending it back through his tray slot, leaving prisoners "hog-tied" or in fetal restraints for hours at a time, placing "naked or partially dressed inmates in outdoor holding cages during inclement weather" where they were "exposed to the elements as well as public view," engaging in unnecessarily high numbers of "cell extractions" in which teams of guards employed prescribed procedures that the court characterized as "undeniably violent maneuver[s] which can involve several weapons, including 38 millimeter gas guns, tasers, short metal batons, and mace," and discharging firearms that were "used unnecessarily, and in some cases, recklessly" and sometimes with lethal consequences. *Id.* at 1171, 1172, 1179-80.

409. *Id.* at 1229.

410. *Id.*

411. *Id.* at 1263.

disturbances"[412] and found in the instant case that "many, if not most, inmates in the SHU experience some degree of psychological trauma in reaction to their extreme social isolation and the severely restricted environmental stimulation in the SHU."[413]

Yet, the court simultaneously ruled that although the conditions in the segregation units were "relatively extreme," the fact that "they do not have a uniform effect on all inmates"[414] led to the conclusion that "for many inmates, it does not appear that the degree of mental injury suffered significantly exceeds the kind of generalized psychological pain that courts have found compatible with 8th Amendment standards."[415] The operative formulation was this one:

> While a risk of a more serious [mental] injury is not non-existent, we are not persuaded, on the present record and given all the circumstances, that the risk of developing an injury to mental health of *sufficiently serious magnitude* due to current conditions in the SHU is high enough for the SHU population as a whole, to find that current conditions in the SHU are *per se* violative of the 8th Amendment with respect to all potential inmates.[416]

This conclusion was unexpected in light of the testimony given at trial but not in the context of prevailing legal precedent. The prison had produced no convincing evidence that the extreme harshness of this environment was necessary to further any legitimate penological purpose, and the court noted that on it had found none.[417] No evidence had been produced to indicate that psychological destructiveness of these conditions was limited only to those prisoners who previously had suffered from mental illness. To the contrary, the thrust of the expert testimony was that trauma of the sort that was being inflicted at the prison, and which the court acknowledged existed for "most" of the prisoners who endured it for longer than brief periods (virtually all of the prisoners housed in punitive segregation), was likely to have acutely painful effects that posed a significant risk of long-term damage.[418] Moreover, many prisoners reported symptoms that

---

412. *Id.* at 1230.

413. *Id.* at 1235. Later in the opinion the court seemed to go a step further: "[T]he record demonstrates that the conditions of extreme social isolation and reduced environmental stimulation found in the Pelican Bay SHU will likely inflict some degree of psychological trauma upon most inmates confined there for more than brief periods." *Id.* at 1265.

414. *Id.*

415. *Id.* In this context the court found that prisoners who were already mentally ill, those with borderline personality disorders, brain damage or mental retardation, impulse-ridden personalities and those with a history of prior psychiatric problems or chronic depression could not be constitutionally housed in these segregation units.

416. *Id.* (emphasis in original).

417. *Id.* at 1264 ("some of these conditions appear, at best, tenuously related to legitimate concerns").

418. The court's suggestion that Haney's study of psychological trauma and isolation-related psychopathology revealed that "the more severe symptoms are only experienced by

were not only indicative of a significant risk of future long-term damage but actually evidence that such damage had already occurred.

The *Madrid* opinion crystalizes the problematic state of the legal doctrine that now governs these issues. A federal court that had been courageous enough to consolidate prisoner complaints and, in essence, initiate the litigation, that had engaged in an unusually sophisticated psychological analysis of an especially elaborate factual record, and that documented adverse effects that were widespread and extreme, nevertheless was forced by existing law to articulate a standard of psychological harm that will be very difficult for future plaintiffs to meet. Admitting that conditions inside these units "may press the outer bound of what most humans can psychologically tolerate,"[419] the court found them legally tolerable because they did not create "a sufficiently high risk to *all* inmates of incurring a serious mental illness."[420] Unfortunately, this portion of the opinion could easily be misinterpreted to mean that no prison can be considered psychologically cruel and unusual unless it is highly likely to drive its prisoners crazy. Although it seems very doubtful that the court intended to articulate such a standard. Yet if consistently misapplied, this extraordinary threshold of cognizable Eighth Amendment psychic pain, limited to those things that create a high risk that everyone exposed to them will become seriously mentally ill, could legitimize virtually any form of degrading, inhumane, and psychologically abusive treatment in prison, no matter how extreme and otherwise harmful. This is because no known set of conditions, in prison or out, can create a high probability that everyone who experiences them will suffer serious mental illness as a result.[421] If this were to become the legal standard by which the psychological significance of the pains of supermax and solitary confinement were judged, it would be no standard at all.

---

a minority of the SHU population" was difficult to interpret in light of the record itself, in which very serious symptoms were reported by significant majorities of prisoners. *Id.* at 1235. Indeed, at one point the court referred to a finding that some 19% of prisoners who responded to a "control" question (i.e., something that was not identified as a symptom of psychological disturbance) as a "relatively high response," possibly indicative of some degree of overall exaggeration. On virtually every actual symptom, however, even on indices of severe psychopathology, the prisoners' response level was much higher—double or more—than the "high" response level to this control question. *Id.*

419. *Id.* at 1267; *see also id.* at 1280 ("Conditions in the SHU may well hover on the edge of what is humanly tolerable for those with normal resilience, particularly when endured for extended periods of time.").

420. *Id.* at 1267 (emphasis added). The court employed a different and more workable standard later in the opinion, when concluding that the prison had "cross[ed] the constitutional line" by forcing certain subgroups of prisoners to endure SHU conditions when it knew that "the likely consequence for such inmates is serious injury to their mental health." *Id.* at 1279.

421. It is important to acknowledge that the *Madrid* court did exempt certain categories of prisoners from placement in the Pelican Bay Security Housing Unit based on their pre-existing psychological state. Prisoners who were already mentally ill or who suffered from chronic depression, from brain damage, or from mental retardation were not to be exposed to the extreme SHU conditions because, as the judge put it, "[s]uch inmates are not required to endure the horrific suffering of a serious mental illness or a major exacerbation

Clearly, any realistic hope of developing meaningful protections for prisoners inside these specially designed "prisons of the future" rests on our ability to fashion standards more psychologically sensitive than those now being applied. Evolving standards of decency must be premised on advances in psychological knowledge as well as changing technological and penological norms. Even in this most recent opinion concerning Pelican Bay—one that seemed to grapple very seriously and thoughtfully with the psychological consequences of this new prison form—the implications of the large and consistent literature documenting the deleterious effects of solitary confinement, although seemingly fully appreciated, were not and could not be effectively brought to bear. Thus, in the spirit of applying existing knowledge to the development of badly needed standards, in the next section we propose a set of tentative guidelines by which conditions of confinement inside modern solitary and punitive segregation units can be more meaningfully regulated.

## IV.
## REGULATING THE USE OF SUPERMAX AND SOLITARY CONFINEMENT: TOWARD HUMANE LIMITS ON THE PAINS OF ISOLATION

Meaningful legal regulation must balance the legitimate interests of prison administrators to maintain institutional security and the physical safety of the line staff and prisoners against the interests of prisoners themselves to be free from unnecessarily cruel and psychologically harmful punishments. To do so, legal regulators must carefully and realistically examine the correctional goals that are achieved and the harms that are inflicted by the use of long-term solitary confinement and punitive segregation. The penological justification of solitary confinement cannot simply be assumed or accepted at the outset of this inquiry. Instead, it must be assessed by examining both the positive and negative impact on prisoner behavior and institutional functioning as well as the physical and psychological harm that results. Legal regulators cannot routinely react with largely unquestioning deference to claims by correctional administrators that solitary confinement is necessary to achieve legitimate penal goals without demanding persuasive evidence to corroborate these claims. Similarly, there is no legal or

---

of an existing mental illness before obtaining relief." *Id.* at 1265. Thus, about a year after its historic decision, the *Madrid* court ordered the state to remove prisoners meeting those diagnostic descriptions from the SHU, to implement plans for the screening and monitoring of the psychiatric condition of prisoners, and to create a special "Psychiatric Security Unit" to provide treatment for acutely disturbed SHU prisoners. Specifically *not* included in the removal order were prisoners suffering from the acute effects of isolation itself, sometimes called "reduced environmental stimulation syndrome," because the court had not found that "the risk of suffering a sufficiently serious degree of psychological trauma was high among all inmates to justify a presumptive exclusionary category based" on this syndrome alone. Madrid v. Gomez, No. C90-3094 (N.D. Cal. Dec. 15, 1995) (remedial order re: exclusion from Security Housing Unit), at 15-16.

*SOLITARY CONFINEMENT*

constitutional justification for narrowly focusing on physical rather than psychological standards of harm and mistreatment, even though judicial analyses of the effects of solitary confinement on prisoners ignored overwhelming evidence of psychological harm of the sort that we reviewed above. By underestimating the psychological pain and deterioration produced by these conditions and simultaneously accepting, often uncritically, the validity of penological justifications, the courts have given prisoners the worst of both worlds: they suffer untold pains inflicted without proven purpose.

For example, according to a recent study of the California prison system,[422] segregation policies adopted in California to deal with that state's gang problem not only have done little to reduce violence or to create a feeling of safety and security among prisoners but actually may have worsened the problem that they were intended to solve. Researchers report increased fear among prisoners—prison life in California is now seen as more "capricious and dangerous"[423]—and, paradoxically, gang activity has *increased* as gang members have been removed and housed in special "security housing units" throughout the system: "In other words, prison authorities' efforts to contain the spread of gangs led, unintentionally, to a vacuum within the prison population within which new prison groupings developed."[424] Prisoners must currently contend with the conflicting loyalties and alliances among some nine or ten different prison gangs in the California system rather than the four or five main gangs that previously operated. Moreover, the prison system's policy of inferring gang membership from what may reflect little more than prior neighborhood contact or acquaintance, combined with the increased level of uncertainty and fear among the prisoners themselves, mean that "gang membership has now become more automatic, especially for Chicanos."[425] Many interviewees expressed precisely the same feeling in Haney's[426] study of the state's harshest punitive segregation prison, Pelican Bay, where many of the suspected gang members have been sent. Prisoners reported having reacted to the official policy of housing them at certain mainline prisons based on the geographical locales in which they previously lived and the perceived high likelihood that they would be erroneously identified as gang members and suffer the negative consequences anyway. When added to the uncertainties of life in badly overcrowded prisons, these things led many prisoners to conclude that the prison administration had in essence given them no other choice but to join gangs.

---

422. Hunt et al., *supra* note 75.
423. *Id.* at 407.
424. *Id.* at 403.
425. *Id.* at 404-5.
426. Haney, *Infamous Punishment, supra* note 12.

A careful analysis of both the negative psychological effects of supermax and long-term solitary confinement and the absence of convincing evidence of its correctional benefits or rational justification leads us to conclude that these practices must be subjected to more searching legal monitoring and regulation. Toward that end, we propose a series of limiting standards that are rooted in the psychological literature and intended as the basis for a more effective, realistic, and psychologically meaningful oversight of solitary and supermax confinement. Like all frameworks for institutional oversight, this one will prove useful only if it is seen as programmatic (i.e., a starting point whose provision should be read as interconnected) and provisional (i.e., in continuous need of evaluation and revision). In general terms, we advocate mandatory screening and monitoring of prisoners placed in solitary confinement for psychiatric reactions, drastically limiting the maximum lengths of time prisoners can be kept in solitary confinement, and greatly improving the nature of the conditions to which prisoners are exposed while incarcerated under such a regime. Specifically:

Segregated prisoners must retain all of the fundamental constitutional rights and privileges afforded mainline prisoners.[427]

Adequate due process should be afforded all prisoners before transfer to disciplinary segregation, solitary, or supermax units, irrespective of the particular purpose that correctional officials ascribe to the transfer itself.[428]

---

427. The argument has been made that, to the degree that coercive mistreatment cannot be eliminated from the solitary confinement regime, the regime itself should be prohibited. For example, Don Foster has concluded that since legal safeguards in South Africa "have usually proved ineffective in protecting detainees from physical and psychological abuses," numerous reforms are required, including "[t]he abolition of solitary confinement and any other form of prescribed social isolation." FOSTER, DETENTION & TORTURE, *supra* note 97, at 178. Other researchers recommend that juvenile institution administrators "[e]liminate separate isolation units. They are a needless drain on the budget and personnel, undermine creative behavior programs, and increase the likelihood that isolation will be overused." Mitchell and Varley, *supra* note 140, at 254.

428. Our preceding discussion of the nature of solitary confinement established its substantial psychological risks. These risks do not vary as a function of the different purposes that correctional decision makers may have for placing a prisoner in such units. To protect prisoners' liberty interests in avoiding such potentially destructive experiences and to safeguard against the erroneous and unreliable placement of prisoners in these painful and sometimes damaging environments, prisoners should be afforded the due process protections first outlined by the United States Supreme Court in Wolff v. McDonnell, 418 U.S. 539 (1974), including advance notice of the violation and evidence and the right to a hearing or disciplinary proceeding that includes the opportunity to present witnesses and other evidence in a manner consistent with institutional security. This recommendation appears somewhat inconsistent with Sandin v. Conner, 515 U.S. 472 (1995), in which the Supreme Court recently decided that 30 days confinement in a Special Holding Unit (much like the generic punitive isolation units to which we have been referring) did not implicate liberty interests of the sort that would require *Wolff*-like due process. In reaching this result, however, the Court focused on whether the segregated confinement represented "a dramatic departure from the basic conditions" of the prisoners sentence, whether it was an "atypical, significant deprivation," and whether conditions in the special unit were similar to others, "even for inmates in the general population." *Id.* at 484 (footnote omitted). Indeed, there is

No prisoner should be kept in administrative segregation for longer than 10 days absent or pending a due process hearing to determine disciplinary segregation status.[429]

Except under truly extraordinary circumstances, segregation from mainline prisoners should be limited to no more than 2 years, irrespective of the nature of the disciplinary offense.[430]

---

nothing about the conditions of confinement in long-term punitive segregation that is "within the range of confinement to be normally expected" by maximum security prisoners. *Id.* at 485. It is worth noting, in this context, that four Justices filed two separate dissents arguing in essence that even a 30-day sentence in the prison segregation unit should trigger the full panoply of *Wolff* due process procedural protections. For example, Justices Breyer and Souter saw such confinement as "work[ing] a fairly major change" in the prisoner's conditions:

As a result of disciplinary segregation. . .Conner, for 30 days, had to spend his entire time alone in his cell (with the exception of 50 minutes each day on average for brief exercise and shower periods, during which he nonetheless remained isolated from other inmates and was constrained by leg irons and waist chains).

*Id.* at 488.

429. Administrative segregation often amounts to a kind of correctional "no man's land" in which prisoners are kept segregated and often isolated for reasons of administrative discretion and sometimes mere convenience or unspecified punitive purposes. On the other hand, it is not difficult to appreciate the legitimate uses to which immediate, short-term housing in such units can be put, such as housing vulnerable prisoners who are awaiting transfers to safer institutions, those who are suspected of serious disciplinary infractions who must be segregated pending a hearing, and so on. However, administrative segregation lends itself to abuse of discretion, precisely because of the often standardless nature of the decision-making process by which it is imposed and the sometimes indefinite length of the confinement itself. Indeed, it represents what one legal commentator has called "the most debilitating punishment the lawful prison has to offer. It is used to break the spirit of prisoners who look too proud or strong, and to settle scores between guards and prisoners that do not lend themselves easily to the factual proof required in disciplinary hearings." Jonathan A. Willens, *Structure, Content and the Exigencies of War: American Prison Law After Twenty-Five Years 1962-1987*, 37 AM. U. L. REV. 41, 129 (1987). Willens also observed: "[I]solation attacks the personality and long separation makes the prisoner a stranger in his community. If citizenship includes 1) a claim to be with people, and 2) a claim to be kept whole, then necessary discretion rejects half of the prisoner's citizenship." *Id.* at 130.

430. This provision should be read in conjunction with *all* subsequent ones, including those concerning access to programs and activities for prisoners confined to segregation for 90 days or longer. *See infra* note 438 and accompanying text. *Compare* AMERICAN CORRECTIONAL ASSOCIATION, MANUAL OF CORRECTIONAL STANDARDS 253 (1959):

Segregation for punishment should be for the shortest period that will accomplish the desired result of making the inmate amenable to discipline, and in any event not over thirty days. With most inmates and for most infractions a period of a few days proves sufficient. In other cases, a few days in punitive segregation followed by thirty to ninety days in administrative segregation, or in some other status that involves continued control or loss of privileges is sufficient. Excessively long periods for punishment defeat their own purpose by embittering and demoralizing the inmate. . . . For isolation and separate confinement, increased security arrangements imposed at the institutional level, these rules provide some discretion. Isolation is to be used only for major violations of disciplinary rules (or a persistent pattern of minor violations) and is limited to ten days rather than the current fifteen. The change follows trends in several states. Separate confinement may be imposed for disciplinary violations for periods of up to thirty days. It may also be used for protective custody.

No prisoner should be confined to segregated housing for indeterminate or indefinite terms.[431]

Conditions of total social isolation and extreme sensory deprivation (e.g., darkness) should be prohibited entirely.[432]

---

Nothing that has been learned since about the psychological consequences of solitary confinement or punitive segregation indicates that these nearly 40-year old guidelines are obsolete. However, they seem wildly out of synch with contemporary practices in which prisoners are confined to segregation for many years. We propose a two-year limit as a compromise between earlier, saner standards and the extraordinary and dangerous practices to which American corrections has become accustomed. *See also* Mitchell and Varley, *supra* note 140 at 254 (recommending much more stringent limits for juveniles). They also recommend that administrators "[p]lace a firm upper time limit on isolation. A 24-hour upper limit is more than sufficient. One of the facilities the authors consulted found a 5-hour limit workable, and judges who enjoin facilities from overusing isolation tend to impose limits in the range of 2 to 5 hours." *Id.* at 254 (reference omitted). *Cf.* Lollis v. New York State Department of Social Services, 322 F. Supp. 473, 482 (S.D.N.Y. 1970): "Measured by the standards of the Eighth Amendment cases . . . [and] the views of experts in the field of adolescent psychology . . . a two-week confinement of a fourteen-year old girl in a stripped room in night clothes with no recreational facilities or even reading matter must be held to violate the Constitution's ban on cruel and unusual punishment." *Id. Compare* Adams v. Carlson, 488 F.2d 619,628 (7th Cir. 1973) (segregation "should not exceed a few months, if that long"). The *Adams* court cited state statutes limiting punitive segregation to approximately one month:

> Several states place a statutory maximum on the time for which a prisoner may be segregated, including Missouri, Ann.Mo. Stats. § 216.455(1) (1962) (ten days), New Hampshire, N.H.Rev.Stats.Ann. § 622:14 (1955) (thirty days), and Tennessee, Tenn. Code Ann. § 41-707 (1955) (thirty days). *Id.* at 628 n. 14. Note, in addition, the regulations of the Texas Department of Corrections referred to in Novak v. Beto, 453 F.2d 661, 667 (5th Cir. 1971) (fifteen days maximum), and those of the Department of Corrections, District of Columbia, cited in Fulwood v. Clemmer, 206 F. Supp. 370, 378 n. 29 (D.D.C. 1962) (fifteen days maximum).

431. Indeterminate terms can result in the kind of abuses the *Madrid* court described but did not prohibit:

> [A]n inmate who was validated [as a gang member] in 1979, but has not engaged in any gang activity or otherwise associated with gang members since then will still be retained in the SHU in 1994, fifteen years later, absent a successful debriefing [in which he must provide incriminating information about other gang members]. The lack of continuing evidence of gang membership or activity is simply considered irrelevant since the justification for administrative segregation is the fact of gang membership itself, not any particular behavior or activity.

*Madrid*, 889 F.Supp. at 1273.

Yet, California state law provides: "Release from segregation status shall occur at the earliest possible time in keeping with the circumstances and reasons for the inmate's initial placement in administrative segregation. . . ." CAL. CODE REGS. tit. 15 § 3339(a) (1994). This contrast underscores the need for specific time limits rather than vague phrases such as "earliest possible time" whose ambiguity makes them impossible to enforce.

432. Such conditions serve no penological purpose and expose prisoners to serious risks of psychopathological reactions. Consistent with this prohibition, Judge McMillan's graduated scale of time limits reflects similar concerns. *See* Berch v. Stahl, 373 F. Supp. 412, 420-1 (W.D.N.C. 1974) ("The court rules that the following types of confinement, when utilized as punitive measures in this jail, violate the Eighth Amendment prohibition against cruel and unusual punishment: (i) Confinement in the 'box' for periods longer than twenty-four (24) hours; (ii) Confinement in the solid-door solitary confinement cells for periods longer than fifteen (15) days; (iii) Confinement in the barred-door solitary confinement cells

Complete social isolation and restricted movement that precludes social interaction should not exceed 30 days in duration for any prisoners.[433]

Prisoners should not be placed in disciplinary segregation when the infraction for which they are being punished was the result of pre-existing psychiatric disorders, mental illness, or developmental disability.[434]

Segregated prisoners should be screened in advance of supermax or solitary confinement and those whose psychological and medical conditions would render them significantly more susceptible to the potentially harmful consequences of the experience should be precluded from it.[435]

Prison mental health staff should be required to articulate explicit diagnostic procedures for screening prisoners who are to be placed in solitary, and to specify the diagnostic criteria that would disqualify prisoners for such confinement.[436]

---

for periods longer than thirty (30) days; and (iv) Depriving an inmate of the clothing necessary for warmth and modesty.").

433. *Cf.* Benjamin & Lux, *Solitary Confinement, supra* note 71, at 284 ("Unless we feel that persons in 'administrative segregation' *should* become hostile, mentally ill and dehumanized the only possible solution is to give *all* prisoners, whatever their label, maximum human contact and a variety of perceptual stimuli. This can only be done by abolishing solitary confinement as we know it, or by limiting a person's stay in solitary until he or she calms down, but in no event for more than a few hours."). Even John Howard, the English prison reformer commonly regarded as having contributed to the early development of solitary confinement in English prisons, understood that long terms of unbroken isolation could lead prisoners to "insensibility or despair," JACKSON, *supra* note 19, at 15. The Center for Criminal Justice proposed a 30 day limitation on punitive segregation and a 60 day limitation on administrative segregation. SHELDON KRANTZ ET AL., MODEL RULES AND REGULATIONS ON PRISONERS' RIGHTS AND RESPONSIBILITIES 182 (1973).

434. The placement of mentally ill and developmentally disabled prisoners in segregation for behavioral problems that are the product of their psychiatric condition or cognitive impairments rather than a culpable disregard of institutional rules is a serious and potentially widespread problem. Indeed, since studies indicate that between 8 and 25% of US prisoners suffer from some form of serious psychiatric disorder, there is much potential for mistake and abuse. A number of commentators have discussed the manifest unfairness of placing psychiatrically impaired prisoners in punitive segregation, where they not only will be punished for their mental illness but also usually receive significantly worse, if any, psychiatric treatment and care. Simultaneously, these inmates are exposed to conditions that are likely to exacerbate their disorder. Hans Toch, *The Disturbed Disruptive Inmate: Where Does the Bus Stop?* 10 J. PSYCH. & L. 327 (1982); Marilyn D. McShane, *The Bus Stop Revisited: Discipline and Psychiatric Patients in Prison,* 17 J. PSYCH. & L. 413 (1989); W. Rold, *Considerations of Mental Health Factors in Inmate Discipline,* 11 J. PRISON & JAIL HEALTH 41 (1992). Consistent with these concerns, the Texas Department of Corrections regulations require a psychiatric team to determine whether a prisoner's "mental status precludes participation in the disciplinary process," whether the mental status "contributed to the alleged disciplinary offense," and whether the mental status "contraindicates any particular form of punishment (e.g., confinement in punitive segregation)." Rold, *supra* at 47.

435. For example, under new policies implemented in 1990, the procedures for entry into Canadian "Special Handling Units" include "a 90-day assessment period" which includes "psychological and psychiatric evaluations and assessments and assessments of the prisoner's educational level." Rosemary L. O'Brien, *Special Handling Units,* F. ON CORRECTIONS RES., Sep. 1992, at 11.

436. As noted the *Madrid* court identified three such groups of prisoners: 1.) "the already mentally ill," 2.) "persons with borderline personality disorders, brain damage or mental retardation, [and] impulse-ridden personalities," and 3.) those with "a history of

Those prisoners who are unfit for segregated housing should not be confined in it at all. Alternative facilities to house and care for such prisoners should be created by prison administrations.[437]

Prisoners housed in segregation should be regularly and carefully monitored by correctional, medical, and mental health staff to detect adverse reactions to segregated confinement. Mental health staff should be present in solitary confinement units a minimum of one hour per month for every two prisoners housed there. All prisoners should be seen by mental health staff no less than once every month for evaluation as to fitness for segregated housing.[438]

Prisoners in segregated housing for longer than three months should be offered the same kinds of activities as those in mainline prison units, albeit on a modified or reduced basis consistent with security concerns, including access to therapy, work, educational, and recreational programs.[439]

---

prior psychiatric problems or chronic depression." *Madrid*, 889 F.Supp. at 1265. This represents an important starting point from which additional and more precise definitions of specialized vulnerabilities to punitive isolation might be developed. Prisoners who do not fall into *Madrid's* general categories nonetheless should be evaluated for such particularized vulnerabilities and excluded if any are detected. There has been an understandably large investment in assessing the "risk" that prisoners will engage in subsequent problematic behavior while in prison or once released. *See* D.A. Clark et al., *A New Methodology for Assessing the Level of Risk in Incarcerated Offenders*, 33 BRIT. J. CRIMINOL. 436 (1993) and references cited therein. We should begin to make similar attempts to assess the risks that prisoners will be psychologically damaged by extreme conditions of confinement, especially since, for some, such damage will be related to subsequent problematic behavior that may include disciplinary infractions and criminality.

437. There are a number of effective models for the provision of mental health services to prisoners who suffer from psychological disturbances and disorders. *See* James R.P. Ogloff et al., *Mental Health Services in Jails and Prisons: Legal, Clinical, and Policy Issues*, 18 L. & PSYCHOL. REV. 109 (1994).

438. According to David Ward, the Minnesota correctional system requires "that inmates in the Control Unit be periodically rotated into the Mental Health Unit for observation and a change of physical environment, as well as for a period of relief from nearby inmates and staff." Ward, *supra* note 11 at 91. Indeed, one of the leading apologists for solitary confinement, Peter Suedfeld, once stressed the importance of using it only in non-punitive, therapeutic ways. According to him this would include explaining the nature and duration of the experience in advance to the prisoner, and implementing the confinement under carefully controlled conditions with close monitoring for any negative effects. He acknowledged that because solitary confinement traditionally has been used in ineffectual and unethical ways, any prisoner who rejected the technique should not be forced to endure it. Suedfeld also has been quoted as having testified in a case concerning the effects of solitary confinement in Canadian prisons that: "I would expect that for many people after some prolonged period of time, especially if there is no hope of being released from that environment, things would tend to become inadequate and an individual would then take on another form of reaction to the environment. That may take place in the form of apathy, fantasizing, general withdrawal from the external environment, some kind of inner life, and in some cases, I expect it would lead to psychosis." Jackson, *supra* note 19, at 79.

439. The new Canadian SHU policy includes "the integration of essential components in programming, including psychiatric intervention, employment opportunities," as well as "the promotion of staff-inmate interaction and fewer physical controls so that the correctional environment will be conducive to inmates changing their behaviour." O'Brien, *supra* note 433. Indeed, if the goal of segregation is redefined to include the proactive promotion

Whenever possible, activities of this sort should not be precluded for those housed in short term solitary confinement terms of three months or less.[440]

Visitation should be offered to segregated prisoners on a basis that resembles mainline visiting as closely as security considerations will allow.[441]

No prisoner should be subjected to punitive segregation solely on the basis of alleged or documented gang membership in the absence of behavioral infractions.[442]

---

of prisoners' return to mainline maximum security housing, then it may need to include specialized or enriched programming.

440. Studies of long-term prisoners indicate that those who are able to work and maintain involvement in other activities and are able to continue contact with the outside world improve in their overall adaptation to prison and decrease "dysphoric" emotional states and stress-related medical problems. *See, e.g.,* Edward Zamble, *Behavior and Adaptation in Long-Term Prison Inmates: Descriptive and Longitudinal Results,* 19 CRIM. JUST. & BEHAV. 409 (1992) (stating that punitive segregation should not be structured and implemented in such a way that it interferes with a prisoner's long-term adaptation to prison).

441. Cooke noted that the liberal visitation policy allowed prisoners to "develop or reestablish close affectional bonds with families or friends," something that was especially important since:

> Many of the prisoners have spent most of their adult lives in penal establishments; the availability of visitors often provides them with the opportunity to learn—for the first time—how to form close adult relationships outside prison. These relationships give them interests which are outside the prison culture and hopefully outside the criminal culture. Finally, the visiting privilege is so important to prisoners that the threat of its loss acts as a powerful control, and can by used by the community as a sanction against bad behaviour.

Cooke, *supra* note 254, at 140-41.

Others have acknowledged the importance of visitation in helping prisoners shed their prison identities. *E.g.,* Thomas Schmid & Richard Jones, *Suspended Identity: Identity Transformation in a Maximum Security Prison,* 14 SYMBOLIC INTERACTION 415, 427 (1991) ("Reaffirmations of his preprison identity by outsiders—visits and furloughs during which others interact with him as if he has not changed—provide powerful support for his efforts to revive his suspended identity."). Persons housed in segregated or isolated environments who have been denied the opportunity for meaningful social interaction in prison are especially in need of outside contact that either affirms their pre-prison identity or encourages them to fashion a post-prison identity that will facilitate their free world adjustment.

442. Gang membership constitutes a "status offense" of the sort that is highly disfavored in other legal contexts. Moreover, the unreliability of administrative decisions to classify someone as a gang member or affiliate increases concern over the unfairness of such status-based placements in supermax and solitary confinement. *See generally,* Tachiki, *supra* note 76. "[G]ang affiliation, in and of itself, should not be constitutionally sufficient to justify the transfer of a prisoner to the SHU. Instead, the procedures for segregating a prison gang member should require evidence of some other kind of infraction, especially those types of infractions normally committed by prison gangs." *Id.* at 1120 (footnote omitted). As one person appointed to monitor the implementation of court orders in an earlier case involving California's punitive segregation units observed: "[G]ang membership. . .is inherently virtually impossible to ascertain or discover with precision. The gang's only tangible existence is in the minds of the prisoners and prison officials." Third Special Report of the Monitor, Toussaint v. Rowland, 711 F.Supp. 536 (N.D. Cal. 1989), at 22. These sources of unreliability are insurmountable. Because of the sub rosa nature of prison gang membership and activity, the identification of alleged gang connections traditionally has been based on the word of so-called "confidential informants," persons who provide information to prison officials usually in order to obtain favorable treatment for themselves. The potential for

Staff members who work in punitive segregation units should be given specialized training that addresses the unique psychological stresses that such environments have for prisoners and guards alike, including in-depth instruction in recognizing and responding to signs of psychological trauma and the psychopathological effects of such isolation.

Staff members who work in punitive segregation units should be monitored for the use of excessive force, removed from such assignments whenever their behavior begins to deteriorate in the face of the pressures of these working conditions, and periodically rotated out of these units to ensure that they maintain a broader perspective on prisoner behavior and the range of potential relationships between staff and inmates.[443]

## CONCLUSION

The recent trend toward increased use of supermax and solitary confinement is dangerously ill-conceived. It ignores or contravenes a diverse and robust empirical literature that has consistently documented the psychologically destructive effects of prolonged extreme idleness and social deprivation. Solitary confinement and punitive isolation take the pains of imprisonment and intensify them, demonstrating little regard for the long-term psychological consequences to prisoners. Commentators who have

---

abuse and the widespread perceptions of unfairness that accompany this process underscore its unreliability and problematic effects. For instance, the misuse of a system like this appeared to be at the root of the New Mexico Penitentiary prison riot at Santa Fe in 1980, perhaps the worst in United States corrections history. *Cf.* Useem, *supra* note 247. In addition, interviews conducted with prisoners in California confirm the current potential for abuse. Interviewers reported that many of the inmates they spoke to regarded these policies as "particularly unfair because it meant that a prisoner could be identified as a gang member and 'jacketed' purely on the basis of information from a confidential informant." Hunt et al., *supra* note 75, at 401. Prisoners who are identified in this way and who are placed in punitive segregation as a result must provide incriminating evidence on others, in what is euphemistically referred to as "debriefing," before they have any hope of being released. Thus, there are powerful incentives that encourage prisoners to volunteer information about each other, without effective quality controls to prevent erroneous or unreliable information from being offered. Because prison officials have no way of knowing whether prisoners are providing accurate information, they cannot and do not screen out or ignore "inaccurate" information or sanction prisoners who offer it.

443. The unique conditions that are created in supermax and solitary confinement lend themselves to abusive mistreatment and the use of excessive force. These units are often built in isolated locations, free from outside scrutiny or the moderating influence of a diverse surrounding community. Staff members have far greater control over prisoners in these units than anywhere else in the prison system. Institutional procedures and routines ensure that staff members will never interact with prisoners on even remotely normal bases or observe them behaving in other than highly constrained, unnatural ways under deprived and desperate circumstances. The tension that pervades supermax and solitary confinement creates the potential for self-fulfilling prophecies in which the staff inadvertently elicits provocative behavior from prisoners (and vice versa), so that confrontations become more likely. On the power of prison roles and situations to dramatically shape the behavior of prison actors, *see* Haney et al., *supra* note 80; Haney & Zimbardo, *Socialization, supra* note 80. *Compare supra* note 406 and accompanying text for the perceptive observations made by the *Madrid* court on precisely these issues.

suggested that there is little or no evidence of the damaging effects of solitary confinement[444] or that the topic "is addressed more as an emotional issue than an empirical one"[445] simply cannot have looked closely and systematically at the empirical record. Although there may be times when the segregation of prisoners from the rest of the population is justified in terms of prison management and violence control, significant deprivations beyond the fact of separation itself cannot be justified on a long-term basis. No convincing evidence has been produced to demonstrate that such policies achieve any lasting positive benefits for the prison systems that employ them. The resulting long-term personal, penal, and social consequences appear to outweigh whatever motives prison administrators may have for seeking new and inventive ways to punish disruptive prisoners.

The distinctive psychological components of the experience of solitary confinement combine and interact creating a whole that is potentially more destructive than the sum of its parts are also independently and separately harmful. Thus, supermax and solitary confinement impose significant and intense restrictions on movement and activity (i.e., prisoners in solitary and punitive isolation are denied the opportunity to move about and engage in meaningful programs in the course of their specialized confinement and, therefore, endure unheard of levels of enforced idleness). Many of the same prisoners suffer drastically limited spatial confinement so that even when prisoners are living alone they are "crowded" in an admittedly unconventional sense and, when housed with another, they are paradoxically both "isolated" and "overcrowded." In addition, they are subjected to the painful and psychologically destructive deprivation of normal social contact and interaction (i.e., lockup prisoners are often prohibited from interacting with other prisoners, staff, and visitors in ways that allow them to have meaningful human contact, maintain social skills, and preserve pre-existing social identities and relationships). And, finally, they are immersed in an atmosphere of negative affect and hostility that comes both from the stigma of such confinement and its heightened potential for mistreatment and abuse. As we have shown, the combination of these separate components produces a harmful psychological mix in supermax and solitary confinement, one whose destructive potential has been empirically well-documented.

In addition, supermax and solitary confinement pose politically and legally unexamined risks that extend beyond the prison walls. Prolonged punitive segregation compels many prisoners to develop habits of survival that may be difficult if not impossible to relinquish once they are released into either the mainline prison population or the free world. Some prisoners will lose the ability to initiate behavior or impose internal organization on their daily routines, jeopardizing their chances for productive post-

---

444. *See, supra* note 93 and references cited therein.
445. Rogers, *supra* note 93, at 341.

prison adjustment. Others will suffer the loss of emotional control and experience increased bouts of impulsive anger that may precipitate future disciplinary infractions, parole violations, and subsequent offenses. Some prisoners will be disabled by the decreased memory and concentration that accompanies extended isolation. Chronic anxiety and the fear of impending breakdowns and other common reactions to solitary confinement will be debilitating for those prisoners in whom they persist. The fear of social interaction and personal intimacy, the loss of the basic ability to interact comfortably with others, and the breakdown of social and familial ties that occur in supermax and solitary confinement are equally problematic, dysfunctional and threaten already disadvantaged ex-convicts with additional handicaps. In addition, chronically isolated prisoners who suffer the long-lasting effects of PTSD may be plagued by recurring symptoms months or years after their experience in solitary confinement. In more extreme cases, prisoners who become psychotic or suicidal while housed under these severe circumstances may cross into dangerous psychological territory from which it will be impossible to return.

At more mundane levels, isolated prisoners spend years in what amounts to a kind of socioeconomic and interpersonal suspended animation, lacking any opportunities to obtain job training, improve educational levels, or to address through counseling, anger management, or violence reduction programs any of the personal problems that may have contributed to their initial placement in these punishment units. Others, finding themselves surrounded by gang members, with few alternative outlets and no opportunities to connect to new or different groups of people, may initiate or intensify their involvement in prison gangs.

Whether or not such confinement is permanently disabling for all prisoners exposed to it, there can be little doubt about not only its capacity to inflict widespread psychological pain but also its potential to significantly undermine already tenuous chances for subsequent adjustment. Indeed, it is difficult to imagine realistic scenarios whereby such long-term solitary confinement will not worsen a prisoner's odds of future successful adjustment, in prison or anywhere else. The fact that solitary and supermax confinement is increasingly reserved for minority prisoners seems to reveal a pattern of punitive social control that selectively targets some groups and not others.[446] By design or not, it also ensures that a significant number of young, minority men will be functionally excluded from living socially productive lives. Vast numbers of minority prisoners, particularly, are thus consigned to life on the margins, in part because of the way they have been treated in prison.

During the mid-1970s, an official Canadian "study group on dissociation" evaluated that country's solitary confinement policy. The so-called Vantour Report observed that while "the most severe hardship for most

---

446. For example, see notes 76-79, *supra*, and accompanying text.

inmates is the deprivation of association," the "ultimate goal of the criminal justice system is the reintegration of the offender into the community— adjustment to life outside of the prison—and the basic fact of life is association."[447] In much earlier times, other observers saw and wrote about different aspects of extremely harsh and lengthy periods of punitive isolation. Charles Dickens was shocked at the long-term solitary confinement he saw in the United States, and described his reactions to it in his *American Notes*:

> I believe that very few men are capable of estimating the immense amount of torture and agony which this dreadful punishment, prolonged for years, inflicts upon the sufferers; and in guessing at it myself, and from what I have seen written upon their faces, from what to my certain knowledge they feel within, I am only the more convinced that there is a depth of terrible endurance in it which none of the sufferers themselves can fathom, and which no man has a right to inflict upon his fellow creatures.[448]

Aside from the politically expedient manipulation of public opinion that has occurred over the last several decades to intensify a rampant "rage to punish,"[449] no new data have emerged, no penetrating insights have been developed, and no thoughtful perspectives have surfaced to challenge the wisdom of these earlier observations.

Yet, we appear to have come full circle on the issue of solitary confinement, with the emerging supermax prison form putting a technological spin on an old and long-discredited idea. The "evolving standards of decency" that not only mark the progress of a maturing society but also provide the benchmark against which cruel and unusual punishments are to be measured have taken an unexpected turn over the last several decades. The politicization of punishment during this period has hastened the translation of popular fear and distrust into extraordinarily punitive crime control policies.[450] This process has been facilitated by the mass media's willingness to pander to what has become a national obsession with crime-related issues and to present an often superficial and one-sided view of the problem. Along with the rise of a punishment industry that wields substantial political as well as economic power, these forces have appeared to "normalize" the most extreme forms of punishment and compromised the Eighth Amendment's ability "to acquire meaning as public opinion becomes enlightened by humane justice."[451]

---

447. VANTOUR, *supra* note 278, at 29.

448. CHARLES DICKENS, AMERICAN NOTES FOR GENERAL CIRCULATION 119-20 (1842).

449. FORER, *supra* note 394.

450. *See* Haney, *Riding the Punishment Wave*, *supra* note 73.

451. Weems v. United States, 217 U.S. 349, 378 (1910).

The entire scale of punishment has shifted; what was regarded as unacceptable just a few decades ago is now seen as part of the normative given in the delivery of penal pain. Supermax and the increased use of solitary confinement are important, terribly problematic by-products of these broader trends. Ironically, absent more meaningful, psychologically-informed legal restraints, intervention, and oversight, these "prisons of the future" promise to return us to some of the worst norms of the nineteenth century.

# Mental Health Issues in Long-Term Solitary and "Supermax" Confinement

## Craig Haney

*This article discusses the recent increase in the use of solitary-like confinement, especially the rise of so-called supermax prisons and the special mental health issues and challenges they pose. After briefly discussing the nature of these specialized and increasingly widespread units and the forces that have given rise to them, the article reviews some of the unique mental-health-related issues they present, including the large literature that exists on the negative psychological effects of isolation and the unusually high percentage of mentally ill prisoners who are confined there. It ends with a brief discussion of recent caselaw that addresses some of these mental health issues and suggests that the courts, though in some ways appropriately solicitous of the plight of mentally ill supermax prisoners, have overlooked some of the broader psychological problems these units create.*

*Keywords: supermax; solitary confinement; effects of imprisonment*

The field of corrections is arguably impervious to much truly significant change. Of all of the institutions in our society, prisons retain the greatest similarity to their early 19th century form. Indeed, until relatively recently, more than a few prisoners were housed in facilities that had been constructed a half century or more ago. Although there have been advances in the methods by which correctional regimes approach the task of changing or rehabilitating prisoners, and a number of improvements made in overall conditions of confinement compared to the 19th century (often brought about by litigation compelling prison systems to modernize and improve), many of the basic facts of prison life have remained relatively constant. Notwithstanding increased sophistication in the technology of incarcerative social control, and the waxing and waning in popularity of one or another kind of prison treatment program, the argument that there has been nothing fundamentally new on the correctional landscape for many years would be difficult to refute.

However, in this article, I suggest that the last decade of the 20th century did see the rise of a new penal form—the so-called supermax prison. Increasing numbers of prisoners now are being housed in a new form of

CRAIG HANEY: University of California, Santa Cruz.

CRIME & DELINQUENCY, Vol. 49 No. 1, January 2003 124-156
DOI: 10.1177/0011128702239239
© 2003 Sage Publications

solitary or isolated confinement that, although it resembles the kind of punitive segregation that has been in use since the inception of the prison, has a number of unique features.[1] At the start of the 1990s, Human Rights Watch (1991) identified the rise of supermax prisons as "perhaps the most troubling" human rights trend in U.S. corrections and estimated that some 36 states either had completed or were in the process of creating some kind of "super maximum" prison facility. By the end of the decade, the same organization estimated that there were approximately 20,000 prisoners confined to supermax-type units in the United States (Human Rights Watch, 2000) and expressed even more pointed concerns about their human rights implications. Because most experts agree that the use of such units has increased significantly since then, it is likely that the number of persons currently housed in supermax prisons is considerably higher.

There are few if any forms of imprisonment that appear to produce so much psychological trauma and in which so many symptoms of psychopathology are manifested. Thus, the mental health implications of these units are potentially very significant. Despite the slight (and sometimes not so slight) variations in the ways different state prison systems approach this most restrictive form of confinement, supermax prisons have enough in common to permit some generalizations about what they are, why they have come about, what special mental health issues they raise, and how they might be regulated and reformed to minimize some of the special risks they pose. I will try to address each of these issues in turn in the pages that follow.

## SUPERMAX CONDITIONS OF CONFINEMENT

Supermax confinement represents a significant variation in the long-standing practice of placing prisoners in what is known as solitary confinement or punitive segregation. For practical as well as humanitarian reasons, prisoners have rarely been confined in literal or complete solitary confinement.[2] But prisoners in solitary or isolation have always been physically segregated from the rest of the prison population and typically excluded from much of the normal programming, routines, opportunities, and collective activities available in the mainline institution. By the late 19th century, most jurisdictions in the United States had, for the most part, restricted solitary confinement to relatively brief periods of punishment that were imposed in response to specified infractions of prison rules.[3]

In contrast to this traditional form of isolation, supermax differs in several important ways—primarily the totality of the isolation, the intended duration of the confinement, the reasons for which it is imposed, and the technological

sophistication with which it is achieved. In particular, supermax prisons house prisoners in virtual isolation and subject them to almost complete idleness for extremely long periods of time. Supermax prisoners rarely leave their cells. In most such units, an hour a day of out-of-cell time is the norm. They eat all of their meals alone in the cells, and typically no group or social activity of any kind is permitted.[4]

When prisoners in these units are escorted outside their cells or beyond their housing units, they typically are first placed in restraints—chained while still inside their cells (through a food port or tray slot on the cell door)—and sometimes tethered to a leash that is held by an escort officer. They are rarely if ever in the presence of another person (including physicians and psychotherapists) without being in multiple forms of physical restraints (e.g., ankle chains, belly or waist chains, handcuffs). Supermax prisoners often incur severe restrictions on the nature and amounts of personal property they may possess and on their access to the prison library, legal materials, and canteen. Their brief periods of outdoor exercise or so-called yard time typically take place in caged-in or cement-walled areas that are so constraining they are often referred to as "dog runs." In some units, prisoners get no more than a glimpse of overhead sky or whatever terrain can be seen through the tight security screens that surround their exercise pens.

Supermax prisoners are often monitored by camera and converse through intercoms rather than through direct contact with correctional officers. In newer facilities, computerized locking and tracking systems allow their movement to be regulated with a minimum of human interaction (or none at all). Some supermax units conduct visits through videoconferencing equipment rather than in person; there is no immediate face-to-face interaction (let alone physical contact), even with loved ones who may have traveled great distances to see them. In addition to "video visits," some facilities employ "tele-medicine" and "tele-psychiatry" procedures in which prisoners' medical and psychological needs are addressed by staff members who "examine" them and "interact" with them over television screens from locations many miles away.

Supermax prisons routinely keep prisoners in this near-total isolation and restraint for periods of time that, until recently, were unprecedented in modern corrections. Unlike more traditional forms of solitary confinement in which prisoners typically are isolated for relatively brief periods of time as punishment for specific disciplinary infractions, supermax prisoners may be kept under these conditions for years on end. Indeed, many correctional systems impose supermax confinement as part of a long-term strategy of correctional management and control rather than as an immediate sanction for discrete rule violations.

In fact, many prisoners are placed in supermax not specifically for what they have done but rather on the basis of who someone in authority has judged them to be (e.g., "dangerous," "a threat," or a member of a "disruptive" group). In many states, the majority of supermax prisoners have been given so-called indeterminate terms, usually on the basis of having been officially labeled by prison officials as gang members. An indeterminate supermax term often means that these prisoners will serve their entire prison term in isolation (unless they debrief by providing incriminating information about other alleged gang members).[5] Prisoners in these units may complete their prison sentence while still confined in supermax and be released directly back into the community. If and when they are returned to prison on a parole violation or subsequent conviction, they are likely to be sent immediately back to supermax because of their previous status as a supermax prisoner.

To summarize: prisoners in these units live almost entirely within the confines of a 60- to 80-square-foot cell, can exist for many years separated from the natural world around them and removed from the natural rhythms of social life, are denied access to vocational or educational training programs or other meaningful activities in which to engage, get out of their cells no more than a few hours a week, are under virtually constant surveillance and monitoring, are rarely if ever in the presence of another person without being heavily chained and restrained, have no opportunities for normal conversation or social interaction, and are denied the opportunity to ever touch another human being with affection or caring or to receive such affection or caring themselves. Because supermax units typically meld sophisticated modern technology with the age-old practice of solitary confinement, prisoners experience levels of isolation and behavioral control that are more total and complete and literally dehumanized than has been possible in the past. The combination of these factors is what makes this extraordinary and extreme form of imprisonment unique in the modern history of corrections. Its emergence in a society that prides itself on abiding "evolving standards of decency" (*Trop v. Dulles*, 1958) to regulate its systems of punishment requires some explanation.

## THE ORIGINS OF THE MODERN SUPERMAX

Two important trends in modern American corrections help to account for the creation of this new penal form. The first is the unprecedented growth in the prison population that started in the mid-1970s and continued into the early years of the 21st century. The rate of incarceration in the United States (adjusting for any increases in overall population) remained stable over the

50-year period from 1925 to 1975. Remarkably, it then quintupled over the next 25-year period. Most state prison systems doubled in size and then doubled again during this period, with no commensurate increase in the resources devoted to corrections in general or to programming and mental health services in particular (Haney & Zimbardo, 1998).

This dramatic influx of prisoners—and the overcrowding crisis it produced—occurred at approximately the same time that another important change was underway. In the mid-1970s, the United States formally abandoned its commitment to the rehabilitative ideals that had guided its prison policy for decades. Often at the insistence of the politicians who funded their prison systems, correctional administrators embraced a new philosophy built on the notion that incarceration was intended to inflict punishment and little else. The mandate to provide educational, vocational, and therapeutic programming in the name of rehabilitation ended at an especially inopportune time (Haney, 1997). Prisons throughout the country were filled to capacity and beyond, and the prisoners who were crowded inside had few opportunities to engage in productive activities or to receive help for preexisting psychological or other problems.

Under these conditions of unprecedented overcrowding and unheard of levels of idleness, prison administrators lacked positive incentives to manage the inevitable tensions and conflicts that festered behind the walls. In systems whose raison d'être was punishment, it was not surprising that correctional officials turned to punitive mechanisms in the hope of buttressing increasingly tenuous institutional controls. Of course, disciplinary infractions often were met with increasing levels of punishment in the modern American prison, even before these trends were set in motion. But the magnitude of the problem faced by correctional administrators in the 1980s pushed their response to an unprecedented level. Supermax prisons emerged in this context—seized on as a technologically enhanced tightening screw on the pressure cooker-like atmosphere that had been created inside many prison systems in the United States. As the pressure from overcrowding and idleness increased, the screw was turned ever tighter.

Historically, correctional polices often harden in times of prison crisis. But once the problem causing the increased tension or turmoil has been identified and resolved, the punitive response typically de-escalates, sometimes leading to even more hospitable conditions and treatment. Unfortunately, the prison overcrowding problem did not subside during the 1980s and 1990s, and the continued punitive atmosphere that marked this period meant that corrections officials were in no position look "soft" in the face of the crisis.

The politics of the era deprived prison administrators of alternative approaches and guaranteed a one-way ratcheting up of punishment in the face of these tensions. They became increasingly committed to more forcibly subduing prisoners whose behavior was problematic ("a threat to the safety and security of the institution"), taking fewer chances with others whom they suspected might be a problem, and set about intimidating everyone else who might be thinking about causing disruption. Supermax simultaneously provided politicians with another stark symbol to confirm their commitment to tough-on-crime policies (Riveland, 1999) and gave prison officials a way of making essentially the same statement behind the walls.

I belabor this recent correctional history to debunk several myths that surround the rise of the supermax prison form. This new kind of prison did not originate as a necessary or inevitable response or backlash to some sort of "permissive" correctional atmosphere that allegedly prevailed in the 1960s, as some who defend the recent punitive trends in imprisonment have suggested (cf. O'Brien & Jones, 1999). It was not a badly needed corrective to liberal prison policies or to previous capitulations to the prisoners' rights movement. Quite the opposite. Supermaxes began in response to the overcrowded and punitive 1980s and came into fruition in the even more overcrowded and more punitive 1990s. They are in many ways the logical extension of a system founded on the narrow premise that the only appropriate response to misbehavior is increased punishment.

In addition, there is no evidence that the rise of supermax prisons was driven by the threat of some new breed of criminal or prisoner. The natural human tendency to individualize, dispositionalize, and sometimes even to demonize problematic behavior, and to ignore the contextual forces that help create it, is intensified in prison systems as perhaps nowhere else. Thus, when correctional officials faced unprecedented pressures from dramatically increased levels of overcrowding and idleness, they naturally ignored the contextual origins of the problem (over which they had little or no control) and blamed the prisoners (over which they did).

But, even if supermax prisons now contain only "the worst of the worst"[6]—a phrase that is often used to justify the use of these newly designed units but whose accuracy is hotly disputed by their critics—there is no evidence that these allegedly "worst" prisoners are any worse than those who had been adequately managed by less drastic measures in the past. In assessing the benefits and burdens of supermax confinement, it is important to keep in mind that correctional officials have not been given a mandate to engage in such extraordinarily punitive and unprecedented measures because they now

confront not only an extraordinarily dangerous but new strain of prisoner that has never before existed. There is no such new breed and no such mandate.

## THE PSYCHOLOGICAL PAINS
## OF SUPERMAX CONFINEMENT

In assessing the mental health concerns raised by supermax prisons, it is important to acknowledge an extensive empirical literature that clearly establishes their potential to inflict psychological pain and emotional damage. Empirical research on solitary and supermax-like confinement has consistently and unequivocally documented the harmful consequences of living in these kinds of environments. Despite some methodological limitations that apply to some of the individual studies, the findings are robust. Evidence of these negative psychological effects comes from personal accounts, descriptive studies, and systematic research on solitary and supermax-type confinement, conducted over a period of four decades, by researchers from several different continents who had diverse backgrounds and a wide range of professional expertise. Even if one sets aside the corroborating data that come from studies of psychologically analogous settings—research on the harmful effects of acute sensory deprivation (e.g., Hocking, 1970; Leiderman, 1962), the psychological distress and other problems that are created by the loss of social contact such as studies of the pains of isolated, restricted living in the free world (e.g., Chappell & Badger, 1989; Cooke & Goldstein, 1989; Harrison, Clearwater, & McKay, 1989; Rathbone-McCuan & Hashimi, 1982), or the well-documented psychiatric risks of seclusion for mental patients (e.g., Fisher, 1994; Mason, 1993)—the harmful psychological consequences of solitary and supermax-type confinement are extremely well documented.

Specifically, in case studies and personal accounts provided by mental health and correctional staff who worked in supermax units, a range of similar adverse symptoms have been observed to occur in prisoners, including appetite and sleep disturbances, anxiety, panic, rage, loss of control, paranoia, hallucinations, and self-mutilations (e.g., Jackson, 1983; Porporino, 1986; Rundle, 1973; Scott, 1969; Slater, 1986). Moreover, direct studies of prison isolation have documented an extremely broad range of harmful psychological reactions. These effects include increases in the following potentially damaging symptoms and problematic behaviors: negative attitudes and affect (e.g., Bauer, Priebe, Haring, & Adamczak, 1993; Hilliard, 1976; Koch, 1986; Korn, 1988a, 1988b; Miller & Young, 1997; Suedfeld, Ramirez, Deaton, & Baker-Brown, 1982), insomnia (e.g., Bauer et al., 1993; Brodsky &

Scogin, 1988; Haney, 1993; Koch, 1986; Korn, 1988a, 1988b), anxiety (e.g., Andersen et al., 2000; Brodsky & Scogin, 1988; Grassian, 1983; Haney, 1993; Hilliard, 1976; Koch, 1986; Korn, 1988a, 1988b; Toch, 1975; Volkart, Dittrich, Rothenfluh, & Werner, 1983; Walters, Callagan, & Newman, 1963), panic (e.g., Toch, 1975), withdrawal (e.g., Cormier & Williams, 1966; Haney, 1993; Miller & Young, 1997; Scott & Gendreau, 1969; Toch, 1975; Waligora, 1974), hypersensitivity (e.g., Grassian, 1983; Haney, 1993; Volkart, Dittrich, et al., 1983), ruminations (e.g., Brodsky & Scogin, 1988; Haney, 1993; Korn, 1988a, 1988b; Miller & Young, 1997), cognitive dysfunction (e.g., Brodsky & Scogin, 1988; Grassian, 1983; Haney, 1993; Koch, 1986; Korn, 1988a, 1988b; Miller & Young, 1997; Suedfeld & Roy, 1975; Volkart, Dittrich, et al., 1983), hallucinations (e.g., Brodsky & Scogin, 1988; Grassian, 1983; Haney, 1993; Koch, 1986; Korn, 1988a, 1988b; Suedfeld & Roy, 1975; Toch, 1975), loss of control (e.g., Grassian, 1983; Haney, 1993; Suedfeld & Roy, 1975; Toch, 1975), irritability, aggression, and rage (e.g., Bauer et al., 1993; Brodsky & Scogin, 1988; Cormier & Williams, 1966; Grassian, 1983; Haney, 1993; Hilliard, 1976; Koch, 1986; Miller & Young, 1997; Suedfeld et al., 1982; Toch, 1975), paranoia (e.g., Cormier & Williams, 1969; Grassian, 1983; Volkart, Dittrich, et al., 1983), hopelessness (e.g., Haney, 1993; Hilliard, 1976), lethargy (e.g., Brodsky & Scogin, 1988; Haney, 1993; Koch, 1986; Scott & Gendreau, 1969; Suedfeld and Roy, 1975), depression (e.g., Andersen et al., 2000; Brodsky & Scogin, 1988; Haney, 1993; Hilliard, 1976; Korn, 1988a, 1988b), a sense of impending emotional breakdown (e.g., Brodsky & Scogin, 1988; Grassian, 1983; Haney, 1993; Koch, 1986; Korn, 1988a, 1988b; Toch, 1975), self-mutilation (e.g., Benjamin & Lux, 1975; Grassian, 1983; Toch, 1975), and suicidal ideation and behavior (e.g., Benjamin & Lux, 1975; Cormier & Williams, 1966; Grassian, 1983; Haney, 1993).

In addition, among the correlational studies of the relationship between housing type and various incident reports, again, self-mutilation and suicide are more prevalent in isolated housing (e.g., Hayes, 1989; Johnson, 1973; A. Jones, 1986; Porporino, 1986), as are deteriorating mental and physical health (beyond self-injury), other-directed violence, such as stabbings, attacks on staff, and property destruction, and collective violence (e.g., Bidna, 1975; Edwards, 1988; Kratcoski, 1988; Porporino, 1986; Sestoft, Andersen, Lilleback, & Gabrielsen, 1998; Steinke, 1991; Volkart, Rothenfluh, Kobelt, Dittrich, & Ernst, 1983). The use of extreme forms of solitary confinement in so-called brainwashing and torture also underscores its painful, damaging potential (e.g., Deaton, Burge, Richlin, & Latrownik, 1977; Foster, 1987; Hinkle & Wolff, 1956; Riekert, 1985; Shallice, 1974; Vrca, Bozikov, Brzovic, Fuchs, & Malinar, 1996; West, 1985). In fact, many

of the negative effects of solitary confinement are analogous to the acute reactions suffered by torture and trauma victims, including post-traumatic stress disorder or PTSD (e.g., Herman, 1992, 1995; Horowitz, 1990; Hougen, 1988; Siegel, 1984) and the kind of psychiatric sequelae that plague victims of what are called "deprivation and constraint" torture techniques (e.g., Somnier & Genefke, 1986).

To summarize, there is not a single published study of solitary or supermax-like confinement in which nonvoluntary confinement lasting for longer than 10 days, where participants were unable to terminate their isolation at will, that failed to result in negative psychological effects. The damaging effects ranged in severity and included such clinically significant symptoms as hypertension, uncontrollable anger, hallucinations, emotional breakdowns, chronic depression, and suicidal thoughts and behavior. Of course, it is important to emphasize that not all supermax prisons are created equal, and not all of them have the same capacity to produce the same number and degree of negative psychological effects. Research on the effects of social contexts and situations in general and institutional settings in particular underscores the way in which specific conditions of confinement do matter. Thus, there is every reason to expect that better-run and relatively more benign supermax prisons will produce comparatively fewer of the preceding negative psychological effects, and the worse run facilities will produce comparatively more.

## THE PREVALENCE OF PAIN
## AND SUFFERING IN SUPERMAX

In addition to the serious nature and wide range of adverse symptoms that have been repeatedly reported in a large number of empirical studies, it is important to estimate their prevalence rates—that is, the extent to which prisoners who are confined in supermax-type conditions suffer its adverse effects. My own research at California's Pelican Bay "security housing unit" (or SHU)—a prototypical supermax prison at the time these data were collected—provides one such estimate. In this section, I describe this research in some detail and situate its findings by comparing them to prevalence rates among several other relevant groups.

In the Pelican Bay study, each prisoner was individually assessed in face-to-face interviews. Because the sample of 100 SHU prisoners was randomly selected, the data are representative of and, within appropriate margins of error, generalizable to the entire group of prisoners at this supermax facility.[7] The following two important areas were explored in each interview. In the

TABLE 1:  Symptoms of Psychological and Emotional Trauma

| Symptom | % Presence Among Pelican Bay SHU Prisoners |
|---|---|
| Anxiety, nervousness | 91 |
| Headaches | 88 |
| Lethargy, chronic tiredness | 84 |
| Trouble sleeping | 84 |
| Impending nervous breakdown | 70 |
| Perspiring hands | 68 |
| Heart palpitations | 68 |
| Loss of appetite | 63 |
| Dizziness | 56 |
| Nightmares | 55 |
| Hands trembling | 51 |
| Tingling sensation[a] | 19 |
| Fainting | 17 |

NOTE: SHU = security housing unit.
a. Not necessarily a symptom of psychological trauma. It is included as a control question to provide a baseline against which to measure the significance of the trauma-related responses.

first, one series of questions focused on whether the prisoner experienced any of 12 specific indices of psychological trauma or distress. A list of those symptoms regarded as reliable indicators of general psychological distress was employed. They were essentially the same indices of distress that Jones (1976) and others have used to assess mainline prison populations. In the second, a different series of questions was designed to determine whether the prisoner suffered any of 13 specific psychopathological effects of isolation. Based on previous research conducted by Grassian (1983) and others (e.g., Brodsky & Scogin, 1988; Korn, 1988a, 1988b), a list of isolation-related symptoms was developed and used to assess each prisoner in this regard.

The results of this prevalence study are depicted in Tables 1 and 2. As Table 1 indicates, every symptom of psychological distress but one (fainting spells) was suffered by more than half of the representative sample of supermax prisoners. Two thirds or more of the prisoners reported being bothered by many of these symptoms in the SHU, and some were suffered by nearly everyone. For example, virtually all of the isolated prisoners were plagued by nervousness and anxiety, by chronic lethargy, and a very high percentage (70%) felt themselves on the verge of an emotional breakdown. In addition, a very high number suffered from headaches and troubled sleep, and more than half were bothered by nightmares. Well over half of the supermax prisoners reported a constellation of symptoms—headaches, trembling, sweaty palms, and heart palpitations—that is commonly associated with hypertension.

TABLE 2:  Psychopathological Effects of Prolonged Isolation

| Symptom | % Presence Among Pelican Bay SHU Prisoners |
|---|---|
| Ruminations | 88 |
| Irrational anger | 88 |
| Oversensitivity to stimuli | 86 |
| Confused thought process | 84 |
| Social withdrawal | 83 |
| Chronic depression | 77 |
| Emotional flatness | 73 |
| Mood, emotional swings | 71 |
| Overall deterioration | 67 |
| Talking to self | 63 |
| Violent fantasies | 61 |
| Perceptual distortions | 44 |
| Hallucinations | 41 |
| Suicidal thoughts | 27 |

NOTE: SHU = security housing unit.

As Table 2 shows, the psychopathological symptoms of isolation were even more prevalent among these prisoners. Almost all of the supermax prisoners reported suffering from ruminations or intrusive thoughts, an oversensitivity to external stimuli, irrational anger and irritability, confused thought processes, difficulties with attention and often with memory, and a tendency to withdraw socially to become introspective and avoid social contact. An only slightly lower percentage of prisoners reported a constellation of symptoms that appeared to be related to developing mood or emotional disorders—concerns over emotional flatness or losing the ability to feel, swings in emotional responding, and feelings of depression or sadness that did not go away. Finally, sizable minorities of supermax prisoners reported symptoms that are typically only associated with more extreme forms of psychopathology—hallucinations, perceptual distortions, and thoughts of suicide.

To put both sets of figures in perspective, it is possible to compare these prevalence rates with those derived from other populations in which similar assessments have been made. For example, Dupuy, Engel, Devine, Scanlon, and Querec (1970) assessed some similar indices of psychological distress with a representative national probability sample of more than 7,000 persons. More recent data focusing on similar indices of psychopathology were collected in Epidemiologic Catchment Area Study (ECAS), a multisite study in which the diagnostic interview schedule (DIS) was used to assess the prevalence of psychiatric symptoms in the population at large (Robins & Regier,

1991). Finally, even more extensive comparisons are possible with another systematic study of the effects of living under isolated prison conditions—Brodsky and Scogin's (1988) research on prisoners confined in two maximum security protective custody units.

Table 3 contains a summary of the comparisons between the prevalence rates found in the two studies of nonincarcerated normal populations, Brodsky and Scogin's protective custody prisoners, and the supermax sample from Pelican Bay SHU (of course, along only those dimensions measured in each of the respective studies). The contrasts with the nonincarcerated normal samples are striking. As would be expected, in almost every instance, the prevalence rates for indices of psychological distress and psychopathology in the samples from the general population are quite low. The only exceptions were for anxiety and nervousness, which Dupuy et al. (1970) found in 45% of their normal sample, and depression, which Robins and Regier (1991) found in almost a quarter of the persons they assessed. Otherwise, the indices of distress and symptoms of psychopathology occurred in less than 20% of the nonincarcerated samples. On the other hand, in both of the isolated prisoner populations, the prevalence rates were well above 50% on virtually all of the measured dimensions. For certain symptoms, rates for the prisoner samples were five to ten or more times as high.

In fact, in both comparative and absolute terms, the prevalence rates were extremely high for the supermax prisoner sample and exceeded even those reported for the protective custody prisoners. Conditions of confinement for protective custody prisoners are in many ways similar to those in supermax confinement. That is, they are typically segregated from the rest of the prison population, restricted or prohibited from participating in prison programs and activities, and often housed indefinitely under what amount to oppressive and isolated conditions. Unlike supermax prisoners per se, however, many have some control over their status as protective custody (PC) prisoners (e.g., many have "volunteered" for this status) and, although they live under the stigma of being PC prisoners, they are technically housed in these units for protection rather than for punishment.

Accordingly, Brodsky and Scogin (1988) found high rates of psychological trauma among their sample of protective custody prisoners, so much so that they worried about the "strong potential for harmful effects" that such confinement represented (p. 279).[8] They also observed, in terms that apply equally well to supermax prisoners, that "when inmates are subjected to extensive cell confinement and deprivation of activities and stimulation, a majority can be expected to report moderate to serious psychological symptoms" (p. 279). Yet, note that on 16 of 18 possible comparisons, the symptom prevalence rate for Pelican Bay SHU prisoners are greater than those reported

136

TABLE 3:   Comparison of Prevalence Rates Between in Normal, Protective Custody, and Supermax Populations

| Description | % Normal Dupuy, Engel, Devine, Scanlon, and Querec's (1970) National Probability Sample of 7,000 Adults | % Normal Robins and Regier's (1991) Multisite Assessment of 20,000 Adults | % Protective Housing Brodsky and Scoggin's (1988) Sample of 31 Prisoners in Protective Housing | % Supermax Haney's (1993) Random Sample of 100 Prisoners in Security Housing Unit |
|---|---|---|---|---|
| Symptoms of psychological trauma | | | | |
| Anxiety, nervousness | 45 | | 84 | 91 |
| Headaches | 13.7 | | 61 | 88 |
| Lethargy, chronic tiredness | 16.8 | | 65 | 84 |
| Trouble sleeping | 16.8 | | 61 | 84 |
| Impending breakdown | 7.7 | | 48 | 70 |
| Perspiring hands | 17 | | 45 | 68 |
| Heart palpitations | 3.7 | | 39 | 68 |
| Dizziness | 7.1 | | 45 | 56 |
| Nightmares | 7.6 | | 42 | 55 |
| Hands trembling | 7 | | 39 | 51 |
| Fainting | | | 0 | 17 |
| Psychopathological effects of isolation | | | | |
| Ruminations | | | 74 | 88 |
| Irrational anger | | 2.9 | 71 | 88 |
| Confused thought process | | 10.8 | 65 | 84 |
| Chronic depression | | 23.5 | 77 | 77 |
| Overall deterioration | | | 52 | 67 |
| Talking to self | | | 68 | 63 |
| Hallucinations | | 1.7 | 42 | 41 |

in the protective custody study. Note also that many of the percentage differences are comparatively large. In fact, the Pelican Bay prevalence rates are, on average, 14.5% greater than those reported for the prisoners in Brodsky and Scogin's study.

The prevalence data collected in the Pelican Bay study partially address another important supermax-related issue. Several mental health experts have written about a distinct set of reactions or a syndrome-like condition that occurs in prisoners who have been subjected to long-term isolation. Canadian psychiatrist George Scott (1969) described what he termed "isolation sickness" as coming from "prolonged solitary confinement" (p. 3). In more recent research, it has been labled "RES" (reduced environmental stimulation) or "SHU" (security housing unit) syndrome. Perhaps the most detailed clinical description of the disorder came from psychiatrist Stuart Grassian (1983), who observed that it included massive free-floating anxiety, hypersensitivity to external stimulation, perceptual distortions or hallucinations, derealization experiences, difficulties with concentration or memory, acute confusional states, aggressive fantasies, paranoia, and motor excitement (that may include violent or self-destructive outbursts).

Because the Pelican Bay prevalence study was not designed to directly diagnose SHU syndrome, prisoners were not questioned about literally each one of its indices. However, the study found that a very high percentage of Pelican Bay prisoners suffered many symptoms similar to the ones Grassian had identified. Specifically, a high percentage of prisoners in the present study reported suffering from heightened anxiety (91%), hyper-responsivity to external stimuli (86%), difficulty with concentration and memory (84%), confused thought processes (84%), wide mood and emotional swings (71%), aggressive fantasies (61%), perceptual distortions (44%), and hallucinations (41%). Moreover, fully 34% of the sample experienced all eight of these symptoms, and more than half (56%) experienced at least five of them.

## THE SOCIAL PATHOLOGIES OF SUPERMAX

The Pelican Bay prevalence study and the other direct studies of the psychological effects of supermax confinement I cited earlier focused on discrete and measurable consequences of this form of imprisonment. The tools used to provide these measurements are extremely useful and scientifically appropriate methods for documenting specific reactions and symptoms. However, they have some inherent limitations that may mask some of the subtle yet important transformations that are brought about by supermax confinement.

For one, indices of measurable harm generally rely on things that persons must be aware of in order to report. Obviously, prisoners must be consciously pained or in distress over a symptom in order to complain about it; the greater their conscious awareness, the higher the frequency and extent of negative effects. However, in the course of adjusting and adapting to the painful and distressing conditions of confinement, many prisoners will strive to essentially "get used to it," adapting and accommodating to make their day-to-day misery seem more manageable. In addition, some supermax prisoners will undergo forms of psychological deterioration of which they are unaware and, therefore, incapable of reporting. As long as the deterioration is not obvious or disabling, it is likely to escape the attention of mental health staff who, in most units, rarely perform careful psychiatric assessments on a routine basis for prisoners who appear to be otherwise minimally functioning.

Indeed, it is not uncommon to encounter a number of supermax prisoners who, although they voice few specific complaints and are not identified by staff as having any noticeable psychological problems or needs, nonetheless have accommodated so profoundly to the supermax environment that they may be unable to live anywhere else. In some instances, these changes are difficult to measure because prisoners are unaware that they are occurring or because they have blunted their perception that such transformations are underway. In other instances, the changes are too broad, complicated, and subtle to be precisely measured. Yet they appear to have lasting mental health implications.

Thus, a number of significant transformations occur in many long-term supermax prisoners that, although they are more difficult to measure, may be equally if not more problematic for their future health and well-being and the health and well-being of those around them. These come about because in order to survive the rigors of supermax, many prisoners gradually change their patterns of thinking, acting, and feeling. Some of these transformations have the potential to rigidify, to become deeply set ways of being, that are, in varying degrees for different people, more or less permanent changes in who these prisoners are and, once they are released from supermax, what they can become. Because they do not represent clinical syndromes per se, and because they constitute patterns of social behavior that are largely "functional" under conditions of isolation—for the most part becoming increasingly dysfunctional only if they persist on return to more normal social settings—I have termed them "social pathologies."

Several of the social pathologies that can and do develop in prisoners who struggle to adapt to the rigors of supermax confinement are discussed below.

First, the unprecedented totality of control in supermax units forces prisoners to become entirely dependent on the institution to organize their exis-

tence. Although this is a potential consequence of institutionalization or "prisonization" in general (e.g., Haney, in press), it occurs to an exaggerated degree in many supermax prisons. Thus, many prisoners gradually lose the ability to initiate or to control their own behavior, or to organize their own lives. The two separate components of this reaction—problems with the self-control and self-initiation of behavior—both stem from the extreme over-control of supermax. That is, all prisoners in these units are forced to adapt to an institutional regime that limits virtually all aspects of their behavior. Indeed, one of the defining characteristics of supermax confinement is the extent to which it accomplishes precisely that. But because almost every aspect of the prisoners' day-to-day existence is so carefully and completely circumscribed in these units, some of them lose the ability to set limits for themselves or to control their own behavior through internal mechanisms. They may become uncomfortable with even small amounts of freedom because they have lost the sense of how to behave in the absence of constantly enforced restrictions, tight external structure, and the ubiquitous physical restraints.

Second, prisoners may also suffer a seemingly opposite reaction that is caused by the same set of circumstances. That is, they may begin to lose the ability to initiate behavior of any kind—to organize their own lives around activity and purpose—because they have been stripped of any opportunity to do so for such prolonged periods of time. Chronic apathy, lethargy, depression, and despair often result. Thus, as their personal initiative erodes, prisoners find themselves unable to begin even mundane tasks or to follow through once they have begun them. Others find it difficult to focus their attention, to concentrate, or to organize activity. In extreme cases, prisoners may literally stop behaving. In either event, it is hard to imagine a set of adaptations more dysfunctional and problematic for persons who will one day be expected to exercise increased self-control and self-initiative in mainline prison settings or in the free world, if and when they are released there.

Third, the absence of regular, normal interpersonal contact and any semblance of a meaningful social context creates a feeling of unreality that pervades one's existence in these places. Because so much of our individual identity is socially constructed and maintained, the virtually complete loss of genuine forms of social contact and the absence of any routine and recurring opportunities to ground one's thoughts and feelings in a recognizable human context leads to an undermining of the sense of self and a disconnection of experience from meaning. Supermax prisoners are literally at risk of losing their grasp on who they are, of how and whether they are connected to a larger social world. Some prisoners act out literally as a way of getting a reaction from their environment, proving to themselves that they are still alive and

capable of eliciting a genuine response—however hostile—from other human beings.

Fourth, the experience of total social isolation can lead, paradoxically, to social withdrawal for some supermax prisoners. That is, they recede even more deeply into themselves than the sheer physical isolation of supermax has imposed on them. Some move from, at first, being starved for social contact to, eventually, being disoriented and even frightened by it. As they become increasingly unfamiliar and uncomfortable with social interaction, they are further alienated from others and made anxious in their presence. In extreme cases, another pattern emerges: This environment is so painful, so bizarre and impossible to make sense of, that they create their own reality—they live in a world of fantasy instead.

Fifth, and finally, the deprivations, restrictions, the totality of control, and the prolonged absence of any real opportunity for happiness or joy fills many prisoners with intolerable levels of frustration that, for some, turns to anger and then even to uncontrollable and sudden outbursts of rage. Others channel their supermax-created anger in more premeditated ways. Many supermax prisoners ruminate in the course of the countless empty hours of uninterrupted time during which they are allowed to do little else. Some occupy this idle time by committing themselves to fighting against the system and the people that surround, provoke, deny, thwart, and oppress them. There are supermax prisoners who become consumed by the fantasy of revenge, and others lash out against those who have treated them in ways they regard as inhumane. Sadly, there are some supermax prisoners who are driven by these deprived and oppressive conditions to pursue courses of action that further ensure their continued deprivation and oppression.

Although I have described these social pathologies as separate and distinct adaptations, they are not mutually exclusive. Thus, prisoners may move through one or another adaptation to their extraordinarily stressful life in supermax, or engage in several at once in an attempt to reduce the pains of their confinement and to achieve a tolerable equilibrium in this otherwise psychologically hostile environment. In fact, in extreme cases and over a long period of time, a combination of seemingly adaptive responses may coalesce into a more or less permanent lifestyle, one lived so exclusively and with such commitment that the prisoner's very being seems to be transformed. For example, some supermax prisoners whose opportunities for self-definition and self-expression have been effectively suppressed for extended periods of time—who have been denied conventional outlets through which to use their intellect or to express their heightened sense of injustice—come increasingly to define themselves in opposition to the prison administration. They begin to gradually fashion an identity that is anchored primarily by the goal of thwart-

ing and resisting the control mechanisms that are increasingly directed at them. The material out of which their social reality is constructed increasingly consists of the only events to which they are exposed and the only experiences they are allowed to have—the minutiae of the supermax itself and all of the nuance with which it can be infused.

Just as the social pathologies of supermax are the creations of a socially pathological environment, taking prisoners out of these places often goes a long way in reducing or eliminating the negative effects. But there is good reason to believe that some prisoners—we do not yet know how many or, in advance, precisely who—cannot and will not overcome these social pathologies; their extreme adaptations to supermax confinement become too ingrained to relinquish. Those who are not blessed with special personal resiliency and significant social and professional support needed to recover from such atypical and traumatic experiences may never return to the free world and resume normal, healthy, productive social lives. These are extraordinary—I believe often needless and indefensible—risks to take with the human psyche and spirit. Such extreme, ultimately dysfunctional, but often psychologically necessary adaptations to supermax confinement underscore the importance of continuing to critically analyze, modify, and reform the extremely harsh conditions that produce them. Understanding how and why they occur also brings some real urgency to the development of effective programs by which prisoners can be assisted in unlearning problematic habits of thinking, feeling, and acting on which their psychological survival in supermax often depends.

But they also highlight another issue. In what is one of the core irrationalities in the logic on which supermax regimes are premised, these units make the ability to withstand the psychological assault of extreme isolation a prerequisite for allowing prisoners to return to the intensely social world of mainline prison or free society. In this way, prisoners who cannot "handle" the profound isolation of supermax confinement are almost always doomed to be retained in it. And those who have adapted all too well to the deprivation, restriction, and pervasive control are prime candidates for release to a social world to which they may be incapable of ever fully readjusting.

## ADDITIONAL MENTAL HEALTH ISSUES IN SUPERMAX

In addition to the negative psychological effects of solitary and supermax-like confinement reviewed above, there are several other important mental health issues raised by the nature of these conditions and the policies by

which prisoners are placed in them. One such issue involves the number of mentally ill prisoners who are housed in supermax. Prisoners often describe their experience in supermax environments as a form of psychological torture; most of them are in varying degrees of psychic pain, and many of them struggle to cope with the daily stress of their confinement. Although in my experience, virtually everyone in these units suffers, prisoners with preexisting mental illnesses are at greater risk of having this suffering deepen into something more permanent and disabling. Those at greatest risk include, certainly, persons who are emotionally unstable, who suffer from clinical depression or other mood disorders, who are developmentally disabled, and those whose contact with reality is already tenuous. There is good reason to believe that many of these prisoners in particular will be unable to withstand the psychic assault of dehumanized isolation, the lack of caring human contact, the profound idleness and inactivity, and the otherwise extraordinarily stressful nature of supermax confinement without significant deterioration and decompensation.

How many such persons are there? Research conducted over the past several decades suggests that somewhere between 10% to 20% of mainline prisoners in general in the United States suffer from some form of major mental illness (e.g., Jamelka, Trupin, & Chiles, 1989; Veneziano & Veneziano, 1996). The percentages in supermax appear to be much higher. Although too few studies have been done to settle on precise estimates of mentally ill supermax prisoners, and the numbers undoubtedly vary some from prison system to prison system, the percentages may be as much as twice as high as in the general prisoner population.

For example, a Canadian study estimated that approximately 29% of prisoners in special handling and long-term segregation units suffered from "severe mental disorders" (Hodgins & Cote, 1991). A more recent study conducted by a group of Washington state researchers (Lovell, Cloyes, Allen, & Rhodes, 2000) found exactly the same thing: 29% of intensive management prisoners in the state's correctional system manifested at least one predefined indication of serious mental disorder (such as multiple admissions to an acute care mental care facility, or having been in one of the prison system's residential mental health units).

Why this overrepresentation? Unproblematic adjustment to prison requires conformity to rigidly enforced rules and highly regimented procedures. Many mentally ill prisoners lack the capacity to comply with these demands and they may end up in trouble as a result. If they are not treated for their problems, the pattern is likely to be repeated and eventually can lead to confinement in a supermax unit. As Toch and Adams (2002) have succinctly put it, "an unknown proportion of people who are problems (prove trouble-

some to settings in which they function) also have problems (demonstrate psychological and social deficits when they are subjected to closer scrutiny)" (p. 13). Prison systems that fail to realize this basic fact will end up blaming—and punishing—prisoners for manifesting psychological conditions for which they should have been treated. Especially for prison systems that lack sufficient resources to adequately address the needs of their mentally ill mainline prisoners, disciplinary isolation and supermax confinement seems to offer a neat solution to an otherwise difficult dilemma. In such systems, supermax becomes the default placement for disruptive, troublesome, or inconvenient mentally ill prisoners. Thus the presence of a disproportionately high number of mentally ill prisoners in supermax often reflects a failure of system-wide proportions.

A number of supermax prisons fail to adequately screen out prisoners with preexisting mental illness, and fail to remove those whose mental health problems worsen under the stress of the extreme isolation, deprivation, and forceful control they confront inside. In addition, many of the units fail to appreciate the potential for these kinds of conditions of confinement to produce psychopathology in previously healthy prisoners. These problems are exacerbated by the fact that even if mental health staff members manage to identify those prisoners with serious psychological and psychiatric needs, many supermaxes are uniquely ill-suited to address them. Not only are they likely to be staffed with too few treatment personnel and plagued by high turnover, but the extraordinary and unyielding security procedures that characterize these kinds of prisons often preclude meaningful and appropriate therapeutic contact.

Thus, supermax prisoners who are in acute distress typically have the option of receiving what is euphemistically called "cell front therapy" in which they can discuss intimate, personal problems with mental health staff who cannot easily see or hear them through the cell doors (unless they speak so loudly that other prisoners in the housing unit also can listen in). Or they can choose to undergo strip searches, be placed in multiple restraints (which are typically left on throughout the therapy session), and taken either to a counselor's office (where correctional officer escorts are often stationed close enough to overhear what is being said) or special rooms fitted with security cages in which the prisoner is placed to be counseled by a therapist who speaks to them through wire screening of the cage. Or, in some places they can submit to "tele-psychiatry" sessions in which disembodied images attempt to assess and address their problems from distant locations. Not surprisingly, under these circumstances many prisoners fail to ask for help or reject it when it is offered.

A separate but related problem pertains to the group of prisoners who, although they do not suffer from preexisting mental illness, nonetheless are

psychologically damaged by the extreme situational stress to which they are subjected in supermax. There is much reason to believe that supermax confinement may produce psychopathology in certain persons who otherwise would not have suffered it. For example, a study of Danish prisoners found that for prisoners who remained in solitary confinement for longer than 4 weeks "the probability of being admitted to the prison hospital for a psychiatric reason was about 20 times as high as for a person [in a mainline prison]" (Sestoft et al., 1998, p. 103), leading the researchers to conclude that "individuals detained [in solitary confinement] are forced into an environment that increases their risk of hospitalization...for psychiatric reasons" (p. 105).

Finally, as I earlier alluded, many of the psychological and psychiatric reactions created or exacerbated by supermax confinement may persist long after a prisoner has been released into the mainline population or freed from incarceration altogether. In addition, even among prisoners who suffer no readily identifiable set of psychological symptoms, the social pathologies of supermax confinement may significantly interfere with long-term adjustment. To date, most supermax prisons appear oblivious to these persistent problems and many offer no meaningful counseling or transitional programs at all to prisoners who are attempting to make the daunting adjustment from near total isolation to an intensely social existence.

These interrelated problems—that prisoners suffering from preexisting mental illnesses are overrepresented in supermax, that the pains of supermax confinement are too severe for many prisoners to withstand, and that many of the psycho- and social pathologies of supermax confinement have disabling long-term consequences—have several important correctional policy implications. In particular, procedures must be implemented for screening prisoners in advance of their transfer to supermax (so that mentally ill and otherwise vulnerable persons are never placed there in the first place). In addition, because the mental health needs of any supermax prisoner can become acute and substantial at any time, prison systems need to be fully prepared to adequately address them (setting aside the obvious question of whether anyone can and should, in a humane system, be housed in such environments in the first place).

This also means that supermax prisons must implement careful psychiatric monitoring of all prisoners during their confinement and have readily accessible procedures in place for the removal of any prisoner at the first sign of deterioration. Given the fact that supermax prisoners behave so little—they are not permitted to actually do much of anything—the opportunities for disturbed behavior to be observed by staff are extremely limited. If monitoring is done passively, as it often is, only the most flagrant cases are likely to come to anyone's attention. Mental health staff who walk through supermax

housing units, pausing briefly at each cell to ask prisoners how they are doing or to pose some other equally superficial, pro forma inquiry are not engaging in careful psychiatric screening. In light of the psychological risks posed by this environment and the widely shared reluctance of these prisoners to admit vulnerability, the regular and in-depth evaluation of supermax prisoners should be regarded as the only acceptable and truly effective form of monitoring.

Finally, supermax units should be required to provide extensive mental health resources that are specifically targeted to ease the psychological pains of this kind of confinement and the extremely difficult transitions that typically follow it. Supermax prisoners must enter so-called de-escalation or step-down programs well in advance of their release, and the programs themselves must grapple seriously and forthrightly with the negative psychological changes that supermax confinement often brings about. This will require prison systems that are in denial about the issues reviewed in the preceding pages to overcome it, and to acknowledge and confront the psychological consequences of housing prisoners under conditions that pose such significant mental health risks. Attempts to provide these kinds of transitional services through programs that are delivered without genuine interpersonal interaction and social contact—some systems actually use videotapes that supermax prisoners watch alone in their cells, supposedly to reacquaint them with the social world they are about to reenter—will prove to be painfully inadequate. Moreover, like all meaningful mental health and counseling services, these transitional programs must be made available to prisoners under genuinely therapeutic conditions that foster some degree of privacy, trust, and supportive social interaction.

## THE LEGAL REGULATION OF SUPERMAX

Because supermax prisons are of relatively recent origin, their constitutionality—the question of whether the conditions of confinement in this new prison form represent cruel and unusual punishment—has been tested in only a few important cases. In this section, I review the three most important legal challenges to supermax confinement and examine the implications of the way in which the courts have responded in each. Judges in all three cases recognized the need for some form of segregated housing in correctional settings, emphatically acknowledged—with varying degrees of clarity and scope—the potential psychological harms of supermax-type confinement, and explicitly prohibited certain categories of prisoners from being housed under such conditions.

The first such case, *Madrid v. Gomez* (1995), addressed conditions of confinement in California's Pelican Bay Security Housing Unit, the site at which my earlier reported research was conducted. The judge was candid and critical in his assessment of the conditions of confinement in the California supermax. He pointed to the "stark sterility and unremitting monotony" of the interior of the prison itself, was concerned about the fact that prisoners "can go weeks, months or potentially years with little or no opportunity for normal social contact with other people," and commented that the sight of prisoners in the barren exercise pens to which they were restricted creating an image "hauntingly similar to that of caged felines pacing in a zoo" (p. 1229).

He found further that "many, if not most, inmates in the SHU experience some degree of psychological trauma in reaction to their extreme social isolation and the severely restricted environmental stimulation in the SHU" (p. 1235). Indeed, the court's opinion acknowledged that "social science and clinical literature have consistently reported that when human beings are subjected to social isolation and reduced environmental stimulation, they may deteriorate mentally and in some cases develop psychiatric disturbances" (p. 1230). He concluded that Pelican Bay inflicted treatment on prisoners that, in his words, "may well hover on the edge of what is humanly tolerable for those with normal resilience, particularly when endured for extended periods of time" (p. 1280).

However, although the judge in *Madrid* also found that overall conditions in the supermax units were "harsher than necessary to accommodate the needs of the institution" (p. 1263), he concluded that he lacked any constitutional basis to close the prison or even to require significant modifications in many of its general conditions. Instead, he barred certain categories of prisoners from being sent there because of the tendency of the facility to literally make them mentally ill or significantly exacerbate preexisting mental illness. In particular, he limited the class of prisoners to be protected from these harms to the mentally ill and those prisoners who were at an unreasonably high risk of suffering a serious mental illness as a result of the conditions (including prisoners diagnosed as chronically depressed, brain damaged, and developmentally disabled).[8] Finally, the judge emphasized that the record before him pertained to prisoners who had been in supermax for no more than a few years and that longer term exposure might require a different result.[9]

In the second significant case to examine conditions of confinement in supermax-like settings, *Ruiz v. Johnson* (1999), a federal district court reached even more sweeping legal conclusions than the judge had in *Madrid*. For nearly 30 years, the *Ruiz* court had overseen the sweeping reform of the Texas prison system. Starting with a landmark opinion in 1980 in which the entire Texas prison system was declared unconstitutional (*Ruiz v. Estelle,*

1980), an extensive number of court-ordered changes had been implemented. Hoping to end this judicial oversight, the state petitioned to terminate the court's jurisdiction, arguing that a sufficient number of reforms had been made in the Texas prison system and that no unconstitutional conditions of confinement remained. The federal court agreed on some counts but disagreed emphatically on others.

Conditions of confinement in Texas's "administrative segregation" or "high security" units were a major part of this round of the *Ruiz* litigation. Despite acknowledging significant improvements in many other areas of the state's prison system, the court ruled that its disciplinary lockup units still operated below constitutionally minimum standards. In particular, the judge ruled that the "extreme deprivations and repressive conditions of confinement" of the administrative segregation units constituted cruel and unusual punishment "both as to the plaintiff class generally and to the subclass of mentally ill inmates housed in such confinement" (p. 861). Indeed, the judge concluded that "more than mere deprivation," the prisoners in these units "suffer actual psychological harm from the almost total deprivation of human contact, mental [stimulation], personal property and human dignity" (p. 913).

The judge also understood that the psychological harm inflicted by long-term supermax confinement could result in mental illness, even among those prisoners not previously afflicted. Thus, the court concluded that "Texas's administrative segregation units are virtual incubators of psychoses—seeding illness in otherwise healthy inmates and exacerbating illness in those already suffering from mental infirmities" (p. 907). The judge was clear and decisive in his ruling, writing that "it is found that administrative segregation is being utilized unconstitutionally to house mentally ill inmates—inmates whose illness can only be exacerbated by the depravity of their confinement" (p. 915).

He further speculated about why prison officials, who were clearly aware of these conditions and cognizant of the "inmates' ensuing pain and suffering" might maintain such a system. Whatever the cause—including the possibility that the officials labored under what he termed "a misconception of the reality of psychological pain"—the judge condemned the fact that the prison system had "knowingly turned its back on this most needy segment of its population" (p. 914).[10]

The final and most recent case, *Jones 'El v. Berge* (2001), presented a somewhat narrower issue but resulted in a similarly strong ruling. In this case, a federal district court in Wisconsin granted prisoners' motion for injunctive relief on the grounds that seriously mentally ill prisoners were at risk of irreparable emotional damage if the state continued to confine them in its supermax facility. The court concluded that the

> extremely isolating conditions in supermaximum confinement cause SHU
> Syndrome in relatively healthy prisoners who have histories of serious mental
> illness, as well as prisoners who have never suffered a breakdown in the past
> but are prone to break down when the stress and trauma become exceptionally
> severe. (pp. 1101-1102)

The court found further that

> credible evidence indicates that Supermax is not appropriate for seriously
> mentally ill inmates because of the isolation resulting from the physical layout,
> the inadequate level of staffing and the customs and policies. Supermax was
> designed to house especially disruptive and recalcitrant prisoners but not men-
> tally ill ones. (p. 1118)

The judge ordered several prisoners to be removed from the supermax facil-
ity. In addition, she required mental health professionals to evaluate several
categories of prisoners among those who remained, and if any of them were
determined to be seriously mentally ill, she ordered that they be transferred
out of supermax.

In each of these three cases in which federal district courts were presented
with evidence of the psychological effects of supermax confinement, they
acknowledged the significant psychological risks it posed, expressed
strongly worded concerns about the constitutionality of exposing prisoners to
these conditions for long periods of time, and expressly prohibited the use of
supermax for certain categories of prisoners (in particular, those with preex-
isting histories of mental illness, and those likely to become mentally ill in the
course of their solitary confinement).

## CONCLUSION

Supermax prisons inflict varying amounts of psychological pain and emo-
tional trauma on prisoners confined in them. The range of
psychopathological reactions to this form of confinement is broad, many of
the reactions are serious, and the existing evidence on the prevalence of
trauma and symptomatology indicates that they are widespread. The mental
health risks posed by this new form of imprisonment are clear and direct,
exacerbated by the tendency of correctional systems to place a disproportion-
ate number of previously mentally ill prisoners in supermax confinement, to
ignore emerging signs of mental illness among the supermax prison popula-
tion, and to fail to provide fully adequate therapeutic assistance to those pris-
oners who are in psychic pain and emotional distress.

It is important to reflect on whether the psychologically destructive conditions to which prisoners in supermax prisons are exposed would be countenanced for any other group in our society. Indeed, revelations that mental patients or elderly nursing home residents have been subjected to punitive isolation are understandably followed by widespread public outcry. Similarly, when typically more psychologically resilient populations have been taken as prisoners of war or as hostages subsequently held in isolation, recognition of the adverse psychological consequences is immediate and generates broad concern. Support for providing psychiatric counseling to the victims of these kinds of traumatic experiences is unquestioned.

The fact that no such recognition and concern is typically extended to prisoners in supermax confinement whose experiences in captivity may be comparable or worse, and of longer duration, raises disturbing questions: Do we allow what we believe to be their blameworthiness for this kind of mistreatment—that they earned it, they deserve it, they asked for it—to blur our understanding of the consequences of the mistreatment itself? That is, has devaluing the prisoners' claim to be free from such harm led to the erroneous perception that the harm is not real? If so, the empirical evidence suggests that we have made a grievous mistake.

I believe that the overwhelming evidence of the negative psychological effects of many forms of long-term supermax confinement provides a strong argument for placing enhanced correctional and legal limits on the use of this new prison form and carefully scrutinizing all aspects of its operation and effect (e.g., Haney & Lynch, 1997, pp. 558-566). As I noted earlier, there are better and worse supermax prisons, and we should take steps to ensure that all such facilities implement the best and most humane of the available practices. In general, far more careful screening, monitoring, and removal policies should be implemented to ensure that psychologically vulnerable—not just mentally ill—prisoners do not end up in supermax in the first place, and that those who deteriorate once there are immediately identified and transferred to less psychologically stressful environments. In addition, prison disciplinary committees should ensure that no prisoner is sent to supermax for infractions that were the result of preexisting psychiatric disorders or mental illness.[11]

Moreover, harsh supermax conditions of confinement themselves must be modified to lessen their harmful effects. That is, it is important to recognize that placing people in conditions of confinement that we know in advance are likely to psychologically harm and endanger them cannot be morally justified merely through assurances that, if and when they do deteriorate, the prison system will make a good faith effort to identify the damage and work reasonably diligently to repair it. Thus, meaningful activities and program-

ming—including access to therapy, work, education, and recreation—should be afforded all supermax prisoners to prevent deterioration, and out-of-cell time should be maximized within the limits of correctional resources. To prevent the total atrophy of social skills and the deterioration of social identities, supermax prisoners should be afforded some form of meaningful collective activity and opportunities for normal social interaction (that includes contact visiting).

Finally, strict time limits should be placed on the length of time that prisoners are housed in supermax. No prisoner should be subjected continuously to even these modified conditions of supermax-like confinement for longer than a period of 2 years, no prisoner should ever be subjected to indeterminate supermax terms for any reason, and no prisoner should be sent to supermax solely on the basis of alleged gang membership in the complete absence of other overt behavioral infractions. Indeed, the units themselves should be organized around the goal of rapid return and reintegration and judged on the basis of their ability to release rather than retain prisoners. Once prisoners are about to be released from supermax confinement, they should be afforded transitional or step-down programming to accustom them to the kind of environment to which they will be sent (mainline prison housing or the free world). Moreover, given the likely long-term effects of such confinement, these transitional programs and services should be continued after the prisoner has been transferred from supermax.

Correctional administrators, politicians, legal decision makers, and members of the public eventually may decide that the harm that supermax prisons inflict is worth the benefit that they arguably beget and that the pains of such confinement are the regrettable but unavoidable price of an otherwise justified policy. However, there are very serious psychological, correctional, legal, and even moral issues at the core of this calculation that are worthy of serious, continued debate. This debate has hardly begun and, in most instances, it has hardly been informed by the empirical record that I have cited in the preceding pages.

Many scholars who have studied supermax prisons—myself included—doubt the validity of the claims that are made on their behalf,[12] and believe that in any event many of the publicly asserted goals of this new form of imprisonment can be achieved through less psychologically onerous and invasive alternatives. Yet, whatever one concludes about the value of supermax prisons in achieving these goals, it represents only one term in a more complex equation. The important determination of what, if any, legitimate role this kind of imprisonment should have in an effective and humane prison system can only be made with its psychological effects clearly in mind. The best available evidence indicates very clearly that many

supermax-like conditions of confinement inflict extraordinary levels of psychological pain and create substantial mental health risks. We should not continue to ignore, overlook, or minimize these data in this continuing and important debate.

## NOTES

1. I have chosen to use the more encompassing term *supermax prison* even though it is rarely used as the official designation for such places. Different prison systems use different terminology to refer to these kinds of units. For example, the program at Marion Penitentiary generally regarded as having given rise to the supermax design was referred to as the "control unit." Arizona's supermax units are called "special management units" or "SMUs"; in California, they are known as "security housing units," or "SHUs"; in Texas, they are "high security units"; Washington State employs the term "intensive management unit" or "IMU," whereas New Mexico prefers "special controls unit" or "SCU." Although penologist Chase Riveland (1999) was correct to conclude that "there is no universal definition of what supermax facilities are and who should be in them" (p. 4), most of these units, whatever they are called, have enough distinctive features in common to be analyzed together.

2. Few "isolation" units, including supermax prisons, have been able to successfully prevent literally all forms of interpersonal communication. Of necessity, prisoners in solitary confinement must have some form of regular and routine contact with staff. In addition, the physical layouts of most such units—adjoining cells connected by plumbing, heating vents, and ventilation ducts—typically allow for some minimal form communication between prisoners (however strained and denatured the "interaction" may be and however inventive prisoners must be to bring it about).

3. Long-term solitary confinement was once a standard feature of imprisonment. But by the last decade of the 19th century, it essentially had been abandoned (see Haney & Lynch, 1997, pp. 481-496). In 1890, U.S. Supreme Court Justice Miller (*Re Medley*, 1890), summarized the preceding hundred years of experience with this kind of punishment by noting, "There were serious objections to it . . . and solitary confinement was found to be too severe." To illustrate, he also provided this account of its psychological effects:

> A considerable number of the prisoners fell, after even a short confinement, into a semifatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; although those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community. (p. 168)

4. In some jurisdictions, overcrowding in these units has forced prison officials to double-cell supermax prisoners. In a sense, this kind of confinement leaves prisoners simultaneously and paradoxically isolated and overcrowded.

5. Most states conduct periodic reviews of such indeterminate sentences. But the reviews are typically pro forma and continued supermax placement is virtually always authorized. Since the initial decision about a prisoner's status as a gang member is based entirely on the judgement of staff members, and since these judgements rarely if ever change, continued and indefinite supermax placement is essentially assured. See Tachiki (1995) for a more detailed discussion of this issue.

6. What, exactly, qualifies a prisoner to be considered one of the so-called "worst of the worst" has never really been clarified in correctional policy or constitutional decision making. Nonetheless, correctional administrators (e.g., Hershberger, 1998) and even some federal judges talk about the category as though it was unproblematic to define and apply. For example, "Common sense, moreover, tells us that the prisoners in the disciplinary unit of a maximum security prison are apt to be the worst of the worst and that guards must therefore use more repressive methods in dealing with them" (*Cooper v. Casey*, 1996, p. 918). See, also, *Jones 'El v. Berge* (2001): "Supermax Correctional Institution is a 500 bed supermaximum security facility in Boscobel, Wisconsin, designed to incarcerate the worst of the worst offenders" (p. 1099). However, as another federal judge correctly observed, "this concept has proven difficult to operationalize" (*Austin v. Wilkinson*, 2002, p. 723). Critics have questioned the use of this terminology and worry that its vagueness leads repeatedly to overclassification and the blanket justification for harsh treatment. When it is applied to prisoners solely on the basis of alleged gang affiliation or in response to disciplinary infractions that, in at least some instances, appear to stem more from mental illness than willful propensities on the part of the prisoner, it seems particularly questionable and subject to abuse. See, for example, DeMaio (2001) and Tachiki (1995).

7. Random sampling of prisoners permits the sample statistics to be generalized to the characteristics of the entire SHU population, within a margin of error associated with the particular estimate. This margin of error is a function of both the size of the sample (in this case, 102) and the specific sample percentage being generalized. For example, at the 95% confidence level (the level ordinarily used in academic and scientific writing), the margin of error for this sample is somewhere between ±6% to 10%, depending on the specific sample percentage. The more even the percentage split (i.e., 50%), the closer to the higher limit (in this case ±10%) the margin of error will be.

8. In a key passage in the opinion, the judge (*Madrid v. Gomez*, 1995) limited his ruling in this way:

> While a risk of a more serious [mental] injury is not non-existent, we are not persuaded, on the present record and given all the circumstances, that the risk of developing an injury to mental health of *sufficiently serious magnitude* due to current conditions in the SHU is high enough for the SHU population as a whole, to find that current conditions in the SHU are *per se* violative of the Eighth Amendment with respect to all potential inmates. (p. 1265)

9. He wrote, "We emphasize, of course, that this determination is based on the current record and data before us. We can not begin to speculate on the impact that Pelican Bay SHU conditions may have on inmates confined in the SHU for periods of 10 or 20 years or more; the inmates studied in connection with this action had generally been confined to the SHU for three years or less" (*Madrid v. Gomez*, 1995, p. 1267).

10. A short time later in the opinion, the judge was equally pointed in his analysis:

> As the pain and suffering caused by a cat-o'-nine-tails lashing an inmate's back are cruel and unusual punishment by today's standards of humanity and decency, the pain and suffering caused by extreme levels of psychological deprivation are equally, if not more, cruel and unusual. The wounds and resulting scars, while less tangible, are no less painful and permanent when they are inflicted on the human psyche. (p. 914)

11. It is important not to be naïve about vague recommendations like "screening, monitoring, and removal." The utility of these reforms turns entirely on the way in which they are actually implemented. For example, if mental health personnel must always defer to the judgements of custodial staff, are under pressure to admit or retain prisoners in supermax whom they believe should not be there, are inadequately trained to recognize vulnerabilities to isolation-related

stressors, or predisposed to attribute psychiatric complaints to preexisting character disorders (and thereby dismiss them), then the reforms will help to ameliorate the harms of supermax very little or not at all.

12. For example, "Not one of the state supermax prisons, however, is necessary, and all are a grave error in the sad tale of man's brutality to man" (Kurki & Morris, 2001, p. 421); "Where prison regimes are so depriving as those offered in most supermax facilities, the onus is upon those imposing the regimes to demonstrate that this is justified. . . . To the best of my knowledge, no convincing demonstration has yet been provided" (King, 2000, p. 182); "Supermaxes have to justify or modify the draconian strictures that typically prevail at entry into the setting. The argument that such strictures are required as an incentive for promotion to a less sensorily-deprived environment is specious because less onerous gradations of conditions would serve the same ends" (Toch, in press).

## REFERENCES

Andersen, H., Sestoft, D., Lillebaek, T., Gabrielsen, G., Hemmingsen, R., & Kramp, P. (2000). A longitudinal study of prisoners on remand: Psychiatric prevalence, incidence and psychopathology in solitary vs. non-solitary confinement. *Acta Psychiatrica Scandinavica, 102,* 19-25.

Austin v. Wilkinson, 189 F. Sup. 2d 719 (2002).

Bauer, M., Priebe, S., Haring, B., & Adamczak, K. (1993). Long-term mental sequelae of political imprisonment in East Germany. *Journal of Nervous & Mental Disease, 181,* 257-262.

Benjamin, T., & Lux, K. (1975). Constitutional and psychological implications of the use of solitary confinement: Experience at the Maine prison. *Clearinghouse Review, 9,* 83-90.

Bidna, H. (1975). Effects of increased security on prison violence. *Journal of Criminal Justice, 3,* 33-46.

Brodsky, S., & Scogin, F. (1988). Inmates in protective custody: First data on emotional effects. *Forensic Reports, 1,* 267-280.

Chappell, N., & Badger, M. (1989). Social isolation and well-being. *Journal of Gerontology, 44,* 169-176.

Cooke, M., & Goldstein, J. (1989). Social isolation and violent behavior. *Forensic Reports, 2,* 287-294.

Cooper v. Casey, 97 F.3d 914 (1996).

Cormier, B., & Williams, P. (1966). Excessive deprivation of liberty. *Canadian Psychiatric Association Journal, 11,* 470-484.

Deaton, J., Burge, S., Richlin, M., & Latrownik, A. (1977). Coping activities in solitary confinement of U.S. Navy POWs in Vietnam. *Journal of Applied Social Psychology, 7,* 239-257.

DeMaio, J. (2001). If you build it, they will come: The threat of overclassification in Wisconsin's supermax prison. *Wisconsin Law Review, 2001,* 207-248.

Dupuy, H., Engel, A., Devine, B., Scanlon, J., & Querec, L. (1970). *Selected symptoms of psychological distress.* Washington, DC: Government Printing Office.

Edwards, K. (1988). Some characteristics of inmates transferred from prison to a state mental hospital. *Behavioral Sciences and the Law, 6,* 131-137.

Fisher, W. (1994). Restraint and seclusion: A review of the literature. *American Journal of Psychiatry, 151,* 1584-1591.

Foster, D. (1987). *Detention & torture in South Africa: Psychological, legal & historical studies.* Cape Town, South Africa: David Philip.

Grassian, S. (1983). Psychopathological effects of solitary confinement. *American Journal of Psychiatry, 140*, 1450-1454.

Haney, C. (1993). Infamous punishment: The psychological effects of isolation. *National Prison Project Journal, 8*, 3-21.

Haney, C. (1997). Psychology and the limits to prison pain: Confronting the coming crisis in Eighth Amendment law. *Psychology, Public Policy, and Law, 3*, 499-588.

Haney, C. (in press). The psychological impact of incarceration: Implications for post-prison adjustment. In J. Travis (Ed.), *From prison to home*. Washington, DC: Urban Institute Press.

Haney, C., & Lynch, M. (1997). Regulating prisons of the future: The psychological consequences of solitary and supermax confinement. *New York University Review of Law and Social Change, 23*, 477-570.

Haney, C., & Zimbardo, P. (1998). The past and future of U.S. prison policy: Twenty-five years after the Stanford Prison Experiment. *American Psychologist, 53*, 709-727.

Harrison, A., Clearwater, Y., & McKay, C. (1989). The human experience in Antarctica: Applications to life in space. *Behavioral Science, 34*, 253-271.

Hayes, L. (1989). National study of jail suicides: Seven years later. Special Issue: Jail suicide: A comprehensive approach to a continuing national problem. *Psychiatric Quarterly, 60*, 7-15.

Herman, J. (1992). A new diagnosis. In J. Herman (Ed.), *Trauma and recovery*. New York: Basic Books.

Herman, J. (1995). Complex PTSD: A syndrome in survivors of prolonged and repeated trauma. In G. Everly & J. Lating, (Eds.), *Psychotraumatology: Key papers and core concepts in post-traumatic stress* (pp. 87-100). New York: Plenum.

Hershberger, G. (1998). To the max: Supermax facilities provide prison administrators with more security options. *Corrections Today, 60*(1), 54-57.

Hilliard, T. (1976). The Black psychologist in action: A psychological evaluation of the Adjustment Center environment at San Quentin Prison. *Journal of Black Psychology, 2*, 75-82.

Hinkle, L., & Wolff, H. (1956). Communist interrogation and indoctrination of "enemies of the states." *Archives of Neurology and Psychiatry, 76*, 115-174.

Hocking, F. (1970). Extreme environmental stress and its significance for psychopathology. *American Journal of Psychotherapy, 24*, 4-26.

Hodgins, S., & Cote, G. (1991). The mental health of penitentiary inmates in isolation. *Canadian Journal of Criminology, 33*, 177-182.

Horowitz, M. (1990). Post-traumatic stress disorders: Psychosocial aspects of the diagnosis. *International Journal of Mental Health, 19*, 21-36.

Hougen, H. (1988). Physical and psychological sequelae to torture: A controlled clinical study of exiled asylum applicants. *Forensic Sciences International, 39*, 5-11.

Human Rights Watch. (1991, November). *Prison conditions in the United States: A Human Rights Watch Report*. New York: Author.

Human Rights Watch. (2000, February). Out of sight: Super-maximum security confinement in the United States. *Human Rights Watch, 12*(1), 1-9.

Jackson, M. (1983). *Prisoners of isolation: Solitary confinement in Canada*. Toronto, Canada: University of Toronto Press.

Jamelka, R., Trupin, E., & Chiles, J. (1989). The mentally ill in prison. *Hospital and Community Psychiatry, 40*, 481-491.

Johnson, E. (1973). Felon self-mutilation: Correlate of stress in prison. In B. Dant (Ed.) *Jail House Blues*. Michigan: Epic.

Jones, A. (1986). Self-mutilation in prison: A comparison of mutilators and nonmutilators. *Criminal Justice and Behavior, 13*, 286-296.

Jones, D. (1976). *The health risks of imprisonment*. Lexington, MA: D. C. Heath.

Jones 'El v. Berge, 164 F. Supp. 1096 (2001).

King, R. (2000). The rise and rise of supermax: An American solution in search of problem? *Punishment and Society, 1,* 163-186.

Koch, I. (1986). Mental and social sequelae of isolation: The evidence of deprivation experiments and of pretrial detention in Denmark. In B. Rolston & M. Tomlinson (Eds.), *The expansion of European prison systems* (Working Papers in European Criminology No. 7, p. 119-129). Belfast, U.K.: Print Workshop.

Korn, R. (1988a). The effects of confinement in the High Security Unit at Lexington. *Social Justice, 15,* 8-19.

Korn, R. (1988b). Follow-up report on the effects of confinement in the High Security Unit at Lexington. *Social Justice, 15,* 20-29.

Kratcoski, P. (1988). The implications of research explaining prison violence and disruption. *Federal Probation, 52,* 27-32.

Kurki, L., & Morris, N. (2001). The purposes, practices, and problems of supermax prisons. *Crime and Justice, 28,* 385-424.

Leiderman, H. (1962). Man alone: Sensory deprivation and behavioral change. *Corrective Psychiatry and Journal of Social Therapy, 8,* 64-74.

Lovell, D., Cloyes, K., Allen, D., & Rhodes, L. (2000). Who lives in super-maximum custody? A Washington State study. *Federal Probation, 64*(2), 33-38.

Madrid v. Gomez, 889 F. Supp. 1146 (1995).

Mason, T. (1993). Seclusion theory reviewed—A benevolent or malevolent intervention? *Medical Science Law, 33,* 95-102.

Miller, H., & Young, G. (1997). Prison segregation: Administrative detention remedy or mental health problem? *Criminal Behaviour and Mental Health, 7,* 85-94.

O'Brien, T., & Jones, D. (1999). A balanced approach for corrections policy needed. *American Psychologist, 54,* 784-785.

Porporino, F. (1986). Managing violent individuals in correctional settings, *Journal of Interpersonal Violence, 1,* 213-237.

Rathbone-McCuan, E., & Hashimi, J. (1982). *Isolated elders: Health and social intervention.* Rockville, MD: Aspen Systems.

Re Medley, 134 U.S. 160 (1890).

Riekert, J. (1985). The DDD syndrome: Solitary confinement and a South African Security Law trial. In A. Bell & R. Mackie (Eds.) *Detention and security legislation in South Africa* (pp. 121-147). Durban, South Africa: University of Natal.

Riveland, C. (1999). *Supermax prisons: Overview and general considerations.* Washington, DC: U.S. Department of Justice.

Robins, L., & Regier, D. (Eds.) (1991). *Psychiatric disorders in America: The epidemologic catchment area study.* New York: Free Press.

Ruiz v. Estelle, 503 F. Supp. 1265 (1980).

Ruiz v. Johnson, 37 F. Supp. 855 (1999).

Rundle, F. (1973). The roots of violence at Soledad. In E. O. Wright (Ed.), *The politics of punishment: A critical analysis of prisons in America* (pp. 163-172). New York: Harper.

Scott, G. (1969). The prisoner of society: Psychiatric syndromes in captive society. *Correctional Psychologist, 3*(7), 3-5.

Scott, G., & Gendreau, P. (1969). Psychiatric implications of sensory deprivation in a maximum security prison. *Canadian Psychiatric Association Journal, 12,* 337-341.

Sestoft, D., Andersen, H., Lilleback, T., & Gabrielsen, G. (1998). Impact of solitary confinement on hospitalization among Danish prisoners in custody. *International Journal of Law and Psychiatry, 21,* 99-108.

156    CRIME & DELINQUENCY / JANUARY 2003

Shallice, T. (1974). The Ulster interrogation techniques and their relation to sensory deprivation research. *Cognition, 1,* 385-405.

Siegel, R. (1984). Hostage hallucinations: Visual imagery induced by isolation and life-threatening stress. *Journal of Nervous and Mental Disease, 172,* 264-272.

Slater, R. (1986). Psychiatric intervention in an atmosphere of terror. *American Journal of Forensic Psychiatry, 7*(1), 5-12.

Somnier, F., & Genefke, I. (1986). Psychotherapy for victims of torture. *British Journal of Psychiatry, 149,* 323-329.

Steinke, P. (1991). Using situational factors to predict types of prison violence. *Journal of Offender Rehabilitation, 17,* 119-132.

Suedfeld, P., Ramirez, C., Deaton, J., & Baker-Brown, G. (1982). Reactions and attributions of prisoners in solitary confinement. *Criminal Justice and Behavior, 9,* 303-340.

Suedfeld, P., & Roy, C. (1975). Using social isolation to change the behavior of disruptive inmates. *International Journal of Offender Therapy and Comparative Criminology, 19,* 90-99.

Tachiki, S. (1995). Indeterminate sentences in supermax prisons based upon alleged gang affiliations: A reexamination of procedural protection and a proposal for greater procedural requirements. *California Law Review, 83,* 1117-1149.

Toch, H. (1975). *Men in crisis: Human breakdowns in prisons.* Chicago: Aldine.

Toch, H. (in press). The future of supermax confinement. *The Prison Journal.*

Toch, H., & Adams, K. (2002). *Acting out: Maladaptive behavior in confinement.* Washington, DC: American Psychological Association.

Trop v. Dulles, 356 U.S. 86 (1958).

Veneziano, L., & Veneziano, C. (1996). Disabled inmates. In M. McShane & F. Williams (Eds.), *Encyclopedia of American prisons* (pp. 157-161). New York: Garland.

Volkart, R., Dittrich, A., Rothenfluh, T., & Werner, P. (1983). Eine kontrollierte untersuchung uber psychopathologische effekte der einzelhaft [A controlled investigation on psychopathological effects of solitary confinement]. *Psychologie—Schweizerische Zeitschrift fur Psychologie und ihre Anwendungen, 42,* 25-46.

Volkart, R., Rothenfluh, T., Kobelt, W., Dittrich, A., & Ernst, K. (1983). Einselhaft als Risikofactor fur psychiatrische Hospitalisierung [Solitary confinement as a risk factor for psychiatric hospitalization]. *Psychiatria Clinica, 16,* 365-377.

Vrca, A., Bozikov, V., Brzovic, Z., Fuchs, R., & Malinar, M. (1996). Visual evoked potentials in relation to factors of imprisonment in detention camps. *International Journal of Legal Medicine, 109,* 114-117.

Waligora, B. (1974). Funkcjonowanie Czlowieka W Warunkach Izolacji Wieziennej [How men function in conditions of penitentiary isolation]. *Seria Psychologia I Pedagogika* NR 34, Poland.

Walters, R., Callagan, J., & Newman, A. (1963). Effect of solitary confinement on prisoners. *American Journal of Psychiatry, 119,* 771-773.

West, L. (1985). Effects of isolation on the evidence of detainees. In A. Bell & R. Mackie (Eds.) *Detention and security legislation in South Africa* (pp. 69-80). Durban, South Africa: University of Natal.



**ANNUAL REVIEWS**

*Annual Review of Criminology*

# Restricting the Use of Solitary Confinement

## Craig Haney

Department of Psychology, University of California, Santa Cruz, California 95064, USA; email: psylaw@ucsc.edu

Annu. Rev. Criminol. 2018.1:285-310. Downloaded from www.annualreviews.org
Access provided by University of California - Santa Cruz on 01/23/18. For personal use only.

Annu. Rev. Criminol. 2018. 1:285–310

First published as a Review in Advance on November 3, 2017

The *Annual Review of Criminology* is online at criminol.annualreviews.org

https://doi.org/10.1146/annurev-criminol-032317-092326

Copyright © 2018 by Annual Reviews. All rights reserved



ANNUAL
REVIEWS **Further**

**Click here** to view this article's online features:
• Download figures as PPT slides
• Navigate linked references
• Download citations
• Explore related articles
• Search keywords

**Keywords**

solitary confinement, prison isolation, prison effects, conditions of confinement

**Abstract**

A robust scientific literature has established the negative psychological effects of solitary confinement. The empirical findings are supported by a theoretical framework that underscores the importance of social contact to psychological as well as physical well-being. In essence, human beings have a basic need to establish and maintain connections to others and the deprivation of opportunities to do so has a range of deleterious consequences. These scientific conclusions, as well as concerns about the high cost and lack of any demonstrated penological purpose that solitary confinement reliably serves, have led to an emerging consensus among correctional as well as professional, mental health, legal, and human rights organizations to drastically limit the practice.

Annu. Rev. Criminol. 2018.1:285-310. Downloaded from www.annualreviews.org
Access provided by University of California - Santa Cruz on 01/23/18. For personal use only.

## INTRODUCTION

The effects of being housed in solitary confinement are now well understood and documented in the scientific literature. There are numerous empirical studies that report robust findings—that is, consistent and corroborative data collected by researchers and clinicians from diverse backgrounds and perspectives, amassed over a period of many decades. With remarkably few exceptions, virtually every one of these studies has found that isolated prisoners experience negative psychological effects and are at a significant risk of serious harm.

In addition, these empirical findings are theoretically sound. That is, there are straightforward scientific explanations for the fact that solitary confinement—the absence of meaningful social contact and interaction with others—produces pain and suffering and can have harmful psychological consequences. Social exclusion and isolation from others is known to cause adverse psychological effects in contexts other than prison; it therefore makes perfect theoretical sense that this experience produces similar negative outcomes in correctional settings, where the isolation is rigidly enforced, the opprobrium and hostility directed at isolated prisoners are extreme, and the other associated deprivations are so severe. Although the significant risk of serious psychological harm exists for all prisoners, it is intensified for those who suffer from a pre-existing mental illness or other vulnerabilities.

As I discuss in this review, this theoretically grounded body of scientific knowledge has served as an important basis for an emerging consensus among scientific researchers as well as corrections professionals and mental health, legal, and human rights organizations on the need to significantly restrict the nature, frequency, and duration of solitary confinement and to exclude certain groups of prisoners from being subjected to it at all.

## THE DEFINITION, USE, AND OPERATIONAL CONSEQUENCES OF SOLITARY CONFINEMENT

For perhaps obvious reasons, total and absolute solitary confinement—literally complete isolation from any form of human contact—does not exist in prison and never has. Instead, the term is generally used in correctional practice, law, and scholarship to refer to conditions of extreme (but not total) isolation from others. I have defined it elsewhere, in a way that is entirely consistent with its use in the broader correctional literature, as

> [S]egregation from the mainstream prisoner population in attached housing units or free-standing facilities where prisoners are involuntarily confined in their cells for upwards of 23 hours a day or more, given only extremely limited or no opportunities for direct and normal social contact with other persons (i.e., contact that is not mediated by bars, restraints, security glass or screens, and the like), and afforded extremely limited if any access to meaningful programming of any kind (Haney 2009, p. 12, footnote 1).

The definition of what constitutes solitary confinement turns less on the exact amount of in-cell time to which a prisoner is subjected and more on the deprivation of normal, direct, and meaningful social contact and access to positive environmental stimulation. Thus, an isolated prisoner who was afforded considerable out-of-cell time during which he or she was denied normal and meaningful forms of direct social contact and positive stimulation or programming would still be in solitary confinement. "Normal" and "direct" contact means at least, as noted above, contact that is not mediated or interposed by such things as "bars, restraints, security glass or screens." But the contact must also be "meaningful," which, in this context, refers to contact with others in a setting

Annu. Rev. Criminol. 2018.1:285-310. Downloaded from www.annualreviews.org
Access provided by University of California - Santa Cruz on 01/23/18. For personal use only.

that provides access to actual programming and/or purposeful activities of common interest or consequence that allow for genuine social interaction and engagement with others.

From a correctional perspective, prisoners are placed in solitary confinement for a number of different reasons. In some instances, prisoners are placed in solitary confinement as punishment, typically a fixed amount of time in isolation meted out in response to a disciplinary infraction. Solitary confinement is also administratively imposed, often justified in vague terms (such as "the safety and security of the institution"), and for durations that last for indefinite amounts of time, targeting certain individuals or groups for whom prison officials deem it necessary. Many prison systems also use a form of solitary confinement to house protective custody prisoners who, for a variety of reasons, cannot be kept safe elsewhere in the prison system. Although protective custody prisoners certainly suffer the negative consequences of solitary confinement that result from the social and sensory deprivations that the experience entails, they are in a somewhat different position, psychologically, from those housed involuntarily in solitary confinement. Because of the ostensible physical protections it affords, solitary confinement may be preferred over what protective custody prisoners regard as more dangerous general population prison housing. Moreover, protective custody prisoners are likely to have some degree of perceived or actual control over their continued retention in solitary confinement, at least in those systems where their placement is considered truly voluntary. Protective custody prisoners in solitary confinement also may be more reluctant to acknowledge or complain about their negative psychological reactions to the experience (because they are highly dependent on the prison system to keep them safe). In any event, they should not be regarded as experiencing solitary confinement exactly as other prisoners do.

Riveland (1999, p. 3) has observed that solitary or segregated confinement typically occurs either in a "freestanding facility, or a distinct unit within a freestanding facility, that provides for the management and secure control of inmates" under conditions characterized by "separation, restricted movement, and limited access to staff and other inmates." As the United States Department of Justice (2013, p. 5) has noted, "[a]n isolation unit means a unit where all or most of those housed in the unit are subjected to isolation."

Although no precise calculation of how many prisoners are being held in solitary confinement in the United States is currently possible (in part because prison and jail systems do not officially identify and report these data on a reliable and consistent basis), recent estimates indicate that the number is not insignificant. For example, one national survey of prison administrators who reported figures for their jurisdictions concluded that "it is fair to estimate that some 80,000–100,000 people were in restricted housing in prisons in the fall of 2014" (Assoc. State Correct. Adm. et al. 2015, p. 10). This estimate does not include the sizable number of jail inmates who are housed in solitary confinement at any given time (e.g., Haney et al. 2015).

A Bureau of Justice Statistics (BJS) survey of a nationally representative sample of 91,177 adult inmates in the United States indicated that, on an average day in 2011–2012, "up to 4.4% of state and federal inmates and 2.7% of jail inmates were held in administrative segregation or solitary confinement" (Beck 2015, p. 1). Although these figures likely represent a modest underestimate (because the sample did not include those who, for various reasons, including their segregation status, could not complete the survey), they nonetheless translate into nearly 70,000 state and federal prisoners and approximately 20,000 jail inmates (estimated from population figures reported by Glaze & Parks 2012).

Even though fewer than 5% of prisoners on average are housed in solitary confinement at any given time, the fact that prisoners cycle in and out of these units means that a much higher number experience these conditions in the course of their prison or jail sentence. The same 2011–2012 BJS survey found that nearly one in five prisoners reported being housed in solitary confinement in the preceding year (Beck 2015). African Americans and "other-race" (a category that includes

Annu. Rev. Criminol. 2018.1:285-310. Downloaded from www.annualreviews.org
Access provided by University of California - Santa Cruz on 01/23/18. For personal use only.

American Indian, Asian, Native Hawaiians, and Pacific Islanders) inmates were significantly more likely to spend time in solitary confinement, as were mentally ill prisoners (Beck 2015). In fact, "[o]n every measure of past mental health problems, inmates who reported a problem were also more likely than other inmates to report that they had spent time in restrictive housing" (Beck 2015, p. 6).

In the nineteenth century, when long-term solitary confinement was actually the modal form of imprisonment in the United States and many other countries, its widespread use was premised on the mistaken belief that prisoners would benefit from the solitude and opportunity for self-reflection and penance that it supposedly afforded as well as from the complete separation from contaminating outside influences, including each other (Rothman 1971). When these beliefs were definitively disproven, in part by showing that solitary confinement was, in the words of Supreme Court Justice Miller, "found to be too severe" (*In re Medley* 1890, p. 168) and an "infamous punishment" that "always implies disgrace" (*In re Medley* 1890, p. 169), it was abandoned by the end of the century. When corrections officials resumed the practice in the latter part of the twentieth century in the United States, they were not pursuing some new and noble penological purpose that solitary confinement seemed likely to achieve. No new research had emerged to indicate that its rejection in the nineteenth century had been based on faulty premises. Instead, its increased use was little more than a correctional expedient, as prison officials attempted to respond to a problematic confluence of larger forces and events, including unprecedented levels of prison overcrowding, the abandonment of a commitment to the rehabilitative ideal and the corresponding loss of positive incentives with which to help manage inmate behavior, and the rise of a penal harm movement that legitimized a range of cruel practices designed to make prisoners suffer (Cullen 1995, Haney 2006).

In addition to the harmful effects of solitary confinement that I discuss in the following section, the emerging consensus that this practice should be significantly limited or eliminated appears to be based on its comparative costs as well as the growing awareness that it may be iatrogenic— that is, it does not achieve its intended objectives and may even worsen the problems it was designed to solve. Specifically, solitary confinement units incur significantly more costs—in their construction, operation, and in other terms—than other types of prison housing (e.g., ACLU Colo. 2011, Pawlaczyk & Hundsdorfer 2010, Shalev 2009). In addition, research has indicated that the introduction of long-term solitary confinement or "supermax" units into a prison system has unpredictable and sometimes counterproductive effects on the overall number of assaults on staff and/or inmates (Briggs et al. 2003, Sundt et al. 2008). There is also no evidence that the widespread use of solitary confinement has any appreciable effect on the size, number, or operation of prison gangs (e.g., Colvin 1992, Hunt et al. 1993, Shalev 2009). In addition, neither short-term nor long-term stays in solitary confinement achieve specific deterrent effects by reducing subsequent disciplinary infractions (e.g., Morris 2016, Reiter 2012) or, apparently, post-prison recidivism (Butler et al. 2017) among prisoners who have experienced it. In fact, ironically, some research suggests that time spent in solitary confinement may increase post-prison rates of re-offending (e.g., Lovell et al. 2007, Mears & Bales 2009). Moreover, whether or not they technically reoffend, many are likely to suffer isolation-related adjustment problems once released back into mainline prisons or free society (e.g., Kupers 2008).

## SCIENTIFIC RESEARCH ON THE PAINFUL AND HARMFUL EFFECTS OF SOLITARY CONFINEMENT

It is useful to think about real-world conditions of solitary confinement along a continuum of harshness or severity, one comprising different dimensions that are imposed on and experienced by prisoners in differing amounts in any given unit. These dimensions include primarily the severity

or degree of social isolation and reduced positive environmental stimulation, which together form the core of the experience, as well as the amount of additional material deprivations, the number of restrictions on movement and other aspects of daily life, and the degree and extent of degrading or hostile treatment to which prisoners are routinely subjected. The different aspects of the experience are amplified by the length of confinement and the amount of control prisoners perceive themselves to have over whether and how they can end it (including whether they are indefinitely, involuntarily, or voluntarily isolated). These components of solitary confinement—which different facilities impose in varying degrees—primarily account for the negative effects and amount of psychological harm suffered. Rather than representing as some sort of Weberian ideal type, solitary confinement is only ever embodied in actual places, ones that exist in any given instance as an amalgam of different conditions that vary along the aforementioned dimensions of harshness and resulting risk of harm. For precisely this reason, the nature and magnitude of its negative effects are not expected to be independent of the particular form it takes, confirming a basic truism in social science: context—here, specific conditions of confinement—matter.

That said, we know that the essence of the experience of solitary confinement—extreme social isolation and the deprivation of positive environmental stimulation—places prisoners at significant risk of serious psychological harm. Prisoners may vary in terms of their vulnerability and resilience in response to this risk, but the risk itself is substantial, and it is typically impossible to determine at the outset of a prisoner's exposure whether and how he or she will survive and at what psychological cost.

Although I concentrate in this review primarily on the socially isolating aspects of the experience, the sensory deprivation components of solitary confinement can contribute significantly to its harmful effects. Some solitary confinement units do, in fact, approximate early psychological experiments on near-total sensory deprivation—darkened cells, little or no sound, and so on. But they are relatively rare nowadays. More commonly in contemporary prisons, solitary confinement subjects prisoners to what has been termed "reduced environmental stimulation"—a term that acknowledges the fact that there is not total (or even nearly total) deprivation of sensory input of any kind but that the meaningful and stimulating aspects of the environment are lacking. Thus, prisoners in solitary confinement are exposed to reduced and monotonous sensory input—an extremely limited and repetitive perceptual and experiential sameness in the physical environment around them. In other instances, however, they are subjected to a great deal of stimulation, but it is aversive or noxious in nature—loud noise, bright lights, foul smells—and they are exposed to these things under circumstances that they typically cannot control. In these cases, the reduction in their environmental stimulation refers to the lack of positive stimuli, despite being bombarded with aversive stimuli that are beyond their control. All of these different but nonetheless problematic sensory aspects of the experience can be harmful to normal, healthy psychological functioning.

In any event, in the admitted absence of a single "perfect" study of the phenomenon (which, for obvious reasons, is practically and ethically proscribed), there is a substantial body of published literature that clearly documents the distinctive patterns of psychological harm that can and do occur when persons are placed in solitary confinement. These outcomes have been consistently identified in accounts written by persons confined in isolation, in descriptive studies authored by mental health professionals and others who worked in many such places, and in a large body of systematic, scientific research conducted on the nature and effects of social isolation more widely—that is, conducted not only in solitary confinement specifically but also in other psychologically similar settings. The studies have been carried out over a period that now spans many decades (and if historical documentation is considered, much longer) and in locations across several continents by researchers with different kinds of professional expertise, ranging from psychiatrists and

Annu. Rev. Criminol. 2018.1:285-310. Downloaded from www.annualreviews.org
Access provided by University of California - Santa Cruz on 01/23/18. For personal use only.

sociologists to historians and architects (e.g., Arrigo & Bullock 2008, Cloyes et al. 2006, Grassian 2006, Haney 2003, Haney & Lynch 1997, Smith 2006).

Even prisoners in solitary confinement who are double-celled (i.e., housed with another prisoner) may nonetheless suffer many of the negative psychological effects that are described in the following pages. In fact, in some ways, prisoners who are double-celled in prison solitary confinement units have the worst of both worlds: they are overcrowded by virtue of being confined nearly around-the-clock with another person inside a typically very small cell, but they are also—and this is the crux of their isolation—simultaneously kept apart from the rest of the mainstream prisoner population as well as being deprived of even minimal freedom of movement, prohibited from access to meaningful prison programs, and denied opportunities for normal, meaningful social interaction. This is especially problematic if prisoners are involuntarily double-celled, have little or no choice over the identity of the person with whom they are housed, and have no practical or feasible means of changing cellmates if they are (or become) incompatible. Because of the inevitable tensions that are created by forcing persons to live around-the-clock in such cramped, deprived conditions, double-celling in solitary confinement units tends to increase the likelihood of violent conflict.

As I noted above, researchers and practitioners know that meaningful social interactions and social connectedness can have a positive effect on people's physical and mental health and, conversely, that social isolation, in general, can undermine health and psychological well-being (e.g., Cacioppo & Cacioppo 2012, DeWall et al. 2011, Fiorillo & Sabatini 2011, Hafner et al. 2011, Karremans et al. 2011, Thornicroft 1991). The long-standing literature on the significant risk that solitary confinement poses for the mental health of prisoners needs to be understood in this theoretical context. In addition to the absence of meaningful human contact and social interaction and the enforced idleness and inactivity, the oppressive security and surveillance procedures and the accompanying hardware and other paraphernalia that are brought or built into these units combine to create extremely harsh, dehumanizing, and deprived conditions of confinement. These conditions predictably impair the psychological functioning of many of the prisoners who are subjected to them (e.g., Arrigo & Bullock 2008, Cloyes et al. 2006, Grassian 2006, Haney 2003, Haney & Lynch 1997, Smith 2006). For some prisoners, the negative effects can be permanent and life-threatening, including an increased likelihood of self-harm and suicide (e.g., Kaba et al. 2014).

A number of the early studies of solitary confinement began with what is now considered a somewhat outmoded theoretical framework, focusing primarily on sensory rather than social deprivation (e.g., Gendreau et al. 1972, Scott & Gendreau 1969, Walters et al. 1963). Even so, the authors of one of the early studies of solitary confinement summarized their findings by concluding that "[e]xcessive deprivation of liberty, here defined as near complete confinement to the cell, results in deep emotional disturbances" (Cormier & Williams 1966, p. 484).

A decade later, Toch's (1975) large-scale psychological study of prisoners in crisis in New York State correctional facilities included important observations about the effects of isolation. After he and his colleagues had conducted numerous in-depth interviews with prisoners, Toch concluded that "isolation panic" was a serious problem in solitary confinement. The symptoms that Toch (1975) reported included rage, panic, loss of control and breakdowns, psychological regression, and a buildup of physiological and psychic tension that led to incidents of self-mutilation. He noted that although isolation panic could occur under other conditions of confinement it was "most sharply prevalent in segregation" (Toch 1975, p. 54). Moreover, it marked an important dichotomy for prisoners: the "distinction between imprisonment, which is tolerable, and isolation, which is not" (Toch 1975, p. 54).

More recent studies also identified a wide range of adverse psychological reactions that frequently occur in solitary confinement. The specific symptoms include stress-related reactions

Annu. Rev. Criminol. 2018.1:285-310. Downloaded from www.annualreviews.org
Access provided by University of California - Santa Cruz on 01/23/18. For personal use only.

(such as decreased appetite, trembling hands, sweating palms, heart palpitations, and a sense of impending emotional breakdown); sleep disturbances (including nightmares and sleeplessness); heightened levels of anxiety and panic; irritability, aggression, and rage; paranoia, ruminations, and violent fantasies; cognitive dysfunction, hypersensitivity to stimuli, and hallucinations; loss of emotional control, mood swings, lethargy, flattened affect, and depression; increased suicidality and instances of self-harm; and, finally, paradoxical tendencies to further social withdrawal. As I discuss in more detail in the following section, the latter reaction—social withdrawal—is related to a broader set of social pathologies that prisoners may experience as they attempt to adapt to the long-term absence of meaningful social contact (for reviews of and citations to the literature in which these specific adverse reactions are documented, see Arrigo & Bullock 2008, Cloyes et al. 2006, Grassian 2006, Haney 2003, Haney & Lynch 1997, Smith 2006).

Solitary confinement is employed more broadly and imposed for longer periods of time in the United States than elsewhere in the world (e.g., Shalev 2009). However, other countries have used solitary confinement, and some still do (e.g., Ross 2013). Thus, there is a large international literature on its adverse psychological effects. Barte's (1989, p. 52) study of the practice in French prisons concluded it had such "psychopathogenic" effects that prisoners placed there for extended periods of time could become schizophrenic instead of receptive to social rehabilitation, rendering the practice unjustifiable, counterproductive, and "a denial of the bonds that unite humankind." Koch's (1986, pp. 124–25) study of "acute isolation syndrome" among detainees in Denmark determined that it occurred after only a few days in isolation and included "problems of concentration, restlessness, failure of memory, sleeping problems and impaired sense of time and ability to follow the rhythm of day and night" and could, if the isolated confinement persisted for "a few weeks" or more, lead to "chronic isolation syndrome," which includes intensified difficulties with memory and concentration, "inexplicable fatigue," a "distinct emotional lability" that included "fits of rage," hallucinations, and the "extremely common" belief among isolated prisoners that "they have gone or are going mad." Volkart et al.'s (1983a) study of penal isolation in Switzerland concluded that when prisoners in normal conditions of confinement were compared to those in solitary confinement, the latter were found to display considerably more psychopathological symptoms, which included heightened feelings of anxiety, emotional hypersensitivity, ideas of persecution, and thought disorders (see also Bauer et al. 1993, Volkart 1983, Volkart et al. 1983b, Waligora 1974.)

The prevalence of psychological symptoms (that is, the percentage of prisoners in these units who suffer from these and related signs of psychological distress) appears to be extremely high. For example, in an early study conducted at the Security Housing Unit (SHU) at Pelican Bay State Prison in California, a very severe solitary confinement facility (e.g., Haney 1993, *Madrid v. Gomez* 1995, Reiter 2016), structured interviews were conducted to systematically assess a randomly selected, representative sample of 100 prisoners to determine the prevalence of symptoms of psychological stress, trauma, and isolation-related psychopathology (Haney 2003). The interviews included a number of demographic questions, brief social and institutional histories, and systematic assessments consisting of 25 specific items, based on the Omnibus Stress Index (Jones 1976) and on others similar to those used in Brodsky & Scogin (1988). Virtually every symptom of psychological stress and trauma but one (fainting) was suffered by more than half of the prisoners who were assessed (with many of the symptoms being acknowledged by two-thirds or more of the prisoners and some by nearly everyone). Well over half of the prisoners in the sample reported a constellation of symptoms—headaches, trembling, sweaty palms, and heart palpitations—that are known to be distress related.

In addition, high numbers of prisoners reported suffering from isolation-related symptoms of pathology. Thus, nearly all of the Pelican Bay SHU prisoners acknowledged ruminations or intrusive thoughts, an oversensitivity to external stimuli, irrational anger and irritability, difficulties with

Annu. Rev. Criminol. 2018.1:285-310. Downloaded from www.annualreviews.org
Access provided by University of California - Santa Cruz on 01/23/18. For personal use only.



**Figure 1**

Number of stress- and isolation-related trauma symptoms reported by solitary confinement versus general population prisoners. Error bars show standard deviation of each group's scores. Abbreviations: SHU, security housing unit; GP, general population.

attention and often with memory, and a tendency to socially withdraw. Almost as many prisoners reported a constellation of symptoms indicative of mood or emotional disorders—concerns over emotional flatness or losing the ability to feel, swings in emotional response, and feelings of depression or sadness that did not go away. Finally, sizable minorities of the prisoners reported symptoms that are typically only associated with more extreme forms of psychopathology—hallucinations, perceptual distortions, and thoughts of suicide.

A subsequent study conducted at the same facility found that these kinds of symptoms were prevalent among a sample of extremely long-term isolated prisoners and experienced at much higher levels and greater intensities than long-term general population prisoners. The same structured interview and systematic assessment format as in the earlier study were used to compare the prevalence of symptoms of psychological stress, trauma, and isolation-related psychopathology in a randomly selected sample of extremely long-term SHU prisoners (who had spent ten years or more in continuous solitary confinement) with a randomly selected sample of general population (GP) prisoners who had spent ten years or more in continuous imprisonment (Haney 2017).[1] The structured interview format and assessment instrument were identical to the ones employed in the earlier study. All of the prisoners in both groups were otherwise mentally healthy; that is, no one from either group was currently on the prison system's mental health caseload.[2]

As **Figure 1** indicates, Haney (2017) found that the extremely long-term isolated SHU prisoners reported nearly twice the mean number of symptoms of both stress-related trauma ($M = 6.88$ versus 3.58, $t = 5.36$, $df = 62$, $p < 0.001$, Cohen's $D = 1.36$) and isolation-related pathology ($M = 8.44$ versus 4.24, $t = 6.63$, $df = 64$, $p < 0.001$, Cohen's $D = 1.66$) overall, as compared to

---

[1]Access to both groups was permitted pursuant to a court order in *Ashker v. Brown* (2014). I am grateful to attorneys from the Center for Constitutional Rights, the California Attorney General's Office, and staff members from the California Department of Corrections and Rehabilitation for their assistance and cooperation in facilitating data collection.

[2]As a result of a federal court decision, *Madrid v. Gomez* (1995), no prisoner on the California Department of Corrections and Rehabilitation's mental health caseload is permitted to be housed in the Pelican Bay Security Housing Unit. To ensure comparability of the samples in this respect, long-term GP prisoners who were currently on the mental health caseload were not included in the study.

Annu. Rev. Criminol. 2018.1:285-310. Downloaded from www.annualreviews.org
Access provided by University of California - Santa Cruz on 01/23/18. For personal use only.

Annu. Rev. Criminol. 2018.1:285-310. Downloaded from www.annualreviews.org
Access provided by University of California - Santa Cruz on 01/23/18. For personal use only.



**Figure 2**

Intensity of stress- and isolation-related trauma symptoms reported by solitary confinement versus general population prisoners. Respondents who reported experiencing the specific symptom during the last three months were asked "how often" and responded with the following measures of intensity: 1, rarely; 2, some; 3, often; or 4, constantly. Error bars show standard deviation of each group's scores. Abbreviations: SHU, security housing unit; GP, general population.

the GP prisoners who had been in prison for similar amounts of time (i.e., ten years or more). In addition, as **Figure 2** indicates, the SHU prisoners who were subjected to extremely long-term solitary confinement reported suffering much greater stress- and trauma-related symptom intensity ($M = 17.7$ versus 7.79, $t = 5.7$, df $= 62$, $p < 0.001$, Cohen's $D = 1.53$), and much greater intensity of isolation-related pathology ($M = 21.66$ versus 9.00, $t = 7.46$, df $= 64$, $p < 0.001$, Cohen's $D = 1.91$) than the long-term GP prisoners. A sequential multiple linear regression was used to determine whether current solitary confinement status explained the difference in the intensity of these isolation-related pathological symptoms. In fact, being in solitary confinement was by far the largest contributor to the intensity of the various negative symptoms that the prisoners suffered, even after controlling for age, marital status, and estimated total time in prison. Finally, Haney (2017) found that the prisoners in long-term solitary confinement were not only significantly more lonely than the long-term GP prisoners ($t = 4.64$, df $= 64$, $p < 0.001$, Cohen's $D = 1.15$), as measured by the UCLA Loneliness Scale (e.g., Russell et al. 1980), but also reported extremely high levels of loneliness rarely found anywhere in the literature.

Although the Haney (2017) study did not include prisoners who were currently identified as suffering from mental illness, the concentration of mentally ill prisoners who are confined in solitary confinement units is often disproportionately high (e.g., Hodgins & Cote 1991, Lovell et al. 2000). This is especially problematic because, for perhaps obvious reasons, mentally ill prisoners are generally more sensitive and reactive to psychological stressors and emotional pain. The harshness and severe levels of deprivation that they experience in solitary confinement are in many ways the antithesis of the kind of benign and socially supportive atmosphere that mental health workers seek to create in genuinely therapeutic environments. Not surprisingly, then,

mentally ill prisoners are more likely to deteriorate and decompensate when they are subjected to the harshness, stress, and deprivations of solitary confinement.[3]

In addition to the specific signs and symptoms of psychological and isolation-related distress cited above, placement in solitary confinement can lead to other negative, even fatal, outcomes. For example, Patterson & Hughes (2008, p. 678) attributed higher suicide rates in solitary confinement units to the heightened levels of environmental stress that are generated by the "isolation, punitive sanctions, [and] severely restricted living conditions" that exist there. They noted that "the conditions of deprivation in locked units and higher-security housing were a common stressor shared by many of the prisoners who committed suicide" (Patterson & Hughes 2008, p. 678). Lanes (2011) found that prisoners with extensive histories of self-injury were especially likely to be placed in solitary confinement, despite research showing that self-injurious behaviors persist at a disproportionately high level in these units (Lanes 2009). In fact, a team of researchers in New York found that "[i]nmates punished by solitary confinement were approximately 6.9 times as likely to commit acts of self-harm after we controlled for the length of jail stay, SMI [whether the inmate was seriously mentally ill], age, and race/ethnicity" (Kaba et al. 2014, p. 445).

It is also important to note that, although social deprivation and the lack of positive stimulation and programming are the sources of the greatest psychological pain that prisoners experience in solitary confinement and what places them at the greatest risk of harm, these units typically deprive prisoners of many other things as well. Solitary confinement commonly includes high levels of repressive control, enforced idleness, and physical and material deprivations that also produce psychological distress and can exacerbate the negative consequences of social deprivation and lack of positive stimulation. Indeed, most of the things that we know are beneficial to prisoners, such as opportunities for meaningful physical exercise or recreation, programming, and visitation (e.g., Wooldredge 1999), are either functionally denied or greatly restricted for prisoners who are housed in solitary confinement. These deprivations combine with the other stressors to which isolated prisoners are subjected and exacerbate their negative psychological effects.

For example, we know that people in general require a certain level of mental and physical activity to remain mentally and physically healthy (e.g., Bize et al. 2007, Penedo & Dahn 2005). Simply put, human beings need movement and exercise to maintain normal functioning. The severe restrictions that are imposed in isolation units—typically no more than an hour or so a day out of their cells—can negatively impact prisoners' well-being. Denying prisoners access to normal and necessary human activity places them at risk of psychological harm.

Similarly, apart from the profound social, mental, and physical deprivations that solitary confinement can produce, prisoners housed in these units experience prolonged periods of monotony and idleness. Many of them experience a special form of sensory deprivation or reduced environmental stimulation—there is an unvarying sameness to the physical stimuli that surround them. Prisoners in solitary confinement exist within the same limited spaces and are subjected to the same repetitive routines, day in and day out. There is little or no external variation to the experiences they are permitted to have or can create for themselves. They not only see and experience the same extremely limited physical environment but also have minimal, routinized, and superficial contacts with the same very small group of people again and again, sometimes for years on end.

---

[3]It is important to note that a prisoner's official designation as mentally ill or not depends on a number of factors, including the criteria used, the nature and circumstances under which s/he is evaluated, and the quality of the staff and procedures by which the judgment is made. Even in prison systems with otherwise adequate mental health care, there are typically a number of emotionally vulnerable prisoners who have not been formally designated as mentally ill but nonetheless are likely to be especially adversely affected by solitary confinement.

Annu. Rev. Criminol. 2018.1:285-310. Downloaded from www.annualreviews.org
Access provided by University of California - Santa Cruz on 01/23/18. For personal use only.

This loss of perceptual and cognitive or mental stimulation may result in the atrophy of important skills and capacities (e.g., Grassian 1983, Haney 2003, Miller & Young 1997).

Indeed, the pain, suffering, and psychic damage that can occur in solitary confinement are underscored by the fact that it is commonly used in so-called brainwashing and certain forms of torture. In fact, many of the negative effects of solitary confinement are analogous to the acute reactions suffered by torture and trauma victims, including post-traumatic stress disorder (PTSD) and the kind of psychiatric sequelae that plague victims of what are called deprivation and constraint torture techniques (e.g., Lippman 1994, Shallice 1974, Somnier & Genefke 1986, Whittaker 1988). For example, Foster (1987, p. 136) listed solitary confinement among the most common "psychological procedures" used to torture South African detainees and concluded that "[g]iven the full context of dependency, helplessness and social isolation common to conditions of South African security law detention, there can be little doubt that solitary confinement under these circumstances should in itself be regarded as a form of torture" (see also Haney & Bakhshay 2017).

Although the empirical consensus on the harmfulness of solitary confinement is broad and deep, there is one notable, albeit highly controversial exception to this generalization. The so-called Colorado Study of one year in administrative segregation (O'Keefe et al. 2010, 2013) purported to find that solitary confinement not only did not put prisoners at a significant risk of harm but actually enhanced the psychological well-being of many of them (including many who were mentally ill). As soon as the study was released, critics from a variety of disciplines identified a range of very serious methodological problems that appeared to completely discredit its findings (e.g., Grassian & Kupers 2011, Rhodes & Lovell 2011, Shalev & Lloyd 2011, Smith 2011). Without cataloging the entire list of all of the serious flaws from which the study suffered, two of them were fatal to any meaningful interpretation of the results. The first such flaw occurred at the outset of the study, when all groups (including the intended control participants) were exposed to a severe form of the key treatment variable—solitary confinement—for nontrivial durations that averaged 30 days (O'Keefe 2017, p. 2). Once the study period was underway, the second fatal flaw occurred. Specifically, both the control and treatment groups were contaminated by being sporadically comingled with one another (that is, more than half of the prisoners in both general population and administrative segregation were placed in the opposite group, or in some other kind of confinement, during the study period). This confounded any possible interpretation of the comparisons between the groups. These and numerous other serious methodological problems led Lovell & Toch (2011, p. 4) to succinctly note in their critique of the study that "[d]espite the volume of the data, no systematic interpretation of the findings is possible."[4]

The Colorado Study's purported findings notwithstanding, two of the leading research consultants on the project subsequently acknowledged that "[i]solation can be harmful to any prisoner" and noted that the adverse effects of isolation can include "anxiety, depression, anger, cognitive disturbances, perceptual distortions, obsessive thoughts, paranoia, and psychosis" (Metzner & Fellner 2010, p. 104). In fact, their deep concerns over the harmfulness of solitary confinement led them to recommend that professional organizations "should actively support practitioners who work for changed segregation policies and they should use their institutional authority to press for a nationwide rethinking of the use of isolation" in the name of a "commitment to ethics and human rights" (Metzner & Fellner 2010, p. 107).

---

[4]A recent meta-analysis claiming to comprehensively and quantitatively summarize the scientific literature on the psychological effects of solitary confinement (Morgan et al. 2016) was unfortunately compromised by the fact that half or more of the key effect sizes on which the authors relied to address this specific issue were derived directly from the fatally flawed O'Keefe et al. (2010) study, making the results of the meta-analysis similarly uninterpretable.

## SOLITARY CONFINEMENT, SOCIAL CONTACT, AND SOCIAL PATHOLOGY

Although the specific symptoms of psychological stress and trauma and the psychopathological effects of isolation are numerous and well-documented and provide important indices of the risks to which isolated prisoners are subjected, there are additional adverse effects that extend beyond these specific symptoms and reactions. Depriving people of normal social contact and meaningful social interaction over long periods of time can damage or distort their social identities, destabilize their sense of self, and, for some, destroy their ability to function normally in free society.

The theoretical explanation for the pain, suffering, and risk of harm of solitary confinement is relatively straightforward. Indeed, psychological science has long recognized the critical role of social contact in establishing and maintaining emotional health and well-being. As one researcher put it: "Since its inception, the field of psychology emphasized the importance of social connections" (DeWall 2013, p. 301). For example, the importance of "affiliation"—the opportunity to have meaningful contact with others—in reducing anxiety in the face of uncertain or fear-arousing stimuli is long established in social psychological literature (e.g., Schachter 1959, Sarnoff & Zimbardo 1961). In addition, one of the ways that people determine the appropriateness of their feelings—indeed, how we establish the very nature and tenor of our emotions—is through contact with others (e.g., Fischer et al. 2003, Saarni 1999, Schachter & Singer 1962, Tiedens & Leach 2004, Truax 1984). Prolonged social deprivation is painful and destabilizing in part because it deprives persons of the opportunity to ground their thoughts and emotions in a meaningful social context—to know what they feel and whether those feelings are appropriate.

Since the early research was conducted on the importance of affiliation, numerous scientific studies have further established the critical psychological significance of social contact, connectedness, and belonging. Researchers have concluded, among other things, that the human brain is literally "wired to connect" to others (Lieberman 2013). Thwarting the need to establish and maintain connections to others not only undermines psychological well-being but increases physical morbidity and mortality. Recognizing the importance of the human need for social contact, connection, and belongingness, social psychologists and others have written extensively about the harmful effects of its deprivation—what happens when people are subjected to social exclusion and isolation.

Years ago, Kelman (1976) argued that denying persons contact with others was a form of dehumanization. More recently, others have documented the ways in which social exclusion is not only "painful in itself," but also "undermines people's sense of belonging, control, self-esteem, and meaningfulness, reduces pro-social behavior, and impairs self-regulation" (Bastian & Haslam 2010, p. 107; internal references omitted). Indeed, the subjective experience of social exclusion can result in what have been called cognitive deconstructive states in which there are emotional numbing, reduced empathy, cognitive inflexibility, lethargy, and an absence of meaningful thought (Twenge et al. 2003). DeWall (2013, p. 302) summarized the serious threat that social exclusion represents to psychological health and well-being by noting that it produces "increased salivary cortisol levels...and blood flow to brain regions associated with physical pain" and "sweeping changes" in attention, memory, thinking, and self-regulation as well as changes in aggression and prosocial behavior. As he put it: "This dizzying array of responses to social exclusion supports the premise that it strikes at the core of well-being" (DeWall 2013, p. 302).

In addition, the social deprivation and social exclusion imposed by solitary confinement can engender broader forms of social pathology, brought about by forcing prisoners to adapt to an environment devoid of normal, meaningful social contact (Haney 2003). That is, to exist and function in the socially pathological environment of solitary confinement, where their day-to-day

Annu. Rev. Criminol. 2018.1:285-310. Downloaded from www.annualreviews.org
Access provided by University of California - Santa Cruz on 01/23/18. For personal use only.

Annu. Rev. Criminol. 2018.1:285-310. Downloaded from www.annualreviews.org
Access provided by University of California - Santa Cruz on 01/23/18. For personal use only.

life is devoid of meaningful interaction and closeness with others, prisoners have little choice but to adapt in socially pathological ways. Over time, they gradually change their patterns of thinking, acting, and feeling to cope with the profoundly asocial world in which they are forced to live, as they attempt to adapt to the absence of social support and the routine feedback that comes from normal, meaningful social contact.

Although these adaptations are functional—even necessary—under the isolated conditions in which prisoners live, eventual adjustment to the absence of others does not mean that social deprivation ceases to be painful. Prisoners liken the absence of meaningful contact and the loss of closeness with others to a dull ache or pain that never goes away. Many of them remain acutely aware of the relationships that have ended and the feelings of closeness to others that they fear can never be rekindled.

Indeed, some prisoners cope with the painful, asocial nature of their isolated existence by paradoxically creating even more distance between themselves and others. The absence of meaningful social contact becomes so painful that they convince themselves that they do not need it—that people are a nuisance, and the less contact with them they have, the better. As a result, these prisoners socially withdraw further from the world around them, receding even more deeply into themselves than the sheer physical isolation of solitary confinement and its attendant procedures require. Others move from initially being starved for social contact to eventually being disoriented and even frightened by it. As they become increasingly unfamiliar and uncomfortable with social interaction, they are further alienated from others and made anxious in their presence (e.g., Cormier & Williams 1966, Haney 2003, Miller & Young 1997).

Finally, these functional (even necessary) social pathologies tend to be internalized and can persist long after the prisoner's time in isolation has ended. Thus, the adaptations move from being consciously employed survival strategies or reactions precipitated by immediate conditions of confinement to more deeply ingrained ways of being. Prisoners may develop extreme habits, tendencies, perspectives, and beliefs that are difficult or impossible for them to relinquish once they are released. Although their adaptations may have been functional under conditions of isolation (or appear to be so), they are highly dysfunctional in the social world most prisoners are expected to re-enter. In extreme cases, these ways of being may be internalized so deeply that they become disabling, interfering with the capacity to live a remotely normal or fulfilling social life. Thus, the experience of long-term isolation can make prisoners' subsequent adjustment—either to the general prison population or to free society—painful and challenging, especially if they are not afforded meaningful assistance in making this transition.

In addition, many solitary confinement units prohibit contact visiting. This means that prisoners are deprived for months, years, or longer of the opportunity to give and receive caring human touch. Yet, psychologists have long known that "Touch is central to human social life. It is the most developed sensory modality at birth, and it contributes to cognitive, brain, and socioemotional development and childhood" (Hertenstein et al. 2006, p. 528; see also Hertenstein & Weiss 2011). Indeed, the need for caring human touch is so fundamental that early deprivation is a risk factor for neurodevelopmental disorders, depression, suicidality, and other self-destructive behavior (e.g., Cascio 2010, Field 2005). Later deprivation is associated with violent behavior in adolescents (e.g., Field 2002). Recent theory and research now indicate that "touch is a primary platform for the development of secure attachments and cooperative relationships," is "intimately involved in patterns of caregiving," serves as a "powerful means by which individuals reduce the suffering of others," and also "promotes cooperation and reciprocal altruism" (Goetz et al. 2010, p. 360).

The uniquely prosocial emotion of compassion "is universally signaled through touch," meaning that persons who live in a world without touch are denied the experience of receiving or

expressing compassion in this way (Stellar & Keltner 2014, p. 337). Researchers have found that caring human touch conveys a sense of security and place, of shared companionship, and of being nurtured as well as feelings of worth and competence, access to reliable alliance and assistance, and guidance and support in stressful situations (e.g., Weiss 1995). A number of experts have argued that caring human touch is so integral to our well-being that it is highly therapeutic; it has been recommended to treat a host of maladies, including depression, suicidality, and learning disabilities (e.g., Dobson et al. 2002, Field 2005).

Of course, not every isolated prisoner suffers all of the previously described adverse psychological reactions to their socially and sensory-deprived conditions of confinement. However, the overall nature and magnitude of the negative psychological reactions that I have documented in my own research and that have been reported by numerous others in the scientific literature underscore the stressfulness and painfulness of this kind of confinement, the lengths to which prisoners must go in their attempt to adapt and adjust to it, and the risk of serious and sometimes permanent harm that it creates. As I noted, the potentially devastating effects of these conditions are reflected in the characteristically high numbers of suicide deaths and incidents of self-harm and self-mutilation that occur in many of these units.

Moreover, especially in light of the large number of prisoners who are exposed to solitary confinement in the course of their prison or jail terms—in any given year, an estimated one in five overall (Beck 2015), as I noted earlier—it is important to note that at least some of the negative psychological effects of solitary confinement are likely to persist long after their time in isolation has ended. Of course, prison and jail systems typically release prisoners from solitary confinement directly back into general population correctional settings, where the aftereffects of isolation may impede their successful reintegration into prison society. More problematic still, many prison systems release prisoners directly from solitary confinement back into free society, often with little or no advance preparation. Reliable estimates of the extent of this practice are difficult to come by, but the 2013 ASCA (Association of State Correctional Administrators)-Liman survey of correctional jurisdictions indicated that nearly 4,500 prisoners had been "released directly from administrative segregation to the streets" that year and that the overwhelming number of prison systems who engaged in the practice nonetheless "did not have a specific policy" for how such releases were to be handled (Assoc. State Correct. Adm. et al. 2015, p. 29).

## THE SCIENTIFIC CONSENSUS ON THE SIGNIFICANT RISK OF SERIOUS PSYCHOLOGICAL HARM IMPOSED BY SOLITARY CONFINEMENT

The accumulated scientific evidence and theoretical framework that I summarized above have established that the experience of solitary confinement can produce a range of very serious adverse psychological effects. We clearly know what happens to people in prison and elsewhere in society when they are deprived of normal social contact for extended periods of time. The research consistently documents and details the risk of psychological harm that social isolation creates, including mental pain and suffering and the increased incidence of self-harm and suicide. The relevant psychological literature underscores the importance of meaningful social contact and interaction, in essence establishing these things as identifiable human needs. Over the long-term, they may be as essential to a person's psychological or mental health as adequate food, clothing, and shelter are to his or her physical well-being.

A number of prominent scholarly, scientific, and medical organizations and expert panels have issued statements reflecting this consensus about the harmfulness of solitary confinement. For example, in 2006, a landmark report was published that was based in large part on a series of

Annu. Rev. Criminol. 2018.1:285-310. Downloaded from www.annualreviews.org
Access provided by University of California - Santa Cruz on 01/23/18. For personal use only.

fact-finding hearings conducted across the United States by the bipartisan Commission on Safety and Abuse in America's Prisons (Gibbons & Katzenbach 2006). In the course of the hearings, diverse groups of nationally recognized experts, stakeholders, and policy makers testified about a wide range of prison-related issues. Among other things, the Commission concluded that solitary and supermax-type units were "expensive and soul destroying" (Gibbons & Katzenbach 2006, p. 59). The next year, in 2007, an international group of prominent mental health and correctional experts meeting on psychological trauma in Istanbul, Turkey, issued a joint statement on "the use and effects of solitary confinement" (Int. Psychol. Trauma Symp. 2007). In what has come to be known as the Istanbul Statement, they acknowledged that the "central harmful feature" of solitary confinement is its reduction of meaningful social contact to a level "insufficient to sustain health and well being." Similarly, the American Public Health Association (2013) issued a statement in which it detailed the public health harms posed by solitary confinement, including that "[p]risoners in long-term solitary confinement are subject to significant mental suffering and deterioration" and "may develop anxiety, panic attacks, paranoia, cognitive impairment, social withdrawal, somatic symptoms, hypersensitivity to external stimuli, and perceptual disturbances."

In 2014, a National Academy of Sciences committee noted that "there are sound theoretical bases for explaining the adverse effects of prison isolation," that being housed on a long-term basis in solitary confinement "can inflict emotional damage" (Natl. Res. Counc. 2014, p. 186) and that "direct studies of prison isolation document a broad range of harmful psychological effects" (Natl. Res. Counc. 2014, p. 187). Even more recently—in April 2016—the National Commission on Correctional Health Care (NCCHC), a professional organization of prison health-care providers, issued a Position Statement on solitary confinement. Relying on many of the scientific sources I cited earlier, the NCCHC declared the "inherent restriction in meaningful social interaction and environmental stimulation and the lack of control adversely impact the health and welfare of all who are held in solitary confinement" and that "[e]ven those without a prior history of mental illness may experience a deterioration in mental health," such that "the very nature of prolonged social isolation is antithetical to the goals of rehabilitation and social integration" (Natl. Comm. Correct. Health Care. 2016, p. 258). And the American Psychological Association (2016) acknowledged that solitary confinement was associated with heightened risk of self-mutilation and suicidality, a range of adverse psychological symptoms such as anxiety, depression, sleep disturbance, paranoia, and aggression, and the exacerbation of pre-existing mental illness and trauma-related symptoms.

The scientific consensus reflects the view that the adverse effects of solitary confinement can inflict real harm. The resulting damage is sometimes so severe that it is irreversible. Indeed, for some prisoners, the attempt to cope with isolated confinement sets in motion a series of long-lasting cognitive, emotional, and behavioral changes that can persist beyond the time that the prisoners are housed in isolation, leading to long-term disability and dysfunction. As the National Academy of Sciences committee put it, solitary confinement "can create or exacerbate serious psychological change in some inmates" that is so negative and severe that it "make[s] it difficult for them to return to the general population of a prison or to the community outside prison" (Natl. Res. Counc. 2014, p. 201).

## THE MOVEMENT TO RESTRICT WHETHER, FOR HOW LONG, AND ON WHOM SOLITARY CONFINEMENT CAN BE IMPOSED

The increasingly broad and deep scientific consensus on the painfulness and harmfulness of solitary confinement, combined with the increased expense and overall ineffectiveness of such units, has led a number of prominent professional legal, mental health, human rights, and even correctional organizations to issue policy statements and recommendations that mandate

significant restrictions on whether solitary confinement should or can be used, the maximum duration that it can be imposed, and the prohibition against imposing it on certain vulnerable groups of prisoners. In this section of the review, I summarize just some of the mandates and directives that have been issued in recent years.

The first issue on which professional consensus has been reached is to limit the use of solitary confinement to an absolute minimum—only those rare instances in which it is deemed absolutely necessary (if, indeed, it is permitted to be used at all). In fact, in recognition of the adverse mental health effects of segregated, solitary, or isolated confinement, the American Bar Association's *Standards for Criminal Justice on the Treatment of Prisoners* (2011) mandate that "[s]egregated housing should be for the briefest term and under the least restrictive conditions practicable." Moreover, the ABA requires that the mental health of all prisoners in segregated housing "should be monitored" through a process that should include daily correctional staff logs "documenting prisoners' behavior," the presence of a "qualified mental health professional" inside each segregated housing unit "[s]everal times a week," weekly observations and conversations between isolated prisoners and qualified mental health professionals, and "[a]t least every [90 days], a qualified mental health professional should perform a comprehensive mental health assessment of each prisoner in segregated housing" (unless such assessment is specifically deemed unnecessary in light of prior individualized observations). In addition, at intervals "not to exceed [30 days], correctional authorities should meet and document an evaluation of each prisoner's progress" in an evaluation that explicitly "should also consider the nature of the prisoner's mental health," and at intervals "not to exceed [90 days], a full classification review" should be conducted that addresses the prisoner's "individualized plan" in segregation with "a presumption in favor of removing the prisoner from segregated housing" (Am. Bar Assoc. 2011, Standard 23–2.9).

The NCCHC recommended that "[s]olitary confinement as an administrative method of maintaining security should be used only as an exceptional measure when other, less restrictive options are not available, and then for the shortest time possible" (Natl. Comm. Correct. Health Care. 2016, p. 260). The American Public Health Association (2013) urged correctional authorities to "eliminate solitary confinement for security purposes unless no other less restrictive option is available to manage a current, serious, and ongoing threat to the safety of others," and recommended that "[p]unitive segregation should be eliminated." The group of international trauma and mental health experts who issued the Istanbul Statement on "the use and effects of solitary confinement" concluded that it should be carefully restricted or abolished altogether: "As a general principle solitary confinement should only be used in very exceptional cases, for as short a time as possible and only as a last resort" (Int. Psychol. Trauma Symp. 2007). A National Academy of Sciences committee concluded similarly that the practice of solitary confinement "is best minimized, and accompanied by specific criteria for placement and regular meaningful reviews for those that are thus confined" (Natl. Res. Counc. 2014, p. 201). Another group—the bipartisan Commission on Safety and Abuse in America's Prisons—went even further, recommending that prison systems "end conditions of isolation" (Gibbons & Katzenbach 2006, p. 57).

In addition, various faith-based organizations have issued similar policy statements and recommendations urging significant reductions in or an outright abolition of solitary confinement. For example, the New York State Council of Churches (2012) passed a resolution in 2012 opposing the use of prison isolation and urging all members of the faith to participate in work to "significantly limit the use of solitary confinement" [see also Presbyt. Church (USA) 2012]. Similarly, that same year, the Rabbinical Assembly (2012) called on prison authorities to end prolonged solitary confinement.

Thus, a broad range of mental health, legal, and human rights standards and recommendations concerning solitary confinement acknowledge that the risk of psychological harm from isolation is

Annu. Rev. Criminol. 2018.1:285-310. Downloaded from www.annualreviews.org
Access provided by University of California - Santa Cruz on 01/23/18. For personal use only.

Annu. Rev. Criminol. 2018.1:285-310. Downloaded from www.annualreviews.org
Access provided by University of California - Santa Cruz on 01/23/18. For personal use only.

significant, and that the harm that can result is substantial and perhaps irreversible. As a result, they mandate that solitary confinement should be imposed, if at all, only as infrequently as possible— i.e., under extraordinary circumstances to accomplish a legitimate penological goal for which there is literally no less-intrusive or less-dangerous alternative available to the person on whom it is imposed.

The second issue on which a widespread professional consensus has emerged in recent years is that, if it is to be used at all, solitary confinement must be limited to very short periods, durations that are measured in hours, days, or weeks, rather than months or years. That is, because the risks of harm from isolated confinement are time- or dose-dependent—i.e., all other things being equal, the risks of psychological and physical damage are expected to increase as a function of the increased length of exposure—the use of solitary confinement should be limited to the briefest amount of time possible. This consensus includes a number of human rights and legal organizations. For example, the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (2011) for the United Nations wrote that in his opinion solitary confinement lasting more than 15 days can constitute "torture." The American Bar Association's (2011) Standards for Criminal Justice hold that "[s]egregated housing should be for the briefest term and under the least restrictive conditions practicable" [Standard 23–2.6(a)] and that at intervals "not to exceed [90 days], a full classification review" should be conducted that addresses the prisoner's "individualized plan" in segregation with "a presumption in favor of removing the prisoner from segregated housing" (Standard 23–2.9). The New York State Bar Association (2013) called on state officials to significantly limit the use of solitary confinement and recommended that solitary confinement for longer than 15 days be proscribed. Similarly, NCCHC's Position Statement specified that solitary confinement of longer than 15 days constitutes "cruel, inhumane, or degrading treatment of inmates" and that correctional health professionals should not employ it (Natl. Comm. Correct. Health Care 2016, p. 260).

The final issue on which there is widespread agreement is that solitary confinement should never be used for certain vulnerable groups of prisoners. That is, numerous expert, legal, and human rights organizations have recommended that because of the increased grave risk of serious harm to which solitary confinement exposes vulnerable prisoners, they should be exempted from being placed in solitary confinement. For example, the NCCHC Position Statement mandated not only that solitary confinement never exceed 15 days continuous duration but also that juveniles, mentally ill individuals, and pregnant women should be "excluded from solitary confinement of any duration," and that health care staff should advocate to correctional officials that they bar juveniles and mentally ill prisoners entirely from such confinement (Natl. Comm. Correct. Health Care 2016, p. 260).

The Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (2011) for the United Nations concluded that solitary confinement for longer than 15 days constitutes torture and that juveniles and people with mental illness should never be held in solitary confinement. The American Academy of Child and Adolescent Psychiatry issued a statement opposing "the use of solitary confinement in correctional facilities for juveniles," stating that "any youth that is confined for more than 24 hours must be evaluated by a mental health professional," and aligning AACAP with the United Nations Rules for the Protection of Juveniles Deprived of their Liberty, which includes among "disciplinary measures constituting cruel, inhuman or degrading treatment" the use of "closed or solitary confinement or any other punishment that may compromise the physical or mental health of the juvenile concerned" (Am. Acad. Child Adolesc. Psychiatry 2012). Similarly, and most recently, the American Psychological Association (2016) took an official position on solitary confinement by supporting "efforts to eliminate the practice" for juveniles. Calls for the prohibition of the use of isolated confinement

for vulnerable populations such as juveniles underscore the widespread recognition that it is a psychologically painful and potentially very harmful environment.

The same message is conveyed by the numerous calls to significantly limit the duration of solitary confinement or to eliminate its use altogether with prisoners who are mentally ill. Thus, the American Psychiatric Association (2012) recommended that "prolonged segregation" (which it defined as segregation lasting longer than four weeks) of adult prisoners with serious mental illness, "with rare exceptions, should be avoided due to the potential for harm to such inmates." Similarly, Mental Health America's (2011) position on seclusion and restraints included their "urg[ing] abolition of the use of seclusion. . .to control symptoms of mental illnesses." The National Alliance on Mental Illness (2016) issued a statement "oppos[ing] the use of solitary confinement and equivalent forms of extended administrative segregation for persons with mental illnesses." The American Public Health Association (2013) observed that mentally ill prisoners are at risk of being "placed in segregation as punishment for behavior that is a product of their illness," and may "deteriorate and experience an exacerbation of symptoms" once housed there. With this in mind, they recommended categorically that "[p]risoners with serious mental illness should be excluded from placement in solitary confinement" and also that all prisoners "should be closely monitored and removed from solitary confinement if continued placement becomes clinically contraindicated." The position statement of the Society of Correctional Physicians (2013) acknowledged "that prolonged segregation of inmates with serious mental illness, with rare exceptions, violates basic tenets of mental health treatment" and recommended against holding these prisoners in segregated housing for more than four weeks (see also Stern 2014.) The Rabbinical Assembly (2012) called on prison authorities to end the use of solitary confinement for juveniles and for people with mental illness. Finally, the National Science Foundation concluded that "[l]ong-term segregation is not an appropriate setting for seriously mentally ill inmates" and that "[i]n all cases, it is important to ensure that those prisoners who are confined in segregation are monitored closely and effectively for any sign of psychological deterioration" (Natl. Res. Counc. 2014, p. 201).

In many ways, the *Standard Minimum Rules for the Treatment of Prisoners* (known as the Mandela Rules) that were approved by the Commission on Crime Prevention and Criminal Justice (2015) of the United Nations codified many of the mandates and standards recommended by other diverse professional groups. The Mandela Rules contain several provisions that are explicitly designed to significantly regulate and limit the use of solitary confinement (which, according to Rule 44, is defined as "confinement of prisoners for 22 hours or more a day without meaningful human contact"). Specifically, Rule 43.1 prohibits the use of "indefinite" and "prolonged" solitary confinement as well as the placement of prisoners in a "dark or constantly lit cell." More generally, Rule 45.1 provides that solitary confinement "shall be used only in exceptional cases as a last resort, for as short a time as possible. . ." and that Rule 45.2 prohibits its use entirely "in the case of prisoners with mental or physical disabilities when their conditions would be exacerbated by such measures." The Commission on Crime Prevention and Criminal Justice's (2015) *Standard Minimum Rules for the Treatment of Prisoners* passed by the United Nations defined "prolonged solitary confinement" as lasting "for a time period in excess of 15 consecutive days" and mandated that such prolonged confinement "shall be prohibited" (Rules 43.1 and 44).

In addition to the scientific evidence on the harmful psychological consequences of denying people opportunities for meaningful social contact and the consensus that has emerged among professional groups that solitary confinement is so dangerous that it must be significantly restricted, correctional systems around the country are themselves rethinking the justification for its continued use. In addition to its greater comparative expense, there is little or no evidence that solitary confinement effectively accomplishes any of the goals for which it is allegedly employed. As I noted earlier, its record on reducing various forms of inmate misbehavior or in stemming the

Annu. Rev. Criminol. 2018.1:285-310. Downloaded from www.annualreviews.org
Access provided by University of California - Santa Cruz on 01/23/18. For personal use only.

proliferation or influence of prison gangs is, at best, mixed and problematic; it may have the opposite of its intended effects. Even the goal of safeguarding certain groups of vulnerable prisoners by placing them in protective custody could be handled in a less restrictive and more humane way so that they are not subjected to severe social and sensory deprivations (and in essence forced to trade their psychological well-being for their physical safety).

The Association of State Correctional Administrators have acknowledged that the "prolonged isolation of individuals is a grave problem in the United States" (quoted in Assoc. State Correct. Adm. et al. 2016, p. 5). In fact, over the past several years, prison systems as diverse as California, Colorado, Idaho, Maine, and North Dakota have recognized the problem in their own prison systems and taken steps to drastically reduce the number of prisoners housed in solitary confinement (e.g., Buntin 2010, Egelko 2016, Heiden 2013, Raemisch 2012, Tapley 2011). In addition, several states have closed their primary solitary confinement units altogether. For example, in January 2013, the Illinois Department of Corrections closed its supermax prison located at the Tamms Correctional Center (Ill. Dep. Correct. 2013). And in the state where the infamous Colorado Study was conducted, not long after the study was released, the Department of Corrections began significantly reducing their administrative segregation population and closed an entire prison that had been recently built as a dedicated solitary confinement facility (Mitchell 2012, Raemisch & Wasko 2015). In fact, most recently, the director of that state's prison system announced that he had ended long-term solitary confinement, so that even prisoners "who commit serious violations like assault will now spend at most 15 days in solitary" (Raemisch 2017, p. A25).

For several years now the Vera Institute of Justice, with funding from United States Department of Justice, has operated a Safe Alternatives to Segregation (SAFE) Initiative, whose explicit goal is to assist state and county correctional systems to reduce their use of segregation and solitary confinement by developing effective alternatives. The 11-member Vera SAFE Initiative Advisory Board includes several state corrections secretaries and deputy secretaries, including those in Colorado, New Mexico, Pennsylvania, and Washington, who are publicly committed to developing ways of achieving significant reductions in the use of prison isolation. Finally, the United States Department of Justice (2016) completed a review of solitary confinement practices in the Federal Bureau of Prisons that recommended significant reductions in its use, including a ban on confining juveniles, pregnant women, and, except in exceptional circumstances, seriously mentally ill prisoners, placing prisoners in the "least restrictive setting necessary," eliminating the use of disciplinary segregation for low-level offenses, and urging reductions in the amount of time prisoners spend in solitary confinement for other more serious offenses, so that prisoners could be returned "to less restrictive conditions as promptly as possible." In an editorial written by President Barack Obama (2016), he noted that "solitary confinement has the potential to lead to devastating, lasting psychological consequences," including depression and "a reduced ability to interact with others," and urged that the Department of Justice's "common-sense principles" for limiting the use of solitary confinement be broadly implemented in the criminal justice system.

In summary, the conclusion that long-term solitary confinement subjects prisoners to a significant risk of serious psychological harm continues to have widespread and growing empirical support, is theoretically sound, and now reflects the overwhelming consensus view of numerous scientific organizations. In addition, there is a movement calling for reform among professional, legal, human rights, and mental health groups that have carefully considered the issue. Corrections officials in various parts of the country are beginning to heed those calls. As ASCA/Liman authors put it, solitary confinement now "has come to be understood by many as a problem in need of a solution" (Assoc. State Correct. Adm. et al. 2016, p. 15).

## CONCLUSION

Solitary confinement has a long and controversial history in the United States and elsewhere in the world (e.g., Arrigo & Bullock 2008, Grassian 2006, Haney & Lynch 1997, Shalev 2009, Smith 2006). During the era of mass incarceration in the United States, increasing numbers of prisoners were subjected to these extremely severe conditions of confinement—as many as an estimated 100,000 at any given time—some of them for periods that lasted years and even decades. Yet the scientific knowledge on the negative effects of isolated confinement is long-standing, robust, and empirically well-documented. The harmful effects include a range of psychological and physical maladies, including a host of specific problematic symptoms of stress, trauma, and the psychopathological effects of isolation, a range of ultimately problematic and dysfunctional adaptations to this form of enforced asocial existence, and heightened levels of morbidity and mortality (including increased self-harm and suicidality). Furthermore, these empirical findings are theoretically well-grounded. In recent years, new insights about the fundamental human need for meaningful social contact and for caring human touch provided important theoretical dimensions to an already existing and widespread appreciation of the adverse medical and psychological consequences of isolation and social exclusion. They have added considerable conceptual weight to the long-standing scientific consensus about the pains, risks, and harms of solitary confinement.

The scientific consensus about the harmfulness of solitary confinement has served as the basis for an emerging movement among professional, mental health, legal, and human rights organizations, calling for the drastic reduction if not elimination of the practice. Recognition of the significant risk of serious harm that solitary confinement imposes has led to newly implemented standards and policies mandating that solitary confinement be used only as an absolute last resort (if at all) and for the shortest amount of time that is absolutely necessary to achieve legitimate penological goals. The time periods should be limited to hours, days, or weeks but never months or years. Moreover, the new standards and policies prohibit the use of solitary confinement with otherwise vulnerable groups such as juveniles and the seriously mentally ill. In addition to the positions taken by these various organizations, an increasing number of correctional officials have finally begun to acknowledge that solitary confinement incurs significant human and economic costs in the absence of commensurate benefits in the form of reliably achieved penological purposes or goals and, accordingly, have taken steps to drastically reduce its use.

The American criminal justice system appears to be coming full circle—again—on the controversial practice of solitary confinement. Armed with much more scientific evidence than nineteenth-century prison reformers and a stronger theoretical framework with which to understand the harmful effects of solitary confinement, an intellectual and human rights consensus has emerged to significantly restrict if not eliminate this punitive, destructive practice.

## DISCLOSURE STATEMENT

The author is not aware of any affiliations, memberships, funding, or financial holdings that might be perceived as affecting the objectivity of this review.

## LITERATURE CITED

ACLU Colo. 2011. *The High Cost of Solitary Confinement*. Denver, CO: ACLU

Am. Acad. Child Adolesc. Psychiatry. 2012. *Solitary Confinement of Juvenile Offenders*. Washington, DC: AACAP. **https://www.aacap.org/aacap/Policy_Statements/2012/Solitary_Confinement_of_ Juvenile_Offenders.aspx**

Annu. Rev. Criminol. 2018.1:285-310. Downloaded from www.annualreviews.org
Access provided by University of California - Santa Cruz on 01/23/18. For personal use only.

Am. Bar Assoc. 2011. *ABA Standards for Criminal Justice: Treatment of Prisoners*. Washington, DC: Am. Bar Assoc. 3rd ed. **https://www.americanbar.org/content/dam/aba/publications/criminal_ justice_standards/Treatment_of_Prisoners.authcheckdam.pdf**

Am. Psychiatr. Assoc. 2012. *Position Statement on Segregation of Prisoners with Mental Illness*. Arlington, VA: APA

Am. Psychol. Assoc. 2016. *Solitary Confinement of Juvenile Offenders*. Washington, DC: APA. **https://www.apa. org/about/gr/issues/cyf/solitary.pdf**

Am. Public Health Assoc. 2013. *Solitary Confinement as a Public Health Issue*. Washington, DC: APHA. **https://apha.org/policies-and-advocacy/public-health-policy-statements/policy-database/2014/ 07/14/13/30/solitary-confinement-as-a-public-health-issue**

Arrigo B, Bullock J. 2008. The psychological effects of solitary confinement on prisoners in supermax units: reviewing what we know and what should change. *Int. J. Offender Ther. Comp. Criminol.* 52:622–40

*Ashker v. Brown*, 4:09-cv-05796-CW (ND Cal. 2014).

Assoc. State Correct. Adm., Yale Law Sch., Arthur Liman Public Interest Progr. 2015. *Time-in-cell: the ASCA-Liman 2014 National Survey of Administrative Segregation in Prison*. ASCA-Liman Rep., Yale Law Sch., New Haven, CT. **https://law.yale.edu/system/files/area/center/liman/document/ asca-liman_administrativesegregationreport.pdf**

Assoc. State Correct. Adm., Yale Law Sch., Arthur Liman Public Interest Progr. 2016. *Aiming to reduce time-in-cell: reports from correctional systems on the numbers of prisoners in restricted housing and on the potential of policy changes to bring about reforms*. ASCA-Liman Rep., Yale Law Sch., New Haven, CT. **https://law.yale.edu/system/files/area/center/liman/document/aimingtoreducetic.pdf**

Barte H. 1989. L'Isolement carceral. *Perspect. Psychiatr.* 28:252–55

Bastian B, Haslam N. 2010. Excluded from humanity: the dehumanizing effects of social ostracism. *J. Exp. Soc. Psychol.* 46:107–13

Bauer M, Priebe S, Haring B, Adamczak K. 1993. Long-term mental sequelae of political imprisonment in East Germany. *J. Nerv. Ment. Dis.* 181:257–62

Beck A. 2015. *Use of restrictive housing in U.S. prisons and jails, 2011–2012.* Bur. Justice Stat. Rep. NCJ 249209, US Dep. Justice, Washington, DC

Bize R, Johnson J, Plotnikoff R. 2007. Physical activity level and health-related quality of life in the general adult population: a systematic review. *Prev. Med.* 45(6):401–15

Briggs C, Sundt J, Castellano T. 2003. The effect of supermax security prisons on aggregate levels of institutional violence. *Criminology* 41:1341–76

Brodsky S, Scogin F. 1988. Inmates in protective custody: First data on emotional effects. *Forensic Rep*. 1:267–280

Buntin J. 2010. Exodus: how America's reddest state—and its most notorious prison—became a model of corrections reform. *Governing* 23:20–27

Butler H, Steiner B, Makarios M, Travis L. 2017. Assessing the effects of exposure to supermax confinement on offender postrelease behaviors. *Prison J*. 97(3):275–95

Cacioppo S, Cacioppo J. 2012. Decoding the invisible forces of social connections. *Front. Integr. Neurosci.* 6(51): 1–7

Cascio C. 2010. Somatosensory processes in neurodevelopmental disorders. *J. Neurodev. Disord.* 2:62–69

Cloyes K, Lovell D, Allen D, Rhodes L. 2006. Assessment of psychosocial impairment in a supermaximum security unit sample. *Crim. Justice Behav.* 33:760–781

Colvin M. 1992. *The Penitentiary in Crisis: From Accommodation to Riot in New Mexico*. Albany, NY: State Univ. New York Press

Comm. Crime Prev. Crim. Justice. 2015. *United Nations Standard Minimum Rules for the Treatment of Prisoners*. New York: UN Econ. Soc. Counc.

Cormier B, Williams P. 1966. Excessive deprivation of liberty. *Can. Psychiatr. Assoc. J.* 11:470–84

Cullen F. 1995. Assessing the penal harm movement. *J. Res. Crime Delinq.* 32:338–58

DeWall C. 2013. Looking back and forward: lessons learned and moving forward. In *The Oxford Handbook of Social Exclusion*, ed. C DeWall, pp. 301–3. New York: Oxford Univ. Press

DeWall N, Deckman T, Pond R, Bonser I. 2011. Belongingness as a core personality trait: how social exclusion influences social functioning and personality expression. *J. Personal.* 79:979–1012

Annu. Rev. Criminol. 2018.1:285-310. Downloaded from www.annualreviews.org
Access provided by University of California - Santa Cruz on 01/23/18. For personal use only.

Dobson S, Upadhyaya S, Conyers I, Raghavan R. 2002. Touch in the care of people with profound and complex needs. *J. Learn. Disabil.* 6:351–62

Egelko R. 2016. Isolation of inmates cut greatly. *San Francisco Chronicle*, Oct. 25, pp. C1, C4.

Field T. 2002. Violence and touch deprivation in adolescents. *Adolescence* 37:735–49

Field T. 2005. Touch deprivation and aggression against self among adolescents. In *Developmental Psychobiology of Aggression*, ed. D Stoff, E Susman, pp. 117–40. New York: Cambridge

Fiorillo D, Sabatini F. 2011. Quality and quantity: the role of social interactions in self-reported individual health. *Soc. Sci. Med.* 73:1644–52

Fischer A, Manstead A, Zaalberg RR. 2003. Social influences on the emotion process. In *European Review of Social Psychology*, Vol. 14, ed. M Hewstone, W Stroebe, pp. 171–202. Hoboken, NJ: Wiley

Foster D. 1987. *Detention* & *Torture in South Africa: Psychological, Legal & Historical Studies*, Cape Town: David Philip

Gendreau P, Freedman N, Wilde G, Scott G. 1972. Changes in EEG alpha frequency and evoked response latency during solitary confinement. *J. Abnorm. Psychol.* 79:54–59

Gibbons J, Katzenbach N. 2006. *Confronting Confinement: A Report of the Commission on Safety and Abuse in America's Prisons*. New York: Vera Inst. Justice

Glaze L, Parks E. 2012. *Correctional populations in the United States, 2011*. Bur. Justice Stat. Rep. NCJ 239972, US Dep. Justice, Washington, DC

Goetz J, Keltner D, Simon-Thomas E. 2010. Compassion: an evolutionary analysis and empirical review. *Psychol. Bull.* 136:351–74

Grassian S. 1983. Psychopathological effects of solitary confinement. *Am. J. Psychiatry* 140:1450–54

Grassian S. 2006. Psychiatric effects of solitary confinement. *Wash. Univ. J. Law Policy* 22:325–83

Grassian S, Kupers T. 2011. *The Colorado Study versus the reality of supermax confinement. Correct. Ment. Health Rep.* 13(1):1–16

Hafner S, Emeny R, Lacruz M, Baumert J, Herder C, et al. 2011. Association between social isolation and inflammatory markers in depressed and non-depressed individuals: results from the MONICA/KORA study. *Brain Behav. Immun.* 25:1701–7

Haney C. 1993. "Infamous punishment": the psychological consequences of isolation. *Natl. Prison Proj. J.* 8(3):3–7, 21

Haney C. 2003. Mental health issues in long-term solitary and "supermax" confinement. *Crime Delinq.* 49:124–56

Haney C. 2006. *Reforming Punishment: Psychological Limits to the Pains of Imprisonment*. Washington, DC: Am. Psychol. Assoc. Books

Haney C. 2009. The social psychology of isolation: why solitary confinement is psychologically harmful. *Prison Serv J.* 181:12–20

Haney C. 2017. The dimensions of "social death": psychological reactions to extremely long-term solitary confinement. Unpublished manuscript

Haney C, Bakhshay S. 2017. Contexts of ill-treatment: the relationship of captivity and prison confinement to cruel, inhuman, or degrading treatment and torture. In *Torture and Its Definition in International Law*, ed. M Basoğlu, pp. 139–78. New York: Oxford Univ. Press

Haney C, Lynch M. 1997. Regulating prisons of the future: the psychological consequences of solitary and supermax confinement. *N. Y. Rev. Law Soc. Change* 23:477–570

Haney C, Weill J, Bakhshay S, Lockett T. 2015. Examining jail isolation: what we don't know can be profoundly harmful. *Prison J.* 96:121–52

Heiden Z. 2013. *Change Is Possible: A Case Study of Solitary Confinement Reform in Maine*. Portland, ME: ACLU Maine. **https://www.aclu.org/report/change-possible-case-study-solitary-confinement-reform-maine**

Hertenstein M, Keltner D, App B, Bulleit B, Jaskolka AR. 2006. Touch communicates distinct emotions. *Emotion* 6:528–533

Hertenstein M, Weiss S, eds. 2011. *The Handbook of Touch: Neuroscience, Behavioral, and Health Perspectives*. New York: Springer

Hodgins S, Cote G. 1991. The mental health of penitentiary inmates in isolation. *Can. J. Criminol.* 33:177–82

Annu. Rev. Criminol. 2018.1:285-310. Downloaded from www.annualreviews.org
Access provided by University of California - Santa Cruz on 01/23/18. For personal use only.

Hunt G, Reigel S, Morales T, Waldorf D. 1993. Changes in prison culture: Prison gangs and the case of the Pepsi generation. *Soc. Probl.* 40:398–409

Ill. Dep. Correct. 2013. *Efficiencies Fact Sheet – FY2013 Budget*. Springfield, IL: Ill. Dep. Correct. **https://www.illinois.gov/gov/budget/Documents/Budget%20Book/FY%202013/FINAL%20Efficiencies%20Fact%20Sheet%20-%20FY2013%20Budget.pdf**

*In re Medley*, 134 U.S. 160 (1890)

Int. Psychol. Trauma Symp. 2007. Istanbul statement on the use and effects of solitary confinement. *Int. Psychol. Trauma Symp.*, *Istanbul*, Dec. 9. **http://www.univie.ac.at/bimtor/dateien/topic8_istanbul_statement_effects_solconfinment.pdf**

Jones D. 1976. *The Health Risks of Imprisonment*. Lexington, KY: Lexington Books

Kaba F, Lewis A, Glowa-Kollisch S, Hadler J, Lee D, et al. 2014. Solitary confinement and risk of self-harm among jail inmates. *Am. J. Public Health* 104:442–47

Karremans J, Heslenfeld D, van Dillen L, Van Lange P. 2011. Secure attachment partners attenuate neural responses to social exclusion: an fMRI investigation. *Int. J. Psychophysiol.* 81:44–50

Kelman H. 1976. Violence without restraint: reflections on the dehumanization of victims and victimizers. In *Varieties of Psychohistory*, ed. G Kren, L Rappaport, pp. 282–314. New York: Springer

Koch I. 1986. Mental and social sequelae of isolation: the evidence of deprivation experiments and of pretrial detention in Denmark. In *The Expansion of European Prison Systems*, ed. B Rolston, M Tomlinson, pp. 119–29. Florence, Italy: Eur. Group Study Deviance Soc. Control

Kupers T. 2008. What to do with the survivors? Coping with long-term effects of isolated confinement. *Crim. Justice Behav.* 35:1005–16

Lanes E. 2009. The association of administrative segregation placement and other risk factors with the self-injury-free time of male prisoners. *J. Offender Rehabil.* 48:529–46

Lanes E. 2011. Are the "worst of the worst" self-injurious prisoners more likely to end up in long-term maximum-security segregation? *Int. J. Offender Rehabil.* 55:1034–50

Lieberman M. 2013. *Social: Why Our Brains Are Wired to Connect*. New York: Random House

Lippman M. 1994. The development and drafting of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. *Boston Coll. Int. Comp. Law Rev.* 27:275–335

Lovell D, Cloyes K, Allen D, Rhodes L. 2000. Who lives in super-maximum custody? A Washington State study. *Fed. Probat.* 64(2):33–38

Lovell D, Johnson L, Cain K. 2007. Recidivism of supermax prisoners in Washington. *Crime Delinq.* 53:633–56

Lovell D, Toch H. 2011. Some observations about the Colorado Segregation Study. *Correct. Ment. Health Rep.* 13(1):3–4, 14–15

*Madrid v. Gomez*, 889 F. Supp. 1146 (1995)

Mears D, Bales W. 2009. Supermax incarceration and recidivism. *Criminology* 47:1131–66

Ment. Health Am. 2011. *Position Statement 24: Seclusion and Restraints*. Alexandria, VA: MHA. **http://www.nmha.org/positions/seclusion-restraints**

Metzner J, Fellner J. 2010. Solitary confinement and mental illness in U.S. prisons: a challenge for medical ethics. *J. Acad. Psychiatry Law* 38:104–8

Miller H, Young G. 1997. Prison segregation: administrative detention remedy or mental health problem? *Crim. Behav. Ment. Health* 7:85–94

Mitchell K. 2012. Colorado prisons turn away from heavy use of solitary confinement. *Denver Post*. June 3. **http://www.denverpost.com/2012/06/03/colorado-prisons-turn-away-from-heavy-use-of-solitary-confinement/**

Morgan R, Gendreau P, Smith P, Gray A, Labrecque R, et al. 2016. Quantitative synthesis of the effects of administrative segregation on inmates' well-being. *Psychol. Public Policy Law* 22:439–61

Morris R. 2016. Exploring the effect of exposure to short-term solitary confinement among violent prison inmates. *J. Quant. Criminol.* 32:1–22

Natl. Alliance Mental Illn. 2016. *Public Policy Platform of the National Alliance on Mental Illness*. Arlington, VA: NAMI. 12th ed. **https://www.nami.org/About-NAMI/Policy-Platform**

Annu. Rev. Criminol. 2018.1:285-310. Downloaded from www.annualreviews.org
Access provided by University of California - Santa Cruz on 01/23/18. For personal use only.

Natl. Comm. Correct. Health Care. 2016. Position statement: solitary confinement (isolation). *J. Correct. Health Care* 22:257–63

Natl. Res. Counc. 2014. *The Growth of Incarceration in the United States: Exploring Causes and Consequences*. Washington, DC: Natl. Acad. Press

New York State Bar Assoc. 2013. *Committee on Civil Rights Report to the House of Delegates: Solitary Confinement in New York State*. Albany, NY: NYSBA. **http://www.nysba.org/WorkArea/ DownloadAsset.aspx?id=26699**

New York State Counc. Churches. 2012. *Resolution Opposing the Use of Prolonged Solitary Confinement in the Correctional Facilities of New York State and New York City*. Albany, NY: New York State Counc. Churches. **https://sites.google.com/site/nyscouncilofchurches/priorities/on-solitary-confinement**

Obama B. 2016. Why we must rethink solitary confinement. *Washington Post*, Jan. 25. **https://www. washingtonpost.com/opinions/barack-obama-why-we-must-rethink-solitary-confinement/2016/ 01/25/29a361f2-c384-11e5-8965-0607e0e265ce_story.html?utm_term=.2367a0d39f64**

O'Keefe M. 2017, March. Reflections on Colorado's Administrative Segregation Study. *NIJ J.* 287:1–7

O'Keefe M, Klebe K, Stucker A, Sturm K, Leggett W. 2010. *One Year Longitudinal Study of the Psychological Effects of Administrative Segregation*. Colorado Spring, CO: Colo. Dep. Correct.

O'Keefe M, Klebe K, Metzner J, Dvoskin J, Fellner J, Stucker A. 2013. A longitudinal study of administrative segregation. *J. Am. Acad. Psychiatry Law* 41:49–60

Patterson R, Hughes K. 2008. Review of completed suicides in the California Department of Corrections and Rehabilitation, 1999–2004. *Psychiatr. Serv.* 59:676–82

Pawlaczyk G, Hundsdorfer B. 2010. Tamms supermax: expensive but is it necessary? *State Journal Register*, Jan. 2, **http://www.sj-r.com/article/20100103/NEWS/301039984**

Penedo F, Dahn J. 2005. Exercise and well-being: a review of mental and physical health benefits associated with physical activity. *Curr. Opin. Psychiatry.* 18:189–93

Presbyt. Church (USA). 2012. *Commissioners' Resolution* 11-22. *On Prolonged Solitary Confinement in U.S. Prisons.* Louisville, KY: Presbyt. Church (USA). **https://pc-biz.org/MeetingPapers/ (S(em2ohnl5h5sdehz2rjteqxtn))/Explorer.aspx?id=4389**

Rabbin. Assembl. 2012. *Resolution on Prison Conditions and Prisoner Isolation*. New York: Rabbin. Assembl. **http://www.rabbinicalassembly.org/story/resolution-prison-conditions-and-prisoner-isolation?tp=377**

Raemisch R. 2012. My night in solitary. *New York Times*, Febr. 20, **http://www.nytimes.com/2014/ 02/21/opinion/my-night-in-solitary.html?_r=0**

Raemisch R. 2017. Why we ended long-term solitary confinement in Colorado. *New York Times*, Oct. 12, p. A25. **https://www.nytimes.com/2017/10/12/opinion/solitary-confinement-colorado-prison. html**

Raemisch R, Wasko K. 2015. *Open the Door: Segregation Reforms in Colorado*. Colorado Springs, CO: CDOC. **https://drive.google.com/file/d/0B30yLl0I1yBRY2h2UDBCZ0Q5WlE/view**

Reiter K. 2012. Parole, snitch, or die: California's supermax prisons and prisoners, 1997–2007. *Punishm. Soc.* 14:530–63

Reiter K. 2016. 23/7: *Pelican Bay Prison and the Rise of Long-Term Solitary Confinement*. New Haven, CT: Yale Univ. Press

Rhodes L, Lovell D. 2011. Is "adaptation" the right question? Addressing the larger context of administrative segregation: commentary on one year longitudinal study of the psychological effects of administrative segregation. *Correct. Ment. Health* 21:1–9

Riveland C. 1999. *Supermax Prisons: Overview and General Considerations*. Washington, DC: US Dep. Justice. **http://static.nicic.gov/Library/014937.pdf**

Ross J, ed. 2013. *The Globalization of Supermax Prisons*. New Brunswick, NJ: Rutgers Univ. Press

Rothman D. 1971. *The Discovery of the Asylum: Social Order and Disorder in the New Republic*. Boston: Little Brown

Russell D, Peplau L, Cutrona C. 1980. The Revised UCLA Loneliness Scale: concurrent and discriminant validity evidence. *J. Personal. Soc. Psychol.* 39:472–80

Annu. Rev. Criminol. 2018.1:285-310. Downloaded from www.annualreviews.org
Access provided by University of California - Santa Cruz on 01/23/18. For personal use only.

Saarni C. 1999. *The Development of Emotional Competence*. New York: Guilford Press

Sarnoff I, Zimbardo P. 1961. Anxiety, fear, and social affiliation. *J. Abnorm. Soc. Psychol.* 62:356–63

Schachter S. 1959. *The Psychology of Affiliation: Experimental Studies of the Sources of Gregariousness*. Stanford, CA: Stanford Univ. Press

Schachter S, Singer J. 1962. Cognitive, social, and physiological determinants of emotional state. *Psychol. Rev.* 69:379–99

Scott G, Gendreau P. 1969. Psychiatric implications of sensory deprivation in a maximum security prison. *Can. Psychiatr. Assoc. J.* 12:337–41

Shalev S. 2009. *Supermax: Controlling Risk Through Solitary Confinement*. Cullompton, UK: Willan Publ.

Shalev S, Lloyd M. 2011. If this be method, yet there is madness in it: commentary on one year longitudinal study of the psychological effects of administrative segregation. *Correct. Ment. Health* 21:1–7

Shallice T. 1974. Solitary confinement—a torture revived? *New Scientist*, Novemb. 28, pp. 666–67

Smith P. 2006. The effects of solitary confinement on prison inmates: a brief history and review of the literature. In *Crime and Justice*, Vol. 34, ed. M Tonry, pp. 441–528. Chicago: Univ. Chicago Press

Smith P. 2011. The effects of solitary confinement: commentary on one year longitudinal study of the psychological effects of administrative segregation. *Correct. Ment. Health* 21:1–11

Soc. Correct. Physicians. 2013. *Position Statement, Restricted Housing of Mentally Ill Inmates*. Littleton, CO: ACCP. **http://accpmed.org/restricted_housing_of_mentally.php**

Somnier F, Genefke I. 1986. Psychotherapy for victims of torture. *Br. J. Psychiatry* 149:323–29

Spec. Rapp. Torture Other Cruel Inhuman Degrading Treat. Punishm. 2011. *Interim Report of the Special Rapporteur of the Human Rights Council on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, U.N. Doc A/66/268, pp. 76–78, August 5, **http://solitaryconfinement.org/uploads/ SpecRapTortureAug2011.pdf**

Stellar J, Keltner D. 2014. Compassion. In *Handbook of Positive Emotions*, ed. M Tugade, M Shiota, L Kirby, pp. 329–41. New York: Guilford

Stern M. 2014. Society of Correctional Physicians calls for caution placing mentally ill in solitary: an important band-aid. *J. Correct. Health Care* 20:92–94

Sundt J, Castellano T, Briggs C. 2008. The sociopolitical context of prison violence and its effect in Illinois. *Prison J.* 88:94–122

Tapley L. 2011. Reform comes to Maine supermax: new commissioner cuts population by more than half; prisoner rights advocates help in the reform. *Portland Phoenix*, Sept. 15, **https://www.prisonlegalnews. org/news/2011/sep/15/reform-comes-to-maine-supermax-new-commissioner-cuts-population- by-more-than-half-prisoner-rights-advocates-help-in-the-reform/**

Thornicroft G. 1991. Social deprivation and rates of treated mental disorder: developing statistical models to predict psychiatric service utilization. *Br. J. Psychiatry* 158:475–84

Tiedens L, Leach C, eds. 2004. *The Social Life of Emotions*. New York: Cambridge Univ. Press

Toch H. 1975. *Men in Crisis: Human Breakdowns in Prisons*. Chicago: Aldine Publ.

Truax S. 1984. Determinants of emotion attributions: a unifying view. *Motiv. Emot.* 8:33–54

Twenge J, Catanese K, Baumeister R. 2003. Social exclusion and the deconstructed state: time perception, meaninglessness, lethargy, lack of emotion, and self awareness. *J. Personal. Soc. Psychol.* 85:409–23

US Dep. Justice. 2013. Letter to the Honorable Tom Corbett, Re: *Investigation of the State Correctional Insti- tution at Cresson and Notice of Expanded Investigation*, May 31, 2013, at p. 5, **http://www.justice.gov/crt/ about/spl/documents/cresson_findings_5-31-13.pdf**

US Dep. Justice. 2016. Report and Recommendations Concerning the Use of Restrictive Housing. **https://www.justice.gov/archives/dag/report-and-recommendations-concerning-use-restrictive- housing**

Volkart R. 1983. *Einzelhaft: Eine Literaturubersicht* (Solitary confinement: A literature survey). *Psychol. -Schweiz. Z. Psychol. Und Ihre Anwend.* 42:1–24

Volkart R, Dittrich A, Rothenfluh T, Werner P. 1983a. *Eine Kontrollierte Untersuchung uber Psychopathologische Effekte der Einzelhaft* (A controlled investigation on psychopathological effects of solitary confinement), Psychologie - Schweizerische Zeitschrift fur Psychologie und ihre Anwendungen 42:25–46

Volkart R, Rothenfluh T, Kobelt W, Dittrich A, Ernst K. 1983b. *Einzelhaft als Risikofaktor fur Psychiatrische Hospitalisierung. Psychiatr. Clin.* 16:365–77

Annu. Rev. Criminol. 2018.1:285-310. Downloaded from www.annualreviews.org
Access provided by University of California - Santa Cruz on 01/23/18. For personal use only.

Annu. Rev. Criminol. 2018.1:285-310. Downloaded from www.annualreviews.org
Access provided by University of California - Santa Cruz on 01/23/18. For personal use only.

Waligora B. 1974. *Funkcjonowanie Czlowieka W Warunkach Izolacji Wieziennej* (How men function in conditions of penitentiary isolation). *Ser. Psychol. Pedagog.* 34:1–123

Walters R, Callagan J, Newman A. 1963. Effect of solitary confinement on prisoners. *Am. J. Psychiatry* 119:771–73

Weiss R. 1995. The attachment bond in childhood and adulthood. In *Attachment Across the Life Cycle*, ed. C Parkes, J Stevenson-Hinde, P Marris, pp. 66–76. London: Routledge

Whittaker S. 1988. Counseling torture victims. *Couns. Psychol.* 16:272–78

Wooldredge J. 1999. Inmate experiences and psychological well-being. *Crim. Justice Behav.* 26:235–50

Annu. Rev. Criminol. 2018.1:285-310. Downloaded from www.annualreviews.org
Access provided by University of California - Santa Cruz on 01/23/18. For personal use only.



**Annual Review of
Criminology**

Volume 1, 2018

# Contents

**The Discipline**

Reflections on Disciplines and Fields, Problems, Policies, and Life
*James F. Short* ....................................................................... 1

Replication in Criminology and the Social Sciences
*William Alex Pridemore, Matthew C. Makel, and Jonathan A. Plucker* ................19

**Crime and Violence**

Bringing Crime Trends Back into Criminology: A Critical Assessment
of the Literature and a Blueprint for Future Inquiry
*Eric P. Baumer, María B. Vélez, and Richard Rosenfeld* ...................................39

Immigration and Crime: Assessing a Contentious Issue
*Graham C. Ousey and Charis E. Kubrin* ....................................................63

The Long Reach of Violence: A Broader Perspective on Data, Theory,
and Evidence on the Prevalence and Consequences of Exposure
to Violence
*Patrick Sharkey* ...................................................................85

Victimization Trends and Correlates: Macro- and Microinfluences
and New Directions for Research
*Janet L. Lauritsen and Maribeth L. Rezey* ................................................ 103

Situational Opportunity Theories of Crime
*Pamela Wilcox and Francis T. Cullen* .................................................... 123

Schools and Crime
*Paul J. Hirschfield* ...................................................................... 149

**Punishment and Policy**

Collateral Consequences of Punishment: A Critical Review
and Path Forward
*David S. Kirk and Sara Wakefield* ........................................................ 171

Annu. Rev. Criminol. 2018.1:285-310. Downloaded from www.annualreviews.org
Access provided by University of California - Santa Cruz on 01/23/18. For personal use only.

Understanding the Determinants of Penal Policy: Crime, Culture,
and Comparative Political Economy
*Nicola Lacey, David Soskice, and David Hope* ............................................. 195

Varieties of Mass Incarceration: What We Learn from State Histories
*Michael C. Campbell* ....................................................................... 219

The Politics, Promise, and Peril of Criminal Justice Reform
in the Context of Mass Incarceration
*Katherine Beckett* ........................................................................... 235

**The Prison**

Inmate Society in the Era of Mass Incarceration
*Derek A. Kreager and Candace Kruttschnitt* ............................................. 261

Restricting the Use of Solitary Confinement
*Craig Haney* ................................................................................. 285

**Developmental and Life-Course Criminology**

Desistance from Offending in the Twenty-First Century
*Bianca E. Bersani and Elaine Eggleston Doherty* ........................................ 311

On the Measurement and Identification of Turning Points
in Criminology
*Holly Nguyen and Thomas A. Loughran* .................................................. 335

**Economics of Crime**

Gun Markets
*Philip J. Cook* ............................................................................... 359

Offender Decision-Making in Criminology: Contributions
from Behavioral Economics
*Greg Pogarsky, Sean Patrick Roche, and Justin T. Pickett* ............................. 379

**Police and Courts**

Policing in the Era of Big Data
*Greg Ridgeway* ............................................................................... 401

Reducing Fatal Police Shootings as System Crashes: Research,
Theory, and Practice
*Lawrence W. Sherman* ...................................................................... 421

The Problems With Prosecutors
*David Alan Sklansky* ........................................................................ 451

Monetary Sanctions: Legal Financial Obligations in US Systems
of Justice
*Karin D. Martin, Bryan L. Sykes, Sarah Shannon, Frank Edwards,*
*and Alexes Harris* ................................................................. 471

Forensic DNA Typing
*Erin Murphy* ........................................................................ 497

**Errata**

An online log of corrections to *Annual Review of Criminology* articles may be found at
http://www.annualreviews.org/errata/criminol

Annu. Rev. Criminol. 2018.1:285-310. Downloaded from www.annualreviews.org
Access provided by University of California - Santa Cruz on 01/23/18. For personal use only.

*Craig Haney*

# The Psychological Effects of Solitary Confinement: A Systematic Critique

ABSTRACT

Research findings on the psychological effects of solitary confinement have been strikingly consistent since the early nineteenth century. Studies have identified a wide range of frequently occurring adverse psychological reactions that commonly affect prisoners in isolation units. The prevalence of psychological distress is extremely high. Nonetheless, use of solitary confinement in the United States vastly increased in recent decades. Advocates defend its use, often citing two recent studies to support claims that isolation has no significant adverse psychological effects, including even on mentally ill people. Those studies, however, are fundamentally flawed, their results are not credible, and they should be disregarded. Critically and comprehensively analyzing the numerous flaws that compromise this recent scholarship underscores the distinction between methodological form and substance, the danger of privileging quantitative data irrespective of their quality, and the importance of considering the fraught nature of the prison context in which research results are actually generated. Solitary confinement has well-documented adverse effects. Its use should be eliminated entirely for some groups of prisoners and greatly reduced for others.

Doing prison research, Alison Liebling has long reminded us, is deeply emotional and intellectually challenging, with different methodological approaches "competing for epistemological prominence—often from different sides of the prison wall" (1999, p. 148). It takes place in "an in-

Electronically published March 9, 2018
   Craig Haney is Distinguished Professor of Psychology, University of California, Santa Cruz.

© 2018 by The University of Chicago. All rights reserved.
0192-3234/2018/0047-0004$10.00

tense, risk-laden, emotionally fraught environment" (p. 163) and within a closed environment in which prison administrators tightly control access to data and most prisoners manifest an entirely legitimate and understandable skepticism toward data gatherers.

This helps explain why, in Liebling's words, "the pains of imprisonment are tragically underestimated by conventional methodological approaches to prison life" (p. 165). The more these conventional approaches encourage us to conceive of prisons as more or less traditional research settings and prisoners as mere specimens to be "objectively assessed," the less likely we are to gain useful insights into prison life or accurately represent the experience of those living inside.

These cautions are doubly applicable to research on solitary confinement.[1] It involves involuntary isolation of prisoners nearly around the clock in sparse cells located in remote or inaccessible units. Solitary confinement denies prisoners any meaningful social contact and access to positive environmental stimulation.

These prisons within prisons are nearly impenetrable to outside researchers (or anyone else). Prison officials tightly control access to solitary confinement units and to the prisoners inside them. They typically rebuff attempts by researchers to observe conditions and practices, let alone to carefully assess their potentially harmful effects. Prisoners in solitary confinement tend to be even more self-protective than other prisoners are (as part of their accommodation to harsh and frequently abusive conditions) and reluctant to have their "measure" taken by persons whom they have no reason to trust. They generally subscribe strongly to prisoner norms against displaying or acknowledging vulnerabilities that could be interpreted as weakness. The inapt pejorative designation of them as collectively "the worst of the worst" does not inspire confidence in or candor toward outsiders, and certainly not toward anyone remotely associated with the prison administration.

These realities pose a host of methodological challenges for anyone interested in understanding the nature and effects of prison isolation. This is in part why studies of the effects of solitary confinement on prisoners

---

[1] I use "solitary confinement" to refer to forms of prison isolation in which prisoners are housed involuntarily in their cells for upward of 23 hours per day and denied the opportunity to engage in normal and meaningful social interaction and congregate activities, including correctional programming. The term subsumes a range of prison nomenclature including "administrative segregation," "security housing units," "high security," and "close management," among others.

have rarely, if ever, approximated experimental research designs (including quasi- or natural experimental designs).

Solitary confinement units not only are largely impenetrable to outsiders but also, of course, are subject to legal and ethical restrictions that preclude random assignment of prisoners into them. The rigid prison rules and operating procedures that govern these places can easily frustrate the use of the kind of meticulous controls over conditions and participants that are needed to carry out anything remotely resembling an experiment. The distinctiveness of solitary confinement units and the nonnegotiable staff mandates under which they operate make it difficult, if not impossible, to implement rigorous conventional research designs (e.g., representative samples, control groups, repeated measures). Efforts to conduct randomized or truly controlled studies inevitably face significant risks that the data collected will be so confounded by inevitable methodological compromises as to be uninterpretable and, therefore, meaningless.

Nonetheless, scholars and researchers know a great deal about the negative effects of solitary confinement. We have firsthand or autobiographical accounts by former prisoners (e.g., Burney 1961) and staff members (e.g., Rundle 1973; Slater 1986); ethnographic, interview, and observational research (e.g., Benjamin and Lux 1975; Toch 1975; Hilliard 1976; Jackson 1983; Rhodes 2004; Reiter 2016); and cross-sectional studies that assess prisoners' psychological reactions at particular times (e.g., Grassian 1983; Brodsky and Scogin 1988; Haney 2003).

Much of the important research is qualitative, but there is a substantial amount of it and the findings are robust. They can also be "triangulated," that is, studied through a range of methods and in settings sometimes similar but not necessarily identical to solitary confinement (e.g., Turner, Cardinal, and Burton 2017). Numerous literature reviews have noted that scientists from diverse disciplinary backgrounds, working independently and across several continents, and over many decades, have reached almost identical conclusions about the negative effects of isolation in general and solitary confinement in particular (e.g., Haney and Lynch 1997; Haney 2003; Grassian 2006; Smith 2006; Arrigo and Bullock 2008). Those robust findings are also theoretically coherent. That is, they are consistent with and explained by a rapidly growing literature on the importance of meaningful social contact for maintenance of mental and physical health.

Largely because of the robustness and theoretical underpinnings of the data, numerous scientific and professional organizations have reached

a broad consensus about the damaging effects of solitary confinement. Several years ago, for example, a National Academies of Science committee reviewed the existing research and concluded that solitary confinement can precipitate such "serious psychological change" in prisoners that the practice "is best minimized" (National Research Council 2014, p. 201). The American Psychological Association (2016, p. 1), the world's largest professional association of psychologists, asserted that "solitary confinement is associated with severe harm to physical and mental health among both youth and adults, including: increased risk of self-mutilation, and suicidal ideation; greater anxiety, depression, sleep disturbance, paranoia, and aggression; exacerbation of the onset of pre-existing mental illness and trauma symptoms; [and] increased risk of cardiovascular problems."

Similarly, the National Commission on Correctional Health Care (2016), a highly respected organization of correctional medical and mental health professionals, promulgated a series of "principles" with respect to solitary confinement. They are intended to guide the ethical conduct of its members, including that placement in solitary confinement for longer than 15 days represents "cruel, inhumane, and degrading treatment" that is "harmful to an individual's health" (p. 260) and that "health care staff must advocate" to remove persons from solitary confinement whenever "their medical or mental health deteriorates" (p. 261).

Summarizing this growing consensus, a joint 2016 statement of the Association of State Correctional Administrators (the largest professional association of American prison administrators) and Yale Law School's Liman Public Interest Program observed that demands for change in use of solitary confinement are being made around the world. More specifically,

> Commitments to reform and efforts to limit or abolish the use of isolating confinement come from stakeholders and actors in and out of government. Documentation of the harms of isolation, coupled with its costs and the dearth of evidence suggesting that it enhances security, has prompted prison directors, legislatures, executive branch officials, and advocacy groups to try to limit reliance on restricted housing. Instead of being cast as the solution to a problem, restricted housing has come to be understood by many as a problem in need of a solution. (Association of State Correctional Administrators and the Arthur Liman Public Interest Program 2016, p. 15)

Even more recently, the director of the Colorado Department of Corrections, Rick Raemisch, announced that Colorado has ended use of long-term solitary confinement, so that even prisoners "who commit serious violations like assault will now spend at most 15 days in solitary" (2017, p. A25). This development in Colorado is especially notable, for reasons that become clear in the pages that follow.

Against this backdrop, in 2009 and 2010 word began to circulate among prison researchers and policy makers that a new, supposedly unassailable scientific study—the "Colorado study"—had produced results that contravened many decades of empirical findings on the harmful effects of prison isolation. Lovell and Toch (2011, p. 3) characterized a number of its findings as "flabbergasting," and indeed they were. Among the most startling were that a year-long stay in solitary confinement resulted in no "significant decline in psychological well-being over time"; that on most measures, including cognitive performance, "there was improved functioning over time"; and most remarkably that many more mentally ill prisoners benefited from isolation than were damaged by it (O'Keefe et al. 2010, pp. 54, 78). The Colorado researchers thus reported data indicating that solitary confinement made prisoners feel and think better, especially if they were mentally ill.

In fact, however, the Colorado study was riddled with serious methodological problems that limited its value and made the meaning of the results impossible to decipher. Notwithstanding its authors' frank, albeit at times opaque and oblique, acknowledgments of some of its fundamental weaknesses, defenders of solitary confinement have seized on it. It has become a last bastion of resistance against a widespread and growing consensus that use of solitary confinement should be eliminated or drastically limited.

The Colorado study's influence has been amplified by an equally flawed meta-analysis that relied very heavily on it and significantly mischaracterized the prior literature on the effects of isolated confinement (Morgan et al. 2016). Of course, the influence of a fundamentally flawed study can grow if it and the data it produced are included in literature reviews that overlook glaring weaknesses. This risk is greater in meta-analytic than in narrative literature reviews that focus on decontextualized "effect sizes" irrespective of methodological shortcomings of individual studies. Unlike narrative reviews, meta-analyses include only quantitative outcomes or effects. This elevates the importance of numerical outcomes and often

scants nuanced assessments of data quality. This is particularly a problem for prison research, an enterprise that is fraught with emotional and methodological challenges, in which aspects of the institutional context or setting can fundamentally alter the nature of the research and the meaning of its results. That is precisely what happened in the Morgan et al. (2016) meta-analysis.

In the following pages, I first discuss the scientific basis for the broad consensus that solitary confinement has substantial negative psychological effects on prisoners. I then discuss the Colorado study and the Morgan et al. (2016) meta-analysis based largely on it. Both are textbook examples of how things can go terribly wrong when researchers fail to take account of the unique nature of the prison environment, the special emotional and methodological challenges of prison research in general, and the contingent and unpredictable conditions and practices that affect solitary confinement units in particular.

### I. Solitary Confinement Research and Practice

Documentation of the damaging nature and psychological effects of solitary confinement has a very long history, dating at least to the early nineteenth century, when solitary confinement was the modal form of imprisonment. The notion that prisoners could be reformed—made "penitent"—by time spent in isolation dominated American correctional thinking and practice and eventually spread throughout Europe. Yet the practice was recognized as a dangerous failure not long after its inception. Haney and Lynch (1997), Toch (2003), Grassian (2006), and Smith (2006) reviewed much of the early historical literature. Reports on solitary confinement at Pentonville Prison in England described "twenty times more cases of mental disease than in any other prison in the country" (Hibbert 1963, p. 160). Accounts of solitary confinement in the Netherlands documented "again and again, reports of insanity, suicide, and the complete alienation of prisoners from social life" (Franke 1992, p. 128). Newspaper reports from Philadelphia observed that prisoners in solitary confinement at the Walnut Street Jail "beg, with the greatest earnestness, that they may be hanged out of their misery" (Masur 1989, p. 83). Charles Dickens concluded that a prisoner kept in that "melancholy house" was like "a man buried alive . . . dead to everything but torturing anxieties and horrible despair" (Dickens 1842, p. 116). A similar regime in Auburn, New York, was described as "a hopeless failure that led to a

marked prevalence of sickness and insanity on the part of convicts in solitary confinement" (Barnes 1921, p. 53). Stuart Grassian (2006, pp. 342–43) reported that "between 1854 and 1909, thirty-seven articles appeared in German scientific journals on the subject of psychotic disturbances among prisoners." The "most consistent factor" accounting for prison psychoses, "reported in over half the total literature, was solitary confinement."

Systematic early studies of solitary confinement in the United States used what is now seen as a somewhat outmoded theoretical framework, focusing narrowly on sensory rather than social deprivation (e.g., Scott and Gendreau 1969; Gendreau et al. 1972). Even so, the authors of one early study concluded that "excessive deprivation of liberty, here defined as near complete confinement to the cell, results in deep emotional disturbances" (Cormier and Williams 1966, p. 484). In a review of the sensory deprivation literature, Haney and Lynch (1997) noted that "the dissimilarities between conditions created in these studies and those in solitary confinement or punitive segregation in correctional institutions are obvious." They also observed that, nonetheless, the early research did "emphasize the importance of sensory stimulation in human experience and the dramatic effects that can be produced when such stimulation is significantly curtailed" (p. 502).

More recent research focuses on the psychological damage that results from social deprivation. Hans Toch's large-scale psychological study of prisoners in crisis in New York State correctional facilities included important observations about the effects of isolation. After conducting numerous in-depth interviews, Toch (1975, p. 54) concluded that "isolation panic" was a serious problem in solitary confinement. The symptoms Toch described included rage, panic, loss of control and breakdowns, psychological regression, and build-ups of physiological and psychic tension that led to incidents of self-mutilation. He noted that isolation panic could occur under other conditions of confinement but that it was "most sharply prevalent in segregation." Moreover, it marked an important dichotomy for prisoners: the "distinction between imprisonment, which is tolerable, and isolation, which is not."

Empirical studies have identified a wide range of frequently occurring adverse psychological reactions to solitary confinement.[2] These include

---

[2] For reviews of the literature documenting these adverse reactions, see Haney and Lynch (1997), Haney (2003), Cloyes et al. (2006), Grassian (2006), Smith (2006), and Arrigo and Bullock (2008).

stress-related reactions (such as decreased appetite, trembling hands, sweating palms, heart palpitations, and a sense of impending emotional breakdown); sleep disturbances (including nightmares and sleeplessness); heightened levels of anxiety and panic; irritability, aggression, and rage; paranoia, ruminations, and violent fantasies; cognitive dysfunction, hypersensitivity to stimuli, and hallucinations; loss of emotional control, mood swings, lethargy, flattened affect, and depression; increased suicidality and instances of self-harm; and, finally, paradoxical tendencies to further social withdrawal.

The prevalence of psychological distress, at least as suffered in certain solitary confinement settings, appears to be extremely high. A study conducted at the Security Housing Unit (SHU) at Pelican Bay State Prison in California (Haney 1993; Reiter 2016), an especially severe solitary confinement facility, is illustrative. Structured interviews were used to assess a randomly selected, representative sample of 100 prisoners to determine the prevalence of symptoms of psychological stress, trauma, and isolation-related psychopathology (Haney 2003). The interviews included demographic questions, brief social and institutional histories, and systematic assessments of 25 items, based in part on the Omnibus Stress Index (Jones 1976) and on other instruments similar to those used in Brodsky and Scogin (1988). Every symptom of psychological stress and trauma but one (fainting) was experienced by more than half of the assessed prisoners; many were reported by two-thirds or more and some by nearly everyone. Well over half of the prisoners reported distress-related symptoms—headaches, trembling, sweaty palms, and heart palpitations.

High numbers of the Pelican Bay SHU prisoners also reported suffering from isolation-related symptoms of pathology. Nearly all reported ruminations or intrusive thoughts, oversensitivity to external stimuli, irrational anger and irritability, difficulties with attention and often with memory, and a tendency to withdraw socially. Almost as many reported symptoms indicative of mood or emotional disorders: concerns over emotional flatness or losing the ability to feel, swings in emotional response, and feelings of depression or sadness that did not go away. Finally, sizable minorities reported symptoms that are typically associated only with more extreme forms of psychopathology—hallucinations, perceptual distortions, and thoughts of suicide.

Social withdrawal, a common reaction to solitary, is related to a broader set of social pathologies that prisoners often experience as they attempt to

adapt to an environment devoid of normal, meaningful social contact. In order to exist and function in solitary confinement, where day-to-day life lacks meaningful interaction and closeness with others, prisoners have little choice but to adapt in ways that are asocial and, ultimately, psychologically harmful.

A large international literature has reached similar conclusions on the adverse psychological effects of solitary confinement. Solitary confinement not only is a common form of mistreatment to which prisoners of war have been subjected and been adversely affected (e.g., Hinkle and Wolff 1956) but also is associated with "higher levels of later life disability" among returnees (Hunt et al. 2008, p. 616). It is frequently used as a component of torture (e.g., Foster, Davis, and Sandler 1987; Nowak 2006; Reyes 2007). Solitary confinement has been studied in more traditional international criminal justice contexts as well. For example, Barte (1989, p. 52) concluded that solitary confinement in French prisons had such "psychopathogenic" effects that prisoners placed there for extended periods could become schizophrenic, making the practice unjustifiable, counterproductive, and "a denial of the bonds that unite humankind."

Koch (1986, pp. 124–25) studied "acute isolation syndrome" among detainees in Denmark that occurred after only a few days in isolation and included "problems of concentration, restlessness, failure of memory, sleeping problems and impaired sense of time and ability to follow the rhythm of day and night." If isolation persisted for a few weeks or more, it could lead to "chronic isolation syndrome," including intensified difficulties with memory and concentration, "inexplicable fatigue," a "distinct emotional liability" that included fits of rage, hallucinations, and the "extremely common" belief among prisoners that "they have gone or are going mad."

Volkart, Dittrich, et al. (1983) studied penal isolation in Switzerland. They concluded that, compared with prisoners in normal confinement, those in solitary displayed considerably more psychopathological symptoms, including heightened feelings of anxiety, emotional hypersensitivity, ideas of persecution, and thought disorders (see also Waligora 1974; Volkart, Rothenfluh, et al. 1983; Bauer et al. 1993).

The major reviews of the literature reach the same conclusions as the seminal studies. Haney and Lynch (1997, pp. 530, 537) noted that "distinctive patterns of negative effects have emerged clearly, consistently, and unequivocally from personal accounts, descriptive studies, and sys-

tematic research on solitary and punitive segregation." The "psychologically destructive treatment" to which prisoners are exposed in solitary confinement is so severe that it likely "would not be countenanced for any other group in our society."

Grassian's extensive survey of solitary confinement research concluded that "the restriction of environmental stimulation and social isolation associated with confinement in solitary are strikingly toxic to mental functioning, including, in some prisoners, a stuporous condition associated with perceptual and cognitive impairment and affective disturbances" (2006, p. 354).

That same year, Smith's comprehensive review concluded that "the vast majority" of studies on the effects of solitary confinement "document significant negative health effects" (2006, p. 456). He observed that "research on effects of solitary confinement has produced a massive body of data documenting serious adverse health effects" (p. 475) including "anger, hatred, bitterness, boredom, stress, loss of the sense of reality, suicidal thoughts, trouble sleeping, impaired concentration, confusion, depression, and hallucinations" (p. 488).

Similarly, Arrigo and Bullock (2008) concluded that "nearly all investigators acknowledge that long-term segregation, mistreatment by correctional staff, and preexisting psychological vulnerability are all apt to result in negative mental health consequences for convicts" and that "the extreme isolation and harsh conditions of confinement in [solitary confinement] typically exacerbate the symptoms of mental illness" (p. 632).

There is an important, theoretically coherent framework that helps explain the consistency of these conclusions. A burgeoning literature in social psychology and related disciplines shows that solitary confinement is a potentially harmful form of sensory deprivation but also, and more destructively, exposes prisoners to pathological levels of social deprivation. Numerous studies have established the critical psychological significance of social contact, connectedness, and belonging (e.g., Fiorillo and Sabatini 2011; Hafner et al. 2011; Cacioppo and Cacioppo 2012). Meaningful social interactions and social connectedness can have a positive effect on people's physical and mental health in settings outside of prison and, conversely, social isolation in general can undermine health and psychological well-being. Thus, it makes sound psychological sense that exposure to especially severe forms of material, sensory, and social deprivation harms prisoners' mental health.

Indeed, researchers have concluded that human brains are "wired to connect" to others (Lieberman 2013). Thwarting the need to establish and maintain connections to others undermines psychological well-being and increases physical morbidity and mortality. Because "social connection is crucial to human development, health, and survival," experts have called for it to be recognized as a national public health priority (Holt-Lunstad, Robles, and Sbarra 2017, p. 527). The involuntary, coercive, hostile, and demeaning aspects of solitary confinement are likely to exacerbate the negative effects of social isolation that have repeatedly been documented in more benign contexts.

Given these long-standing and theoretically informed findings, a study purporting to show that psychological effects of solitary confinement range from harmless to beneficial would normally not be taken seriously. Sometimes, however, the appearance of seemingly objective scientific findings provides legitimacy to doubtful conclusions, especially when they support contested policy or political agendas. That is precisely what happened in the case of the Colorado study. Its authors described it as a scientific advance over all previous studies, and some commentators prematurely lauded its methodological rigor. It appeared on the surface to be an ambitious and well-designed longitudinal study, with appropriate comparison groups and a host of dependent variables that were to be examined. Data were collected through the repeated administration of instruments said to be validated, and an unusually large number of prisoners were to be assessed over a 1-year period.

The reality was very different. The project could not be, and was not, carried out as planned, partly because of powerful demands and correctional contingencies inherent in prison settings in general and solitary confinement in particular. The problems proved insurmountable: comparison groups were not comparable, and the integrity of the "treatments" each group received was quickly corrupted. I discuss these and numerous other problems in the next section. The fundamental methodological flaws that plagued the study prevented collection of any meaningful data and ensured that no meaningful conclusions could be drawn.

The Colorado study nonetheless has continued to play an outsized role in contentious policy debates in which proponents of solitary confinement draw on it to support positions that are becoming indefensible. Defenders have characterized the study as "an outstanding example of applied correctional research" that was "planned with great care," em-

ployed a "rigorous" design, and produced results that "were about as conclusive as possible" showing that solitary confinement has few or no adverse effects (Gendreau and Labrecque 2016, p. 9).

A year after the study's release, the National Institute of Corrections devoted an entire issue of *Corrections and Mental Health* to discussion of it. One writer (other than the Colorado researchers themselves) who endorsed its results and defended its methodology was Paul Gendreau, a well-known Canadian researcher and long-time prison system employee. Despite not having published primary research data on isolation since the early 1970s, he had defended its use over many decades, for example, in a 1984 article entitled "Solitary Confinement Is Not Cruel and Unusual: People Sometimes Are!" (Gendreau and Bonta 1984). In *Corrections and Mental Health*, Gendreau hailed the Colorado study as a "truly significant contribution to our knowledge base about the effects of prison life for one of the most severe forms of incarceration" and asserted that "in terms of its methodological rigor" no other study "comes close" (Gendreau and Theriault 2011, p. 1). Moreover, despite the deep skepticism voiced by all of the other contributors to the special issue except Gendreau and the study's authors, the journal's editor described the Colorado study as "an important report" because it showed that "administrative segregation is not terribly harmful" (Immarigeon 2011, p. 1).

Similarly, when a brief summary of the study appeared in a scholarly journal (O'Keefe et al. 2013), it was accompanied by commentary written by several prominent clinicians who claimed to have witnessed as much as or more psychological improvement among isolated prisoners than decompensation. They praised the study as "groundbreaking" and described its methodology as "solid" (Berger, Chaplin, and Trestman 2013, pp. 61–63). The authors averred that "the extremes of solitary confinement have been misunderstood" and that "people are resilient and are able to thrive under even difficult environmental conditions."

The respected Irish prison researcher Ian O'Donnell, though more circumspect, offered similar observations. Although O'Donnell acknowledged some limitations, he praised the study's methodology and invoked its results to support some of his own views. "However unpalatable they might appear to some parties," he asserted, the study's findings "must be taken seriously" (2014, p. 120). O'Donnell characterized the study as "valuable" because, he said, it "highlights the individual's capacity to adapt" (p. 122). He defended the Colorado researchers against criticism, noting that it is ethically impossible to study solitary confinement with "suffi-

cient scientific rigour to satisfy everyone" (p. 122). The study's results suggest, he wrote, "that segregation was not highly detrimental to those forced to endure it" (p. 120) and that the harmfulness of this form of penal confinement "may have been over-emphasized" (p. 123).[3]

The Colorado study also figures prominently in correctional policy reviews by recalcitrant prison officials who do not want to modify segregation practices and in litigation over the harmful effects of solitary confinement, where those defending it are eager to find support.[4] For example, the US Government Accountability Office conducted a review of segregated housing practices in the federal Bureau of Prisons (BOP): "BOP HQ officials cited the 2010 DOJ-funded study of the psychological impact of solitary confinement in the Colorado state prison system. This study showed that segregated housing of up to 1 year may not have greater negative psychological impacts than non-segregated housing on inmates. While the DOJ-funded study did not assess inmates in BOP facilities, BOP management told us this study shows that segregation has

---

[3] O'Donnell indicated that the study documented the "benefits" of solitary, ones he suggested derived from "the many hours spent in quiet contemplation" in solitary confinement units. He also suggested that the results buttressed his own belief that "severe forms of trauma are sometimes accompanied by an improvement in functioning" (p. 123).

[4] For example, consider the "Expert Report by Robert Morgan, PhD, Ashker, et al. v. Governor, et al., Case No.:C09-05796 CW (N.D. Cal.)" submitted under oath to a federal district court. Morgan opined that being housed in extremely harsh solitary confinement (the SHU in California's Pelican Bay State Prison) for "*ten or more continuous years* does not place inmates at substantial risk of serious mental harm" (p. 1; emphasis added), a position that he supported in part by citing the Colorado study. He described the study as "the most sophisticated study to date on the topic" of the effects of solitary confinement, claimed it showed "an absence of adverse effects for segregated inmates" (p. 1), and cited the results of his own meta-analysis (which was incorporated into Morgan et al. [2016], which I discuss later in this essay) to buttress his defense of long-term solitary confinement. Similarly, see the "Expert Report Provided in the Matter of BCCLA and JHS v. AGC, Court No.:S150415" by Jeremy Mills, PhD, filed in support of the continued use of solitary confinement in Canadian prisons. The Colorado study is described by Mills as "quite likely the most sophisticated longitudinal study to date examining the effects of segregation on mentally ill and non–mentally ill offenders" (p. 13). He also characterized meta-analyses like the Morgan et al. meta-analysis, of which he was a coauthor, as "a hallmark of the scientific process" (p. 12). Mills embraced the Colorado study's conclusions as supportive of his own, which were gleaned from his "clinical experience" working in segregation units on behalf of the Canadian Correctional Service. These included his view that both mentally ill and non–mentally ill prisoners usually need only "a few days" of "a period of adjustment" to get used to solitary confinement. He suggested that prisoners placed in solitary confinement "more frequently" forgo the adjustment period entirely because "they are familiar with the environment" (p. 14). Neither Morgan nor Mills acknowledged the Colorado study's numerous fundamental methodological flaws or indicated that the Morgan et al. meta-analysis on which they relied was based primarily on it.

little or no adverse long-term impact on inmates" (Government Accountability Office 2013, p. 39).

The Colorado study's continuing cachet in prison policy making and important legal circles means that its scientific bona fides bear especially careful analysis. Examining and deconstructing its methodology is a tedious but worthwhile exercise because it illustrates the difficulty of honoring norms of scientific rigor in a setting in which conventional research designs are nearly impossible to implement and necessary trade-offs are especially costly to the quality of the data collected. I turn to that exercise in Section II and to a deconstruction of the Morgan et al. (2016) meta-analysis in Section III.

## II. Interrogating the Colorado Study

Results of the Colorado study appeared in two versions: a lengthy final report to the National Institute of Justice (O'Keefe et al. 2010) and a short article in the *Journal of the American Academy of Psychiatry and Law* (O'Keefe et al. 2013). I mostly discuss the more detailed National Institute of Justice report.[5] I also draw on two depositions, under oath, of Maureen O'Keefe, the lead researcher, in connection with prisoner litigation concerning Colorado's "supermax" facility (where much of the study was conducted). In response to detailed questions, O'Keefe discussed numerous issues not raised in the report or fully addressed in published exchanges following its release.[6]

Why the study was undertaken is unclear. Neither of the primary researchers had prior experience with solitary confinement. Maureen O'Keefe had a master's degree in clinical psychology but no prior involvement in research on the effects of isolation. Kelli Klebe was a psychometrician who also had no direct experience with solitary confinement (O'Keefe 2010, pp. 13–14). Yet they designed the study (pp. 77–79).

The study's impetus may have come from Larry Reid, warden of the Colorado supermax prison that housed prisoners assigned to administra-

---

[5] A number of brief but highly critical commentaries by prison researchers also questioned aspects of the methodology: Grassian and Kupers (2011), Rhodes and Lovell (2011), Shalev and Lloyd (2011), and Smith (2011). See also the response to at least some of these criticisms by Metzner and O'Keefe (2011).

[6] The two depositions are Deposition of Maureen O'Keefe, *Dunlap v. Zavaras*, Civil Action no. 09-CV-01196-CMA-MEH, October 5, 2010; and Deposition of Maureen O'Keefe at 96, 101 *Sardakowski v. Clements*, Civil Action no. 12-CV-01326-RBJ-KLM, October 25, 2013.

tive segregation. O'Keefe indicated that Reid "kept pushing for the study to be done" and served as a member of the study's advisory board (2010, p. 51). A few years before the Colorado study was planned, administrators at a Wisconsin supermax had lost a lawsuit over their use of solitary confinement (*Jones 'El v. Berge*, 164 F.Supp. 2d 1097 [W.D. Wis. 2001]), and Reid apparently wanted to avoid a similar decision. As O'Keefe (2013, p. 44) observed, "I believe [Reid's] concern was that Wisconsin had lost the case and it had severely restricted their ability to use administrative segregation."

The Colorado researchers said that they expected to find that administrative segregation had negative psychological effects: "We hypothesized that inmates in segregation would experience greater psychological deterioration over time than comparison inmates, who were comprised of similar offenders confined in non-segregation prisons" (O'Keefe et al. 2010, p. viii). If so, Warden Reid did not appear to share that view. The Colorado Department of Corrections then housed "three times as many people in solitary confinement as the average state prison system" (*Correctional News* 2012, p. 1). Moreover, O'Keefe (2013, p. 46) acknowledged that Reid "was very pro administrative segregation and all of us on the project felt that way."

Psychologist John Stoner, the mental health coordinator at the Colorado supermax prison, also strongly supported administrative segregation and served as a member of the study's advisory board. He had testified in the Wisconsin case that administrative segregation was not "as detrimental to mental health as others have found it to be" (*Jones 'El v. Berge*, p. 1104). Among other things, Stoner said that he was not troubled by Wisconsin's use of "boxcar" cells with solid metal doors that closed off visual contact and muffled sound because he thought they were "necessary for the protection of staff and other inmates" (p. 1104). He also observed in written testimony that prisoners in isolation who appeared to be seriously mentally ill were likely not as sick as other experts indicated; he speculated that they might be malingering. Although Stoner told the court in *Jones 'El v. Berge* that the isolated housing conditions at the prison were entirely appropriate, the judge disagreed. She held that the Wisconsin facility was unconstitutionally harsh for mentally ill prisoners and ordered them removed.

In any event, the Colorado researchers started out with a seemingly good idea and what appeared to be a reasonable research design. They would identify groups of prisoners housed in administrative segregation

(AS) and in the general population (GP), subdivided into those suffering from serious mental illness (MI) and not (NMI). Their psychological status would be tracked for 1 year to determine whether and how the different groups were affected by different conditions of confinement.[7] The characteristics of the AS and GP prisoners were not matched at the outset but were expected to be more or less comparable because all had committed rules violations for which they might have received an AS placement.

Assignments to AS were thus not random. The researchers reported that "placement into AS or GP conditions occurred as a function of routine prison operations, pending the outcome of their AS hearing, without involvement of the researchers. . . . Inmates who returned to GP following an AS hearing were assumed to be as similar as possible to AS inmates and, therefore, comprised the comparison groups" (O'Keefe et al. 2010, p. 17). The prisoners whom prison authorities chose to send to administrative segregation became the treatment group and those returned to the general population became the comparison group (again, with each group subdivided into those identified by the prison system as mentally ill and those not).

Unfortunately, the plan fell apart almost immediately. The prison context and "routine prison operations" fundamentally undermined the research design.

### A. Contamination of Treatment and Comparison Groups

The study's implementation was compromised in two fundamental ways. It is important at this juncture to acknowledge the distinction between mere methodological "limitations"—respects in which a study is not perfect—and problems that are so fundamental that they make the resulting data uninterpretable. The two flaws from which the Colorado study suffered were fatal—separately and in combination.

1. *All Participants Were Exposed to the Treatment.*   All participants in the study, including those in the comparison group, were initially placed

---

[7] Data for one group of participants—prisoners "with the most acute psychiatric symptoms" housed at a psychiatric treatment facility where they lived and interacted with one another "on their living unit" (O'Keefe et al. 2010, pp. 14–15)—did not bear directly on the issue of whether and how much prisoners were affected by AS. The researchers included them separately "to study inmates with serious mental illness and behavioral problems who were managed in a psychiatric prison setting" (p. 17). The prisoners in this group were not living in conditions remotely comparable to prisoners housed in conventional GP or AS units.

in "punitive segregation," a severe form of solitary confinement, for unspecified but not insignificant periods, before being assigned to administrative segregation or the general population. "At the time leading up to and during their AS hearing," the researchers acknowledged, "inmates have typically been in segregation" (O'Keefe et al. 2010, p. 8).[8] The reason was that Colorado prison officials were required to hold hearings to determine whether prisoners were guilty of infractions and if so whether AS punishment was warranted. Prisoners in Colorado as elsewhere are placed in special housing while they await the outcomes of their disciplinary hearings, often for days or weeks before the process is complete. Thus, the researchers also noted that "offenders reclassified to AS *remain* in a punitive segregation bed until an AS bed becomes available" (O'Keefe et al. 2013, p. 50; emphasis added).

Although this is routine correctional practice, its methodological implications were disastrous. It meant that all members of the comparison group were exposed to a severe dose of the isolation "treatment" before the study began. O'Keefe et al. (2010, p. 9) indicated that the punitive segregation conditions where prisoners were kept while disciplinary proceedings unfolded were so harsh that they were "only intended to be used for a short period of time." This severity distinguished it from AS, which was intended to be used for much longer periods. Here is how they described punitive segregation:

> Punitive segregation offenders remain in their cell for 23 to 24 hours a day, only coming out for recreation and showers, both of which are located in the living unit. Therefore, most do not leave the unit during their segregation time. Services including meals, library, laundry, and even medical and mental health appointments occur at the cell door. If a situation warrants an offender to be out of cell, the offender is placed in full restraints and escorted to a room within the unit

---

[8] Why "typically" is unclear. The report indicates that all prisoners (including the GP comparison groups) were placed in some form of isolation before, during, and shortly after their AS hearings. It is hard to imagine a procedure in which a prisoner would be taken directly out of GP, immediately given an AS hearing, and immediately returned to GP, without having spent time in some form of isolated housing. In fact, the authors reported that AS participants "on average completed their initial test 7 days (SD = 7.3) after their AS hearing," that GP participants on average "were tested 16 days (SD = 18.9) after their hearing," and that "on average, 43 percent of inmates . . . [had] been confined in segregation (40 percent in AS groups and 3 percent in GP groups) for an average of 18.2 days (SD = 18.1)" (p. 30). These figures are mathematically impossible. Moreover, they are at odds with O'Keefe's deposition testimony and with a statement in a more recent published "reflection" on the study (O'Keefe 2017).

where he or she can meet privately. Many offenders do not like being taken out of their cells because of the use of full restraints. Additionally, they may not like leaving their cell because officers may take the opportunity to search the cell for contraband.

Due to the disciplinary nature of punitive segregation, offenders are stripped of most privileges during their stay. Punitive segregation inmates are neither allowed to work nor permitted to participate in programs or education. Furthermore, their televisions are removed, and they cannot order canteen beyond essential hygiene items. (O'Keefe et al. 2010, p. 8)

Punitive segregation prisoners were denied visits, which were considered too labor intensive for prison staff to administer.

In contrast to AS, prisoners in punitive segregation also were denied the opportunity to engage in programming or education and were "unable to begin working their way toward leaving segregation" (O'Keefe et al. 2010, p. 9). Thus, even study participants who wound up in AS likely experienced punitive segregation as a much worse form of treatment.

This initial exposure of all participants to an especially harsh form of solitary confinement in punitive segregation made it impossible to draw meaningful inferences about any separate, subsequent effects of GP versus AS. There can be no comparison group in a study in which all of its participants are subjected to a harsh form of the treatment whose effects are being measured.

It is impossible to know whether or how control group prisoners were damaged by the time spent in punitive segregation and whether those effects continued throughout the study. Nor could anyone know whether the AS prisoners were actually relieved to enter the "treatment" because it was less harsh than punitive segregation. These imponderables could account for participants' psychological reactions, including the reported lack of differences between the AS and GP groups and the reported "improvement" or lack of deterioration of many members of the AS group. This was thus no longer a study of administrative segregation compared with no administrative segregation, but of varying and unspecified amounts of segregation experienced by everyone.

A different kind of analysis might have salvaged something by using the exact periods of overall exposure to administrative segregation–like conditions (including time in punitive segregation) as a continuous variable to estimate whether duration had an effect. However, the amount of time in segregation each prisoner experienced is not reported, so this

kind of analysis was apparently not conducted. O'Keefe et al. (2010) treated their data as if they had done a classic treatment versus no treatment study, even though they had not.

The likelihood that initial exposure to punitive segregation conditions had significant negative psychological effects on most participants is more than just speculation. The National Institute of Justice report acknowledged that three of the four groups "showed symptoms that were associated with the SHU syndrome" from the outset (O'Keefe et al. 2010, p. viii), which seems a clear indication that the initial period of segregation adversely affected participants before their AS terms began. High levels of psychological distress measured during or after the prisoners' initial exposure to punitive segregation continued throughout the study. O'Keefe emphasized in a deposition that prisoners in all groups reported "pretty high elevations" of psychological distress (2010, p. 171) and that "clearly, very clearly, the offenders responded with very high elevations. They reported high levels of psychological distress" (p. 201).

Symptoms of distress were so elevated that the researchers wondered, and tried to test, whether the prisoners were malingering: "We had this huge rate of offenders who looked like they could be malingering" (O'Keefe 2013, p. 89). O'Keefe recognized, however, that high scores on a malingering scale "could indicate a lot of psychological problems." In the end, the researchers "didn't really believe that [the prisoners] were malingering" and discarded the results of the malingering scale without analyzing them (p. 89).

Thus, although the researchers acknowledged that most of the participants began the study very much affected by emotional and behavioral trauma, they seem not to have considered that much of that trauma resulted from time spent in the punitive segregation units. Nor did they consider that, when participants "naturally got better as time went on" (O'Keefe 2013, p. 91), it was likely because the conditions of punitive segregation that all of them had experienced were now alleviated, even for those who ended up in AS.

The amount of time that the study participants spent in punitive segregation was problematic, especially because even very brief periods of isolation can have damaging psychological effects. The United Nations Special Rapporteur on Torture, Juan Mendez, has noted that "it is clear short-term solitary confinement can amount to torture or cruel, inhuman, or degrading treatment" and recommended that solitary confinement "in excess of 15 days should be subject to an absolute prohibition"

(2011, p. 23). The United Nations adopted that recommendation in the "Mandela Rules," which defined "prolonged solitary confinement" as lasting "for a time period in excess of 15 consecutive days," and mandated prohibition of such prolonged confinement (Commission on Crime Prevention and Criminal Justice 2015, rules 43.1, 44). The National Commission on Correctional Health Care (2016) also characterized "prolonged solitary confinement" lasting for more than 15 days as "cruel, inhumane, and degrading treatment" because it is "harmful to an individual's health" (p. 260). Yet all of the prisoners in GP and AS experienced a nontrivial duration or dose of isolation that lasted well beyond this potentially damaging threshold. A key table in the National Institute of Justice report indicated that, at the time of their first test interval, participants had spent considerable average times in "Other seg": GP MI prisoners 12.4 days, GP NMI 39.8 days, AS MI 88.9 days, and AS NMI 90.3 days (O'Keefe et al. 2010, table 5).

In her deposition testimony, O'Keefe could not remember exactly how long study participants remained in punitive segregation before their charged disciplinary infractions were resolved. At one point, she said, "When an offender acted out, they were put in punitive seg and generally given notice of a hearing pretty quickly, and then the hearing happened, again pretty quickly after that" (2013, p. 93). Later she "guessed" the time was around "the two week mark" (p. 94). That was not remotely accurate, according to table 5 in the report, except for the GP MI group. O'Keefe later offered another estimate, this time that prisoners were kept in various punitive segregation units "an average of 30 days" before their initial testing session (2017, p. 2). This, too, is much less time than the National Institute of Justice report showed. In any event, it appears that all study participants were subjected at the outset to harsh conditions of punitive segregation for at least twice as long as the Mandela Rules would prohibit, even before the study officially began.

2. *Uncontrolled Cross Contamination.* The second fundamental flaw was as important as the first. It, too, occurred because placement and retention in AS were correctional rather than methodological decisions. The researchers admitted that they "lack[ed] control over the independent variable, which in this case is the conditions of confinement" (O'Keefe et al. 2010, p. 35). There was, in their words, "contamination across groups," because some AS participants "were not confined in segregation for their entire period of participation in the study" and because some GP participants "may have at some time during their study partic-

ipation been placed in punitive segregation or even AS" (p. 35). The researchers also acknowledged that prisoners in the various subgroups "may have [been in] multiple locations within a study period" (p. 35).[9] In fact, not only did participants move between AS and GP, but a number of them were housed in other conditions during the study, including the hospital and "community placement" (p. 36).

Transferring prisoners back and forth between locations and custody statuses is routine correctional practice, but it had disastrous methodological consequences. It meant that some AS prisoners in the study were released into GP for good behavior, some GP prisoners were placed in AS (or punitive segregation) for rule violations, and some members of both groups were transferred to other settings. Having both control and experimental group members move back and forth between treatment and control conditions (and other unspecified places) destroyed the integrity of the two groups and made it impossible to compare their experiences meaningfully.

The contamination occurred differently between groups. By the end of the study, only small and very different numbers of "uncontaminated" participants were left in each group.[10] Methodologically speaking, a true, a natural, or even a quasi experiment cannot be completed if researchers lose control of the integrity of their treatment and comparison groups. The researchers, however, simply aggregated the contaminated prisoners' data into the groups in which they were originally placed.

O'Keefe et al. (2010, p. 35) acknowledged that "one of the challenges of applied research is the researchers' lack of control over the independent variables," but that admission does not ameliorate the problem. They

[9] They wrote that "participants remained in their assigned group regardless of their placements throughout the prison system" (O'Keefe et al. 2010, p. 35), but mean by this that individual prisoners were considered to be in those groups for purposes of data analyses even though they did not actually remain housed there.

[10] There were only 26 "pure" cases in the AS MI group (of the original 64), 39 in AS NMI (of 63), 13 in GP MI (of 33), and only 11 in GP MI (of 43) (O'Keefe et al. 2010, p. 35). All the others moved back and forth between treatment, control, and miscellaneous other conditions on an unspecified number of occasions. Thus two-thirds (52 of 76) of the GP control participants spent time in segregation or other non-GP settings during the study period, and their self-reports were used to contrast their prison experiences and reactions with those of the AS prisoners, half of whom (62 of 127) spent unspecified amounts of time in GP or elsewhere. The "pure" cases were pure only in the sense that they were not contaminated by moving back and forth between treatment, control, and other conditions during the study. They were still "contaminated" by being exposed to punitive segregation before the study officially began.

nonetheless asserted that "a significant advantage of this study is the use of comparison groups to determine if [persons in AS] change over time differentially compared to similar groups who are not placed in AS" (p. 59). However, they did not compare similar groups and thus can reach no conclusions about differences in the groups' experiences.

In fact, it is impossible to conclude anything meaningful from the Colorado results. Lovell and Toch (2011, p. 4) in their initial commentary on it correctly concluded that "despite the volume of the data, no systematic interpretation of the findings is possible."

### B. Additional Serious Flaws

The researchers' inability to maintain control of key aspects of their research created numerous additional methodological problems. These problems further negated the possibility that any credible or meaningful findings would emerge from the study.

The additional problems pertained to how the participants were selected and how the various groups were composed, what the researchers recorded (or failed to record) about the experiences of members of the different groups, and questionable data collection procedures. Most stemmed from unyielding correctional realities and some from unwise methodological choices.

1. *Sampling and Group Composition.* The initial sample was drawn from among prisoners deemed eligible for the study by virtue of having received a disciplinary write-up and scheduled hearing to determine whether they would be placed in AS or returned to GP. The initial group of eligible prisoners was much larger than the number selected to participate. The decision about whom to approach was made single-handedly and, as she would characterize it, "haphazardly" by O'Keefe: "I would determine who we used, who we included in our study" (2010, p. 116).

The major consideration for inclusion was proximity to the field researcher: "We had one researcher, so we had to be able to manage her workload" (O'Keefe 2010, p. 116). She described the process as "haphazard selection. . . . We didn't do it in a random fashion, but we didn't necessarily do it in a very targeted fashion either" (p. 116). Participants were drawn from only 10 of Colorado's 26 men's GP prisons (O'Keefe et al. 2013, p. 51). A disproportionate number came from Limon Correctional Facility "[because] it's fairly close" (O'Keefe 2013, p. 66). This was not mentioned in either the National Institute of Justice report or

the briefer published version of the study. If there was anything significantly different about that prison, for example, if its punitive segregation unit (where participants were housed before the study began) was especially harsh or its GP units (to which many participants were returned) were particularly dangerous, troubled, or inhumane, then a disproportionate number of prisoners would have been affected by being held there.[11] There is no way to tell.

There was also unexplained and unnecessary imprecision in the composition of the groups. In addition to being composed of persons subjected to punitive segregation immediately before they entered GP, the GP group began as an amalgam of prisoners who subsequently lived under different conditions of confinement. Thus, "thirteen participants in the GP groups were selected from the diversion program (for being at risk of AS placement)" (O'Keefe 2010, p. 30). The report elsewhere implied that all of the prisoners were at risk of AS placement because all had AS hearings; apparently that was not true, and some were "diverted" out of the process entirely.

A potentially more serious problem concerned the composition of the AS group. O'Keefe et al. (2010, p. 8) asserted that "Colorado does not house protective custody; therefore, no AS placements occur at the request of inmates." This is a correctional non sequitur. Colorado may not officially house protective custody inmates, but they exist in every American prison system. Protective custody inmates often end up housed in AS, whether or not they formally request it. In the Colorado study, an unusually large group of AS participants were identified as having sex offender needs: 30 percent of the AS NMI prisoners and 44 percent in the full AS group (p. 45). In other prison systems, many, possibly all, such prisoners would be protective custody cases. To be sure, protective custody prisoners are subject to the painful and potentially harmful effects of social and sensory deprivation. However, they are in a very different situation psychologically than prisoners placed in AS for punishment. Protective custody prisoners typically prefer to be housed in AS-type conditions instead of what they regard as more dangerous GP environments. As a result, they are likely to be reluctant to voice complaints about living

---

[11] O'Keefe understood the implications of the sampling methods. Concerning work by others on the effects of administrative segregation, she wrote, "Of particular concern is that sampling procedures are often not discussed, and thus it is impossible to know if the findings were based on a representative sample" (2008, p. 127).

conditions or adverse emotional reactions, lest they be moved. That a third of the AS NMI prisoners and nearly half of the AS group overall in the Colorado study were probably protective custody cases undermined any straightforward interpretation of the data.

Gang members presented a similar problem. Thirty percent of AS MI prisoners and 43 percent of those in the AS NMI group were identified as gang members (O'Keefe et al. 2010, table 9). Being a gang member would ordinarily reduce a prisoner's willingness to report psychological distress because that would be a sign of vulnerability that might be interpreted as weakness.

Thus, nearly three-quarters of both the mentally ill and non–mentally ill AS prisoners were likely protective custody cases or gang members. Yet the researchers ignored the implications of this entirely.

2. *Uncontrolled Differences in GP Conditions.*  The control condition—GP—referred to placement in one of 10 different prisons. However, none of the specific conditions of confinement at any of those prisons is described.[12] Variations in GP environments matter because, obviously, unless all GP prisoners experienced the same environment, they were not really in the same condition. If some of the GP environments were so troubled, dangerous, and harsh that they approximated or were worse than conditions in AS, it would be impossible to make meaningful comparisons.

A disproportionate number of study participants were housed in the Limon Correctional Facility (O'Keefe 2013, p. 66). This appears to have been an especially troubled prison when the study was conducted. In 2010, a journalist wrote about "Limon's long history of inmate violence, including two fatal stabbings in five years and the beating death of a correctional officer" (Mitchell 2010).[13] The prison's 5-year violent history encompassed the entire period of the Colorado study from July 2007 through March 2010 (O'Keefe et al. 2010, p. vii). This meant that many study participants came from (and GP comparison group prisoners remained in) an especially harsh and dangerous GP environment, perhaps one as psychologically stressful as an AS unit. In fact, Limon's vi-

---

[12] The published article indicated only that "GP inmates have access to significant out-of-cell time (e.g., >10 hours/day), jobs, and programming" (O'Keefe et al. 2013, p. 51). No additional information about the GP environments was provided.

[13] There were also allegations that in 2008 sex offenders at the prison were targeted by gang members who extorted them to pay "rent" and repeatedly threatened and assaulted them (*Davis v. Zavaras*, 2010 WL 625043 [D. Colorado 2010]).

olent history may have been serious enough to have precipitated recurring violence-related lockdowns (e.g., Associated Press 2007), including in the GP units where some of the control inmates were housed. None of this was commented on or taken into account.

3. *Uncontrolled Differences in AS Conditions.*  Colorado study AS participants were ostensibly in the same study condition but were nonetheless exposed to very different conditions of confinement. These differences were not recorded or quantified and thus could not be taken into account. First, as I noted, all study participants experienced varying amounts of a harsh form of prison isolation, punitive segregation, before the study began. For a significant number (apparently, the majority) of the AS prisoners, that continued for a quarter or more of the length of the study. Thus, "When the study began, there was a 3-month average wait for inmates to be transferred to [AS]," which was "due to a shortage of beds. While on the waitlist, AS inmates were held in a punitive segregation bed at their originating facility" (O'Keefe et al. 2010, p. 19).

The median stay in punitive segregation for AS participants was reported as 99 days (which means that half were longer), although a very small group of prisoners were moved "quickly" into AS. Despite these very different periods in prestudy punitive isolation, all AS participants were lumped together for purposes of analysis.[14]

There was additional imprecision about how much and what kind of isolation any one AS participant experienced. Some "were not confined in segregation for their entire period of participation in the study" but were released into GP or other less onerous settings (O'Keefe et al. 2010, p. 19).

However, even beyond this, it is impossible to know exactly what conditions of confinement were experienced by participants who remained in AS throughout the study. The reason is that Colorado's AS program operated a "level" system in which a prisoner's "quality of life" (QOL) varied as a function of behavioral compliance and programming. Changes in QOL were meant to be incentives for compliance with unit rules and eventual reassignment to GP. The average length of AS stay was said to be 2 years, with the expectation that prisoners would spend at least 1 year in AS. However, the minimum stays specified for the QOL program

---

[14]  The "distance between when they were ad-seged and when they went to CSP became longer and longer because of the wait list in DOC" (O'Keefe 2010, p. 108). An unspecified but not insignificant number of administrative segregation prisoners "were held in the punitive segregation bed but classified as ad-seg. And that's the—for the study average to be about 90 days, but people could be there pretty short, pretty long" (p. 109).

envisioned much shorter stays: 7 days at level I, 90 at level II, and 90 at level III—187 days altogether—after which prisoners were eligible for consideration for reassignment back to GP (O'Keefe et al. 2010, p. 11).

Providing achievable incentives for good behavior and early release from AS are sensible correctional practices. However, they, too, further compromised any meaningful interpretation of the study results.

This methodological problem was significant because the differences in QOL at different levels of AS were substantial. The researchers acknowledged that "it was expected that [prisoners in AS] might experience varying amounts of isolation based on the amount of time spent at different [QOL] levels" (O'Keefe et al. 2010, p. 40). But these varying amounts of isolation were not documented or taken into account.

O'Keefe acknowledged that the researchers initially wanted information from prison staff on participants' out-of-cell time, "to track every time they left their cell," but could not obtain it because the data "just were not coded consistently or every time" by correctional officers (2013, p. 55). That meant that the researchers were unable to track the basic facts of whether, when, and for how long any one prisoner was at one or another AS level or incorporate these data into their analysis (p. 60). O'Keefe et al. (2010, pp. 40–41) reported that staff records yielded "conflicting information," and "it was often difficult to decipher and/or interpret the records." Thus, "it was not possible to code or use [them] in the study."

4. *Failure to Control or Record Treatment Dose.* There was more to these uncontrolled and unrecorded variations than just minor differences in the amount or duration of isolation. The variations in isolation in the AS condition—including for the relatively few prisoners who stayed in AS continuously—were very significant. The QOL level III AS prisoners were given additional privileges and allowed to have jobs as orderlies or in the barbershop. This permitted significant out-of-cell time, during which the prisoners were presumably unrestrained and in contact with others.[15] These opportunities are rare in prison AS units anywhere and

---

[15] As O'Keefe et al. (2010, p. 12) noted, "Arguably one of the most important benefits of QOL level three is an offender's ability to have more contact with friends and family. While offenders' visits remain noncontact, they are increased to four 3-hour visits per month and four 20-minute phone sessions. . . . One additional benefit is that offenders may now be eligible to work as a porter or barber. . . . Benefits to being offered a job position include the ability to earn money, increased time out of cell, and two additional phone sessions per month."

constitute a significant modification in the nature of the isolation experienced by an unspecified number of AS prisoners. They introduced even more heterogeneity into the "same" condition in the study than already existed.

The researchers also noted that an AS prisoner who acted out could be even more significantly locked down by being placed "on special controls in the intake unit where he can be carefully monitored" and "additional sanctions may be imposed through the disciplinary process" (O'Keefe et al. 2010, p. 13).

None of these and other variations in actual day-to-day conditions of confinement were taken into account. The researchers also did not record and were unable to estimate other basic, important variations in the experiences and treatment of the study participants. These included the number of social or family visits prisoners had, visits from attorneys (O'Keefe 2010, p. 164), and the nature or amount of mental health services the prisoners (including those who were mentally ill) received. As O'Keefe summarized, "We did not look at any facet of segregation or correctional conditions that might affect the outcome of the study. We merely looked at, based on their conditions of confinement—that is, whether they had originally been coded 'AS' or 'GP'—and then noted 'if they reported worse change over time'" (p. 207). But whether a prisoner had originally been coded AS or GP did not indicate what "conditions of confinement" he had experienced in the course of the study.

## C. Miscellaneous Data Collection Problems and Issues

In addition, there were very serious problems with how the Colorado researchers initially structured and eventually implemented the data collection process as well as with the dependent measures they used. Some of these problems were the product of the challenging nature of the prison environment. Others were not.

1. *A Single, Inexperienced Field Researcher.*   Almost all the data collection was done by one inexperienced research assistant who had only a bachelor's degree, no graduate training, and no prior experience working with prisoners or in a prison setting. She was single-handedly responsible for conducting five to six separate testing sessions in which she administered between 10 and 12 separate tests with each of 247 participants in 10 different prisons.

The data collection was unusually challenging. O'Keefe noted, "Say when she was at CSP [the AS facility], she might have a whole bunch

of [participants] and she would go back and forth checking to make sure that they were all right, and administering the questionnaires when she needed to" (2010, p. 118). Yet no one oversaw her day-to-day work (p. 130). O'Keefe had no recollection of ever observing her administering the tests and indicated Klebe did not (2013, p. 85).

2. *Solicitation and Consent.*   When prisoners' participation and consent were solicited, they were told, somewhat misleadingly, that "we're looking at how inmates across the entire DOC are adjusting to prison life" (O'Keefe 2010, p. 199). O'Keefe characterized this as "being cautious without being dishonest" (p. 200). The consent form told prisoners that the "risks of this study to you are very small in contrast with the benefits that are high. This study will help us to figure out what types of men adjust better to prison and how to help those who are struggling with prison life" (O'Keefe 2013, pp. 81–82). This, too, was misleading. The study was not about the types of men who adjust better to prison and how to help them. Moreover, no consideration was apparently given to the possibility that prisoners might want to appear to be "adjusting" rather than "struggling." This would apply with special force to AS prisoners, hoping to advance their QOL level and with that gain additional privileges and earlier release from the unit.

3. *Prison Employee?*   The field researcher had to complete "the full CDOC [Colorado Department of Corrections] training academy" and at all times was required "to wear a visible CDOC badge that permitted her unescorted access to the facilities" (O'Keefe et al. 2010, p. 28). Although O'Keefe was "not sure" how the field researcher introduced herself to prisoners, she conceded that "it could be" that prisoners thought the field researcher was a DOC employee (2010, p. 125).

Prisoners in general, and especially in AS units, are typically reluctant to confide in prison staff (including even mental health staff) because of potential adverse consequences. Those consequences can include increased surveillance, placement in degrading "suicide watch" cells, or transfer to or retention in some other form of AS. For these reasons, prisoners frequently avoid admitting that they feel suicidal, depressed, frightened, angry, panicky, out of control, or violent.

That prisoners could reasonably infer that the field researcher/prison employee was checking on their "adjustment" is likely to have dampened their willingness to disclose sensitive feelings. This possibility is nowhere discussed. Despite the fact that while the study was under way, O'Keefe acknowledged awareness of the fraught nature of prisoner-staff

relations, especially in AS units: "Administrative segregation facilities are characterized by the complete control exerted over inmates by correctional staff. The typical 'we-they' dynamic between inmates and staff is exacerbated in segregated settings where inmates have almost no control over their environment. Prisoner abuses have been discovered and punished in administrative segregation settings, but in other situations Human Rights Watch found that 'management has tacitly condoned the abuse by failing to investigate and hold accountable those who engage in it'" (2008, p. 126; internal citations omitted).

4. *Undermining Trust.* Little was done to overcome what O'Keefe described as the "we-they" dynamic that she believed was likely to be exacerbated in prison AS units. Two related problems with the Colorado study likely exacerbated the effects of this dynamic. The first was an error of omission: no interviews were conducted to establish rapport with prisoners. O'Keefe indicated that "it was not part of the study to probe and ask them [the prisoners] about themselves" (2013, p. 75). Without rapport-building interactions, prisoners in the study were unlikely to have had much confidence that the field researcher was interested in their well-being or that personal revelations would be handled with sensitivity.

The second problem is more troubling. The field researcher was apparently required (or decided on her own) to challenge prisoners if she thought their answers were "questionable" or "untruthful, or if she found the pattern of their responses abnormal" (O'Keefe et al. 2010, p. 36). There was no explicit or systematic protocol by which this judgment was reached (none is described). In any event, the field researcher reviewed the prisoners' responses on the spot, in their presence, every time they completed a questionnaire. If she was skeptical, the prisoner was asked to redo the test. Prisoners could decide to redo the test or not, but "if the participant said he was being honest and the researcher still did not believe him, she marked the test as questionable" (p. 36).

These practices potentially created very significant data quality problems. They not only jeopardized the development of rapport or trust but also increased the chances that prisoners would give situationally desirable answers. In addition, the problems likely extended to more prisoners than only those who were challenged directly, but to other prisoners who learned through word of mouth that they would be asked to redo their questionnaires if the researcher was skeptical of their answers.

5. *"Untruthful" and Other Questionable Data.* Twelve percent of participants "had a questionable response pattern on any measure at any

time period" (O'Keefe et al. 2010, p. 36). It is unclear whether that figure included all participants who were asked about their answers or only those whose answers were marked "questionable." If challenged prisoners admitted being untruthful and redid the questionnaire, the second versions of their answers were incorporated into the study data. However, even if the field researcher was skeptical and prisoners chose not to redo their questionnaires, "we still included that in the study. . . . In order to increase our statistical power . . . we left those cases in" (O'Keefe 2010, p. 166).

In addition, 23 participants withdrew their consent and dropped out before the study was completed. However, their data were retained and used in the overall analyses (O'Keefe et al. 2010, p. 19). The dropouts constituted nearly 10 percent of the 247 participants. This meant that, in total, more than 20 percent of the participants whose data were included in the study results were adjudged to have given untruthful responses or withdrew from the study.

6. *An AS "Heisenberg Effect"?*   The repeated testing procedure changed the conditions of confinement, especially for AS prisoners otherwise subject to extreme social deprivation. The six interactions of approximately an hour each between the field researcher and the prisoners, no matter how strained or superficial they might have been, increased the otherwise minimal social contact that AS prisoners had with people outside the segregated housing unit.[16] In many prison systems, there are many AS prisoners who get no visits at all. The mere act of repeatedly attempting to measure the effects of severe conditions of isolated confinement can change them, if only slightly, for the better.

7. *Miscellaneous Issues.*   There were other irregular, questionable, and unexplained research decisions and data anomalies. Exactly why prisoners were assigned to AS or GP was not indicated, even though this was how the treatment and control groups were created. Assignment to AS was apparently nearly automatic: no more than "approximately 10 percent of hearings do not result in AS placement" (O'Keefe et al. 2010, p. 17). This raised questions, never addressed, about what accounted for the unusual outcome in the case of the group that was returned to GP.

---

[16] It apparently exceeded the contact AS MI prisoners had with mental health staff: "Offenders with mental illness who are stable are offered a one-on-one session at least once every 90 days," which takes place "in a noncontact booth in the visiting room" (O'Keefe et al. 2010, p. 11).

Nor were reasons discussed for why the NMI prisoners who returned to GP had more disciplinary infractions (average 16 each) than those sent to AS (13.2 average). Nor were reasons discussed for why AS MI prisoners had 70 percent more disciplinary infractions on average than the AS NMI inmates (22 infractions compared with 13.2; O'Keefe et al. 2010, table 9). Nor was there discussion of the effects of exclusion of prisoners from the study who did not read English at an eighth-grade level on the representativeness of the final group of participants, especially with respect to ethnicity and the prevalence of cognitive impairments.

### D. Troubling Dependent Measures

There were also serious problems in the handling of dependent variables in the study. Dependent measures were said to have been selected on the basis of several important criteria. However, the first two criteria the researchers identified—"(1) use of assessments with demonstrated reliability and validity, (2) use of multiple sources for providing information (e.g., self-report, clinician ratings, files)" (O'Keefe et al. 2010, p. 19)—did not apply to the dependent measures that were actually used in the analyses.

1. *Unvalidated Scales and Instruments.*   Some of the study's scientific bona fides were based on its claimed use of validated and objective assessment instruments. The researchers asserted that "the use of a reliable and valid standardized measure in the present study enabled objective assessment of psychological functioning" (O'Keefe et al. 2013, p. 57).

Indeed, O'Keefe acknowledged that "inaccurate judgments" could be made if instruments were not properly validated (2010, p. 22). However, she later conceded that only "a very low number" of the numerous scales and measures used, perhaps no more than one or two, had been normed or validated with a prisoner population (pp. 144–45).[17]

---

[17] There was no evidence that even the Brief Symptom Index (BSI), on which the researchers relied exclusively in the published version of the study, O'Keefe et al. (2013), had ever been validated with a prisoner as opposed to a "forensic" population. One study that the authors cited to support its psychometric properties (Kellett et al. 2003) concerned the BSI's reliability with persons suffering from intellectual disabilities and did not include a representative sample of prisoners (the "forensic" portion of the sample consisted of 45 "intellectually disabled" convicted persons who were "detained in a maximum security hospital" [p. 129]). The second, Boulet and Boss (1991), was a study of "psychiatric inpatients and outpatients who presented for evaluation at the forensic service of a psychiatric hospital" (p. 434). The third, Zinger, Wichmann, and Andrews (2001), focused on prisoners but did not report reliability or validity data for the BSI.

2. *"Constructs" That Could Not Be Interpreted or Compared.*   The near-exclusive reliance on prisoners' self-report assessments was problematic because the researchers chose to separate the various scales into their component parts and then recombine items into eight separate "constructs." Instead of reporting scores on the instruments or scales themselves, only the constructs built from them were presented as standardized composite rather than numerical scores (O'Keefe et al. 2010, p. 22). This meant that the significance of reported overall trends and comparisons between groups was, as Lovell and Toch (2011, p. 4) put it, "difficult to assess because of the degree to which the data have been cooked."

There are a number of unanswered questions concerning construction of composite scales including their basic validity (whether the instruments measured what they purported to measure), whether the various subscales were reliable for this population, and whether the distributions of scores lent themselves to the statistical manipulations and recombinations that occurred. Transformations to the data, the number of instruments, items, and constructs, and the amount of scale and subscale reconstruction that occurred make the results difficult to put in the context of any larger literature using the same self-reported assessments.

3. *Ignoring Behavioral Data.*   Researchers who use many rating scales (especially ones not validated for the particular population) generally use other methods of data collection as a validity check. The most basic is a face-to-face interview to establish rapport and acquire background information. When possible, behavioral data (by records reviews or behavioral rating scales completed by others) are included. These different sources of information should be reconcilable, and the interviews provide the glue that binds them. Prison researchers typically take things prisoners say to them very seriously, in part because they contextualize other things being measured or studied. However, no interviews were conducted in the Colorado study, and little or no special effort appears to have been expended to establish rapport. Instead, the researchers engaged in context-free coding and analysis of answers on prepackaged forms associated with tests not typically used with this population. As Lovell and Toch (2011, p. 3) observed, "Readers find themselves swimming in a flood of psychometric data; every so often a clue drifts by, lacking, however, a tether to the context—to what was going on around the prisoners and staff while they carried out this study—we are left to guess what it might mean."

Other kinds of data collection were contemplated including asking corrections officers and clinicians to complete rating scales: "The Brief Psychiatric Rating Scale was completed by clinical staff and the Prison Behavior Rating Scale was completed by correctional officers and case managers" (O'Keefe et al. 2010, p. 26). However, key details about this process were omitted (i.e., exactly who was supposed to complete scales, when, and with what kind of training). In the end, it did not matter. The rating scales were infrequently completed and the responses were too unreliable to be useful. The data were discarded. The researchers ultimately relied only on data from prepackaged, field researcher–administered rating scales.

There was one potential exception. Prison mental health staff kept official accounts of genuine psychiatric emergencies or "crisis events." Any situation that required "immediate psychological intervention is considered a crisis event; crisis events are documented by clinicians" (O'Keefe et al. 2010, p. 42). Because these are typically extreme, clinically significant events, they tend to be reliably recorded. If the prisoners' self-reporting was valid, the results should be more or less consistent with behavioral measures of psychological distress or crisis. In the Colorado study, they were not. Among the 33 GP MI prisoners for whom data were reported, there were only three "crisis events" (on average, one for every 11 inmates). Among the 64 AS MI prisoners, there were 37 "crisis events" (one for every two; O'Keefe et al. 2010, figs. 29, 30). This suggests that at least some mentally ill prisoners were doing much worse in AS than their counterparts were doing in GP.

The researchers dismissed the implications of this incongruity: "Because the number of participants who experienced a crisis event was so small, it was not possible to include this variable as an outcome measure in the change over time analyses" (O'Keefe et al. 2010, p. 42). Thus the significant disparity between self-reports and the behavioral measures was ignored, even though it directly contradicted the study's main finding that AS did not adversely affect the mental health of mentally ill participants. Instead, as they put it, because the mental health crisis data "raise more questions than they provide answers," they were deemed "outside the scope of the current research" (p. 42).

In sum, for all of the above stated reasons, the Colorado study is so methologically flawed that literally no meaningful conclusions can be drawn from it. Drastic compromises necessitated by the complex realities of the prison setting and a series of questionable methodological decisions made

by the researchers rendered its results uninterpretable. The Colorado study was not the "most sophisticated" study done to date on the psychological effects of solitary confinement. Its results do not "need to be taken seriously," but cannot be taken for anything at all. Commentators who have praised the study either did not read it very carefully, were unaware of available sources of information on how it was actually conducted, or did not seriously consider the implications of its fundamental flaws.

Ordinarily, a study of this sort would die a quiet death, notwithstanding an occasional prison system's attempt to resuscitate it to defend questionable segregation practices or a scholar overlooking its flaws because its findings comport with his or her own views. However, it has recently been given a second life, figuring prominently in a recently published meta-analysis (Morgan et al. 2016). Its results threaten to live on in another form and to misrepresent the findings of the large, long-established, and frequently reconfirmed literature on the harmful effects of solitary confinement.

### III.  The Limits and Dangers of Meta-Analysis

Meta-analysis—"a quantitative method of synthesizing empirical research results in the form of effect sizes" (Card 2012, p. 7)—is an important methodological advance that allows researchers to estimate the overall magnitude of relationships between variables. However, it cannot substitute for careful narrative reviews of scientific literature. Meta-analysis comes with substantial limitations, especially for prison research. The prison setting rarely lends itself to collection of meaningful quantitative data capable of generating the kinds of effect sizes on which meta-analyses depend. Most classic book-length treatments of prison life have been primarily ethnographic—not quantitative at all. They contain few if any numerical data, including in the seminal American works by Cressey (1940), Sykes (1958), Toch (1975, 1977), Jacobs (1977), and Irwin (1980) and major comparable British works including Cohen and Taylor (1972) and Crewe (2009).

Similarly, few quantitative effect sizes appear in studies of solitary confinement. This is true of the studies that tell us much of what we know about these institutions, how they operate, and the lengths to which prisoners must go in order to survive inside them, including those from Rhodes (2004), Shalev (2009), Reiter (2016), and Kupers (2017). It is also true of most of the numerous studies of the negative psychological con-

sequences of prison isolation that are discussed in the most-often-cited literature reviews. The nature of the settings and the routine prison operations that govern them make many kinds of conventional research designs impossible to implement.

Because the best prison research is qualitative, or does not lend itself to generating effect sizes, meta-analyses conducted on many important prison topics will be compromised by serious sample bias, resulting in "the drawing of inferences that do not generalize to the population of interest (typically all research conducted on the topic)" (Strube, Gardner, and Hartmann 1985, p. 66).

The concern is not only that meta-analyses on important prison topics almost invariably ignore or underrepresent the larger literature, but also that they privilege certain kinds of studies far beyond their actual scientific merit, and do so in a way that many readers are unlikely to appreciate. One critique rightly observed that readers "might not be motivated to look beyond the meta-analyses themselves due to confidence in the objective, straightforward nature of the tasks of conducting a meta-analysis, reporting findings, and making recommendations" (Coyne, Thombs, and Hagedorn 2010, p. 108). Reducing entire studies to single or multiple effect sizes almost invariably creates a false equivalency between them. Readers can easily be mesmerized by arrays of numbers that appear simply and accurately to represent highly complex and substantially different underlying realities.

The two meta-analyses contained in the Morgan et al. (2016) article suffer from all of these problems and more. They need to be scrutinized carefully because of the stakes involved and the possibility that they will mislead correctional decision makers and policy makers by their "surprising results," ones that, as the authors say, "do not fit with people's intuitive analysis of what happens when you isolate offenders" in solitary confinement. The resulting conclusions are indeed "in marked contrast to the 'fiery opinions' . . . commonly presented in the scientific and advocacy literature" in which solitary confinement "has been likened to torture, with debilitating consequences" (p. 455). They warrant conscientious examination.

## A.  Truncating the Scope of Literature Reviewed

The first problem with Morgan et al. (2016) is the tiny number and unrepresentative nature of studies included in its two separate meta-

analyses. Literature reviews, whether narrative or meta-analytic, are useful only if they faithfully represent the literature being examined. As Card (2012, p. 10) put it, "If the literature reviewed is not representative of the extant research, then the conclusions drawn will be a biased representation of reality." Morgan et al. (2016) excluded a vast number of published studies, including most of the key works.

The first meta-analysis, "Research Synthesis I," reported that over 90 percent of the published material that they found on the topic was eliminated: "Of the 150 studies located, only 14 (or 9.3 percent) were suitable for analysis according to our inclusion criteria" (Morgan et al. 2016, p. 442). The second meta-analysis, "Research Synthesis II," began with an astonishing 40,589 articles, which were reduced by "trained research assistants" using unspecified methods to 61. A "trained research assistant" then used unspecified methods to reduce that number to 19 (0.05 percent of the initial literature; pp. 442–43).

A meta-analysis that includes so little of the available relevant literature is not a synthesis of much of anything. In addition to the drastic reduction in the sheer number of articles included, the selection criteria used by Morgan et al. (2016) excluded key studies but included questionable other ones. Among the articles excluded is Grassian (1983), regarded as one of the seminal studies on the adverse effects of solitary confinement. Morgan et al. also ignored most of the work discussed in widely cited literature reviews by Haney and Lynch (1997), Haney (2003), Grassian (2006), Smith (2006), and Arrigo and Bullock (2008).

Despite the small numbers of studies included, tables reporting effect sizes seem to suggest that a vast number of studies were taken into account. A closer look reveals something different. Many of the studies have little or nothing to do with the key question of whether and when solitary confinement is psychologically harmful. Morgan et al. (2016) included studies that addressed medical outcomes, and behavioral outcomes such as recidivism and institutional misconduct, that have not been widely studied and are not central to understanding solitary confinement's psychological effects. Thus, despite the drastic reduction in overall number of studies, many of the studies actually included were simply beside the main point.

When the largely irrelevant studies are set aside, only six studies on the psychological effects of solitary confinement remain in the first meta-analysis and 10 in the second. Two in the first were excluded from the sec-

ond and six others were added.[18] No explanation is given for why different sets of articles appeared in the two meta-analyses. In any event, the truncated set of 12 studies was not remotely representative of the larger scientific literature on the psychological effects of solitary confinement.

### B. Overreliance on the Colorado Study

Even "the most thorough sampling and complete data recovery cannot make up for basic limitations in the data base" (Strube, Gardner, and Hartmann 1985, p. 68). Indeed, "An experiment that is deficient in either statistical conclusion validity, internal validity, or construct validity is meaningless and, therefore, worthless. Consequently, it should not be used" (Chow 1987, p. 266). Notwithstanding these basic methodological truisms, tables 2 and 4 in Morgan et al. (2016) reveal that both meta-analyses relied primarily on the fatally flawed Colorado study. It provided the bulk of the effect sizes on which their overall conclusions were based.

Thus, in the first meta-analysis, I counted 24 of 50 relevant effect sizes on "psychological outcomes" that came from the Colorado study. In the second meta-analysis, 140 of 210 effect sizes came from the Colorado study.[19] Because of its sample size, the weights given to the multiple effect sizes from the Colorado study dwarf those of most of the other studies included.

As tables 2 and 4 in Morgan et al. (2016) make clear, they repackaged the Colorado results in a way that allowed them to dominate the analyses.[20] Thus, when they claimed that their results "are even more compelling when one considers that primary studies with the strongest designs produced much smaller effects," they were referring primarily to the un-

---

[18] The first (Morgan et al. 2016, table 2) included six studies that explicitly addressed psychological effects of solitary confinement: Ecclestone, Gendreau, and Knox (1974), Suedfeld et al. (1982), Miller and Young (1997), Zinger, Wichmann, and Andrews (2001), Andersen et al. (2003), and O'Keefe et al. (2010). The second (Morgan et al. 2016, table 4) added six studies: Walters, Callagan, and Newman (1963), Miller (1994), Coid et al. (2003), Cloyes et al. (2006), and Kaba et al. (2014); but it omitted Suedfeld et al. (1982) and Andersen et al. (2003).

[19] "Anti-social indicators" such as "re-admission" and "behavior" like re-arrest and "physical health" outcomes were omitted from this calculation of psychological effects.

[20] Zinger, Wichmann, and Andrews (2001) accounted for another four effect sizes in table 2 and 30 in table 4. It too is fundamentally flawed, as I explain in the next section. By my count, it and the Colorado study account for 28 of 50 relevant effect sizes in the first meta-analysis and 170 of 210 in the second.

interpretable O'Keefe et al. (2010) study. However, few if any of the fundamental defects of the Colorado study were even mentioned and none was seriously engaged. Instead, the authors simply described the Colorado study as "the most sophisticated study" ever done on the topic (Morgan et al. 2016, p. 441) and relied on it for the bulk of their conclusions.[21]

## C. Including Other Methodologically Flawed Studies

There are serious problems with a number of the other studies included in the Morgan et al. (2016) analyses. For example, Zinger, Wichmann, and Andrews (2001) accounted for the next-largest number of effect sizes in their meta-analyses. However, there are several problems with how the results of this study were treated and serious issues with how the study itself was conducted, raising questions about whether it should have been included at all. Its sample size is erroneously listed in table 2 as 136. Although 136 was the initial number of participants, only 60 remained at the end of 60 days. The $N$ shown in table 4 is, correctly, the 60 who remained, but that also is misleading. That number includes a majority of prisoners in the "administrative segregation" group (13 of 23) who were there voluntarily. Only 10 involuntary prisoners remained in administrative segregation at the end of 60 days. Thus this study was weighted far too heavily in the first meta-analysis and given a misleading weight in the second.

The results of Zinger, Wichmann, and Andrews (2001) are in any case impossible to interpret. They are based on data from a sample that combined "voluntarily" and "involuntarily" segregated prisoners. Voluntarily isolated prisoners (such as protective custody prisoners who "choose" to be in isolation) control their own fates; at least in theory, they can leave. In addition, in most cases they know that by staying they are at least safe from threats to their well-being elsewhere in the prison system, ones they presumably fear and necessarily want to avoid more than the pain and harm they may endure in solitary confinement. They are thus

---

[21] Morgan et al. (2016) appear to have overweighted the disproportionate number of effect sizes they took from the Colorado study, treating the $N$'s in each group as though their integrity was maintained throughout. However, as I noted, the bulk of the Colorado study participants moved back and forth between groups. Thus the "uncontaminated" cases are far fewer than Morgan et al. cited and used. Because O'Keefe et al. (2010) did not disaggregate their data, Morgan et al. must have relied on the confounded results, treating all participants as if they remained in their original groups for the duration of the study and weighted effect sizes as if this had been the case.

motivated to adapt to their isolation—or to appear to have adapted to it—in ways that involuntarily isolated prisoners are not. They should not be treated as if their experiences represent the effects of solitary confinement on involuntarily segregated prisoners.

A second and more important problem is the significant amount of attrition that occurred. Especially in longitudinal research, participants leave studies for various reasons. This inevitably complicates comparisons over time or between groups because people who remain are likely to be different from those who leave, thereby changing the compositions of the groups in ways that are difficult to specify.[22] This is especially a problem in prison research because prison administrators decide where prisoners are housed, under what conditions, and for how long; they do so on the basis of considerations that have nothing to do with the goals of researchers. In Zinger, Wichmann, and Andrews (2001), the reduction in the number of administrative segregation prisoners after 60 days, from 83 to 23, only 10 of whom were involuntary, means that attrition reduced the number of involuntarily segregated prisoners by 80 percent. The reasons for the attrition were not given.

Attrition is seldom random. That it results largely, if not entirely, from decisions made by prison administrators means that Zinger, Wichmann, and Andrews (2001) wound up with a group that was significantly different, in indeterminate ways, from the group with which they began.[23] They do not report whether and in what ways the prisoners who remained differed from those with whom the study began.[24]

---

[22] Zinger, Wichmann, and Andrews acknowledge this: "Attrition is a major drawback to psychological research in general. The problem with attrition is especially relevant to the evaluation of the psychological effects of segregation" (2001, p. 56). However, they ignored the extent of this problem in presenting and interpreting their results.

[23] If, for example, disproportionate numbers of transferred prisoners were considered too "vulnerable" to remain in administrative segregation, were reacting especially negatively, or were adjusting poorly and were especially effective at convincing the prison administration to return them to the general prison population, those left behind would be, by definition, those least affected by the experience. Alternatively, if those who remained at the end of 60 days were the most recalcitrant and least compliant, perhaps explaining why the prison administrators were less likely to release them, they may have been especially "difficult" prisoners who were less likely to admit vulnerability or weakness in the assessments they underwent. Or if the voluntary administrative segregation prisoners remaining after 60 days were the least willing or able to return to the general prison population, they may have been unlikely to admit that they were suffering lest this jeopardize their continued safekeeping. Any of these possible scenarios could greatly compromise interpretation of the results, and none of them appear to have been considered.

[24] The assertion that "none of the attrition was attributable to prisoners being incapable of participating in the study because of episodes of delusion or hallucination or suicide at-

An additional methodological problem was acknowledged in passing but not fully discussed, either in the published article or in Zinger's (1998) dissertation, on which it was based. "Practice effects" are a common problem in longitudinal studies because they require repeated administration over time of the same tests or measures. Participants may recall the questions and intentionally or inadvertently try to reproduce the same or similar answers, or lose interest and reply with stock, rote answers, or, if the tests include performance measures, improve (because of practice) each time they take the test. If any of these things occurs, the existence of real changes (especially negative ones) will be masked or minimized.

Zinger (1998) himself recognized that "artifacts of repeated testing" likely played a role in producing apparent improvements in functioning and the lack of signs of deterioration and that practice effects may have accounted for prisoners "report[ing] less problems over time" (p. 93). He also observed that it is well known that "participants lose interest in answering repeatedly to identical questions and tend to report less problems over time" (p. 92).[25] Thus, practice effects may have accounted in large part for the findings of "no change" or "improvement" on the measures used and repeatedly administered.

There are also significant problems with several other studies that were included in the already small group that Morgan et al. (2016) considered. For example, Cloyes et al. (2006) did not compare administrative segregation with nonadministrative segregation at all. Instead, all of the prisoners involved in their study were in solitary confinement. The effect size Morgan et al. reported was the only statistical test of differences between groups that appeared anywhere in Cloyes et al. (2006, p. 772). However, it is a *t*-test of differences in Brief Psychiatric Rating Scale scores between two groups of solitary confinement prisoners—those identified as seriously mentally ill or not, both of which were housed in isolation. Data from this study did not belong in the meta-analysis.

---

tempts" (Zinger, Wichmann, and Andrews 2001, p. 71) sets far too high a threshold and does not adequately address the matter. "Episodes of delusion or hallucination or suicide attempts" are hardly the only measures of whether someone is being so adversely affected that he would seek to be transferred elsewhere or, in the opinion of a correctional administrator or mental health staff member, need to be moved.

[25] Zinger, Wichmann, and Andrews (2001) did acknowledge that reports of "better mental health and psychological functioning over time" are "common in studies which rely on studies with repeated measures designs" (p. 74) but then ignored the implications of this for interpretation of results that showed exactly this.

Walters, Callagan, and Newman (1963) arguably does not belong either. It is over 50 years old and, more importantly, the participants were all volunteers. They were not typical of prisoners involuntarily placed in solitary confinement. In addition, the study lasted only 4 days, not long enough to reach a conclusion that the psychological effects of solitary confinement are minimal. The one effect size Morgan et al. (2016) reported, for "anxiety," is .57 with a weight of .726 (table 4, p. 452). Yet the only mention of numerical data for anxiety in Walters, Callagan, and Newman's study was this: "More isolated than non-isolated prisoners reported an increase in anxiety from the pre-test to post-test period ($p = .038$, Fisher's Exact Probability Test)." It is impossible to calculate an effect size from this statistic.

Another included study, Andersen et al. (2003, table 2), reported only chi-squares and $p$-values. It is not clear how Morgan et al. (2016) managed to calculate effect sizes from those data.

The decision to include Ecclestone, Gendreau, and Knox (1974) is also questionable. The study is more than 40 years old and, more importantly, included only prisoners who volunteered to spend 10 days in isolation. For previously noted reasons, the experience of volunteers is not comparable to that of involuntary administrative segregation prisoners. In addition, the study used an almost indecipherable measure of psychological functioning—the Repertory Grid Technique—which does not appear to have been used in published prison research before or since.[26] Moreover, half of the initial participants "quit the experiment after two days of solitary confinement" (p. 179), which meant that the assignment of participants was no longer "random," the results suffered from significant attrition bias, and the remaining volunteer participants knew that they could leave whenever they wanted. Notwithstanding these problems, Ecclestone, Gendreau, and Knox concluded that isolated confinement was "not more stressful than normal institutional life" (p. 178). Morgan et al. (2016) included this study in both meta-analyses and singled it out as having one of the stronger research designs (along with Zinger, Wichmann, and Andrews [2001] and O'Keefe et al. [2010]).[27]

---

[26] Description of the nature and scoring of the Repertory Grid Technique was so complicated that it consumed nearly two full pages of text (Ecclestone, Gendreau, and Knox 1974, pp. 180–81).

[27] The studies deemed to have stronger research designs were identified by name only in Morgan et al.'s (2016) Research Synthesis I, although an estimate of the strength of the designs was also apparently used in Research Synthesis II. Morgan et al. concluded that

In sum, Morgan et al.'s (2016) meta-analyses were based on one fundamentally flawed and uninterpretable study (O'Keefe et al. 2010), another with an attrition rate of 80 percent over a 60-day period (Zinger, Wichmann, and Andrews 2001), two that were four decades old and included only volunteers (Walters, Callagan, and Newman 1963; Ecclestone, Gendreau, and Knox 1974), and one (Cloyes et al. 2006) that could not provide an effect size on the impact of AS.

Few readers are intimately familiar with the solitary confinement literature or willing to invest the effort to read and evaluate each of the studies cited in Morgan et al. (2016). Similarly, few are willing to carefully examine the hundreds of effect sizes included in the two meta-analyses or are able to make judgments about the propriety of the particular statistical techniques used in the calculations.[28] The presentation of a vast array of numerical data in Morgan et al. gives the impression of an objective representation of equally meaningful effect sizes, but it is not the reality. Their conclusion that solitary confinement has modest or no significant negative psychological effects is not at all what a significant preponderance of the relevant empirical research shows and is at odds with findings

_____

these studies with "stronger designs" were the ones that showed "less impairment" due to isolated confinement (p. 456). My critical discussion of the individual studies in question shows why.

[28] Morgan et al. (2016) appear to have used statistical methods that require very stringent assumptions and will give misleading results if these assumptions are violated (e.g., Aguinis, Gottfredson, and Wright 2011). Furthermore, the meta-analytic method they used requires a large number of studies to assess these assumptions, and there were not enough studies to assess them. Specifically, they used a random-effects meta-analysis model. This model assumes that the included studies are a random sample from some definable universe of studies. For example, are the prisons represented in Morgan et al.'s meta-analysis a random sample of all US prisons? If not, they cannot claim that their results generalize to this universe. Random-effects meta-analyses also assume that weights and sample sizes are uncorrelated with the effect sizes. If they are correlated, the results will be biased. The correlation between the sample sizes and effect sizes reported in their table 1 indicate that the correlation is about −.5, which could severely bias the results. In a random-effects meta-analysis, both the mean and the variance of the effect sizes in the universe are key parameters that need to be estimated and both require confidence intervals. Morgan et al. reported only the sample estimate of the variance and not the confidence interval. However, the confidence interval for the variance requires a strong assumption of normally distributed effect sizes, and the confidence interval is very sensitive to minor violations of this assumption. A large number of studies are needed to assess the normality assumption—much larger than the number used. Morgan et al. also appear to have used a new and unproven method for combining multiple effect sizes from a single study. This method requires at least a moderate number of studies (10–20, the more the better), more than the separate meta-analyses that were used. Finally, Morgan et al. also used extremely crude and inaccurate methods to approximate effect sizes in studies that did not provide enough information to correctly compute an effect size.

that are consistent across many decades, theoretically coherent, and buttressed by a very large and growing literature on the harmful effects of social isolation in contexts other than prison.

Misleading repackaging of bad data can ripple through the field and produce an echo chamber in which motivated commentators repeat each others' flawed conclusions. Thus O'Keefe (2017, p. 5) recently asserted that "a recent meta-analysis found small to moderate adverse psychological effects resulting from [solitary confinement] that were no greater in magnitude than the overall effects of incarceration. These findings are consistent with our Colorado results." She was referring to the Morgan et al. (2016) meta-analysis, whose conclusions were not only "consistent" with the Colorado results but based largely on them.

### IV. Conclusion

These two studies offer several cautionary tales about the fraught nature of prison research, especially on the methodologically challenging and politically charged topic of solitary confinement. The first of these tales is about the potential influence of bad, uninterpretable data on public discourse and correctional policy. Once the results of research that bear the trappings of science enter into public and policy discourse, it is difficult to correct the record, especially when motivated advocates are willing to overlook fatal flaws in the research. Unfortunately, when this transpires, researchers can lose control of the narrative by which their research is described and the manner in which it is applied. For example, O'Keefe has repeatedly and steadfastly defended her Colorado research but has opposed the uses to which others have put it. She was emphatic that she did "not believe in any way and we do not promote the study as something to argue for the case of segregation. . . . My interpretation is that people believe that this study sanctions administrative segregation for mentally ill and non–mentally ill alike. . . . I do not believe that the conclusions lend to that and that is not the intended use of our study" (2013, p. 96).[29] Yet, that is exactly the use to which a number of interested parties have put it.

---

[29] Two prominent advisory board members, Jeffrey Metzner and Jamie Fellner (2010), published a "post–Colorado study" article that seemed to contravene the study's findings. They conceded that "isolation can be harmful to any prisoner" and noted that the potentially adverse effects of isolation include "anxiety, depression, anger, cognitive disturbances, perceptual distortions, obsessive thoughts, paranoia, and psychosis" (p. 104)—not at all what

408        Craig Haney

The Colorado study is also a stark reminder that attempts to implement conventional experimental or even quasi-experimental research designs in prison environments face a number of often insurmountable obstacles. The ordinary demands of prison operations nearly always doom even the most carefully planned such studies, and certainly anything resembling a traditional experiment. Savvy prison researchers understand that the desire to treat a prison environment as if it were a research laboratory should be resisted. Real people live (and die) in prison, a setting in which the core dynamics between prisoners and staff are governed by forces beyond the researchers' control.

In separate but related ways, both the Colorado study and the Morgan et al. (2016) meta-analyses underscore the pitfalls of allowing the veneer of scientific rigor to substitute for its reality. They also show the limitations of focusing on quantitative outcomes with little or no concern for precisely how and under what conditions data were acquired. The de-contextualized and de-individualized approach to data collection that characterized the Colorado study allowed researchers to treat all participants within each of the study groups as if they were the same, when clearly they—and especially their prison experiences—were not. Ignoring the prison context and individual prisoner trajectories helped render the findings incoherent and uninterpretable.

Similarly, Morgan et al. (2016) illustrate the shortcomings of attempting to apply an otherwise useful approach for summarizing quantitative data to environments as complex and variable as prisons (or especially solitary confinement units). Whatever the benefits of reducing empirical results to effect sizes may be, omitting an entire field's best-known and most in-depth works from consideration because most do not lend themselves to meta-analytic reductions means that nuance and context are inevitably ignored. The compromise in "scientific truth" is far too great.

Some critics of meta-analysis argue that "a literature review should *not* be a formalized or standardized one" (Chow 1987, p. 267; emphasis

---

the Colorado study claimed. Metzner and Fellner's deep concerns led them to recommend that professional organizations "should actively support practitioners who work for changed segregation policies and they should use their institutional authority to press for a nationwide rethinking of the use of isolation" in the name of their "commitment to ethics and human rights" (p. 107). Zinger has become an eloquent critic of the use of solitary confinement in Canada (e.g., Makin 2013) even though defenders of the practice continue to cite his dissertation research to justify its use.

added). As Chow observed, "It is not the case that narrative reviews lack rigor. To the contrary, rigor is maintained by reviewers of the traditional [narrative] approach when they evaluate the validity of individual studies" (p. 268). Meta-analyses, even when done well, risk compromising the richness of the prison data they seek to summarize.

In any event, the magnitude of what can be and often is lost in the course of the compromises made in the kind of research critically discussed in this essay often goes unrecognized. Amid thousands of data entries and hundreds of effect sizes reported in these two studies, there are few references to the core subjectivity, institutional trajectory, or life outcome of a single individual prisoner confined in an isolation unit. Nor is there acknowledgment that the studies focused on human beings rather than on interchangeable data points.

Martha Nussbaum (1995) noted in a different context that regarding people as "fungible" and denying them their subjectivity are powerful ways to ensure their objectification. Objectivity in prison research is a worthy goal, except when it results in objectification of prisoners and others in the prison environment. Feeley and Simon (1992) observed that the era of mass imprisonment occasioned and was facilitated by the emergence of a "new penology" whose key elements—"statistical prediction, concern with groups, strategies of management"—shifted the focus of the prison enterprise "toward mechanisms of appraising and arranging groups rather than intervening in the lives of individuals" (p. 459). This actuarial approach still defines the modern prison. It should not be made worse and reinforced by scholarship that exacerbates rather than alleviates or exposes these depersonalizing tendencies.

Studying only at a distance, as the research criticized in this essay did, requires precisely that kind of objectifying sacrifice. If John Irwin was right, that the close study of people in general and prisoners in particular uncovers their humanity, and I think he was, then the opposite is also true. Studying prisoners at a distance, without trying fully to understand and adequately to convey the conditions in which they live or to gain an "appreciation of their meaning worlds, motivations, and aspirations" (1987, p. 47), leaves us with little insight into basic truths about them. That includes whether and how much they are adversely affected by near-total deprivation of meaningful sensory and social contact.

The insurmountable methodological flaws of the Colorado study and the fundamental inadequacy of the Morgan et al. (2016) meta-analysis

should preclude policy makers from using either in debates over the proper use of solitary confinement and the nature of its psychological effects.

REFERENCES

Aguinis, Herman, Ryan Gottfredson, and Thomas Wright. 2011. "Best-Practice Recommendations for Estimating Interaction Effects Using Meta-Analysis." *Journal of Organizational Behavior* 32:1033–43.

American Psychological Association. 2016. *Statement on the Solitary Confinement of Juvenile Offenders*. Washington, DC: American Psychological Association, Public Information Government Relations Office. http://www.apa.org/about /gr/issues/cyf/solitary.pdf.

Andersen, Henrik, D. Setstoft, T. Lillebaek, G. Gabrielsen, and R. Hemmingsen. 2003. "A Longitudinal Study of Prisoners on Remand: Repeated Measures of Psychopathology in the Initial Phase of Solitary versus Non-solitary Confinement." *International Journal of Law and Psychiatry* 26:165–77.

Arrigo, Bruce, and Jennifer Bullock. 2008. "The Psychological Effects of Solitary Confinement on Prisoners in Supermax Units: Reviewing What We Know and What Should Change." *International Journal of Offender Therapy and Comparative Criminology* 52:622–40.

Associated Press. 2007. "Limon Prison under Lockdown after Assault." *Vail (CO) Daily*, September 13. http://www.vaildaily.com/news/limon-prison -under-lockdown-after-assault/.

Association of State Correctional Administrators and the Arthur Liman Public Interest Program. 2016. *Aiming to Reduce Time-in-Cell: Reports from Correctional Systems on the Numbers of Prisoners in Restricted Housing and on the Potential of Policy Changes to Bring About Reforms*. New Haven, CT: Yale Law School.

Barnes, Harry Elmer. 1921. "The Historical Origin of the Prison System in America." *Journal of Criminal Law and Criminology* 12:35–60.

Barte, Henri. 1989. "L'isolement carceral." *Perspectives Psychiatriques* 28:252–55.

Bauer, Michael, Stefan Priebe, Bettina Haring, and Kerstin Adamczak. 1993. "Long-Term Mental Sequelae of Political Imprisonment in East Germany." *Journal of Nervous and Mental Disease* 181:257–62.

Benjamin, Thomas, and Kenneth Lux. 1975. "Constitutional and Psychological Implications of the Use of Solitary Confinement: Experience at the Maine State Prison." *Clearinghouse Review* 9:83–90.

Berger, Ronald, Paul Chaplin, and Robert Trestman. 2013. "Commentary: Toward an Improved Understanding of Administrative Segregation." *Journal of the American Academy of Psychiatry and Law* 41:61–64.

Boulet, Jack, and Marvin Boss. 1991. "Reliability and Validity of the Brief Symptom Index." *Psychological Assessment* 3:433–37.

Brodsky, Stanley, and Forrest Scogin. 1988. "Inmates in Protective Custody: First Data on Emotional Effects." *Forensic Reports* 1:267–80.

Burney, Christopher. 1961. *Solitary Confinement*. New York: Macmillan.

Cacioppo, Stephanie, and John Cacioppo. 2012. "Decoding the Invisible Forces of Social Connections." *Frontiers of Integrative Neuroscience* 6:1–7.

Card, Noel. 2012. *Applied Meta-Analysis for Social Science Research*. New York: Guilford.

Chow, Sui. 1987. "Meta-Analysis of Pragmatic and Theoretical Research: A Critique." *Journal of Psychology* 121(23):259–71.

Cloyes, Kristin, David Lovell, David Allen, and Lorna Rhodes. 2006. "Assessment of Psychosocial Impairment in a Supermaximum Security Unit Sample." *Criminal Justice and Behavior* 33:760–81.

Cohen, Stanley, and Laurie Taylor. 1972. *Psychological Survival: The Experience of Long-Term Imprisonment*. New York: Pantheon.

Coid, Jeremy, Ann Petruckevitch, Paul Bebbington, Rachel Jenkins, Traolach Brugha, Glyn Lewis, Michael Farrell, and Nicola Singelton. 2003. "Psychiatric Morbidity in Prisoners and Solitary Cellular Confinement. I: Disciplinary Segregation." *Journal of Forensic Psychiatry and Psychology* 14:298–319.

Commission on Crime Prevention and Criminal Justice. 2015. *United Nations Standard Minimum Rules for the Treatment of Prisoners*. New York: United Nations Economic and Social Council.

Cormier, Bruno, and Paul Williams. 1966. "Excessive Deprivation of Liberty." *Canadian Psychiatric Association Journal* 11(6):470–84.

*Correctional News*. 2012. "New Colorado Prison Closed Down." November 14. http://correctionalnews.com/2012/11/14/new-colorado-prison-closed-down/.

Coyne, James, Brett Thombs, and Mariet Hagedorn. 2010. "It Ain't Necessarily So: A Review and Critique of Recent Meta-Analyses of Behavioral Medicine Interventions in *Health Psychology*." *Health Psychology* 29:107–16.

Cressey, Donald. 1940. *The Prison Community*. Boston: Christopher Publishing.

Crewe, Ben. 2009. *The Prisoner Society: Power, Adaptation, and Social Life in an English Prison*. Oxford: Oxford University Press.

Dickens, Charles. 1842. *American Notes*. New York: Harper & Brothers.

Ecclestone, C., Paul Gendreau, and Clifford Knox. 1974. "Solitary Confinement of Prisoners: An Assessment of Its Effects on Inmates' Personal Constructs and Adrenal Cortical Activity." *Canadian Journal of Behavioral Science* 6:178–91.

Feeley, Malcolm, and Jonathan Simon. 1992. "The New Penology: Notes on the Emerging Strategy of Corrections and Its Implications." *Criminology* 30:449–74.

Fiorillo, Damiano, and Fabio Sabatini. 2011. "Quality and Quantity: The Role of Social Interactions in Self-Reported Individual Health." *Social Science and Medicine* 73:1644–52.

Foster, Don, Dennis Davis, and Diane Sandler. 1987. *Detention and Torture in South Africa*. New York: St. Martin's.

Franke, Herman. 1992. "The Rise and Decline of Solitary Confinement." *British Journal of Criminology* 32:125–43.

Gendreau, Paul, and James Bonta. 1984. "Solitary Confinement Is Not Cruel and Unusual: People Sometimes Are!" *Canadian Journal of Criminology* 26:467–78.

Gendreau, Paul, and Ryan Labrecque. 2016. "The Effects of Administrative Segregation: A Lesson in Knowledge Cumulation." In *The Oxford Handbook of Prisons and Imprisonment*, edited by John Wooldredge and Paula Smith. New York: Oxford University Press.

Gendreau, Paul, and Yvette Theriault. 2011. "Bibliotherapy for Cynics Revisited: Commentary on *One Year Longitudinal Study of the Psychological Effects of Administrative Segregation*." *Corrections and Mental Health: An Update of the National Institute of Corrections*. https://community.nicic.gov/blogs/mental health/archive/2011/06/21/bibliotherapy-for-cynics-revisited-commentary-on -one-year-longitudinal-study-of-the-psychological-effects-of-administrative -segregation.aspx.

Gendreau, Paul, et al. 1972. "Changes in EEG Alpha Frequency and Evoked Response Latency during Solitary Confinement." *Journal of Abnormal Psychology* 79:54–59.

Government Accountability Office. 2013. *Improvements Needed in Bureau of Prisons' Monitoring and Evaluation of Impact of Segregated Housing*. Washington, DC: US Government Accountability Office.

Grassian, Stuart. 1983. "Psychopathological Effects of Solitary Confinement." *American Journal of Psychiatry* 140(11):1450–54.

———. 2006. "Psychiatric Effects of Solitary Confinement." *Washington University Journal of Law and Policy* 22:325–83.

Grassian, Stuart, and Terry Kupers. 2011. "The Colorado Study versus the Reality of Supermax Confinement." *Correctional Mental Health Report* 13(1):1, 9–11.

Hafner, S., R. Emeny, M. Lacruz, J. Baumert, C. Herder, et al. 2011. "Association between Social Isolation and Inflammatory Markers in Depressed and Non-depressed Individuals: Results from the MONICA/KORA Study." *Brain Behavior and Immunity* 25:1701–7.

Haney, Craig. 1993. "Infamous Punishment: The Psychological Consequences of Isolation." *National Prison Project Journal* 8(2):3–7, 21.

———. 2003. "Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement." *Crime and Delinquency* 49:124–56.

Haney, Craig, and Mona Lynch. 1997. "Regulating Prisons of the Future: The Psychological Consequences of Solitary and Supermax Confinement." *New York University Review of Law and Social Change* 23:477–570.

Hibbert, Christopher. 1963. *The Roots of Evil: A Social History of Crime and Punishment*. Boston: Little, Brown.

Hilliard, Thomas. 1976. "The Black Psychologist in Action: A Psychological Evaluation of the Adjustment Center Environment at San Quentin Prison." *Journal of Black Psychology* 2:75–82.

Hinkle, Lawrence, and Harold Wolff. 1956. "Communist Interrogation and Indoctrination of 'Enemies of the State.'" *Archives of Neurology and Psychiatry* 76:115–74.

Holt-Lunstad, Julianne, Theodore Robles, and David Sbarra. 2017. "Advancing Social Connectedness as a Public Health Priority in the United States." *American Psychologist* 72:517–30.

Hunt, Stephen, Mack Orsborn, Harvey Checkoway, Mary Biggs, Miles McFall, and Tim Takaro. 2008. "Later Life Disability Status Following Incarceration as a Prisoner of War." *Military Medicine* 173:613–18.

Immarigeon, Russ. 2011. "One Year Longitudinal Study of the Psychological Effects of Administrative Segregation: Introduction." *Corrections and Mental Health: An Update of the National Institute of Corrections*. https://community .nicic.gov/blogs/mentalhealth/archive/2011/06/21/one-year-longitudinal-study -of-the-psychological-effects-of-administrative-segregation-introduction.aspx.

Irwin, John. 1980. *Prisons in Turmoil*. Boston: Little, Brown.

———. 1987. "Reflections on Ethnography." *Journal of Contemporary Ethnography* 16:41–48.

Jackson, Michael. 1983. *Prisoners of Isolation: Solitary Confinement in Canada*. Toronto: University of Toronto Press.

Jacobs, James. 1977. *Stateville*. Chicago: University of Chicago Press.

Jones, David. 1976. *The Health Risks of Imprisonment*. Lexington, MA: Lexington Books.

Kaba, Fatos, Andrea Lewis, Sarah Glowa-Kollisch, James Hadler, David Lee, Howard Alper, Daniel Selling, Ross MacDonald, Angela Solimo, Amanda Parsons, and Homer Venters. 2014. "Solitary Confinement and Risk of Self-Harm among Jail Inmates." *American Journal of Public Health* 104:442–47.

Kellett, Stephen, Nigel Beail, David Newman, and Pat Frankish. 2003. "Utility of the Brief Symptom Inventory in the Assessment of Psychological Distress." *Journal of Applied Research in Intellectual Disabilities* 16:127–34.

Koch, Ida. 1986. "Mental and Social Sequelae of Isolation: The Evidence of Deprivation Experiments and of Pretrial Detention in Denmark." In *The Expansion of European Prison Systems*, edited by Bill Rolston and Mike Tomlinson. Working Papers in European Criminology, no. 7. Stockholm: European Group for the Study of Deviance and Social Control.

Kupers, Terry. 2017. *Solitary: The Inside Story of Supermax Isolation and How We Can Abolish It*. Oakland: University of California Press.

Lieberman, Matthew. 2013. *Social: Why Our Brains Are Wired to Connect*. New York: Random House.

Liebling, Alison. 1999. "Doing Research in Prison: Breaking the Silence?" *Theoretical Criminology* 3:147–73.

Lovell, David, and Hans Toch. 2011. "Some Observations about the Colorado Segregation Study." *Correctional Mental Health Report* 13(1):3–4, 14.

Makin, Kirk. 2013. "Canadian Prisons 'Out of Step' on Solitary Confinement." *Globe and Mail*, March 21. https://www.theglobeandmail.com/news/politics /canadian-prisons-out-of-step-on-solitary-confinement/article10103358/.

Masur, Louis. 1989. *Rites of Execution: Capital Punishment and the Transformation of American Culture, 1776–1865*. New York: Oxford University Press.

Mendez, Juan. 2011. *Interim Report of the Special Rapporteur of the Human Rights Council on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*. New York: United Nations.

Metzner, Jeffrey, and Jamie Fellner. 2010. "Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics." *Journal of the Acad-*

*emy of Psychiatry and Law* 38:104–8. http://www.hrw.org/sites/default/files/related_material/Solitary%20Confinement%20and%20Mental%20Illness%20in%20US%20Prisons.pdf.

Metzner, Jeffrey, and Maureen O'Keefe. 2011. "The Psychological Effects of Administrative Segregation: The Colorado Study." *Correctional Mental Health Report* 13(1):1–2, 12–14.

Miller, Holly. 1994. "Reexamining Psychological Distress in the Current Conditions of Segregation." *Journal of Correctional Health Care* 1:39–53.

Miller, Holly, and Glenn Young. 1997. "Prison Segregation: Administrative Remedy or Mental Health Problem?" *Criminal Behaviour and Mental Health* 7:85–94.

Mitchell, Kirk. 2010. "Limon Prison Incentives Keep Inmates in Check." *Denver Post*, November 24. http://www.deseretnews.com/article/700085422/Limon-prison-incentives-keep-inmates-in-check.html.

Morgan, Robert, Paul Gendreau, Paula Smith, Andrew Gray, Ryan Labrecque, Nina MacLean, Stephanie Van Horn, Angelea Bolanos, Ashley Batastini, and Jeremy Mills. 2016. "Quantitative Synthesis of the Effects of Administrative Segregation on Inmates' Well-Being." *Psychology, Public Policy, and Law* 22:439–61.

National Commission on Correctional Health Care. 2016. "Position Statement: Solitary Confinement (Isolation)." *Journal of Correctional Health Care* 22:257–63. http://www.ncchc.org/solitary-confinement.

National Research Council. 2014. *The Growth of Incarceration in the United States: Exploring Causes and Consequences*. Washington, DC: National Academies Press.

Nowak, Manfred. 2006. "What Practices Constitute Torture?" *Human Rights Quarterly* 28:809–41.

Nussbaum, Martha. 1995. "Objectification." *Philosophy and Public Affairs* 24:249–91.

O'Donnell, Ian. 2014. *Prisoners, Solitude, and Time*. New York: Oxford University Press.

O'Keefe, Maureen. 2008. "Administrative Segregation from Within: A Corrections Perspective." *Prison Journal* 88:123–43.

———. 2017. "Reflections on Colorado's Administrative Segregation Study." *NIJ Journal* 278:1–8. https://nij.gov/journals/278/Pages/reflections-on-colorado-administrative-segregation-study.aspx.

O'Keefe, Maureen, Kelli Klebe, Jeffrey Metzner, Joel Dvoskin, Jamie Fellner, and Alysha Stucker. 2013. "A Longitudinal Study of Administrative Segregation." *Journal of the American Academy of Psychiatry and Law* 41:49–60.

O'Keefe, Maureen, Kelli Klebe, Alysha Stucker, Kristin Sturm, and William Leggett. 2010. *One Year Longitudinal Study of the Psychological Effects of Administrative Segregation*. Final Report to the National Institute of Justice. Washington, DC: US Department of Justice, National Institute of Justice.

Raemisch, Rick. 2017. "Putting an End to Long-Term Solitary." *New York Times*, October 13. https://www.nytimes.com/2017/10/12/opinion/solitary-confinement-colorado-prison.html.

Reiter, Keramet. 2016. *23/7: Pelican Bay Prison and the Rise of Long-Term Solitary Confinement*. New Haven, CT: Yale University Press.

Reyes, Hernan. 2007. "The Worst Scars Are in the Mind: Psychological Torture." *International Review of the Red Cross* 89:591–616. https://www.icrc.org/en/international-review/article/worst-scars-are-mind-psychological-torture.

Rhodes, Lorna. 2004. *Total Confinement: Madness and Reason in the Maximum Security Prison*. Berkeley: University of California Press.

Rhodes, Lorna, and David Lovell. 2011. "Is Adaptation the Right Question? Addressing the Larger Context of Administrative Segregation: Commentary on One Year Longitudinal Study of the Psychological Effects of Administrative Segregation." *Corrections and Mental Health: An Update of the National Institute of Corrections* (June 21). http://community.nicic.gov/cfs-file.ashx/__key/CommunityServer.Components.PostAttachments/00.00.05.95.19/Supermax-_2D00_-T-_2D00_-Rhodes-and-Lovell.pdf.

Rundle, Frank. 1973. "The Roots of Violence at Soledad." In *The Politics of Punishment: A Critical Analysis of Prisons in America*, edited by Erik Wright. New York: Harper.

Scott, George, and Paul Gendreau. 1969. "Psychiatric Implications of Sensory Deprivation in a Maximum Security Prison." *Canadian Psychiatric Association Journal* 14:337–41.

Shalev, Sharon. 2009. *Supermax: Controlling Risk through Solitary Confinement*. Portland, OR: Willan.

Shalev, Sharon, and Monica Lloyd. 2011. "*If* This Be Method, Yet There Is Madness in It: Commentary on One Year Longitudinal Study of the Psychological Effects of Administrative Segregation." *Corrections and Mental Health: An Update of the National Institute of Corrections* (June 21). http://community.nicic.gov/cfs-file.ashx/__key/CommunityServer.Components.PostAttachments/00.00.05.95.21/Supermax-_2D00_-T-_2D00_-Shalev-and-Lloyd.pdf.

Slater, Robert. 1986. "Psychiatric Intervention in an Atmosphere of Terror." *American Journal of Forensic Psychology* 7(1):5–12.

Smith, Peter Scharff. 2006. "The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature." In *Crime and Justice: A Review of Research*, vol. 34, edited by Michael Tonry. Chicago: University of Chicago Press.

———. 2011. "The Effects of Solitary Confinement: Commentary on One Year Longitudinal Study of the Psychological Effects of Administrative Segregation." *Corrections and Mental Health: An Update of the National Institute of Corrections* (June 21). http://community.nicic.gov/cfs-file.ashx/__key/CommunityServer.Components.PostAttachments/00.00.05.95.22/Supermax-_2D00_-T-_2D00_-Smith.pdf.

Strube, Michael, William Gardner, and Donald Hartmann. 1985. "Limitations, Liabilities, and Obstacles in Reviews of the Literature: The Current Status of Meta-Analysis." *Clinical Psychology Review* 5:63–78.

Suedfeld, Peter, Carmenza Ramirez, John Deaton, and Gloria Baker-Brown. 1982. "Reactions and Attributes of Prisoners in Solitary Confinement." *Criminal Justice and Behavior* 9:303–40.

Sykes, Gresham. 1958. *Society of Captives*. Princeton, NJ: Princeton University Press.

Toch, Hans. 1975. *Men in Crisis: Human Breakdowns in Prison*. New York: Aldine.

———. 1977. *Living in Prison: The Ecology of Survival*. New York: Free Press.

———. 2003. "The Contemporary Relevance of Early Experiments with Super-max Reform." *Prison Journal* 83:221–28.

Turner, Scott, Laura Cardinal, and Richard Burton. 2017. "Research Design for Mixed Methods: A Triangulation-Based Framework and Roadmap." *Organizational Research Methods* 20:243–67.

Volkart, Reto, Adolf Dittrich, Thomas Rothenfluh, and Paul Werner. 1983. "Eine Kontrollierte Untersuchung uber Psychopathologische Effekte der Einzelhaft" [A controlled investigation on psychopathological effects of solitary confinement]. *Psychologie—Schweizerische Zeitschrift fur Psychologie und ihre Anwendungen* 42:25–46.

Volkart, Reto, Thomas Rothenfluh, W. Kobelt, Adolf Dittrich, and K. Ernst. 1983. "Einzelhaft als Risikofaktor fur Psychiatrische Hospitalisierung" [Solitary confinement as a risk for psychiatric hospitalization]. *Psychiatria Clinica* 16:365–77.

Waligora, Bogusław. 1974. "Funkcjonowanie Czlowieka W Warunkach Izolacji Wieziennej" [How men function in conditions of penitentiary isolation]. *Seria Psychologia I Pedagogika* 34:1–123.

Walters, Richard, John Callagan, and Albert Newman. 1963. "Effect of Solitary Confinement on Prisoners." *American Journal of Psychiatry* 119:771–73.

Zinger, Ivan. 1998. "The Psychological Effects of 60 Days in Administrative Segregation." PhD diss., Carlton University, Department of Psychology.

Zinger, Ivan, Cherami Wichmann, and D. Andrews. 2001. "The Psychological Effects of 60 Days in Administrative Segregation." *Canadian Journal of Criminology* 43:47–83.

Copyright 2020 by Craig Haney

Printed in U.S.A.
Vol. 115, No. 1

# THE SCIENCE OF SOLITARY: EXPANDING THE HARMFULNESS NARRATIVE

*Craig Haney*

**ABSTRACT**—The harmful effects of solitary confinement have been established in a variety of direct observations and empirical studies that date back to the nineteenth century, conducted in many different countries by researchers with diverse disciplinary backgrounds. This Essay argues that these effects should be situated and understood in the context of a much larger scientific literature that documents the adverse and sometimes life-threatening psychological and physical consequences of social isolation, social exclusion, loneliness, and the deprivation of caring human touch as they occur in free society. These dangerous conditions are the hallmarks of solitary confinement. Yet they are imposed on prisoners in far more toxic forms that exacerbate their harmful effects, are incurred in addition to the adverse consequences of incarceration per se, and operate in ways that increase their long-term negative impact. This broader empirical and theoretically grounded scientific perspective expands the harmfulness narrative about solitary confinement and argues in favor of much greater restrictions on its use.

**AUTHOR**—Distinguished Professor of Psychology; B.A., University of Pennsylvania; M.A., Ph.D., Stanford University; J.D., Stanford Law School. I am grateful to the editors of the *Northwestern University Law Review* for their careful attention to detail and assistance in publishing this Essay and for the invitation to participate in this Symposium, as well as to the participants in the Symposium, from whom I learned a great deal.

211

NORTHWESTERN UNIVERSITY LAW REVIEW

INTRODUCTION ..................................................................................................212

I.   THE EFFECTS OF SOLITARY CONFINEMENT ARE SITUATED WITHIN A BROAD
     AND WELL-ESTABLISHED SCIENTIFIC LITERATURE ...........................................221

II.  SOLITARY CONFINEMENT AS "TOXIC" SOCIAL ISOLATION .................................235

III. THE EFFECTS OF SOLITARY CONFINEMENT ARE COMPOUNDED BY THE
     EFFECTS OF IMPRISONMENT PER SE .................................................................241

IV.  THE LEGACY OF SOLITARY CONFINEMENT: THE PERSISTENCE OF ISOLATION
     EFFECTS.........................................................................................................248

CONCLUSION .....................................................................................................254

## INTRODUCTION

Knowledge about the psychological and physical harms inflicted by solitary confinement has evolved considerably over the last several decades.[1] Ironically, growing awareness of its serious adverse effects coincided with the increasingly widespread use of the practice during the era of mass incarceration that began in the 1970s.[2] This recent several-decade period of prison growth also represents the "modern era" of solitary confinement in corrections, in contrast to its widespread—and, for a time, nearly universal—use in the nineteenth century. Over a century ago, the terrible effects that solitary confinement had on prisoners led to condemnation of the practice

---

[1] "Solitary confinement" is a term of art in corrections, one whose longstanding negative connotations have spawned a number of seemingly less pejorative alternative descriptors across different jurisdictions (including "administrative segregation," "close management," "security housing," and what appears to be the current favorite, "restrictive housing"). In this Essay, I will use the original term to encompass all of these variations. From a psychological perspective, "solitary confinement" is defined less by the purpose for which it is imposed, or the exact amount of time during which prisoners are confined to their cells, than by the degree to which they are deprived of normal, direct, meaningful social contact and denied access to positive environmental stimulation and activity. Thus, even a regime incorporating a considerable amount of out-of-cell time during which a prisoner is simultaneously prohibited from engaging in normal, direct, meaningful social contact and positive stimulation or programming would still constitute a painful and potentially damaging form of solitary confinement. Especially in a prison context, the terms "normal" and "direct" mean that the contact itself is not mediated or obstructed by bars, restraints, security glass or screens, or the like. "Meaningful" refers to voluntary contact that permits purposeful activities of common interest or consequence that takes place in the course of genuine social interaction and engagement with others.

[2] For several different perspectives on this pivotal era in the United States' criminal justice history and its consequences for prisoners and the larger society from which they were drawn, see MICHELLE ALEXANDER, THE NEW JIM CROW: MASS INCARCERATION IN THE AGE OF COLORBLINDNESS (rev. ed. 2012); MARIEKE LIEM, AFTER LIFE IMPRISONMENT: REENTRY IN THE ERA OF MASS INCARCERATION (2016); NAT'L RESEARCH COUNCIL OF THE NAT'L ACADS., THE GROWTH OF INCARCERATION IN THE UNITED STATES: EXPLORING CAUSES AND CONSEQUENCES (Jeremy Travis, Bruce Western & F. Stevens Redburn eds., 2014).

and a long period of relative disuse. Thus, even by the mid-nineteenth century, many state prison systems had concluded that the once widely used harsh form of complete isolation was "impracticable, inhuman, and intolerably expensive."[3]

Of course, solitary confinement—"the hole"—was never completely eliminated. Most prisons and jails retained special cells in which prisoners could be kept for relatively brief periods of time to separate them from others for safety reasons, or as a form of punishment for disciplinary infractions. For example, in Gresham Sykes's classic account of a typical maximum-security prison in the United States in the mid-1950s, he reported that solitary confinement was used sparingly "for those prisoners who are being punished for infractions of the prison rules."[4] Moreover, even before the era of mass incarceration produced widespread overcrowding and countenanced harsh treatment of prisoners more broadly, some especially troubled and cruel prisons did utilize solitary confinement as a form of severe punishment. For example, in the mid-1950s, Mississippi's Parchman prison farm built a special "Maximum Security Unit" (or MSU), described as a "low-slung brick-and-concrete bunker in the middle of a former cotton field, surrounded by four guard towers, two razor-wire fences, and a series of electric gates" that housed the state's new gas chamber and a solitary confinement unit.[5] The latter was used "for the isolation and punishment of disruptive convicts" that one prisoner recalled as a place "where they just beat the living crap out of you. . . . Nobody left there without bumps and busted bones."[6]

However, the widespread use of longer-term solitary confinement returned with a vengeance in the 1970s. Changes brought about in the recent modern era of the use of solitary confinement saw significant increases in the numbers of persons who were subjected to it and the lengths of time they were kept there. Not only have prisoners been placed in solitary confinement for months and years rather than days or weeks, but increasing numbers of prisoners have been subjected to this form of harsh treatment.[7] Its renewed

---

[3] *Adoption of the Separate System in the States of Central Europe,—and Its Prospects Else-Where*, 12 PA. J. PRISON DISCIPLINE & PHILANTHROPY 79 (1857).

[4] GRESHAM M. SYKES, THE SOCIETY OF CAPTIVES: A STUDY OF A MAXIMUM SECURITY PRISON 7 (First Princeton Classic ed. 2007) (1958). As an indication of exactly how sparingly even short-term solitary confinement was employed, the offense of "possession of home-made knife, metal, and emery paper" resulted in "5 days in segregation with restricted diet." *Id.* at 43.

[5] DAVID M. OSHINSKY, "WORSE THAN SLAVERY": PARCHMAN FARM AND THE ORDEAL OF JIM CROW JUSTICE 228 (1996).

[6] *Id.* at 229.

[7] *See, e.g., infra* note 8; *see also* John J. Gibbons & Nicholas de B. Katzenbach, *Confronting Confinement: A Report of the Commission on Safety and Abuse in America's Prisons*, 22 WASH. U. J.L.

popularity continued until recently, despite accumulating evidence that solitary confinement fails to achieve the penological purposes for which it is ostensibly used, is far more expensive to implement and operate than other correctional regimes, and produces negative psychological and physical consequences that raise serious questions about its constitutionality and its status as a form of torture.[8]

My own involvement in prison research and litigation examining the psychological effects of isolation parallels the recent resurgence of this condemnable punishment in the late 1970s and early 1980s. The early challenges to solitary confinement in which I was involved focused on what were sometimes termed "lock-up" units in different parts of the country. These cases resulted in narrowly drawn court opinions concerned largely with the degraded environmental conditions inside these facilities and whether prisoners were deprived of the "basic necessities of life," interpreted to mean "adequate food, clothing, shelter, sanitation, medical care, and personal safety."[9] The era of mass incarceration was already underway when these challenges were brought, which meant that overcrowded prison systems throughout the country were struggling to maintain order in the face of an unprecedented influx of prisoners. In an attempt to meet this and other demands, prison administrators often adopted an exigent strategy: to segregate prisoners whom they viewed as disruptive or problematic. The

---

& POL'Y 385, 461–62 (2006) (reporting that between 1995 and 2000 the overall number of prisoners in segregation or solitary confinement increased 40%, and the number in "disciplinary segregation" increased 68%); Ryan T. Sakoda & Jessica T. Simes, *Solitary Confinement and the U.S Prison Boom*, CRIM. JUST. POL'Y REV. (Dec. 29, 2019), https://journals.sagepub.com/doi/full/10.1177/0887403419895315 [https://perma.cc/QY8H-2B4E] (reporting the increasing use and especially the increasing lengths of stay in solitary confinement units in the Kansas prison system that roughly coincided with the era of mass incarceration in the United States).

    [8] See the studies and statements reviewed and summarized in *Consensus Statement of the Santa Cruz Summit on Solitary Confinement and Health*, 115 NW. U. L. REV. 335 (2020) [hereinafter *Santa Cruz Summit*]; Craig Haney & Shirin Bakhshay, *Contexts of Ill-Treatment: The Relationship of Captivity and Prison Confinement to Cruel, Inhuman, or Degrading Treatment and Torture*, *in* TORTURE AND ITS DEFINITION IN INTERNATIONAL LAW: AN INTERDISCIPLINARY APPROACH 139 (Metin Başoğlu ed., 2017); Craig Haney, *Restricting the Use of Solitary Confinement*, 1 ANN. REV. CRIMINOLOGY 285 (2018) [hereinafter Haney, *Restricting Solitary Confinement*]; *see also* Federica Coppola, *The Brain in Solitude: An (Other) Eighth Amendment Challenge to Solitary Confinement*, 6 J.L. & BIOSCIENCES 1 (2019); Jules Lobel, *Prolonged Solitary Confinement and the Constitution*, 11 U. PA. J. CONST. L. 115 (2008). Relatedly, philosopher Kimberley Brownlee has argued that social deprivation, which she defined as "a persisting lack of minimally adequate opportunities for decent or supportive human contact including interpersonal interaction, associative inclusion, and interdependent care," represents a deprivation of a basic human right. Kimberley Brownlee, *A Human Right Against Social Deprivation*, 63 PHIL. Q. 199, 199 (2013).

    [9] Hoptowit v. Ray, 682 F.2d 1237, 1258 (9th Cir. 1982) (opining on conditions of confinement in the isolation, segregation, and protective custody units in Washington State Penitentiary).

decisions to do so were often reached on vague, unspecified, and questionable bases. Some appeared to stem from racially tinged fears about prisoners of color becoming politically militant and better organized, including those accused of "practic[ing] Black Pantherism."[10] As Heather Thompson's book about the tragic 1971 Attica prisoner rebellion notes, by the start of the 1970s several New York prisons operated dreaded solitary confinement units that were used to house prisoners whom correctional officials perceived to be political activists, many of whom were prisoners of color.[11] Her compelling account is also replete with examples of the role that law enforcement and prison officers' racial fears of and animosities toward

---

[10]  This was one of the specific justifications for the continued retention of members of the "Angola 3" in a form of solitary confinement inside Louisiana's Angola Prison Farm for approximately four decades. *See* ALBERT WOODFOX WITH LESLIE GEORGE, SOLITARY 192 (2019). The extremely long-term, indefinite solitary confinement of prisoners—lasting a decade or more—was often reserved for prisoners perceived to be members of prison gangs, a designation that frequently had racial or ethnic implications. *See, e.g.*, Keramet A. Reiter, *Parole, Snitch, or Die: California's Supermax Prisons and Prisoners, 1997-2007*, 14 PUNISHMENT & SOC'Y 530 (2012); Keramet Reiter, Joseph Ventura, David Lovell, Dallas Augustine, Melissa Barragan, Thomas Blair, Kelsie Chesnut, Pasha Dashtgard, Gabriela Gonzalez, Natalie Pifer & Justin Strong, *Psychological Distress in Solitary Confinement: Symptoms, Severity, and Prevalence in the United States, 2017-2018*, 110 AM. J. PUB. HEALTH SUPPLEMENT S56, S58 (2020); *see also* Scott N. Tachiki, *Indeterminate Sentences in Supermax Prisons Based upon Alleged Gang Affiliations: A Reexamination of Procedural Protection and a Proposal for Greater Procedural Requirements*, 83 CALIF. L. REV. 1115, 1117–49 (1995). Comprehensive surveys and individual statewide investigations have documented the overrepresentation of prisoners of color in solitary confinement units. For example, a self-report survey of a very large sample of U.S. correctional jurisdictions conducted from 2017 to 2018 by the Association of State Correctional Administrators (ASCA) and the Yale Law School's Liman Center for Public Interest Law found that among the thirty-three jurisdictions that provided racial breakdowns, there were modest racial disproportions in solitary confinement overall—including an especially large overrepresentation of African-American women in solitary confinement compared to their white counterparts—and wide variations between jurisdictions. THE ASS'N OF STATE CORR. ADM'RS & THE LIMAN CTR. FOR PUB. INTEREST LAW AT YALE LAW SCHOOL, REFORMING RESTRICTIVE HOUSING: THE 2018 ASCA-LIMAN NATIONWIDE SURVEY OF TIME-IN-CELL (2018), https://law.yale.edu/centers-workshops/arthur-liman-center-public-interest-law/liman-center-publications [https://perma.cc/68A2-KZXH]; *see also* Margo Schlanger, *Prison Segregation: Symposium Introduction and Preliminary Data on Racial Disparities*, 18 MICH. J. RACE & L. 241 (2013) (reporting racial disproportions in the use of solitary confinement in several different state prison systems); Sakoda & Simes, *supra* note 7 (reporting racial disproportions in the use of solitary confinement in the Kansas prison system, especially in the durations of time spent in solitary confinement by young African-American men); Michael Schwirtz, Michael Winerip & Robert Gebeloff, *The Scourge of Racial Bias in New York State's Prisons*, N.Y. TIMES (Dec. 3, 2016) https://www.nytimes.com/2016/12/03/nyregion/new-york-state-prisons-inmates-racial-bias.html?_r=0 [https://perma.cc/529Y-MJDX] (reporting that African-American prisoners were 65% more likely to be sent to solitary confinement than whites). *See generally* Andrea C. Armstrong, *Race, Prison Discipline, and the Law*, 5 U.C. IRVINE L. REV. 759 (2015).

[11]  HEATHER ANN THOMPSON, BLOOD IN THE WATER: THE ATTICA PRISON UPRISING OF 1971 AND ITS LEGACY (2016).

African-American prisoners played in fueling their overreactions before, during, and after their violent, deadly retaking of the prison.

It is important to note that the era of mass incarceration and increased use of solitary confinement followed on the heels of the civil rights and Black Power movements of the 1960s and 1970s. Both are now understood as having "empowered marginalized groups to engage in protest that demanded a radical redistribution of political, social and economic power."[12] In the larger society, and certainly in U.S. prisons, the attempted power redistribution was met with forceful resistance that was designed to suppress and eliminate it. The fact that "the American penal system [was] a locus of black power activism"[13] was arguably one factor that contributed to the rise of long-term solitary confinement. In my experience, a disproportionate number of the prisoners who were placed in solitary confinement, and especially those who were subjected to extremely long-term solitary confinement—stays measured in years or even decades—were prisoners of color.[14] The often unverified perception that their radical political views—as much or more than their specific actions—posed a "threat to the safety and security of the institution" served as the premise for their lengthy, often indefinite isolation.

In any event, prisoners began to be crammed inside makeshift lockup units for expediency more than anything else,[15] and the nineteenth century's lessons about the harmfulness of solitary confinement were either forgotten

---

[12] Zoe Colley, *War Without Terms: George Jackson, Black Power and the American Radical Prison Rights Movement, 1941–1971*, 101 HISTORY 265, 266–67 (2016). See also historian Joe Street's speculation that the postprison demise of former Black Panther Party leader Huey Newton was caused not only by unrelenting police harassment but also the "soul break[ing]" effects of his experiences in solitary confinement. Joe Street, *The Shadow of the Soul Breaker: Solitary Confinement, Cocaine, and the Decline of Huey P. Newton*, 84 PAC. HIST. REV. 333, 336–37, 345 (2015).

[13] Colley, *supra* note 12, at 267; *see also* DAN BERGER, CAPTIVE NATION: BLACK PRISON ORGANIZING IN THE CIVIL RIGHTS ERA (2014); DONALD F. TIBBS, FROM BLACK POWER TO PRISON POWER: THE MAKING OF JONES v. NORTH CAROLINA PRISONERS' LABOR UNION (2012); Angela A. Allen-Bell, *Perception Profiling & Prolonged Solitary Confinement Viewed Through the Lens of the Angola 3 Case: When Prison Officials Become Judges, Judges Become Visually Challenged, and Justice Becomes Legally Blind*, 39 HASTINGS CONST. L.Q. 763, 766 (2012) (discussing the legal implications of the Angola 3 case and the prolonged solitary confinement to which they were subjected).

[14] *See supra* note 10; *see also* Johnson v. Wetzel, 209 F. Supp. 3d 766 (M.D. Pa. 2016) (ordering the release from solitary into general population of an African-American prisoner who, despite suffering ongoing psychological harm, was held in solitary confinement for thirty-six years in the absence of credible evidence that he posed a threat to institutional security).

[15] *See, e.g.*, Toussaint v. Rushen, 553 F. Supp. 1365, 1374–75 (N.D. Cal. 1983) (opining on the fact that prisoners were being "arbitrarily placed and retained in segregated housing" as a way "to simply warehouse" them, including "for reasons other than their conduct").

or ignored in the face of what were perceived as more pressing concerns.[16] The devolution of the federal penitentiary in Marion, Illinois is an instructive example. Marion was opened in 1963 and was intended to replace the high-security federal prison at Alcatraz, which closed the same year.[17] Although it was designated as the highest security level prison in the federal system, as Stephen Richards noted, "In effect, Marion was a small version of a 'mainline' penitentiary."[18] A "control unit" with a limited number of cells was constructed within Marion penitentiary in 1973, and was operated as a dedicated solitary confinement unit in which prisoners were intended to be housed in nearly complete isolation for extremely long periods of time. However, largely in response to the lethal violence that occurred within the control unit in October 1983, the entire prison was "locked down" and began to be operated as a long-term lockup prison. Thus, after 1983, Marion was "the first federal prison operated entirely as a high-security isolation supermax."[19]

That same year, psychiatrist Stuart Grassian published an in-depth clinical assessment of a group of prisoners in a solitary confinement unit in a prison in Walpole, Massachusetts. His findings helped to raise awareness about the potentially severe psychiatric consequences of this kind of extreme prison isolation.[20] Increased concern about the issue came at an especially opportune time, as more prison systems in the United States were beginning a return to the long-abandoned practice of solitary confinement. In fact, a number of prison systems reacted to the unprecedented influx of prisoners in the 1970s and 1980s (that included a significant number of mentally ill prisoners whose needs penal institutions were thoroughly ill-equipped to address) by creating what was essentially a new prison form. Sometimes called "supermax" prisons, these facilities were explicitly designed to impose extreme levels of isolation (often made possible by the introduction

---

[16] In an often-quoted passage from a late nineteenth-century case, *In re Medley*, 134 U.S. 160, 168 (1890), Justice Samuel Miller summarized the consensus view that the once widespread practice of solitary confinement was "too severe." He noted that "[a] considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community." *Id.*

[17] Stephen C. Richards, *USP Marion–The First Federal Supermax*, 88 PRISON J. 6, 9 (2008).

[18] *Id.*

[19] *Id.* at 10, 18; *see also* THE MARION EXPERIMENT: LONG-TERM SOLITARY CONFINEMENT & THE SUPERMAX MOVEMENT (Stephen C. Richards ed., 2015). A "high tech" federal supermax, ADX, was opened in 1994, and Marion was eventually converted into a medium-security prison in 2007.

[20] Stuart Grassian, *Psychopathological Effects of Solitary Confinement*, 140 AM. J. PSYCHIATRY 1450, 1450–54 (1983).

of a new generation of correctional technology) and to do so on a long-term basis.[21] As Chase Riveland observed in the late 1990s, in addition to an expedient attempt to manage such an unexpectedly large numbers of prisoners, the proliferation of supermax prisons was also in part motivated by the fact that they were seen as "politically and publicly attractive" facilities that, at the time, had "become political symbols of how 'tough' a jurisdiction ha[d] become."[22]

My first experience inside a truly modern supermax prison occurred in 1990, when I toured the recently opened Security Housing Unit (SHU) at the Pelican Bay State Prison in California. At the time, Pelican Bay's reputation as one of the nation's first and most draconian supermax prisons was just being established. By then, I had been inside many makeshift solitary confinement units where prison systems were beginning to isolate increasingly large numbers of prisoners for what would eventually amount to unprecedented amounts of time. I had learned that many prisoners in these units struggled to adapt to and survive the degraded conditions, enforced idleness, and extreme social deprivation to which they were subjected. However, researchers like myself were just beginning to understand and document the depth and breadth of the suffering.

In contrast to the crowded, noisy, and dirty lockup units I visited in places like San Quentin and Folsom State Prisons, the Penitentiary of New Mexico, and the Washington State Penitentiary, the free-standing SHU at Pelican Bay was stark and frightening for an entirely different reason: it gave no indication that it was a place that housed actual human beings. Although I had been inside many prisons before my first visit to Pelican Bay, I had never seen one like this, resembling a massive storage facility where inanimate objects are housed. The sights and sounds of human activity or evidence that real people lived there—the sorts of things that every prison manifested—were nowhere to be found. Even inside the housing units, or

---

[21] CHASE RIVELAND, NAT'L INST. CORR., U.S. DEP'T JUSTICE, SUPERMAX PRISONS: OVERVIEW AND GENERAL CONSIDERATIONS 2 (1999). Riveland correctly noted in 1999 that "[t]here is no universal definition of what supermax facilities are and who should be placed in them." *Id.* at 4. Although there is still no precise definition for what constitutes a "supermax" prison, they are generally identified by: (1) the extent to which the facility itself is devoted to isolating prisoners (i.e., typically a freestanding facility rather than a unit within a prison that otherwise does not utilize isolation); (2) the heightened degree of isolation they impose (primarily because most were explicitly designed to isolate prisoners and tend to be somewhat newer facilities that employ correctional technology in order to more effectively do so); and (3) the reasons or justifications for placing prisoners in solitary confinement, with a disproportionate number of prisoners confined there because of who the prison system perceives them to be, including representing generalized threats to the safety and security of the institution, rather than specific acts for which they are being punished. *See id.* at 4–6.

[22] *Id.* at 5.

115:211 (2020)                                             *The Science of Solitary*

"pods," there was an eerie, unsettling quiet, and a reliance more on technological than human forms of control. These conditions led *60 Minutes* correspondent Mike Wallace to exclaim, when he first entered one of the Pelican Bay housing units, that it "looks a little bit like a spaceship or a space station."[23]

In 1992, after the prison had been operating for only a few years, I began a series of court-ordered visits there to interview a large sample of prisoners, selected randomly from the prison roster, to try to determine whether and how they were being affected by the experience. The level of suffering and trauma they reported shocked me and led me to spend the next several decades studying the effects of prison isolation in scores of prisons and correctional systems around the country. When I returned to Pelican Bay some twenty years later, it was a bittersweet reunion with several of the men from my original sample—ones who, tragically, had never left the SHU in the intervening two decades.[24]

The basic harmfulness of solitary confinement is now a largely settled scientific fact. A number of articles published in recent years have comprehensively catalogued a wide range of studies demonstrating the adverse psychological effects and other consequences that befall persons who are subjected to this cruel form of imprisonment.[25] A few outlier studies

[23] *60 Minutes: Wallace at Pelican Bay* (CBS television broadcast Sept. 12, 1993), https://www.cbs.com/shows/60_minutes/video/c77u_9DB_JMZCukdtURkP9SUu0TFLlK3/from-the-archives-60-minutes-first-pelican-bay-report/ [https://perma.cc/RPS7-YBFB].

[24] As I will describe later in this Essay, I returned to the SHU at Pelican Bay in 2011 to conduct interviews with a representative sample of prisoners who had been confined there on an extremely long-term basis (i.e., ten years or more). *See infra* notes 130–136 and accompanying text. I was also able to separately interview a number of men who had been in the SHU essentially since it had opened in 1989, including several from my original 1992 sample. *See* Craig Haney, *Solitary Confinement, Loneliness, and Psychological Harm* [hereinafter Haney, *Solitary Confinement, Loneliness, and Psychological Harm*], *in* SOLITARY CONFINEMENT: EFFECTS, PRACTICES, AND PATHWAYS TOWARD REFORM 129, 134–35 (Jules Lobel & Peter Scharff Smith eds., 2020).

[25] These many studies have been carefully reviewed in a number of publications. *See, e.g.*, Kristin G. Cloyes, David Lovell, David G. Allen & Lorna A. Rhodes, *Assessment of Psychosocial Impairment in a Supermaximum Security Unit Sample*, 33 CRIM. JUST. & BEHAV. 760 (2006); Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 WASH. U. J.L. & POL'Y 325 (2006); Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. REV. L. & SOC. CHANGE 477 (1997); Haney, *Restricting Solitary Confinement*, *supra* note 8; Peter Scharff Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, 34 CRIME & JUST. 441 (2006); *see also*, Mimosa Luigi, Laura Dellazizzo, Charles-Édouard Giguère, Marie-Hélène Goulet & Alexandre Dumais, *Shedding Light on "the Hole": A Systematic Review and Meta-Analysis on Adverse Psychological Effects and Mortality Following Solitary Confinement in Correctional Settings*, FRONTIERS IN PSYCHIATRY, Aug. 2020.

that purport to find little or no harm have been largely debunked,[26] and many professional mental health, medical, legal, human rights, and correctional organizations have promulgated strong position statements that urge or require significantly limiting the use of solitary confinement and even prohibiting it entirely for especially vulnerable groups of prisoners.[27] Placement in solitary confinement can have dramatic, even lethal, effects; for example, research continues to show that the highest rates of self-harm and suicide in prison occur in conditions of isolation.[28] However, even those prisoners who survive the experience of solitary confinement often suffer long-lasting physical and psychological damage.[29]

In this Essay, I address several separate but interrelated issues that are often only alluded to in discussions about the nature and effects of solitary confinement. Although sometimes overlooked, they importantly expand the narrative about the harmfulness of this increasingly unjustifiable practice. These issues are critical to make explicit and to directly address, in part to respond to the occasional but persistent claims minimizing the magnitude of the harm inflicted by solitary confinement. A very small number of defenders of solitary confinement continue to advance three specific minimizing arguments, namely that: (1) there is simply not enough evidence to establish the harmfulness of solitary confinement; (2) although the negative effects may be real, their impact is *de minimis*; and (3) whatever effects do occur will dissipate quickly over time, so that persons adversely affected soon regain their prior level of psychological well-being.

However, I argue that these assertions can and should be turned on their heads. Indeed, their *opposite* is actually true. First, we now know that solitary

---

[26] *See, e.g.*, Craig Haney, *The Psychological Effects of Solitary Confinement: A Systematic Critique*, 47 CRIME & JUST. 365 (2018) [hereinafter Haney, *Psychological Effects of Solitary Confinement*].

[27] *See, e.g.*, WMA Statement on Solitary Confinement, WORLD MED. ASS'N (Nov. 28, 2019), https://www.wma.net/policies-post/wma-statement-on-solitary-confinement/ [https://perma.cc/S8TW-8X2Y] (prohibiting the use of solitary confinement with children, pregnant women, women less than six months postpartum, breastfeeding mothers and those with infants, prisoners with "mental health problems," and those with "physical disabilities or other medical conditions where their conditions would be exacerbated by such measures").

[28] *See, e.g.*, Louis Favril, Rongqin Yu, Keith Hawton & Seena Fazel, *Risk Factors for Self-Harm in Prison: A Systematic Review and Meta-Analysis*, 7 LANCET PSYCHIATRY 682 (2020); Fatos Kaba, Andrea Lewis, Sarah Glowa-Kollisch, James Hadler, David Lee, Howard Alper, Daniel Selling, Ross MacDonald, Angela Solimo, Amanda Parsons & Homer Venters, *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, 104 AM. J. PUB. HEALTH 442 (2014); Paolo Roma, Maurizio Pompili, David Lester, Paolo Girardi & Stefano Ferracuti, *Incremental Conditions of Isolation as a Predictor of Suicide in Prisoners*, 233 FORENSIC SCI. INT'L e1, e1 (2013). Prisoners appear to be at greatest risk of suicide early in their stay in solitary confinement, but they remain at risk throughout. *See* Bruce B. Way, Donald A. Sawyer, Sharen Barboza & Robin Nash, *Inmate Suicide and Time Spent in Special Disciplinary Housing in New York State Prison*, 58 PSYCHIATRIC SERVS. 558, 559 (2007).

[29] *See infra* notes 142–153 and accompanying text.

confinement research represents a subset of a much larger scientific literature where the adverse consequences of analogous experiences have been *extensively* documented and are beyond question. Second, the effects of solitary confinement are hardly *de minimis*, especially because they occur *in addition* to the baseline and very substantial harms of imprisonment per se. And finally, the harmful effects can persist long after a person leaves solitary confinement. In fact, sometimes the most disabling consequences manifest themselves most clearly and strongly upon release.

I.   THE EFFECTS OF SOLITARY CONFINEMENT ARE SITUATED WITHIN A BROAD AND WELL-ESTABLISHED SCIENTIFIC LITERATURE

It is commonplace and entirely appropriate in scientific circles to repeat the mantra that "more research is needed." In so many words, most empirical articles end with a form of this admonition. It is always a defensible and sometimes necessary refrain. There is really no research topic on which additional data would not be at least marginally useful and some for which, given the relatively undeveloped state of our knowledge, it would be essential. However, that claim that we simply do not have enough data to conclude that solitary confinement is harmful to prisoners is sometimes employed for a different reason—to justify its continued use. Yet the assertion is incorrect and inapt. As I noted earlier, we now have more than sufficient data to conclude that solitary confinement is a harmful practice. The findings that support this conclusion are robust and derive from an array of studies conducted from the nineteenth century onwards by researchers with different kinds of scientific training, employing a variety of methods, and operating in several different continents. Thus, statements to the effect that "existing literature documenting the effects of segregation . . . is inconclusive" are made by authors who are either unaware of the full extent of the research on solitary confinement and what it shows or who, for some reason, fail to consider the larger body of scientific knowledge of which it is a part.[30]

However, beyond ensuring that the *entire* database that bears directly on the issue is taken into account, it is also important to understand that although solitary confinement is often discussed as if it were *sui generis*—a distinct, unique phenomenon that only occurs and therefore can only be studied and assessed in prison settings—it has clear analogues in the free world. These civilian analogues are critical for prison scholars and researchers as well as litigators, correctional policymakers, and legal

---

[30] Carl B. Clements, Richard Althouse, Robert K. Ax, Phillip R. Magaletta, Thomas J. Fagan & J. Stephen Wormith, *Systemic Issues and Correctional Outcomes: Expanding the Scope of Correctional Psychology*, 34 CRIM. JUST. & BEHAV. 919, 925 (2007).

decision-makers to consistently acknowledge, advert to, and rely on. They serve as the broad and deep scientific underpinnings of research that demonstrates the harmful effects of solitary confinement per se. Thus, knowledge about solitary confinement does not exist in an empirical or theoretical vacuum. Instead, what we know about the negative psychological effects of prison isolation is situated in a much larger scientific literature about the harmfulness of social isolation, loneliness, and social exclusion in society more generally. There is now a wealth of scientific knowledge about the adverse consequences of these negative experiences as they occur in contexts and settings outside prison.

This broader literature about the deleterious impact of isolation is the scientific framework through which the effects of solitary confinement should be understood and interpreted, in part because prison research is notoriously difficult to conduct and even more difficult to conduct properly. Prisons are the quintessential closed institutions in our society to which meaningful access is especially challenging, if not often impossible, to arrange.[31] Moreover, even those intrepid researchers who do obtain access to prisons typically lack control over where and how prisoners are housed and for how long, as these decisions are governed by correctional staff rather than scientific contingencies.[32] Solitary confinement units are especially closed off to outsiders and dominated by nonnegotiable correctional mandates and practices. Absent these constraints in the world outside prison, researchers from a wide variety of disciplines have been able to conduct a vast number of scientific studies on the effects of social isolation and social exclusion and the related experience of loneliness. This extensive literature forms the much larger empirical database and theoretical framework in which the results of research on solitary confinement in prison are situated.

Current scientific knowledge on the effects of social isolation and social exclusion is based on a wealth of methodologically sophisticated studies, many of which have been conducted over the last three decades. The data

---

[31]  It is a truism among researchers that "[p]risons are far more shrouded from publicity" than other aspects of the criminal justice system. Aaron Doyle & Richard V. Ericson, *Breaking into Prison: News Sources and Correctional Institutions*, 38 CANADIAN J. CRIMINOLOGY 155, 180 (1996). The lack of direct access affects the nature, amount, and quality of the scholarship as well as news coverage that is devoted to these facilities. *See, e.g.*, Beth Schwartzapfel, *Inside Stories*, COLUM. JOURNALISM REV. (Mar./Apr. 2013), https://archives.cjr.org/cover_story/inside_stories.php [https://perma.cc/6VD7-C4UD].

[32]  The inability of researchers to exercise proper control over their prisoner participants doomed several well-intentioned longitudinal studies of solitary confinement, ones in which normal correctional decision-making resulted in unacceptable and confounding levels of attrition and the contamination of research conditions that doomed any meaningful interpretation of the results. *See, e.g.*, Haney, *Psychological Effects of Solitary Confinement*, *supra* note 26.

produced have corroborated, underscored, and deepened what many of us who have been studying prison solitary confinement have learned as well—namely, that meaningful social contact is a fundamental human need whose deprivation has a range of potentially very serious psychological and even physical effects. Because the research on the harmfulness of social isolation in general is so extensive, I am able to review no more than a representative sample of its most important findings in this Essay. However, even this brief summary establishes that there is now an extremely impressive body of scientific knowledge that enables us to more fully understand and appreciate the nature and significance of the adverse effects of solitary confinement in prison.[33]

The need to belong, to be socially connected, and to have social contact with others has been recognized for decades in psychology and other behavioral sciences.[34] Psychologists have long known that social contact is fundamental to establishing and maintaining emotional health and well-being. In fact, years ago, social psychologist Herbert Kelman argued that denying persons contact with others was a form of "dehumanization"—it denied people something that was fundamental to their humanity.[35] As one researcher put it more recently: "Since its inception, the field of psychology emphasized the importance of social connections."[36] Social psychologists have also demonstrated, in classic research conducted decades ago, that "affiliation"—the opportunity to have meaningful contact with others—helps reduce anxiety in the face of uncertainty or fear-arousing stimuli.[37] Indeed, one of the ways that people not only determine the appropriateness of their feelings but also how we establish the very nature and tenor of our emotions is through the social contact we have with others.[38] Thus, prolonged

---

[33] *See* Coppola, *supra* note 8, at 186–87 (discussing some of the legal implications of this broader literature for the regulation and elimination of solitary confinement).

[34] *See* Roy F. Baumeister & Mark R. Leary, *The Need to Belong: Desire for Interpersonal Attachments as a Fundamental Human Motivation*, 117 PSYCHOL. BULL. 497, 497 (1995).

[35] Herbert C. Kelman, *Violence Without Moral Restraint: Reflections on the Dehumanization of Victims and Victimizers*, 29 J. SOC. ISSUES 25 (1973).

[36] C. Nathan DeWall, *Looking Back and Forward: Lessons Learned and Moving Ahead*, *in* THE OXFORD HANDBOOK OF SOCIAL EXCLUSION 301, 301 (C. Nathan DeWall ed., 2013).

[37] *See* STANLEY SCHACHTER, THE PSYCHOLOGY OF AFFILIATION: EXPERIMENTAL STUDIES OF THE SOURCES OF GREGARIOUSNESS (1959); Irving Sarnoff & Philip G. Zimbardo, *Anxiety, Fear, and Social Affiliation*, 62 J. ABNORMAL & SOC. PSYCHOL. 356, 356 (1961); Philip Zimbardo & Robert Formica, *Emotional Comparison and Self-Esteem as Determinants of Affiliation*, 31 J. PERSONALITY 141 (1963).

[38] *See* CAROLYN SAARNI, THE DEVELOPMENT OF EMOTIONAL COMPETENCE (1999); Agneta H. Fischer, Antony S.R. Manstead & Ruud Zaalberg, *Social Influences on the Emotion Process*, 14 EUR. REV. SOC. PSYCHOL. 171 (2003); Stanley Schachter & Jerome E. Singer, *Cognitive, Social, and Physiological Determinants of Emotional State*, 69 PSYCHOL. REV. 379, 383–84 (1962); Steven R. Truax,

N O R T H W E S T E R N   U N I V E R S I T Y   L A W   R E V I E W

social deprivation is painful and destabilizing in part because it deprives persons of the opportunity to ground their thoughts and emotions in a meaningful social context—to know what they feel and whether those feelings are appropriate.

In addition, Naomi Eisenberger and Matthew Lieberman and others have concluded that there is a neurological basis for "social pain"—the feelings of hurt and distress that come from negative social experiences such as social deprivation, exclusion, rejection, or loss. They and their colleagues have found that the neurological underpinnings of social and physical pain are related; both kinds of feelings share some of the same neural circuitry and computational mechanisms (i.e., they are processed in some of the same ways).[39] Moreover, as they observed, unlike the experience of physical pain, which is largely transitory, social pain is more susceptible to being relived. Indeed, although persons who experience physical pain can recall the qualities and degree of intensity of the painful experience, they are largely unable to reexperience the sensation. Social pain, on the other hand, engages the affective pain system and can be actually relived months, or even years, later.[40]

Not surprisingly then, numerous scientific studies have established the psychological significance of social contact, connectedness, and belongingness. Among other things, researchers have concluded that, as Lieberman put it, the human brain is literally "wired to connect" to other

---

*Determinants of Emotion Attributions: A Unifying View*, 8 MOTIVATION & EMOTION 33 (1984). *See generally* THE SOCIAL LIFE OF EMOTIONS (Larissa Z. Tiedens & Colin Wayne Leach eds., 2004).

[39] *See* Naomi I. Eisenberger, *The Pain of Social Disconnection: Examining the Shared Neural Underpinnings of Physical and Social Pain*, 13 NATURE REVS.: NEUROSCIENCE 421, 421 (2012). Eisenberger's and related research found that, although physical and social pain are "not the same experience," they do "share some underlying neural substrates," and there is "a common experiential element" to them both that "motivates individuals to terminate or escape the negative stimulus" they represent. Naomi I. Eisenberger, *Social Pain and the Brain: Controversies, Questions, and Where to Go from Here*, 66 ANN. REV. PSYCHOL. 601, 621 (2015); *see also* Naomi I. Eisenberger, Matthew D. Lieberman & Kipling D. Williams, *Does Rejection Hurt? An fMRI Study of Social Exclusion*, 302 SCIENCE 290 (2003); Naomi I. Eisenberger & Matthew D. Lieberman, *Why Rejection Hurts: A Common Neural Alarm System for Physical and Social Pain*, 8 TRENDS COGNITIVE SCI. 294, 294 (2004); Meghan L. Meyer, Kipling D. Williams & Naomi I. Eisenberger, *Why Social Pain Can Live On: Different Neural Mechanisms Are Associated with Reliving Social and Physical Pain*, PLOS ONE (June 10, 2015) [hereinafter Meyer et al., *Why Social Pain Can Live On*], https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0128294 [https://perma.cc/GDU5-P26T].

[40] Meghan L. Meyer and her colleagues noted that "reliving a socially painful event could lead to other affective experiences besides pain, such as feelings of sadness, loss, or even anger." Meyer et al., *Why Social Pain Can Live On*, *supra* note 39.

224

115:211 (2020)                                        *The Science of Solitary*

persons.[41] Thwarting this need to connect not only undermines psychological well-being but also increases physical morbidity and mortality.[42] Social contact is crucial to normal human development, and when it is impaired, disrupted, or denied, a host of interrelated maladies occur in children as well as adults.[43] Thus, the deprivation of something as fundamentally important as social contact produces a range of predictably negative effects.

Some of the most dramatic demonstrations of the harmful effects of social deprivation have been found in animal research, where researchers are able to employ more intrusive scientific procedures and controls than with humans. These studies have found that social isolation actually alters the brain's neurochemistry, structure, and function. Thus, social isolation operates as a chronic stressor that can change the brain chemistry of animals in ways that negatively affect the cellular mechanisms of aging,[44] precipitate depression-like behavior in mammals,[45] and suppress the animal immune response to illness.[46] Social isolation also leads to anxiety-like behavior in animals, impairs their working memory, and disrupts their brain activity.[47] It also modifies their neuroendocrinal responses in ways that exacerbate the effects of stress,[48] which suggests that isolation is not only stressful in its own

---

[41] MATTHEW D. LIEBERMAN, SOCIAL: WHY OUR BRAINS ARE WIRED TO CONNECT (2013). Lieberman wrote that: "Our brains evolved to experience threats to our social connections in much the same way they experience physical pain . . . . The neural link between social and physical pain also ensures that staying socially connected will be a lifelong need, like food and warmth." *Id.* at 4–5.

[42] *See infra* notes 65–81 and the studies cited therein.

[43] *See, e.g.*, Linda A. Chernus, *"Separation/Abandonment/Isolation Trauma:" What We Can Learn from Our Nonhuman Primate Relatives*, 8 J. EMOTIONAL ABUSE 469, 470 (2008) (discussing the harmful developmental consequences of early social deprivation in the form of maternal loss for humans and nonhuman primates).

[44] *See* Jennie R. Stevenson, Elyse K. McMahon, Winnie Boner & Mark F. Haussmann, *Oxytocin Administration Prevents Cellular Aging Caused by Social Isolation*, 103 PSYCHONEUROENDOCRINOLOGY 52, 52–53 (2019).

[45] *See* Yu Gong, Lijuan Tong, Rongrong Yang, Wenfeng Hu, Xingguo Xu, Wenjing Wang, Peng Wang, Xu Lu, Minhui Gao, Yue Wu, Xing Xu, Yaru Zhang, Zhuo Chen & Chao Huang, *Dynamic Changes in Hippocampal Microglia Contribute to Depressive-Like Behavior Induced by Early Social Isolation*, 135 NEUROPHARMACOLOGY 223 (2018).

[46] *See* John P. Capitanio, Stephanie Cacioppo & Steven W. Cole, *Loneliness in Monkeys: Neuroimmune Mechanisms*, 28 CURRENT OPINION BEHAV. SCI. 51, 51 (2019); Wenjuan Wu, Takeshi Yamaura, Koji Murakami, Jun Murata, Kinzo Matsumoto, Hiroshi Watanabe & Ikuo Saiki, *Social Isolation Stress Enhanced Liver Metastasis of Murine Colon 26-L5 Carcinoma Cells by Suppressing Immune Response in Mice*, 66 LIFE SCI. 1827, 1827–28 (2000).

[47] *See* Candela Zorzo, Magdalena Méndez-López, Marta Méndez & Jorge L. Arias, *Adult Social Isolation Leads to Anxiety and Spatial Memory Impairment: Brain Activity Pattern of COx and c-Fos*, 365 BEHAV. BRAIN RES. 170, 170–71 (2019).

[48] *See* Juliano Viana Borges, Betânia Souza de Freitas, Vinícius Antoniazzi, Cristophod de Souza dos Santos, Kelem Vedovelli, Vivian Naziaseno Pires, Leticia Paludo, Maria Noêmia Martins de Lima & Elke Bromberg, *Social Isolation and Social Support at Adulthood Affect Epigenetic Mechanisms, Brain-*

NORTHWESTERN UNIVERSITY LAW REVIEW

right, but also compromises an organism's ability to tolerate and manage stress more generally.[49]

In fact, the damaging effects of social isolation on laboratory animals are so well documented that they have led governmental and scientific funding organizations, such as the National Research Council, to prohibit researchers from placing animals in completely isolated conditions for prolonged periods.[50] Such treatment is considered unethical and constitutes a basis for denying or revoking funding to scientists who violate this prohibition. As a result, university research facilities that conduct animal research have "institutional animal care and use committees" that promulgate guidelines for conducting animal research, virtually all of which include limitations on the degree to which laboratory animals can be subjected to any form of social isolation.[51]

---

*Derived Neurotrophic Factor Levels and Behavior of Chronically Stressed Rats*, 366 BEHAV. BRAIN RES. 36, 36–37 (2019); Marishka K. Brown, Ewa Strus & Nirinjini Naidoo, *Reduced Sleep During Social Isolation Leads to Cellular Stress and Induction of the Unfolded Protein Response*, 40 SLEEP 1, 1 (2017).

[49] Some researchers have discerned what they believe is a relationship between isolation and an animal world analogue of PTSD, noting, for example, that socially isolated mice manifest "an exacerbation of aggressive behavior and . . . an increase in anxiety- and depressive-like behaviors, as well as . . . exaggerated contextual fear responses and impaired fear extinction." Andrea Locci & Graziano Pinna, *Social Isolation as a Promising Animal Model of PTSD Comorbid Suicide: Neurosteroids and Cannabinoids as Possible Treatment Options*, 92 PROGRESS NEURO-PSYCHOPHARMACOLOGY & BIOLOGICAL PSYCHIATRY 243, 244 (2019) (citation omitted).

[50] The National Research Council cautions researchers that, because "[a]ppropriate social interactions among members of the same species" are "essential to normal development and well-being," the "[s]ingle housing of social species should be the exception and justified based on experimental requirements or veterinary-related concerns about animal well-being," "limited to the minimum period necessary," and "enrich[ed]" either by other forms of species-compatible (and even human) contact. INST. FOR LAB. ANIMAL RESEARCH, NAT'L RESEARCH COUNCIL OF THE NAT'L ACADS., GUIDE FOR THE CARE AND USE OF LABORATORY ANIMALS 64 (8th ed. 2011); *see also* Alka Chandna, *Commentary: A Belmont Report for Animals: An Idea Whose Time Has Come*, 29 CAMBRIDGE Q. HEALTHCARE ETHICS 46, 47–48 (2020) (referencing studies documenting the suffering and self-destructive behavior engaged in by laboratory animals confined in "ethologically inappropriate environments" such as social isolation, including the pathological reactions that occur "when primates are deprived of companionship, sufficient space, and sufficient environmental complexity").

[51] For example, Emory University's animal care guidelines mandate "environmental enrichment" for nonhuman primates used in research. The enrichment is aimed at "identifying and providing the environmental stimuli necessary for psychological and physiological wellbeing." INSTITUTIONAL ANIMAL CARE AND USE COMM., EMORY UNIV., ENVIRONMENTAL ENRICHMENT FOR NONHUMAN PRIMATES 1 (2019), http://www.iacuc.emory.edu/documents/policies/360_Environmental_Enrichment_for_Nonhuman_Pri mates.pdf [https://perma.cc/5UTL-8YJ5] (citation omitted). The Emory guidelines mandate that "all nonhuman primates must be housed with one or more members of the same species." *Id.* at 2. Any exception to this policy requires advanced approval and is "reviewed by the Attending Veterinarian every 30 days." *Id.*

Of course, the results of animal studies are not directly transferable to human populations. However, hundreds of studies done with human participants have reached many of the same conclusions. As I noted above, the scientific literature that documents these adverse effects is far too voluminous to comprehensively review. In the summary that follows, to narrow the focus to a manageable, yet representative sample of studies, I will concentrate primarily on those published in just the last several years.

Scientists have continued to add to existing knowledge about the ways in which social isolation and loneliness in society at large are significant risk factors for a wide range of mental health problems.[52] Specifically, social isolation increases the prevalence of depression and anxiety among

---

[52] Although very closely related, the experiences of "loneliness" and "social isolation" are not identical. Loneliness is the negative *subjective* feeling of being isolated or disconnected from others, whereas social isolation is the *objective* condition of that disconnection. For obvious reasons, animal studies focus only on the effects of social isolation; studies with human participants may examine one or another or both experiences. *See, e.g.*, Nancy E.G. Newall & Verena H. Menec, *Loneliness and Social Isolation of Older Adults: Why It Is Important to Examine These Social Aspects Together*, 36 J. Soc. & Pers. Relationships 925, 926–27 (2019); Kimberley J. Smith & Christina Victor, *Typologies of Loneliness, Living Alone, and Social Isolation, and Their Associations with Physical and Mental Health*, 39 Ageing & Soc'y 1709, 1710 (2019); Jingyi Wang, Brynmor Lloyd-Evans, Domenico Giacco, Rebecca Forsyth, Cynthia Nebo, Farhana Mann & Sonia Johnson, *Social Isolation in Mental Health: A Conceptual and Methodological Review*, 52 Soc. Psychiatry & Psychiatric Epidemiology 1451 (2017). Not surprisingly, there are high levels of loneliness among prisoners housed in the extreme social isolation of solitary confinement. *See* Haney, *Solitary Confinement, Loneliness, and Psychological Harm*, *supra* note 24, at 136. In my review of the broader scientific literature, I will refer to the experience— loneliness or social isolation—as it is identified in the research itself.

NORTHWESTERN UNIVERSITY LAW REVIEW

adolescents and adults[53] and is also related to psychosis,[54] paranoia,[55] and suicidal behavior.[56] Among those persons who already have been diagnosed or identified as suffering from psychiatric disorders in free society, isolation has been implicated in the persistence of delusional or psychotic beliefs,[57] a lack of insight into one's psychiatric symptoms,[58] and a higher rate of

---

[53] *See, e.g.*, Joshua Hyong-Jin Cho, Richard Olmstead, Hanbyul Choi, Carmen Carrillo, Teresa E. Seeman & Michael R. Irwin, *Associations of Objective Versus Subjective Social Isolation with Sleep Disturbance, Depression, and Fatigue in Community-Dwelling Older Adults*, 23 AGING & MENTAL HEALTH 1130 (2019); Nathaniel A. Dell, Michelle Pelham & Allison M. Murphy, *Loneliness and Depressive Symptoms in Middle Aged and Older Adults Experiencing Serious Mental Illness*, 42 PSYCHIATRIC REHABILITATION J. 113 (2019); S. Häfner, R.T. Emeny, M.E. Lacruz, J. Baumert, C. Herder, W. Koenig, B. Thorand & K.H. Ladwig, *Association Between Social Isolation and Inflammatory Markers in Depressed and Non-Depressed Individuals: Results from the MONICA/KORA Study*, 25 BRAIN, BEHAV., & IMMUNITY 1701 (2011); Lisa M. Jaremka, Rebecca R. Andridge, Christopher P. Fagundes, Catherine M. Alfano, Stephen P. Povoski, Adele M. Lipari, Doreen M. Agnese, Mark W. Arnold, William B. Farrar, Lisa D. Yee, William E. Carson, III, Tanios Bekaii-Saab, Edward W. Martin, Jr., Carl R. Schmidt & Janice K. Kiecolt-Glaser, *Pain, Depression and Fatigue: Loneliness as a Longitudinal Risk Factor*, 33 HEALTH PSYCHOL. 948 (2014); C. Richardson, E. Oar, J. Fardouly, N. Magson, C. Johnco, M. Forbes & R. Rapee, *The Moderating Role of Sleep in the Relationship Between Social Isolation and Internalising Problems in Early Adolescence*, 50 CHILD PSYCHIATRY & HUM. DEV. 1011 (2019); Ilse M. J. van Beljouw, Eric van Exel, Jenny de Jong Gierveld, Hannie C. Comijs, Marjolijn Heerings, Max. L. Stek & Harm W. J. van Marwijk, *"Being All Alone Makes Me Sad": Loneliness in Older Adults with Depressive Symptoms*, 26 INT'L PSYCHOGERIATRICS 1541 (2014); Lixia Ge, Chun Wei Yap, Reuben Ong & Bee Hoon Heng, *Social Isolation, Loneliness and Their Relationships with Depressive Symptoms: A Population-Based Study*, PLOS ONE (Aug. 23, 2017), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0182145 [https://perma.cc/63Q4-YZME].

[54] *See, e.g.*, Anson K. C. Chau, Chen Zhu & Suzanne Ho-Wai So, *Loneliness and the Psychosis Continuum: A Meta-Analysis on Positive Psychotic Experiences and a Meta-Analysis on Negative Psychotic Experiences*, 31 INT'L REV. PSYCHIATRY 5 (2019); Dorothy Ann Nejedlo DeNiro, *Perceived Alienation in Individuals with Residual-Type Schizophrenia*, 16 ISSUES IN MENTAL HEALTH NURSING 185 (1995).

[55] *See, e.g.*, Sarah Butter, Jamie Murphy, Mark Shevlin & James Houston, *Social Isolation and Psychosis-Like Experiences: A UK General Population Analysis*, 9 PSYCHOSIS 291 (2017).

[56] *See, e.g.*, COMM. ON PATHOPHYSIOLOGY & PREVENTION OF ADOLESCENT & ADULT SUICIDE, INST. OF MED. OF THE NAT'L ACADS., REDUCING SUICIDE: A NATIONAL IMPERATIVE (S.K. Goldsmith, T. C. Pellmar, A. M. Kleinman & W. E. Burney eds., 2002); Raffaella Calati, Chiara Ferrari, Marie Brittner, Osmano Oasi, Emilie Olié, André F. Carvalho & Philippe Courtet, *Suicidal Thoughts and Behaviors and Social Isolation: A Narrative Review of the Literature*, 245 J. AFFECTIVE DISORDERS 653 (2019); John L. Oliffe, Genevieve Creighton, Steve Robertson, Alex Broom, Emily K. Jenkins, John S. Ogrodniczuk & Oliver Ferlatte, *Injury, Interiority, and Isolation in Men's Suicidality*, 11 AM. J. MEN'S HEALTH 888 (2017).

[57] *See, e.g.*, P. A. Garety, E. Kuipers, D. Fowler, D. Freeman & P. E. Bebbington, *A Cognitive Model of the Positive Symptoms of Psychosis*, 31 PSYCHOL. MED. 189, 190–91 (2001) (writing about the way that social marginalization contributes to beliefs about the self as "vulnerable to threat, or about others as dangerous" and the way that "social isolation contributes to the acceptance of . . . psychotic appraisal by reducing access to alternative more normalizing explanations").

[58] *See, e.g.*, R. White, P. Bebbington, J. Pearson, S. Johnson & D. Ellis, *The Social Context of Insight in Schizophrenia*, 35 SOC. PSYCHIATRY & PSYCHIATRIC EPIDEMIOLOGY 500 (2000).

hospitalization and rehospitalization.[59] Persons experiencing mental health crises also report severe loneliness which may, in turn, exacerbate their mental illness,[60] creating a downward spiral toward decompensation.

Social isolation can also lead to reduced cognitive functioning in humans.[61] Some studies have shown that the significant direct relationship between loneliness and decreased cognitive functioning is partially mediated by the presence of depressive symptoms.[62] However, a study by Elvira Lara and her colleagues found that loneliness and social isolation lead to decreased intellectual functioning on a variety of cognitive tests over time, even after controlling for depression among older participants. To prevent such a decline, the study recommended "the enhancement of social participation and the maintenance of emotionally supportive relationships."[63] Other studies demonstrate that even when loneliness does not directly produce cognitive decline, it has an effect on neural processes that, in turn, "relate[s] to worse cognitive performance on processing speed and attention, executive function, working memory, and verbal memory immediate recall."[64]

As in studies with laboratory animals, there are a number of well documented harmful physical and medical outcomes associated with social isolation and loneliness in humans, including adverse effects on neurological

---

[59] *See, e.g.*, Tennyson Mgutshini, *Risk Factors for Psychiatric Re-Hospitalization: An Exploration*, 19 INT'L J. MENTAL HEALTH NURSING 257 (2010); Graham Thornicroft, *Social Deprivation and Rates of Treated Mental Disorder: Developing Statistical Models to Predict Psychiatric Service Utilisation*, 158 BRIT. J. PSYCHIATRY 475 (1991).

[60] *See, e.g.*, Jingyi Wang, Brynmor Lloyd-Evans, Louise Martson, Ruimin Ma, Farhana Mann, Francesca Solmi & Sonia Johnson, *Epidemiology of Loneliness in a Cohort of UK Mental Health Community Crisis Service Users*, 55 SOC. PSYCHIATRY & PSYCHIATRIC EPIDEMIOLOGY 811 (2019).

[61] *See, e.g.*, Paolo de Sousa, William Sellwood, Alaw Eldridge & Richard P. Bentall, *The Role of Social Isolation and Social Cognition in Thought Disorder*, 269 PSYCHIATRY RES. 56 (2018); Laura Fratiglioni, Hui-Xin Wang, Kjerstin Ericsson, Margaret Maytan & Bengt Winblad, *Influence of Social Network on Occurrence of Dementia: A Community-Based Longitudinal Study*, 355 LANCET 1315 (2000); Aparna Shankar, Mark Hamer, Anne McMunn & Andrew Steptoe, *Social Isolation and Loneliness: Relationships with Cognitive Function During 4 Years of Follow-Up in the English Longitudinal Study of Ageing*, 75 PSYCHOSOMATIC MED. 161 (2013).

[62] *See, e.g.*, Joanna McHugh Power, Jianjun Tang, Rose Ann Kenny, Brian A. Lawlor & Frank Kee, *Mediating the Relationship Between Loneliness and Cognitive Function: The Role of Depressive and Anxiety Symptoms*, 24 AGING & MENTAL HEALTH 1071, 1076 (2019) (noting that among older adults there is likely a reciprocal effect between loneliness and decreased cognitive functioning).

[63] Elvira Lara, Francisco Félix Caballero, Laura Alejandra Rico-Uribe, Beatriz Olaya, Josep Maria Haro, José Luis Ayuso-Mateos & Marta Miret, *Are Loneliness and Social Isolation Associated with Cognitive Decline?*, 34 INT'L J. GERIATRIC PSYCHIATRY 1613, 1614, 1620 (2019).

[64] Terea Montoliu, Vanesa Hidalgo & Alicia Salvador, *The Relationship Between Loneliness and Cognition in Healthy Older Men and Women: The Role of Cortisol*, 107 PSYCHONEUROENDOCRINOLOGY 270, 277 (2019).

and endocrinological processes. As one group of researchers summarized, "These findings indicate that loneliness may compromise the structural and functional integrity of multiple brain regions."[65] For example, Nathan Spreng and his colleagues have shown that loneliness is inversely related to a sense of "life meaning" (i.e., a subjective sense of purpose), and that both are in turn related to measures of neural connectivity.[66] In addition, social isolation adversely impacts the functioning of the human immune system,[67] undermines health outcomes in general,[68] and is associated with higher rates of mortality. That is, the experience of social isolation literally lowers the age at which people die.[69] In fact, researchers have concluded that the health

---

[65] Laetitia Mwilambwe-Tshilobo, Tian Ge, Minqi Chong, Michael A. Ferguson, Bratislav Misic, Anthony L. Burrow, Richard M. Leahy & R. Nathan Spreng, *Loneliness and Meaning in Life Are Reflected in the Intrinsic Network Architecture of the Brain*, 14 SOC. COGNITIVE & AFFECTIVE NEUROSCIENCE 423, 424 (2019); *see also* Jacob Y. Stein, Yafit Levin, Yael Lahav, Orit Uziel, Heba Abumock & Zahava Solomon, *Perceived Social Support, Loneliness, and Later Life Telomere Length Following Wartime Captivity*, 37 HEALTH PSYCH. 1067 (2018).

[66] Mwilambwe-Tshilobo et al., *supra* note 65.

[67] *See, e.g.*, Naomi I. Eisenberger, Mona Moieni, Tristen K. Inagaki, Keely A. Muscatell & Michael R. Irwin, *In Sickness and in Health: The Co-Regulation of Inflammation and Social Behavior*, 42 NEUROPSYCHOPHARMACOLOGY REVIEWS. 242 (2017); Sarah D. Pressman, Sheldon Cohen, Gregory E. Miller, Anita Barkin, Bruce S. Rabin & John J. Treanor, *Loneliness, Social Network Size, and Immune Response to Influenza Vaccination in College Freshmen*, 24 HEALTH PSYCH. 297 (2005); Bert N. Uchino, Ryan Trettevik, Robert G. Kent de Grey, Sierra Cronan, Jasara Hogan & Brian R. W. Baucom, *Social Support, Social Integration, and Inflammatory Cytokines: A Meta-Analysis*, 37 HEALTH PSYCH. 462 (2018).

[68] *See, e.g.*, Johannes Beller & Adina Wagner, *Loneliness, Social Isolation, Their Synergistic Interaction, and Mortality*, 37 HEALTH PSYCH. 808 (2018); Caitlin E. Coyle & Elizabeth Dugan, *Social Isolation, Loneliness and Health Among Older Adults*, 24 J. AGING & HEALTH 1346 (2012); Damiano Fiorillo & Fabio Sabatini, *Quality and Quantity: The Role of Social Interactions in Self-Reported Individual Health*, 73 SOC. SCI. & MED. 1644 (2011); Liesl M. Heinrich & Eleonora Gullone, *The Clinical Significance of Loneliness: A Literature Review*, 26 CLINICAL PSYCH. REV. 695 (2006).

[69] *See* Marko Elovainio, Christian Hakulinen, Laura Pulkki-Råback, Marianna Virtanen, Kim Josefsson, Markus Jokela, Jussi Vahtera & Mika Kivimäki, *Contribution of Risk Factors to Excess Mortality in Isolated and Lonely Individuals: An Analysis of Data from the UK Biobank Cohort Study*, 2 LANCET PUB. HEALTH e260 (2017); Brett Friedler, Joshua Crapser & Louise McCullough, *One Is the Deadliest Number: The Detrimental Effects of Social Isolation on Cerebrovascular Diseases and Cognition*, 129 ACTA NEUROPATHOLOGY 493 (2015); Louise C. Hawkley & John T. Cacioppo, *Loneliness Matters: A Theoretical and Empirical Review of Consequences and Mechanisms*, 40 ANNALS BEHAV. MED. 218, 219 (2010); Julianne Holt-Lunstad, Timothy B. Smith & J. Bradley Layton, *Loneliness and Social Isolation as Risk Factors for Mortality: A Meta-Analytic Review*, 10 PERSPS. PSYCH. SCI. 227 (2015); Matthew Pantell, David Rehkopf, Douglas Jutte, Leonard Syme, John Balmes & Nancy Adler, *Social Isolation: A Predictor of Mortality Comparable to Traditional Clinical Risk Factors*, 103 AM. J. PUB. HEALTH 2056 (2013); Jussi Tanskanen & Timo Anttila, *A Prospective Study of Social Isolation, Loneliness, and Mortality in Finland*, 106 AM. J. PUB. HEALTH 2042 (2016); Andrea Fleisch Marcus, Alex H. Illescas, Bernadette C. Hohl & Adana A. M. Llanos, *Relationships Between Social Isolation, Neighborhood Poverty, and Cancer Mortality in a Population-Based Study of US Adults*,

risk of social isolation on mortality rates is comparable to that caused by cigarette smoking.[70]

In part because of its dramatic life-shortening effects, as one recent review of the literature put it, "The problem of loneliness and social isolation is of growing global concern."[71] Indeed, the well-documented negative psychological and physical effects of social isolation and loneliness have led to international recognition that they represent a worldwide public health crisis.[72] Acknowledging this fact, an international commission assembled by former French President Nicholas Sarkozy and led by Nobel Prize winners Joseph Stiglitz and Amartya Sen and economist Jean-Paul Fitoussi identified social connectedness as one of the key indicators of a nation's social progress, quality of life, and well-being.[73] More recently, the social isolation of older adults was the focus of two Canadian National Seniors Council reports, which discussed the nature of the psychological and medical risks of social isolation and what can be done to address them.[74] In 2017, the former Surgeon General of the United States, Vivek Murthy, warned business leaders about what he described as a "loneliness epidemic" and its harmful health consequences.[75] In a more recent book, Murthy elaborated on the

---

PLOS ONE (Mar. 8, 2017), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0173370 [https://perma.cc/89KS-DGE3].

[70] *See* Julianne Holt-Lunstad, Timothy B. Smith, Mark Baker, Tyler Harris & David Stephenson, *Social Relationships and Mortality Risk: A Meta-Analytic Review*, PLOS MED. (July 27, 2010), https://journals.plos.org/plosmedicine/article?id=10.1371/journal.pmed.1000316 [https://perma.cc/J8DP-JN99].

[71] Cathrine Mihalopoulos, Long Khanh-Dao Le, Mary Lou Chatterton, Jessica Bucholc, Julianne Holt-Lunstad, Michelle H. Lim & Lidia Engel, *The Economic Costs of Loneliness: A Review of Cost-of-Illness and Economic Evaluation Studies*, 55 SOC. PSYCHIATRY & PSYCHIATRIC EPIDEMIOLOGY 823, 834 (2019). Although the authors concluded that it was difficult to precisely estimate the economic costs of loneliness and social isolation, they noted that most studies "reported excess healthcare costs associated with loneliness/isolation," and that the projected costs "are likely to be under-estimated." *Id.*

[72] *See, e.g.*, N. Leigh-Hunt, *An Overview of Systematic Reviews on the Public Health Consequences of Social Isolation and Loneliness*, 152 PUB. HEALTH 157 (2017).

[73] JOSEPH E. STIGLITZ, AMARTYA SEN & JEAN-PAUL FITOUSSI, REPORT BY THE COMMISSION ON THE MEASUREMENT OF ECONOMIC PERFORMANCE AND SOCIAL PROGRESS (2009), https://www.cpc.unc.edu/projects/rlms-hse/publications/1921 [https://perma.cc/KD95-F2GA].

[74] THE NAT'L SENIORS COUNCIL, GOV'T OF CAN., REPORT ON THE SOCIAL ISOLATION OF SENIORS 2013-2014 (2014), https://www.canada.ca/en/national-seniors-council/programs/publications-reports/2014/scoping-social-isolation.html [https://perma.cc/2NY8-8FYH]; THE NAT'L SENIORS COUNCIL, GOV'T OF CAN., WHO'S AT RISK AND WHAT CAN BE DONE ABOUT IT? A REVIEW OF THE LITERATURE ON THE SOCIAL ISOLATION OF DIFFERENT GROUPS OF SENIORS (2017), https://www.canada.ca/en/national-seniors-council/programs/publications-reports/2017/review-social-isolation-seniors.html [https://perma.cc/E4DZ-SSJB].

[75] *See* Vivek Murthy, *Work and the Loneliness Epidemic: Reducing Isolation at Work Is Good for Business*, HARV. BUS. REV. (2017), https://hbr.org/cover-story/2017/09/work-and-the-loneliness-epidemic [https://perma.cc/QWQ6-HZCK]; Dan Schawbel, *Vivek Murthy: How to Solve the Work*

negative effects of social isolation, made recommendations about how to best combat them, and promoted what he called "the healing power of human connection."[76] In 2018, the British Prime Minister, Theresa May, appointed a "Minister for Loneliness" for her nation,[77] as news magazines conceded that it represented a "serious public health problem."[78] Finally, in 2020, in a study designed to contribute to "a larger global effort to combat the adverse health impacts of social isolation,"[79] a National Academy of Sciences Committee concluded that the negative consequences of social isolation "may be comparable to or greater than other well-established risk factors such as smoking, obesity, and physical inactivity,"[80] and another group of prominent researchers termed the experience of loneliness a "modern behavioral epidemic" and cautioned that it represented a "lethal behavioral toxin" that accounted for more annual deaths than cancer or strokes.[81]

Paralleling the research that has been conducted on the adverse psychological and medical effects of social isolation and loneliness, there is a closely related and well-developed body of literature on what has been termed "social exclusion"—what happens when people are involuntarily and purposely separated from others, as they are in prison solitary confinement units. These studies, too, show that this kind of social separation produces a host of serious negative consequences. For example, Mark Leary and his colleagues have shown that increasing degrees of social exclusion can successively lower self-esteem, which in turn relates to greater levels of depression, anxiety, and a host of other psychological problems. In fact, they have suggested that self-esteem itself may be largely a reflection of a

---

*Loneliness Epidemic*, FORBES (Oct. 7, 2017, 9:54 AM), https://www.forbes.com/sites/danschawbel/2017/10/07/vivek-murthy-how-to-solve-the-work-loneliness-epidemic-at-work/#22653b417172 [https://perma.cc/DNC3-5B4K].

[76] VIVEK H. MURTHY, TOGETHER: THE HEALING POWER OF HUMAN CONNECTION IN A SOMETIMES LONELY WORLD (2020).

[77] *See* Ceylan Yeginsu, *U.K. Appoints a Minister for Loneliness*, N.Y. TIMES (Jan. 17, 2018), https://www.nytimes.com/2018/01/17/world/europe/uk-britain-loneliness.html [https://perma.cc/QX94-ZY7A].

[78] *Loneliness Is a Serious Public-Health Problem*, ECONOMIST (Sept. 1, 2018), https://www.economist.com/international/2018/09/01/loneliness-is-a-serious-public-health-problem [https://perma.cc/YQ3X-P2SJ].

[79] COMM. ON THE HEALTH & MED. DIMENSIONS OF SOC. ISOLATION & LONELINESS IN OLDER ADULTS, THE NAT'L ACADS. OF SCIS., ENG'G & MED., SOCIAL ISOLATION AND LONELINESS IN OLDER ADULTS: OPPORTUNITIES FOR THE HEALTH CARE SYSTEM, at xii (2020).

[80] *Id.* at 2–12.

[81] Dilip V. Jeste, Ellen E. Lee & Stephanie Cacioppo, *Battling the Modern Behavioral Epidemic of Loneliness: Suggestions for Research and Interventions*, 77 JAMA PSYCHIATRY 553 (2020).

person's level or state of social connectedness.[82] Researchers have also documented the fact that excluding persons from contact with others is not only "painful in itself," but also "undermines people's sense of belonging, control, self-esteem, and meaningfulness, . . . reduces pro-social behavior, and impairs self-regulation."[83] Indeed, the subjective experience of social exclusion can result in what have been called "cognitive deconstructive states," which include emotional numbing, reduced empathy, cognitive inflexibility, lethargy, and an absence of meaningful thought.[84]

Social exclusion also has been shown to heighten people's feelings of physical vulnerability and increase the expectation that they will experience physical harm in the future.[85] It may also precipitate aggressive behavior—"action-oriented coping"—in response.[86] Two authors summarized these overall effects this way:

> Social exclusion is detrimental and can lead to depression, alienation, and sometimes even to violent behaviour. Laboratory studies show that even a brief episode of exclusion lowers mood, causes social pain, which is analogous to physical pain, and elicits various behavioural responses, such as aggressive behaviour or affiliation-seeking behavior.[87]

In fact, the editor of the *Oxford Handbook of Social Exclusion* concluded the volume by summarizing the "serious threat" that social exclusion represents to psychological health and well-being, including "increase[d] salivary cortisol levels . . . and blood flow to brain regions

---

[82] *See, e.g.*, Mark R. Leary, Alison L. Haupt, Kristine S. Straussen & Jason T. Chokel, *Calibrating the Sociometer: The Relationship Between Interpersonal Appraisals and State Self-Esteem*, 74 J. PERSONALITY & SOC. PSYCHOL. 1290, 1297–98 (1998); Mark R. Leary, Lisa S. Schreindorfer & Alison L. Haupt, *The Role of Low Self-Esteem in Emotional and Behavioral Problems: Why Is Low Self-Esteem Dysfunctional?*, 14 J. SOC. & CLINICAL PSYCHOL. 297, 307 (1995).

[83] Brock Bastian & Nick Haslam, *Excluded from Humanity: The Dehumanizing Effects of Social Ostracism*, 46 J. EXPERIMENTAL SOC. PSYCHOL. 107, 107 (2010) (internal citations omitted).

[84] *See* Jean M. Twenge, Kathleen R. Catanese & Roy F. Baumeister, *Social Exclusion and the Deconstructed State: Time Perception, Meaninglessness, Lethargy, Lack of Emotion, and Self-Awareness*, 85 J. PERSONALITY & SOC. PSYCHOL. 409, 411, 415, 421 (2003).

[85] *See, e.g.*, Kristy K. Dean, Grace Wentworth & Nikole LeCompte, *Social Exclusion and Perceived Vulnerability to Physical Harm*, 18 SELF & IDENTITY 87 (2019).

[86] Katharina Reiter-Scheidl, Ilona Papousek, Helmut K. Lackner, Manuela Paechter, Elisabeth M. Weiss & Nilüfer Aydin, *Aggressive Behavior After Social Exclusion Is Linked with the Spontaneous Initiation of More Action-Oriented Coping Immediately Following the Exclusion Episode*, 195 PHYSIOLOGY & BEHAV. 142, 142, 148 (2018).

[87] Aleksi H. Syrjämäki & Jari K. Hietanen, *The Effects of Social Exclusion on Processing of Social Information—A Cognitive Psychology Perspective*, 58 BRIT. J. SOC. PSYCHOL. 730, 730 (2018) (citations omitted) (footnotes omitted); *see also* C. Nathan DeWall, Timothy Deckman, Richard S. Pond, Jr. & Ian Bonser, *Belongingness as a Core Personality Trait: How Social Exclusion Influences Social Functioning and Personality Expression*, 79 J. PERSONALITY 1281, 1281–82 (2011).

associated with physical pain," "sweeping changes" in attention, memory, thinking, and self-regulation, as well as changes in aggression and prosocial behavior. As he put it, "This dizzying array of responses to social exclusion supports the premise that it strikes at the core of well-being."[88]

An additional, painful component of solitary confinement is the fact that prisoners in such units are denied opportunities to give and receive caring human touch. Many of them go for weeks, months, or even years without touching another person with affection. This kind of deprivation also has been studied extensively in contexts outside prison. Psychologists have long known that "[t]ouch is central to human social life. It is the most developed sensory modality at birth, and it contributes to cognitive, brain, and socioemotional development throughout infancy and childhood."[89] Recent research now indicates that "touch is a primary platform for the development of secure attachments and cooperative relationships."[90] We know that, among other things, it is "intimately involved in patterns of caregiving."[91] Indeed, caring physical touch functions as a "powerful means by which individuals reduce the suffering of others."[92] It also "promotes cooperation and reciprocal altruism."[93]

The need for caring human touch is so fundamental that early deprivation is an established risk factor for neurodevelopmental disorders, depression, suicidality, and other self-destructive behavior.[94] Later deprivation is associated with violent behavior in adolescents.[95] The uniquely prosocial emotion of "[c]ompassion is universally signaled through touch," so that persons who live in a world without touch are denied the experience

---

[88] DeWall, *supra* note 36, at 302; Johan C. Karremans, Dirk J. Heslenfeld, Lotte F. van Dillen & Paul A. M. Van Lange, *Secure Attachment Partners Attenuate Neural Responses to Social Exclusion: An fMRI Investigation*, 81 INT'L J. PSYCHOPHYSIOLOGY 44, 44, 49 (2011).

[89] Matthew J. Hertenstein, Dacher Keltner, Betsy App, Brittany A. Bulleit & Ariane R. Jaskolka, *Touch Communicates Distinct Emotions*, 6 EMOTION 528, 528 (2006). *See generally* THE HANDBOOK OF TOUCH: NEUROSCIENCE, BEHAVIORAL, AND HEALTH PERSPECTIVES 373–499 (Matthew J. Hertenstein & Sandra J. Weiss eds., 2011) (discussing, in Section V, the relevance of touch for development and health).

[90] Jennifer L. Goetz, Dacher Keltner & Emiliana Simon-Thomas, *Compassion: An Evolutionary Analysis and Empirical Review*, 136 PSYCHOL. BULL. 351, 360 (2010).

[91] *Id.*

[92] *Id.*

[93] *Id.*

[94] *See, e.g.*, Carissa J. Cascio, *Somatosensory Processes in Neurodevelopmental Disorders*, 2 J. NEURODEVELOPMENTAL DISORDERS 62, 62–63 (2010) (neurodevelopmental disorders); Tiffany Field, *Touch Deprivation and Aggression Against Self Among Adolescents*, in DEVELOPMENTAL PSYCHOBIOLOGY OF AGGRESSION 117, 117 (David M. Stoff & Elizabeth J. Susman eds., 2005) (depression, suicidality, and other self-destructive behavior).

[95] *See* Tiffany Field, *Violence and Touch Deprivation in Adolescents*, 37 ADOLESCENCE 735, 735, 744–45 (2002).

of receiving or expressing compassion in this way.[96] Conversely, a number of experts argue that caring human touch is so integral to our well-being that it is actually therapeutic. Thus, it has been recommended to treat a host of psychological maladies including depression, suicidality, and learning disabilities.[97] Researchers have found that caring human touch mediates a sense of security and place, a sense of shared companionship, a sense of being nurtured, feelings of worth and competence, access to reliable alliance and assistance, and guidance and support in stressful situations.[98] The deprivation of caring human touch in solitary confinement deprives prisoners of these things.

In sum, there is a carefully developed and empirically well-documented scientific framework that catalogues the broad range of very serious adverse effects brought about by social isolation, loneliness, social exclusion, and the deprivation of caring touch. These effects have been found in numerous studies that confirm the destructive and even life-threatening consequences for animals as well as humans. It is important not only to situate the harmfulness of solitary confinement in this larger scientific framework but also to recognize that, for reasons discussed below, the adverse effects of isolation in a *correctional* setting are likely to be far greater.

## II. Solitary Confinement as "Toxic" Social Isolation

The literature reviewed in the preceding Part summarized findings from studies conducted in a wide range of free-world settings. It is important to acknowledge that, the animal research notwithstanding, the adverse effects of social isolation, loneliness, social exclusion, and the deprivation of caring human touch that I reviewed above were assessed in environments that are much more benign than those that prevail in jail and prison solitary confinement units. By virtually any measure, solitary confinement in correctional settings is likely to be significantly *more* stressful, hurtful, harmful, and dangerous than in the larger society, where the range of deleterious effects I reviewed in the previous Part have been elaborately documented.

---

[96] *See, e.g.*, Jennifer E. Stellar & Dacher Keltner, *Compassion*, *in* HANDBOOK OF POSITIVE EMOTIONS 329, 337 (Michele M. Tugade, Michelle N. Shiota & Leslie D. Kirby eds., 2014).

[97] *See, e.g.*, Susan Dobson, Shripati Upadhyaya, Ian Conyers & Raghu Raghavan, *Touch in the Care of People with Profound and Complex Needs*, 6 J. LEARNING DISABILITIES 351, 360 (2002); Field, *supra* note 94, at 134.

[98] *See, e.g.*, Robert S. Weiss, *The Attachment Bond in Childhood and Adulthood*, *in* ATTACHMENT ACROSS THE LIFE CYCLE 72–75 (Colin Murray Parkes, Joan Stevenson-Hinde & Peter Marris eds., 1995).

Of course, there are arguably "better" and "worse" solitary confinement units, and prisoners are likely to suffer more and deteriorate more rapidly in those that are the harshest and most deprived. Thus, psychologist Carl Clements and his colleagues were surely correct to observe that relevant "[c]ontext factors includ[ing] privacy, access to daylight, length of cell confinement per day, noise and overcrowding levels, and staff functioning"[99] have some bearing on the isolated prisoner's well-being. Yet, even their discussion seemed to ignore what researchers now understand to be the most destructive aspect of solitary confinement—the deprivation of meaningful human social contact. As the larger literature I reviewed on social isolation and loneliness underscores, although the immediate discomforting aspects of the experience can be ameliorated, it is isolation itself that is dangerous.

Obviously, lonely, isolated persons in the free world are likely to have far more privacy, access to nature, freedom of movement, and so on than prisoners housed in solitary confinement. Yet they are still at great psychological and physical risk by virtue of their social isolation. The onerous aspects of prison and jail isolation only intensify the painfulness of this powerful stressor and worsen its impact. For one, prison and jail solitary confinement is a form of coercively enforced and nearly complete isolation. As I have noted before, "There is no other place on earth where persons are so completely and involuntarily isolated from one another."[100] Except in special cases, prisoners rarely go willingly into solitary confinement. Indeed, in many instances they must be forcibly removed from their cells ("cell extracted") and taken to solitary confinement by special tactical units of correctional officers who are suited up in body armor, armed with special weapons (e.g., batons, pepper spray, tasers), and who operate in tandem to physically control, subdue, and dominate prisoners.[101] The elaborate procedures correctional officers are routinely instructed to employ means that the encounters themselves are inherently confrontational and prone to

---

[99]  Clements et al., *supra* note 30, at 926.

[100]  Haney, *Solitary Confinement, Loneliness, and Psychological Harm*, *supra* note 24, at 132.

[101]  In California, Department of Corrections procedures explicitly instructed standard five-man cell extraction teams to proceed in this fashion: the first member of the team enters the cell carrying a large shield, used to push the prisoner back into a corner of the cell; the second member follows closely, wielding a special cell extraction baton, to strike the inmate on the upper part of his body to induce him to raise his arms in self-protection; thus unsteadied, the inmate is pulled off balance by another member of the team whose job is to place leg irons around his ankles; once downed, a fourth member of the team places him in handcuffs; the fifth member stands ready to fire a taser gun or rifle that shoots wooden or rubber bullets at prisoners who continue to resist. Craig Haney, *"Infamous Punishment": The Psychological Consequences of Isolation*, 8 NAT'L PRISON PROJECT J. 3, 21 n.6 (1993).

escalation. It is not uncommon for them to turn increasingly physically violent and, in that sense, they are traumatic for everyone involved.[102]

To take just one firsthand account, here is the description of Mika'il DeVeaux, a sociology lecturer who spent twenty-five years incarcerated in the New York State prison system. He observed frequent cell extractions (termed "being dragged out") occurring inside solitary confinement units in the 1980s, ones that were traumatizing to witness as well as to experience directly:

> [B]eing "dragged out" meant that a person was dragged out of a cell feet first, with their head trailing behind on the floor, and often being beaten while being moved. I can still remember the screams, the wailing, the cursing, and the anger. These events were alarming because all who witnessed them unfold could feel the humiliation and shame. We in the cells were utterly powerless and could face a similar fate. There was nothing I could do, nothing anyone could do, except hope to get out of there alive. The possibility of being beaten was all too real. Whom could I tell? Who would listen? Who would care?[103]

Moreover, solitary confinement is virtually always accompanied by a host of additional deprivations that extend beyond the sheer lack of meaningful social contact. Those additional deprivations commonly include the lack of positive or pleasurable environmental stimulation in settings that prisoners are unable to significantly modify. That is, the physical environment in most solitary confinement units is characterized by its closed-in nature (in the cells, of course, but also in the cellblocks themselves) and unchanging drabness. As I have described them previously: "Inside their cells, units, and 'yards,'" prisoners in solitary confinement units "are surrounded by nothing but concrete, steel, cinderblock, and metal fencing—often gray or faded pastel, drab and sometimes peeling paint, dingy, worn floors. There is no time when they escape from these barren 'industrial' environments."[104] Indeed, many of these units are explicitly, often inventively, designed to limit or eliminate the prisoners' contact with nature—restricting or foreclosing exposure to natural light, grass, and even glimpses of the horizon or sky. There are even some units where prisoners cannot easily tell whether it is day or night.

---

[102] *See* Erica Goode, *When Cell Door Opens, Tough Tactics and Risk*, N.Y. TIMES, July 29, 2014, at A1, A12; Erica Goode, *New Trial Sought in Death of Man Pulled from Cell*, N.Y. TIMES, Aug. 23, 2014, at A16.

[103] Mika'il DeVeaux, *The Trauma of the Incarceration Experience*, 48 HARV. C.R.-C.L. L. REV. 257, 273 (2013).

[104] Craig Haney, *A Culture of Harm: Taming the Dynamics of Cruelty in Supermax Prisons*, 35 CRIM. JUST. & BEHAV. 956, 968 (2008).

NORTHWESTERN UNIVERSITY LAW REVIEW

The only variations in sensory stimulation are typically auditory, but these too often come in the form of aversive, loud noises that, in addition to the banging of heavy metal doors, include pounding on walls and shouting or screaming at all hours of the day and night from other prisoners who may be mentally ill and/or suffering from the effects of isolation.[105]

In addition, solitary confinement virtually always entails severe restrictions on the amount and kind of personal property prisoners can possess. In many such units, they have limited access to electronic appliances (such as radios and televisions) or may be prohibited from having any, and are more severely restricted than other prisoners in terms of the commissary products they may purchase from the prison store and even in the already limited amount of reading material they can keep in their cells. Prisoners in solitary confinement also typically have limited or no access to meaningful activity or programming, either inside or outside their cells. Other than the few prisoners who are selected as "tier tenders"—to clean units and perhaps deliver mail to other prisoners—they are prohibited from working, receiving vocational training, taking in-person educational classes of any kind, or participating in hobby craft. Most solitary confinement units impose strict limits on access to telephones so that, in addition to limited numbers of noncontact visits, they are significantly cut off from the outside world.

Stuart Grassian has noted that the medical profession has long known that, even in hospital settings where patients go to receive caring treatment, greatly restricted access to social and environmental stimulation can have a "profoundly deleterious effect,"[106] including adversely impacting "patients in intensive care units, spinal patients immobilized by the need for prolonged

---

[105] I have personally toured and inspected a number of solitary confinement units in which the noise was so loud that it was difficult to converse with persons standing nearby. On the other hand, some solitary confinement units do, in fact, approximate the near total sensory deprivation paradigm in operation in early experiments conducted on the subject—darkened cells, little or no sound, and so on. But they are relatively rare nowadays. More commonly in contemporary prisons, solitary confinement units subject prisoners to what has been termed "reduced environmental stimulation"—a term that acknowledges the fact that there is not *total* (or even nearly total) deprivation of sensory input of any kind, but that the meaningful, positive, stimulating aspects of the environment are lacking. Thus, prisoners in solitary confinement are exposed to a reduced and monotonous kind of sensory input—an extremely limited and repetitive perceptual and experiential sameness in the physical environment around them. In some other instances, they are subjected to a great deal of stimulation, but it is aversive or noxious in nature—loud noise, bright lights, foul smells—and they have little or no control over the exposure. In these cases, the reduction in their "environmental stimulation" refers to the lack of *positive* stimuli, despite being bombarded with aversive stimuli that are beyond their control. All of these different but nonetheless problematic sensory aspects of the experience can be harmful to normal, healthy psychological functioning.

[106] Stuart Grassian, *Neuropsychiatric Effects of Solitary Confinement*, *in* THE TRAUMA OF PSYCHOLOGICAL TORTURE 113, 114 (Almerindo E. Ojeda ed., 2008).

238

traction, and patients with impairment of their sensory apparatus (such as eye-patched or hearing impaired patients)."[107] Of course, prisoners are not placed in solitary confinement to receive treatment or be administered to in caring ways. Unlike social isolation in most free-world contexts, solitary confinement in jails and prisons is also "pejoratively imposed," in the sense that significant stigma and gratuitous humiliation are commonly associated with it. From the perspective of the staff at least, and in some instances the prisoners as well, a prisoner in solitary confinement is in an even more degraded status than a mainline prisoner. Prisoners who are placed in solitary confinement are sometimes referred to as the "worst of the worst," but they are virtually always treated as the "lowest of the low."[108] I have suggested elsewhere that prisoners in solitary confinement are enveloped in a "culture of harm" that includes not only the isolating architecture and procedures that characterize the environment, but also the "atmosphere of thinly veiled hostility and disdain [that] prevails."[109] Interactions with staff are "fraught with resentment and recrimination"[110] and an "ecology of cruelty" subjects

---

[107] *Id.* (citing Florence S. Downs, *Bed Rest and Sensory Disturbances*, 74 AM. J. NURSING 434 (1974); Rosemary Ellis, *Unusual Sensory and Thought Disturbances After Cardiac Surgery*, 72 AM. J. NURSING 2021 (1972); C. Wesley Jackson, Jr., *Clinical Sensory Deprivation: A Review of Hospitalized Eye-Surgery Patients*, *in* SENSORY DEPRIVATION: FIFTEEN YEARS OF RESEARCH (John P. Zubek ed., 1969); Donald S. Kornfeld, Sheldon Zimberg & James R. Malm, *Psychiatric Complications of Open-Heart Surgery*, 273 NEW ENG. J. MED. 287 (1965); Herbert R. Lazarus & Jerome H. Hagens, *Prevention of Psychosis Following Open-Heart Surgery*, 124 AM. J. PSYCHIATRY 1190 (1968); Eugene Ziskind, *Isolation Stress in Medical and Mental Illness*, 168 J. AM. MED. ASS'N 1427 (1958); Eugene Ziskind, Harold Jones, William Filante & Jack Goldberg, *Observations on Mental Symptoms in Eye Patched Patients: Hypnagogic Symptoms in Sensory Deprivation*, 116 AM. J. PSYCHIATRY 89 (1960)). Grassian also reported on early studies of the ways in which extreme social isolation and the absence of positive environmental stimulation could take a severe toll on persons in other contexts where they were voluntarily pursuing otherwise positive goals and activities, such as "extremely isolating military settings and explorations in land and space." *Id.* (citing A. M. Hastin Bennett, *Sensory Deprivation in Aviation*, *in* SENSORY DEPRIVATION 161 (Philip Solomon, Philip E. Kubzansky, P. Herbert Leiderman, Jack H. Mendelson, Richard Trumbull & Donald Wexler eds., 1961); Jeanette J. Cochrane & S.J.J. Freeman, *Working in Arctic and Sub-Arctic Conditions: Mental Health Issues*, 34 CANADIAN J. PSYCHIATRY 884 (1989); Sanford J. Freedman & Milton Greenblatt, *Studies in Human Isolation II: Hallucinations and Other Cognitive Findings*, 11 U.S. ARMED FORCES MED. J. 1479 (1960); E.K. Eric Gunderson, *Emotional Symptoms in Extremely Isolated Groups*, 9 ARCHIVES GEN. PSYCHIATRY 362 (1963); E.K. Eric Gunderson & Paul D. Nelson, *Adaptation of Small Groups to Extreme Environments*, 34 AEROSPACE MED. 1111 (1963)).

[108] Among the many "pains of imprisonment" to which prisoners in general are subjected, and that have the capacity to adversely affect them upon release, is the extent to which they are dehumanized, degraded, and disrespected. *See, e.g.*, James M. Binnall, *Respecting Beasts: The Dehumanizing Quality of the Modern Prison and an Unusual Model for Penal Reform*, 17 J.L. & POL'Y 161, 185–86 (2008). These aspects of prison life are greatly intensified in solitary confinement units.

[109] Haney, *supra* note 104, at 960.

[110] *Id.*

prisoners in solitary confinement to the implements of forceful subjugation, including "handcuffs, belly chains, leg irons, spit shields, strip cells, four-point restraints, canisters of pepper spray, batons, and rifles," often wielded by flak-jacketed, helmeted officers.[111]

Unlike socially isolated persons in free society, prisoners in solitary confinement are profoundly "alone" but, paradoxically, are afforded limited or no access to privacy. Among other things, they are subjected to unannounced, prolonged, and invasive visual inspections in a way that other prisoners are not. Since literally everything prisoners in solitary confinement "do" occurs within the small space of their cell (or, during brief periods of time when they have access to it, the "yard," where they are also carefully monitored), their surveillance far exceeds that of even mainline prisoners. The latter have at least some freedom of movement to enter limited prison spaces where they are not so closely observed. In extreme cases, prisoners in solitary confinement may have cameras trained on them literally all the time (and frequently do if they are placed in suicide or aptly named "watch" cells, where around-the-clock video monitoring is commonplace). In addition, the limited contact that prisoners in solitary confinement have with medical and mental health staff often takes place "cell front," so even otherwise highly sensitive conversations about physical or psychological vulnerabilities and personal concerns are susceptible to being "overheard" by custody staff and other prisoners. This helps explain why many prisoners in solitary confinement forego these contacts altogether. In any event, the constant surveillance and lack of privacy are additional toxic aspects of solitary confinement.[112]

The multiple dimensions of institutional control and surveillance and harsh contingencies that prevail inside jail and prison solitary confinement units not only produce natural human reactions and adaptations to the experience of social isolation and loneliness but also can set other dysfunctional and problematic dynamics in motion. These dynamics, in turn, may lead to even more painful and extended stays in solitary confinement. For example, several studies have found that the experience of loneliness leads naturally to hypervigilance about perceived social threats which, in

---

[111] *Id.* at 970.

[112] Access to privacy is "important because it is posited to provide experiences that support normal psychological functioning, stable interpersonal relationships, and personal development." Stephen T. Margulis, *Privacy as a Social Issue and Behavioral Concept*, 59 J. SOC. ISSUES 243, 246 (2003); *see also* Darren Ellis, Ian Tucker & David Harper, *The Affective Atmospheres of Surveillance*, 23 THEORY & PSYCH. 716 (2017); Darhl M. Pedersen, *Psychological Functions of Privacy*, 17 J. ENVTL. PSYCH. 147 (1997).

115:211 (2020)                                         *The Science of Solitary*

turn, can produce overreactions to potentially threatening external stimuli.[113] This helps to explain why prisoners in solitary confinement are susceptible to a form of "institutional paranoia" in which they come to distrust literally everyone with whom they interact. This distrust may include not only prison personnel, but also extend to other prisoners whom they begin to suspect of harboring ill will or conspiring against them. Although entirely understandable under the circumstances in which it occurs—prisoners in solitary confinement have often said to me, only partly in jest, that "it isn't paranoia if people really *are* out to get you"—the adaptation of distrusting everyone and distancing oneself from them makes the social pain of solitary confinement more difficult for them to alleviate. Relatedly, researchers have found that loneliness reduces the amount of pleasure persons derive from rewarding social stimuli.[114] This means that even the extraordinarily rare forms of positive social stimulation that might occur in solitary confinement may have only limited beneficial or ameliorating effects because the effects of extreme isolation have numbed the prisoners' capacity to enjoy or benefit from it.

Thus, there are many reasons why the adverse psychological and physical effects of social isolation and exclusion and the deprivation of caring touch that occur in the course of solitary confinement in correctional settings are likely to be *far worse* than in society at large, where those effects have proven to be severe and even life-threatening.

## III. THE EFFECTS OF SOLITARY CONFINEMENT ARE COMPOUNDED BY THE EFFECTS OF IMPRISONMENT PER SE

Although there is a well-settled scientific consensus over the harmfulness of solitary confinement, there are occasional outlier claims made that appear to unduly minimize the seriousness of the damage it does to prisoners. Typically voiced by persons who seem unaware of the much larger compelling body of scientific knowledge about the adverse effects of social isolation in society at large,[115] this seeming defense of the continued

---

[113] *See, e.g.*, Munirah Bangee, Rebecca A. Harris, Nikola Bridges, Ken J. Rotenberg & Pamela Qualter, *Loneliness and Attention to Social Threat in Young Adults: Findings from an Eye Tracker Study*, 63 PERSONALITY & INDIVIDUAL DIFFERENCES 16, 22 (2014); Stephanie Cacioppo, Munirah Bangee, Stephen Balogh, Carlos Cardenas-Iniguez, Pamela Qualter & John T. Cacioppo, *Loneliness and Implicit Attention to Social Threat: A High-Performance Electrical Neuroimaging Study*, 7 COGNITIVE NEUROSCIENCE 138, 155–56 (2016).

[114] *See, e.g.*, John T. Cacioppo & Louise C. Hawkley, *Perceived Social Isolation and Cognition*, 13 TRENDS IN COGNITIVE SCI. 447, 449 (2009).

[115] Commentators such as Paul Gendreau and Ryan Labrecque who incorrectly describe solitary confinement as primarily "an environment with severe restrictions placed on auditory, visual and

use of solitary confinement takes several forms. In addition to the claim that I addressed in Part I (to the effect that "there is just not enough data to know"), some commentators have asserted that, although solitary confinement is potentially harmful, it inflicts only *de minimis* damage that, in any event, is likely to dissipate over time (i.e., upon release back to a mainline prison population or into free society). For example, meta-analysts Robert Morgan and his colleagues made a point of rejecting what they characterized as "fiery opinions" lodged by a number of knowledgeable experts against the practice of solitary confinement, accusing the scholars who voiced them of "lack[ing] a social perspective." The "social perspective" Morgan and his colleagues appeared to have in mind was their own claim that the effects of solitary confinement are no greater than the "adverse effects resulting from general incarceration."[116] They repeated the same assertion a page later in their article: "[T]he magnitude of the adverse effects of [solitary confinement] placement tend to be *small to moderate*, and no greater than the magnitude of effects for incarceration, generally speaking."[117]

Two other coauthors of the Morgan meta-analysis go even further, stating "there are no estimates of the precise magnitude of the effects of prison life, although we expect it is likely close to zero."[118] This same kind of minimization appears in sworn testimony given by some of the same authors, testifying as expert witnesses in defense of the use of solitary confinement in various jurisdictions, including in a case where prisoners were held continuously for at least ten years or more (some for more than

---

kinesthetic stimulation" but make little or no mention of the social deprivation that is its essence have badly missed the point. Paul Gendreau & Ryan M. Labrecque, *The Effects of Administrative Segregation: A Lesson in Knowledge Cumulation*, *in* THE OXFORD HANDBOOK OF PRISONS AND IMPRISONMENT 340, 340 (John Wooldredge & Paula Smith eds., 2018). Solitary confinement is harmful primarily because it deprives prisoners of meaningful social contact; the deprivation of positive environmental stimulation exacerbates those effects, but it is not the primary source of the harm. Thus, despite noble calls to "search for convergent validity from diverse empirical and theoretical literatures," they have completely ignored the most relevant literature of all—that which documents the extremely deleterious effects of social deprivation. *Id.* at 342.

[116] Robert D. Morgan, Paul Gendreau, Paula Smith, Andrew L. Gray, Ryan M. Labrecque, Nina MacLean, Stephanie A. Van Horn, Angelea D. Bolanos & Ashley B. Batastini, *Quantitative Syntheses of the Effects of Administrative Segregation on Inmates' Well-Being*, 22 PSYCHOL., PUB. POL'Y, & L. 439, 455 (2016).

[117] *Id.* at 456 (emphasis added).

[118] Gendreau & Labrecque, *supra* note 115, at 343. They argued further that, if there are any effects of prison life ("close to zero"), it is "criminogenic outcomes" rather than psychological disability that is "the most adverse outcome of incarceration." *Id.* at 344. In fact, current research indicates that the adverse effects are a great deal more than "zero" and extend well beyond criminogenic outcomes.

twenty years).[119] The point of these and similar statements appears to be to implicitly minimize the suffering and harm "from segregation" by suggesting that the amount is "no more than" or "comparable to" the suffering and harm that prison life in general inflicts, which the defenders of solitary confinement allege are "mild to moderate." By characterizing the negative effects of prison in general as *de minimis* (indeed, "close to zero"), and the harmfulness of solitary confinement as "no more than that," they seem to imply that there is relatively little reason for concern.[120]

In fact, however, if we were to assume that the suffering and harm inflicted by solitary confinement are actually "comparable to" or "no more than" the suffering and harm brought about by incarceration generally, then there would still be *grave* cause for concern. That is because what are commonly described as the "pains of imprisonment" are now well understood to have a powerful psychological and even physical impact. The negative effects are well documented and often truly severe.[121] As I will

---

[119] Robert Morgan, the first author of the aforementioned meta-analysis, has made this exact point in several cases in which he has offered such testimony. For example: "Thus, it is my opinion that the mental health concerns experienced by inmates in the SHU are not time dependent (i.e., 2 years, 5 years, 10 years, 20 years) such that inmates serving 10 or more years in the PBSP SHU are no better or worse off, from a clinical mental health perspective, than if they served less than 10 years of SHU confinement." Expert Report by Dr. Robert Morgan at 12, Ashker v. Brown, No. C 09-05796 CW (N.D. Cal. Mar. 13, 2015).

[120] Defenders of solitary confinement also sometimes point to the fact that a sizable minority of prisoners in some prison systems seem to "prefer" solitary confinement to mainline prison housing because the prisoners sometimes request placement in so-called "protective custody," "safekeeping," or "sensitive needs" housing units that may operate as de facto solitary confinement units. The problem with this assertion is that it overlooks the terrible Hobson's choice with which such prisoners are confronted, namely, whether or not to attempt to preserve their physical well-being at the expense of their mental health. Because physical threats in prison are often dire, tangible, and imminent, it is not surprising that some prisoners assume (or gamble) that they may be able to psychologically withstand the rigors of solitary confinement while protecting themselves from violent victimization. Some miscalculate and suffer significant psychological pain or worse. *See, e.g.*, Stanley L. Brodsky & Forrest R. Scogin, *Inmates in Protective Custody: First Data on Emotional Effects*, 1 FORENSIC REP. 267, 269–70 (1988). Kimberley Brownlee has argued in this context that the notion of "voluntary self-isolation" should be regarded with great skepticism because, as she noted, "'voluntariness' depends on the range and value of the choices available." Brownlee, *supra* note 8, at 206. Moreover, "[i]f a person's principal forms of social interaction are hostile, degrading, or cruel, then she may voluntarily withdrawal from that social environment but, given the context, her decision will not differ much from a non-voluntary withdrawal." *Id.* The prisoners' "preferences" in these cases are more a reflection of the terrible mainline prison conditions and forms of treatment from which they are fleeing than the benign nature of the solitary confinement units they have been compelled to enter.

[121] Much of this evidence is summarized in several book-length treatments of the topic. *See, e.g.*, CRAIG HANEY, REFORMING PUNISHMENT: PSYCHOLOGICAL LIMITS TO THE PAINS OF IMPRISONMENT (2006) [hereinafter HANEY, REFORMING PUNISHMENT]; COMM. ON CAUSES & CONSEQUENCES OF HIGH RATES OF INCARCERATION, NAT'L RES. COUNCIL OF THE NAT'L ACADS., THE GROWTH OF INCARCERATION IN THE UNITED STATES: EXPLORING CAUSES AND CONSEQUENCES (Jeremy Travis,

discuss in more detail below, although some of the effects of general incarceration do not fully manifest themselves until after prisoners are released from prison, the adverse consequences of imprisonment are substantial and can be life altering. They are hardly "small to moderate" or "close to zero."

For example, Alison Liebling and her colleagues reported that the measured levels of distress in eleven of the twelve prisons they studied were "extraordinarily high" and above the threshold that ordinarily triggers an inquiry into whether a patient is suffering from a treatable emotional or psychological illness.[122] Reviews of the literature on the prevalence of post-traumatic stress disorder (PTSD) and interrelated trauma-based symptoms that include depression, emotional numbing, anxiety, isolation, and hypervigilance among prisoners suggest that this disorder may occur as much as ten times more often than in the general population.[123] The severity of environmental stress to which prisoners are exposed significantly affects the levels of anxiety and depression that they experience during confinement.[124] In addition, Jason Schnittker and his colleagues have shown

---

Bruce Western & Steve Redburn eds., 2014); THE EFFECTS OF IMPRISONMENT (Alison Liebling & Shadd Maruna eds., 2005). In addition, there are numerous empirical studies and published reviews of the available literature. *See, e.g.*, Craig Haney, *Prison Effects in the Era of Mass Incarceration*, 20 PRISON J. 1 (2012) [hereinafter Haney, *Prison Effects*]; Diana Johns, *Confronting the Disabling Effects of Imprisonment: Toward Prehabilitation*, 45 SOC. JUST. 27 (2018).

[122] Alison Liebling, Linda Durie, Annick Stiles & Sarah Tait, *Revisiting Prison Suicide: The Role of Fairness and Distress*, *in* THE EFFECTS OF IMPRISONMENT, *supra* note 121, at 216.

[123] Although the orders of magnitude vary as a function of the different prevalence estimates for both the general and incarcerated populations, no researchers doubt that "inmate rates of PTSD are substantially higher than rates in the general population." Laura E. Gibson, John C. Holt, Karen M. Fondacaro, Tricia S. Tang, Thomas A. Powell & Erin L. Turbitt, *An Examination of Antecedent Traumas and Psychiatric Comorbidity Among Male Inmates with PTSD*, 12 J. TRAUMATIC STRESS 473, 474 (1999); *see also* Ashley Goff, Emmeline Rose, Suzanna Rose & David Purves, *Does PTSD Occur in Sentenced Prison Populations? A Systematic Literature Review*, 17 CRIM. BEHAV. & MENTAL HEALTH 152 (2007); Carolyn J. Heckman, Karen L. Cropsey & Tawana Olds-Davis, *Posttraumatic Stress Disorder Treatment in Correctional Settings: A Brief Review of the Empirical Literature and Suggestions for Future Research*, 44 PSYCHOTHERAPY: THEORY, RES., PRAC., TRAINING 46 (2007); Nancy Wolff, Jessica Huening, Jing Shi & B. Christopher Frueh, *Trauma Exposure and Posttraumatic Stress Disorder Among Incarcerated Men*, 91 J. URB. HEALTH 707 (2014). A recent international meta-analysis of the prevalence of PTSD among prisoners estimated it to be five times greater among imprisoned men and eight times greater among imprisoned women than in the general population. Gergo Baranyi, Megan Cassidy, Seena Fazel, Stefan Priebe & Adrian P. Mundt, *Prevalence of Posttraumatic Stress Disorder in Prisoners*, 40 EPIDEMIOLOGIC REV. 134, 142 (2018).

[124] *See, e.g.*, Colin Cooper & Sinéad Berwick, *Factors Affecting Psychological Well-Being of Three Groups of Suicide-Prone Prisoners*, 20 CURRENT PSYCHOL. 169 (2001). It is important to be reminded exactly what such stress consists of. For example, noting that "[n]o one leaves unscarred," Mika'il DeVeaux has provided a powerful firsthand account of the traumatic nature of the prison life he experienced, one whose aftereffects he still struggled to overcome long after his release: "I found the

that many of these psychiatric symptoms (especially anxiety- and depression-related disorders) persist long after release and represent significant obstacles to successful reentry.[125]

Moreover, the experience of imprisonment is so stressful that it adversely affects prisoners' physical health. Having been in prison can increase rates of morbidity, especially the likelihood of contracting infectious and stress-related illnesses.[126] It also affects mortality rates.[127] In fact, Evelyn Patterson's study of persons released from prison in New York State concluded that each year spent in prison reduced a person's life span by two years.[128] As I noted, many of the adverse effects on physical and mental health are long-lasting, persisting well beyond a person's time in prison.[129]

Thus, the assertion that incarceration in general produces only "small to moderate" negative effects is flatly incorrect. In this context, however, it

---

prison experience traumatic because of the assaults and murders I witnessed while incarcerated, because of the constant threat of violence, because of the number of suicides that took place, and because I felt utterly helpless about the degree to which I could protect myself." DeVeaux, *supra* note 103, at 257, 264–65.

[125] Jason Schnittker, *The Psychological Dimensions and the Social Consequences of Incarceration*, 651 ANNALS AM. ACAD. POL. & SOC. SCI. 122, 135–36 (2014); Kristin Turney, Christopher Wildeman & Jason Schnittker, *As Fathers and Felons: Explaining the Effects of Current and Recent Incarceration on Major Depression*, 53 J. HEALTH & SOC. BEHAV. 465, 466 (2012); *see also* Shelley Johnson Listwan, Mark Colvin, Dena Hanley & Daniel Flannery, *Victimization, Social Support, and Psychological Well-Being: A Study of Recently Released Prisoners*, 37 CRIM. JUST. & BEHAV. 1140 (2010).

[126] *See, e.g.*, Michael Massoglia & Brianna Remster, *Linkages Between Incarceration and Health*, 134 PUB. HEALTH REPS. 8S, 10S (2019) (Supplement I); Michael Massoglia, *Incarceration as Exposure: The Prison, Infectious Disease, and Other Stress-Related Illnesses*, 49 J. HEALTH & SOC. BEHAV. 56, 57 (2008).

[127] *See, e.g.*, Ingrid A. Binswanger, Marc F. Stern, Richard A. Deyo, Patrick J. Heagerty, Allen Cheadle, Joann G. Elmore & Thomas D. Koepsell, *Release from Prison—A High Risk of Death for Former Inmates*, 356 NEW ENG. J. MED. 157, 159–61 (2007).

[128] Evelyn J. Patterson, *The Dose-Response of Time Served in Prison on Mortality: New York State, 1989–2003*, 103 AM. J. PUB. HEALTH 523, 523 (2013) [hereinafter Patterson, *The Dose-Response of Time Served in Prison on Mortality*].

[129] *See, e.g.*, Paul C. Archibald, *Criminal Justice Contact, Stressors, and Depressive Symptoms Among Black Adults in the United States*, 43 AM. J. CRIM. JUST. 486, 488 (2018); Shervin Assari, Reuben Jonathan Miller, Robert Joseph Taylor, Dawne Mouzon, Verna Keith & Linda M. Chatters, *Discrimination Fully Mediates the Effects of Incarceration History on Depressive Symptoms and Psychological Distress Among African American Men*, 5 J. RACIAL & ETHNIC HEALTH DISPARITIES 243, 246 (2018); Robynn Cox, *Mass Incarceration, Racial Disparities in Health, and Successful Aging*, 42 J. AM. SOC'Y ON AGING 48, 51 (2018); Adrian Grounds & Ruth Jamieson, *No Sense of an Ending: Researching the Experience of Imprisonment and Release Among Republican Ex-Prisoners*, 7 THEORETICAL CRIMINOLOGY 347, 351, 354–56 (2003); Yujin Kim, *The Effect of Incarceration on Midlife Health: A Life-Course Approach*, 34 POPULATION RES. POL'Y REV. 827, 829 (2015); Turney et al., *supra* note 125, at 466; Tomoko Udo, *Chronic Medical Conditions in U.S. Adults with Incarceration History*, 38 HEALTH PSYCHOL. 217, 217–18 (2019).

is important to keep in mind that whether or not the adverse effects of solitary confinement are nearly equal to or perhaps much greater than the effects of incarceration generally, they are experienced in addition to the baseline effects of imprisonment. In this way, the harmfulness of solitary confinement represents an *increment* of suffering and harm that is always incurred above and beyond the deleterious effects of imprisonment per se, which are already experienced by prisoners who are, by definition, already incarcerated at the time they are placed in solitary confinement.

This fact was underscored by a study I conducted several years ago at Pelican Bay State Prison, comparing the number and intensity of symptoms of psychological stress, trauma, and isolation-related psychopathology between a sample of long-term isolated prisoners and a sample of long-term general population prisoners.[130] I used a structured interview and systematic assessment format to identify the symptoms they were experiencing and selected the sample participants randomly to ensure their representativeness (except that I explicitly excluded persons suffering from diagnosed mental health problems at the time the study was conducted).[131] Because of the harshness of the mainline maximum security prison from which the general population prisoners were drawn—which a number of them described as "the worst" they had ever been in—the comparison between the groups represented an especially stringent test of the effects of long-term solitary confinement.[132] An additional factor that added to the stringency of this

---

[130] The isolated prisoners had spent ten years or more in continuous solitary confinement at the Pelican Bay Security Housing Unit, and they were compared to the general population prisoners (then housed at the Pelican Bay maximum-security mainline prison) who had spent ten years or more in continuous imprisonment. All of the prisoners in both groups were otherwise mentally healthy; that is, no one from either group was currently on the prison system's mental health caseload. The details of this study are described in Haney, *Restricting Solitary Confinement*, *supra* note 8, at 291–92, and Haney, *Solitary Confinement, Loneliness, and Psychological Harm*, *supra* note 24, at 134–38.

[131] Largely as a result of a federal court decision, no prisoner on the California Department of Corrections and Rehabilitation's mental health caseload was permitted to be housed in the solitary confinement facility at Pelican Bay. Madrid v. Gomez, 889 F. Supp. 1146 (N.D. Cal. 1995). To ensure comparability of the samples in this respect, no long-term general population prisoner currently on the mental health caseload was included in the study.

[132] The conditions of confinement in the maximum-security prison from which the general population prisoners were selected were severe. They were virtually all double-celled inside standard general population cells, were "cell fed" (i.e., they ate all of their meals in their cells rather than in a common dining hall), had very limited "out-of-cell time," could obtain access to only a restricted number of "jobs" (e.g., working in the kitchen, barber shop, or serving as a tier tender), and could enroll in only a single educational class. In addition, because the general population facility was located in the same geographically remote location as the solitary confinement facility, general population prisoners, like their solitary confinement counterparts, also tended to have relatively few visitors. However, unlike the solitary confinement prisoners, those in general population were allowed to congregate through "dayroom" time, outdoor group exercise, and to have contact visits. *See* Haney, *Restricting Solitary*

comparison was the fact that many general population prisoners had themselves spent long periods (for some, years) confined in one or another solitary confinement unit before their current nonsolitary housing assignment. For some of them, this included previously having spent time in the Pelican Bay solitary confinement unit under study.[133]

Given the severity of the overall conditions to which both groups of prisoners were subjected, it was not surprising to learn they all acknowledged some degree of suffering and distress. Yet there was absolutely no comparison in the levels reported by the general population versus isolated prisoners. On nearly every single specific dimension measured, the prisoners currently in solitary confinement were in significantly more pain, were more traumatized and stressed, and manifested far more isolation-related pathological reactions. Thus, they not only reported experiencing significantly more stress and trauma-related symptoms[134] and significantly more isolation-related indices of pathology,[135] but the orders of magnitude were quite large. The isolated prisoners reported nearly twice as many symptoms overall as compared to those in the general population.

In addition to determining the presence or absence of a symptom, I also asked prisoners to estimate the frequency with which they had been bothered by these symptoms over approximately the last three-month period (as a way of gauging intensity or the degree to which they suffered from the particular symptom or underlying problem).[136] With the exception of headaches, which were reported at reasonably high levels of intensity for both groups, the only symptoms on which there were no significant differences between the solitary confinement and general population prisoners pertained almost exclusively to symptoms that were reported very infrequently by both groups (e.g., fainting, suicidality). In fact, the mean intensities of the reported

---

*Confinement*, *supra* note 8, at 291–92; Haney, *Solitary Confinement, Loneliness, and Psychological Harm*, *supra* note 24, at 134–38.

[133] Many of the general population prisoners who had been in solitary confinement in the past acknowledged the lasting aftereffects of isolation. Some attributed at least some of the problems and symptoms that they were currently experiencing to the time that they had spent in solitary confinement and acknowledged struggling to overcome these effects (including impaired social relations and persistent feelings of loneliness) once released from isolation. *See* Haney, *Restricting Solitary Confinement*, *supra* note 8, at 291–92; Haney, *Solitary Confinement, Loneliness, and Psychological Harm*, *supra* note 24, at 134–38.

[134] These symptoms included experiencing anxiety, lethargy, troubled sleep, heart palpitations, and a sense of impending breakdown. *See* Haney, *Restricting Solitary Confinement*, *supra* note 8, at 291–93.

[135] These symptoms included depression, uncontrolled ruminations, impaired thought processes, and social withdrawal. *Id.*

[136] Prisoners who reported suffering from a symptom were asked whether they experienced it rarely, sometimes, often, or constantly. *Id.*

symptoms were not only significantly different between the groups, but also nearly or more than double for the prisoners in solitary confinement as compared to those prisoners housed in general population.

It is also important to note that the painful, traumatic, and harmful experience of imprisonment is endured by many persons who have suffered a disproportionate number of adverse experiences *before* incarceration. They are thus especially vulnerable to the "retraumatization" of prison.[137] As Cherie Armour summarized: "[P]re-existing traumatic experiences are common in both male and female prisoners which are further exacerbated by traumas experienced within prison."[138] The same can be said of prisoners confined in solitary confinement, who are traumatized yet again by the added stress and deprivation imposed by social isolation.[139]

## IV. THE LEGACY OF SOLITARY CONFINEMENT: THE PERSISTENCE OF ISOLATION EFFECTS

Another way to minimize the harmfulness of solitary confinement is to assume that, however unpleasant the experience may be, its effects will dissipate over time once a prisoner is moved to a different and better setting, either into a mainline prison or through release back to free society. Thus, apologists for the practice argue "the effects of [solitary] confinement are

---

[137] For a discussion of the role of preprison risk factors and traumas in the etiology of criminal behavior that can lead to imprisonment, see Craig Haney, CRIMINALITY IN CONTEXT: THE PSYCHOLOGICAL FOUNDATIONS OF CRIMINAL JUSTICE REFORM (2020).

[138] Cherie Armour, *Mental Health in Prison: A Trauma Perspective on Importation and Deprivation*, 5 INT'L J. CRIMINOLOGY & SOC. THEORY 886, 891 (2012); *see also* Andy Hochstetler, Daniel S. Murphy & Ronald L. Simons, *Damaged Goods: Exploring Predictors of Distress in Prison Inmates*, 50 CRIME & DELINQ. 436 (2004) (finding that there were significant interrelationships between preprison and prison trauma that had lasting postprison effects); Alison Liebling, *Vulnerability and Prison Suicide*, 35 BRIT. J. CRIMINOLOGY 173 (1995); Benjamin Meade & Benjamin Steiner, *The Effects of Exposure to Violence on Inmate Maladjustment*, 40 CRIM. JUST. & BEHAV. 1228, 1230 (2013) (finding that exposure to various forms of violence before incarceration adversely affects adjustment to prison); Merry Morash, Seokjin Jeong, Miriam Northcutt Bohmert & Daniel R. Bush, *Men's Vulnerability to Prisoner-on-Prisoner Violence: A State Correctional System Case Study*, 92 PRISON J. 290, 299–304 (2012) (finding that the strongest predictor of whether a male prisoner was sexually victimized in prison was having had a history of childhood sexual abuse).

[139] Not surprisingly, the stressfulness of prison life in general and solitary confinement in particular impacts persons with preexisting vulnerabilities even more acutely and can lead to heightened levels of suicidality. *See, e.g.*, Ronald L. Bonner, *Stressful Segregation Housing and Psychosocial Vulnerability in Prison Suicide Ideators*, 36 SUICIDE & LIFE-THREATENING BEHAV. 250, 252 (2006); Eric Lanes, *The Association of Administrative Segregation and Other Risk Factors with the Self-Injury-Free Time of Male Prisoners*, 48 J. OFFENDER REHABILITATION 529, 533 (2009); Raymond F. Patterson & Kerry Hughes, *Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999 to 2004*, 59 PSYCHIATRIC SERVS. 676, 677–78 (2008).

negative but do not produce 'lasting emotional damage.'"[140] Unfortunately, this misapprehends the nature of prison effects generally and the effects of solitary confinement more specifically. Some of the worst effects of incarceration derive from the forced accommodations prisoners must make to the atypical and dehumanizing nature of prison life. Sometimes termed "prisonization," the necessary adaptations to the pains of imprisonment require prisoners to undergo a series of psychological changes that are often difficult to relinquish upon release, when these habits and ways of being are no longer needed or even functional. They represent the psychic aftereffects of incarceration that may significantly interfere with successful reintegration into the world outside prison.[141] This is especially true when formerly incarcerated persons enter free society without proper preparation or ongoing transitional services designed to help them traverse the psychological, social, and economic barriers they are likely to confront.

In fact, as implied by my discussion of the impact of imprisonment per se in Part III, there is now extensive research documenting the long-lasting consequences of incarceration, ones that can undermine a formerly incarcerated person's quality of life. They contribute to the difficulties many face in attempting to avoid a return to prison, as well as in ensuring their physical and mental health and enabling them to become contributing members of society. Some of the lasting effects of time spent in prison impact formerly incarcerated persons directly on a personal and psychological level.[142] Other adverse effects impair the nature and stability of the relationships that formerly incarcerated persons are able to initiate and maintain.[143] Still others relate directly to the negative health consequences

---

[140] Gendreau & Labrecque, *supra* note 115, at 350 (taking issue with the contrary observation of psychiatrist Terry Kupers).

[141] *See, e.g.*, STEPHEN J. BAHR, RETURNING HOME: REINTEGRATION AFTER PRISON OR JAIL (2015); Craig Haney, *The Psychological Impact of Incarceration: Implications for Postprison Adjustment* [hereinafter Haney, *The Psychological Impact of Incarceration*], *in* PRISONERS ONCE REMOVED: THE IMPACT OF INCARCERATION AND REENTRY ON CHILDREN, FAMILIES, AND COMMUNITIES 33 (Jeremy Travis & Michelle Waul eds., 2003); Christy A. Visher & Jeremy Travis, *Transitions from Prison to Community: Understanding Individual Pathways*, 29 ANN. REV. SOC. 89 (2003).

[142] *See, e.g.*, HANEY, REFORMING PUNISHMENT, *supra* note 121; Haney, *Prison Effects*, *supra* note 121; Haney, *The Psychological Impact of Incarceration*, *supra* note 141; Michael Massoglia & William Alex Pridemore, *Incarceration and Health*, 41 ANN. REV. SOC. 291, 293 (2015); Schnittker, *supra* note 125; Turney et al., *supra* note 125, at 466.

[143] *See, e.g.*, Holly Foster & John Hagan, *Supportive Ties in the Lives of Incarcerated Women: Gender, Race/Ethnicity, and Children's Human Rights*, 17 J. GENDER RACE & JUST. 257, 258 (2014); Michael Massoglia & Cody Warner, *The Consequences of Incarceration: Challenges for Scientifically Informed and Policy-Relevant Research*, 10 CRIMINOLOGY & PUB. POL'Y 851, 853 (2011); Kristin Turney, *Hopelessly Devoted? Relationship Quality During and After Incarceration*, 77 J. MARRIAGE &

that compromise their physical well-being.[144] They combine with the social stigma and diminished employment opportunities and other "collateral consequences"[145] of having been imprisoned to create substantial barriers to reintegration and long-term well-being. For example, Sebastian Daza and his colleagues provided a stark summary of the results of their long-term, nationwide study of this issue, stating that they "estimate that incarceration's adult mortality excess translates into a loss of between four and five years of life expectancy at age 40" and that at least some of the "gap in mortality between the United States and peer countries" seems to be attributable to this nation's "differential imprisonment experiences."[146]

Bruce Western and his colleagues have chronicled the numerous structural challenges that formerly incarcerated persons face upon their release from prison. Under the best of circumstances, this stressful transition involves the "anxiety of adjusting to social interaction in a free society under conditions of severe material deprivation."[147] Except in the most carefully implemented reentry programs, however, many who are released from prison are left to navigate these challenges on their own with minimal governmental or outside assistance. Alessandro De Giorgi's compelling narrative of the plight of many formerly incarcerated persons describes them as not only forced to grapple with the stigma of incarceration, but also "scrambling to disentangle themselves from the treacherous grips of chronic poverty, sudden homelessness, untreated physical and mental suffering, and the lack of meaningful social services."[148] There is reason to believe that time spent

---

FAM. 480, 480–81 (2015); Christopher Wildeman, *Parental Imprisonment, the Prison Boom, and the Concentration of Childhood Disadvantage*, 46 DEMOGRAPHY 265, 266 (2009).

[144] *See, e.g.*, Valerio Baćak & Christopher Wildeman, *An Empirical Assessment of the "Healthy Prisoner Hypothesis,"* 138 SOC. SCI. & MED. 187 (2015); Binswanger et al., *supra* note 127, at 159–61; Massoglia, *supra* note 126, at 57; Evelyn J. Patterson, *Incarcerating Death: Mortality in U.S. State Correctional Facilities, 1985–1998*, 47 DEMOGRAPHY 587, 601 (2010); Patterson, *The Dose-Response of Time Served in Prison on Mortality*, *supra* note 128, at 523; David L. Rosen, Victor J. Schoenbach & David A. Wohl, *All-Cause and Cause-Specific Mortality Among Men Released from State Prison, 1980–2005*, 98 AM. J. PUB. HEALTH 2278, 2278 (2008); Jason Schnittker & Andrea John, *Enduring Stigma: The Long-Term Health Effects of Incarceration on Health*, 48 J. HEALTH & SOC. BEHAV. 115, 115–16 (2007).

[145] *See, e.g.*, INVISIBLE PUNISHMENT: THE COLLATERAL CONSEQUENCES OF MASS INCARCERATION (Marc Mauer & Meda Chesney-Lind eds., 2002); Gabriel J. Chin, *The New Civil Death: Rethinking Punishment in the Era of Mass Incarceration*, 160 U. PA. L. REV. 1789 (2012).

[146] Sebastian Daza, Alberto Palloni & Jerrett Jones, *The Consequences of Incarceration for Mortality in the United States*, 57 DEMOGRAPHY 577, 591–92 (2020).

[147] Bruce Western, Anthony A. Braga, Jaclyn Davis & Catherine Sirois, *Stress and Hardship After Prison*, 120 AM. J. SOC. 1512, 1514 (2015).

[148] Alessandro De Giorgi, *Back to Nothing: Prisoner Reentry and Neoliberal Neglect*, 44 SOC. JUST. 83, 88 (2017).

in solitary confinement increases the difficulty of successfully overcoming these barriers.

Although data are mixed on whether time spent in solitary confinement specifically increases postprison criminal behavior (beyond the criminogenic effects of incarceration per se), it surely does not decrease it.[149] Here, too, a more meaningful measure of the extent of long-lasting damage incurred by solitary confinement is the quality of life that prisoners who endured it are able to manage once released.[150] There is evidence that they encounter more serious obstacles to successful reintegration back into free society, and that there are few if any specific programs available that acknowledge their solitary-confinement-related traumas and assist them in overcoming the psychological aftereffects.[151] Solitary confinement survivors suffer postprison adjustment problems at higher rates than the already high rates

[149] *See, e.g.*, H. Daniel Butler, Benjamin Steiner, Matthew D. Makarios & Lawrence F. Travis III, *Assessing the Effects of Exposure to Supermax Confinement on Offender Postrelease Behaviors*, 97 PRISON J. 275, 277–80 (2017); David Lovell, L. Clark Johnson & Kevin C. Cain, *Recidivism of Supermax Prisoners in Washington State*, 53 CRIME & DELINQ. 633, 643–49 (2007); Daniel P. Mears & William D. Bales, *Supermax Incarceration and Recidivism*, 47 CRIMINOLOGY 1131, 1151 (2009); Laurence L. Motiuk & Kelley Blanchette, *Characteristics of Administratively Segregated Offenders in Federal Corrections*, 41 CANADIAN J. CRIMINOLOGY 131, 139–40 (2001); Youngki Woo, Laurie Drapela, Michael Campagna, Mary K. Stohr, Zachary K. Hamilton, Xiaohan Mei & Elizabeth Thompson Tollefsbol, *Disciplinary Segregation's Effects on Inmate Behavior: Institutional and Community Outcomes*, CRIM. JUST. POL'Y REV. 1, 11–14 (2019). The most recent study on this issue concluded that, in comparison to a matched sample of formerly incarcerated persons who had not been housed in solitary confinement during their prison term, solitary confinement survivors suffered "*higher post-release recidivism, proportionately more new commitments for all crime types, and shorter time to rearrest.*" Kristen M. Zgoba, Jesenia M. Pizarro & Laura M. Salerno, *Assessing the Impact of Restrictive Housing on Inmate Post-Release Criminal Behavior*, 45 AM. J. CRIM. JUST. 102, 118 (2020) (emphasis in original).

[150] Most research on the effects of solitary confinement on subsequent in-prison behavior (i.e., in the mainline housing units to which prisoners are returned to serve the remainder of their prison sentences) has focused narrowly on disciplinary infractions. *See e.g.*, Justine A. Medrano, Turgut Ozkan & Robert Morris, *Solitary Confinement Exposure and Capital Inmate Misconduct*, 42 AM. J. CRIM. JUST. 863, 864 (2017); Robert G. Morris, *Exploring the Effect of Exposure to Short-Term Solitary Confinement Among Violent Prison Inmates*, 32 J. QUANTITATIVE CRIMINOLOGY 1, 2 (2016). More broadly, however, a group of Stanford researchers found that behavioral patterns and psychological reactions developed in the course of adapting to solitary confinement were persistent and problematic when formerly long-term isolated prisoners attempted to transition back to mainline prison housing. *See* HUMAN RIGHTS IN TRAUMA MENTAL HEALTH LAB, STANFORD UNIV., MENTAL HEALTH CONSEQUENCES FOLLOWING RELEASE FROM LONG-TERM SOLITARY CONFINEMENT IN CALIFORNIA 10 (2017), https://ccrjustice.org/sites/default/files/attach/2018/04/CCR_StanfordLab-SHUReport.pdf [https://perma.cc/5WGK-UBBN]. Psychiatrist Terry Kupers, who has written extensively about the mental health risks of solitary confinement, has termed the lingering effects of the experience "SHU postrelease syndrome." *See* TERRY ALLEN KUPERS, SOLITARY: THE INSIDE STORY OF SUPERMAX ISOLATION AND HOW WE CAN ABOLISH IT 151–67 (2017).

[151] *See, e.g.*, Daniel Pforte, *Evaluating and Intervening in the Trauma of Solitary Confinement: A Social Work Perspective*, 48 CLINICAL SOC. WORK J. 77, 85 (2020).

experienced by formerly incarcerated persons in general, including being more likely to manifest symptoms of PTSD.[152] In addition, as Lauren Brinkley-Rubinstein and her colleagues reported, formerly incarcerated persons who had spent time in solitary confinement were significantly more likely than other former prisoners to die during their first year of community reentry, especially from suicide, homicide, and opioid abuse.[153]

Western and his colleagues have emphasized the critical role played by "social integration"—not just finding a stable residence and obtaining gainful employment, but also "establishing community belonging"—in facilitating postprison adjustment.[154] They also acknowledged the critical importance of family ties "in normalizing the lives of those coming out of prison."[155] Yet these are precisely the things that time spent in solitary confinement can directly impede. The barriers that are routinely placed on access to telephones and visitation for prisoners in solitary confinement (special procedures and limited times), and the typically impersonal, noncontact nature of the visits (that must often take place "through glass and over phones") interfere with ongoing communication and contact; they serve as significant obstacles to the preservation of meaningful social relationships, beyond those typically encountered by prisoners in general.

In addition, prisoners in solitary confinement are often forced to adopt a range of necessary but ultimately problematic survival strategies. Although they are normal reactions adopted in response to the abnormal social deprivation of solitary confinement, they represent "social pathologies"—learning to live in the absence of others—that can impede subsequent social adjustment. As I have previously described them, these adaptations transcend the immediate and specific indices of pain and suffering that are reflected in studies of the effects of solitary confinement and involve significant changes in prisoners' relationships with others and even with

---

[152] *See e.g.*, Brian O. Hagan, Emily A. Wang, Jenerius A. Aminawung, Carmen E. Albizu-Garcia, Nickolas Zaller, Sylviah Nyamu, Shira Shavit, Joseph Deluca & Aaron D. Fox, *History of Solitary Confinement Is Associated with Post-Traumatic Stress Disorder Symptoms Among Individuals Recently Released from Prison*, 95 J. URB. HEALTH 141, 146 (2018).

[153] Lauren Brinkley-Rubinstein, Josie Sivaraman, David L. Rosen, David H. Cloud, Gary Junker, Scott Proescholdbell, Meghan E. Shanahan & Shabbar I. Ranapurwala, *Association of Restrictive Housing During Incarceration with Mortality After Release*, JAMA NETWORK OPEN, Oct. 2019, https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2752350 [https://perma.cc/6NDF-NQY2]; *see also* Christopher Wildeman & Lars Andersen, *Solitary Confinement Placement and Post-Release Mortality Among Formerly Incarcerated Individuals: A Population-Based Study*, 5 LANCET PUB. HEALTH e107 (2020).

[154] Western et al., *supra* note 147, at 1515.

[155] *Id.*

themselves.[156] Prisoners in solitary confinement are forced into even greater levels of dependency on institutional structures than those in mainline prisons because there is so much less they are allowed to "do" for themselves. The forced asociality they endure can undermine their sense of self, placing them "literally at risk of losing their grasp on who they are," as well as eventually "becom[ing] increasingly unfamiliar and uncomfortable with social interaction."[157] If and when this happens, it will become increasingly difficult for them to undertake the task of social integration that Western and others have identified as crucial to the successful reintegration. Moreover, if the experience of solitary confinement places them at greater risk of remaining at the margins of social life after prison, they are ironically and painfully more likely to incur what we now know are the harmful effects of social isolation and loneliness that befall others in free society.

There is one additional issue that increases the potentially long-lasting negative effects of time spent in solitary confinement—the disproportionate number of mentally ill prisoners who are still being placed there by some prison systems.[158] The explanations for this unfortunate fact are multifaceted and difficult to completely disentangle. For one, persons with mental illness are at greater risk of committing disciplinary infractions and, in prisons that do not properly take their mental health conditions into account, they may be placed in solitary confinement as a result. In addition, some prisoners without preexisting mental health problems may develop them there, while others with underlying but undetected psychological disorders or vulnerabilities may have their conditions greatly exacerbated under the extraordinary stress of isolated confinement. Whatever the origins of their mental health symptoms and problems, these prisoners are all uniquely vulnerable to the harmful effects of solitary confinement. Their heightened vulnerability is precisely why many legal, human rights, mental health, and even correctional organizations have issued recommendations or mandates to exclude the mentally ill from such units.[159] The unfortunate fact that some

---

[156] Craig Haney, *Mental Health Issues in Solitary and "Supermax" Confinement*, 49 CRIME & DELINQ. 124, 139 (2003).

[157] *Id.* at 139–40.

[158] Laura Dellazizzo, Mimosa Luigi, Charles-Édouard Giguère, Marie-Hélène Goulet & Alexandre Dumais, *Is Mental Illness Associated with Placement in Solitary Confinement in Correctional Settings? A Systematic Review and Meta-Analysis*, 29 INT'L J. MENTAL HEALTH NURSING 576, 579 (2020); Reiter, et al., *supra* note 10; Arthur T. Ryan & Jordan DeVylder, *Previously Incarcerated Individuals with Psychotic Symptoms Are More Likely to Report a History of Solitary Confinement*, 290 PSYCHIATRY RES. 113064 (2020).

[159] For example, the United Nations' so-called "Mandela Rules" on the treatment of prisoners prohibits the placement of mentally ill persons in solitary confinement. *See* UNITED NATIONS ON DRUGS

NORTHWESTERN UNIVERSITY LAW REVIEW

backward prison systems still place disproportionate numbers of mentally ill prisoners in solitary confinement means that there will be a number of formerly incarcerated persons who not only eventually reenter society with psychological or emotional problems that may require them to arrange and maintain access to treatment, but also that many of them will be solitary confinement survivors who must cope with its aftereffects as well.[160]

In any event, for mentally ill prisoners and all others released from solitary confinement, one of the most damaging aspects of the experience may well be its capacity to instill a sense of perpetual loneliness. If human beings are "wired to connect," then solitary confinement acts to disconnect those wires. Many people struggle to reconnect them long after returning to a social world and to the routine presence of others in their life. Some cannot successfully do so. Indeed, many prisoners in long-term solitary confinement fear that their ability to form or maintain relationships with other people will atrophy so significantly that it never regenerates. This is in many ways its cruelest and most debilitating long-term consequence, another component of the "social death" so many victims of long-term solitary confinement experience. It means that the experience of solitary confinement is not only a concentrated—indeed, "toxic"—form of social isolation that is harmful in its own right, but one that also has lasting effects, increasing the risk that its victims will be consigned to isolated and lonely lives even after they have been released from prison.

CONCLUSION

Solitary confinement represents a particularly toxic, dangerous subset of a much broader, scientifically well-documented, extremely harmful condition—the deprivation of meaningful social contact. Researchers, public health policymakers, and politicians now understand the adverse effects of social isolation, and many are devising strategies to respond to the very serious threat to personal and even societal well-being that this kind of deprivation represents. The research on this topic is compelling and has burgeoned over the last several decades. The evidence continues to mount

---

& CRIME, THE UNITED NATIONS STANDARD MINIMUM RULES FOR THE TREATMENT OF PRISONERS (THE NELSON MANDELA RULES) 14 (2015), https://www.unodc.org/documents/justice-and-prison-reform/Nelson_Mandela_Rules-E-ebook.pdf [https://perma.cc/62U6-Q4SJ]. Others do as well. *See Solitary Confinement (Isolation)*, NAT'L COMM'N ON CORR. HEALTH CARE (Apr. 10, 2016), http://www.ncchc.org/solitary-confinement [https://perma.cc/3QSS-R4L7]. See also the statement from the 2018 international Santa Cruz Summit, *Santa Cruz Summit, supra* note 8.

[160] Perhaps not surprisingly, formerly incarcerated persons who also suffer from mental illness have more difficulty in generally successfully adjusting to postprison life. *See, e.g.*, Kristin G. Cloyes, Bob Wong, Seth Latimer & Jose Abarca, *Time to Prison Return for Offenders with Serious Mental Illness Released from Prison: A Survival Analysis*, 37 CRIM. JUST. & BEHAV. 175 (2010).

254

that social isolation, social exclusion, loneliness, and the deprivation of caring human touch can and do inflict serious psychological and physical damage.

As this Essay makes clear, nowhere in society are these kinds of social harms inflicted as completely, cruelly, and intentionally than in solitary confinement units. Direct studies of the terrible consequences of prison isolation are but one component of the theoretically coherent and extensive empirical database on which legal and correctional decisionmakers can and should draw in devising policies to address the harmfulness of this dangerous practice. In contrast to the now well-known adverse consequences of social isolation in society at large, the deprivations inflicted in solitary confinement units are truly extreme and forcefully impose many additional kinds of deprivation, ones that worsen the painful and damaging effects of the experience. Moreover, the toxic deprivations of solitary confinement are imposed *in addition to* the already significant and harmful pains of imprisonment per se. The negative consequences of time spent in solitary confinement are hardly *de minimis* or short-lived, but rather have the capacity to incur serious and even life-threatening damage that persists long after the experience of prison isolation, or imprisonment itself, has ended.

There are now unquestionably sound scientific reasons to radically rethink the circumstances under which solitary confinement can be humanely employed if, indeed, it can or ever should be.

NORTHWESTERN UNIVERSITY LAW REVIEW