# EXHIBIT 15

## DECLARATION OF AMELIA L. BIZZARO

I, Amelia L. Bizzaro, declare as follows, pursuant to 28 U.S.C. § 1746:

1. I am an Assistant Federal Public Defender at the Federal Public Defender, District of Nevada. I represent Wesley Paul Coonce Jr., whose death sentence was commuted by President Biden on December 23, 2024.

2. Following the commutation, a BOP attorney told me and other national § 2255 counsel that our commuted clients would be considered for placement within BOP facilities that include federal medical centers, mental health step-down programs, and high security penitentiaries. But that changed after President Trump's executive order directing the Attorney General to "take all lawful and appropriate action to ensure that these offenders are imprisoned in conditions consistent with the monstrosity of their crimes and the threats they pose." In line with that Order, the Attorney General's Memorandum, and meetings between BOP officials and members of the Attorney General's/Deputy Attorney General's Office, I understood that the BOP's directions were now to refer everyone to ADX. Details about those conversations appear below.

3. On April 7, 2010, the government charged Wesley and Charles Michael Hall each with one count of first-degree murder for the death of Victor Castro-Rodriguez at the U.S. Medical Center for the Federal Prisoners in Springfield, Missouri. At the time, Wesley was serving a sentence of life without the possibility of parole for a prior conviction. Following a lengthy trial, the jury found both men guilty and returned verdicts for death. On July 18, 2014, the court formally imposed the death sentences.

4. Wesley timely appealed. On July 25, 2019, the Eighth Circuit affirmed his convictions and sentence. *See United States v. Coonce*, 932 F.3d 623, 632–34 (8th Cir. 2019). Wesley timely filed a petition for writ of certiorari in the United States Supreme Court. While it was pending, the American Association for Intellectual and Developmental Disability (AAIDD) released a new manual on intellectual disability,

changing the definition of age of onset. Wesley filed a supplemental petition asking the Court to remand to the Eighth Circuit for consideration of this new definition. The government agreed. Nonetheless, in an apparently unprecedented decision, the Court ignored the parties' joint request and denied certiorari. *Coonce v. United States*, 142 S.Ct. 25, 30 (2021) (Sotomayor, J., joined by Breyer and Kagan, JJ, dissenting) ("To my knowledge, the Court has never before denied a GVR in a capital case where both parties have requested it, let alone where a new development has cast the decision into such doubt.").

5. On October 23, 2020, the district court for the Western District of Missouri appointed my office, the Federal Public Defender, District of Nevada, and Attorney John Jenab to represent Wesley. I was assigned to the case.

6. On May 6, 2024, Wesley filed a timely § 2255 motion to vacate, set aside or correct sentence and for a new trial under seal.

7. On December 23, 2024, President Joseph Biden commuted Wesley's sentence from death to life without the possibility of parole. In light of this commutation, Wesley voluntarily dismissed his § 2255 motion on January 7, 2025.

8. On January 7, 2025, I participated in a zoom meeting with other national § 2255 counsel and Attorney Chris Synsvoll, an attorney from the Bureau of Prisons.

9. Atty. Synsvoll invited individual defense teams to reach out to him to set up meetings about their cases. I accepted his invitation and emailed him on January 7, 2025, requesting a meeting.

10. At the January 7, 2025, Atty. Synsvoll explained BOP's designation process for determining where clients, like Wesley, whose sentences had been commuted would be transferred within the BOP. He explained it would be an individualized process, which would involve examining clients' pre-sentence reports, and institutional history. Atty. Synsvoll said that individual teams would have the ability to provide input to the BOP about where clients should go.

11. Atty. Synsvoll said that if any teams had specific information they wanted BOP to consider, they should send it to him as soon as possible, but ideally no later than January 10, 2025. Atty. Synsvoll explained that there would be a group of people within BOP reviewing each client individually, and any information a defense team shares with Atty. Synsvoll about their client would be shared with the BOP decision making team. He said the information that would be the most helpful would relate to a client's medical conditions and mental health, whether documented in BOP records or not; adjustment during confinement (including the defense teams' observations that may not be reflected in the records); any incidents that occurred that the defense team wanted to provide context for; the location of family if the family is in contact with the client and frequently visits or those visits would increase (which could include the defense team if the defense team is the only one visiting).

12. He requested the information be provided by memo or letter sent via email.

13. Atty. Synsvoll identified the people most involved in this decision as Rick Stover and Shane Salem and said he was not making this decision. He said the three of them had met the day before and were just beginning the process.

14. Atty. Synsvoll said the sooner defense teams sent him information, the better. Ideally, he said he'd like to receive information by close of business January 10, 2025. He, Mr. Stover and Mr. Salem planned to meet on Tuesday, January 14, 2025, and he wanted the information before that meeting.

15. Mr. Synsvoll explained that BOP would not move the clients within days; it would likely take a few weeks, but he didn't think it would take months.

16. After describing the process, Mr. Synsvoll explained the special programs and placements within the BOP that were possible. He specifically spoke about the secure mental health step down programs at USP-Allenwood and USP-Atlanta, and described the stages of those placements. He also described the

transitional care unit at Allenwood, medical center placements, and other transitional unit programs/step down programs.

17. Atty. Synsvoll also spoke about the incoming change in administration. He didn't think the BOP could move a person off of the Special Confinement Unit (SCU) (federal death row), only for the new administration to send them back. He said he was hard to conceive of sending someone to a SCU when they didn't have a death sentence. He did acknowledge that the new administration could say something like, "everyone to ADX,"[1] but said such a decision "comes with other issues." He noted that the BOP has a lot of policies and protocols in place, which should make it difficult to easily "undo" things done under the current (Biden) administration.

18. Atty. Synsvoll described ADX and said that just because a person was convicted in a prison killing didn't mean that person would automatically be designated to ADX. But, he said, ADX would be considered and a conviction for a prison killing may increase a person's chances of going to ADX. For clients involved in prison killings, Atty. Synsvoll said the BOP would be looking closely at the client's adjustment in the SCU.

19. On January 10, 2025, Attorney John Jenab and I met by Zoom with Atty. Synsvoll to discuss Wesley. Atty. Synsvoll was familiar with Wesley because he had previously testified at Wesley's capital trial about Wesley's appropriate placement within BOP. During the January 10 meeting, Atty. Synsvoll noted that Wesley had been designated as mental health care level 2, but based on his review of Wesley's file it was his opinion that this designation was too low.

20. Atty. Synsvoll said Wesley should be considered for placement at a secure mental health unit at a high security penitentiary. Atty. Synsvoll noted that the most important aspect for placement consideration in Wesley's case was his

---

[1] ADX is the abbreviation for the BOP's supermax prison, which is part of the Federal Correctional Complex in Florence, Colorado.

4

mental health and he invited us to provide any additional information relevant to the placement decision that was not already contained in Wesley's central file. He was also clear that Wesley would be considered for ADX.

21. Atty. Synsvoll explained that during the process of being considered for ADX, Wesley's records would be reviewed by a doctor in psychological services. Because such a review is record based, Atty. Synsvoll explained it was important that Atty. Jenab and I provide any information we had related to Wesley's mental health, especially if we had information that was not reflected in the BOP's Psychology Data System.

22. Atty. Jenab and I told Atty. Synsvoll that Wesley had been diagnosed with intellectual disability and fetal alcohol spectrum disorder (FASD). We confirmed that we planned to provide information about both diagnoses with our submission.

23. Mr. Synsvoll also explained that if the psychologist who performs the record review determines that Wesley is not appropriate for ADX based on his mental health, that finding can be overridden only if the BOP determines he is an extraordinary security risk who can only be managed at ADX. Atty. Synsvoll noted that Wesley's most recent incident reports were from December 2016 and June 2017. Given the length of time that had passed without an incident report, he said it would be hard for BOP to make a finding that Wesley is an extraordinary security risk that can only be managed at ADX.

24. On January 10, 2025, I emailed Atty. Synsvoll a letter from Atty. Jenab and I about Wesley's mental health and the diagnoses we had obtained during our representation of him that were not reflected in his BOP records. We also provided copies of expert reports in support of our letter.

25. On January 28, 2025, I participated in a Zoom meeting with other national § 2255 counsel and Atty. Synsvoll. Atty. Synsvoll confirmed that the process for determining designation that he previously described on January 7,

5

2025 remained in place. The only thing that had changed, he said, was President Donald Trump's executive order, which directed the attorney general's office to review BOP's plan for placement.

26. Atty. Synsvoll explained that the BOP has to present its plan for individual placements to the AG's office for "discussion and approval." The BOP was presenting it to the Office of the Deputy Attorney General (ODAG) on January 30, 2025. He said Acting BOP Director Lathrop would present the BOP's plan to their liaison in the ODAG. Atty. Synsvoll confirmed that the information he received from the individual defense teams would be part of the BOP's presentation. He assured counsel that he put information we sent to him into the right hands. For example, he said mental health information went to people within psychological services. He said he overshared the information with people within the BOP to make sure the right people had it.

27. At the time of the meeting, the rest of the people originally on death row received notice that they were being considered for ADX. Atty. Synsvoll described that as people from within USP Terre Haute reacting to the executive order and without authority. He reiterated that just because a client received notice that ADX was being considered did not mean they were being referred to ADX. Atty. Synsvoll said the BOP stopped the notices when they found out. The original 12 (of which Wesley was one) who got the notice were, at that moment, the only ones who were truly being considered for ADX.

28. Atty. Synsvoll said the BOP is in a holding pattern until they get some direction from the AG's office. He was hopeful that he would get that direction at the upcoming presentation and that he would be able to reach out to everyone with the decision. He did not know what the timing of the ODAG's and Attorney General's "approval" meant—that is, whether the BOP presents to the ODAG and the ODAG makes the decision right then, or whether they would have to wait for a decision from the new attorney general once she was confirmed.

29. Atty. Synsvoll explained that even if the ODAG approved the BOP's recommended individual placements on January 30, 2025, it would take about eight weeks to complete the transfers. If there was no decision on January 30, 2025, then Atty. Synsvoll expected the BOP would leave the meeting with direction and would start the process over again. In that situation, Atty. Synsvoll would reach out to the individual defense teams to discuss specific clients and what additional information was needed.

30. Atty. Synsvoll provided a summary of the 37 clients who had been commuted: two were at Springfield Medical center and would likely remain there, one is already at ADX and there were no plans to move him, which left 34 people who were awaiting designation. Atty. Synsvoll anticipated there were a few people with medical issues that needed to be addressed, but no one else would remain at the Special Confinement Unit (SCU) unless the ODAG said so. If that's the case, it would require a review of the SCU institution supplement, which currently makes it clear the only people who can be on the SCU are those with a current death sentence.

31. I left the meeting at this point to leave for a client visit.

32. On February 11, 2025, I emailed Atty. Synsvoll upon learning that everyone except the "medical" inmates would be sent to ADX. I wrote to find out if Wesley was considered a medical inmate and asked for time for Atty. Jenab and I to speak to him.

33. Around February 12, 2025, I learned from another attorney that all commuted clients were being considered for placement at ADX with the exception of those two with serious medical needs who were already at federal medical centers.

34. On February 19, 2025, Atty. Synsvoll met by zoom with Atty. Jenab. I was unable to attend because I was traveling on another case. I spoke to Atty. Jenab about the meeting and learned that the mental health record review of

7

Wesley's case had been completed and the reviewing doctor determined that Wesley's mental health needs made him ineligible for placement at ADX. We have since been waiting to find out either where he will be placed or if there will be a finding that he is an extraordinary security risk who can only be managed at ADX.

I declare under penalty of perjury the foregoing is true and correct.

Dated: March 27, 2025

_____
Amelia L. Bizzaro