# EXHIBIT 21

# DECLARATION OF MARY M. KINCAID

I, Mary M. Kincaid, hereby declare:

1. I am employed as an Assistant Federal Public Defender at Federal Defender Services of Eastern Tennessee. I was appointed to represent Ricardo Sanchez, Jr. on March 29, 2021. He was indigent at the time of my appointment, and remains indigent.

2. On May 14, 2009, Mr. Sanchez was convicted of in a number of counts involving a conspiracy with the intent to distribute cocaine (21 U.S.C. §§ 841(a)(1), 846); carjacking resulting in death (18 U.S.C. § 2119); and using or carrying a firearm in relation to a crime of violence or drug trafficking crime, or possessing a firearm in furtherance of a crime of violence or drug trafficking crime, and in the course of the same causing death defined as murder (18 U.S.C. § 924(c)(1), (j)). The jury sentenced him to death for two of the carjacking counts, and the Judge imposed life sentences consecutively to the death sentence.

3. On December 23, 2024, President Biden granted Mr. Sanchez clemency and commuted his death sentence to life imprisonment without the possibility of parole.

4. On December 31, 2004, I received an email from a colleague regarding the classification and redesignation of our clients on federal death row after the clemency grant. In a document attached to the email, Chris Synsvoll was listed as a contact at the BOP to provide information for reclassification on behalf of our clients.

5. I emailed Chris Synsvoll and requested a meeting with him. On January 13, 2025, I met with Mr. Synsvoll via Zoom regarding the proposed redesignation of my client, Ricardo Sanchez, Jr.

6. I explained to Mr. Synsvoll that our primary concerns were that a designation had accommodations appropriate for Mr. Sanchez's diagnosis of intellectual disability, as well as a geographic location near his family in West Palm Beach, Florida.

7. The reason for our concern about geographic location is two-fold: one, because we are currently litigating his petition for habeas corpus in the Southern District of Florida, so it would lighten the burden on the U.S. Marshals to have Mr. Sanchez located nearby; and two, Mr. Sanchez is very close to his family, who all reside in West Palm Beach, Florida. Visiting Mr. Sanchez in Terre Haute, Indiana has presented significant financial barriers for his family.

8. Mr. Synsvoll agreed that placement near family can be very helpful to the BOP's interests and assured me that the BOP policy was to designate prisoners as close to home as practicable.

9. Pursuant to 18. U.S.C. § 3621 (b), the BOP should "place the prisoner in a facility as

1

close as practicable to the prisoner's primary residence, and to the extent practicable, in a facility within 500 driving miles of that residence." Mr. Synsvoll seemed aware of that provision and indicated that the BOP would endeavor to place Mr. Sanchez within 500 miles of his home in West Palm Beach. Specifically, we discussed USP-Coleman (High) and FCI-Coleman (Medium) in Sumterville, Florida.

10. Mr. Synsvoll was very interested in the intellectual disability diagnosis and inquired if Mr. Sanchez is designated as such by the BOP. Although the BOP has not given that diagnosis, I discussed with Mr. Synsvoll the various mental health practitioners and medical doctors who have opined that Mr. Sanchez is intellectually disabled.

11. Mr. Synsvoll proposed a few different ideas for Mr. Sanchez's designation, considering the information I gave regarding his intellectual disability.

12. First, Mr. Synsvoll proposed the "Skills Program" at Coleman Medium, as well as the "Skills Program" opening soon at USP Allenwood. He explained that Skills Programs cater to inmates with intellectual disabilities. He said that if Mr. Sanchez completed the Skills program successfully at a location that was not Coleman Medium, he could potentially then be moved to a Medium-Security facility that was geographically closer to West Palm Beach, Florida.

13. Secondly, Mr. Synsvoll proposed a residential treatment program called the "Challenge Program," which he said assisted prisoners with certain disabilities and mental health issues to adjust to the prison setting. I do not recall the location(s) of that program, but it was my understanding that the intent would still be to place Mr. Sanchez as close to West Palm Beach as possible.

14. Mr. Synsvoll appeared concerned about Mr. Sanchez's intellectual disability and seemed to sincerely desire to find a program that fit Mr. Sanchez's needs. Overall, Mr. Synsvoll seemed amenable to finding the most fitting designation for Mr. Sanchez, especially given his significant mental health needs, rather than a one-size-fits-all determination.

15. During our conversation, I told Mr. Synsvoll that I did not think Mr. Sanchez was a candidate for ADX, given his non-violent history. But because I had heard rumors of the possibility of placement at ADX, I asked how likely Mr. Synsvoll thought a placement at ADX was for Mr. Sanchez. He replied that he did not think it was likely.

16. I spoke briefly with Mr. Synsvoll regarding Mr. Sanchez's disciplinary history, pointing out the lack of violent incidents. Mr. Synsvoll indicated that "good time" in the Special Confinement Unit ("SCU") would count in the prisoners' favor in regard to custody classification.

17. I told Mr. Synsvoll that I would follow up with information regarding Mr. Sanchez's intellectual disability, as well as an expert report on Mr. Sanchez's disciplinary

history. The expert, Jack Donson, who was a long-time BOP counselor, opined that Mr. Sanchez's records indicated that he was a generally compliant inmate who would not present problems for staff or a security threat.

18. I left the meeting feeling very positive that the BOP intended to honor the First Step Act's geographic requirement, and that it would make individualized decisions regarding designations. I had the impression that Mr. Synsvoll intended to recommend programs that could help Mr. Sanchez to best navigate this transition, given his particular challenges, including his intellectual disability, and lack of violent history during incarceration.

19. On January 14, 2025, I sent Mr. Synsvoll a letter requesting redesignation to one of the options we spoke about, and further documented the reasons we believed Mr. Sanchez did not need to be placed at ADX or similar maximum security facility. I also sent an excerpt from our clemency petition which summarized Mr. Sanchez's intellectual disability diagnosis. Finally, I sent him an opinion by a BOP expert explaining that Mr. Sanchez's disciplinary record was non-serious, non-violent, and did not present the need for maximum security.

20. On January 20, 2025, President Trump issued the Executive Order entitled, "Restoring the Death Penalty and Protecting public Safety."

21. Shortly after that, we learned that Mr. Sanchez, along with the other prisoners who had been granted clemency, received a referral to ADX.

22. On January 28, 2025, I attended a Zoom meeting for attorneys of clients who were granted clemency, regarding BOP redesignation of those clients. Mr. Synsvoll spoke to the group on the call. He communicated that the ADX notices that were issued right after the Executive Order were given to our clients in error, and that the BOP was still planning to make individualized determinations as to our clients. Mr. Synsvoll expressed that the BOP did not intend to redesignate all of the men given clemency to ADX, and that the majority of them would not be recommended to go to ADX.

23. However, in early February, we were notified that Mr. Sanchez had received another notice of referral for placement at ADX.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true to the best of my knowledge and recollection.

Dated: 4-4-2025

Mary M. Kincaid

3