# EXHIBIT 24

## DECLARATION OF ROBERT LEE

I, Robert Lee, being over the age of eighteen years and competent, declare as follows:

1. I am a lawyer licensed to practice in the Commonwealth of Virginia and the State of Mississippi, including the federal district courts and courts of appeals in those jurisdictions. I represent David Anthony Runyon (BOP# 57997-083).

2. In 2009, a jury in the United States District Court for the Eastern District of Virginia convicted Mr. Runyon on three counts: conspiracy to commit murder-for-hire, 18 U.S.C. § 1958(a); carjacking resulting in death, 18 U.S.C. § 2119; and murder with a firearm in relation to a crime of violence, 18 U.S.C. § 924(c)(1), (j)(1). In November 2023, I was appointed by the United States District Court for the Eastern District of Virginia pursuant to 18 U.S.C. § 3599 to represent Mr. Runyon in post-conviction proceedings, including executive clemency proceedings, relating to these convictions and death sentences imposed in federal court. Mr. Runyon has been in the custody of the United States Bureau of Prisons (BOP) since 2009. Mr. Runyon was entitled to appointment of counsel in all court proceedings related to these charges because he was found to be indigent. He has remained indigent throughout his custody and my representation, and is currently indigent.

3. On December 23, 2024, the President of the United States commuted Mr. Runyon's death sentences to sentences of life without parole. Mr. Runyon's conviction for murder under 18 U.S.C. § 924 is pending appellate review in the United States Court of Appeals for the Fourth Circuit.

4. Because Mr. Runyon no longer has a death sentence, it was my understanding that he would be moved from "death row" at the United States Penitentiary at Terre Haute (USP-Terre Haute) to another facility.

5. In anticipation of such a move, I participated in a January 7, 2025, zoom call in which BOP Supervisory Attorney Chris Synsvoll addressed a number of attorneys representing clients like Mr. Runyon, whose death sentences had been commuted and who were in custody at USP-Terre Haute awaiting transfers. During the call, Mr. Synsvoll advised counsel that the BOP intended to follow its normal process for assessing proper placements for the 37 people who had their death sentences commuted. This would involve a case-by-case review of each client's behavior, history, mental and physical health, criminal convictions, and other factors particular to the inmate under review. He noted that BOP had a range of facilities in which inmates could be placed, and it was BOP's goal to find the right place for each client. He described several special programs at BOP facilities that could be possibilities for placement, like the Life Connections program at USP-Terre Haute. He invited input from counsel on

1

these and any other relevant matters. He said he was prepared to receive this information from counsel and provide it to those at the BOP who would be making the designation decisions. He also offered to meet individually via zoom or phone call with each client's counsel to discuss issues counsel wanted to raise about their respective clients.

6. On January 8, 2025, Elizabeth Peiffer, my co-counsel, and I met via zoom with Mr. Synsvoll, to discuss plans for Mr. Runyon's transition from "death row" at USP- Terre Haute to another facility suitable to his history and circumstances.

7. Mr. Synsvoll advised that decisions about classification and placement for Mr. Runyon (and other former death row prisoners) would be made on an individualized basis and that Mr. Runyon's transition would be reviewed by the "decision team," made up of two of Mr. Synsvoll's superiors at BOP, as well as BOP medical and mental health professionals.

8. Mr. Synsvoll asked what information we wanted to provide to be considered in that individualized review. We stressed two general areas of information: Mr. Runyon's stellar disciplinary record in the BOP as well as in local jails where he had been in custody for years during his trial and post-conviction evidentiary hearing, and his compromised medical condition which left him especially vulnerable in general population prison settings.

9. Mr. Synsvoll looked at materials he had and acknowledged Mr. Runyon's excellent disciplinary record in BOP custody. He communicated that, in his experience, placement at ADX-Florence would not be considered appropriate in light of this record. Mr. Synsvoll estimated that Mr. Runyon would likely be placed at a United States Penitentiary for a period of time before he could be moved to a less-restrictive custodial setting (i.e., a medium-security prison).

10. Mr. Synsvoll invited us to submit descriptions of Mr. Runyon's good behavior in other, less-restricted custodial settings, as well as the nature of his medical condition and its impact. We provided that information, including a declaration from a neuropsychiatrist who has evaluated Mr. Runyon which expresses his professional concern for Mr. Runyon's safety in a general population prison environment.

11. At the January 8, 2025, meeting, we described Mr. Runyon's medical conditions, including encephalomalacia—the death of a portion of his brain, a very serious and permanent condition, seizures, vertigo (which cause imbalance and falls, and for which he has received treatment while in BOP custody), and vision issues.

12. One transition option we discussed briefly was whether Mr. Runyon could be placed in one of the BOP's Federal Medical Centers (FMCs). Mr. Synsvoll advised that FMCs

are like hospitals and may not be suitable for Mr. Runyon because he did not appear to need acute medical care at the moment like, for example, a person in need of radiation treatment for cancer. Mr. Synsvoll said it was possible to look into whether Mr. Runyon might be more accurately classified as a medical care level 3, which could affect his placement. Based on the information we provided, Mr. Synsvoll said that Mr. Runyon's current classification as medical care level 2 might be lower than it should and not reflect the level care Mr. Runyon may need.

13. Regarding placement at a BOP facility other than an FMC, Mr. Synsvoll advised that it was unlikely Mr. Runyon could start at a medium-security facility without first spending time in custody in an open USP level prison environment. Mr. Synsvoll advised, however, that it is reasonable to expect that Mr. Runyon would be sent to an open penitentiary. Mr. Synsvoll offered that, based on Mr. Runyon's excellent disciplinary record, he seems like a good candidate to get to a medium level security facility eventually.

14. In terms of other alternatives for placements, Mr. Synsvoll offered that the Life Connections program at USP-Terre Haute could be a good fit for Mr. Runyon. Mr. Synsvoll explained that Life Connections is a faith-based program that is focused on life skills and reintegration. He said that Mr. Runyon's good behavior and strong Christian faith and spirituality made him a promising candidate for this program.

15. On January 28, 2025, I participated in a second group call with Mr. Synsvoll and attorneys representing clients whose death sentences were commuted in December 2024. Those attorneys explained that their clients were reporting that they had been told that were going to be referred to the "super maximum-security" facility at the correctional complex in Florence, Colorado, commonly referred to as "ADX." Mr. Synsvoll responded that nothing had changed in the process the BOP would follow in making appropriate placements for clients, or in the BOP's goal to find the right placement for each client. He said there was no plan for immediate blanket designations to ADX at that time.

16. Mr. Synsvoll explained that now, following President Trump's Executive Order, the BOP would be required to submit their plans for placement to the Deputy Attorney General at the U.S. Department of Justice for discussion and approval. He mentioned that he still had the materials counsel had provided about their clients, and had assembled his own information as part of a presentation to be made to the Deputy Attorney General later that week on January 30. Mr. Synsvoll noted that this additional level of review was new, and had not been a part of previous reviews, referrals or placement decisions. Mr. Synsvoll described the BOP's review as being in a "holding pattern"; BOP had reached the end of its review and decision process, and now was waiting for responses from the Deputy Attorney General and/or the Attorney General.

17. As of the January 28 zoom call, Mr. Synsvoll offered that some of the clients would be referred for placement at ADX, but the BOP was referring others—20 or so—for placement at United States Penitentiaries. He said it was likely that inmates transferred to USPs would have to spend 12 to 18 months at such a facility before being moved to a lower security placement, i.e., an FCI.

18. As of March 20, 2025, Mr. Runyon has not received notice that he would be transferred to ADX.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my recollection.

_____          March 26, 2025
Robert Lee

4