# EXHIBIT 25

## DECLARATION OF ELIZA MEREDITH

I, Eliza Meredith, hereby declare the following:

1. I am an attorney in the Arkansas Federal Public Defender's Office, which is appointed to represent Norris G. Holder, Jr. under 18 U.S.C. § 3599. Mr. Holder was indigent at the time of appointment under § 3599, and he remains indigent. I was assigned to Mr. Holder's case in August 2023. Following President Biden's commutation of Mr. Holder's death sentence and before President Trump's Executive Order, I was initially told by a Bureau of Prisons ("BOP") official that Mr. Holder would be redesignated pursuant to BOP policy and that the BOP had determined that he would be sent to a U.S. Penitentiary. After the Executive Order and Attorney General's memorandum were issued, the BOP official told me that Mr. Holder should expect to be sent to the Administrative Maximum Facility in Florence, Colorado ("ADX"). The following paragraphs contain details of those conversations.

2. In 1998, Mr. Holder was convicted and sentenced to death in the Eastern District of Missouri for bank robbery resulting in death, in violation of 18 U.S.C. §§ 2113(a) and (e), and for carrying a firearm during a crime of violence resulting in death, in violation of 18 U.S.C. §§ 924(c) and (j). For the past 26 years, Mr. Holder has been incarcerated in the Special Confinement Unit ("SCU") at the U.S. Penitentiary ("USP") in Terre Haute, Indiana.

3. On December 23, 2024, President Joseph R. Biden, Jr. granted Mr. Holder clemency and commuted his death sentences to sentences of life imprisonment without the possibility of parole.

4. In the days following the commutation, my focus shifted to Mr. Holder's future institutional placement. On December 31, 2024, I learned that Chris Synsvoll would be the primary point of contact at the BOP for questions regarding the classification and placement of Mr. Holder and the 36 other men whose death sentences were commuted by President Biden.

5. **On January 6, 2025**, my co-counsel, Madeline Cohen, and I spoke with Mr. Synsvoll over Zoom for approximately thirty minutes. Mr. Synsvoll explained that the process the BOP was using to determine where Mr. Holder and the other commuted death row prisoners should be transferred would be similar to the process the BOP uses to classify and place incoming prisoners. The BOP would look at Mr. Holder's convictions, his background, his mental health and medical needs, his institutional history (including his past programming and any disciplinary history), and any specific security concerns such as gang involvement to ensure his placement in a safe and appropriate setting where he would transition well into a general population prison. Mr. Synsvoll encouraged me to submit a summary of Mr. Holder's background and prior programming to assist in the designation process.

6. Mr. Synsvoll informed us that based on his preliminary review of Mr. Holder's BOP records, it appeared he was a strong candidate for placement at a

2

BOP facility other than ADX. Mr. Synsvoll suggested that Mr. Holder could go to a lower security or population-type setting depending on the programming. Mr. Synsvoll stated that an FCI-Medium might even be considered.

7. Mr. Synsvoll encouraged us to prepare a memorandum summarizing any information relevant to Mr. Holder's classification or placement that might be helpful to the BOP in making its determination.

8. I asked Mr. Synsvoll whether the BOP would consider the First Step Act provision requiring that federal prisoners be placed within 500 miles of their last address, barring special security overrides. I explained that Mr. Holder has strong family relationships in St. Louis, Missouri. Mr. Synsvoll explained that the BOP would take this into consideration and encouraged us to highlight these facts in our memorandum about Mr. Holder.

9. In our discussion, I highlighted that Mr. Holder is a nonviolent individual whose crime was rooted in trauma and desperation for a functional prosthetic leg. I emphasized Mr. Holder's genuine and enduring remorse, his acceptance of responsibility, and the fact that he did not kill the victim in his case. I also stressed his absence of any gang ties before or after coming to prison and his strong religious faith and desire to help others. Mr. Synsvoll stated that this was helpful information and would be considered in the designation process; he encouraged us to include this information in our written memorandum about Mr. Holder.

10. I asked Mr. Synsvoll if Mr. Holder should anticipate restrictive housing at any point during the process of moving to a new, long-term placement. Mr. Synsvoll said that Mr. Holder's designation would probably have him move directly into an open housing or a population housing unit absent some other security or safety reason that would warrant placement into restrictive housing.

11. Mr. Synsvoll said the BOP would be meeting later that same day and throughout the week. He advised that the BOP hoped to be able to move quickly to classify and designate the former death-sentenced prisoners, particularly those who would not be referred for placement at ADX.

12. **On January 7, 2025**, I attended a group Zoom with Mr. Synsvoll and attorneys for the other 36 men whose death sentences were commuted. Mr. Synsvoll reiterated that the designation process would involve the consideration of multiple factors, and he encouraged legal teams to submit information about their clients to assist with placement at the most appropriate BOP facility. Mr. Synsvoll explained that while he would be the BOP point-person throughout this process, the actual decisionmakers would be Rick Stover, Senior Deputy Assistant Director of the Designation and Sentence Computation Center, and Shane Salem, Assistant Direct for the Correctional Programs Division. Mr. Synsvoll also discussed specific programs that are available at certain BOP facilities that might be appropriate for some of the 37 commuted prisoners, such as programs designed for individuals with serious mental illness, programs for older prisoners, and programs for prisoners

whose institutional history indicated a strong commitment to faith-based programming and public service.

13. **On January 8, 2025**, Ms. Cohen submitted to Mr. Synsvoll by email a five-page memorandum regarding Mr. Holder. As highlighted in the memorandum, Mr. Holder had requested placement through a BOP application process into the Life Connections Program at USP Terre Haute and was awaiting an interview. Mr. Holder had previously participated in the House of Healing program, which is related to Life Connections. Placement in the Life Connections program would enable Mr. Holder to remain relatively close to his family and friends in St. Louis, and to continue his progress in faith-based, trauma-informed programming with an emphasis on community service. For these reasons, we strongly encouraged Mr. Synsvoll and the BOP to consider designating Mr. Holder for placement in the Life Connections program.

14. **On January 15, 2025**, Ms. Cohen sent Mr. Synsvoll an email, copying me, with additional information regarding Mr. Holder. Ms. Cohen relayed that during a visit earlier in the week, Mr. Holder advised her that he "very much wants to participate in Life Connections, and is open to participating in the Life Connections program at another facility, even if that means he would be farther from his family during the time he is in that program." Ms. Cohen also requested confirmation from Mr. Synsvoll that he received the message as well as the detailed memorandum submitted the prior week, on January 8, 2025.

15. **On January 22, 2025**, Mr. Synsvoll confirmed receipt of the materials sent regarding Mr. Holder. Mr. Synsvoll wrote in an email that he "did receive everything and shared the information with each of the persons involved in the designation process. The information was shared with those persons yesterday morning."

16. **On January 27, 2025**, Ms. Cohen and I spoke with Mr. Synsvoll over Zoom again regarding the status of Mr. Holder's classification and designation to a new facility. One week before our meeting, on January 20, 2025, President Donald J. Trump had issued an Executive Order, entitled "Restoring The Death Penalty And Protecting Public Safety." The Executive Order directed the Attorney General to "evaluate the places of imprisonment and conditions of confinement for each of the 37 murderers whose Federal death sentences were commuted by President Biden, and . . . [to] take all lawful and appropriate action to ensure that these offenders are imprisoned in conditions consistent with the monstrosity of their crimes and the threats they pose." Mr. Synsvoll confirmed that Mr. Holder, along with nearly everyone else on the federal row, had since received a notice of psychological evaluation for possible placement at ADX.

17. Mr. Synsvoll clarified that these notices did not mean the BOP had referred Mr. Holder or most of the other former death row prisoners for placement at ADX. According to Mr. Synsvoll, staff at USP Terre Haute distributed the notices without any direction from central office simply based on reading the Executive Order. Mr. Synsvoll said that while twelve of the former death row prisoners, not

6

including Mr. Holder, had received notices of psychological evaluation for *possible* referral to ADX prior to January 20, 2025, neither those men nor any of the others had, in fact, been *referred* for placement at ADX, a determination that requires significant advance procedures.

18. Mr. Synsvoll stated that because of the Executive Order, the BOP had been directed to present to the Office of the Deputy Attorney General ("ODAG") a proposal or plan regarding how each of the 37 former death row prisoners should be classified and designated. Mr. Synsvoll told us he had just gotten off a call with the Assistant Director of Correctional Programs, and his understanding was that Acting Director Lothrop would present the BOP's proposal or plan to the ODAG on Thursday, January 30. Mr. Synsvoll said that the point-person at the ODAG would be Paul Perkins, who was a Trump appointee.

19. Mr. Synsvoll advised us that his understanding was that since the issuance of the Executive Order, the options under consideration for the 37 men now included some sort of mass placement at ADX.

20. When Ms. Cohen suggested that President Trump's Executive Order had put the BOP in a difficult position, Mr. Synsvoll nodded his head in agreement.

21. Mr. Synsvoll stated that the BOP was going to try to be candid with the ODAG about the Bureau's view of the most appropriate placements for the commuted prisoners based on security needs and institutional resources. He said that ADX is a prison with a specific security and programming mission, one he was very familiar with based on his many years working at the Florence BOP complex.

He said the BOP did not want to house prisoners at ADX who do not need the security and control that facility provides. Accordingly, he advised us, the BOP planned to inform the ODAG that it needed the latitude to place these 37 prisoners in facilities appropriate to their security needs and based on institutional resources.

22. Specific to Mr. Holder, Mr. Synsvoll assured us that a placement in the Life Connections program was still on the table. Mr. Synsvoll shared that he had been maintaining a detailed spreadsheet with information and placement recommendations specific to Mr. Holder and the other 36 men whose death sentences were commuted.

23. Mr. Synsvoll again stated that Mr. Holder was someone who did not need to be at ADX. However, Mr. Synsvoll said that if Mr. Holder were to be referred to ADX, he would likely be placed in a unit known colloquially as the "AARP unit," a unit for older, well-behaved prisoners that is less restrictive. He also indicated that initial placement in an FCI-Medium was no longer reasonable to expect.

24. **On January 28, 2025**, I attended another group Zoom with Mr. Synsvoll and attorneys for the other 36 men whose death sentences were commuted. Mr. Synsvoll relayed much of the same information he had told me the previous day regarding the status of the designation process in the wake of President Trump's Executive Order.

25. Mr. Synsvoll emphasized to the group that no one had been referred to ADX and that the BOP was not starting from scratch: the plan previously discussed

8

on January 7 remained in place (specifically, with the exception of the 12 men who had been referred to ADX prior to the Executive Order, to recommend placement at an appropriate USP), and all materials provided with respect to our clients had been received and shared with relevant decisionmakers within the BOP. According to Mr. Synsvoll, the BOP needed to present the plan to the ODAG for review, discussion, and approval. He said that the BOP was pulling it together in written form to present to the ODAG on Thursday, January 30.

26. Mr. Synsvoll did not think most of the 34 former death-sentenced prisoners who have been housed at the SCU would remain there, but he anticipated that 1-3 individuals would remain at the SCU due to medical holds. He advised that keeping all the men at the SCU indefinitely would require review of an institution supplement which makes clear that only individuals with death sentences can be housed there.

27. Mr. Synsvoll stated that the BOP was continuing to consider all possible facilities for the commuted prisoners' designation, not just ADX. While Mr. Synsvoll indicated that only USPs and secure mental health programs were reasonable to expect as initial designations for these men, he said that after 12-18 months of successful adjustment in a USP, our clients might be able to transfer to lower-security facilities if their unit teams determined that was appropriate and supported removal of the "public safety" factor from their classification.

28. Mr. Synsvoll reiterated the BOP was in a holding pattern until the agency received direction from the ODAG. Mr. Synsvoll explained that if the ODAG

approved the BOP's plan, the expected transfer timeline would be approximately eight weeks for individuals who were moving to facilities other than ADX. Mr. Synsvoll explained that if the ODAG did not approve the BOP's plan, then he would reach out to the group and provide further direction. He also said that, to his knowledge, the ODAG had never been involved in designations.

29. Mr. Synsvoll said that teams could continue submitting information to him about their clients. He encouraged us to submit materials as soon as possible, however, citing another meeting with the ODAG later that week.

30. **On January 29, 2025**, I sent Mr. Synsvoll additional materials regarding Mr. Holder and asked that it be shared with the relevant decisionmakers at the BOP.

31. **On February 11, 2025**, I learned about a rumor that the BOP would refer all of the former death row prisoners to ADX. That day, I sent an email to Mr. Synsvoll seeking confirmation and any information specific to Mr. Holder. I received an automatic reply from Mr. Synsvoll, stating that he was out of the office until February 17. Mr. Synsvoll later emailed back, and we scheduled a time to meet the following week.

32. **On February 20, 2025**, Ms. Cohen and I again spoke with Mr. Synsvoll over Zoom for close to one hour. He explained that the BOP had presented its spreadsheet of recommendations for each of the men to the ODAG, but the proposal had been rejected. Instead, almost all of the commuted prisoners would be referred for placement at ADX, including Mr. Holder. Mr. Synsvoll stated that there

were only two men, both with medical needs requiring their placement at a Medical Facility for Federal Prisoners, who would not be referred to ADX.

33. Mr. Synsvoll explained the procedures the BOP is required to follow before transferring a prisoner to ADX, including a psychological assessment and a hearing. He stated that because of the ODAG's direct involvement in the process, we should assume the outcome of these procedures would be for all of the men other than those going to medical facilities to be transferred to ADX, regardless of their actual security needs.

34. Mr. Synsvoll stated that the Deputy Attorney General and Attorney General were personally involved in making this decision. He indicated that the decision was driven by President Trump's Executive Order and a related memorandum issued by Attorney General Bondi and was not based on the BOP's assessment of the prisoners' security needs or of institutional resources.

35. I asked Mr. Synsvoll if he could tell us what the BOP had recommended for Mr. Holder's designation. Mr. Synsvoll responded that the BOP had recommended Mr. Holder be transferred to the Life Connections Program at USP Terre Haute.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States and Arkansas that the foregoing is true and correct to the best of my knowledge and recollection.

_____
Eliza Meredith

Dated: March 26, 2025