# EXHIBIT 26

Declaration of Kelly Miller
Pursuant to 28 U.S.C. § 1746

1. I am an Assistant Federal Public Defender in the Office of the Federal Public Defender for the Middle District of Pennsylvania. My office was appointed on February 22, 2017, to represent Alejandro Enrique Ramirez Umaña in his proceedings challenging his convictions and sentences under 28 U.S.C. § 2255 in *Umaña v. United States*, 3:16-cv-00057 (W.D.N.C), Following the Biden Administration's commutation of Mr. Umaña's death sentence, a Bureau of Prisons (BOP) official told me, in calls on January 7, 2025, and January 8, 2025, that the commutees would not automatically be sent to ADX, but would be considered for placement options that included federal medical centers, mental health stepdown programs, and high security penitentiaries, and that designation decisions would be made by the BOP. Subsequently, in a conversation in February 2025, the same BOP official told me that BOP understood its directions from the office of the Attorney General/Deputy Attorney General were to refer all of the commutees to ADX.

2. Mr. Umaña was found indigent by the United States District Court for the Western District of North Carolina in July 2010. That indigency finding has remained unchanged for the duration of his proceedings in his criminal case and § 2255 proceedings. In providing this declaration, I am not disclosing and do not intend to disclose any attorney-client privileged communications that I have had with Mr. Umaña in the course of my representation of him.

3. On April 19, 2010, in *United States v. Umaña*, 3:08-cr-134-2 (W.D.N.C.), a jury returned a verdict finding Mr. Umaña guilty of Count 1 (RICO conspiracy, 18 U.S.C. § 1962(d)); Counts 22 and 24 (VICAR murder, 18 U.S.C. § 1959(a)(1)); Counts 23 and 25 (use and possession of a firearm in relation to crimes of violence, 18 U.S.C. §§ 924(c) & (j)(1)); Count 27 (illegal alien in possession of firearm, 18 U.S.C. § 922(g)(5)); Count 28 (robbery affecting interstate commerce, 18 U.S.C. § 1951); Count 61 (conspiracy to commit witness tampering, 18 U.S.C. § 371); and Count 63 (witness tampering, 18 U.S.C. § 1512(b)(1)).

4. On April 28, 2010, the jury returned sentences of death on Counts 22-25. On July 27, 2010, the United States District Court for the Western District of North Carolina entered judgment sentencing Mr. Umaña to death on Counts 22-25; life imprisonment on Count 1; 120 months on Count 27; 240 months on Count 28; 60 months on Count 61; and 240 months on Count 63, with all terms to be served concurrently, except for the sentences of death on Counts 23 and 25, which were to be served consecutively.

5. Mr. Umaña has been confined in the Special Confinement Unit ("SCU") at USP-Terre Haute since 2010.

6. On December 23, 2024, President Joseph R. Biden, Jr., commuted Mr. Umaña's sentences of death to sentences of life imprisonment without the possibility of parole.

7. On January 7, 2025, I attended a meeting, via Zoom, with Federal Bureau of Prisons attorney Christopher Synsvoll and attorneys representing other men whose death sentences had been commuted by President Biden ("the commutees"). The purpose of the meeting was for attorney Synsvoll to advise all present as to the policies and processes that would apply to BOP's rehousing of the commutees.

8. During the January 7, 2025, meeting, Mr. Synsvoll explained that the rehousing of each commutee would be based on their individual circumstances, and described factors that BOP would consider in the redesignation process. He said that the Unit Team in the SCU at USP-Terre Haute would have input about where the commutees would be placed. He said that BOP gave the orders to the SCU Unit Team the day prior to our Zoom meeting to prepare their input. He told us that the Unit Team may need to meet with the commutees as the Unit Team prepared their input, particularly if the commutee had never been housed in BOP general population before.

9. Mr. Synsvoll told us to send him a brief, formal, written submission outlining factors we would like BOP to consider in the redesignation process. BOP personnel, including Mr. Synsvoll, were meeting again on Tuesday (January 15, 2025). Mr. Synsvoll wanted us to send him the written submissions with enough time to allow him to review the submissions prior to the meeting.

10. Mr. Synsvoll told us that the written submission should include anything about our client's medical or mental health that we wanted BOP to consider. Mr. Synsvoll told us that, to be considered in the redesignation process, a Serious Mental Illness (SMI) diagnosis did not need to come from BOP but could come from outside mental health experts. If we had mental health information that we wanted to share with BOP for designation purposes, but needed to otherwise keep confidential because of ongoing litigation in the criminal/2255 cases, Mr. Synsvoll said that we should discuss those concerns with him and try to work out how to keep the information confidential while still providing it to BOP to assist in the redesignation. Mr. Synsvoll stressed that BOP needed the medical and mental health information we had about our clients to make the best redesignation decision possible for each commutee.

11. Mr. Synsvoll told us that the written submission should also include anything about our client's institutional adjustment that was not reflected in BOP's records, including any context we could provide for disciplinary infractions. Mr. Synsvoll told us that BOP would consider institutional adjustment in the redesignation process.

12. Mr. Synsvoll told us that if we wanted BOP to consider a specific institution or region for placement, we should include that request in the written submission. For example, if the commutee had family connections and there were geographic locations that would facilitate family visitation, he told us to tell him that. Mr. Synsvoll also told us that BOP would consider legal team proximity if we asked them to.

13. Mr. Synsvoll told us that he expected it would take a few weeks for BOP to make its redesignation decisions and for transfers of the commutees to begin. He did not anticipate that

the process would take months. He told us that the head of the Designation and Sentence Computation Center would be the final decision maker on placements.

14. Mr. Synsvoll described several possible placement options to us. For example, he told us about the two mental health stepdown units within BOP, one at USP-Allenwood and the other at USP-Atlanta. He told us that if a commutee had SMI, as defined by the BOP program statement, they could qualify for a mental health stepdown unit. He told us that the end goal of the mental health stepdown units is to transition the inmate to an open population institution, typically another USP. He told us that the placement timeline for the mental health stepdown units is usually two to three months and that it might be possible to transfer a commutee with SMI to a mental health facility such as MCFP-Springfield until a bed opened in one of the mental health stepdown units.

15. Mr. Synsvoll also told us about the Secure Stages program, an 18-to-24-month stepdown program focused on people with personality disorders located at USP-Florence. He told us that there was a second Secure Stages unit expected to come online soon at USP-Allenwood.

16. Mr. Synsvoll also told us about the Secure Skills program for inmates with Intellectual Disability. He told us that the Secure Skills program was not yet operational. He hoped that it would be online in the next few months. It would also be located at USP-Allenwood.

17. Mr. Synsvoll also told us about the transitional care unit at USP-Allenwood for inmates who could not step down; the Life Connections program located at Terre Haute; and programs available for elderly inmates.

18. Mr. Synsvoll told us that transitional units are not single celled but are open housing units with a cell mate. However, wardens have discretion to tailor transitional programming to inmate needs. Mr. Synsvoll told us that, if we had expert information supporting the need for single celling of the commutees, we should put that in our written submission to him.

19. Mr. Synsvoll also told us about SHU Alternatives, an alternative to placement in Special Housing Units, which included psychiatric treatment and transition goals. He told us the program focuses on life skills and institutional adjustment and currently existed at medium security facilities, including FCI-Florence Medium. He told us that BOP was exploring whether it could establish additional SHU Alternatives programs at some USPs.

20. Mr. Synsvoll told us that commutees with a Medical Care Level 4 were required to be placed in a BOP medical facility and commutees with a Medical Care Level 3 may be placed in a BOP medical facility. He told us that Mental Health Care Levels 3 and 4 would also be a driving factor in determining placement. I understood that to mean that BOP had options in designating the commutees; that Mental Health Care Levels 3 and 4 would be controlling factors that would guide BOP's designation decisions, and that if I could provide BOP with evidence demonstrating that Mr. Umaña should be classified as a Mental Health Care Level 3 or 4 that this classification could prevent his designation to ADX.

21. Mr. Synsvoll described the facilities at ADX-Florence, including the Control Unit, the general population step down unit, and the unit for elderly inmates. He told us that inmates could be referred to the control unit for a recent, very serious violent act such as murder, serious assault, or escape. The unit for elderly inmates was an available option for inmates 50 years old and older who had no history of violence and currently had space to house additional inmates.

22. Mr. Synsvoll told us that any commutee placed in the ADX-Florence general population stepdown program would initially be single celled regardless of their step in the stepdown. He told us that a designation to the ADX stepdown program would not mean that the commutee had to start at stage 1 of the stepdown program. He told us that BOP could place inmates at the step equivalent of their current custody conditions in the SCU, which would make it possible to complete stepdown more quickly. Mr. Synsvoll told us that BOP had internally discussed the possibility of moving the commutees through any stepdown program quicker than an ordinary inmate might move through it. BOP had discussed wanting to get the commutees into open population units when they were ready.

23. Mr. Synsvoll told us that the ADX stepdown program is designed to take a minimum of 27 months to complete. He told us that it is at least six months before an inmate in the stepdown program has their first review, but BOP could and would review the commutees more frequently if placed in the ADX stepdown program.

24. Mr. Synsvoll told us that there was no waitlist for the ADX stepdown unit. If a commutee was designated to ADX stepdown, they could be placed in the appropriate step for them right away as long as there were no separations or security issues that prevented their placement with that cohort of inmates at that step.

25. Mr. Synsvoll told us that none of the commutees would go directly to a medium security facility because none of the commutees had been in an open population situation. However, he told us that the time an individual commutee spent in the SCU would count towards the time needed to qualify for placement in a medium security facility. Mr. Synsvoll told us that BOP had identified some commutees who could go to a medium security facility if they adjusted well and quickly to the USP general population setting.

26. Mr. Synsvoll told us that convictions for prison killings would not result in an automatic ADX placement, and that commutees' individual adjustment in the SCU would be considered even if they had been convicted of a prison killing.

27. Mr. Synsvoll encouraged us to speak with him individually about our clients' particular situations. He told us that he would tell us if we should anticipate an ADX referral at individual meetings with him.

28. Mr. Synsvoll told us that the ADX designation process can be completed in as little as four days. However, he told us that BOP wanted to take the time to make good decisions regarding the commutees' redesignations.

29. Mr. Synsvoll told us that BOP was discussing whether they could make changes in the SCU at USP-Terre Haute to facilitate transition while the redesignation process was happening. For example, they discussed whether they could provide the commutees increased time out of cell now, to begin acclimating them to more time out of cell. BOP was also going to seek advice from officials from the Oregon Department of Corrections regarding how Oregon transitioned their death row inmates to general population when their sentences were commuted. Mr. Synsvoll said that Director Peters was aware that the prospect of going directly to a mainline institution could cause anxiety for the commutees. BOP was concerned about ensuring the safety of the commutees during this process and facilitating a positive adjustment.

30. On January 8, 2025, my colleague, Assistant Federal Public Defender James Lawley, and I met with Mr. Synsvoll via Microsoft Teams to discuss Mr. Umaña's case specifically.

31. During the January 8, 2025, call, Mr. Synsvoll told us that BOP was considering a referral to general population at ADX-Florence for Mr. Umaña. Mr. Synsvoll told us that Mr. Umaña would have the opportunity to participate in the stepdown program, but he did not know at that time what step Mr. Umaña would start on.

32. After we summarized Mr. Umaña's mental health impairments, our conversation focused on Mr. Umaña's intellectual disability. Mr. Synsvoll told us that inmates with intellectual disability have difficulty completing the stepdown program at ADX. Mr. Synsvoll did not want Mr. Umaña to be placed into a stepdown program that he could not complete because of his intellectual disability. Mr. Synsvoll told us that a unit at USP-Allenwood, specifically tailored to the needs of inmates with intellectual disability, was supposed to come online in the next couple of months. Mr. Synsvoll told us to send him information about Mr. Umaña's impairments in writing.

33. We also told Mr. Synsvoll that Mr. Umaña does not receive family visits and that his primary source of support is his legal team. Mr. Synsvoll confirmed our location in Pennsylvania and told us to include any request about geographic region in our written submission.

34. On January 13, 2025, I emailed Mr. Synsvoll a memorandum about Mr. Umaña's mental health impairments, institutional adjustment considerations, and community ties. I summarized information developed in Mr. Umaña's criminal trial and § 2255 proceedings regarding his Intellectual Disability, Post-Traumatic Stress Disorder, Brain Damage/Neurocognitive Impairment, and Psychotic Symptomology; described BOP records documenting his encounters with BOP psychological services; requested that Mr. Umaña's mental health care level be increased; requested accommodation for his impairments in the transition process; and stated his legal team's belief that ADX placement was inappropriate given Mr. Umaña's mental health needs. I described ways in which Mr. Umaña's impairments have impacted his institutional adjustment, including summarizing BOP records that show his adaptation and acquisition of new skills is slow. I described how the solitary confinement conditions of the SCU have had a negative impact on Mr. Umaña's mental health, including his legal team's observations of exacerbation of his traumatic and psychotic symptomology during periods of increased social

deprivation. Finally, I described Mr. Umaña's limited community ties in the United States and stated my belief that a placement that facilitated contact with his Pennsylvania legal team would be beneficial to his successful transition. I did not receive a written response from Mr. Synsvoll to my email sending him this memorandum.

35.     On January 14, 2025, I had a legal call with Mr. Umaña. He had received an English-language form from psychological services that he tried to read to me. I observed that Mr. Umaña had difficulty reading and understanding the form. From his attempt at reading, I discerned that the form had to do with a psychological evaluation in connection with a referral to the ADX generally, and possibly the ADX control unit specifically.

36.     On January 14, 2025, I emailed Mr. Synsvoll to ask if BOP had decided to try to designate Mr. Umaña to the ADX control unit; to explain that Mr. Umaña had received a form from psychological services, in English, that he had difficulty understanding; and to ask for a copy of the form Mr. Umaña had attempted to describe to me. I explained to Mr. Synsvoll that, given Mr. Umaña's difficulty understanding and communicating what BOP's paperwork said, it was impossible for me to give Mr. Umaña competent advice without a copy. On January 15, 2025, Mr. Synsvoll responded to my email, provided me a blank copy of BOP's Notice of Psychological Evaluation, reiterated that Mr. Umaña was being considered for referral to ADX general population, and stated that he had provided USP-Terre Haute a copy of the form in Spanish and asked that they use the Spanish form to again provide Mr. Umaña notice of the psychological evaluation.

37.     On January 28, 2025, I listened to parts of a meeting, via Zoom, between Mr. Synsvoll and a group of attorneys representing commutees. I was boarding a plane from Philadelphia to Indianapolis at the time of this meeting and have no independent recollection of the specifics that were discussed.

38.     On January 30, 2025, I emailed Mr. Synsvoll with additional information concerning Mr. Umaña's mental health developed in connection with his § 2255 proceedings and asked Mr. Synsvoll if he could facilitate a mental health evaluation of Mr. Umaña to assess his present functioning.

39.     On February 11, 2025, having received information that the majority of the commutees were going to be transferred to ADX-Florence, I emailed Mr. Synsvoll to ask if Mr. Umaña was being referred to ADX and whether that referral was to general population or the control unit. In response, Mr. Synsvoll and I scheduled a meeting for February 19, 2025.

40.     On February 19, 2025, Assistant Federal Public Defender Lawley and I met with Mr. Synsvoll via Microsoft Teams. Mr. Synsvoll told us that on Tuesday, February 11, 2025, the BOP had been notified by the Attorney General's Office that all the commutees should be referred to ADX-Florence. The Attorney General's Office directed BOP to complete the ADX referral process within 60 days for all of the commutees. Mr. Synsvoll told us that Mr. Umaña's referral would be to ADX-Florence, general population, maximum security.

41. Mr. Synsvoll explained the ADX referral process to Mr. Lawley and me as follows: Having received direction from the Attorney General's Office that all 34 of the commutees should be referred to ADX-Florence, the next step was for the SCU Unit Team at USP-Terre Haute to prepare the ADX referral packet. The Unit Team referral packet would include a cover letter or memorandum discussing how the ADX referral criteria apply to the commutee; the commutees's disciplinary history; the commutee's program review statement; and medical and mental health screens. The Unit Team referral packet would be transmitted to North Central Regional Director Matevousian. If Director Matevousian agreed that Mr. Umaña met the ADX referral criteria, the referral would be transmitted to Rick Stover, Senior Deputy at the Designation and Sentence Computation Center. If Senior Deputy Stover agreed that Mr. Umaña met the ADX referral criteria, BOP would assign a hearing administrator. At the point in the process where a hearing administrator was assigned, Mr. Umaña would receive formal notice of hearing for the ADX referral. BOP regulations require 24-hour notice of the ADX hearing, but in practice, it is usually a couple of days between the formal notice and the hearing. It would be up to Mr. Umaña whether he wanted to participate in the hearing. He would not be required to participate in the hearing. But if he did want to participate, BOP would assign a staff representative to help him if he asked for one. Mr. Umaña would be allowed to present written statements at the hearing. If, following the hearing, the hearing administrator decided that Mr. Umaña met the criteria for ADX, the referral would be transmitted to BOP Assistant Director Shane Salem who would be the final decision maker regarding the ADX referrals.

42. Mr. Synsvoll told us that Mr. Umaña would have access to step down programming in the ADX general population unit. Mr. Synsvoll told us that, as of the morning of our conversation, February 19, 2025, BOP was still planning to individually evaluate the commutees to determine what step of the stepdown program they would be placed in based on their individual needs. At that time, BOP was considering Mr. Umaña for the first step of the stepdown program. Under ideal circumstances, the ADX general population stepdown program takes 27 months to complete. Mr. Umaña would have his first review after 12 months. However, Mr. Synsvoll told us that he is the "weatherman," and that "the weather can change at any moment." Mr. Synsvoll told us that he would have a better idea about stepdown specifics as BOP continues discussions with the Deputy Attorney General.

43. I asked Mr. Synsvoll if the information we had sent him about Mr. Umaña's mental health would follow Mr. Umaña through all steps of the ADX referral process. Mr. Synsvoll told us that it would. My question prompted Mr. Synsvoll to review his emails to confirm that he had shared the information we had provided him with the appropriate people. As he was reviewing his emails, he said that he was keeping "all [his] emails" about the commutees' redesignation process.

44. After reviewing his emails, Mr. Synsvoll told us that Dr. Guitierez with BOP psychological services had reviewed the information we had sent to Mr. Synsvoll. On January 23, 2025, Dr. Guitierez determined that Mr. Umaña met the mental health exclusion criteria for the ADX. Mr. Synsvoll told us that, because of BOP's determination that Mr. Umaña met the mental health exclusion criteria, Mr. Umaña's process would contain an additional step than the process he had previously described. For Mr. Umaña, the next step would be a meeting of a committee

tasked with deciding whether institutional security concerns would require Mr. Umaña's placement at the ADX despite BOP's determination that he met the mental health exclusion criteria. Mr. Synsvoll told us that this committee would be meeting on Monday and Tuesday of the following week (February 24-25, 2025). He told us that he expected Mr. Umaña would be notified in writing of the committee's decision within about a week of the committee's meeting.

45. Mr. Synsvoll told us that, because Mr. Umaña met the mental health exclusion criteria, his referral process would likely move slower than other commutees because of the extra step of the security committee. For Mr. Umaña, the SCU Unit Team would prepare the ADX referral packet after it was decided that institutional security needs overrode the mental health exclusion. Mr. Synsvoll told us that, if it was decided that institutional security needs overrode the mental health exclusion, it would likely be a couple of weeks until Mr. Umaña received formal notice of ADX referral and had his hearing.

46. Mr. Synsvoll told us that, if Mr. Umaña was sent to ADX despite meeting the mental health exclusion criteria, he would be reviewed more frequently than other inmates to determine whether institutional security concerns continued to override the mental health exclusion. Instead of receiving a review at 12 months, Mr. Umaña would be reviewed every six months.

47. I asked Mr. Synsvoll if he could email me copies of any formal documents BOP provides to Mr. Umaña regarding the referral process. Mr. Synsvoll told me that he would email me a copy of the decision of the security committee and any further referral to the ADX.

48. Mr. Synsvoll advised us to ensure that Mr. Umaña exhausted his administrative remedies and fully administratively appealed all decisions. Mr. Synsvoll told us that the first adverse decision that Mr. Umaña would need to challenge through the normal administrative remedy process would be the decision that security needs overrode Mr. Umaña's mental health exclusion. Mr. Synsvoll told us that Mr. Umaña should grieve all adverse decisions he receives through the normal administrative remedy process except for the final decision designating him to the ADX. Mr. Synsvoll told us that, for the final decision designating him to ADX, Mr. Umaña would have 30 days to appeal directly to general counsel at BOP's central office.

49. On March 3, 2025, I emailed Mr. Synsvoll to ask if a decision had been made about the potential security override of Mr. Umaña's mental health exclusion. On March 6, 2025, Mr. Synsvoll responded that he was still waiting for the final decision paperwork.

I declare under penalty of perjury that the foregoing is true and correct to the best of my personal knowledge, information, and belief, subject to 28 U.S.C. § 1746.

Executed on: 3/28/2025

Kelly Miller

8