# EXHIBIT 28

## Declaration of Kimberly Newberry

I, Kimberly Newberry, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1) I am employed as an assistant federal public defender. My office represents Daryl Lawrence in his § 2255 litigation in the Southern District of Ohio. Following the commutation of Mr. Lawrence's death sentence by President Biden, I was told by a BOP official that the BOP's designation team had determined that Mr. Lawrence should be sent to a high security penitentiary. After the Executive Order and Attorney General's Memorandum were issued, and after meetings with representatives from the Attorney General and Deputy Attorney General's Offices, the BOP official told us that Mr. Lawrence now would almost certainly be sent to ADX. Details of those conversations are set forth below.

2) In February 2006, Mr. Lawrence was convicted of three counts of armed bank robbery (18 U.S.C. § 2113(a)), attempted bank robbery, three counts of using or carrying a firearm during and in relation to an armed bank robbery (18 U.S.C. § 924(c)(1)(A)(ii)), one count of armed bank robbery resulting in death (18 U.S.C. § 2113 (a), (d), (e)); and one count of causing death by use of a firearm during commission of a bank robbery (18 U.S.C. § 924(c), (j)(1)). Mr. Lawrence was sentenced to one death sentence, life in prison without parole, and 781 months in prison. Mr. Lawrence was found indigent prior to his trial and received appointed counsel, and he has remained indigent since then.

3) On December 23, 2024, President Biden commuted Mr. Lawrence's death sentence. Mr. Lawrence's § 2255 counsel immediately started to gather information on what the process would be to designate Mr. Lawrence for placement within the Bureau of Prisons (BOP) following his transfer from the Special Confinement Unit (SCU).

4) On January 7, 2024, Chris Synsvoll, an attorney with BOP, met with defense counsel representing those who received commutations. He told us he would be our main point of contact for the BOP as our clients went through the redesignation process. I was on that call.

5) On this group call, Mr. Synsvoll explained that each of our clients would receive an individual assessment to determine their new designation. The BOP was considering multiple United States Penitentiary (USP) locations for the 37 men whose sentences were commuted.

6) Mr. Synsvoll informed us this would be an individualized process similar to anyone else requiring re-designation within the BOP, and that the BOP would be looking at factors such as our clients' prior history, prison disciplinary record, participation in classes, and medical and mental health history. The SCU unit teams at USP Terre Haute would be gathering this information at the institutional level, but Mr. Synsvoll told us that we can

1

and should submit anything on our clients' behalf that would be relevant to this process. This included anything about our clients' medical and mental health history that the BOP may not be aware of, information we had about our clients' adjustment to prison, and the geographic location of our clients' families, or those who would be most likely to visit with them (such as the legal team). Mr. Synsvoll preferred that we provide this as a formal submission via memorandum rather than an email.

7) Mr. Synsvoll told us that Rick Stover would be the final decisionmaker, with assistance from Shane Salem. I did not catch their titles during that call, but I understood them to be Mr. Synsvoll's superiors in the BOP and part of the BOP designation team.

8) At this point in early January, Mr. Synsvoll explained that the BOP designation team was at the start of the process, but it had already met twice. The BOP expected to complete the process and have a decision on everyone's designation within weeks, not months. He urged us to provide our client-specific memos to him by that Friday, January 10, 2025, as the designation team was reviewing everyone individually and had a lot to get through in the next few weeks.

9) Mr. Synsvoll asked us to share all potentially relevant information with his team so they could make more informed placement decisions. He stressed the importance of BOP having as much information as possible to make informed placement decisions.

10) Mr. Synsvoll walked us through the various programs that our clients might be transferred to. The purpose was so that if there was a specific placement that might be appropriate for our clients' individual needs, we could include this in our submissions.

11) Mr. Synsvoll explained there are two elderly programs within the BOP focused on those who are aging and have medical conditions. There are also medical centers meant to support people who require a Care 3 or Care 4 level of health care or mental health care. Depending on their condition, it is possible for those at a medical center to be transferred to another facility after their treatment. There are also elderly care facilities for those aged 65 and older.

12) Mr. Synsvoll also described other BOP programs, including those based on mental health. These are restrictive housing programs for those with severe mental health issues, and they include a stepdown component to help participants prepare for life in general population. The program includes the use of small groups and mental health treatment, and there are progressive steps to work through. The mental health units are available at the facilities in Atlanta and Allenwood. Successful completion of the program usually results in transfer to the general population of another USP. Mr. Synsvoll told us that the wait to get into these programs is usually a couple of months, and they were still deciding whether anyone from the SCU placed in one of those mental health units would be transferred to the medical center in Springfield to wait, or if they would just stay at Terre Haute. He said the

2

psychology team is still making the determination on the best way to handle the wait. He also told us that consideration for these programs did not depend on a current BOP diagnosis and emphasized that if we have uncovered any relevant mental health information in our work on our cases, we should let them know. The BOP designation team will then pass that information along to help determine the best placement for a person's care level.

13) Mr. Synsvoll also noted that there is an additional mental health unit tailored for those with personality disorders. This is also a high security stepdown program that is available at USP Florence, with a similar program soon to open at USP Allenwood.

14) During the meeting, Mr. Synsvoll also said there is a long-term transitional care unit for those who need mental health treatment and will not be able to be designated to a facility's general population.

15) Mr. Synsvoll said a new program will soon be available at USP Allenwood for those with intellectual disabilities.

16) Mr. Synsvoll told us there are several transitional units that are designed to be an alternative to the Special Housing Units. These are psychology-based programs intended for people to work toward placement in a general population and work on topics like life skills, positive behavior, and prison adjustment. These are offered at medium facilities, such as FCI Florence. Mr. Synsvoll explained that the BOP was looking into whether it could set up a transitional program at a couple of the USPs to provide support for some of the SCU prisoners in their transition back to a general population. The secure treatment placements generally last for 18 months, depending on the stage of treatment and security level of the prisoner.

17) Mr. Synsvoll explained that transitional units are not single-celled, and they are an open population setting. The programs allow the wardens to tailor the units to the needs of the population.

18) Mr. Synsvoll told us about the Life Connections Program, which is a faith-based reentry program offered to the general population at USP Terre Haute and soon to be opened at USP Tucson. Even though it has a reentry component, it is still available to people with life sentences. In this eighteen-month program, the prisoners work on special skills to serve as role models within the prison and admission to the program relies heavily on good prison conduct. The program features sessions on victim impact, mentoring, healthy living, and family contact and engagement; and it has a community service component. Prisoners must apply to get into the program, and they must meet certain criteria such as participation in any financial restitution that has been ordered in their case, English-language competency, at least a GED or working toward their GED, no deportation orders or gang activity, and

3

approval by the unit team at Terre Haute. Mr. Synsvoll said that some prisoners coming from the SCU would be eligible to enter this program based on their clean prison record.

19) Mr. Synsvoll informed us that while not everyone would get referred to ADX, some would. For those people who are designated to ADX, he explained that it does not necessarily mean that they would automatically be placed in the first step of the stepdown program. They could be placed in a step further along in the program, where appropriate. Each person might also progress through the steps more quickly than the guidelines suggest, with frequent review to gauge how each of the prisoners is progressing. This would be done with the hope of transitioning them to an open population sooner without sacrificing their own or others' safety.

20) Mr. Synsvoll confirmed that there is currently bed space at the ADX stepdown program. Those coming off the SCU could be placed as far along as the third step of the stepdown program if the unit team and designation team recommended it. He warned there could also be some delay due to separatee issues, where two prisoners cannot be in the same unit at the same time. For those placed in the control unit, his team would take a look at each person's adjustment once he got out there, and then they would decide how much time was necessary in this more restrictive setting. He also told us that ADX placements are not automatic. They must follow a process, including notice and a hearing.

21) Mr. Synsvoll explained that the stepdown program is most restrictive in the first step, in which people are still single-celled and are allowed only individual recreational time, but that as they progress, their contact with others increasingly opens up. Mr. Synsvoll said that usually those in the stepdown program are reviewed at a minimum every six months, but that his team would be reviewing the SCU transfers more frequently to try and get the prisoners moved to another facility as soon as they were ready.

22) Mr. Synsvoll clarified that when someone is being considered for the control unit, and the designation team is reviewing his files for a recent history of attempted escapes or violent incidents, that that means fairly recent. If there are older attempts, they will be noted but will not drive placement into the control unit.

23) Mr. Synsvoll said that even a prior prison murder would not result in an automatic designation to ADX but would just increase someone's likelihood of such placement as the team would still need to review the rest of the file.

24) Mr. Synsvoll told us ADX also has a unit for those over 50. This unit is only for people who have no violent incidents toward staff or other prisoners and functions as an open housing unit. Mr. Synsvoll described it as a mellow unit intended for those who may not be able to transition to general population but do not need a higher security level, and it includes programming privileges. Mr. Synsvoll said that this program is colloquially referred to as the "AARP unit."

4

25) Mr. Synsvoll said it was not inconceivable that someone could go straight from the SCU to a medium-security facility, although he thought it more likely they would go to a USP first. For those doing well within their USPs, they could later be transferred to a medium facility.

26) Mr. Synsvoll asked that, now that he had outlined the programs for us, if we had requests for a specific institution or program that we thought would best suit our clients, that was the type of information the designation team wanted to have.

27) Mr. Synsvoll told us another major factor is location of the prisoner's family. He told us to let him know if certain institutions would help our clients maintain their family ties.

28) Mr. Synsvoll explained that he would take the information we sent him and then meet with the rest of the BOP designation team to review the files and make the decision from there on where to send each person. He also offered to speak on the phone with individual teams if we had any questions or wanted to learn more about the various programs.

29) On January 10, 2025, my colleagues submitted information on behalf of Mr. Lawrence to Mr. Synsvoll. Our memo included information such as the fact that Mr. Lawrence will be turning 50 in April, when he would be eligible for the AARP unit; that Mr. Lawrence has a chronic blood cancer, polycythemia vera, which requires frequent blood draws and outpatient phlebotomy treatment several times a year; that Mr. Lawrence has not received any disciplinary write-ups in his nearly twenty years in BOP custody and that his PATTERN score is "Low"; that Mr. Lawrence has participated in classes that have been offered in the SCU over the years; that Mr. Lawrence is very close to his family, including his 97-year-old mother and his children, and that most of his relatives reside in Columbus, Ohio; that Mr. Lawrence's § 2255 litigation is ongoing in the Federal District Court for the Southern District of Ohio; and that Mr. Lawrence has consistently expressed remorse for his actions. Our memo referred to a letter that Cory Shepherd, the former SCU unit manager, had written in support of Mr. Lawrence's clemency petition, noting that from a security and management standpoint, he required less oversight because of his good conduct, even-keeled disposition, and respectful manner. In the letter, Mr. Shepherd had acknowledged the concerted effort and self-discipline it takes for someone to go as long as Mr. Lawrence has without a disciplinary write-up, describing this as a true testament to Mr. Lawrence's character. Mr. Shepherd also opined that Mr. Lawrence could safely be managed in a general population environment.

30) On January 17, 2025, I, along with other members of our team, had a call with Mr. Synsvoll to talk about Mr. Lawrence and his specific designation needs. By this call, Mr. Synsvoll had received our January 10th submission regarding Mr. Lawrence.

31) Mr. Synsvoll expressed the view that Life Connections would be great for Mr. Lawrence. Mr. Synsvoll gave us more information on the Life Connections program, including that newcomers are assigned to a mentor who has been in the program longer and can model good prison behavior for others. He also told us that there is no waiting list to get into Life Connections, so Mr. Lawrence would be able to start the program within USP Terre Haute's general population right away.

32) Mr. Synsvoll apprised us of new honors units opening in several facilities, and that these units would be available to prisoners who were not involved in disruptive conduct. He suggested that Mr. Lawrence's participation in Life Connections would increase the odds that he could someday transfer to one of these honors units.

33) We also discussed the Life Connections program at the USP in Tucson, as Mr. Lawrence has a daughter in Arizona. Mr. Synsvoll noted several times that proximity to family is an important factor they consider in placement decisions in an effort to maintain family ties.

34) At the end of this call, Mr. Synsvoll expected to get back to us on Tuesday or Wednesday the following week (January 20 or January 21) because he had a meeting with the assistant director to go over the BOP designation team's current plans for each of the commuted men. (By "assistant director," I assumed that to mean Shane Salem.) The expected timeframe was that the designations would be finalized and the transfers completed within eight to ten weeks.

35) On January 28, 2025, Mr. Synsvoll again spoke with defense counsel for the individuals whose death sentences had been commuted on a Zoom call so we could get clarity on President Trump's January 20, 2025, Executive Order mandating that the places of imprisonment and conditions of confinement for our clients be "consistent with the monstrosity of their crimes and the threats they pose" and giving the Attorney General supervisory authority over the placement process. I was on this call.

36) A few days before this call, I heard from several other lawyers that all of our clients were being referred to ADX and had received a notice to that effect.

37) On the January 28th call, Mr. Synsvoll told us that his team was continuing with the same process as before. They were still considering individualized placements, and they were not recommending that everyone go to ADX. He explained that there were 12 people who had received ADX referrals before the Executive Order, but for the rest of the individuals, the designation team within BOP was going to continue to recommend placement at other institutions. The only thing that had changed on their end was that they now needed to present their designation plan to someone in the Office of the Deputy Attorney General ("ODAG"). Acting BOP Director Lathrop would be making that presentation based on the recommendations of the BOP designation team. This would include the materials the legal teams had submitted on behalf of their clients.

6

38) Regarding the ADX referrals that were issued to everyone in the SCU, Mr. Synsvoll told us that the staff at USP Terre Haute had gotten ahead of themselves in anticipating that the Executive Order meant everyone would go to ADX. Mr. Synsvoll said that those referrals did not come from the BOP designation team. Only twelve people were under consideration for placement at ADX by the BOP designation team, and no one had received a formal referral yet.

39) Mr. Synsvoll said he did not know the timing of when they would get direction from the ODAG. He did not know if the ODAG would wait until incoming Attorney General Pam Bondi was confirmed and sworn in, or if the ODAG would try to move forward before then. He was hopeful to have an answer for us soon. He said that if the ODAG rejected the BOP's designation recommendations, the BOP designation team might have to start over with the process. He said that even if the ODAG approved BOP's designation recommendations, it could still take several weeks before the transfers took place. He was also hopeful that if the Attorney General's Office turned down any part of their recommendation, they would get some guidance for an alternative.

40) Mr. Synsvoll explained that if the ODAG instead suggested that everyone should remain in the SCU, that would require a review of the institution supplement because the SCU is intended only for those under a death sentence. It was not anticipated that this would happen.

41) Sometime after the January 28th call with Mr. Synsvoll, I learned from other attorneys with SCU clients that the post-Executive Order ADX referral notices passed out by the SCU Unit Team were rescinded. However, Attorney General Bondi signed a memorandum on February 5, 2025 adopting the Executive Order, and on February 11, 2025, I learned that almost all of the commuted prisoners had once again received notice that they were being referred to ADX.

42) On February 20, 2025, I, along with other members of Mr. Lawrence's legal team, met with Mr. Synsvoll over Zoom to discuss the new wave of ADX referrals.

43) On this call, Mr. Synsvoll walked us through the standard practice for the ADX referral process. He explained that the process starts when the warden of an institution, here USP Terre Haute, submits a referral memo. That memo should explain why each prisoner meets the criteria for restrictive placement, with the officials having reviewed their disciplinary history, programming and adjustment, their program review reports, mental health and medical assessments, education, and their general history within BOP custody. This then gets forwarded to the regional director in Kansas City and goes up the chain of command. After that, a hearing administrator will be assigned. The hearing administrator notifies the prisoner in a formal written notice that he is being referred to ADX, including the reasons

why. The referred prisoner also undergoes a medical and mental health screening, as ADX is unable to address certain health needs.

44) After the hearing, the administrator prepares a report and recommendation detailing the reasons for why placement at ADX is or is not appropriate. That report is then forwarded to the assistant director of the Correctional Programs Division, Shane Salem. If he accepts the hearing administrator's recommendation of an ADX designation, then the prisoner will be notified that he's being designated to ADX and given instructions on how to appeal the decision.

45) Mr. Synsvoll stated that it has been BOP's practice not to transfer anyone to ADX while they have an appeal pending. He did not know whether the ODAG or AG would honor that past practice for the commuted SCU prisoners, so it was possible they could get transferred to ADX before their appeals were complete.

46) Mr. Synsvoll told us our clients could provide any other information they have about not meeting the criteria for ADX placement during their hearing, either in writing or verbally.

47) Mr. Synsvoll explained that while this is the usual process, following the January 20th Executive Order, the BOP is now required to coordinate with the Attorney General's Office. Mr. Synsvoll did not know when and where in the process someone within the Attorney General's Office would weigh in, but he felt they could exercise veto power if, for example, BOP did not recommend someone for ADX and the Attorney General disagreed.

48) Mr. Synsvoll informed us that because the Attorney General's Office was not open to transfer to other institutions outside of ADX, the BOP planned to present to ODAG the option of placing suitable prisoners into the intermediate step in the ADX stepdown program. The proposal was to get these lower-risk prisoners into a step where they could start integrating with others as soon as possible. They would then be eligible for transfer to a USP after completing the program. However, based on Mr. Synsvoll's meetings with ODAG so far, Mr. Synsvoll did not think ODAG was particularly interested in anyone going to an intermediate level. It was also still possible that ODAG would not be interested in anyone going to the stepdown program at all and that everyone could instead be placed under stricter conditions of confinement at ADX.

49) On February 27, 2025, I, along with other members of Mr. Lawrence's legal team, had another Zoom with Mr. Synsvoll. He confirmed that everyone's referral packet had been submitted to the North Central Regional Director as part of the ADX referral process. The referrals still had not been sent on to the Designation and Sentence Computation Center ("DSCC"), but BOP would soon be at the step of scheduling hearings.

8

Case 1:25-cv-01161-TJK   Document 2-30   Filed 04/16/25   Page 10 of 10

50) We informed Mr. Synsvoll that Mr. Lawrence's death sentence had been vacated after the 2006 trial, and, while his appeal was pending, the BOP had performed the classification and designation process with his life-without-parole sentence in place and designated him to general population at USP Terre Haute. He was then transferred to general population at USP Lee. Mr. Lawrence had no disciplinary write-ups during that time. After his death sentence was reinstated by the Sixth Circuit in 2009, BOP then re-designated Mr. Lawrence to the SCU. Mr. Synsvoll told us that this was relevant information that Mr. Lawrence could present at his hearing, either orally or in writing. Mr. Synsvoll took notes on this information and said he was also going to send this to Joel Ramone at DSCC to make sure it was included in Mr. Lawrence's referral packet.

51) Mr. Synsvoll said that after the Executive Order, it would not be possible for any of our clients to go to USPs. BOP was now waiting to hear whether the DAG would allow BOP to place the commuted prisoners in the intermediate step of the ADX stepdown program or to the unit reserved for prisoners 50 and older with no history of violence against staff or prisoners (the "AARP unit"). Mr. Synsvoll said the BOP team had proposed to the DAG that these other options be used for placement.

52) Mr. Synsvoll confirmed that with respect to Mr. Lawrence, prior to the issuance of the Executive Order, the BOP designation team had no objections to his going to the Life Connections program. Instead, this rejection came from someone within the ODAG or the Attorney General's Office.

53) Mr. Synsvoll said it would be possible that Mr. Lawrence could get slotted into the second, intermediate step of the stepdown program but that, because of the Executive Order, this was up to the ODAG. It was also still possible that the ODAG could require that Mr. Lawrence be placed in a unit with stricter conditions of confinement.

54) Mr. Synsvoll did not know if this review by the Attorney General is a one-time review during these initial designations, or if she will remain involved in the commuted prisoners' placements over the next four years.

55) In several of the calls, Mr. Synsvoll made reference to a spreadsheet he was maintaining with client-specific information for each of the commuted individuals and the redesignation recommendations the BOP team had made for each of them, including to institutions other than ADX.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_Kimberly Newberry_ (signature)          3/27/2025

Kimberly Newberry                         Date