# EXHIBIT 30

**DECLARATION OF F. ITALIA PATTI PURSUANT TO 28 U.S.C. § 1746**

1. I, F. Italia Patti, am an Assistant Federal Defender at Indiana Federal Community Defenders (IFCD). I was one of Charles Hall's attorneys in his post-conviction proceedings. After Mr. Hall's death sentence was commuted by President Biden, I was told by a Bureau of Prisons (BOP) official that prior to the issuance of the Executive Order, the BOP had recommended that Mr. Hall be redesignated to either a medical center or a high security facility capable of managing his medical needs. But after the Executive Order, the BOP official told us that by default everyone (with the possible exception of the individuals already in federal medical centers) would almost certainly be sent to ADX. Below are details of these conversations.

2. Mr. Hall is indigent. Post-conviction counsel were appointed pursuant to 18 U.S.C. § 3599(a)(2).

3. Mr. Hall was convicted of murder in the Western District of Missouri on May 7, 2014. The jury returned its penalty-phase verdicts on June 2, 2014, concluding that Mr. Hall should receive the death penalty. Mr. Hall was formally sentenced to death on July 18, 2014. Mr. Hall filed a § 2255 motion on April 28, 2024. His death sentence was commuted on December 23, 2024. In light of the commutation, Mr. Hall voluntarily dismissed his § 2255 motion on January 22, 2025.

4. Shortly after Mr. Hall's commutation, we learned that attorney Chris Synsvoll would be the BOP's point of contact for redesignation of all the people who received commutations. On January 3, 2025, Angie Elleman, lead counsel on Mr. Hall's § 2255, sent BOP Attorney Chris Synsvoll a letter highlighting Mr. Hall's serious medical issues, explaining that a federal medical center is the only appropriate placement for Mr. Hall.

5. On January 6, 2025, I, along with co-counsel Angie Elleman, Jean Giles, and Keith O'Connor, met with Mr. Synsvoll by videoconference. During that meeting, we acknowledged that Mr. Hall would likely be considered for placement at ADX because he had been convicted of murder in a BOP facility, but that his complicated and severe medical issues should preclude him from placement at ADX. Mr. Hall is classified by the BOP as a Care Level 3 inmate, although he appears to meet the criteria for Care Level 4. We explained our view that Mr. Hall needed to be housed in federal medical center or, at minimum, needed to be housed at a Care Level 3 facility. We told Mr. Synsvoll that we feared Mr. Hall would die at ADX because, as a Care Level 2 facility, it is simply not equipped to meet Mr. Hall's serious medical needs. We also pointed out that Mr. Hall had not had a single disciplinary write-up since the crime that sent him to death row, in 2012, including while he was housed in a federal medical center in 2021-2023. Mr. Synsvoll suggested that, in addition to the letter we had sent him on January 3, we also send excerpts of Mr. Hall's BOP medical and psychology records.

6. On January 7, 2025, my co-counsel and I attended a meeting with Mr. Synsvoll open to all attorneys for individuals whose death sentences had been commuted. The information Mr. Synsvoll conveyed at this meeting was consistent with what he had conveyed to Ms. Elleman, Ms. Giles, Mr. O'Connor, and me the day before, although of course our conversation the day

before was focused on issues specific to Mr. Hall. At the January 7 meeting, Mr. Synsvoll explained that redesignation decisions would be made according to the BOP's standard policy; that is, BOP officials would evaluate each person individually, taking into account medical conditions, mental health conditions, and disciplinary history. Mr. Synsvoll invited the attorneys present at that meeting to send him information addressing those issues, so that the BOP officials tasked with making redesignation decisions could make informed decisions. Mr. Synsvoll emphasized that our clients were not automatically being sent to ADX and explained that placement options included federal medical centers, mental health step-down programs, and USPs.

7. On January 10, 2025, I emailed Mr. Synsvoll a follow up letter and documents about Mr. Hall's complicated and severe medical and mental health issues, including excerpts of Mr. Hall's BOP medical and psychology records, as Mr. Synsvoll had suggested. The material we sent Mr. Synsvoll explained that, among other medical and mental health issues, Mr. Hall has a particularly aggressive form of Crohn's disease. While under a sentence of death, Mr. Hall had to be housed at a federal medical center (FMC Butner) in 2021-2023. He has had twenty-three separate hospital admissions or trips to the hospital from USP Terre Haute since he returned from FMC Butner in May of 2023. He had seven admissions to the hospital or outside hospital trips during his time at FMC Butner in 2021-2023. And he had a total of 201 admissions to the hospital or outside hospital trips from September 11, 2004, to January 9, 2025.

8. On January 22, 2025, Angie Elleman emailed Mr. Synsvoll to inform him that Mr. Hall had developed an open wound near his stoma site and ask if there was any update as to where Mr. Hall would be placed.

9. On January 27, 2025, I met with Mr. Synsvoll along with co-counsel Keith O'Connor. At this meeting, Mr. Synsvoll assured Mr. O'Connor and me that the BOP committee looking into where to place the individuals whose sentences had been commuted were still making individualized placement decisions, were still considering factors like individuals' medical needs, and were taking the information we had provided about Mr. Hall into account.

10. On January 28, 2025, my co-counsel and I attended a meeting with Mr. Synsvoll open to all attorneys for individuals whose death sentences had been commuted. Mr. Synsvoll's comments during this meeting were consistent with what he told Mr. O'Connor and me the day before. Mr. Synsvoll informed us that the staff at the Special Confinement Unit (death row) had gotten ahead of themselves and distributed paperwork about ADX to all the individuals whose death sentences were commuted on their own initiative, not because someone higher up within the BOP had directed them to do so. Mr. Synsvoll also reassured us that the only change in the process since the January 7 meeting was that after BOP officials made individualized placement decisions, as discussed on January 7, the placement decisions now needed to be submitted to the Attorney General or Deputy Attorney General for approval.

11. On February 11, 2025, Ms. Elleman emailed Mr. Synsvoll again. She scheduled a follow up meeting with Mr. Synsvoll for February 18, 2025, but Mr. Synsvoll was not able to make it to that meeting. Ms. Elleman exchanged several emails with Mr. Synsvoll attempting to

schedule a follow up meeting and was finally able to schedule a meeting for March 10, 2025. Because Ms. Elleman was not available at the time Mr. Synsvoll could meet, I attended the meeting along with paralegal Scott Subick.

12. At the March 10, 2025, meeting, Mr. Synsvoll explained to Mr. Subick and me that prior to the January 20, 2025 Executive Order, the BOP committee making placement decisions had indicated that not everyone whose death sentence had been commuted needed to be sent to ADX. At that juncture, they determined that Mr. Hall should be designated to a medical center or, at minimum, a Care Level 3 facility, with a plan for structured socialization to reintegrate him into general population.

13. Mr. Synsvoll further explained that, following the Executive Order, the BOP committee was told to look at what the President and the AG were saying. The BOP committee members took that to mean that everyone needed to be referred to ADX.

14. Even after receiving this instruction, the BOP committee flagged Mr. Hall as potentially medically precluded from going to ADX. After I asked clarifying questions, Mr. Synsvoll explained that the most the BOP committee could do at that juncture was flag someone as potentially medically precluded. The BOP's Office of Medical Designations would make a determination. Mr. Synsvoll informed me that the information we had provided would be among the information taken into account.

15. Mr. Subick then updated Mr. Synsvoll on Mr. Hall's most recent medical status, specifically that Mr. Hall had been to the hospital recently and was fighting an infection.

16. Mr. Synsvoll indicated that he would pass the update along, as he had with Ms. Elleman's prior update about Mr. Hall's medical condition.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection. Executed on March 27, 2025.

Florence Italia Patti