# EXHIBIT 32

## DECLARATION OF LEANE RENÉE

I, Leane Renée, declare as follows pursuant to 28 U.S.C. § 1746:

1. I am a Supervisory Assistant Federal Public Defender for the Middle District of Pennsylvania. In May 2019, Judge Guzman of the Northern District of Illinois appointed my office to represent Ronald Mikos in his 28 U.S.C. § 2255 proceedings challenging his conviction and sentence. Following the commutation of Mr. Mikos's death sentence, a Federal Bureau of Prisons (BOP) official told me in January 2025, that Mr. Mikos would not be redesignated to Administrative Maximum (ADX) based upon factors such as Mr. Mikos's age, serious medical conditions, and no prior history of incarceration. Although those facts did not change, in February 2025, the same BOP official shifted our conversations to prepare for Mr. Mikos being designated to ADX. Those conversations are detailed below.

2. I am providing this declaration regarding Mr. Mikos, a prisoner in the BOP, Registration No. 20716-424. Mr. Mikos has been indigent since his incarceration began in 2002, and he remains indigent. In providing this declaration, I am not disclosing and do not intend to disclose any attorney-client privileged communications that I have had with Mr. Mikos in the course of my representation of him.

3. On March 14, 2024, on behalf of Mr. Mikos and pursuant to 18 U.S.C. § 3599(e), my co-counsel and I petitioned former President Joseph R. Biden, Jr. for clemency. On December 23, 2024, President Biden commuted Mr. Mikos's death sentence to life in prison without parole. Mr. Mikos is one of 37 men (the "commutees") who received commutations of death sentences from President Biden.

4. Following the commutation of Mr. Mikos's death sentence, I understood that Mr. Mikos would be transferred from the Special Confinement Unit (SCU) at the U.S. Penitentiary in

1

Terre Haute to a less restrictive setting within the BOP. The SCU is a restricted unit designated for male prisoners who have active federal death sentences, and Mr. Mikos no longer has a death sentence. To acquire my understanding of what was going to take place, I initially reviewed the BOP designation standards that were available online at the time. Those standards explained how the BOP considers multiple factors to determine the appropriate security level and placement of each prisoner. Those standards also explained that, in addition to offense severity, the BOP considers other information relevant to the appropriate placement of a prisoner, such as programming needs, prior convictions and/or history of violence, medical needs, institutional adjustment, and proximity to family and court/legal team members.

5. Mr. Mikos is now serving a life sentence which began in 2002; he has no prior convictions; and during his 19 years in the SCU, Mr. Mikos has had only two incident reports, both for nonviolent conduct, in 2011 and 2015. In 2019, the BOP evaluated Mr. Mikos for overall pattern risk level; he received the minimum, *i.e.*, lowest possible, scores for "general" and "violent" risk of recidivism.

6. Mr. Mikos is 76 years old and presents increasing healthcare needs commensurate with his advancing age, which are germane to designation within the BOP. Mr. Mikos is experiencing memory loss and cognitive decline, neurological impairments, and numerous advancing age-related medical conditions, including substantial challenges with mobility and balance.

7. On January 7, 2025, Chris Synsvoll, Senior Counsel/Advisor, Office of the Director, Federal Bureau of Prisons, who is now Supervisory Attorney for the Program Review Division, External Auditing Branch of the BOP, met virtually with attorneys who represent commutees to inform us about the BOP designation process and the commutees' impending transfers out of the SCU. I attended that meeting.

8. At the outset of the January 7 meeting, Mr. Synsvoll explained that he was on a detail assignment for the BOP. He explained that, in that role, the BOP had designated him as the point of contact for counsel who represent commutees who would be transferred elsewhere within the BOP system. He indicated during that meeting that the commutees' designations would be determined by individual assessments and each commutee's individualized circumstances.

9. Mr. Synsvoll reported during that January 7 meeting that the SCU team had just received notice to begin assessments of the commutees for purposes of the designation decisions. He indicated that, in those assessments, the SCU team would consider, among other things, the level of anxiety and concerns for physical safety that each commutee had about the prospect of being placed in general population and having a cell mate.

10. During the January 7 meeting, Mr. Synsvoll invited counsel to interact with him directly about their specific clients and any concerns about their impending transfers. He also asked the attorneys to provide a brief memorandum or letter on behalf of their clients and providing information specific to their clients that could assist the designation team,[1] such as medical conditions, institutional adjustment capabilities and issues, and regional preferences to foster social or legal visits. He asked us to send all information directly to him, so that he could provide it to the designation team and therefore be certain the designation team would receive it and be able to

---

[1] Through my meetings with Mr. Synsvoll, it is my understanding that Mr. Synsvoll is working with two BOP "teams" in the designation process. The Secure Confinement Unit Team (SCU Team) consists of corrections staff in the SCU itself. Their role includes providing direct knowledge of each commutee to assist with individualized designation planning, preparing designation packets, and providing and collecting relevant paperwork to commutees in the SCU. Mr. Synsvoll is also part of a higher-level "designation team" that obtains input from the SCU team and includes individuals who are responsible for final determinations on individual designations, such as the North Central Regional Director and a Senior Deputy at the Designation and Sentence Computation Center.

consider it. He said medical conditions were an important factor to address in these memos, especially if counsel had relevant information that may or may not be covered in BOP records.

11. At that time, Mr. Synsvoll said transfers of the commutees away from the SCU would not take place within the next several days but would not take a long time. He informed the group that transfers would happen in a matter of weeks, but not months.

12. Mr. Synsvoll also addressed special considerations for elderly commutees and those with medical needs. He informed us that the designation team would look closely at medical needs and along those lines, the team was looking at two, possibly more, older commutees. Mr. Synsvoll described several placement options within BOP, including Federal Medical Centers (FMC), and programs designed for aging prisoners. He explained that prisoners with Medical Care Level 4 classifications are required to be designated to FMCs, while prisoners with Medical Care Level 3 classifications could be designated to FMCs because FMCs can manage chronic conditions. He told us that classifications such as Medical Care Level 3 or 4 would be determining factors in the designations for commutees who have these classifications.

13. Mr. Synsvoll further explained that "elderly" is defined in BOP Program Statement 5241.01, and that "elderly" includes anyone 65 or older. He told us he would email information to the meeting organizers that identified BOP facilities that have programs for elderly prisoners. He also told us that with more information about a specific commutee's needs, it was possible that the designation team would upgrade a care level.

14. Mr. Synsvoll said it usually takes 10-15 years in general population before a prisoner is eligible to step down to a medium-security prison. He said that for the commutees, the designation team would consider years in custody along with the SCU team's individualized assessment to identify commutees who might possibly be eligible for designation to a medium-security prison. He indicated that some commutees were being considered for medium security, so

4

that it was possible but not very likely that a commutee would go straight from the SCU to medium security. He said medium security is on the table, just not likely to be immediately.

15. Mr. Mikos has had a number of medical issues for some time as he has aged while incarcerated, and he was moved into a handicap cell in the SCU more than a year ago. On January 8, 2025, the BOP finally classified Mr. Mikos at Medical Care Level 3. A BOP *Summary Reentry Plan – Progress Report* dated January 21, 2025, lists Mr. Mikos's Current Care Assignment as Medical Care Level 3 "unstable, complex chronic care," with a start date of January 8, 2025.

16. On January 10, 2025, my co-counsel and I spoke with Mr. Synsvoll regarding Mr. Mikos's designation and transfer. At the start of the conversation, Mr. Synsvoll immediately told us that he already knew a little about Mr. Mikos. He said that Mr. Mikos was one of the first people the SCU team addressed in the designation meeting that Mr. Synsvoll had had with the SCU team on January 7, 2025. Before we began to talk about our client, Mr. Synsvoll said he was aware that Mr. Mikos is the oldest man on federal death row and that he had never been incarcerated before this case. Mr. Synsvoll also told us that the SCU team did not think Mr. Mikos would be willing to go to general population. We agreed with that observation.

17. Mr. Synsvoll informed us during that call that Mr. Mikos was considered Medical Care Level 3. Therefore, Mr. Synsvoll said, there was no way that Mr. Mikos would go to ADX. He explained that ADX is limited to prisoners who are Medical Care Level 2 or lower. Mr. Synsvoll said that because USP Terre Haute is a Medical Care Level 3 facility, Mr. Mikos might be able to remain there, but in a less restrictive unit than the SCU.

18. My co-counsel and I shared our client's medical, mobility, and safety concerns that factor against designation in a USP. We shared that Mr. Mikos would have considerable concern and anxiety about his physical safety should he be placed in a general population or open dormitory setting, in substantial part because of his age and physical/mobility limitations, including difficulty

5

navigating stairs. Given these safety concerns, we proposed designation to a facility with other prisoners who have similar medical and age-related limitations. We summarized Mr. Mikos's cognitive decline, repeated falls resulting in injuries, and increasing need for assistance with activities of daily living. We explained to Mr. Synsvoll that we believe Mr. Mikos meets the criteria for Medical Care Level 4 and that, even if BOP has not yet classified him at that level, he will only continue to decline and require increasing medical treatment and assistance. We provided our view that, especially given Mr. Mikos's advanced age, it makes more sense to place Mr. Mikos at a BOP facility where he can age in place, such as an FMC. We suggested FMC Rochester because that location is within 500 miles of Mr. Mikos's family, social connections, and members of his legal team. Mr. Synsvoll said an FMC could be considered with appropriate justification, though he noted that beds are at a premium in FMCs.

19. In addition to the concerns raised by Mr. Mikos's limited mobility, Mr. Mikos continues to require handrails and additional space to avoid recurring falls with injuries, in his cell and shower. For this reason, the BOP medical department assigned Mr. Mikos to a handicap cell. Mr. Synsvoll assured us that, because the medical department prescribed a handicap cell for Mr. Mikos, he would almost certainly always be single-celled because about 90% of handicap cells in the BOP system are single cells.

20. At this point in our conversation, Mr. Synsvoll opined that FMC Rochester may be a good fit for Mr. Mikos. He again recalled that the SCU team brought up Mr. Mikos immediately when they met with Mr. Synsvoll to discuss designations on Tuesday, January 7, 2025.

21. Mr. Synsvoll requested that we prepare a designation memo concerning Mr. Mikos. He explained that attorneys are in an ideal position to recommend the most suitable designation for their own clients, and the BOP seriously considers such recommendations. Mr. Synsvoll urged us to include in our memo details regarding Mr. Mikos's anxiety about being in general population

6

and how Mr. Mikos's medical and mobility issues affect his safety. He said he would be meeting with the designation team again on Tuesday, January 13, and urged us to provide the memo in time for consideration in that meeting. He predicted that the moves would be complete in a matter of weeks, not months.

22. On January 13, 2025, we emailed a 4-page memorandum with supporting BOP records to Mr. Synsvoll detailing Mr. Mikos's medical issues and substantial safety concerns related to those issues, in addition to his age and status as an "outlier" who socially isolates due to his physical limitations.

23. The BOP medical records we provided with the memo confirm that Mr. Mikos has numerous chronic, unstable medical conditions. Mr. Mikos is diagnosed with, among other things, heart disease, enlarged prostate with related urinary complications, hypertension, diabetes, lower extremity edema, degenerative disc disease with cervical spondylosis and spinal stenosis, diverticulosis, hypothyroidism, and recurrent pressure ulcers. His ocular complications, such as glaucoma, cataracts, double vision, and macular hole degeneration, require examinations and treatment with specialists outside the prison four times per year. Mr. Mikos takes more than a dozen daily medications.

24. BOP's own records reflect that Mr. Mikos's comorbidities cause several additional documented complications, including slow and unsteady gait, decreased mobility, lightheadedness, dizziness, and shortness of breath. Mr. Mikos fell and sustained injuries three times in the past year. In turn, his medical providers have issued the following current prescriptions: a handicap cell with handrails, compression stockings (which he no longer has strength or dexterity to pull on), front cuffs, a gel mattress "overlay" to address bed sores, and a second blanket for age-related cold intolerance. Mr. Mikos has asked for a cane or other device to help him walk and a wedge for his

7

bed because his physician recommended that he elevate his legs to address his edema, but to date, those assistive devices have been denied.

25. On January 22, 2025, a member of the SCU staff informed Mr. Mikos that all the commutees were going to ADX and handed him a form. On January 23, 2025, I emailed Mr. Synsvoll to ask for a call to discuss Mr. Mikos's designation. Mr. Synsvoll agreed to speak the morning of the following Monday, January 27, 2025.

26. On the morning of January 27, Mr. Synsvoll emailed us to ask to move our meeting to the afternoon because he had two internal meetings that morning "concerning the housing of those who received a commutation to their death sentences. By moving the meeting, I will be able to provide up-to-date information to you during our discussion." We agreed and met virtually with Mr. Synsvoll that afternoon.

27. During that meeting on the afternoon of January 27, Mr. Synsvoll assured us that the designation team was still working to create a specific designation plan for each commutee. Mr. Synsvoll said the SCU acted out of turn when they provided a BOP *Notice of Mental Health Evaluation* form, as part of a referral to ADX, to everyone awaiting designation decisions. Mr. Synsvoll emailed the form to me during our meeting and said it was the form everyone received the week before. Mr. Synsvoll was very clear during our meeting, however, that transfers to ADX were not a done deal and that no decisions or final plans had been made.

28. Mr. Synsvoll then told us that the BOP staff addressing the designations for the commutees would be submitting their plan for transfers and designations to the Attorney General/Deputy Attorney General. He said the designation team put a lot of time into creating plans specific to each of the commutees. He told us that the recommendation memos provided by the various counsel teams had been helpful and taken into consideration in developing the

individualized designation plans that would be submitted to the Attorney General/Deputy Attorney General.

29. Mr. Synsvoll told us that because Mr. Mikos had not received notice of an ADX referral by that time, that meant that the designation team would ***not*** be recommending an ADX referral for him. Mr. Synsvoll stated that a number of options were available for commutees who were not going to ADX Florence or FMC Springfield. Mr. Synsvoll told us that the information we provided in our memo regarding Mr. Mikos's health and safety concerns would be presented to the liaison in the Office of the Deputy Attorney General and that information provided by the commutees' counsel would inform decisions about where to place different commutees.

30. Mr. Synsvoll said that he and the designation team would meet again on January 30, 2025, and he hoped to have more information then, although he acknowledged that final plans might not be determined at that meeting

31. Unbeknownst to us as Mr. Mikos's counsel, however, the very same day we were speaking with Mr. Synsvoll, a document was apparently being generated that suggested Mr. Mikos was a Care Level 2, rather than a Care Level 3. Specifically, in a BOP *Health Services – Medical Duty Status* report for Mr. Mikos dated January 27, 2025, the comments section notes an abrupt reduction in Mr. Mikos's care level: "1/27/25 – Care Level 2 – Age >70 – DM, Ortho, HTN, Lipid." My co-counsel and I did not receive this form until late February 2025. To my knowledge, Mr. Mikos had only one medical examination between January 8, 2025 (the date of the form reporting the Care Level 3 classification) and January 27, 2025 (the date of the form suggesting the Care Level 2 classification), which was an appointment with an ophthalmology specialist outside the prison. I am aware of no basis to reduce his medical care level, given that Mr. Mikos's health and medical conditions remained the same, to my knowledge, during that short period of time.

32. By February 11, 2025, we were concerned that all commutees in the SCU were going to be transferred, immediately, to ADX. We emailed Mr. Synsvoll to indicate such a move would be improper and would violate the law. Mr. Sysnvoll replied by indicating that he was on leave and would be available to discuss the following week, the week of February 18, 2025.

33. On February 19, 2025, my co-counsel and I again spoke to Mr. Synsvoll regarding Mr. Mikos's designation and transfer. I reported that I had heard that only "medicals" were excluded from referrals to ADX and asked if that included anyone classified as Medical Care Level 3. Mr. Synsvoll reported that it did not. Mr. Synsvoll explained that the two commutees who were already at FMC Springfield would remain there and would not be referred to ADX. He said that all other commutees—including Mr. Mikos—would be referred to ADX for placement in general population. This was in direct contradiction to Mr. Synsvoll's statements, just a few weeks earlier, confirming that Mr. Mikos would not be transferred to ADX, did not fit the criteria for designation to ADX, and in all events would be assessed individually to identify an appropriate facility given his unique needs.

34. During this call, Mr. Synsvoll told us that because Mr. Mikos is 76 years old, he likely would be recommended for the high-security unit at ADX for prisoners over age 50 who have no recent incidents of violence toward staff or other prisoners. Mr. Sysnvoll referred to this unit as the "AARP Unit" and noted that Mr. Mikos appears to meet the criteria for placement there. He said the unit has handicap-equipped cells and that four beds in the unit were presently available.

35. Mr. Synsvoll also noted that if Mr. Mikos transferred to ADX general population, he might be assigned to the high-security unit later. Mr. Synsvoll said he hoped that the team at ADX would be able to address Mr. Mikos's medical needs. He expressed concern, however, that Mr. Mikos would have to deal with stairs if he were assigned to the general population in ADX. He said the high-security unit, on the other hand, is more equipped to deal with mobility issues.

He further stated that due to Mr. Mikos's current medical classification as Care Level 3, he would be more likely to be placed in a handicap-accessible cell at ADX, and Mr. Synsvoll had already discussed Mr. Mikos's medical needs and related accommodations with the team at ADX.

36. Between Mr. Synsvoll's representation on January 10, 2025, that Mr. Mikos would *not* (and could *not*) be designated to ADX and his contrary representation on February 19, 2025, that Mr. Mikos *would* be going to ADX, Mr. Mikos's circumstances did not change. Mr. Mikos did not have any incident reports during that time. His health and numerous chronic, degenerative conditions did not improve.

37. I have substantial concern about Mr. Mikos being sent to ADX, particularly given that ADX is not equipped to provide appropriate care to someone classified as Medical Care Level 3 (and perhaps soon to be classified as Medical Care Level 4). I am deeply concerned for his health, well-being, and physical safety and believe that transferring Mr. Mikos to ADX would put him at substantial risk of serious injury, not to mention a worsening of his many medical conditions.

I declare under penalty of perjury that the foregoing is true and correct to the best of my personal knowledge, information, and belief, subject to 28 U.S.C. § 1746.

Executed on March 28, 2025        By: _____
                                              Leane Renée