**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| REJON TAYLOR, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 1:25-cv-01161-TJK |
| DONALD J. TRUMP, *et al.*, in their official capacities, | |
| *Defendants.* | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'**
**MOTION FOR A PRELIMINARY INJUNCTION**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................... iii

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

I.      FACTUAL BACKGROUND ................................................................... 2

        A.      BOP's Statutory Authority to Designate Inmates' Place of Imprisonment............. 2

        B.      BOP's Designations Process ........................................................... 4

        C.      Commutation of Plaintiffs' Death Sentences, and BOP's Ongoing
                Consideration of Redesignation ...................................................... 7

        D.      Executive Order 14,164 and the Attorney General's February 5
                Memorandum ......................................................................... 9

        E.      Conditions at ADX Florence............................................................ 10

II.     PROCEDURAL HISTORY .................................................................... 13

LEGAL STANDARD ........................................................................................... 14

ARGUMENT .................................................................................................... 15

I.      PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS BECAUSE
        THE COURT LACKS SUBJECT-MATTER JURISDICTION. ...................................... 16

        A.      The United States Has Not Waived Sovereign Immunity..................................... 16

        B.      Congress Has Precluded Judicial Review of Plaintiffs' Challenges to
                BOP's Transfer Process........................................................................ 19

        C.      Plaintiffs Lack Standing, and Their Claims Are Not Ripe.................................. 21

        D.      Plaintiffs Have Not Exhausted Their Administrative Remedies............................ 23

II.     PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS BECAUSE
        THEIR CLAIMS ARE MERITLESS. ............................................................ 25

        A.      The Administrative Procedure Act Bars Plaintiffs' Claims (Counts 8–9). ........... 25

                1.      *BOP's Inmate Placement Decisions Are Committed to the Agency's
                        Discretion by Law.* .............................................................. 25

                2.      *Plaintiffs Do Not Show Any "Agency" Action.* ................................ 26

i

        *3.   Plaintiffs Do Not Show Any "Final" Action.* .................................................. 28

        *4.   The APA Does Not Provide a Cause of Action Because an Alternative Adequate Remedy Is Available to Plaintiffs.* ............................... 29

    B.     Plaintiffs' Administrative Procedure Act Claims (Counts 8–9) Lack Merit. ........ 30

        *1.   Defendants' Actions Did Not Exceed Their Statutory Authority and Were Not Unlawful (Count 8).* ....................................................................... 30

        *2.   Defendants' Actions Were Not Arbitrary and Capricious (Count 9).* .............. 32

    C.     Plaintiffs' Procedural Due Process Claim (Count 1) Lacks Merit. ....................... 32

        *1.   The Transfer of Plaintiffs to the ADX Would Not Deprive Them of Any Liberty Interest.* ............................................................................................ 33

        *2.   Even if a Liberty Interest Were Implicated by a Transfer to the ADX, the Procedural Protections Already Provided by BOP Are Constitutionally Sufficient.* .............................................................................. 36

    D.     Plaintiffs' Equal Protection Claim (Count 2) Lacks Merit. .................................. 38

    E.     Plaintiffs' Eighth Amendment Claim (Count 3) Lacks Merit. ............................. 43

        *1.   ADX Conditions of Confinement Are Not Objectively Cruel and Unusual.* ......................................................................................................... 44

        *2.   ADX Conditions of Confinement Are Not Subjectively Cruel and Unusual.* ......................................................................................................... 46

    F.     Plaintiffs' "Pardon Power" Claim (Count 7) Lacks Merit. .................................. 48

III.    PLAINTIFFS HAVE NOT SHOWN IRREPARABLE HARM. ...................................... 49

IV.    THE REMAINING FACTORS COUNSEL AGAINST PRELIMINARY INJUNCTIVE RELIEF. .................................................................................................... 51

V.    ANY INJUNCTIVE RELIEF SHOULD BE NARROWLY TAILORED AND PERMIT LAWFUL AGENCY ACTIVITY. ...................................................................... 52

VI.    ANY INJUNCTIVE RELIEF SHOULD BE STAYED PENDING APPEAL AND ACCOMPANY A BOND. ................................................................................................. 53

CONCLUSION ................................................................................................................ 53

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Ajaj v. United States*,
   293 F. App'x 575 (10th Cir. 2008) ............................................................... 45

*Alcresta Therapeutics, Inc. v. Azar*,
   318 F. Supp. 3d 321 (D.D.C. 2018) ............................................................. 15

*Am. Whitewater v. Tidwell*,
   770 F.3d 1108 (4th Cir. 2014) .................................................................... 30

*Ancient Coin Collectors Guild v. CBP*,
   801 F. Supp. 2d 383 (D. Md. 2011) ............................................................ 27

*Aref v. Lynch*,
   833 F.3d 242 (D.C. Cir. 2016) .................................................................... 36

*Arizonans for Off. Eng. v. Arizona*,
   520 U.S. 43 (1997)...................................................................................... 22

*\*Bennett v. Spear*,
   520 U.S. 154 (1997).................................................................................... 28

*Bolling v. Sharpe*,
   347 U.S. 497 (1954).................................................................................... 38

*Bornales v. Lappin*,
   713 F. Supp. 2d 47 (D.D.C. 2010) .............................................................. 41

*Bowen v. Massachusetts*,
   487 U.S. 879 (1988).................................................................................... 29

*Brandon v. D.C. Bd. of Parole*,
   823 F.2d 644 (D.C. Cir. 1987) .................................................................... 39

*Brown v. Holder*,
   770 F. Supp. 2d 363 (D.D.C. 2011) .............................................................. 3

*Califano v. Yamasaki*,
   442 U.S. 682 (1979).................................................................................... 52

*Chamber of Com. of U.S. v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996) .................................................................... 27

*Chaplaincy of Full Gospel Churches v. England,
  454 F.3d 290 (D.C. Cir. 2006) ....................................................... passim

Clapper v. Amnesty Int'l USA,
  568 U.S. 398 (2013) ................................................................... 23

Cohen v. United States,
  151 F.3d 1338 (11th Cir. 1998) ..................................................... 18

Davis v. FEC,
  554 U.S. 724 (2008) ................................................................... 22

Davis v. Fed. Bureau of Prisons,
  2016 WL 1156755 (D. Colo. Mar. 24, 2016) .................................... 45

Davis v. Pension Benefit Guar. Corp.,
  571 F.3d 1288 (D.C. Cir. 2009) ..................................................... 15

Delaney v. DeTella,
  256 F.3d 679 (7th Cir. 2001) ........................................................ 47

Dellinger v. Bessent,
  2025 WL 559669 (D.C. Cir. Feb. 15, 2025) ..................................... 53

Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz,
  601 U.S. 42 (2024) ..................................................................... 19

Dep't of Homeland Sec. v. New York,
  140 S. Ct. 599 (2020) ................................................................. 52

Detroit Int'l Bridge Co v. Gov't of Canada,
  189 F. Supp. 3d 85 (D.D.C. 2016) ................................................. 27

Doe v. McHenry,
  -- F. Supp. 3d --, 2025 WL 388218 (D.D.C. Feb. 4, 2025) ................... 20

DSE, Inc. v. United States,
  169 F.3d 21 (D.C. Cir. 1999) ........................................................ 53

Elm 3DS Innovations LLC v. Lee,
  2016 WL 8732315 (E.D. Va. Dec. 2, 2016) ..................................... 29

*Farmer v. Brennan,
  511 U.S. 825 (1994) .................................................................. passim

iv

*FDIC v. Meyer,*
  510 U.S. 471 (1994).................................................................................. 16

Fletcher v. DOJ,
  17 F. Supp. 3d 89 (D.D.C. 2014) ............................................................ 16

Florida v. Dep't of Health & Hum. Servs.,
  19 F.4th 1271 (11th Cir. 2021)................................................................. 52

Franklin v. Dist. of Columbia,
  163 F.3d 625 (D.C. Cir. 1998) ................................................................. 34

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992).................................................................................. 26

Garcia v. Vilsack,
  563 F.3d 519 (D.C. Cir. 2009) ................................................................. 29

Ex parte Garland,
  71 U.S. (4 Wall.) 333 (1866).................................................................... 49

Georgacarakos v. Wiley,
  2010 WL 1291833 (D. Colo. Mar. 30, 2010)........................................... 34

*Gowadia v. Stearns,*
  596 F. App'x 667 (10th Cir. 2014)........................................................... 45

Greater New Orleans Fair Hous. Action Ctr. v. HUD,
  639 F.3d 1078 (D.C. Cir. 2011) ............................................................... 16

Guttenberg v. Emery,
  26 F. Supp. 3d 88 (D.D.C. 2014) ............................................................ 15

Hatch v. Dist. of Columbia,
  184 F.3d 846 (D.C. Cir. 1999) ................................................................. 35

*Hatim v. Obama,*
  760 F.3d 54 (D.C. Cir. 2014) ................................................................... 42

Hewitt v. Helms,
  459 U.S. 460 (1983)............................................................................ 34, 36

*Hill v. Pugh,*
  75 F. App'x 715 (10th Cir. 2003)........................................................ 44, 45

*Hope v. Pelzer,*
    536 U.S. 730 (2002) ........................................................................................ 47, 48

*Hudson v. McMillian,*
    503 U.S. 1 (1992) ............................................................................................ 44, 50

*In re Robinson,*
    917 F.3d 856 (5th Cir. 2019) ................................................................................ 41

*J. Roderick MacArthur Found. v. FBI,*
    102 F.3d 600 (D.C. Cir. 1996) ............................................................................. 23

*James v. Reno,*
    39 F. Supp. 2d 37 (D.D.C. 1999) .......................................................................... 41

*Jasperson v. Fed. Bureau of Prisons,*
    460 F. Supp. 2d 76 (D.D.C. 2006) ........................................................................ 18

*Johnson v. Daley,*
    339 F.3d 582 (7th Cir. 2003) ................................................................................ 38

*Jones v. Bock,*
    549 U.S. 199 (2007) ............................................................................................. 24

*Jordan v. Fed. Bureau of Prisons,*
    191 F. App'x 639 (10th Cir. 2006) ........................................................................ 34

*Kadamovas v. Siereveld,*
    2019 WL 2869674 (S.D. Ind. July 3, 2019) .......................................................... 44

*Kaemmerling v. Lappin,*
    553 F.3d 669 (D.C. Cir. 2008) ............................................................................. 24

*Kansas v. Becerra,*
    -- F. Supp. 3d --, 2025 WL 212358 (N.D. Iowa Jan. 16, 2025) ............................ 25

*Knapp Med. Ctr. v. Hargan,*
    875 F.3d 1125 (D.C. Cir. 2017) ........................................................................... 21

*Kontrick v. Ryan,*
    540 U.S. 443 (2004) ............................................................................................. 21

*Ky. Dep't of Corr. v. Thompson,*
    490 U.S. 454 (1989) ............................................................................................. 33

*Lane v. Peña,*
   518 U.S. 187 (1996) ............................................................................... 16

*Lewis v. Casey,*
   518 U.S. 343 (1996) ............................................................................... 52

*Love v. Bureau of Prisons,*
   2025 WL 105845 (D.D.C. Jan. 15, 2025) ............................................. 18

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ......................................................................... 21, 23

*Lujan v. Nat'l Wildlife Fed'n,*
   497 U.S. 871 (1990) ......................................................................... 27, 28

*Lyle v. Sivley,*
   805 F. Supp. 755 (D. Ariz. 1992) ......................................................... 26

*Marshall v. Reno,*
   915 F. Supp. 426 (D.D.C. 1996) ........................................................... 41

*Martin v. Gerlinski,*
   133 F.3d 1076 (8th Cir. 1998) .............................................................. 18

*Mathews v. Eldridge,*
   424 U.S. 319 (1976) ............................................................................... 36

*McKune v. Lile,*
   536 U.S. 24 (2002) ................................................................................. 18

*McMillan v. Wiley,*
   813 F. Supp. 2d 1238 (D. Colo. 2011) .................................................. 45

*Mdewakanton Band of Sioux in Minn. v. Bernhardt,*
   464 F. Supp. 3d 316 (D.D.C. 2020) ...................................................... 24

*\*Meachum v. Fano,*
   427 U.S. 215 (1976) ..................................................................... 19, 34, 41

*Michael M. v. Superior Ct. of Sonoma Cnty.,*
   450 U.S. 464 (1981) ............................................................................... 38

*Miller v. Fed. Bureau of Prisons,*
   703 F. Supp. 2d 8 (D.D.C. 2010) .......................................................... 34

*Mississippi v. Johnson,*
    71 U.S. (4 Wall.) 475 (1866)...................................................................... 52

*Moody v. Daggett,*
    429 U.S. 78 (1976)........................................................................................ 34

*Morrisey v. Brewer,*
    408 U.S. 471 (1972)...................................................................................... 36

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)........................................................................................ 30

*Murthy v. Missouri,*
    144 S. Ct. 1972 (2024).................................................................................. 22

*Nken v. Holder,*
    556 U.S. 418 (2009)................................................................... 15, 51, 53

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004)........................................................................................ 27

*Ohio Valley Env't Coal. v. Aracoma Coal Co.,*
    556 F.3d 177 (4th Cir. 2009)........................................................................ 30

*Palmore v. United States,*
    411 U.S. 389 (1973)...................................................................................... 21

*Patchak v. Zinke,*
    138 S. Ct. 897 (2018).................................................................................... 21

*Pearson v. Ramos,*
    237 F.3d 881 (7th Cir. 2001)........................................................................ 43

*Perry Cap. LLC v. Mnuchin,*
    864 F.3d 591 (D.C. Cir. 2017) ..................................................................... 29

*Pittman v. Lappin,*
    662 F. Supp. 2d 58 (D.D.C. 2009) ............................................................... 17

*Plyler v. Doe,*
    457 U.S. 202 (1982)...................................................................................... 38

*Porche v. Salazar,*
    2019 WL 1373683 (D. Or. Mar. 5, 2019)..................................................... 20

*Preiser v. Rodriguez*,
   411 U.S. 475 (1973) ............................................................................... 43

*Procunier v. Martinez*,
   416 U.S. 396 (1974) ............................................................................... 36

*Prows v. Fed. Bureau of Prisons*,
   981 F.2d 466 (10th Cir. 1992) ............................................................... 26

*Pryor-El v. Kelly*,
   892 F. Supp. 261 (D.D.C. 1995) .................................................. 38, 39, 42

*Quinn v. Wexford Health Sources, Inc.*,
   8 F.4th 557 (7th Cir. 2021) .................................................................... 44

*Reynolds v. Quiros*,
   990 F.3d 286 (2d Cir. 2021) ................................................................... 42

*\*Rezaq v. Nalley*,
   677 F.3d 1001 (10th Cir. 2012) ....................................................... *passim*

*Rhodes v. Chapman*,
   452 U.S. 337 (1981) .......................................................................... 43, 44

*Ross v. Blake*,
   578 U.S. 632 (2016) ............................................................................... 24

*Royer v. BOP*,
   933 F. Supp. 2d 170 (D.D.C. 2013) ....................................................... 20

*\*Sandin v. Conner*,
   515 U.S. 472 (1995) .......................................................................... 33, 35

*Scoggins v. Lee's Crossing Homeowners Ass'n*,
   718 F.3d 262 (4th Cir. 2013) ................................................................. 23

*Sea Containers Ltd. v. Stena AB*,
   890 F.2d 1205 (D.C. Cir. 1989) ............................................................. 49

*Sills v. FCI Talladega Warden*,
   2023 WL 1775725 (11th Cir. Feb. 6, 2023) ........................................... 19

*Silver State Land, LLC v. Schneider*,
   145 F. Supp. 3d 113 (D.D.C. 2015) ....................................................... 30

*Silverstein v. Fed. Bureau of Prisons*,
    559 F. App'x 739 (10th Cir. 2014) ........................................................... 45

*South Carolina v. United States*,
    912 F.3d 720 (4th Cir. 2019) ................................................................. 23

*Sprint Commc'ns Co. v. APCC Servs., Inc.*,
    554 U.S. 269 (2008) ............................................................................ 21

*Thye v. United States*,
    109 F.3d 127 (2d Cir. 1997) ................................................................. 19

*Trump v. New York*,
    592 U.S. 125 (2020) ............................................................................ 23

*Tucker v. Branker*,
    142 F.3d 1294 (D.C. Cir. 1998) .............................................................. 38

*Tulare Cnty. v. Bush*,
    185 F. Supp. 2d 18 (D.D.C. 2001) ............................................... 26, 32, 42

*Tulare Cnty. v. Bush*,
    306 F.3d 1138 (D.C. Cir. 2002) .............................................................. 26

*Turner v. Safley*,
    482 U.S. 78 (1987) ............................................................................. 43

*United States v. Allen*,
    247 F.3d 741 (8th Cir. 2001) ................................................................. 41

*United States v. Basham*,
    561 F.3d 302 (4th Cir. 2009) .............................................................. 7, 41

*United States v. Council*,
    77 F.4th 240 (4th Cir. 2023) .............................................................. 7, 41

*United States v. Hager*,
    721 F.3d 167 (4th Cir. 2013) .............................................................. 7, 41

*United States v. Hall*,
    945 F.3d 1035 (8th Cir. 2019) ............................................................... 41

*United States v. Jackson*,
    327 F.3d 273 (4th Cir. 2003) .............................................................. 7, 41

*United States v. King*,
  338 F.3d 794 (7th Cir. 2003) ........................................................................ 26

*United States v. Lawrence*,
  735 F.3d 385 (6th Cir. 2013) ........................................................................ 41

*United States v. Mikhel*,
  889 F.3d 1003 (9th Cir. 2018) .................................................................... 7, 41

*United States v. Mikos*,
  539 F.3d 706 (7th Cir. 2008) ........................................................................ 41

*\*United States v. Mitchell*,
  463 U.S. 206 (1983) ....................................................................................... 16

*United States v. Runyon*,
  707 F.3d 475 (4th Cir. 2013) ........................................................................ 41

*United States v. Sherwood*,
  312 U.S. 584 (1941) ....................................................................................... 16

*United States v. Taylor*,
  814 F.3d 340 (6th Cir. 2016) ...................................................................... 7, 41

*United States v. Tipton*,
  95 F.4th 831 (4th Cir. 2024) ......................................................................... 41

*United States v. Torrez*,
  869 F.3d 291 (4th Cir. 2017) ........................................................................ 41

*United States v. Troya*,
  733 F.3d 1125 (11th Cir. 2013) ..................................................................... 41

*United States v. Umaña*,
  750 F.3d 320 (4th Cir. 2014) ........................................................................ 41

*Univ. of Tex. v. Camenisch*,
  451 U.S. 390 (1981) ....................................................................................... 52

*Versata Dev. Corp. v. Rea*,
  959 F. Supp. 2d 912 (E.D. Va. 2013) ........................................................... 29

*Webster v. Doe*,
  486 U.S. 592 (1988) ....................................................................................... 20

*Wilkinson v. Austin,*
  545 U.S. 209 (2005) ................................................................................................ *passim*

*Wills v. Barnhardt,*
  2022 WL 4481492 (10th Cir. Sept. 27, 2022) ...................................................... 20

*Winter v. Nat. Res. Defense Council, Inc.,*
  555 U.S. 7 (2008) ................................................................................................... 15

*Wis. Gas Co. v. FERC,*
  758 F.2d 669 (D.C. Cir. 1985) ............................................................................. 49

*Women Prisoners of D.C. Dep't of Corrs. v. Dist. of Columbia,*
  93 F.3d 910 (D.C. Cir. 1996) .............................................................................. 38

*Woodford v. Ngo,*
  548 U.S. 81 (2006) ................................................................................................. 24

*Xiaoda Liu v. Mayorkas,*
  548 F. Supp. 3d 1 (D.D.C. 2021) ......................................................................... 14

*Z St., Inc. v. Koskinen,*
  44 F. Supp. 3d 48 (D.D.C. 2014) ........................................................................ 17

## Statutes

5 U.S.C. § 701 ......................................................................................................... 25

5 U.S.C. § 702 .................................................................................................... 17, 25

5 U.S.C. § 704 ............................................................................................... 26, 28, 29

5 U.S.C. § 706 ......................................................................................................... 30

18 U.S.C. § 509 .................................................................................................... 9, 10

18 U.S.C. § 3621 ............................................................................................... *passim*

18 U.S.C. § 3625 ......................................................................................... 17, 20, 25

28 U.S.C. § 509 ....................................................................................................... 31

Act of May 14, 1930, Pub. L. No. 71-218, 46 Stat. 325 (1930). ............................. 2, 9

Act of Sept. 14, 1959, Pub. L. No. 86-256, 73 Stat. 518 (codified at 18 U.S.C. § 4083) ......... 3, 19

First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 .................................................. 19, 20

Sentencing Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 1837 ............................................ 3

**<u>Rules</u>**

Fed. R. Civ. P. 65 ................................................................................................................ 53

Fed. R. Civ. P. 26 ................................................................................................................ 11

**<u>Other Authorities</u>**

Exec. Order No. 14,164 ................................................................................. *passim*

28 C.F.R. § 542.13 ............................................................................................................. 24

28 C.F.R. § 542.14 ............................................................................................................. 24

28 C.F.R. § 542.15 ............................................................................................................. 24

# INTRODUCTION

Congress has vested the Federal Bureau of Prisons ("BOP") with broad authority to manage the imprisonment of federal inmates to best serve the penological purposes of imprisonment, public safety, and the needs of prisoners. Incumbent within that authority is the discretion to designate the place in which any individual prisoner should be held in custody. Plaintiffs are 21 federal prisoners whose crimes of conviction justified imposition of the penalty of death. However, on December 23, 2024, former President Biden took the unprecedented step of commuting virtually all the sentences of prisoners on federal death row, including Plaintiffs', to life imprisonment without the possibility of parole. Immediately thereafter, the BOP began the arduous process of finding an alternate facility for those 37 inmates, including coordinating with Plaintiffs' attorneys to collect information specific to each Plaintiff's background, needs, and conditions. BOP's redesignation process is dictated by long-standing BOP policy, set forth in BOP Program Statement 5100.08. That extensive, multi-step process began only recently and is currently ongoing. BOP has not issued any final decision on where to relocate any Plaintiff, and any such decision would be subject to multiple administrative appeals before it became final.

Plaintiffs, unhappy with a January 20, 2025, Executive Order that directed the Attorney General to "evaluate" the places of imprisonment and conditions of confinement for the recent commutees, now seek to interrupt the BOP's deliberative process by claiming that their ultimate redesignation to the United States Penitentiary—Administrative Maximum in Florence, Colorado ("ADX Florence")—the conditions of which Plaintiffs disfavor—is somehow inevitable and should be enjoined. According to Plaintiffs, by virtue of the Executive Order and the Attorney General's February 5 implementing Memorandum, the BOP's redesignation process has been rendered a "sham," the outcome of which is predetermined: Transfer to ADX Florence. Plaintiffs have brought ten claims—of which they presently press six—under the Constitution and

Administrative Procedure Act. None has merit, and none entitles Plaintiffs to the extraordinary remedy of preliminary injunctive relief.

*First*, Plaintiffs cannot show a likelihood of success on the merits of their claims because the Court cannot reach the merits at all: It lacks subject-matter jurisdiction. Defendants have not waived sovereign immunity; BOP's placement decisions are unreviewable; Plaintiffs lack standing and their claims are unripe; and Plaintiffs have not exhausted their administrative remedies. The substance of Plaintiffs' constitutional and APA claims fare no better and fail for multiple reasons. *Second*, Plaintiffs cannot show irreparable harm—a requisite element for preliminary injunctive relief—because their alleged "harm" (transfer to ADX Florence) has not materialized and may never materialize. Even if Plaintiffs were temporarily transferred to ADX Florence for the pendency of this case, they have not demonstrated that harm experienced by virtue of any such temporary placement would be "irreparable." *Third*, the equities and public interest favor permitting BOP to complete its considered redesignation review, which is to the benefit of Plaintiffs, other inmates, BOP staff, and the public. The Motion for Preliminary Injunction should be denied.

## **BACKGROUND**

### I.    **Factual Background**

#### A.  BOP's Statutory Authority to Designate Inmates' Place of Imprisonment

Nearly a century ago, Congress established the BOP within the Department of Justice and specified that BOP's director would serve under the Attorney General. Act of May 14, 1930, Pub. L. No. 71-218, 46 Stat. 325 (1930). The 1930 Act further provided, *inter alia*, that the "Attorney General of the United States or his authorized representative . . . shall designate the places of confinement where the sentences of all such [convicted] persons shall be served." *Id.* § 7, 46 Stat. at 326. The Act afforded the Attorney General substantial discretion in this regard, providing that

the Attorney General "may designate any available, suitable, and appropriate institutions, whether maintained by the Federal Government or otherwise or whether within or without the judicial district in which convicted." *Id.*, 46 Stat. at 326–27. Since establishing BOP, Congress has continued to confer on the Executive Branch the discretion over where to imprison individuals convicted of crimes in federal court. *See, e.g.*, Act of Sept. 14, 1959, Pub. L. No. 86-256, 73 Stat. 518 (codified at 18 U.S.C. § 4083); Sentencing Reform Act of 1984, Pub. L. No. 98-473, §§ 211–212, 98 Stat. 1837, 2007 (codified as amended at 18 U.S.C. § 3621).

Persons who are sentenced "to a term of imprisonment" in federal court (and the District of Columbia Superior Court) are "committed to the custody" of BOP "until the expiration of the term imposed, or until earlier released for satisfactory behavior." 18 U.S.C. § 3621(a). Per BOP policy, initial BOP facility assignments are referred to as "designations," and reassignments are referred to as "redesignations." *See* ECF No. 2-8, BOP Program Statement 5100.08, *as amended*, "Inmate Security Designation and Custody Classification" (hereafter, "PS 5100.08"), Ch. 1 p.1 (re: initial assignments) & Ch. 2 p.6 (defining "redesignation"). Congress has tasked BOP with "designat[ing] the place of the prisoner's imprisonment" and authorized it to "designate any available penal or correctional facility" meeting "minimum standards of health and habitability" that BOP "determines to be appropriate and suitable." 18 U.S.C. § 3621(b). BOP's decision where to place an inmate is unreviewable, as Plaintiffs acknowledge. ECF No. 1 ("Compl.") ¶ 48 ("Federal law and regulations give Defendant BOP *the exclusive authority* to determine the institutional placement of every person in its custody." (emphasis added) (citing § 3621(b))); *see also, e.g.*, *Brown v. Holder*, 770 F. Supp. 2d 363, 365–66 (D.D.C. 2011) (collecting cases).

BOP's broad, unreviewable discretion to make designation and redesignation decisions is guided by "the resources of the facility contemplated," "the nature and circumstances of the offense," "the history and characteristics of the prisoner," any statement by the sentencing court

about the "purposes" of imprisonment or the "type of penal or correctional facility," and policy statements by the Sentencing Commission. 18 U.S.C. § 3621(b)(1)–(5). BOP is also instructed to place prisoners close to their primary residence, where possible. *Id.* § 3621(b).

B.  <u>BOP's Designations Process</u>

BOP Program Statement 5100.08 "provides policy and procedure regarding [BOP's] inmate classification system," in recognition that, "classification of inmates is necessary to place each inmate in the most appropriate security level institution that also meets their program needs and is consistent with the Bureau's mission to protect society." PS 5100.08 § 1 ("Purpose and Scope"). BOP institutions are classified into one of five security levels: Minimum, Low, Medium, High, and Administrative. *Id.*, Ch. 1 p.1. The classifications are based on "the level of security and staff supervision the institution is able to provide." *Id.* Similarly, BOP inmates are classified based on, *inter alia*, "[t]he level of security and supervision the inmate requires." *Id.*

Designation decisions are based "primarily" upon the "level of security and supervision the inmate requires," "[t]he level of security and staff supervision the institution is able to provide," and the inmate's program needs. *Id.* Redesignations "are considered in much the same manner using many of the same factors used at the time of initial designation," in addition to the inmate's institutional adjustment and program performance. *Id.*, Ch. 1 p.3. Relevant here, "Administrative" BOP facilities are "institutions with special missions," such as "the containment of extremely dangerous, violent, or escape-prone inmates." BOP, *About Our Facilities*, https://www.bop.gov/about/facilities/federal_prisons.jsp (last visited May 1, 2025). ADX Florence is one such Administrative facility, in BOP's North Central Region. *Id.*

The approval process for redesignations to ADX Florence, a "special mission" institution, is governed by PS 5100.08 Chapter 7, § 21 (pp.16–19) ("Institutions with Special Missions"), and by an October 15, 2012, Memorandum entitled "Administrative Maximum Facility (ADX)

4

General Population Referral Procedures" (ECF No. 2-9, hereafter, "the ADX Referral Memo"). *See also* **Ex. A** hereto (Salem Decl.) ¶¶ 12–13. Per BOP policy, assignments to ADX Florence "will ordinarily be made without regard for such factors as release destination or program needs, such as education and vocational training." PS 5100.08, Ch. 7 pp.17–18. As Plaintiffs emphasize, the decision to redesignate an inmate to ADX Florence "lies exclusively with BOP." Compl. ¶ 66. The process is outlined below.

### Step 1: Unit Staff Initiate a Referral for the DSCC's Consideration.

The first step in the process for referral to general population at ADX Florence is the same as it would be for referral to another BOP facility: "[S]taff [at the original facility] will initiate the referral process in accordance with the procedures outlined in Program Statement 5100.08." ADX Referral Memo, Attach. A at 2–3. The next steps, outlined in detail in the Salem Declaration accompanying this Motion (**Exhibit A**), are as follows. Facility staff transmit their referral packet to the originating facility's Warden. ADX Referral Memo, Attach. A at 3; Salem Decl. ¶ 15(A). If the Warden concurs with referral, the referral packet is signed and forwarded to the Regional Director. ADX Referral Memo, Attach. A at 3; Salem Decl. ¶ 15(B); PS 5100.08, Ch. 7 p.17 (§ 21(b)(1)). If the Regional Director concurs with referral, the referral packet is submitted to the Designation and Sentence Computation Center ("DSCC")—the BOP office where the BOP's classification and designation functions are centralized. ADX Referral Memo, Attach. A at 3; Salem Decl. ¶ 15(C).

Next, DSCC staff "conduct an initial assessment of the referral packet and the inmate's need for placement at ADX-GP [GP = General Population]." ADX Referral Memo, Attach. A at 3; Salem Decl. ¶ 15(D). Simultaneously, the DSCC forwards the packet to the Administrator of Psychology Services at BOP's Central Office. ADX Referral Memo, Attach. A at 3; Salem Decl. 15(D). If the DSCC determines the inmate is *not* appropriate for ADX-GP placement, it sends the

packet to the Assistant Director for the Correctional Programs Division ("CPD"), who notifies the referring Warden. If the DSCC determinates the inmate *is* appropriate for ADX-GP placement, BOP policy guarantees the inmate a hearing on the proposed referral—discussed further below. ADX Referral Memo, Attach. A at 3; Salem Decl. ¶ 15(D), (E).

### Step 2: A Hearing Is Held for All Inmates Referred for Potential Placement at ADX.

Pursuant to the ADX Referral Memo, and although not required by law, BOP's National Discipline Hearing Administrator ("DHA") designates a Hearing Administrator to conduct "due process hearings" specifically for inmates who are referred for potential placement to the ADX-GP or to Special Management Units ("SMU"). ADX Referral Memo at 1; Salem Decl. ¶ 15(E). The Hearing Administrator "will have correctional experience, including institution work with inmates, institutional experience in observing and evaluating inmate adjustment and disruptive behavior, and knowledge of the options available in the [BOP] for dealing with such conduct." Further, the Hearing Administrator "will be familiar with BOP policies and operations, including the criteria for placement of inmates in different institutions with emphasis on the ADX." ADX Referral Memo, Attach. A at 6; Salem Decl. ¶ 15(E).

The hearing process begins when the Hearing Administrator provides inmates with a Notice of Hearing, which includes the "[s]pecific evidence" that forms the basis for the referral (unless such information would jeopardize the safety and security of the institution or endanger staff or others). ADX Referral Memo, Attach. A at 6. The Notice "must be delivered at least 24 hours prior to the hearing," and if the inmate is illiterate, "staff shall explain the Notice and these procedures to the inmate." *Id.* The inmate can attend and participate in the hearing, including by presenting evidence. *Id.*, Attach. A at 6–7; Salem Decl. ¶ 15(E); Compl. ¶¶ 72–73. At the conclusion of the hearing and following a review of all material, the Hearing Administrator "shall prepare a written recommendation on whether placement of the inmate at the ADX is warranted."

ADX Referral Memo, Attach. A at 7; Compl. ¶ 74. Within 15 working days after the Hearing, the

Hearing Administrator sends a copy of their report to the National DHA for review before

forwarding to the Assistant Director, CPD, or designee. ADX Referral Memo, Attach. A at 7;

Salem Decl. ¶ 15(H). Within 30 working days, the CPD Assistant Director or designee "shall

accept or reject" the Hearing Administrator's recommendation. ADX Referral Memo, Attach. A

at 8; Salem Decl. ¶ 15(I). The Assistant Director will notify the Senior Deputy Assistant Director

over the DSCC ("SDAD, DSCC"),[1] of their "final decision." ADX Referral Memo, Attach. A at

8; Salem Decl. ¶ 15(J).

### Step 3: Per BOP Policy, Inmates Designated to the ADX-GP Have the Right to Appeal.

If the inmate disagrees with a final decision of redesignation to ADX, the process does not

end. Instead, the inmate may appeal through BOP's Administrative Remedy Program—first to the

SDAD, DSCC, and then again to the Office of General Counsel. ADX Referral Memo, Attach. A

at 8; Salem Decl. ¶¶ 22, 24; *see also* Compl. ¶ 76.

C. Commutation of Plaintiffs' Death Sentences, and BOP's Ongoing Consideration of
   Redesignation

Plaintiffs are 21 federal prisoners who, until December 23, 2024, had sentences of death

and accordingly were housed at U.S. Penitentiary Terre Haute ("Terre Haute"), Special

Confinement Unit ("SCU"). *See* Compl. ¶¶ 2, 4. Plaintiffs' crimes of conviction include bank

robbery, carjacking, racketeering, and rape; all were convicted of at least one count of murder, and

many have escaped or attempted to escape confinement. *See, e.g.*, *United States v. Taylor*, 814

F.3d 340, 345 (6th Cir. 2016); *United States v. Basham*, 561 F.3d 302, 309–14, 316 (4th Cir. 2009);

*United States v. Council*, 77 F.4th 240, 245 (4th Cir. 2023); *United States v. Hager*, 721 F.3d 167,

175 (4th Cir. 2013); *United States v. Jackson*, 327 F.3d 273, 280 (4th Cir. 2003); *United States v.*

---

[1] Formerly referred to as the Chief, DSCC, as indicated in the ADX Referral Memo.

*Mikhel*, 889 F.3d 1003, 1016, 1017, 1020 (9th Cir. 2018).

On December 23, 2024, former President Biden made an unprecedented decision to commute the sentences of 37 of the 40 prisoners on federal death row, including Plaintiffs', to life imprisonment without the possibility of parole. ECF No. 1-1 (Clemency Grant); *see* Compl. ¶ 2. BOP promptly began its housing redesignation review of those housed in SCU whose sentences had been commuted, given SCU's mission to house inmates who have received a sentence of death. BOP staff met with Plaintiffs' attorneys on multiple occasions, beginning January 7, 2025, and collected information about Plaintiffs from their representatives. *See, e.g.*, ECF No. 2-17 (Bizzaro Decl.) ¶¶ 8–10.[2] After reviewing and considering the vast amount of information provided to BOP, and consistent with PS 5100.08 and the ADX Referral Memo, the DSCC recommended that most of the Plaintiffs in this case be transferred to ADX Florence. Salem Decl. ¶¶ 16–17. Critically, the Assistant Director for CPD has not yet made a final decision of redesignation for *any* of the Plaintiffs. *Id.* ¶ 17 (CPD Assistant Director Salem attesting that he has not designated any of the 21 Plaintiffs for transfer to ADX Florence); *id.* ¶ 16 (status chart); *see also* ADX Referral Memo, Attach. A at 6–7 (outlining process); *see also* ECF No. 2-35 (Plaintiff Taylor Decl.) ¶¶ 24–25 (acknowledging on April 14, 2025, that "we haven't received a final designation from BOP headquarters").

---

[2] Plaintiffs claim that, before President Trump took office, BOP counsel estimated the likelihood of Plaintiffs' future redesignation to ADX. *E.g.*, Compl. ¶¶ 14–34, 80 (speculating, "[o]n information and belief," about BOP's "initial[]" determinations that Plaintiffs were not "appropriate" for placement at ADX); *see also generally* ECF Nos. 2-17 through 2-34, 2-36, 2-37 (Plaintiffs' attorneys' declarations). Although Defendants vigorously contest Plaintiffs' representation, it is immaterial to resolution of Plaintiffs' Motion for Preliminary Injunction because (i) no Plaintiff has actually been designated to ADX, and (ii) BOP's process, which remains ongoing, has been followed and BOP will continue to follow its policies as well as relevant statutory and constitutional laws. *See infra*.

Even assuming that the CPD Assistant Director agrees with the Hearing Administrator's recommendation(s) to place Plaintiffs at ADX, Plaintiffs' transfer to ADX Florence would be neither imminent nor inevitable. Instead, Plaintiffs would have the opportunity to appeal the Assistant Director's final decision—twice. ADX Referral Memo, Attach. A at 8. Plaintiffs do not allege, and there is no evidence, that any Plaintiff has appealed from any decision by the Assistant Director to redesignate him to ADX Florence.

### D. Executive Order 14,164 and the Attorney General's February 5 Memorandum

On January 20, 2025, while BOP's evaluation of the potential redesignations of Plaintiffs was underway, President Trump issued an Executive Order titled "Restoring the Death Penalty and Protecting Public Safety." *See* ECF No. 2-4, Exec. Order No. 14,164, 90 Fed. Reg. 8463 (hereafter, the "Executive Order" or "EO"). The Executive Order accurately observed that President Biden had "commuted the sentences of 37 of the 40 most vile and sadistic rapists, child molesters, and murderers on Federal death row." EO at 1. The Executive Order directed the Attorney General to "evaluate" the places of imprisonment and conditions of confinement for each of the 37 inmates whose death sentences had been commuted by former President Biden. *Id.* § 3(e). The Executive Order further directed the Attorney General to "take all lawful and appropriate action" to "ensure" that the offenders are imprisoned in conditions "consistent" with their crimes of conviction and "the threats they pose." *Id.* The Executive Order clarified that "[n]othing in this order shall be construed to impair or otherwise affect . . . the authority granted by law to an executive department or agency, or the head thereof." *Id.* § 7(a)(i). In any event, Attorney General involvement in BOP's process would not be surprising because, as stated *supra* § I.A, Congress established the BOP within the Department of Justice nearly a century ago and, in so doing, specified that the BOP's director would serve under the Attorney General. Act of May 14, 1930; *see* 18 U.S.C. § 509 (stating that the Attorney General is "vested" with the authority to perform and carry out "[a]ll functions

of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice").

On February 5, 2025, Attorney General Bondi issued a Memorandum to all Department of Justice employees, entitled, "Restoring a Measure of Justice to the Families of Victims of Commuted Murderers." *See* ECF No. 2-5 (hereafter, the "AG Memo"). The AG Memo observed that the former Administration's commutation of death sentences "undermined our justice system" and "robbed the victims' families of the justice promised." *Id.* Among other things, the AG Memo directed BOP to ensure that, "the conditions of confinement for each of the 37 commuted murderers are consistent with the security risks those inmates present because of their egregious crimes, criminal histories, and all other relevant considerations." *Id.* Neither the Executive Order nor the AG Memo purported to retract, overrule, or otherwise alter BOP Program Statement 5100.08, nor did they in any way purport to change the factors BOP has always considered for inmate designations. As stated above, the Executive Order disavows any interpretation that would impair BOP's authority under, *inter alia*, the Prison Litigation Reform Act ("PLRA") or First Step Act ("FSA") (EO § 7(a)(i)), and the AG Memo instructs the BOP to consider "all . . . relevant considerations."

E.  Conditions at ADX Florence

Plaintiffs allege that they will be transferred to ADX-GP. Inmates in the ADX-GP comprise a unique inmate population because ADX-GP units are "designed for male inmates who have demonstrated an inability to function in a less restrictive environment without being a threat to others, or to the secure and orderly operation of the institution." PS 5100.08, Ch. 7 p.17. Thus, an inmate referred to the ADX-GP will meet one or both of the following criteria: (i) the inmate's placement in other correctional facilities "creates a risk to institutional security and good order or poses a risk to the safety of staff, inmates, others, or to public safety" or (ii) as a result of the

10

inmate's status, either before or after incarceration, the inmate "may not be safely housed in the general population of another institution." *See* ADX Referral Memo, Attach. A at 1. While Plaintiffs purport to characterize conditions at ADX Florence through reliance on an "expert" (Compl. ¶¶ 100–13), the reality is different.[3] *See generally* **Ex. B** hereto (Armijo Decl.).

ADX-GP inmates have individual cells, which contain beds with mattresses and bedding; showers with curtains; sinks; desks; permanently affixed stools; shelves; and televisions that receive over 50 channels and have access to educational, religious, and other programming. Armijo Decl. ¶¶ 10, 20. Each cell has a window to the outside, *id.* ¶ 6(a), and inmates are permitted to have certain personal items in their cells, which may include photographs, reading and educational materials, and art supplies, *id.* ¶¶ 10, 18. ADX-GP also has a variety of spaces for inmates to use outside of their cells, including: (1) indoor and outdoor spaces for recreation and exercise, *id.* ¶¶ 35–41; (2) a law library, which contains a computer terminal, *id.* ¶ 33; (3) a gymnasium with enclosures for five inmates to participate in group classes, *id.* ¶ 39; and (4) a psychology classroom, which includes enclosures for group therapy sessions, *id.* ¶ 50. Programming occurs in cells (on television), as well as in group settings and one-on-one. *Id.* ¶ 42. Inmates may also take part in one-on-one education and tutoring sessions. *Id.* ¶ 43. And literacy teachers conduct rounds, during which they pass by every inmate cell at least once per week. *Id.*

The ADX also provides medical care to inmates. Health Services staff are available on-site to inmates 14 hours per day, 7 days per week, for routine and urgent care and on-call for all hours Health Services staff are not on-site, and local medical facilities and hospitals are available all the time. *Id.* ¶ 54. Medical staff visit each unit every day, and "inmates have access to medical and

---

[3] Plaintiffs' putative "experts" (ECF Nos. 2-10, 2-11) have not submitted the requisite Federal Rule of Civil Procedure 26(a)(2)(B) materials and have not submitted to examination by Defendants; therefore, this Court should not treat them as "experts" at this time. Defendants reserve the right to rebut these witnesses at the appropriate juncture.

mental health visits upon request." *Id.* ¶ 59. The ADX Psychology Department runs group therapy sessions for six inmates at a time 2 times per day, 5 days per week, *id.* ¶ 50, and they are available to meet with inmates in private sessions, *id.* ¶ 51.

ADX-GP inmates have frequent opportunities for social interaction with one another. In addition to the aforementioned opportunities for interaction during group classes and group therapy, ADX inmates can, and frequently do, talk to their neighbors in adjacent cells. *Id.* ¶ 32. They can also talk to each other during recreation. *Id.*

ADX-GP inmates also have many opportunities to socialize with visitors. All inmates may have up to five in-person, non-contact social visits by individuals from outside the prison per month (and inmates may request additional visits), lasting up to seven hours each. *Id.* ¶¶ 26–27. Inmates are also permitted an unlimited number of visits by Ministers of Record and their attorneys, each also lasting up to seven hours each. *Id.* ¶¶ 28, 33. A prisoner visitation service also stops by the ADX, offering inmates the opportunity to talk to someone in visits that do not count against monthly limits. *Id.* ¶ 29. Inmates can also make four 15-minute social telephone calls each month and may send and receive an unlimited amount of written legal and social correspondence to and from individuals outside the prison. *Id.* ¶¶ 30–31.

Finally, ADX-GP inmates communicate throughout the day with BOP staff. In addition to the aforementioned opportunities during individual and group education and individual and group therapy, correctional officers pass by every cell every 30 minutes, all day, every day. *Id.* ¶ 34. Members of Unit Team also make daily rounds, during which they stop by each inmate's cell. *Id.* ¶ 14. (They also conduct bi-annual Program Reviews with each inmate, which "give staff and inmates the opportunity to discuss issues in an open format and recommend or revise institutional goals." *Id.*) And the ADX Warden and other ADX leadership, as well as every ADX Department Head make weekly rounds, passing by each inmate's cell. *Id.* ¶ 34. During each of these various

12

interactions, BOP staff may talk with an individual inmate for an extended amount of time at his cell door if he so desires. *Id.*

The ADX also incentivizes good behavior through, *inter alia*, performance pay for work details. *Id.* ¶ 41. And the ADX participates in FSA programming, which provides quarterly incentives to reward inmates for completing certain programming, such as Starbucks coffee, pizza, and candy that is not available at Commissary. *Id.* ¶ 16. Finally, and unlike in the SCU, inmates in the ADX may have the opportunity to "step down" through a progression of housing with fewer restrictions and additional freedoms to the point where they may be transferred out of the ADX entirely to a high-security institution. *Id.* ¶¶ 69–71; Salem Decl. ¶ 11; *see* **Ex. D** hereto (Inst. Supp. FLM 5321.09(1)A, "General Population and Step-Down Unit Operations").

## II.    Procedural History

On April 16, 2025, Plaintiffs filed a lawsuit for declaratory and injunctive relief premised on their theory that, "[b]ut for EO 14164, the Bondi Memo, and Defendants' Redesignation Directive, Plaintiffs would not be assigned to ADX." Compl. ¶ 122.[4] Plaintiffs bring ten claims arising out of the Executive Order and AG Memo against Defendants President Trump; Attorney General Bondi; Principal Associate Deputy Attorney General Bove; the BOP; and various BOP officials, all in their official capacities. *Id.* ¶¶ 35–43.[5]  With the exception of Counts 8 through 10, the claims are brought against all Defendants: (1) Procedural Due Process; (2) Equal Protection; (3) Eighth Amendment—Cruel and Unusual Punishment; (4) Eighth Amendment—Deliberate

---

[4] Plaintiffs inaccurately define the Executive Order, Attorney General Memo, and any placement decisions regarding Plaintiffs that were made subsequent to the Executive Order and Attorney General Memo, as the Redesignation "Directive." Mot. at 1.

[5] The named BOP officials are: BOP Director Marshall; BOP Associate Deputy Director Toomey; BOP Assistant Director of the Correctional Programs Division Salem; BOP Senior Deputy Assistant Director of the DSCC Stover; and BOP North Central Regional Director Matevousian. Compl. ¶¶ 38–42.

Indifference to Medical/Mental Health Needs; (5) Article I, § 9—Bill of Attainder; (6) Article I, § 9—Ex Post Facto Punishment; (7) Article II, § 2—Clemency Power; (8) Administrative Procedure Act ("APA")—Agency Action in Excess of Statutory Jurisdiction or Authority, or Otherwise not in Accordance with Law, against Defendants Bondi and Bove; and (9) APA—Arbitrary and Capricious Agency Conduct, against Defendants Bondi and Bove; (10) APA—Notice and Comment, against Defendant Bondi. Compl. ¶¶ 10, 126–203. Plaintiffs seek a declaratory judgment that the Executive Order and AG Memo are unlawful, as well as injunctive relief. *Id.* ¶ 11; *id.* at 56–57 (Prayer).

Also on April 16, Plaintiffs filed a Motion for Temporary Restraining Order, which pursues six of the ten Counts in their Complaint. ECF No. 2; *see also infra* n.9. On April 17, 2025, following a videoconference with the Court and by Court order, Defendants filed a Notice reiterating that no final decision of transfer has been made as to any Plaintiff in this action and explaining that, under BOP's normal designation review and transfer process, BOP would not otherwise transfer any Plaintiff to the ADX until at least May 16, 2025. ECF No. 19. Thus, the Court converted Plaintiffs' Motion for Temporary Restraining Order to a Motion for Preliminary Injunction; directed Defendants to oppose the Motion by May 2, 2025; directed Plaintiffs to reply by May 9, 2025; and scheduled a May 12, 2025, in-person hearing. Apr. 17, 2025, Minute Order.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary remed[y] that should be granted only when the moving party, by a clear showing, carries the burden of persuasion." *Xiaoda Liu v. Mayorkas*, 548 F. Supp. 3d 1, 3 (D.D.C. 2021) (cleaned up). "To warrant preliminary injunctive relief, the moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by

the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). When "the Government is the opposing party," the assessment of "harm to the opposing party" and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plaintiffs assert that courts in this district follow a "sliding scale" approach. ECF No. 2-1, Memo. ISO Pls.' Mot. for TRO (hereafter, "Mot.") at 14 (internal pagination). However, this Court has expressed "strong doubts" that the sliding-scale approach survives *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). *Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 324 (D.D.C. 2018) (Kelly, J.); *Guttenberg v. Emery*, 26 F. Supp. 3d 88, 100 n.5 (D.D.C. 2014) ("Even a narrow reading of the Court's holding in *Winter* supports the view that sliding-scale analysis is obsolete."). "[A]t minimum," both the likelihood-of-success factor and irreparable-injury factors must be met. *See Guttenberg*, 26 F. Supp. 3d at 100 n.5; *see also, e.g.*, *Nken*, 556 U.S. at 438 ("When considering success on the merits and irreparable harm, courts cannot dispense with the required showing of one simply because there is a strong likelihood of the other." (Kennedy, J., concurring)); *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) ("[U]nder the Supreme Court's precedents, a movant cannot obtain a preliminary injunction without showing *both* a likelihood of success *and* a likelihood of irreparable harm, among other things." (Kavanaugh, J., concurring)).

## **ARGUMENT**

Plaintiffs fail to establish any of the preliminary injunction factors. *First*, Plaintiffs cannot show likelihood of success on the merits because this Court lacks jurisdiction to consider their claims (which are, in any event, meritless): Defendants have not waived sovereign immunity; BOP's placement decisions are unreviewable; Plaintiffs lack standing and their claims are not ripe; and Plaintiffs have failed to exhaust administrative remedies. *Second*, there is no irreparable harm, because the premise of Plaintiffs' Complaint—that they are being transferred to ADX Florence—

is factually incorrect. Plaintiffs have not been redesignated to ADX Florence. Plaintiffs' subjective

speculation does not amount to actual or imminent injury. More fundamentally, even if Plaintiffs

*were* transferred to ADX Florence for the months while this case is pending, a time-limited transfer

to ADX does not amount to "irreparable" harm. *Third*, the balance of equities and public interest

favor allowing BOP to use its considered judgment and expertise in making placement decisions,

for the safety of Plaintiffs, BOP staff, and the public. Plaintiffs' Motion should be denied.

## I.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS BECAUSE THE COURT LACKS SUBJECT-MATTER JURISDICTION.

Plaintiffs cannot reach—let alone succeed on—the substantive merits of their claims. For

this reason alone, their Motion should be denied. *See Greater New Orleans Fair Hous. Action Ctr.*

*v. HUD*, 639 F.3d 1078, 1088 (D.C. Cir. 2011) ("When a plaintiff has not shown a likelihood of

success on the merits, there is no need to consider the other factors.").

A.    The United States Has Not Waived Sovereign Immunity.

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies

from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). "Sovereign immunity is jurisdictional in

nature." *Id.* In other words, "the 'terms of the United States' consent to be sued in any court define

that court's jurisdiction to entertain the suit." *Id.* (quoting *United States v. Sherwood*, 312 U.S. 584,

586 (1941)) (alterations omitted); *see also, e.g.*, *United States v. Mitchell*, 463 U.S. 206, 212 (1983)

("It is axiomatic that the United States may not be sued without its consent and that the existence

of consent is a prerequisite for jurisdiction."). "A waiver of the Federal Government's sovereign

immunity must be unequivocally expressed in statutory text, and will not be implied." *Lane v.*

*Peña*, 518 U.S. 187, 192 (1996) (citations omitted). Plaintiffs bear the burden of establishing the

government's waiver of sovereign immunity. *Fletcher v. DOJ*, 17 F. Supp. 3d 89, 93 (D.D.C. 2014).

Defendants here are a federal agency and federal officials sued in their official capacities; therefore, sovereign immunity protects them from suit unless plaintiffs establish a waiver. *See Z St., Inc. v. Koskinen*, 44 F. Supp. 3d 48, 63 (D.D.C. 2014) ("The sovereign immunity doctrine applies equally to the government itself and to a federal official sued in his official capacity."), *aff'd sub nom.*, 791 F.3d 24 (D.C. Cir. 2015); *Pittman v. Lappin*, 662 F. Supp. 2d 58, 60 (D.D.C. 2009) ("An official capacity suit against a federal official is one against the agency itself and, as such, one against the United States.").

To the extent Plaintiffs assert that the APA supplies a basis for the Court's jurisdiction, they are mistaken. As a general matter, the APA waives sovereign immunity for lawsuits against federal agencies for allegedly unlawful (or unconstitutional) agency actions, if the plaintiff is seeking a remedy "other than money damages." 5 U.S.C. § 702. Although Plaintiffs seek injunctive relief here, they cannot invoke the APA's waiver because Congress separately provided that the waiver "do[es] not apply" to BOP decisions about prisoner housing placement. Specifically, under 18 U.S.C. § 3625 (entitled "Inapplicability of the Administrative Procedure Act"), the APA "do[es] not apply to the making of any determination, decision, or order under this subchapter." "[T]his subchapter" includes 18 U.S.C. § 3621. Section 3621, in turn, provides that it is for "[t]he Bureau of Prisons" to "designate the place of the prisoner's imprisonment" after considering certain factors. Plaintiffs' attempt to challenge BOP designation decisions must fail.

Plaintiffs' argument that Section 3625 does not bar review of their claims, *see* Mot. at 29–30, is incorrect. Their argument first depends on the premise that "Plaintiffs do not challenge a particular designation decision," *id.* at 29, but that premise is faulty. Their Complaint is premised on the notion that the Government "will condemn Plaintiffs to potentially indefinite incarceration in ADX." Compl. ¶ 185. And Plaintiffs ask the Court to order Defendants to "assign the Plaintiffs to housing locations based on the designation decisions that had been reached prior to the issuance

17

of the Executive Order and Bondi Memo," which Plaintiffs claim was not the ADX for any of them. *Id.*, Prayer ¶ B. Plaintiffs insist that they are merely challenging orders that will result in their clients being transferred to the ADX. But that distinction is meaningless because, in their words, the AG Memo "predetermined" the placement. No matter how Plaintiffs frame it, they are ultimately challenging what they anticipate will be their designations to the ADX, and that is precisely what Section 3625 bars them from doing.

Even if Plaintiffs' argument did not rely on a faulty premise, it relies on inapposite case law. *Martin v. Gerlinski*, 133 F.3d 1076 (8th Cir. 1998) and *Jasperson v. Fed. Bureau of Prisons*, 460 F. Supp. 2d 76 (D.D.C. 2006) both dealt with agency rulemaking decisions and premised their holdings on that notion; whereas here, the applicable policy is the ADX Referral Memo, which has not changed. And *Love v. Bureau of Prisons* is similarly inapposite because it challenged "a broad policy that informs the designation decision." 2025 WL 105845, at *4, *11 (D.D.C. Jan. 15, 2025). But Plaintiffs' entire Complaint is premised on the allegation that they, as a group of 21 specific individuals, are being singled out for different treatment from BOP's general placement policy because of Defendants' animus for them. *See* Compl. ¶ 142 ("The motivation for the disparate treatment is animus: Defendant Trump has expressed clear animus toward Plaintiffs."). That is plainly the opposite of challenging a widely applicable policy or agency rule.

That Congress chose to maintain the sovereign immunity of the United States in this context is unsurprising: "Deciding how to classify prisoners and choosing the institution in which to place them are part and parcel of the inherently policy-laden endeavor of maintaining order and preserving security within our nation's prisons." *Cohen v. United States*, 151 F.3d 1338, 1344 (11th Cir. 1998); *see also, e.g.*, *McKune v. Lile*, 536 U.S. 24, 39 (2002) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."). That is why, "[a]s part of its expansive authority to manage federal prisons, the BOP" alone has been delegated

"the power to 'designate the place of the prisoner's imprisonment' and to transfer 'a prisoner from one penal or correctional facility to another.'" *Sills v. FCI Talladega Warden*, 2023 WL 1775725, at *2 (11th Cir. Feb. 6, 2023) (per curiam) (quoting 18 U.S.C. § 3621(b)).

It is Congress's prerogative—not the judiciary's—to waive the federal government's immunity. *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 48–49 (2024). Defendants are aware of no other congressional waiver of sovereign immunity that might conceivably apply here, and Plaintiffs have not identified any. Absent a waiver of sovereign immunity, there is no jurisdiction.

B.    Congress Has Precluded Judicial Review of Plaintiffs' Challenges to BOP's Transfer Process.

Even if there were some as-yet-unidentified waiver of sovereign immunity that covered Plaintiffs' claims, Congress affirmatively precluded judicial review of BOP's housing-placement decisions in a separate statutory provision enacted with the First Step Act of 2018: "Notwithstanding *any other provision of law*, a designation of a place of imprisonment [by the BOP] is not reviewable by any court." First Step Act of 2018, Pub. L. No. 115-391 § 601, 132 Stat. 5194, 5237 (codified at 18 U.S.C. § 3621(b)) (emphasis added). Section 3621(b) provides BOP "extensive latitude" in assigning prisoners to correctional facilities. *Thye v. United States*, 109 F.3d 127, 129–30 (2d Cir. 1997); *see also* § 3621(b) (BOP "may designate any available penal or correctional facility" satisfying minimum standards of health and habitability that BOP "determines to be appropriate and suitable" based on its consideration of several discretionary factors). BOP's broad discretion in this area is firmly established, and Congress has long entrusted the Executive Branch to make placement decisions as it sees fit. *See* 18 U.S.C. § 4083 (1948); *cf. Meachum v. Fano*, 427 U.S. 215, 224 (1976) (holding that the "decision to assign the convict to a particular institution is not subject to audit under the Due Process Clause, although the degree of

19

confinement in one prison may be quite different from that in another").

Courts have applied this jurisdiction-stripping provision to bar judicial review of BOP's redesignation decisions. *See, e.g.*, *Porche v. Salazar*, 2019 WL 1373683, at *1 (D. Or. Mar. 5, 2019); *Wills v. Barnhardt*, 2022 WL 4481492, at *2 (10th Cir. Sept. 27, 2022). At least one Circuit has held that § 3621(b) bars review even where the challenge to designation raises constitutional claims, such as due process. *Wills*, 2022 WL 4481492, at *4 (rejecting argument that § 3621(b) did not apply to due process and equal protection challenges because "§ 3621(b) contains no such limiting language").

Notwithstanding Congress's clear instructions in the text of the statute, another judge in this District previously found that § 3621(b) "do[es] not divest the Court of jurisdiction to entertain constitutional claims" because the statute is "not sufficiently explicit to bar consideration" of such claims. *Doe v. McHenry*, -- F. Supp. 3d --, 2025 WL 388218, at *2 (D.D.C. Feb. 4, 2025) (Lamberth, J.). The court so concluded based primarily on *Webster v. Doe*, 486 U.S. 592 (1988), where the Supreme Court held that a statute that gave the CIA director "discretion" to terminate employees did not preclude review of constitutional claims. *Id.* at 603. But unlike the statute in *Webster*, § 3621(b) not only gives BOP broad discretion to make placement decisions but also contains an *express* nonreviewability provision that was absent in *Webster*. *See* § 3621(b) (designation decisions are "not reviewable by any court"). Congress easily could have carved out constitutional claims, but it did not do so. Congress could not have been clearer that it intended to preclude all judicial review of placement decisions.[6]

---

[6] Judge Lamberth's 2013 opinion in *Royer v. BOP*, 933 F. Supp. 2d 170 (D.D.C. 2013), is similarly inapposite. *Royer* concerned a different provision of the PLRA—18 U.S.C. § 3625. The court held that § 3625 was insufficiently clear to preclude judicial review of constitutional claims. 933 F. Supp. 2d at 181–82. But *Royer* did not address the nonreviewability provision at issue here. Nor could it, as Congress added that provision in 2018, five years after *Royer* was decided. *See* Pub. L.

Congress's "control over the jurisdiction of the federal courts is plenary." *Patchak v. Zinke*, 138 S. Ct. 897, 906 (2018) (quotations omitted). Because Congress alone "possess[es] the sole power of creating the tribunals (inferior to the Supreme Court)," it also has the exclusive power "of withholding jurisdiction from them in the exact degrees and character which to Congress may seem proper for the public good." *Palmore v. United States*, 411 U.S. 389, 401 (1973) (quotations omitted); *accord Kontrick v. Ryan*, 540 U.S. 443, 452 (2004) ("Only Congress may determine a lower federal court's subject-matter jurisdiction." (citing U.S. Const. art. III, § 1)). Ultimately, when Congress limits federal jurisdiction, "it exercises a valid legislative power no less than when it lays taxes, coins money, declares war, or invokes any other power that the Constitution grants it." *Patchak*, 138 S. Ct. at 906. And "what the Congress gives, the Congress may take away." *Knapp Med. Ctr. v. Hargan*, 875 F.3d 1125, 1128 (D.C. Cir. 2017). The Congress has "take[n] away" this Court's ability to review BOP's placement decisions at issue in this case.

C.    <u>Plaintiffs Lack Standing, and Their Claims Are Not Ripe.</u>

Even if Defendants were not immune (they are), and even if the decisions at issue were reviewable (they are not), Plaintiffs still are not entitled to injunctive relief because they lack Article III standing and because their claims are not ripe.

Article III's case-or-controversy requirement mandates that the plaintiff bears the burden of establishing his or her standing to sue. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The "irreducible constitutional minimum of standing" contains three elements. *Id.* A plaintiff must demonstrate that he or she is suffering (1) "an injury in fact," (2) causally connected to the "alleged conduct of the defendant," and (3) "likely" to "be remedied by the relief plaintiff seeks." *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 273–74 (2008) (quotations omitted). To have

---

No. 115-391, 132 Stat. 5194. *Royer* thus does not support the conclusion that the Court has authority to review Plaintiffs' challenge to BOP's transfer decisions, despite the language in § 3621.

standing, the plaintiff must have set out the three constitutional elements for standing at the time

of the complaint. *See Davis v. FEC*, 554 U.S. 724, 732–33 (2008) ("'To qualify as a case fit for

federal-court adjudication, an actual controversy must be extant at all stages of review[.]'" (quoting

*Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 67 (1997)). Moreover, "for every defendant, there

must be at least one plaintiff with standing to seek an injunction." *Murthy v. Missouri*, 144 S. Ct.

1972, 1988 (2024). Thus, rather than asserting standing "in gross," Plaintiffs must untangle "*each*

claim they press against *each* defendant." *See id.* (emphasis added) (citation omitted).

      Plaintiffs do not directly address their alleged standing to sue. However, referral to ADX

Florence is the gravamen of all their claims. *See, e.g.*, Mot. at 29 ("Plaintiffs are about to be cast

into ADX only because the Attorney General and her Deputy countermanded the lawful decisions

made by the BOP and replaced them with a sham process that will condemn Plaintiffs to potentially

indefinite incarceration under the harshest conditions of confinement. The injury for each Plaintiff,

therefore, is directly traceable to the Bondi Memo and the unlawful policy it set in motion.").

      The evidence does not support Plaintiffs' theory of a "sham process," let alone their

apparent belief that incarceration at ADX Florence is an imminent inevitability. None of the 21

Plaintiffs have been redesignated to ADX Florence. Salem Decl. ¶ 17; *id.* ¶ 16 (status chart). Nor

can Plaintiffs credibly claim that transfer is imminent. *See id.* ¶¶ 22–24. Under longstanding BOP

policy, which the Executive Order and AG Memo neither rescinded nor amended, Plaintiffs are in

the midst of an ongoing process that possibly could result in a transfer to ADX Florence on some

undetermined future date. *See generally id.*; *see also generally* ADX Referral Memo, Attach. A.

Even if Plaintiffs received a final decision of redesignation from the CPD's Assistant Director,

Plaintiffs could appeal that decision—twice. *See* Salem Decl. ¶¶ 22, 24; ADX Referral Memo,

Attach. A at 7–8 (describing process, including appeal); **Ex. C** hereto (Stover Decl.) ¶ 6. BOP's

historical practice when an inmate has been designated to ADX-GP is to wait for that

administrative remedy process, including all appeals, to be completed prior to physically transferring the inmate. BOP sees no need to deviate from that practice here. Salem Decl. ¶ 23. That process may take up to approximately 170 days. *Id.* ¶ 24.

Because Plaintiffs' alleged injury is neither actual nor imminent, it cannot serve as the basis for Article III standing. *Lujan*, 504 U.S. at 560 (citation omitted); *J. Roderick MacArthur Found. v. FBI*, 102 F.3d 600, 606 (D.C. Cir. 1996) ("It is not enough for the [plaintiff] to assert that it might suffer an injury in the future, or even that it is likely to suffer an injury at some unknown future time. Such 'someday' injuries are insufficient." (quoting *Lujan*, 504 U.S. at 564)); *see also, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013) (an "objectively reasonable" likelihood of harm "at some point in the future" is too speculative to satisfy Article III standing).

For similar reasons, Plaintiffs' claims are not ripe for review. *See South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019) (discussing the "obvious overlap" between the doctrines of standing and ripeness (quotations omitted)); *accord Trump v. New York*, 592 U.S. 125, 131 (2020). "A case is fit for adjudication when the action in controversy is final and not dependent on future uncertainties." *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 270 (4th Cir. 2013) (quotations omitted). Plaintiffs' claims are dependent on future uncertainties, not the least of which is whether they will be transferred to ADX as they apparently fear. Moreover, any such redesignation would be subject to a thorough administrative appeals process that could result in an overturning of the decision. Nothing about Plaintiffs' claims is fit for adjudication at this time.

D.    Plaintiffs Have Not Exhausted Their Administrative Remedies.

Plaintiffs' claims all fail for the additional reason that they have not exhausted their administrative remedies, which are prescribed both by statute and by BOP policy.[7] "There is no

---

[7] Defendants acknowledge, but do not concede, that this Court considers a failure-to-exhaust

question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). As a general matter, to exhaust administrative remedies as to any given complaint, an inmate must: (i) attempt to resolve the problem informally with prison officials; (ii) if unsuccessful, initiate a request to the warden of their facility; (iii) if unsatisfied by the warden's response, appeal to the regional director within 20 calendar days; and (iv) if the regional director does not provide the relief sought, escalate the complaint to the BOP's General Counsel office. 28 C.F.R. §§ 542.13(a), 542.14(a), 542.15(a). In the context of a redesignation to ADX, the process is modified somewhat as set forth in the ADX Referral Memo. Thereunder, inmates have a two-level appeal process: first to the DSCC, and then to the General Counsel. *See* ADX Referral Memo, Attach. A at 8; Salem Decl. ¶¶ 22, 24.

Plaintiffs have not appealed any redesignation decision, as they will be entitled to do in the event of an ADX designation under the ADX Referral Memo, because there has not been a designation, yet. Salem Decl. ¶¶ 16–17. The law does not excuse Plaintiffs' failure. *See, e.g.*, *Ross v. Blake*, 578 U.S. 632, 640 (2016) (failure to exhaust administrative remedies cannot be excused by purportedly "special circumstances"); *Woodford v. Ngo*, 548 U.S. 81, 91 n.2 (2006) (even facially meritorious constitutional claims must be exhausted); *Kaemmerling v. Lappin*, 553 F.3d 669, 675 (D.C. Cir. 2008) ("Even if an inmate believes that seeking administrative relief from the prison would be futile and even if the grievance system cannot offer the particular form of relief sought, the prisoner nevertheless must exhaust the available administrative process."). Because Plaintiffs have not exhausted their administrative remedies, their claims cannot proceed.[8]

---

argument pursuant to Rule 12(b)(6), not 12(b)(1). *Mdewakanton Band of Sioux in Minn. v. Bernhardt*, 464 F. Supp. 3d 316, 321 n.4 (D.D.C. 2020), *aff'd sub nom.*, 848 F. App'x 439 (D.C. Cir. 2021) (per curiam).

[8] Certain Plaintiffs have preemptively filed administrative remedies pursuant to the standard

II.    **PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS BECAUSE THEIR CLAIMS ARE MERITLESS.**

Even if Plaintiffs could show subject-matter jurisdiction and administrative exhaustion (they cannot), Plaintiffs still fail to show a likelihood of success on the merits because they cannot demonstrate that any future decision to transfer Plaintiffs from the SCU to ADX would be "categorical, unjustified, and unconstitutional." *See* Compl. ¶ 1.[9]

A.    The Administrative Procedure Act Bars Plaintiffs' Claims (Counts 8–9).

Plaintiffs cannot show likelihood of success on their APA claims because (1) the challenged agency decisions are unreviewable under the APA and, instead, are committed to agency discretion by law; (2) Plaintiffs do not show any *agency* action; (3) Plaintiffs do not show any *final* action; and (4) an adequate alternative remedy is available to Plaintiffs.

1.    *BOP's Inmate Placement Decisions Are Committed to the Agency's Discretion by Law.*

Plaintiffs challenge BOP inmate placement determinations that are committed to the agency's discretion by law; therefore, they are not entitled to preliminary injunctive relief. *See* 5 U.S.C. § 701(a)(2). Section 3625 provides, in relevant part, that APA review under 5 U.S.C. § 702 does "not apply to the making of any determination, decision, or order" under that statutory subchapter, including decisions regarding "the place of the prisoner's imprisonment" pursuant to

---

process set forth in BOP Program Statement 1330.18. *See generally* Stover Decl. Because there is no actual designation for Plaintiffs to challenge—and because these administrative remedies were not filed in accordance with the ADX Referral Memo—they cannot satisfy the exhaustion requirement. In any event, none of those administrative remedies have completed the four-step process. *Id.* ¶¶ 8–9.

[9] Plaintiffs do not address the likelihood of success on the merits of their Eighth Amendment—medical and/or mental health needs (Count 4), bill of attainder (Count 5), *ex post facto* (Count 6), or APA notice and comment (Count 10) claims. Defendants therefore do not respond to those claims here, and Plaintiffs are not entitled to preliminary relief on them. *E.g.*, *Kansas v. Becerra*, -- F. Supp. 3d --, 2025 WL 212358, at *9 (N.D. Iowa Jan. 16, 2025).

18 U.S.C. § 3621(b) ("The Bureau may at any time, having regard for the same matters, direct the transfer of a prisoner from one penal or correctional facility to another."). Courts have explained that "[i]n enacting section 3625, Congress intended to 'carve out' an area of decision making committed solely to agency discretion and not subject to judicial review." *Lyle v. Sivley*, 805 F. Supp. 755, 759 (D. Ariz. 1992); *see United States v. King*, 338 F.3d 794, 798 (7th Cir. 2003) ("Under 18 U.S.C. § 3621(b), the BOP is authorized to house a prisoner . . . *anywhere* it deems appropriate." (emphasis added)); *Prows v. Fed. Bureau of Prisons*, 981 F.2d 466, 469 n.3 (10th Cir. 1992) ("Under 18 U.S.C. § 3621(b), the Bureau of Prisons . . . may direct confinement in any available facility and may transfer a prisoner from one facility to another at any time."). For this and the many other reasons described above as to why the Court lacks jurisdiction, *see supra* § I, review is not available to Plaintiffs under the APA.

## 2.    *Plaintiffs Do Not Show Any "Agency" Action.*

Plaintiffs' APA claims are asserted exclusively against Defendants Bondi and Bove, but review under the APA is available only for "agency action." 5 U.S.C. § 704. Presidential actions and actions taken by executive branch officials at the direction of the President are not agency actions reviewable under the APA.

As a threshold matter, it is "well-settled" that Presidential action is not subject to review under the APA. *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *Tulare Cnty. v. Bush*, 306 F.3d 1138, 1143 (D.C. Cir. 2002). It follows that, because the President, the Attorney General, and the Principal Associate Deputy Attorney General are not "agencies" under the APA, their actions cannot meet the APA's requirement of a "final agency action." *Franklin*, 505 U.S. at 796; *Tulare Cnty. v. Bush*, 185 F. Supp. 2d 18, 28 (D.D.C. 2001), *aff'd*, 306 F.3d 1138 (D.C. Cir. 2002).

Plaintiffs here challenge an Executive Order (i.e., a non-reviewable Presidential action) and Attorney General Memo. Plaintiffs claim that the AG Memo "implement[ed] EO 14164."

Compl. ¶ 6. That claim is not reviewable under the APA, irrespective of whether it is brought against the President, as a technicality. *See Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1326 (D.C. Cir. 1996) (cause of action under the APA not available to challenge an executive order because the APA applies only to a "person suffering legal wrong because of *agency* action" (citation omitted)). Thus, Plaintiffs' allegations that the Attorney General lacked authority to issue the AG Memo, that she acted not in accordance with law, or that the issuance was arbitrary and capricious are all non-cognizable under the APA. *See id.*

Though Plaintiffs purport to solely challenge the *issuance* of the AG Memo, *see* Mot. at 25, to the extent they actually challenge the *implementation* of the AG Memo, their claim likewise fails. First, where the Complaint is effectively seeking review of the President's action by suing an agency head who was acting on behalf of the President, the agency head's actions are not reviewable under the APA. *See Ancient Coin Collectors Guild v. CBP*, 801 F. Supp. 2d 383, 402 (D. Md. 2011) (concluding that where the Department of State was acting on behalf of the President, its actions were not reviewable under the APA), *aff'd*, 698 F.3d 171 (4th Cir. 2012); *Detroit Int'l Bridge Co v. Gov't of Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016) (noting that "[s]everal cases have concluded that an agency's action on behalf of the President, involving discretionary authority committed to the President, is 'presidential' and unreviewable under the APA" and concluding that the action by the Department of State on behalf of the President was unreviewable under the APA), *aff'd on other grounds*, 883 F.3d 895 (D.C. Cir. 2018).

Second, and even more fundamentally, Plaintiffs do not even identify a discrete action that the defendant agency here—BOP—has taken that is purportedly subject to APA review. A plaintiff must plead "an identifiable action or event." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990); *see Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (APA limits judicial review to "circumscribed, discrete agency actions"). The agency actions that can properly be challenged

under the APA are "circumscribed [and] discrete." *Norton*, 542 U.S. at 62. By contrast, the APA does not provide for "general judicial review of" agency conduct, *Lujan*, 497 U.S. at 899.

### 3.    *Plaintiffs Do Not Show Any "Final" Action.*

Agency action must be "final" to be reviewable under the APA. 5 U.S.C. § 704. Agency action is final only if two requirements are met. The agency action "must mark the consummation of the agency's decisionmaking process," and "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted). Plaintiffs define the agency action here as the issuance of the AG Memo, but the AG Memo neither marked the consummation of BOP's decision-making process nor determined any rights or obligations from which legal consequences will flow to Plaintiffs. The issuance of the AG Memo does not mark the "consummation" of BOP's decision-making process because the process Plaintiffs complain of is the one that they speculate will *eventually* result in their transfer from the SCU to the ADX. As already explained, BOP is in the ongoing stages of the redesignation process for Plaintiffs. No Plaintiff has received a final determination regarding ADX referral by the Assistant Director for CPD and no Plaintiff has appealed that determination, a process that could take up to 170 days to complete. Salem Decl. ¶¶ 16–17, 24. Therefore, BOP's decision making on Plaintiffs' anticipated transfer is not complete.

The action of issuing the AG Memo also did not determine Plaintiffs' rights or obligations, and no legal consequences flow from it. Plaintiffs do not even allege, for example, that the AG Memo has caused them to be transferred, and AD Salem's declaration explains that, in accordance with the direction of the AG Memo, BOP is following the same review and evaluation process that it always uses for all transfers. Salem Decl. ¶¶ 18–19. BOP has not made any final decision to transfer any Plaintiff to the ADX, and Plaintiffs therefore do not challenge any final agency action as required to state an APA claim.

4.     *The APA Does Not Provide a Cause of Action Because an Alternative Adequate Remedy Is Available to Plaintiffs.*

Review under the APA is available only where "there is no other adequate remedy in a court." 5 U.S.C. § 704. The requirement that a plaintiff have "no other adequate remedy in court," *id.*, reflects that "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action," *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). "[T]he alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the 'same genre.'" *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (citation omitted). Further, a remedy may be adequate even if "the arguments which can be raised [in the alternative proceeding] are not identical to those available in an APA suit." *Elm 3DS Innovations LLC v. Lee*, 2016 WL 8732315, at *6 (E.D. Va. Dec. 2, 2016). If there exists an alternative adequate judicial remedy, a plaintiff lacks a cause of action under the APA. *See Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017); *see also Versata Dev. Corp. v. Rea*, 959 F. Supp. 2d 912, 927 (E.D. Va. 2013) (dismissing putative APA claim under Rule 12(b)(6) because decision at issue was not a final agency action and an alternative adequate remedy existed by way of appeal to the Federal Circuit), *aff'd*, 793 F.3d 1352 (Fed. Cir. 2015). As already described above in § I.D, Plaintiffs have an adequate alternative remedy in the individualized agency appeal process. If and when Plaintiffs receive final designations by the Assistant Director, they may then appeal those designations to the DSCC Chief (the position now titled SDAD). Salem Decl. ¶ 24; Stover Decl. ¶ 6; ADX Referral Memo, Attach. A. at 8. If a Plaintiff is dissatisfied with the SDAD, DSCC's ruling, he may appeal again, to the BOP General Counsel. Salem Decl. ¶ 24; Stover Decl. ¶ 6; ADX Referral Memo, Attach. A at 8. The individualized determination and appeal process prescribed by BOP policy permits BOP to make an individualized determination as to each inmate, properly accounting for the relevant statutory factors. Plaintiffs' litigation approach, in contrast,

seeks only en masse relief.

BOP's process is therefore an adequate alternative remedy, and Plaintiffs are barred from bringing their claims.

B.    Plaintiffs' Administrative Procedure Act Claims (Counts 8–9) Lack Merit.

Even if Plaintiffs were able to properly assert APA claims, those claims are not likely to succeed. Under the APA, the Court may set aside an agency action if the Court finds that the challenged action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). The Court's review is "highly deferential and narrow" and focused on ensuring that the agency has set forth its reasons for decision and provided a reasoned explanation for its action. *Silver State Land, LLC v. Schneider*, 145 F. Supp. 3d 113, 124 (D.D.C. 2015) (citations omitted), *aff'd*, 843 F.3d 982 (D.C. Cir. 2016). The agency need only "provide[] an explanation of its decision that includes a rational connection between the facts found and the choice made." *Am. Whitewater v. Tidwell*, 770 F.3d 1108, 1115 (4th Cir. 2014) (quoting *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009)). A court "is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Here, Defendants have not acted unlawfully or arbitrarily and capriciously.

1.    *Defendants' Actions Did Not Exceed Their Statutory Authority and Were Not Unlawful (Count 8).*

Plaintiffs' allegation that the Attorney General unlawfully issued the AG Memo "to direct the BOP to subject a discrete class of prisoners . . . to a different designation process than that spelled out in the statute," Mot. at 25, misunderstands the Attorney General's statutory role and function and is also contradicted by the factual record. To begin, Congress has given BOP the

30

exclusive authority to designate "the place of [a] prisoner's imprisonment." 18 U.S.C. § 3621(b). Plaintiffs identify no statute or case law suggesting that the Attorney General cannot be involved in BOP's inmate placement decisions. BOP is, of course, an agency of the United States Department of Justice ("DOJ"), and the Attorney General leads the DOJ. Indeed, 28 U.S.C. § 509 expressly provides that "[a]ll functions of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice are vested in the Attorney General," subject to limited exceptions not at issue here. It is thus nonsensical to suggest that the head of the agency, to whom statutory responsibility has been assigned, cannot play any role in how that statutory responsibility is exercised. Plaintiffs' APA claim, based on exceeding statutory authority or unlawful agency action, is therefore not likely to succeed.

In any event, though Plaintiffs variously claim that the Attorney General "overr[o]de a BOP placement decision," "require[d] the BOP to treat the prisoner's commutation as a relevant factor in a prisoner's housing," and "force[d] the BOP to place every Plaintiff into ADX," Mot. at 25, the record does not reflect it. As stated previously, BOP has not made any placement decision for any inmate to date, and in fact, the referral process for each Plaintiff is ongoing. Salem Decl. ¶¶ 16–17. Further, the AG Memo did not "direct" BOP to treat Plaintiffs' sentence commutations as relevant factors in their placements; instead, it directed BOP simply to ensure that Plaintiffs' ultimate designations "are consistent with the security risks those inmates present because of their egregious crimes, criminal histories, and all other relevant considerations." AG Memo. BOP's longstanding policy, before and since issuance of the AG Memo, is to take these factors into account. *See generally* PS 5100.08. The AG Memo never so much as references the ADX, let alone "forces" BOP to place every Plaintiff there. Plaintiffs' many attorney declarations show, at most, that BOP has made every effort to consider all information that Plaintiffs' counsel consider relevant to future placement decisions. And in fact, the only SCU inmate who has received a placement

decision to date has not been placed in the ADX. Salem Decl. ¶ 16.

        2.    *Defendants' Actions Were Not Arbitrary and Capricious (Count 9).*

Plaintiffs' sole basis for arguing that Defendants' actions were arbitrary and capricious—that "the Attorney General and her Deputy have abandoned years of settled practice without explanation," Mot. at 26—is similarly foreclosed by the factual record. Plaintiffs perplexingly claim that the AG Memo "hijack[ed] BOP's designation process" in that it "adopted an entirely new, extra-statutory policy of commanding that the BOP *recommend* placements to the DAG." *Id.* at 27. Plaintiffs are unable to point to anything in the AG Memo (or any other DOJ or BOP document) that supports their position. Rather, the sole basis for their allegations is their attorneys' post-hoc interpretation of a series of oral conversations they had with a single BOP employee. Setting aside that those declarations mostly contain interpretive statements, the *facts* demonstrate that BOP has not changed its redesignation process. *See generally* Salem Decl. Nor is it true that the AG Memo gave ODAG a role in the assignment process that it did not previously have. The AG Memo never mentions ODAG, and AD Salem—the final BOP decisionmaker on Plaintiffs' placements—explains that he will exercise his discretion to make individualized placement determinations. Salem Decl. ¶ 19.

Finally, Plaintiffs appear to be confused about how APA challenges work when they state that, "nothing in the administrative record even attempts to account for these multiple departures from years of settled practice." Mot. at 28. Defendants have not yet filed an administrative record, nor are they required to at this juncture. What matters is the record before the Court on Plaintiffs' Preliminary Injunction Motion, and that record demonstrates that BOP has not changed its method for designating inmates for assignment.

        C.    <u>Plaintiffs' Procedural Due Process Claim (Count 1) Lacks Merit</u>.

Plaintiffs allege that their transfer to the ADX would violate their rights to procedural due

process. Such claims are analyzed in two steps: "the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989). There is no liberty interest in avoiding a transfer to the ADX. Thus, no constitutionally mandated procedures are required. *Id.* at 465. However, to the extent procedural protections were required by the Due Process Clause, the record shows that the protections Plaintiffs will receive are sufficient. Plaintiffs are therefore unlikely to prevail on their procedural due process claim.

       *1.*     *The Transfer of Plaintiffs to the ADX Would Not Deprive Them of Any Liberty Interest.*

"A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' . . . or it may arise from an expectation or interest created by state law or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). "In the penological context, not every deprivation of liberty at the hands of prison officials has constitutional dimension. This is so because incarcerated persons retain only a 'narrow range of protected liberty interests.'" *Rezaq v. Nalley*, 677 F.3d 1001, 1011 (10th Cir. 2012) (citation omitted). Therefore, "the Due Process Clause does not protect every change in the conditions of confinement having a substantial adverse impact on the prisoner." *Sandin v. Conner*, 515 U.S. 472, 478 (1995). Instead, "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Thompson*, 490 U.S. at 460–61 (citation omitted). In addition to liberty interests created by virtue of the Constitution, the government may create a protected liberty interest if it "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515

U.S. at 484.

"[T]he Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement." *Austin*, 545 U.S. at 221. That is because transfer among prisons is "within the normal limits or range of custody which the conviction has authorized the [government] to impose." *Meachum*, 427 U.S. at 224–25. The same rule applies where, as here, the proposed transfer would be to ADX. *Rezaq*, 677 F.3d at 1015 ("The conditions at ADX . . . do not, in and of themselves, give rise to a liberty interest because they are substantially similar to conditions experienced in any solitary confinement setting."); *see also Jordan v. Fed. Bureau of Prisons*, 191 F. App'x 639, 653 (10th Cir. 2006) (no liberty interest implicated by inmate's placement in administrative detention at the ADX for a period of nearly five years); *Georgacarakos v. Wiley*, 2010 WL 1291833, at *12 (D. Colo. Mar. 30, 2010) (no liberty interest implicated by incarceration at the ADX).

In *Meachum*, for example, no liberty interest existed "even though the change of facilities involved a significant modification in conditions of confinement, later characterized by the Court as a 'grievous loss.'" *Hewitt v. Helms*, 459 U.S. 460, 468 (1983) (quoting *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976)); *see also Franklin v. Dist. of Columbia*, 163 F.3d 625, 634–35 (D.C. Cir. 1998) (housing and classification decisions are the "ordinary consequence of confinement for committing a crime," and do not give rise to a liberty interest "[u]nless the prisoner is subjected to some extraordinary treatment"); *Miller v. Fed. Bureau of Prisons*, 703 F. Supp. 2d 8, 16 (D.D.C. 2010) ("The due process claim necessarily fails because it is settled law that a prisoner does not have a liberty interest in his place of confinement or custody classification that can be redressed by the due process clause of the constitution.").

Plaintiffs have no liberty interest protected by the Due Process Clause in avoiding a transfer to the ADX, where they would be permitted to visit with family and friends, religious ministers,

and a volunteer prisoner visitation service for potentially unlimited duration; take part in group classes of five to six inmates at a time that cover everything from creative arts to tradecrafts to anger management; have access to leisure and law libraries; get direct one-on-one psychological counseling and academic tutoring; participate in an incentive program to obtain rewards like Starbucks coffee; and have access to TVs in every cell with over fifty channels plus music and other educational and religious programming. *See generally* Armijo Decl. Further, transfer to the ADX does not constitute punishment and does not by itself increase the length of incarceration. Salem Decl. ¶ 10. Indeed, unlike in the SCU, inmates in the ADX have the opportunity to step down through a progression of housing with fewer restrictions and additional freedoms to the point where they may be transferred out of the ADX entirely to a high-security institution. Armijo Decl. ¶¶ 68–70; Salem Decl. ¶ 11; Ex. D (Institution Supplement regarding "General Population and Step-Down Unit Operations"). In any case, Plaintiffs here are subject to the sentence of life imprisonment without parole. ECF No. 1-1.

Nor is there any *government-created* liberty interest in avoiding a transfer to the ADX because such a transfer does not impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. In this Circuit, whether a transfer imposes an "atypical and significant hardship" is determined "in relation to the most restrictive conditions that prison officials, exercising their administrative authority to ensure institutional safety and good order, routinely impose on inmates serving similar sentences." *Hatch v. Dist. of Columbia*, 184 F.3d 846, 847 (D.C. Cir. 1999). Every Plaintiff is currently serving a life sentence (and until very recently, a death sentence). There are only three inmates in the entire BOP who are serving more severe sentences (of death); one of them is housed at ADX and the other two are housed in SCU. It stands to reason that BOP should give appropriate consideration to house Plaintiffs, who are serving the most severe sentences in the entire BOP, at the most restrictive

35

facility in BOP, where many, many other inmates serving life sentences are also already housed. Plaintiffs are therefore under no "atypical and significant hardship," and have not been deprived of any liberty interest. *See also, e.g.*, *Rezaq*, 677 F.3d at 1015 ("[C]onditions at ADX are comparable to those routinely imposed in the administrative segregation setting," and "the conditions in the general population unit at ADX are not extreme as a matter of law.").[10]

> 2. *Even if a Liberty Interest Were Implicated by a Transfer to the ADX, the Procedural Protections Already Provided by BOP Are Constitutionally Sufficient.*

Even assuming *arguendo* that Plaintiffs were deprived of a protected liberty interest by virtue of their transfer to the ADX, the procedures they have received (and will receive) are constitutionally sufficient. The requirements of due process are "flexible" and "call[] for such procedural protections as the particular situation demands." *Morrisey v. Brewer*, 408 U.S. 471, 481 (1972); *Austin*, 545 U.S. at 224; *see also Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (identifying factors used to determine procedures mandated by Constitution). For instance, the Due Process Clause does not invariably require an opportunity to be heard in advance of a decision. *See Hewitt*, 459 U.S. at 476 & n.8 (providing inmate opportunity to be heard within reasonable time after decision to place him in administrative segregation constitutionally sufficient). Nor does Due Process require a formal hearing. *Procunier v. Martinez*, 416 U.S. 396, 418–19 (1974)

---

[10] Plaintiffs' heavy reliance on *Aref v. Lynch*, 833 F.3d 242 (D.C. Cir. 2016), *see* Mot. at 15–18, is misplaced, because that case is inapposite. In *Aref*, the court recognized the implication of a liberty interest in avoiding transfer to a communications management unit ("CMU"), which restricts social interaction more than ADX. The court noted: "[a]n inmate placed in administrative segregation [such as ADX] may be wholly unable to communicate with his family or the outside world, but that restriction will generally only last for a few weeks. Inmates housed in CMUs, by contrast, may spend years denied contact with their loved ones and with diminished ability to communicate with them." *Aref*, 833 F.3d at 257. Notably, even after finding that a liberty interest was implicated in *Aref* by a transfer to a CMU, the D.C. Circuit noted that "appellants are challenging fundamentally predictive judgments in an area where administrators are given broad discretion and the government's legitimate interests in maintaining CMUs must be accorded substantial weight. [Therefore,] . . . only minimal process is likely due." *Id.* at 258.

(procedural due process requirements met where inmate was notified of the rejection of a letter addressed to him and he had an opportunity to protest that decision, despite his First Amendment right to uncensored communication).

Notwithstanding the low bar set by the Due Process Clause as to an inmate's place of confinement, BOP has gone above and beyond what is required here. In accordance with the 2012 ADX Referral Memo, inmates who are being considered for possible future transfer to the ADX receive "a hearing notice containing 'specific evidence which forms the basis for the referral'" to ADX; a psychological assessment of the appropriateness for transfer; a hearing at which the inmate may be present, make a statement, and present evidence to the Hearing Administrator; a copy of the Hearing Administrator's written recommendation as to whether placement at the ADX is warranted; second-level review by the AD, and two levels of appeal of the AD's decision, should an inmate choose to pursue it. Salem Decl. ¶¶ 15, 22–24; ADX Referral Memo, Attach A. at 6–8. That is more than enough process. *See Austin*, 545 U.S. at 225–26 (notice and fair rebuttal opportunity "are among the most important procedural mechanisms for purposes of avoiding erroneous deprivations" of liberty interests). Plaintiffs *themselves* acknowledge BOP's proactivity in soliciting inmate-specific information for consideration in its redesignation process and answering Plaintiffs' attorneys' inquiries over email and multiple videoconferences. *See, e.g.*, ECF Nos. 2-17, 2-18, 2-19, 2-22, 2-23, 2-24, 2-25, 2-26, 2-27, 2-28, 2-29, 2-30, 2-32, 2-33, 2-34, 2-36, 2-37 (Plaintiffs' attorneys' declarations).

Plaintiffs argue that BOP's process is a "sham" because some of the Plaintiffs' hearing examiners reports (1) contain similar reasoning for recommended ADX placements, (2) have errors related to certain details of the hearings, and (3) were issued "hours" after the hearings. Mot. at 20–21. Given that BOP is mandated to consider factors such as the nature, circumstances, and severity of an inmate's criminal offense in placement, it is not surprising that there would be certain

similarities in placement across a group of inmates who had all committed heinous crimes, including murder. And if Plaintiffs feel that the reports contained errors, the solution is not to enjoin the entire process as to all Plaintiffs but rather to wait for final individualized determinations to be made and to appeal those determinations if Plaintiffs feel the determinations depended upon inaccuracies. Finally, the speed with which a process plays out cannot provide the basis for a procedural due process claim. It is common practice for hearing examiners to complete their reports immediately following the hearings while the hearing itself is still fresh in their minds. Salem Decl. ¶ 17. Ultimately, Plaintiffs' subjective mistrust does not render BOP's conduct unconstitutional.

D.    Plaintiffs' Equal Protection Claim (Count 2) Lacks Merit.

Contrary to Plaintiffs' argument, BOP's anticipated transfer of Plaintiffs to the ADX does not violate equal protection. The Fourteenth Amendment's Equal Protection guarantee, as applied to the Federal Government through the Due Process Clause of the Fifth Amendment, *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954), "requires the government to treat similarly situated persons alike," *Women Prisoners of D.C. Dep't of Corrs. v. Dist. of Columbia*, 93 F.3d 910, 924 (D.C. Cir. 1996). "The Constitution, however, 'does not require things which are different in fact or opinion to be treated in law as though they were the same.'" *Id.* (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)); *accord Michael M. v. Superior Ct. of Sonoma Cnty.*, 450 U.S. 464, 469 (1981). "Thus, the [d]issimilar treatment of dissimilarly situated persons does not violate equal protection." *Women Prisoners*, 93 F.3d at 924 (quotations omitted).

Because "conviction of crime justifies the imposition of many burdens," *Johnson v. Daley*, 339 F.3d 582, 585–86 (7th Cir. 2003), prisoners are not a suspect class, *Tucker v. Branker*, 142 F.3d 1294, 1300 (D.C. Cir. 1998). Therefore, to establish a cognizable Equal Protection claim, Plaintiffs "must establish two necessary predicates." *Pryor-El v. Kelly*, 892 F. Supp. 261, 269–70

38

(D.D.C. 1995). First, "the prisoner must establish that he or she was treated differently than other prisoners in his or her circumstances." *Id.* at 270. Second, "he or she must establish that such unequal treatment was the result of intentional or purposeful discrimination." *Id.* "Even if the prisoner can make this threshold showing, ordinarily only rational basis review is warranted." *Id.* (citing *Brandon v. D.C. Bd. of Parole*, 823 F.2d 644, 650 (D.C. Cir. 1987)); *see also* Mot. at 23 (agreeing that rational-basis review applies). Plaintiffs fail at all three steps.

*First*, Plaintiffs do not prove that they are similarly situated to other former death-row inmates (who, Plaintiffs assert, were referred to facilities other than ADX after their death sentences were commuted). Mot. at 22. Plaintiffs' understanding of the redesignation of other death-row inmates to other facilities is based on their own attorney's "research" of "publicly available information"; that attorney's conversations with other unidentified attorneys, which are not memorialized; and "on information and belief." *See* ECF No. 2-12 (Patton Decl.) ¶¶ 5–7. Notably, Plaintiffs offer no evidence of the circumstances of these other 18 prisoners. Nor do Plaintiffs offer evidence of the various institutional needs at the time of the other prisoners' redesignations.

Plaintiffs' crimes, it bears noting, include:

➢ **Taylor:** Carjacking and kidnapping resulting in death. In addition, while incarcerated pretrial, Taylor was part of a group of inmates who attempted to escape.

➢ **Basham and Fulks:** Escape from a detention center and commission of murders and kidnapping of two females. While incarcerated, Basham has engaged in sexually aggressive and threatening behavior towards female employees.

➢ **Coonce and Hall:** Unprovoked murder of another inmate, including binding him and stomping and standing on his neck.

➢ **Council:** Murder of two female bank employees during a bank robbery.

➤ **Hager:** Stabbing a woman 80 times in her legs, chest, neck, face, hands, buttocks, and back while she was in the bathtub and while her toddler was in the next room.

➤ **Holder:** Bank robbery resulting in the fatal shooting of a bank security guard.

➤ **Jackson:** Kidnapping, sexual assault, and murder of a college student after Jackson duct-taped her to a tree before shooting her in the head.

➤ **Kadamovas and Mikhel:** Conviction based on having "abducted, held hostage, and killed five people, dumping each victim's body in the New Melones Reservoir outside Yosemite National Park." Mikhel and Kadamovas trapped one victim in Kadamovas's home for three days, strangled him to death, and—before taking his body to the reservoir—ate dinner with Mikhel's girlfriend "with the body still in the van." While awaiting trial on these charges, Kadamovas and Mikhel also conspired to escape federal custody by enlisting the help of a motorcycle gang and smuggling tools into the prison.

➤ **Lawrence:** Multiple armed bank robberies and killing of a police officer.

➤ **Mikos:** Murder of one of his former patients who had been subpoenaed to testify against him; Mikos shot her six times at close range.

➤ **Roane and Tipton:** Drug-related enterprise involving firearms, multiple murders, and racketeering.

➤ **Robinson:** Multiple murders, including the murder of a man Robinson mistakenly believed was responsible for his loss of $30,000, and another murder five months later in retaliation for a fraudulent drug transaction.

➤ **Runyon:** Murder for hire of a United States Navy Officer. Runyon shot him five times at close range.

➤ **Sanchez and Troya:** Murder of an entire family execution-style, including two young children, to protect a drug-trafficking ring.

➢ **Torrez:** Murder of female Navy Intelligence Specialist on a military base, and previous State crimes for kidnapping and rape of a female graduate student and murder of young girls.

➢ **Umaña:** Murder of two brothers, whom Umaña believed had insulted his gang, MS-13.[11]

"That an inmate's conduct, in general or in specific instances, may often be a major factor in the decision of prison officials to transfer him is to be expected unless it be assumed that transfers are mindless events." *Meachum*, 427 U.S. at 228.

"There can be no doubt that the BOP transfers prisoners for any of a variety of administrative reasons." *Bornales v. Lappin*, 713 F. Supp. 2d 47, 50 (D.D.C. 2010), *aff'd*, 2011 WL 1100065 (D.C. Cir. Mar. 11, 2011) (per curiam); *accord Meachum*, 427 U.S. at 225. There is no basis upon which this Court can conclude that the other 18 prisoners referenced in Plaintiffs' Motion are "similarly situated." *See, e.g.*, *Marshall v. Reno*, 915 F. Supp. 426, 432 (D.D.C. 1996) (plaintiff's "bald[]" assertion that "he was treated differently than other prisoners in his circumstances" did not satisfy first step of Equal Protection claim); *James v. Reno*, 39 F. Supp. 2d 37, 40–41 (D.D.C. 1999) ("plaintiff's cursory description of six other inmates transferred to FCI Three Rivers does not establish that they were 'similarly situated' to him. There are several factors considered in determining a prisoner's custody classification other than length of sentence and type

---

[11] *Taylor*, 814 F.3d at 345; *Basham*, 561 F.3d at 309–14, 316, 320; *United States v. Hall*, 945 F.3d 1035, 1038–39 (8th Cir. 2019); *Council*, 77 F.4th at 245; *Hager*, 721 F.3d at 175; *United States v. Allen*, 247 F.3d 741, 756 (8th Cir. 2001); *Jackson*, 327 F.3d at 280; *Mikhel*, 889 F.3d at 1016, 1017, 1020; *United States v. Lawrence*, 735 F.3d 385, 398 (6th Cir. 2013); *United States v. Mikos*, 539 F.3d 706, 708 (7th Cir. 2008); *In re Robinson*, 917 F.3d 856, 859–60 (5th Cir. 2019); *United States v. Runyon*, 707 F.3d 475, 484–86 (4th Cir. 2013); *United States v. Troya*, 733 F.3d 1125, 1129–37 (11th Cir. 2013); *United States v. Tipton*, 95 F.4th 831, 836–40 (4th Cir. 2024); *United States v. Torrez*, 869 F.3d 291, 295–97 (4th Cir. 2017); *United States v. Umaña*, 750 F.3d 320, 329 (4th Cir. 2014).

of offense."), *aff'd*, 1999 WL 615084 (D.C. Cir. July 2, 1999) (per curiam); *cf. Reynolds v. Quiros*,

990 F.3d 286, 300–01 (2d Cir. 2021) (conducting prisoner-by-prisoner analysis for purposes of

Equal Protection claim and acknowledging that "the comparative heinousness of each prisoner's

offenses may, in some circumstances, factor into a particular equal protection analysis"), *cited in*

Mot. at 25. Therefore, step one of the Equal Protection analysis is not met.

      *Second*, although Plaintiffs speculate about Defendants' purportedly malicious intentions

(Mot. at 22, 24), the available *evidence* demonstrates that BOP has carefully and vigorously applied

the same criteria to Plaintiffs as it would to other inmates also under consideration for

redesignation: PS 5100.08 and the ADX Referral Memo. *See generally* Salem Decl. Plaintiffs'

accusation that the BOP has instituted a "sham" process with a "pre-determined" result that is

"run" by the Attorney General's Office is nothing more than that—an accusation. *See* Mot. at 23

(citing nothing); *id.* at 24 (arguing, without citation, that the Executive Order and AG Memo

"force[] the trained professionals in the BOP to accede to the retaliatory impulses of political

appointees" and therefore show animus). "The Court need not accept [Plaintiffs'] legal conclusions

cast in the form of factual allegations." *Pryor-El*, 892 F. Supp. at 270. Plaintiffs' animus theory

cannot rebut the sworn testimony of BOP's Assistant Director for CPD, Shane Salem, who (unlike

Plaintiffs) has personal knowledge and affirms that he will make individualized determinations

about each Plaintiff's potential referral to ADX if and when he receives the Hearing

Administrator's recommendation for such referral. Salem Decl. ¶ 19.

      *Third*, even if Plaintiffs had made a cognizable Equal Protection claim, there is no question

that BOP's ongoing decision-making process satisfies rational-basis review—even assuming, as

Plaintiffs now do, that BOP's eventual future decision is for Plaintiffs to be redesignated to ADX.

Courts "are to uphold prison regulations that 'impinge on inmates' constitutional rights' as long as

those regulations are 'reasonably related to legitimate penological interests.'" *Hatim v. Obama*,

760 F.3d 54, 58 (D.C. Cir. 2014) (quoting *Turner v. Safley*, 482 U.S. 78, 84–85, 89 (1987)); *see also Rhodes v. Chapman*, 452 U.S. 337, 351 n.16 (1981) (prison administration is "peculiarly within the province of the legislative and executive branches of government"); *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 (1973) ("It is difficult to imagine an activity in which [the government] has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons."). On their face, PS 5100.08 and the ADX Referral Memo—which the Executive Order and AG Memo did not displace (Salem Decl. ¶ 18)—serve critical penological interests by requiring individualized determinations as to the proper redesignation location for each eligible prisoner.

E.    Plaintiffs' Eighth Amendment Claim (Count 3) Lacks Merit.

The Eighth Amendment requires that prison officials provide "humane conditions of confinement." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Among other responsibilities, prisons must "take reasonable measures to guarantee the safety of the inmates." *Id.* (citation omitted). The obligation to protect inmates may require the use of segregated confinement as "the least cruel measure" available. *Pearson v. Ramos*, 237 F.3d 881, 885 (7th Cir. 2001). While such conditions are restrictive, the "Constitution does not mandate comfortable prisons, and prisons . . . which house persons convicted of serious crimes, cannot be free of discomfort." *Rhodes*, 452 U.S. at 349. Indeed, such "restrictive and even harsh [conditions] are part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 347.

Because restrictive, and even harsh, conditions of confinement are constitutionally permissible, Plaintiffs face a demanding standard for establishing that conditions of confinement amount to cruel and unusual punishment in violation of the Eighth Amendment. *See Farmer*, 511 U.S. at 837 ("The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'"). Plaintiffs are no doubt aware of this fact, as one of them has

43

already lost multiple Eighth Amendment claims in other courts. *See Kadamovas v. Siereveld*, 2019 WL 2869674, at *2 (S.D. Ind. July 3, 2019) (dismissing Eighth Amendment claim by Plaintiff Kadamovas based on opening of legal mail and noting that "[t]his marks at least the third time Mr. Kadamovas has brought an action or appeal in federal court that was dismissed for failure to state a claim on which relief may be granted"). To establish an Eighth Amendment violation, a prisoner must show (1) conditions of confinement that amount to an extreme deprivation and (2) that prison officials knew of, but deliberately disregarded, a substantial risk of serious harm that these conditions pose. Both the "objective and . . . subjective component . . . must be satisfied." *Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 565 (7th Cir. 2021) (citation omitted).

*1.     ADX Conditions of Confinement Are Not Objectively Cruel and Unusual.*

To satisfy the first step, an inmate challenging his conditions of confinement must show that a prison official's acts or omissions have inflicted a deprivation that is "objectively, sufficiently serious." *Farmer*, 511 U.S. at 834 (quotation marks and citation omitted). Such deprivations include conditions that (1) "involve the wanton and unnecessary infliction of pain," (2) are "grossly disproportionate to the severity of the crime warranting imprisonment," or (3) "deprive inmates of the minimal civilized measure of life's necessities," such as "essential food, medical care, or sanitation." *Rhodes*, 452 U.S. at 346–48. Deprivations must be "extreme . . . to make out a conditions-of-confinement claim." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

In *Hill v. Pugh*, 75 F. App'x 715 (10th Cir. 2003), for example, an inmate at ADX Florence—the same facility at issue in this case—alleged that he was "isolated in his cell twenty-three hours a day for five days a week and twenty-four hours the remaining two days," and that the "resulting sensory deprivation amounts to cruel and unusual punishment." *Id.* at 721. The Tenth Circuit affirmed dismissal on the pleadings of the Eighth Amendment claim because the inmate had not alleged any deprivation of "'his minimal physical requirements'" such as "'food, shelter,

44

clothing, and warmth.'" *Id.* (quoting inmate's Complaint). In so doing, the Tenth Circuit held that "[m]ere 'inactivity, lack of companionship and a low level of intellectual stimulation do not constitute cruel and unusual punishment.'" *Id.* (citation omitted).

Numerous other courts have also held that ADX conditions are not objectively cruel and unusual. *See, e.g.*, *Gowadia v. Stearns*, 596 F. App'x 667, 674 (10th Cir. 2014) (affirming dismissal on the pleadings because, absent a "specific deprivation, imprisonment at the ADX facility does not violate the Eighth Amendment"); *Silverstein v. Fed. Bureau of Prisons*, 559 F. App'x 739, 741, 763 (10th Cir. 2014) (affirming summary judgment on Eighth Amendment claim by ADX prisoner spending thirty years in solitary confinement); *Ajaj v. United States*, 293 F. App'x 575, 582–84 (10th Cir. 2008) (affirming summary judgment on Eighth Amendment claim involving "lock-down for 23 hours per day"); *Davis v. Fed. Bureau of Prisons*, 2016 WL 1156755, at *6 (D. Colo. Mar. 24, 2016) (adopting recommendation to dismiss because allegation that inmate "is confined to his cell for twenty[-]three hours a day" did not plead Eighth Amendment claim); *McMillan v. Wiley*, 813 F. Supp. 2d 1238, 1244, 1250–51 (D. Colo. 2011) (allegations that inmate only "leaves his cell up to five times per week for two hours of recreation in a single man cage" did not plead Eighth Amendment claim because "lack of social opportunities" are "common to many high-security prisons around the country" (citation omitted)).

Rather than contending with the voluminous case law weighing against their claims, Plaintiffs instead rely on misrepresentations about actual ADX conditions and also omit reference to numerous opportunities for out-of-cell time and social interaction. For example, they state that ADX inmates "receive 'programming' through the television, alone." Mot. at 32. Not so. In fact, inmates can attend classes in groups of five on everything from parenting to vocational training to disease prevention and awareness. Armijo Decl. ¶¶ 39–40.  And they can also attend psychology therapy in groups of six. *Id.* ¶ 50. Additionally, Plaintiffs misleadingly claim that "people remain

in these cells nearly all day, every day." But Plaintiffs appear to only be "counting" recreation time as time spent out of cell. In fact, in addition to being out of cells for recreation time and the aforementioned classes, ADX inmates are entitled to five social visits per month (or more, upon request), prisoner visitation service visits, and an unlimited amount of Minister of Record and attorney visits, none of which are time capped during visitation hours. *Id.* ¶¶ 27–29, 33. Some inmates are additionally out of their cells to work as orderlies and receive performance pay. *Id.* ¶ 41. And while Plaintiffs bemoan the "total isolation" of the ADX, Mot. at 9 (citation omitted), in addition to the numerous aforementioned opportunities for interaction, ADX inmates may talk with each other while in their cells, Armijo Decl. ¶ 32; talk with correctional officers on their rounds every thirty minutes, *id.* ¶ 34; talk with a member of the BOP Unit Team when they conduct daily rounds, *id.* ¶ 14; talk with the ADX Warden and other ADX leadership or any of the various Department Heads during weekly rounds, *id.* ¶ 34; attend one-on-one education and tutoring sessions, *id.* ¶ 43; participate in individual psychological therapy, *id.* ¶ 51; and interact with Health Services Department staff available 14 hours per day, 7 days per week, *id.* ¶ 54. ADX inmates may also send and receive an unlimited amount of written legal and social mail to and from individuals outside the prison. *Id.* ¶ 31. In short, as courts have held time and time again, conditions at the ADX are not objectively cruel and unusual.

### 2.    *ADX Conditions of Confinement Are Not Subjectively Cruel and Unusual.*

An inmate challenging his conditions of confinement must also show that each defendant had a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834 (citation omitted). Because "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment," that state of mind must be "more than mere negligence." *Id.* at 834, 835 (citation omitted). Rather, it must be "'deliberate indifference' to inmate health or safety." *Id.* at 834 (citation omitted). Under this standard, drawn from the criminal law of recklessness, a prison official may be liable only if "he

knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847. Actual knowledge is required: "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837; *see also id.* at 838 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment.").

Here, Plaintiffs fail to carry their burden to establish facts regarding any of Defendants' knowledge, or actions or failure to act, of the kind courts have found sufficient to establish deliberate indifference. *Cf., e.g.*, *Delaney v. DeTella*, 256 F.3d 679, 681 n.1, 685–86 (7th Cir. 2001) (summary judgment properly denied where officials prohibited all out-of-cell exercise for six months despite prior court injunction requiring five hours per week of exercise, prison's own directive to same effect, and officials' inaction when inmate "requested medical attention frequently"). The ADX's alleged conditions are no more severe than those at other prisons, including prisons where inmates spend "twenty-three hours per day" isolated in cells that are "small and stark," which conditions are "not extreme as a matter of law." *Rezaq*, 677 F.3d at 1005, 1015. How, then, can it be "obvious" that the alleged conditions in the ADX pose a substantial risk of serious harm? Plaintiffs have a heavy burden when seeking a preliminary injunction, and they do not present any facts that would support the conclusory assertion that one can infer a substantial risk of serious harm from conditions in the ADX—much less that each Defendant actually drew that inference. *See Farmer*, 511 U.S. at 837 (official "must also draw the inference").

Rather than set forth any facts that would suggest that any particular Defendant was deliberately indifferent to a risk of harm, Plaintiffs instead rely on the notion that such indifference can be presumed based on the circumstances. Mot. at 32–33. In so doing, Plaintiffs rely on the case of *Hope v. Pelzer*, 536 U.S. 730 (2002), where the Court found made a finding of deliberate

indifference. But, in Plaintiffs' own words, that case dealt with a situation where "prison officials chained an Alabama prisoner to a hitching post, for hours and without water or bathroom access, for refusing to work." Mot. at 33 (citing *Hope*, 536 U.S. at 738). That is a far cry from the circumstances that ADX inmates face, and Plaintiffs make no genuine attempt to analogize between the two, nor could they.

In short, Plaintiffs attempt to plead deliberate indifference based solely on the conditions of confinement themselves, rather than by presenting evidence to show each Defendant's state of mind. But the Supreme Court has expressly "rejected a reading of the Eighth Amendment that would allow liability to be imposed on prison officials solely because of the presence of objectively inhumane prison conditions" without any showing of "subjective recklessness." *Farmer*, 511 U.S. at 838, 839. Plaintiffs offer nothing more than this legally impermissible strict liability approach and conclusory allegations, and they are therefore unlikely to succeed on the merits of their Eighth Amendment claim.

F.   Plaintiffs' "Pardon Power" Claim (Count 7) Lacks Merit.

Finally, Plaintiffs bring a claim pursuant to Article II, § 2, clause 1, which provides that that the President "shall have Power to grant . . . Pardons for Offenses against the United States" (hereafter, "Pardon Power"). According to Plaintiffs, the Executive Order "unconstitutionally interferes with and abridges President Biden's exercise of his Article II clemency powers," by "attempting to transform this instrument of lenity into one of brutality." Mot. at 35.

The problem with this claim is that it is not based in reality. On its face, the Executive Order simply directs the Attorney General to "evaluate" the places of imprisonment and conditions of confinement for each of the 37 inmates whose death sentences had been commuted, and further directs the Attorney General to "take all lawful and appropriate action" to "ensure" that the offenders are imprisoned in conditions "consistent" with their crimes of conviction and "the threats

48

they pose." EO § 3(e). Even if President Trump's Executive Order *had* directed Plaintiffs' placement at ADX Florence—and it does not come close to doing so, notwithstanding Plaintiffs' characterization—Plaintiffs would not have a claim because, as discussed elsewhere in this Opposition, the conditions at ADX are not unconstitutional. *Supra* § II.E.

The civil war cases on which Plaintiffs rely do not support their theory. Mot. at 36–37. In *Garland*, for example, a former Confederate state senator and attorney had been pardoned "for all offences committed by his participation . . . in the Rebellion." *Ex parte Garland*, 71 U.S. (4 Wall.) 333, 375 (1866). Subsequent to his pardon, Congress enacted legislation that barred him from resuming the practice of law due to his prior association with the Confederacy. *Id.* The Supreme Court ruled in favor of the attorney, explaining that "to exclude him . . . from continuing in the enjoyment of a previously acquired right, is to enforce a punishment for that offence notwithstanding the pardon." *Id.* at 381. Plaintiffs bear no resemblance to the petitioner in *Garland*, as they do not seek to reinstate a "previously acquired right." *Id.* The only "right" Plaintiffs have acquired is to avoid imposition of the death penalty for their crimes of conviction, and the Executive Order does not impair it.

## III.    PLAINTIFFS HAVE NOT SHOWN IRREPARABLE HARM.

In this Circuit, there is a "high standard for irreparable injury." *Chaplaincy*, 454 F.3d at 297. Any alleged irreparable harm "must be both certain and great; it must be actual and not theoretical." *Id.* (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). It also must be of such "*imminence* that there is a clear and present need for equitable relief." *Id.* (quotations omitted). A motion for preliminary injunctive relief can be denied solely on the basis that plaintiffs have failed to demonstrate irreparable injury. *See id.* ("A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." (citing *Sea Containers Ltd. v. Stena AB*,

890 F.2d 1205, 1210–11 (D.C. Cir. 1989))). Plaintiffs have failed to meet this standard.

Plaintiffs seem to understand the weakness of their assertion of irreparable harm, as they devote only one single page to the argument in a brief that exceeds 40. *See* Mot. at 39–40. Plaintiffs' theory of irreparable harm is that Defendants have "substituted a blanket designation sending all the Plaintiffs to ADX for the indefinite future." *Id.* at 40. The problem with this theory is that it is counterfactual. Defendants have not substituted anything, because *Plaintiffs have not been redesignated yet*, to ADX Florence or anywhere else. Salem Decl. ¶ 17. Even if they were redesignated to ADX Florence, that redesignation would be subject to Plaintiffs' appeal. ADX Referral Memo, Attach. A at 8. Because it is at best speculative, Plaintiffs' theory of irreparable harm cannot succeed. *Chaplaincy*, 454 F.3d at 297.

Assuming that Plaintiffs will, at some time in the future, be redesignated to ADX Florence, Plaintiffs' claim would fare no better. Plaintiffs voice concerns about conditions at the facility—concerns that, as BOP explains in its declaration by Associate Warden Armijo—are not well-founded. *See* Armijo Decl. (describing actual ADX conditions and opportunities for social interactions, learning, medical care, and other opportunities); *see also supra* § II.E (explaining why ADX conditions do not amount to Eighth Amendment violation). Thus, even taking Plaintiffs' concerns about "prolonged" exposure to restrictive housing at ADX Florence at face value (*e.g.*, Compl. ¶¶ 111–114), Plaintiffs offer no evidence to show that they would be "irreparably" harmed by being *temporarily* housed at ADX Florence while this case is pending. Plaintiffs' own arguments are to the contrary. *See* Mot. at 11 (professing concern over "indefinite[]" housing at ADX); *id.* at 12 ("Plaintiffs may stay in ADX for *decades*, regardless of what the BOP might urge." (emphasis added)); *id.* at 31 (explaining that Plaintiffs' claims do not "center" on "temporally-limited" conditions of solitary confinement, but rather on ADX conditions "*imposed indefinitely*"

(emphasis added)).[12]

For the foregoing reasons, Plaintiffs do not establish "irreparable harm" by reference to future redesignation to ADX during the pendency of this case. Should Plaintiffs ultimately prevail on the merits of their claims, and if they were transferred to ADX Florence in the meantime, BOP would expeditiously return them to Terre Haute SCU. *See* Salem Decl. ¶ 26.

## IV.  THE REMAINING FACTORS COUNSEL AGAINST PRELIMINARY INJUNCTIVE RELIEF.

The balance of equities and the public interest do not favor granting the extraordinary remedy of a preliminary injunction. These final two factors merge in cases where relief is sought from the government. *Nken*, 556 U.S. at 435. Plaintiffs make the circular argument that, "[where the government's actions violate the Constitution and subject plaintiffs to irreparable harm, both the equities and the public interest weigh in plaintiffs' favor." Mot. at 40–41. But, for the reasons discussed at length in Sections I, II, and III, Plaintiffs cannot establish a constitutional violation, and have not been irreparably harmed; indeed, because no final redesignation decision has issued (and any such decision would be subject to Plaintiffs' administrative appeals), they have not been harmed at all. Although Plaintiffs assert that there is "no legitimate interest at all on the Defendants' side," *id.* at 41, Plaintiffs' Motion seeks to interrupt and delay lawful BOP review of its own inmates for redesignation, without legal basis. BOP's designation decisions are within its exclusive purview and are intended to preserve the safety of inmates, employees, and surrounding communities. The public interest and equities favor allowing BOP's redesignation process to play out as intended by longstanding BOP policy, pursuant to BOP's statutory authority. Thus, the

---

[12] To the extent that Plaintiffs premise their irreparable injury on the alleged constitutional violations, there is "no *per se* rule" that a constitutional violation "*automatically* constitutes irreparable harm." *Chaplaincy*, 454 F.3d at 301. Plaintiffs' argument simply bootstraps the merits of their constitutional claims to their irreparable harm allegations. As explained in Part II, in any event, Plaintiffs' claims lack merit.

balance of equities and public interest favor Defendants.

## V.    ANY INJUNCTIVE RELIEF SHOULD BE NARROWLY TAILORED AND PERMIT LAWFUL AGENCY ACTIVITY.

"[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Lewis v. Casey*, 518 U.S. 343, 360 (1996) (explaining that an injunction should not provide "a remedy beyond what [is] necessary to provide relief" to the injured parties). In line with these principles, to the extent the Court intends to grant Plaintiffs' request for a preliminary injunction, such relief should be narrowly tailored to apply only to Plaintiffs and the agency defendants, and to leave intact the Defendants' authority to transfer Plaintiffs to institutions other than the ADX.

Any preliminary relief should be limited to address any established harms of the present Plaintiffs. There is no basis for extending relief to non-parties in this suit (or to Plaintiffs that have failed to articulate any imminent, irreparable harm). Accordingly, any preliminary injunction should confirm that all obligations in the injunctive order apply only with respect to redesignations to ADX Florence involving Plaintiffs specifically. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions *of the parties* until a trial on the merits can be held." (emphasis added)); *see also Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) ("Universal injunctions have little basis in traditional equitable practice."); *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1282 (11th Cir. 2021) (noting that the "appropriate circumstances" for issuing a nationwide injunction "are rare").

Moreover, although Plaintiffs name the President as a defendant, any injunction against the President would be improper. Courts have no authority to second-guess "discretion[ary]" acts taken by the President "in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S.

(4 Wall.) 475, 499, 501 (1866); *see also Dellinger v. Bessent*, 2025 WL 559669, at *12 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting) (outlining the President's immunity from judicial encroachment).

## VI.   ANY INJUNCTIVE RELIEF SHOULD BE STAYED PENDING APPEAL AND ACCOMPANY A BOND.

To the extent the Court issues any injunctive relief, Defendants respectfully request that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at a minimum, administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized. For the reasons explained above, Defendants have, at a minimum, satisfied the requirements for a stay of any injunction pending appeal. *See Nken*, 556 U.S. at 434 (describing the standard for obtaining such a stay and noting the "substantial overlap" between that standard and "the factors governing preliminary injunctions").

The Defendants also respectfully request that any injunctive relief accompany a bond under Fed. R. Civ. P. 65(c), which provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." This Rule provides "broad discretion in the district court to determine the appropriate amount of an injunction bond." *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999).

## <u>CONCLUSION</u>

For these reasons, this Court should deny Plaintiffs' Preliminary Injunction Motion.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

ANDREW I. WARDEN
Assistant Branch Director

*/s/ Marianne F. Kies*
CHRISTOPHER EDELMAN
Senior Counsel
MARIANNE F. KIES
KEVIN BELL
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: 202-353-1819
Email: Marianne.F.Kies@usdoj.gov

*Attorneys for Defendants*