**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

REJON TAYLOR, *et al.*,

                    *Plaintiffs*,

       v.

DONALD J. TRUMP, *et al.*, in their official
capacities,

                    *Defendants*.

Case No.  1:25-cv-01161-TJK

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
<u>PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

<u>Page</u>

ADDITIONAL BACKGROUND ...................................................................................1

    I.   Before the AG and DAG intervened, BOP had concluded the designation review. ...1

    II.   ADX is a prison of unparalleled severity. ................................................3

ARGUMENT .............................................................................................................5

    II.   Plaintiffs' claims are properly before the Court. ...........................................5

        A.   The jurisdiction-stripping provisions cited by Defendants do not apply. ..5

        B.   Plaintiffs have standing. ...........................................................7

        C.   The PLRA's exhaustion requirement does not bar preliminary relief. ......9

    II.   Plaintiffs are likely to prevail on the merits.............................................11

        A.   The Bondi Memo violates the APA. ......................................................11

        B.   Defendants violated Plaintiffs' right to equal protection of the laws.......19

        C.   The Redesignation Directive violates Plaintiffs' due process rights. ......23

        D.   The Redesignation Directive violates the Eighth Amendment...............27

        E.   The EO violates Article II. ....................................................................30

    III.  Plaintiffs will suffer irreparable harm if this Court does not intervene....................32

    IV.  The balance of equities and public interest weigh heavily in Plaintiffs' favor..........35

CONCLUSION ......................................................................................................36

**TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Advance Am. v. FDIC,*
    2017 WL 2672741 (D.D.C. Feb. 23, 2017) ..............................................................33

*Aids Vaccine Advoc. Coal. v. U.S. Dep't of State,*
    2025 WL 752378 (D.D.C. Mar. 10, 2025) ..............................................................19

*Ajaj v. United States,*
    293 F. App'x 575 (10th Cir. 2008) ..............................................................28

*Al-Joudi v. Bush,*
    406 F. Supp. 2d 13 (D.D.C. 2005) ..............................................................34

*Am. Clinical Lab'y Ass'n v. Azar,*
    931 F.3d 1195 (D.C. Cir. 2019) ..............................................................6

*Am. Fed'n of Gov't Emps. AFL-CIO v. U.S. Off. of Pers. Mgmt.,*
    2025 WL 1150698 (N.D. Cal. Apr. 18, 2025) ..............................................................17

*Am. First Legal Found. v. Becerra,*
    2024 WL 3741402 (D.D.C. Aug. 9, 2024) ..............................................................35

*Am. Lib. Ass'n v. FCC,*
    406 F.3d 689 (D.C. Cir. 2005) ..............................................................15

*Am. Vanguard Corp. v. Jackson,*
    803 F. Supp. 2d 8 (D.D.C. 2011) ..............................................................15, 16

*Archdiocese of Washington v. Washington Metropolitan Area Transit Authority,*
    897 F.3d 314 (D.C. Cir. 2018) ..............................................................35

*Aref v. Lynch,*
    833 F.3d 242 (D.C. Cir. 2016) ..............................................................23, 24, 25

*Associated Press v. Budowich,*
    2025 WL 1039572 (D.D.C. Apr. 8, 2025) ..............................................................33

*Banzhaf v. Smith,*
    737 F.2d 1167 (D.C. Cir. 1984) ..............................................................12

*Bennett v. Spear,*
    520 U.S. 154 (1997) ..............................................................13

*Booth v. Churner*,
    532 U.S. 731 (2001) ........................................................................................9

*Bowen v. Mich. Acad. of Fam. Physicians*,
    476 U.S. 667 (1986) ........................................................................................6

*Brown v. Plata*,
    563 U.S. 493 (2011) ......................................................................................23

*Bucklew v. Precythe*,
    587 U.S. 119 (2019) ......................................................................................27

*Chamber of Com. of U.S. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) .....................................................................12

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ...............................................................32, 33

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*,
    846 F.3d 1235 (D.C. Cir. 2017) ...................................................................12

*City & Cnty. of San Francisco v. Trump*,
    2025 WL 1282637 (N.D. Cal. May 3, 2025) ...............................................13

*Cmty. Hosps. of Cent. Cal. v. NLRB*,
    335 F.3d 1079 (D.C. Cir. 2003) ...................................................................20

*Cmty. Treatment Ctrs., Inc. v. City of Westland*,
    970 F. Supp. 1197 (E.D. Mich. 1997) .........................................................16

*Davis v. Fed. Bureau of Prisons*,
    2016 WL 1156755 (D. Colo. Mar. 24, 2016) ..............................................28

*Debenedetto v. Rardin*,
    2022 WL 3647823 (D. Minn. Aug. 24, 2022) .............................................16

*Detroit Int'l Bridge Co. v. Canada*,
    189 F. Supp. 3d 85 (D.D.C. 2016) ...............................................................13

*Doe v. McHenry*,
    2025 WL 388218 (D.D.C. Feb. 4, 2025) ..........................................6, 10, 32

*Drs. for Am. v. Off. of Pers. Mgmt.*,
    2025 WL 452707 (D.D.C. Feb. 11, 2025) ...................................................19

*E. Bay Sanctuary Covenant v. Trump*,
    932 F.3d 742 (9th Cir. 2018) ........................................................................12

*Ex parte Garland*,
    71 U.S. (4 Wall.) 333 (1866) ........................................................................31

*Farmer v. Brennan*,
    511 U.S. 825 (1994) ................................................................................28

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ..................................................................................9

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ................................................................................13

*Fletcher v. Menard Corr. Ctr.*,
    623 F.3d 1171 ........................................................................................10

*Garner v. Kennedy*,
    713 F.3d 237 (5th Cir. 2013) ..................................................................21

*Gomez v. Trump*,
    485 F. Supp. 3d 145 (D.D.C. 2020) ......................................................14

*Gowadia v. Stearns*,
    596 F. App'x 667 (10th Cir. 2014) .........................................................28

*Grace v. Barr*,
    965 F.3d 883 (D.C. Cir. 2020) ...............................................................12

*Hill v. Pugh*,
    75 F. App'x 715 (10th Cir. 2003) ...........................................................28

*Hope v. Pelzer*,
    536 U.S. 730 (2002) ..........................................................................26, 30

*Hudson v. McMillian*,
    503 U.S. 1 (1992) ...................................................................................28

*Jackson v. District of Columbia*,
    254 F.3d 262 (D.C. Cir. 2001) ...............................................................10

*Jones v. Bock*,
    549 U.S. 199 (2007) ..................................................................................9

*Kaemmerling v. Lappin*,
    553 F.3d 669 (D.C. Cir. 2008) .................................................................9

*Kalita v. BOP*,
    2007 WL 3406068 (N.D. W. Va. Nov. 8, 2007) ....................................16

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020) ...............................................................32

*La. Pub. Serv. Comm'n v. FCC*,
   476 U.S. 355 (1986)........................................................................................................15

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
   2025 WL 1187730 (D.D.C. Apr. 24, 2025).....................................................7, 9, 33

*Levine v. Apker*,
   455 F.3d 71 (2d Cir. 2006) ...........................................................................................18

*Love v. BOP*,
   2025 WL 105845 (D.D.C. Jan. 16, 2025).....................................................................5

*McMillan v. Wiley*,
   813 F. Supp. 2d 1238 (D. Colo. 2011)........................................................................28

*McNary v. Haitian Refugee Ctr.*,
   498 U.S. 479 (1991)..........................................................................................................6

*Mills v. District of Columbia*,
   571 F.3d 1304 (D.C. Cir. 2009).....................................................................................32

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)...........................................................................................................19

*Murthy v. Missouri*,
   603 U.S. 43 (2024).........................................................................................................8, 9

*Nat'l Ass'n for Advancement of Colored People v. U.S. Dep't of Educ.*,
   2025 WL 1196212 (D.D.C. Apr. 24, 2025)................................................................33

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
   2025 WL 597959 (D.D.C. Feb. 25, 2025)..........................................................13, 19

*Nat'l Treasury Emps. Union v. United States*,
   927 F.2d 1253 (D.C. Cir. 1991)....................................................................................32

*New York v. Trump*,
   133 F.4th 51 (1st Cir. 2025)...........................................................................................12

*Nken v. Holder*,
   556 U.S. 418 (2009).........................................................................................................35

*Orr v. Trump*,
   2025 WL 1145271 (2025)........................................................................................22, 23

*Palakovic v. Wetzel*,
   854 F.3d 209 (3d Cir. 2017) .........................................................................................29

*Perkins Coie LLP v. U.S. Dep't of Just.*,
   2025 WL 1276857 (D.D.C. May 2, 2025)............................................................22, 32

*Porche v. Salazar*,
　　2019 WL 1373683 (D. Or. Mar. 5, 2019) .................................................................. 7

*Porter v. Clarke*,
　　923 F.3d 348 (4th Cir. 2019) .................................................. 28, 29, 30, 34

*Proctor v. LeClaire*,
　　846 F.3d 597 (2d Cir. 2017) .................................................................. 26, 27

*Pub. Citizen v. U.S. Trade Representative*,
　　5 F.3d 549 (D.C. Cir. 1993) .................................................................. 13

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
　　758 F.3d 296 (D.C. Cir. 2014) .................................................................. 6, 7

*Reynolds v. Quiros*,
　　990 F.3d 286 (2nd Cir. 2021) .................................................................. 21

*Rezaq v. Nalley*,
　　677 F.3d 1001 (10th Cir. 2012) .................................................................. 3, 24

*Rhodes v. Chapman*,
　　452 U.S. 337 (1981) .................................................................. 28

*Rodriguez v. Copenhaver*,
　　823 F.3d 1238 (9th Cir. 2016) .................................................................. 5

*Romer v. Evans*,
　　517 U.S. 620 (1996) .................................................................. 20, 22

*Ross v. Blake*,
　　578 U.S. 632 (2016) .................................................................. 9

*Royer v. BOP*,
　　933 F. Supp. 2d 170 (D.D.C. 2013) .................................................................. 6

*Silverstein v. Fed. Bureau of Prisons*,
　　559 F. App'x 739 (10th Cir. 2014) .................................................................. 29, 31

*Sourbeer v. Robinson*,
　　791 F.2d 1094 (3d Cir. 1986) .................................................................. 26

*State v. Su*,
　　121 F.4th 1 (9th Cir. 2024) .................................................................. 12

*U.S. Dep't of Agric. v. Moreno*,
　　413 U.S. 528 (1973) .................................................................. 22

*United States ex rel. Accardi v. Shaughnessy,*
    347 U.S. 260 (1964) .................................................................................15, 16

*United States v. Allen,*
    247 F.3d 741 (8th Cir. 2001) ...........................................................................26

*United States v. Klein,*
    80 U.S. (13 Wall.) (1871) ...............................................................................31

*United States v. Nixon,*
    418 U.S. 683 (1974) ........................................................................................15

*United States v. Wilson,*
    322 F.3d 353 (5th Cir. 2003) .............................................................................1

*United States v. Young,*
    463 F.2d 934 (D.C. Cir. 1972) ...........................................................................1

*Wedelstedt v. Wiley,*
    477 F.3d 1160 (10th Cir. 2007) .......................................................................18

*Whitley v. Albers,*
    475 U.S. 312 (1986) ...................................................................................28, 29

*Wilkinson v. Austin,*
    545 U.S. 209 (2005) ...................................................................................24, 27

*Wills v. Barnhardt,*
    2022 WL 4481492 (10th Cir. Sept. 27, 2022) ...................................................7

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President,*
    2025 WL 946979 (D.D.C. Mar. 28, 2025) .......................................................33

*Wood v. Beauclair,*
    692 F.3d 1041 (9th Cir. 2012) .........................................................................29

**STATUTES**

18 U.S.C. § 3621 ....................................................................................................1

18 U.S.C. § 3621(b) .......................................................................................*passim*

18 U.S.C. § 3625 ...........................................................................................5, 6, 11

18 U.S.C. § 3626(a)(2) ........................................................................................35

28 U.S.C. § 509 ..............................................................................................15, 26

28 U.S.C. § 1915(g) .............................................................................................10

42 U.S.C. § 1997e(a) ...................................................................................................9

**REGULATIONS**

28 C.F.R. § 0.95(d) ............................................................................................16, 17

28 C.F.R. § 0.96(c) ............................................................................................16, 17

**OTHER AUTHORITIES**

Dep't of Justice, Statement of Collette S. Peters, Director Federal Bureau of Prisons
    Before the Committee on the Judiciary United States Senate (Sept. 29, 2022) ...........3

Terry A. Kupers, *A Community Mental Health Model in Corrections*,
    26 Stan. L. & Pol'y Rev. 119 (2015) ..........................................................................4

U.S. Courts, Civil Statistical Tables for the Federal Judiciary,
    Table C-5 (Dec. 31, 2024) ........................................................................................34

## ADDITIONAL BACKGROUND

Although Defendants concede the redesignation process began "immediately" after the commutations were announced, Opp. 1, they fail to address—much less dispute—Plaintiffs' account of what transpired between December 23, 2024, and the initiation of the ADX referral process in late February 2025. That period is critical to this litigation. By early February, BOP had completed its redesignation review and determined Plaintiffs should be placed at various high-security USPs and FMCs—*not ADX*.

But the history that Defendants ignore demonstrates that the redesignation process currently underway is a sham. But for the Redesignation Directive, BOP's initial placement decisions would have been finalized, and Plaintiffs would have been transferred to USPs and FMCs. This litigation arises solely because Defendants aborted the lawful process to impose their extra-judicial punishment.

## I.      Before the AG and DAG intervened, BOP had concluded the designation review.

BOP began the redesignation process for the commuted people shortly after President Biden's clemency action on December 23, 2024. Opp. 1, 8. Mr. Synsvoll, one of the redesignation team members, gathered information about each commuted person from his capital counsel, and communicated with counsel over multiple meetings about the status of the review as it unfolded. *See, e.g.*, ECF 2-2, Ex. 25 ¶ 5, Ex. 28 ¶ 5, Ex. 33 ¶¶ 8, 10.[1]

The BOP redesignation team compiled the material it received, conducted an independent review of the relevant placement criteria per 18 U.S.C. § 3621 and PS 5100.08,[2] and made individualized placement decisions for each Plaintiff. *See* ECF 2-2, Ex. 25 ¶ 22, Ex.

---

[1] Defendants conspicuously omitted a declaration from Mr. Synsvoll, who has personal knowledge. The Court should presume his testimony would be unfavorable to Defendants. *See United States v. Young*, 463 F.2d 934, 939 (D.C. Cir. 1972); *see also United States v. Wilson*, 322 F.3d 353, 363 (5th Cir. 2003).

[2] Program Statement 5100.08 sets out this brief process, which begins with Unit Staff and ends with Designation and Sentence Computation Center ("DSCC") approval. It looks nothing like the lengthy one for ADX designations on which Defendants focus great attention.

20 ¶ 8, Ex. 28 ¶ 55. These decisions were memorialized in a spreadsheet,[3] identifying where each person would be placed. *See id.* at Ex. 25 ¶ 22, Ex. 20 ¶ 8, Ex. 28 ¶ 55. The redesignation review was complete under BOP policy, and it determined that all Plaintiffs should be transferred to USPs or FMCs—not ADX. *See* ECF 2-8 at 19; ECF 2-2, Ex. 16 ¶ 10, Ex. 30 ¶¶ 12, 14, Ex. 26 ¶ 44. Four of the Plaintiffs had been referred for transfer to ADX, but found to meet ADX exclusionary criteria because of their mental health conditions. Declaration of Maria V. Morris ("Morris Decl.") ¶ 11; *see also id.*, Ex. 9 (Supp. Gibson Decl.) at 4-5.[4]

Following the EO, the Office of the Deputy AG ("ODAG") placed the redesignation team in a holding pattern, preventing it from finalizing its redesignation decisions. *See* ECF 2-2, Ex. 15 ¶ 28, Ex. 16 ¶ 10, Ex. 22 ¶ 9, Ex. 25 ¶¶ 18, 28, Ex. 24 ¶ 16. Instead, the BOP team was required to submit its decisions to ODAG for review and approval. *Id.* at Ex. 20 ¶ 8, Ex. 24 ¶ 16, Ex. 25 ¶ 18, Ex. 30 ¶ 10. On or around January 30, BOP presented its individualized placement decisions to ODAG. *Id.* at Ex. 15 ¶ 26, Ex. 24 ¶ 16, Ex. 25 ¶ 25. But on February 11, 2025, the AG and DAG rejected those placement decisions, *id.* at Ex. 16 ¶ 10, Ex. 17 ¶ 9, Ex. 25 ¶ 32, and instead ordered BOP to refer all of the commutees to ADX, *id.* at Ex. 16 ¶¶ 1, 10, Ex. 25 ¶¶ 33-34, Ex. 31 ¶ 1, including those previously excluded from ADX for medical or mental health reasons, *id.* at Ex. 23 ¶ 18, Ex. 30 ¶¶ 13-14, Ex. 32 ¶¶ 17, 33, 36.[5] Defendants do

---

[3] Defendants have acknowledged the existence of this spreadsheet but refused to produce it. *See* Morris Decl. Ex. 1 (Email of K. Bell to M. Morris).

[4] Defendants rely on the declaration of Mr. Salem to create the appearance of disputed facts. Salem asserts: (1) "no designations were finalized" prior to the Executive Order and Bondi Memo, and (2) "no designations were made" before February 5, 2025. *See* ECF No. 40-1, ¶ 27. But these statements are misleading. "Designation" is a term of art that refers to the order issued by the DSCC needed to finalize BOP placement decisions. *See* ECF 2-2, Ex. 6 at Ch. 2, p. 2 (defining "designation"); *id.*, Ch. 2, P. 4 (defining "redesignation"). Understanding that term, there is no dispute that no "designations" happened because DSCC did not issue orders prior to the EO or Bondi Memo. But only Plaintiffs explain *why* that step was never reached—the DAG/AG unlawfully intervened before the BOP independent placement decisions *could* be finalized—and, critically, Mr. Salem does not deny that explanation.

[5] The documents Defendants have produced and those provided by Plaintiffs themselves demonstrate that Defendants took actions to allow individuals who were too medically impaired to go to ADX to go there anyway. Morris Decl. ¶¶ 13-14, Exs. 4, 5.

not address, much less refute, these events. Instead, they begin their account of the redesignation process *after* the forced ADX referrals had already been issued. As explained below, those referrals led to sham hearings with predetermined outcomes. *See infra* 8; *see also* Supp. Gibson Decl. at 4-7.

## II.    ADX is a prison of unparalleled severity.

Elsewhere, Defendants do not so much ignore the relevant facts as distort them. They agree, for instance, that ADX holds incarcerated people behind two sets of doors in a "single occupancy cell" smaller than an average parking space for 22-24 hours a day. ECF 40-2 ("Armijo Decl.") ¶¶ 9, 11, 37. They admit that people eat all meals alone in their cells, *id.* at ¶ 11, within arm's reach of their toilet. They do not dispute that the only outside "window" in a cell is a narrow slit four inches wide, facing cement and sky. ECF 2-2, Ex. 9 ¶ 19; Morris Decl., Ex. 10 ("Supp. King Decl.") ¶ 9. But they resist calling ADX what it is: highly restrictive solitary confinement.

Defendants celebrate the aspiration that people in ADX's General Population *might* get out of these cells ten hours every week for recreation (less than two hours per day), but concede this is subject to exceptions. Armijo Decl. ¶ 37. They do not mention that the exceptions swallow the rule and that recreation is "frequently cancelled." *Rezaq v. Nalley*, 677 F.3d 1001, 1005 (10th Cir. 2012); ECF 2-2, Ex. 9 ¶ 21 (noting same).[6]

Defendants assure the Court that "all inmates at ADX-GP have contact with staff in the prison daily," Armijo Decl. ¶ 34, but do not describe that contact. Eric King does—reporting that staff conducting count or delivering meals "do not normally talk with you," Supp. King Decl. ¶ 15, and that "the longest I ever talked to an administrator [in 18 months] was about a minute," *id.* ¶ 27. Defendants accept Dr. Haney's description of interactions between staff and

---

[6] *See*, *e.g.*, Dep't of Justice, Statement of Collette S. Peters, Director Federal Bureau of Prisons Before the Committee on the Judiciary United States Senate 11 (Sept. 29, 2022), https://shorturl.at/Ta7ow (discussing "chronic staffing difficulties" at ADX and other prisons).

incarcerated people as "sporadic, infrequent, and routinized, amounting to no more than a few minutes a week of pro forma verbal exchange." ECF 2-2, Ex. 9 ¶ 19.[7] And they make no attempt to challenge the conclusion that these fleeting exchanges do nothing to mitigate the harms of social isolation.[8]

Defendants' declarants assert that "inmates can and do speak to other inmates in adjacent cells," Armijo Decl. ¶ 32, without explaining that speaking in ADX occurs by trying to shout through the plumbing or "stand[ing] at the door and yell[ing] at the top of your lungs," Supp. King Decl. ¶ 36. They mention "group programming," Armijo Decl. ¶ 39. But the few selected to participate must do so shackled and inside individual phone-booth size cages.[9] *Id.* Otherwise, all programming is offered in-cell, largely via CCTV. *Id.* at ¶¶ 17, 20-24. And the Warden acknowledges that "ADX General Population inmates are not permitted to congregate," *id.* at ¶ 63, even for prayer—a tenet of some Plaintiffs' faiths.

Ultimately, Defendants downplay the conditions of ADX, contending that it resembles any other ordinary facility. But, as Plaintiffs' expert explains, ADX is "by far the most restrictive and isolating prison in the BOP." ECF 2-2, Ex. 8 at 9.

---

[7] ECF 2-2, Ex. 9 ¶ 14 ("It was constructed and continues to be operated in such a way that the people housed there are prohibited from having any form of meaningful social interaction."); ¶16 (finding the "combination of the cell configuration and solid concrete cell construction prohibits prisoners from seeing into each other's cells or communicating with each other" and "extremely limited day-to-day communication or contact … with prison staff occurs through … two doors"); ¶ 19 ("ADX prisoners have told me that they can go for days with little or no actual verbal exchange with staff.")

[8] As Dr. Haney describes, "meaningful social contact is a fundamental human need, and whose deprivation has a range of potentially very serious psychological and even physical effects." ECF 2-2, Ex. 9 ¶ 49.

[9] Psychiatrist Dr. Terry Kupers has described these as "approximately the shape of a telephone booth" and observes that "prisoners call these booths 'cages' and tell me that when they are placed inside of them, they feel they are being treated like animals." Terry A. Kupers, *A Community Mental Health Model in Corrections*, 26 Stan. L. & Pol'y Rev. 119, 152 (2015).

## ARGUMENT

**II.    Plaintiffs' claims are properly before the Court.**

Defendants raise a host of threshold arguments. None are persuasive.

### A.    The jurisdiction-stripping provisions cited by Defendants do not apply.

Defendants argue that this Court lacks jurisdiction to hear Plaintiffs' claims. Opp. 16-19. In support, they cite 18 U.S.C. § 3625, which precludes APA review of any "determination, decision, or order," including designation determinations and decisions under 18 U.S.C. § 3621(b). Defendants separately invoke § 3621(b) as an additional bar on the Court's jurisdiction—"[n]otwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."

But Defendants fundamentally mischaracterize Plaintiffs' suit. This error infects all of Defendants' arguments. Sections 3625 and 3621(b) pose no bar to judicial review because Plaintiffs do not challenge a BOP "determination, decision, or order" to imprison Plaintiffs in ADX, or a BOP "designation of a place of imprisonment." Defendants cherry-pick from Plaintiffs' Complaint to insist that Plaintiffs are, in fact, seeking to challenge their ultimate redesignation to ADX. *See* Opp. 17-18. But they plainly are not.

To be clear, Plaintiffs' APA claims challenge the Bondi Memo implementing the EO. *See infra* 11-19. That is not a designation decision. Plaintiffs' equal protection and due process claims concern the fact that Plaintiffs are being subject to a sham process, one that no other person formerly confined to death row has faced. *See infra* 19-27. Again, not a designation decision. And Plaintiffs' Article II claim challenges an executive order, *see infra* 30-32, while their Eighth Amendment claim concerns the use of that sham process to inflict pain without penological justification, *see infra* 27-30. Courts routinely and correctly find claims such as these outside the scope of §§ 3625 and 3621(b)'s jurisdiction-stripping provisions because they do not challenge the designation of a person's place of imprisonment. *See Love v. BOP*, 2025

WL 105845, at *11 (D.D.C. Jan. 16, 2025) (Section 3621); *Rodriguez v. Copenhaver*, 823 F.3d

1238, 1242 (9th Cir. 2016) (Section 3625); *see also* Mot. 29-30.[10]

And Defendants are wrong to suggest that the relief Plaintiffs seek proves they are

challenging their ultimate designations. Opp. 17-18. Plaintiffs are seeking a return to the lawful

process that the sham, truncated proceedings replaced. Though a lawful approach to Plaintiffs'

designations may yield different placement decisions, it is also beside the point. A permissible

challenge to an unlawful process that might reverse an individual designation cannot foreclose

the challenge itself. Otherwise, individuals could bring claims against the procedure supporting

a designation decision only if that designation would not change should they succeed. That

makes no sense. And if true, every case allowing individuals to challenge unconstitutional

practices used to reach individual determinations like these—determinations that are otherwise

unreviewable by courts—was wrongly decided. *Cf., e.g.*, *McNary*, 498 U.S. at 492; *supra* n.10.

But even if the Court finds that Plaintiffs challenge a "determination, decision, or order"

under § 3625 or "a designation of a place of imprisonment" under § 3621(b), it still has

jurisdiction to consider their constitutional claims. "The Supreme Court has long held that a

statutory bar to judicial review precludes review of constitutional claims only if there is 'clear

and convincing' evidence that the Congress so intended." *Ralls Corp. v. Comm. on Foreign*

*Inv. in U.S.*, 758 F.3d 296, 308 (D.C. Cir. 2014). As courts in this district have explicitly held,

neither § 3625 nor § 3621(b) is sufficiently explicit to bar consideration of constitutional

claims. *See Royer v. BOP*, 933 F. Supp. 2d 170, 181-82 (D.D.C. 2013); *Doe v. McHenry*, 2025

WL 388218, at *2 (D.D.C. Feb. 4, 2025); Opp. 20 n.6 (conceding *Royer* "held that § 3625 was

---

[10] The Supreme Court and D.C. Circuit have long held that similar statutory provisions
depriving courts of jurisdiction over individual determinations do not bar challenges to
"practice[s] or procedure[s] employed in making" case-by-case determinations. *McNary v.
Haitian Refugee Ctr.*, 498 U.S. 479, 492 (1991); *Bowen v. Mich. Acad. of Fam. Physicians*,
476 U.S. 667, 675-76 (1986); *Am. Clinical Lab'y Ass'n v. Azar*, 931 F.3d 1195, 1208 (D.C.
Cir. 2019).

insufficiently clear to preclude judicial review of constitutional claims").[11]

### B.    Plaintiffs have standing.

Defendants next claim that Plaintiffs lack standing because their injury "is neither actual nor imminent." Opp. 23. That is wrong.

*First*, Defendants incorrectly assert that "referral to ADX Florence is the gravamen of all [Plaintiffs'] claims," and that because no Plaintiff has yet been officially designated to ADX, Plaintiffs lack standing. *Id.* at 22. But Defendants (again) misunderstand Plaintiffs' Complaint. Plaintiffs challenge the EO, the Bondi Memo, and the unlawful process that flowed from these directives. Because that process is well underway, the harm is more than imminent; it is ongoing, and Plaintiffs have standing to challenge it.

*Second*, Plaintiffs' transfer to ADX is indeed imminent. Through the sham and truncated process now underway, 20 of the 21 Plaintiffs have now received recommendations for ADX transfer. Defendants make empty representations that it would take upwards of 170 days before Plaintiffs would be moved, Opp. 22-23, but when Plaintiffs' counsel asked them to stipulate to this fact, Defendants refused and reserved the right to transfer the Plaintiffs as early as May 31, 2025. Morris Decl., Ex. 6 (Email from C. Edelman to C. Kendrick). "Defendants' argument that the harm to Plaintiffs is merely speculative is belied by both the text of the Executive Order and the factual record before this Court." *League of United Latin Am. Citizens v. Exec. Off. of the President* ("*LULAC*"), 2025 WL 1187730, at *41-42 (D.D.C. Apr. 24, 2025).

---

[11] The two unpublished and out-of-circuit cases Defendants cite are unpersuasive. In both, *pro se* litigants sued when BOP refused to send them to facilities closer to home. In *Porche v. Salazar*, a magistrate judge held the claim barred by § 3621, without discussing the scope of § 3621(b). 2019 WL 1373683, at *1 (D. Or. Mar. 5, 2019)*.* And *Wills v. Barnhardt* contains no discussion of the Due Process Clause or § 3621, except to say that the statute does not specifically make constitutional claims reviewable, so they must be unreviewable. 2022 WL 4481492, at *1, *4 (10th Cir. Sept. 27, 2022). This conflicts with the D.C. Circuit's rule, where constitutional claims are presumptively reviewable, even in the face of a "broadly worded statutory bar." *Ralls Corp.*, 758 F.3d at 308.

*Third*, Defendants assert that under *Murthy v. Missouri*, 603 U.S. 43 (2024), Plaintiffs must state in their complaint "'*each* claim they press against *each* defendant.'" Opp. 36 (quoting *Murthy*, 603 U.S. at 61) (emphasis added by Defendants). But Defendants misinterpret *Murthy*. There, social media users alleged that restrictions on their speech were traceable to federal agency officers who allegedly pressured non-party social media platforms to moderate content. *See* 603 U.S. at 48. The Court held that at least one plaintiff needed to make a threshold showing that "a particular defendant pressured a particular platform to censor a particular topic *before* that platform suppressed a particular plaintiff's speech on that topic." *Id*. at 61. Because the third-party platforms began to suppress plaintiffs' speech before the government's challenged communications, the causal link between the government's alleged conduct and the purported injury was too attenuated to establish standing. *Id*.

Here, however, the link between Defendants' actions and Plaintiffs' injuries is not at all attenuated. Plaintiffs challenge specific actions by named officials who have intentionally singled them out for retaliatory and punitive treatment. Plaintiffs have shown that:

(a) on January 20, 2025, his first day in office, Defendant Trump issued an EO targeting the Plaintiffs because President Biden had commuted their death sentences, *see* Compl. ¶¶ 5, 35, 45-46; ECF 2-2, Ex. 1;

(b) on February 5, 2025, Defendant Bondi issued a memo ordering DOJ and BOP to implement the EO without further delay, *see* Compl. ¶¶ 6, 36, 47; ECF 2-2, Ex. 3;

(c) prior to the EO and the Bondi Memo, BOP staff, including the Deputy Assistant Director of the DSCC who holds this authority, *see* ECF 2-2, Ex. 6 at 19, had decided that each Plaintiff would be moved to BOP facilities other than ADX, *see id.* at Ex. 25 ¶ 22, Ex. 20 ¶ 8, Ex. 28 ¶ 55;

(d) Defendants Bondi and Bove overturned these placement decisions and categorically predetermined that each Plaintiff would be moved to ADX, *see id.* at Ex. 16 ¶¶ 1, 10, Ex. 25 ¶¶ 32-34, Ex. 28 ¶¶ 37, 55; and

(e) BOP Defendants are responsible for the sham redesignation process that followed, *see* Compl. ¶¶ 8, 38-43.

Moreover, Plaintiffs' claims are redressable: they seek an order restoring the *status quo ante* and restraining Defendants from any *ultra vires* action that redesignated Plaintiffs to ADX.

In sum, Plaintiffs have shown a substantial likelihood of establishing each element of standing. *Murthy*, 603 U.S. at 58; *see also LULAC*, 2025 WL 1187730, at *21. They are currently suffering a concrete and particularized injury in fact, caused by Defendants, and this injury likely would be redressed by the requested judicial relief. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380-81 (2024).

      **C.**      **The PLRA's exhaustion requirement does not bar preliminary relief.**

Defendants erroneously invoke the PLRA exhaustion requirement, 42 U.S.C. § 1997e(a), arguing that because "Plaintiffs have not appealed any redesignation decision … their claims cannot proceed." Opp. 24. But Defendants are once again confused about Plaintiffs' challenges and, in any event, ignore binding precedent that holds exhaustion is no bar given the circumstances here. Under the PLRA, failure to exhaust administrative remedies is an affirmative defense, on which Defendants bear the burden of pleading and proof. *Jones v. Bock*, 549 U.S. 199, 216 (2007). Defendants have failed to meet that burden.

To start, as explained previously, this action is not challenging Plaintiffs' redesignation decisions. Instead, Plaintiffs challenge the EO, the Bondi Memo, and the unlawful process flowing from these directives, *not* their ultimate designations to ADX. The PLRA requires exhaustion only of "available" remedies, meaning remedies "capable of use" to obtain "some relief." *Ross v. Blake*, 578 U.S. 632, 642 (2016) (citations omitted). And for a remedy to provide "some relief," the prison officials must have authority to grant it. *Booth v. Churner*, 532 U.S. 731, 736 (2001); *see, e.g.*, *Kaemmerling v. Lappin*, 553 F.3d 669, 676 (D.C. Cir. 2008) (holding BOP grievance system was not an available remedy for statutorily mandated DNA testing, since BOP had no discretion not to collect DNA). Here, BOP officials have zero practical authority to grant relief against the stacked process and pre-determined outcome resulting from the Presidential intervention ratified by the AG. Accordingly, the BOP grievance process is not "available" for the Plaintiffs' complaints, and they need not have exhausted it.

*See Doe*, 2025 WL 388218, at *3 ("The text of the Executive Order plainly requires the BOP to perform the allegedly unlawful facility transfer and to withhold the prescribed hormone therapy drugs. Thus, there is no form of relief that is within the BOP's discretion to provide and that would remedy the plaintiffs' supposed constitutional violations.").

Exhaustion is also unavailable because Defendants can transfer Plaintiffs to ADX before exhaustion runs its course. Other than an assertion that BOP's "historical practice" is to wait until all appeals are completed before transferring a prisoner to ADX, Opp. 22, nothing in BOP policies *prohibits* the transfer pending exhaustion. And Defendants refuse to state that they will keep Plaintiffs at Terre Haute past May 31, 2025. *See* Morris Decl., Ex. 6. "If a prisoner has been placed in imminent danger of serious physical injury by an act that violates his constitutional rights, administrative remedies that offer no possible relief in time to prevent the imminent danger from becoming an actual harm can't be thought available." *Fletcher v. Menard Corr. Ctr.*, 623 F.3d 1171, 1173 (7th Cir. 2010). The same is true of other claims of serious deprivations of constitutional and statutory rights, like those at issue here.[12]

Finally, the D.C. Circuit has held that under the PLRA, courts retain their traditional equitable discretion to maintain the status quo pending exhaustion. *See Jackson v. District of Columbia*, 254 F.3d 262, 267-68 (D.C. Cir. 2001). If this Court determines that Plaintiffs must complete the grievance process before it can hear their statutory and constitutional claims concerning the EO, Bondi Memo, and the unlawful actions that flowed from those directives, then the Court may, and should, grant preliminary relief here to prevent disruption of the status quo while Plaintiffs complete such administrative challenges.

---

[12] The *Fletcher* court referred to "imminent danger of serious physical injury" using language from the PLRA's "three strikes" provision, 28 U.S.C. § 1915(g). *See* 623 F.3d at 1172-73. The court did not exclude other kinds of serious claims from its analysis.

**II.     Plaintiffs are likely to prevail on the merits.**

    **A.     The Bondi Memo violates the APA.**

Defendants contend that preliminary injunctive relief is not warranted on Plaintiffs' APA claims because, in their view, the APA bars review and the claims are without merit. Defendants are wrong on both counts.

    **1.     The APA does not bar review of the Bondi Memo.**

As a preliminary matter, Defendants once again misunderstand the agency action that Plaintiffs challenge. Plaintiffs' APA claims, at this stage, are limited to the AG's undisputed actions—*i.e.*, the interference with the BOP process through the Bondi Memo implementing the EO. At this juncture, Plaintiffs have not challenged any BOP action under the APA.[13] Yet Defendants repeatedly mischaracterize Plaintiffs' APA claims as challenging their final placement determinations. To be clear: the only agency action currently at issue is that of the AG. Once focused on *that* action, Defendants' arguments fall apart.

Start with Defendants' argument that the APA bars review because the challenged action is committed to agency discretion by law. Opp. 25-26. Putting aside that Defendants are wrong that 18 U.S.C. § 3625 precludes review of Plaintiffs' claims, *see supra* 5-6, Defendants simply misunderstand the agency action. It is not the "BOP inmate placement determinations," Opp. 25, but the unprecedented interference into the process by the AG through her implementation of the EO. With respect to *that* agency action, there is no credible argument of a delegation of discretion, nor do Defendants advance one.

The same is true for Defendants' argument that the BOP appeal process supplies an adequate remedy which supplants the APA. Opp. 29-30. Again, this wrongly assumes that the challenged agency action is the BOP placement determination. Not so. And, again, there can

---

[13] Importantly, Plaintiffs' non-APA claims, including their constitutional claims, do not require a "final agency action," as defined under the APA, for their claims to be ripe for review. Moreover, once the BOP placement decisions become final, Plaintiffs reserve the right to amend their Complaint to seek any appropriate relief under the APA.

be no credible argument that the BOP grievance process is somehow an adequate remedy to challenge the unlawful usurpation of power by the AG that launched the ADX referral process in the first place. "When considering whether an alternative remedy is adequate and therefore preclusive of APA review," the D.C. Circuit has instructed that courts must "look for clear and convincing evidence of legislative intent to create a special, alternative remedy and thereby bar APA review." *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 846 F.3d 1235, 1244 (D.C. Cir. 2017) (cleaned up). Here, there is *zero* evidence—let alone clear and convincing evidence—that Congress intended BOP appeals to serve as a remedy for the unlawful usurpation of authority by an entirely different agency.

Defendants next contend that Plaintiffs fail to show any agency action because "Presidential actions and actions taken by executive branch officials at the direction of the President are not agency action reviewable under the APA." Opp. 26. But Defendants are wrong. In the APA claims, Plaintiffs challenge the Bondi Memo, not EO 14164 or any action by the President. It is black letter law that "[f]inal actions of the Attorney General fall within the definition of agency action reviewable under the APA." *Banzhaf v. Smith*, 737 F.2d 1167, 1168 (D.C. Cir. 1984); *accord Grace v. Barr*, 965 F.3d 883, 900 (D.C. Cir. 2020) (reviewing AG's action under APA as arbitrary and capricious). That the Bondi Memo purports to implement EO 14164 is of no consequence—"final agency actions, even if implementing an executive order, are subject to judicial review under the APA." *State v. Su*, 121 F.4th 1, 15 (9th Cir. 2024); *see also Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) ("[T]hat the Secretary's regulations are based on the President's [EO] hardly seems to insulate them from judicial review under the APA …."); *New York v. Trump*, 133 F.4th 51, 70 n.17 (1st Cir. 2025) (similar); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 770 (9th Cir. 2018).

The cases cited by Defendants are far afield. Opp. 26-27. They concern instances where the President had "final constitutional or statutory responsibility for the final step necessary for

the agency action directly to affect the parties," *Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993) (clarifying *Franklin v. Massachusetts*, 505 U.S. 788 (1992)), or "actions involving the exercise of discretionary authority vested in the President by law," *Detroit Int'l Bridge Co. v. Canada*, 189 F. Supp. 3d 85, 99 (D.D.C. 2016). Here, those circumstances are not present. Congress has vested discretion over the designation and transfer process in BOP—not the President—and the AG is unlawfully inserting herself into that process. *See infra* 14-17.

Last, Defendants argue that there is no "final" agency action. Opp. 28. But the Bondi Memo implementing the EO is "final" because it "mark[s] the consummation of the agency's decisionmaking process," from which "rights or obligations have been determined" and "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

*First*, the Bondi Memo "mark[s] the consummation" of the AG's "decisionmaking" that the BOP must disregard the relevant statutory scheme and focus instead on the single factor that will result in their transfer to ADX. *City & Cnty. of San Francisco v. Trump*, 2025 WL 1282637, at *35 (N.D. Cal. May 3, 2025); *see infra* 17-18. In arguing otherwise, Defendants once again mischaracterize Plaintiffs' claims. Opp. 28. Plaintiffs challenge what the AG has done, not what BOP may do. And nothing about the Bondi Memo is interlocutory.

*Second*, the AG's actions have created "rights or obligations" and "legal consequences." The Bondi Memo creates "obligations" because it commanded BOP to engage in a truncated designation and transfer process for Plaintiffs—in other words, a sham. Read alongside the EO it implements, the Memo plainly "does not read like a guidance that leaves" the nature of the process for designation "decisions solely in the hands of" BOP. *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 2025 WL 597959, at *6 (D.D.C. Feb. 25, 2025). And it has "legal consequences" because individuals—like Plaintiffs—have been adversely affected by that directive. Defendants' observation that no Plaintiff has yet been transferred to ADX is

irrelevant. Opp. 28. What matters is that, but for the Bondi Memo, BOP would not be engaged in this sham in the first place. *See supra* 1-3, 8. Despite their attempt to suggest otherwise, the ADX hearing process that Plaintiffs are undergoing right now is *not* the regular § 3621(b) redesignation process. ADX hearings are only required if there is an ADX referral. That *all* 21 Plaintiffs were referred to ADX and are undergoing the ADX hearing process after the AG issued her directive to BOP confirms the Memo's legal effect. *See Gomez v. Trump*, 485 F. Supp. 3d 145, 193 (D.D.C. 2020) (agency action final when Plaintiffs were subject to "additional eligibility requirements" for "visa applications"); *see also* Morris Decl., ¶¶ 11-12; Supp. Gibson Decl. at 4-7.

In sum, Defendants' arguments that the APA bars review of Plaintiffs' claims are premised on a misunderstanding of the agency action. Nothing bars this Court from reaching the merits of Plaintiffs' APA claims, on which they are likely to succeed.

### 2. The Bondi Memo exceeds the AG's statutory authority and is not in accordance with law.

#### i. No statute authorizes the AG's interference.

The merits of the APA claim are straightforward. As Defendants concede, Congress gave BOP *exclusive* authority over the designation and transfer process for people in the federal prison system. Opp. 30-31. In 18 U.S.C. § 3621(b), Congress set forth the precise criteria the agency must consider when exercising that function. The Bondi Memo's unprecedented intervention in Plaintiffs' post-clemency transfer process is not authorized by § 3621(b) or any other statute, and the AG has thus exceeded her lawful authority, in violation of the APA. Mot. 25-26.

In response, Defendants argue that Plaintiffs have failed to identify a statute showing that the AG cannot be involved in placement decisions that have been delegated to BOP under § 3621 (b). Opp. 31. But this betrays a fundamental misunderstanding of agency power. "Agencies owe their capacity to act to the delegation of authority from Congress." *Am. Lib.*

14

*Ass'n v. FCC*, 406 F.3d 689, 708 (D.C. Cir. 2005). Without relevant enabling legislation, an agency "literally has no power to act." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). In other words, to prevail on an APA challenge, Plaintiffs do not need to show that Congress passed a statute *withholding* power from an agency (here, the AG); rather, Defendants must identify *enabling* legislation supporting her exercise of authority. Without it, the AG "literally has no power to act." *Id.*

Defendants attempt to rely on 28 U.S.C. § 509, which vests in the AG the functions of all agencies and officers housed within DOJ, including BOP, as the statute giving the AG the power to act. Opp. 31. Defendants suggest that this broad catch-all authorizes the AG, as the head of DOJ, to usurp BOP's role under § 3621(b), thus enabling the Bondi Memo's interference with Plaintiffs' placement within the federal prison system. But, as Plaintiffs explain below, Defendants overlook that the AG long ago delegated away any power over the designation and transfer of people incarcerated in federal prisons to the BOP. And under bedrock principles of administrative law, "once a regulation has been issued delegating power from one officer to a subordinate, the former may not thereafter invoke the delegated power himself, at least not as long as the regulation remains in effect." *Am. Vanguard Corp. v. Jackson*, 803 F. Supp. 2d 8, 13 (D.D.C. 2011) (cleaned up); *accord United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265-68 (1964); *United States v. Nixon*, 418 U.S. 683, 695-96 (1974). As a result, where authority has been delegated to an agency official "to take a particular action under a statute, *only* that official may take such action." *Am. Vanguard*, 803 F. Supp. 2d at 15; *see, e.g.*, *Accardi*, 347 U.S. at 267 ("[A]s long as the regulations remain operative, the Attorney General denies himself the right to sidestep the Board or dictate its decision in any manner.").

*American Vanguard* provides a straightforward illustration. There, the Environmental Protection Agency delegated the power to issue a particular order to a specific agency official,

who subsequently redelegated the power to a subordinate. *See* 803 F. Supp. 2d at 14. When a different official attempted to exercise the delegated power, the court invalidated the resulting order, rejecting the argument that the original delegee retained the authority to exercise the authority that had been redelegated. *See id.* at 14-15. Because that delegation remained in effect, the superior official "denied himself the authority to exercise the discretion delegated … even though the original authority was his," and his exercise of the power he delegated away was therefore "not 'in accordance with law' under the APA." *Id.*

The same is true here. The AG long ago vested BOP's director with the power to "[d]esignat[e] places of imprisonment or confinement" and "order[] transfers from one institution to another," 28 C.F.R. § 0.96(c), and to direct the "[c]lassification, commitment, control, or treatment of persons committed to the custody of the Attorney General," *id.* § 0.95(d). Courts across the country have recognized that by regulation the AG has delegated to BOP authority over the designation and transfer of federal prisoners. *See, e.g.*, *Cmty. Treatment Ctrs., Inc. v. City of Westland*, 970 F. Supp. 1197, 1202 (E.D. Mich. 1997) (explaining that the AG's "power to designate where federal prisoners shall be committed" has been "delegate[d] … to the BOP"); *Kalita v. BOP*, 2007 WL 3406068, at *4 (N.D. W. Va. Nov. 8, 2007); *Debenedetto v. Rardin*, 2022 WL 3647823, at *2 (D. Minn. Aug. 24, 2022). As a result, the AG cannot invoke or exercise those powers here—"*only* [BOP] may take such action," *Am. Vanguard*, 803 F. Supp. 2d at 15, and the AG cannot "dictate [BOP's] decision in any manner," *Accardi*, 347 U.S. at 267.

Yet dictating BOP's decisionmaking is the Bondi Memo's plain purpose and effect. The Bondi Memo exercises unlawful authority by commanding BOP to take specific actions regarding Plaintiffs' post-clemency transfer process. Defendants halfheartedly suggest that the Memo does not interfere with BOP's placement process because it merely echoes the agency's existing policies. *See* Opp. 31 (citing PS 5100.08). But this does not pass the smell test. On its

face, the Bondi Memo "directed" the agency to ensure that Plaintiffs are imprisoned "consistent with the security risks those inmates present." ECF 2-2, Ex. 3. The AG issued the Memo at the directive of the President, who entered office determined to seek retribution for his predecessor's clemencies, *see* Compl. 13-14, and who commanded the AG "to ensure that these offenders are imprisoned in conditions consistent with the monstrosity of their crimes and the threats they pose." ECF 2-2, Ex. 1 at 2. Following the EO, the AG's Office began its unlawful intermeddling, starting with the DAG's review and veto of BOP's previously settled designation decisions, and culminating in the Bondi Memo. *See supra* 1-3, 8.[14] BOP followed the AG's marching orders, and *every single* Plaintiff received a cookie-cutter referral to ADX. *See supra* 1-3, 8; *see also* Supp. Gibson Decl. at 4-7. Many of these referrals were contrary to BOP policy and practice. Supp. Gibson Decl. at 7. Defendants, who do not dispute these facts, cannot whitewash the Bondi Memo's unambiguous directive to BOP. *See Am. Fed'n of Gov't Emps. AFL-CIO v. U.S. Off. of Pers. Mgmt.*, 2025 WL 1150698, at *7 (N.D. Cal. Apr. 18, 2025) (rejecting government's "sanitized record" against plaintiffs' "mountain of evidence"). The undisputed facts show that the purpose and effect of the Bondi Memo was to dictate where Plaintiffs would be housed—the very power the AG ceded when she delegated her authority over designations and transfers to BOP. *See* 28 C.F.R. §§ 0.95(d), 0.96(c). Because the AG has no authority in this regard, the Bondi Memo is without lawful authority and is contrary to law.

ii.    **The Bondi Memo directs BOP to disregard § 3621(b).**

Even if the AG could exercise authority over BOP's designating and transfer process, the Bondi Memo still exceeds the AG's statutory authority. Under § 3621(b), BOP's discretion to assign a prisoner to an available facility is cabined by the statute's mandatory direction to

---

[14] Plaintiffs alleged that on February 11, 2025, the AG and DAG rejected those placement decisions, and instead ordered BOP to refer all of the commutees to ADX, including those previously excluded from ADX for medical or mental health reasons. *See supra* 1-3, 8. The documents Defendants have produced show that the referral process started or restarted for all but two of the Plaintiffs on February 12 or 13, 2025. Morris Decl., ¶¶ 11-12.

consider *all five* statutorily enumerated factors. *See Levine v. Apker*, 455 F.3d 71, 81 (2d Cir. 2006); *Wedelstedt v. Wiley*, 477 F.3d 1160, 1166 (10th Cir. 2007). Those factors include, among others, "the resources of the facility contemplated," "the nature and circumstances of the offense," and "the history and circumstances of the prisoner." 18 U.S.C. § 3621(b)(1)-(3). The Bondi Memo, however, orders BOP to cast aside this carefully designed scheme by directing BOP to punish Plaintiffs for President Biden's acts of clemency and ignore any statutory factors that might counsel against a transfer to ADX. Mot. 25.

Against this, Defendants argue the Bondi Memo is irrelevant because no placement decisions have been made, the referral process remains ongoing, and the Memo makes no mention of ADX. Opp. 31. But the AG's actions are evident on the face of the Bondi Memo. *First*, it opens by excoriating President Biden's acts of clemency as having "undermined our justice system" and directing BOP "to achieve justice for the victims' families," making clear that its entire purpose is to punish Plaintiffs because President Biden commuted their death sentences. ECF 2-2, Ex. 3. Section 3621(b), however, does not permit BOP to consider retribution for a former President's act of clemency—or the super-addition of punishment beyond a court-imposed sentence—as a relevant factor in choosing where to transfer a person. *Second*, in addition to retribution for their commutations, the Bondi Memo identifies one factor, and one factor only—"the security risks those inmates present"—that will dictate their "conditions of confinement." ECF 2-2, Ex. 3. But the Bondi Memo uses "security risks" as a dog whistle to direct BOP to *override* consideration of the statutory factors governing transfer decisions, hence the uniform ADX referrals. *See Wedelstedt*, 477 F.3d at 1166; *Levine*, 455 F.3d at 81.

The AG cannot override the statutorily required process by inserting new factors (the fact of clemency) and directing BOP to unduly weigh another (security risks); doing so exceeds the AG's lawful authority.

18

### 3.     The Bondi Memo is arbitrary and capricious.

Defendants' sole response to Plaintiffs' arbitrary and capricious claim is to concoct a factual dispute regarding the record. They argue that "BOP has not changed its redesignation process." Opp. 32. Again, Defendants misunderstand the agency action. Plaintiffs' APA claims challenge the *AG's* adoption of the Bondi Memo, and it is the *AG's* adoption of the Bondi Memo that was arbitrary and capricious. *See* Mot. 26-28 (explaining why "the actions of the Attorney General were arbitrary and capricious"). BOP's subsequent response to the Bondi Memo has minimal relevance, if any, to this claim, which straightforwardly alleges that the AG failed to provide a reasoned explanation for the facts found and choices made, including the Bondi Memo's unprecedented decision to interfere with BOP's designation process and make retribution for a former President's act of clemency a relevant factor. *See* Mot. 26-28; *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

On its face, the Bondi Memo does not offer *any* reasoned explanation for the AG's decision to intervene in Plaintiffs' post-clemency placement, and Defendants do not so much as attempt to provide one in the single paragraph they devote to the issue in their opposition. *See* Opp. 32. Without any such explanation, the Bondi Memo is arbitrary and capricious under well-settled law, and Plaintiffs are clearly likely to succeed on the merits. *See, e.g.*, *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 2025 WL 752378, at *11 (D.D.C. Mar. 10, 2025) (granting preliminary injunction on arbitrary and capricious claim where agency action lacked reasoned explanation); *see also Nat'l Council of Nonprofits*, 2025 WL 597959, at *14; *Drs. for Am. v. Off. of Pers. Mgmt.*, 2025 WL 452707, at *8 (D.D.C. Feb. 11, 2025).

### B.     Defendants violated Plaintiffs' right to equal protection of the laws.

Plaintiffs are likely to succeed on the merits of their Equal Protection claim. The claim is straightforward: Plaintiffs are similarly situated to the 18 people in federal custody who were resentenced from death to life without parole before them, either via commutations or court

orders. Yet, unlike those 18 people—who did not receive ADX referrals despite a prior death sentence and who were all sent to USPs—every single Plaintiff received a referral to ADX, an unprecedented (and unlawful) deviation from BOP practice. Supp. Gibson Decl. at 6-7.[15]

Defendants do not dispute this disparate treatment, and they do not explain why Plaintiffs did not receive the same process as the 18 who came before them. Instead, Defendants claim they are following standard BOP practices, Opp. 42, but that is belied by the undisputed facts: Defendant Trump publicly broadcast his hatred of Plaintiffs and directed his AG to intervene in the BOP's placement decisions; Defendants Bondi and Bove did so, overturning the BOP's considered judgment that no Plaintiff should be sent to ADX; and Defendant BOP staff subsequently issued ADX referrals for every Plaintiff. The disparate treatment of Plaintiffs "is a status-based classification of persons undertaken for its own sake, something the Equal Protection Clause does not permit," *Romer v. Evans*, 517 U.S. 620, 622 (1996). All of Defendants' arguments to the contrary fail.

*First*, Defendants assert that Plaintiffs are not similarly situated to the 18 people resentenced from death to life without parole before them. Opp. 39-42. They disparage Plaintiffs' evidence that all 18 people previously resentenced from death to life without parole were sent to a USP and not to ADX. *Id.* Yet, despite their easy access to the relevant information, they do not actually dispute the disparate treatment.[16]

To distract from this failure, Defendants cite a series of cases in which *pro se* incarcerated plaintiffs lost Equal Protection claims that were asserted in conclusory fashion

_____

[15] Plaintiffs' Equal Protection claim challenges the disparate *process*—interference by the AG's Office at the direction of Defendants Trump and Bondi resulting in the referral of each Plaintiff to ADX—and not the ADX placement itself. It is the referral, and not any final redesignation determination, that constitutes a perversion of the ordinary statutory and administrative process and sets Plaintiffs apart from the 18 previously resentenced federal death row prisoners.

[16] Defendants are in possession of the facts surrounding the redesignation and placement of these 18 people; the failure to dispute Plaintiffs' facts with evidence suggests it does not exist. *See supra* n.1; *Cmty. Hosps. of Cent. Cal. v. NLRB*, 335 F.3d 1079, 1086-87 (D.C. Cir. 2003) (holding a presumption may arise from failure to produce evidence to which party has access).

with little or no evidence. Opp. 41-42. But decisions from *pro se* litigation are "not controlling[,]" even within the same jurisdiction, particularly where *pro se* plaintiffs have not developed a record or effectively opposed defendants' arguments. *Garner v. Kennedy*, 713 F.3d 237, 244-45 (5th Cir. 2013). And the one counseled case Defendants cite supports Plaintiffs' position. Opp. 42. In *Reynolds v. Quiros*, 990 F.3d 286, 300-01 (2nd Cir. 2021), the court found three incarcerated people to be similarly situated when each had been sentenced to death and then resentenced to life without parole, despite some differences in their circumstances. *Id.* The court concluded there were "no differences between the underlying crimes of conviction in the instant case sufficient to justify discrepant treatment." *Id.* at 301. So too here. All 18 were, like Plaintiffs, formerly sentenced to death. Defendants' suggestion that the crimes of conviction in those 18 capital cases differed enough from those in Plaintiffs' cases to justify the disparate treatment defies logic.

*Second*, Defendants do not provide a valid reason for the unprecedented referral of *every Plaintiff* to ADX, since the parties agree that designation decisions must be based not on a person's crime but on institutional adjustment and program performance, the level of supervision required and available, and programming needs. Opp. 4. Defendants' heavy reliance on the Plaintiffs' crimes of conviction appears instead to be an appeal to the same animus that drove the ADX referrals in the first place. Opp. 39-41. Indeed, in the reviews to determine whether there were "extraordinary security concerns" necessitating placement at ADX for those Plaintiffs who were considered too mentally ill to go there, Defendants note that each Plaintiff "was referred for placement at the ADX *because he was previously sentenced to death but was granted clemency in December 2024*, leading to his current life sentence." Morris Decl. ¶ 10 (emphasis added), Ex. 3; Supp. Gibson Decl. at 4-5.

That animus rests on uncontroverted evidence, which Defendants simply ignore. They do not acknowledge, much less attempt to explain, Defendant Trump's public exhortation to

Plaintiffs to "GO TO HELL!" or his characterization of them as "vile and sadistic" in his EO. Compl. ¶ 46. The Supreme Court has recognized animus in far less virulent statements in, for example, striking down a bar on benefits for households made up of unrelated people because the legislative history demonstrated congressional distaste for "hippie communes." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 530-34 (1973) (holding that the "desire to harm a politically unpopular group cannot constitute a legitimate governmental interest").

Following *Moreno*, district courts have found animus to be the motivating factor in several executive orders issued by Defendant Trump. Earlier this month, a court struck down an Executive Order targeting a law firm for constitutionally protected activities that incurred the wrath of the President. *See Perkins Coie LLP v. U.S. Dep't of Just.*, 2025 WL 1276857, at *3 (D.D.C. May 2, 2025). The court explained that "settling personal vendettas by targeting a disliked business or individual for punitive government action is not a legitimate use of the powers of the U.S. government or an American President." *Id.* at 40.

Another court recently enjoined an agency policy implementing an Executive Order that stripped long-standing protections from transgender Americans. *Orr v. Trump*, 2025 WL 1145271 (D. Mass. Apr. 18, 2025) (challenging Executive Order and State Department Policy related to passport gender markers). The court held that the Executive Order and policy changes sprang from animus because, among other reasons, they imposed "a 'broad and undifferentiated disability' on a discrete group of people" and were issued along with other statements containing "powerfully demeaning language." *Id.* at *13 (citing *Romer*, 517 U.S. at 632), *14. The same is true here, as the President wields his power against a politically unpopular group, with no rational basis for the resulting disparate treatment.

*Finally*, Defendants suggest the court must defer uncritically to Defendants and find BOP's tainted decision-making process has a rational basis. But deference is due when prison officials exercise their correctional judgment and expertise, not when politicians intervene to

overrule that judgment. And courts "may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Brown v. Plata*, 563 U.S. 493, 511 (2011). Given the animus demonstrated by Defendants, "under any standard of review, such targeting of a politically unpopular group runs afoul of our Nation's constitutional commitment to equal protection." *Orr*, 2025 WL 1145271, at *14.

      **C.**      **The Redesignation Directive violates Plaintiffs' due process rights.**

      Plaintiffs are likely to succeed on the merits of their procedural due process claim. They have a liberty interest in avoiding the "atypical and significant" hardship of ADX, and Defendants have provided no meaningful opportunity to protect that interest.

      *First*, Plaintiffs have established a liberty interest under this Circuit's binding precedent. *Aref v. Lynch*, 833 F.3d 242, 255 (D.C. Cir. 2016), established the controlling standard, requiring consideration of (i) the severity of conditions "relative to administrative segregation," (ii) the duration of confinement; and (iii) the "duration relative to [the] length of administrative segregation routinely imposed on prisoners serving similar sentences."[17] Defendants provide no meaningful rebuttal under any of the three factors.

      On the first factor—severity—Defendants appear to respond with a list of services and programs purportedly available at ADX. *See* Opp. 34-35. Even taking these representations at face value—despite ample evidence to the contrary, *see supra* 3-4—this response considers ADX conditions in a vacuum. The relevant inquiry assesses conditions relative to the baseline of administrative segregation. *Aref*, 833 F.3d at 255. And Defendants do not dispute the factors that make ADX *more* isolating than administrative segregation, such as the ban on contact visits and the length of confinement, which exacerbates the denial of meaningful social interaction. *See* Mot. 16; *see also Aref*, 833 F.3d at 257 (noting that social isolation is a

---

[17] Defendants observe that *Aref* involved a challenge to a different type of confinement, *see* Opp. 36 n.10, but that does not change the standard the Court must use.

deprivation that "necessarily increase[s] in severity over time"). These factors render conditions at ADX more severe than routinely imposed administrative segregation.[18] Indeed, Defendants concede ADX is the "most restrictive facility in BOP." Opp. 49-50.

The second and third *Aref* factors look to the duration of confinement—a "crucial element" because a liberty interest can arise from "prolonged or indefinite" deprivation even under "less-severe conditions." 833 F.3d at 254-55. Even if the court determines the ADX conditions are "no more restrictive than administrative segregation," it is still "required" to determine whether the duration of confinement is "atypical compared to the length of administrative segregation routinely imposed on similarly situated" people. *Id.* (cleaned up).

ADX confinement for the Plaintiffs—ordered by an EO with no end date—would be "indefinite and could be permanent." *Id.* at 257. Defendants do not refute this. They observe that designation to ADX does not "increase the length of incarceration," Opp. 35, but that is irrelevant. They also point to ADX's step-down program, but they stop short of asserting the program will be available to the Plaintiffs. Opp. 35. Even with the step-down program, confinement at ADX lasts, on average, five to six years.[19] Additionally, nine of the Plaintiffs were referred to ADX despite a BOP psychologist determining that their "mental health disorder or cognitive limitations make it unlikely [they] could successfully progress through ADX Florence." Morris Decl. ¶¶ 8-9; Supp. Gibson Decl. at 4-5. Moreover, the mere availability of such opportunities for "periodic review" does not make a deprivation durationally limited. *Aref*, 833 F.3d at 248, 257; *see also Wilkinson v. Austin*, 545 U.S. 209,

---

[18] Defendants cite to *Rezaq v. Nalley*, 677 F.3d 1001 (10th Cir. 2012), but that Tenth Circuit decision carries no weight because it applied a different liberty-interest inquiry than *Aref*, which is binding on this Court. *See* Opp. 33; *Aref*, 833 F.3d 242, 253 n.7 (noting the Tenth Circuit's "inconsistent[]" baseline for establishing atypicality and the factors "unique[]" to its standard). The other out-of-circuit cases on which Defendants rely are similarly inapt. *See id.* at 254.

[19] Trial Tr. (July 27, 2023) at 52, *United States v. Bowers*, 18 Cr. 292 (W.D. Pa. Aug. 1, 2023), ECF 1529.

214-15 (2005) (holding that confinement was "indefinite" because the length of super-max placement was limited "only by [plaintiffs'] sentence," notwithstanding regular placement reviews).[20]

Rather than grapple with *Aref*, Defendants simply assert that ADX referrals are appropriate given Plaintiffs' sentences and because "many, many" others serving life sentences are also there. Opp. 35-36. That, once more, is irrelevant. The controlling question is how ADX confinement compares to the conditions "*routinely* imposed on prisoners serving similar sentences." *Aref*, 833 F.3d at 255 (emphasis added). At least 90 percent of people serving life sentences in the BOP are not at ADX. *See* Morris Decl. ¶¶ 17-18, Exs.7-8; Supp. Gibson Decl. at 4. And the BOP designated the 18 who had death sentences previously converted to life sentences—those most "similar" to Plaintiffs—to USPs. *See* ECF 2-2, Ex. 10 ¶ 7. ADX is not "routine" or an "ordinary incident[] of prison life" for people with life sentences. *Aref*, 833 F.3d at 252, 254.

*Second*, the corruption of the designation process by the EO and Bondi Memo denied Plaintiffs a meaningful opportunity to be heard. Defendants make much of the procedures at Plaintiffs' ADX hearings, but this misses the point. The relevant complaint here is the directive that initiated these hearings. Defendants do not contest that, prior to the EO and Bondi Memo, BOP officials reached settled decisions under § 3621 to transfer each Plaintiff to a USP. Nor do they dispute that the AG and DAG then perverted this process by ordering the referral of each Plaintiff to ADX. These facts compel the conclusion that prior to the hearings, Defendants Bondi and Bove "developed a pre-review conclusion" to transfer Plaintiffs to ADX "no matter

---

[20] Defendants rely on a misleading paraphrase of *Aref* to imply that ADX confinement may only last a few weeks, quoting *Aref* as stating an "inmate placed in administrative segregation *[such as ADX]* may be wholly unable to communicate with his family or the outside world, but that restriction will generally only last for a few weeks." Opp. 36 n.10 (Defendants' insertion italicized and bolded). To be clear, there is no evidence that confinement at ADX *for anyone* lasts just a "few weeks."

what the evidence shows"—the very definition of a sham process. *Proctor v. LeClaire*, 846 F.3d 597, 610 (2d Cir. 2017).

Assistant Director Salem's declaration does not alter this conclusion. While he states his role in reviewing ADX hearing decisions, Defendants assert in their briefing that the AG retains authority over the designation process. *See* Opp. 31 (citing 28 U.S.C. § 509). The core issue thus remains: Plaintiffs have no meaningful opportunity to be heard, because the ultimate decision-makers at DOJ have already made up their minds.

Evidence from Plaintiffs' ADX hearings, riddled with factual errors and boilerplate language, confirms that BOP is merely going through the motions to comply with the Redesignation Directive. Supp. Gibson Decl. at 4-7; ECF 2-2, Exs. 12-13 (reports with interchangeable boilerplate); Ex. 33 ¶ 22 (describing inaccuracies).[21] Defendants suggest that factual errors can be appealed, but that too misses the point. These errors "raise[] red flags about whether the underlying reviews were conducted genuinely." *Proctor*, 846 F.3d at 613; *see also Sourbeer v. Robinson*, 791 F.2d 1094, 1102 (3d Cir. 1986) (finding that "careless" errors supported a finding that the plaintiff was "not afforded meaningful process"). Defendants next assert that the use of boilerplate language is due to the "similarities" in Plaintiffs' crimes of conviction. Opp. 37-38. But Plaintiffs have different conviction histories, as well as different institutional histories. Morris Decl. ¶ 15; Supp. Gibson Decl. at 4. Moreover, Defendants may not rely on "criminal history alone" to support designation to ADX. *Proctor*, 846 F.3d at 612. Such an outcome would make "a mockery of *Hewitt*'s admonition against indefinite confinement" by permitting "the continuation of [confinement] based solely on past events that

---

[21] ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████ In fact, the evidence was "overwhelming that [his codefendant] fired the shots … that killed" the victim, and ██████ lost his leg long *before* the crime. *United States v. Allen*, 247 F.3d 741, 756, 777 (8th Cir 2001), *rev'd on other grounds*, 536 U.S. 953 (2002).

will never change." *Id.*[22]

Finally, Defendants fail to assert *any* governmental interest in the interruption of BOP's usual process. Under the *Mathews* balancing test, the state's entitlement to "procedural flexibility" rests on its "interest in maintaining safe detention facilities." *Proctor*, 846 F.3d at 611; *see also Wilkinson*, 545 U.S. at 227 (affirming super-max placement procedures based on state's interest in "prison security"). But here, Defendants do not dispute that BOP's initial review—accounting for prison security—determined Plaintiffs could be properly placed at a USP or FMC. They do not claim Plaintiffs' security needs changed. The only thing that is different is the Redesignation Directive, which replaced BOP's decisions with executive fiat. *See* Supp. Gibson Dec. at 6-7 (concluding that the post-EO designation process is inconsistent with BOP policy and practice).

**D.    The Redesignation Directive violates the Eighth Amendment.**

Defendants seek to force Plaintiffs to serve their life without parole sentences in harsh and painful conditions for no penological purpose. This violates the Eighth Amendment. Defendants misconstrue the nature of this claim, suggesting Plaintiffs broadly challenge the constitutionality of conditions at ADX and therefore seek to shoehorn Plaintiffs' claims into a traditional conditions claim.[23] But Plaintiffs challenge the intentional imposition of harm, meted out as extra-judicial punishment without any penological justification.

The "cruel and unusual punishment" clause casts a wide net. It bars punishments that "'superadd[]' pain well beyond what's needed to effectuate" the sentence. *Bucklew v. Precythe*, 587 U.S. 119, 136-37 (2019). And it protects against the excessive use of force; the failure to

---

[22] In at least four instances, Defendants decided to transfer a Plaintiff based solely on his crime of conviction. ECF 2, Ex. 10 at 5-7. Several of the Plaintiffs were transferred based on a combination of their crimes of conviction and non-violent disciplinary infractions or violent infractions from five or ten or even more years ago. *Id*. Transferring someone to ADX for actions in the distant past is contrary to BOP policy and practice. Supp. Gibson Decl. at 7.

[23] While Plaintiffs do not seek a ruling broadly declaring the conditions of confinement at ADX unconstitutional, they do not concede the constitutionality of those conditions.

protect from harm; inadequate medical or mental health care; and inhumane conditions of confinement. *Hudson v. McMillian*, 503 U.S. 1, 8-11 (1992); *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Given the amendment's broad scope, its protections "should also be applied with due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged." *Whitley v. Albers*, 475 U.S. 312, 320 (1986). But regardless of which standard is applied, a common thread runs through: The Eighth Amendment proscribes the "unnecessary and wanton infliction of pain." *Id.* And "among unnecessary and wanton inflictions of pain are those that are totally without penological justification." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (cleaned up). Plaintiffs are therefore likely to prevail on the merits of their Eighth Amendment claim because Defendants seek to force them to serve their sentences (1) in objectively painful conditions, (2) without any penological justification.

*First*, Plaintiffs have amply demonstrated that conditions at ADX are objectively painful.[24] *See supra* 3-4; *see also* ECF 2-2, Ex. 9 ¶¶ 13-27. Defendants cite several out-of-circuit cases, most of which are unpublished, to support their assertion that the conditions at ADX are not objectively harmful, but none carry weight. Opp. 44-45. Most were brought by *pro se* plaintiffs and all but one were litigated without the benefit of expert and scientific evidence about the harms of solitary confinement.[25] Because they "did not introduce any expert reports or analyses concerning the risks of serious psychological and emotional harms attributable to long-term solitary confinement," they "failed to establish an evidentiary record that would have allowed [a] Court to find that prolonged solitary confinement poses a serious risk of psychological and emotional harm." *Porter v. Clarke*, 923 F.3d 348, 359 (4th Cir. 2019)

---

[24] Defendants decided to send at least five Plaintiffs to ADX after BOP psychologists determined that "ADX Florence placement is likely to exacerbate [their] mental health condition." Morris Decl. ¶ 8.

[25] *See generally Gowadia v. Stearns*, 596 F. App'x 667 (10th Cir. 2014); *Hill v. Pugh*, 75 F. App'x 715 (10th Cir. 2003); *Ajaj v. United States*, 293 F. App'x 575 (10th Cir. 2008); *Davis v. Fed. Bureau of Prisons*, 2016 WL 1156755 (D. Colo. Mar. 24, 2016); *McMillan v. Wiley*, 813 F. Supp. 2d 1238 (D. Colo. 2011).

(holding two prior circuit court cases on solitary confinement "not controlling" because of the lack of consideration of expert and scientific evidence). By contrast, Plaintiffs have provided ample record evidence of the longstanding scientific consensus regarding the harms of solitary confinement. *See supra* 3-4; ECF 2-2, Ex. 9 ¶¶ 33–61 and sources cited therein.

Moreover, the sole case proffered by Defendants that included expert evidence—*Silverstein v. Fed. Bureau of Prisons*, 559 F. App'x 739 (10th Cir. 2014)—turned largely on factors unique to the particular plaintiff. *Id.* at 763 (noting that plaintiff's in-custody history of repeated violence made it a "*deeply* atypical case"). The court also decided *Silverstein* prior to many of the scientific studies on which courts across the country now rely, and it runs counter to decisions from other courts of appeal that have held that solitary confinement conditions akin to those at ADX give rise to an Eighth Amendment violation. *See, e.g.*, *Porter*, 923 F.3d at 358-59 (holding solitary confinement conditions violated Eighth Amendment and determining two precedential cases not controlling because they predated much of the scientific research on solitary confinement); *Palakovic v. Wetzel*, 854 F.3d 209, 225 (3d Cir. 2017) (similar and acknowledging "the robust body of legal and scientific authority" recognizing solitary confinement's "devastating mental health consequences").

*Second*, Plaintiffs have demonstrated that Defendants' infliction of this objective harm is without any penological justification—which necessarily demonstrates the "unnecessary and wanton" infliction of pain. Defendants' own documents confirm that there is no penological justification for the transfers. Supp. Gibson Decl. at 6-7. Under any standard applied, imposing harm without penological justification violates the Eighth Amendment. In the force context, "[w]here there is no legitimate penological purpose for a prison official's conduct, courts have presumed malicious and sadistic intent." *Wood v. Beauclair*, 692 F.3d 1041, 1049-50 (9th Cir. 2012) (applying *Whitley*, 475 U.S. at 320). It follows that if a lack of penological justification meets the more stringent "malicious and sadistic" test, it satisfies the lower "deliberate

29

indifference" test used in conditions and medical care cases (and on which Defendants rely). Indeed, "if a prison official lacks a legitimate penological justification for subjecting an inmate to a condition of confinement that poses a substantial risk of serious harm—like prolonged solitary confinement ... then the official is presumptively acting with deliberate indifference to that risk." *Porter*, 923 F.3d at 362; *see also Hope v. Pelzer*, 536 U.S. 730, 746 (2002) (holding unconstitutional prison officials' actions that were "totally without penological justification"). No additional state of mind evidence is required.

Defendants do not supply a penological justification, not could they. Following the commutations, the BOP underwent its standard redesignation process, which considered all legitimate penological factors. As a result, Defendants decided to place each Plaintiff at a USP or FMC. But after the EO and Bondi Memo, the BOP referred each Plaintiff to ADX. Defendants admit as much in the extraordinary security concerns reviews for those Plaintiffs who were too mentally ill to go to ADX: "He was referred for placement at the ADX because he was previously sentenced to death but was granted clemency in December 2024, leading to his current life sentence."[26] Morris Decl. ¶ 10, Ex. 3; Supp. Gibson Decl. at 4-5. This imposition of harm, without any penological purpose, violates the Eighth Amendment.

### E.    The EO violates Article II.

Punishing people because they received a commutation violates Article II, Section 2 of the Constitution. Mot. 35-39. Defendants do not contest this. Instead, they argue the EO is not punitive because it is facially neutral and does not undo the commutations. Opp. 48-49. Not so.

The EO is not facially neutral—it reeks of retaliation. It lambasts President Biden's clemencies as an effort to "subvert" and "defy" the "laws of our nation" and "make a mockery of justice," while simultaneously castigating Plaintiffs as "vile," "sadistic," and "evil." ECF 2-4 § 1. And it commands that Plaintiffs be "imprisoned in conditions consistent with the

---

[26] ████████████████ is one of the documents' signatories. Morris Decl. ¶ 10, Ex. 3.

monstrosity of their crimes." *Id.* § 3(e). This directive has no basis in § 3621 or PS 5100.08. Suggesting that § 3(e) merely calls for a neutral "evaluation" of Plaintiffs' imprisonment, Opp. 48, strains credulity. The EO is clear: Defendant Trump wanted Plaintiffs to be subjected to the harshest and most restrictive conditions of confinement because he disagreed with President Biden's use of the clemency power.[27]

Defendants argue the EO does not violate Article II because it does not nullify the legal result of the commutations—"avoid[ing] imposition of the death penalty." Opp. 49. But the Article II clemency power protects against both direct and *indirect* diminishment of its effect. *See Ex parte Garland*, 71 U.S. (4 Wall.) 333, 380-81 (1866) (holding that loyalty oath requirement for attorneys violated Article II because it "accomplished indirectly" the aim of limiting the effect of pardon granted to ex-Confederate); *United States v. Klein*, 80 U.S. (13 Wall.) 128, 147 (1871) (holding that proviso construing pardon as proof of disloyalty that precluded claim for return of property "impair[ed] the effect of a pardon, and thus infring[ed] the constitutional power of the Executive").[28]

The EO mirrors this unconstitutional approach. The ordinary effect of the commutations should have moved Plaintiffs from the highly restrictive conditions on federal death row to a less-restrictive setting to serve out their newly imposed life sentences. Instead, they were denied such placements and targeted for automatic referral to ADX.[29] This

---

[27] Indeed, it is telling that immediately after President Trump issued the EO, the staff overseeing federal death row referred *every* commuted prisoner to ADX. *See* ECF 2-2, Ex. 35 ¶ 7; ECF 2-2, Ex. 15 ¶ 27; ECF 2-2, Ex. 28 ¶ 38. Though BOP rescinded these referrals, they underscore the natural reading of the EO, which was to command extra-judicial punishment.

[28] Defendants' attempt to distinguish *Garland* fails. There, Congress also did not nullify the pardon's legal effect—avoiding treason prosecution. Although the case involved a 'previously acquired right,' *Garland* did not limit Article II claims to such circumstances. And the 'right' was a privilege to practice in federal court, not a legal right. *Garland* (and *Klein*) establish the broader principle that allowing indirect punishments to stand undermines the clemency power.

[29] Contrary to Defendants' assertion, the core of the Article II claim is not about the constitutionality of conditions at ADX. Opp. 49. *Garland* and *Klein* show that the retaliatory punishment need not constitute a separate constitutional violation to infringe Article II.

retaliatory treatment diminishes the effect of the President Biden's commutations, which imposed no conditions on the way Plaintiffs' life sentences were to be served. Consequently, Plaintiffs are likely to succeed on their claim that Defendants infringed on the Article II clemency power.

### III.    Plaintiffs will suffer irreparable harm if this Court does not intervene.

Defendants maintain that constitutional violations alone cannot cause irreparable injury. They confine their argument on this point to a footnote, citing *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006), for the proposition that "there is 'no *per se* rule' that a constitutional violation '*automatically* constitutes irreparable harm.'" Opp. 51 n.12 (quoting 454 F.3d at 301) (emphasis in original). But they ignore a robust body of law that contradicts their position. "It has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (cleaned up). Even "a prospective violation of a constitutional right constitutes irreparable injury for … purposes" of "seeking equitable relief." *Karem v. Trump*, 960 F.3d 656, 667 (D.C. Cir. 2020) (cleaned up); *cf. Nat'l Treasury Emps. Union v. United States*, 927 F.2d 1253, 1254 (D.C. Cir. 1991) (Thomas, J.) (irreparable harm established when "First Amendment interests are either threatened or in fact being impaired at the time relief is sought" (cleaned up)).

Just since January 20, 2025, courts in this District have repeatedly found irreparable harm and granted temporary restraining orders or preliminary injunctions against executive orders and other executive action based upon threatened or ongoing constitutional violations. For example, in *Doe v. McHenry*, a court granted a TRO for imminent violations of the Eighth Amendment rights of incarcerated transgender people, acknowledging that "a prospective violation of a constitutional right constitutes irreparable injury." 2025 WL 388218, *5 (D.D.C. Feb. 4, 2025) (cleaned up); *see also, e.g.*, *Perkins Coie LLP*, 2025 WL 1276857, at *46-47

(constitutional violations "are sufficient, by themselves, to establish irreparable harm"); *LULAC*, 2025 WL 1187730, at *41-42; *Nat'l Ass'n for Advancement of Colored People v. U.S. Dep't of Educ.*, 2025 WL 1196212, at *7 (D.D.C. Apr. 24, 2025); *Associated Press v. Budowich*, 2025 WL 1039572, at *17 (D.D.C. Apr. 8, 2025); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 2025 WL 946979, at *1 (D.D.C. Mar. 28, 2025).

Even *Chaplaincy*, the sole case on which Defendants rely, rejected the proposition for which they cite it. After acknowledging the appeal of that proposition "at first blush," the D.C. Circuit held that the nature of an Establishment Clause violation, in which the "infringement occurs the moment the government action takes place," meant that alleging the constitutional violation, without more, suffices to establish irreparable harm. 454 F.3d at 299, 303; *see also Advance Am. v. FDIC*, 2017 WL 2672741, at *10 (D.D.C. Feb. 23, 2017) ("While one sentence within *Chaplaincy of Full Gospel Churches* is in accord with that position, 454 F.3d at 301, that sentence is at odds with other parts of the very same opinion, as well as other rulings of the D.C. Circuit, supra, and the great weight of precedent.").

In the same way, the constitutional violations alleged here, "if true, inflict[] irremediable injury." *Chaplaincy*, 454 F.3d at 303. Defendants deprived Plaintiffs of equal protection by treating them differently than the 18 people whose death sentences were previously converted to life without parole. The unequal treatment is the irreparable harm. Defendants deprive Plaintiffs of due process by abandoning the ordinary redesignation protocol in favor of a sham process. The deprivation of a liberty interest without the process that is due is an irreparable harm. And, by definition, when the government inflicts cruel and unusual punishment with no valid penological basis, it inflicts irreparable harm. So too when a person is punished by a presidential decree solely for receiving a commutation.

Defendants' additional arguments on irreparable harm once again betray a misunderstanding of Plaintiffs' Complaint. To start, the argument that Plaintiffs cannot show

irreparable harm because BOP has not yet made final decisions to redesignate them to ADX, *see* Opp. 49-50, again focuses on the final designation as the harm. But Plaintiffs' APA and constitutional claims focus on how the EO and Bondi Memo corrupted the statutorily mandated redesignation process in order to punish Plaintiffs and undermine their commutations. It is this *new* perverted and punitive process, not the original ordinary one, that is "ongoing." *See* Supp. Gibson Decl. at 7. Nothing about this harm is "counterfactual" or "speculative." Opp. 50-51.

Defendants also claim that Plaintiffs would suffer no injury if "*temporarily* housed at ADX" because, should Plaintiffs prevail, Defendants would "expeditiously return" them to the Terre Haute SCU. Opp. 50-51. But in 2024, the 3,311 cases pending in this district had an overall median time from filing to final disposition of 6.8 months. *See* U.S. Courts, Civil Statistical Tables for the Federal Judiciary, Table C-5 (Dec. 31, 2024). Cases that reached either pretrial conference or trial had median times for resolution of 41.1 months and 49.9 months, respectively. *Id*. Without this Court's preliminary intervention, therefore, Plaintiffs would suffer the conditions at ADX for months or maybe even years before they could expect a resolution and transfer back. Mental health experts have established that even a short time in solitary confinement conditions like those at ADX has serious negative psychological effects. *See* ECF 2-2, Ex. 9 ¶¶ 35, 45, 66. As the Fourth Circuit observed, "there is not a single published study of solitary or supermax-like confinement in which nonvoluntary confinement lasted for longer than 10 days, where participants were unable to terminate their isolation at will, that failed to result in negative psychological effects." *Porter*, 923 F.3d at 356 (cleaned up). In addition, the process of transporting Plaintiffs multiple times itself presents risks of irreparable harm.[30] Plaintiffs have therefore demonstrated that they will be irreparably harmed

---

[30] The risks are particularly acute for Plaintiffs who are medically fragile. *See, e.g.*, Compl. ¶ 19 (Plaintiff Fulks), ¶ 21 (Plaintiff Hall), ¶ 26 (Plaintiff Mikos); *see also* Morris Decl., Ex. 11 (declaration of Plaintiff Mikos detailing ███████████████████████). If the Court does not grant a preliminary injunction preventing transfer to ADX, Plaintiffs will face additional irreparable harm from multiple, ultimately unlawful transfers to and from ADX.

absent immediate intervention from this Court.

### IV.    The balance of equities and public interest weigh heavily in Plaintiffs' favor.

Defendants acknowledge that the BOP's "historical practice" has been to not transfer anyone to ADX until all appeals have played out, a process that can take about 170 days, Opp. 22-23, and yet refuse to state that they will keep Plaintiffs at USP-Terre Haute past May 31, 2025. *See* Morris Decl., Ex. 6 (C. Edelman to C. Kendrick email). Defendants make no effort to explain how an order to follow their historic practice would cause them harm (and they pointedly refuse to promise that they will follow that practice of their own accord).[31] Furthermore, by operation of law, any preliminary injunction in this matter will expire after 90 days unless this Court issues a final order before then, *see* 18 U.S.C. § 3626(a)(2), which means the relief available in this motion will impose no burden on Defendants apart from what they customarily impose on themselves. Because Defendants cannot demonstrate any harm from maintaining the status quo while this litigation proceeds, and because "the public interest favors the protection of constitutional rights," *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 335 (D.C. Cir. 2018), the Court should rule that the equities and public interest strongly favor preliminary injunctive relief.[32]

---

"Facing requests for preliminary injunctive relief, courts often find a showing of irreparable harm where the movant's health is in imminent danger." *Al-Joudi v. Bush*, 406 F. Supp. 2d 13, 20 (D.D.C. 2005).

[31] Plaintiffs respectfully requests that the Court waive the security requirement in Rule 65(c) of the Federal Rules of Civil Procedure pursuant to its "broad discretion" to require no bond. *Am. First Legal Found. v. Becerra*, 2024 WL 3741402, at *16 n.11 (D.D.C. Aug. 9, 2024) (cleaned up). The district court can "dispense with any security requirement" in situations like this one "where the restraint will do the defendant no material damage" and "where there has been no proof of likelihood of harm." *Id.* (cleaned up).

[32] Contrary to Defendants' unsupported request, the Court should not immediately stay its preliminary injunction order. Should the Court grant relief, Defendants may attempt to carry their burden to show that a stay is appropriate. *See Nken v. Holder*, 556 U.S. 418, 433-34 (2009) ("The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion"). They have not yet carried that burden; unless and until the Court grants relief, any stay request is premature.

## CONCLUSION

Plaintiffs respectfully request their request for a preliminary injunction be granted.

Dated: May 12, 2025                         Respectfully submitted,
       Washington, DC


                                            /s/ Maria V. Morris
Brian Stull, N.C. 36002*                    David C. Fathi, Wash. 24893**
Claudia Van Wyk, Penn. 95130*               Maria V. Morris, D.C. 1697904
**ACLU FOUNDATION**                         Jennifer Wedekind, D.C. 1012362
201 W. Main St., Ste. 402                   **ACLU FOUNDATION**
Durham, NC 27701                            915 15th Street NW
Tel: (919) 682-5659                         Washington, DC 20005
bstull@aclu.org                             Tel: (202) 393-4930
cvanwyk@aclu.org                            dfathi@aclu.org
                                            mmorris@aclu.org
                                            jwedekind@aclu.org


Corene T. Kendrick, Cal. 226642*            Sara Norman, Cal. 189536*
**ACLU FOUNDATION**                         **LAW OFFICES OF SARA NORMAN**
425 California St., Ste. 700                P.O. Box 170462
San Francisco, CA 94104                     San Francisco, CA 94117
Tel: (202) 393-4930                         Tel: (415) 236-3763
ckendrick@aclu.org                          sara@saranormanlaw.com

Laura Rovner, Colo. 35592*
Nicole Godfrey, Colo. 41546
Miriam Kerler, Colo. 56575***
**STUDENT LAW OFFICE**
**UNIVERSITY OF DENVER**
**STURM COLLEGE OF LAW**
2255 E. Evans Ave., Ste. 335
Denver, CO 80210
Tel: (303) 871-6140
laura.rovner@du.edu
nicole.godfrey@du.edu
miriam.kerler@du.edu

Joseph Margulies, Ill. 6198353
(Admitted to D.D.C. as pro bono counsel)
**CORNELL UNIVERSITY**
Professor of the Practice of Government
216 White Hall
Ithaca, NY 14850
Tel: (607) 255-6477
jm347@cornell.edu

David Patton*
Ian Robertson*
Krysta Kilinski*
**HECKER FINK LLP**
350 Fifth Ave, 63rd Floor
New York, NY 10118
Tel: (212) 763-0883
dpatton@heckerfink.com
irobertson@heckerfink.com
kkilinski@heckerfink.com

C.J. Sandley, Ala. 5317-S48R*
Kayla Vinson, Ala. 3664-S48Q*
D. Korbin Felder, Miss. 106643*
**CENTER FOR CONSTITUTIONAL**
**RIGHTS**
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6443
csandley@ccrjustice.org
kvinson@ccrjustice.org
kfelder@ccrjustice.org

Carmen Iguina González
**HECKER FINK LLP**
1050 K Street NW, Suite 1040
Washington, DC 20001
Tel: (202) 742-2661
ciguinagonzalez@heckerfink.com

*Attorneys for Plaintiffs*
*\* Admitted pro hac vice*
*\*\* Not admitted in D.C.; practice limited to*
*federal courts. Admitted pro hac vice.*
*\*\*\* Application for admission to District of*
*D.C. accepted, awaiting June 2, 2025*
*admission ceremony*