# EXHIBIT 9



Paul Gibson, Chief Operation Officer
Paul@bopera.org
WWW.bopera.org
Cell:        570-504-6586
Business:  212 461-2252

Supporting people in Prison and the Federal Justice Community

## AFFIDAVIT OF PAUL GIBSON

I, Paul Gibson, hereby declare under penalty of perjury that the following is true and correct.

### STATEMENT OF EXPERTISE

My expertise is set forth in my prior declaration filed with the Court at Docket No. 2-10 and incorporated herein.

### SCOPE OF REVIEW

I previously submitted a declaration explaining the transfer policy, process and eligibility as it refers to inmates referred to the Florence Administrative Maximum Facility (ADX). I have been asked to review additional discovery materials which include <u>Male Custody Classification Forms</u> (BP-338s) for the twenty Plaintiffs in this case and the first seven ADX Referral Packets that were produced to the plaintiff's counsel. Plaintiffs' counsel have informed me that these were the only ADX Referral Packets that have been produced to them at the time of my review. I have also reviewed three other Plaintiffs ADX Administrative Hearing Reports that were provided to Plaintiffs' counsel by the Plaintiffs themselves. I expand here upon my opinion.

### SUMMARY OF OPINION

The documents reviewed further support the agency's actions to transfer inmates to the ADX is arbitrary and is not based on fundamental BOP policy and process. It strengthens my previous opinion and raises additional significant concerns regarding the abuse of discretion and action that contradict the spirit and intent of the BOP Policy 5100.08, <u>Inmate Security Designation and Custody Classification</u> which is the core directive referenced throughout my previous declaration and herein. This policy was filed with this Court at Docket No. 2-8.

### CUSTODY CLASSIFICATION AND TRANSFER PROCESS

From a fundamental policy perspective, inmates meet with their unit team on a cyclical basis, referred to as a program review, who evaluate previous correctional program recommendations and progress to set future measurable goals regarding rehabilitation. These team meetings occur every six months for inmates who have lengthy sentences including lifers. Once a year, the unit team also assess static and dynamic factors that determine an inmates' security level and custody classification and updates the data within the SENTRY computer system. They may also have a program review when changes occur, such as the commutation of a death sentence. The classification process and security scoring was described in more general terms in my previous declaration. Here, with the benefit of the individual data for each inmate, I describe it in more detail.

**Base Score:** The first step in determining an inmate's security level is the determination of his base score. A case manager inputs static factors about the inmate, including his role in the offense, detainers, criminal history, history of violence, history of escape, education level, history of drug or alcohol abuse, age at the time the BP-338 was scored, and whether he voluntarily surrendered for service of his sentence. The BOP's SENTRY system is an automated system that converts these factors into points. The point system is described in Policy 5100.08, Chapter 6, B1 thru B11. SENTRY totals the points to obtain a "Base" Score. A higher Base Score indicates that the inmate needs a higher level of security.

Attached hereto as Exhibit A is an exemplar of a BP-338, the January 7, 2025 BP-338 for ▉▉▉▉▉▉▉▉. The BP-338 shows that ▉▉▉▉▉▉▉ has 540 months until his release, which is the standardized number for anyone with a non-parolable life sentence. It shows that his crime of conviction was of the "greatest" severity, for which he is assigned 7 points. His criminal history adds 2 points, and his age category adds 2 points. None of the other factors add any points to his Base score. His Base score is 11 points.

**Custody Score:** Custody scoring, unlike the Base score, is discretionary. BOP staff assess dynamic factors including: program participation, living skills (which refers to the inmate's demeanor, attitude, personal accountability, and nature of interaction with staff and other inmates), the type and frequency of disciplinary reports, and family and community ties. BOP staff assign a number of points for each of these factors and the percentage of time the inmate has already served on their sentence. The point system for the Custody Score, like that of the Base Score, is described in Policy 5100.08, Chapter 6, C1-C7. Once BOP staff enter these points, SENTRY totals them up to obtain a "Custody Total." For Custody scoring, a greater number of points means a lesser degree of need for staff supervision.

The BP-338 for ▉▉▉▉▉▉▉ shows that he received 3 points for percentage of time served, which is the lowest number of points available for that factor. For all the other factors, he received the highest number of possible points, resulting in a Custody Total of 19. *See* Ex. A.

**Custody Variance:** The BOP classification system has a matrix that takes both the Base Score and the Custody Total into account and can either add or subtract points to the Base Score. The matrix is set out in Policy 5100.08, Chapter 6, p. 15 (Doc. 2-8 at 75).

For ▉▉▉▉▉▉▉ the Base Score of 11 and the Custody Total of 19 results in a Variance of -3. *See* Ex. A.

**Security Total:** The Security Total is determined by combining the Base Score and the Variance.

For ▉▉▉▉▉▉▉ his Base Score is 11 and his Variance is -3, so his Security Total is 8. *See* Ex. A.

**Security Level:** In general, the Security Total determines the inmate's Security Level. There are four security levels: minimum, low, medium or high security.[1] For male inmates, the Security Total corresponds with Security Level as follows:

---

[1] There is also an administrative security level. This applies to situations that fall outside the norms of security classification and includes people who have not yet been convicted or classified and people in Federal Medical Centers, who are housed based on their medical or mental health condition rather than their security classification.

2

| Security Level | |
|---|---|
| MINIMUM | 0-11 Points |
| LOW | 12-15 Points |
| MEDIUM | 16-23 Points |
| HIGH | 24 + Points |

However, inmates with over thirty years until release, including those with non-parolable life sentences, are assigned a public safety factor or "PSF" for sentence length. This PSF results in the automatic classification as high security, regardless of the security scoring, unless it is waived. As a result, people who would otherwise be classified as minimum, low or medium security are nonetheless classified as high security if they have a life sentence.

On Ex. A, ███████████ PSFs appear on the left-hand column, near the top: "PUBSFTY: GRT SVRTY, SENT LGTH". These are PSFs for Great Severity due to his role in the current offense, and Sentence Length. This is reflected in the "LEVEL AND CUSTODY SUMMARY" section of the BP-338, where, although ███ ████████ Security Total is 8, which would ordinarily result in a Security Level of Minimum, is instead classified as High Security.

**Custody level:** There are four custody levels including <u>Maximum</u>, <u>In</u>, <u>Out</u> and <u>Community</u>. Custody Level, like Custody Scoring, is discretionary. Based largely on the Custody Variance, the SENTRY system recommends whether the inmate's Custody Level should decrease (if the variance is negative), increase (if the variance is positive), or remain the same (if the variance is zero). When the Warden or the unit staff do not follow the SENTRY recommendation, they must provide a written justification as to why they did not comply with the recommendation.

The BP-338 for ████████████ shows that SENTRY recommended a decrease in his Custody Level. This is to be expected given the -3 Custody Variance. However, staff maintained his current Max Custody Level. The reason given for not following the recommendation of SENTRY was: "Inmate ████████ is not appropriate for a reduction from MAX custody at this time." See Ex. A.

**Security Level, Custody Level and Types of Facilities:** There is only a rough correlation between Security Level, Custody Level and the type of facility to which an inmate may be assigned. The possible Custody Levels and types of facilities for each Security Level are as follows:

| Security Level | Custody Level | Types of Facilities |
|---|---|---|
| Minimum | Community & Out | Camp |
| Low | Out & In | FCI |
| Medium | Out & In | FCI |
| High | In & Maximum | USP |
| | Maximum | ADX |

3

Far more Maximum Custody inmates are housed in USPs than in the ADX. Approximately less than 10% of the BOP population, are Maximum Custody. The ADX currently houses only approximately 350 people, all of which are Max Custody.

## SUMMARY OF BP-338s

Most of the 20 post-commutation BP-338's I reviewed for the Plaintiffs were completed during the first two weeks of January 2025.

They all state that the inmates are high security, which is primarily due to their life sentence. However, as shown in the chart below, most of the 20 do not have security points commensurate with high security:

| Security Level | Plaintiffs with Points Commensurate with the Security Level |
|---|---|
| Minimum | 9 |
| Low | 2 |
| Medium | 7 |
| High | 2 |

It appears that 18 of the 20 are classified as high security only because of the sentence length Public Safety Factor.

Additionally, 12 of the 20 are described as having "good" living skills. Another 4 of the 20 are described as having "average" living skills.

## SUMMARY OF ADX REFERRAL PACKETS

The ADX Referral Packets that I have reviewed relate to the ADX hearing process for seven of the Plaintiffs. It is worth noting that six of the seven are for Plaintiffs with points that would put them at medium or high security.

**Timing:**

Three of the packets reflect an ADX Mental Health Evaluation happening in January 2025. Each of these three inmates was found to meet mental health exclusionary criteria. That means that they should not be transferred to ADX unless there was an Extraordinary Security Concern review and that review found that they could only be managed at the ADX. Each of them had an Extraordinary Security Review, respectively on February 18, 2025, March 4, 2025, and March 5, 2025 and all three were found appropriate for the ADX.

Nothing else in any of the ADX Referral Packets reflects any part of the referral process occurring prior to February 12, 2025.

**ADX Mental Health Evaluations and Extraordinary Security Concerns Reviews:**
Each of the 7 packets includes an ADX Mental Health Evaluation report. Each of these reports state: "He was previously sentenced to death, but he was granted clemency in December 2024. As a result, the inmate has been referred to the ADX for completion of a life sentence."

4

Four of the 7 packets reflected a finding by a psychologist that the inmate met one or two mental health exclusionary criteria. All of them were found to meet the criteria: "His mental health disorder or cognitive limitations make it unlikely he could successfully progress through ADX Florence." Two of them also met the criteria: "ADX Florence placement is likely to exacerbate his mental health condition."

The Extraordinary Security Concerns reviews done for each of them appear quite similar. They each state: "He was referred for placement at the ADX because he was previously sentenced to death but was granted clemency in December 2024, leading to his current life sentence." They describe the offense that resulted in the death sentence, and the inmate's mental health history in the BOP. They list the inmate's disciplinary offenses, without mentioning when any of the offenses occurred, although one had had no disciplinaries since ▮▮▮ another had no disciplinaries since ▮▮▮ another had more recent disciplinaries but none involving violence since ▮▮▮ Each review includes a one-word, redacted response to the question: "Are Inmate's crimes of such notoriety that the Inmate cannot be safely housed in a less secure environment with other inmates without a substantial risk of harm to him?" The "Discussion/Recommendation" section of each review reads almost identically. They start with a short paragraph noting that the inmate's death sentence was recently commuted to a life sentence, describing the inmate's mental health diagnoses and sometimes the defense counsel's concerns, and noting that the inmate's impairment "precludes him from placement in the ADX without the presence of extraordinary security concerns." The discussion then states, verbatim in every one of the reviews provided: "Staff from the Psychology Services Branch, Correctional Programs Division, Designations & Sentence Computation Center, and Office of General Counsel (Committee) reviewed the Inmate's security needs. The Committee reviewed his history of disciplinary infractions, institutional adjustment, threat to staff and inmates, and current presentation, and it was determined his security concerns were extraordinary and he could be placed in the ADX." These reviews are signed off by the members of the Committee including ▮▮▮▮▮▮▮▮▮▮▮▮▮

**ADX Referral Notices**
Each of the 7 packets includes a Notice of Hearing on Referral for Transfer to ADX Florence General Population. Each of the ADX Referral Notices notes that the inmates are High Security and Maximum Custody, without any discussion of the inmate's security points. They each state that the inmate has an STG designation of Death Row Inmate, even though these notices were issued in April 2025, months after the death sentences were commuted and the inmates went through a program review.

Six of the inmates whose packets I reviewed have had institutional misconduct during their incarceration. Their ADX Referral Notices were nearly identical. For those six, the basis given for the ADX referral were:
1. Your conduct creates a risk to institution security and good order, poses a risk to the safety of staff, inmates or others, or to public safety.
2. As a result of your status either before or after incarceration, you may not be safely housed in the general population of a regular correctional institution.

Each of the six had both of these factors listed.

The Notice then set out the "facts or situation(s) resulting in the recommendation for transfer", which included a description of the inmates crimes, the fact that he was sentenced to death and that the death sentence was commuted to life imprisonment, a listing without dates of the inmate's disciplinary history, a paragraph about BOP's belief that the inmate's communications or contacts with others poses a risk of death or serious bodily injury to others, citing to the inmate's conviction. Each notice of hearing ends

5

with: "Accordingly, it is determined that your present security management concerns, which cannot be met, adequately, in general population of a regular institution."

Notably, several of these inmates have had no violent disciplinaries for ten years or more.

The seventh notice, for ███████ is somewhat different. He has been in prison since 2001 and has no disciplinaries. The basis given for ███████ referral are:
1. The Inmate's placement in other correctional facilities creates a risk to institutional security and good order or poses a risk to the safety of staff, Inmates, others, or to public safety.
2. As a result of the inmate's status, either before or after incarceration, the inmate may not be safely housed in the general population of another institution.
3. The inmate has notoriety to the extent that the inmate's well-being would be jeopardized in a less secure setting.

As with the other notices, ███████ notice describes his crime, the fact that he was sentenced to death and that the death sentence was commuted to a life sentence. The factual basis given for his referral consists solely of his arrival at USP Terre Haute SCU on June 25, 2001, his crime of conviction, and a statement that "Institution staff believe Inmate ███████ placement in other correctional facilities creates a risk to institutional security and good order and poses a risk to the safety of staff, inmates, others, or to public safety. A recommendation to transfer inmate ███████ to the ADX-GP was submitted and a placement hearing was approved to be conducted."

**ADX Administrative Hearing Reports**
The 7 packets each also includes an ADX General Population Hearing Administrator's Report. As with the Notices, the Hearing Reports for each of the inmates with a history of disciplinaries relies on those disciplinaries to justify the recommendation for placement, without any reference to when the disciplinaries occurred. In my experience submitting these packets, the dates of the misconduct is critically important just as it is with the custody classification form (BP-338). The BP-338 scores discipline based on seriousness and recency and more recent misconduct is scored higher than older misconduct. Failure to take this into consideration will discount improved conduct and behavior.

The Hearing Report for ███████ who has no disciplinaries, relies on precisely the same information as stated in the Notice – his 2001 arrival at USP Terre Haute SCU, his crime of conviction, and the statement regarding the institutional staff's belief that he poses a risk to the safety of staff, inmates, others, or to the public.

## SPECIFIC AREAS OF CONCERN

The collective data from the BP-338s I reviewed demonstrates that the assessment process and policy criteria considerations for transferring inmates to the ADX ignore the policy, past practices and direct assessment by the unit team who are the only BOP staff who have had daily direct interactions with the inmates.

For instance, the classification policy defines "good living skills" as:

> "The inmate fully complies with staff expectations. He/she consistently receives outstanding sanitation and work reports and impresses staff as a 'model inmate' in all other aspects of adjustment. He/she has developed a good rapport with staff. This high level of responsibility is consistent throughout the year."

6

The policy defines "average living skills" as:

> "The inmate generally complies with staff expectations although falls short of providing a full and complete effort. He/she has been counseled about sanitation, work performance and/or other aspects of adjustment; however, the inmate is not viewed as problematic. The inmate's rapport with staff is satisfactory. The inmate presents well personally; however, he/she fails to display any significant motivation for self-improvement."

Twelve of the twenty post-commutation BP-338s reviewed indicated that staff rated the inmates as having good living skills, and another four were rated as average. It is not consistent with BOP practice that a person with good or average living skills (in other words, a model inmate) would be sent to ADX, absent a recent and serious incident.

Also, it appears that 18 of the 20 are classified as high security only because of the sentence length public safety factor. Indeed, 9 have Security Totals that would result in their being minimum security, but for the sentence length public safety factor. It is not consistent with BOP practice that a person who is high security solely due to their sentence length but who have Security Totals that would otherwise be at minimum, low, or medium security would be sent to ADX, absent a serious history of misconduct. Even most people who are high security are not sent to the ADX.

Perhaps the greatest deviation from BOP practice is that when people are sent to ADX, it is generally in response to recent, serious misconduct. The ADX referral packets that I reviewed did not include any instances of recent serious misconduct. Sending people to ADX based on disciplinary histories that have no violence for several years is extremely unusual.

## CONCLUSION

The recent discovery further demonstrates that the process for designating the Plaintiffs to ADX was irregular and did not follow BOP policy and practice. These placement decisions appear to have been made without serious regard for the Plaintiffs individual histories and conduct, or their mental health needs. The ADX Referral Packets and BP-338s showed that there is no penological reason to redesignate most if not all of these inmates to the ADX. It appears to me that they were redesignated to the ADX solely based on their death sentences having been commuted. This is contrary to BOP policy and practice.

Executed on this 9th day of May 2025

_____
Paul Gibson
Chief Operating Officer

# Exhibit A