**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

REJON TAYLOR et al.,

    *Plaintiffs*,

v.

DONALD J. TRUMP et al.,

    *Defendants*.

Civil Action No. 25-1161 (TJK)

### MEMORANDUM OPINION

Then-President Biden commuted the death sentences of 37 federal prisoners shortly before leaving office. On the day of his inauguration, President Trump issued an executive order directing the Attorney General to make sure that these former death-row inmates serve their life sentences in prison "conditions consistent with the monstrosity of their crimes" and with their security risks. Upon taking office, Attorney General Pam Bondi issued a memorandum to implement that directive.

Plaintiffs are 21 of the 37 recipients of former President Biden's commutation. They allege that Bondi, at President Trump's request, unlawfully hijacked the normal process that the Bureau of Prisons uses to decide where to place inmates. Before Bondi got involved, all Plaintiffs were purportedly slated to go to facilities other than the supermax at ADX Florence. But by late April, officials for the Bureau had held hearings and recommended that all Plaintiffs but one should be transferred to ADX—the most secure and restrictive federal prison in the United States. And that switch would not have happened, Plaintiffs claim, had Bondi not interfered with the normal process. So Plaintiffs sued and moved for preliminary relief against what they describe as a sham process that covered up predetermined decisions to transfer all of them to ADX.

The Court cannot grant that relief—at least not now. To obtain it, Plaintiffs must show that they are likely to succeed on the merits of their claims. But for any prisoner to prevail in court, Congress requires that he exhaust available administrative remedies first. And as Defendants point out, Plaintiffs have not done so. The Bureau of Prisons offers an administrative process for challenging final designations to ADX, and Plaintiffs have not completed—or, to the Court's knowledge, even started—that process. Because the Court lacks discretion to append exceptions to Congress's exhaustion requirement, it will deny Plaintiffs' motion for a preliminary injunction. Still, the Court expects that the Bureau of Prisons—if, as it asserts, it is applying its normal process here—will follow what it maintains is the usual practice of not transferring Plaintiffs before their administrative appeals conclude.

## I.  Background

### A.  The Executive Order

Within hours of taking office on January 20, 2025, President Trump issued an executive order addressing the "37 murderers whose Federal death sentences were commuted" by former President Biden. *Restoring the Death Penalty and Protecting Public Safety*, 90 Fed. Reg. 8463 (codified Jan. 30, 2025). The death penalty, according to the order, "is an essential tool for deterring and punishing those who would commit the most heinous crimes." *Id.* But "for too long, politicians and judges" have "defied and subverted the laws of our country" by trying to "thwart the execution of lawfully imposed capital sentences." *Id.* President Trump thus directed the Attorney General to take several steps so that laws "authoriz[ing] capital punishment are respected and faithfully implemented." *Id.* One such directive spurred this litigation by instructing the Attorney General to "evaluate the places of imprisonment and conditions of confinement for each of the 37" former death-row prisoners who received the commutation. *Id.* at 8464. Beyond that, the Attorney General must "take all lawful and appropriate action to ensure that" the "conditions" of

imprisonment for these "offenders" are "consistent with the monstrosity of their crimes and the threats they pose." *Id.*

Attorney General Bondi acted to implement that part of the executive order about two weeks later. In a memo titled "Restoring a Measure of Justice to the Families of Victims of Commuted Murderers," Bondi "directed" the Federal Bureau of Prisons ("BOP" or "the Bureau") to do what President Trump called for. Specifically, the Bureau must ensure that the "conditions of confinement" for this group of 37 prisoners reflect "the security risks" that they "present because of their egregious crimes, criminal histories, and all other relevant considerations." Off. of the Att'y Gen., Memorandum for All Department of Justice Employees: Restoring a Measure of Justice to the Families of Victims of Commuted Murderers (Feb. 5, 2025), https://www.justice.gov/ag/media/1388526/dl?inline. This is one of three steps, the memo appears to assert, necessary "to achieve justice for the victims' families." *Id.*

### B.    ADX and the Redesignation Process

Plaintiffs are 21 of the prisoners whose death sentences were commuted. When they received those commutations, they were incarcerated in BOP's Special Confinement Unit within Terre Haute Penitentiary—*i.e.*, "the federal death row." ECF No. 1 ("Compl.") ¶ 4. So BOP began the process of relocating these prisoners within the federal system once those death sentences became life-in-prison sentences. According to Plaintiffs, BOP officials initially "recommended" that "most" of them "be redesignated from" Terre Haute's special unit to "high security" United States penitentiaries "or BOP health care facilities." *Id.* But President Trump's executive order and Bondi's memo changed everything, Plaintiffs say. Swapping in a "new procedure" for the "usual BOP redesignation process," Bondi and others kickstarted a "sham process that categorically predetermined" the new place of incarceration for all Plaintiffs: "Florence Administrative Maximum

Facility ("ADX")," the "supermax prison" home to the "most oppressive conditions in the entire federal prison system." *Id.* ¶ 7.

Some background on BOP's process for assigning inmates to prisons is necessary to unpack these allegations. Under 18 U.S.C. § 3621(b), BOP must "designate the place of [a] prisoner's imprisonment." The Bureau, after considering five factors, may select "any available penal or correctional facility" that it "determines to be appropriate and suitable." 18 U.S.C. § 3621(b)(1)–(5). To guide those determinations, BOP policy classifies institutions into one of five security levels: minimum, low, medium, high, and administrative. ECF No. 1-6 ("PS 5100.08") at 11. Inmates also receive security classifications that are mainly "based on" the "level of security and supervision" that they "require[]," as well as the "inmate's program needs"—things like "substance abuse," "training," "counseling," and "medical/mental health treatment." *Id.* But the Bureau considers other "factors" too. *Id.* at 11–12. BOP handles redesignations—that is, "transfers" from one institution to another—"in much the same manner" that it does initial assignments. *Id.* at 13. Still, because a redesignation follows time already spent in prison, BOP also "carefully review[s]" "the inmate's institutional adjustment and program performance." *Id.*

Within the federal system, Colorado's ADX stands alone as "the most secure prison." ECF No. 40-2 ¶ 5. Designed for "BOP's most disruptive, dangerous, or high-profile inmates," ADX—dubbed the "Alcatraz of the Rockies"—"employs unique security and control procedures." *Id.*; ECF No. 2-11 ¶ 14. Because ADX possesses these unique features and is meant for "inmates who have demonstrated an inability to function in a less restrictive environment without being a threat," BOP has special procedures for transferring inmates there. PS 5100.08 at 98. To start, other "high security institution[s] should be considered" before ADX. *Id.* If those alternatives are not appropriate, then the staff at the inmate's current institution "will initiate the referral process" and submit

4

a referral packet to the warden. ECF No. 2-9 ("ADX Referral Memo") at 4–5. An inmate must meet at least one of two criteria to warrant referral to ADX: (1) his "placement in other correctional facilities creates a risk" to security, "good order," staff, other inmates, or "public safety," or (2) his "status" is such that he cannot "be safely housed in the general population of another institution." *Id.* at 3. To flesh out those requirements, BOP has listed several "factors" that "warrant consideration for such placement." *Id.* Violating "federal or state law" while incarcerated, for example, implicates potential ADX referral. *Id.* So does participating in "group misconduct" that harms "the orderly operation of a correctional facility." *Id.* at 3–4.

An initial referral charts the path to a hearing and final determination. Before that happens, three individuals must concur with the referral: the warden, the regional director, and the Designation and Sentence Computation Center. ADX Referral Memo at 5. If they all do, BOP schedules "a hearing on the appropriateness" of sending the inmate to ADX. *Id.* The hearing administrator must prepare a notice—including "[s]pecific evidence" forming "the basis for the referral"—and send it to the inmate, who has an opportunity to appear and present evidence at the hearing. *Id.* at 8–9. Next, the hearing administrator "prepare[s] a written recommendation" with "specific reasons" and "sufficient detail" for an ADX referral if he finds it to be appropriate. *Id.* at 9. That recommendation goes to the Assistant Director for the Correctional Programs Division for a "final decision." *Id.* at 9–10. The inmate may then challenge that decision through a two-step appeal process that eventually puts the case before BOP's Office of General Counsel. *See id.* at 10.

On Plaintiffs' account, BOP began "gather[ing] information about" them after they received their commutations. ECF No. 46 at 10. The Bureau, Plaintiffs say, eventually "made individualized placement decisions for each Plaintiff" and "determined that all Plaintiffs should be transferred" to places other than "ADX." *Id.* at 11. For example, Plaintiff Brandon Council's

5

attorney submitted a sworn declaration that a BOP lawyer told her in mid-February that the Bureau "had determined that Mr. Council should not be designated to ADX." ECF No. 2-18 ¶ 10. But Council and all other Plaintiffs were referred to ADX sometime after Bondi issued her memo, and all (except Brandon Basham) had ADX hearings in April.[1]  *See* ECF No. 40-1 ("Salem Decl.") at 8.  As of May 22, one Plaintiff—Chadrick Fulks—had received a final designation for ADX.  *See* ECF No. 48 ("Hearing Tr.") at 82.

### C. Procedural History

On April 16, Plaintiffs sued President Trump, Bondi, Deputy Attorney General Emil Bove, BOP, and several of the Bureau's officials.  *See generally* Compl.  They challenged President Trump's executive order and Bondi's memo as unconstitutional for several reasons while also alleging that the latter violates the Administrative Procedure Act.  *See id.* at 60.  The same night that they filed the complaint, Plaintiffs moved for a temporary restraining order because—"on information and belief"—Defendants would "begin transferring the Plaintiffs to ADX as soon as the week of April 21." ECF No. 2 at 1.

The Court scheduled a hearing the next day to discuss the timeline for briefing and a decision. Based on those discussions, the Court ordered the parties to appear for a hearing on Plaintiffs' motion on the morning of April 18. Defendants, though, submitted a notice on the evening of April 17, informing the Court that they would not transfer any Plaintiff to ADX until May 16 at the earliest.  *See* ECF No. 19 at 1.  Given that new timeline, the Court—as the parties requested—converted Plaintiffs' motion for a temporary restraining order into one for a preliminary injunction.  *See id.* at 2; Minute Order of April 17, 2025. In early May, the parties asked to push the hearing

---

[1] According to Defendants, Basham "was under consideration for ADX placement but has mental health needs necessitating a transfer to another facility before further consideration can be given to ADX placement." ECF No. 40-1 ¶ 16.

date because Defendants represented that they would not transfer any Plaintiff to ADX before May 31. *See* ECF No. 41 at 2–3. The Court held the preliminary-injunction hearing on May 22.

## II. Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right," but only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22, 24 (2008). To obtain that remedy, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. "[P]laintiffs bear the burden of persuasion on all four preliminary injunction factors." *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014).

Two factors are essential: likelihood of success on the merits and irreparable harm. Before the Supreme Court's decision in *Winter*, a sliding-scale approach permitted a "weak showing on one factor to be overcome by a strong showing on another." *Brennan Ctr. for Just. at N.Y.U. L. Sch. v. DOJ*, 498 F. Supp. 3d 87, 96 (D.D.C. 2020). But now "it is clear that failure to show a likelihood of irreparable harm" is, "standing alone, sufficient to defeat the motion." *Id.* (quoting *Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 512 (D.D.C. 2018)); *see also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). So too is the "failure to show a likelihood of success on the merits" enough to show that a preliminary injunction is not warranted. *English v. Trump*, 279 F. Supp. 3d 307, 316 (D.D.C. 2018).

## III. Analysis

As part of the likelihood-of-success inquiry, a plaintiff seeking a preliminary injunction must show that he is likely to clear jurisdictional and other threshold hurdles. *Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015). *see also, e.g.*, *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 623 (D.C. Cir. 2020). The exhaustion of "administrative remedies" is one such threshold issue,

7

*Howard v. Evans*, 193 F. Supp. 2d 221, 223 (D.D.C. 2002), though the allocation of that burden turns on whether the exhaustion requirement is an affirmative defense. Because Defendants have shown that Plaintiffs have an available administrative remedy but have not exhausted it, Plaintiffs have failed to establish "a substantial likelihood of success on the merits"—a prerequisite for preliminary relief. *Swain v. Junior*, 961 F.3d 1276, 1292 (11th Cir. 2020).

Federal law requires prisoners to pursue internal grievance procedures before coming to court. That rule reflects Congress's judgment that "prison officials" should have the "time and opportunity to resolve complaints concerning the exercise of their responsibilities before" an inmate "initiat[es]" a "federal case." *Kaemmerling v. Lappin*, 553 F.3d 669, 674 (D.C. Cir. 2008). To further that goal, Congress bolstered what was a "weak exhaustion provision" by amending it in the Prison Litigation Reform Act ("PLRA"). *Woodford v. Ngo*, 548 U.S. 81, 84 (2006). That statute now provides that "[n]o action shall be brought with respect to prison conditions . . . by a prisoner" until he "exhaust[s]" "such administrative remedies as are available." 42 U.S.C. § 1997e(a). And this "exhaustion requirement" sweeps broadly, applying "to all inmate suits about prison life, whether they involve general circumstances or particular episodes." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Still, because "the failure to exhaust is an affirmative defense under the PLRA," inmates need not "specially plead or demonstrate exhaustion in their complaints." *Jones v. Bock*, 549 U.S. 199, 216 (2007). So the "exhaustion requirement," though rigorous when invoked as a defense, is "not jurisdictional." *Ali v. District of Columbia*, 278 F.3d 1, 6 (D.C. Cir. 2002).

Congress's revamped exhaustion rule for prisoners comes with several new features. First, exhaustion is "mandatory," so "district court[s]" no longer possess "discretion" to address unexhausted claims. *Porter*, 534 U.S. at 524. Second, prisoners are not "excused from completing the

8

administrative remedy process" just because they think "that it is futile." *Banks v. Lappin*, 539 F. Supp. 2d 228, 238 (D.D.C. 2008). Third, "exhaustion" remains "a prerequisite to suit" even if "the prisoner seeks relief not available in grievance proceedings." *Porter*, 534 U.S. at 524. Said slightly differently: so long as "some relief for the action complained of" is available in the "grievance procedure[]," the prisoner must exhaust it. *Ross v. Blake*, 578 U.S. 632, 642 (2016). Fourth, and as somewhat of a catch-all rule, "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." *Id.* at 648. Whether that requirement applies "hinges" only on whether the administrative remedies are "available" because the PLRA insists that a prisoner exhaust those remedies—but only those remedies—before suing. *Id.* at 642.

Defendants argue that Plaintiffs have not exhausted their administrative remedies for ADX referrals, and Plaintiffs seem to concede the point. *See* ECF No. 46 at 18–19 (arguing only that Plaintiffs need not have exhausted those remedies). That makes sense; the two-step appeal procedure kicks in only after an inmate receives a final determination about ADX placement. *See* ADX Referral Memo at 10. And as of May 22, only one Plaintiff had received such a determination. *See* Hearing Tr. at 82; *see also* Salem Decl. ¶ 17 (Assistant Director Salem explaining that he has not made ADX placement decisions for Plaintiffs). So Plaintiffs face a steep climb given the Supreme Court's repeated instruction: when "Congress sets the rules" with "mandatory exhaustion statutes like the PLRA," courts lack "discretion" to "excuse a failure to exhaust" for "special circumstances" or other reasons. *Ross*, 578 U.S. at 639.

None of Plaintiffs' arguments gets them around that problem. They begin by arguing that BOP lacked discretion to grant relief against the executive order, "the Bondi Memo, and the unlawful process flowing from these directives." ECF No. 46 at 18. And because the grievance procedure does not permit that kind of relief, Plaintiffs reason, no remedy is "available." *Ross*,

9

578 U.S. at 643. So they had "nothing to exhaust." *Id.* (citation omitted). Not so.

Plaintiffs overstate the need for the relief available in the administrative process to mirror the relief sought in federal court. To be sure, the grievance process for ADX designations may not provide a way for Plaintiffs to invalidate the Bondi Memo or the executive order—or even to redo the process that they claim was a sham. But that limit does not mean that "the relevant administrative procedure lacks authority to provide *any* relief." *Ross*, 578 U.S. at 643 (emphasis added) (quoting *Booth v. Churner*, 532 U.S. 731, 736 (2001)). And *that* inquiry dictates whether the PLRA's exhaustion requirement applies. Time and again, courts have explained that "[e]ven when the prisoner seeks relief not available in grievance proceedings," he must still "exhaust[]" before bringing "suit." *Porter*, 534 U.S. at 524 (citing *Booth*, 532 U.S. at 741). In other words, it does not matter whether the grievance system offers the "*particular* form of relief sought." *Applewhite v. Bivens*, 717 F. Supp. 2d 68, 71 (D.D.C. 2010) (emphasis added) (quoting *Kaemmerling*, 553 F.3d at 675); *see also, e.g.*, *Valentine v. Collier*, 978 F.3d 154, 161 (5th Cir. 2020) ("[E]xhaustion is not excused just because inmates cannot obtain the precise relief they seek.").

Against that backdrop, Plaintiffs need to exhaust the grievance procedure for ADX designations because that process is "capable" of providing "*some* relief for the action complained of." *Ross*, 578 U.S. at 642 (emphasis added) (citation omitted). No one disputes that this administrative procedure *could,* at least in theory, lead to the reversal of an ADX designation. After all, the appeal process is for challenges to "the decision" to finally designate an inmate for ADX. *See* ADX Referral Memo at 10. And taking Plaintiffs at their word that they challenge the process resulting from the Bondi Memo and the executive order, that process is still one *for designating inmates to ADX*. So a grievance procedure that offers relief against that ultimate designation also offers "some relief for" the alleged process problems. *Ross*, 578 U.S. at 642 (citation omitted). Process

10

matters, of course, but it cannot be said that relief against the result of a process is no relief at all.

Nor does Plaintiffs' "assessment of the viability of the [grievance] process" render it "unavailable." *Rivera v. DOJ*, No. 12-cv-168 (RLW), 2013 WL 1285145, at *5 (D.D.C. Mar. 28, 2013). True, they may "believe[] that seeking administrative relief" through this process "would be futile." *Kaemmerling*, 553 F.3d at 675. But they "nevertheless must exhaust." *Id.* And that rule holds true even when a prisoner believes that the deck is stacked against him—for instance, because he must "bring[] his complaint to the same people who perpetuated the offenses against him." *Jeanes v. DOJ*, 231 F. Supp. 2d 48, 51 (D.D.C. 2002). Such a theory "confuses availability with futility," and the latter is no exception to the PLRA's exhaustion requirement. *Id.*

Plaintiffs' examples of administrative remedies that were not "available" show why this one is. In *Kaemmerling*, a prisoner sued to enjoin a statute that required BOP to collect for DNA analysis "bodily sample[s]" from inmates convicted of certain crimes. 553 F.3d at 673. And that challenge, the D.C. Circuit explained, was "the rare one in which" the prisoner "had no administrative process to exhaust." *Id.* at 675. The Bureau had "no discretion not to collect [his] DNA"; Congress had mandated that it do so. *Id.* In this way, the administrative process could not offer "any relief" or permit BOP "to take any action whatsoever in response to his complaint." *Id.* (describing BOP's inability to "articulate a single possible way the prison's administrative system could provide relief"). Here, though, BOP can offer some relief to Plaintiffs—reversing final ADX determinations—even if not the "exact type of relief" they "seek[]"—enjoining (in some way) the Bondi Memo, executive order, or the resulting process. *Id.* Put differently, *Kaemmerling* would help Plaintiffs if the prisoner there had challenged the process for selecting inmates for DNA collection and if the administrative remedy had offered only a way to challenge the ultimate selection rather than the underlying process. But that situation is not what the D.C. Circuit addressed.

11

Judge Lamberth's recent decision in *Doe v. McHenry* is distinguishable for similar reasons. There, three transgender prisoners challenged an executive order directing the Attorney General to "ensure that males are not detained in women's prisons" and that federal funds do not support medical treatment with the "purpose of conforming an inmate's appearance to that of the opposite sex." 763 F. Supp. 3d 81, 84 (D.D.C. 2025) (citation omitted). The "text of the Executive Order," in other words, "*plainly* requires the BOP to perform the allegedly unlawful facility transfer" and to withhold medications. *Id.* at 87 (emphasis added). And for that reason, "no form of relief" was available to the prisoners; BOP could not counter the directive about transferring the prisoners and denying them access to medications. *Id.* Again, though, Plaintiffs here have access to a grievance procedure that permits challenges to final ADX determinations—*i.e.*, a procedure that offers *some* relief to a complaint about a process for making those determinations. And unlike the executive order in *Doe*, nothing in the order relevant here (or in the Bondi Memo) purports to strip BOP of the ability to reverse such a determination. By pointing that out, the Court does not pre-determine whether Plaintiffs have shown that the executive order or the Bondi Memo implicitly directs BOP to send Plaintiffs to ADX. Rather, the existence of the appeal process for ADX designations—coupled with the lack of a directive "plainly" preventing BOP from reversing those designations—means that Plaintiffs have not shown that BOP could not provide "*any* relief" responsive to their complaints about the ADX designation process. *Id.* (quoting *Ross*, 578 U.S. at 643). At most, they have established that they are unlikely to prevail in their future administrative appeals. But even assuming they have, this argument would still require the Court to impermissibly "read [a] futility" exception into the PLRA. *Booth*, 532 U.S. at 741 n.6.

Nor is this administrative remedy unavailable just because BOP could, in theory, transfer Plaintiffs to ADX before they complete the appeal process. Recall that the PLRA's "text and

12

history alike foreclose" any "'special circumstances' exception" to its exhaustion requirement. *Ross*, 578 U.S. at 638.  But that is close to what Plaintiffs ask for with this argument: a carveout to the mandatory exhaustion scheme when prisoners raise "claims of serious deprivations of constitutional and statutory rights" that might occur before the grievance process plays out.  ECF No. 46 at 19.  Enforcing the exhaustion requirement in such cases may seem harsh.  But "Congress sets the rules" in "mandatory exhaustion regimes" like the PLRA's, and the Court has no "role in creating exceptions."  *Ross*, 578 U.S. at 639.

Resisting this conclusion, Plaintiffs point to *Fletcher v. Menard Correctional Center*, 623 F.3d 1171 (7th Cir. 2010).  In that case, Judge Posner reasoned that administrative remedies are not "available" if "a prisoner has been placed in imminent danger of serious physical injury" but cannot obtain any "possible relief in time to prevent" that danger "from becoming an actual harm." *Id.* at 1173.  A process that "takes two weeks to exhaust," after all, provides "no possibility of some relief" when the inmate "is in danger of being killed tomorrow."  *Id.* at 1174 (internal quotation marks omitted).  Plaintiffs contend that this rationale extends to the potential loss of "constitutional and statutory rights" in play here.  ECF No. 46 at 19.

It does not.  To start, the part of *Fletcher* that Plaintiffs lean on is dicta; the panel held that the prisoner had failed to exhaust because he had access to an expedited emergency procedure that he did not use.  *See* 623 F.3d at 1174–75; *see also Valentine v. Collier*, 956 F.3d 797, 805 (5th Cir. 2020) (per curiam) (describing this aspect of *Fletcher* as a "hypothetical" about "administrative remedies" that "might" be unavailable).  Moreover, "*Fletcher* was decided before *Ross*," *see Nellson v. Barnhart*, 454 F. Supp. 3d 1087, 1093 (D. Colo. 2020), and at least some tension exists between the Seventh Circuit's decision and the Supreme Court's emphasis that courts cannot "add unwritten limits onto th[e] rigorous textual requirements" of the PLRA's exhaustion provision,

13

*Ross*, 578 U.S. at 639. That rule would have little content if courts could use the narrow (and text-based) "unavailability" exception to "decid[e] that exhaustion would be unjust or inappropriate in a given case"—precisely what "the PLRA prevent[s]." *Id.* at 641. Simply put, Congress has "foreclos[ed] judicial discretion to excuse the failure to exhaust," even in cases of "futility or hardship." *Fleming v. U.S. Dep't of Agric.*, 987 F.3d 1093, 1098 (D.C. Cir. 2021) (internal quotation marks and citation omitted).

But even on its own terms, *Fletcher* does not help Plaintiffs. That case contemplated a situation in which there was "no administrative remed[y] for warding off" an "imminent danger." *Fletcher*, 623 F.3d at 1173. And the example *Fletcher* gave—a grievance procedure that takes two weeks is unavailable for a prisoner "told that members of the Aryan Brotherhood were planning to kill him within the next 24 hours" while guards ignored the threat—shows that not just any danger will do. *Id.* So even assuming detention in ADX presents "serious" risks, the "danger" discussed in the *Fletcher* hypothetical was both far more "imminent" and severe. *Goldsmith v. Correct Care Sols.*, No. 12-cv-3738 (JRB), 2015 WL 2437332, at *5–6 (N.D. Ill. Mar. 31, 2015) (rejecting prisoner's "imminent danger exception to exhaustion" for this reason). The BOP official responsible for final ADX determinations has explained that BOP's "historical practice" is to "wait[] for th[e] administrative remedy process" to play out before "physically transferring the inmate," and that he does not know of "any reason to deviate from" that practice. Salem Decl. ¶ 23. More to the point, Plaintiffs have not shown that no administrative remedy can "ward[] off" the danger they fear. *Fletcher*, 623 F.3d at 1173. True, Plaintiffs insist that they challenge the executive order, Bondi Memo, and the allegedly warped ADX designation *process* that resulted, and the grievance procedure is likely no vehicle for challenging those things. But under *Fletcher*, what matters is whether the administrative remedy can address an "imminent danger of serious

14

*physical injury.*" *Id.* (emphasis added). And Plaintiffs do not (and cannot) claim that the allegedly sham process itself—apart from the ultimate ADX designation—creates such an imminent danger. Because Plaintiffs can challenge that designation through the administrative process, and because they have not shown that imminent and significant physical harm will occur before that process unfolds, *Fletcher* does not convince the Court that this administrative remedy is unavailable under the PLRA.

Plaintiffs' last redoubt is the D.C. Circuit's decision in *Jackson v. District of Columbia*, 254 F.3d 262 (2001). As in *Fletcher*, *Jackson* did not actually hold that a prisoner need not exhaust administrative remedies; the Circuit instead "[a]gree[d] with the district court that the prisoners failed to exhaust their administrative remedies" and remanded to "dismiss the complaint without prejudice." 254 F.3d at 264. But in doing so, *Jackson* explained that "federal courts" can "issue injunctions to preserve the *status quo* while administrative proceedings are in progress and prevent impairment of the effective exercise of appellate jurisdiction." *Id.* at 268 (citation omitted). Plaintiffs, relying on that language, urge the Court to "grant preliminary relief . . . to prevent disruption of the status quo while [they] complete" the administrative-remedy process. ECF No. 46 at 19.

*Jackson* does not support that request for relief on this record. To begin, courts do not seem to have relied on *Jackson* to issue injunctions in prisoner-filed cases when the prisoner has failed to exhaust. And it is unclear whether this aspect of *Jackson* survives recent Supreme Court decisions. The PLRA provides that "[n]o *action* shall be brought" before a prisoner exhausts available "administrative remedies." 42 U.S.C. § 1997e(a) (emphasis added). Since *Jackson*, the Supreme Court has emphasized that this statutory command means that "exhaustion" is "required for any *suit* challenging prison conditions." *Woodford*, 548 U.S. at 85 (emphasis added); *see also Jones*, 549 U.S. at 211 ("There is no question that exhaustion is mandatory under the PLRA and

15

that unexhausted claims *cannot be brought* in court." (emphasis added)).  And before a court can issue an injunction, a plaintiff must do just that—bring an "action."  That is why the Eleventh Circuit has explained that the PLRA's "exhaustion requirement" is a "necessary component[] of the likelihood of success inquiry" that "a court must undertake in order to issue a preliminary injunction in the first instance."  *Swain v. Junior*, 958 F.3d 1081, 1091 (2020) (per curiam); *Swain*, 961 F.3d at 1292; *see also Washington v. Fed. Bureau of Prisons*, No. 16-cv-3913 (BHH) (KDW), 2019 WL 2125246, at *6 (D.S.C. Jan. 3, 2019) (explaining that "*Jackson*" was "decided before the United States Supreme Court made it clear that full exhaustion of available administrative remedies is required before a court may consider any claim for relief, including injunctive relief").  So *Jackson*'s assertion that district courts possess discretion to issue injunctions in this context even when the prisoner plaintiff fails to exhaust available remedies chafes against the Supreme Court's more recent directives about the PLRA's "mandatory exhaustion regime[]" that "forecloses[es] judicial discretion."  *Ross*, 578 U.S. at 639.

But even if *Jackson* retains some force, it does not warrant pre-exhaustion injunctive relief here.  *Jackson* said that a court may "protect" prisoners from "irreparable injury" by "preserv[ing] the *status quo* while administrative proceedings are in progress."  254 F.3d at 268.  In other words, *Jackson* at most provides discretion to stay administrative action if some irreparable harm will occur during the exhaustion process.  But Plaintiffs have not shown that this kind of harm will befall them while they pursue administrative remedies—which, to reiterate, Plaintiffs have not started doing yet.  And even if they eventually challenge final ADX designations administratively, any such interim harm would be speculative on this record.  As discussed, the BOP official in charge of designations has submitted a sworn declaration explaining that BOP historically does not transfer inmates to ADX until the administrative-remedy process concludes, and that he does

16

not know any reason why that practice would change for Plaintiffs. *See* Salem Decl. ¶ 23.

To be sure, Plaintiffs' theory of the case is that everything about this process is different from what BOP normally does. And the evidence may ultimately support that theory. But even though Defendants have formally represented only that they will not transfer Plaintiffs before May 31, *see* ECF No. 41 at 2, Plaintiffs have not offered a non-speculative basis for finding that Defendants—given Assistant Director Salem's declaration—are likely to move them to ADX before finalizing any administrative appeals. Of course, if Defendants *do* transfer any Plaintiffs to ADX before those appeals conclude, or truncate those appeals in an unusual way, such a departure from BOP's ordinary practice would support Plaintiffs' argument that the designation process at issue here is hardly business as usual for the Bureau. And it would raise serious questions about who is calling the shots: BOP or someone outside that agency.

### IV. Conclusion

For all the above reasons, the Court will deny Plaintiffs' motion for a preliminary injunction, ECF No. 2. A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: May 27, 2025