**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

REJON TAYLOR, *et al.*,

                     *Plaintiffs*,

         v.

DONALD J. TRUMP, *et al.*, in their
official capacities,

                 *Defendants.*

Case No. 1:25-cv-01161-TJK

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION .......................................................................................................... 1

FACTUAL AND LEGAL BACKGROUND ...................................................................... 2

I.    The Attorney General's Oversight of BOP, and BOP's Authority to Designate Inmates' Place of Imprisonment .......................................................................... 2

II.   Commutation of Plaintiffs' Death Sentences, and BOP's Housing Redesignations Process ................................................................................................................... 3

III.  Plaintiffs' Claims .................................................................................................. 8

LEGAL STANDARDS .................................................................................................... 9

ARGUMENT .............................................................................................................. 10

I.    The Court Lacks Subject Matter Jurisdiction ..................................................... 11

      A.    The United States has not waived sovereign immunity. ............................ 11

      B.    Congress has specifically precluded judicial review of Plaintiffs' challenges to BOP's transfer process. .......................................................................... 14

      C.    Plaintiffs lack standing, and their claims are not ripe. ............................. 17

            1.    Plaintiffs lack standing. .................................................................. 17

            2.    Plaintiffs' claims are not ripe. ........................................................ 18

II.   Plaintiffs Have Not Exhausted Their Administrative Remedies. ........................ 19

III.  Plaintiffs Fail to State a Claim Upon Which Relief Can Be Granted ................. 20

      A.    Plaintiffs' Fifth Amendment claims fail as a matter of law. ..................... 20

            1.    Plaintiffs do not state a claim for violation of procedural due process. .......... 20

            2.    Plaintiffs do not state a claim for violation of equal protection. ..................... 24

      B.    Plaintiffs' Eighth Amendment claims fail as a matter of law. ................... 27

            1.    ADX conditions of confinement are not objectively cruel and unusual as to any plaintiff. ........................................................................ 28

            2.    ADX conditions of confinement are not subjectively cruel and unusual. ........ 30

      C.    Plaintiffs' remaining Constitutional claims fail as a matter of law. ........... 32

D.    Plaintiffs do not raise cognizable Administrative Procedure Act claims. .................. 34

1.    The AG Memo is not subject to APA review because it is not final agency action. ................................................................................ 35

2.    The AG Memo is not subject to APA review because Congress committed inmate housing designation determinations to agency discretion. ................................................................................ 38

3.    The AG Memo is not subject to APA review because an alternative adequate remedy is available to Plaintiffs. ........................................ 38

4.    The AG Memo is lawful. ................................................................ 39

5.    The AG Memo is not a legislative rule that required notice-and-comment rulemaking. ................................................................ 41

CONCLUSION ................................................................................................ 43

## TABLE OF AUTHORITIES

**CASES**

*Ahmad v. Jacquez*,
　860 F. App'x 459 (9th Cir. 2021) ........................................................... 15

*Ajaj v. United States*,
　293 F. App'x 575 (10th Cir. 2008) ......................................................... 29

*Al-Aulaqi v. Panetta*,
　35 F. Supp. 3d 56 (D.D.C. 2014) ........................................................... 32

*Am. Mining Cong. v. Mine Safety & Health Admin.*,
　995 F.2d 1106 (D.C. Cir. 1993) ............................................................. 42

*Argentine Rep. v. Amerada Hess Shipping Corp.*,
　488 U.S. 428 (1989) ............................................................................... 16

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009) ............................................................................... 10

*Atherton v. D.C. Off. of Mayor*,
　567 F.3d 672 (D.C. Cir. 2009) ............................................................... 10

*Barr v. Clinton*,
　370 F.3d 1196 (D.C. Cir. 2004) ............................................................... 9

** *Bell Atl. Corp. v. Twombly*,
　550 U.S. 544 (2007) ............................................................................... 10

*BellSouth Corp. v. FCC*,
　144 F.3d 58 (D.C. Cir. 1998) ................................................................. 32

*Bennett v. Spear*,
　520 U.S. 154 (1997) ............................................................................... 35

*Bolling v. Sharpe*,
　347 U.S. 497 (1954) ............................................................................... 24

*Bowen v. Massachusetts*,
　487 U.S. 879 (1988) ............................................................................... 39

*Brandon v. D.C. Bd. of Parole*,
　823 F.2d 644 (D.C. Cir. 1987) ............................................................... 25

*Broadgate Inc. v. U.S. Citizenship & Immigr. Servs.*,
  730 F. Supp. 2d 240 (D.D.C. 2010) ...................................................... 42

*Cal. Dep't of Corr. v. Morales*,
  514 U.S. 499 (1995) .......................................................................... 33

*Chamber of Com. of U.S. v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) ............................................................ 11

*Church v. Biden*,
  573 F. Supp. 3d 118  (D.D.C. 2021) .................................................... 18

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) .......................................................................... 17

*Cohen v. United States*,
  151 F.3d 1338 (11th Cir. 1998) ..................................................... 12, 13

*Collins v. Youngblood*,
  497 U.S. 37 (1990) ............................................................................ 33

*Corr. Servs. Corp. v. Malesko*,
  534 U.S. 61 (2001) ............................................................................ 39

*CropLife Am. v. EPA*,
  329 F.3d 876 (D.C. Cir. 2003) ............................................................ 36

** *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
  452 F.3d 798 (D.C. Cir. 2006) ..................................................... *passim*

*Davis v. BOP*,
  No. 15-cv-884, 2016 WL 1156755 (D. Colo. Mar. 24, 2016) ................. 29

*Delaney v. DeTella*,
  256 F.3d 679 (7th Cir. 2001) .............................................................. 31

*Dobbert v. Florida*,
  432 U.S. 282 (1977) .......................................................................... 33

*Doe v. McHenry*,
  763 F. Supp. 3d 81 (D.D.C. 2025) ...................................................... 15

*Dynalantic Corp. v. Dep't of Defense*,
  115 F.3d 1012 (D.C. Cir. 1997) .......................................................... 18

*Edwards v. Carter*,
    445 F. Supp. 1279 (D.D.C. 1978) ............................................................... 18

*Egbert v. Boule*,
    596 U.S. 482 (2022) ................................................................................ 32

** *Farmer v. Brennan*,
    511 U.S. 825 (1994) ...................................................................... 28, 30, 31

*FDA v. Wages & White Lion Invs., L.L.C.*,
    145 S. Ct. 898 (2025) ........................................................................ 40, 41

*FDIC v. Meyer*,
    510 U.S. 471 (1994) .................................................................................. 11

*Fin. Mkts. Ass'n v. U.S. Commodity Futures Trading Comm'n*,
    67 F. Supp. 3d 373 (D.D.C. 2014) ............................................................... 37

*Fletcher v. DOJ*,
    17 F. Supp. 3d 89 (D.D.C. 2014) ................................................................. 11

*Garcia v. Vilsack*,
    563 F.3d 519 (D.C. Cir. 2009) .................................................................... 39

*Garner v. Jones*,
    529 U.S. 244 (2000) ................................................................................ 33

*Georgacarakos v. Wiley*,
    No. 07-cv-1712, 2010 WL 1291833 (D. Colo. Mar. 30, 2010) ................................ 31

*Gowadia v. Stearns*,
    596 F. App'x 667 (10th Cir. 2014) ............................................................... 29

*Harrison v. BOP*,
    248 F. Supp. 3d 172 (D.D.C. 2017) .............................................................. 12

*Hatch v. Dist. of Columbia*,
    184 F.3d 846 (D.C. Cir. 1999) .................................................................... 21

*Hatim v. Obama*,
    760 F.3d 54 (D.C. Cir. 2014) ...................................................................... 26

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ................................................................................ 38

*Hemphill v. Dep't of Treasury*,
　No. 21-cv-673 (TJK), 2021 WL 5038655 (D.D.C. Oct. 29, 2021) ............................................ 10

*Hewitt v. Helms*,
　459 U.S. 460 (1983) .................................................................................................................... 22

*Hidalgo v. FBI*,
　344 F.3d 1256 (D.C. Cir. 2003) .................................................................................................. 39

*Hill v. Pugh*,
　75 F. App'x 715 (10th Cir. 2003) ............................................................................................... 29

*Hudson v. McMillian*,
　503 U.S. 1 (1992) ................................................................................................................... 29, 37

*In re Robinson*,
　917 F.3d 856 (5th Cir. 2019) ....................................................................................................... 3

*Info. Ctr. v. DHS*,
　653 F.3d 1 (D.C. Cir. 2011) ....................................................................................................... 42

*J. Roderick MacArthur Found. v. FBI*,
　102 F.3d 600 (D.C. Cir. 1996) .................................................................................................... 17

*James v. Reno*,
　39 F. Supp. 2d 37 (D.D.C. 1999),
　*aff'd*, No. 99-5081, 1999 WL 615084 (D.C. Cir. July 2, 1999) ................................................. 26

*Jerome Stevens Pharms., Inc. v. FDA*,
　402 F.3d 1249 (D.C. Cir. 2005) .................................................................................................. 10

*Johnson v. Daley*,
　339 F.3d 582 (7th Cir. 2003) ..................................................................................................... 24

*Jones v. Bock*,
　549 U.S. 199 (2007) .................................................................................................................... 19

*Jordan v. BOP*,
　191 F. App'x 639 (10th Cir. 2006) ............................................................................................. 21

*Kaemmerling v. Lappin*,
　553 F.3d 669 (D.C. Cir. 2008) .................................................................................................... 20

*Kelley v. District of Columbia*,
　893 F. Supp. 2d 115 (D.D.C. 2012) ........................................................................................... 23

*Khadr v. United States*,
    529 F.3d 1112 (D.C. Cir. 2008) ................................................................ 9

*Kiyemba v. Obama*,
    605 F.3d 1046 (D.C. Cir. 2010) .............................................................. 33

*Knapp Med. Ctr. v. Hargan*,
    875 F.3d 1125 (D.C. Cir. 2017) .............................................................. 16

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994) ................................................................................ 9

*Ky. Dep't of Corr. v. Thompson*,
    490 U.S. 454 (1989) ........................................................................ 20, 21

*Lane v. Peña*,
    518 U.S. 187 (1996) .............................................................................. 11

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ........................................................................ 38, 41

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .............................................................................. 17

*Lyle v. Sivley*,
    805 F. Supp. 755 (D. Ariz. 1992) .......................................................... 12

*Marshall v. Reno*,
    915 F. Supp. 426 (D.D.C. 1996) ............................................................ 25

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) .............................................................................. 22

*McKune v. Lile*,
    536 U.S. 24 (2002) ................................................................................ 38

*McMillan v. Wiley*,
    813 F. Supp. 2d 1238 (D. Colo. 2011) .................................................. 29

*Meachum v. Fano*,
    427 U.S. 215 (1976) ...................................................................... 14, 21, 25

*Molycorp, Inc. v. EPA*,
    197 F.3d 543 (D.C. Cir. 1999) .......................................................... 36, 37

*Morrisey v. Brewer,*
  408 U.S. 471 (1972) ................................................................... 22

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ...................................................................... 40

*Nat'l Ass'n of Broadcasters v. Fed. Commc'ns Comm'n,*
  --- F.4th ---, 2025 WL 2178565 (D.C. Cir. Aug. 1, 2025) .......... 42

*Nat'l Ass'n of Home Builders v. Norton,*
  415 F.3d 8 (D.C. Cir. 2005) ....................................................... 37

*Nixon v. Adm'r of Gen. Servs.,*
  433 U.S. 425 (1977) ............................................................. 32, 33

*Palmore v. United States,*
  411 U.S. 389 (1973) ................................................................... 16

*Paradissiotis v. Rubin,*
  171 F.3d 983 (5th Cir. 1999) ..................................................... 32

*Patchak v. Zinke,*
  583 U.S. 244 (2018) ................................................................... 16

*PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.,*
  588 U.S. 1 (2019) ....................................................................... 41

*Pearson v. Ramos,*
  237 F.3d 881 (7th Cir. 2001) ..................................................... 28

*Perry Cap. LLC v. Mnuchin,*
  864 F.3d 591 (D.C. Cir. 2017) ................................................... 39

*Phillips v. Hawk,*
  No. 98-5513, 1999 WL 325487 (D.C. Cir. Apr. 14, 1999) .......... 43

*Pinson v. DOJ,*
  514 F. Supp. 3d 232 (D.D.C. 2021) ........................................... 14

*Plyler v. Doe,*
  457 U.S. 202 (1982) ................................................................... 24

*Porche v. Salazar,*
  No. 3:19-cv-77, 2019 WL 1373683 (D. Or. Mar. 5, 2019) .......... 15

*Porter v. CIA*,
    778 F. Supp. 2d 60 (D.C. Cir. 2011) ................................................................ 10

*Porter v. Nussle*,
    534 U.S. 516 (2002) ......................................................................................... 19

*Preiser v. Rodriguez*,
    411 U.S. 475 (1973) ......................................................................................... 26

*Procunier v. Martinez*,
    416 U.S. 396 (1974) ......................................................................................... 22

*Prows v. BOP*,
    981 F.2d 466 (10th Cir. 1992) ......................................................................... 12

*Pryor-El v. Kelly*,
    892 F. Supp. 261 (D.D.C. 1995) ............................................................ 24, 25, 26

*Quinn v. Wexford Health Sources, Inc.*,
    8 F.4th 557 (7th Cir. 2021) .............................................................................. 28

*RCM Techs., Inc. v. DHS*,
    614 F. Supp. 2d 39 (D.D.C. 2009) ................................................................... 37

*Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) ............................................................................................. 41

*Reno v. Koray*,
    515 U.S. 50 (1995) ........................................................................................... 43

*Reynolds v. Quiros*,
    990 F.3d 286 (2d Cir. 2021) ............................................................................. 25

** *Rezaq v. Nalley*,
    677 F.3d 1001 (10th Cir. 2012) ............................................................ 21, 22, 31

*Rhodes v. Chapman*,
    452 U.S. 337 (1981) ............................................................................ 26, 28, 29

*Ross v. Blake*,
    578 U.S. 632 (2016) ......................................................................................... 20

*Royer v. BOP*,
    933 F. Supp. 2d 170 (D.D.C. 2013) ............................................................ 15, 16

*Sadler v. DOJ*,
   No. 18-cv-1695, 2019 WL 4644030 (D.D.C. Sept. 23, 2019) ........................................ 12, 13

*Sanders v. Kerry*,
   180 F. Supp. 3d 35 (D.D.C. 2016) ........................................................................... 10

*Sandin v. Conner*,
   515 U.S. 472 (1995) ............................................................................................... 21

*Schick v. Reed*,
   419 U.S. 256 (1974) ............................................................................................... 34

*Sharifymoghaddam v. Blinken*,
   No. 23-cv-1472, 2023 WL 8047007 (D.D.C. Nov. 17, 2023) ..................................... 2

*Silva v. United States*,
   45 F.4th 1134 (10th Cir. 2022) ............................................................................... 39

*Silver State Land, LLC v. Schneider*,
   145 F. Supp. 3d 113 (D.D.C. 2015), *aff'd*, 843 F.3d 982 (D.C. Cir. 2016) ............... 39

*Silverstein v. BOP*,
   559 F. App'x 739 (10th Cir. 2014) .......................................................................... 29

*Speelman v. United States*,
   461 F. Supp. 2d 71 (D.D.C. 2006) ............................................................................ 9

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ............................................................................................... 17

*Sprint Commc'ns Co. v. APCC Servs., Inc.*,
   554 U.S. 269 (2008) ............................................................................................... 17

*Thye v. United States*,
   109 F.3d 127 (2d Cir. 1997) .................................................................................... 14

*Tingzi Wang v. USCIS*,
   375 F. Supp. 3d 22 (D.D.C. 2019) ........................................................................... 42

*Trump v. New York*,
   592 U.S. 125 (2020) .......................................................................................... 18, 19

*Tucker v. Branker*,
   142 F.3d 1294 (D.C. Cir. 1998) ............................................................................... 24

*Turner v. Safley*,
  482 U.S. 78 (1987)........................................................................................................26

*United States v. Basham*,
  561 F.3d 302 (4th Cir. 2009).........................................................................................3

*United States v. Council*,
  77 F.4th 240 (4th Cir. 2023)..........................................................................................3

*United States v. Hager*,
  721 F.3d 167 (4th Cir. 2013).........................................................................................3

*United States v. Jackson*,
  327 F.3d 273 (4th Cir. 2003).........................................................................................3

*United States v. King*,
  338 F.3d 794 (7th Cir. 2003).......................................................................................12

*United States v. Lawrence*,
  735 F.3d 385 (6th Cir. 2013).........................................................................................3

*United States v. Mikhel*,
  889 F.3d 1003 (9th Cir. 2018).......................................................................................3

*United States v. Mikos*,
  539 F.3d 706 (7th Cir. 2008).........................................................................................3

*United States v. Runyon*,
  707 F.3d 475 (4th Cir. 2013).........................................................................................4

*United States v. Taylor*,
  814 F.3d 340 (6th Cir. 2016).........................................................................................3

*United States v. Tipton*,
  95 F.4th 831 (4th Cir. 2024)..........................................................................................4

*United States v. Torrez*,
  869 F.3d 291 (4th Cir. 2017).........................................................................................4

*United States v. Troya*,
  733 F.3d 1125 (11th Cir. 2013).....................................................................................4

*United States v. Umaña*,
  750 F.3d 320 (4th Cir. 2014).........................................................................................4

*Warren v. U.S. Parole Comm'n,*
    659 F.2d 183 (D.C. Cir. 1981)..............................................................................33

*Webster v. Doe,*
    486 U.S. 592 (1988).............................................................................................15

*Westefer v. Snyder,*
    422 F.3d 570 (7th Cir. 2005)...............................................................................33

*Wilkinson v. Austin,*
    545 U.S. 209 (2005)..................................................................................21, 22, 23

*Wills v. Barnhardt,*
    No. 21-1383, 2022 WL 4481492 (10th Cir. Sept. 27, 2022)............................14, 15

*Women Prisoners of D.C. Dep't of Corrs. v. Dist. of Columbia,*
    93 F.3d 910 (D.C. Cir. 1996)...............................................................................24

*Woodford v. Ngo,*
    548 U.S. 81 (2006)...............................................................................................20

**STATUTES**

5 U.S.C. § 553..............................................................................................................41

** 5 U.S.C. § 701.........................................................................................................38

** 5 U.S.C. § 702....................................................................................................11, 13

** 5 U.S.C. § 704....................................................................................................35, 39

** 5 U.S.C. § 706.........................................................................................................39

** 18 U.S.C. § 3621............................................................................................ *passim*

** 18 U.S.C. § 3625................................................................................................12, 16

** 18 U.S.C. § 4041.................................................................................................2, 40

** 18 U.S.C. § 4042..............................................................................................2, 3, 38

18 U.S.C. § 4083...........................................................................................................14

28 U.S.C. § 503.........................................................................................................2, 40

28 U.S.C. § 509............................................................................................................40

** 42 U.S.C. § 1997e ................................................................................................ 19

Act of May 14, 1930, Pub. L. No. 71-218, 46 Stat. 325 ........................................................ 2

** First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 ........................................... 14, 16

**RULES**

** Fed. R. Civ. P. 12(1) ........................................................................................ *passim*

** Fed. R. Civ. P. 12(6) ........................................................................................ *passim*

LCvR 7(n) .......................................................................................................... 1

**REGULATIONS**

28 C.F.R. § 542.13 ............................................................................................... 19

28 C.F.R. § 542.14 ............................................................................................... 19

28 C.F.R. § 542.15 ............................................................................................... 19

**EXECUTIVE ORDER**

Exec. Order No. 14,164, 90 Fed. Reg. 8463 (Jan. 20, 2025) ............................................. *passim*

** Pursuant to Local Civil Rule 7(a), Defendants' counsel has placed asterisks in the margin to the left of those cases and authorities on which Defendants chiefly rely.

## INDEX OF COMPLAINT EXHIBITS CITED

Compl. Ex. 1     ECF 1-1     Executive Grant of Clemency (Dec. 23, 2024) ("Clemency Grant")

Compl. Ex. 2     ECF 1-2     Executive Order 14164 of January 20, 2025, *Restoring the Death Penalty and Protecting Public Safety*, 90 Fed. Reg. 8,463 (Jan. 30, 2025) ("EO 14164")

Compl. Ex. 3     ECF 1-3     Memorandum from the Attorney General, to Department of Justice Employees, *Restoring a Measure of Justice to the Families of Victims of Commuted Murderers* (Feb. 5, 2025) ("AG Memo")

Compl. Ex. 5     ECF 1-5     BOP Program Statement 5310.16, *Treatment and Care of Inmates with Mental Illness* (as amended Feb. 18, 2025) ("PS 5310.16")

Compl. Ex. 6     ECF 1-6     BOP Program Statement 5100.08, *Inmate Security Designation and Custody Classification* (as amended Mar. 6, 2025) ("PS 5100.08")

Compl. Ex. 7     ECF 1-7     Memorandum from Assistant Director, Correctional Programs Division, Federal Bureau of Prisons, *Administrative Maximum Facility (ADX) General Population Referral Procedures* (Oct. 15, 2012) ("ADX Referral Memo")

## INTRODUCTION

Congress has vested the Federal Bureau of Prisons ("BOP") with broad authority to manage the imprisonment of federal inmates to best serve the penological purposes of imprisonment, public safety, and the needs of prisoners. Included within that statutorily granted authority is the discretion to designate the place in which any individual prisoner should be held in custody.

Plaintiffs are 21 federal prisoners who were sentenced to death for their crimes of conviction. On December 23, 2024, the White House announced that former President Biden took the unprecedented step of commuting the sentences of virtually all prisoners on federal death row—37 in total, including the 21 Plaintiffs—to life imprisonment without the possibility of parole. Thereafter, BOP began the process of finding an alternate facility for these 37 inmates whose death sentence had been commuted, in accordance with BOP policy.

Plaintiffs challenge Defendants' implementation of a January 20, 2025, Executive Order that directed the Attorney General to "evaluate" the places of imprisonment and conditions of confinement for the recent commuted inmates, and a February 5, 2025 memorandum from the Attorney General that directed BOP to "ensure that the conditions of confinement" for each of the commuted inmates is "consistent with the security risks those inmates present." They seek to interrupt BOP's policy-driven process by claiming that their redesignation to the Administrative Maximum United States Penitentiary in Florence, Colorado ("ADX Florence")—the conditions of which Plaintiffs disfavor—should be enjoined. According to Plaintiffs, by virtue of the Executive Order and the Attorney General's memorandum, BOP's redesignation process was rendered a "sham," which predetermined Plaintiffs' placement at ADX Florence. Plaintiffs bring ten claims under the Constitution and Administrative Procedure Act ("APA").

Defendants move to dismiss all claims pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. First, the Court lacks subject-matter jurisdiction, and

1

accordingly must dismiss Plaintiffs' claims without reaching the merits. Defendants have not waived sovereign immunity; BOP's placement decisions are unreviewable; Plaintiffs lack standing; and Plaintiffs' claims are unripe. Second, Plaintiffs' claims are also subject to dismissal because Plaintiffs have not exhausted their administrative remedies. Third, even on the merits, each of Plaintiffs' claims—including their seven Constitutional claims and three Administrative Procedure Act claims—fails as a matter of law. For these reasons, and as discussed further below, the Court should grant Defendants' motion to dismiss pursuant to Rule 12(b)(1) or, alternatively, pursuant to Rule 12(b)(6).[1]

## FACTUAL AND LEGAL BACKGROUND

### I.    The Attorney General's Oversight of BOP, and BOP's Authority to Designate Inmates' Place of Imprisonment

"The Attorney General is the head of the Department of Justice." 28 U.S.C. § 503. Congress established the BOP within the Department of Justice and specified that BOP's director shall be "appointed by and serve directly under the Attorney General." Act of May 14, 1930, Pub. L. No. 71-218, 46 Stat. 325 (1930), codified as amended at 18 U.S.C. § 4041. The Attorney General "may appoint such additional officers and employees as [s]he deems necessary." 18 U.S.C. § 4041. When establishing BOP, Congress further provided that the duties of BOP shall be performed "under the direction of the Attorney General." *Id*. § 4042. Those duties include "hav[ing] charge of the management and regulation of all Federal penal and correctional

---

[1] Local Civil Rule 7(n) provides for the filing of a certified list of the contents of the administrative record "[i]n cases involving the judicial review of administrative agency actions." D.D.C. Local Civ. R. 7(n). Here, because Plaintiffs have prematurely come into court, challenging non-final agency actions prior to exhaustion of their administrative remedies, this case does not involve the judicial review of "administrative agency actions," and thus Local Civil Rule 7(n) does not apply. To the extent the Court deems that it does apply, Defendants request to file the certified list of the contents of the administrative record at a later stage of the case, after the motion to dismiss is decided. Adjudication of this Motion does not require consideration of the administrative record, and courts in this District "routinely allow agencies to waive compliance with Rule 7(n)(1)" where, as here, "the administrative record is not necessary for the court's decision." *Sharifymoghaddam v. Blinken*, No. 23-cv-1472, 2023 WL 8047007, at *3 (D.D.C. Nov. 17, 2023) (collecting cases).

institutions," and "provid[ing] suitable quarters" for federal inmates, among others.  *Id.* § 4042(a).

Persons who are sentenced "to a term of imprisonment" in federal court are "committed to the custody" of BOP "until the expiration of the term imposed."  18 U.S.C. § 3621(a).  Initial BOP facility assignments are called "designations," and reassignments are "redesignations."  *See* BOP Program Statement 5100.08 at Ch. 1 p.1 & Ch. 2 p.6, ECF No. 1-6 (Ex. 6 to Compl.) (hereafter, "PS 5100.08").  Congress has tasked BOP with "designat[ing] the place of the prisoner's imprisonment" and authorized it to "designate any available penal or correctional facility" meeting "minimum standards of health and habitability" that BOP "determines to be appropriate and suitable."  18 U.S.C. § 3621(b); *see also* Compl. ¶ 48, ECF No. 1 (acknowledging that "[f]ederal law and regulations give . . . BOP the exclusive authority to determine the institutional placement of every person in its custody").

In exercising its broad discretion to make designation and redesignation decisions, BOP considers "the resources of the facility contemplated," "the nature and circumstances of the offense," "the history and characteristics of the prisoner," any statement by the sentencing court about the "purposes" of imprisonment or the "type of penal or correctional facility," and pertinent policy statements by the Sentencing Commission.  18 U.S.C. § 3621(b)(1)–(5).

## II.    Commutation of Plaintiffs' Death Sentences, and BOP's Housing Redesignations Process

Plaintiffs are federal prisoners whose crimes of conviction include bank robbery, carjacking, racketeering, and rape; all were convicted of at least one count of murder, and many have escaped (or attempted to escape) confinement.[2]  On December 23, 2024, the White House

---

[2] *See, e.g.*, *United States v. Taylor*, 814 F.3d 340 (6th Cir. 2016); *United States v. Basham*, 561 F.3d 302 (4th Cir. 2009); *United States v. Council*, 77 F.4th 240 (4th Cir. 2023); *United States v. Hager*, 721 F.3d 167 (4th Cir. 2013); *United States v. Jackson*, 327 F.3d 273 (4th Cir. 2003); *United States v. Mikhel*, 889 F.3d 1003 (9th Cir. 2018); *United States v. Lawrence*, 735 F.3d 385 (6th Cir. 2013); *United States v. Mikos*, 539 F.3d 706 (7th Cir. 2008); *In re Robinson*, 917 F.3d 856 (5th Cir. 2019);

announced that former President Biden commuted the death sentences of 37 of the 40 federal inmates who had been sentenced to death, including Plaintiffs' death sentences, to life imprisonment without the possibility of parole.  ECF No. 1-1 (Ex. 1 to Compl.) (hereafter "Clemency Grant"); *see* Compl. ¶ 2.  Thereafter, "BOP officials began working . . . to reclassify and transfer" the commuted inmates from the Special Confinement Unit ("SCU") at U.S. Penitentiary Terre Haute ("USP Terre Haute")—where most federal death row inmates are housed—to a different BOP facility.  *See* Compl. ¶ 4.  Plaintiffs allege that "BOP officials recommended in the first instance that most Plaintiffs be redesignated from the SCU to high security USPs or BOP health care facilities." *Id.*

On January 20, 2025, President Trump issued an Executive Order titled "Restoring the Death Penalty and Protecting Public Safety." *See* Exec. Order No. 14,164, 90 Fed. Reg. 8463 (Jan. 20, 2025), ECF No. 1-2 (Ex. 2 to Compl.) (hereafter, the "Executive Order" or "EO 14164").  The Executive Order states that capital punishment is essential for deterring heinous crimes and ensuring justice, *id.* § 1, and it directs the Attorney General to take certain actions consistent with that policy statement, *id.* §§ 3–6.  As relevant here, the Executive Order directs the Attorney General to "evaluate" the places of imprisonment and conditions of confinement for each of the 37 inmates whose death sentences had been commuted by former President Biden, and to "take all lawful and appropriate action to ensure that these offenders are imprisoned in conditions consistent with the monstrosity of their crimes and the threats they pose." *Id.*  § 3(e).  The Executive Order notes that "[n]othing in this order shall be construed to impair or otherwise affect . . . the authority granted by law to an executive department or agency, or the head thereof." *Id.* § 7(a)(i).

---

*United States v. Runyon*, 707 F.3d 475 (4th Cir. 2013); *United States v. Troya*, 733 F.3d 1125 (11th Cir. 2013); *United States v. Tipton*, 95 F.4th 831 (4th Cir. 2024); *United States v. Torrez*, 869 F.3d 291 (4th Cir. 2017); *United States v. Umaña*, 750 F.3d 320 (4th Cir. 2014).

On February 5, 2025, Attorney General Bondi issued a one-page guidance memorandum to Department of Justice employees, titled "Restoring a Measure of Justice to the Families of Victims of Commuted Murderers." *See* ECF No. 1-3 (Ex. 3 to Compl.) (hereafter, the "AG Memo"). The AG Memo states that the December 2024 death sentence commutations had "undermined our justice system" and "robbed the victims' families of the justice promised." *Id.* The AG Memo directs the Department to take certain actions, and includes a direction to BOP to "ensure that the conditions of confinement for each of the 37 commuted murderers are consistent with the security risks those inmates present." *Id.* The AG Memo states that "[t]his guidance is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person." *Id.* n.1.

As noted above, BOP had already begun the redesignation process when the AG Memo issued. *See* Compl. ¶¶ 4, 77, 79. BOP's process is outlined in BOP Program Statement 5100.08, which "provides policy and procedure regarding [BOP's] inmate classification system," in recognition that "classification of inmates is necessary to place each inmate in the most appropriate security level institution that also meets their program needs and is consistent with the Bureau's mission to protect society." PS 5100.08 § 1. BOP institutions are classified into one of five security levels, of which "Administrative" is the highest, based on "the level of security and staff supervision the institution is able to provide." *Id.*, Ch. 1 p.1; *see also* BOP, *About Our Facilities*, https://www.bop.gov/about/facilities/federal_prisons.jsp (last visited Aug. 6, 2025) (explaining that Administrative Facilities are "institutions with special missions," such as "the containment of extremely dangerous, violent, or escape-prone inmates").

Plaintiffs allege that at least by the time they filed their Complaint, BOP had begun the specific process of redesignating them to the "General Population" unit at ADX Florence ("ADX-

GP"), an Administrative facility in BOP's North Central Region.  *See* Compl. ¶¶ 69 n.21, 86–90,

120.  The process for redesignation to ADX-GP is governed by PS 5100.08, Chapter 7, and by an

October 15, 2012, Memorandum from the Assistant Director of BOP's Correctional Programs

Division ("CPD"), ECF No. 1-7 (Ex. 7 to Compl.) (hereafter, "the ADX Referral Memo").  Compl.

¶ 66.  The ADX Referral Memo provides that an inmate referred to the ADX-GP will meet one or

both of the following criteria: (i) the inmate's placement in other correctional facilities "creates a

risk to institutional security and good order or poses a risk to the safety of staff, inmates, others,

or to public safety," or (ii) as a result of the inmate's status, either before or after incarceration, the

inmate "may not be safely housed in the general population of another institution."  ADX Referral

Memo, Attach. A at 1.  The ADX Referral Memo prescribes the following, multistep process for

redesignating a federal inmate to ADX-GP:

 ***First***, facility staff transmit their referral packet to the originating facility's Warden.  ADX

Referral Memo, Attach. A at 2–3; Compl. ¶ 69.  If the Warden concurs with referral, the referral

packet is signed and forwarded to the Regional Director.  ADX Referral Memo, Attach. A at 3; PS

5100.08, Ch. 7 p.17 (§ 21(b)(1)).  If the Regional Director concurs with referral, the referral packet

is submitted to the Designation and Sentence Computation Center ("DSCC")—the BOP office

where the BOP's classification and designation functions are centralized.  ADX Referral Memo,

Attach. A at 3.  DSCC staff "conduct an initial assessment of the referral packet and the inmate's

need for placement at ADX-GP."  *Id.*  Simultaneously, the DSCC forwards the packet to the

Administrator of Psychology Services at BOP's Central Office.  *Id.*  If the DSCC determines the

inmate is not appropriate for ADX-GP placement, it sends the packet to the Assistant Director for

CPD, who notifies the referring Warden.  *Id.*

 ***Second***, if the DSCC determines the inmate is appropriate for ADX-GP placement, BOP

provides the inmate a "due process hearing" on the proposed referral.  ADX Referral Memo at 1.

A designated Hearing Administrator provides inmates with a Notice of Hearing, which includes the "[s]pecific evidence" that forms the basis for the referral (unless such information would jeopardize the safety and security of the institution or endanger staff or others). *Id.*, Attach. A at 6. The Hearing Administrator is required to have significant correctional experience, and to "be familiar with BOP policies and operations, including the criteria for placement of inmates in different institutions with emphasis on the ADX." *Id.*, Attach. A at 6. The inmate can attend and participate in the hearing, and present evidence. *Id.*, Attach. A at 6–7; Compl. ¶¶ 72–73.

**Third**, at the conclusion of the hearing and following a review of all material, the Hearing Administrator "shall prepare a written recommendation on whether placement of the inmate at the ADX is warranted." ADX Referral Memo, Attach. A at 7; Compl. ¶ 74. Within (ordinarily) 30 working days of receiving the Hearing Administrator's report, the CPD Assistant Director or designee "shall accept or reject" the Hearing Administrator's recommendation. ADX Referral Memo, Attach. A at 8. The Assistant Director will notify the Senior Deputy Assistant Director over the DSCC ("SDAD, DSCC"),[3] of their "final decision." *Id.*

**Fourth**, and finally, if an inmate disagrees with a final decision of redesignation to ADX-GP, the inmate may appeal through BOP's Administrative Remedy Program—first to the SDAD, DSCC, and then again to the Office of General Counsel. *Id.*; *see also* Compl. ¶ 76.

Plaintiffs allege that "beginning in the second week of April 2025, BOP Hearing Administrators conducted ADX hearings by videoconference for each Plaintiff," Compl. ¶ 90, and that the Hearing Administrator recommended that ADX placement was "warranted" for each of them, *id.* ¶ 91. As of the time that Plaintiffs filed the Complaint, the CPD Assistant Director had

---

[3] Formerly referred to as the Chief, DSCC, as indicated in the ADX Referral Memo.

not made a redesignation determination for any of the Plaintiffs.[4]  *See* Compl. ¶¶ 75–76, 96.  Nor

had the Administrative Remedy Program appeals process begun.  *See id.* ¶ 76.  For those Plaintiffs

who were later redesignated to ADX, and who administratively appealed their redesignation, that

process has not yet been completed.[5]  *See* Status Report at 3, *Kadamovas v. BOP*, No. 23-cv-22

(S.D. Ind. Aug. 7, 2025.), ECF No. 165 ("*Kadamovas* Status Report").

## III.    Plaintiffs' Claims

On April 16, 2025, Plaintiffs filed the instant lawsuit.  The Complaint defines the phrase

"Redesignation Directive" to include "EO 14164, the [AG] Memo, and the [alleged] new [but

unspecified] orders, procedures, and [allegedly] predetermined decisions made pursuant to it."

Compl. ¶ 7.  Plaintiffs assert that "[b]ut for" the Executive Order, AG Memo, and the so-called

"Redesignation Directive," Plaintiffs "would not be assigned to ADX."  Compl. ¶ 122.  Plaintiffs

bring ten claims against Defendants President Trump; the Attorney General; the Principal

Associate Deputy Attorney General; BOP; and various BOP officials, all in their official

capacities.  *Id.* ¶¶ 35–43.[6]  With the exception of Counts 8 through 10, which are brought only

against Defendants Bondi and Bove, the claims are brought against all Defendants: (1) Fifth

Amendment—Procedural Due Process; (2) Fifth Amendment—Equal Protection; (3) Eighth

Amendment—Cruel and Unusual Punishment; (4) Eighth Amendment—Deliberate Indifference

to Medical/Mental Health Needs; (5) Article I, § 9—Bill of Attainder; (6) Article I, § 9—Ex Post

---

[4] One Plaintiff—Brandon Basham—has since been redesignated and transferred, but not to ADX. Instead, he is incarcerated at MCFP Springfield, which is a federal medical center.  *See* https://www.bop.gov/inmateloc/ (results of "Find By Name" search for Brandom Basham) (last visited Aug. 6, 2025).

[5] Two Plaintiffs either did not submit Administrative Remedy appeals regarding their designation to ADX-GP or did not properly do so.  *See Kadamovas* Status Report at 3 n.1.

[6] The named BOP officials are: the BOP Director; the BOP Associate Deputy Director; the BOP Assistant Director of the Correctional Programs Division; the BOP Senior Deputy Assistant Director of the DSCC; and the BOP North Central Regional Director. Compl. ¶¶ 38–42.

Facto; (7) Article II, § 2—Clemency Power; (8) Administrative Procedure Act ("APA")—Agency Action in Excess of Statutory Jurisdiction or Authority, or Otherwise not in Accordance with Law; (9) APA—Arbitrary and Capricious Agency Conduct; and (10) APA—Notice and Comment. Compl. ¶¶ 10, 126–203. Counts 1 through 7 challenge the so-called "Redesignation Directive," and Counts 8 through 10 challenge the AG Memo. Plaintiffs seek a declaratory judgment that the Executive Order and AG Memo are unlawful, as well as injunctive relief. *Id.* ¶ 11; *id.* at 56–57 (Prayer for Relief).

Also on April 16, Plaintiffs filed a Motion for Temporary Restraining Order, which pursued six of the ten Counts in their Complaint. ECF No. 2. The Court converted Plaintiffs' Motion for Temporary Restraining Order to a Motion for Preliminary Injunction, and it denied that Motion on May 27, 2025, holding that Plaintiffs were not likely to succeed on the merits of their clams because they had not exhausted their available administrative remedies. Order on Pls.' Mot. for Prelim. Inj. at 2, ECF No. 50 ("PI Order").

Defendants now move to dismiss all claims pursuant to Rules 12(b)(1) and 12(b)(6).

## LEGAL STANDARDS

Motions brought pursuant to Rule 12(b)(1) challenge whether the district court has jurisdiction over the action. *See* Fed. R. Civ. P. 12(b)(1). "Federal courts are courts of limited jurisdiction," *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), and a party claiming subject matter jurisdiction bears the burden of demonstrating that jurisdiction exists, *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008). Although the Court must give the plaintiff the benefit of inferences that can be derived from the facts alleged in the complaint, *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004), "the Court need not accept factual inferences drawn by plaintiff[] if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiff['s] legal conclusions," *Speelman v. United States*, 461 F. Supp. 2d

71, 73 (D.D.C. 2006). When resolving a motion made under Rule 12(b)(1), a court may consider material beyond the allegations in the plaintiff's complaint. *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253–54 (D.C. Cir. 2005).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court will ordinarily "accept as true all of the factual allegations contained in the complaint," *Atherton v. D.C. Off. of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009) (citation omitted), and construe the allegations in the plaintiff's favor, *Porter v. CIA*, 778 F. Supp. 2d 60, 65 (D.C. Cir. 2011). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions" or to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. To resolve a Rule 12(b)(6) Motion, the Court may consider documents that are: (i) referenced in the complaint and central to a plaintiff's claims; and/or (ii) "public documents of which a court may take judicial notice." *Sanders v. Kerry*, 180 F. Supp. 3d 35, 41 (D.D.C. 2016) (cleaned up); *see Hemphill v. Dep't of Treasury*, No. 21-cv-673 (TJK), 2021 WL 5038655, at *3 (D.D.C. Oct. 29, 2021), *aff'd*, No. 21-5261, 2022 WL 1701529 (D.C. Cir. May 25, 2022) (per curiam).

## ARGUMENT

This Court should dismiss Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) because, for several reasons, it lacks jurisdiction. Even if there were jurisdiction, Plaintiffs have failed to exhaust administrative remedies as required by the Prison Litigation Reform Act ("PLRA"). Additionally, Plaintiffs fail to state any claim upon which relief can be granted, and the Complaint should be dismissed pursuant to Rule 12(b)(6).

## I.        The Court Lacks Subject Matter Jurisdiction

Plaintiffs' ten counts and their requested relief all focus on BOP's redesignation of their place of imprisonment, purportedly from USP Terre Haute to ADX Florence.  As a result, this Court has no jurisdiction to hear these claims.  First, the United States is immune from Plaintiffs' claims, because the APA's waiver of sovereign immunity in 5 U.S.C. § 702 expressly excludes BOP's designation decisions.  Absent a waiver of sovereign immunity, there is no subject-matter jurisdiction.  Even if there were some as-yet-unidentified waiver of sovereign immunity that covered Plaintiffs' claims, Congress affirmatively precluded judicial review of BOP's housing-placement decisions in a separate statutory provision enacted with the First Step Act of 2018 ("FSA").  Finally, Plaintiffs do not plausibly allege facts that meet the constitutional requirements of Article III standing and ripeness.  Pursuant to Rule 12(b)(1), the Complaint should be dismissed.

### A.        The United States has not waived sovereign immunity.

Plaintiffs' Complaint fails to plead a waiver of sovereign of immunity that supposedly supplies jurisdiction.  "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."  *FDIC v. Meyer*, 510 U.S. 471, 475 (1994); *see Fletcher v. DOJ*, 17 F. Supp. 3d 89, 93 (D.D.C. 2014) (plaintiffs bear the burden of establishing waiver).  And that waiver must be "unequivocally expressed in statutory text," and "will not be implied."  *Lane v. Peña*, 518 U.S. 187, 192 (1996).

There is no such waiver.  The only statute Plaintiffs even hint at for waiving jurisdiction is 5 U.S.C. § 702, *see* Compl. ¶ 12, but that provision does not apply to claims involving BOP placement decisions, regardless of how those claims are styled.  To be sure, the APA generally waives sovereign immunity for lawsuits against federal agencies for allegedly unlawful (or unconstitutional) agency actions when the plaintiff seeks a remedy "other than money damages," even when not brought under the APA.  5 U.S.C. § 702; *see Chamber of Com. of U.S. v. Reich*, 74

F.3d 1322, 1328 (D.C. Cir. 1996).  But, in 18 U.S.C. § 3625 (entitled "Inapplicability of the Administrative Procedure Act"), Congress decided that § 702 "do[es] not apply to the making of any determination, decision, or order" where to place or transfer a prisoner under § 3621(b).  In other words, "what the APA gives," Section 3625 "takes away," and the United States "has not waived sovereign immunity" for Plaintiffs' claims.  *See Harrison v. BOP*, 248 F. Supp. 3d 172, 182–83 (D.D.C. 2017); *accord Sadler v. DOJ*, No. 18-cv-1695, 2019 WL 4644030, at *4 (D.D.C. Sept. 23, 2019) (Kelly, J.) (holding that the court "lacks subject-matter jurisdiction" because, under § 3625, "no waiver of sovereign immunity applie[d] to [plaintiff's] constitutional claims").

Congress's decision under Section 3625 to retract the sovereign immunity waiver makes sense.  "In enacting section 3625, Congress intended to 'carve out' an area of decision making committed solely to agency discretion and not subject to judicial review."  *Lyle v. Sivley*, 805 F. Supp. 755, 759 (D. Ariz. 1992); *see United States v. King*, 338 F.3d 794, 798 (7th Cir. 2003) ("Under 18 U.S.C. § 3621(b), the BOP is authorized to house a prisoner . . . *anywhere* it deems appropriate." (emphasis added)); *Prows v. BOP*, 981 F.2d 466, 468 n.3 (10th Cir. 1992) ("Under 18 U.S.C. § 3621(b), the Bureau of Prisons . . . may direct confinement in any available facility and may transfer a prisoner from one facility to another at any time.").  And for good reason. "Deciding how to classify prisoners and choosing the institution in which to place them are part and parcel of the inherently policy-laden endeavor of maintaining order and preserving security within our nation's prisons."  *Cohen v. United States*, 151 F.3d 1338, 1344 (11th Cir. 1998). Section 3625 thus reflects Congress's judgment that the BOP should have the exclusive authority to decide where to incarcerate its prisoners—without interference from lawsuits like Plaintiffs'.

Plaintiffs hint that their claims relate to some broader action by Defendants that preceded Plaintiffs' formal redesignations to ADX.  *See, e.g.*, Compl. ¶ 7 (defining the "Redesignation Directive" that Plaintiffs purport to challenge).  However, the allegations in their Complaint are

pellucid: each of Plaintiffs' 10 Counts impermissibly attacks BOP's alleged decision to transfer Plaintiffs to ADX Florence. *See id.* ¶ 129 (Count 1—"Plaintiffs have a liberty interest in avoiding their transfer to ADX"); *id.* ¶ 141 (Count 2—Defendants "undertook a sham process of hearings and recommendations that was implemented with the intent to redesignate every Plaintiff to ADX"); *id.* ¶¶ 147–48 (Count 3—allegations about the conditions of confinement at ADX); *id.* ¶ 159 (Count 4—alleging deliberate indifference to potential harm to mentally ill Plaintiffs from placement in ADX); *id.* ¶ 166 (Count 5—alleging that but for Defendants' improper actions, Plaintiffs would not be designated to ADX); *id.* ¶ 172 (Count 6—alleging that Defendants will place Plaintiffs in "indefinite solitary confinement" at ADX, rather than follow "the usual process of BOP in making placement determinations"); *id.* ¶ 181 (Count 7—alleging that Defendants prevented Plaintiffs from being "redesignated to the general population of a penitentiary" and instead "redesignated [them] to the most notorious federal prison in the country[,]" *i.e.*, ADX); *id.* ¶ 185 (Count 8—alleging a "sham process that will condemn Plaintiffs to potentially indefinite incarceration in ADX"); *id.* ¶ 196 (Count 9—alleging irreparable harm from Plaintiffs' designation to ADX); *id.* ¶ 199 (Count 10—alleging that the "[AG] Memo," which Plaintiffs elsewhere allege caused them to be redesignated to the ADX, *see id.* ¶ 7, did not follow proper notice and comment procedures). Even the relief that Plaintiffs demand is aimed at their designations. *See id.* Prayer ¶ (B) (requesting an order "assign[ing] the Plaintiffs to housing locations" based on alleged initial designation recommendations by BOP staff that preceded the Executive Order and [AG] memo.).

Irrespective of how Plaintiffs may now attempt to reframe their allegations, fundamentally their Complaint attacks BOP's designation of their place of imprisonment under 18 U.S.C. § 3621(b). As a result, their claims are not subject to judicial review. *See* 18 U.S.C. §§ 3621(b), 3625; *Sadler*, 2019 WL 4644030, at *3. Because the waiver in 5 U.S.C. § 702 cannot cover Plaintiffs' attack on BOP's placement decisions, and Plaintiffs identify no other applicable waiver

of sovereign immunity, this Court has no jurisdiction to hear their claims.

**B.    Congress has specifically precluded judicial review of Plaintiffs' challenges to BOP's transfer process.**

Separately, Congress affirmatively precluded judicial review of BOP's housing-placement decisions when it enacted the First Step Act of 2018: "Notwithstanding *any other provision of law*, a designation of a place of imprisonment [by the BOP] is not reviewable by any court."  First Step Act of 2018, Pub. L. No. 115-391 § 601, 132 Stat. 5194, 5237 (codified at 18 U.S.C. § 3621(b)) (emphasis added).  Section 3621(b) provides BOP "extensive latitude" in assigning prisoners to correctional facilities.  *Thye v. United States*, 109 F.3d 127, 129–30 (2d Cir. 1997); *see also* § 3621(b) (BOP "may designate any available penal or correctional facility" satisfying minimum standards of health and habitability that BOP "determines to be appropriate and suitable" based on its consideration of several discretionary factors).  BOP's broad discretion in this area is firmly established, and Congress has long entrusted the Executive Branch to make inmate placement decisions as it sees fit.  *See* 18 U.S.C. § 4083  ("Persons convicted of offenses against the United States or by courts-martial punishable by imprisonment for more than one year may be confined in *any* United States penitentiary." (emphasis added)); *cf. Meachum v. Fano*, 427 U.S. 215, 224 (1976) (holding that the "decision to assign the convict to a particular institution is not subject to audit under the Due Process Clause, although the degree of confinement in one prison may be quite different from that in another"); *Pinson v. DOJ*, 514 F. Supp. 3d 232, 242 (D.D.C. 2021) (because "courts lack" the BOP's "expertise as to what is required to keep a correctional facility orderly and safe," Congress "has gone so far as to limit courts' ability to review BOP security and facility designations").

Courts have applied this jurisdiction-stripping provision to bar judicial review of BOP's redesignation decisions.  *See, e.g.*, *Wills v. Barnhardt*, No. 21-1383, 2022 WL 4481492, at *4 (10th

Cir. Sept. 27, 2022) ("The district court also correctly held that § 3621(b) deprived it of jurisdiction to review the BOP's decision on [the inmate's] transfer request."); *Ahmad v. Jacquez*, 860 F. App'x 459, 462 (9th Cir. 2021) ("Pursuant to § 3621(b), we lack jurisdiction to consider [the inmate's] individual challenge to the BOP's transfer decision."); *Porche v. Salazar*, No. 3:19-cv-77, 2019 WL 1373683, at *1 (D. Or. Mar. 5, 2019). At least one Circuit has held that § 3621(b) bars review even where the challenge to designation raises constitutional claims, such as due process. *Wills*, 2022 WL 4481492, at *4 (rejecting argument that § 3621(b) did not apply to due process and equal protection challenges because "§ 3621(b) contains no such limiting language").

Notwithstanding Congress's clear instructions in the text of the statute, another judge in this District previously found, when ruling on a preliminary injunction motion, that § 3621(b) "do[es] not divest the Court of jurisdiction to entertain constitutional claims" because the statute is "not sufficiently explicit to bar consideration" of such claims. *Doe v. McHenry*, 763 F. Supp. 3d 81, 85 (D.D.C. 2025) (Lamberth, J.). The court so concluded based primarily on *Webster v. Doe*, 486 U.S. 592 (1988), where the Supreme Court held that a statute that gave the CIA director "discretion" to terminate employees did not preclude review of constitutional claims. *Id.* at 603. But unlike the statute in *Webster*, § 3621(b) not only gives BOP significant discretion to make placement decisions but also contains a key provision absent in *Webster*—a nonreviewability provision that is both *express* and *broad*. *See* 18 U.S.C. § 3621(b). Congress easily could have carved out constitutional claims, but instead provided that "[n]otwithstanding *any other provision of law*," BOP's designation decisions are "not reviewable by any court." *Id.* § 3621(b)(5) (emphasis added). Congress could not have been clearer that it intended to preclude all judicial review of placement decisions.[7]

---

[7] Judge Lamberth's 2013 opinion in *Royer v. BOP*, 933 F. Supp. 2d 170 (D.D.C. 2013), is similarly

Congress's "control over the jurisdiction of the federal courts is plenary." *Patchak v. Zinke*, 583 U.S. 244, 252 (2018) (citations omitted). Congress "possess[es] the sole power of creating the tribunals (inferior to the Supreme Court)" as well as the exclusive power to "withhold[] jurisdiction from them in the exact degrees and character which to Congress may seem proper for the public good." *Palmore v. United States*, 411 U.S. 389, 401 (1973) (citations omitted). The "subject-matter jurisdiction of the lower federal courts is determined by Congress." *Argentine Rep. v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 433 (1989). And "what the Congress gives, the Congress may take away." *Knapp Med. Ctr. v. Hargan*, 875 F.3d 1125, 1128 (D.C. Cir. 2017). The Congress has "take[n] away" this Court's ability to review BOP's placement decisions at issue in this case. *See id.*

Plaintiffs may argue that Section 3621(b) does not preclude review of their claims because they filed their Complaint before BOP had finalized its designation decisions. But irrespective of whether they frame their challenge as one against EO 14164 and the AG Memo, *see, e.g.*, Compl. ¶¶ 125, 127, 159, 184, 191, 199, or as against the "Redesignation Directive," *see, e.g.*, *id.* ¶¶ 137, 162, 168, 181, the Complaint is crystal clear: Plaintiffs complain about their anticipated redesignation to ADX and seek an order "assign[ing] the Plaintiffs to housing locations" of their preference instead. *Id.* Prayer ¶ (B). Such a challenge to "a designation of a place of imprisonment under [Section 3621(b)] is not reviewable by any court," *see* 18 U.S.C. § 3621(b)(5), and this Court lacks jurisdiction to hear Plaintiffs' claims.

---

inapposite. *Royer* concerned a different provision of the PLRA—18 U.S.C. § 3625. The court held that § 3625 was insufficiently clear to preclude judicial review of constitutional claims. *Royer*, 933 F. Supp. 2d at 181–82. But *Royer* did not address the nonreviewability provision at issue here. Nor could it, as Congress added that provision in 2018, five years after *Royer* was decided. *See* Pub. L. No. 115-391, 132 Stat. 5194. *Royer* thus does not support the conclusion that the Court has authority to review Plaintiffs' challenge to BOP's transfer decisions.

**C.      Plaintiffs lack standing, and their claims are not ripe.**

Setting aside that Congress has not provided a relevant waiver of sovereign immunity and has specifically precluded judicial review of Plaintiffs' claims, Plaintiffs cannot invoke this Court's jurisdiction because they lack Article III standing and their claims are not ripe.

1.      Plaintiffs lack standing.

Article III's case-or-controversy requirement mandates that the plaintiff bears the burden of establishing standing to sue. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The "irreducible constitutional minimum of standing" contains three elements. *Id.* Plaintiffs must demonstrate that they are suffering (1) "an injury in fact," (2) causally connected to the "alleged conduct of the defendant," and (3) "likely" to "be remedied by the relief plaintiff seeks." *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 273–74 (2008) (citation omitted). To establish standing, the three constitutional elements must be satisfied at the time of the filing of the complaint. *See Lujan*, 504 U.S. at 569 n.4 (citation omitted) ("The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed.").

Plaintiffs do not directly address their alleged concrete injury giving rise to standing, but referral to ADX Florence is the gravamen of all their claims. *See, e.g.*, *supra* at 13. These allegations are insufficient to meet the requirements of injury in fact because Plaintiffs do not plausibly allege that any potential injury from their redesignation and transfer to ADX is "actual or imminent." *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (citation omitted); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013) (an "objectively reasonable" likelihood of harm "at some point in the future" is too speculative to satisfy Article III standing); *see also J. Roderick MacArthur Found. v. FBI*, 102 F.3d 600, 606 (D.C. Cir. 1996) ("It is not enough for the [plaintiff] to assert that it might suffer an injury in the future, or even that it is likely to suffer an injury at some unknown future time. Such 'someday' injuries are insufficient." (quoting *Lujan*, 504 U.S. at

564)).  By their own allegations, Plaintiffs face a lengthy administrative remedy process that is ongoing.  Compl. ¶¶ 68–76; *e.g.*, *Kadamovas* Status Report at 3 n.1; *see also* ADX Referral Memo, Attach. A at 8 (detailing appeals process).  The only Plaintiff who has been transferred anywhere, to date, was not transferred to ADX Florence.  *See supra* at 8 n.4.

Nor do Plaintiffs plausibly allege the causation or redressability elements of Article III standing.  With respect to causation, Plaintiffs do not and cannot plausibly allege that enjoining the Executive Order or AG Memo would cause them not to be transferred to ADX.  Similarly, there is no plausible allegation that Plaintiffs' claimed injury would be redressed by a favorable decision declaring those documents unlawful or prohibiting their application to these Plaintiffs.  *See Dynalantic Corp. v. Dep't of Defense*, 115 F.3d 1012, 1017 (D.C. Cir. 1997) ("redressability and traceability overlap as two sides of a causation coin").

2.    <u>Plaintiffs' claims are not ripe.</u>

For similar reasons, Plaintiffs' claims are not ripe for review.  *See, e.g.*, *Edwards v. Carter*, 445 F. Supp. 1279, 1286 n.10 (D.D.C. 1978) (discussing the overlap between the doctrines of standing and ripeness); *accord Trump v. New York*, 592 U.S. 125, 131 (2020) (per curiam).  "For a claim to be ripe under Article III, the plaintiff must establish constitutional minima akin to that of standing by showing an injury-in-fact; allegations of possible future injury do not satisfy this requirement."  *Church v. Biden*, 573 F. Supp. 3d 118, 134  (D.D.C. 2021) (citation modified).  In other words, a case is not "constitutionally" ripe where it is "dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  *Id.* (quoting *Trump*, 592 U.S. at 131).  Here, Plaintiffs' claims are dependent on future uncertainties, including uncertainty over whether they will *ever* be transferred to ADX as they currently fear.  As a result, Plaintiffs' claims are unripe for review.

## II.    Plaintiffs Have Not Exhausted Their Administrative Remedies.

Plaintiffs' claims all fail for the additional reason that they have not exhausted their administrative remedies, which are prescribed both by statute and by BOP policy. This Court has already held that Plaintiffs were unlikely to succeed on their merits of their claims because they did not exhaust their administrative remedies prior to filing suit. PI Order at 2. Because Plaintiffs still have not exhausted their administrative remedies, dismissal is warranted. *See id.* at 8 ("Federal law requires prisoners to pursue internal grievance procedures before coming to court."); *id.* (PLRA exhaustion is "mandatory," so district courts "no longer possess 'discretion' to address unexhausted claims" (quoting *Porter v. Nussle*, 534 U.S. 516, 524 (2002)).

The PLRA provides that "'[n]o action shall be brought with respect to prison conditions . . . by a prisoner' until he 'exhaust[s]' 'such administrative remedies as are available.'" *Id.* (quoting 42 U.S.C. § 1997e(a)). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007) (citation omitted). The PLRA's exhaustion requirement "sweeps broadly, applying 'to all inmate suits about prison life, whether they involve general circumstances or particular episodes.'" PI Order at 8 (quoting *Porter*, 534 U.S. at 532). As a general matter, to exhaust administrative remedies as to any given complaint, an inmate must: (i) attempt to resolve the problem informally with prison officials; (ii) if unsuccessful, initiate a request to the warden of their facility; (iii) if unsatisfied by the warden's response, appeal to the regional director within 20 calendar days; and (iv) if the regional director does not provide the relief sought, escalate the complaint to the BOP's General Counsel office. 28 C.F.R. §§ 542.13(a), 542.14(a), 542.15(a). In the context of a redesignation to ADX-GP, the process is modified somewhat as set forth in the ADX Referral Memo. Thereunder, inmates have a two-level appeal process: first to the DSCC, and then to the General Counsel. *See* 2012 ADX Referral Memo, Attach. A at 8.

19

Plaintiffs do not allege that they have completed any appeal of any redesignation decision, and this Court has already found that they did not.  *See generally* PI Order.  The law does not excuse Plaintiffs' failure.  *See, e.g.*, *Ross v. Blake*, 578 U.S. 632, 640 (2016) (failure to exhaust administrative remedies cannot be excused by purportedly "special circumstances"); *Woodford v. Ngo*, 548 U.S. 81, 91 n.2 (2006) (even facially meritorious constitutional claims must be exhausted); *Kaemmerling v. Lappin*, 553 F.3d 669, 675 (D.C. Cir. 2008) ("Even if an inmate believes that seeking administrative relief from the prison would be futile and even if the grievance system cannot offer the particular form of relief sought, the prisoner nevertheless must exhaust the available administrative process.").  Because Plaintiffs have not pleaded that they exhausted their administrative remedies, the Court should dismiss their claims.

## III.    Plaintiffs Fail to State a Claim Upon Which Relief Can Be Granted

Even if Plaintiffs could show subject-matter jurisdiction and administrative exhaustion, each of their ten claims fail as a matter of law and should be dismissed pursuant to Rule 12(b)(6).

### A.    Plaintiffs' Fifth Amendment claims fail as a matter of law.

Plaintiffs bring two claims under the Fifth Amendment's Due Process Clause: a claim for violation of procedural due process (Count 1, Compl. ¶¶ 126–35)), and a claim for violation of equal protection (Count 2, Compl. ¶¶ 136–45).  Both claims fail as a matter of law.

#### 1.    Plaintiffs do not state a claim for violation of procedural due process.

Plaintiffs allege that their transfer to the ADX would violate their rights to procedural due process.  Such claims are analyzed in two steps: "the first asks whether there exists a liberty or property interest which has been interfered with by the State[;] the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient."  *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).  Plaintiffs fail to establish either prong of this analysis.

***Plaintiffs Do Not Identify a Liberty Interest.***  "A liberty interest may arise from the

Constitution itself, by reason of guarantees implicit in the word 'liberty,' . . . or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). With respect to the Constitution, "incarcerated persons retain only a 'narrow range of protected liberty interests.'" *Rezaq v. Nalley*, 677 F.3d 1001, 1011 (10th Cir. 2012) (citation omitted). "As long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Thompson*, 490 U.S. at 460–61 (citation omitted). For state-created interests, the government may create a protected liberty interest if it "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484.

Plaintiffs' procedural due process claim—premised on a purported state-created interest, Compl. ¶¶ 128–31—fails.[8] There is no government-created liberty interest in avoiding a transfer to the ADX. In this Circuit, whether a transfer imposes an "atypical and significant hardship" is determined "in relation to the most restrictive conditions that prison officials, exercising their administrative authority to ensure institutional safety and good order, routinely impose on inmates serving similar sentences." *Hatch v. Dist. of Columbia*, 184 F.3d 846, 847 (D.C. Cir. 1999). Every Plaintiff is currently serving a life sentence (and until very recently, a death sentence), commensurate with the seriousness of their many crimes of conviction. There are only three

---

[8] To the extent Plaintiffs' alleged liberty interest arises from the Constitution, their claim fails. "[T]he Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement." *Austin*, 545 U.S. at 221. That is because transfer among prisons is "within the normal limits or range of custody which the conviction has authorized the [government] to impose." *Meachum*, 427 U.S. at 224–25. The Tenth Circuit (where ADX is located) has repeatedly held that same rule applies where, as here, the proposed transfer would be to ADX. *See Rezaq*, 677 F.3d at 1015 ("The conditions at ADX . . . do not, in and of themselves, give rise to a liberty interest."); *Jordan v. BOP*, 191 F. App'x 639, 653 (10th Cir. 2006) (no liberty interest implicated by inmate's placement in administrative detention at the ADX for a period of nearly five years). Plaintiffs have no liberty interest protected by the Due Process Clause in avoiding a transfer to the ADX.

inmates in the entire BOP who are serving more severe sentences (of death); one of them is housed at ADX and the other two are housed in SCU.  It would be reasonable for BOP to house Plaintiffs, who are serving the most severe sentences in the entire BOP, at the most restrictive facility in BOP, where many other inmates serving life sentences are also already housed.  Plaintiffs are therefore under no "atypical and significant hardship," and have not been deprived of any liberty interest. *See also, e.g.*, *Rezaq*, 677 F.3d at 1015 ("[C]onditions at ADX are comparable to those routinely imposed in the administrative segregation setting," and "are not extreme as a matter of law.").

***Plaintiffs Will Receive Adequate Process.*** Even if Plaintiffs were deprived of a protected liberty interest, the procedures they have received (and will receive) are constitutionally sufficient. The requirements of due process are "flexible" and "call[] for such procedural protections as the particular situation demands." *Morrisey v. Brewer*, 408 U.S. 471, 481 (1972); *Austin*, 545 U.S. at 224; *see Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (identifying factors used to determine procedures mandated by Constitution).  For instance, the Due Process Clause does not invariably require an opportunity to be heard in advance of a decision.  *Hewitt v. Helms*, 459 U.S. 460, 476 & n.8 (1983) (providing inmate opportunity to be heard within reasonable time after decision to place him in administrative segregation was constitutionally sufficient).  Nor does Due Process require a formal hearing.  *Procunier v. Martinez*, 416 U.S. 396, 418–19 (1974) (process requirements met where inmate was notified of the rejection of a letter addressed to him and he had an opportunity to protest that decision, despite his First Amendment right to uncensored communication).

BOP has exceeded its constitutional obligations.  In accordance with the 2012 ADX Referral Memo, inmates who are being considered for possible future transfer to the ADX have received "a hearing notice containing 'specific evidence which forms the basis for the referral'" to ADX; a psychological assessment of the appropriateness of transfer; a hearing in which the inmate

may participate and present evidence to the Hearing Administrator; a copy of the Hearing Administrator's written recommendation as to whether placement at the ADX is warranted; second-level review by the AD, and two levels of appeal of the AD's decision, should an inmate choose to pursue it.  ADX Referral Memo, Attach A. at 6–8; *see also* Compl. ¶¶ 66–76.  That is more than enough process to satisfy the Due Process Clause.  *Austin*, 545 U.S. at 225–26 (notice and fair rebuttal opportunity are "among the most important procedural mechanisms for purposes of avoiding erroneous deprivations" of liberty interests).

Plaintiffs allege that BOP's process is a "sham" and their placement at ADX was "categorically predetermined" by the Executive Order and the AG Memo.  Compl. ¶¶ 7, 86–87. However, on their face, neither document purported to retract, overrule, or otherwise alter the designation factors outlined in 18 U.S.C. § 3621 or BOP Program Statement 5100.08, nor did they in any way purport to change the factors BOP has always considered for inmate designations.  To the contrary, the AG Memo's guidance that BOP should consider the commuted inmates' "crimes, criminal histories, and all other relevant considerations" echoes 18 U.S.C. § 3621(b), which provides that BOP may designate any available correctional facility upon consideration of "the nature and circumstances of the offense," "the history and characteristics of the prisoner," and other relevant considerations.  18 U.S.C. § 3621(b)(1)–(5).

Nor do Plaintiffs *plausibly* allege that the BOP had made designation decisions before the AG Memo issued.  *See, e.g.*, Compl. ¶¶ 14–34, 80 (speculating, "[o]n information and belief," about BOP's "initial[]" determinations that Plaintiffs were not "appropriate" for placement at ADX); *Kelley v. District of Columbia*, 893 F. Supp. 2d 115, 119 (D.D.C. 2012) ("[T]he Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept the plaintiff's legal conclusions.").  At most, Plaintiffs plausibly allege that BOP had *begun* the redesignation process in January 2025—as its existing

policies expressly contemplated it would do.  *See* Compl. ¶¶ 66–76 (outlining process in ADX Referral Memo).[9]

>    2.    Plaintiffs do not state a claim for violation of equal protection.

BOP's anticipated transfer of Plaintiffs to the ADX also does not violate equal protection. The Fourteenth Amendment's Equal Protection guarantee, applied to the Federal Government through the Due Process Clause of the Fifth Amendment, *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954), "requires [the government] to treat similarly situated persons alike," *Women Prisoners of D.C. Dep't of Corrs. v. Dist. of Columbia*, 93 F.3d 910, 924 (D.C. Cir. 1996).  "The Constitution, however, 'does not require things which are different in fact or opinion to be treated in law as though they were the same.'"  *Id.* (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  "Thus, the [d]issimilar treatment of dissimilarly situated persons does not violate equal protection."  *Women Prisoners*, 93 F.3d at 924 (citation omitted).

Because "conviction of crime justifies the imposition of many burdens," *Johnson v. Daley*, 339 F.3d 582, 585–86 (7th Cir. 2003), prisoners are not a suspect class, *Tucker v. Branker*, 142 F.3d 1294, 1300 (D.C. Cir. 1998).  Therefore, to establish a cognizable Equal Protection claim, Plaintiffs "must establish two necessary predicates."  *Pryor-El v. Kelly*, 892 F. Supp. 261, 269–70 (D.D.C. 1995).  First, "the prisoner must establish that he or she was treated differently than other prisoners in his or her circumstances."  *Id.* at 270.  Second, "he or she must establish that such

---

[9] In support of their "sham" argument, Plaintiffs also aver that some of the Plaintiffs' hearing examiners reports (1) contain similar reasoning for recommended ADX placements, (2) have errors related to certain details of the hearings, and (3) were issued "hours" after the hearings. Compl. ¶¶ 88–95.  But a hearing examiner report is not a final agency decision, and it remains subject to further BOP review.  Further, given that BOP is mandated to consider factors such as the nature, circumstances, and severity of an inmate's criminal offense in placement, it is not surprising that there may be certain similarities in placement across a group of inmates who had all committed heinous crimes, including murder.  The ongoing Administrative Remedy appeals process allows Plaintiffs to challenge any errors they believe exist in their hearing reports or individual determinations.  Finally, the speed with which a process plays out cannot provide the basis for a procedural due process claim, as it is logical that hearing examiners would complete their reports promptly while the hearing itself is still fresh in their minds.  Ultimately, Plaintiffs' subjective mistrust does not engender a plausible claim for violation of procedural due process.

unequal treatment was the result of intentional or purposeful discrimination." *Id.* "Even if the prisoner can make this threshold showing, ordinarily only rational basis review is warranted." *Id.* (citing *Brandon v. D.C. Bd. of Parole*, 823 F.2d 644, 650 (D.C. Cir. 1987). Plaintiffs fail to surmount any of these hurdles.

**First**, Plaintiffs do not plausibly allege that they are more similarly situated to eighteen other former death-row inmates who, Plaintiffs aver, were redesignated to facilities other than ADX, as compared to other inmates with life imprisonment terms who have been designated to ADX. Compl. ¶¶ 78, 138. Notably, the Complaint does not plead any facts surrounding the circumstances of those other eighteen prisoners. *See generally id.*; *Meachum*, 427 U.S. at 228 ("That an inmate's conduct, in general or in specific instances, may often be a major factor in the decision of prison officials to transfer him is to be expected unless it be assumed that transfers are mindless events."); *Reynolds v. Quiros*, 990 F.3d 286, 300–01 (2d Cir. 2021) (conducting prisoner-by-prisoner analysis for purposes of equal protection claim and acknowledging that "the comparative heinousness of each prisoner's offenses may, in some circumstances, factor into a particular equal protection analysis").[10] Plaintiffs' crimes include but are not limited to, murder (of which all 21 have been convicted), in addition to carjacking, kidnapping, rape, racketeering, and escape or attempted escape from custody.[11] Absent any *facts* to support their "similarly-situated" theory, Plaintiffs' Equal Protection claim fails at step one. *See, e.g.*, *Marshall v. Reno*,

---

[10] The only facts in the Complaint concerning the eighteen prior prisoners illustrate that those individuals are *dissimilar* because—unlike Plaintiffs—at least some of them were resentenced pursuant to court order, rather than by blanket presidential commutation. Compl. ¶ 138 ("Prior to the promulgation of the Redesignation Directive, people under sentence of death in the federal system who were resentenced to life without parole due to a commutation *or court action* were subject to redesignation by BOP to determine where they would be housed." (emphasis added)). Plaintiffs' infamy—which particularly exists by virtue of the unique circumstances under which their death penalties were commuted—distinguishes them materially from the other, unnamed, eighteen prisoners.

[11] *See* Plaintiffs' criminal cases cited *supra* at 3–4 n. 2.

915 F. Supp. 426, 432 (D.D.C. 1996) (plaintiff's "bald[]" assertion that "he was treated differently than other prisoners in his circumstances" did not satisfy first step of Equal Protection claim); *James v. Reno*, 39 F. Supp. 2d 37, 40–41 (D.D.C. 1999) (plaintiff's "cursory description of six other inmates" did "not establish that they were 'similarly situated' to him" because "[t]here are several factors considered in determining a prisoner's custody classification other than length of sentence and type of offense"), *aff'd*, No. 99-5081, 1999 WL 615084 (D.C. Cir. July 2, 1999) (per curiam).

*Second*, although Plaintiffs speculate about Defendants' purportedly malicious intentions, the plausibly alleged facts demonstrate that BOP has applied the same criteria to Plaintiffs as it would to other inmates also under consideration for redesignation: PS 5100.08 and the ADX Referral Memo.  Plaintiffs' conclusory accusation that the BOP has instituted a "sham" process with a "pre-determined" result set by the Attorney General's Office, Compl. ¶¶ 7, 86–87, is nothing more than that—conclusory.  The Court, however, "need not accept [Plaintiffs'] legal conclusions cast in the form of factual allegations."  *Pryor-El*, 892 F. Supp. at 270.

*Third*, even if Plaintiffs had made a cognizable Equal Protection claim, there is no question that BOP's ongoing decision-making process satisfies rational-basis review—even assuming, as Plaintiffs now do, that BOP's eventual future decision is for Plaintiffs to be transferred to ADX. Courts "are to uphold prison regulations that 'impinge on inmates' constitutional rights' as long as those regulations are 'reasonably related to legitimate penological interests.'"  *Hatim v. Obama*, 760 F.3d 54, 58 (D.C. Cir. 2014) (quoting *Turner v. Safley*, 482 U.S. 78, 84–85, 89 (1987)); *see also Rhodes v. Chapman*, 452 U.S. 337, 351 n.16 (1981) (prison administration is "peculiarly within the province of the legislative and executive branches of government"); *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 (1973) ("It is difficult to imagine an activity in which [the government] has a stronger interest, or one that is more intricately bound up with state laws,

26

regulations, and procedures, than the administration of its prisons.").  On their face, PS 5100.08

and the ADX Referral Memo—which the Executive Order and AG Memo did not displace—serve

critical penological interests by requiring individualized determinations as to the proper

redesignation location for each eligible prisoner.

### B.    Plaintiffs' Eighth Amendment claims fail as a matter of law.

Plaintiffs bring two claims under the Eighth Amendment: one entitled "Cruel and Unusual

Punishments" (Count 3, Compl. ¶¶ 146–51), and one entitled "Deliberate Indifference to Serious

Medical and/or Mental Health Needs" (Count 4, Compl. ¶¶ 152–61).  In Count 3, Plaintiffs contend

that "[t]he solitary confinement inflicted at ADX is objectively painful and harmful, and constitutes

the type of unnecessary and wanton infliction of pain that gives rise to an Eighth Amendment

violation."  *Id.* ¶ 147.  Additionally, they allege, "Defendants seek to impose particularly harsh

punishment on Plaintiffs due to their animus against Plaintiffs and the prior Administration."  *Id.*

¶ 150.  In Count 4, Plaintiffs contend that "[w]ithout the appropriate level of necessary medical

and mental health treatment at ADX, the Health Care Plaintiffs will predictably experience the

gratuitous infliction of pain, and serious and irreparable physical and psychological harm."[12]  *Id.*

¶ 156; *see also id.* ¶ 160.

As a threshold matter, because none of the Plaintiffs have actually been transferred to ADX,

they lack standing to bring their Eighth Amendment claims, which are also unripe.  *See supra*

§ I(C).  The merits of Plaintiffs' Eighth Amendment claims, if considered at all, are governed by

the same legal standard.  Therefore, Counts 3 and 4 are discussed together below.

The Eighth Amendment requires that prison officials provide "humane conditions of

---

[12] Plaintiffs define "Health Care Plaintiffs" to include "Plaintiffs Basham, Coonce, Council, Fulks, Hall, Kadamovas, Lawrence, Mikhel, Mikos, Roane, Runyon, Sanchez, and Umaña," who they allege "have each been diagnosed with serious medical and/or mental health needs."  Compl. ¶ 154.

confinement." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Among other responsibilities, prisons must "take reasonable measures to guarantee the safety of the inmates." *Id.* (citation omitted). The obligation to protect inmates may require the use of segregated confinement as "the least cruel measure" available. *Pearson v. Ramos*, 237 F.3d 881, 885 (7th Cir. 2001). While such conditions are restrictive, the "Constitution does not mandate comfortable prisons, and prisons . . . which house persons convicted of serious crimes, cannot be free of discomfort." *Rhodes*, 452 U.S. at 349. Indeed, such "restrictive and even harsh [conditions] are part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 347.

Because restrictive, and even harsh, conditions of confinement are constitutionally permissible, Plaintiffs face a demanding standard for establishing that conditions of confinement amount to cruel and unusual punishment in violation of the Eighth Amendment. *See Farmer*, 511 U.S. at 837 ("The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'"). To establish an Eighth Amendment violation, a prisoner must show (1) conditions of confinement that amount to an extreme deprivation, and (2) that prison officials knew of, but deliberately disregarded, a substantial risk of serious harm that these conditions pose. Both the "objective and . . . subjective component . . . must be satisfied." *Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 565 (7th Cir. 2021).

> 1. ADX conditions of confinement are not objectively cruel and unusual as to any plaintiff.

To satisfy the first prong (regarding extreme deprivation), an inmate challenging conditions of confinement must show that a prison official's acts or omissions have inflicted a deprivation that is "objectively, sufficiently serious." *Farmer*, 511 U.S. at 834 (citation omitted). Such deprivations include conditions that (1) "involve the wanton and unnecessary infliction of pain," (2) are "grossly disproportionate to the severity of the crime warranting imprisonment," or

(3) "deprive inmates of the minimal civilized measure of life's necessities," such as "essential food, medical care, or sanitation." *Rhodes*, 452 U.S. at 347–48. Deprivations must be "extreme . . . to make out a conditions-of-confinement claim." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

In *Hill v. Pugh*, 75 F. App'x 715 (10th Cir. 2003), for example, an inmate at ADX Florence—the same facility at issue in this case—alleged that he was "isolated in his cell twenty-three hours a day for five days a week and twenty-four hours the remaining two days," and that the "resulting sensory deprivation amounts to cruel and unusual punishment." *Id.* at 721. The Tenth Circuit affirmed dismissal on the pleadings of the Eighth Amendment claim because the inmate had not alleged any deprivation of "'his minimal physical requirements'" such as "'food, shelter, clothing[,] and warmth.'" *Id.* (quoting inmate's Complaint). In so doing, the Tenth Circuit held that "[m]ere 'inactivity, lack of companionship and a low level of intellectual stimulation do not constitute cruel and unusual punishment.'" *Id.* (citation omitted).

Numerous other courts in the Tenth Circuit (where ADX is located) have also held that ADX conditions are not objectively cruel and unusual. *See, e.g.*, *Gowadia v. Stearns*, 596 F. App'x 667, 674 (10th Cir. 2014) (affirming dismissal on the pleadings because, absent a "specific deprivation, imprisonment at the ADX facility does not violate the Eighth Amendment[]"); *Silverstein v. BOP*, 559 F. App'x 739, 741, 763 (10th Cir. 2014) (affirming summary judgment on Eighth Amendment claim by ADX prisoner spending thirty years in solitary confinement); *Ajaj v. United States*, 293 F. App'x 575, 582–84 (10th Cir. 2008) (affirming summary judgment on Eighth Amendment claim involving "lock-down for 23 hours per day"); *Davis v. BOP*, No. 15-cv-884, 2016 WL 1156755, at *6 (D. Colo. Mar. 24, 2016) (dismissing claim because allegation that inmate "is confined to his cell for twenty[-]three hours a day" did not plead Eighth Amendment claim); *McMillan v. Wiley*, 813 F. Supp. 2d 1238, 1244, 1251 (D. Colo. 2011) (allegations that inmate only "leaves his cell up to five times per week for two hours of recreation

29

in a single man cage" did not plead Eighth Amendment claim because "lack of social opportunities" are "common to many high-security prisons around the country" (citation omitted)).

Plaintiffs do not allege that they will face conditions of confinement at ADX, should they be transferred there, that differ from the ADX conditions of confinement that courts have already approved or that otherwise constitute "cruel and unusual punishment." With respect to the "Health Care Plaintiffs," Plaintiffs do not plausibly allege that they will be deprived of the sorts of medical and health care that they currently receive within BOP custody. For example, BOP Program Statement 5310.16, *Treatment and Care of Inmates with Mental Illness*, which Plaintiffs attached to their Complaint, ECF No. 1-5 (Ex. 5 to Compl.), applies equally to ADX as it does to USP Terre Haute. In sum, even if they are assumed to be true, Plaintiffs' allegations about ADX's conditions (Compl. ¶¶ 99–120) do not establish objectively cruel and unusual punishment.

2.    ADX conditions of confinement are not subjectively cruel and unusual.

An inmate challenging his conditions of confinement must also show that each defendant had a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834 (citation omitted). Because "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment," that state of mind must be "more than mere negligence." *Id.* at 834–835 (citation omitted). Rather, it must be "'deliberate indifference' to inmate health or safety." *Id.* at 834 (citation omitted). Under this standard, drawn from the criminal law of recklessness, a prison official may be liable only if "he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847. Actual knowledge is required: "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837; *see also id.* at 838 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment.").

Here, Plaintiffs—including the "Health Care Plaintiffs" in Count 4—fail to plead facts regarding any of Defendants' knowledge, or actions or failure to act, of the kind courts have found sufficient to establish deliberate indifference. *Cf., e.g.*, *Delaney v. DeTella*, 256 F.3d 679, 681 n.1, 685–86 (7th Cir. 2001) (summary judgment properly denied to officials where they prohibited all out-of-cell exercise for six months despite prior court injunction requiring five hours per week of exercise, prison's own directive to same effect, and officials' inaction when inmate "requested medical attention frequently"). The ADX's alleged conditions are no more severe than those at other prisons, including prisons where inmates spend "twenty-three hours per day" isolated in cells that are "small and stark," which conditions are "not extreme as a matter of law." *Rezaq*, 677 F.3d at 1015; *see also Georgacarakos v. Wiley*, No. 07-cv-1712, 2010 WL 1291833, at *12 (D. Colo. Mar. 30, 2010) (rejecting challenge to conditions of confinement at ADX). Plaintiffs have a heavy burden when seeking injunctive relief, and they do not present any facts that would support the conclusory assertion that one can infer a substantial risk of serious harm from conditions in the ADX—much less that each Defendant actually drew that inference. *See Farmer*, 511 U.S. at 837 (official "must also draw the inference").

In short, Plaintiffs attempt to plead deliberate indifference based solely on the conditions of confinement themselves, rather than by presenting plausible facts to show each Defendant's state of mind. But the Supreme Court has expressly "rejected a reading of the Eighth Amendment that would allow liability to be imposed on prison officials solely because of the presence of objectively inhumane prison conditions" without any showing of "subjective recklessness." *Id.* at 838, 839. And BOP could not plausibly have a sufficiently culpable state of mind given that the redesignation process is not even final. Plaintiffs offer nothing more than their legally impermissible strict liability approach and conclusory allegations about "animus," and their Eighth Amendment claims fail as a result.

C.    **Plaintiffs' remaining Constitutional claims fail as a matter of law.**

Plaintiffs' remaining three Constitutional claims—regarding the Bill of Attainder Clause, Compl. ¶¶ 162–67 (Count 5), the Ex Post Facto Clause, *id.* ¶¶ 168–74 (Count 6), and the President's Clemency Power, *id.* ¶¶ 175–82 (Count 7)—can be dispensed of easily. First, Plaintiffs lack a direct cause of action to pursue these constitutional claims. *See Egbert v. Boule*, 596 U.S. 482, 491 (2022) (explaining that since the Supreme Court "fashioned new causes of action" under the Fifth Amendment and the Eighth Amendment in 1979 and 1980, respectively, "the Court has not implied additional causes of action under the Constitution," and "[a]t bottom, creating a cause of action is a legislative endeavor"). Second, each of these claims fails on its own terms.

***Bill of Attainder.*** Plaintiffs fail to state a claim under the Bill of Attainder Clause. That clause provides that "[n]o Bill of Attainder or ex post facto Law shall be passed." A Bill of Attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1977); *see also BellSouth Corp. v. FCC*, 144 F.3d 58, 62–67 (D.C. Cir. 1998) (explaining that the Bill of Attainder Clause serves as a limitation on the Legislative Branch). "A Bill of Attainder requires *legislative action* intended to punish an individual," i.e., "formal action of either the House or Senate." *Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 82 (D.D.C. 2014); *see also Paradissiotis v. Rubin*, 171 F.3d 983, 988 (5th Cir. 1999) ("No circuit court has yet held that the bill of attainder clause . . . applies to regulations promulgated by an executive agency."). Here, as discussed further in Section III(D)(1) below, Plaintiffs have not even alleged final agency action—let alone Congressional action. "Because Plaintiffs can point to no legislative action, the Bill of Attainder Clause does not apply." *Al-Aulaqi*, 35 F. Supp. 3d at 82.

Even if the collection of items that Plaintiffs refer to as the "Redesignation Directive" could somehow be considered legislative, which they cannot, Plaintiffs' Bill of Attainder claim would

still fail.  The decision of where to transfer Plaintiff inmates does not "'inflict[] punishment' within the constitutional proscription against bills of attainder."  *See Nixon*, 433 U.S. at 472–73.  Before this case arose, Plaintiffs were already convicted and sentenced to death, and then that sentence was commuted to the lesser punishment of life imprisonment.  Their potential future transfer out of USP Terre Haute does not constitute punishment in the constitutional sense because it would "deprive [them] of no right they already possessed."  *Kiyemba v. Obama*, 605 F.3d 1046, 1048 (D.C. Cir. 2010).

*Ex Post Facto*.  For similar reasons, Plaintiffs fail to state a claim that the "Redesignation Directive" violates the Ex Post Facto Clause.  That Clause is "aimed at laws that retroactively alter the definition of crimes or increase the punishment for criminal acts."  *Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 504 (1995) (citation omitted).  To offend the Ex Post Facto Clause, the treatment complained of must somehow increase the plaintiff's punishment, *Warren v. U.S. Parole Comm'n*, 659 F.2d 183, 193 (D.C. Cir. 1981), which a transfer from USP Terre Haute to ADX would not do.  "'Punishment' for ex post facto analysis concerns the length of imprisonment, not the conditions of imprisonment."  *Westefer v. Snyder*, 422 F.3d 570, 576 (7th Cir. 2005) (citing *Garner v. Jones*, 529 U.S. 244, 250 (2000)); *see also, e.g.*, *Dobbert v. Florida*, 432 U.S. 282, 294 (1977) (statute did not violate Ex Post Facto Clause where "there was no change in the quantum of punishment attached to the crime").  Plaintiffs do not allege that the "Redesignation Directive" would increase the length of their imprisonment.  Further, the possibility that Plaintiffs could be housed at any BOP facility at BOP's discretion existed well before each Plaintiff committed the crimes for which they are convicted, and thus BOP's discretionary housing decisions cannot be considered "*ex post facto*."  *See* Act of May 14, 1930 § 7, 46 Stat. at 326; *Collins v. Youngblood*, 497 U.S. 37, 41 (1990) (explaining that "*ex post facto*" means "after the fact" and refers to certain types of statutes that are passed after someone commits a crime).

***Clemency Power.*** Plaintiffs fail to state a claim that the "Redesignation Directive" violates Article II, § 2, cl. 1, which provides that that the President "shall have Power to grant Reprieves and Pardons for Offenses against the United States" (hereafter, "Clemency Power").[13] Plaintiffs assert that the "Redesignation Directive" "unconstitutionally interferes with the exercise of the Article II clemency power because it diminishes or impairs the effect of" President Biden's December 2024 commutation order. Compl. ¶ 181. Yet they cite no authority for the proposition that the Clemency Clause is privately enforceable against the Executive Branch. Moreover, assuming arguendo that the so-called "Redesignation Directive" could be understood to be a Prison designation decision, Plaintiffs have no legal basis for their novel theory that such a decision could undermine a commutation order that imposed no conditions, restrictions, or even preferences on where the commuted inmates would subsequently be imprisoned.

Plaintiffs cite *Schick v. Reed* for the proposition that the Clemency Power is protected from any "actions that attempt to abridge, diminish, impair, or limit the effect of its exercise." Compl. ¶ 176 (citing *Shick*, 419 U.S. at 266). But any decision to designate Plaintiffs to ADX would not "modif[y], abridge[], or diminish[]" the commutation order. *See Schick*, 419 U.S. at 266. The Clemency Grant simply "COMMUTE[D] the sentences of death imposed . . . to sentences of life imprisonment without the possibility of parole." Clemency Grant at 1. That commutation would remain intact regardless of where Plaintiffs are imprisoned.

Accordingly, the Court should dismiss Plaintiffs' constitutional claims in Counts 5–7.

**D.    Plaintiffs do not raise cognizable Administrative Procedure Act claims.**

Unlike their constitutional claims, which all challenge the "Redesignation Determination" as Plaintiffs broadly define it, Plaintiffs' three APA claims are each directed specifically at the AG

---

[13] "Presidential power to commute criminal sentences derives" from this clause. *Schick v. Reed*, 419 U.S. 256, 260 (1974).

Memo.  Plaintiffs assert that the AG Memo is in excess of statutory authority, arbitrary and capricious, or otherwise not in accordance with law, and thereby violative of the APA.  Compl. ¶¶ 183–197 (Counts 8 and 9).  They also assert that the AG Memo constitutes a "legislative rule" that required notice-and-comment rulemaking.  *Id.* ¶¶ 198–203 (Count 10).  But the AG Memo is not subject to APA review for three separate but individually sufficient reasons: (1) it is not final agency; (2) Congress committed inmate housing designation determinations to agency discretion; and (3) an alternative adequate remedy is available to Plaintiffs through BOP's Administrative Remedy process.  Even if the AG Memo were subject to APA review, it was not unlawful nor did it constitute a legislative rule.  Therefore, Plaintiffs do not state an APA claim.

1.    The AG Memo is not subject to APA review because it is not final agency action.

Agency action must be "final" to be reviewable under the APA.  5 U.S.C. § 704.  Agency action is final only if two requirements are met.  The agency action "must mark the consummation of the agency's decisionmaking process," and "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted).  Plaintiffs define the agency action here as the issuance of the AG Memo, Compl. ¶¶ 184, 191, but that document neither marked the consummation of the housing-designations decision-making process nor determined any rights or obligations from which legal consequences will flow to Plaintiffs.  The AG Memo merely directed BOP to take into consideration certain facts that are already required by statute: the commuted inmates' crimes, their criminal histories, and "all other relevant considerations."  AG Memo at 1; *see also* 18 U.S.C. § 3621(b)(1)–(5).

The issuance of the AG Memo plainly did not mark the "consummation" of BOP's decision-making process with respect to housing redesignations for the commuted inmates.  The

Complaint itself appears to recognize that the AG Memo did not mark the consummation of this process, as it defines the "Redesignation Directive" as including the AG Memo and "orders, procedures, and . . . decisions" that followed it.  Compl. ¶ 7.  In any event, the redesignations process remained ongoing at the time the Complaint was filed, as the Complaint itself acknowledges.  *See* Compl. ¶¶ 75–76, 96.

Further, the action of issuing the AG Memo did not determine Plaintiffs' rights or obligations, and no legal consequences have flowed from it.  Expounding on the second prong of the *Bennett* test, the D.C. Circuit has explained that "the distinction between 'general statements of policy' and 'rules' is critical."  *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 807 (D.C. Cir. 2006).  To distinguish between a rule or "binding norm" with legal consequences and "an unreviewable statement of policy," courts should consider both the "effects of an agency's action" and the "agency's expressed intentions."  *Id.* at 806 (citation omitted).  The first line of inquiry considers "whether the agency has '(1) impose[d] any rights and obligations, or (2) genuinely [left] the agency and its decisionmakers free to exercise discretion.'"  *Id.* (alterations in original) (quoting *CropLife Am. v. EPA*, 329 F.3d 876, 883 (D.C. Cir. 2003)).  The second considers "(1) the [a]gency's own characterization of the action; (2) whether the action was published in the Federal Register or the Code of Federal Regulations; and (3) whether the action has binding effects on private parties or on the agency."  *Id.* at 806–07 (alteration in original) (quoting *Molycorp, Inc. v. EPA*, 197 F.3d 543, 545 (D.C. Cir. 1999)).

Both lines of inquiry confirm that the AG Memo is, at most, a general statement of policy that informs the housing designation determinations conducted by BOP.  First, the AG Memo does not direct a specific outcome; it directs BOP to "ensure that the conditions of confinement" of the commuted inmates "are consistent with the security risks those inmates present."  AG Memo at 1.  BOP retains discretion to determine the specific housing designation for each commuted inmate.

36

*See id.*  Second, the AG Memo contained explicit language indicating that no rights or obligations would flow from it.  *Id.* at 1 n.1 ("This guidance is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural[.]"); *see Ctr. for Auto Safety*, 452 F.3d at 806 (although not dispositive, "[t]he language used by an agency is an important consideration" in determining the "effects" of an action).  The AG Memo was not published in the Federal Register or the Code of Federal Regulations, and it did not have any binding effect outside the agency.  *See Id.* at 806–07.

Plaintiffs' Complaint appears to find fault in BOP's allegedly considering the AG Memo when making housing designation determinations.  But that is entirely unremarkable; general statements of policy are *meant* to be consulted and even relied upon.  *See Sec. Indus.  & Fin. Mkts. Ass'n v. U.S. Commodity Futures Trading Comm'n*, 67 F. Supp. 3d 373, 422 (D.D.C. 2014) ("[T]he 'pressure to voluntarily conform' . . . is part and parcel of many policy statements." (citation omitted)).  Even "*encourag[ing]*" compliance with a policy statement does not render it a final agency action unless legal consequences necessarily follow.  *Ctr. for Auto Safety*, 452 F.3d at 809; *see also RCM Techs., Inc. v. DHS*, 614 F. Supp. 2d 39, 46 (D.D.C. 2009) ("If a policy is 'permissive' or if officials are 'free to exercise their discretion' pursuant to the policy—even if officials are 'encouraged' to act a certain way—then 'rights or obligations' have not been determined." (citation omitted)).  "[P]ractical" consequences, as opposed to legal consequences, are not enough: "if the practical effect of the agency action is not a *certain change* in the legal obligations of a party, the action is non-final for the purposes of judicial review."  *Ctr. for Auto Safety*, 452 F.3d at 811 (emphasis added) (quoting *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 15 (D.C. Cir. 2005).  On its face, the AG Memo merely directs BOP to ensure that the conditions of confinement of the commuted inmates are consistent with certain statutorily permissible considerations.  Because the AG Memo does not "command[], require[], order[], or

dictate[]," *id.* at 809, particular housing designation determinations or conditions of confinement, it is not binding and cannot be final agency action.

2.    The AG Memo is not subject to APA review because Congress committed inmate housing designation determinations to agency discretion.

The APA is clear that it applies "*except to the extent*" that "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). BOP's placement decisions plainly fall within that category, as Congress did not provide express, objective criteria for the agency to consider in the designation process that might give a reviewing court a "meaningful standard" by which to assess BOP's exercise of discretion. *See Heckler v. Chaney*, 470 U.S. 821, 830 (1985) ("[I]f no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.'"). BOP conducts its housing duties "under the direction of the Attorney General." 18 U.S.C. § 4042. And Congress provided a diverse set of broad and inherently subjective factors for BOP to consider when performing these duties, such as "the resources of the facility contemplated"; "the nature and circumstances of the offense"; and the "history and characteristics of the prisoner." *See* 18 U.S.C. § 3621(b). The statute does not provide any standard by which to judge how the resources of a BOP facility ought or ought *not* to impact an inmate's designation, and the same is true for the other statutory factors. Therefore, the complicated balancing of these factors rest "peculiarly within [BOP's] expertise." *See Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) (citation omitted); *McKune v. Lile*, 536 U.S. 24, 39 (2002) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."). Under § 702(a)(2), this Court is precluded from second-guessing these expert decisions, and therefore APA review is not available here.

3.    The AG Memo is not subject to APA review because an alternative adequate remedy is available to Plaintiffs.

Review under the APA is available only where "there is no other adequate remedy in a

court." 5 U.S.C. § 704. The requirement that a plaintiff have "no other adequate remedy in a court," *id.*, reflects that "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action," *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). "[T]he alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the 'same genre.'" *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (citation omitted). If there exists an alternative adequate judicial remedy, a plaintiff lacks a cause of action under the APA. *See Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017). Here, BOP's Administrative Remedy Program provides Plaintiffs an "adequate 'means through which allegedly unconstitutional actions" or other alleged defects with the redesignations process "can be brought to the attention of the BOP and prevented from recurring." *See Silva v. United States*, 45 F.4th 1134, 1141 (10th Cir. 2022) (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001)). Judicial review at this juncture would improperly interfere with the agency's ability to "exercise its discretion and expertise on the matter and to make a factual record to support its decision." *Hidalgo v. FBI*, 344 F.3d 1256, 1258 (D.C. Cir. 2003) (citation omitted). BOP's administrative process is therefore an adequate alternative remedy, and Plaintiffs lack a cause of action to directly challenge the AG Memo under the APA.

### 4.    The AG Memo is lawful.

Even if Plaintiffs were able to properly assert APA claims to challenge the AG Memo, that memorandum was lawful. Under the APA, the Court may set aside an agency action if the Court finds that the challenged action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). The Court's review is "highly deferential and narrow" and focused on ensuring that the agency has set forth its reasons for decision and provided a reasoned explanation for its action. *Silver State Land, LLC v. Schneider*, 145 F. Supp. 3d 113, 124

(D.D.C. 2015) (citations omitted), *aff'd*, 843 F.3d 982 (D.C. Cir. 2016).  A court "is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

As discussed above in section III(D)(1), the AG Memo at most constitutes a statement of agency policy, directing BOP to "ensure that the conditions of confinement" for the commuted inmates "are consistent with the security risks those inmates present" in light of their crimes of conviction, criminal histories, and other relevant considerations.  AG Memo at 1.  The Attorney General plainly possesses statutory authority to issue policies for the Department of Justice and BOP.  *See, e.g.*, 28 U.S.C. § 503 (the Attorney General is the head of the Department); 18 U.S.C. § 4041 (the Attorney General oversees BOP); 28 U.S.C. § 509 ("All functions of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice are vested in the Attorney General," subject to limited exceptions not at issue here).  Plaintiffs therefore fail to state an APA claim based on exceeding statutory authority or unlawful agency action.

Plaintiffs' "arbitrary and capricious" claim also fails as a matter of law.  Plaintiffs assert that the AG Memo "abruptly departs from the longstanding position of the DOJ."  Compl. ¶ 194.  But as discussed above, the factors that the AG Memo directs BOP to consider are factors that BOP already would consider under PS 5100.08 and the ADX Referral Memo (as well as the relevant statute, 18 U.S.C. § 3621(b)).  Plaintiffs' well-pleaded allegations do not indicate that the AG Memo constituted a change in position.  And even if it had, agencies "'are free to change their existing policies as long as they provide a reasoned explanation for the change,' 'display awareness that [they are] changing position,' and[, where relevant,] consider 'serious reliance interests.'"  *FDA v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898, 917 (2025) (citations omitted).  Plaintiffs cannot claim that they possessed a "reliance interest" in PS 5100.08 or the October 2012 ADX

Referral Memo at all, let alone a "serious reliance interest." *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30–31 (2020) (describing ways that individuals may have structured their lives or made major life decisions in reliance on existing policy); *White Lion Invs.*, 145 S. Ct. at 927 ("Our prior change-in-position cases have set a much higher bar, requiring, for example, 'decades of industry reliance on [an agency's] prior policy.'" (citation omitted)).  In any event, the AG Memo provides sufficient explanation for its guidance to BOP.  It observes that "each of the 37 commuted murderers" present "security risks," and therefore the BOP "is directed to ensure that [their] conditions of confinement" "are consistent with the security risks" they present.  AG Memo at 1.  Plaintiffs do not state a claim that the AG Memo was arbitrary and capricious.

>    5.    The AG Memo is not a legislative rule that required notice-and-comment rulemaking.

Even if the AG Memo constituted "final agency action," it did not require notice-and-comment rulemaking as alleged by Plaintiffs.[14]  In addition to the considerations discussed above demonstrating that the AG Memo is not a "rule," it is also clear that the AG Memo was not an exercise of the agency's legislative power.

The APA provides that agencies must use notice-and-comment rulemaking to implement "substantive" legislative rules.  *Lincoln*, 508 U.S. at  196  (citing 5 U.S.C. § 553(b)).  By contrast, the "notice-and-comment requirements . . . do not apply to 'interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice.'"  *Id.* (quoting 5 U.S.C. § 553(b)).  A legislative rule that must go through notice and comment "has the 'force and effect of law.'"  *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 588 U.S. 1, 7 (2019) (citation omitted).  And a rule has the force of law "only if Congress has delegated legislative power to the agency

---

[14] The D.C. Circuit has described "final agency action" and *de facto* rules "that could not properly be promulgated absent . . . notice-and-comment rulemaking" as "alternative ways of viewing the question," because the latter proposition would "implicitly prove" the former.  *Ctr. for Auto Safety*, 452 F.3d at 806.

and . . . the agency intended to exercise that power in promulgating the rule." *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993). Legislative rules "can bind private parties," *Nat'l Ass'n of Broadcasters v. Fed. Commc'ns Comm'n*, --- F.4th ---, 2025 WL 2178565, at *5 (D.C. Cir. Aug. 1, 2025), whereas interpretive rules and general statements of policy "are non-binding outside the agency," *see id.* "In determining whether an agency adopted a new legislative rule, courts look to whether the rule 'effects a substantive regulatory change to the statutory or regulatory regime.'" *Tingzi Wang v. USCIS*, 375 F. Supp. 3d 22, 40 (D.D.C. 2019) (Kelly, J.) (quoting *Elec. Priv. Info. Ctr. v. DHS*, 653 F.3d 1, 6–7 (D.C. Cir. 2011).

For the reasons discussed above, the AG Memo is not even a rule, does not carry the force of law, and therefore cannot require notice-and-comment rulemaking. *Ctr. for Auto Safety*, 452 F.3d at 807 ("If the 1998 policy guidelines constitute a *de facto* rule, as appellants claim, then they would clearly meet *Bennett*'s test for final agency action."). The AG Memo was directed within the Department of Justice; it does not bind private parties. *See Nat'l Ass'n of Broadcasters*, 2025 WL 2178565, at *5. Moreover, the permissive language of the AG Memo—including that BOP should "ensure that the conditions of confinement" for the commuted inmates "are consistent with . . . all . . . relevant considerations," AG Memo at 1—indicates that the agency did not intend the memorandum to have the force and effect of law. *Broadgate Inc. v. U.S. Citizenship & Immigr. Servs.*, 730 F. Supp. 2d 240, 245 (D.D.C. 2010) ("[A] good indication of a general policy statement is the agency's use of permissive, rather than binding, language; if the 'rule' leaves the agency free to exercise discretion, it is likely a policy statement.").

The AG Memo did not "effect[] a substantive regulatory change to the statutory or regulatory regime." *Tingzi Wang*, 375 F. Supp. 3d at 40 (citation omitted). Again, the factors that the AG Memo directed BOP to consider were consistent with 18 U.S.C. § 3621(b). Thus, the AG Memo did not change the statutory regime. To the extent Plaintiffs argue that the AG Memo

amended the process prescribed by PS 5100.08 or the October 2012 ADX Referral Memo, which they have not plausibly alleged, such change would not constitute "substantive regulatory change," as those BOP policies were themselves merely statements of agency policy subject to revision at the discretion of the agency. *See, e.g.*, *Reno v. Koray*, 515 U.S. 50, 61 (1995) (describing BOP's program statement on credit for time served as an "internal agency guideline . . . that does not require notice and comment"); *Phillips v. Hawk*, No. 98-5513, 1999 WL 325487, at *1 (D.C. Cir. Apr. 14, 1999) (BOP's program statements 5100.06 and 5800.09, which relate to inmates' security level classifications, are "internal agency guidelines that are not subject to the rigors of the APA" (citation omitted)).

In sum, the AG Memo was not a legislative rule, and therefore it did not require notice-and-comment rulemaking prior to issuance.

## CONCLUSION

For these reasons, this Court should grant Defendants' motion and dismiss Plaintiffs' complaint.


Dated: August 7, 2025                          Respectfully submitted,

                                               BRETT A. SHUMATE
                                               Assistant Attorney General

                                               ANDREW I. WARDEN
                                               Assistant Branch Director

                                               */s/ Lisa Zeidner Marcus*
                                               LISA MARCUS (NY Bar No. 4461679)
                                               CHRISTOPHER EDELMAN
                                               Senior Counsel
                                               MARIANNE F. KIES
                                               KEVIN BELL
                                               Trial Attorneys
                                               U.S. Department of Justice
                                               Civil Division, Federal Programs Branch

1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 514-3336
Email: lisa.marcus@usdoj.gov

*Attorneys for Defendants*