**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

REJON TAYLOR, *et al.*,

                  *Plaintiffs,*

       v.

DONALD J. TRUMP, *et al.*, in their official
capacities,

                  *Defendants.*

Case No. 1:25-cv-01161-TJK

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS COONCE, MIKOS, AND RUNYON'S
<u>SECOND MOTION FOR A TEMPORARY RESTRAINING ORDER</u>**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ................................................................. 3

   I.   Plaintiffs' Redesignation to ADX .................................................................................. 3

   II.   Plaintiffs Coonce, Mikos, and Runyon Have Diligently Tried to Exhaust Their
      Administrative Appeals ................................................................................................. 5

   III. Plaintiffs Coonce, Mikos, and Runyon Have Serious Medical and Mental Health
      Conditions and Needs.................................................................................................... 7

      A.  Medical Conditions and Needs ............................................................................ 7

      B.  Mental Illness and Intellectual Disabilities ........................................................ 9

   IV. ADX Is BOP's Highest Security and Most Restrictive Prison.................................... 11

   V.   ADX Is a Medical and Mental Health Care Level 2 Prison That Cannot Provide
      Constitutionally Adequate Health Care for Plaintiffs Coonce, Mikos, and Runyon...... 15

   VI. Plaintiffs Coonce, Mikos, and Runyon Will Suffer Serious Injury During Transport to
      ADX ............................................................................................................................ 17

LEGAL STANDARD............................................................................................................... 20

ARGUMENT ............................................................................................................................ 20

   I.   Plaintiffs Coonce, Mikos, and Runyon Are Likely to Succeed on the Merits of Count
      Four, Their Eighth Amendment Deliberate Indifferent Claim.................................... 20

      A.  Administrative Exhaustion Is Not Available Here.............................................. 20

      B.  Plaintiffs Coonce, Mikos, and Runyon Are Likely to Succeed on the Merits of
          Their Eighth Amendment Deliberate Indifference Claim...................................... 23

         1.  Plaintiffs Have Serious Medical and Mental Health Needs ............................... 24

         2.  Transfer to and Incarceration at ADX Poses Significant Risks of Serious Harm
            to Plaintiffs ................................................................................................... 24

         3.  Defendants Have Acted with Deliberate Indifference to Plaintiffs' Serious
            Medical and Mental Health Needs by Redesignating Them to ADX ............... 29

         4.  Redesignation to ADX Will Cause Plaintiffs Coonce, Mikos, and Runyon
            Irreparable Harm .......................................................................................... 31

   II.  The Balance of Equities and Public Interest Weigh Heavily in Plaintiffs' Favor.......... 33

CONCLUSION.......................................................................................................................... 34

## TABLE OF AUTHORITIES

**CASES**

*Ahlschlager v. Imhof,*
    No. 24 Civ. 8267, 2024 WL 5168732 (E.D.N.Y. Dec. 19, 2024) ...................................... 33

*Al-Joudi v. Bush,*
    406 F. Supp. 2d 13 (D.D.C. 2005) .................................................................................... 33

*Aref v. Lynch,*
    833 F.3d 242 (D.C. Cir. 2016) .......................................................................................... 14

*Bernier v. Allen,*
    38 F.4th 1145 (D.C. Cir. 2022) .................................................................................. 29, 30

*Brown v. District of Columbia,*
    514 F.3d 1279 (D.C. Cir. 2008) ........................................................................................ 29

*Brown v. Plata,*
    563 U.S. 493 (2011) .......................................................................................................... 23

*Callicotte v. Cheney,*
    744 F. Supp. 3 (D.D.C. 1990) .......................................................................................... 33

*Colwell v. Bannister,*
    763 F.3d 1060 (9th Cir. 2014) ......................................................................................... 30

*Conservation L. Found. v. Ross,*
    422 F. Supp. 3d 12 (D.D.C. 2019) ................................................................................... 31

*Davis v. Dist. of Columbia,*
    158 F.3d 1342 (D.C. Cir. 1998) ....................................................................................... 31

*De'Lonta v. Angelone,*
    330 F.3d 630 (4th Cir. 2003) ........................................................................................... 30

*Doe v. McHenry,*
    763 F. Supp. 3d 88 (D.D.C. 2025) ............................................................................. 21, 31

*Edmo v. Corizon, Inc.,*
    935 F.3d 757 (9th Cir. 2019) ........................................................................................... 33

*Estelle v. Gamble,*
    429 U.S. 97 (1976) ...................................................................................................... 23, 29

*Farmer v. Brennan*,
    511 U.S. 825 (1994)..................................................................................................... 23

*Fletcher v. Menard Corr. Ctr.*,
    623 F.3d 1171 (7th Cir. 2010) ................................................................................... 21

*Helling v. McKinney*,
    509 U.S. 25 (1993)....................................................................................................... 23

*M.G.U. v. Nielsen*,
    325 F. Supp. 3d 111 (D.D.C. 2018)........................................................................... 33

*McPherson v. Lamont*,
    457 F. Supp. 3d 67 (D. Conn. 2020)........................................................................... 21

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ..................................................................................... 33

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)..................................................................................................... 31

*Nat'l Senior Citizens L. Ctr., Inc. v. Legal Servs. Corp.*,
    581 F. Supp. 1362 (D.D.C. 1984)............................................................................... 31

*Palakovic v. Wetzel*,
    854 F.3d 209 (3d Cir. 2017)....................................................................................... 12

*Pursuing Am.'s Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016) ................................................................................... 33

*Roe v. Elyea*,
    631 F.3d 843 (7th Cir. 2011) ..................................................................................... 30

*Ross v. Blake*,
    578 U.S. 632 (2016)..................................................................................................... 21

*Simms v. District of Columbia*,
    872 F. Supp. 2d 90 (D.D.C. 2012)............................................................................. 33

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    540 F. Supp. 3d 45 (D.D.C. 2021)............................................................................. 31

*Taylor v. Trump*,
    788 F. Supp. 3d 1 (D.D.C. 2025)....................................................................... 1, 3, 5, 6, 20

iii

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008).................................................................................... 20, 31

**STATUTES**

42 U.S.C. § 1997e............................................................................................ 20

**REGULATIONS**

28 C.F.R. § 544............................................................................................... 14

**RULES**

Fed. R. Civ. P. 65(c) ....................................................................................... 34

**OTHER AUTHORITIES**

*About Our Facilities*, Fed. Bureau of Prisons,
  www.bop.gov/about/facilities/federal_prisons.jsp........................................ 14

Attorney General Pamela Bondi (@AGPamBondi), X (Sept. 25, 2025, 5:47 PM),
  https://perma.cc/8ELX-NJBK ........................................................................ 5

Breanne Deppisch, *EXCLUSIVE: Bondi Transfers Former Death Row Inmates Commuted by
  Biden to 'Supermax' Prison*, Fox News Channel (Sept. 25, 2025, 7:49 PM),
  https://perma.cc/W8Q2-JSMD ...................................................................... 5

Eric Daugherty (@EricLDaugh), X (Sept. 25, 2025, 5:47 PM), https://perma.cc/M7RR-3DQA.. 5

Fed. Bureau of Prisons, Program Statement 5267.09 (Dec. 10, 2015), https://perma.cc/C84H-
  5F82 .......................................................................................................... 14

Further Observations of the United States of America, Inmates of the Administrative
  Maximum United States Prison, Case No. 13.956 (Dec. 2024) at 8,
  https://www.state.gov/wp-content/uploads/2024/12/Case-No.-13.956-Inmates-of-ADX-
  U.S.-Further-Observations.pdf..................................................................... 13

*Life Sentences in the Federal System*, U.S. Sent'g Comm'n (2022),
  www.bop.gov/about/statistics/statistics_inmate_sentences.jsp ....................... 11

Mark Binelli, *Inside America's Toughest Federal Prison*, N.Y. Times (Mar. 26, 2015),
  https://archive.ph/XS1eE ............................................................................ 12

Ray Sanchez & Alexandra Field, *What's Life Like in Supermax Prison?*, CNN (Dec. 6, 2023,
  2:48 PM), https://perma.cc/S86W-T8SQ......................................................... 12

*Sentences Imposed*, Fed. Bureau of Prisons,
    www.bop.gov/about/statistics/statistics_inmate_sentences.jsp ........................................... 11

*Statistics: Restricted Housing*, Fed. Bureau of Prisons,
    www.bop.gov/about/statistics/statistics_inmate_shu.jsp ................................................... 14

*Stay in Touch*, Fed. Bureau of Prisons, https://www.bop.gov/inmates/communications.jsp ....... 14

U.S. Dep't of Just., *Report and Recommendations Concerning the Use of Restrictive Housing
    – Final Report*, at 38 (Jan. 2016), https://perma.cc/2NY7-7UNE ...................................... 11

## INTRODUCTION

Three of the Plaintiffs who remain in this action have serious medical and/or mental health conditions and face life-threatening risks if transferred to the U.S. Penitentiary Florence Administrative Maximum ("ADX") facility in Florence, Colorado, the Federal Bureau of Prisons' ("BOP") "supermax" prison, where Defendants intend to send them in short order. Plaintiffs Coonce, Mikos, and Runyon have conditions that disqualify them from transfer to ADX because of that facility's inability to meet their medical and/or mental health needs, but will be sent there anyway because of new policies requiring BOP to bypass usual policy and procedure and ensure the harshest conditions of confinement possible for them, like others formerly on federal death row whose sentences were commuted by the previous administration. ECF 1 (Compl.); ECF 2-1 (Mot. for TRO) at 1-14; ECF 46 (Reply in Supp. of Mot. for Prelim. Inj.) (describing "Redesignation Directive"). These Plaintiffs seek the intervention of this Court to bar Defendants from transferring them to ADX because even a short time in the extreme conditions there, as well as the arduous process of being transported to ADX, will without a doubt result in grave injury if not death because of their medical and psychological vulnerabilities.

This Court previously denied a motion for preliminary injunctive relief by all plaintiffs who were originally part of this action on the basis that none had exhausted their administrative remedies under the Prison Litigation Reform Act ("PLRA"). *Taylor v. Trump*, 788 F. Supp 3d 1, 8-13 (D.D.C. 2025). In discussing the threshold requirement of exhaustion, the Court noted an exception to the rule, as where an incarcerated person faces an imminent risk of serious physical danger if made to wait for the administrative process to run its course, rendering the remedy effectively unavailable. *Id.* at 11-12 (citing *Fletcher v. Menard Corr. Ctr.*, 623 F.3d 1171 (7th Cir. 2010)). That is the predicament in which Plaintiffs Coonce, Mikos, and Runyon find themselves

1

here. All have made diligent efforts to exhaust, but the process is not yet complete. And yet in the time between now and the end of their administrative appeals processes, they face a risk that the government may nonetheless transfer them to ADX: BOP and ADX are operationally ready to transport and receive the commutees, and Defendants' counsel will not commit to more than stating that they will not transfer any Plaintiff before October 31, 2025, even though they have confirmed that Plaintiffs Coonce, Mikos, and Runyon have not yet exhausted their administrative appeals. Defendants' counsel will not even commit to giving Plaintiffs' counsel prompt notice of when their clients' appeals are complete, leaving Plaintiffs at risk of being sent to ADX before they are even aware that they have exhausted their administrative appeals and can attempt to block the transfer. If transfer of these medically vulnerable Plaintiffs occurs, they will suffer certain injury or even death, as detailed in the declarations that support the instant motion. This request for emergency relief thus cannot wait.

Plaintiffs Coonce, Mikos, and Runyon move for relief under the prior constitutional and statutory arguments raised in their initial motion for a temporary restraining order, *see* Mot. for TRO, incorporated here by reference, as well as an additional Eighth Amendment argument not made in the prior motion: Defendants' deliberate indifference to their serious medical and mental health needs. *See* Compl. ¶¶ 152-61. Because these Plaintiffs show a likelihood of success on the merits, demonstrable risks of imminent irreparable harm, and that Defendants' actions serve no legitimate penological purpose and indeed negate BOP placement criteria entirely, this Court should enter a temporary restraining order barring Defendants from moving them to ADX to prevent unnecessary risk to their lives. That these medically vulnerable Plaintiffs have not yet

completed their administrative appeals is no bar because administrative appeals are effectively unavailable under the circumstances.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     Plaintiffs' Redesignation to ADX

On December 23, 2024, President Biden exercised his presidential power to commute the federal death sentences of 37 people, granting them sentences of life without parole. ECF 2-3 (Clemency Grant). In response, President Trump issued Executive Order No. 14164 on his first day in office, directing the Attorney General to "evaluate the places of imprisonment and conditions of confinement for each of the 37 murderers whose Federal death sentences were commuted by President Biden" and to "ensure that these offenders are imprisoned in conditions consistent with the monstrosity of their crimes and the threats they pose." ECF 2-4 (EO). Attorney General Bondi then issued a memorandum to implement EO 14164 (the "Bondi Memo"), setting in motion an unauthorized process that imminently will cast Plaintiffs into the most restrictive prison in the federal system. *See* ECF 2-5 (Bondi Memo).

The Executive Order and the Bondi Memo—together, the "Redesignation Directive"—and the actions by BOP that followed, upended BOP's policy for determining the placement of every person in federal custody, which was already well underway for Plaintiffs. *See Taylor*, 788 F. Supp 3d at 5-7 (describing the ordinary process and what had already been done for Plaintiffs prior to the Redesignation Directive). That process included considering the medical and mental health needs of Plaintiffs in matching them with appropriate facilities. Indeed, prior to the Redesignation Directive, BOP attorney Christopher Synsvoll encouraged Plaintiffs' post-conviction counsel to provide Plaintiffs' medical and mental health information to the BOP team determining new housing placements for each of the commuted individuals. *See* ECF 2-17 (Bizzaro Decl.) ¶ 11;

ECF 2-26 (Lee Decl.) ¶ 5; ECF 2-34 (Renee Decl.) ¶ 10. Those determinations included that Plaintiffs Coonce, Mikos, and Runyon were medically ineligible for ADX and should instead be sent to Federal Medical Centers ("FMCs") or U.S. Penitentiaries ("USPs") with the capability to meet their health needs. *See* Bizzaro Decl. ¶¶ 19-20, 22-23, 34 (Plaintiff Coonce found by BOP doctor to be ineligible for ADX due to his fetal alcohol spectrum disorder and intellectual disability diagnoses); Renee Decl. ¶¶ 6, 15, 17-19, 23-24 (Plaintiff Mikos, a 76-year-old with multiple co-morbidities, required Medical Care Level 3 placement and therefore could not be housed at ADX); Lee Decl. ¶ 11-12 (BOP Attorney Synsvoll acknowledged that a Care Level 3 classification may be more appropriate for Plaintiff Runyon given his severe traumatic brain injury, encephalomalacia (softening and loss of brain tissue), temporal lobe epilepsy, and vertigo).

After the Trump administration changed course, however, Defendants abandoned any regard for the medical needs and "care level" designations of the 37 commutees, including Plaintiffs Coonce, Mikos, and Runyon, either downgrading their care levels without justification

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████. ECF 45-3 (Morris Decl.) ¶¶ 11-12.

███████████████████████████████████████████████████████████████

██████████. Ex. 1 (Mikos Decl.) ¶ 24.[1]

---

[1] Citations to "Ex. __" are to the exhibits to the Declaration of C.J. Sandley, filed contemporaneously with this motion.

On September 24, 2025, news outlets reported that BOP had moved eight death row commutees from Terre Haute to ADX.[2] One article explained that "Justice Department officials" had told the outlet that "[Attorney General] Bondi has prioritized ways to penalize these individuals, in coordination with directives from Trump" and "an earlier DOJ memo"—*i.e.*, the Bondi Memo.[3] The next day, the Attorney General celebrated the occasion in the Oval Office with the President, announcing the transfers "to supermax facilities"—*i.e.*, ADX—"where they will be treated like they're on death row for the rest of their lives."[4] She later made explicit what she had implied in the Bondi Memo, stating that "Joe Biden's last-minute commutations of death row prisoners are a stain on our justice system and a betrayal of the families of victims," and "[w]e have begun transferring the monsters Biden commuted to Supermax prisons, where they will spend the rest of their lives in conditions that match their egregious crimes."[5] Neither the Attorney General nor anyone else explained how the ADX transfers could be reconciled with BOP's prior determination that Plaintiffs would not be transferred to ADX.

## II.    Plaintiffs Coonce, Mikos, and Runyon Have Diligently Tried to Exhaust Their Administrative Appeals

When Plaintiffs Coonce, Mikos, and Runyon received their final ADX designations in late May/early June 2025, a two-step administrative appeal process began. *E.g.*, Mikos Decl. ¶ 1; *Taylor*, 788 F. Supp 3d at 9. Since then, they have been attempting to pursue the BOP appeals process to the best of their abilities but have encountered delays. For example, Plaintiff Mikos'

---

[2] *See, e.g.*, Breanne Deppisch, *EXCLUSIVE: Bondi Transfers Former Death Row Inmates Commuted by Biden to 'Supermax' Prison*, Fox News Channel, (Sept. 24, 2025, 7:49 PM), https://perma.cc/W8Q2-JSMD.
[3] *Id.*
[4] Eric Daugherty (@EricLDaugh), X (Sept. 25, 2025, 9:05 PM), https://perma.cc/M7RR-3DQA.
[5] Attorney General Pamela Bondi (@AGPamBondi), X (Sept. 25, 2025, 5:47 PM), https://perma.cc/8ELX-NJBK.

BP-11 submission (the second step of his appeal) was rejected by BOP for including an attachment, even though his BP-10 submission also included that same attachment but was not rejected, and even though neither the BP-11 form itself nor 2012 Davis Memo setting forth the appeal process prohibit attaching additional pages. Sandley Decl. ¶ 9; ECF 2-9 (ADX Referral Memo). As of the date of this filing, Plaintiffs have not completed the exhaustion process of those appeals, to the best of their knowledge.[6]

In opposing Plaintiffs' initial motion for a preliminary injunction, Defendants represented to the Court that "BOP historically does not transfer inmates to ADX until the administrative-remedy process concludes" and they "do not know of any reason why that practice would change for Plaintiffs," and the Court relied on that representation in denying Plaintiffs' motion. *Taylor*, 788 F. Supp 3d at 13 (citing ECF 40-1 (Salem Decl.) ¶ 23). The circumstance have now changed, necessitating the instant motion: eight non-plaintiff individuals whose death sentences were commuted by President Biden have been transferred to ADX, Ex. 2 (Donson Decl.) at 2, demonstrating that BOP is now positioned to make these transfers, and most of the original plaintiffs in this action (17) are presumably next in line, having completed and lost their administrative appeals of their redesignations to ADX. Even though Plaintiffs Coonce, Mikos, and Runyon have not yet completed their administrative appeals, they face a risk of being transferred along with the exhausted plaintiffs: Defendants' counsel have represented to Plaintiffs' counsel

---

[6] When BOP responds to an administrative appeal of an ADX redesignation, the response is mailed to the incarcerated person (a departure from how BOP typically provides responses to grievances). Thus, there is typically a several-day delay between when someone has exhausted the administrative remedy process and when they *know* they have exhausted. Plaintiffs' counsel asked Defendants to provide prompt notification of Plaintiffs' exhaustion to avoid such a lag, and Defendants declined. In fact, BOP denied several of the original Plaintiffs' appeals on September 30, 2025, and Defendant's counsel did not inform Plaintiffs' counsel until October 16, 2025. Sandley Decl. ¶ 7. Those Plaintiffs have still not received their denials as of this filing.

that Defendants commit not to transfer any Plaintiff only until October 31, 2025. Ex. 6 (A. Warden Email); *see* Sandley Decl. ¶ 7. Indeed, when Plaintiffs' counsel explicitly asked Defendants' counsel for renewed assurances that they will not transfer any Plaintiff until he has completed his administrative appeals, even if after October 31, and to give Plaintiffs' counsel timely notice when that occurs, Defendants' counsel declined to provide such assurances. A. Warden Email.

III. **Plaintiffs Coonce, Mikos, and Runyon Have Serious Medical and Mental Health Conditions and Needs**

Plaintiffs Coonce, Mikos, and Runyon suffer from serious medical conditions, physical impairments, mental illness, and/or intellectual disabilities.

A. **Medical Conditions and Needs**

Plaintiffs Mikos and Runyon have complex and chronic medical conditions that demand ongoing specialized care. Their conditions are also deteriorating and their needs will only increase with time. They require placement in a BOP institution with an Institutional Medical Care Level of 3 or higher, *see infra* 8-9, and Defendants know full well that sending them to ADX presents an intolerable risk of serious injury, both during the process of transport to ADX and while confined at ADX, a Care Level 2 facility.

**Plaintiff Ronald Mikos** will be turning 77 in December. ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████

**Plaintiff David Runyon**, age 54, ██████████████████████████

███████████████████████████████████████████

████████████████████████████ Plaintiff Runyon's post-conviction counsel provided this

information, along with an expert neuropsychiatrist and epileptologist's declaration, to BOP during

the redesignation process. Lee Decl. ¶¶ 10-11. Based on this information, BOP Attorney Synsvoll

told Plaintiff Runyon's post-conviction counsel that his Medical Care Level 2 classification may

be inadequate and that a Care Level 3 classification may be more appropriate. *Id.* ¶ 12. ████████

███████████████████████████████████████████

██████████████████████████████████████

### B. Mental Illness and Intellectual Disabilities

Plaintiffs Coonce and Runyon have conditions that constitute serious mental illness and

place them at risk of serious psychological and physical danger during the transfer to ADX and

upon placement there.

**Plaintiff Wesley Coonce**, age 45, ██████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████ While BOP has classified Plaintiff Coonce as a Mental Health Care Level

2, Bizzaro Decl. ¶ 19, BOP Attorney Synsvoll, prior to the Redesignation Directive, told Plaintiff

Coonce's post-conviction counsel that he believed Plaintiff Coonce's care level should be higher

than 2 and that the most important factor for his post-commutation placement would be his mental

health. *Id.* ¶¶ 19-21.

Following Plaintiff Coonce's commutation, his post-conviction counsel provided BOP

with information regarding Plaintiff Coonce's fetal alcohol spectrum disorder and intellectual

disability diagnoses to be considered by BOP in determining Plaintiff Coonce's new placement.

*Id.* ¶¶ 22, 24. Nonetheless, following the Redesignation Directive and BOP's policy shift, Plaintiff

Coonce was referred for placement at ADX. *See id.* ¶ 33. ████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ *Id.* ¶ 34; Brockman Decl.

¶ 44. Despite those medical findings, Defendants dangerously overrode that conclusion and

redesignated Plaintiff Coonce to ADX anyway. *See* ECF 53-1 (Mot. to Dismiss) at 8.

**Plaintiff David Runyon**, also discussed above, ████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████ He has been diagnosed with encephalomalacia—the death of a portion of his brain. Lee

Decl. ¶ 11. ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████ Plaintiff

Runyon's post-conviction counsel provided this information to BOP during the redesignation

process following his commutation. *See* Lee Decl. ¶¶ 10-11. ████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

IV.    **ADX Is BOP's Highest Security and Most Restrictive Prison**

ADX is the most restrictive federal prison in the country.[7] It houses less than 0.25% of all people incarcerated in federal custody[8]—people whom BOP has classified as the "most violent, predatory, disruptive, and escape-prone" in federal custody. DOJ Restrictive Housing Report at 38.

Defendants are redesignating Plaintiffs to ADX's "general population," but the term is a misnomer here. Even in general population, people at ADX are imprisoned under uniquely oppressive conditions and isolated from nearly all human contact. ECF 2-10 (Gibson Decl.) at 7 ("[T]he super-max concept involves total isolation. . . . It is by far the most restrictive and isolating prison in the BOP."). They live alone in a concrete and steel cell roughly the size of a parking space. Haney Decl. ¶ 17. Their food is delivered to their cells, where they eat within arm's reach of their toilets. Gibson Decl. ¶ 7. They shower in their cells, so that staff need not engage in even the limited contact required to escort them to showers on the range.[9] Any religious or educational "programming" takes place in their cells, via closed circuit television. Haney Decl. ¶ 19. Although group prayer is an essential tenet of some faiths, religious services are only available by closed-

---

[7] *See* U.S. Dep't of Just., *Report and Recommendations Concerning the Use of Restrictive Housing – Final Report*, at 38 (Jan. 2016), https://www.justice.gov/dag/file/815551/dl (hereafter "DOJ Restrictive Housing Report"); *see also* ECF 2-11 (Haney Decl.) ¶ 14.

[8]    *Restricted    Housing*,    Fed.    Bureau    of    Prisons, www.bop.gov/about/statistics/statistics_inmate_shu.jsp (noting that ADX "is a unique facility designed to house inmates who pose the greatest risks to staff, other inmates and the public"). For reference and comparison, 3,555 people in federal custody are serving life sentences. *See Sentences    Imposed*,    Fed.    Bureau    of    Prisons, www.bop.gov/about/statistics/statistics_inmate_sentences.jsp. Nearly half of those sentenced to life imprisonment between 2016 and 2021 were convicted of murder. *Life Sentences in the Federal System*,    U.S.    Sent'g    Comm'n    (2022), www.bop.gov/about/statistics/statistics_inmate_sentences.jsp.

[9] Transcript of Trial Testimony of BOP Attorney Chris Synsvoll at 2885-86, *United States v. Saipov*, No. 17 Cr. 722 (S.D.N.Y. Feb. 22, 2023) (hereafter "Synsvoll Saipov Tr.").

circuit television. *Id.* Natural light comes through a single, narrow slit of a window, four inches wide, designed to ensure that nothing is visible except cement and sky. *Id.* ¶ 17.

People remain in these cells nearly all day, every day.[10] If they get a chance to exercise, they do so alone, either in a small cage that staff refer to as a "dog run" or in an empty indoor room only slightly larger than their cells.[11] No one at ADX can ever touch the hand of a loved one, DOJ Restrictive Housing Report at 40; all visits—including legal visits—are conducted "through a thick glass window[.]" Haney Decl. ¶ 22.[12] A leading expert has described ADX as "the most socially isolating prison environment [he has] encountered anywhere in the United States or elsewhere in the world." *Id.* ¶ 13. A former warden at ADX called it "a clean version of hell"[13] and "much worse than death."[14] The damage inflicted by conditions like those at ADX is well-documented. A "robust body of legal and scientific authority recogniz[es] the devastating mental health consequences caused by long-term isolation in solitary confinement." *Palakovic v. Wetzel*, 854 F.3d 209, 225 (3d Cir. 2017); *see* Haney Decl. ¶ 33. "These include increases in the following potentially damaging symptoms and problematic behaviors: anxiety, withdrawal, hypersensitivity, ruminations, cognitive dysfunction, hallucinations, loss of control, irritability, aggression, and

---

[10] *Compare* DOJ Restrictive Housing Report at 41 (describing 10.5 hours per week of out-of-cell time) *with* Haney Decl. ¶ 15 (finding time in cell between 22-24 hours per day).

[11] Haney Decl. ¶ 24 (explaining that recreation is "limited to the one or two days a week when they are allowed outdoor[s] . . . with a limited number of others confined individually, in separate outdoor cages").

[12] By design, even these non-contact visits are likely to be rare for most prisoners, as BOP built ADX "in a remote and sparsely populated area of Colorado, a several hour drive from the Denver International Airport." Haney Decl. ¶ 14.

[13] Mark Binelli, *Inside America's Toughest Federal Prison*, N.Y. Times (Mar. 26, 2015), https://archive.ph/XS1eE.

[14] Ray Sanchez & Alexandra Field, *What's Life Like in Supermax Prison?* CNN (Dec. 6, 2023, 2:48 PM), https://perma.cc/S86W-T8SQ.

rage, paranoia, hopelessness, a sense of impending emotional breakdown, self-mutilation, and suicidal ideation and behavior." Haney Decl. ¶ 35.

If they are sent to ADX, Plaintiffs Coonce, Mikos, and Runyon will likely endure these conditions indefinitely, in part because their health conditions will impede their ability to participate in programming that would allow them to be transferred out of the prison. Brockman Decl. ¶ 33. While ADX policy contemplates that the minimum time to progress through the Step-Down Program is over two years, *see* ECF 2-16 (FLM 5321.09(1)A), BOP acknowledges that the process could take far longer and there is no outer time limit.[15] Indeed, as recently as 2023, an Assistant United States Attorney represented, and a former BOP official testified, that the average time to step down is five to six years.[16] In addition, since Plaintiffs, like the others commutees, are being punished for their crimes of conviction and the commutations they received, there is no reason to believe the Attorney General's calculus will ever change: according to Defendant Bondi, the Government's goal is to "mov[e] them to supermax facilities where they will be treated like they're on death row for the rest of their lives."[17] The consequences for Plaintiffs Coonce, Mikos, and Runyon will be devastating.

---

[15] Further Observations of the United States of America, Inmates of the Administrative Maximum United States Prison, Case No. 13.956 (Dec. 2024) at 8, https://www.state.gov/wp-content/uploads/2024/12/Case-No.-13.956-Inmates-of-ADX-U.S.-Further-Observations.pdf.

[16] Trial Tr. (July 18, 2023) at 7, *United States v. Bowers*, No. 18 Cr. 292 (W.D. Pa. Aug. 24, 2023), ECF 1562; Trial Tr. (July 27, 2023) at 52, *United States v. Bowers*, No. 18 Cr. 292 (W.D. Pa. Aug. 1, 2023), ECF 1529.

[17] *Supra* n.4 (recorded statement of Attorney General Bondi: "As you saw very recently, we are moving the inmates who were on death row who Joe Biden or the auto pen commuted their sentences off of death row. We're moving them to supermax facilities where they will be treated like they're on death row for the rest of their lives.").

By contrast, in the typical general population unit at a United States Penitentiary, people are allowed outside their cells nearly all day.[18] They eat communally. They exercise, attend in-person educational and vocational programming, and participate in classes with others. They work and earn a salary. They can learn a trade. They can go to congregate worship and participate in communal prayer. *See generally* 28 C.F.R. § 544 (setting out programming). They have in-person, contact visits with loved ones.[19] They have access to email communications.[20]

Precisely because the conditions at ADX are so exceptionally severe, BOP has always tightly restricted placement there. Under BOP policy, people typically "'work' their way to the ADX through progressive acts of predatory violence and/or extremely disruptive behavior, demonstrating they cannot function in an open population institution without posing a risk to the safety and security of the institution staff, inmates, and the public." DOJ Restrictive Housing Report at 38. At least until the Redesignation Directive, BOP had a policy in place that typically reserved ADX for those who demonstrate "severe or chronic behavior patterns that cannot be addressed in any other Bureau institution." ECF 2-8 (PS 5100.08), ch. 7, p.17-18. For this reason, people are almost never sent to ADX in the first instance; "redesignation to another high security institution should be considered first." *Id.*; Gibson Decl. at 5 (noting that "[a] referral to ADX for

---

[18] *See generally About Our Facilities*, Fed. Bureau of Prisons, www.bop.gov/about/facilities/federal_prisons.jsp (setting out housing in various levels of custody). Though people in administrative segregation are confined to their cells, this form of detention will "generally only last for a few weeks." *Aref v. Lynch*, 833 F.3d 242, 257 (D.C. Cir. 2016); *see also Statistics: Restricted Housing*, Fed. Bureau of Prisons, www.bop.gov/about/statistics/statistics_inmate_shu.jsp (overwhelming majority of people placed in segregation are there fewer than 90 days, and fewer than ½ of one percent are in restricted housing longer than a year at a time).

[19] Fed. Bureau of Prisons, Program Statement 5267.09 (Dec. 10, 2015) (hereafter "PS 5267.09"), at 17, at www.bop.gov/policy/progstat/5267_09.pdf.

[20] *Stay in Touch*, Fed. Bureau of Prisons, https://www.bop.gov/inmates/communications.jsp (detailing methods for maintaining contact with prisoners, including email).

14

inmates who have not exhibited recent violent behavior, such as the serious assault or murder of other inmates or staff, is an abuse of the agency's discretion" because "[t]he need for such a restrictive environment is the only legitimate penological purpose for designating an inmate to the ADX."). In the ordinary course, placement at ADX should occur only after a lengthy process of consideration and observation. In effect, BOP policy and protocol "presume[] ADX is inappropriate unless conclusively shown otherwise." *Compare* Gibson Decl. at 5, *with* ECF 2-15 (Taylor Hrg. Rpt.) at 4 (presuming, based only on commuted death-sentence "inability to safely remain at any general population setting").

## V.    ADX Is a Medical and Mental Health Care Level 2 Prison That Cannot Provide Constitutionally Adequate Health Care for Plaintiffs Coonce, Mikos, and Runyon

BOP uses a medical classification system intended to match a person's healthcare needs with a facility's ability to meet those needs. Turner-Foster Decl. ¶ 6. BOP assigns each person it incarcerates a Medical Care Level signifying the degree of medical care they require, and each facility an Institutional Care Level indicating the type of medical and mental health care it is capable of providing. Turner-Foster Decl. ¶¶ 7-8; ECF 1-4 (Care Level Guidance) at 2-3.

Former BOP facility clinical director Dr. Turner-Foster explains in her declaration:

Institution Care Levels are based on an institution's clinical capabilities, proximity to medical centers, the type of care that nearby hospitals can provide, access to subspecialists, other community-based resources, local labor market, and impact on other correctional programs. Staffing levels are greater at institutions that have higher care level assignments.

Inmate Care Levels are based on a person's medical and/or mental health needs. A person with greater chronic, complex, or intense conditions and needs will have a higher Care Level, as will a person who needs more frequent interventions and services and who has less functional capability.

Turner-Foster Decl. ¶¶ 7-8.

ADX is a Care Level 2 facility, meaning that BOP has found it capable of housing only people who "have stable chronic conditions managed by Health Services employees and

15

supplemented by existing community resources." *Id.* ¶¶ 9, 14. "Care Level 2 inmates generally self-manage their conditions and need infrequent visits to medical specialists or community facilities." *Id.* ¶ 9. In contrast, "Care Level 3 institutions house inmates who have more complex medical conditions and are more fragile." *Id.* "They require frequent clinical contacts with Health Services employees and more visits to community medical specialists. They may also periodically require hospitalization to stabilize their conditions." *Id.*; *see also* Donson Decl. at 10 ("[A]n institution designated as medical Care Level 3 has a higher level of internal medical resources (including staff and infrastructure) as well as resources in the surrounding community, such as a regional hospitals and specialists, within a limited distance which enables access to all levels of care.").

Plaintiffs Coonce, Mikos, and Runyon each have health conditions and needs greater than ADX has the capability to address. Indeed, they are only being sent to ADX because Defendants downgraded their medical care levels or disregarded BOP's original assessments about their needs. ADX's remote rural location will make access to offsite specialists particularly difficult, which Plaintiffs Mikos and Runyon regularly need. *See* Turner-Foster Decl. ¶¶ 17, 65, 71. Emergency care is also distant; ADX's closest hospital is a 23-minute drive away and has only a Level IV Trauma Center. Turner-Foster Decl. ¶ 30. The closest Level I Trauma Center is an hour from ADX. *Id.*

Because ADX is the highest-security federal prison in the country, additional security protocols for offsite visits will also apply. For example, if Plaintiffs Mikos and Runyon are able to access outside specialty care, their maximum custody designations will require that they be subjected to significant restraints during transport—likely greater than what they experience currently—███████████████████████████████████████████

16

███████████████████████████████████████████████. *See* Donson Decl. at 3-4

Turner-Foster Decl. ¶¶ 72-81; Mosqueda Decl. ¶¶ 7-9. These barriers stand in addition to the

bureaucratic hurdles and understaffing that impede access to health care in general in BOP

facilities. Donson Decl. at 4-5.

## VI. Plaintiffs Coonce, Mikos, and Runyon Will Suffer Serious Injury During Transport to ADX

The first eight commutees transferred from Terre Haute to ADX in mid-September 2025

were transported in ████████████████████ Donson Decl. at 2; Ex. 7 (Gardiner Decl.)

¶ 3(c). According to an account by Shannon Agofsky—one of the commutees transferred by bus

—the men were ████████████████████. *See* Gardiner Decl. ¶ 3(d). Their

███████████████████████████████████ *Id.*; Donson

Decl. at 4.



Their ████████████████████████████████████

██████ Gardiner Decl. ¶ 3(d). ███████████████████

████████████████████████████████████

██████████████ *Id.* ¶ 3(a)-(b). The ███████████████████ to sit

hunched forward for the whole trip. *Id.* ¶ 3(g). Because of ████████████████

█████████████████ *Id.* ¶ 3(e). By the time they arrived, "he could not close his hands

or hold a pen to fill out forms." *Id*. The ███████████████████ in places causing them to "ooz[e] blood." *Id*. By the end of the trip, his wrists were so swollen that "edema fluid was leaking out." *Id*. When ███████████████, his "left wrist started bleeding again to the point where [blood] dripped on the floor." *Id*. One of the officers said, "[T]hat looks bad." *Id*. Mr. Agofsky was not offered any medical care. *Id*. Nor did he receive a medical screening when he arrived or in the weeks that followed, in contrast to his experience being transferred to other institutions within BOP. *Id*. ¶ 3(h).

During the trip itself, ████████████████████████████████████

████████████████████████████████ *Id*. ¶ 3(f). █████████████████
██████████████████████████████ made it impossible to go without
urinating on himself. *Id*. ████████████████████████████████████
██████████████████████ *Id*. ¶ 3(c).
████████████████████████ *Id*.

Plaintiffs Coonce, Mikos, and Runyon recognize that their transport to another prison at some point is inevitable given that they can no longer remain in the Terre Haute SCU now that they are no longer serving death sentences. *See* Renee Decl. ¶ 4. But among the unique harms here is the risk of multiple transports, in the manner described above, if Plaintiffs are sent to ADX but ultimately prevail in their claims and are therefore redesignated to other facilities. As demonstrated by Mr. Agofsky's account, each of these moves would entail, at best, "lengthy periods of time spent in highly restrictive restraints with limited toilet access and difficulties eating, along with a very limited ability to address medical and mental health needs." Donson Decl. at 3 While transport one way would be excruciating on its own given Plaintiffs' medical and mental health conditions

and BOP's limited to non-existent accommodations, forcing these men to undergo the trip multiple times would be untenable.

The risks of transport arise in part from the likelihood that Plaintiffs will be transported by bus or van in a large group.[21] *See* Donson Decl. at 2. Large group transport presents particular risks for Plaintiffs Coonce and Runyon, whose symptoms of serious mental illness may be exacerbated by the intense stress of the situation—including possible security conditions like ███████████████

████████████████, as Mr. Agofsky described—and result in behavior that may elicit the use of force by correctional staff. Brockman Decl. ¶¶ 36, 38; Gardiner Decl. ¶ 3(c). Plaintiffs will also without doubt be placed in highly restrictive restraints, including the black box, for the 16-plus-hour driving trip from Terre Haute, Indiana, to Florence, Colorado. Donson Decl. at 4, 9; Gardiner Decl. ¶ 3(a)-(b), (d)-(e). With the black box restraints, for example, "proper hygiene following defecation would be impossible," let alone the ability to urinate; even the movement needed to feed oneself is severely restricted. Donson Decl. at 4; *see* Gardiner Decl. ¶ 3(f). Swelling occurs when the black box is used for any length of time, but given the duration here, and the forced forward hunch caused by the hands and feet being shackled to the waist, ████████████████

████████████████████████████████████████████████████

████████████████ *See* Gardiner Decl. ¶ 3(e); Mosqueda Decl. ¶¶ 4, 12. As former BOP case manager Jack Donson states, leg shackles and belly chains are "simply cruel for people who are

---

[21] It is also possible, though unlikely, that Defendants will transport Plaintiffs to ADX by plane. Transport by plane would still involve "lengthy periods of time spent in highly restrictive restraints with limited toilet access and difficulties eating, along with a very limited ability to address medical and mental health needs." Donson Decl. at 3. Any individualized attention that requires medical or mental health expertise and release from restraints will be difficult—if not impossible—to accommodate and "[t]hese prisoners are likely to be deprived of that attention for periods of many hours at a time, possibly over several days." Donson Decl. at 4.

elderly and/or have certain health conditions which make them susceptible to falls and restraint lesions that are prone to infections in the correctional setting such as MRSA." Donson Decl. at 4; *see also* Mosqueda Decl. ¶ 7. Another factor making this transport dangerous for Plaintiffs with mobility issues is that they will be issued soft shoes, similar to slippers, for the transport, which "combined with leg irons makes movement/walking difficult, especially for those with unstable gait, mobility impairments, or prosthetic limbs." Donson Decl. at 5. In shackles and soft shoes, forced to get on and off vehicles, ████████████████████████████ *See* Mosqueda Decl. ¶ 9. Furthermore, minimal, if any, healthcare staff will join the transport, making it "simply impossible" to treat any of these medically vulnerable Plaintiffs "with careful individual attention." Donson Decl. at 5; *see* Brockman Decl. ¶ 36. Even after the trip, and despite medical need, medical care and screenings may not be provided. Gardiner Decl. ¶ 3(e), (h).

## LEGAL STANDARD

To obtain a temporary restraining order, Plaintiffs must show that: (1) they will likely succeed on the merits; (2) they will likely be irreparably harmed if relief were withheld; (3) the balance of equities tilts their way; and (4) the public interest favors injunctive relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

**I.    Plaintiffs Coonce, Mikos, and Runyon Are Likely to Succeed on the Merits of Count Four, Their Eighth Amendment Deliberate Indifferent Claim**

### A.  Administrative Exhaustion Is Not Available Here

Incarcerated people are generally required to exhaust administrative remedies under the PLRA before bringing actions. 42 U.S.C. § 1997e(a); *Taylor*, 788 F. Supp. 3d at 4. The PLRA requires exhaustion only of "available" remedies, meaning remedies "capable of use" to obtain

"some relief." *Ross v. Blake*, 578 U.S. 632, 642 (2016) (citations omitted); *Doe v. McHenry*, 763 F. Supp. 3d 81, 86 (D.D.C. 2025).

The Seventh Circuit and other federal district courts have recognized that "[i]f a prisoner has been placed in imminent danger of serious physical injury by an act that violates his constitutional rights, administrative remedies that offer no possible relief in time to prevent the imminent danger from becoming an actual harm can't be thought available." *Fletcher v. Menard Corr. Ctr.*, 623 F.3d 1171, 1173 (7th Cir. 2010) (Posner, J.). An "imminent health threat" that puts incarcerated people at risk can render an "administrative process inadequate to the task of handling Plaintiffs' urgent complaints regarding their health." *McPherson v. Lamont*, 457 F. Supp. 3d 67, 81 (D. Conn. 2020).

This Court recently concluded that administrative remedies were unavailable in *Doe v. McHenry*, another BOP case involving executive order-mandated transfers that were likely to lead to serious physical (and psychological) harm. There, transgender women facing mandatory transfer to men's prisons were likely to experience physical and sexual violence and worsening symptoms of gender dysmorphia. *Doe*, 763 F. Supp. 3d at 88-89. Similarly, here, Plaintiffs Coonce, Mikos, and Runyon face an imminent threat of serious physical injury while they await BOP's response to their grievances. The harms that could befall them at and during transport to ADX for even a short time include, ███████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ Mosqueda Decl. ¶ 11; Turner-Foster Decl. ¶ 59; and for Plaintiffs Coonce and Runyon, "a significant risk of a physical altercation or other use-of-force response to the symptoms of a person with serious mental illness under the stress of a long-distance transfer[,]" Brockman Decl. ¶¶ 36, 38; "complete breakdown of the psyche and disconnection from reality,

and collapse and withdrawal from ordinary life[,]" self-harm, and even death by suicide. Brockman Decl. ¶¶ 36, 38, 125, 146; Haney Decl. ¶¶ 30, 43.

The risks of danger to Plaintiffs at ADX and during transport are thus clear, and the risks are also imminent. Eight commutees have already been transferred, meaning that BOP is operationally prepared to make transfers, as is ADX prepared to receive the commutees. Defendants' counsel have only committed not to transfer any Plaintiff to ADX before October 31. A. Warden E-mail. When specifically asked by Plaintiffs' counsel for assurances that Plaintiffs whose appeals are still pending will not be moved before their administrative processes are complete—even if that is after October 31—Defendants' counsel's only response was that "BOP does not commit to anything beyond that date." *Id.* BOP and ADX's readiness, coupled with Defendants' failure to provide assurances about unexhausted Plaintiffs, *id.*, as well as BOP's operational interest in transferring the remaining Plaintiffs at USP-Terre Haute to ADX together as a group, Donson Decl. at 2, 9, creates a more than speculative risk that Plaintiffs Coonce, Mikos, and Runyon could be transferred in short order with the other commutees. Meanwhile, Defendants' ongoing and public animus toward Plaintiffs hangs over the process, urging it forward.[22] With the imminent life-threatening risks Plaintiffs face and the real possibility that they will be transferred to ADX before they exhaust their administrative appeals, the Court should find that the grievance process is unavailable.[23]

---

[22] *See, e.g.*, *supra* n.5 ("Joe Biden's last-minute commutations of death row prisoners are a stain on our justice system and a betrayal of the families of victims," and "[w]e have begun transferring the monsters Biden commuted to Supermax prisons, where they will spend the rest of their lives in conditions that match their egregious crimes.").

[23] Additionally, given BOP's unexplained and arbitrary rejection of Plaintiff Mikos' BP-11 form, *see* Sandley Decl. ¶ 9, there is sufficient evidence to find that the exhaustion process is unavailable for him because prison administrators are thwarting him "from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 578 U.S. at 643-44.

In addition, these medically vulnerable Plaintiffs could be transferred to ADX before they actually receive their final administrative appeal responses because several days typically elapse between the time when BOP issues a response and when an incarcerated person receives it. For example, Plaintiff Mikos' first-step BP-10 grievance response was dated July 17, 2025, by BOP, and Plaintiff Mikos did not receive it until July 21. Sandley Decl. ¶ 9. Plaintiffs' counsel has asked Defendants' counsel to provide notice as soon as BOP issues final administrative grievance responses to the Plaintiffs, but Defendants' counsel has declined to do so, instead waiting over two weeks to notify Plaintiffs' counsel of several of the original Plaintiffs' final appeal responses (and Plaintiffs themselves have still not received copies of the denials, which were issued nearly three weeks ago). Sandley Decl. ¶ 7; *see* A. Warden Email. The administrative appeals process may thus very well conclude for Plaintiffs Coonce, Mikos, and Runyon before they are aware. Plaintiffs could be transferred during that window, without the ability to file a motion for emergency relief in time to prevent their transfers.

**B. Plaintiffs Coonce, Mikos, and Runyon Are Likely to Succeed on the Merits of Their Eighth Amendment Deliberate Indifference Claim**

Deliberate indifference to serious medical and mental health needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *Brown v. Plata*, 563 U.S. 493, 510-11 (2011); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Both current harm and the risk of future harm are protected. *See Helling v. McKinney*, 509 U.S. 25, 33-34 (1993) ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."). Defendants are deliberately indifferent if they know of and disregard an excessive risk to an incarcerated person's health. *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994). Placing Plaintiffs Coonce, Mikos, and Runyon in ADX constitutes such deliberate indifference because ADX is not equipped to address their medical and mental

23

health needs and because the profoundly restrictive setting will exacerbate the risk of harm from their health conditions. Further, the transfer process itself will impose serious hardship and risk of injury and death to these Plaintiffs.

### 1. Plaintiffs Have Serious Medical and Mental Health Needs

Each of these medically vulnerable Plaintiffs has serious medical and/or mental health needs. *See supra* 7-11. BOP officials previously concluded that Plaintiffs' medical and mental health conditions precluded placement at ADX. *Supra* 9-11. Despite the known risks to these Plaintiffs, Defendants have redesignated them to ADX in dangerous disregard for the harm that is certain to occur.

### 2. Transfer to and Incarceration at ADX Poses Significant Risks of Serious Harm to Plaintiffs

*Mental Health Harm*

According to Dr. Andrea Brockman, a former ADX psychologist with over a decade of experience providing and directing care in multiple BOP correctional environments, "placing seriously mentally ill and/or cognitively impaired persons at ADX, and even transporting them there, creates a substantial risk of serious physical harm and long-lasting psychiatric symptoms." Brockman Decl. ¶ 38.

Dr. Brockman has described risks to Plaintiffs with serious mental illness in immediate anticipation of transfer, during the transfer, and while at ADX. Regarding the current anticipatory stage, Dr. Brockman emphasizes the impact on Plaintiffs Coonce and Runyon of facing the possibility that they will never leave ADX, both because their mental illness and/or cognitive impairments make it unlikely that they can complete the step-down process, Brockman Decl. ¶¶ 33-34, 119, and because of Defendant Bondi's repeated public statements that Plaintiffs will

remain at ADX for the rest of their lives.[24] This current pre-transfer "acute period poses the highest risk of suicide and self harm." *Id.* ¶ 125.

Dr. Brockman also identified significant risks during the transfer process, likely "in full shackles and a 'black box' handcuff cover for many hours, with ordinary medication dispensing compromised, and in close proximity to many people in various states of stress." *Id.* ¶ 36. For Plaintiffs Coonce and Runyon, Dr. Brockman finds:

> a significant risk of a physical altercation or other use-of-force response to the symptoms of a person with serious mental illness under the stress of a long-distance transfer, with added security and restraints, and a break from the ordinary routines under which prisoners with serious mental illness function best. This creates the risk of an improper, and potentially dangerous, response by untrained staff.

*Id.* Her findings are echoed by former BOP official Jack Donson, who writes that "[t]here is a good chance, if someone is sufficiently agitated, that their actions may cause staff to use force to restrain them, and then remove and isolate them, possibly in four-point restraints. The potential for disruptive incidents and injuries in such a close, intense, crowded environment is high." Donson Decl. at 8. He concludes that the "operational complexities, severe restraint policies, and lengthy deprivations that transportation will involve would be extremely taxing, physically and mentally, on someone in average overall health. The impact on people who have serious medical needs, physical disabilities, and mental health vulnerabilities could be severe." *Id.* at 12.

Dr. Brockman's prognosis for these Plaintiffs at ADX, even in the short term, is even bleaker. "In terms of psychiatric harm, even for those who do not take their lives or attempt to do so, their tenuous connection to reality will become greatly exacerbated by constant isolation in ADX's uniquely severe conditions and without adequate treatment." Brockman Decl. ¶ 38. Particularly given Defendants' intention to keep Plaintiffs at ADX for the rest of their lives and

---

[24] *Supra* n. 5

acknowledgement by BOP of Plaintiffs' inability to navigate out of the facility through the step-down program, these Plaintiffs are at risk for a "complete breakdown of the psyche and disconnection from reality, and collapse and withdrawal from ordinary life." *Id.* ¶ 146; *see also id.* ¶¶ 25-26, 142 (recounting inadequacies in ADX mental-health treatment).

  ***Medical Harm***

  Dr. Nicoletta Turner-Foster, a former prison clinical director with decades of experience delivering and supervising medical care in the BOP system, explains, "No one in BOP custody should be designated to a facility that does not match their Care Level. When a person is designated to an institution that cannot meet their medical needs, they face significant risks to their physical safety and well-being." Turner-Foster Decl. ¶ 12; *see also* Mosqueda Decl. ¶ 12.





The difficulties of transporting people incarcerated at ADX outside the prison for specialty medical care—which both Mr. Mikos and Mr. Runyon require frequently—are manifold: approval is a long, bureaucratic process "that discourage[s] approval of care"; the transfer itself takes multiple staff members, at a time of extreme staffing shortages in BOP; and patients are transported in full restraints, adding profound physical and mental stress to the experience. Donson Decl. at 11; *see also* Turner-Foster Decl. ¶ 29. The difference from Terre Haute (or another Care Level 3 facility) to ADX is so profound "you're putting patients' lives in jeopardy by putting them in Care

Level 2 at ADX when they need higher levels of medical care." Donson Decl. at 11; *see also* Turner Foster Decl. ¶ 12 ("When a person is designated to an institution that cannot meet their medical needs, they face significant risks to their physical safety and well-being.").

In sum, ADX cannot provide the level of medical care required by Plaintiffs Mikos and Runyon. They are likely to experience serious harm and even death if they do not receive the necessary medical care. Turner Foster Decl. ¶ 4; Mosqueda Decl. ¶¶ 13-14; Donson Decl. at 11.

### *Transport Harms*

Plaintiffs Coonce, Mikos, and Runyon could face transport to ADX as soon as October 31, 2025. As detailed above, that transport will likely entail at ███████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████. Gardiner Decl. ¶ 3(a)-(b), (d). Plaintiffs can expect that staff will not remove the restraints at any point during the transport to ADX, including to use the restroom. *Id.* ¶ 3(e)-(f).

Without the availability of appropriate medical and mental health care during their transport to ADX, Plaintiffs will predictably experience gratuitous pain, and serious and irreparable physical and psychological harm. ████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

████ Likewise, Plaintiffs Coonce and Runyon, because of their serious mental illness and/or

intellectual disabilities, face a significant risk of serious harm from "physical altercation or other use-of-force response to the symptoms of a person with serious mental illness under the stress of a long-distance transfer," "decompensation and profound distress." Brockman Decl. ¶¶ 36-37.

Critically, the possibility of multiple transfers, should Plaintiffs prevail on the merits of their claims after transfer to ADX and ultimately be redesignated to another facility, "would multiply the damage." Brockman Decl. ¶ 37; ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████

### 3. Defendants Have Acted with Deliberate Indifference to Plaintiffs' Serious Medical and Mental Health Needs by Redesignating Them to ADX

Defendants' decision to redesignate Plaintiffs to ADX—a facility they know is not equipped to manage and treat their serious medical needs—demonstrates deliberate indifference. Deliberate indifference to serious medical needs is evidenced by a failure "to provide timely, available, and appropriate treatment for a known, serious medical condition posing excessive risk to an inmate's health or safety[.]" *Bernier v. Allen*, 38 F.4th 1145, 1151 (D.C. Cir. 2022). For example, an official who "intentionally den[ies] or delay[s] access to medical care or intentionally interfere[s] with the treatment once prescribed" acts with deliberate indifference in violation of the Eighth Amendment. *Brown v. District of Columbia*, 514 F.3d 1279, 1283 (D.C. Cir. 2008) (alterations in original) (quoting *Estelle v. Gamble*, 429 U.S. 97, 105 (1976)).

Further, the D.C. Circuit has "assumed" that treatment decisions "based exclusively on nonmedical considerations such as cost or administrative convenience rather than any medical justification can suffice to state an Eighth Amendment deliberate indifference claim." *Bernier*, 38 F.4th at 1151. This is in accord with other courts, which hold that the delay or denial of medical

care for non-medical reasons constitutes deliberate indifference. *See, e.g.*, *Colwell v. Bannister*, 763 F.3d 1060, 1063 (9th Cir. 2014) (holding that the "blanket, categorical denial of medically indicated surgery solely on the basis of an administrative policy . . . is the paradigm of deliberate indifference"); *Roe v. Elyea*, 631 F.3d 843, 861-63 (7th Cir. 2011) (holding that doctor who implemented blanket policy basing HCV treatment on sentence length rather than a patient's individual condition was deliberately indifferent); *De'Lonta v. Angelone*, 330 F.3d 630, 635 (4th Cir. 2003) (holding that plaintiff adequately states an Eighth Amendment claim when medical care is denied "based solely on the Policy rather than on a medical judgment concerning [the plaintiff's] specific circumstances.").

As described above, ADX is simply not equipped to provide the level of care Plaintiffs Coonce, Mikos, and Runyon require because of its severely restrictive, isolating environment; its Care Level 2 designation with fewer health care staff and limited access to outside specialty, emergency and hospital resources; and the barriers to outside care presented by the security requirements of moving people incarcerated at ADX. BOP, in knowingly transferring these Plaintiffs to ADX, will be unable to provide "timely, available, and appropriate treatment" for their serious medical conditions, placing each of them at a substantial risk of serious harm. *See Bernier*, 38 F.4th at 1151. Moreover, this determination was based not on individualized medical needs or even legitimate security concerns, but "based exclusively on nonmedical considerations": the Redesignation Directive and clear animus by Defendants Trump and Bondi. *See Bernier*, 38 F.4th at 1151; ███████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████

30

Despite their knowledge of Plaintiffs' serious medical and mental health conditions and the risk that ADX placement entails, Defendants have nevertheless designated them to ADX in deliberate indifference to their serious medical and mental health needs.

### 4. Redesignation to ADX Will Cause Plaintiffs Coonce, Mikos, and Runyon Irreparable Harm

To obtain a preliminary injunction, Plaintiffs must demonstrate that irreparable injury "is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. Irreparable injury results where damages cannot adequately compensate for the loss if the injunction is denied. *Conservation L. Found. v. Ross*, 422 F. Supp. 3d 12, 34 (D.D.C. 2019) (preliminary injunction appropriate where "remedies available at law, such as monetary damages, are inadequate to compensate for that injury." (citation omitted)); *Nat'l Senior Citizens L. Ctr., Inc. v. Legal Servs. Corp.*, 581 F. Supp. 1362, 1372 (D.D.C. 1984) (finding injunction appropriate where money damages could not adequately compensate for plaintiff's injuries). A showing of *likely* future harm can qualify as irreparable. *See Doe v. McHenry*, 763 F. Supp. 3d 81, 89 (D.D.C. 2025) ("[A] prospective violation of a constitutional right constitutes irreparable injury . . . ." (quoting *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998))); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 540 F. Supp. 3d 45, 55 (D.D.C. 2021) (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 162 (2010); and *Winter*, 555 U.S. at 22).

Here, the standard is met. Plaintiffs Coonce, Mikos, and Runyon face imminent, irreparable risks of serious harm from transport to and placement at ADX, even for a short time. Brockman Decl. ¶ 38 ("[P]lacing seriously mentally ill and/or cognitively impaired persons at ADX, and even transporting them there, creates a substantial risk of serious physical harm and long-lasting psychiatric symptoms."). Even with the provision of *some* medical and mental health care, there are still serious risks of irreparable harm. ████████████████████

31

███████████████████████████████████████████████

████████████ Indeed, *no* amount of mental health care will prevent these Plaintiffs from suffering the harms of solitary confinement at ADX. *See generally* Haney Decl.

Plaintiffs Coonce and Runyon, because of their serious mental health needs and intellectual disabilities, face a substantial risk of physical injury from the acute stress of the pre-transfer period; from the stress of transport itself, including a risk of an altercation or assault; and of course once at ADX, a "complete breakdown of the psyche and disconnection from reality, and collapse and withdrawal from ordinary life," self-harm, and even death by suicide. Brockman Decl. ¶¶ 36, 38, 125, 146; *see also* Donson Decl. at 3-5, 7; Haney Decl. ¶¶ 30, 85.

Plaintiffs Mikos and Runyon, because of their serious medical needs, also face significant risks to their physical safety and health. Turner-Foster Decl. ¶¶ 65, 70-71, 83; *see also* Mosqueda Decl. ¶ 12. The difference from Terre Haute (or another Care Level 3 facility) to ADX is so profound that "you're putting patients' lives in jeopardy by putting them in Care Level 2 at ADX when they need higher levels of medical care." Donson Decl. at 11. ████████████

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████

Courts have recognized that such injuries are irreparable. *See, e.g.*, *Callicotte v. Cheney*, 744 F. Supp. 3, 3 n.1 (D.D.C. 1990) (discussing risk of suicide as irreparable harm); *M.G.U. v. Nielsen*, 325 F. Supp. 3d 111, 122 (D.D.C. 2018) ("profound hopelessness, despair, depression and even suicidal urges" are irreparable harm); *Al-Joudi v. Bush*, 406 F. Supp. 2d 13, 20 (D.D.C. 2005) (finding irreparable harm where Guantanamo Bay detainees engaged in a hunger strike were "vulnerable to further physical deterioration, and possibly death, by virtue of their custodial status at Guantanamo and weakened physical condition"); *Edmo v. Corizon, Inc.*, 935 F.3d 757, 797-98 (9th Cir. 2019) (holding that "severe, ongoing psychological distress" and a "high risk of . . . suicide" constitute irreparable harm); *Ahlschlager v. Imhof*, No. 24 Civ. 8267, 2024 WL 5168732, at *3 (E.D.N.Y. Dec. 19, 2024) (increased risk of depression, anxiety, unsteady gait and falling due to loss of service dog constitutes irreparable harm).

## II.    The Balance of Equities and Public Interest Weigh Heavily in Plaintiffs' Favor

In cases against the government, courts can consider the balance of equities and the public interest together. *See Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). Where the government's actions violate the Constitution and subject plaintiffs to irreparable harm, both the equities and the public interest weigh in plaintiffs' favor. "It is always in the public interest to prevent the violation of a party's constitutional rights." *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (internal quotation marks and citation omitted); *see also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (same).

As described in detail in this Memorandum, the Redesignation Directive and BOP's new policy will place Plaintiffs Coonce, Mikos, and Runyon at unique risk of grave harm during

transport to and upon arrival at ADX. And it will do this for no legitimate penological purpose, but only to give expression to vindictive animus. The equities and public interest align on Plaintiffs' side, with no legitimate interest at all on the Defendants' side. This factor, like the others this Court must consider, weighs heavily in favor of an injunction.

<u>**CONCLUSION**</u>

Plaintiffs Coonce, Mikos, and Runyon's death sentences were lawfully commuted. Defendants cannot now reimpose the death sentence by subjecting these medically high-risk Plaintiffs to conditions that place them at substantial risk of profound harm. Nor can Defendants place these Plaintiffs in imminent danger of serious physical injury while Plaintiffs wait to complete their administrative grievances. An administrative remedy process that ties a person's hands from taking protective measures in the face of imminent danger of serious injury is not an available process.

For the foregoing reasons, Plaintiffs respectfully request that the Court grant this Motion for a Temporary Restraining Order, enjoin Defendants from redesignating and transferring Plaintiffs Coonce, Mikos, and Runyon to ADX, and direct Defendants to enforce the placement designations reached by BOP prior to the Bondi Memo. The Court should also retain jurisdiction over the matter to ensure that categorical redesignations are not applied to these Plaintiffs in the future, and waive a security bond under Rule 65(c). A proposed Order is attached.

Dated: October 21, 2025
        Washington, DC

Brian Stull, N.C. 36002*
Claudia Van Wyk, Penn. 95130*
**ACLU FOUNDATION**
201 W. Main St., Ste. 402
Durham, NC 27701
Tel: (919) 682-5659
bstull@aclu.org
cvanwyk@aclu.org

Corene T. Kendrick, Cal. 226642*
**ACLU FOUNDATION**
425 California St., Ste. 700
San Francisco, CA 94104
Tel: (202) 393-4930
ckendrick@aclu.org

Laura Rovner, Colo. 35592*
Nicole Godfrey, Colo. 41546
Miriam Kerler, Colo. 56575
**STUDENT LAW OFFICE**
**UNIVERSITY OF DENVER**
**STURM COLLEGE OF LAW**
2255 E. Evans Ave., Ste. 335
Denver, CO 80210
Tel: (303) 871-6140
laura.rovner@du.edu
nicole.godfrey@du.edu
miriam.kerler@du.edu

Respectfully submitted,

*/s/ Maria V. Morris*
David C. Fathi, Wash. 24893**
Maria V. Morris, D.C. 1697904
Carmen Iguina González, D.C. 1644730
Jennifer Wedekind, D.C. 1012362
**ACLU FOUNDATION**
915 15th Street NW
Washington, DC 20005
Tel: (202) 393-4930
dfathi@aclu.org
mmorris@aclu.org
ciguinagonzalez@aclu.org
jwedekind@aclu.org

Sara Norman, Cal. 189536*
**LAW OFFICES OF SARA NORMAN**
P.O. Box 170462
San Francisco, CA 94117
Tel: (415) 236-3763
sara@saranormanlaw.com

C.J. Sandley, Ala. 5317-S48R*
Kayla Vinson, Ala. 3664-S48Q*
D. Korbin Felder, Miss. 106643*
**CENTER FOR CONSTITUTIONAL**
**RIGHTS**
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6443
csandley@ccrjustice.org
kvinson@ccrjustice.org
kfelder@ccrjustice.org

35

Joseph Margulies, Ill. 6198353***
**CORNELL UNIVERSITY**
Professor of the Practice of Government
216 White Hall
Ithaca, NY 14850
Tel: (607) 255-6477
jm347@cornell.edu

David Patton*
Ian Robertson*
Krysta Kilinski*
**HECKER FINK LLP**
350 Fifth Ave, 63rd Floor
New York, NY 10118
Tel: (212) 763-0883
dpatton@heckerfink.com
irobertson@heckerfink.com
kkilinski@heckerfink.com

*Attorneys for Plaintiffs*

*\* Admitted pro hac vice.*
*\*\* Not admitted in D.C.; practice limited to*
*federal courts. Admitted pro hac vice.*
*\*\*\* Admitted to D.D.C. as pro bono counsel.*