**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| REJON TAYLOR, *et al.*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) Case No. 1:25-cv-01161-TJK |
| | ) |
| DONALD J. TRUMP, President of the United States, *in his official capacity*, et al., | ) |
| | ) |
| *Defendants*. | ) |
| | ) |
| REJON TAYLOR, *et al.*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) Case No. 1:25-cv-03742-TJK |
| | ) |
| DONALD J. TRUMP, President of the United States, *in his official capacity*, et al., | ) |
| | ) |
| *Defendants*. | ) |

**DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR TEMPORARY RESTRAINING ORDER**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

FACTUAL AND LEGAL BACKGROUND .......................................................................... 2

I.   The Attorney General's Oversight of BOP, and BOP's Authority to Designate
     Inmates' Place of Imprisonment ........................................................................ 2

II.  Commutation of Plaintiffs' Death Sentences, and BOP's Housing
     Redesignations Process and Decisions ............................................................. 4

III. Plaintiffs' Earlier Attempt to Challenge Their Designation to ADX: *Taylor I* ............... 9

IV.  *Taylor II* ............................................................................................................. 10

V.   The Motions for TRO ......................................................................................... 10

LEGAL STANDARD .......................................................................................................... 11

ARGUMENT ....................................................................................................................... 12

I.   Plaintiffs Cannot Show Likelihood of Success on the Merits of Their Claims .............. 12

     A.   The Court Lacks Subject Matter Jurisdiction ............................................. 12

          1.   The United States has not waived sovereign immunity. ................... 13

          2.   Congress has specifically precluded judicial review of Plaintiffs'
               challenges to BOP's transfer process. ............................................. 15

          3.   *Taylor I* Plaintiffs, who have not exhausted, lack standing. ............. 18

     B.   Plaintiffs are unable to succeed on the merits of their Administrative
          Procedure Act claims. ................................................................................ 19

          1.   Plaintiffs' APA claims are foreclosed by 18 U.S.C. § 3625. ............. 20

          2.   The AG Memo and the "Mandatory ADX Policy" are not subject to
               APA review because they are not final agency actions. ................... 20

          3.   The AG Memo and alleged "Mandatory ADX Policy" are not subject to
               APA review because Congress committed inmate housing designation
               determinations to agency discretion. ................................................ 23

          4.   The AG Memo is lawful. ................................................................... 24

          5.   There was no "Mandatory ADX Policy." ........................................... 26

i

C.   Plaintiffs are unlikely to succeed on the merits of their Fifth Amendment claims. ................................................................................................ 27

1.   Plaintiffs do not clearly establish a violation of procedural due process. ........ 27

2.   Plaintiffs do not clearly establish a violation of equal protection. ................... 31

D.   Plaintiffs are unlikely to succeed on the merits of their Eighth Amendment claim. ................................................................................................ 34

1.   Plaintiffs do not show an "excessive risk to inmate health or safety" from transfer to ADX. ................................................................. 35

2.   Plaintiffs do not show Defendants' subjective awareness of substantial risk of serious harm. ................................................................. 36

E.   The *Taylor I* Plaintiffs are unlikely to succeed for the additional reason that they have not exhausted their administrative remedies. ........................................... 38

II.   Plaintiffs Fail to Establish Irreparable Harm ................................................... 40

III.   The Balance of the Equities and the Public Interest Favor the Government. ................ 41

CONCLUSION ................................................................................................ 42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ahmad v. Jacquez,*
  860 F. App'x 459 (9th Cir. 2021) ......................................................... 16

*Ajaj v. United States,*
  293 F. App'x 575 (10th Cir. 2008) ....................................................... 35

*Argentine Republic v. Amerada Hess Shipping Corp.,*
  488 U.S. 428 (1989) ............................................................................. 18

*Barr v. Pearson,*
  909 F.3d 919 (8th Cir. 2018) ............................................................... 37

*Bennett v. Spear,*
  520 U.S. 154 (1997) ....................................................................... 21, 23

*Bernier v. Allen,*
  38 F.4th 1145 (D.C. Cir. 2022) ...................................................... 34, 35

*Bolling v. Sharpe,*
  347 U.S. 497 (1954) ............................................................................. 31

*Brandon v. D.C. Bd. of Parole,*
  823 F.2d 644 (D.C. Cir. 1987) ............................................................. 32

*Brown v. BOP,*
  602 F. Supp. 2d 173 (D.D.C. 2009) ..................................................... 20

*Chamber of Com. of U.S. v. Reich,*
  74 F.3d 1322 (D.C. Cir. 1996) ............................................................. 13

*Chaplaincy of Full Gospel Churches v. England,*
  454 F.3d 290 (D.C. Cir. 2006) ....................................................... 40, 41

*Chef Time 1520 LLC v. Small Bus. Admin.,*
  646 F. Supp. 3d 101 (D.D.C. 2022) ..................................................... 11

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ............................................................................. 18

*CropLife Am. v. EPA,*
  329 F.3d 876 (D.C. Cir. 2003) ............................................................. 21

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
452 F.3d 798 (D.C. Cir. 2006) ................................................ 21, 22, 23

*Davis v. BOP*,
2016 WL 1156755 (D. Colo. Mar. 24, 2016) ................................ 35

*Delaney v. DeTella*,
256 F.3d 679 (7th Cir. 2001) .................................................... 37

*Doe v. McHenry*,
763 F. Supp. 3d 81 (D.D.C. 2025) ......................................... 17, 39

*Estelle v. Gamble*,
429 U.S. 97 (1976) ................................................................ 34, 36

*Farmer v. Brennan*,
511 U.S. 825 (1994) ........................................................... *passim*

*FDA v. Wages & White Lion Invs., LLC*,
145 S. Ct. 898 (2025) ................................................................ 26

*FDIC v. Meyer*,
510 U.S. 471 (1994) .................................................................. 13

*Fletcher v. DOJ*,
17 F. Supp. 3d 89 (D.D.C. 2014) ............................................... 13

*Fletcher v. Menard Corr. Ctr.*,
623 F.3d 1171 (7th Cir. 2010) ................................................... 38

*Gowadia v. Stearns*,
596 F. App'x 667 (10th Cir. 2014) ............................................. 35

*Hanson v. District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024) .................................................. 11

*Hardy v. District of Columbia*,
601 F. Supp. 2d 182 (D.D.C. 2009) ........................................... 34

*Harrison v. BOP*,
248 F. Supp. 3d 172 (D.D.C. 2017) ........................................... 13

*Hatch v. Dist. of Columbia*,
184 F.3d 846 (D.C. Cir. 1999) ................................................... 28

*Hatim v. Obama*,
   760 F.3d 54 (D.C. Cir. 2014) ................................................................. 33, 42

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ................................................................................. 24

*Helling v. McKinney*,
   509 U.S. 25 (1993) ................................................................................... 36

*Hewitt v. Helms*,
   459 U.S. 460 (1983) ................................................................................. 30

*Hill v. Pugh*,
   75 F. App'x 715 (10th Cir. 2003) ........................................................... 35

*In re Robinson*,
   917 F.3d 856 (5th Cir. 2019) .................................................................... 4

*J. Roderick MacArthur Found. v. FBI*,
   102 F.3d 600 (D.C. Cir. 1996) ............................................................... 18

*James v. Reno*,
   39 F. Supp. 2d 37 (D.D.C. 1999) ........................................................... 33

*Johnson v. Daley*,
   339 F.3d 582 (7th Cir. 2003) .................................................................. 31

*Jordan v. BOP*,
   191 F. App'x 639 (10th Cir. 2006) ......................................................... 28

*Khadr v. United States*,
   529 F.3d 1112 (D.C. Cir. 2008) .............................................................. 12

*Knapp Med. Ctr. v. Hargan*,
   875 F.3d 1125 (D.C. Cir. 2017) .............................................................. 18

*Ky. Dep't of Corr. v. Thompson*,
   490 U.S. 454 (1989) ........................................................................... 27, 28

*Lane v. Pena*,
   518 U.S. 187 (1996) ................................................................................. 13

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ................................................................................. 24

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................... 12, 18, 19

*Lyle v. Sivley*,
    805 F. Supp. 755 (D. Ariz. 1992) ............................................................. 14

*Marshall v. Reno*,
    915 F. Supp. 426 (D.D.C. 1996) ............................................................. 33

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ................................................................................. 29

*McKune v. Lile*,
    536 U.S. 24 (2002) ............................................................................ 24, 42

*McMillan v. Wiley*,
    813 F. Supp. 2d 1238 (D. Colo. 2011) ................................................... 35

*McPherson v. Lamont*,
    457 F. Supp. 3d 67 (D. Conn. 2020) ...................................................... 38

*Meachum v. Fano*,
    427 U.S. 215 (1976) .......................................................................... 16, 28

*Molycorp, Inc. v. EPA*,
    197 F.3d 543 (D.C. Cir. 1999) ............................................................... 21

*Morrisey v. Brewer*,
    408 U.S. 471 (1972) ................................................................................. 29

*Morrison v. BOP*,
    2021 WL 1209210 (D.D.C. Mar. 30, 2021) ........................................... 37

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................................... 25

*Munaf v. Geren*,
    553 U.S. 674 (2008) ................................................................................. 11

*Nat'l Ass'n of Home Builders v. Norton*,
    415 F.3d 8 (D.C. Cir. 2005) .................................................................... 23

*Nat'l Council of Nonprofits v. OMB*,
    2025 WL 314433 (D.D.C. Jan. 28, 2025) ............................................... 11

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................................. 12, 41

*Palmore v. United States*,
    411 U.S. 389 (1973) ........................................................................................ 18

*Patchak v. Zinke*,
    583 U.S. 244 (2018) ........................................................................................ 17

*Pinson v. DOJ*,
    514 F. Supp. 3d 232 (D.D.C. 2021) ............................................................... 16

*Plyler v. Doe*,
    457 U.S. 202 (1982) ........................................................................................ 31

*Porche v. Salazar*,
    2019 WL 1373683 (D. Or. Mar. 5, 2019) ..................................................... 16

*Pryor-El v. Kelly*,
    892 F. Supp. 261 (D.D.C. 1995) .............................................................. 31, 32

*Quinn v. Wexford Health Sources, Inc.*,
    8 F.4th 557 (7th Cir. 2021) ............................................................................ 38

*RCM Techs., Inc. v. DHS*,
    614 F. Supp. 2d 39 (D.D.C. 2009) ................................................................ 22

*Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) ........................................................................................... 26

*Reynolds v. Quiros*,
    990 F.3d 286 (2d Cir. 2021) ........................................................................... 32

*Rezaq v. Nalley*,
    677 F.3d 1001 (10th Cir. 2012) ......................................................... 27, 28, 29

*Rhodes v. Chapman*,
    452 U.S. 337 (1981) ........................................................................................ 33

*Royer v. BOP*,
    933 F. Supp. 2d 170 (D.D.C. 2013) ............................................................... 17

*Sadler v. DOJ*,
    2019 WL 4644030 (D.D.C. Sept. 23, 2019) ........................................... 13, 15

*Sandin v. Conner,*
    515 U.S. 472 (1995) ........................................................................................... 28

*Sea Containers Ltd. v. Stena AB,*
    890 F.2d 1205 (D.C. Cir. 1989) ........................................................................ 41

*Sec. Indus. & Fin. Mkts. Ass'n v. CFTC,*
    67 F. Supp. 3d 373 (D.D.C. 2014) .................................................................... 22

*Silver State Land, LLC v. Schneider,*
    145 F. Supp. 3d 113 (D.D.C. 2015) .................................................................. 25

*Silverstein v. BOP,*
    559 F. App'x 739 (10th Cir. 2014) .................................................................... 35

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ........................................................................................... 18

*Sprint Commc'ns Co. v. APCC Servs., Inc.,*
    554 U.S. 269 (2008) ........................................................................................... 18

*Thye v. United States,*
    109 F.3d 127 (2d Cir. 1997) .............................................................................. 16

*Tucker v. Branker,*
    142 F.3d 1294 (D.C. Cir. 1998) ........................................................................ 31

*Turner v. Safley,*
    482 U.S. 78 (1987) ........................................................................................ 33, 42

*United States v. Council,*
    77 F.4th 240 (4th Cir. 2023) ............................................................................... 4

*United States v. Hager,*
    721 F.3d 167 (4th Cir. 2013) ............................................................................... 4

*United States v. Jackson,*
    327 F.3d 273 (4th Cir. 2003) ............................................................................... 4

*United States v. Lawrence,*
    735 F.3d 385 (6th Cir. 2013) ............................................................................... 4

*United States v. Mikhel,*
    889 F.3d 1003 (9th Cir. 2018) ............................................................................. 4

*United States v. Mikos*,
   539 F.3d 706 (7th Cir. 2008) ................................................................... 4

*United States v. Runyon*,
   707 F.3d 475 (4th Cir. 2013) ................................................................... 4

*United States v. Taylor*,
   814 F.3d 340 (6th Cir. 2016) ................................................................... 4

*United States v. Tipton*,
   95 F.4th 831 (4th Cir. 2024) ................................................................... 4

*United States v. Torrez*,
   869 F.3d 291 (4th Cir. 2017) ................................................................... 4

*United States v. Troya*,
   733 F.3d 1125 (11th Cir. 2013) ............................................................... 4

*United States v. Umaña*,
   750 F.3d 320 (4th Cir. 2014) ................................................................... 4

*Webster v. Doe*,
   486 U.S. 592 (1988) ............................................................................. 17

*Wilkinson v. Austin*,
   545 U.S. 209 (2005) ..................................................................... *passim*

*Wills v. Barnhardt*,
   2022 WL 4481492 (10th Cir. Sept. 27, 2022) ...................................... 16

*Wilson-Millan v. BOP*,
   2022 WL 1568868 (D.D.C. May 18, 2022) .......................................... 20

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ........................................................................... 11, 18

*Women Prisoners of D.C. Dep't of Corrs. v. Dist. of Columbia*,
   93 F.3d 910 (D.C. Cir. 1996) ............................................................... 31

*Zadvydas v. Davis*,
   533 U.S. 678 (2001) ............................................................................. 29

**Statutes**

5 U.S.C. § 701 ........................................................................... 13, 24

5 U.S.C. § 702 ........................................................................................................ *passim*

5 U.S.C. § 704 ........................................................................................................ 20

5 U.S.C. § 706 ........................................................................................................ 24

18 U.S.C. § 3621 .................................................................................................... *passim*

18 U.S.C. § 3625 .................................................................................................... *passim*

18 U.S.C. § 4041 .................................................................................................... 3, 25

18 U.S.C. § 4042 .................................................................................................... 3, 24

18 U.S.C. § 4083 .................................................................................................... 16

18 U.S.C. § 3626 .................................................................................................... 20

28 U.S.C. § 503 ...................................................................................................... 2, 25

28 U.S.C. § 509 ...................................................................................................... 25

**Other Authorities**

U.S. Const. amend. VIII .......................................................................................... 34

# INDEX OF EXHIBITS

Ex. 1    Supplemental Declaration of Shane Salem, Assistant Director, Correctional Programs Division, Federal Bureau of Prisons, U.S. Department of Justice (Oct. 25, 2025)

Ex. 2    Declaration of David Lazariuk, Associate Warden Federal Correctional Complex in Florence, Colorado ("FCC Florence"), Federal Bureau of Prisons, U.S. Department of Justice (Oct. 25, 2025)

- Ex. 2-A:  Attachment A to Declaration of David Lazariuk; Health Services Memoranda regarding each Plaintiff designated to ADX.

- Ex. 2-B:  Attachment B to Declaration of David Lazariuk; Psychology Services Memoranda regarding those Plaintiffs designated to ADX with a diagnosed "Serious Mental Illness."

- Ex. 2-C:  Attachment C to Declaration of David Lazariuk; Extraordinary Security Concern (ESC) Reviews regarding those Plaintiffs designated to ADX for whom an ESC review was conducted.

Ex. 3    Declaration of Kevin Stremmel, Prisoner Transportation Coordinator, Federal Bureau of Prisons, U.S. Department of Justice (Oct. 25, 2025)

- Ex. 3-A:  Attachment A to Declaration of Kevin Stremmel; blank copy of form BP-A0659 – Medical Summary of Federal Prisoner/Alien in Transit

Ex. 4    Email from Defendants' counsel to Plaintiffs' counsel (Sept. 29, 2025)

## INDEX OF PLAINTIFFS' EXHIBITS CITED HEREIN

| *Taylor II*<br>**1:25-cv-3742**<br>**ECF No.** | **Document Name** | *Taylor I*<br>**25-cv-1161**<br>**ECF No.** |
|---|---|---|
| ECF 4-3<br>(TRO Ex. 1) | Executive Grant of Clemency (Dec. 23, 2024) ("Clemency Grant") | ECF 1-1 |
| ECF 4-4<br>(TRO Ex. 2) | Executive Order 14164 of January 20, 2025, *Restoring the Death Penalty and Protecting Public Safety*, 90 Fed. Reg. 8463 (Jan. 30, 2025) ("EO 14164") | ECF 1-2 |
| ECF 4-5<br>(TRO Ex. 3) | Memorandum from the Attorney General, to Department of Justice Employees, *Restoring a Measure of Justice to the Families of Victims of Commuted Murderers* (Feb. 5, 2025) ("AG Memo") | ECF 1-3 |
| ECF 4-7<br>(TRO Ex. 5) | BOP Program Statement 5310.16, CN-1, *Treatment and Care of Inmates with Mental Illness* (as amended Feb. 18, 2025) ("PS 5310.16") | ECF 1-5 |
| ECF 4-8<br>(TRO Ex. 6) | BOP Program Statement 5100.08, *Inmate Security Designation and Custody Classification* (as amended Mar. 6, 2025) ("PS 5100.08") | ECF 1-6 |
| ECF 4-9<br>(TRO Ex. 7) | Memorandum from Assistant Director, Correctional Programs Division, Federal Bureau of Prisons, *Administrative Maximum Facility (ADX) General Population Referral Procedures* (Oct. 15, 2012) ("ADX Referral Memo") | ECF 1-7 |

## INTRODUCTION

Confronted with a dispositive motion to dismiss in *Taylor v. Trump*, 25-cv-1161-TJK (D.D.C.) (*Taylor I*), to which they have yet to respond, Plaintiffs seek a do-over. But nothing in their new complaint (*Taylor v. Trump*, 25-cv-3742-TJK (D.D.C.) (*Taylor II*)), or their Motions for Temporary Restraining Order (Motions), cures the many threshold defects that remain fatal to their claims.[1] For starters, despite their obligation to establish subject-matter jurisdiction and their abundant notice of Defendants' arguments for why jurisdiction is lacking, Plaintiffs do not attempt to surmount the many jurisdictional obstacles that preclude preliminary injunctive relief. As discussed in *Taylor I*, the Administrative Procedure Act's (APA) waiver of sovereign immunity does not apply to Plaintiffs' claims because 18 U.S.C. § 3625 expressly excludes the Federal Bureau of Prisons' (BOP) designation decisions from that waiver. Moreover, Congress went further and affirmatively foreclosed judicial review of BOP's housing-placement decisions by statute, in the First Step Act of 2018. 18 U.S.C. § 3621(b). Plaintiffs cannot show a clear likelihood of success on the merits where, as here, there is no subject-matter jurisdiction.

Plaintiffs' claims also fail on the merits. Plaintiffs challenge Defendants' implementation of a January 20, 2025, Executive Order that directed the Attorney General to "evaluate" the places of imprisonment for the former death-row inmates whose sentences were commuted in December 2024 to life imprisonment, and the Attorney General's related February 5, 2025, memorandum. Plaintiffs conclusorily assert that BOP then adopted an unwritten "Mandatory ADX Policy" directing that "all death row commutees . . . be transferred to the [allegedly] harshest facility in the federal prison system"—the United States Penitentiary, Administrative Maximum Facility (ADX),

---

[1] Defendants' Motion to Dismiss *Taylor I* has been pending since August 7, 2025. *See Taylor I*, ECF 53. Defendants also anticipate filing a motion to dismiss in *Taylor II* in short order.

located in Florence, Colorado. Pls.' Mem. ISO Mot. for TRO, *Taylor II* (ECF 4-1), at 16 (hereafter, "*Taylor II* Mem."). But the record shows that no such policy exists. Rather, pursuant to its own, pre-existing individualized redesignation procedures, BOP made inmate-specific transfer decisions. And not all commuted inmates were redesignated to ADX. Plaintiffs are unable to succeed on the merits of their APA claims for multiple other reasons, including that 18 U.S.C. § 3625 forecloses such claims. Plaintiffs are not likely to succeed on their Fifth Amendment claims because they do not identify a liberty interest, they received adequate process, and they do not establish that they were treated differently than other inmates in their circumstances. Nor are the ten Plaintiffs who bring an Eighth Amendment claim of deliberate indifference likely to succeed, because, *inter alia*, this subset of Plaintiffs has not established that a future transfer to ADX (or placement at ADX) would pose an excessive risk to their health or safety.

Finally, even if this Court reaches the issue of irreparable harm, which it should not do (given the lack of subject matter jurisdiction here), the Court must deny the Motions. Plaintiffs do not demonstrate that they will suffer irreparable harm in transfer to ADX, or that temporary confinement at ADX is itself irreparably harmful. And the equities and public interest favor allowing BOP's redesignation and transfer processes to play out as intended by longstanding BOP policy, and the individualized redesignations decisions BOP made pursuant to its statutory authority. The Court should deny Plaintiffs' Motions.

## FACTUAL AND LEGAL BACKGROUND

### I.    The Attorney General's Oversight of BOP, and BOP's Authority to Designate Inmates' Place of Imprisonment

"The Attorney General is the head of the Department of Justice." 28 U.S.C. § 503. Congress established the BOP within the Department of Justice and specified that BOP's director shall be "appointed by and serve directly under the Attorney General." Act of May 14, 1930, Pub.

L. No. 71-218, 46 Stat. 325 (1930), codified as amended at 18 U.S.C. § 4041.  The Attorney General "may appoint such additional officers and employees as [s]he deems necessary."  18 U.S.C. § 4041.  When establishing BOP, Congress further provided that the duties of BOP shall be performed "under the direction of the Attorney General."  *Id.* § 4042.  Those duties include "hav[ing] charge of the management and regulation of all Federal penal and correctional institutions," and "provid[ing] suitable quarters" for federal inmates.  *Id.* § 4042(a).

Persons sentenced "to a term of imprisonment" in federal court are "committed to the custody" of BOP "until the expiration of the term imposed."  *Id.* § 3621(a).  Initial BOP facility assignments are "designations," and reassignments are "redesignations."  *See* BOP Program Statement 5100.08 at Ch. 1 p.1 & Ch. 2 p.6, *Taylor II*, ECF 4-8 (hereafter, "PS 5100.08").[2] Congress has tasked BOP with "designat[ing] the place of the prisoner's imprisonment" and authorized it to "designate any available penal or correctional facility" meeting "minimum standards of health and habitability" that BOP "determines to be appropriate and suitable."  18 U.S.C. § 3621(b); *Taylor II* Compl. (ECF 1) ¶ 49 ("[f]ederal law gives Defendant BOP the exclusive authority to determine the institutional placement of every person in its custody").

In exercising its broad discretion to make designation and redesignation decisions, BOP considers "the resources of the facility contemplated," "the nature and circumstances of the offense," "the history and characteristics of the prisoner," any statement by the sentencing court about the "purposes" of imprisonment or the "type of penal or correctional facility," and pertinent policy statements by the Sentencing Commission.  18 U.S.C. § 3621(b)(1)–(5).

---

[2] Defendants provide parallel ECF numbers from the *Taylor I* docket in their "Index of Plaintiffs' Exhibits Cited," *supra* at xii.

## II.    Commutation of Plaintiffs' Death Sentences, and BOP's Housing Redesignations Process and Decisions

Plaintiffs are federal prisoners whose crimes of conviction include bank robbery, carjacking, racketeering, and rape; all were convicted of at least one count of murder; and many have escaped (or attempted to escape) confinement.[3]  On December 23, 2024, the White House announced that then-President Biden commuted the death sentences of 37 of the 40 federal inmates who had been sentenced to death, including Plaintiffs' death sentences, to life imprisonment without the possibility of parole.  *Taylor II*, ECF 4-3 (hereafter Clemency Grant); *Taylor II* Compl. ¶ 2.  BOP officials then "began working . . . to reclassify and transfer" the commuted inmates from the Special Confinement Unit (SCU) at U.S. Penitentiary Terre Haute (USP Terre Haute)—where most federal death row inmates are housed—to a different BOP facility.  *See Taylor II* Compl. ¶ 4. Plaintiffs allege that "BOP officials recommended in the first instance that most Plaintiffs should be redesignated from the SCU to maximum security USPs or BOP health care facilities."  *Id.*

On January 20, 2025, President Trump issued an Executive Order titled "Restoring the Death Penalty and Protecting Public Safety."  *See* Exec. Order No. 14,164, 90 Fed. Reg. 8463 (Jan. 20, 2025), *Taylor II*, ECF 4-4 (hereafter, Executive Order or EO 14,164).  The Executive Order states that capital punishment is essential for deterring heinous crimes and ensuring justice, *id.* § 1, and it directs the Attorney General to take certain actions consistent with that policy statement, *id.* §§ 3–6.  As relevant here, the Executive Order directs the Attorney General to "evaluate" the places

---

[3] *See, e.g.*, *United States v. Taylor*, 814 F.3d 340 (6th Cir. 2016); *United States v. Council*, 77 F.4th 240 (4th Cir. 2023); *United States v. Hager*, 721 F.3d 167 (4th Cir. 2013); *United States v. Jackson*, 327 F.3d 273 (4th Cir. 2003); *United States v. Mikhel*, 889 F.3d 1003 (9th Cir. 2018); *United States v. Lawrence*, 735 F.3d 385 (6th Cir. 2013); *United States v. Mikos*, 539 F.3d 706 (7th Cir. 2008); *In re Robinson*, 917 F.3d 856 (5th Cir. 2019); *United States v. Runyon*, 707 F.3d 475 (4th Cir. 2013); *United States v. Troya*, 733 F.3d 1125 (11th Cir. 2013); *United States v. Tipton*, 95 F.4th 831 (4th Cir. 2024); *United States v. Torrez*, 869 F.3d 291 (4th Cir. 2017); *United States v. Umaña*, 750 F.3d 320 (4th Cir. 2014).

of imprisonment and conditions of confinement for each of the 37 inmates whose death sentences had been commuted by former President Biden, and to "take all lawful and appropriate action to ensure that these offenders are imprisoned in conditions consistent with the monstrosity of their crimes and the threats they pose." *Id.* § 3(e). The Executive Order notes that "[n]othing in this order shall be construed to impair or otherwise affect . . . the authority granted by law to an executive department or agency, or the head thereof." *Id.* § 7(a)(i).

On February 5, 2025, Attorney General Bondi issued a one-page guidance memorandum to Department of Justice employees, titled "Restoring a Measure of Justice to the Families of Victims of Commuted Murderers." *See Taylor II*, ECF 4-5 (hereafter, AG Memo). The AG Memo states that the December 2024 death sentence commutations had "undermined our justice system" and "robbed the victims' families of the justice promised." *Id.* The AG Memo directs the Department to take certain actions and includes a direction to BOP to "ensure that the conditions of confinement for each of the 37 commuted murderers are consistent with the security risks those inmates present." *Id.* The AG Memo states that "[t]his guidance is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person." *Id.* n.1.

BOP's redesignation process is outlined in BOP Program Statement 5100.08, which "provides policy and procedure regarding [BOP's] inmate classification system," in recognition that "classification of inmates is necessary to place each inmate in the most appropriate security level institution that also meets their program needs and is consistent with the Bureau's mission to protect society." PS 5100.08 § 1. BOP institutions are classified into one of five security levels based on "the level of security and staff supervision the institution is able to provide." *Id.*, Ch. 1 p.1. "Administrative" facilities have the highest level of security. *Id.*; *see also* BOP, *About Our*

*Facilities*, https://www.bop.gov/about/facilities/federal_prisons.jsp (last visited Oct. 22, 2025) (explaining that Administrative facilities are "institutions with special missions," such as "the containment of extremely dangerous, violent, or escape-prone inmates").

The process for redesignation to the "General Population" unit at ADX Florence (ADX-GP), is governed by PS 5100.08, Chapter 7, and by an October 15, 2012, Memorandum from the Assistant Director of BOP's Correctional Programs Division ("CPD"), *Taylor II*, ECF 4-9 (hereafter, ADX Referral Memo). *Taylor II* Compl. ¶¶ 66, 68. The ADX Referral Memo provides that an inmate referred to the ADX-GP will meet one or both of the following criteria: (i) the inmate's placement in other correctional facilities "creates a risk to institutional security and good order or poses a risk to the safety of staff, inmates, others, or to public safety," or (ii) as a result of the inmate's status, either before or after incarceration, the inmate "may not be safely housed in the general population of another institution." ADX Referral Memo, Attach. A at 1. The ADX Referral Memo prescribes the following, multistep process—that BOP followed here[4]—for redesignating a federal inmate to ADX-GP:

***First***, facility staff transmit their referral packet to the originating facility's Warden. ADX Referral Memo, Attach. A at 2–3; *Taylor II* Compl. ¶ 71. If the Warden concurs with referral, the referral packet is signed and forwarded to the Regional Director. ADX Referral Memo, Attach. A at 3; PS 5100.08, Ch. 7 p.17 (§ 21(b)(1)). If the Regional Director concurs with referral, the referral packet is submitted to the Designation and Sentence Computation Center (DSCC)—the BOP office where the BOP's classification and designation functions are centralized. ADX Referral Memo, Attach. A at 3. DSCC staff "conduct an initial assessment of the referral packet

---

[4] These steps, along with the dates that they occurred, are outlined in the Declaration of Shane Salem, Assistant Director, Correctional Programs Division, BOP (May 2, 2025), previously filed in *Taylor I*, No. 25-cv-1161, ECF 40-1, and the Supplemental Declaration of Shane Salem (Oct. 25, 2025), attached hereto as Exhibit 1 (hereafter, Supp. Salem Decl.).

and the inmate's need for placement at ADX-GP."[5]  *Id.*  Simultaneously, the DSCC forwards the packet to the Administrator of Psychology Services at BOP's Central Office.  *Id.*

**Second**, if the DSCC determines the inmate is appropriate for ADX-GP placement, BOP provides the inmate a "due process hearing" on the proposed referral.  ADX Referral Memo at 1. A designated Hearing Administrator provides inmates with a Notice of Hearing, which includes the "[s]pecific evidence" that forms the basis for the referral (unless such information would jeopardize the safety and security of the institution or endanger staff or others).  *Id.*, Attach. A at 6.  The Hearing Administrator is required to have significant correctional experience, and to "be familiar with BOP policies and operations, including the criteria for placement of inmates in different institutions with emphasis on the ADX."  *Id.*, Attach. A at 6.  The inmate can attend and participate in the hearing, and present evidence.  *Id.*, Attach. A at 6–7; *Taylor II* Compl. ¶¶ 74–75.

**Third**, at the conclusion of the hearing and following a review of all material, the Hearing Administrator "shall prepare a written recommendation on whether placement of the inmate at the ADX is warranted," and provide that recommendation to the Assistant Director for CPD.  ADX Referral Memo, Attach. A at 7; *Taylor II* Compl. ¶ 76.  Shane Salem serves as Assistant Director for CPD, a role he has held since October 2024.  Assistant Director Salem is charged with "making the decision to accept or reject the Hearing Administrator's recommendation," "weighing the factors outlined in the ADX Referral Memo and PS 5100.08."  *Taylor I*, ECF 40-1 (Salem Decl.) ¶ 19; *see also* ADX Referral Memo, Attach. A at 9.

**Fourth**, and finally, if an inmate disagrees with a final decision of redesignation to ADX-GP, the inmate may appeal through BOP's Administrative Remedy Program—first to the Senior

---

[5] If the DSCC determines the inmate is not appropriate for ADX-GP placement, (s)he sends the packet to the Assistant Director for CPD, who notifies the referring Warden.  ADX Referral Memo, Attach. A at 3.

Deputy Assistant Director over the DSCC, and then again to the Office of General Counsel. *Id.*; *see also Taylor II* Compl. ¶ 78.

Here, Plaintiffs (other than Plaintiff Basham) were given notice and completed an ADX Referral hearing in April 2025 in accordance with BOP policy. Supp. Salem Decl. ¶ 6. The Hearing Administrator's Reports and supporting documentation were then forwarded to Assistant Director Salem. *Id.* As the Assistant Director charged with making the decision to accept or reject the Hearing Administrator's recommendation, Assistant Director Salem rendered a decision on each SCU inmate individually, weighing the factors outlined in the ADX Referral Memo and PS 5100.08. *Id.* ¶ 9. He decided that designation to ADX is appropriate for each of the Plaintiffs, except for Mr. Basham. *Id.* ¶ 6. He made these decisions in May 2025. *Id.* ¶ 9.

Plaintiff Basham had been under consideration for ADX placement but had mental health needs necessitating a transfer to another facility before further consideration can be given to ADX placement for him. *Id.* ¶ 6. Accordingly, Mr. Basham was redesignated from FCC Terre Haute to the Medical Center for Federal Prisoners in Springfield, Missouri. *Id.* He was transferred there on May 21, 2025, and remains housed there currently. *Id.*

At the time that Plaintiffs filed their original Complaint in *Taylor I* (April 16, 2025), Assistant Director Salem had not made a redesignation determination for any of them. *See* Supp. Salem Decl. ¶ 9 ("I made these decisions in May 2025."); *Taylor II* Compl. ¶¶ 101 ("Plaintiffs began receiving their ADX General Population Placement Decisions on or after June 3, 2025."). Nor had the Administrative Remedy Program appeals process begun. *See id.* As of the filing of their Complaint in *Taylor II*, however, Plaintiffs in *Taylor II* have administratively exhausted their ADX referrals.[6] *Taylor II* Compl. ¶ 9; *see* Supp. Salem Decl. ¶ 11; *infra* Part III.

---

[6] Plaintiffs Coonce, Mikos, and Runyon, who remain Plaintiffs in *Taylor I* with Plaintiff Basham,

**III.    Plaintiffs' Earlier Attempt to Challenge Their Designation to ADX: *Taylor I***

Plaintiffs filed *Taylor I* on April 16, 2025.  *See* No. 25-cv-1161, ECF 1.  This Court converted their motion for temporary restraining order (*id.*, ECF 2) to a motion for preliminary injunction (*id.*, Apr. 17, 2025, Minute Order).  Following a hearing, this Court denied the motion on the basis that Plaintiffs had not yet exhausted their administrative remedies (*id.*, May 27, 2025, Memo. Op., ECF 50).  Subsequently, on or after June 3, 2025, Plaintiffs received notice that they were being designated to the ADX.  *Taylor II* Compl. ¶ 101.  They filed administrative remedies challenging that designation and proceeded through the administrative process.  *See id.* ¶ 103.

Defendants, in turn, moved to dismiss *Taylor I* in its entirety on jurisdictional grounds, among others.  *Taylor I*, ECF 53.  The *Taylor I* Plaintiffs then sought and obtained a 60-day extension of time to respond to Defendants' motion to dismiss, to October 20, 2025.  *Id.*, ECF 54; Aug. 15, 2025, Minute Order.  Allegedly, the extension was necessary because of "the combined demands of litigation by Plaintiffs' counsel in other cases, the law school faculty supervisors starting a weeklong training of new clinical law students, and long-scheduled leaves of absence." *Id.*, ECF 54 ¶ 2.  Ultimately, however, at least the *Taylor II* Plaintiffs asserted that they planned not to respond to Defendants' August 2025 motion at all.  *Id.*, ECF 55.

On Friday, September 26, 2025, as Plaintiffs' administrative remedy proceedings were concluding, BOP, through counsel, notified Plaintiffs' counsel that BOP was committed to not transferring Plaintiffs to ADX prior to October 31, 2025.  *See* Ex. 4 hereto (Sept. 29, 2025, counsel correspondence).  Defendants' counsel conveyed that this timeframe would allow the briefing of Plaintiffs' then-anticipated further motion for injunctive relief on a preliminary injunction motion schedule under the Local Rules.  *Id.*  Instead, Plaintiffs chose to wait 27 more days—until October

---

either have not yet exhausted their administrative remedies or have not properly submitted their administrative appeals.  *See* Supp. Salem Decl. ¶¶ 12–16.

22, 2025—to file their Motions.  Putatively, Plaintiffs filed *Taylor II* to address the Court's exhaustion concerns from *Taylor I*.  *Taylor I*, ECF 54; *see also Taylor II* Compl. n.1.  *Taylor I* remains pending, however, as to the handful of Plaintiffs who have not yet exhausted.  *Id.*, ECF 59.  So too does Defendants' Motion to Dismiss.

## IV.  *Taylor II*

Plaintiffs filed *Taylor II* on October 21, 2025.  ECF 1.  Plaintiffs use the phrase "Redesignation Directive" to refer to "EO 14164 and the Bondi Memo," *Taylor II* Compl. ¶ 7, asserting that "in the wake of the Redesignation Directive's instruction," BOP developed an "unwritten policy" to redesignate Plaintiffs to ADX, a purported "Mandatory ADX Policy," *id.* ¶¶ 8, 11.  Plaintiffs assert that "[b]ut for" the "Redesignation Directive" and the "Mandatory [albeit, unwritten] ADX Policy," Plaintiffs would not be assigned to ADX.  *E.g.*, *Taylor II* Compl. ¶ 203.  Plaintiffs bring eleven claims against Defendants President Trump; the Attorney General; the Principal Associate Deputy Attorney General; the Associate Deputy Attorney General; BOP; and various BOP officials, all in their official capacities.  *Id.* ¶¶ 35–44.[7]  The claims in *Taylor II* are materially identical to those in *Taylor I*, except that *Taylor II* Plaintiffs add an *ultra vires* claim. Plaintiffs seek a declaratory judgment that the AG Memo, "Redesignation Directive," and "Mandatory ADX Policy" are unlawful, as well as injunctive relief.  *Id.* at 77 (Prayer for Relief).

## V.  The Motions for TRO

On October 22, 2025, Plaintiffs filed Motions for Temporary Restraining Order in *Taylor I* and *Taylor II*.  Plaintiffs' Motion in *Taylor II* raises only some of the eleven claims in their Complaint; it does not cover Count 3 (Eighth Amendment – Cruel and Unusual Punishment),

---

[7] The named BOP officials in *Taylor II* are: the BOP Director; the BOP Deputy Director; the BOP Assistant Director of the Correctional Programs Division; the BOP Chief of the DSCC; and the BOP North Central Regional Director.  Compl. ¶¶ 39–43.

Count 10 (APA – Notice and Comment), or Count 11 (*Ultra Vires*).  *See generally Taylor II* Mem.; *see also Taylor II* Compl. ¶¶ 182–87, 278–93.[8]  Plaintiffs' renewed motion for TRO in *Taylor I* focuses only on the *Taylor I* Plaintiffs' Eighth Amendment claim for deliberate indifference, while purporting to "incorporate[] by reference" the original motion for preliminary injunction in *Taylor I*.  Pls.' Mem. ISO Mot. for TRO, *Taylor I* (ECF 62-1), at 2 (hereafter, "*Taylor I* Mem.").  Defendants address below the *Taylor I* Plaintiffs' Eighth Amendment deliberate indifference claim.  As to the *Taylor I* Plaintiffs' other claims, Defendants incorporate by reference both their opposition to Plaintiffs' original motion for preliminary injunction, Defs.' Opp., *Taylor I* ECF 40, and their motion to dismiss, *id.* ECF 53.

## LEGAL STANDARD

"The decision of whether to award a TRO is analyzed using the same factors applicable to preliminary injunctive relief[.]"  *Chef Time 1520 LLC v. Small Bus. Admin.*, 646 F. Supp. 3d 101, 109 (D.D.C. 2022) (cleaned up).  A temporary restraining order, like a preliminary injunction, is extraordinary relief granted only to preserve the status quo.  *See Nat'l Council of Nonprofits v. OMB*, No. 25-cv-239, 2025 WL 314433, at *2 (D.D.C. Jan. 28, 2025).  It is "an extraordinary and drastic remedy," and "never awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted).  As such, it may "only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  To obtain a temporary restraining order, a plaintiff "must show: (1) 'he is likely to succeed on the merits,' (2) 'he is likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in his favor,' and (4) issuing 'an injunction is in the public interest.'"  *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (quoting *Winter*, 555 U.S. at 20).  When

---

[8] Defendants reserve all arguments on *Taylor II* Plaintiffs' Count 3, Count 10, and Count 11 claims for forthcoming briefing.

"the Government is the opposing party," the assessment of "harm to the opposing party" and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I.    Plaintiffs Cannot Show Likelihood of Success on the Merits of Their Claims

Plaintiffs cannot establish a likelihood of success on the merits of their claims.  As an initial matter, this Court lacks jurisdiction to hear Plaintiffs' claims for at least three independent reasons, discussed below.  Even if this Court could reach the merits of Plaintiffs' claims, those claims fail.

### A.    The Court Lacks Subject Matter Jurisdiction

It is axiomatic that Plaintiffs bear the burden of showing subject-matter jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008).  Defendants have demonstrated the Court's lack of jurisdiction twice before in *Taylor I*—first in opposition to Plaintiffs' preliminary-injunction motion, and again in Defendants' pending but unanswered motion to dismiss.  Plaintiffs' Motions do not address, *at all*, the Court's jurisdiction over their claims, which challenge BOP's redesignation of their place of imprisonment to ADX.  *See generally* Motions (no discussion of Court's jurisdiction).  Because the same jurisdictional defects plague Plaintiffs' Motions—and, indeed, are even more manifest in the *Taylor II* Complaint than they were in *Taylor I*—the Court must deny the Motions.

The Court lacks jurisdiction over Plaintiffs' claims for at least three reasons.  First, the United States is immune because the APA's waiver of sovereign immunity in 5 U.S.C. § 702 expressly excludes BOP's designation decisions.  Absent a waiver of sovereign immunity, there is no subject-matter jurisdiction.  Even if there were some as-yet-unidentified waiver of sovereign immunity that covered Plaintiffs' claims, Congress affirmatively precluded judicial review of BOP's housing-placement decisions in a separate statutory provision enacted with the First Step

Act of 2018 (FSA).  Finally, the *Taylor I* Plaintiffs do not meet the constitutional requirements of Article III standing.  Absent subject-matter jurisdiction, their Motions should be denied.

### 1.    The United States has not waived sovereign immunity.

Plaintiffs fail to identify, let alone establish, a waiver of sovereign immunity.  "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994); *see Fletcher v. DOJ*, 17 F. Supp. 3d 89, 93 (D.D.C. 2014) (plaintiffs bear the burden of establishing waiver).  Such a waiver must be "unequivocally expressed in statutory text," and "will not be implied." *Lane v. Pena*, 518 U.S. 187, 192 (1996).

No waiver of sovereign immunity exists.  The only statute Plaintiffs even hint at for waiving jurisdiction is 5 U.S.C. § 702, *see Taylor I* Compl. ¶ 12, *Taylor II* Compl. ¶ 16, but § 702 does not apply to claims involving BOP placement decisions, regardless of how those claims are styled.  To be sure, the APA generally waives sovereign immunity for suits against federal agencies for allegedly unlawful (or unconstitutional) agency actions in cases seeking remedies "other than money damages," even when not brought under the APA.  5 U.S.C. § 702; *see Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996).  But, in 18 U.S.C. § 3625 (entitled "Inapplicability of the Administrative Procedure Act"), Congress expressly withdrew that waiver in this context, stating that § 702 "do[es] not apply to the making of any determination, decision, or order" where to place or transfer a prisoner under § 3621(b).[9]  Thus, "what the APA gives," § 3625 "takes away," and the United States "has not waived sovereign immunity" for Plaintiffs' claims.  *See Harrison v. BOP*, 248 F. Supp. 3d 172, 182–83 (D.D.C. 2017); *accord Sadler v. DOJ*, No. 18-cv-1695, 2019 WL 4644030, at *4 (D.D.C. Sept. 23, 2019) (Kelly, J.) (holding that the

---

[9] Indeed, as discussed further in Section I.B.1, *infra*, 18 U.S.C. § 3625 precludes not just the applicability of § 702, but more broadly provides that the provisions of the APA, 5 U.S.C. §§ 554, 555, and 701–706 "do not apply to the making of any determination, decision, or order under this subchapter"—entitled "Imprisonment."  18 U.S.C. § 3625.

court "lacks subject-matter jurisdiction" because, under § 3625, "no waiver of sovereign immunity applie[d] to [plaintiff's] constitutional claims"); *see also, e.g.*, *Lyle v. Sivley*, 805 F. Supp. 755, 759 (D. Ariz. 1992) ("In enacting section 3625, Congress intended to 'carve out' an area of decision making committed solely to agency discretion and not subject to judicial review.").

Plaintiffs' Motions fail to advance any basis for a waiver of sovereign immunity. Nor do their Complaints. To the contrary, each of Plaintiffs' claims attacks BOP's alleged decision to transfer Plaintiffs to ADX, triggering § 3625. *See Taylor I* ¶ 129 (Count 1—"Plaintiffs have a liberty interest in avoiding their transfer to ADX"); *id.* ¶ 141 (Count 2—Defendants "undertook a sham process of hearings and recommendations that was implemented with the intent to redesignate every Plaintiff to ADX"); *id.* ¶¶ 147–48 (Count 3—allegations about the conditions of confinement at ADX); *id.* ¶ 159 (Count 4—alleging deliberate indifference to potential harm to mentally ill Plaintiffs from placement in ADX); *id.* ¶ 166 (Count 5—alleging that but for Defendants' improper actions, Plaintiffs would not be designated to ADX); *id.* ¶ 172 (Count 6— alleging that Defendants will place Plaintiffs in "indefinite solitary confinement" at ADX, rather than follow "the usual process of BOP in making placement determinations"); *id.* ¶ 181 (Count 7—alleging that Defendants prevented Plaintiffs from being "redesignated to the general population of a penitentiary" and instead "redesignated [them] to the most notorious federal prison in the country[,]" *i.e.*, ADX); *id.* ¶ 185 (Count 8—alleging a "sham process that will condemn Plaintiffs to potentially indefinite incarceration in ADX"); *id.* ¶ 196 (Count 9—alleging irreparable harm from Plaintiffs' designation to ADX); *id.* ¶ 199 (Count 10—alleging that the "[AG] Memo," which Plaintiffs elsewhere allege caused them to be redesignated to the ADX, *see id.* ¶ 7, did not follow proper notice and comment procedures). Even the relief that Plaintiffs demand is aimed at their designations. *See id.* Prayer ¶ (B) (requesting an order "assign[ing] the Plaintiffs to housing locations" based on alleged initial designation recommendations by BOP staff that preceded the

Executive Order and [AG] memo.); *see also, e.g.*, *Taylor I* Mem. at 1 ("These Plaintiffs seek the intervention of this Court to bar Defendants from transferring them to ADX.").

The *Taylor II* Complaint similarly focuses on Plaintiffs' redesignation to and placement at ADX—even more so than the Complaint in *Taylor I*. Indeed, Plaintiffs in *Taylor II* have created an entirely new defined term—"Mandatory ADX Policy"—to challenge their ADX designations. *Taylor II* ¶ 8. The title for their Complaint is: "The illegal Redesignation Directive and Mandatory ADX Policy *to indefinitely incarcerate commuted persons at U.S. Penitentiary Florence Administrative Maximum Facility (ADX)*." *Id.* (under case caption) (emphasis added). Like *Taylor I*, the eleven Counts in *Taylor II* target BOP's designation decision, and seek injunctive relief "ordering all Defendants but the President to assign Plaintiffs to BOP facilities and units that BOP had previously determined were appropriate for each Plaintiff." *See, e.g.*, *Taylor II* Compl. ¶¶ 15, 163 (Count 1), 174 (Count 2), 183 (Count 3), 192 (Count 4), 203 (Count 5), 210 (Count 6), 216 & 218 (Count 7), 254 (Count 8), 268 (Count 9).

Irrespective of how Plaintiffs' may now attempt to reframe their allegations in briefing, their Complaints challenge BOP's designation of their place of imprisonment under 18 U.S.C. § 3621(b) and ask the Court to second-guess that designation. Plaintiffs' claims are not subject to judicial review. *See* 18 U.S.C. §§ 3621(b), 3625; *Sadler*, 2019 WL 4644030, at *3. Because the waiver in § 702 does not apply, and Plaintiffs identify no other applicable waiver of sovereign immunity, this Court lacks jurisdiction.

> **2.    Congress has specifically precluded judicial review of Plaintiffs' challenges to BOP's transfer process.**

Congress also affirmatively precluded judicial review of BOP's housing-placement decisions when it enacted the First Step Act of 2018: "Notwithstanding *any other provision of law*, a designation of a place of imprisonment [by the BOP] is not reviewable by any court." First Step

Act of 2018, Pub. L. No. 115-391 § 601, 132 Stat. 5194, 5237 (codified at 18 U.S.C. § 3621(b))
(emphasis added). Section 3621(b) provides BOP "extensive latitude" in assigning prisoners to
correctional facilities. *Thye v. United States*, 109 F.3d 127, 129–30 (2d Cir. 1997); *see also*
§ 3621(b) (BOP "may designate any available penal or correctional facility" satisfying minimum
standards of health and habitability that BOP "determines to be appropriate and suitable" based on
its consideration of several discretionary factors). BOP's broad discretion in this area is firmly
established, and Congress has long entrusted the Executive Branch to make inmate placement
decisions as it sees fit. *See* 18 U.S.C. § 4083 ("Persons convicted of offenses against the United
States or by courts-martial punishable by imprisonment for more than one year may be confined
in *any* United States penitentiary." (emphasis added)); *cf. Meachum v. Fano*, 427 U.S. 215, 224
(1976) (holding that the "decision to assign the convict to a particular institution is not subject to
audit under the Due Process Clause, although the degree of confinement in one prison may be
quite different from that in another"); *Pinson v. DOJ*, 514 F. Supp. 3d 232, 242 (D.D.C. 2021)
(because "courts lack" the BOP's "expertise as to what is required to keep a correctional facility
orderly and safe," Congress "has gone so far as to limit courts' ability to review BOP security and
facility designations").

Courts have applied this jurisdiction-stripping provision to bar judicial review of BOP's
redesignation decisions. *See, e.g.*, *Wills v. Barnhardt*, No. 21-1383, 2022 WL 4481492, at *4 (10th
Cir. Sept. 27, 2022) ("The district court also correctly held that § 3621(b) deprived it of jurisdiction
to review the BOP's decision on [the inmate's] transfer request."); *Ahmad v. Jacquez*, 860 F. App'x
459, 462 (9th Cir. 2021) ("Pursuant to § 3621(b), we lack jurisdiction to consider [the inmate's]
individual challenge to the BOP's transfer decision."); *Porche v. Salazar*, No. 3:19-cv-77, 2019
WL 1373683, at *1 (D. Or. Mar. 5, 2019). At least one Circuit has held that § 3621(b) bars review
even where the challenge to designation raises constitutional claims, such as due process. *Wills*,

2022 WL 4481492, at *4 (rejecting argument that § 3621(b) did not apply to due process and equal protection challenges because "§ 3621(b) contains no such limiting language").

Notwithstanding Congress's clear instructions in the text of the statute, another judge in this District previously found, when ruling on a TRO motion, that § 3621(b) "do[es] not divest the Court of jurisdiction to entertain constitutional claims" because the statute is "not sufficiently explicit to bar consideration" of such claims. *Doe v. McHenry*, 763 F. Supp. 3d 81, 85 (D.D.C. 2025) (Lamberth, J.). The court so concluded based primarily on *Webster v. Doe*, 486 U.S. 592 (1988), where the Supreme Court held that a statute that gave the CIA director "discretion" to terminate employees did not preclude review of constitutional claims. *Id.* at 603. But unlike the statute in *Webster*, § 3621(b) not only gives BOP significant discretion to make placement decisions but also contains a key provision absent in *Webster*—a nonreviewability provision that is both *express* and *broad*. *See* 18 U.S.C. § 3621(b). Congress could have carved out constitutional claims but provided that "[n]otwithstanding *any other provision of law*," BOP's designation decisions are "not reviewable by any court." *Id.* § 3621(b)(5) (emphasis added). Congress could not have more clearly expressed an intent to preclude all judicial review of placement decisions.[10]

Congress's "control over the jurisdiction of the federal courts is plenary." *Patchak v. Zinke*, 583 U.S. 244, 252 (2018) (citations omitted). Congress "possess[es] the sole power of creating the tribunals (inferior to the Supreme Court)" as well as the exclusive power to "withhold[] jurisdiction from them in the exact degrees and character which to Congress may seem proper for

---

[10] Judge Lamberth's 2013 opinion in *Royer v. BOP*, 933 F. Supp. 2d 170 (D.D.C. 2013), is similarly inapposite. *Royer* concerned a different provision of the PLRA—18 U.S.C. § 3625. The court held that § 3625 was insufficiently clear to preclude judicial review of constitutional claims. *Royer*, 933 F. Supp. 2d at 181–82. But *Royer* did not address the nonreviewability provision at issue here. Nor could it, as Congress added that provision in 2018, five years after *Royer* was decided. *See* Pub. L. No. 115-391, 132 Stat. 5194. *Royer* thus does not support the conclusion that the Court has authority to review Plaintiffs' challenge to BOP's transfer decisions.

the public good." *Palmore v. United States*, 411 U.S. 389, 401 (1973) (citations omitted). Therefore, the "subject-matter jurisdiction of the lower federal courts is determined by Congress." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 433 (1989). And "what the Congress gives, the Congress may take away." *Knapp Med. Ctr. v. Hargan*, 875 F.3d 1125, 1128 (D.C. Cir. 2017). The Congress has "take[n] away" this Court's ability to review BOP's placement decisions at issue in this case. *See id.*

### 3.    *Taylor I* **Plaintiffs, who have not exhausted, lack standing.**

Setting aside that Congress has not provided a relevant waiver of sovereign immunity and has specifically precluded judicial review of Plaintiffs' claims, the *Taylor I* Plaintiffs cannot invoke this Court's jurisdiction because they lack Article III standing. The "irreducible constitutional minimum of standing" contains three elements. *Id.* Plaintiffs must demonstrate that they are suffering (1) "an injury in fact," (2) causally connected to the "alleged conduct of the defendant," and (3) "likely" to "be remedied by the relief plaintiff seeks." *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 273–74 (2008) (citation omitted). To establish standing, the three constitutional elements must be satisfied at the time of the filing of the complaint. *See Lujan*, 504 U.S. at 569 n.4 (citation omitted) ("The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed.").

Plaintiffs do not directly address their alleged concrete injury giving rise to standing, but referral to ADX is the gravamen of all their claims. *See, e.g.*, *supra* at 14–15. These allegations are insufficient to meet the requirements of injury in fact because *Taylor I* Plaintiffs do not establish that any potential injury from their redesignation and transfer to ADX is "actual or imminent." *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (citation omitted); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013) (an "objectively reasonable" likelihood of harm "at some point in the future" is too speculative to satisfy Article III standing); *see also J. Roderick MacArthur Found.*

*v. FBI*, 102 F.3d 600, 606 (D.C. Cir. 1996) ("It is not enough for the [plaintiff] to assert that it might suffer an injury in the future, or even that it is likely to suffer an injury at some unknown future time. Such 'someday' injuries are insufficient." (quoting *Lujan*, 504 U.S. at 564)). By their own telling, *Taylor I* Plaintiffs Coonce, Mikos, and Runyon's administrative remedy processes are ongoing. No. 25-cv-1161, ECF 59; *Taylor I* Mem. at 6; *see also* ADX Referral Memo, Attach. A at 8 (detailing appeals process). The only *Taylor I* Plaintiff who has been transferred anywhere, to date, was not transferred to ADX Florence. Supp. Salem. Decl. ¶ 6 (*Taylor I* Plaintiff Basham). To be clear, Plaintiff Basham has submitted no administrative remedy request related to designation to ADX because he was not redesignated there.[11]

### B.    Plaintiffs are unable to succeed on the merits of their Administrative Procedure Act claims.

Plaintiffs argue that both the AG Memo and the purported "Mandatory ADX Policy" each are in excess of statutory authority, arbitrary and capricious, or otherwise not in accordance with law, and thereby violate the APA. *Taylor II* Mem. at 9–18; *Taylor II* Compl. ¶¶ 224–77 (Counts 8 and 9).[12] Neither the AG Memo nor the alleged "Mandatory ADX Policy" is subject to APA review, for three independent reasons. First, 18 U.S.C. § 3625 unambiguously forecloses APA review of decisions regarding the place of an inmate's imprisonment and his transfer to other federal facilities. Second, neither the AG Memo nor the "Mandatory ADX Policy" are final agency

---

[11] In addition, to the extent that Plaintiffs predicate standing on the expected *transfer* itself, Plaintiffs' injuries are not redressable under Article III because they would invariably be transferred somewhere else if it were not ADX. *Taylor I* Mem. at 18 (Plaintiffs "recogniz[ing]" that "their transport to another prison at some point is inevitable given that they can no longer remain in the Terre Haute SCU now that they are no longer serving death sentences"). Plaintiffs speculate that *if* they were transferred, and then they were transferred somewhere else in the future, their harms would be amplified—but that is speculation, not standing.

[12] As noted previously, the *Taylor I* renewed TRO does not contain separate argument regarding the *Taylor I* Plaintiffs' APA claims but instead purports to incorporate by reference prior arguments made in their initial preliminary injunction motion.

actions.    Third, Congress committed inmate housing designation determinations to agency discretion.    Even if the AG Memo was subject to APA review, it was not unlawful.    Finally, record evidence establishes that there was no "Mandatory ADX Policy."    Plaintiffs are unlikely to succeed on their APA claims.

### 1.    Plaintiffs' APA claims are foreclosed by 18 U.S.C. § 3625.

18 U.S.C. § 3625 states unambiguously that the APA's judicial review provisions, 5 U.S.C. §§ 701–706, do not "apply to the making of any determination, decision, or order under this subchapter" titled "Imprisonment."[13]    Here, Plaintiffs attempt to bring APA challenges to the AG Memo and the "Mandatory ADX Policy," both of which (they assert) improperly directed the decisions to redesignate Plaintiffs to the ADX.    Such claims fall squarely within the terms of § 3625.    Lest there be any question that Plaintiffs contest matters that fall within the scope of the "Imprisonment" subchapter, their TRO motion cites § 3621 no fewer than fifteen times.    *Taylor II* TRO Mot. at 2, 11, 12, 13, 14, 16, 23, 26.    Section 3625 therefore forecloses Plaintiffs' APA claims. *See, e.g.*, *Brown v. BOP*, 602 F. Supp. 2d 173, 176 (D.D.C. 2009) ("The plaintiff's place of imprisonment, and his transfers to other federal facilities, are governed by 18 U.S.C. § 3621(b), which is specifically exempt from challenge under the APA."); *accord Wilson-Millan v. BOP*, No. 21-cv-1375, 2022 WL 1568868, at *3 (D.D.C. May 18, 2022).    Plaintiffs' APA claims fail.

### 2.    The AG Memo and the "Mandatory ADX Policy" are not subject to APA review because they are not final agency actions.

Plaintiffs' challenge to the AG Memo and the purported Mandatory ADX Policy also fail because the APA only permits review of "final" agency action.    5 U.S.C. § 704.    Agency action is final only if two necessary conditions are met.    Namely, the agency action "must mark the

---

[13] The "Imprisonment" subchapter includes 18 U.S.C. §§ 3621 through 3626, which cover such topics as "[i]mprisonment of a convicted person," *id.* § 3621, "place of imprisonment," *id.* § 3621(b), and "[a]ppropriate remedies with respect to prison conditions," *id.* § 3626.

consummation of the agency's decisionmaking process," and "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted).  Neither the AG Memo nor the "Mandatory ADX Policy" meets this test.

***The AG Memo Is Not Final Agency Action.***  The AG Memo plainly did not mark the "consummation" of BOP's decision-making process with respect to housing redesignations for the commuted inmates.  Plaintiffs appear to agree.  Namely, they allege that *after* the AG Memo was issued, BOP adopted "a new, unwritten policy that referred all Plaintiffs for redesignation," *i.e.*, the alleged "Mandatory ADX Policy," *Taylor II* Compl. ¶ 8, and then undertook a designation process that included written notices, individual hearings, Plaintiff-specific reports, and "ultimately" individual decisions by Assistant Director Salem, *id.* ¶¶ 90–101.

Further, the AG Memo did not determine Plaintiffs' rights or obligations, and no legal consequences have flowed from it.  Expounding on the second prong of the *Bennett* test, the D.C. Circuit has explained that "the distinction between 'general statements of policy' and 'rules' is critical."  *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 807 (D.C. Cir. 2006).  To distinguish between a rule or "binding norm" with legal consequences and "an unreviewable statement of policy," courts should consider both the "effects of an agency's action" and the "agency's expressed intentions."  *Id.* at 806 (citation omitted).  The first line of inquiry considers "whether the agency has '(1) impose[d] any rights and obligations, or (2) genuinely [left] the agency and its decisionmakers free to exercise discretion.'"  *Id.* (alterations in original) (quoting *CropLife Am. v. EPA*, 329 F.3d 876, 883 (D.C. Cir. 2003)).  The second considers "(1) the [a]gency's own characterization of the action; (2) whether the action was published in the Federal Register or the Code of Federal Regulations; and (3) whether the action has binding effects on private parties or on the agency."  *Id.* at 806–07 (alteration in original) (quoting *Molycorp, Inc. v.*

*EPA*, 197 F.3d 543, 545 (D.C. Cir. 1999)).

The AG Memo directed BOP to take into consideration certain facts that are already required by statute: the commuted inmates' crimes, their criminal histories, and "all other relevant considerations." AG Memo at 1; *see also* 18 U.S.C. § 3621(b)(1)–(5). At most, it is a general statement of policy that has informed BOP's housing designation determinations. This is clear for two reasons. First, the AG Memo does not direct a specific outcome; it directs BOP to "ensure that the conditions of confinement" of the commuted inmates "are consistent with the security risks those inmates present." AG Memo at 1. BOP retains discretion to determine the specific housing designation for each inmate. *See id.*; *see also Taylor I*, ECF 40-1 (Salem Decl.) ¶ 19. Second, the AG Memo contains explicit language indicating that no rights or obligations would flow from it. AG Memo at 1 n.1 ("This guidance is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural[.]"); *see Ctr. for Auto Safety*, 452 F.3d at 806 (although not dispositive, "[t]he language used by an agency is an important consideration" in determining the "effects" of an action). The AG Memo was not published in the Federal Register or the Code of Federal Regulations, and it did not have any binding effect outside the agency. *See id.* at 806–07.

Plaintiffs appear to fault BOP's allegedly considering the AG Memo when making housing designation determinations. But if it did, that would be unremarkable; general statements of policy are *meant* to be consulted and even relied on. *See Sec. Indus. & Fin. Mkts. Ass'n v. CFTC*, 67 F. Supp. 3d 373, 422 (D.D.C. 2014) ("[T]he 'pressure to voluntarily conform' . . . is part and parcel of many policy statements." (citation omitted)). Even "*encourag[ing]*" compliance with a policy statement does not render it a final agency action unless legal consequences necessarily follow. *Ctr. for Auto Safety*, 452 F.3d at 809; *see also RCM Techs., Inc. v. DHS*, 614 F. Supp. 2d 39, 46 (D.D.C. 2009) ("If a policy is 'permissive' or if officials are 'free to exercise their discretion'

pursuant to the policy—even if officials are 'encouraged' to act a certain way—then 'rights or obligations' have not been determined." (citation omitted)).   "[P]ractical" consequences, as opposed to legal consequences, are not enough: "if the practical effect of the agency action is not a *certain change* in the legal obligations of a party, the action is non-final for the purposes of judicial review." *Ctr. for Auto Safety*, 452 F.3d at 811 (emphasis added) (quoting *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 15 (D.C. Cir. 2005)).   On its face, the AG Memo merely directs BOP to ensure that the conditions of confinement of the commuted inmates are consistent with statutorily permissible considerations.   Because the AG Memo does not "command[], require[], order[], or dictate[]," *id.* at 809, any housing designation or conditions of confinement, it is not binding and cannot be final agency action.

   ***The "Mandatory ADX Policy" Is Not Final Agency Action.***   The so-called "Mandatory ADX Policy" also does not constitute final agency action.   Plaintiffs allege that the issuance of this alleged unwritten policy preceded the notices and individual hearings held by BOP hearing administrators, *Taylor II* Compl. ¶¶ 90–91, not that it marked "the consummation" of the redesignation process, *Bennett*, 520 U.S. at 177–78.   In any event, Plaintiffs' conclusory allegations of the existence of this supposed "new, unwritten policy," *Taylor II* Compl. ¶ 8, allegedly mandating that all commuted inmates be redesignated to ADX, are not entitled to weight.   Assistant Director Salem, who actually made the designation decisions, has declared that there was no such mandate.   Supp. Salem Decl. ¶¶ 6–9.   And not all commuted inmates were redesignated to ADX. *See id.* ¶ 6.   A non-existent policy by definition cannot "determine rights or obligations" or cause "legal consequences." *See Bennett*, 520 U.S. at 177–78.

   3.    **The AG Memo and alleged "Mandatory ADX Policy" are not subject to APA review because Congress committed inmate housing designation determinations to agency discretion.**

By its own terms, the APA does not allow review of Plaintiffs' challenges to the AG Memo

and "Mandatory ADX Policy." The APA is clear that it applies "*except to the extent*" that "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). BOP's placement decisions are within that category, as Congress did not provide express, objective criteria for the agency to consider in the designation process that might give a reviewing court a "meaningful standard" by which to assess BOP's exercise of discretion. *See Heckler v. Chaney*, 470 U.S. 821, 830 (1985) ("[I]f no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.'"). BOP conducts its housing duties "under the direction of the Attorney General." 18 U.S.C. § 4042. And Congress provided a diverse set of broad and inherently subjective factors for BOP to consider when performing these duties, such as "the resources of the facility contemplated"; "the nature and circumstances of the offense"; and the "history and characteristics of the prisoner." *See id.* § 3621(b). The statute does not provide any standard by which to judge how the resources of a BOP facility ought or ought *not* to impact an inmate's designation, and the same is true for the other statutory factors. Therefore, the complicated balancing of these factors rest "peculiarly within [BOP's] expertise." *See Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) (citation omitted); *McKune v. Lile*, 536 U.S. 24, 39 (2002) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."). Under § 702(a)(2), this Court is precluded from second-guessing these expert decisions.

### 4. The AG Memo is lawful.

Even if Plaintiffs were able to properly assert APA claims to challenge the AG Memo, that memorandum was lawful. Under the APA, the Court may set aside an agency action if the Court finds that the challenged action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). The Court's review is "highly deferential and narrow"

and focused on ensuring that the agency has set forth its reasons for decision and provided a reasoned explanation for its action. *Silver State Land, LLC v. Schneider*, 145 F. Supp. 3d 113, 124 (D.D.C. 2015) (citations omitted), *aff'd*, 843 F.3d 982 (D.C. Cir. 2016). A court "is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

As discussed *supra* in Section I.B.2, the AG Memo at most constitutes a statement of agency policy, directing BOP to "ensure that the conditions of confinement" for the commuted inmates "are consistent with the security risks those inmates present" in light of their crimes of conviction, criminal histories, and other relevant considerations. AG Memo at 1. The Attorney General possesses express statutory authority to issue policies for the Department of Justice and BOP. *See, e.g.*, 28 U.S.C. § 503 (the Attorney General is the head of the Department); 18 U.S.C. § 4041 (the Attorney General oversees BOP); 28 U.S.C. § 509 ("All functions of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice are vested in the Attorney General," subject to limited exceptions not at issue here). Plaintiffs therefore fail to state, let alone clearly succeed on, an APA claim based on exceeding statutory authority or unlawful agency action.

Nor is the AG Memo "arbitrary and capricious." Plaintiffs assert that the AG Memo "replaced" the policies and procedures of PS 5100.08. *Taylor II* Mem. at 14. Not so. As discussed above, the factors that the AG Memo directs BOP to consider are factors that BOP already would consider under PS 5100.08 and the ADX Referral Memo (as well as the relevant statute, 18 U.S.C. § 3621(b)). And BOP followed the PS 5100.08 and ADX Referral Memo policies and procedures for designating each Plaintiff to ADX. *See* ECF 40-1 (Salem Decl.) ¶ 19; Supp. Salem Decl. ¶¶ 6–11. Even if the AG Memo modified the earlier policies, agencies "'are free to change their existing policies as long as they provide a reasoned explanation for the change,' 'display awareness that

[they are] changing position,' and[, where relevant,] consider 'serious reliance interests.'" *FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898, 917 (2025) (citations omitted). Plaintiffs cannot claim that they possessed a "reliance interest" in PS 5100.08 or the October 2012 ADX Referral Memo, let alone a "serious reliance interest." *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30–31 (2020) (describing ways that individuals may have structured their lives or made major life decisions in reliance on existing policy); *White Lion Invs.*, 145 S. Ct. at 927 ("Our prior change-in-position cases have set a much higher bar, requiring, for example, 'decades of industry reliance on [an agency's] prior policy.'" (citation omitted)). In any event, the AG Memo provides sufficient explanation for its guidance to BOP. It observes that "each of the 37 commuted murderers" present "security risks," and therefore the BOP "is directed to ensure that [their] conditions of confinement" "are consistent with the security risks" they present. AG Memo at 1.

### 5.    There was no "Mandatory ADX Policy."

Plaintiffs' conclusory allegations of an unwritten "Mandatory ADX Policy" are insufficient to overcome evidence (including sworn testimony) that BOP made individualized redesignation decisions. Plaintiffs argue that the alleged unwritten policy "direct[ed] all death row commutees to be transferred to the harshest facility in the federal prison system"—ADX. *Taylor II* Mem. at 16. Yet, not all commuted inmates were actually transferred to ADX. One commuted inmate, Brandon Basham, a Plaintiff in *Taylor I*, was redesignated and transferred to the United States Medical Center for Federal Prisoners ("MCFP") in Springfield, Missouri. Supp. Salem Decl. ¶ 6. Another commuted inmate was transferred on a writ to state authorities in Arizona for prosecution under state law. *Id.* ¶ at 2 n.1. For those commuted inmates who went through the ADX redesignation process, BOP spent many hours and resources putting together individual referral packets, issuing notices, conducting hearings, issuing reports, and making individualized decisions. If there was a "mandatory" policy to ignore individual considerations and send all

commuted inmates to ADX no matter what, BOP could have achieved that outcome with far less effort. But there was no such policy. *Id.* ¶¶ 8–9. Plaintiffs are unlikely to succeed in their claim that a non-existent policy violated the APA.

### C. Plaintiffs are unlikely to succeed on the merits of their Fifth Amendment claims.

Plaintiffs bring two claims under the Fifth Amendment's Due Process Clause: a claim for violation of procedural due process (Count 1), and a claim for violation of equal protection (Count 2). *See Taylor I* Compl. ¶¶ 126–45; *Taylor II* Compl. ¶¶ 160–81. Neither claim is likely to succeed on the merits.[14]

### 1. Plaintiffs do not clearly establish a violation of procedural due process.

Plaintiffs assert that their transfer to the ADX would violate their rights to procedural due process. Such claims are analyzed in two steps: "the first asks whether there exists a liberty or property interest which has been interfered with by the State[;] the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989). Plaintiffs fail to establish either prong of this analysis.

***Plaintiffs Do Not Identify a Liberty Interest.*** "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' . . . or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). With respect to the Constitution, "incarcerated persons retain only a 'narrow range of protected liberty interests.'" *Rezaq v. Nalley*, 677 F.3d 1001, 1011 (10th Cir. 2012) (citation omitted). "As long as the conditions or degree of confinement to which the prisoner is subjected

---

[14] As noted *supra* (at 11), the *Taylor I* Plaintiffs purport to incorporate their arguments about these claims from prior preliminary-injunction briefing. *Taylor I* Mem. at 2. Defendants therefore focus here on *Taylor II* Plaintiffs' Fifth Amendment arguments. *See Taylor II* Mem. at 18–28.

is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Thompson*, 490 U.S. at 460–61.  For state-created interests, the government may create a protected liberty interest if it "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).

Plaintiffs' procedural due process claim—premised on a purported state-created interest, *Taylor II* Compl. ¶¶ 162–65—fails.[15]  There is no government-created liberty interest in avoiding a transfer to the ADX.  In this Circuit, whether a transfer imposes an "atypical and significant hardship" is determined "in relation to the most restrictive conditions that prison officials, exercising their administrative authority to ensure institutional safety and good order, routinely impose on inmates serving similar sentences."  *Hatch v. Dist. of Columbia*, 184 F.3d 846, 847 (D.C. Cir. 1999).  Every Plaintiff is currently serving a life sentence (and until very recently, a death sentence), commensurate with the seriousness of their many crimes of conviction.  There are only three inmates in the entire BOP who are serving more severe sentences (of death); one of them is housed at ADX and the other two are housed in SCU.  It was not unreasonable for BOP to redesignate Plaintiffs to ADX, where many other inmates serving life sentences are also already housed.  Plaintiffs are therefore under no "atypical and significant hardship," and have not been

---

[15] To the extent Plaintiffs' alleged liberty interest arises from the Constitution, their claim fails. "[T]he Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement." *Austin*, 545 U.S. at 221.  That is because transfer among prisons is "within the normal limits or range of custody which the conviction has authorized the [government] to impose." *Meachum*, 427 U.S. at 224–25.  The Tenth Circuit (where ADX is located) has repeatedly held that same rule applies where, as here, the proposed transfer would be to ADX. *See Rezaq*, 677 F.3d at 1015 ("The conditions at ADX . . . do not, in and of themselves, give rise to a liberty interest."); *Jordan v. BOP*, 191 F. App'x 639, 653 (10th Cir. 2006) (no liberty interest implicated by inmate's placement in administrative detention at the ADX for a period of nearly five years).  Plaintiffs have no liberty interest protected by the Due Process Clause in avoiding a transfer to the ADX.

deprived of any liberty interest. *See also, e.g.*, *Rezaq*, 677 F.3d at 1015 ("[C]onditions at ADX are comparable to those routinely imposed in the administrative segregation setting," and "are not extreme as a matter of law.").

Plaintiffs' duration argument does not salvage their procedural due process claims. Plaintiffs contend that a liberty interest exists not only by virtue of ADX's conditions (*Taylor II* Mem. at 18–19), but also because the duration of imprisonment at ADX is unknown (*id.* at 20–21). Plaintiffs speculate that their ADX placement will be indefinite because of malice, based on an extra-record statement by the Attorney General. *Id.* at 20. However, the indefinite nature of Plaintiffs' confinement is due to the commutations of their sentences, not to any housing designation decision made by Defendants. Plaintiffs further argue that the "indefinite" and potentially "permanent" nature of their imprisonment elevates their claimed liberty interest. *Id.*; *see also id.* (arguing that "Defendants intend to isolate Plaintiffs at ADX 'for the rest of their lives'"). But that would mean that placement of any inmate with a life sentence at ADX would "raise 'a serious constitutional problem,'" *id.* (quoting *Zadvydas v. Davis*, 533 U.S. 678, 690, 699 (2001)), which cannot be true. *E.g.*, *Rezaq*, 677 F.3d at 1015. Moreover, although Plaintiffs insist that their (speculated) duration of time in restrictive housing at ADX would be atypical, Plaintiffs elide that, "[p]ursuant to BOP policy, everyone in the SCU—who is there solely by virtue of a death sentence—is held in solitary confinement." *Taylor I* Compl. at 28 n.34. Plaintiffs fail to show that conditions at ADX are atypical for them.

***Plaintiffs Received Adequate Process.*** The procedures BOP provided to Plaintiffs are constitutionally sufficient. The requirements of due process are "flexible" and "call[] for such procedural protections as the particular situation demands." *Morrisey v. Brewer*, 408 U.S. 471, 481 (1972); *Austin*, 545 U.S. at 224; *see Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (identifying factors used to determine procedures mandated by Constitution). For instance, the

Due Process Clause does not invariably require an opportunity to be heard in advance of a decision. *Hewitt v. Helms*, 459 U.S. 460, 476 & n.8 (1983) (providing inmate opportunity to be heard within reasonable time after decision to place him in administrative segregation was constitutionally sufficient).

BOP has exceeded its constitutional obligations.  In accordance with the 2012 ADX Referral Memo, inmates who have been redesignated to the ADX received "a hearing notice containing 'specific evidence which forms the basis for the referral'" to ADX; a psychological assessment of the appropriateness of transfer; a hearing in which the inmate could participate and present evidence to the Hearing Administrator; a copy of the Hearing Administrator's written recommendation as to whether placement at the ADX is warranted; second-level review by the AD, and two levels of appeal of the AD's decision.  ADX Referral Memo, Attach A. at 6–8; *see, e.g.*, Supp. Salem Decl. ¶¶ 6, 9–11.  That is more than enough process to satisfy the Due Process Clause.  *Austin*, 545 U.S. at 225–26 (notice and fair rebuttal opportunity among "the most important procedural mechanisms for purposes of avoiding erroneous deprivations" of liberty).

Plaintiffs nonetheless argue that "Defendants carried out a sham process solely to effectuate a predetermined result, the antithesis of due process." *Taylor II* Mem. at 21.  However, on their face, neither the Executive Order nor the AG Memo—which Plaintiffs claim "corrupted" BOP's process (*id.* at 22)—purported to retract, overrule, or otherwise alter the designation factors outlined in 18 U.S.C. § 3621 or BOP Program Statement 5100.08, nor did they in any way purport to change the factors BOP has always considered for inmate designations.  To the contrary, the AG Memo's guidance that BOP should consider the commuted inmates' "crimes, criminal histories, and all other relevant considerations" echoes 18 U.S.C. § 3621(b), which provides that BOP may designate any available correctional facility upon consideration of "the nature and circumstances of the offense," "the history and characteristics of the prisoner," and other relevant considerations.

18 U.S.C. § 3621(b)(1)–(5). The attached sworn declaration of Assistant Director Salem confirms that he "rendered a decision on each SCU inmate individually, weighing the factors outlined in the ADX Referral Memo and PS 5100.08," and that he made these decisions in May 2025. Supp. Salem Decl. ¶ 9.[16]

### 2.    Plaintiffs do not clearly establish a violation of equal protection.

BOP's anticipated transfer of Plaintiffs to the ADX also does not violate equal protection. The Fourteenth Amendment's Equal Protection guarantee, applied to the Federal Government through the Due Process Clause of the Fifth Amendment, *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954), "requires [the government] to treat similarly situated persons alike," *Women Prisoners of D.C. Dep't of Corrs. v. Dist. of Columbia*, 93 F.3d 910, 924 (D.C. Cir. 1996). "The Constitution, however, 'does not require things which are different in fact or opinion to be treated in law as though they were the same.'" *Id.* (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). "Thus, the [d]issimilar treatment of dissimilarly situated persons does not violate equal protection." *Women Prisoners*, 93 F.3d at 924 (citation omitted).

Because "conviction of crime justifies the imposition of many burdens," *Johnson v. Daley*, 339 F.3d 582, 585–86 (7th Cir. 2003), prisoners are not a suspect class, *Tucker v. Branker*, 142 F.3d 1294, 1300 (D.C. Cir. 1998). Therefore, to establish a cognizable Equal Protection claim, Plaintiffs "must establish two necessary predicates." *Pryor-El v. Kelly*, 892 F. Supp. 261, 269–70 (D.D.C. 1995). First, "the prisoner must establish that he or she was treated differently than other prisoners in his or her circumstances." *Id.* at 270. Second, "he or she must establish that such

---

[16] In support of their "sham" argument, Plaintiffs aver that some of the Plaintiffs' Administrative Remedy documents contain similar reasoning for recommended ADX placements. *Taylor II* Mem. at 23. But given that BOP is mandated to consider factors such as the nature, circumstances, and severity of an inmate's criminal offense in placement, it is not surprising that there may be certain similarities in placement across a group of inmates who had all committed heinous crimes, including murder.

unequal treatment was the result of intentional or purposeful discrimination." *Id.* "Even if the prisoner can make this threshold showing, ordinarily only rational basis review is warranted." *Id.* (citing *Brandon v. D.C. Bd. of Parole*, 823 F.2d 644, 650 (D.C. Cir. 1987). Plaintiffs' Motions fail to surmount any of these hurdles.

**First,** Plaintiffs do not establish that they are more similarly situated to eighteen other former death-row inmates who, Plaintiffs assert, were redesignated to facilities other than ADX, rather than other inmates with life imprisonment terms who have been designated to ADX such as the eight commuted inmates who were transferred from USP Terre Haute to ADX in September 2025. *Taylor II* Mem. at 24; *see Taylor I*, ECF 4-10 (Patton Decl.) ¶¶ 4, 7. Notably, Plaintiffs do not provide any facts surrounding the circumstances of those other eighteen prisoners. *See generally Taylor II* Mem. at 24; ECF 4-10; *Reynolds v. Quiros*, 990 F.3d 286, 300–01 (2d Cir. 2021) (conducting prisoner-by-prisoner analysis for purposes of equal protection claim and acknowledging that "the comparative heinousness of each prisoner's offenses may, in some circumstances, factor into a particular equal protection analysis").[17] Plaintiffs' crimes include but are not limited to, murder (of which all have been convicted), in addition to carjacking, kidnapping, rape, racketeering, and escape or attempted escape from custody.[18] Absent any *facts* to support

---

[17] The only allegations concerning those eighteen prior prisoners illustrate that those individuals are *dissimilar* because—unlike Plaintiffs—at least some of them were resentenced pursuant to court order, rather than by blanket presidential commutation. *E.g.*, *Taylor I* Compl. ¶ 138 ("Prior to the promulgation of the Redesignation Directive, people under sentence of death in the federal system who were resentenced to life without parole due to a commutation *or court action* were subject to redesignation by BOP to determine where they would be housed." (emphasis added)). Plaintiffs do not cite authority supporting their assertion that, "[t]he fact that some of the prior 18 people were commuted and some were resentenced by court order does not make them differently situated from Plaintiffs." *Taylor II* Mem. at 25 n.17. Facts inarguably play a role in at least some resentencing decisions, and Plaintiffs have not provided any here. Moreover, Plaintiffs' infamy—which particularly exists by virtue of the unique circumstances under which their death sentences were commuted—distinguishes them materially from the other, unnamed, eighteen prisoners.

[18] *See* examples of Plaintiffs' criminal cases cited *supra* at 4 n.3.

their "similarly-situated" theory, Plaintiffs' Equal Protection claim fails at step one.  *See, e.g.*, *Marshall v. Reno*, 915 F. Supp. 426, 432 (D.D.C. 1996) (plaintiff's "bald[]" assertion that "he was treated differently than other prisoners in his circumstances" did not satisfy first step of Equal Protection claim); *James v. Reno*, 39 F. Supp. 2d 37, 40–41 (D.D.C. 1999) (plaintiff's "cursory description of six other inmates" did "not establish that they were 'similarly situated' to him" because "[t]here are several factors considered in determining a prisoner's custody classification other than length of sentence and type of offense"), *aff'd*, No. 99-5081, 1999 WL 615084 (D.C. Cir. July 2, 1999) (per curiam).

**Second**, although Plaintiffs speculate about Defendants' purportedly malicious intentions, based on a Presidential post on Truth Social and an Attorney General comment on X (*Taylor II* Mem. at 27 & 9 n.7), the facts demonstrate that BOP has applied the same criteria to Plaintiffs as it would to other inmates also under consideration for redesignation: PS 5100.08 and the ADX Referral Memo.  *See, e.g.*, Supp. Salem Decl. ¶ 9.

**Third**, even if Plaintiffs had made a cognizable Equal Protection claim, there is no question that BOP's redesignation process satisfies rational-basis review.  Courts "are to uphold prison regulations that 'impinge on inmates' constitutional rights' as long as those regulations are 'reasonably related to legitimate penological interests.'"  *Hatim v. Obama*, 760 F.3d 54, 58 (D.C. Cir. 2014) (quoting *Turner v. Safley*, 482 U.S. 78, 84–85, 89 (1987)); *see also Rhodes v. Chapman*, 452 U.S. 337, 351 n.16 (1981) (prison administration is "peculiarly within the province of the legislative and executive branches of government").  On their face, PS 5100.08 and the ADX Referral Memo—which the Executive Order and AG Memo did not displace (*e.g.*, Supp. Salem Decl. ¶ 7)—serve critical penological interests by requiring individualized determinations as to the proper redesignation location for each eligible prisoner.

**D.    Plaintiffs are unlikely to succeed on the merits of their Eighth Amendment claim.**

Plaintiffs allege that "[w]ithout the appropriate level of necessary medical and mental health treatment at ADX, the "Health Care Plaintiffs" will predictably experience the gratuitous infliction of pain and serious and irreparable physical and psychological harm." *Taylor II* Compl. ¶ 192.[19]  Relevant here, they frame this Eighth Amendment Deliberate Indifference claim in terms of harm to the mental health needs of seven Plaintiffs (identified in the *Taylor II* Plaintiffs' Motion) (the "Mental Health Plaintiffs"), and the medical needs of two of those seven Plaintiffs (the "Medical Plaintiffs").  *See Taylor II*, ECF 3-3 (Sealed Mem.), at 28.  Plaintiffs Coonce, Mikos, and Runyon make a substantially similar Eighth Amendment claim in *Taylor I*, which fails for the same reasons as the claim in *Taylor II*.  *See Taylor I* Mem. at 24–31.

The Eighth Amendment's prohibition of "cruel and unusual punishments," U.S. Const. amend. VIII, imposes a "government[al] obligation to provide medical care for those whom it is punishing by incarceration," *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  That obligation prohibits prison officials from exhibiting "deliberate indifference to a substantial risk of serious harm to an inmate." *Hardy v. District of Columbia*, 601 F. Supp. 2d 182, 187 (D.D.C. 2009) (cleaned up).  To succeed on their claim that Defendants acted with deliberate indifference to their medical and mental health needs when redesignating them to ADX, Plaintiffs must show that Defendants "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  "Mere inadvertent or negligent failures to provide care do not amount to deliberate indifference." *Bernier v. Allen*, 38 F.4th 1145, 1151 (D.C. Cir. 2022).  "[A]n official 'must both be aware of facts from which the inference could be drawn that a substantial risk of

---

[19] *Taylor II* Plaintiffs define "Health Care Plaintiffs" to include certain Plaintiffs who they allege "have each been diagnosed with serious medical and/or mental health conditions." *Taylor II* Compl. ¶ 190.

serious harm exists, and he must also draw the inference.'"  *Id.* (quoting *Farmer*, 511 U.S. at 837).

        **1.**       **Plaintiffs do not show an "excessive risk to inmate health or safety" from transfer to ADX.**

Plaintiffs have not established that a future transfer to ADX (or placement at ADX) would pose an "excessive risk" to their health or safety.

To the extent that Plaintiffs tether the alleged "excessive risk" to the conditions of confinement at ADX, they fail.  *See Taylor II* Mem. at 28 (arguing that the "brutal conditions" at ADX "place [Mental Health and Medical Plaintiffs] at profound risk of harm"), 34 (suggesting that Mental Health Plaintiffs are "at risk of a 'complete breakdown of the psyche and disconnection from reality'" due to conditions at ADX).  As a threshold matter, courts have repeatedly found that the conditions at ADX pass constitutional muster.  *See, e.g.*, *Hill v. Pugh*, 75 F. App'x 715, 721 (10th Cir. 2003); *see also, e.g.*, *Gowadia v. Stearns*, 596 F. App'x 667, 674 (10th Cir. 2014); *Silverstein v. BOP*, 559 F. App'x 739, 741, 763 (10th Cir. 2014); *Ajaj v. United States*, 293 F. App'x 575, 582–84 (10th Cir. 2008); *Davis v. BOP*, No. 15-cv-884, 2016 WL 1156755, at *6 (D. Colo. Mar. 24, 2016); *McMillan v. Wiley*, 813 F. Supp. 2d 1238, 1244, 1251 (D. Colo. 2011).  In any event, the Supreme Court has expressly "rejected a reading of the Eighth Amendment that would allow liability to be imposed on prison officials solely because of the presence of objectively inhumane prison conditions" without any showing of "subjective recklessness."  *Farmer*, 511 U.S. at 838, 839.  Plaintiffs have made no such showing.  *See infra*.

Plaintiffs' conclusory statements about what *kinds* of inmates can be safely housed and properly treated at ADX (*e.g.*, *Taylor I* Mem. at 24–28; *Taylor II* Mem. at 28–29, 38–42), do not change the outcome.  Namely, although Plaintiffs insist that ADX is unequipped to treat them (*Taylor I* Mem. at 26–27, 30; *Taylor II* Mem. at 28–29, 38–42), the reality is that ADX—a Care Level 2 facility—safely houses inmates with medical needs like Plaintiffs'.  *See* Decl. of David

Lazariuk (attached hereto as Ex. 2) ¶ 29 (ADX "routinely houses and provides treatment" to Mental Health Care level 1 and 2 inmates); *id.* ¶¶ 16–17, 31–32 (all but one of the Plaintiffs has a Care Level of 1 or 2; only one Plaintiff is classified as Medical Care Level 3, and no Plaintiff is classified as Mental Health Care Level 3). Regardless, despite being a Care Level 2 facility, ADX safely houses inmates who have been designated as Care Level 3. *Id.* ¶¶ 19, 29, 35; *see, e.g.*, Decl. of Kevin Stremmel (attached hereto as Exhibit 3) ¶ 14 (one of the eight former SCU inmates transferred to ADX in September 2025 was classified as Medical Care Level 3, and two were classified as Mental Health Care Level 3).

To the extent Plaintiffs' Deliberate Indifference claims are predicated on their physical transfer *from* USP Terre Haute *to* ADX (*see Taylor I* Mem. at 24–25, 28–29; *Taylor II* Mem. at 33–34, 40–41), Plaintiffs also do not show that transfer to ADX poses an excessive risk to them. BOP is well accustomed to transferring inmates with a broad range of medical and mental health needs, having transferred over **37,000 inmates** *so far in 2025*. Stremmel Decl. ¶ 6. BOP has myriad procedures in place to accomplish transfers safely, including by bringing a minimum seven-day supply of any clinically necessary medications on the trip. *See id.* ¶¶ 5–13. If a medical emergency occurs during transport, the transport team has a procedure for communicating with the originating and receiving facilities and can divert to a medical facility if necessary. *Id.* ¶ 12. To reiterate, eight inmates were already transferred from SCU to ADX without significant incident, including inmates who were classified as Medical and Mental Health Care Level 3. *Id.* ¶ 14.

### 2. Plaintiffs do not show Defendants' subjective awareness of substantial risk of serious harm.

To demonstrate a Deliberate Indifference claim, Plaintiffs must show that BOP officials inflicted "unnecessary and wanton infliction of pain contrary to contemporary standards of decency." *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (citing *Estelle*, 429 U.S. at 104). It is "a

state of mind more blameworthy than negligence," *Farmer*, 511 U.S. at 835, that is "more akin to 'criminal recklessness,'" *Morrison v. BOP*, No. 19-cv-1838 (CRC), 2021 WL 1209210, at *3 (D.D.C. Mar. 30, 2021) (quoting *Barr v. Pearson*, 909 F.3d 919, 922 (8th Cir. 2018)). "[M]ere disagreement over the proper treatment cannot support a finding of deliberate indifference." *Id.* (quotations omitted).

Plaintiffs, who have not yet been transferred to ADX, do not offer evidence that BOP "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety" when making the redesignation decisions, *Farmer*, 511 U.S. at 832, or that any BOP official will inflict unnecessary and wanton pain on them when transfer does occur in the future. *Cf., e.g.*, *Delaney v. DeTella*, 256 F.3d 679, 681 n.1, 685–86 (7th Cir. 2001) (summary judgment properly denied to officials where they prohibited all out-of-cell exercise for six months despite prior court injunction requiring five hours per week of exercise, prison's own directive to same effect, and officials' inaction when inmate "requested medical attention frequently"). Instead of relying on facts, Plaintiffs rely on conclusory statements that BOP's justification for redesignating Plaintiffs to ADX is "specious," and the supposed consensus as to the potential harms from restrictive housing. *See Taylor II* Mem. at 35–38. But neither contention satisfies this prong of their Deliberate Indifference claims. Plaintiffs' "sham" theory is based on ADX's purported inability to care for them (*e.g.*, *Taylor I* Mem. at 29–31), but as discussed above this is not true. Plaintiffs' ADX referral process, which BOP conducted in accordance with BOP's ADX Referral Memo, found that Plaintiffs' mental health needs did not preclude them from ADX placement. *See* Lazariuk Decl. ¶ 35. The fact that BOP reached an outcome Plaintiffs disfavor does not render the process a sham. Indeed, the fact that Plaintiff Basham was *not* referred to ADX is further evidence of BOP's individualized process. Plaintiffs cannot prevail by ignoring data points that disprove their theory. And, as discussed above, Plaintiffs cannot establish a Deliberate Indifference claim by pointing generally to

conditions of confinement. *Farmer*, 511 U.S. at 838, 839. Finally, Plaintiffs make no showing

that BOP officials would exhibit deliberate indifference to their needs during transport. *See Quinn*

*v. Wexford Health Sources, Inc.*, 8 F.4th 557, 565 (7th Cir. 2021) (noting both the "objective and

. . . subjective component . . . must be satisfied").

    **E.**    **The *Taylor I* Plaintiffs are unlikely to succeed for the additional reason that they have not exhausted their administrative remedies.**

    This Court denied Plaintiffs' original motion for temporary injunctive relief (*Taylor I*, ECF

2) because Plaintiffs in *Taylor I* had failed to exhaust (*id.*, ECF 50). Nothing has changed since

then: By their own admission, the four Plaintiffs who remain in *Taylor I* have yet to complete the

statutorily prescribed administrative remedy process. *Taylor I*, ECF 59; *Taylor I* Mem. at 6; *see*

*also* ADX Referral Memo, Attach. A at 8 (detailing appeals process). Indeed, *Taylor I* Plaintiff

Basham has not even filed an administrative remedy related to placement at ADX because he was

not designated there. *See supra* at 8. Ignoring the fact of Plaintiff Basham's current assignment

to MCFP Springfield altogether, the three *Taylor I* Plaintiffs who have filed a renewed TRO insist

that the Court should change its mind because, according to Plaintiffs, they meet an exception to

the exhaustion requirement. *Taylor I* Mem. at 20–23. Because they do not, *Taylor I* Plaintiffs'

Motion should be denied for this reason alone.

    Although conceding that they have not yet exhausted, *Taylor I* Plaintiffs Coonce, Mikos,

and Runyon contend that they need not exhaust because they "face an imminent threat of serious

physical injury while they await BOP's response to their grievances." *Taylor I* Mem. at 21 (citing

*Fletcher v. Menard Corr. Ctr.*, 623 F.3d 1171, 1173 (7th Cir. 2010), *McPherson v. Lamont*, 457 F.

Supp. 3d 67, 81 (D. Conn. 2020)). Specifically, Plaintiffs assert, "[t]he risks of danger to Plaintiffs

at ADX and during transport are . . . clear, and the risks are also imminent," so administrative

remedies aren't "available." *Id.* at 21–22. But simply saying something does not make it true. As

detailed above (Section I.D) and in the attached Declaration of Prisoner Transportation Coordinator Kevin Stremmel (Exhibit 3), Plaintiffs' concerns are not founded in reality: The BOP is well equipped to assist with Plaintiffs' asserted medical and mental conditions, both during transport and upon arrival at ADX, even in the (speculative) event that such assistance becomes emergently necessary. *See generally* Stremmel Decl.

Judge Lamberth's decision in *McHenry*, involving three male-to-female transgender women in BOP custody, does not warrant a different result. 763 F. Supp. 3d 81. For one thing, the preliminary injunction is on appeal to the D.C. Circuit. *See* No. 25-5099 (D.C. Cir. filed Apr. 2, 2025), *oral argument held* Sept. 5, 2025 (Dkt. 2133707). *Second*, the facts of *McHenry* are materially distinguishable. The inmates in *McHenry* allegedly suffered from gender dysphoria, for which they had been prescribed and treated with hormone therapy. *Id.* at 84. Per Executive Order, BOP decided to transfer these inmates from a female to a male prison. *Id.* The same Executive Order "plainly require[d]" BOP to "withhold the prescribed hormone therapy drugs." *Id.* at 87. "Thus, there is no form of relief that is within the BOP's discretion to provide and that would remedy the plaintiffs' supposed constitutional violations." *Id.* "Under these rare circumstances, administrative exhaustion is excused" because exhaustion would be a "dead end." *Id.* at 86–87. Here, by contrast, Plaintiffs' transfer to ADX is not inevitable by operation of Executive Order. Thus, at the end of the *Taylor I* Plaintiffs' administrative remedy process, the final decision may not be transfer to ADX. Finally, even if *Taylor I* Plaintiffs' transfer to ADX were inevitable and imminent, as discussed at length herein, and unlike the District Court found for Plaintiffs in *McHenry*, they have not clearly established an Eighth Amendment violation associated with ADX transfer that conceivably could excuse them from exhausting. Because they have not exhausted, and must exhaust, *Taylor I* Plaintiffs' Motion should be denied.

## II.    Plaintiffs Fail to Establish Irreparable Harm

Plaintiffs have not shown that they will likely suffer irreparable harm from the transfer to ADX.  In this Circuit, there is a "high standard for irreparable injury": to qualify, an injury must be "both certain and great," "actual and not theoretical," "imminen[t]," and "beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297–98 (D.C. Cir. 2006) (emphasis and quotation marks omitted) (holding that "tangible injury" was too "hypothetical" where challenged practice merely "reduce[d the] Appellants' *opportunities* for promotion").

Here, Plaintiffs do not allege, let alone establish, that they will face any "tangible injury" that is either "certain and great" or irreparable from their transfer to ADX.  *See id.* at 298.  Plaintiffs largely argue that they are "irreparably harmed" by the alleged loss of Fifth Amendment and Eighth Amendment protections.  *Taylor II* Mem. at 42–43.  But there is "no *per se* rule" that a constitutional violation "*automatically* constitutes irreparable harm." *Chaplaincy*, 454 F.3d at 301.  And as discussed *supra* §§ I.C and I.D, Plaintiffs do not establish a likelihood of constitutional violation, let alone a "certain" one.  *Chaplaincy*, 454 F.3d at 298.  Nor do they show that the conditions they will face at ADX are materially different, from a constitutional perspective, from the conditions in which they have been living at USP Terre Haute.  Plaintiffs' argument simply bootstraps the merits of their constitutional claims to their irreparable harm allegations.

Plaintiffs voice concerns about conditions at the ADX facility and the transfer trip itself— concerns that, as BOP explains in its declaration by ADX Associate Warden David Lazariuk (Exhibit 2) and Prisoner Transportation Coordinator Kevin Stremmel (Exhibit 3)—are not well-founded.  *See* Lazariuk Decl. ¶¶ 7–38 (describing ADX medical and mental health services); Stremmel Decl. ¶¶ 5–14 (describing how BOP takes an inmate's medical conditions into account whenever transporting an inmate from one facility to another); *see also generally Taylor I*, ECF 40-2 (Armijo Decl.) (describing actual ADX conditions and opportunities for social interactions,

learning, and other opportunities). Thus, even taking Plaintiffs' concerns about "prolonged" exposure to restrictive housing at ADX Florence at face value (*e.g.*, *Taylor II* Compl. ¶¶ 128–30), Plaintiffs offer no evidence to show that they would be "irreparably" harmed by being *temporarily* housed at ADX Florence while this case is pending. Nor do Plaintiffs show irreparable injury from the forthcoming transfer trip itself. Transfers between BOP institutions are a regular occurrence. BOP has already transferred more than 37,000 inmates between facilities during calendar year 2025, including eight former SCU inmates who were transferred from USP Terre Haute to ADX in September without significant incident. Stremmel Decl. ¶¶ 6, 14. Plaintiffs have not shown that the risk of physical or mental harm from the trip they will take is likely, must less certain.

Plaintiffs' failure to demonstrate irreparable injury provides a sufficient basis for this Court to deny their Motions. *See Chaplaincy*, 454 F.3d at 297 ("A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." (citing *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1210–11 (D.C. Cir. 1989))).

## III.    The Balance of the Equities and the Public Interest Favor the Government

The balance of equities and the public interest do not favor granting the extraordinary remedy of a temporary restraining order. These final two factors merge in cases where relief is sought from the government. *Nken*, 556 U.S. at 435. Plaintiffs make the circular argument that, "[w]hen the government violates the law and subjects plaintiffs to irreparable harm, the equities and public interest weigh in plaintiffs' favor." *Taylor II* Mem. at 44–45. But, for the reasons discussed at length above, Plaintiffs cannot establish a constitutional violation, and have not been irreparably harmed. Plaintiffs' Motions seek to disrupt BOP housing designation determinations for federal inmates, without legal basis. BOP's designation decisions are within its exclusive purview and are intended to preserve the safety of inmates, employees, and surrounding

communities.  A TRO would impermissibly interfere with the government's administration of its

federal prisons and the execution of Executive Branch policy.  "[P]rison administrators, and not

the courts, are to make the difficult judgments concerning institutional operations."  *Turner v.*

*Safley*, 482 U.S. 78, 89 (1987) (alterations and quotation marks omitted).  And "[i]t is well settled

that the decision where to house inmates," in particular, "is at the core of prison administrators'

expertise." *McKune*, 536 U.S. at 39.  The D.C. Circuit has accordingly recognized the need to

"accord prison administrators wide-ranging deference in the adoption and execution of policies

and practices that in their judgment are needed to preserve internal order and discipline and to

maintain institutional security." *Hatim v. Obama*, 760 F.3d 54, 59 (D.C. Cir. 2014) (alterations,

emphasis, and quotation marks omitted).  Thus, the balance of equities and public interest favor

Defendants.

## CONCLUSION

For these reasons, this Court should deny Plaintiffs' Motions for Temporary Restraining

Orders.


Dated:  October 25, 2025                              Respectfully submitted,

                                                     BRETT A. SHUMATE
                                                     Assistant Attorney General

                                                     ANDREW I. WARDEN
                                                     Assistant Branch Director

                                                     */s/ Lisa Zeidner Marcus*
                                                     LISA ZEIDNER MARCUS
                                                     (NY Bar No. 4461679)
                                                     Senior Counsel
                                                     MARIANNE F. KIES
                                                     KEVIN BELL
                                                     Trial Attorneys
                                                     U.S. Department of Justice
                                                     Civil Division, Federal Programs Branch

1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 514-3336
Email: lisa.marcus@usdoj.gov

*Attorneys for Defendants*